# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DePuy Mitek, Inc.     ) <br>       a Massachusetts Corporation     ) <br>         ) <br>        Plaintiff,     ) <br>         ) <br>        v.     ) <br>         ) <br> Arthrex, Inc.     ) <br>       a Delaware Corporation and     ) <br>         ) <br> Pearsalls Ltd.     ) <br>       a Private Limited Company  <br>    of the United Kingdom <br><br>        Defendants. | Civil No. 04-12457 PBS |

**DePuy Mitek's Memorandum in Support of Its Motion**
**for Summary Judgment of Infringement and No Inequitable Conduct**

**Table of Contents**

Table of Authorities ...................................................................................................... iv

DEPUY MITEK'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR
     SUMMARY JUDGMENT OF INFRINGEMENT ........................................................... 1

I.     INTRODUCTION ................................................................................................ 1

II.    THE PARTIES AND THE SUTURE MARKETPLACE ................................. 1

III.   THE INVENTION IN MITEK'S 446 PATENT .............................................. 2

IV.   ARTHREX'S INFRINGING FIBERWIRE SUTURE AND ITS
     DEVELOPMENT ................................................................................................ 2

     A.     FiberWire's Construction ......................................................................... 2

     B.     FiberWire's Development Mirrors the Teachings of Mitek's 446 Patent .............. 4

V.    SUMMARY JUDGMENT AND LITERAL INFRINGEMENT LAW ........................... 5

     A.     Law Of Summary Judgment ..................................................................... 5

     B.     Law of Literal Patent Infringement ......................................................... 5

VI.   ARTHREX'S FIBERWIRE SUTURES LITERALLY INFRINGE CLAIMS 1, 2,
     8, 9, and 12 OF MITEK'S 446 PATENT ........................................................ 6

     A.     FiberWire Literally Infringes Claim 1 of Mitek's 446 Patent ............... 6

           1.     If the Court Adopts Mitek's Definition of PE Then FiberWire
                 Literally Contains the "PE" Claim Element ................................. 6

           2.     If the Court Adopts Mitek's Definition of "Consisting Essentially
                 Of" Then FiberWire Literally Contains the "Consisting Essentially
                 Of" Claim Element ...................................................................... 7

           3.     FiberWire Has The Remaining Claim Elements And Therefore
                 Literally Infringes Claim 1 of Mitek's 446 Patent ...................... 9

     B.     FiberWire Needle Products Literally Infringe Claim 2 of Mitek's 446
           Patent ..................................................................................................... 11

     C.     FiberWire Literally Infringes Claim 8 of Mitek's 446 Patent ............... 12

     D.     FiberWire Literally Infringes Claim 9 of Mitek's 446 Patent ............... 13

     E.     FiberWire Literally Infringes Claim 12 of Mitek's 446 Patent ............. 13

VII.     CONCLUSION ........................................................................................................ 13

DEPUY MITEK'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR
         SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT .................................. 14

VIII.    THE PROSECUTION HISTORY OF MITEK'S 446 PATENT ..................................... 14

         A.       The Filing Of the 511 Application ......................................................... 14

         B.       The First Office Action: The Patent Examiner Rejects the Suture Claims
                  Over Burgess ........................................................................................... 15

         C.       First Office Action Response: Applicants Argue Burgess Is Nonanalagous
                  Art ........................................................................................................... 16

         D.       Second Office Action And Response: Burgess Rejection Is Dropped &
                  Claims Are Rejected Over Kaplan ........................................................... 17

         E.       Third Office Action And Response:  Claims Are Amended And Allowed
                  Over Kaplan ............................................................................................ 17

         F.       Arthrex's Inequitable Conduct Allegations ............................................ 18

IX.      LAW OF INEQUITABLE CONDUCT & SUMMARY JUDGMENT .......................... 18

         A.       Arthrex Carries A Heavy Burden of Proving Inequitable Conduct ...................... 18

         B.       Summary Judgment Standards .................................................................. 20

X.       SUMMARY JUDGMENT OF ARTHREX'S INEQUITABLE CONDUCT
         DEFENSES & COUNTERCLAIMS IS WARRANTED ................................................. 20

         A.       Arthrex's Allegations Should Be Rejected Because Merely Arguing With
                  the Patent Office About The Teachings of a Disclosed Reference Is Not
                  Inequitable Conduct ................................................................................ 21

         B.       Arthrex Lacks Any Credible Evidence of Inequitable Conduct From
                  Which A Reasonable Trier of Fact Could Find Inequitable Conduct Based
                  on Kaplan ................................................................................................ 22

                  1.       Arthrex Has No Evidence Of A Material Misrepresentation
                           Regarding Kaplan ....................................................................... 22

                  2.       Arthrex Has No Evidence of Intent to Deceive With Respect to
                           Kaplan ........................................................................................ 23

         C.       Arthrex Lacks Any Credible Evidence of Inequitable Conduct From
                  Which A Reasonable Trier of Fact Could Find Inequitable Conduct Based
                  on Burgess ............................................................................................... 24

1.      Arthrex Has No Evidence Of A Material Misrepresentation
Regarding Burgess ........................................................................................ 24

        a)      Mr. Goodwin Did Not Make A Material Misrepresentation
Regarding Burgess .......................................................................24

2.      Arthrex's Allegations Regarding Burgess Should be Dismissed
Because Arthrex Has No Evidence of Intent To Deceive......................... 27

XI.     CONCLUSION............................................................................................................ 28

## Table of Authorities

### Federal Cases

*AK Steel Corp. v. Sollac*,
  344 F.3d 1234 (Fed. Cir. 2003)................................................................................7

*Akzo N.V. v. U.S. Int'l Trade Commission*,
  808 F.2d 1471 (Fed. Cir. 1986)......................................................................21, 26

*Amgen, Inc. v. Hoechst Marion Roussel, Inc.*,
  314 F.3d 1313 (Fed. Cir. 2003)..............................................................................24

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..........................................................................................5, 20

*Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*,
  853 F.2d 1557 (Fed. Cir. 1988)........................................................................5, 20

*Baxter Int'l Inc. v. McGraw, Inc.*,
  149 F.3d 1321 (Fed. Cir. 1998)..............................................................................20

*Beckton Dickinson & Co. v. Syntron Bioresearch Inc.*,
  51 U.S.P.Q. 2d 1722 (S.D. Cal. 1998)...................................................................21

*Black & Decker Inc. v. Hoover Service Ctr.*,
  765 F. Supp. 1129 (D. Conn. 1991).......................................................................21

*Buildex Inc. v. Kason Industrial, Inc.*,
  849 F.2d 1461 (Fed. Cir. 1998)..............................................................................18

*Burlington Industrial Inc. v. Dayco Corp.*,
  849 F.2d 1418 (Fed. Cir. 1988)..............................................................................14

*CFMT, Inc. v. YieldUp Int'l Corp.*,
  349 F.3d 1333 (Fed. Cir. 2003)......................................................................21, 26

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).........................................................................................5, 20

*Dawn Equip. Co. v. Kentucky Farms Inc.*,
  140 F.3d 1009 (Fed. Cir. 1998)................................................................................6

*Digital Control Inc. v. Charles Machine Works*,
  437 F.3d 1309 (Fed. Cir. 2006)..............................................................................19

*Eaton Corp. v. Rockwell Int'l Corp.*,
  323 F.3d 1332 (Fed. Cir. 2003)......................................................................19

*FMC Corp. v. Manitowoc Co., Inc.*,
  835 F.2d 1411 (Fed. Cir. 1987)......................................................................14

*Gardco Mfg., Inc. v. Herst Lighting Co.*,
  820 F.2d 1209 (Fed. Cir. 1987)......................................................................18

*Gargoyles Inc. v. United States*,
  33 U.S.P.Q. 2d 1595 ......................................................................................21

*Hebert v. Lisle Corp.*,
  99 F.3d 1109 (Fed. Cir. 1996)........................................................................19

*Hoffman-La Roche, Inc. v. Promega Corp.*,
  323 F.3d 1354 (Fed. Cir. 2003)......................................................................18

*Invitrogen Corp. v. Clontech Labs., Inc.*,
  429 F.3d 1052 (Fed. Cir. 2005)......................................................................23

*Jumpsport, Inc. v. Jumpking, Inc.*,
  Nos., 05-1182, 05-1196, 05-1197, 2006 U.S. App. LEXIS 18448 (Fed. Cir.
  July 21, 2006)..........................................................................................19, 27

*Life Techs., Inc. v. Clontech Labs., Inc.*,
  224 F.3d 1320 (Fed. Cir. 2000)................................................................21, 26

*M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc.*,
  439 F.3d 1335 (Fed. Cir. 2006)................................................................19, 27

*Manville Sales Corp. v. Paramount Sys., Inc.*,
  917 F.2d 544 (Fed. Cir. 1990)........................................................................19

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995)............................................................................5

*Mentor H/S, Inc. v. Medical Device Alliance, Inc.*,
  244 F.3d 1365 (Fed. Cir. 2001)......................................................................19

*Miller Pipeline Corp. v. British Gas PLC*,
  69 F. Supp. 2d 1129 (S.D. Ind. 1999) ...........................................................21

*Old Town Canoe Co. v. Confluence Holdings Corp.*,
  448 F.3d 1309 (Fed. Cir. 2006)................................................................19, 24

*W.E. Hall Co., Inc. v. Atlanta Corrugating, LLC*,
370 F.3d 1343 (Fed. Cir. 2004)....................................................................................7

**Federal Statutes**

35 U.S.C. §121 .........................................................................................................15

35 U.S.C. § 271(a) ......................................................................................................5

**Federal Regulations**

37 C.F.R. §1.142.......................................................................................................15

37 C.F.R. §1.56.........................................................................................................19

**DEPUY MITEK'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT OF INFRINGEMENT**

## I.     INTRODUCTION

Plaintiff, DePuy Mitek, Inc. ("Mitek") moves for summary judgment that Arthrex, Inc.

literally infringes claims 1, 2, 8, 9, and 12 of Mitek's U.S. Patent No. 5,314,446 ("446 Patent")

by selling its FiberWire surgical suture.[1]  Mitek's motion is predicated on the Court adopting

Mitek's proposed constructions of the claim terms "PE" and "consistently essentially of."[2]  If the

Court adopts Mitek's construction for those two terms, then summary judgment of infringement

should be granted because there are no genuine issues of material fact with respect to the

structure of Arthrex's accused FiberWire products.

## II.     THE PARTIES AND THE SUTURE MARKETPLACE

Mitek is a company in Raynham, Massachusetts, and Defendants are Arthrex, a company

in Naples, Florida and Pearsalls, Ltd., a UK company that manufactures the FiberWire suture for

Arthrex.  Mitek and Arthrex sell products, including sutures, used in orthopedic surgery.  Sutures

are a thread-like material that doctors and surgeons use for wound, tissue, tendon, or muscle

repair.  Sutures can be sold as "free strands" (*i.e.*, suture alone) or attached to a needle or

anchor.[3]  Pearsalls exclusively manufactures and imports FiberWire bulk suture into the United

States for Arthrex.  Pearsalls and Arthrex have worked together extensively as partners to design,

develop, manufacture, and sell the accused FiberWire products.

---

[1]     This memorandum is supported by "DePuy Mitek's Statement of Facts in Support of its Motion for Summary Judgment of Infringement and No Inequitable Conduct," and Exhibits attached thereto.  Mitek's Statement of Material Facts is cited as "Mitek Fact #."

[2]     Mitek, of course, does not concede non-infringement if the Court does not adopt its construction of the terms "PE" and "consisting essentially of."  There will just likely be issues of fact that could preclude dispositive adjudication.

[3]     Suture anchors are devices that implant into bone and are used in conjunction with a suture to reattach tendons, muscles, or ligaments to bone.

## III.    THE INVENTION IN MITEK'S 446 PATENT

Mitek's 446 Patent claims a braided suture (Mitek Fact #1).  The braided suture is formed from at least two sets of yarns, with each yarn formed of multiple filaments of a fiber-forming material (*id.*).  The first set of yarns is selected from the materials "PTFE, FEP, PFA, PVDF, PETFE, PP, and PE," and the second set of yarns is selected from the materials "PET, nylon, and aramid" (*id.*).   The first and second sets of yarns are braided so that at least one yarn from the first set of yarns is in direct intertwining contact with at least one yarn from the second set of yarns (*id.*).

In making the braids disclosed and claimed in Mitek's 446 Patent, the inventors departed from tradition and discovered that by braiding two yarns of the different materials listed above, in a certain configuration where at least one yarn from the first set is in direct intertwining contact with a yarn from the second set, a braid could be made with improved properties relative to a braid of just one of the materials (Mitek Fact #7).  In fact, Mitek's 446 Patent states that "it is possible to tailor the physical and biological properties of the braid by varying the type and proportion of each of the dissimilar fiber forming materials used, as well as adjusting the specific configuration of the braid" (Mitek Fact #6).

## IV.    ARTHREX'S INFRINGING FIBERWIRE SUTURE AND ITS DEVELOPMENT

### A.    FiberWire's Construction

There is no dispute about the structure of Arthrex's FiberWire sutures.[4]  FiberWire

---

[4]    TigerWire is also a suture made by Pearsalls and sold by Arthrex (Mitek Fact #8). TigerWire is basically identical to FiberWire with the exception that one PET yarn is replaced by one nylon yarn (Mitek Fact #9).  TigerWire is braided in the same way as FiberWire (Mitek Fact #10).  TigerWire infringes Mitek's 446 Patent for the same reasons that FiberWire infringes. Except as noted otherwise, Mitek refers to both FiberWire and TigerWire as "FiberWire."

sutures contain a sheath or cover formed by braiding yarns of polyethylene ("PE")[5] and yarns of polyethylene terephthalate ("PET") (Mitek Fact #12).  The PE and PET yarns are braided in direct intertwining contact (Mitek Fact #18).  The FiberWire suture is available in many different sizes; however, Arthrex has admitted that different FiberWire sizes are braided in the same manner (Mitek Fact #23).[6]  The following drawings[7] illustrate the sheath/core arrangement and PE/PET braid construction of the FiberWire suture.



FiberWire is sold by Arthrex in the United States as a free strand (not attached to anything), attached to needles, and attached to suture anchors (Mitek Fact #48 and #51). Whether FiberWire is attached to a needle or anchor is irrelevant to the question of infringement because the structure of the FiberWire suture is the same whether it is attached to needle, anchor, or sold as a free strand. Arthrex sells FiberWire under numerous product codes.[8]  Mitek moves

---

[5]      FiberWire is made from ultra high molecular weight PE ("UHMW PE"), which is a type of PE (Mitek Fact #21). Arthrex documents refer to UHMW PE as simply PE (Mitek Fact #22).
[6]      The FiberWire size 4-0 suture has the same sheath configuration as the other size FiberWire sutures (Mitek Fact #24).  However, the 4-0 FiberWire does not have a core, but that does not impact the infringement issues because the claims do not require a core (Mitek Fact #25).
[7]      These drawings are taken from U.S. Patent 6,716,234 assigned to Arthrex.
[8]      Arthrex's FiberWire and TigerWire suture products include at least the products having the following Arthrex catalog product codes: AR-7200, AR-7201, AR-7202, AR-7203, AR-

for summary judgment that all Arthrex FiberWire products literally infringe claims 1, 2, 8, 9, and 12 including those described by the product codes set forth in footnote 8. [9]

**B.    FiberWire's Development Mirrors the Teachings of Mitek's 446 Patent**

Don Grafton, Arthrex's developer of FiberWire, testified that before developing FiberWire, he developed a suture having a braid of only one material, a homogeneous braid of PE (Mitek Fact #27).  But he found this PE braid to be unacceptable because it had poor knot strength properties (Mitek Fact #28).  As Mr. Grafton explained, the PE was so lubricous it would not hold a knot (Mitek Fact #29).  To increase the knot strength, Mr. Grafton braided together two different materials, PE and PET (Mitek Fact #30).  Mr. Grafton tested the PE and PET braid and found that it had improved strength properties as compared to the PE braid (*i.e.*, the heterogeneous PE/PET braid vs. the homogeneous PE braid) (Mitek Fact #30 and #31).  This braid of two different materials ultimately became FiberWire.  The development of FiberWire mirrors the language of Mitek's 446 Patent because Arthrex "tailor[ed] the physical and biological properties of the braid by varying the type and proportion of each of the dissimilar fiber forming materials used, as well as adjusting the specific configuration of the braid" (Mitek Fact #6).

---

7204, AR-7205, AR-7205T, AR-7207, AR-7209, AR-7209SN, AR-7209T, AR-7210, AR-7211, AR-7219, AR-7220, AR-7221, AR-7222, AR-7223, AR-7225, AR-7227-01, AR-7227-02, AR-7228, AR-7229-12, AR-7229-20, AR-7230-01, AR-7230-02, AR-7232-01, AR-7232-02, AR-7232-03, AR-7237, AR-7250, AR-7251, AR-1320BNF, AR-1322BNF, AR-1322-75SF, AR-1322-752SNF, AR-1915SNF, AR-1920SNF, AR-1322SX, AR-1322SXF, AR-1324B, AR-1324BF, AR-1324BF-2, AR-1324BNF, AR-1324HF, AR-1324SF,AR-1934BF, AR-1934BF-2, AR-1934BFT, AR-1934BFX, AR-1934BNF, AR-1934BLF, AR-1915SF, AR-1920BF, AR-1920BF-37, AR-1920BFT, AR-1920BN, AR-1920BNF, AR-1920BNP, AR-1920BT, AR-1920SF, AR-1920SFT, AR-1925BF, AR-1925BFSP, AR-1925BNF, AR-1925BNP, AR-1925SF, AR1927-BF, AR-1927BNF, AR-1928SF, AR-1928SF-2, AR-1928SNF, AR-1928SNF-2, AR-2225S, and AR-2226S (Mitek Fact #26).

[9]    To the extent Arthrex has marketed additional product codes since it provided to Mitek the information in footnote 8, those products would also infringe for the same reasons stated herein providing the structure of FiberWire is the same as the current FiberWire products.

## V.    SUMMARY JUDGMENT AND LITERAL INFRINGEMENT LAW

### A.    Law Of Summary Judgment

Under FED. R. CIV. P. 56(c), summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  As the moving party here, Mitek bears the initial burden of demonstrating that it is entitled to summary judgment. *Celotex*, 477 U.S. at 324-25.  The burden then shifts to Arthrex to show that there is a genuine issue of material fact.  "To create a genuine issue of fact, the nonmovant [Arthrex] must do more than present *some* evidence on an issue it asserts is disputed."  *Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1560 (Fed. Cir. 1988) (emphasis in original).  Arthrex must come forward with sufficient evidence from which a reasonable trier of fact could return a verdict in its favor.  *Id.*  It is appropriate to grant summary judgment of infringement of a patent claim just as with any other kind of claims.  *Id*.

### B.    Law of Literal Patent Infringement

Direct patent infringement is the making, using, selling, offering to sell, or importing an invention covered by the claims of a valid patent without the authority of the patentee.  35 U.S.C. § 271(a).  Determining whether a patent has been literally infringed involves two steps: (1) claim construction, followed by (2) a determination whether the properly construed claim encompasses the accused structure.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995)(en banc).  Claim construction is a question of law within the province of the Court. *Id.* at 979.  The determination or application of the proper construction to FiberWire is the subject of this summary judgment motion.

To establish infringement the plaintiff must prove that each claim element is literally present in the accused product. *Dawn Equip. Co. v. Kentucky Farms Inc.*, 140 F.3d 1009, 1014 (Fed. Cir. 1998).

## VI. ARTHREX'S FIBERWIRE SUTURES LITERALLY INFRINGE CLAIMS 1, 2, 8, 9, and 12 OF MITEK'S 446 PATENT

If the Court adopts Mitek's proposed constructions of the claim terms "PE" and "consistently essentially of," summary judgment of infringement should be granted because there are no genuine issues of material fact with respect to the structure of Arthrex's accused FiberWire products and whether they literally have all of the elements of the asserted claims.

### A. FiberWire Literally Infringes Claim 1 of Mitek's 446 Patent

Arthrex's expert and fact witnesses agree that all claim elements of the asserted claims (with the exception of "PE" and "consisting essentially of" under Arthrex's construction) are found in FiberWire. However, if the Court adopts Mitek's definitions of "PE" and "consisting essentially of," then it is undisputed that FiberWire contains each and every element of the claims 1, 2, 8, 9, and 12 of Mitek's 446 Patent. Accordingly, summary judgment of infringement is appropriate.

#### 1. If the Court Adopts Mitek's Definition of PE Then FiberWire Literally Contains the "PE" Claim Element

Mitek proposes that the claim term "PE" means "PE includes any polymer formed from a repeating ethylene monomer (*i.e.* "PE" – means all types of polyethylene ("PE") including ultra high molecular weight polyethylene)."[10] It is undisputed that FiberWire has PE. Although FiberWire has one type of PE, namely UHMW PE, there can be no dispute, under Mitek's construction, that it satisfies the "PE" limitation.

---

[10] Mitek's position of this issue is set forth in its Claim Construction brief being filed concurrently herewith.

Mr. Dreyfuss, Arthrex's lead FiberWire Engineer, testified that the FiberWire suture is made from PE yarns that are made of a plurality of filaments (Mitek Fact #16). Further, numerous Arthrex documents confirm that FiberWire is made of PE (Mitek Fact #22). Accordingly, it is undisputed that, given Mitek's construction of PE, this claim element is literally found in Arthrex's FiberWire. Consequently, if the Court adopts Mitek's construction that the claim term "PE" means "all types of polyethylene (PE) including ultra high molecular weight polyethylene ("UHMW PE") then this claim element is literally found in Arthrex's FiberWire.

> **2.  If the Court Adopts Mitek's Definition of "Consisting Essentially Of" Then FiberWire Literally Contains the "Consisting Essentially Of" Claim Element**

Mitek proposes that the claim term "consisting essentially of" means:

> The "novel and basic characteristics" of the invention are a heterogeneous braid of dissimilar non-bioabsorbable yarns of the materials claimed, where at least one yarn from the first set is in direct intertwining contact with a yarn from the second set, and the dissimilar yarns have at least some different properties that contribute to the overall properties of the braid. Consisting essentially of excludes sutures that contain bioabsorbable materials as the first and second fiber-forming materials.[11]

The transitional phrase "consisting essentially of" has been interpreted by the Federal Circuit to denote a partially open term, which permits the inclusion of additional elements to the claim as long as those elements do not materially affect the basic and novel properties of the invention. *AK Steel Corp. v. Sollac*, 344 F.3d 1234, 1239 (Fed. Cir. 2003). Thus a product can infringe a claim if it contains, in addition to the recited claim elements, immaterial elements not recited by the claim that do not affect the basic and novel properties of the invention. *W.E. Hall Co., Inc. v. Atlanta Corrugating, LLC*, 370 F.3d 1343, 1353 (Fed. Cir. 2004).

---

[11]    Mitek's position of this issue is set forth in its Claim Construction brief being filed concurrently herewith.

But if Mitek's construction of "consisting essentially of" (*i.e.,* the identification of the basic and novel characteristics of the invention) is adopted, there is no genuine issue of material fact because Arthrex has not disputed that any structure in FiberWire materially affects the basic and novel characteristics *as defined by Mitek*.

FiberWire has a coating that Arthrex states acts as a lubricant (Mitek Fact #32).  Dr. Brookstein, Mitek's expert, stated that this coating does not materially affect the basic and novel characteristics of the invention as defined by Mitek (Mitek Fact #33).   Regardless of the coating, FiberWire still has a heterogeneous braid of dissimilar non-bioabsorbable yarns of the type claimed, where at least one yarn from the first set is in direct intertwining contact with a yarn from the second set, and the dissimilar yarns have at least some different properties that contribute to the overall properties of the braid (Mitek Fact #34).  In particular, the FiberWire coating is: (1) non-bioabsorbable; (2) does not materially affect bioabsorbability of the yarns; (3) does not materially affect at least one yarn from the first set being in direct intertwining contact with a yarn from the second set; and (4) does not materially affect each yarn from contributing to the overall properties of the heterogeneous braid (Mitek Fact #35-38).

Under *Arthrex's construction* of "consisting essentially of," Arthrex contends that the coating on the FiberWire suture takes it outside the scope of the claims.  But Arthrex has not offered any evidence that under *Mitek's construction* of "consisting essentially of," the coating materially affects the basic and novel characteristics of the invention.  Therefore, Dr. Brookstein's statements are undisputed.

Arthrex's TigerWire contains one nylon strand.  But Dr. Brookstein, Mitek's expert, stated that the single nylon strand does not materially affect the basic and novel characteristics as defined by Mitek for at least two reasons (Mitek Fact #40).  First, nylon is expressly mentioned

in claim 1 as one of the fiber-forming materials from which the second set of yarns can be made (Mitek Fact #1). Thus, the inventors contemplated it as being part of their invention and not as changing the basic and novel characteristics of their invention. Second, including a nylon yarn instead of one yarn of PET (nylon makes up only 3.4% of TigerWire suture – Mitek Fact #41) does not materially affect the basic and novel characteristics of the invention because the braid is still a heterogeneous braid of non-bioabsorbable yarns of the type claimed, at least one yarn of PE is in direct intertwining contact with a PET yarn, and the nylon does not materially affect the yarns from contributing to the properties of the overall braided suture (Mitek Fact #42-44).

Arthrex's has contended that, under its construction of "consisting essentially of," the introduction of one strand of nylon in TigerWire materially affects the basic and novel characteristics of Mitek's claimed invention. Arthrex, however, has failed to offer any evidence that under *Mitek's construction* of "consisting essentially of," the nylon materially affects the basic and novel characteristics of the invention. Therefore, Dr. Brookstein's statements are undisputed.

Accordingly, it is undisputed that, given Mitek's construction of "consisting essentially of," there is nothing in FiberWire or TigerWire that materially affects the basic and novel characteristics of the invention. Consequently, if the Court adopts Mitek's construction of the claim term "consisting essentially of," then this claim element is literally found in Arthrex's FiberWire.

### 3. FiberWire Has The Remaining Claim Elements And Therefore Literally Infringes Claim 1 of Mitek's 446 Patent

All the limitations of claim 1 (other than "PE" and "consisting essentially of") are also literally present in FiberWire. In fact, Arthrex does not dispute that the remaining claim elements are in FiberWire. Accordingly, if the Court adopts Mitek's construction of "PE" and

"consisting essentially of," it is undisputed that FiberWire literally contains each and every

element of claim 1 of Mitek's 446 Patent and therefore summary judgment of literal

infringement is appropriate.

     The following table shows claim language, the claim construction, and the corresponding

evidence applying the claim construction to Arthrex's FiberWire.

| Claim 1 of the '446 Patent | Claim Construction | FiberWire Suture Products |
|---|---|---|
| A surgical suture consisting essentially of a heterogeneous braid composed of a first and second set of continuous and discrete yarns in a sterilized, braided construction wherein at least one yarn from the first set is in direct intertwining contact with a yarn from the second set; and | <u>Consisting essentially of</u> – <br><br>The basic and novel characteristics are a heterogeneous braid of dissimilar non-bioabsorbable yarns of the type claimed, where at least one yarn from the first set is in direct intertwining contact with a yarn from the second set, and the dissimilar yarns have at least some different properties that contribute to the overall properties of the braid<br><br><u>Direct intertwining contact</u> - <br>undisputed | FiberWire and TigerWire are surgical sutures (Mitek Fact #11).<br><br>Q.   Okay.  And is the FiberWire heterogeneous braid composed of a first and second set of continuous and discrete yarns?<br>A.   Yes.<br>Q.   Okay.  And is the FiberWire heterogeneous sheath braid composed of discrete yarns in a sterilized braided construction?<br>A.   Yes (Mitek Fact #13).<br><br>Q.   And does the FiberWire heterogeneous braided sheath have a braided construction where at least one yarn from the first set is in direct intertwining contact with a yarn from the second set?<br>A.   There is intertwining contact, yes (Mitek Fact #18). |
| a)  each yarn from the first set is composed of a plurality of filaments of a first fiber-forming material selected from the group consisting of PTFE, FEP, PFA, PVDF, PETFE, PP and PE; and | <u>PE</u> – <br>all types of polyethylene (PE) including ultra high molecular weight polyethylene ("UHMW PE")." | Q.  What is -- How do you characterize that strand of polyethylene when Pearsalls receives it?<br>A.  It is a various -- various individual filaments make up the yarn that's received.  And the yarn may be several filaments to many. |

| | | (Mitek Fact #16). |
|---|---|---|
| b) each yarn from the second set is composed of a plurality of filaments of a second fiber-forming material selected from the group consisting of PET, nylon, and aramid; and | Undisputed | Each FiberWire™ suture product has PET as a second set of yarns (Mitek Fact #49).<br><br>Q. Same way? So the PET used in Arthrex's FiberWire sutures is in the form of yarn, and that PET yarn is made up of several twisted monofilaments of PET?<br><br>A. Correct (Mitek Fact #17).<br><br>Q. Okay. And the next part says, "Each yarn from the second set is composed of a plurality of filaments of a second fiber-forming material selected from the group of PET, nylon and aramid." Do you see that?<br>A. Yes.<br>Q. Does FiberWire meet that criteria?<br>A. It has the PET in it.<br>Q. So, it meets that criteria?<br>A. Uh-huh. (Mitek Fact #46). |
| c) optionally a core. | Undisputed | Arthrex's FiberWire™ sutures have a core except for 4-0 FiberWire (Mitek Fact #47). |

Accordingly, it is undisputed that FiberWire literally contains each and every element of claim 1 of Mitek's 446 Patent.

**B.    FiberWire Needle Products Literally Infringe Claim 2 of Mitek's 446 Patent**

Claim 2 depends on claim 1 and further recites that the suture of claim 1 is attached to a needle. It is undisputed that Arthrex sells its FiberWire attached to a needle (Mitek Fact #48).

| Claim 2 | Arthrex's FiberWire needle products |
|---------|-------------------------------------|
| The surgical suture of claim 1 wherein the suture is attached to a needle. | Arthrex's FiberWire needle products have FiberWire suture attached to a needle[12] (Mitek Fact #48). |

Accordingly, Arthrex's FiberWire suture contains each and every element of claim 2 of

Mitek's 446 Patent and therefore summary judgment of infringement is proper.

### C.     FiberWire Literally Infringes Claim 8 of Mitek's 446 Patent

Claim 8 depends from claim 1 and further recites that the second set of yarns in the suture

of claim 1 is PET.  It is undisputed that FiberWire's second set of yarns is PET.

| Claim 8 | FiberWire Structure |
|---------|---------------------|
| The surgical suture of claim 1 wherein the second set of yarns is PET. | Each FiberWire suture product has PET as a second set of yarns (Mitek Fact #49).<br><br>Q.  Same way?  So the PET used in Arthrex's FiberWire sutures is in the form of yarn, and that PET yarn is made up of several twisted monofilaments of PET?<br><br>A.  Correct (Mitek Fact #17).<br><br>Q.  Okay.  And the next part says, "Each yarn from the second set is composed of a plurality of filaments of a second fiber-forming material selected from the group of PET, nylon and aramid." Do you see that?<br>A.     Yes.<br>Q.     Does FiberWire meet that criteria?<br>A.     It has the PET in it. |

---

[12]     Arthrex's FiberWire and TigerWire needle products includes all Arthrex's products that are sold with a needle attached to a FiberWire or TigerWire suture including at least the following Arthrex catalog product codes AR-7200, AR-7202, AR-7204, AR-7205, AR-7205T, AR-7207, AR-7211, AR-7219, AR-7220, AR-7223, AR-7225, AR-7227-01, AR-7227-02, AR-7228, AR-7229-12, AR-7229-20, AR-7230-01, AR-7230-02, AR-7232-01, AR-7232-02, AR-7232-03, AR-7250, AR-7251, AR-1320BNF, AR-1322BNF, AR-1322-752SNF, AR-1915SNF, AR-1920SNF, AR-1324BNF, AR-1920BNP, AR-1934BNF, AR-1920BN, AR-1920BNF, AR-1925BNF, AR-1925BNP, AR-1927BNF, AR-1928SNF, and AR-1928SNF-2.

| | |
|---|---|
| | Q.    So, it meets that criteria? |
| | A.    Uh-huh. (Mitek Fact #46). |

Accordingly, Arthrex's FiberWire suture contains each and every element of claim 8 of the 446 Patent and therefore summary judgment of infringement is proper.

**D.    FiberWire Literally Infringes Claim 9 of Mitek's 446 Patent**

| Claim 9 | Arthrex's FiberWire Products |
|---|---|
| The surgical suture of claim 8 wherein the volume fraction of the first set of yarns in the braided sheath and core ranges from about 20 to 80 percent. | Every FiberWire and TigerWire construction has a ratio of the cross-sectional area of ultra high molecular weight PE in the sheath and core to the total cross sectional area of all the yarns in the surgical suture that ranges from 20 to 80 percent (Mitek Fact #50). |

Accordingly, Arthrex's FiberWire suture contains each and every element of claim 9 of the 446 Patent and therefore summary judgment of infringement is proper.

**E.    FiberWire Literally Infringes Claim 12 of Mitek's 446 Patent**

Claim 12 depends on claim 8 and further recites that the suture of claim 8 is attached to a needle.  It is undisputed that FiberWire is sold attached to a needle.

| Claim 12 | Arthrex's FiberWire Needle Products |
|---|---|
| The surgical suture of claim 8 wherein the suture is attached to a needle. | Arthrex's FiberWire needle products have either FiberWire suture attached to a needle (Mitek Fact #48; *see also* footnote 12). |

Accordingly, Arthrex's FiberWire suture contains each and every element of claim 12 of the 446 Patent and therefore summary judgment of infringement is proper.

**VII.    CONCLUSION**

For the foregoing reasons, Mitek requests that the Court grant summary judgment that Arthrex literally infringes claims 1, 2, 8, 9, and 12 of Mitek's 446 Patent.

**DEPUY MITEK'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT**

Mitek moves for summary judgment dismissal of Arthrex's and Pearsalls' inequitable conduct defenses and counterclaims predicated upon those defenses.[13]  Arthrex alleges that the attorneys, who prosecuted the application leading to Mitek's 446 Patent, committed inequitable conduct by making statements about references that the Examiner undisputedly considered. Arthrex does not allege that any prior art was withheld from the Examiner.  Rather, Arthrex's arguments boil down to nothing more than disagreeing with the prosecuting attorneys' and the Examiner's interpretation of two references.  That is not inequitable conduct.  Arthrex's allegations are precisely the type of spurious inequitable conduct charges that the Federal Circuit has condemned as "an absolute plague."[14]  Accordingly, Arthrex's inequitable conduct defenses and counterclaims should be disposed of under Rule 56.

**VIII.   THE PROSECUTION HISTORY OF MITEK'S 446 PATENT**

   **A.     The Filing Of the 511 Application**

The application that matured into Mitek's 446 Patent (511 application) was filed on February 19, 1992, naming Dr. Mark Steckel as a co-inventor (Mitek Fact #53 and #54).  The application as originally filed had 24 claims (Mitek Fact #55).  Claims 1-20 were directed to heterogeneous braids ("braid claims"), and claims 21-24 were directed to surgical sutures ("suture claims") (Mitek Fact #56 and #57).

---

[13]     Arthrex and Pearsalls are jointly represented by the same law firm.  They have made the same pleadings with respect to inequitable conduct (compare Ex. 17 with Ex. 18).  Thus, Mitek generally refers to Arthrex and Pearsalls together as "Arthrex" in this portion of its memorandum.

[14]     *Burlington Indus. Inc. v. Dayco Corp.,* 849 F.2d 1418, 1422 (Fed. Cir. 1988); *see also FMC Corp. v. Manitowoc Co.*, *Inc.* 835 F.2d 1411, 1415 (Fed. Cir. 1987) ("'Inequitable conduct' is not, or should not be, a magic incantation to be asserted against every patentee.").

Messrs. Matthew Goodwin and Hal Woodrow, two in-house attorneys, prosecuted the 511 application (Mitek Fact #58 and #59 ). With the filing of the 511 application, Mr. Goodwin submitted an Information Disclosure Statement in which he disclosed eleven references, including U.K. Patent Application GB 2 218 321A ("Burgess") (Mitek Fact #60 and #61).

### B.    The First Office Action: The Patent Examiner Rejects the Suture Claims Over Burgess

In the First Office Action, the Examiner issued a restriction requirement (Mitek Fact #62 and #63).[15] Per the Examiner, claims 1-20 were directed to heterogeneous braids which were independent and distinct inventions from claims 21-24 which were directed to surgical sutures (Mitek Fact #56 and #57). The Examiner stated that the inventions claimed in claims 1-20 are "deemed to be useful as a fishing line" (Mitek Fact #64). The Examiner further stated that the braid and suture inventions were "*patentably distinct* since there is nothing in the record to show them to be obvious variants" (Mitek Fact #65). The Examiner further ruled that the braid and suture claims "have acquired a separate status in the art because of their recognized divergent subject matter" (Mitek Fact #66). Applicants elected to prosecute the surgical suture claims (claims 21-24) (Mitek Fact #67). Although the Examiner stated that the braid and suture claims were "patentably distinct" and "not obvious variants," (Mitek Fact #68) he also rejected the suture claims as obvious over a fishing line reference (Mitek Fact # 69) that Mr. Goodwin submitted with the IDS (Mitek Fact # 61)-- Burgess, U.K. Patent Application 2,218,312A, ("Burgess") (Mitek Fact #70).

---

[15]    A patent examiner issues a restriction requirement when it is believed that the claims as filed are directed to more than one invention. 35 U.S.C. §121; 37 C.F.R. §1.142. The purpose of a restriction requirement is to prevent an applicant from prosecuting claims directed to more than invention in one patent. *Id.*

## C.    First Office Action Response: Applicants Argue Burgess Is Nonanalagous Art

In response to the First Office Action, Applicants distinguished Burgess from the claimed invention relying, primarily, on a nonanalagous art argument that persons wanting to make a suture would not look to the fishing line art as instructive (Mitek Fact #72-74).  Similar to the Examiner's reasoning in restricting the claims, Applicants emphasized to the Examiner that the property considerations for fishing lines, such as disclosed in Burgess, are different from the property considerations for surgical sutures (compare Mitek Fact #67 with Mitek Fact #75).

For example, Applicants pointed out that an important characteristic of sutures – which hold wounds together– is knot strength, which was not even mentioned in Burgess (Mitek Fact #76 and #77).  Further, Mr. Goodwin explained that sutures and fishing line have different requirements because: (i) a surgeon ties sutures into conventional square knots at a very fast pace for patient safety; (ii) surgeons generally form a pre-knot with a suture and then slide it down the suture until the knot is adjacent the body tissue desired to be stitched; and (iii) after a suture knot is placed, surgeons make additional throws for knot security (Mitek Fact #78-80).  Mr. Goodwin further explained that there are no similar requirements for a fishing line (*id.*).  Mr. Goodwin also noted that the Burgess fishing line had some filaments composed of high tensile polythene thread that, although having some good strength properties, have poor knot strength properties (Mitek Fact #81).

In conclusion, Mr. Goodwin emphasized the dissimilarities in property requirements for sutures versus fishing lines (Mitek Fact #82).  Applicants stated that

> In view of the dissimilarities in property requirements between sutures and fishing line, there would be no incentive for a medical designer who wishes to improve the properties of a braided suture to study the art related to braided fishing lines. Even if he did use the teachings of the fishing line art to modify a suture, then he would inevitably design an unacceptable suture.

(Mitek Fact #83).

### D.    Second Office Action And Response: Burgess Rejection Is Dropped & Claims Are Rejected Over Kaplan

After receiving the response regarding Burgess, the Examiner issued a Second Office

Aaction (Mitek Fact #84).  The Examiner considered the Burgess rejection moot, so there was no

further discussion of the reference (Mitek Fact #85 and #86).  But the Examiner rejected the

claims over two different patents including U.S. Patent No. 5,147,400 (Mitek Fact #87).  Per the

Examiner, Kaplan was relevant because it disclosed a core and a braided sheath component made

from "individual filaments having more than two different chemical compositions, one or more

of which optionally being nonbioabsorable" (Mitek Fact #88).  In response to the Second Office

Action, the Applicants argued, *inter alia*, that Kaplan did not disclose the claimed yarns in direct

intertwining contact (Mitek Fact #89).

### E.    Third Office Action And Response:  Claims Are Amended And Allowed Over Kaplan

In the Third Office Action, the Examiner maintained the rejections of the suture claims

over Kaplan but on new grounds (Mitek Fact #90-92).  Per the Examiner, Kaplan disclosed a

braided sheath component that may be fabricated from individual filaments having more than

two different chemical compositions, one or more of which optionally being nonbioabsorable

(Mitek Fact #93).  The Applicants responded by, *inter alia*, amending the claims to exclude

bioabsorbable materials as the first and second fiber-forming materials and argued that the

claims were patentable over Kaplan (Mitek Fact #94-96).  Mr. Woodrow explained, *inter alia*,

that Kaplan did not anticipate or render obvious the claimed invention as amended because

Kaplan disclosed sheath yarn components that are "bioabsorbable or semi-bioabsorbable," and

the amended claims recited nonbioabsorbable yarns (Mitek Fact #97).  After Mr. Woodrow's

response was submitted, the U.S. Patent & Trademark Office ("Patent Office") issued a Notice of Allowance (Mitek Fact #98).

### F.    Arthrex's Inequitable Conduct Allegations

Arthrex does not allege that any material information was withheld with respect to Kaplan (Mitek Fact #99). Rather, Arthrex merely incorrectly alleges that inequitable conduct was committed with respect to Kaplan because the applicants and their attorneys mischaracterized and misrepresented Kaplan during the prosecution (Mitek Fact #100).

Arthrex's pleaded allegations with respect to Burgess are sparse and have changed like shifting sands. Arthrex's allegations now appear to be based on Mr. John Witherspoon's, Arthrex's patent law expert, opinions where he incorrectly opines that three statements Mr. Goodwin made in responding to the rejection over the Burgess fishing line reference were material misrepresentations (Mitek Fact #101-103).

## IX.    LAW OF INEQUITABLE CONDUCT & SUMMARY JUDGMENT

### A.    Arthrex Carries A Heavy Burden of Proving Inequitable Conduct

Arthrex carries the heavy burden of proving inequitable conduct by clear and convincing evidence. *Hoffman-La Roche, Inc. v. Promega Corp*., 323 F.3d 1354, 1359 (Fed. Cir. 2003). Clear and convincing evidence – which is higher than a preponderance of the evidence standard – is defined as "evidence which produces in the mind of the trier of fact 'an abiding conviction that the truth of the factual contentions [is] 'highly probable.'" *Buildex Inc. v. Kason Indus., Inc.,* 849 F.2d 1461, 1463 (Fed. Cir. 1998).

Inequitable conduct is an equitable issue to be resolved by the Court. *Gardco Mfg., Inc. v. Herst Lighting Co*., 820 F.2d 1209, 1212 (Fed. Cir. 1987). There is no right to a jury trial on inequitable conduct issues, including factual issues. *Id.* at 1212-13.

To prove inequitable conduct, Arthrex must show that the patent applicants failed to disclose material information or submitted materially false information to the Patent Office, and did so with intent to deceive the examiner. *Jumpsport, Inc. v. Jumpking, Inc.*, Nos., 05-1182, 05-1196, 05-1197, 2006 U.S. App. LEXIS 18448, at *18-19 (Fed. Cir. July 21, 2006) (Ex. A). Materiality and intent are separate and essential elements of an inequitable conduct defense. *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc.*, 439 F.3d 1335, 1340 (Fed. Cir. 2006) (citing *Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 552 (Fed. Cir. 1990)). Further, materiality does not presume intent. *Id.*; *see also Old Town Canoe Co. v. Confluence Holdings Corp*., 448 F.3d 1309, 1322 (Fed. Cir. 2006).

Information is material if a reasonable examiner would have considered it important in deciding whether to allow the patent application. *Digital Control Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1315 (Fed. Cir. 2006).[16] Information is not material when the examiner actually knows of the information or it is cumulative to disclosed information. *Mentor H/S, Inc. v. Medical Device Alliance, Inc*., 244 F.3d 1365, 1378 (Fed. Cir. 2001). Intent to deceive cannot be inferred solely from the fact that information was not disclosed. *M. Eagles Tool Warehouse,* 439 F.3d at 1340; *Hebert v. Lisle Corp.,* 99 F.3d 1109, 1116 (Fed. Cir. 1996). Further, an actor's conduct must be viewed in light of all the circumstances including evidence of good faith. *Eaton Corp. v. Rockwell Int'l Corp*., 323 F.3d 1332, 1345-46 (Fed. Cir. 2003). Also, materiality and intent are judged on a sliding scale: "The more material the omission, the less evidence of

---

[16]    There has been some debate as to whether the 1992 amendments to 37 C.F.R. §1.56 changed the materiality standard. *Digital Control Inc.,* 437 F.3d 1309 at 1315. But recently, the Federal Circuit held that the 1992 C.F.R. amendments were not intended to supplant the reasonable examiner standard and applied the reasonable examiner standard. *Id.* at 1316. Thus, Mitek relies on the reasonable examiner standard here.

intent [that is] required to find that inequitable conduct has occurred." *Baxter Int'l Inc. v. McGraw, Inc*., 149 F.3d 1321, 1327 (Fed. Cir. 1998).

### B.     Summary Judgment Standards

Under FED. R. CIV. P. 56(c), summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  As the movant without the ultimate burden of proof on inequitable conduct, Mitek's burden on summary judgment is merely to demonstrate the absence of a genuine issue of material fact.  *Id.* at 323.  Once that burden has been satisfied, the burden then shifts to nonmovant Arthrex to come forward with sufficient evidence from which a reasonable trier of fact could return a verdict in its favor.  *Avia Group Int'l., Inc. v. L.A. Gear, Inc.,* 853 F.2d 1557, 1560 (Fed. Cir. 1988).  To meet this burden, non-movant Arthrex must do more than present some evidence on an issue that it asserts is disputed:

> [T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  If the evidence [of the non-movant] is merely colorable, or is not significantly probative, summary judgment may be granted.

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249-250 (1986) (citations omitted*).*  Further, on summary judgment, the Court must view the evidence presented through the prism of Arthrex's clear and convincing evidentiary burden.  *Id.* at 254.

### X.     SUMMARY JUDGMENT OF ARTHREX'S INEQUITABLE CONDUCT DEFENSES & COUNTERCLAIMS IS WARRANTED

Summary disposition of Arthrex's claims and defenses regarding both Kaplan and Burgess is proper for three independent reasons.  First, merely arguing about a disclosed reference is not, as Arthrex suggests, inequitable conduct.  Second, in both instances, no material

information was withheld from the Examiner and no material misrepresentations were made to the Examiner.  Third, in both instances, Arthrex has no evidence that anyone substantively involved with the prosecution of Mitek's 446 Patent had an intent to deceive the Examiner.

### A. Arthrex's Allegations Should Be Rejected Because Merely Arguing With the Patent Office About The Teachings of a Disclosed Reference Is Not Inequitable Conduct

Arthrex's inequitable conduct claims fall short as a matter of law because the Examiner had before him the Kaplan and Burgess references that are at the heart of Arthrex's counterclaims and defenses (Mitek Fact #69 and #104-106).  The Examiner was free to reach his own conclusions about Kaplan and Burgess.  Courts routinely reject inequitable conduct allegations of the type made by Arthrex.[17]

Arthrex's arguments are basically that they disagree with the arguments applicants made about the disclosed references.  But an infringer's disagreement with position's taken during prosecution do not constitute inequitable conduct.  *Life Techs.,* 224 F.3d at 1326 (Fed. Cir. 2000) (holding that inventors interpretation of a disclosed reference was not inequitable conduct);  *Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471, 1482, (Fed. Cir. 1986) (holding that applicant's argument distinguishing prior art was not a material misrepresentation because the Examiner could reach his/her own conclusions regarding the prior art); *CFMT, Inc. v. YieldUp Int'l Corp*., 349 F.3d 1333, 1342 (Fed. Cir. 2003) (reversing finding of inequitable conduct as "clear error"

---

[17]  *Life Techs., Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320, 1326 (Fed. Cir. 2000) (holding that inventors interpretation of a disclosed reference was not inequitable conduct);  *Miller Pipeline Corp. v. British Gas PLC,* 69 F. Supp. 2d 1129, 1136-37 n.4 (S.D. Ind. 1999) (finding applicant's argument about a disclosed reference was not inequitable conduct);  *Beckton Dickinson & Co. v. Syntron Bioresearch Inc.,* 51 U.S.P.Q. 2d 1722, 1733-34 (S.D. Cal. 1998) (finding no inequitable conduct regarding discussion of disclosed references);  *Gargoyles Inc. v. United States*, 33 U.S.P.Q.2d 1595, 1605 (finding applicant's attempt to distinguish prior art was not inequitable conduct);  *Black & Decker Inc. v. Hoover Service Ctr.*, 765 F. Supp. 1129, 1138 (D. Conn. 1991) (finding that mere characterization of a reference does not constitute inequitable conduct).

where patent applicant's advocacy was at most an overstatement, not a misrepresentation). Although this should dispose of Arthrex's counterclaims and defenses, Mitek has addressed Arthrex's lack of evidence on the merits below.  When Arthrex's counterclaims and defenses are put to scrutiny against Arthrex's burden to prove clearly and convincingly the elements of materiality and intent, Arthrex's counterclaims and defenses fail and should be summarily dismissed.

### B.  Arthrex Lacks Any Credible Evidence of Inequitable Conduct From Which A Reasonable Trier of Fact Could Find Inequitable Conduct Based on Kaplan

#### 1.  Arthrex Has No Evidence Of A Material Misrepresentation Regarding Kaplan

It is undisputed that the Examiner fully considered Kaplan in connection with allowing the claims of Mitek's 446 Patent – the reference was relied on and applied in two separate Office Actions (Mitek Fact #87-97 and #104-106).  So Arthrex is left searching for alleged misrepresentations and mischaracterizations about Kaplan to trump up its inequitable conduct defense.  Coming up short, Arthrex tries to spin Mr. Woodrow's statements about Kaplan into misrepresentations.  In particular, Arthrex strains to turn Mr. Woodrow's interpretation that Kaplan's sheath yarn component "always contains at least in part, a bio-absorbable portion and that Kaplan teaches away from [the claimed] combination of non-bioabsorbable yarns" into a misrepresentation (Mitek Fact #107).  But there is absolutely no evidence that this interpretation is wrong, much less that Mr. Woodrow thought it was wrong, and intentionally made an argument he knew to be wrong to deceive the Examiner.  Rather, the only record evidence is that Mr. Woodrow still believes the statement to be correct (Mitek Fact #108) and the Examiner thought it was correct.

Arthrex simply has no evidence to the contrary. Neither of Arthrex's technical experts offered any opinions regarding Kaplan's teachings (Mitek Fact #109). Further, Arthrex's patent law expert did not opine on any misconduct regarding Kaplan (Mitek Fact #110). Arthrex is left with nothing more than its trial counsel's allegations. But trial counsel's assertions are no substitute for the clear and convincing evidence Arthrex needs to establish that this statement was a material misrepresentation. *See, e.g, Invitrogen Corp. v. Clontech Labs., Inc*., 429 F.3d 1052, 1068 (Fed. Cir. 2005) (attorney argument is no substitute for substantiated expert testimony about technical evidence) (citing *American Airlines, Inc. v. United States*, 204 F.3d 1103, 1112 (Fed. Cir. 2000); *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.,* 45 F.3d 1550, 1562 (Fed. Cir. 1995) ("There must be sufficient substance, other than attorney argument, to show that the issue requires trial.")). Thus, Arthrex is left with a blank evidentiary slate as to any material misrepresentation about Kaplan. Accordingly, Arthrex's inequitable conduct defense based on Kaplan should be dismissed.

### 2. Arthrex Has No Evidence of Intent to Deceive With Respect to Kaplan

Even if Arthrex could establish materiality (and it cannot), Arthrex's claim also fails because it has no evidence that anyone substantively involved with the prosecution of Mitek's 446 Patent had any intent to deceive the Examiner with respect to Kaplan. Not only did Arthrex fail to plead any evidence of intent (Mitek Fact #111), but Arthrex failed to identify any evidence of intent to deceive in its responses to Mitek's interrogatories (Mitek Fact #112). Arthrex deposed the prosecuting attorneys, Mr. Goodwin and Mr. Woodrow,[18] and co-inventor Dr.

---

[18]     When asked about the prosecution regarding Kaplan, Mr. Woodrow testified that Kaplan was distinguishable for many reasons including those pointed out during the prosecution (Mitek Fact #108). Thus, Arthrex has no evidence that Mr. Woodrow thought Kaplan disclosed something different than what Mr. Woodrow explained to the Patent Office, much less that he intentionally misrepresented Kaplan (Mitek Fact #114).

Steckel, and never identified any evidence of intent (Mitek Fact #113). With the evidentiary

record closed, Arthrex comes up short again. Accordingly, having no evidence of intent, Arthrex

and Pearsalls defenses and counterclaims based on Kaplan should be dismissed.[19]

> **C.    Arthrex Lacks Any Credible Evidence of Inequitable Conduct From Which A Reasonable Trier of Fact Could Find Inequitable Conduct Based on Burgess**

Like its claims regarding Kaplan, Arthrex's allegations regarding Burgess fail because

Arthrex has no clear and convincing evidence to prove the materiality and intent elements of its

inequitable conduct counterclaims and defenses.

> **1.    Arthrex Has No Evidence Of A Material Misrepresentation Regarding Burgess**

> > **a)    Mr. Goodwin Did Not Make A Material Misrepresentation Regarding Burgess**

It is undisputed that the Examiner fully considered Burgess in connection with allowing

the claims of Mitek's 446 Patent – not only did Applicants provide it to the Examiner (Mitek

Fact #60 and #61), but the Examiner applied the reference in rejecting the claims (Mitek Fact

#69). Just as with Kaplan, the trained patent examiner was free to reach his own conclusions

about Burgess. Thus, Arthrex is again left trying to concoct an argument about alleged

misrepresentations regarding a reference, Burgess, that was fully considered by the Examiner.

In its efforts to string together an argument, Arthrex's allegations have shifted throughout

this case and now appear to be found in the *rebuttal* expert report of Mr. John Witherspoon,

Arthrex's patent law expert. Mr. Witherspoon and Arthrex try to spin three statements by Mr.

Goodwin about *fishing line* and the Burgess reference into material misrepresentations on the

---

[19]    *Old Town Canoe Co.*, 448 F.3d at 1322 (affirming JMOL that inequitable conduct was not committed where infringer lacked evidence of intent to deceive); *Amgen, Inc. v. Hoechst Marion Roussel, Inc*., 314 F.3d 1313, 1358 (Fed. Cir. 2003) ("[W]e will not find inequitable conduct on an evidentiary record that is completely devoid of evidence of a patentee's intent to deceive the [Patent Office].").

incorrect belief that these statements were inconsistent with co-inventor, Dr. Steckel's deposition

testimony regarding *sutures* (Mitek Fact #101-103). Thus, Arthrex's argument hinges on first

proving that Mr. Goodwin's fishing line statements are inconsistent with Dr. Steckel's testimony

regarding his suture development (Mitek Fact #127). But since there is no inconsistency, no

reasonable trier of fact could find Mr. Goodwin's statements materially inconsistent with Dr.

Steckel's testimony.

Mr. Witherspoon cites to the following three statements made by Mr. Goodwin in the

office action response regarding Burgess:

1. In fact, the *fishing line of Burgess* would have poor knot strength properties
   because of its braided construction;
2. The *property requirements for fishing line* yield a braid with poor knot strength
   and security, and the requirements for sutures yield a braid which has by necessity
   excellent knot strength and security;
3. Even if [a medical designer] *did use the teachings of the fishing line* art to modify
   a suture then he would inevitably design an unacceptable suture.

(Mitek Fact #102). Mr. Witherspoon incorrectly alleges that these statements are material

misrepresentations because they are allegedly inconsistent with Dr. Steckel's deposition

testimony about his work developing *sutures* and what would make "an acceptable *suture.*"

(Mitek Fact #115). But Dr. Steckel's testimony is not inconsistent with Mr. Goodwin's cited

statements. Mr. Goodwin's first cited statement is about the "fishing line of Burgess" (Mitek

Fact #102). Dr. Steckel's allegedly inconsistent statement is about sutures, not fishing line or

Burgess (Mitek Fact #115). Mr. Goodwin's second cited statement is about "the property

requirements for fishing line" (Mitek Fact #102). Dr. Steckel's cited testimony says nothing

about fishing lines, much less the property requirements for fishing lines (Mitek Fact #115). Mr.

Goodwin's third cited statement is about what a medical designer would do if he used the

teachings of the fishing line art to modify suture (Mitek Fact #102). Dr. Steckel's cited

testimony says nothing about what a medical designer would do if he used the teachings of fishing line art (Mitek Fact #115). In fact, there is no evidence that Dr. Steckel was familiar with fishing line properties or considered designing sutures from fishing lines (Mitek Fact #116 and #117). Nor is there any evidence that Dr. Steckel disagreed with Mr. Goodwin's argument that Burgess was nonanalogous art (Mitek Fact #118). Thus, there is no inconsistency between Mr. Goodwin's statements to the Patent Office and Dr. Steckel's work and no material. *Life Techs., Inc.*, 224 F.3d at 1326; *Akzo N.V.*, 808 F.2d at 1482. Accordingly, because there is no inconsistency, there was no misrepresentation, much less a material misrepresentation. In any event, Mr. Goodwin's advocacy in responding to an office action does not rise to the level of a misrepresentation. *CFMT,* 349 F.3d at 1342 (reversing finding of inequitable conduct as "clear error" where patent applicant's advocacy was at most an overstatement, not a misrepresentation).

Even Mr. Witherspoon, Arthrex's patent law expert, admitted that there was insufficient record evidence to conclude that Mr. Goodwin did anything wrong. Mr. Witherspoon carefully limited his opinions to stating that there "*may*" have been a violation of the duty of disclosure (Mitek Fact #119). He reaffirmed at his deposition that on the present record he could not formulate an opinion about whether there was inequitable conduct (Mitek Fact #120). Mr. Witherspoon admitted that "[b]ut I would be -- *I would not be inclined*, at this point, to say that they, in fact, did violate it, knowing only what I know now" (*id.*).

The evidentiary record is closed and Arthrex's evidentiary slate about Burgess, just as with Kaplan, is blank. Accordingly, Arthrex's inequitable conduct claim should be summarily dismissed.

### 2.     Arthrex's Allegations Regarding Burgess Should be Dismissed Because Arthrex Has No Evidence of Intent To Deceive

Even if Arthrex could establish materiality (and it cannot), Arthrex's claim also fails because it has no evidence that anyone substantively involved with the prosecution of Mitek's 446 Patent had any intent to deceive the Examiner with respect to Burgess. Intent is an essential and separate element of Arthrex's inequitable conduct defense. *M. Eagles Tool Warehouse,* 439 F.3d at 1340. Yet, Arthrex has no evidence of any intent to deceive, much less the required threshold level of intent. *Jumpsport*, 2006 U.S. App. LEXIS 18448 at *19 (Ex.A). Not only did Arthrex fail to plead any evidence of intent (Mitek Fact #121), but Arthrex failed to identify any evidence of intent to deceive in its responses to Mitek's interrogatories (Mitek Fact #122). Arthrex deposed the prosecuting attorneys, Mr. Goodwin and Mr. Woodrow, and co-inventor Dr. Steckel, and never identified any evidence of intent (Mitek Fact #123). Further, its experts have not pointed to any evidence of intent in connection with Burgess. Arthrex comes up short again of having clear and convincing evidence to submit to a trier of fact.

Not only is there is no evidence of any intent to deceive, there is evidence of good faith. Mr. Goodwin cited the Burgess reference to the Examiner (Mitek Fact #61). If Mr. Goodwin wanted to deceive the Examiner about Burgess – as Arthrex suggests – he would simply have not cited it at all. Arthrex's allegations defy common sense. Further, Dr. Steckel testified that he disclosed to the Examiner the information that Arthrex claims was allegedly withheld information[20] (Mitek Fact #124). Thus, as Dr. Steckel believed he disclosed, what Arthrex alleges was withheld, he could not have intended to deceive the Examiner.

---

[20]     There can also be no misrepresentation because the 446 Patent discloses Dr. Steckel's allegedly withheld testimony about polyethylene (Mitek Fact #125).

## XI.    CONCLUSION

Arthrex's and Pearsalls' inequitable conduct allegations are precisely the type of meritless allegations that the Federal Circuit has criticized as a "plague." No material information was withheld, and no material misrepresentations were made. The Examiner fully considered the references. Further, there is no evidence of intent to deceive. Summary judgment of Arthrex's inequitable conduct defenses and claims is warranted.

Dated: August 11, 2006

DEPUY MITEK, INC.,
By its attorneys,
 _/s/ Erich M. Falke_____
Dianne B. Elderkin
Lynn A. Malinoski
Michael J. Bonella
Erich M. Falke
WOODCOCK WASHBURN LLP
One Liberty Place - 46th Floor
Philadelphia, PA 19103
(215) 568-3100

Daniel J. Gleason (BBO #194900)
Michelle Chassereau Jackson (BBO #654825)
Nutter McClennen & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA. 02210-2604

## CERTIFICATE OF SERVICE

I certify that I am counsel for DePuy Mitek, Inc. and that true and correct copies of:

**DePuy Mitek, Inc.'s Motion for Summary Judgment of Infringement and No Inequitable Conduct; and**

**DePuy Mitek's Memorandum In Support of Its Motion for Summary Judgment of Infringement and No Inequitable Conduct; and**

**DePuy Mitek's Statement of Facts In Support of Its Motion for Summary Judgment of Infringement and No Inequitable Conduct**

were served on counsel for Defendants Arthrex, Inc. and Pearsalls Ltd. on this date via the Court's e-mail notification with the following recipients being listed as filing users for Defendants:

Charles W. Saber
Dickstein Shapiro
1825 Eye Street, NW
Washington, DC 2006
saberc@dicksteinshapiro.com

Raymond P. Ausrotas
Todd & Weld LLP
28 State Street, 31st Floor
Boston, MA 02109
rausrotas@toddweld.com

Dated: August 11, 2006                    /s/ Erich M. Falke_____
                                          Erich M. Falke

LEXSEE 2006 US APP LEXIS 18448

**JUMPSPORT, INC., Plaintiff-Appellant, v. JUMPKING, INC., ICON HEALTH AND FITNESS, INC., SAM'S WEST, INC. (doing business as Sam's Club), SAM'S EAST, INC. (doing business as Sam's Club), and GLOBAL SPORTS, INC., Defendants-Cross Appellants. and WAL-MART STORES, INC., Defendant-Cross Appellant, and AMWAY CORPORATION (now known as Alticor, Inc.), Defendant-Cross Appellant, and KMART CORPORATION, HEDSTROM CORPORATION, and HAMMACHER SCHLEMMER & CO., INC., Defendants.**

**05-1182, 05-1196, 05-1197**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

*2006 U.S. App. LEXIS 18448*

**July 21, 2006, Decided**

**PRIOR HISTORY:** *Jumpsport, Inc. v. Jumpking, Inc., 213 F.R.D. 329, 2003 U.S. Dist. LEXIS 4112 (N.D. Cal., 2003)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent holder filed an infringement action against defendants, competitors, a competitor's parent company, and retailers. The United States District Court for the Northern District of California granted summary judgments on contributory infringement and the validity of certain patent claims and entered judgment following a jury verdict on issues of infringement, validity, inventorship, and false advertising. The parties appealed.

**OVERVIEW:** The patent holder's invention was directed to a trampoline surrounded by a safety fence. The competitors manufactured trampoline enclosures. The jury's conclusion that an accused product did not infringe the patents was supported by substantial evidence because the patent claims required independent poles and the poles of the accused product were connected to each other in an inflexible manner. The jury's finding that the retailers were not liable for infringement was sufficiently supported because there was no evidence that the retailers induced infringement. The finding that another accused product infringed the patents was supported by substantial evidence because there was evidence that a competitor should have known that consumers would assemble the competitor's stand-alone enclosures around trampolines. The finding that claims requiring end caps on trampoline poles were not invalid due to obviousness was supported by substantial evidence because there

were no standards expressly requiring end caps on trampoline poles. The parent company was not liable for contributory infringement because there was no evidence that anyone purchased repair parts from the parent company.

**OUTCOME:** The court affirmed the district court's judgment in all respects.

**LexisNexis(R) Headnotes**

*Civil Procedure > Trials > Judgment as Matter of Law > General Overview*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
*Patent Law > Jurisdiction & Review > Standards of Review > De Novo Review*
[HN1] The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie. In the Ninth Circuit, both the grant and denial of a motion for judgment as a matter of law are reviewed de novo. Judgment as a matter of law requires that the court view the evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in favor of that party.

*Civil Procedure > Judgments > Relief From Judgment > Motions for New Trials*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*

*Patent Law > Jurisdiction & Review > Standards of Review > Abuse of Discretion*

[HN2] The denial of a motion for a new trial is a procedural issue not unique to patent law which the United States Court of Appeals for the Federal Circuit reviews under the law of the regional circuit where the appeal from the district court normally would lie. In the Ninth Circuit, a district court's order denying a motion for a new trial is reviewed for abuse of discretion.

*Patent Law > Jurisdiction & Review > Standards of Review > De Novo Review*
*Patent Law > Jurisdiction & Review > Standards of Review > Substantial Evidence*

[HN3] A determination of infringement is a question of fact that is reviewed for substantial evidence when tried to a jury. An invalidity determination based on anticipation is also a question of fact that is reviewed for substantial evidence following a jury verdict. The appellate court reviews a jury's conclusions on obviousness, a question of law, without deference, and the underlying findings of fact, whether explicit or implicit within the verdict, for substantial evidence.

*Patent Law > Inequitable Conduct > General Overview*
*Patent Law > Jurisdiction & Review > Standards of Review > Abuse of Discretion*
*Patent Law > Jurisdiction & Review > Standards of Review > Clearly Erroneous Review*

[HN4] The United States Court of Appeals for the Federal Circuit reviews a district court's ultimate determination of inequitable conduct for abuse of discretion and its threshold findings regarding materiality and intent to mislead for clear error. A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*Patent Law > Inequitable Conduct > Burdens of Proof*

[HN5] A patent may be rendered unenforceable for inequitable conduct if an applicant, with intent to mislead or deceive the examiner, fails to disclose material information or submits materially false information to the PTO during prosecution. The party asserting inequitable conduct must prove a threshold level of materiality and intent by clear and convincing evidence.

*Civil Procedure > Summary Judgment > Appellate Review > Standards of Review*

[HN6] The United States Court of Appeals for the Federal Circuit reviews a district court's grant of summary

judgment de novo, reapplying the standard applicable at the district court.

*Civil Procedure > Summary Judgment > Standards > General Overview*

[HN7] Summary judgment is appropriate when it has been shown that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Fed. R. Civ. P. 56(c)*.

*Patent Law > Infringement Actions > Infringing Acts > Contributory, Indirect & Induced Infringement*

[HN8] See *35 U.S.C.S. § 271(c)*.

*Patent Law > Infringement Actions > Infringing Acts > Contributory, Indirect & Induced Infringement*

[HN9] In order to succeed on a claim of contributory infringement, a plaintiff must show an act of direct infringement.

*Patent Law > Statutory Bars > Public Use Bar > Elements*

[HN10] *35 U.S.C.S. § 102(b)* provides that a person shall be entitled to a patent unless the invention was in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States. The United States Court of Appeals for the Federal Circuit has defined "public use" as including any use of the claimed invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor.

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
*Evidence > Procedural Considerations > Rulings on Evidence*

[HN11] The United States Court of Appeals for the Federal Circuit reviews evidentiary rulings of the district court, applying the law of the regional circuit. The Ninth Circuit reviews evidentiary rulings for abuse of discretion; to reverse, the United States Court of Appeals for the Federal Circuit must conclude both that the district court abused its discretion and that the error was prejudicial so that it more probably than not tainted the verdict.

**JUDGES:** [*1]    Before LOURIE, Circuit Judge, PLAGER, Senior Circuit Judge, and LINN, Circuit Judge.

**OPINIONBY:** LOURIE

**OPINION:** LOURIE, Circuit Judge.

JumpSport, Inc. ("JumpSport") appeals from the judgment of the United States District Court for the Northern District of California following a jury verdict in favor of Jumpking, Inc. ("Jumpking"), ICON Health and Fitness, Inc. ("ICON"), Sam's West, Inc. and Sam's East, Inc. (collectively "Sam's Club"), Global Sports, Inc. ("Global"), Alticor Corporation (formerly Amway Corporation) ("Alticor"), and Wal-Mart Stores, Inc. ("Wal-Mart") (collectively "defendants") of noninfringement of U.S. Patents 6,053,845 and 6,251,207 as to the FunRing-2 product, no willfulness as to infringement of valid claims, invalidity of certain claims of those patents, misjoined inventorship of Byron Bertsch, false advertising by JumpSport, and no damages for Jumpking's false advertising. JumpSport, Inc. v. Jumpking, Inc., No. C 01-4986 (N.D. Cal. Mar. 18, 2004) (Judgment); JumpSport, Inc. v. Jumpking, Inc., No. C 01-4986 (N.D. Cal. Mar. 18, 2004) (March 18, 2004 Order); JumpSport, Inc. v. Jumpking, Inc., No. C 01-4986 (N.D. Cal. Aug. 20, 2004)(Aug. 20, 2004 Order [*2] ); JumpSport, Inc. v. Jumpking, Inc., No. C 01-4986 (N.D. Cal. Nov. 23, 2004) (Nov. 23, 2004 Order). JumpSport also appeals from the district court's grant of ICON's motion for summary judgment that ICON was not liable for contributory infringement of the '845 and '207 patents, the district court's grant of the defendants' motion for summary judgment that claims 16 and 40 of the '207 patent were invalid because of anticipation, and the district court's admission into evidence of noninfringement letters received by Jumpking and ICON. JumpSport, Inc. v. Jumpking, Inc., No. C 01-4986 (N.D. Cal. Dec. 18, 2002) (Dec. 18, 2002 Order); JumpSport, Inc. v. Jumpking, Inc., No. C 01-4986 (N.D. Cal. June 2, 2003 Order).

Jumpking, ICON, Sam's Club, Global, Alticor, and Wal-Mart cross-appeal from the judgment of the district court following a jury verdict in favor of JumpSport of infringement of the '845 and '207 patents as to the FunRing-1 and JumpGuard products, no invalidity of certain claims of the '845 and '207 patents, no failure to join Gary Stoffer as a coinventor of the '845 and '207 patents, and no unenforceability of the '845 and '207 patents because [*3] of inequitable conduct. Judgment; August 20, 2004 Order; March 18, 2004 Order; Nov. 23, 2004 Order.

Because substantial evidence supports the jury's findings as to infringement, validity, inventorship, false advertising, and damages for false advertising, because the court did not err in holding that ICON is not liable for contributory infringement of the '845 and '207 patents and that claims 16 and 40 of the '207 patent were anticipated by the Curtis enclosure, and because the court did

not abuse its discretion in determining that the patents were not unenforceable and in admitting noninfringement letters received by Jumpking and ICON into evidence, we affirm.

BACKGROUND

The '845 and '207 patents, both entitled "Trampoline or the Like with Enclosure," have almost identical specifications, and were issued to JumpSport as assignee. The invention is directed to a trampoline surrounded by a safety fence extending above the rebounding surface. '845 patent, Abstract; '207 patent, Abstract. As recited in independent claim 1 of the patents, the safety enclosure is comprised of flexible material that is coupled to a system of independent poles and to the rebounding mat. [*4] '845 patent, col. 20, ll. 27-39; '207 patent, col. 20, ll. 21-34.

Jumpking manufactures and sells trampoline enclosures, including the FunRing-1 and FunRing-2 products. ICON is Jumpking's parent corporation. Hedstrom Corporation ("Hedstrom") also manufactures and sells trampoline enclosures, including the JumpGuard product. Sam's Club, Global, Wal-Mart, and Alticor (collectively the "retailer defendants") are retailers that sell the FunRing-1 and FunRing-2, and/or the JumpGuard products. On December 19, 2001, JumpSport filed a complaint against the defendants in the United States District Court for the Northern District of California alleging that the defendants infringed the '845 and '207 patents and asserting that Jumpking and ICON engaged in false advertising. The defendants filed counterclaims alleging invalidity of certain claims of the '845 and '207 patents and alleging unenforceability of those patents. Jumpking and ICON also asserted false advertising claims against JumpSport.

Prior to trial, the district court resolved two motions for summary judgment and issued a claim construction order. First, the court granted ICON's motion for summary judgment that ICON was not liable for [*5] contributory infringement. Dec. 18, 2002 Order, slip op. at 3. Second, the court granted the defendants' motion for summary judgment that claims 16 and 40 of the '207 patent were anticipated under § 102(b) because the Curtis enclosure was in public use more than a year before the patent application was filed. June 2, 2003 Order, slip op. at 4, 5, 9, 10. Third, the court issued a claim construction order adopting Jumpking's proposed definition of the claim term "independent poles" to mean "more than one structurally supportive member that is elongated and often cylindrical (or pieces of the same that connect together to form one pole) wherein each pole is not connected to another pole above the surface of the mat in a substantively inflexible manner." JumpSport, Inc. v. Jumpking, Inc., No. C 01-4986, slip op. at 1 (N.D. Cal. Aug. 21, 2003) (Claim Construction Order). See Jump-

Sport, Inc. v. Jumpking, Inc., No. C 01-4986 (N.D. Cal. July 18, 2003) (July 18, 2003 Order) (holding that Jump-Sport's statements in its prosecution history did not limit the meaning of "independent poles" to exclude U-shaped poles, and thus adopting JumpSport's proposed construction of [*6] that term).

On December 5, 2003, the jury returned a verdict on the issues of infringement, validity, inventorship, false advertising, and false advertising damages. First, the jury found that Jumpking's FunRing-1 product infringed claims 1, 7, 13, and 17 of the '845 patent and claims 5, 9, and 14 of the '207 patent, that Hedstrom's JumpGuard product infringed claims 1, 2, 7, 15, and 17 of the '845 patent and claims 9 and 10 of the '207 patent, that the infringement was not willful, and that the FunRing-2 product did not infringe either the '845 or the '207 patent. The jury also determined that the retailer defendants and ICON were not liable for infringement. Second, the jury found that claims 2, 3, 11, and 12 of the '845 patent and claims 1, 24, 25, 31, 32, 33, and 35 of the '207 patent were invalid because of anticipation, and that claims 29 and 38 of the '207 patent were invalid because of obviousness. Third, the jury made findings of fact that Donald Strasser was a co-inventor of the '845 and '207 patents and that Byron Bertsch, a listed inventor on the patents, was not a co-inventor of the '845 and '207 patents. Finally, the jury found that both Jumpking and JumpSport engaged [*7] in false advertising under the Lanham Act, but that neither party owed damages to the other party.

Following the jury verdict, the court held that the applicant for the '845 and '207 patents did not engage in inequitable conduct and those patents were thus not unenforceable. March 18, 2004 Order, slip op. at 11-12. The court also determined that both Jumpking and JumpSport engaged in false advertising under state law, and granted Jumpking's request for injunctive relief. Id., slip op. at 1-5. In addition, the court granted JumpSport's motion to correct inventorship to add Donald Strasser as an inventor and remove Byron Bertsch as an inventor of the '845 and '207 patents. Id., slip op. at 7-8.

The court entered a final judgment on March 18, 2004. Judgment, slip op. at 1. The court then ruled on the parties' post-trial motions for judgment as a matter of law and/or motions for a new trial as to false advertising, co-inventorship, ICON's liability for infringement, and invalidity. The court denied all those motions except for JumpSport's motion for a judgment as a matter of law that claims 2, 3, 11, and 12 of the '845 patent and claims 24, 25, 31, 33, and 35 of the '207 [*8] patent were not anticipated. August 20, 2004 Order; Nov. 23, 2004 Order.

JumpSport timely appealed and the defendants timely cross-appealed the district court's judgment. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

DISCUSSION

I. Jury Verdict

[HN1] "The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." Summit Tech., Inc. v. Nidek Co., 363 F.3d 1219, 1223 (Fed. Cir. 2004). In the Ninth Circuit, both the grant and denial of a motion for judgment as a matter of law are reviewed de novo. Lytle v. Carl, 382 F.3d 978, 982 (9th Cir. 2004); Horphag Research Ltd. v. Pellegrini, 337 F.3d 1036, 1040 (9th Cir. 2003). Judgment as a matter of law requires that "we view the evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in favor of that party." Id. (citation omitted). [HN2] "The denial of a motion for a new trial is a procedural issue not unique to patent law which we review under [*9] the law of the regional circuit where the appeal from the district court normally would lie." EMI Group N. Am., Inc. v. Cypress Semiconductor Corp., 268 F.3d 1342, 1347 (Fed. Cir. 2001). In the Ninth Circuit, a district court's order denying a motion for a new trial is reviewed for abuse of discretion. Magnussen v. YAK, Inc., 73 F.3d 245, 246 (9th Cir. 1996).

[HN3] A determination of infringement is a question of fact that is reviewed for substantial evidence when tried to a jury. TI Group Automotive Systems (N. Am.), Inc. v. VDO N. Am., L.L.C., 375 F.3d 1126, 1133 (Fed. Cir. 2004). An invalidity determination based on anticipation is also a question of fact that is reviewed for substantial evidence following a jury verdict. Id. We review a jury's conclusions on obviousness, a question of law, without deference, and the underlying findings of fact, whether explicit or implicit within the verdict, for substantial evidence. Id.

On appeal, JumpSport argues that the district court erred in not granting its motions for judgment as a matter of law and that the court abused its discretion in denying its motions for a new trial, asserting [*10] that (1) the FunRing-2 product infringes claims 1, 3, 12, 13, or 17 of the '845 patent and claim 14 of the '207 patent, (2) the FunRing-1 product infringes claim 12 of the '845 patent and claims 10, 25, 26, 28, 31, 33, 34, 35, and 37 of the '207 patent, (3) ICON induced infringement by the FunRing-1 product, (4) the retailer defendants are liable for infringement of the '845 and '207 patents, (5) claims 29 and 38 of the '207 patent are not invalid because of obviousness, (6) Byron Bertsch is a co-inventor of the '845 and '207 patents, (7) JumpSport did not engage in false advertising, and (8) JumpSport has proven that it suf-

fered damages from Jumpking's false advertising. In particular, JumpSport contends that the district court's construction of the claim term "independent poles" requires a finding that the FunRing-2 product infringes the '845 and '207 patents. The defendants respond that the court did not err in denying JumpSport's motions for judgment as a matter of law on infringement, validity, inventorship, false advertising, and false advertising damages, arguing that substantial evidence supports the jury verdict as to those issues, and that the court did not abuse its discretion [*11] in denying JumpSport's motions for a new trial.

On cross-appeal, Jumpking, ICON, Sam's Club, Global, and Wal-Mart argue that the district court erred in not granting its motions for judgment as a matter of law and/or that the court abused its discretion in denying its motions for a new trial, asserting that (1) claims 1, 7, and 17 of the '845 patent and claims 9 and 10 of the '207 patent are invalid on various grounds, (2) claim 3 of the '845 patent is invalid because of anticipation, (3) FunRing-1 does not infringe claim 13 of the '845 patent and claims 5 and 14 of the '207 patent, and (4) claims 26, 28, 34, and 37 of the '207 patent are invalid because of obviousness. Alticor and Wal-Mart further contend that the court erred in not granting its motions for judgment as a matter of law and/or the court abused its discretion in denying its motions for a new trial, asserting that (1) claims 1, 7, 15, and 17 of the '845 patent are invalid, (2) claims 2 and 11 of the '845 patent are invalid because of anticipation, (3) the JumpGuard product does not infringe claims 9 and 10 of the '207 patent, and (4) Gary Stoffer should have been named a co-inventor on the '845 and '207 patents. JumpSport [*12] responds that the court did not err in denying the defendants' motions for judgment as a matter of law on infringement, validity, and inventorship, arguing that substantial evidence supports the jury verdict as to those issues, and that the court did not abuse its discretion in denying the defendants' motions for a new trial.

We conclude that substantial evidence supports the jury verdict as to infringement, validity, inventorship, false advertising, and damages for false advertising. In addition, although we have considered the parties' arguments on those issues, we conclude that the district court did not abuse its discretion in denying the parties' motions for a new trial on the issues of infringement, validity, and false advertising. Despite the excessive and undue multiplication of the issues on appeal, we will discuss them individually.

Turning first to infringement, we agree with the defendants that ample evidence exists in the record to support the verdict that FunRing-2 does not infringe the '845 and '207 patents. The asserted claims of the '845 and '207 patents require "independent poles," which the district court construed to mean "more than one structurally supportive [*13] member that is elongated and often cylindrical (or pieces of the same that connect together to form one pole) wherein each pole is not connected to another pole above the surface of the mat in a substantively inflexible manner." Claim Construction Order, slip op. at 1 (emphases added). That definition was proposed by JumpSport, and is not challenged by JumpSport on appeal. Because Jumpking presented evidence at trial that the poles in the FunRing-2 product are connected to each other in an "inflexible manner," substantial evidence supports the jury's conclusion that FunRing-2 does not infringe the '845 and '207 patents.

We also agree with the defendants that substantial evidence supports the jury's verdict that ICON did not induce infringement of the FunRing-1 product. Viewing the evidence in the light most favorable to the defendants, a jury could have reasonably concluded that JumpSport failed to prove that ICON had the requisite knowledge so as to be liable for inducement of infringement. We also agree with the defendants that substantial evidence supports the jury's verdict that the FunRing-1 product does not infringe additional claims of the asserted patents, viz. [*14], claim 12 of the '845 patent and claims 10, 25, 26, 28, 31, 33, 34, 35, and 37 of the '207 patent.

In addition, we agree with the defendants that substantial evidence supports the jury's verdict that the retailer defendants are not liable for infringement of the '845 and '207 patents. JumpSport's only proof of direct infringement by the retailer defendants was testimony by JumpSport's expert based on raw sales data that were never shown to the jury. Moreover, JumpSport did not introduce any evidence on any retailer defendants' induced infringement. Accordingly, we affirm the judgment that the retailer defendants are not liable for infringement.

Further, we agree with JumpSport that substantial evidence supports the jury's finding that the FunRing-1 product infringes the '845 and '207 patents. The record contains evidence that stand-alone FunRing-1 enclosures were sold to consumers, and that Jumpking knew or should have known that consumers would assemble the enclosures around trampolines. Viewing that evidence in the light most favorable to JumpSport, a reasonable jury could have concluded that Jumpking's sales of FunRing-1 induced infringement.

Turning next to validity, we agree [*15] with JumpSport that substantial evidence supports the jury's finding that claims 1, 7, 15, 17 of the '845 patent and claims 9 and 10 of the '207 patent were not invalid. The defendants argue that the claims requiring end caps on the trampoline poles were rendered obvious by ASTM

standards requiring mats on trampoline frames covering the springs and the covering of open tubing on home playground equipment. However, none of the ASTM standards expressly requires end caps on trampoline poles. We thus affirm the conclusion that invalidity of those claims was not shown.

Similarly, we reject the defendants' assertion that claims 31, 33, and 35 of the '207 patent are invalid because of obviousness. For the reasons already stated, it would not have been obvious to put end caps around the trampoline poles. Further, it would not have been obvious to use resilients heaths on the trampoline poles because the ASTM standards require padding of the steel frame of the trampoline, not the trampoline poles. We also reject the defendants' assertions that claims 2, 3, and 11 of the '845 patent were not invalid for anticipation. Further, the defendants' motion for a new trial on validity was conditional, [*16] and none of those conditions was met.

In addition, we affirm the court's judgment that claims 29 and 38 of the '207 patent are invalid because of obviousness. JumpSport argues that those obviousness conclusions are invalid as a matter of law because of alleged inconsistencies in the jury verdict form. The jury indicated on the verdict form that claims 3, 11, and 12 of the '845 patent and claims 24 and 25 of the '207 patent would have been obvious in addition to being anticipated, even though the verdict form expressly instructed the jury to determine obviousness only for those claims that were not found to be invalid for anticipation. That inconsistency was harmonized, however, when the district court disregarded the jury's answers as to those claims, first granting the defendants' motion for judgment as a matter of law that there was no anticipation of those claims, and then granting JumpSport's motion for judgment as a matter of law that the JumpGuard product infringed claim 11 of the '845 patent. Because the district court did not abuse its discretion in ignoring the jury's answers as to whether claims 3, 11, and 12 of the '845 patent and claims 24 and 25 of the '207 patent [*17] would have been obvious, we uphold the jury verdict of obviousness as to claims 29 and 38 of the '207 patent. Further, as noted, the defendants' motion for a new trial on that issue was conditional, and none of those conditions was met.

On the issue of inventorship, we agree with the defendants that substantial evidence supports the jury's finding that Bertsch was not a co-inventor of the '845 and '207 patents, and we agree with JumpSport that substantial evidence supports the jury's finding that Stoffer was omitted as a co-inventor of those patents. Finally, we agree with the defendants that substantial evidence supports the jury's verdict that JumpSport engaged in false advertising and that JumpSport suffered no damages

from Jumpking's false advertising. Viewing the evidence in the light most favorable to Jumpking, a reasonable jury could have concluded that JumpSport did not demonstrate a sufficient nexus between the statements and any monetary damages. Accordingly, we affirm the judgment of JumpSport's false advertising and no damages for Jumpking's false advertising.

## II. Inequitable Conduct

[HN4] We review a district court's ultimate determination of inequitable conduct [*18] for abuse of discretion, and its threshold findings regarding materiality and intent to mislead for clear error. *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp., 267 F.3d 1370, 1379 (Fed. Cir. 2001).* "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S. Ct. 525, 92 L. Ed. 746 (1948).*

On cross-appeal, the defendants argue that the district court abused its discretion in holding that there was no inequitable conduct. The defendants point out that the court failed to address the materiality of the withheld references. JumpSport responds that the district court's decision should be affirmed because there was no clear and convincing evidence of intent, and the references were not material.

We agree with JumpSport that the district court did not abuse its discretion in determining that there was no inequitable conduct. [HN5] "A patent may be rendered unenforceable for inequitable conduct if an applicant, with intent to mislead or deceive the examiner, fails to disclose [*19] material information or submits materially false information to the PTO during prosecution." *Digital Control, Inc. v. Charles Mach. Works, 437 F.3d 1309, 1313 (Fed. Cir. 2006).* "The party asserting inequitable conduct must prove a threshold level of materiality and intent by clear and convincing evidence." Id. Here, the district court found that there was no clear and convincing evidence of a culpable intent by the applicant to withhold references. Based on the record, we conclude that that finding was not clearly erroneous. Further, the court's failure to determine the materiality of the withheld references was not legal error because intent is a "separate and essential component of inequitable conduct." *GFI, Inc. v. Franklin Corp., 265 F.3d 1268, 1274 (Fed. Cir. 2001)* (quoting *Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 552 (Fed. Cir. 1990)).* Accordingly, the court did not abuse its discretion in holding that the '845 and '207 patents were not unenforceable for inequitable conduct.

## III. Summary Judgment

[HN6] We review a district court's grant of summary judgment de novo, reapplying the standard applicable [*20] at the district court. *Rodime PLC v. Seagate Tech., Inc., 174 F.3d 1294, 1301 (Fed. Cir. 1999)*. [HN7] Summary judgment is appropriate when it has been shown "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *Contract Mgmt., Inc. v. Rumsfeld, 434 F.3d 1145, 1146 (9th Cir. 2006)*.

On appeal, JumpSport argues that the district court erred in granting ICON's motion for summary judgment that ICON was not liable for contributory infringement because ICON's sales of replacement parts did not constitute "permissible repair." JumpSport also contends that the court erred in granting the defendants' motion for summary judgment that the Curtis enclosure was in public use and anticipated claims 16 and 40 of the '207 patent because Curtis maintained control of the enclosure, it was located in his backyard, and he did not commercialize it.

ICON responds that the district court correctly held that there was no genuine issue of material fact regarding whether ICON was liable for contributory infringement. ICON concedes that the court [*21] erroneously relied on the doctrine of permissible repair, but asserts that that error was harmless because there was no evidence that anyone actually purchased FunRing repair parts using ICON's website. In addition, the defendants argue that the court did not err in granting the defendants' motion for summary judgment that the Curtis enclosure was in public use and anticipated claims 16 and 40 of the '207 patent because there was corroborated evidence that Curtis did not put any restrictions on access to the trampoline, including its enclosure.

We agree with ICON that there was no genuine issue of material fact that ICON was not liable for contributory infringement. [HN8] *35 U.S.C. § 271(c)* provides that "[w]hoever offers to sell or sells within the United States . . . a component of a patented machine, manufacture, combination or composition . . . constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer." [HN9] In order to succeed on a claim [*22] of contributory infringement, the plaintiff must show an act of direct infringement. *Golden Blount, Inc. v. Robert H. Peterson Co., 365 F.3d 1054, 1061 (Fed. Cir. 2004)* (citations omitted). Here, JumpSport did not introduce any evidence of direct infringement, viz., that anyone purchased repair parts using ICON's website, and used those parts to engage in direct infringement. Accordingly, we affirm

the court's grant of ICON's motion for summary judgment of no contributory infringement.

We also agree with the defendants that there was no genuine issue of material fact regarding whether the Curtis enclosure anticipated claims 16 and 40 of the '207 patent. [HN10] *35 U.S.C. § 102(b)* provides that "[a] person shall be entitled to a patent unless . . . the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." "We have defined 'public use' as including 'any use of [the claimed] invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor.'" *Lough v. Brunswick Corp., 86 F.3d 1113, 1119 (Fed. Cir. 1996)* [*23] (citations omitted). Here, there is no question that Curtis did not limit, restrict, or oblige to secrecy the persons in the neighborhood who used his trampoline enclosure, and therefore it was in public use. Moreover, while Curtis maintained control of the trampoline in his backyard, he did not control access to it or make any effort to keep it confidential. Because JumpSport concedes that if the Curtis enclosure is considered to have been in public use, claims 16 and 40 of the '207 patent are invalid, we thus affirm the court's grant of the defendants' motion for summary judgment.

### IV. Evidentiary Ruling

[HN11] We review evidentiary rulings of the district court, applying the law of the regional circuit. *Sulzer Textil A.G. v. Picanol N.V., 358 F.3d 1356, 1363 (Fed. Cir. 2004)*. The Ninth Circuit reviews evidentiary rulings for abuse of discretion; to reverse, we must conclude both that the district court abused its discretion and that the error was prejudicial so that it more probably than not tainted the verdict. *McEuin v. Crown Equip. Corp., 328 F.3d 1028, 1032 (9th Cir. 2003)*.

On appeal, JumpSport argues that the district court abused its [*24] discretion in admitting into evidence noninfringement letters received by Jumpking and ICON. According to JumpSport, those letters were not probative of willfulness and were unduly prejudicial. Jumpking and ICON respond that the noninfringement letters served to confirm prior oral opinions and were relevant to the "totality of circumstances" in showing good faith.

We agree with Jumpking and ICON that the district court did not abuse its discretion in admitting the noninfringement letters in evidence. Because the written letters confirmed the conclusion of an earlier oral opinion that the FunRing-1 and FunRing-2 products did not infringe the '207 patent and/or the patent was likely invalid, they were relevant to the willfulness inquiry. To the extent the letters exceeded the scope of the oral opinions that they were purported to confirm, the general counsel for

2006 U.S. App. LEXIS 18448, *

Jumpking and ICON testified that it was because new information had become available in the meantime. Moreover, because JumpSport was able to cross-examine both the general manager of Jumpking and the general counsel for Jumpking and ICON concerning the differences between the oral and written opinions, the admission of the [*25] letters was not prejudicial. Accordingly, the court acted within its discretion in admitting the letters.

We have considered the parties' remaining arguments and find them to be unpersuasive. If we have not expressly dealt with any of the argued issues in this opinion, it is not because we have failed to consider it. We have considered all issues that were raised in the voluminous briefs and found none that justify a reversal.

CONCLUSION

Because the jury verdict as to infringement, validity, inventorship, and false advertising was supported by substantial evidence, we affirm the district court's judgment on those issues. We also affirm the court's grant of ICON's motion for summary judgment that ICON is not liable for contributory infringement of the '845 and '207 patents, and the court's grant of the defendants' motion for summary judgment that claims 16 and 40 of the '207 patent were invalid. In addition, we affirm the court's determination of no inequitable conduct and its admission of noninfringement letters received by Jumpking and ICON into evidence as within the court's discretion. In sum, we affirm the district court's judgment in all respects.