# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **DePuy Mitek, Inc.**<br>    **a Massachusetts Corporation** | ) ) ) | |
|     **Plaintiff,** | ) ) | |
|     **v.** | ) ) | **Civil No. 04-12457 PBS** |
| **Arthrex, Inc.**<br>    **a Delaware Corporation and** | ) ) ) | |
| **Pearsalls Ltd.**<br>    **a Private Limited Company**<br>    **of the United Kingdom** | ) ) ) ) | |
|     **Defendants.** | ) ) | |

**DePuy Mitek's Memorandum in Support of it Motion to Strike Arthrex's Reliance
On Its Own Interrogatory Contentions and Dr. Mukherjee's TigerWire Opinions In
Opposition to DePuy Mitek's Motion For Summary Judgment of
<u>Infringement and No Inequitable Conduct</u>**

# Table of Contents

I.      Arthrex's Reliance On Its Contention Interrogatory Responses Should Be
        Stricken ........................................................................................................ 1

        A.      Defendants' Interrogatory Responses Are Inadmissible Hearsay Under
                FED. R. EVID. 801(c) ........................................................................... 1

        B.      Defendants' Interrogatory Responses Are Inadmissible Because They Do
                Not Qualify As Expert Testimony ......................................................... 2

II.     Dr. Mukherjee's Opinion That TigerWire's Nylon Materially Affects Pliability Is
        Inadmissible Because It Lacks A Reliable Method And Foundation ................................ 3

        A.      Dr. Mukherjee's TigerWire "Drape" and "Feel" Tests Are Inadmissible
                Because He Did Not Conduct Any Such Tests ........................................ 4

        B.      Dr. Mukherjee's TigerWire/Pliability Opinion Should Be Excluded
                Because It Is Scientifically Unreliable ................................................. 5

                1.      Legal Standards For Admitting Dr. Mukherjee's "Drape" Test &
                        Pliability Opinions ...................................................................... 5

                2.      Dr. Mukherjee Admits That His "Drape" Test Does Not Satisfy
                        *Daubert's* Admissibility Standards .......................................... 6

                3.      Dr. Mukherjee Admitted That He Relied On the Wrong Nylon
                        Data ................................................................................................ 8

                4.      Dr. Mukherjee's Opinion Regarding Nylon's Effects Is Not Based
                        On A Reliable Methodology or Foundation ............................... 9

III.    Conclusion ........................................................................................................ 12

## Table of Authorities

### Federal Cases

*Albert v. Warner-Lambert Co.*,
 234 F. Supp. 2d 101 (D. Mass 2002) ..........................................................................10

*Amorgianos v. Amtrak*,
 303 F.3d 256 (2nd Cir. 2002)......................................................................................9

*Celebrity Cruises, Inc. v. Essef Corp.*,
 434 F. Supp. 2d 169 (S.D. N.Y. 2006).........................................................................11

*Daubert v. Merrell Dow Pharms., Inc.*,
 509 U.S. 579 (1993).......................................................................................... *passim*

*Duff v. Lobdell-Emery Manufacturing Co.*,
 926 F. Supp. 799 (N.D. Ind. 1996) ..............................................................................2

*GE v. Joiner*,
 522 U.S. 136 (1997).....................................................................................................5

*Garside v. Osco Drug, Inc.*,
 895 F.2d 46 (1st Cir. 1990)...........................................................................................2

*Kumho Tire Co. v. Carmichael*,
 526 U.S. 137 (1999)......................................................................................................5

*Morrow v. Wal-Mart Stores, Inc.*,
 152 F.3d 559 (7th Cir. 1998) ........................................................................................2

*United States of America v. Rodriguez-Felix*,
 450 F.3d 1177 (10th Cir 1998) .....................................................................................8

### Federal Statutes

Fed. R. Civ. P. 26(b) ...........................................................................................................2

Fed. R. Evid. 104 ................................................................................................................1, 5

Fed. R. Evid. 104(a) ............................................................................................................1, 5

Fed. R. Evid. 702 ................................................................................................................2, 5, 10, 11

Fed. R. Evid. 801(c) ............................................................................................................2

Fed. R. Evid. 801(d)(2).......................................................................................................2

## I.    Arthrex's Reliance On Its Contention Interrogatory Responses Should Be Stricken

In opposing Mitek's motion for summary judgment of infringement, Arthrex argues that its FiberWire products do not infringe because "tipping" has a material affect on the novel and basic characteristics of the invention claimed in Mitek's U.S. Patent No. 5,314,446. Arthrex also argues that the reverse doctrine of equivalents applies. The only evidentiary support that Arthrex cites to is defendants' responses to Mitek's contention interrogatories (Arthrex SJ Opp. at 8 *citing to* Arthrex SJ Opp. Exs. 14 and 15).[1] But defendants' contention interrogatory responses are not admissible by Arthrex because they are hearsay, attorney argument, and essentially expert testimony from unqualified counsel. As the proponent of the evidence, Arthrex bears the burden of proving its admissibility under FED. R. EVID. 104(a) by a preponderance of the evidence. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 593 n.10 (1993). Arthrex cannot sustain that burden here. Therefore, defendants interrogatory responses (Arthrex SJ Opp. Exs. 14 and 15) and Arthrex's reliance on them (Arthrex SJ Opp. at 8-9; Arthrex Response to Mitek Facts 12, 16, 20, 21, 22, 34, 37, and 38) should be stricken.

### A.    Defendants' Interrogatory Responses Are Inadmissible Hearsay Under FED. R. EVID. 801(c)

In opposing Mitek's motion for summary judgment of infringement, Arthrex relies on defendants' responses to contention interrogatories to prove the truth of the matter regarding the effects of tipping FiberWire and how FiberWire operates relative to the claimed invention (Arthrex SJ Opp. at 8 *citing to* Arthrex SJ Opp. Exs. 14 and 15). But Arthrex's offering of its

---

[1]    "Arthrex SJ Opp." refers to "Defendants' Opposition to DePuy Mitek's Motion for Summary Judgment of Infringement and No Inequitable Conduct." "Arthrex SJ Opp. Ex." refers to the exhibits to "Defendants' Opposition to DePuy Mitek's Motion for Summary Judgment of Infringement and No Inequitable Conduct." "Arthrex Response to Mitek Fact" refers to "Defendants' Responses to DePuy Mitek's Statement of Undisputed Material Facts In Support of Its Motion for Summary Judgment of No Inequitable Conduct." This memorandum is supported by Mitek's Exhibits which are attached hereto and cited as "Ex. #."

own interrogatory responses for the truth of the matter asserted is hearsay as defined in FED. R. EVID. 801(c) and should be stricken. *Garside v. Osco Drug, Inc*., 895 F.2d 46, 50 (1st Cir. 1990) (citing cases; affirming district court's holding that interrogatory responses are inadmissible hearsay on summary judgment); *Duff v. Lobdell-Emery Mfg. Co*., 926 F. Supp. 799, 803 (N.D. Ind. 1996) (granting motion to strike party's reliance on its own interrogatory answers).

Interrogatory responses may be admissible as nonhearsay under FED. R. EVID. 801(d)(2) if they qualify as an admission by a party-opponent. But Arthrex's reliance on defendants' interrogatory responses does not qualify as an admission by a party-opponent. Thus, Arthrex may not admit or rely on defendants' responses to contention interrogatories, as evidence on summary judgment or at trial, because it is well-established that "hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment." *Garside*, 895 F.2d at 50; *see also Morrow v. Wal-Mart Stores, Inc.,* 152 F.3d 559, 563 (7th Cir. 1998) ("hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial").

### B.    Defendants' Interrogatory Responses Are Inadmissible Because They Do Not Qualify As Expert Testimony

FED. R. EVID. 702 and FED. R. CIV. P. 26(b) set forth very specific requirements for expert testimony. Defendants' contention interrogatory responses raise issues regarding tipping, the effect of tipping on the novel and basic characteristics of the invention, and the reverse doctrine of equivalents. All of these issues are properly the subject of expert testimony and are properly subject to the requirements set forth in the Federal Rules. But Arthrex's counsel is not qualified to provide expert testimony and should not be able to evade the admissibility requirements for expert testimony that are set forth in FED. R. EVID. 702 and FED. R. CIV. P. 26(b).

**II.     Dr. Mukherjee's Opinion That TigerWire's Nylon Materially Affects Pliability Is Inadmissible Because It Lacks A Reliable Method And Foundation**

TigerWire is basically identical to FiberWire accept that it has a nylon marker band that is substituted for one PET yarn (Ex. 1 at 31:24-32:16; 79:17-80:4; 106:20-25), and does not have blue dye.  Arthrex admits that the purpose of the black nylon marker band is to provide TigerWire with a striped black and white look, so that it is visually identifiable by a surgeon (Ex. 2 at 74:21-76:5).  Nevertheless, Arthrex opposes Mitek's summary judgment motion by alleging that there is no infringement because Dr. Mukherjee has opined that the nylon marker band materially affects TigerWire's pliability (Arthrex SJ Opp. at 7, n.5; Arthrex Response To Mitek Facts 40-45, *citing to* Arthrex SJ Opp. Ex. 6 at 30-31).  Mitek moves to strike this opinion as lacking a reliable foundation and methodology.

In his rebuttal expert report, Dr. Mukherjee describes "drape" and "feel" tests, certain nylon material properties, and unidentified, hearsay statements that allegedly support his opinion that TigerWire does not infringe Mitek's 446 Patent.  But Arthrex has a problem because Dr. Mukherjee never performed these so-called drape and feel tests on TigerWire, per his own deposition testimony, and thus, they cannot be admissible evidence here.  Dr. Mukherjee's "drape" test is further inadmissible because Dr. Mukherjee admitted that it is not scientifically reliable.  Also, Dr. Mukherjee's opinion based on material properties is inadmissible because he admittedly relied on the wrong material properties.  Finally, his opinion based on unsupported, hearsay statements is contradicted by Arthrex's own admissions, which he failed to consider.  Thus, Dr. Mukherjee's "opinions" about TigerWire are not based on any scientifically reliable methodology and should be stricken.

**A.     Dr. Mukherjee's TigerWire "Drape" and "Feel" Tests Are
        Inadmissible Because He Did Not Conduct Any Such Tests**

Dr. Mukherjee admitted that he never performed any "drape" or "feel" tests on

TigerWire.   Therefore, any opinion predicated on such tests is unsupported and should be

stricken.

According to Dr. Mukherjee, drape tests involve draping a suture over his "extended

index finger and observing the degree to which the suture conforms to the shape of" his finger

(Ex. 3 at 27).  Although Dr. Mukherjee reported a TigerWire "drape" test in his rebuttal report

(*id*. at 31), he admitted at his deposition that he had never conducted such a test:

> Q.    Let me ask a better question.  Did you do
>       a drape test of any other FiberWire or TigerWire
>       samples in forming your opinions?
> A.    No.
>
> Q.    You saw a TigerWire suture, you said?
> A.    Yeah, it was shown there in the -- the –
>       the booth.
> Q.    But you didn't do a drape test –
> A.    No.
> Q.    -- of the TigerWire?
>       Did Mr. Tamburo give you TigerWire samples
>       to do a drape test?
> A.    No.
> Q.    Did you do a drape test of TigerWire while
>       Mr. Tamburo was present?
> A.    No, no.  TigerWire, I wouldn't have done
>       anything.

 (Ex. 4 at 515:5-8; 515:18-516:5).

Dr. Mukherjee also states in his report that he "felt" TigerWire, but again at his

deposition, he could only remember "seeing" TigerWire and admitted that he had not done

anything with TigerWire (*id*. at 515:13-20; 516:4-5; 122:7-124:17).[2]

---

[2]     Significantly, Arthrex misstates Dr. Mukherjee's opinion in its response to Mitek Facts
40-45.  According to Arthrex, Dr. Mukherjee stated that "nylon *would* adversely affected [sic]

The fact that Dr. Mukherjee did not produce any TigerWire samples in response to a subpoena requesting all tested samples is further evidence that he did not perform any such tests (Ex. 5 at Things to Be Produced Request No. 1).  Dr. Mukherjee only produced two FiberWire samples in response to the subpoena (Ex. 4 at 511:16-20).  According to Dr. Mukherjee those are the only two samples that he tested (Ex. 4 at 509:7-15; 511:16-20).[3]

Thus, as Dr. Mukherjee did not actually perform the tests described in his report, they should be stricken.

### B.    Dr. Mukherjee's TigerWire/Pliability Opinion Should Be Excluded Because It Is Scientifically Unreliable

#### 1.    Legal Standards For Admitting Dr. Mukherjee's "Drape" Test & Pliability Opinions

In order for expert testimony to be admissible it must satisfy FED. R. EVID. 702.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999);  *Daubert,* 509 U.S. at 589.  Under *Daubert*, this Court acts as a "gatekeeper," excluding "junk science" that does not meet the standards of reliability required under Rule 702.  *GE v. Joiner*, 522 U.S. 136, 142 (1997).  The trial court accomplishes this goal through a preliminary determination that the proffered evidence is both reliable and relevant under FED. R. EVID. 104(a).  FED. R. EVID. 104 advisory committee's note; *Daubert*, 509 U.S. at 589-95.

Scientific evidence is deemed reliable if the principles and methodology used by the expert proffering it are grounded in methods of science.  *Id.* at 592-95.  A non-exhaustive list of factors for determining whether scientific testimony is sufficiently reliable to be admitted into evidence, include:

---

knot tie-down" (Arthrex Response To Mitek Fact 40).  But Dr. Mukherjee merely opined that the feel "*would suggest* that the addition of the nylon would adversely affect knot tie-down" (Arthrex Ex. 6 at 31).  Arthrex conspicuously omits the word "suggest."

[3]    The only other option is that Dr. Mukherjee disposed of the samples.  If that is the case, the spoliation of evidence is a further ground for exclusion.

(1)    whether the scientific theory or technique can be (and has been) tested;
(2)    whether the theory or technique has been subject to peer review and publication;
(3)    whether there is a known or potential error rate;
(4)    the existence of standards controlling the technique's operation; and
(5)    the level of the theory's or technique's acceptance within the relevant discipline.

*Id.* at 593-94.

In addition to considering reliability, the Court must assess whether the principles and methods have been properly applied to the facts of the case. *Id*. at 593. As the proponent of Dr. Mukherjee's testimony, Arthrex bears the burden of establishing that his testimony is admissible by a preponderance of the evidence. *Id.* at 593, n.10.

### 2.    Dr. Mukherjee Admits That His "Drape" Test Does Not Satisfy *Daubert's* Admissibility Standards

Even if Dr. Mukherjee had conducted a TigerWire drape test, which he did not, it would be inadmissible because Dr. Mukherjee admitted that his drape tests are not scientifically reliable. At his deposition, Dr. Mukherjee was cross-examined by providing him with two *FiberWire* samples and asking him to conduct his drape test. After extensive cross-examination about the subjective nature of his drape test, Dr. Mukherjee admitted no less than *eight times* that drape tests are scientifically unreliable:

Q.    Now, the drape test that you performed, is
there any literature that describes drape tests?
A.    No, this is just a very subjective test.
And I just wanted to get a feel for that. That's why
I did. *It's not scientific.*

Q.    Okay. Did -- have you ever -- did you
consider -- in your analysis, did you ask what the
history of the Exhibits 364 and 365 sutures were, how
they were handled before you got them?
A.    No, I didn't. This is just a curiosity
for my sake. That's what I did, so I was not – *it
was not a scientific*, just done -- I just wanted to
know, because I had suture experience, just to see
what it looked like.

A.      And, you know, I also look at this part,
        whether it's really conforming to this side of the
        finger.
Q.      Okay.
*A.      Again, this is very subjective,
        scientific -- not a scientific --*
Q.      Okay.
A.        -- test.

Q.      Did you factor in your analysis how far
        down the suture hangs from either side, whether it had
        to be equal or not?
A.      I -- I -- I tried to do it equal.
Q.      Okay.
A       *And again, it's an unscientific*, it's a –
        it's just a feel of the suture and my point of view.
Q.      Uh-huh.
A.      Get a feel what the suture looked like.

Q.      Well, you just did.  You just changed the
        position of your hand and that changed how it
        conformed, right?
A.      Well, no, I don't think so.
Q.      You did.  You rotated your hand.
A.      *Again, this is a very --*
*A.      -- subjective --*
*A.      -- nonscientific --*
Q.      Okay.
A.      -- test.

Q.      Okay.  And you agree this isn't a
        scientific test?
*A.      I -- I -- I'm repeating.  This is not a
        scientific.  It's my way to look at the sutures --*
Q.      Okay.
A.      -- what I feel like, that's all.
Q.      Now, if you adjust the suture in your hand
        could that change how it conforms?
A.      I will not guess on anything.  *This is not
        a scientific test,* this is just to get a feel.  *I have
        to rely on Dr. Burks' report and Norman Gitis' report,
        more scientific basis to show the difference.  This is
        no way to make a conclusion.  This is a nonscientific
        test.*

(Ex. 4 at 509:16-20; 513:7-16; 517:3-10; 518:19-519:2; 521:17-522:4; 523:3-17) (emphasis

added) (objections omitted).  Dr. Mukherjee further admitted that his "drape" test was not subject

to peer review, which is another *Daubert* indication that his test should not be admitted:

> Q.    Now, the drape test that you performed, is
> there any literature that describes drape tests?
> A.    No, this is just a very subjective test.
> And I just wanted to get a feel for that.  That's why
> I did.  It's not scientific.

(*id*. at 509:16-20);  *United States of America v. Rodriguez-Felix*, 450 F.3d 1117, 1126 (10th Cir

1998).  In fact, Dr. Mukherjee's "drape" test is so speculative that he admitted that he did not

even consider whether a draped suture would still confirm to the shape of his hand in the same

way, if he moved his hand:

> Q.    Okay.  If you change the position of the
> suture in your hand can that change how it conforms –
> A.    I -- I cannot --
> Q.    -- to your hand?
> A     I cannot comment on that because those are
> not things I -- I considered.
> Q.    You didn't?
> A.    No.

(Ex. 4 at 523:19-524:3) (objection omitted).  Also, Dr. Brookstein criticized Dr. Mukherjee's

drape test as not being scientifically valid for a number of reasons (Ex. 6 at ¶53), and that

testimony was not rebutted.  Accordingly, Dr. Mukherjee's TigerWire "drape" test should not be

admitted.

> ### 3.    Dr. Mukherjee Admitted That He Relied On the Wrong Nylon Data

Dr. Mukherjee also opined that TigerWire's nylon marker band materially affected

pliability because it is allegedly stiffer than the FiberWire PET yarn that it replaced and allegedly

has a different diameter.  But Dr. Mukherjee's opinion was based on the wrong data.  Dr.

Mukherjee relied on the properties of nylon 6,6 "molding compound" (Ex. 3 at 30 *citing to* Ex.

26).  But to do so was scientifically unacceptable because TigerWire uses nylon fiber, not nylon

molding compound (Ex. 1. at 79:25-80:4; Ex. 4 at 526:4-7).  Dr. Mukherjee admitted that nylon

molding compound properties are not the same as those for nylon fibers (Ex. 4 at 476:5-477:4).[4]

    As he cannot, Dr. Mukherjee failed to show that nylon molding compound properties are

comparable to fiber properties.  Further, Dr. Mukherjee provided no peer-review, accepted

theory or technique that permits citing molding compound properties in place of fiber properties

for suture applications.  Dr. Brookstein opined that fiber properties differ from Dr. Mukherjee's

cited molding compound properties, and it is improper to use nylon "molding compound"

properties for nylon fiber properties absent some explanation as to why they apply (Ex. 6 at

¶¶57, 58).  Thus, Dr. Mukherjee's opinion that TigerWire's nylon materially affects pliability

based on molding compound properties has no scientific basis or valid methodology and fails

*Daubert's* admissibility test.  *Daubert*, 509 U.S. at 592-93;  *Amorgianos v. Amtrak*, 303 F.3d

256, 268 (2nd Cir. 2002) (affirming exclusion of expert testimony where expert omitted relevant

data in calculations).

### 4.    Dr. Mukherjee's Opinion Regarding Nylon's Effects Is Not Based On A Reliable Methodology or Foundation

    Once Dr. Mukherjee's tests and incorrect data are stripped away, Dr. Mukherjee's

noninfringement TigerWire opinion rests solely on the following proposition --  "Mr. Benavitz

also informed me that Arthrex has received customer feedback that TigerWire is more stiff than

FiberWire" (Ex. 3 at 31).  But Dr. Mukherjee's supposed opinion based on Mr. Benavitz'

---

[4]    Dr. Mukherjee's analysis is further flawed because even if it were proper to use molding compound properties, Dr. Mukherjee's data shows no significant difference because the flexural modulii of PET and nylon have extensive overlap (Ex. 3 at Ex. 26).  According to Dr. Mukherjee's incorrect data, the flexural modulus of PET compounds range from 350,000 to 450,000 psi, and nylon's ranges from 410,000 to 470,000 psi. (*id.*).  Dr. Mukherjee provides no explanation as to why changing one strand of PET to nylon would have a material effect when the properties are about the same, even under his incorrect data.

statements is inadmissible because Dr. Mukherjee testified that he did not rely on Mr. Benavitz's statements:

> Q.    Did anything you discussed with him form or
>        impact your opinions at all?
> A.    No.

(Ex. 4 at 124:15-17).

Further, even if Dr. Mukherjee did rely on Mr. Benavitz's statements, his opinion should be excluded because his reliance on Mr. Benavitz's statements to the exclusion of other relevant evidence does not satisfy *Daubert's* requirement that expert opinions be based on a reliable foundation and FED. R. EVID. 702's requirement that expert opinions be based on "sufficient facts or data." *Daubert,* 509 U.S. at 589-590, 597; *Albert v. Warner-Lambert Co*., 234 F. Supp. 2d 101, 104 (D. Mass 2002). Dr. Mukherjee's and Mr. Benavitz's conversation was less than 5 minutes and took place at a conference (Ex. 4 at 122:7-124:5). While supposedly relying on this conversation, Dr. Mukherjee ignored the most pertinent evidence on the issue -- whether substituting one nylon yarn for one PET yarn materially affects pliability -- which was Mr. Dreyfuss' testimony (Ex. 7; Ex. 4 at 134:3-24). Mr. Dreyfuss is Arthrex's engineering manager for its upper extremity products (Ex. 1 at 5:11-13). As Arthrex's Rule 30(b)(6) witness,[5] Mr. Dreyfuss testified that TigerWire and FiberWire have essentially the same feel:

> Q.    Other than the visual distinction that you can
>        see with the introduction of a nylon marking strand, does
>        the nylon marking strand in TigerWire affect any other
>        characteristic of the braided suture?
> A.    Yes.
> Q.    What is -- what?
> A.    *Minute differences in its feel and strength,*
>        *characteristics*.

---

[5]    Ex. 1 at 8:16-9:5 (testifying as to Topic Nos. 1-3 in Mitek's Third Amended Notice, Ex. 8, which include, *inter alia*, design and development of TigerWire, the materials used in TigerWire, and the reasons for selecting TigerWire's materials and structure).

(Ex. 2 at 75:6-14).  Mr. Dreyfuss further testified that TigerWire and FiberWire have "very similar knot strength, tensile strength, [and] *handleability*,"[6] and are very similar in "*all of* the characteristics that define FiberWire" (*id.* at 76:2-5) (emphasis added).  Because Dr. Mukherjee supposedly relies on Mr. Benavitz's statements without considering Mr. Dreyfuss' testimony and the proper material properties, his opinion fails to satisfy *Daubert's* and FED. R. EVID. 702's reliability requirements.

The nature of Mr. Benavitz's "statements" highlight that they are an unreliable basis for Dr. Mukherjee's opinion.  Mr. Benavitz's statements are:

- unidentified (statements from customers to him or other marketing persons and then to him);
- double or even triple hearsay;
- lack any supporting documentation; and
- not authenticated.

Dr. Mukherjee never analyzed the context of these statements, who actually made them, how many such statements were made, or anything about the statements.  He makes no mention that he considered or relied on any documents regarding customer feedback about TigerWire's stiffness.  Arthrex did not even identify Mr. Benavitz in its Rule 26 Initial Disclosures as someone knowledgeable about the issues in this case, and he was never deposed.  Mr. Benavitz's self-serving statements first came to light in Dr. Mukherjee's March expert report.  Relying on only such unidentifiable, self-serving statements from Arthrex, ignoring Mr. Drefyuss' testimony, and relying on the wrong material property data to support noninfringement does not satisfy *Daubert's* requirement that the opinion rest on a reliable foundation and FED. R. EVID. 702's requirement that expert opinions be based on "sufficient facts or data."  *Celebrity Cruises,*

---

[6]    Arthrex asserts that pliability is included within handleability (Defendants' Memorandum In Support of Defendant's Arthrex, Inc.'s and Pearsalls, Ltd.'s Motion For Summary Judgment at 4).

*Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 181 (S.D. N.Y. 2006) (excluding expert testimony that ignored relevant information and was not properly justified).

## III.    Conclusion

Defendants' contention interrogatory answers are inadmissible hearsay, incompetent evidence, and unqualified expert testimony.  Therefore, defendants interrogatory responses (Arthrex SJ Opp. Exs. 14 and 15) and Arthrex's reliance on them in opposing Mitek's Summary Judgment motion (Arthrex SJ Opp. at 8-9; Arthrex Response to Mitek Facts 12, 16, 20, 21, 22, 34, 37, and 38) should be stricken.

Dr. Mukherjee's opinion with respect to TigerWire and pliability is based on tests that were not performed and an unreliable methodology.  Accordingly, Arthrex's reliance on it in opposing Mitek's motion for summary judgment of infringement should be stricken, which includes striking:

- Arthrex's reliance on Dr. Mukherjee's opinions (Arthrex's SJ Opp. at 5, n.7);
- Arthrex's SJ Opp. Ex. 6 at 30-31; and
- Arthrex's Responses to Mitek Facts 40-45.


Date:  September 15, 2006                DEPUY MITEK, INC.,
                                         By its attorneys,

                                          /s/ Erich M. Falke_____
                                         Dianne B. Elderkin
                                         Lynn A. Malinoski
                                         Michael J. Bonella
                                         Erich M. Falke
                                         WOODCOCK WASHBURN LLP
                                         One Liberty Place - 46th Floor
                                         17th and Market Streets
                                         Philadelphia, PA 19103
                                         (215) 568-3100

Daniel J. Gleason (BBO #194900)
Michelle Chassereau Jackson (BBO 654825)
NUTTER MCCLENNEN & FISH LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA. 02210-2604
(617) 439-2000

## CERTIFICATE OF SERVICE

I certify that I am counsel for DePuy Mitek, Inc. and that a true and correct copy of:

**DePuy Mitek's Memorandum in Support of it Motion to Strike Arthrex's Reliance On Its Own Interrogatory Contentions and Dr. Mukherjee's TigerWire Opinions In Opposition to DePuy Mitek's Motion For Summary Judgment of Infringement and No Inequitable Conduct**

was served on counsel for Defendants Arthrex, Inc. and Pearsalls Ltd. on this date via the Court's e-mail notification with the following recipients being listed as filing users for Defendants:

> Charles W. Saber
> Dickstein Shapiro
> 1825 Eye Street, NW
> Washington, DC 2006
> saberc@dicksteinshapiro.com


> Raymond P. Ausrotas
> Todd & Weld LLP
> 28 State Street, 31st Floor
> Boston, MA 02109
> rausrotas@toddweld.com


Dated: September 15, 2006                    _/s/ Erich M. Falke_____
                                             Erich M. Falke

# EXHIBIT 1

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

1

2

3  DePuy Mitek, Inc., a
   Massachusetts Corporation,

4

5       Plaintiff,

6       vs.                          CIVIL ACTION
                                     NO. 04-12457 PBS
7  Arthrex, Inc., a Delaware
   Corporation,

8       Defendant.

9  _____/

10

11 DEPOSITION OF:        PETER DREYFUSS

12 DATE:                 September 16, 2005

13 TIME:                 8:59 a.m. to 1:54 p.m.

14 LOCATION:             The Ritz-Carlton Golf Resort
                         2600 Tiburon Drive
15                       Naples, FL   34112

16 TAKEN BY:             Plaintiff

17 REPORTER:             Deborah A. Krotz, RPR, CRR

18 VIDEOGRAPHER:         Les Smoak, CLVS

19

20

21

22

23

24

25

**Page 2**

1 APPEARANCES:
2 For the Plaintiff:    ERICH M. FALKE, ESQ.
       and ANGELA VERRECCHIO
3         Woodcock Washburn, LLP
          One Liberty Place, 46th Floor
4         Philadelphia, PA 19103
5 For the Defendant:    SALVATORE P. TAMBURO, ESQ.
       Dickstein, Shapiro,
6         Morin & Oshinsky, LLP
          2101 L Street NW
7         Washington, DC 20037-1526
8         JOHN W. SCHMIEDING, ESQ.
          General Counsel
9         Arthrex, Inc.
          1370 Creekside Boulevard
10        Naples, FL 34108-1945
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1        THE COURT REPORTER:  This is the videotaped
2  deposition of Peter Dreyfuss taken by the plaintiff
3  in the case of DePuy Mitek, Inc. versus Arthrex,
4  Inc., Civil Action No. 04-12457 PBS.
5        We are at The Ritz-Carlton, 2600 Tiburon Drive,
6  Naples, Florida.  Today is September 16th, 2005.  The
7  time is now 8:59 a.m.
8        At this time, would counsel please -- Oh, I'm
9  sorry.
10       The videographer is Les Smoak.  My name is Debbie
11 Krotz; I am the court reporter with the firm of Donovan
12 Court Reporting.
13       At this time, would counsel please state their
14 appearances for the record.
15       MR. FALKE:  Erich Falke and Angie Verrecchio for
16 Plaintiff, DePuy Mitek.
17       MR. TAMBURO:  Sal Tamburo and John Schmieding for
18 Defendant, Arthrex, Inc.
19 THEREUPON,
20            PETER DREYFUSS,
21 a witness, having been first duly sworn, upon his oath,
22 testified as follows:
23            DIRECT EXAMINATION
24 BY FALKE:
25   Q.  Good morning.

**Page 3**

1        I N D E X
2 WITNESS:                    PAGE:
3 PETER DREYFUSS
4 DIRECT EXAMINATION              4
 BY FALKE:
5
6
       E X H I B I T S
7
8
  EXHIBIT    DESCRIPTION    PAGE:
9
 DePuy Mitek    drawing by Peter Dreyfuss of    65
10 Exhibit No. 117   Twisting Process for Core
       Production of FiberWire
11 DePuy Mitek    drawing of Peter Dreyfuss    71
 Exhibit No. 118   Approximate Braiding Process
12 DePuy Mitek    drawing of Peter Dreyfuss    76
 Exhibit No. 119   Partial Schematic of 8-carrier
13       Braiding Machine
 DePuy Mitek    drawing of Peter Dreyfuss of    91
14 Exhibit No. 120   Coating Process Schematic
 DePuy Mitek    drawing of Peter Dreyfuss of    97
15 Exhibit No. 121   the Approximate Cross-Section
       of Arthrex 2-0 FiberWire
16 DePuy Mitek    the Approximate Cross-Section    100
 Exhibit No. 122   of No. 2 FiberWire
17       of No. 2 FiberWire
 DePuy Mitek    drawing of Peter Dreyfuss of    103
18 Exhibit No. 123   the Approximate Cross-Section
       of Size 0 FiberWire
19 DePuy Mitek    drawing of Peter Dreyfuss of    103
 Exhibit No. 124   the Approximate Cross-Section
20       of Size 3-0 FiberWire
 DePuy Mitek    drawing of Peter Dreyfuss of    104
21 Exhibit No. 125   the Approximate Cross-Section
       of Size 4-0 FiberWire
22 DePuy Mitek    drawing of Peter Dreyfuss of    106
 Exhibit No. 126   the Approximate Cross-Section
23       of Size 2 TigerWire
 DePuy Mitek    Technical File Arthrex    107
24 Exhibit No. 127   FiberWire Volume 2
 DePuy Mitek    drawing of Peter Dreyfuss of    110
25 Exhibit No. 128   the Approximate Cross-Section
       of 2mm FiberTape

**Page 5**

1   A.  Good morning.
2   Q.  Could you please state your name for the record.
3   A.  Peter Dreyfuss.
4   Q.  Could you also state your address for the record,
5 please.
6   A.  2417 Kings Lake Boulevard, Naples, Florida.
7   Q.  Are you currently employed, Mr. Dreyfuss?
8   A.  Yes, I am.
9   Q.  And who are you employed with?
10  A.  Arthrex.
11  Q.  And what is your position at Arthrex?
12  A.  I'm the Engineering Manager for Upper Extremity
13 Products.
14  Q.  Have you ever been deposed, Mr. Dreyfuss?
15  A.  No, I have not.
16  Q.  I'm just going to go over a few of the ground
17 rules just so we're all on the same page.  You've taken an
18 oath to answer the questions truthfully; do you understand
19 that?
20  A.  Yes.
21  Q.  And if you could answer all my questions verbally
22 rather than maybe a shake of the head or a nod of the
23 head; that way, the Court reporter can take down what you
24 say -- excuse me -- as opposed to your actions.
25  A.  Yes.

2 (Pages 2 to 5)

**6**

1 Q. Okay. Do you understand today that you're here
2 to testify on behalf of Arthrex as a corporation as
3 opposed to Peter Dreyfuss, individually?
4 A. Yes.
5 Q. Okay. Is there any reason today you can think of
6 why you can't give honest testimony?
7 A. No.
8 Q. Also, throughout the day, we'll be taking breaks,
9 generally about once every hour, but if there's some point
10 between an hour period that you need to take a break,
11 please feel free to say you need to take a break, and
12 we'll try to accommodate you as soon as we can.
13 A. Thanks.
14 Q. Okay. What did you do to prepare for today's
15 deposition?
16 A. I reviewed the designership files for the
17 FiberWire product. I met with John and Sal and a few
18 other people at Arthrex to refresh topic memory.
19 I attempted to contact Don Grafton on several
20 phone calls, and I was unable to get through to him.
21 Q. You mentioned that you met with John Schmieding
22 right?
23 A. Yes.
24 Q. And Sal Tamburo?
25 A. Yes.

**7**

1 Q. And you also mentioned others. What others did
2 you meet with to prepare for today's deposition?
3 A. Tara Schaneville. She's an engineer at Arthrex,
4 and she's our -- she's new. She's our textiles expert.
5 Q. Okay. And what was her name? Tara?
6 A. Tara, Tara. She's Tara Schaneville.
7 Q. Schaneville?
8 A. Yes.
9 Q. Okay. And also, one other thing for background,
10 if -- there are going to be questions that I ask you that
11 you're going to be able to anticipate the end of my
12 question by what I say at the beginning of the question.
13 If you could just pause and wait until I finish the
14 question before answering, it'll help the court reporter
15 make a clean transcript. And also, it'll give your
16 counsel an opportunity to object to my questions. But if
17 he does object, you still have an obligation to answer the
18 question unless he instructs you not to answer based on a
19 few different grounds; do you understand that?
20 A. Yes.
21 Q. Okay. On how many occasions did you meet with
22 Tara, John, Sal to prepare for today's deposition?
23 A. With Tara, two occasions, specifically for this
24 deposition.
25 Q. And how long were those two occasions?

**8**

1 A. One was a meeting that she was in with John and
2 Sal and the other --
3 MR. TAMBURO: Chuck Saber.
4 A. -- Chuck Saber. The meeting was approximately
5 two -- two to three hours.
6 Q. Okay.
7 A. And then I spoke with her for about 20 minutes
8 subsequent to that.
9 Q. Okay. I'd like to show you Exhibit 100 which is
10 in front of you. It's DePuy Mitek's Third Amended Notice
11 of Deposition of Arthrex, Inc. Have you seen Exhibit 100
12 before?
13 A. This?
14 Q. Yes.
15 A. No, I haven't.
16 Q. Okay. If you turn to Page 4 of Exhibit 100, do
17 you understand that you're here to testify today on behalf
18 of the corporation Arthrex with respect to Topics 1, 2,
19 and 3 on Page 4 of Exhibit 100?
20 A. Yes. I have seen this -- this page of the
21 document before.
22 Q. You've seen this page but not --
23 A. Right.
24 Q. Okay. But you understand that you're here to
25 testify on behalf of Arthrex for Topics 1, 2, and 3 of

**9**

1 this notice?
2 A. Yes.
3 Q. Okay. And do you feel that you are knowledgeable
4 to discuss Topic 1 of Exhibit 100?
5 A. Yes.
6 Q. Do you feel that you are the most knowledgeable
7 person at Arthrex to testify on behalf of Topic No. 1 in
8 Exhibit 100?
9 A. Yes.
10 Q. Do you feel knowledgeable about testifying to
11 Topic No. 2 in Exhibit 100?
12 A. Yes.
13 Q. Do you feel that you're the most knowledgeable at
14 Arthrex, the testimony related to Topic No. 2 in
15 Exhibit 100?
16 A. No. Possibly.
17 Q. Who might, other than you, at Arthrex be the most
18 knowledgeable to discuss Topic No. 2 in Exhibit 100?
19 A. Tara Schaneville.
20 Q. And Topic No. 3, do you feel you're knowledgeable
21 to talk about Topic No. 3 in Exhibit 100?
22 A. Yes.
23 Q. Do you feel you're the most qualified person at
24 Arthrex to testify in response to Topic No. 3 in
25 Exhibit 100?

3 (Pages 6 to 9)

30

1   A.  Yes.
2   Q.  Is it true then that the No. 2 FiberWire used in
3 AR-7201 has the same braiding as any Arthrex product that
4 has a No. 5 FiberWire in it?
5   A.  Yes.
6   Q.  Is it true then that the No. 2 FiberWire used in
7 AR-7201 has the same braiding as any Arthrex product that
8 has a No. 2-0 FiberWire in it?
9   A.  Yes.
10   Q.  Is it true then that the No. 2 FiberWire used in
11 AR-7201 has the same braiding as any Arthrex product that
12 has a 0 FiberWire in it?
13   A.  I believe so.
14   Q.  Is it true then that the No. 2 FiberWire used in
15 AR-7201 has the same braiding as any Arthrex product that
16 has a 2 -- Strike that.  Let me rephrase that.
17       Is it true then that the No. 2 FiberWire used in
18 AR-7201 has the same braiding as any Arthrex product that
19 has a 3-0 FiberWire in it?
20   A.  I don't know.
21   Q.  And who would know that?
22   A.  Tara Schaneville.
23   Q.  Okay.  Is it true then that the No. 2 FiberWire
24 used in AR-7201 has the same braiding as any Arthrex
25 product that has a 4-0 FiberWire used in it?

31

1   A.  I don't know.
2   Q.  And Tara would also know that?
3   A.  Correct.
4   Q.  Okay.  Other than the No. 2, 5, 0, 2-0, 3-0, and
5 4-0, are there any other size FiberWires sold by Arthrex?
6   A.  Yes.
7   Q.  Okay.  What other sizes of FiberWire other than
8 2, 5, 0, 0-2, 0-3 -- Yeah, strike that.
9       What other sizes other than 5, 2, 0, 2-0, 3-0,
10 and 4-0 are sold by Arthrex?
11   A.  A FiberTape.
12   Q.  Okay.  Anything else?
13   A.  No.
14   Q.  And is the braid of TigerWire different than the
15 braid used in the No. 2 FiberWire?
16       MR. TAMBURO:  Object to the form.
17   Q.  Do you understand the question?
18   A.  Yes.
19   Q.  Okay.
20   A.  Yes.
21   Q.  They are different?
22   A.  The braid in -- I'm sorry.  Please rephrase or
23 repeat.
24   Q.  Sure.  Sure.  Is the braid in any Arthrex
25 TigerWire different than the braid used in Arthrex's No. 2

32

1 FiberWire?
2   A.  The braid, no.
3   Q.  Are the materials used in any Arthrex TigerWire
4 different than the braid -- than the materials used in
5 Arthrex's No. 2 FiberWire?
6       MR. TAMBURO:  Object to the form.
7   A.  Yes.
8   Q.  And how are they different?
9   A.  There is a strand -- one carrier of PET is
10 replaced by one carrier of nylon.
11   Q.  Is that only difference in the braid between
12 Arthrex's TigerWire products of any size and Arthrex's No
13 2 FiberWire?
14   A.  Yes.
15   Q.  So the coating is the same; is that right?
16   A.  Yes.
17   Q.  And the coating used on all Arthrex FiberWire
18 products, TigerWire products is MED-2174; right?
19   A.  Yes.
20   Q.  Has any other coating been used by Arthrex at any
21 time to coat any of Arthrex's FiberWire products or
22 TigerWire products?
23   A.  No.
24       MR. FALKE:  Sal, during the course of the break,
25   do you think you could try to contact Tara Schaneville

33

1   to try to find the answer to I think the three
2   questions of 2-0, 3-0 --
3       MS. VERRECCHIO:  No, not 2-0.
4       MR. FALKE:  Not 2-0.  Right.  3-0, 4-0, and 0
5   just to find out if the braid used in those sizes is
6   the same as No. 2.
7       MR. TAMBURO:  The same as No. 2?
8       MR. FALKE:  Right.
9       MR. TAMBURO:  Sure.
10       MR. FALKE:  Thanks.
11       Why don't we -- Can we take a break now and try
12   to find out, because that will help out.
13       MR. TAMBURO:  Sure.
14       VIDEOGRAPHER:  Going off the record.  We're off
15       (A short break was held from 9:46 a.m. to 9:58
16   a.m.)
17       VIDEOGRAPHER:  Back on the record.
18   BY MR. FALKE:
19   Q.  Over the break, did you have a chance to talk to
20   Tara Schaneville?
21   A.  Yes.
22   Q.  Is the No. 0 FiberWire constructed -- Strike
23   that.
24       Is the No. 0 FiberWire braided the same was as
25   the No. 2 FiberWire in AR-7201?

9 (Pages 30 to 33)

78

1 like the carriers alternate between ultra high molecular
2 weight polyethylene and PET; is that right?
3    A.  Yes, to my knowledge.
4    Q.  Okay.  Good.  I think we're finished with that
5 for now.  Could you initial and date that, please.
6        And maybe, if it's correct, label that with
7 Arthrex FiberWire 2-0, 3-0, and 4-0.  And if you want to
8 put behind the 4-0 no core, that would be great, if it's
9 accurate.
10       Okay.  Now can we try to draw the braiding for
11 Arthrex's No. 0 FiberWire suture that has 12 carriers?
12       I think ultimately what I'm trying to get at is I
13 understand that with the eight-carrier braid of 2-0, 3-0,
14 and 4-0 FiberWire, the carriers alternate, PET, ultra high
15 molecular weight polyethylene, PET, and so on and so
16 forth?
17   A.  Yes.
18   Q.  Is that alternating configuration the same for
19 the braiding used with 12 carriers on the No. 0 FiberWire
20 suture?
21   A.  Yes.
22   Q.  Okay.  And is that alternating configuration of
23 PET and ultra high molecular weight polyethylene the same
24 for the 16-carrier braid of Arthrex's No. 2 FiberWire
25 suture?

79

1    A.  Yes.
2    Q.  Okay.  So there's never an instance then in any
3 manufacture of any Arthrex FiberWire suture where two
4 carriers next to each other are the same material; is that
5 right?
6    A.  I believe so.
7    Q.  Okay.  So it's never like four carriers of PET,
8 then four carriers of PET, and then carriers of -- you
9 know -- so on?
10   A.  I -- I believe so.
11   Q.  Okay.  Okay.  How many carriers are used in the
12 manufacturing of Arthrex's TigerWire sutures?  And that
13 includes TigerTail, as well.
14   A.  Sixteen.
15   Q.  Sixteen?
16   A.  (Witness nods head affirmatively).
17   Q.  Okay.  And how is -- Is the carrier configuration
18 any different in the braiding and manufacturing of the No.
19 2 TigerWire versus the No. 2 FiberWire?
20   A.  No.  Configuration?
21   Q.  Right.
22   A.  No.
23   Q.  Okay.  Okay.  But how are they different then?
24   A.  Material.
25   Q.  Right.  In what way are the materials different

80

1 between the Arthrex TigerWire sutures and the Arthrex
2 FiberWire -- No. 2 FiberWire sutures?
3    A.  One carrier of PET is replaced with a -- one yarn
4 of PET is replaced with a yarn of nylon.
5    Q.  And what type of nylon is used in Arthrex's
6 TigerWire and TigerTail products?
7    A.  I'm not sure.
8    Q.  Okay.  Okay.
9        Okay.  I think we've been talking about the ARM
10 8784 braiding process; is that right?
11   A.  Correct.
12   Q.  And other than the FiberTape, have we already
13 discussed the braiding process for every other Arthrex
14 FiberWire suture?
15   A.  Yes.
16   Q.  Okay.  Okay.  Then after we have done the
17 braiding on ARM 8784, as I understand this, the sutures
18 are coming out the top, out of the page; right?
19   A.  (Witness nods head affirmatively).
20   Q.  And the middle of the core, for those FiberWire
21 sutures that have a core, the core comes straight up, and
22 then these carriers kind of form like a cone coming out;
23 right?
24   A.  Correct.
25   Q.  And it's pulled out, and then we have the maypole

81

1 effect?
2    A.  Correct.
3    Q.  Do you know how fast the -- or at what speed the
4 yarn is being or the suture is being braided?
5    A.  It's quite slow.  It would be maybe -- maybe like
6 1 to 2 feet per minute.  Maybe a little more, but slow
7 would be a term.
8    Q.  Okay.  And then if we go down to the next step on
9 ARM 8784, it says wind to skein.
10   A.  Skein.
11   Q.  Do you know what that means?
12   A.  I assume it's some sort of a -- another term for
13 a different spool of some sort.
14   Q.  Okay.  So as the suture -- the braided suture
15 comes out of the braiding process, it's wound around
16 another spool?
17   A.  A takeup, yes, part or piece.
18   Q.  As we talked about the braiding process so far in
19 the use of ultra high molecular weight polyethylene and
20 PET, are those materials different colors with respect to
21 any of the FiberWire sutures?
22   A.  I'm sorry.  Say it again.
23   Q.  Sure.  I'm wondering what color are the yarns
24 made of the ultra high molecular weight polyethylene and
25 the PET?

21 (Pages 78 to 81)

106

1   Q.  Okay.  Now what I'd like you to draw is a
2 cross-section of Arthrex's TigerWire suture.
3   A.  Okay.  Which size?  Actually, there's --
4   Q.  That's a good question.  How many sizes of
5 TigerWire are there?
6   A.  No, technically, there's only one.
7   Q.  Okay.  Is that a No. 2 size?
8   A.  Correct.
9   Q.  Okay.  So just to rephrase, can you please draw a
10 No. 2 TigerWire as sold by Arthrex?
11   A.  (Witness complying).
12   Q.  And I'm going to mark your drawing of No. 2
13 TigerWire as sold by Arthrex with DePuy Mitek Exhibit 126.
14       (DePuy Mitek Exhibit No. 126, drawing of Peter
15   Dreyfuss of the Approximate Cross-Section of Size 2
16   TigerWire, was marked for identification.)
17   Q.  Do you know how many carriers are in the Arthrex
18 No. 2 TigerWire?
19   A.  Sixteen.
20   Q.  Sixteen.  So the configuration of the sheath or
21 cover in Arthrex's No. 2 TigerWire is exactly the same as
22 the sheath or cover as Arthrex's No. 2 FiberWire with the
23 exception that one of the PET carriers has been replaced
24 with a black nylon carrier?
25   A.  Correct.

107

1   Q.  Okay.  So the sheath has alternating yarns made
2 up of ultra high molecular weight and polyester or PET
3 with the exception of one carrier that is black nylon?
4   A.  Correct.
5   Q.  Okay.  And the adjacent yarns in the sheath are
6 in contact with each other in the same intertwining manner
7 as Exhibits 125, 124, 123, 122, and 121?
8   A.  Correct.
9   Q.  Okay.  All right.  Thank you.
10       Okay.  Now I'd like to talk about FiberTape.
11 Could you explain to me the process that Pearsalls goes
12 through to manufacture FiberTape from the stage of
13 individual yarns?
14       Actually -- Do you know what?  I might have a
15 document here that would help you out.
16       I'm going to show you what's being marked as
17 DePuy Mitek Exhibit 127.  It's a document with Bates
18 numbers ARM 8847 through 9091.
19       One is double-sided; one isn't.  That one goes to
20 Sal.  No.  I'm sorry.  That one goes to Sal.
21       Okay.  We're talking about Exhibit No. 127.
22       (DePuy Mitek Exhibit No. 127, Technical File
23   Arthrex FiberWire Volume 2, was marked for
24   identification.)
25   Q.  Have you seen Exhibit 127 before?

108

1   A.  Not to my knowledge, no.  Not ...
2   Q.  If you could turn to Page ARM 9003.  Now you can
3 -- I'm sorry; it's the page before also, ARM 9002.
4       I'm going to ask the question again.  If you need
5 to reference this page, go right ahead.  Can you explain
6 to me the process that Pearsalls goes through to
7 manufacture Arthrex's FiberTape?
8   A.  In short, a tape component is -- They use the --
9 a braiding machine.  But the carriers are configured in
10 such a way that the braids don't -- the ends of the
11 carriers don't actually cross, and, therefore, it's an
12 open braid which, when it's taken up on the takeup spool,
13 it flattens out, makes a tape.  That tape is then
14 incorporated -- stitched into a piece of FiberWire suture
15 along its length with a length of -- the length of
16 FiberWires on the ends which have no tape.  The middle
17 portion of the construct is FiberWire and FiberTape
18 interstitched, and the ends and the FiberTape ends within
19 the FiberWire, and then there's ends of FiberWire outside
20 of that.
21   Q.  Okay.  So does Arthrex's FiberTape include an
22 Arthrex No. 2 FiberWire suture?
23   A.  Yes.
24   Q.  And does it include the Arthrex FiberWire No. 2
25 suture as depicted in Exhibit 122?

109

1   A.  Yes.
2   Q.  Can you just draw for me, please, the
3 cross-section of an Arthrex FiberWire Tape as --
4   A.  Can I -- May I simplify it?  Representative of
5 FiberWire and tape without all ...
6   Q.  Sure.  You can start about that, and if I'm
7 confused or need more, then I'll let you know.  But you
8 can start with that.
9       MR. TAMBURO:  I'm going to object to this line of
10   questioning regarding FiberTape as outside the scope
11   of the notice, which seems to be limited to FiberWire
12   sutures.
13       MR. FALKE:  Well ... I think we defined in our
14   first set of either documentary requests or
15   Interrogatories as FiberWire including FiberWire or
16   any product that includes FiberWire, but your
17   objection is -- you know -- it's your objection.
18       MR. TAMBURO:  I thought I heard a different
19   definition today of FiberWire suture that would not
20   include FiberWire Tape.
21       MR. FALKE:  Right.  But I think the notice was
22   probably using the definitions of the other discovery,
23   not necessarily definitions of mine, but --
24       MR. TAMBURO:  Fine.  I just wanted to note my
25   objection.

28 (Pages 106 to 109)

# EXHIBIT 2

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DePuy Mitek, Inc., a
Massachusetts Corporation,

    Plaintiff,

    vs.                   CIVIL ACTION
                      NO. 04-12457 PBS

Arthrex, Inc., a Delaware
Corporation,

    Defendant.
_____/


CONTINUATION
DEPOSITION OF:    PETER DREYFUSS

DATE:             December 7, 2005

TIME:             8:03 a.m. to 1:21 p.m.

LOCATION:        The Staybridge Suites
                 4805 Tamiami Trail North
                 Naples, FL

TAKEN BY:        Plaintiff

REPORTER:        Deborah A. Krotz, RPR, CRR

VIDEOGRAPHER:    Michael Sturdevant, CLVS

74

1 Q. And if you see in the second paragraph, second
2 sentence, it says, "The Black/White Suture commonly known
3 as TigerWire has a blend of nylon and the ultra high
4 molecular weight polyethylene." Do you see that?
5 A. Yes.
6 Q. And if you skip a sentence, it says, "In place of
7 the nylon, a silk suture will be used." Do you see that?
8 A. Yes, I do.
9 Q. Is the only difference between Arthrex's
10 TigerWire and Arthrex's FiberWire with silk is the silk
11 suture is used in place of the nylon marker strand in
12 Arthrex's TigerWire product; is that right?
13 MR. SABER: Object; vague and confusing question.
14 Q. Do you understand the question?
15 A. I understand, I believe, from what I read here
16 that that is true.
17 Q. And the last time we were here, you described the
18 design and construction of the TigerWire product. Do you
19 remember that?
20 A. Yes, I understand that.
21 Q. What is the purpose of the nylon marking strand
22 in Arthrex's TigerWire product?
23 A. Identification. Visual identification.
24 Q. Is there any other purpose to the nylon marking
25 strand in Arthrex's TigerWire product?

75

1 A. That's the primary purpose. I'm not sure if
2 there's secondary purposes, per se.
3 Q. Does the introduction of a nylon marking strand
4 in the TigerWire product affect any of the physical
5 characteristics of the TigerWire product?
6 A. Affect in --
7 Q. Other than the visual distinction that you can
8 see with the introduction of a nylon marking strand, does
9 the nylon marking strand in TigerWire affect any other
10 characteristic of the braided suture?
11 A. Yes.
12 Q. What is -- what?
13 A. Minute differences in its feel and strength,
14 characteristics.
15 Q. But you would describe them as minute
16 differences?
17 A. Not enough to cause it not to become a product.
18 Q. Can you explain that?
19 A. It's --
20 Q. In other words, the introduction of the nylon
21 marking strand doesn't affect any of the marketing
22 qualities or engineering qualities that make FiberWire
23 FiberWire; does that make sense?
24 MR. SABER: Objection; vague.
25 A. It -- They are comparable.

76

1 Q. But they show -- But a No. 2 TigerWire, for
2 instance, and a No. 2 FiberWire show very similar knot
3 strength, tensile strength, handleability, and what not,
4 all of the characteristics that define FiberWire?
5 A. I believe so.
6 Q. Okay. And is that true also with the
7 introduction of silk rather than a nylon marker?
8 A. I don't know.
9 Q. Do you know whether the silk used in the
10 FiberWire with silk suture affects any of the
11 characteristics of the suture?
12 A. No, I don't.
13 Q. Based on your understanding of Arthrex's
14 FiberWire with silk product, do you think you would be
15 able to draw a cross-section of the suture?
16 A. I -- No.
17 Q. No? But as far as you know, the only difference
18 between the TigerWire and a FiberWire with silk is instead
19 of the nylon, it's a piece of silk?
20 A. That would be a good generalization.
21 Q. Okay. And Don Grafton would know this
22 information?
23 A. I believe so, yes.
24 (DePuy Mitek Exhibit No. 142, Design History File
25 for FiberWire 3-0 and 4-0, ARM 6580 through 6950, was

77

1 marked for identification.)
2 Q. I'm going to hand you a document labeled DePuy
3 Mitek Exhibit 142. It's a document with Bates numbers ARM
4 6580 through 6950.
5 Have you seen Exhibit 142 before?
6 A. I believe so.
7 Q. And what is DePuy Mitek Exhibit 142?
8 A. The Design History File for FiberWire new sizes
9 -- new sizes of FiberWire.
10 Q. And what new sizes for FiberWire?
11 A. 3-0 and 4-0.
12 Q. Do you have any reason to believe the information
13 in Exhibit 142 is inaccurate?
14 MR. SABER: Objection; overbroad.
15 A. No, I don't.
16 MR. FALKE: I'm just trying to authenticate the
17 document.
18 MR. SABER: No, I have no problem with you
19 authenticating the document, but I -- you know -- this
20 is, again, a document of hundreds of pages. And to
21 ask him to -- a generalized question like that I think
22 is kind of unfair.
23 BY MR. FALKE:
24 Q. Do the instructions for use that are included
25 with all of Arthrex's FiberWire product indicate that the

20 (Pages 74 to 77)

# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

DePuy Mitek, Inc.
      a Massachusetts Corporation

          Plaintiff,

      v.

Arthrex, Inc.
      a Delaware Corporation

          Defendant.

Civil Action No. 04-12457 PBS

## RESPONSIVE EXPERT REPORT OF DR. DEBI PRASAD MUKHERJEE CONCERNING NON-INFRINGEMENT OF U.S. PATENT NO. 5,314,446 AND OTHER MATTERS

Pursuant to the provisions of Rule 26(a)(2) of the Federal Rules of Civil Procedure, the Joint Case Management Statement adopted by the Court on February 18, 2005, and agreement between the parties, the undersigned, Dr. Debi Prasad Mukherjee, an expert witness for Defendants Arthrex, Inc. and Pearsalls, Limited (together, "Defendants") hereby sets forth his responsive expert report concerning non-infringement and other matters as follows.

demonstrating that the coating materially affects FiberWire's pliability/bendability.  Ex. 20 at 3-4.

In addition, I conducted my own subjective "drape test" on samples of coated and uncoated FiberWire suture to determine the coating's effect on the pliability of the suture.  The drape test involves draping the suture over my extended index finger and observing the degree to which the suture conforms to the shape of my finger.  The results of my test showed that the coated FiberWire suture conformed to the shape of my index finger to a much greater degree than did the uncoated FiberWire suture, confirming that the coating materially affects FiberWire's pliability.

Further, Dr. Robert Burks performed a subjective tactile feel and knot tiedown analysis on coated and uncoated FiberWire suture.  The results of his observations (Ex. 21) provide further support that the coating applied to FiberWire materially affects these handling properties.  For example, Dr. Burks – not knowing which suture sample was coated and which was uncoated – consistently selected the coated sample as having better tactile feel as well as better tie-down performance.

Therefore, for the reasons explained above, it is my opinion the coating applied to the FiberWire suture materially affects the above-described handleability and pliability characteristics of FiberWire.

> 2.    Coating materially affects FiberWire's knot security and knot strength

Based on my review of the three micrographs, it appears that they are very different and that they are too unclear to draw any conclusions from them. Despite the lack of clarity, however, it appears that the individual braid filaments are grouped together to a much greater degree in the Tab G micrograph than they are in the Tab E micrograph. This is an indication that coating has permeated into the braid.

In any event, Dr. Brookstein's conclusions are inconsistent with the findings discussed below. In addition to the tests described above, CETR also conducted a scanning electron microscopy (SEM) examination of coated and uncoated FiberWire suture. My review of the scans performed to date appears to indicate that the coating does extend into the braid. Ex. 20 at Fig. 14. This is consistent with the effect coating has on FiberWire's pliability, as described above.

F.    The nylon added to TigerWire suture materially affects its pliability

I understand that Arthrex's TigerWire suture has the same construction as FiberWire suture except that one of the PET carriers is replaced with nylon 6,6. All the reasons discussed in connection with FiberWire also apply to TigerWire. Further, it is well known in the art of manufacturing and/or processing of fibers that nylon 6,6 fibers of the type used in TigerWire are generally more stiff (i.e., less pliable) than fibers made of PET, as used in FiberWire and TigerWire. Ex. 26. Therefore, the act of removing one PET carrier and replacing it with a nylon 6,6 carrier during the braiding process, as is done with TigerWire, introduces a less pliable material into the composite braid.

30

It is also my understanding from discussions with Bill Benavitz of Arthrex that the diameter of the nylon 6,6 fibers used in TigerWire is greater than that of the PET which it replaces. Therefore, the nylon 6,6 fiber makes up a greater percentage of the braid cross-section area than does the PET fiber it replaces. Mr. Benavitz also informed me that Arthrex has received customer feedback that TigerWire is more stiff than FiberWire. In addition, I held a sample of both commercial FiberWire and TigerWire and the TigerWire felt stiffer and more course than the same sized FiberWire. I also conducted the drape test on the two samples and found that the FiberWire conformed to the shape of my finger to a much greater degree than the TigerWire, indicating that the addition of the nylon appears to make TigerWire stiffer and less pliable. For these reasons, it is my opinion that the addition of nylon 6,6 in TigerWire materially affects its pliability. Moreover, the course feel would suggest that the addition of the nylon would adversely affect knot tie-down.

Dr. Brookstein stated that the purpose of the nylon included in TigerWire is for visual identification, and refers to Peter Dreyfuss's testimony to support his opinion. Brookstein Report at ¶ 46. Whether or not Dr. Brookstein's report is accurate, it does not change the fact that, as explained above, the addition of nylon materially affects TigerWire's pliability.

G.   Adding an adhesive to FiberStick suture materially affects its handleability

31

# MUKHERJEE RESPONSIVE REPORT
# EXHIBIT 26

# Properties

**Polyethylene Terephthalate /PET**
**Unfilled**

## Topics  Index

```
************************************
```
*Copyright 2002 by Roger D. Corneliussen*
```
************************************
```

Values are from Modern Plastics Encyclopedia 99.

To jump to a particular property, click on the name listed below.

Melt Flow
Melting Temperature
Glass Transition
Processing Molding Pressure
Processing Molding Temperature
Compression Ratio
Mold Shrinkage
Tensile Strength
Elongation
Tensile Yield Strength
Compressive Strength
Flexural Strength
Tensile Modulus
Flexural Modulus
Izod Impact Strength
Hardness
Deflection Temperature
Thermal Expansion
Thermal Conductivity
Specific Gravity
Dielectric Strength
Water Absorption

Note: The ASTM numbers are linked to
their descriptions on the ASTM website.
To go to the description, simply
click on the ASTM number

Melt Flow
ASTM D1238
(gm/10 min)
**--- gm /10 min**

Melting Temperature  degrees C
Tm Crystalline
**212 to 265 C**

To go back to contents,
click on
Contents

Glass Transition (C)
Tg (Amorphous)
**68 to 80 C**

Processing Temperature Range Degrees F
Extrusion
**440 to 660 F for injection molding**

click on
Modulus

Compressive Modulus (psi)
ASTM D695
**--- psi**
**--- GPa**

To go back to contents,
click on
Contents

Flexural Modulus (psi)
ASTM D790
At 73 F
**350000 to 450000 psi**
**2.3 to 3.0 GPa**
At 200 F
**--- psi**
**--- GPa**
At 250 F
**--- psi**
**--- GPa**
At 300 F
**--- psi**
**--- GPa**

Izod Impact (ft-lb/in of notch)
ASTM D256
**0.25 to 0.7 ft lb/in of notch**

To go back to contents,
click on
Contents

Hardness
Rockwell ASTM D785
**M94-101; R111**
**--**
Shore D65 ASTM D2240/D2583
**---**

Coefficient of Linear Thermal Expansion
**65 (10 x exp −6) in/in /C**
**0.000 065  in/in /C**

Deflection Temperature under flexural load (F)
ASTM D648
264 psi **---**
**70 to 150 F**
66 psi **---**
**167 F**

To go back to contents,
click on
Contents

# Properties

## Nylon 66
## Molding Compound

## Topics  Index

**********************************
*Copyright 2002 by Roger D. Corneliussen*
**********************************

Values are from Modern Plastics Encyclopedia 99.

To jump to a particular property, click on the name listed below.

Melt Flow

Melting Temperature

Glass Transition

Injection Molding Pressure

Injection Molding Temperature

Compression Ratio

Mold Shrinkage

Tensile Strength

Elongation

Tensile Yield Strength

Compressive Strength

Flexural Strength

Tensile Modulus

Flexural Modulus

Izod Impact Strength

Hardness

Deflection Temperature

Thermal Expansion

Thermal Conductivity

Specific Gravity

Dielectric Strength

**17 900  psi**
**Conditioned with 50% relative humidity**
**6 100 psi**

Tensile Modulus (psi)
ASTM D638
**Dry as molded (about 0.2% moisture content)**
**230 000 to 550 000 psi**
**Conditioned with 50% relative humidity**
**230 000 to 500 000 psi**

To go to Modulus Values,
click on
Modulus

Compressive Modulus (psi)
ASTM D695
**--- psi**

Flexural Modulus (psi)
ASTM D790
At 73 F
**Dry as molded (about 0.2% moisture content)**
**410 000 to 470 000 psi**
**Conditioned with 50% relative humidity**
**185 000 psi**

To go to Modulus Values,
click on
Modulus

Izod Impact (ft-lb/in of notch)
ASTM D256A
**Dry as molded (about 0.2% moisture content)**
**0.55 to 10 ft lb/in of notch**
**Conditioned with 50% relative humidity**
**0.85 to 2.1 ft-lb/in of notch**

Hardness
Rockwell ASTM D785
**Dry as molded (about 0.2% moisture content)**
**R120 M83**
**Conditioned with 50% relative humidity**
**M95 to M105**

Coefficient of Linear Thermal Expansion
(10 exp-6 )in/in/C
**80 (10 x exp −6) in/in /C**
**0.000 080 in/in /C**

Deflection Temperature under flexural load (F)
ASTM D648
**264 psi ---**
**Dry as molded (about 0.2% moisture content)**
**158 to 212 F**
**66 psi  ---**

# EXHIBIT 4

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF MASSACHUSETTS

 3

 4      DEPUY MITEK, INC., a           )

 5      Massachusetts corporation,     )

 6              Plaintiff,             )   Civil Action

 7          vs.                        )   04-12457 PBS

 8      ARTHREX, INC., a Delaware      )

 9      corporation,                   )

10              Defendant.            )

11

12

13           -    -    -    -    -    -

14      The deposition of DEBI PRASAD

15  MUKHERJEE was taken on Tuesday, June 13,

16  2006, commencing at 9:08 a.m., at the

17  offices of Dickstein Shapiro Morin &

18  Oshinsky LLP, 2101 L Street, N.W.,

19  Washington, D.C., before Susanne Bergling,

20  Registered Merit Reporter and Notary Public.

21           -    -    -    -    -    -

22

23

24

25
```

122

1    Q. How about a Tara Shaneville (ph), I think
2  it is, did you ever speak with her?
3    A. No, thought that I can --
4    Q. How about Don Grafton?
5    A. I knew Don Grafton before this case, but
6  during this case, I didn't spoke -- speak to him.
7    Q. Okay, all right. Why did you speak with
8  Mr. Benavitz?
9    A. I saw him at the Academy of Orthopedic
10  Surgeons meeting, and I believe I looked at the
11  FiberWire suture or -- FiberWire suture, that's
12  all. I don't remember exactly what I spoke, but I
13  am more interested in just to know what products
14  they have.
15    Q. Well, you referenced him in one of your
16  reports, that you had spoken with him, so --
17    A. Yeah.
18    Q. -- what conversation did you -- had you had
19  with him regarding this case?
20    A. Tell me where I said that.
21    Q. It's in your responsive report at page 5.
22    A. This is 239?
23      MR. TAMBURO: 240.
24      THE WITNESS: 240?
25      BY MR. BONELLA:

123

1    Q. Page 5.
2    A. Page 5.
3    Q. Section 3, Review and Use of Documents and
4  Other Materials, third line from the end of that
5  section.
6    A. If my memory serves me right, I think I
7  looked at the -- again, I'm not sure, the
8  FiberWire -- I mean, the Tiger (ph) suture, if I
9  remember correctly, that's where I saw it, and
10  that's all. I probably did -- I don't know
11  whether I did any lab test or anything like that,
12  I don't remember exactly. That was very small
13  conversation, less than five minutes.
14    Q. So, you spoke -- I'm getting confused.
15  Your conversations with Benavitz, you're talking
16  about the one you had with relevance to this case
17  as opposed to the discussion you had at the
18  conference?
19    A. Well, that's the discussion at the
20  conference.
21    Q. Is the one you're referencing?
22    A. That's what I'm talking about, yeah.
23    Q. Okay. And was that academy conference, is
24  that March 22nd?
25    A. Academy of Orthopedic Surgeons meeting,

124

1  yeah --
2    Q. March 22nd?
3    A. -- in Chicago, yes.
4    Q. Of this year?
5    A. Uh-huh.
6    Q. And what -- do you recall what you
7  discussed with him?
8    A. Again, I -- you know, I remember, you know,
9  just -- I'm only interested in their products,
10  what they have, because we are interested in doing
11  orthopedic evaluation of their products.
12    Q. So, what do you remember about your
13  discussion with him?
14    A. That's all I remember, that --
15    Q. Did anything you discussed with him form or
16  impact your opinions at all?
17    A. No.
18    Q. Okay. Did you ever speak with
19  Mr. Witherspoon?
20    A. Yes, I did.
21    Q. How long did -- how many
22  conversations did you have with Mr. Witherspoon?
23    A. I think couple of times.
24    Q. Couple of times, two to three?
25    A. About that.

125

1    Q. Okay. And how long were those
2  conversations?
3    A. It could be half an hour, 45 minutes, or
4  maybe less. I don't remember.
5    Q. And what were those discussions about?
6    A. Well, he was helping me with the legal side
7  of this, and that's what was expressed in my
8  report. The legal part came from him.
9    Q. He was helping you understand the legal
10  framework?
11    A. I don't understand, but what he described
12  to me, yes, I did.
13    Q. So, he was helping you understand the legal
14  context for your report?
15    A. Some -- some things that, you know, that he
16  went over, um-hum, yes, I understood.
17    Q. Okay. And developing this report, your
18  three reports, did you speak with the lawyers from
19  Mr. Tamburo's firm?
20    A. Yes, I spoke to Mr. Saber and Mr. Tamburo
21  several times.
22    Q. How about Mr. Soffen, did you ever speak
23  with him?
24    A. In the beginning, yes.
25    Q. Okay. So, you have met Mr. Soffen?

32 (Pages 122 to 125)

134

1 Pearsalls?
2    A. No.
3    Q. In Exhibit 23 -- the first report, Exhibit
4 239, at the end, Exhibit 1, there's the documents
5 reviewed and considered in connection with that
6 report.
7    A. Yeah.
8    Q. Did you list all the documents reviewed and
9 considered in connection with forming your
10 opinions in Exhibit 239 in Exhibit 1 of Exhibit
11 239?
12    A. Yes.
13    Q. Okay. How about Exhibit 240, Exhibit 1,
14 again, the documents reviewed and considered, did
15 you list in Exhibit 1 to Exhibit 240 all the
16 documents reviewed and considered in forming your
17 opinions with respect to Exhibit 240?
18    A. Yes.
19    Q. Okay. And Exhibit 356, your rebuttal
20 expert report, for Exhibit 356, did you list all
21 the documents reviewed and considered in forming
22 your opinions expressed in Exhibit 34 -- in
23 Exhibit 356 in Exhibit 1 to that report?
24    A. Yes.
25    Q. Okay. Now, you have three reports, right?

136

1 reviewed and considered those materials? Did you
2 ask for all information bearing on an issue from
3 the law firm or --
4    A. They supplied and I asked and I supplied
5 some information.
6    Q. Okay.
7    A. So, that's how it worked. Mostly they
8 supplied.
9    Q. Okay. Did you ask the law firm for all
10 information bearing on an issue?
11    A. Yes.
12    Q. Okay. And you took their word that they
13 gave you everything that was relevant to that
14 information?
15    A. That's correct.
16    Q. Okay. The testing that Dr. Gitis did, were
17 you present for that testing?
18    A. I was not present.
19    Q. Okay. The testing that Dr. Burks did, were
20 you present for that testing?
21    A. No.
22    Q. I'm going to refer to the claims of the
23 '446 patent today, when we talk about them, the
24 ones that I think you have opined on are claims 1,
25 2, 8, 9 and 12. Is that right?

135

1    A. Yeah.
2    Q. So, they list all of the -- they list and
3 describe all of the opinions that you have in this
4 case?
5    A. That's correct.
6    Q. Okay. Do you have any opinions that you've
7 formed subsequent to signing these reports with
8 respect to this case?
9    MR. TAMBURO: Objection, vague.
10    THE WITNESS: No.
11    BY MR. BONELLA:
12    Q. Okay. Have you looked at any additional
13 materials since you signed the last report,
14 Exhibit 356?
15    MR. TAMBURO: Objection, vague.
16    THE WITNESS: Related to this case?
17    BY MR. BONELLA:
18    Q. Yes.
19    A. Okay. No.
20    Q. Are you or have you been asked to prepare
21 another expert report in this case?
22    A. No.
23    Q. In forming your report or your opinions,
24 you listed the materials that you reviewed and
25 considered. How did it come about that you

137

1    A. That's correct.
2    Q. Okay. So, when we talk about -- can we
3 just, for shorthand, refer to the claims of the
4 '446 patent, and when we refer to the claims of
5 the '446 patent, we will be referring to claims 1,
6 2, 8, 9 and 12. Is that okay?
7    A. That's fine.
8    Q. Because those are the only ones you have
9 opinions on, right?
10    A. Okay.
11    MR. BONELLA: Let's take a short break.
12    VIDEOGRAPHER: We are going off the record
13 at 11:39.
14    (A brief recess was taken.)
15    VIDEOGRAPHER: We're back on the record at
16 11:47.
17    BY MR. BONELLA:
18    Q. In forming the opinions in your responsive
19 report, Exhibit 240, do you recall any other
20 communications you received from anyone that you
21 used in forming your report?
22    A. Other than are listed here?
23    Q. Right.
24    A. No.
25    Q. Did you see any drafts of Dr. Burks' report

35 (Pages 134 to 137)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 04-12457 PBS

| | |
|---|---|
| DEPUY MITEK, INC., a Massachusetts | ) |
| Corporation, | ) |
| Plaintiff, | ) |
| v. | ) |
| ARTHREX, INC., a Delaware Corporation | ) |
| Defendant. | ) |
| | ) |

Videotaped Deposition of DEBI PRASAD MUKHERJEE

- VOLUME TWO -

Washington, DC

Wednesday, June 14, 2006

The videotaped deposition of DEBI PRASAD MUKHERJEE,

Volume Two, was held on Wednesday, June 14, 2006,

commencing at 9:12 a.m., at the offices of Dickstein

Shapiro Morin & Oshinsky LLP, 2101 L Street,

Northwest, Washington, DC, before Mary Ann Payonk,

RDR, Certified Realtime Reporter, Registered Diplomate

Reporter and Notary Public.

b6700ed5-0cd8-431b-9964-a0e9cbabf4ea

Page 474

```
1      A    Again, as far as I know, you got to do the
2  statistical analysis of the whole data.
3      Q    Did you --
4      A    You cannot pick this 27 percent times it
5  goes up and down because if you do it -- more
6  experiments, that 27 percent could be the other -- the
7  other way.
8      Q    It might go up?  It might go up to
9  50 percent?
10     A    Yeah, it could be.  Could be.  But that's
11 why you take the average and the standard deviation.
12 That's what I didn't do but that I should have done.
13     Q    Okay.  Can you explain why -- look at --
14 if you go down the left-hand side of the page you see
15 the entry of 22 September '05?
16     A    206874?
17     Q    2687 to 22 September '05?
18     A    Yeah.
19     Q    The value went from die of 16.61 to
20 measure of 15.05.
21     A    Right.
22     Q    Can you explain that?
23     A    No.  The same -- same my explanation as
24 before.  I explained to you before.
25     Q    Did anyone tell you about intermediate
```

Page 475

```
1  stage of data from Pearsalls?
2      A    I don't remember.
3      Q    Okay.  Did you ask for the intermediate
4  stage data?
5          MR. TAMBURO:  Objection, assumes facts.
6      A    I did not.
7  BY MR. BONELLA:
8      Q    Okay.  Do you know what the difference
9  between the intermediate stage and the measure stage
10 is?
11     A    No, I do not.
12     Q    Okay.  Did you -- in relying on Exhibit 25
13 did you consider any error analysis of your data?
14     A    No, I did not.
15     Q    Okay.  In the average at the end that you
16 saw of Exhibit 25 --
17     A    Uh-huh.
18     Q    -- 14.39 to 14.84 --
19     A    Right.
20     Q    -- is that a statistically significant
21 difference?
22     A    I cannot guess, but I did not do the
23 statistical calculations.  I cannot give you the
24 answer.
25     Q    Okay.  The next exhibit to your report is
```

Page 476

```
1  Exhibit 26.
2      A    Yes.
3      Q    It says properties of PET.
4      A    Yes.
5      Q    And the next -- the third page is nylon 66
6  properties?
7      A    Page 3?
8      Q    Right.
9      A    Nylon 66.
10     Q    Right, okay.  Under the PET it says it's
11 unfilled, and under the nylon 66 it's molding
12 compound.
13     A    That's correct.
14     Q    Okay.  These aren't fiber properties,
15 right?
16          MR. TAMBURO:  Objection, assumes facts and
17 it's vague.
18     A    I'm not sure.
19 BY MR. BONELLA:
20     Q    You're not sure?
21     A    No.
22     Q    In relying on -- in this case to determine
23 properties for PET and -- well, is there a difference
24 between molding compound properties and fiber
25 properties --
```

Page 477

```
1          MR. TAMBURO:  Objection, vague.
2  BY MR. BONELLA:
3      Q    -- for nylon 66?
4      A    The -- it can be.
5      Q    Okay.
6      A    But I relied on the suture properties,
7  because that's really the way -- the final product.
8      Q    Okay.
9      A    But fibers, it -- normally, they're
10 stronger than the molding.
11     Q    Okay.  Did you rely on -- well, how about
12 unfilled PET?  Is that the same as fiber PET?
13          MR. TAMBURO:  Objection.  Objection,
14 vague.
15     A    Probably not.  It's probably molding also.
16 BY MR. BONELLA:
17     Q    Okay.  I'd like to ask you about a couple
18 documents.  I'd like to show you a few Mitek exhibits
19 320.  Can we put that back together?
20     A    Yeah, okay.
21     Q    Here, why don't you put that back
22 together?
23     A    Okay.  Yeah, no, this -- I was -- I was
24 worried about that.  Okay, thank you.
25     Q    Ever see this document before?
```

Page 506

1  suture B with suture B were subtle -- well, let me
2  back up. Did you -- have you been shown Dr. Burks'
3  deposition transcript?
4      A    No.
5      Q    No? Would you like to see it?
6      A    No.
7      Q    Why not?
8      A    Because that's not relevant in my report
9  here.
10     Q    It's not relevant to your opinions?
11     A    I mean right now, what I'm going right
12  through.
13     Q    Is Dr. Burks' deposition transcript
14  relevant to your opinions?
15     A    Based on the -- I was -- I was informed
16  and, as I reported here, that's all I -- I can do
17  right now.
18     Q    Okay. The question is a yes-or-no
19  question. Is Dr. Burks' deposition transcript
20  relevant to your opinions?
21         MR. TAMBURO: Objection, calls for a legal
22  conclusion.
23     A    No. I rely on the expert report.
24  BY MR. BONELLA:
25     Q    Okay. Would you -- if he said in his

Page 507

1  deposition that the differences between suture A and
2  suture B were subtle, is that information you'd like
3  to consider in forming your opinions?
4      A    No.
5          MR. TAMBURO: Objection.
6  BY MR. BONELLA:
7      Q    Why not?
8          MR. TAMBURO: Mischaracterizes the
9  testimony, vague question, and calls for legal
10  conclusion.
11  BY MR. BONELLA:
12     Q    Why not?
13     A    Again, I go by his expert report that he
14  saw the difference. That's the only thing that I can
15  go by so I cannot answer your question, no.
16     Q    If he -- if he described the differences
17  between suture A and suture B as subtle and it was
18  even with gloves off, is that something you'd like to
19  know?
20         MR. TAMBURO: Objection, vague.
21     A    No.
22         MR. TAMBURO: Mis -- give me a chance to
23  object.
24         THE WITNESS: Okay. Sorry.
25         MR. TAMBURO: Okay? Objection, vague, and

Page 508

1  mischaracterizes the testimony, incomplete
2  hypothetical.
3  BY MR. BONELLA:
4      Q    So you don't want to know what his
5  testimony was about the tests?
6          MR. TAMBURO: Objection, mischaracterized
7  the witnesses testimony.
8      A    Correct. I don't want to know.
9  BY MR. BONELLA:
10     Q    And you don't want to know what Dr. Burks
11  testified about how he actually did the test in his
12  deposition?
13     A    No.
14     Q    And do you know want to know how Dr. Burks
15  described the results that he obtained from the test
16  in the deposition?
17     A    No.
18     Q    "No," meaning you don't want to know?
19     A    That's correct.
20         MR. BONELLA: Let's take a quick break.
21         THE VIDEOGRAPHER: Now going off the video
22  record at 11:04 a.m.
23         (A recess was taken from 11:04 a.m.
24         through 11:18 a.m.)
25         THE VIDEOGRAPHER: We're now back on the

Page 509

1  video record. The time is 11:18 a.m. and this is the
2  start of tape two, volume two in the continuing
3  deposition of Debi Prasad Mukherjee.
4          (Exhibit No. 364 was marked.)
5          (Exhibit No. 365 was marked.)
6  BY MR. BONELLA:
7      Q    Dr. Mukherjee, we've marked what counsel
8  has produced for inspection here at the deposition as
9  DePuy Mitek Exhibit 364 is a suture that -- in a bag
10  that's labeled as uncoated, and Exhibit 365 is a
11  suture in a bag labeled as coated. Do you see those?
12     A    Yes.
13     Q    Are those the sutures that you performed a
14  drape test on?
15     A    Yes.
16     Q    Now, the drape test that you performed, is
17  there any literature that describes drape tests?
18     A    No, this is just a very subjective test.
19  And I just wanted to get a feel for that. That's why
20  I did. It's not scientific.
21     Q    Is the drape test that you performed, is
22  that subject to peer review?
23     A    No, it isn't.
24     Q    No? Okay. Can you show me -- well, let
25  me back up. When you were given the samples to

24  (Pages 506 to 509)

b6700ed5-0cd8-431b-9964-a0e9cbabf4ea

Page 510

1  perform the drape test, do you know where they came
2  from?
3          MR. TAMBURO: Objection, vague.
4      A    For sure, I didn't know, but I had to
5  depend on the counsel where it came from.
6  BY MR. BONELLA:
7      Q    Well, what did you think? Where do you
8  think they came from?
9      A    I don't know.
10     Q    Okay. Did Dr. Gitis send them to you?
11     A    No.
12     Q    Who gave them to you? Counsel?
13     A    Yes.
14     Q    Where did you perform the drape test?
15     A    It was actually in a hotel in Chicago.
16     Q    Okay.
17     A    I was in a meeting.
18     Q    Who was present?
19     A    Sal was there, Sal, Mr. Tamburo.
20     Q    Anybody else present?
21     A    No.
22     Q    How -- when you were given the samples,
23  were they given to you on spools, or how were they
24  given to you?
25     A    Just like this.

Page 511

1      Q    In the bags?
2      A    Not -- I didn't know which one is which.
3      Q    You didn't?
4      A    No.
5      Q    Okay. Doesn't say that in your report,
6  that you didn't know which one was which.
7      A    Before the test, I did not know which one
8  is which.
9      Q    You didn't?
10     A    No.
11     Q    Okay.
12     A    If I -- after the test --
13     Q    Okay.
14     A    -- and I was just curious to know what we
15  found.
16     Q    Okay. Now, the samples that you were
17  given, do you know, are these the exact samples that
18  you were given? Were you given any more samples, or
19  just these two?
20     A    That's it.
21     Q    That's it?
22          Do you know how these samples were handled
23  before they were given to you?
24          MR. TAMBURO: Objection, vague.
25     A    I do not know.

Page 512

1  BY MR. BONELLA:
2      Q    Can handling sutures affect its
3  handleability properties?
4          MR. TAMBURO: Objection, vague.
5      A    It can, but nonabsorbables normally don't.
6  Absorbables, yes, because the change in moisture and
7  handling.
8  BY MR. BONELLA:
9      Q    Even for nonabsorbables, if you handle
10  them a lot. Even for nonabsorbables, if you handle
11  them and bend them won't that change the -- can't that
12  change the properties?
13          MR. TAMBURO: Objection, assumes facts and
14  is vague.
15     A    It's possible, but very minimum.
16  BY MR. BONELLA:
17     Q    Did you ever hear of functional testing?
18     A    Of?
19     Q    Of sutures.
20     A    Yes.
21     Q    And what -- and what do you understand
22  that to be?
23     A    There is different kind of functional
24  test. It depends on the handling, the surgical use,
25  knot tying, all the other things. There are many

Page 513

1  tests.
2      Q    Okay. Have you ever done -- have you ever
3  seen any test results from Dr. Steckel to the
4  difference between sutures that were handled, sutures
5  that were not handled?
6      A    I probably have, but I don't remember.
7      Q    Okay. Did -- have you ever -- did you
8  consider -- in your analysis, did you ask what the
9  history of the Exhibits 364 and 365 sutures were, how
10  they were handled before you got them?
11          MR. TAMBURO: Objection, vague.
12     A    No, I didn't. This is just a curiosity
13  for my sake. That's what I did, so I was not -- it
14  was not a scientific, just done -- I just wanted to
15  know, because I had suture experience, just to see
16  what it looked like.
17  BY MR. BONELLA:
18     Q    Could you --
19     A    Go ahead.
20     Q    Could you tell by feeling the sutures
21  which was coated and which was uncoated?
22          MR. TAMBURO: Objection.
23  BY MR. BONELLA:
24     Q    Or is it by the drape test that you
25  performed that you thought one was coated and one was

25  (Pages 510 to 513)

b6700ed5-0cd8-431b-9964-a0e9cbabf4ea

Page 514

1  uncoated?
2         MR. TAMBURO: Objection, vague and
3  compound.
4      A   I don't remember whether I felt it. I may
5  or may not.
6  BY MR. BONELLA:
7      Q   Okay. Do you have experience enough that
8  you can tell differences between sutures based on
9  feel, whether they're coated or uncoated?
10     A   I used to, but now it's a little rusty
11 now.
12     Q   Rusty now?
13     A   It was many years ago.
14     Q   Okay. Can you show me with the exhibits
15 how you performed the drape test?
16     A   I didn't understand.
17     Q   Can you show me the drape test that you
18 performed with Exhibits 364 and 365?
19     A   Oh, oh, yes, yes. You want me to show for
20 each one of those samples?
21     Q   Yes, but let me back up before you do
22 that. Did you do at a drape test on any other samples
23 besides Exhibits 364 and 365?
24         MR. TAMBURO: Objection, vague.
25     A   Not in relation to this suture but we

Page 516

1      A   No.
2      Q   Did you do a drape test of TigerWire while
3  Mr. Tamburo was present?
4      A   No, no. TigerWire, I wouldn't have done
5  anything.
6      Q   Okay. Can you show me then the drape test
7  that you did with Exhibits 364 and 365?
8      A   I'll do the best I can.
9      Q   Okay.
10     A   Remember, this is not a scientific test.
11     Q   Okay.
12     A   It's a -- very subjective. It's my
13 curiosity.
14     Q   Okay.
15     A   This is what I did.
16     Q   Now you're using Exhibit 364?
17     A   I don't know.
18     Q   That's the suture that was out of the
19 Exhibit 364 bag.
20     A   364, yeah.
21     Q   And you put it over your finger?
22     A   Yeah.
23     Q   Okay.
24     A   And I just looked at two things, you know,
25 how far -- how much this conform. I let it hang like

Page 515

1  always did when I was developing sutures.
2  BY MR. BONELLA:
3      Q   All right.
4      A   Not in this context, no.
5      Q   Let me ask a better question. Did you do
6  a drape test of any other FiberWire or TigerWire
7  samples in forming your opinions?
8      A   No.
9      Q   No?
10     A   Only these samples.
11     Q   You didn't do a drape test of TigerWire
12 samples?
13     A   The only thing I did not remember at the
14 academy was that I saw a TigerWire suture with Mr.
15 what's his name? Bernard?
16     Q   Benovitz.
17     A   Benovitz. I don't remember that.
18     Q   You saw a TigerWire suture, you said?
19     A   Yeah, it was shown there in the -- the --
20 the booth.
21     Q   But you didn't do a drape test --
22     A   No.
23     Q   -- of the TigerWire?
24         Did Mr. Tamburo give you TigerWire samples
25 to do a drape test?

Page 517

1  that and see how much is conformed to my finger.
2      Q   Okay.
3      A   And, you know, I also look at this part,
4  whether it's really conforming to this side of the
5  finger.
6      Q   Okay.
7      A   Again, this is very subjective,
8  scientific -- not a scientific --
9      Q   Okay.
10     A   -- test.
11     Q   Now, if you pull the suture down on this
12 side --
13     A   Pull this one?
14     Q   Yep, just pull this one down a little bit.
15 Doesn't it change how much --
16     A   No.
17     Q   -- it conforms?
18     A   I didn't -- I didn't want to handle too
19 much, but --
20     Q   Does it --
21     A   -- I didn't see any -- doesn't conform.
22 It's still -- the distance is still --
23     Q   Sure.
24     A   -- considerable.
25     Q   And --

26 (Pages 514 to 517)

b6700ed5-0cd8-431b-9964-a0e9cbabf4e

Page 518

1    A    And this loop is still, you know, is
2  bigger open loop.
3    Q    Now, the way you're holding it now the
4  suture lengths are about equal --
5    A    Correct.
6    Q    -- from either end. Doesn't the weight of
7  the suture on the other side -- on either side affect
8  how much it conforms on either side?
9    A    I don't think so.
10    Q    It doesn't?
11    A    No.
12    Q    What's your basis for saying that?
13    A    Because if you lay the suture pliability,
14  and that's Norm Gitis' results and all those things,
15  so the weight is really very minimum. So it's
16  really -- the weight of suture, the length difference
17  and the weight difference is very minimal. So I -- my
18  conclusion was it should not make a difference.
19    Q    Did you factor in your analysis how far
20  down the suture hangs from either side, whether it had
21  to be equal or not?
22    A    I -- I -- I tried to do it equal.
23    Q    Okay.
24    A    And again, it's an unscientific, it's a --
25  it's just a feel of the suture and my point of view.

Page 519

1    Q    Uh-huh.
2    A    Get a feel what the suture looked like.
3    Q    Okay. Now, can you put the coated on and
4  show how the coated suture -- trying to make sure we
5  keep them separate here so we know which one is which.
6  Just hold that one over your finger, or --
7    A    Here, I'll put it in the envelope.
8    Q    No, keep that on your finger.
9    A    This one here.
10    Q    I'll pull this one.
11    A    I can't do both, both hands.
12    Q    Here, I'll pull this one out for you.
13        MR. TAMBURO: Keep them separate.
14  BY MR. BONELLA:
15    Q    Put them both on your finger and see how
16  compare. So if we put the -- Exhibit 364 closer to
17  your hand --
18    A    I'll put this one here?
19    Q    Right, Exhibit 364 on your hand.
20    A    Okay.
21    Q    Okay. And now I'm going to put 365
22  towards the edge of your hand.
23    A    Okay.
24    Q    Now, describe to me how they're different.
25    A    And see how this one conforms in my eye

Page 520

1  close to the -- this finger, and -- and that one a
2  little closer to this surface of the finger.
3    Q    Well, this looks close to your surface of
4  the finger.
5    A    No. You see the loop? I'm looking at the
6  loop.
7    Q    What loop?
8    A    This loop that made -- the suture max with
9  respect to this. How --
10    Q    At the top?
11    A    How -- yeah.
12    Q    This loop right here?
13    A    This here and then this side.
14    Q    Okay.
15    A    Both side. And you can see how this loop
16  is open.
17    Q    Well, this one's open further than this
18  one on this side.
19    A    Well --
20        MR. TAMBURO: Objection. Is that a
21  question?
22  BY MR. BONELLA:
23    Q    Right?
24        MR. TAMBURO: Or are you testifying?
25  BY MR. BONELLA:

Page 521

1    Q    So the one on -- the one closer to the end
2  is Exhibit 365 is open closer -- is open further than
3  Exhibit 364, right?
4    A    It's very simple way. It is my opinion
5  this is conforming to this finger surface more than
6  this one. Looking at these --
7    Q    Okay.
8    A    -- and this --
9    Q    How about this side? Is your opinion that
10  that one's conforming more to the surface?
11    A    Well, I have to leave my, you know --
12  again, the --
13    Q    You changed the position of your hand.
14    A    No, but I -- I didn't --
15        MR. TAMBURO: Objection, argumentative.
16  BY MR. BONELLA:
17    Q    Well, you just did. You just changed the
18  position of your hand and that changed how it
19  conformed, right?
20    A    Well, no, I don't think so.
21    Q    You did. You rotated your hand.
22    A    Again, this is a very --
23        MR. TAMBURO: Objection.
24    A    -- subjective --
25        MR. TAMBURO: It's not a question.

27 (Pages 518 to 521)

b6700ed5-0cd8-431b-9964-a0e9cbabf4ea

Page 522

```
1      A    -- nonscientific --
2  BY MR. BONELLA:
3      Q    Okay.
4      A    -- test.
5      Q    Could you rotate your hand back to the
6  position it was in?
7      A    I put -- no, I -- normally I might have
8  done it, but I don't know.  You are saying that, but I
9  don't remember that, I just -- I just took this finger
10 out because it was touching.
11     Q    But you rotated your hand and changed the
12 position.  Now, on the -- the -- on the left-hand side
13 are you saying one conforms more?
14     A    Yeah, this conforms more.
15         MR. TAMBURO:  Whose left-hand side?
16         MR. BONELLA:  His left-hand side.
17 BY MR. BONELLA:
18     Q    It does?
19     A    Yeah.
20     Q    Why do you say that?
21     A    That's what I'm looking at, these
22 separation between this surface and the suture.
23     Q    Doesn't this one come closer to your hand
24 and this one comes further out?
25     A    No.
```

Page 524

```
1  BY MR. BONELLA:
2      Q    You didn't?
3      A    No.
4      Q    Do you know -- have you ever seen a --
5  let's put these back.
6      A    Okay.
7      Q    This is 365.
8          MR. TAMBURO:  That was the coated, yeah.
9          THE WITNESS:  Yeah.
10         MR. BONELLA:  And this is 364.
11         THE WITNESS:  Right.
12 BY MR. BONELLA:
13     Q    Did you consider in your analysis in this
14 drape test -- well, let me back up.  Have you ever
15 seen a suture round around -- wound around a spool?
16     A    Yes.
17     Q    Okay.  And have you ever seen a suture
18 come off a spool?  It kind of takes the shape of the
19 spool.  It's kind of --
20     A    Yes, I've seen that.
21     Q    Okay.  Did you consider in your analysis
22 how -- whether -- in your drape test analysis, excuse
23 me, how the sutures were taken -- how the sample were
24 on the spool and whether that mattered?
25     A    No, I didn't consider.  I didn't see any
```

Page 523

```
1      Q    You don't see that?
2      A    No.
3      Q    Okay.  And you agree this isn't a
4  scientific test?
5      A    I -- I -- I'm repeating.  This is not a
6  scientific.  It's my way to look at the sutures --
7      Q    Okay.
8      A    -- what I feel like, that's all.
9      Q    Now, if you adjust the suture in your hand
10 could that change how it conforms?
11         MR. TAMBURO:  Objection, vague.
12     A    I will not guess on anything.  This is not
13 a scientific test, this is just to get a feel.  I have
14 to rely on Dr. Burks' report and Norman Gitis' report,
15 more scientific basis to show the difference.  This is
16 no way to make a conclusion.  This is a nonscientific
17 test.
18 BY MR. BONELLA:
19     Q    Okay.  If you change the position of the
20 suture in your hand can that change how it conforms
21     A    I -- I cannot --
22     Q    -- to your hand?
23         MR. TAMBURO:  Objection, vague.
24     A    I cannot comment on that because those are
25 not things I -- I considered.
```

Page 525

```
1  curling like that.
2      Q    Okay.
3      A    Normally you see if it's very stiff
4  suture.
5      Q    Okay.  But you didn't see the spools that
6  they were taken from?  You didn't see them taken off
7  the spools?
8      A    No, no, I did not.
9      Q    Okay.  Did you see any spools of
10 FiberWire?
11         MR. TAMBURO:  Objection, vague.
12     A    No, I have not.
13 BY MR. BONELLA:
14     Q    Okay.  In Dr. Gitis' testing, is it your
15 understanding that he tested a -- a number 2 FiberWire
16 sutures?
17     A    That's correct.
18     Q    Okay.  He -- he didn't do any testing of
19 TigerWire, right?
20     A    What's in the report, that's what he
21 tested.
22     Q    Okay.  Did you ask Dr. Gitis to do any
23 testing of the TigerWire?
24     A    No, I did not.
25     Q    Why not?
```

28 (Pages 522 to 525)

b6700ed5-0cd8-431b-9964-a0e9cbabf4ea

Page 526

1    A    Because that's not my decision to do what
2 test -- what samples to be tested so I didn't go to
3 TigerWire.
4    Q    Do you have an opinion about how -- do you
5 know that TigerWire has one nylon --
6    A    Yes.
7    Q    -- strand in it?
8        And do you have an opinion about how that
9 nylon strand affects TigerWire's pliability?
10    A    It's in my report. The nylon will
11 affect --
12    Q    Okay.
13    A    -- the pliability.
14    Q    Did you do any -- why didn't Dr. Gitis do
15 some TigerWire pliability tests to determine the
16 effect of nylon?
17    A    I cannot answer. I do not know.
18    Q    Is it required to -- for -- to have a
19 pliability test that Dr. Gitis did in order to
20 determine the effect of nylons on the pliability of
21 FiberWire?
22        MR. TAMBURO: Objection, vague.
23    A    Probably.
24 BY MR. BONELLA:
25    Q    Okay. Where were you given the -- the

Page 527

1 '446 patent, the -- the Hunter patent that's Exhibit 3
2 to your report?
3    A    Exhibit 3, yes.
4    Q    Where were you given that, the Hunter
5 patent?
6    A    Please clarify.
7    Q    When's the first time you saw the Hunter
8 patent?
9    A    I don't remember exactly, but very early
10 stage when -- when I was consult -- I was actually
11 contacted for expert witness.
12    Q    Uh-huh.
13    A    The first time I came here, I saw the --
14 the -- the '446 patent.
15    Q    Is it the first thing you saw in
16 connection with this case?
17    A    I cannot say that. I saw several things,
18 but --
19    Q    Okay.
20    A    The patent is one of them.
21    Q    Is the -- is reading the '446 patent one
22 of the first things you did?
23    A    I don't know the first thing or second
24 thing or tenth thing, but I --
25    Q    Okay.

Page 528

1    A    I did look at '446 --
2    Q    Did --
3    A    -- at that time.
4    Q    Did you read the '446 patent early on to
5 see whether you could form any opinions in the case?
6        MR. TAMBURO: Objection, vague.
7    A    Not before the discussions here before I
8 came here.
9 BY MR. BONELLA:
10    Q    Before you came to meet with the lawyers?
11    A    Yeah.
12    Q    So you didn't read the '446 patent before
13 you came to meet with the lawyers. You met with the
14 lawyers, and then when did you read the '446 patent?
15        MR. TAMBURO: Objection, vague, and
16 mischaracterizes the testimony, compound.
17 BY MR. BONELLA:
18    Q    I'm not trying to mischaracterize, I'm
19 just trying to understand. I'm not trying to
20 mischaracterize.
21    A    You know, it -- I don't understand myself
22 that -- if I remember correctly. But please pardon
23 me. I'm a more than 67 years old man so I don't
24 remember a lot of things.
25    Q    Well, you look great for 67.

Page 529

1    A    But that's why I -- I just don't remember.
2 I mean, it's -- I read it.
3    Q    Okay. If you don't remember, I'm just
4 trying to figure out what happened in the sequence of
5 events.
6    A    Well, it's very difficult for me to
7 reconstruct all of this.
8    Q    Okay.
9    A    I -- I -- I'm trying to help you roughly
10 is what it is.
11    Q    Right. And so you were contacted in
12 connection with this case, and you came and met with
13 the lawyers here?
14    A    Yes.
15    Q    Okay. Before you came and met with the
16 lawyers did you read anything in connection with the
17 case?
18    A    Not connection with the case, but I knew
19 about Arthrex suture. Like I told you before, I
20 valued it not at their expense or the -- just because
21 I was interested because it was a strong suture. So I
22 knew something about the suture.
23    Q    Okay.
24    A    That FiberWire suture.
25    Q    Okay. But in connection with the case did

29 (Pages 526 to 529)

# EXHIBIT 5

AO 88 (11/91) Subpoena in a Civil Case

# United States District Court

## FOR THE DISTRICT OF LOUISIANA

DePuy Mitek, Inc.,
    a Massachusetts Corporation

          Plaintiff,

               v.

Arthrex, Inc.,
    a Delaware Corporation and

Pearsalls Ltd.,
    A Private Limited Company
    of the United Kingdom,

          Defendants.

**SUBPOENA IN A CIVIL CASE in the United States District Court for the District of Massachusetts**

**Case Number: 04cv12457 PBS**

TO:    Debi Prasad Mukherjee
        1501 Kings Highway, P.O. Box 33932
        Shreveport, Louisiana 71130

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case. The deposition will be recorded by stenographic means and recorded by video and audio tape, and by instant visual display of the stenographic record.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Dickstein Shapiro Morin & Oshinsky LLP<br>2101 L Street NW<br>Washington, D.C. 20037-1526 USA | June 13, 2006 at 8:00 a.m. |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the documents and things set forth in Schedule A attached hereto at the place, date, and time specified below:

| PLACE | DATE AND TIME |
|---|---|
| Dickstein Shapiro Morin & Oshinsky LLP<br>2101 L Street NW<br>Washington, D.C. 20037-1526 USA | June 13, 2006 at 8:00 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (ATTORNEY FOR PLAINTIFF ) | DATE |
|---|---|
| *Lynn Malinoski* | 6/8/06 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Lynn Malinoski, Woodcock Washburn LLP, One Liberty Place, 46th Floor, Philadelphia, Pennsylvania 19103, 215-568-3100

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

AO 88 (11/91) Subpoena in a Civil Case

---

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

Signature of Server

_____

Address of Server

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

© PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for depositions, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the material or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
(I) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place

more than 100 miles from the place where that person resides, is employed

or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(b)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or
(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden.
(B) If a subpoena
(I) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## Schedule A

Pursuant to Rule 45 of the Federal Rules of Civil Procedure and the Local Rules of the District of Massachusetts, Plaintiff DePuy Mitek, by and through its counsel, will take the deposition upon oral examination of Debi Prasad Mukherjee beginning on June 13, 2006 at 8:00 a.m. at the offices of Dickstein Shapiro Morin & Oshinsky LLP, 2101 L Street NW, Washington, D.C. 20037 USA. The deposition will be conducted before an officer authorized by law to administer oaths and will be recorded by stenographic and video means. The deposition will proceed from day to day, weekends and federal holidays excluded, until completed.

### Instructions and Definitions

1.     DePuy Mitek has sued Arthrex in the United States District Court for the District of Massachusetts for Arthrex's infringement of U.S. Patent No. 5,314,446. A copy of DePuy Mitek's Amended Complaint is attached as Exhibit 1.

2.     "Arthrex" means Arthrex, Inc. and includes each of its predecessors, successors, subsidiaries, divisions, and departments.

3.     "Concerning" means referring to, relating to, commenting upon, evidencing or embodying.

4.     "Communication(s)" means any transmission of information by one or more persons or between two or more persons by any means including, but not limited to, emails, telephone conversations, letters, telegrams, teletypes, telexes, telecopies, computer linkups, written memoranda, and face-to-face conversations.

5.     "You" means Debi Prasad Mukherjee.

## Schedule A: Documents To Be Produced

### Request No. 1

All communications between any of Arthrex, you, Dr. Gitis, Dr. Burks, and/or Dickstein, Shapiro, Morin & Oshinsky LLP concerning the lawsuit commenced by the Complaint attached as Exhibit 1.

### Request No. 2

All documents and things concerning this lawsuit, including, but not limited to, documents concerning "Expert Report of Dr. Debi Prasad Mukherjee Concerning Invalidity of U.S. Patent No. 5,314,446," "Responsive Expert Report of Dr. Debi Prasad Mukherjee Concerning Non-infringement of U.S. Patent No. 5,314,446 and Other Matters," and "Rebuttal Expert Report of Dr. Debi Prasad Mukherjee."

## Things To Be Produced

### Request No. 1

All tested and untested samples referred to in "Expert Report of Dr. Debi Prasad Mukherjee Concerning Invalidity of U.S. Patent No. 5,314,446" dated March 3, 2006, and in "Responsive Expert Report of Dr. Debi Prasad Mukherjee Concerning Non-infringement of U.S. Patent No. 5,314,446 and Other Matters" dated March 24, 2006, or that Dr. Mukherjee evaluated or had in his possession, including any spools or other information concerning the samples.

### Request No. 2

All tested and untested FiberWire suture samples referred to in Dr. Gitis' "Comparative Suture Testing" report dated March 23, 2006.

# EXHIBIT 6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DePuy Mitek, Inc.<br>    a Massachusetts Corporation | )<br>)<br>) | |
|       Plaintiff, | ) | |
|         v. | )<br>) | **Civil No. 04-12457 PBS** |
| Arthrex, Inc.<br>    a Delaware Corporation and | )<br>)<br>) | |
| Pearsalls Ltd.,<br>    a Private Limited Company<br>    of the United Kingdom, | )<br>)<br>)<br>) | |
|       Defendants. | )<br>) | |

## Rebuttal Expert Report of Dr. David Brookstein

### I.    Background Information

1.    I previously submitted an expert report in this case on March 3, 2006.  I have been asked

to opine on certain opinions expressed by Dr. Mukherjee in his report entitled the "Responsive

Expert Report of Dr. Debi Prasad Mukherjee Concerning Non-Infringement of U.S. Patent No.

5,314,446 and Other Matters."

2.    I have reviewed the "Responsive Expert Report of Dr. Debi Prasad Mukherjee

Concerning Non-Infringement of U.S. Patent No. 5,314,446 and Other Matters," the documents

referenced in my prior report and those listed in Ex. H attached hereto.

### II.    Summary of Opinions

3.    I disagree with Dr. Mukherjee's opinion that there is no infringement under the doctrine

of equivalents, if "PE," as used in the claims of the 446 Patent, is construed not to include

UHMWPE.

obtained in CETR's "pliability" test. But they are not. During the pliability tests, CETR found that the coated suture had a lower modulus, as shown by its smaller slope (Mukherjee Res. Report at Ex. 20 at 3-4). In contrast, the other two CETR tests report a higher modulus for the coated suture, but it is not clear by how much from the graph and data (Mukherjee Res. Report at Ex. 20 at 5-8). The point being that the tests results are inconsistent. They appear to contradict the conclusions drawn by Dr. Mukherjee from the CETR "pliability" tests. Based on the limited information that I have about the tests, they are either inconclusive or show that coating has no material affect on tensile strength because the variations are due to the testing, not the material.

52.     I also disagree with the conclusions that Dr. Mukherjee draws from the "pliability" tests because they appear to be contradicted by Pearsalls' testing. Ex. AA summarizes the results of Pearsalls' tension tests on batches of FiberWire at the "dye," "intermediate," and "measure" stages. Pearsalls found that FiberWire's tensile strength basically stayed the same between the uncoated FiberWire and FiberWire that underwent the coating processes. Although there are some variations in the reported measurements (*i.e.*, the tensile strength appears to go up, down, and stay the same), it is my opinion that these are really just an artifact of the testing (*i.e.,* operator variations, knot tying, or the expected variations inherent to textile testing) and not true variations (see paragraphs 40-41). I note that Dr. Mukherjee ignores these data in his analysis.

### (4)     Dr. Mukherjee's "Drape" Test Is Flawed & Inconclusive

53.     I have considered Dr. Mukherjee's "drape test." This "test" is overly simplistic and flawed. Dr. Mukherjee states that he performed his drape test by "draping the suture over [his] extended index finger and observing the degree to which the suture conforms to the shape of [his] finger" (Mukherjee Res. Report at 27). First, I do not understand what he means by "conforms to the shape of my finger." Therefore, I cannot fully respond to his statement

because, among other reasons, I cannot tell what he measured. Second, it appears that Dr. Mukherjee is attempting to approximate FiberWire's pliability by determining FiberWire's ability to bend by using his finger as a test rig. But this method is flawed because he did not provide a true cantilever end support. Consequently, there is no defined position as to where FiberWire begins its bending, and no definitive way to determine the degree of bending. Third, diameter affects pliability, and Dr. Mukhejee does not provide any diameter measurements for the samples that he compared. Therefore, based on what I can determine from his report, it is not possible to scientifically compare the pliability of the uncoated and coated FiberWire using this method.

54.    I note that Dr. Mukherjee relies on documents that refer to Ethicon and Mitek products in his analysis (Mukherjee Res. Report at 23-24, Mukherjee Res. Report Exs. 14, 15, 17, & 18). I disagree that these documents are relevant to the analysis because they discuss products and coatings that are different than FiberWire. It is my opinion, that the effect of FiberWire's coating on FiberWire cannot be determined with reference to other products.

### B.    If Dr. Mukherjee Is Correct Regarding The Meaning Of The Novel And Basic Characteristics, TigerWire's Nylon Does Not Materially Affect Them

55.    Dr. Mukherjee has opined that TigerWire does not infringe for the same reasons that he expressed regarding FiberWire (Mukherjee Res. Report at 30). I disagree for the reasons stated above with respect to FiberWire.

56.    I understand that the differences between TigerWire and FiberWire are that TigerWire is not dyed blue and replaces one PET yarn strand with one black nylon yarn strand. Dr. Mukherjee opines that TigerWire's nylon materially affects pliability (Mukherjee Res. Report at 30-31). I disagree. The purpose of the nylon strand is for visual identification (Ex. V at 74:21-23). It is my opinion that replacing one PET yarn with one nylon yarn does not materially affect

the novel and basic characteristics of the claimed suture because the nylon marker does not

prevent or materially affect FiberWire's PET and UHMWPE from being dissimilar, from being

braided, or from being braided to have improved handleability and pliability without

significantly sacrificing physical properties. I note that Dr. Mukherjee does not opine otherwise.

Rather, he seems to opine that the nylon marker affects pliability. He does not address the issue

of whether FiberWire's braid of dissimilar yarns with improved handleability and pliability

performance without significantly sacrificing physical properties is affected.

57.     Dr. Mukherjee states that TigerWire's nylon yarn "make[s] TigerWire stiffer" than

FiberWire, and "materially" affects "pliability" (Mukherjee Res. Report at 31). He also states

that "nylon 6,6 fibers of the type used in TigerWire are generally more stiff (*i.e.* less pliable) than

fibers made of PET, as used in FiberWire and TigerWire" (Mukherjee Res. Report at 30). I

again disagree. First, I disagree that generally TigerWire's nylon 6,6 fibers are necessarily

stiffer than PET fibers. Dr. Mukherjee cites to his Ex. 26 for the principle that nylon is stiffer

than PET. But Ex. 26 shows the comparative characteristics of "unfilled" PET and "molding

compound" nylon. These are not the characteristics of fibers made from these polymers. Thus,

it is my opinion that it is improper, absent further information, to rely on this molding compound

data for fiber properties. Even if it were proper to rely on this data, Ex. 26 shows that PET has a

flexural modulus of 350,000 psi to 450,000 psi and that nylon 6,6 has a flexural modulus of

410,000 psi to 470,000 psi. There is a significant overlap in these ranges. Based on this data, it

is possible that nylon 6,6 fibers and PET fibers used in FiberWire and TigerWire have

substantially the same flexibility. In that instance, the substitution of one nylon fiber for one

PET fiber would have no substantial affect on the pliability of the braid. Second, even if the

nylon and PET yarns have different flexibility, but the flexibility were still in the range cited in

Ex. 26, it is my opinion that replacing one nylon yarn with one PET yarn would not materially affect the suture's pliability because the two types of material are close enough in flexural modulus as to be essentially indistinguishable in the FiberWire braid. In fact, the one nylon yarn only makes up about 12% of the suture by weight (Ex. EE at ARM 14744).

58.    Dr. Murkherjee's opinion that nylon 66 is generally more stiff than polyester is contradicted by *Marks' Standard Handbook for Mechanical Engineers* (Ex. J at Table 2 at p. 6-155). The elastic modulus of nylon 66 fiber ranges from 25 to 50 gpd and the elastic modulus for polyester fiber, which I read to include polyester, ranges from 50-80 gpd. Thus, it is indicated that nylon 66 fiber is *less stiff* than polyester.

59.    My opinion that TigerWire's nylon does not materially affect TigerWire's pliability is supported by Arthrex's testimony. My. Dreyfuss from Arthrex testified that TigerWire and FiberWire show "very similar" knot strength, tensile strength, [and] handleability (Ex. V at 76:1-5). Also, Mr. Dreyfuss testified that that the nylon strand had only "minute" effects on the feel of the suture as compared to FiberWire (Ex. V at 75:13).

60.    I understand that Dr. Mukherjee relies on a "drape" test comparing FiberWire and TigerWire. My comments and opinions about Dr. Mukherjee's "drape" test above apply here as well. Additionally, I do not understand what Dr. Mukherjee means when his says "to a much greater degree" and the "course [sic] feel would suggest that the addition of the nylon would adversely affect knot tie-down" (Mukherjee Res. Report at 31). Therefore, I cannot really respond to his opinion. Nevertheless, I understand that Dr. Hermes has considered both no. 2 TigerWire and FiberWire. I also understand that he could not determine any significant difference in the stiffness of TigerWire and FiberWire. Again, Dr. Mukherjee provides no diameter measurements for the samples, and diameter can affect pliability.

68.    I reserve the right to comment further on Dr. Mukherjee's analyses and report when more information about the analyses becomes available.   I may use trial demonstratives to explain my opinions.

Dated: April 13, 2006

_____

David Brookstein, Sc.D.
Fellow-American Society of Mechanical Engineers

37

# BROOKSTEIN REBUTTAL REPORT
# EXHIBIT J

*Marks'*
# Standard Handbook for Mechanical Engineers

*Revised by a staff of specialists*

**THEODORE BAUMEISTER**   *Editor-in-Chief*
Stevens Professor Emeritus of Mechanical Engineering,
Columbia University in the City of New York

**EUGENE A. AVALLONE**   *Associate Editor*
Consulting Engineer; Professor of Mechanical Engineering,
The City College of the City University of New York

**THEODORE BAUMEISTER III**   *Associate Editor*
Consultant, Information Systems Department,
E. I. du Pont de Nemours & Co.

*Eighth Edition*

**McGRAW-HILL BOOK COMPANY**

New York   St. Louis   San Francisco   Auckland   Bogotá
Düsseldorf   Johannesburg   London   Madrid
Mexico   Montreal   New Delhi   Panama
Paris   São Paulo   Singapore
Sydney   Tokyo   Toronto

Library of Congress Cataloged The First Issue
of this title as follows:

Standard handbook for mechanical engineers. 1st– ed.;
1916–

New York, McGraw-Hill.

v. Illus. 18–24 cm.

Title varies: 1916–58: Mechanical engineers' handbook.
Editors: 1916–51, L. S. Marks.—1958–  T. Baumeister.
Includes bibliographies.

1. Mechanical engineering—Handbooks, manuals, etc.      I. Marks,
Lionel Simeon, 1871–  ed.  II. Baumeister, Theodore, 1897–
ed.  III. Title: Mechanical engineers' handbook.

TJ151.S82        502'.4'621        16–12915

Library of Congress        [r68z²60–2]
ISBN 0-07-004123-7


MARKS' STANDARD HANDBOOK FOR MECHANICAL ENGINEERS

Copyright © 1978, 1967, 1958 by McGraw-Hill, Inc. All Rights Reserved.
Copyright renewed 1979 by Lionel P. Marks and Alison P. Marks.
Copyright renewed 1952 by Lionel S. Marks. Copyright renewed 1969, 1958 by Lionel
Peabody Marks.
Copyright 1951, 1941, 1930, 1924, 1916 by McGraw-Hill, Inc. All Rights Reserved.
Printed in the United States of America. No part of this publication may be repro-
duced, stored in a retrieval system, or transmitted, in any form or by any means,
electronic, mechanical, photocopying, recording, or otherwise, without the prior
written permission of the publisher.

67891011  KPKP  87654321

| First Edition | Third Edition | Fifth Edition | Seventh Edition |
|---|---|---|---|
| *Eleven Printings* | *Seven Printings* | *Seven Printings* | *Fifteen Printings* |
| Second Edition | Fourth Edition | Sixth Edition | |
| *Seven Printings* | *Thirteen Printings* | *Eight Printings* | |

*The editors for this book were Harold B. Crawford and Lester Strong
and the production supervisor was Teresa F. Leaden.
It was set in Janson by University Graphics, Inc.*

*Printed and bound by Kingsport Press, Inc.*

*The editors and the publishers will be grateful to readers who notify them
of any inaccuracy or important omission in this book*

**Table 1. Fiber Properties***

| Kind | Source | Length of fiber, in. | Width or diam of cells, microns | Specific gravity | Moisture regain,‡ percent | Chemical description | Principal uses |
|---|---|---|---|---|---|---|---|
| Cotton....... | Plant seed hair | 5/8-2 | 8-27 | 1.52 | 8.5 | Cellulose | Industrial, household, apparel |
| Jute†....... | Plant bast | 50-80 | 15-20 | 1.48 | 13.7 | Lignocellulose | Bagging, twine, carpet backing |
| Wool......... | Animal | 2-16 | 10-50 | 1.32 | 17 | Protein | Apparel, household, industrial |
| Viscose....... | Manufactured | Any | 8-43 | 1.52 | 11 | Regenerated cellulose | Apparel, industrial, household |
| Cellulose acetate | Manufactured | Any | 12-46 | 1.33 | 6 | Cellulose ester | Apparel, industrial, household |
| Nylon........ | Manufactured | Any | 8 | 1.14 | 4.2 | Polyamide | Apparel, industrial, household |
| Casein....... | Manufactured | Any | 11-28 | 1.3 | 4.1 | Protein | Apparel |
| Flax†....... | Plant bast | 12-36 | 15-17 | 1.5 | 12 | Cellulose | Household, apparel, industrial |
| Hemp†....... | Plant bast | ..... | 18-23 | 1.48 | 12 | Cellulose | Twine, halyards, rigging |
| Sisal†....... | Plant leaf | 30-48 | 10-30 | .... | .... | Lignocellulose | Twine, cordage |
| Manila†....... | Plant leaf | 60-140 | 10-30 | .... | .... | Lignocellulose | Rope, twine, cordage |
| Ramie†....... | Plant bast | 3-10 | 24-70 | 1.52 | .... | Cellulose | Household, apparel, seines |
| Silk......... | Silkworm | Any | 5-23 | 1.35 | 11 | Protein | Apparel, household, industrial |
| Glass........ | Manufactured | Any | 3 | 2.5 | 0 | Fused metal oxides | Industrial, household |
| Dacron........ | Manufactured | Any | 8 | 1.38 | 0.4 | Polyester | Apparel, industrial, household |

1 in = 0.0254 m; $1\mu = 10^{-6}$ m. The more up-to-date term for the micron ($\mu$) is the micrometer ($\mu$m).

*Adapted from Smith, Textile Fibers, *Proc. ASTM*, 1944; Appel, A Survey of the Synthetic Fibers, *Am. Dyestuff Reporter*, 34, 1945, pp. 21-26; and other sources.

†These fibers are commercially used as bundles of cells. They vary greatly in width. Width figures given are for the individual cells.

‡In air at 70°F and 65 percent relative humidity.

**Table 2. Tensile Properties of Single Fibers***

| Fiber | Breaking tenacity, gpd | Extension at break, percent | Elastic recovery at corresponding strain, percent | Elastic modulus,† gpd |
|---|---|---|---|---|
| Glass................ | 6.0-7.3 | 3.0-4.0 | 100 at 2.9 | 200-300 |
| Fortisan (rayon)............... | 6.0-7.0 | 6 | 100 at 1.2<br>60 at 2.4 | 150-200 |
| Flax...................... | 2.6-7.7 | 2.7-3.3 | 65 at 2 | .... |
| Nylon 6, 6............... | 4.6-9.2 | 16-32 | 100 at 8 | 25-50 |
| Nylon 6............... | 4.5-8.6 | 16-40 | 100 at 8 | 25-50 |
| Silk.................... | 2.4-5.1 | 10-25 | 92 at 2 | 75-125 |
| Saran.................. | 1.1-2.3 | 15-25 | 95 at 10 | .... |
| Cotton................. | 3.0-4.9 | 3-7 | 74 at 2 | 50-100 |
| Steel (90,000 psi T.S.)...... | 0.9 | 28 | ........ | 300 |
| Steel (music wire)............. | 3.5 | 8 | ........ | 300 |
| Viscose rayon.............. | 1.5-5.0 | 15-30 | 82 at 2 | 50-150 |
| Wool.................... | 1.0-1.7 | 25-35 | 99 at 2 | 25-40 |
| Acetate rayon............ | 1.3-1.5 | 23-34 | 100 at 1 | 25-40 |
| Polyester................ | 4.4-7.8 | 10-25 | 100 at 2 | 50-80 |
| Polypropylene.............. | 4.0-7.0 | 15-25 | 95 at 7 | 15-50 |
| Polytetrafluoroethylene.......... | 1.7 | 13 | ........ | .... |

*From Kaswell, "Wellington Sears Handbook of Industrial Textiles," Wellington Sears Co., Inc.

†From Kaswell, "Textile Fibers, Yarns, and Fabrics." Reinhold.

# EXHIBIT 7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

DEPUY MITEK
EXHIBIT 239
04cv12457

| | |
|---|---|
| DePuy Mitek, Inc.<br>    a Massachusetts Corporation<br><br>        Plaintiff,<br><br>    v.<br><br>Arthrex, Inc.<br>    a Delaware Corporation<br><br>        Defendant. | Civil Action No. 04-12457 PBS |

## EXPERT REPORT OF DR. DEBI PRASAD MUKHERJEE
## CONCERNING INVALIDITY OF U.S. PATENT NO. 5,314,446

Pursuant to the provisions of Rule 26(a)(2) of the Federal Rules of Civil Procedure, the Joint Case Management Statement adopted by the Court on February 18, 2005, and agreement between the parties, the undersigned, Dr. Debi Prasad Mukherjee, an expert witness for Defendants Arthrex, Inc. and Pearsalls, Limited (together, "Defendants") hereby sets forth his expert report as follows.

## EXHIBIT 1 - DOCUMENTS REVIEWED AND CONSIDERED

1) U.S. Patent No. 5,314,446

2) Prosecution History of U.S. Patent No. 5,314,446

3) U.S. Patent No. 4,610,688

4) U.S. Patent No. 5,120,802

5) U.S. Patent No. 4,563,392

6) U.S. Patent No. 4,543,286

7) U.S. Patent No. 5,318,575

8) U.S. Patent No. 6,716, 234

9) U. S. Patent No. 3,454,011

10) U.S. Patent Application No. 2005/0149118

11) U.S. Patent Application No. 2004/0267313

12) UK Patent Application No. 2,218,312A to Burgess

13) Cohan, et al., *An Evaluation of Ultrastrong Polyethylene Fiber as an Ophthalmic Suture*, Arch Ophthalmol – Vol. 103, December 1985 (ARM 25132 - 137)

14) *Dyneema SK60, High strength/ high modulus fiber, Properties & Applications* (PR 08420 -- 29)

15) Arthrex's responses to DePuy Mitek's interrogatories

16) DePuy Mitek's responses to Arthrex's interrogatories

17) Dr. Mark Steckel's laboratory notebooks

18) Deposition transcript of Dr. Mark Steckel

19) Deposition transcript of Dennis D. Jamiolkowski

20) Ethicon document DMI 095020

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DEPUY MITEK
EXHIBIT 240
04cv12457

DePuy Mitek, Inc.
    a Massachusetts Corporation )

       Plaintiff,

    v.

Arthrex, Inc.
    a Delaware Corporation

       Defendant.

Civil Action No. 04-12457 PBS

## RESPONSIVE EXPERT REPORT OF DR. DEBI PRASAD MUKHERJEE CONCERNING NON-INFRINGEMENT OF U.S. PATENT NO. 5,314,446 AND OTHER MATTERS

Pursuant to the provisions of Rule 26(a)(2) of the Federal Rules of Civil Procedure, the Joint Case Management Statement adopted by the Court on February 18, 2005, and agreement between the parties, the undersigned, Dr. Debi Prasad Mukherjee, an expert witness for Defendants Arthrex, Inc. and Pearsalls, Limited (together, "Defendants") hereby sets forth his responsive expert report concerning non-infringement and other matters as follows.

## EXHIBIT 1 - DOCUMENTS REVIEWED AND CONSIDERED

1) U.S. Patent No. 5,314,446

2) Prosecution History of U.S. Patent No. 5,314,446

3) Expert Report of Dr. David Brookstein

4) U.S. Patent No. 4,610,688

5) U.S. Patent No. 5,120,802

6) U.S. Patent No. 5,318,575

7) U.S. Patent No 4,563,392

8) U.S. Patent No. 4,543,286

9) U.S. Patent No. 5,147,383

10) U.S. Patent No. 5,089,013

11) U.S. Patent No. 4,532,929

12) U.S. Patent No. 4,994,074

13) U.S. Patent No. 4,983,180

14) U.S. Patent No. 4,649,920

15) UK Patent Application No. 2,218,312A to Burgess

16) Cohan, et al., *An Evaluation of Ultrastrong Polyethylene Fiber as an Ophthalmic Suture*, Arch Ophthalmol – Vol. 103, December 1985 (ARM 25132 - 137)

17) *Dyneema SK60, High strength/ high modulus fiber, Properties & Applications* (PR 08420 – 29)

18) Arthrex's responses to DePuy Mitek's interrogatories

19) DePuy Mitek's responses to Arthrex's interrogatories

20) Dr. Mark Steckel's laboratory notebooks

21) Deposition transcript of Dr. Mark Steckel

22) Deposition transcript of Dennis D. Jamiolkowski

23) Deposition transcript of Donald Grafton

24) Deposition transcript of Robert Sluss

25) Rodeheaver et al., Knotting and Handling Characteristics of Coated Synthetic Absorbable Suture, Journal of Surgical Research 35, 525-530 (1983).

26) Herrman, MD, Tensile Strength and Knot Security of Surgical Suture Materials, The American Surgeon, 209-217 (April 1971).

27) DMI 60231-34

28) DMI 94394

29) Arthrex FiberWire Directions for Use

30) DMI 39421, 39438

31) Ethicon Wound Closure Manual

32) ARM 699

33) Comparative Suture Testing Report of Center for Tribology, Inc.

34) Report of Robert Burks, MD

35) Pearsalls knot strength data document

36) Stiffness data for nylon and PET (www.maropolymeronline.com)

37) FiberStick marketing materials

38) Pearsalls Silkworm documents (PR 8400-03)

39) ARM 10564

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

DePuy Mitek, Inc.　　　　　　　　　 )
　　　a Massachusetts Corporation 　)
　　　　　　　　　　　　　　　　　 )
　　　　　　Plaintiff, 　　　　　　 )
　　　　　　　　　　　　　　　　　 )
　　　v. 　　　　　　　　　　　　 )　　Civil Action No. 04-12457 PBS
　　　　　　　　　　　　　　　　　 )
Arthrex, Inc. 　　　　　　　　　　 )
　　　a Delaware Corporation 　　　 )
　　　　　　　　　　　　　　　　　 )
　　　　　　Defendant. 　　　　　　 )
_____ )

## <u>REBUTTAL EXPERT REPORT OF DR. DEBI PRASAD MUKHERJEE</u>

Pursuant to the provisions of Rule 26(a)(2) of the Federal Rules of Civil

Procedure, the Joint Case Management Statement adopted by the Court on February 18,

2005, and agreement between the parties, the undersigned, Dr. Debi Prasad Mukherjee,

an expert witness for Defendants Arthrex, Inc. and Pearsalls, Limited (together,

"Defendants") hereby sets forth his rebuttal expert report as follows.



DEPUY MITEK
EXHIBIT 356
04cv12457

## EXHIBIT 1 - DOCUMENTS REVIEWED AND CONSIDERED

1) U.S. Patent No. 5,314,446

2) Prosecution History of U.S. Patent No. 5,314,446

3) U.S. Patent No. 4,610,688

4) U.S. Patent No. 5,120,802

5) U.S. Patent No. 5,318,575

6) U.S. Patent No. 6,716, 234

7) UK Patent Application No. 2,218,312A to Burgess

8) Cohan, et al., *An Evaluation of Ultrastrong Polyethylene Fiber as an Ophthalmic Suture*, Arch Ophthalmol – Vol. 103, December 1985 (ARM 25132 - 137)

9) *Dyneema SK60, High strength/ high modulus fiber, Properties & Applications* (PR 08420 – 29)

10) Dr. Mark Steckel's laboratory notebooks

11) Deposition transcript of Dr. Mark Steckel

12) Cheng et al., *Radiation Processing for Modification of Polymers*, 2003 Annual Technical Conference of the Society of Plastics Engineering

13) Ethicon document DMI 095020

# EXHIBIT 8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DePuy Mitek Inc.,<br>    a Massachusetts Corporation | ) ) ) | |
|     Plaintiff. | ) ) | |
|       v. | ) ) | **CIVIL ACTION NO. 04-12457 PBS** |
| Arthrex Inc.,<br>    a Delaware Corporation | ) ) ) | |
|     Defendant. | ) ) | |

### Third Amended Notice Of Deposition Of Arthrex, Inc.

PLEASE TAKE NOTICE THAT, pursuant to Federal Rule of Civil Procedure 30,

beginning at 9:00 a.m., on September 15 and 16, 2005, Plaintiff DePuy Mitek will take the

deposition upon oral examination of Defendant Arthrex, Inc. at the Ritz Carlton Golf Resort,

2600 Tiburon Drive, Naples, Florida 34109 before a Notary Public or duly authorized officer

authorized to administer oaths.  The deposition will be recorded by stenographic means and may

also be recorded by video or audio tape, and by instant visual display of the stenographic record.

Pursuant to FED. R. CIV. P. 30(b)(6), DePuy Mitek requests that Arthrex produce one or

more officer(s), director(s), managing agent(s), or other persons who are designated and consent

to testify on its behalf as to each of the topics set forth in Schedule A, attached hereto.  Pursuant

to said rule, Arthrex is required to prepare said designee(s) to testify as to matters known by, or

reasonably available to, Arthrex falling within each of the stated topics.

Arthrex is requested to identify in writing to DePuy Mitek, on or before May 19, 2005,

the persons who will testify on its behalf and the matters on which each such person will testify.

The deposition will proceed in accordance with the Federal Rules of Civil Procedure and will continue from day to day (Sundays and holidays excluded) until completed unless otherwise agreed.

You are invited to attend and cross-examine.

Date: 9/12/65

DEPUY MITEK, INC.,

By its attorneys,

Dianne B. Elderkin
Lynn A. Malinoski
Michael J. Bonella
Erich M. Falke
WOODCOCK WASHBURN LLP
One Liberty Place - 46th Floor
17th and Market Streets
Philadelphia, PA 19103
(215) 568-3100

Daniel J. Gleason (BBO #194900)
Michelle Chassereau Jackson (BBO 654825)
Nutter McClennen & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA. 02210-2604
617-439-2000

**Schedule A**

**Definitions**

1.     For purposes of this deposition notice, "FiberWire suture(s)" means each Arthrex suture that is or have been sold under the tradenames FiberWire or TigerWire.

2.     For purposes of this deposition notice, "FiberWire suture product(s)" means each Arthrex product that has been or is sold with a FiberWire suture attached to it (*e.g.*, Arthrex's anchors and needles that are sold with FiberWire and TigerWire attached to them).

## Topics

1.      The design and development of FiberWire sutures, including all filament materials considered and the reasons for the same, all filament materials selected and the reasons for the same, all filaments materials rejected and the reasons for the same, all coatings considered and the reasons for the same, all coatings selected and the reasons for the same, all coatings rejected and the reasons for the same, the structure of all prototypes or samples considered in connection with developing FiberWire sutures, the reasons for selecting the structure of the FiberWire sutures currently being sold by Arthrex, and the reasons for rejecting other structures for the commercial FiberWire sutures.

2.      The structure, construction, manufacturing and use of FiberWire sutures.

3.      All materials that are used to construct FiberWire sutures, including, without limitation, polymers, coatings, dyes, or adhesives.

4.      The properties of all the materials used to construct FiberWire sutures, including, without limitation, tensile strength, bending rigidity, knot strength, surface energy, coefficients of friction, knot slippage, knot security, pliability, and handleability.

5.      Testing of the materials that are used to construct FiberWire sutures.  Testing includes, without limitation, any testing relating to the tensile strength, bending rigidity, knot strength, surface energy, coefficients of friction, knot slippage, knot security, pliability, and handleability.

6.      Testing of FiberWire sutures at various stages in the manufacturing process, including, without limitation, after braiding, before coating, after coating, before scouring, after scouring, before heat stretching, and after heat stretching.  Testing includes, without limitation, any testing relating to the tensile strength, bending rigidity, knot strength, surface energy, coefficients of friction, knot slippage, knot security, pliability, and handleability.

7.      The structure, design, construction, and use of Arthrex's FiberWire suture products and attaching them to FiberWire sutures.

8.      An explanation of the persons involved in the development, design, manufacturing, marketing, and selling of Arthrex's FiberWire sutures and FiberWire suture products including their job titles and their respective involvement with the FiberWire sutures and FiberWire suture products.

9.      The markets in which Arthrex's FiberWire sutures and FiberWire suture products compete including an explanation of what products Arthrex contends compete with them, the market share for each product since they were first sold, an explanation of Arthrex's marketing literature for its FiberWire sutures and FiberWire suture products, and the steps taken to market FiberWire sutures and FiberWire suture products.

10.     Arthrex's marketing and business plans for FiberWire sutures and FiberWire suture products.

4

11.    The manufacturing process for producing each FiberWire suture and FiberWire suture product, including those that are sold outside of the United States including, but not limited to, each entity that is involved in making each such product, the responsibility of each entity with respect to FiberWire sutures and FiberWire suture products, each entity's relationship with Arthrex, Inc., any contract between Arthrex, Inc. and each entity that involves FiberWire sutures or FiberWire sutures products, where each manufacturing process is performed on FiberWire suture and FiberWire suture product, and the chain of production of each FiberWire suture and FiberWire suture product from materials to a final product.

12.    Communications with the Federal Food and Drug Administration concerning FiberWire sutures and FiberWire suture products.

13.    All facts supporting Arthrex's contentions that it relied on and was "materially prejudiced" by "DePuy Mitek's silence" as alleged in Arthrex's Response to DePuy Mitek's Interrogatory No. 8.

14.    Arthrex's corporate history and structure.

## CERTIFICATE OF SERVICE

I certify that the foregoing DePuy Mitek Inc.'s Third Amended Notice of Deposition of

Arthrex, Inc. was served *via* facsimile on September 12, 2005 on the following:

Charles W. Saber
Dickstein, Shapiro, Morin & Ochinsky, LLP
2101 L. Street, NW
Washington, DC 20037-1526.
Fax: (202) 887-0689

Christopher Weld, Jr.
Todd & Weld LLP
28 State Street, 31st Floor
Boston, MA 02109
Fax: (617) 227-5777

Dated:  September 12, 2005

_____
Erich M. Falke