**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **DePuy Mitek, Inc.** ) | |
|     **a Massachusetts Corporation** ) | |
| ) | |
|     **Plaintiff,** ) | |
| ) | |
|     **v.** ) | **Civil No. 04-12457 PBS** |
| ) | |
| **Arthrex, Inc.** ) | |
|     **a Delaware Corporation and** ) | |
| ) | |
| **Pearsalls Ltd.** ) | |
|     **a Private Limited Company** ) | |
|   **of the United Kingdom** ) | |
| ) | |
|     **Defendants.** ) | |
| ) | |

**DePuy Mitek's Motion For Leave To Reply To Arthrex's Opposition**
**To Plaintiff DePuy Mitek's Motion To Strike Hearsay Exhibit**
**And All Citation And Commentary Thereto**

DePuy Mitek moves for leave to reply to "Defendants' Opposition To Plaintiff DePuy Mitek's Motion To Strike Hearsay Exhibit And All Citation And Commentary Thereto" to address new evidence and arguments recited in Defendants', Arthrex's and Pearsalls', opposition papers.   In opposing Mitek's motion, Defendants relied on a declaration from Dr. Mukherjee, their technical expert, about the Allied Signal brochure.  But Dr. Mukherjee never considered the Allied Signal brochure during expert discovery.  He did not cite it any of his three expert reports, mention it at his deposition, or produce it in response to a subpoena.  Thus, Mitek did not know about this evidence in advance of its motion.  Further, Arthrex made arguments that were not addressed in Mitek's opening brief, and which invite legal error.  Thus, Mitek requests leave of the Court to reply to these issues.  Mitek's proposed reply is attached hereto.

Dated: September 22, 2006

DEPUY MITEK, INC.,
By its attorneys,


/s/ Erich M. Falke         
Dianne B. Elderkin
Lynn A. Malinoski
Michael J. Bonella
Erich M. Falke
WOODCOCK WASHBURN LLP
One Liberty Place - 46th Floor
17th and Market Streets
Philadelphia, PA 19103
(215) 568-3100

Daniel J. Gleason (BBO #194900)
Michelle Chassereau Jackson (BBO #654825)
Nutter McClennen & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA. 02210-2604
617-439-2000

## CERTIFICATE OF SERVICE

I certify that I am counsel for DePuy Mitek, Inc. and that true and correct copies of:

**DePuy Mitek's Motion For Leave To Reply To Arthrex's Opposition
To Plaintiff DePuy Mitek's Motion To Strike Hearsay Exhibit
And All Citation And Commentary Thereto**

were served on counsel for Defendants Arthrex, Inc. and Pearsalls Ltd. on this date via the Court's e-mail notification with the following recipients being listed as filing users for Defendants:

Charles W. Saber
Dickstein Shapiro
1825 Eye Street, NW
Washington, DC 2006
saberc@dicksteinshapiro.com

Raymond P. Ausrotas
Todd & Weld LLP
28 State Street, 31st Floor
Boston, MA 02109
rausrotas@toddweld.com

Dated:  September 22, 2006          /s/ Erich M. Falke
Erich M. Falke

**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **DePuy Mitek, Inc.** | ) | |
|     **a Massachusetts Corporation** | ) | |
| | ) | |
|     **Plaintiff,** | ) | |
| | ) | |
|     **v.** | ) | **Civil No. 04-12457 PBS** |
| | ) | |
| **Arthrex, Inc.** | ) | |
|     **a Delaware Corporation and** | ) | |
| | ) | |
| **Pearsalls Ltd.** | ) | |
|     **a Private Limited Company** | ) | |
|   **of the United Kingdom** | ) | |
| | ) | |
|     **Defendants.** | ) | |
| | ) | |

**Plaintiff DePuy Mitek's Reply In Support Of Motion To Strike
<u>Hearsay Exhibit And All Citation And Commentary Thereto</u>**

# Table of Contents

I.     The Allied Signal Brochure Does Not Fall Within Any of the Four Hearsay Exceptions Identified By Arthrex ...................................................................... 1

    A.     Mere Production of A Document Does Not Make It A Business Record Under FED. R. EVID. 803(6) ................................................................. 1

    B.     The Allied Signal Brochure Does Not Fall Within the "Market Reports, Commercial Publication" Exception of FED. R. EVID. 803(17) ............................. 4

    C.     The Allied Signal Brochure Does Not Fall Within the "Learned Treatise" Exception of FED. R. EVID. 803(18) ......................................................... 6

        1.     FED. R. EVID. 803(18) Does Not Permit Admission of the Allied Signal ............................................................................... 6

        2.     Neither Dr. Mukherjee Nor Dr. Hermes Provided the Foundation to Establish That A Marketing Brochure Is a Learned Treatise ................ 6

    D.     The Allied Signal Brochure Does Not Fall Within the Catch All Exception of FED. R. EVID. 807 .............................................................. 10

    E.     Contrary to Arthrex's Assertions, Arthrex is Trying To Admit the Allied Signal Brochure for Hearsay Purposes ................................................. 10

II.    Arthrex's Allegations of Some Sinister Plot Are Wrong ..................................... 11

III.   Conclusion .................................................................................... 11

## Table of Authorities

### Federal Cases

*Air Land Forwarders, Inc. v. United States*,
172 F.3d 1338 (Fed. Cir. 1999)................................................................1, 2

*Charles E. Hill & Assocs. v. Compuserve, Inc.*,
No. 97-0434-C, 2000 U.S. Dist. LEXIS 14200 (S.D. In. Aug. 24, 2000) ...................9

*Crane v. Crest Tankers*,
47 F.3d 292 (8th Cir. 1995) ...................................................................4

*In re Dual-Deck Video Cassette Recorder Antitrust Litigation*,
Nos. MDL-765, CIV 87-987, 1990 U.S. Dist. LEXIS 19207 (D. Ariz. July 25,
1990) ...................................................................................5

*Falco v. Alpha Affiliates, Inc.*,
No. 97-494, 2000 U.S. Dist. LEXIS 7480 (D. Del. Feb. 9, 2000)................................2

*Finchum v. Ford Motor Co.*,
57 F.3d 526 (7th Cir. 1995) ...................................................................6

*In re: Fred Hawes Organization, Inc.*,
No. C-2-89-471, 1990 U.S. Dist. LEXIS 19986 (S.D. Oh. 1990) ...............................4

*John Paul Mitchell System v. Quality King Distributors, Inc.*,
106 F. Supp. 2d 462 (S.D. N.Y. 2000)......................................................2, 3

*LNC Investments, Inc. v. First Fidelity Bank*,
126 F. Supp. 2d 778 (S.D. N.Y. 2001)......................................................4, 9

*Shepherd v. American Broadcasting Cos.*,
862 F. Supp. 505 (D. D.C. 1994) ...........................................................5

*Thermal Design, Inc v. Indoor Courts of America, Inc.*,
No. 03-C-249-C, 2004 U.S. Dist. LEXIS 6341 (W.D. Wis. April 9, 2004).................5

*Triple Crown America, Inc. v. Biosynth Ag*,
No. 96-7476, 1999 U.S. Dist. LEXIS 7056 (E.D. Pa. May 13, 1999).........................5

*United States v. Jones*,
712 F.2d 115 (5th Cir. 1983) ..............................................................9

*Woodward v. Sensor Prods., Inc*., Nos. 5:04CV0001, 5:04CV00079, 2005 U.S.
Dist. LEXIS 16479 (W.D. Va. August 11, 2005)..........................................9

**Federal Statutes**

Fed. R. Civ. P. 26(a)(2) ...........................................................................................6

Fed. R. Civ. P. 26(b)(1) ...........................................................................................3

Fed. R. Civ. P. 34 ....................................................................................................3

Fed. R. Evid. 803 .....................................................................................................1

Fed. R. Evid. 902(11) ..........................................................................................1, 3

Fed. R. Evid. 803(6) .................................................................................................1

Fed. R. Evid. 807 .................................................................................................. 10

Fed. R. Evid. 803(18) ........................................................................................ 4, 6, 9

Fed. R. Evid. 803(17) ........................................................................................ 4, 5, 9

Try as it might, Arthrex cannot shoe horn the Allied Signal brochure into any FED. R. EVID. 803 hearsay exception. Arthrex opted not to take discovery of Allied Signal during fact discovery. Further, Arthrex opted not to afford Mitek fair notice of its intended use of this brochure, by obtaining and serving an affidavit from Allied Signal under FED. R. EVID. 902(11). Thus, Arthrex did not provide Mitek the opportunity to cross-examine an Allied Signal witness regarding its admissibility. Rather, Arthrex chose to hide its intended use of this document by not seeking the proper fact discovery, not using the document with its own experts, using the document with a Mitek expert on the eve of the close of expert discovery, and submitting it as evidence in its briefing. Having failed to comply with the many options that it had to try to fairly lay foundation for its admissibility, Arthrex cannot now ignore the rules of evidence.

## I.    The Allied Signal Brochure Does Not Fall Within Any of the Four Hearsay Exceptions Identified By Arthrex

### A.    Mere Production of A Document Does Not Make It A Business Record Under FED. R. EVID. 803(6)

Arthrex admits by its silence that the Allied Signal brochure is not an Allied Signal business record. Nor could Arthrex contend otherwise because there is no record testimony from Allied Signal with respect to the document.

Rather, Arthrex incorrectly asserts that the *Allied Signal Brochure* qualifies as a *Mitek* business record under FED. R. EVID. 803(6) merely because Mitek produced it (Arthrex Br. at 3-4). But Arthrex is wrong. In order to qualify as a Mitek business record, Arthrex had the burden of showing that Mitek "relied upon the accuracy of the document" and "there are other circumstances indicating the trustworthiness of the document" based upon "foundation testimony of a [Mitek] witness with first-hand knowledge of [Mitek's] record keeping procedures." *Air Land Forwarders, Inc. v. United States*, 172 F.3d 1338, 1343 (Fed. Cir. 1999) (*citing* cases at

1342); *Falco v. Alpha Affiliates, Inc.*, No. 97-494, 2000 U.S. Dist LEXIS 7480, at *50-*51 (D. Del. Feb. 9, 2000)(Ex. 4). But Arthrex made no attempt to satisfy these requirements.

First, it submitted no testimony from any Mitek witness, much less the required foundational testimony. Second, there is absolutely no evidence that Mitek ever relied upon the document in its business. In fact, the record is undisputed that the only Mitek witness to testify about the document did not recognize it (Arthrex Ex. 4 at 314:18-20). This fact is key because as the cases cited in *Air Land Forwarders, Inc. v. United States* made clear that the fact that the producing party relied upon a third-party document is the key fact in establishing its credibility and admissibility. *Id.* at 1342-43. Third, there is absolutely no evidence of "other circumstances indicating trustworthiness" because there is no evidence that Mitek ever did anything with the document at all. Thus, as Arthrex has failed to show any of the admissibility factors, including the important reliance factor, the Allied Signal brochure is not a Mitek business record.

Ignoring the well-developed standards for determining whether a third-party document produced by a party qualifies as a business record, Arthrex cites to one isolated case from a District Court (Arthrex Br. at 4). But the case to which Arthrex cites is in accord with the general law, and does not provide blanket admissibility for produced documents, as Arthrex alleges. In that case, four shipping records and invoices, produced by a custodian of records in response to a subpoena, were held to fall within the business record exception. *John Paul Mitchell Sys. v. Quality King Distributors, Inc.*, 106 F. Supp. 2d 462, 471-473 (S.D. N.Y. 2000). Although not spelling out the reliance requirement, the Court effectively found reliance because the producing party relied upon them as business records to show the sale and distribution of its products. *Id.* at 472. Further, there were exceptional circumstances in that case because the documents were produced by the custodian of records, and the custodian refused to testify about

them based on the Fifth Amendment self-incrimination privilege.  *Id.* at 472-473.  Also, the producing company, CDM, appears to have been a small individually owned company.  *Id.* at 467-69.  In contrast, here there is no evidence that Mitek ever relied upon the Allied Signal brochure.  This is not a case of a small company producing a few isolated documents in response to a subpoena.  Rather, Mitek has produced about 95,000 pages of documents.  Surely, Mitek cannot be held to have vouched for the admissibility of every produced document.  Also, no witness here invoked the fifth amendment, and Arthrex had plenty of opportunity to fairly establish admissibility by either deposing Allied Signal or obtaining an affidavit under FED. R. EVID. 902(11) and providing Mitek the opportunity to cross-examine Allied Signal.

As a matter of policy, Arthrex's assertion that merely producing a document in response to a FED. R. CIV. P. 34 document request establishes its admissibility is nonsense and contrary to the Rules of Civil Procedure.  FED. R. CIV. P. 26(b)(1) requires the production of documents that are "reasonably calculated to lead to the discovery of admissible evidence," and does not permit a party to withhold a document merely because it is not admissible.  Such a rule would require a party to determine admissibility during discovery, which would raise even more discovery disputes.  Further, such a rule would be impossible to administer because neither the Court nor a party can properly make admissibility determinations until the issues have been ripen sufficiently for trial, and the offering party has made clear its intended use of the document.

If Arthrex intended to use the Allied Signal brochure, it should have properly obtained an affidavit under FED. R. EVID. 902(11).  Because Arthrex chose the tactic of not affording itself of the proper and fair methods for establishing admissibility, Mitek did not have the opportunity to investigate the document and cross-examine witnesses about it.  Arthrex should not be rewarded by simply having evidence admitted.

**B.    The Allied Signal Brochure Does Not Fall Within the "Market Reports, Commercial Publication" Exception of FED. R. EVID. 803(17)**

In order to prove that the Allied Signal brochure falls within the commercial publication exception of FED. R. EVID. 803(17), Arthrex had the burden of proving that the brochure was "generally used and relied upon by the public or by persons in particular occupations."  But Arthrex failed to satisfy that burden because there is no evidence about this particular Allied Signal brochure being used by anyone, much less the public or persons in particular occupations. Although Arthrex submits Dr. Mukherjee's affidavit (which it does not even rely upon in its commercial exception argument), Dr. Mukherjee provided no testimony whatsoever about this particular Allied Signal brochure being relied upon by anyone.  Rather, Dr. Mukherjee merely provides the conclusory statement that the brochures of "these types" are "the best sources of information" (Arthrex Ex. 3 at ¶3).  Dr. Mukherjee's conclusory self-serving statement fails because it is not about this particular brochure, and he has no knowledge, much less first hand knowledge of this particular brochure being used or relied upon.[1]   The factor is critical because the reliance on the document is what makes it sufficiently trustworthy to be admissible.

---

[1]    *Crane v. Crest Tankers*, 47 F.3d 292, (8th Cir. 1995) (reversing District Court for admitting publication by the Lawyers and Judges Publishing Co. as not falling within the FED. R. EVID. 803(17) exception because there was no foundation that the particular exhibits are generally used or relied upon by the public or persons in the legal or other professions);  *LNC Invs., Inc. v. First Fid. Bank*, 126 F. Supp. 2d 778  (S.D. N.Y. 2001) (excluding newsletter published by Avitas, an appraisal firm, because expert's testimony that he was generally familiar with the newsletters printed by Avitas, but not the particular one sought to be admitted was insufficient foundation to satisfy FED. R. EVID. 803(17) & (18)); *In re: Fred Hawes Organization, Inc.*, No. C-2-89-471, 1990 U.S. Dist. LEXIS 19986, at *13 (S.D. OH 1990) (holding that National Association of Electrical Distributors report did not satisfy the Fed. R. Evid. 803(17) because there was no evidence concerning the use of or reliance on the NAED report by the electrical suppliers industry generally) (Ex. 5).

Further, the commercial publication exception of FED. R. EVID. 803(17) was designed for admission of objective facts that do not need verification.[2]   Here, Arthrex relies on subjective statements like UHMWPE is "far superior;" "UHMWPE is one of the strongest synthetic fibers ever created;" "UHMWPE has been considered a specialized high performance product;" an arbitrary molecular weight distinction between so-called "general purpose PE" and ultra high molecular weight PE, and UHMWPE has "superior strength characteristics" (Arthrex Ex. 3 at ¶¶4-11).  The commercial publication exception was not designed for such subjective statements.

Further, the Allied Signal marketing brochure is replete with tests and data with no verification of the tests, the testing methodology, or the results.[3]  Notably, Dr. Mukherjee does not even try to vouch for the entire brochure.  Because Allied Signal was never deposed about this document's contents, there is no way of verifying their accuracy.  Although Arthrex cites to the copyright date and the document's statement that the brochure was published, this fails to show the purpose behind the document, if and when it was actually published, the circumstances surrounding its publication, or how the information in the document was determined and if it was relied upon by anyone.

---

[2]     *In re Dual-Deck Video Cassette Recorder Antitrust Litigation,* Nos. MDL-765, CIV 87-987, 1990 U.S. Dist. LEXIS 19207, at * 13-*15 (D. Ariz. July 25, 1990) (holding newspaper articles not within the FED. R. EVID. 803(17) exception because the rule only covers reports that rely on objective facts that do not need verification) (Ex. 6);  *Triple Crown America, Inc. v. Biosynth Ag,* no. 96-7476, 1999 U.S. Dist. LEXIS 7056, at *6 (E.D. Pa. May 13, 1999) (Rule 803(17) is limited to a published tabulation, compilation or collection of objective factual data such as stock market closings, currency exchange rates, bank interest rates, weights and measurements or similar information) (Ex. 7).

[3]     *Shepherd v. American Broadcasting Cos*., 862 F. Supp. 505, 508 (D. D.C. 1994) (holding that fees surveys in publications like the *Legal Times* do not satisfy the rule 803(17) exception because there is no showing that the fees are reliable in what lawyers actually charge); *Thermal Design, Inc v. Indoor Courts of Am., Inc.,* No. 03-C-249-C, 2004 U.S. Dist. LEXIS 6341, at *20 (W.D. Wis. April 9, 2004) (holding that Owens Corning advertisement does not satisfy the FED. R. EVID. 803(17) exception because there was no witness with personal knowledge to testify to the truth of the document's contents) (Ex. 8).

**C.    The Allied Signal Brochure Does Not Fall Within the "Learned Treatise" Exception of FED. R. EVID. 803(18)**

 **1.    FED. R. EVID. 803(18) Does Not Permit Admission of the Allied Signal**

The Allied Signal marketing brochure is not admissible under the learned treatise exception of FED. R. EVID. 803(18).  The learned treatise exception only permits statements from a learned treatise to be read into evidence, not the "treatise."  *Id.*; *Finchum v. Ford Motor Co.*, 57 F.3d 526, 531, 532 (7th Cir. 1995) (holding that a treatise was inadmissible and statements from the Treatise could be read into evidence).  Thus, contrary to Arthrex's assertions, the learned treatise exception does not permit Arthrex to simply admit the Allied Signal brochure.

 **2.    Neither Dr. Mukherjee Nor Dr. Hermes Provided the Foundation to Establish That A Marketing Brochure Is a Learned Treatise**

Further, no statements from the Allied Signal brochure are admissible under the Learned Treatise exception of FED. R. EVID. 803(18) because there is absolutely no record evidence that the Allied Signal brochure is a reliable publication.  Although Arthrex cites to Dr. Mukherjee's declaration, Dr. Mukherjee nowhere states that he has any knowledge about publication of or reliance on the Allied Signal brochure.  The Allied Signal brochure's, authors, date of publication, circumstances surrounding publication, intended audience, and distributed, if any, are all unknown.

In any event, Dr. Mukherjee's Allied Signal declaration should be stricken because this is his first testimony about the Allied Signal brochure.  Dr. Mukherjee's expert reports were required to have a "complete statement of all opinions to be expressed and the basis and reasons therefore; *and the data or other information* considered by the witness in forming the opinions."  FED. R. CIV. P. 26(a)(2)(B).  Dr. Mukherjee did not comply with this rule.  Therefore, Mitek has

moved to strike his Allied Signal declaration as set forth in Mitek's Motion To Strike Dr.

Mukherjee's  Declarations.

Contrary to Arthrex's assertions that there is no prejudice by permitting new testimony

from Dr. Mukherjee (Arthrex Br. at 6, n.3), there would be severe prejudice in permitting Dr.

Mukherjee's new opinions.  Mitek was not afforded the opportunity to consider Dr. Mukherjee's

opinions based on the Allied Signal brochure during expert discovery.  Further, Arthrex was able

to escape having Dr. Mukherjee being cross-examined at his deposition.  Thus, Mitek was not

able to test the veracity of his statements based on the brochures.  Further, Arthrex knows that

cross examining a witness at deposition is far different cross examining a witness at trial.

Further, through these tactics, Arthrex was able to escape Mitek taking fact discovery on the

brochure's authenticity and origin, and having Mitek's experts consider it and research it in

forming their opinions.  Arthrex should not be permitted to circumvent the rules of civil

procedure by withholding expert opinions until after expert discovery and submitting them in

replies to summary judgment motions.  Amazingly, Arthrex accuses Mitek of "gamesmanship."

The facts, not rhetoric, speak loudly about who is playing games.

Further, contrary to Arthrex's assertions, Dr. Hermes did not testify that the Allied Signal

brochure is a reliable publication.  Rather, he testified that he had never seen the document

(Arthrex Ex. 4 at 314:18-20).  When confronted with the document for the first time at his

deposition and not having read it in its entirety, Dr. Hermes testified that he did not understand

the document because he did not know the context of the statements:

> Q.    Do you have an understanding of what
>        commodity-type polyethylene is?
> A.    No, I don't.  You know, this is a --
>        this is an advertising brochure by Allied Fibers,
>        Allied Signal, and I'm sure they have a meaning
>        in their own mind and are trying to make a point,

but I don't know what the point is, sir.

Q.       Do you agree with the 50,000 to
several hundred thousand molecular weight for
conventional polyethylene fibers?

A.       No, because I don't understand what
conventional polyethylene means other than as
outlined in this -- in this brochure.

Q.       Do you agree that the authors of this
brochure are trying to tell someone of ordinary
skill in the art that the molecular weight of --
ultra high molecular weight of polyethylene is
significantly different than the molecular weight
of conventional polyethylene fibers?

THE WITNESS:  Mr. Saber, I don't
know who they're speaking to in this document.
I really don't know.  It's not cited as a
reference, so I can't answer that question as to
who they're speaking to.

Q.       Right.  Do you have an understanding
that the authors are trying to say that the
molecular weight of ultra high molecular weight
PE is substantially higher than the molecular
weight of conventional PE --
-- that that's what they're trying to
say?

BY MR. SABER:

Q.       Do you have that understanding?

The WITNESS:  I understand  that's the -- that's the content of the
brochure.  I also understand as someone skilled
in the polymer art that they're making an
arbitrary distinction of molecular weight ranges
and that there's a continuum of molecular weight
ranges from 50,000 to 5 million and above, I'm
certain.

(*id.* at 315:19-25; 318:3-20; 319:3-25) (objections omitted).

Further, Dr. Hermes called into question discussions set forth in the brochure and noted

that its technical descriptions were inadequate because it was a sales brochure:

Q.       This refers to a specific structure
for the ultra high molecular weight PE, doesn't
it?

> A.    Where are you taking me on this
> document?
> Q.    In the portion Chemistry.
> A.    Okay, Chemistry.
> Q.    Yeah.
> A.    (Witness reviewing document.)  If
> you're asking me to base a scientific opinion on
> the words a simplistic view of the structure on a
> molecular scale could be described as a bundle of
> rods, with occasional entanglement points, and
> then describing conventional PE containing chain
> folds of short length that don't make a
> contribution to strength, I would say that that
> description is quite inadequate in describing the
> structure of -- the relationship of structure and
> properties for the material.  This is a sales
> brochure and it's being presented as a sales
> brochure.

(Ex. 9 at 323:21-324:16).  Dr. Hermes also questioned other descriptions which Arthrex tries to

read into the brochure (*id.* at 324:17-326:11; 328:17-332:16).  There is absolutely no record

evidence that the Allied Signal brochure was ever relied upon by anyone, that it is reliable

publication, [4] or has been subject to peer review, much less a "learned treatise."  Thus, it cannot

be admitted under the learned treatise exception.

---

[4]    *United States v. Jones*, 712 F.2d 115, 121 (5th Cir. 1983) (prior testimony was not admissible as a learned treatise because the learned treatise exception is "confined to published works that have been *subjected to widespread collegial scrutiny*") (emphasis added);  *Woodward v. Sensor Prods., Inc.*, Nos. 5:04CV00001, 5:04CV00079, 2005 U.S. Dist. LEXIS 16479, at *18 (W.D. Va. August 11, 2005) (excerpts from the book Polymer Thick Film inadmissible because no foundation testimony) (Ex. 10);  *LNC Invs.,* 126 F. Supp. 2d at 804 (S.D. N.Y. 2001) (excluding newsletter published by Avitas, an appraisal firm, because expert's testimony that he was generally familiar with the newsletters printed by Avitas, but not the particular one sought to be admitted was insufficient foundation to satisfy FED. R. EVID. 803(17) & (18));  *Charles E. Hill & Assocs. v. Compuserve, Inc.,* No. 97-0434-C, 2000 U.S. Dist. LEXIS 14200, at *40 (S. D. In. Aug. 24, 2000) (holding that publication did not fall within the learned treatise exception in-part because the expert did not vouch for the reliability of the publication) (Ex. 11).

**D.    The Allied Signal Brochure Does Not Fall Within the Catch All Exception of FED. R. EVID. 807**

The Allied Signal brochure is not admissible under the catch-all hearsay exception because Arthrex did not comply with FED. R. EVID. 807's notice requirement.  FED. R. EVID 807 required Arthrex to provide notice "sufficiently in advance" of the hearing, so that Mitek had a "fair opportunity" to consider it.  Here, Arthrex did not do that.  Arthrex's experts did not rely on the document, and Arthrex did not cite the document in response to interrogatories.  Arthrex first raised the significance of the document as expert discovery was closing and dispositive motion was beginning at the end of July 2006.  This tactic prevented Mitek from taking fact discovery about the document, having Mitek's experts consider the document, and having Arthrex's experts cross-examined about the document.

Arthrex's notice allegations are so lame they are an admission that Arthrex did not comply with the Rule.  Arthrex alleges that there was notice because Mitek produced the document.  But that is not notice by Arthrex of its intended use of the document, as is required by the Rule.  Further, Mitek produced about 95,000 pages of documents.  Surely that is not notice that Arthrex intends to use all of the documents, and Mitek should investigate the admissibility of each document.  Also, the residual exception does not apply for the reasons that the other exceptions do not apply, as described above.

**E.    Contrary to Arthrex's Assertions, Arthrex is Trying To Admit the Allied Signal Brochure for Hearsay Purposes**

Arthrex asserts a single non-hearsay purpose, namely that the "industry believes that" [general purpose PE and UHMWPE] are different products" (Arthrex Br. at 8).  But as there is no evidence about the authorship, publication, and distribution of the brochure, there is no evidence that the statements in the Allied Signal brochure have been adopted by any industry. Further, the document does not even refer to "general purpose PE."   Thus, the document does

not even support the limited nonhearsay purpose which Arthrex asserts.  Further, even if it does have a nonhearsay purpose, it would be admissible only for that limited purpose.  For example, it would not be admissible as Arthrex has intended to use it for the truth of the matter asserted.

## II.     Arthrex's Allegations of Some Sinister Plot Are Wrong

As it had done throughout its briefing in an effort to distract from the evidence and issues, Arthrex tries to spin a tale and place a black hat on Mitek.  Arthrex asserts that Mitek had an evil scheme to circumvent the page limit requirements.  The mere statement of the allegations speak to their absurdity.  If Mitek wanted more pages it would have simply asked for them or moved for them.  Further, it is ironic that Arthrex would allege this when it departed from the rules and used what appears to be 1.5 line spacing in its opposition summary judgment brief, and it appears that adjusting the brief to 2 line spacing would lengthened Arthrex's brief beyond the 20 page limit. D. Mass. L.R. 5.1(a)(2) and 7.1(b)(4).

Also, Arthrex's assertion that a motion to strike should not be presented with a motion and memorandum is unsupported and contrary to the rules of practice.  Finally, Arthrex accused Mitek of not meeting and conferring.  But Arthrex took the position that the parties did not have to meet and confer on summary judgment motions (Ex. 12), so it is curious that it would take a contrary position with respect to issues pertaining to the summary judgment briefing.  Nevertheless, Mitek met and conferred with Arthrex on September 21, 2006, and the parties were not able to resolve the issue.

## III.    Conclusion

Because the proffered brochure is inadmissible hearsay, all use of it should be precluded and the brochure itself should be stricken.  Each of Defendants' proposed Statements Of Fact Nos. 9, 48-49, and 51-53, the use of the brochure on page 1 of Defendants' Motion For Summary

Judgment, and the use of the brochure on pages 1 and 14 of Defendants' Opening Brief On

Claim Construction should also be stricken.

Dated: September 22, 2006                    DEPUY MITEK, INC.,
                                             By its attorneys,


                                             /s/ Erich M. Falke
                                             Dianne B. Elderkin
                                             Lynn A. Malinoski
                                             Michael J. Bonella
                                             Erich M. Falke
                                             WOODCOCK WASHBURN LLP
                                             One Liberty Place - 46th Floor
                                             17th and Market Streets
                                             Philadelphia, PA 19103
                                             (215) 568-3100

                                             Daniel J. Gleason (BBO #194900)
                                             Michelle Chassereau Jackson (BBO #654825)
                                             Nutter McClennen & Fish LLP
                                             World Trade Center West
                                             155 Seaport Boulevard
                                             Boston, MA. 02210-2604
                                             617-439-2000

**CERTIFICATE OF SERVICE**

I certify that I am counsel for DePuy Mitek, Inc. and that true and correct copies of:

**Plaintiff DePuy Mitek's Reply In Support Of Motion To Strike Hearsay Exhibit And All Citation And Commentary Thereto**

were served on counsel for Defendants Arthrex, Inc. and Pearsalls Ltd. on this date via the Court's e-mail notification with the following recipients being listed as filing users for Defendants:

> Charles W. Saber
> Dickstein Shapiro
> 1825 Eye Street, NW
> Washington, DC 2006
> saberc@dicksteinshapiro.com
>
> Raymond P. Ausrotas
> Todd & Weld LLP
> 28 State Street, 31st Floor
> Boston, MA 02109
> rausrotas@toddweld.com

Dated:  September 22, 2006                    /s/ Erich M. Falke
                                            Erich M. Falke

**Exhibit 4**

LEXSEE 2000 US DIST LEXIS 7480

**FALCO, a Delaware partnership, Plaintiff, v. ALPHA AFFILIATES, INC., a Delaware corporation, WILLIAM J. McGRATH and THOMAS J. ELLIOTT, Defendants.**

**Civil Action No. 97-494 MMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2000 U.S. Dist. LEXIS 7480*

**February 9, 2000, Decided**

**NOTICE:** [*1]   FOR ELECTRONIC PUBLICATION ONLY

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff landlord and defendants, insolvent tenant and its principals, filed motions in limine in plaintiff's action to collect damages under a terminated commercial lease.

**OVERVIEW:** The court was asked to decide the parties' status under a commercial lease. The court predicted that the state court would adopt the modern view regarding suretyships and applying that view, one defendant principal had suretyship status under the lease regardless of whether his guaranty was conditional or unconditional because his guaranty was unambiguously a secondary obligation for all of the amounts due under the lease. Because all aspects of the lease unambiguously defined the scope of the guaranty as a guaranty for the entire lease, the parol evidence rule barred the admission of extrinsic evidence to prove the scope of the guaranty. The extrinsic evidence of prior negotiations would be admissible at trial for the sole purpose of proving fraudulent or material misrepresentations inducing defendant principal with the suretyship to enter into his personal guaranty of the lease. Both defendant principals were jointly and severally liable because neither the lease nor the surrounding circumstances rebutted the presumption of joint and several liability. Third party invoices would be admissible, provided plaintiff laid the proper foundation under *Fed. R. Evid. 803(6)*.

**OUTCOME:** Court determined that one defendant principal had suretyship status because his guaranty was unambiguously a secondary obligation for all amounts due under the lease, parol evidence of prior negotiations would be admissible for sole purpose of proving fraudu-lent or material misrepresentations, defendant principals were jointly and severally liable.

**LexisNexis(R) Headnotes**

*Contracts Law > Contract Interpretation > Fiduciary Responsibilities*
*Real Property Law > Landlord & Tenant > Lease Agreements > Commercial Leases > General Overview*
[HN1] In the context of a commercial lease, a guaranty is conditional if some event, other than default of the principal obligor, must occur before the guarantor becomes liable. The most common type of conditional guaranty is one where the obligee must attempt to collect from the principal obligor before the guarantor. If the guaranty is absolute, the obligee need not attempt to collect from the primary obligor before the guarantor.

*Contracts Law > Contract Interpretation > Fiduciary Responsibilities*
*Contracts Law > Negotiable Instruments > Enforcement > Joint & Several Instruments*
*Real Property Law > Landlord & Tenant > Lease Agreements > Commercial Leases > General Overview*
[HN2] Under early Delaware cases, an obligee must give notice of the principal obligor's default on a commercial lease only to a conditional guarantor. However, the modern trend is to abolish the distinction between absolute and conditional guarantors for purposes of determining the guarantor's rights and instead focus on his suretyship status. The Delaware Supreme Court has not spoken to this issue.

*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*

2000 U.S. Dist. LEXIS 7480, *

*Governments > Courts > Dicta*
[HN3] In order to predict the decision of the Delaware Supreme Court on a given issue, the federal court considers decisions of the lower Delaware courts, federal court decisions interpreting Delaware law, state and federal decisions under other analogous state law, considered dicta, scholarly works, and any other reliable indicia of how the Delaware Supreme Court would decide the issue. Moreover, the trial court does not disregard a decision of an intermediate appellate state court on an issue of controlling state law unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.

*Contracts Law > Contract Interpretation > Fiduciary Responsibilities*
*Real Property Law > Landlord & Tenant > Lease Agreements > Commercial Leases > General Overview*
[HN4] In order for the guarantor's rights to attach to a commercial lease, he must have suretyship status, which is defined as (1) pursuant to contract (the secondary obligation), an obligee has recourse against a person (the secondary obligor) or that person's property with respect to the obligation (the underlying obligation) of another person (the principal obligor) to that obligee, (2) to the extent that the underlying obligation or the secondary obligation is performed the obligee is not entitled to performance of the other obligation, and (3) as between the principal obligor and the secondary obligor, it is the principal obligor who ought to perform the underlying obligation or bear the cost of performance.

*Contracts Law > Defenses > Fraud & Misrepresentation > Material Misrepresentation*
*Contracts Law > Types of Contracts > Guaranty Contracts*
*Real Property Law > Landlord & Tenant > Lease Agreements > Commercial Leases > General Overview*
[HN5] In the context of commercial leases, the general rule is that a secondary obligation is voidable due to a fraudulent or material misrepresentation by the obligee that induces the secondary obligor to enter into the secondary obligation. Delaware law is in accord insofar as it holds contracts voidable if they were procured based upon fraudulent misrepresentations. Although no Delaware case holds guaranty obligations voidable due to material misrepresentations, the federal court predicts that the Delaware Supreme Court will adopt the Restatement view and find guaranty obligations voidable on both grounds.

*Contracts Law > Contract Interpretation > Fiduciary Responsibilities*
*Real Property Law > Landlord & Tenant > Lease Agreements > Commercial Leases > General Overview*
[HN6] In the context of a commercial lease, unless the secondary obligation is a continuing guaranty, voidability applies only to misrepresentations that the obligee makes prior to or contemporaneous with the time that the guarantor enters into the secondary obligation.

*Contracts Law > Contract Interpretation > Fiduciary Responsibilities*
*Contracts Law > Formation > Acceptance > General Overview*
*Real Property Law > Landlord & Tenant > Lease Agreements > Commercial Leases > General Overview*
[HN7] As a general rule, once the commercial lease guarantor's offer to guarantee is accepted by the obligee, it is a contract, and is not terminable unilaterally by the guarantor.

*Contracts Law > Formation > Acceptance > General Overview*
*Contracts Law > Formation > Offers > Revocable Offers*
*Real Property Law > Landlord & Tenant > Lease Agreements > Commercial Leases > General Overview*
[HN8] There is an exception to the general rule that allows a commercial lease guarantor to terminate the guaranty if it is a continuing guaranty. A continuing guaranty is generally defined as a contract pursuant to which a person agrees to be a secondary obligor for all future obligations of the principal obligor to the obligee. Likewise, Delaware law defines a continuing guaranty as one which is not limited to a single transaction, but which contemplates a future course of dealing, covering a series of transactions, and generally for an indefinite time. The theory is that a continuing guaranty is an offer to guarantee a series of future obligations, which the primary obligor has not yet entered into. Since the guaranty is not accepted until the primary obligor enters into each future obligation, the guarantor may revoke his offer to guaranty as to any future obligation not yet executed. The guarantor remains liable for obligations already entered into prior to the revocation.

*Contracts Law > Contract Interpretation > Fiduciary Responsibilities*
*Contracts Law > Types of Contracts > Guaranty Contracts*
*Real Property Law > Landlord & Tenant > Lease Agreements > General Overview*

2000 U.S. Dist. LEXIS 7480, *

[HN9] Whether the guaranty on a commercial lease is a continuing guaranty is a matter of contract interpretation, which is a matter of law for the court.

***Contracts Law > Contract Interpretation > Fiduciary Responsibilities***
***Contracts Law > Types of Contracts > Lease Agreements > General Overview***
***Real Property Law > Landlord & Tenant > Lease Agreements > Commercial Leases > General Overview***
[HN10] Courts generally find continuing guaranties in two categories of cases. First, if a lease gives the tenant an option to extend the term, a guaranty for the lease is a continuing guaranty as to the extension and can be revoked as to the extension before the lease is extended. Second, if a guarantor guarantees all future loans or leases entered into by the primary obligor, the guaranty is continuing and revocable as to all loans or leases not yet entered into by the primary obligor.

***Contracts Law > Contract Interpretation > Fiduciary Responsibilities***
***Real Property Law > Landlord & Tenant > Lease Agreements > Commercial Leases > General Overview***
[HN11] In the context of a commercial lease, the general rule is that an obligor may not impair the suretyship status of the secondary obligor.

***Contracts Law > Contract Interpretation > Fiduciary Responsibilities***
***Contracts Law > Performance > Discharges & Terminations***
***Real Property Law > Landlord & Tenant > Lease Agreements > Commercial Leases > General Overview***
[HN12] The secondary obligor on a commercial lease has the right to terminate the contract upon non-disclosure of certain events by the obligee, but only if the contract gives the secondary obligor the power to terminate the guaranty upon occurrence of that event.

***Contracts Law > Contract Interpretation > General Overview***
***Contracts Law > Defenses > General Overview***
***Evidence > Relevance > Parol Evidence***
[HN13] Under Delaware law, the parol evidence rule generally bars the admission of extrinsic evidence of prior or contemporaneous contract negotiations to interpret the meaning of, vary the terms of, or create ambiguity in a contract. However, parol evidence may be admissible under two exceptions to the parol evidence rule (1)

to interpret ambiguous contract terms, or (2) to prove one party was fraudulently induced to enter the contract.

***Contracts Law > Defenses > General Overview***
***Contracts Law > Formation > Ambiguity & Mistake > General Overview***
***Evidence > Relevance > Parol Evidence***
[HN14] Guaranty obligations in a commercial lease are interpreted according to the same standards as general contracts. The interpretation of language in a contract is a matter of law, in which the court interprets the meaning of contract terms based solely on the contract itself. The court may not consider the proffered parol evidence in determining whether the contract term is ambiguous. However, if the court finds the contract term to be ambiguous, then the parol evidence is admissible to help interpret the meaning of the term and the interpretation becomes a question for the trier of fact.

***Contracts Law > Contract Interpretation > General Overview***
***Contracts Law > Defenses > Ambiguity & Mistake > General Overview***
[HN15] To determine whether a contract term is ambiguous, the test is whether it is reasonably susceptible to at least two possible meanings. A contract term is not ambiguous simply because the parties cannot agree on the meaning. Moreover, the court is not bound by the meaning that the parties ascribe to the contract terms.

***Contracts Law > Contract Interpretation > Parol Evidence > General Overview***
***Contracts Law > Defenses > Fraud & Misrepresentation > Material Misrepresentation***
***Evidence > Documentary Evidence > Parol Evidence***
[HN16] An exception to the parol evidence rule's ban on extrinsic evidence of prior or contemporaneous negotiations is to prove that the contract is void or voidable due to fraud. Generally, guaranty provisions are voidable, not only due to fraudulent misrepresentations, but also due to material misrepresentations. The federal court predicts that the Delaware Supreme Court would find guaranty provisions voidable due to both fraudulent and material misrepresentations.

***Contracts Law > Negotiable Instruments > Enforcement > Joint & Several Instruments***
***Contracts Law > Third Parties > Joint & Several Contracts***
***Contracts Law > Types of Contracts > Joint Contracts***

[HN17] Co-promisers are liable jointly if all of them have promised the entire performance which is the subject of the contract. The effect of a joint obligation is that each joint promisor is liable for the whole performance jointly assumed. It has been said that persons who bind themselves jointly for the performance of one entire duty become sureties for one another for performance of the contract. When a several obligation is entered into by two or more parties in one instrument, it is as though each has executed separate instruments. Under these circumstances, each party is bound separately for the performance which he or she promises, and is not bound jointly with anyone else. A joint and several contract is a contract with each promisor and a joint contract with all, so that all parties having a joint and several obligation are bound jointly as one party, and also severally as separate parties at the same time.

### Contracts Law > Contract Interpretation > Fiduciary Responsibilities

[HN18] Delaware statutory law provides that an obligation or written contract of several persons shall be joint and several, unless otherwise expressed. *Del. Code Ann. tit. 6, § 2701*. This presumption of joint and several liability can only be rebutted by evidence revealing the objective intent of the parties to have a different type of obligation. The intent of the parties is revealed by the language of the contract, the subject matter, and the circumstances surrounding creation of the obligation.

### Contracts Law > Contract Interpretation > Fiduciary Responsibilities
### Real Property Law > Landlord & Tenant > Lease Agreements > Commercial Leases > General Overview

[HN19] In the context of a commercial lease, when there is more than one secondary obligor with respect to the same underlying obligation, each secondary obligor is liable to the obligee in accordance with the terms of its secondary obligation, provided that the obligee's aggregate recovery from all secondary obligors with respect to an underlying obligation may not exceed the amount of the underlying obligation plus any additional amounts recoverable pursuant to the terms of the secondary obligations. It is presumed that, absent language to the contrary, an obligee can recover the entire amount of the guaranty from either or both of the secondary obligors.

### Contracts Law > Contract Interpretation > Fiduciary Responsibilities
### Contracts Law > Remedies > Compensatory Damages > General Overview

[HN20] Under Delaware law, if parties to a contract are jointly liable, the jury must make only one award and may not apportion damages between the parties.

### Evidence > Hearsay > Rule Components > Declarants
### Evidence > Hearsay > Rule Components > Statements
### Governments > Courts > Authority to Adjudicate

[HN21] Under *Fed. R. Evid. 802*, hearsay is not admissible except as provided by the Federal Rules of Evidence or by other rules prescribed by the United States Supreme Court pursuant to statutory authority or by Act of Congress. *Fed. R. Evid. 801(c)* defines hearsay as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

### Evidence > Hearsay > Exceptions > Business Records > Normal Course of Business

[HN22] Under *Fed. R. Evid. 803(6)*, a memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness, is admissible. The term "business" as used in Rule 803(6) includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

### Evidence > Hearsay > Exceptions > Business Records > Normal Course of Business
### Evidence > Testimony > Lay Witnesses > Opinion Testimony > General Overview

[HN23] To obtain admission under *Fed. R. Evid. 803(6)*, a custodian of records or other qualified witness must provide testimony sufficient to lay a foundation that: (1) the person who wrote the records had personal knowledge of the contents of the records, (2) the records were made contemporaneously with the actions recorded, (3) the records were made in the ordinary course of business, and (4) the records were regularly kept by the business.

### Evidence > Inferences & Presumptions > General Overview

2000 U.S. Dist. LEXIS 7480, *

[HN24] The party seeking to introduce the testimony into evidence bears the burden of establishing its admissibility.

***Evidence > Hearsay > Exceptions > Business Records > General Overview***
[HN25] If the custodian of records or other qualified witness provides testimony that business records fulfill each requirement of *Fed. R. Evid. 803(6)*, the court has discretion whether to admit them into evidence.

***Evidence > Hearsay > Exceptions > Business Records > General Overview***
[HN26] One of the requirements of *Fed. R. Evid. 803(6)* is that the records be prepared in the ordinary course of business. Records that are prepared in anticipation of litigation do not fulfill this requirement.

***Evidence > Hearsay > Exceptions > Business Records > General Overview***
[HN27] For purposes of determining admissibility under *Fed. R. Evid. 803(6)*, the custodian or other qualified witness need not be the person that created the records. Moreover, the phrase "other qualified witness" in Rule 803(6) should be given its broadest possible interpretation. The witness need not be a member or employee of the entity that created the records. Circumstantial evidence of the elements of Rule 803(6) is sufficient to lay a foundation for admissibility. Under certain circumstances, Rule 803(6) permits the admission of business records through the testimony of a witness not affiliated with the third party entity that created the records.

***Evidence > Documentary Evidence > Writings > General Overview***
***Evidence > Hearsay > Exceptions > Business Records > Normal Course of Business***
[HN28] The Third Circuit Court of Appeals has examined the admissibility of third party created records and defined the contours of testimony required to lay a foundation for admission of those records under *Fed. R. Evid. 803(6)*. The admission of third party records incorporated into the business records of an entity is permitted under Rule 803(6) if a custodian or other qualified witness from that entity testifies to three requirements. First, the entity must regularly incorporate the third party records into its own records kept in the regular course of business activity. Second, the entity must rely on the accuracy of the third party records. Third, and most important, the witness must be able to vouch for the accuracy of the third party records.

***Civil Procedure > Trials > Jury Trials > Right to Jury Trial***
***Constitutional Law > Bill of Rights > Fundamental Rights > Trial by Jury in Civil Actions***
[HN29] The Seventh Amendment provides that "in suits at common law, where the amount in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. Const. amend. VII.

***Civil Procedure > Trials > Jury Trials > Actions in Equity***
***Civil Procedure > Trials > Jury Trials > Right to Jury Trial***
***Constitutional Law > Bill of Rights > Fundamental Rights > Trial by Jury in Civil Actions***
[HN30] *Fed. R. Civ. P. 38(a)* is coextensive with U.S. Const. amend. VII, providing that the right of trial by jury as declared by U.S. Const. amend. VII shall be preserved to the parties inviolate. The phrase "suits at common law" in the Seventh Amendment means that the jury trial right attaches only in cases involving legal, as opposed to equitable, claims.

***Civil Procedure > Trials > Jury Trials > Right to Jury Trial***
***Constitutional Law > Bill of Rights > Fundamental Rights > Trial by Jury in Civil Actions***
[HN31] For purposes of entitlement to a jury trial, determining whether a claim is legal or equitable involves a two-part test. First, the court compares the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, the court examines the remedy sought and determines whether it is legal or equitable in nature. The second stage of this analysis is more important than the first.

***Civil Procedure > Trials > Jury Trials > Right to Jury Trial***
***Constitutional Law > Bill of Rights > Fundamental Rights > Trial by Jury in Civil Actions***
[HN32] In a diversity action asserting state law claims, the right to trial by jury is to be determined according to federal law.

***Civil Procedure > Trials > Jury Trials > Right to Jury Trial***
***Constitutional Law > Bill of Rights > Fundamental Rights > Trial by Jury in Civil Actions***

[HN33] The Third Circuit Court of Appeals has held that an action for rescission of a contract is an equitable, not a legal, remedy for which there is no right to a jury trial.

*Civil Procedure > Pleading & Practice > Pleadings > Counterclaims > General Overview*
*Contracts Law > Breach > Causes of Action > General Overview*
*Contracts Law > Secured Transactions > Default > Foreclosure & Repossession > Notice Requirements*
[HN34] When there are numerous counterclaims sounding at law underlying an equitable counterclaim, the jury first decides the questions of fact and then the judge decides whether rescission is an appropriate remedy.

*Contracts Law > Breach > General Overview*
*Contracts Law > Defenses > Fraud & Misrepresentation > General Overview*
*Contracts Law > Remedies > Election of Remedies*
[HN35] A cursory review of Delaware law indicates that, although remedies may be pursued in the alternative, at some point, the plaintiff must make an election of remedies. If the plaintiff has a claim for fraudulently inducing entry into a contract, the plaintiff must elect between a tort action for fraud or an action for rescission of the contract. Likewise, if the contract is breached, the non-breaching party must elect from affirming the contract and suing for damages or bringing an action to rescind the contract.

**COUNSEL:** Janet Z. Charlton, Esq., Young, Conaway, Stargatt & Taylor, Wilmington, Delaware, for plaintiff.

Mark A. Kearney, Esq., Elliott Reihner Siedzikowski & Egan, P.C., Blue Bell, Pennsylvania, for Elliott, defendant.

Kathleen M. Miller, Esq., Smith Katzenstein & Furlow LLP, Wilmington, Delaware, for Elliott, defendant.

**JUDGES:** Murray M. Schwartz, Senior District Judge.

**OPINION BY:** Murray M. Schwartz

**OPINION:**

### MEMORANDUM OPINION

Submitted on Briefing
DATED: February 9, 2000
Wilmington, Delaware

Murray M. Schwartz
**Senior District Judge**

### I. Introduction

Falco, a Delaware partnership and landlord, brought the present action to collect damages under a terminated commercial lease against Tenant Alpha Affiliates ("Alpha"), an insolvent Delaware corporation, and its principals William J. McGrath and Thomas J. Elliott. McGrath and Elliott executed the lease both as officers of Alpha and individually as guarantors. Elliott filed cross-claims against McGrath and counterclaims against Falco. Alpha and McGrath have not entered appearances. Trial is scheduled to commence on February 14, 2000.

Falco filed one and Elliott filed two Motions in [*2] Limine which together raise five issues. First, Elliott asks the Court to declare that he and Falco have certain rights, duties, and remedies under the guaranty provision. Second, Falco challenges the admissibility of negotiations leading up to Elliott signing the guaranty under the parol evidence rule. Third, Falco requests the Court enter an order that Elliott and McGrath are jointly and severally liable for the amounts due under the guaranty. Fourth, Elliott challenges the admissibility of certain invoices as being inadmissible hearsay. Fifth, Elliott requests the Court to order that his counterclaim for rescission of the guaranty obligation be submitted to the jury by special interrogatory.

The Court holds as follows. First, the Court clarifies the rights, duties, and remedies of Elliott under the guaranty provision, as discussed in detail below. Second, the extrinsic evidence of prior negotiations will be admissible at trial for the sole purpose of proving fraudulent or material misrepresentations inducing Elliott to enter into his personal guaranty of the Lease. Third, if liable for the amounts due under the guaranty, Elliott and McGrath are jointly and severally liable, and [*3] no jury instruction will be given to apportion liability in conjunction with an instruction on joint and several liability. However, an appropriate instruction will be given with respect to Elliot's crossclaim against McGrath for contribution. Fourth, the invoices prepared by Falco and the third party invoices received by Falco will be admissible if Falco can provide sufficient testimony to lay a foundation for their admission, as outlined in this opinion. The Court does not rule on the admissibility of invoices prepared by Falco's attorneys. n1 Fifth, the facts underlying the rescission claim will be decided by the jury, but whether rescission is warranted will be determined by the Court.

n1 See, *infra*, note 20.

### II. Facts

2000 U.S. Dist. LEXIS 7480, *

A more detailed statement of the background facts can be found in the Court's opinions on a motion to dismiss, Docket Item ("D.I.") 9, and a motion for summary judgment, D.I. 40.

On July 14, 1994, the Lease and Rider were entered into by Falco, by its partner Lloyd Schmeusser, and [*4] Alpha, by its principals Elliott and McGrath. Paragraph 3 of the Rider required Alpha to deposit $ 18,445.86 cash as a security deposit. Lease P 4; Rider P 3. After 45 days, Alpha was required to provide substitute security in the form of a performance bond in the amount of $ 110,675.10, an irrevocable letter of credit, or the personal guarantees to the Lease by Elliott and McGrath. Rider P 3. n2 Alpha never paid the security deposit and Falco declared a termination of the Lease.

n2 Paragraph 3 of the Rider provides:

Tenant shall deposit with Landlord upon execution hereof the sum of eighteen thousand four hundred forty-five dollars and eighty-six cents ($ 18,445.86) as the security deposit provided for in Paragraph 4. Within forty-five (45) days of the date hereof, Tenant shall provide for the benefit of landlord as substitute security, a performance bond in the sum of $ 110,675.10 (representing one year's Basic Rent and estimated additional rent pursuant to paragraphs 6, 7, 8 and 9) with an insurance or surety company licensed to do business in the State of Delaware acceptable to Landlord in the reasonable exercise of Landlord's discretion and in a form acceptable to Landlord in the reasonable exercise of the Landlord's discretion, which performance bond shall be a substitute for the $ 18,445.86 security deposit, which sum shall be refunded by Landlord to Tenant upon the effective date of the surety bond. Failure to provide the performance bond as aforesaid shall constitute an event of default under Paragraph 21 of this Lease permitting Landlord to immediately terminate this Lease by serving a written notice upon Tenant without affording Tenant an opportunity to remedy the default.

The performance bond and the amount thereof shall be subject to all of the terms and conditions of Paragraph 4 of this Lease. As an additional substitute for this security, Landlord will accept an irrevocable Letter of Credit in lieu of the above stated Security Bond or Landlord will accept the personal guarantees of the principals of Alpha, Inc., Thomas J. Elliott and William J. McGrath, to this Lease Agreement.

[*5]

On August 4, 1994, the parties met to discuss the termination. Elliott and McGrath executed new signature lines on the Lease which read:

/s/ William J. McGrath 8/4/94
Guarantor    (Date)

William J. McGrath -Individually
S.S. # ███████████

/s/ Thomas J. Elliott 8/4/94
Guarantor    (Date)
Thomas J. Elliott -Individually
S.S. # ███████████

McGrath and Elliott, along with Schmeusser, also signed an "Amendment to Rider" dated August 4, 1994, which states:

Par 3 of said Rider is amended as follows:

On even date herewith William J. McGrath ("McGrath") and Thomas J. Elliott ("Elliott") signed individual guarantees for the above referenced lease.

On or before September 15, 1994, McGrath and Elliott have the option to provide to Falco the performance bond, or irrevocable letter of credit referenced in Par. 3 of the Rider, as substitute Security for these personal guarantees.

In the event said performance bond or irrevocable letter of credit is not provided, the personal guarantees shall remain in effect.

D.I. 32, Exh. E; D.I. 33, Exh. B. On August 5, Falco informed Alpha, "Per our discussions and agreements on August 4, 1994 regarding [*6] the above referenced Lease Agreement, my August 3, 1994 letter terminating your Lease is effectively withdrawn." D.I. 32, Exh. F.

Alpha defaulted on the Lease in early 1995, failing to pay rent in January and February 1995. D.I. 32, Exh. H. Falco informed Alpha that if it did not cure the deficiency within 30 days, it would terminate the lease on March 20, 1995. *Id.* In April 1995, Falco brought an action in Delaware Superior Court, New Castle County, for rent in the amount of $ 20,105.98, the rent due as of March 20, 1995, "together with rent and other amounts that have accrued since March 20, 1995." D.I. 32, Exh. I. Falco obtained a default judgment against Alpha in that action. D.I. 1, P 8.

On July 23, 1997, Falco brought the present action against Alpha for rent continuing to owe on the Lease and against McGrath and Elliott as guarantors. Elliott filed a crossclaim against McGrath for indemnification and contribution, and a four count counterclaim against Falco alleging: (I) fraudulent non-disclosure; (II) breach of contract; (III) breach of the implied covenant of good faith; and (IV) rescission. Trial is scheduled to commence on February 14, 2000.

**III. Discussion**

**A.  [*7]    Rights, Duties, and Remedies of Falco and Elliott Under Guaranty Provision**

Elliott asks the Court to declare that Falco and Elliott have the following rights and duties under the Lease: (1) Elliott, as a conditional guarantor, has a right to receive notice of Alpha's default and that Falco's failure to provide notice releases Elliott from his guaranty; (2) Falco owed Elliott a duty of reasonable care and diligence and breached that duty by improperly dealing with Alpha and selling Alpha Affiliate's printing equipment; (3) Falco may not recover from Elliott the costs associated with pursuing the debts of Alpha from Alpha; and, (4) Elliott had the right to revoke his guaranty. Falco responds that: (1) Elliott has no right to receive notice of Alpha's default because Elliott was an absolute guarantor; (2) if Elliott was entitled to notice, his remedy is only a release of the guaranty to the extent of his damage; (3) Falco may recover from Elliott the costs of retaking the premises from Alpha; and, (4) Falco owes Elliott no duty of reasonable care and diligence.

Both Falco and Elliott rely upon Delaware case law which distinguishes between the duties owed to absolute and conditional [*8] guarantors. *See Ajax Rubber Co. v. Gam, 34 Del. 260, 151 A. 828, 830 (Del.Super. 1924); Gaylords, Inc. v. Tollins, Inc., 1984 Del. Super. LEXIS 720, *4-6 (Del.Super. 1984).* [HN1] A guaranty is condi-

tional if some event, other than default of the principal obligor, must occur before the guarantor becomes liable. *See id.* The most common type of conditional guaranty is one where the obligee must attempt to collect from the principal obligor before the guarantor. *See id.* If the guaranty is absolute, the obligee need not attempt to collect from the primary obligor before the guarantor. *See id.* [HN2] Under these Delaware cases, the obligee must give notice of the principal obligor's default only to a conditional guarantor. *See id.*

However, the modern trend, as recited in the Restatement (Third) of Suretyship and Guaranty, is to abolish the distinction between absolute and conditional guarantors for purposes of determining the guarantor's rights and instead focus on his suretyship status. n3 *See* Restatement (Third) of Suretyship and Guaranty, Introductory Note; § 1, comment c. The Delaware Supreme Court has not spoken to this issue. Were this case not on the [*9] eve of trial, the Court would certify this question to the Delaware Supreme Court. n4 However, in the interests of going forward with the trial, the Court will predict how the Delaware Supreme Court would decide this issues. *See Farris v. JC Penney Co., Inc., 176 F.3d 706, 713 (3d Cir. 1999).*

----

n3 The distinction between these obligations has been retained for purposes of determining contractual rights. *See Restatement (Third) of Suretyship and Guaranty § 15.* A "guarantor of collection" is equivalent to the common law conditional guarantor and requires the obligor to first attempt to collect from the primary obligor. *See id.* at § 15(b). A "guarantor" is equivalent to the common law absolute guarantor and is liable upon default of the primary obligor, even if the obligee does not attempt to collect from the primary obligor. *See id.* at § 15(a). A "surety" is jointly and severally liable with the primary obligor for the underlying obligation, regardless of whether the primary obligor defaults. *See id.* at § 15(c).

----

n4 Trial is scheduled to commence on February 14, 2000.

----

[*10] [HN3]

In order to predict the decision of the Delaware Supreme Court, this Court considers decisions of the lower Delaware courts, federal court decisions interpreting Delaware law, state and federal decisions under other analogous state law, considered dicta, scholarly works, and any other reliable indicia of how the Delaware Su-

2000 U.S. Dist. LEXIS 7480, *

preme Court would decide this issue. *See Farris v. JC Penney Co., Inc., 176 F.3d 706, 713 (3d Cir. 1999); 2- J Corp. v. Tice, 126 F.3d 539, 541 (3d Cir. 1997).* Moreover, "we do not disregard a decision of an intermediate appellate state court on an issue of controlling state law unless we are 'convinced by other persuasive data that the highest court of the state would decide otherwise.'" *Chemical Leaman Tank Lines, Inc. v. Aetna Cas. and Sur. Co., 177 F.3d 210, 227 (3d Cir. 1999).*

This Court predicts the Delaware Supreme Court would adopt the Restatement view of abolishing the distinction between absolute and conditional guarantors. First, the Delaware Supreme Court has previously adopted the views of the predecessor to the Restatement (Third) of Suretyship and Guaranty, the Restatement (First) of Security. [*11] *See Royal Indem. Co. v. Alexander Industries, Inc., 58 Del. 548, 211 A.2d 919 (Del. 1965); Frank C. Sparks Co. v. Huber Baking Co., 48 Del. 9, 96 A.2d 456 (Del. 1953).* Also, the lower Delaware courts have adopted the Restatement (First) of Security in at least six cases. n5 In one of those cases, the Chancery Court adopted the *Restatement (First) of Security § 82,* which was the predecessor to *section 1 of the Restatement (Third) of Suretyship and Guaranty,* which abolished the distinction between absolute and conditional guarantors. *See Gellis, 322 A.2d 287 at 291.*

n5 *See Stewart v. Bank of Delaware, 1992 Del. Super. LEXIS 515, 1992 WL 423940 (Del.Super. 1992); Federal Deposit Ins. Corp. v. Bloom, 1986 Del. Super. LEXIS 1217, 1986 WL 221 (Del.Super. 1986); Kent County Levy Court v. International Underwriters, Inc., 1985 Del. Ch. LEXIS 480, 1985 WL 149635 (Del.Ch. 1985) Gellis v. S. Gellis & Co., Inc., 322 A.2d 287 (Del.Ch. 1974); Sussex Finance Co. v. Goslee, 46 Del. 242, 82 A.2d 743 (Del.Super. 1951); Theisen v. Hoey, 30 Del. Ch. 269, 58 A.2d 569 (Del.Ch. 1948).*

[*12]

In addition, the Restatement (Third) of Suretyship and Guaranty cites a number of jurisdictions which abolished the distinction prior to publication of the Restatement (Third) of Suretyship and Guaranty. *See id.* at § 1, Reporters Notes. Also, a Westlaw search revealed that at least ten cases from other jurisdictions have cited *section 1 of the Restatement (Third) of Suretyship and Guaranty,* n6 and at least 51 cases have cited other sections of the Restatement (Third) of Suretyship and Guaranty. As a consequence, this Court predicts that the Delaware Supreme Court would abolish the distinction between absolute and conditional guarantors and follow the Restate-

ment view of rights and remedies based upon suretyship status..

n6 *AmTote Intern., Inc. v. PNGI Charles Town Gaming Ltd. Liability Co., 66 F. Supp. 2d 782 (N.D.W.Va. 1999); Chemical Bank v. Meltzer, 93 N.Y.2d 296, 712 N.E.2d 656, 690 N.Y.S.2d 489 (N.Y. 1999); Striar v. American Medical Intern., Inc., 45 Mass. App. Ct. 87, 695 N.E.2d 1079 (Mass.App.Ct. 1998); In re Spirco, Inc., 221 B.R. 361 (W.D.Pa., Apr 13, 1998); Chemical Bank v. Meltzer, 245 A.D.2d 214, 666 N.Y.S.2d 624 (N.Y.A.D. 1997); Guarantee Co. of North America v. City of Cleveland, 1997 U.S. Dist. LEXIS 15285, 1997 WL 614406 (N.D.Ohio 1997); Matter of Liquidation of Integrity Ins. Co., 147 N.J. 128, 685 A.2d 1286 (N.J. 1996); Transamerica Premier Ins. Co. v. U.S., 32 Fed. Cl. 308 (Fed.Cl. 1994); L & A Contracting Co. v. Southern Concrete Services, Inc., 17 F.3d 106 (5th Cir. 1994) Peoples Nat. Bank, Kingfisher, Oklahoma v. U.S., 30 Fed. Cl. 391 (Fed.Cl. 1994).*

[*13]

Given this prediction, the Court will now discuss: (1) Elliott's suretyship status under the Lease; (2) Elliott's rights and remedies against Falco; and, (3) Falco's right to collect certain costs from Elliott.

### 1. Elliott's Suretyship Status

[HN4] In order for the guarantor's rights to attach, he must have "suretyship status," which is defined as:

(a) pursuant to contract (the "secondary obligation"), an obligee has recourse against a person (the "secondary obligor") or that person's property with respect to the obligation (the "underlying obligation") of another person (the "principal obligor") to that obligee; and
(b) to the extent that the underlying obligation or the secondary obligation is performed the obligee is not entitled to performance of the other obligation; and
(c) as between the principal obligor and the secondary obligor, it is the principal obligor who ought to perform the underlying obligation or bear the cost of performance.

*Restatement (Third) of Suretyship and Guaranty § 1.* In this case, Falco is the obligee, Alpha is the primary obli-

gor, and Elliott and McGrath are both secondary obligors. All of the obligations owed by Alpha to Falco under [*14] the Lease are collectively the underlying obligation. As discussed in more detail in Section III.B.1, *infra*, Elliott's guaranty is unambiguously a secondary obligation for all of the amounts due under Alpha's underlying obligation under the Lease. Therefore, Elliott has suretyship status under the Lease, regardless of whether Elliott's guaranty is conditional or unconditional. *See id.*

### 2. Elliott's Rights and Remedies

Since Elliott has suretyship status, his rights and remedies concerning notice of Alpha's default, Falco's dealings with Elliott, Falco's sale of the equipment, and Elliot's right to revoke his guaranty are governed by four provisions of the Restatement (Third) of Suretyship and Guaranty: § 12 regarding voidability of the lease due to misrepresentations; § 16 regarding continuing guaranties; § 37 regarding impairment of suretyship status; and, § 47 regarding nondisclosure of events.

#### a. Section 12: Voidability due to Misrepresentations

Section 12 outlines [HN5] the general rule that a secondary obligation is voidable due to a fraudulent or material misrepresentation by the obligee that induces the secondary obligor to enter into the secondary obligation. [*15] *See Restatement (Third) of Suretyship and Guaranty § 12.* n7 Delaware law is in accord with the Restatement (Third) of Suretyship and Guaranty insofar as it holds contracts voidable if they were procured based upon fraudulent misrepresentations. *See Anglin v. Bergold, 565 A.2d 279, 1989 WL 88265, *2 (Del. 1989) (citing Scott Douglas Corp. v. Greyhound Corp., 304 A.2d 309, 317 (Del.Super. 1973)).* Although the Court has found no Delaware case which holds guaranty obligations voidable due to material misrepresentations, this Court predicts that the Delaware Supreme Court will adopt the Restatement view and find guaranty obligations voidable on both grounds.

N7 *Restatement (Third) of Suretyship and Guaranty § 12* provides:

(1) If the secondary obligor's assent to the secondary obligation is induced by a fraudulent or material misrepresentation by the obligee upon which the secondary obligor is justified in relying, the secondary obligation is voidable by the secondary obligor.

(2) If the secondary obligor's assent to the secondary obligation is induced by a fraudulent or material misrepresentation by either the principal obligor or a third person upon which the secondary obligor is justified in relying, the secondary obligation is voidable by the secondary obligor unless the obligee, in good faith and without reason to know of the misrepresentation, gives value or relies materially on the secondary obligation.

(3) Subject to subsections (4) and (5), if, before the secondary obligation becomes binding, the obligee:

(a) knows facts unknown to the secondary obligor that materially increase the risk beyond that which the obligee has reason to believe the secondary obligor intends to assume; and

(b) has reason to believe that these facts are unknown to the secondary obligor; and

(c) has a reasonable opportunity to communicate them to the secondary obligor; the obligee's nondisclosure of these facts to a secondary obligor constitutes a material misrepresentation.

(4) For purposes of subsection (3), whether the obligee has reason to believe that (i) facts unknown to the secondary obligor materially increase the risk beyond that which the secondary obligor intends to assume and (ii) such facts are unknown to the secondary obligor, shall be determined in light of the obligee's reasonable beliefs as to:

(a) the nature of the secondary obligor's relationship to the principal obligor;

(b) the nature of the secondary obligor's business; and

(c) the secondary obligor's ability to obtain knowledge of such facts independently in the exercise of ordinary care.

(5) Notwithstanding subsection (3), if the secondary obligor controls the principal obligor, is controlled by the principal obligor, or is under common control with the principal obligor, nondisclosure to the secondary obligor by the obligee of facts

    (a) about the principal obligor;
    (b) known or disclosed to the principal obligor; or
    (c) about the underlying obligation that the obligee is under no duty to disclose to the principal obligor

does not constitute a material misrepresentation.

(6) For purposes of this section, if the contract creating the secondary obligation is a continuing guaranty (§ 16), the continuing guarantor is treated as having assented to a secondary obligation with respect to each underlying obligation of the principal obligor at the time that underlying obligation was incurred.

[*16]

Under § 12, [HN6] unless the secondary obligation is a "continuing guaranty," as defined in § 16, voidability applies only to misrepresentations that the obligee makes prior to or contemporaneous with the time that the guarantor enters into the secondary obligation. As discussed in detail in Section III.A.1.c, *infra*, Elliot's guaranty is not a "continuing guaranty" as defined in *Restatement (Third) of Suretyship and Guaranty § 16*. Therefore, Falco's duty under § 12 to not make fraudulent or material misrepresentations is limited to representations it made to Elliott prior to and contemporaneous with the time he signed the guaranty.

The factual record is not sufficiently developed for the Court to resolve, as a matter of law, whether Falco breached its duty to not make fraudulent or material misrepresentations to Elliott. However, as discussed in more detail in Section III.B.2, *infra*, Elliott may introduce extrinsic evidence to the Lease in order to prove a claim under § 12. If Elliott can prove fraudulent or material misrepresentations, his guaranty is voidable at his option.

**b. Section 16: Continuing Guaranty and Right of Termination**

Elliott argues that he had the [*17] power to terminate his guaranty at any time during the course of the Lease. [HN7] As a general rule, once the guarantor's offer to guarantee is accepted by the obligee, it is a contract, and is not terminable unilaterally by the guarantor.

*See, e.g., Danby v. Osteopathic Hospital Ass'n, 101 A.2d 308, 312-13 (Del.Ch. 1954)*. In this case, there is no question that Falco accepted Elliot's offer to guarantee the Lease when they executed the new signature page and Amendment to Rider on August 4, 1996.

[HN8] However, both the *Restatement (Third) of Suretyship and Guaranty § 16* and Delaware law provide an exception to this rule and allow a guarantor to terminate the guaranty if it is a "continuing guaranty." *See Restatement (Third) of Suretyship and Guaranty § 16*; n8 *Elysian Federal Savings Bank v. Sullivan, 1990 Del. Ch. LEXIS 30, 1990 WL 20737, *5 (Del.Ch. 1990); Danby, 101 A.2d at 312; Cooling v. Springer, 42 Del. 228, 30 A.2d 466, 469 (Del.Super. 1943)*. Section 16 defines a "continuing guaranty" as "a contract pursuant to which a person agrees to be a secondary obligor for all future obligations of the principal obligor to the obligee." *Restatement* [*18] *(Third) of Suretyship and Guaranty § 16*. Likewise, Delaware law defines a "continuing guaranty" as "one which is not limited to a single transaction, but which contemplates a future course of dealing, covering a series of transactions, and generally for an indefinite time." *Cooling, 30 A.2d at 469*. The theory is that a continuing guaranty is an offer to guarantee a series of future obligations, which the primary obligor has not yet entered into. *See id.* Since the guaranty is not accepted until the primary obligor enters into each future obligation, the guarantor may revoke his offer to guaranty as to any future obligation not yet executed. *See id.* The guarantor remains liable for obligations already entered into prior to the revocation. *See id.*

n8 Section 16 provides:

A continuing guaranty is a contract pursuant to which a person agrees to be a secondary obligor for all future obligations of the principal obligor to the obligee. A continuing guaranty is terminable, and may be terminated by the continuing guarantor by notice to the obligee. If the continuing guarantor is a natural person, the continuing guaranty is terminated by the death of the continuing guarantor unless the continuing guaranty provides otherwise. Upon termination of a continuing guaranty, the continuing guarantor remains a secondary obligor with respect to obligations of the principal obligor incurred prior to termination and becomes a secondary obligor with

respect to obligations of the principal obligor incurred by extensions of credit to the principal obligor after termination pursuant to a commitment that became binding before termination. Otherwise, the continuing guarantor does not become a secondary obligor with respect to any obligations incurred by the principal obligor after termination.

*Id.*

[*19] [HN9]

Whether the guaranty is a continuing guaranty is a matter of contract interpretation, which is a matter of law for the Court. *See Pellaton v. Bank of New York, 592 A.2d 473, 477 (Del. 1991).* Elliott asserts that his guaranty is a continuing guaranty because, under the Lease, Alpha could incur further indebtedness after he signed the guaranty due to costs that were not fixed at the time he signed the guaranty. These costs presumably include, but are not limited to, tax liability (Lease P 6); insurance liability (P 7); snow removal, parking lot maintenance, etc. (P 8); utilities (P 9); and, termination damages (P 22). Elliott has not cited, and the Court has not located, a single case to support a guaranty for a lease being a continuing guaranty because of future debts specified in the Lease but not yet incurred.

[HN10] Courts generally find continuing guaranties in two categories of cases. First, if a lease gives the tenant an option to extend the term, a guaranty for the lease is a continuing guaranty as to the extension and can be revoked as to the extension before the lease is extended. *See, e.g., Flexi-Van Leasing, Inc. v. Isaias, 23 F. Supp. 2d 419, 423-24 (S.D.N.Y. 1998).* [*20] Second, if a guarantor guarantees all future loans or leases entered into by the primary obligor, the guaranty is continuing and revocable as to all loans or leases not yet entered into by the primary obligor. *See, e.g., Elysian, 1990 WL 20737 at *5.*

Elliott's guaranty has none of the characteristics of the continuing guaranties in those cases. The guaranties in those cases involved future debts that the primary obligor had not yet contracted to incur. In contrast, Alpha contracted with Falco to incur all of the debts enumerated in the Lease for the five year term of the Lease prior to Elliott executing his guaranty. In addition, the continuing guaranties in the other cases cover only future indebtedness which can be incurred at the option of the primary obligor. In this case, Alpha's additional indebtedness would not be incurred at the option of Alpha, but

rather, is caused by outside forces, such as tax laws, insurance rates, and snowfall amounts. Finally, Alpha does not have the right to enter into any additional obligations not listed in the Lease. Therefore, even though the exact amounts are not fixed, Elliott's guaranty is for all of the obligations stated in [*21] the Lease. His obligation is not a continuing guaranty and could not have been terminated once it was accepted by Alpha and Falco on August 4, 1994.

### c. Section 37: Impairment of Suretyship Status

Section 37 sets forth [HN11] the general rule that an obligor may not impair the suretyship status of the secondary obligor. *See Restatement (Third) of Suretyship and Guaranty § 37.* n9 The rule enumerates several types of impairment of suretyship status, which are detailed in § § 39-43. It also contains a catch-all provision for other types of impairments, detailed in § 44. Section 37 also sets forth the remedies that a secondary obligor has against the obligee, including discharge of all or part of his obligation. *See id.* Although the Delaware Supreme Court has not adopted this provision, this Court predicts, for the reasons stated earlier, the Delaware Supreme Court would do so.

n9 Section 37 provides:

(1) If the obligee acts to increase the secondary obligor's risk of loss by increasing its potential cost of performance or decreasing its potential ability to cause the principal obligor to bear the cost of performance, the secondary obligor is discharged as described in subsections (2) and (3), and the secondary obligor has a claim against the obligee as described in subsection (4). An act that increases the secondary obligor's risk of loss by increasing its potential cost of performance or decreasing its potential ability to cause the principal obligor to bear the cost of performance is an "impairment of suretyship status."

(2) If the obligee fundamentally alters the risks imposed on the secondary obligor by:

(a) releasing the principal obligor from a duty other than the payment of

money (§ 39(c)(iii)); or

(b) agreeing to a modification of the duties of the principal obligor that either amounts to a substituted contract or imposes risks on the secondary obligor fundamentally different from those imposed on the secondary obligor prior to modification (§ 41(b)(i));

the secondary obligor is discharged from any unperformed portion of the secondary obligation as more fully set forth in those sections.

(3) If the obligee impairs the secondary obligor's recourse against the principal obligor by:

(a) releasing the principal obligor from a duty to pay money (§ 39(c)(ii));

(b) granting the principal obligor an extension of time for performance of its duties pursuant to the underlying obligation (§ 40(b));

(c) agreeing to a modification of the duties of the principal obligor, other than a release or an extension of time, that does not amount to a substituted contract or impose risks on the secondary obligor fundamentally different from those imposed on the secondary obligor

prior to modification (§ 41(b)(ii));

(d) impairing the value of an interest in collateral securing the underlying obligation (§ 42);

(e) failing to institute an action before expiration of the statute of limitations governing the underlying obligation (§ 43); or

(f) any other act or omission that impairs the principal obligor's duty of performance, the principal obligor's duty to reimburse, or the secondary obligor's right of restitution or subrogation (§ 44);

the secondary obligor is discharged from its duties pursuant to the secondary obligation to the extent set forth in those sections in order to prevent the impairment of recourse from causing the secondary obligor a loss.

(4) If the obligee impairs the secondary obligor's suretyship status

(a) after the secondary obligor performs any portion of the secondary obligation; or

(b) before the secondary obligor performs a portion of the secondary obligation, if the secondary obligor then performs:

(i) without knowledge of such impairment;

(ii) for the benefit of an intended beneficiary who can enforce the

secondary obliga-
tion notwithstand-
ing such impair-
ment; or
(iii) under business
compulsion;

the secondary obligor has a claim
against the obligee with respect to
such performance to the extent
that such impairment would have
discharged the secondary obligor
with respect to that performance.

*Restatement (Third) of Suretyship and Guaranty
§ 37.*

[*22]

At this stage the facts are not well enough developed
to determine whether Falco's alleged failure to give no-
tice of Alpha's default to Elliott; alleged improper deal-
ing with Elliott; and sale of Alpha's printing equipment,
constitute an impairment of Elliot's suretyship status un-
der § 37. It seems clear to the Court that it would not
constitute an impairment under any of the enumerated
impairments in § § 39-41 and 43. n10 Also, assuming
Alpha's obligations under the Lease were not secured by
a security interest in collateral, there would not be an
impairment of Elliot's suretyship status by an impairment
of collateral, under section 42. n11

n10 These are:

(a) releasing the principal obligor
from a duty to pay money (§
39(c)(ii));
(b) granting the principal obligor
an extension of time for perform-
ance of its duties pursuant to the
underlying obligation (§ 40(b));
(c) agreeing to a modification of
the duties of the principal obligor,
other than a release or an exten-
sion of time, that does not amount
to a substituted contract or impose
risks on the secondary obligor
fundamentally different from those
imposed on the secondary obligor
prior to modification (§ 41(b)(ii));
(d) impairing the value of an inter-
est in collateral securing the un-
derlying obligation (§ 42);
(e) failing to institute an action be-
fore expiration of the statute of

limitations governing the underly-
ing obligation (§ 43).

*Id.* at § 37.
[*23]

n11 Section 42 provides:

(1) If the underlying obligation is
secured by a security interest in
collateral and the obligee impairs
the value of that interest, the sec-
ondary obligation is discharged to
the extent that such impairment
would otherwise increase the dif-
ference between the maximum
amount recoverable by the secon-
dary obligor pursuant to its subro-
gation rights (§ § 27-31) and the
value of the secondary obligor's
interest in the collateral.
(2) Impairing the value of a secu-
rity interest in collateral includes:

(a) failure to obtain or maintain perfection or
recordation of the interest in collateral;

(b) release of collateral without
substitution of collateral of equal
value or equivalent reduction of
the underlying obligation;
(c) failure to perform a duty to
preserve the value of collateral
owed to the principal obligor or
the secondary obligor; and
(d) failure to comply with applica-
ble law in disposing of collateral.

*Id.* at § 42.

However, these actions may constitute an impair-
ment under the catch-all provision in § 44, which reads:

If otherwise than described [*24] in § §
39-43 the obligee impairs the principal
obligor's duty of performance (§ 21), the
principal obligor's duty to reimburse (§ §
22-25), or the secondary obligor's right of
restitution (§ 26) or subrogation (§ § 27-
31), the secondary obligor is discharged
from its duties pursuant to the secondary
obligation to the extent that such impair-

ment would otherwise cause the secondary obligor a loss.

*Id.* at § 44. However, the factual record is not well enough developed to determine as a matter of law whether these acts constitute an impairment of Elliot's suretyship status. As such, the parties will be permitted to introduce evidence at trial to prove or disprove whether Elliot's suretyship status has been impaired.

### d. Section 47: Non-Disclosure of Events

Section 47 gives [HN12] the secondary obligor the right to terminate the contract upon non-disclosure of certain events by the obligee, but only if the contract gives the secondary obligor the power to terminate the guaranty upon occurrence of that event. *See Restatement (Third) of Suretyship and Guaranty § 47*. n12 The Lease nowhere gives Elliott the right to terminate his guaranty for any reason. Therefore, assuming [*25] the Delaware Supreme Court were to adopt this section, it would not provide any recourse for Elliott.

n12 This section provides:

If, pursuant to the terms of the contract creating the secondary obligation, the secondary obligor has the power, upon the occurrence of a specified event, to terminate the secondary obligation with respect to subsequent defaults of the principal obligor on the underlying obligation or subsequently incurred duties of the principal obligor, and:

(a) such event occurs;
(b) the obligee knows such event has occurred; and
(c) the obligee has reason to know that the occurrence of such event is unknown to the secondary obligor;

the secondary obligor is discharged from the secondary obligation with respect to defaults of the principal obligor that occur, or duties of the principal obligor in-

curred, thereafter and before the secondary obligor obtains knowledge of the occurrence of the event.

*Id.*

### 3. Falco's Right to Collect Certain Costs from Elliott

It is unclear [*26] what costs that the parties dispute that Falco has a right to recover from Elliott. Elliott argues that Falco may not charge him for "costs associated in pursuing the debts of the principal debtor, Alpha Associates." D.I. 34 at 4. Without responding directly to Elliot's argument, Falco contends that it may recover its costs associated with eviction of Alpha and sale of its equipment. D.I. 60 at 5-6. In reply, Elliott asserts that he is not liable for any "expenses or costs outside the Lease Agreement."

As discussed in more detail in Section III.B.1, *infra*, Elliott is unambiguously liable as guarantor for all amounts due under the terms of Lease for the entire five year term of the Lease. This includes, but is not limited to, payment of rent (P 3); taxes (P 6); insurance (P 7); snow removal, parking lot maintenance, grass cutting, landscaping, security, common area electric, and other common area charges (P8); utilities (P 9); repairs and maintenance (P 13); and, damages due to Tenant's default (P 22). Thus, Elliott is liable for all costs and expenses to the extent they are provided for in the Lease. Without knowing exactly what costs and expenses the parties seek to admit or [*27] exclude, and not being advised what other Lease provision they assert to be relevant, the Court cannot rule on whether they fall within the terms of Elliot's guaranty of the Lease.

### B. Admission of Parol Evidence

Elliott seeks to introduce evidence of negotiations between him and Falco, prior to his executing the guaranty provision for the Lease on August 4, 1996. [HN13] Under Delaware law, the parol evidence rule generally bars the admission of extrinsic evidence of prior or contemporaneous contract negotiations to interpret the meaning of, vary the terms of, or create ambiguity in a contract. *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232 (Del. 1997)*. However, Elliott asserts that the evidence is admissible under two exceptions to the parol evidence rule: (1) to interpret ambiguous contract terms, *see id.*; and/or (2) to prove one party was fraudulently induced to enter the contract. *See Anglin v. Bergold, 565 A.2d 279, 1989 WL 88265, *2 (Del. 1989)* (citing *Scott Douglas Corp. v. Greyhound Corp.,*

*304 A.2d 309, 317 (Del.Super. 1973)).* The Court finds that the lease is not ambiguous but that the parol [*28] evidence is admissible for the purpose of proving fraudulent inducement.

### 1. Ambiguity in Lease

[HN14] Guaranty obligations are interpreted according to the same standards as general contracts. *See Restatement (Third) of Suretyship and Guaranty § 14.* The interpretation of language in a contract is a matter of law, in which the Court interprets the meaning of contract terms based solely on the contract itself. *See Pellaton v. Bank of New York, 592 A.2d 473, 477 (Del. 1991); Mesa Partners v. Phillips Petroleum Co., 488 A.2d 107, 113 (Del.Ch. 1984).* The Court may not consider the proffered parol evidence in determining whether the contract term is ambiguous. *See id.* However, if the Court finds the contract term to be ambiguous, then the parol evidence is admissible to help interpret the meaning of the term and the interpretation becomes a question for the trier of fact. *See id.*

[HN15] To determine whether a contract term is ambiguous, the test is whether it "is reasonably susceptible to at least two possible meanings." *Eagle Industries, 702 A.2d at 1231.* A contract term is not ambiguous simply because the parties cannot agree on [*29] the meaning. *See Rhone-Poulenc Basic Chemicals Co. v. American Motorists Insurance Co., 616 A.2d 1192, 1196 (Del. 1992).* Moreover, the Court is not bound by the meaning that the parties ascribe to the contract terms. *See Eagle Industries, 702 A.2d at 1231.*

Here, the parties dispute the scope of the guaranty executed by Elliott. Falco asserts that the guaranty is unambiguous and that Elliott personally guaranteed all amounts due under the lease by Alpha. Elliott counters that his guaranty was only for the $ 18,445.86 security deposit, or the Lease is at least ambiguous as to whether he guaranteed all amounts due under the Lease or only the security deposit. The Court finds the Lease is unambiguous that Elliott guaranteed all amounts due under the entire Lease.

In the original Lease, before Elliott executed the guaranty, paragraph 3 of the Rider n13 unambiguously explained that Elliott's guaranty would be for all sums due under the Lease. Paragraph 3 provided that Alpha deposit an $ 18,445.86 cash security deposit with Falco on the date of the execution of the Lease. After that date, Alpha had 45 days to provide "substitute security," in exchange for [*30] the cash security deposit, in one of three forms: (1) a performance bond for $ 110,675.10, (2) an irrevocable letter of credit for $ 110,675.10, or (3) "the personal guarantees of the principals of Alpha, Inc., Thomas J. Elliott and William J. McGrath, to this Lease Agreement." This language is clear that the guaranty is

for "the Lease Agreement," not for the security deposit. Nowhere does the Lease or Rider limit the scope of the guaranty to only the security deposit. In addition, paragraph 3 unambiguously stated that the guaranty for the lease would be a substitute security for the $ 18,445.86 cash security deposit, not that the guaranty would be for the cash security deposit.

n13 See Facts, section II, *supra,* for full text of Rider P 3.

Moreover, under the terms of paragraph 3, it would defy all logic for the guaranty to be limited to only the $ 18,445.86 cash security deposit. Although Falco was willing to accept $ 18,445.86 in cash as the security deposit to start the Lease, the Lease provides for substitution [*31] with three non-cash alternatives. The first two alternatives, the performance bond and the letter of credit, were for substantially more money than the cash security deposit. Given the history of nonpayment, it is illogical that Falco would accept a personal guaranty, in lieu of cash, in the same amount as the cash security deposit. Rather, paragraph 3 is clear that the guaranty was for the entire Lease.

The new signature page also leads to the unambiguous conclusion that Elliott's guaranty was for the entire Lease. Unless the contract indicates otherwise, the use of the terms "guarantor" and "guaranty" mean that the signatory to the guaranty is liable, as a secondary obligor, for the entire obligation that the principal obligor has under the contract. *See Restatement (Third) of Suretyship and Guaranty § 15(a).* Alpha, as Tenant, was the principal obligor for all amounts due under the Lease and Elliott signed as "Guarantor." Moreover, other provisions in the Lease and Rider refer to Elliott's obligation as a "guaranty." In addition, the Lease contains no limitation or intimation that Elliott's guaranty is for only the security deposit. It is concluded the Lease language unambiguously [*32] indicates that Elliott is a secondary obligor for the entire obligation of Alpha and is liable for the full amount due under the Lease.

Finally, the Amendment to Rider unambiguously verifies that Elliot's guaranty was for the entire Lease. The Amendment to Rider states that Elliott and McGrath "signed individual guarantees *for the above referenced lease.*" (emphasis added). It does not state that the guaranty is solely for the security deposit. Moreover, the Amendment to Rider preserved Elliott's option of substituting the performance bond or the irrevocable letter of credit, as provided in paragraph 3 of the original Rider, for his personal guaranty. Because the Amendment to Rider references the substitute security options to paragraph 3 of the Rider, it indicates that the guaranty has the

same scope as provided in paragraph 3 of the Rider, which is for the entire Lease. It follows the Amendment to Rider also unambiguously shows that Elliot's guaranty was for the entire Lease.

Because all aspects of the Lease unambiguously define the scope of the guaranty as a guaranty for the entire Lease, the parol evidence rule bars the admission of extrinsic evidence to prove the scope of [*33] the guaranty.

### 2. Fraud

[HN16] Another exception to the parol evidence rule's ban on extrinsic evidence of prior or contemporaneous negotiations is to prove that the contract is void or voidable due to fraud. *See Anglin, 1989 WL 88265,* at *2. The rationale for the exception is that, if fraudulent misrepresentations induced a party to enter the contract, then there was no mutual assent, no contract, and the parol evidence rule does not apply. *See James River-Pennington, Inc. v. CRSS Capital, Inc., 1995 Del. Ch. LEXIS 22, 1995 WL 106554,* *6 (Del.Ch. 1995). The *Restatement (Third) of Suretyship and Guaranty § 12* provides that guaranty provisions are voidable, not only due to fraudulent misrepresentations, but also due to material misrepresentations. n14 This Court predicts that the Delaware Supreme Court will adopt the Restatement view, and will find guaranty provisions voidable due to both fraudulent and material misrepresentations. Accordingly, extrinsic evidence is admissible to prove that an obligee fraudulently or materially misrepresented facts which induced a guarantor to enter into a guaranty. However, it is not admissible to prove fraudulent or material misrepresentation [*34] in connection with the obligee's performance. *See James River-Pennington, Inc., 1995 WL 106554* at *6.

n14 *See* note 6, *supra,* for text of § 12.

Elliott has not pled a defense of fraudulent or material misrepresentations inducing him to enter into the guaranty provisions. D.I. 12. However, Elliott has asserted a counterclaim against Falco for "Fraudulent Nondisclosure." *Id.* at PP 25-35. Although this counterclaim relates primarily to Falco's fraudulent misrepresentations in performing its obligations under the Lease, it can also plausibly be read to include a claim for fraudulent or material misrepresentations inducing him to enter the guaranty. Elliott claims that Falco "intentionally and fraudulently concealed material facts to fraudulently induce [Elliott] into continuing his alleged relationship with [Falco]" and that this occurred "from July 1994." *Id.* at PP 27-28. Paragraphs 29-35 further elaborate on these allegations. Since Elliott did not sign the guaranty until

August 4, 1994, the [*35] counterclaim can be read to allege that Falco's fraudulent and material misrepresentations induced Elliott into continuing his relationship with Falco by signing the guaranty.

Therefore, extrinsic evidence of prior or contemporaneous negotiations leading up to Elliott's signing the guaranty will be admissible for the limited purpose of proving fraudulent or material misrepresentations inducing him to enter into it. *See James River-Pennington, 1995 WL 106554,* at *6. Whether Elliott was induced to enter the guaranty becomes an issue for the trier of fact. *See Fort Howard Cup Corp. v. Quality Kitchen Corp., 1992 Del. Super. LEXIS 337, 1992 WL 207276,* *3 (Del. Ch. 1992). However, the extrinsic evidence will not be admissible to prove fraudulent or material misrepresentations in Falco's performance of the Lease obligations, or for any other purpose.

In conclusion, the extrinsic evidence of prior negotiations will be admissible at trial for the sole purpose of proving fraudulent or material misrepresentations inducing Elliott to enter into his personal guaranty of the Lease. It will not be admissible to prove the scope of the guaranty, in which Elliott unambiguously guaranteed all [*36] amounts due under the lease, or for any other purpose. If Falco desires, it may submit a proposed limiting jury instruction to be given upon its request at the time defendant Elliott offers the evidence of the negotiations leading up to agreement on the original lease.

### C. Joint and Several Liability of Elliott and McGrath

Falco requests the Court enter an order that Elliott and McGrath are jointly and severally liable for the amounts due under the guaranty. In response, Elliott argues that he and McGrath are severally, but not jointly, liable on the guaranty. In the alternative, Elliott requests that the Court submit a special interrogatory to the jury regarding apportionment of damages between him and McGrath. For the following reasons, the Court holds that Elliott and McGrath are jointly and severally liable and that Elliott is not entitled to a special interrogatory apportioning liability in conjunction with an instruction on joint and several liability.

This dispute centers on whether Elliott and McGrath are jointly and severally liable, or only severally liable, on the guaranty provisions of the Lease. The difference between joint, several, and joint and several liability [*37] for obligations under a contract is as follows:

> [HN17]
> Copromisers are liable "jointly" if all of them have promised the entire performance which is the subject of the contract. The effect of a joint obligation is that each

joint promisor is liable for the whole performance jointly assumed. It has been said that persons who bind themselves jointly for the performance of one entire duty become sureties for one another for performance of the contract. . . .

When a "several" obligation is entered into by two or more parties in one instrument, it is as though each has executed separate instruments. Under these circumstances, each party is bound separately for the performance which he or she promises, and is not bound jointly with anyone else.

A "joint and several" contract is a contract with each promisor and a joint contract with all, so that all parties having a joint and several obligation are bound jointly as one party, and also severally as separate parties at the same time.

Richard A. Lord, 12 Williston on Contracts § 36:1 (4th ed. 1999) ("Williston").

[HN18] Delaware statutory law provides that "an obligation or written contract of several persons shall be joint and [*38] several, unless otherwise expressed." *6 Del. Code § 2701*. This presumption of joint and several liability can only be rebutted by evidence revealing the objective intent of the parties to have a different type of obligation. *See* Williston, § § 36:2, 36:3; *Restatement (Second) of Contracts § § 288*, 289. The intent of the parties is revealed by the language of the contract, the subject matter, and the circumstances surrounding creation of the obligation. *See id.*

Moreover, this presumption is also embraced by the Restatement (Third) of Suretyship and Guaranty, which provides:

[HN19]
When there is more than one secondary obligor with respect to the same underlying obligation, each secondary obligor is liable to the obligee in accordance with the terms of its secondary obligation, provided that the obligee's aggregate recovery from all secondary obligors with respect to an underlying obligation may not exceed the amount of the underlying obligation plus any additional amounts recoverable pursuant to the terms of the secondary obligations.

*Restatement (Third) of Suretyship and Guaranty § 52*. Under this section, it is presumed that, absent language to the contrary, an obligee [*39] can recover the entire amount of the guaranty from either or both of the secondary obligors.

The Court finds no evidence sufficient to rebut the presumption of joint and several liability. First, the text of the Lease and Rider contains no language indicating that Elliott and McGrath are separately liable for individual shares of the guaranty. To the contrary, paragraph 3 of the Rider states that, as substitute security, Falco would only accept the personal guarantees of both Elliott and McGrath. Also, the revised signature page contains the signatures of both Elliott and McGrath as guarantors with no mention of them having separate obligations, such as "guarantor for 50%." Moreover, the Amendment to Rider states that Falco had accepted the personal guaranties of Elliott *and* McGrath and that Elliott *and* McGrath have the option of dissolving the personal guaranties by posting a performance bond or letter of credit. However, there is no mention of divisibility of any obligation between Elliott and McGrath. Since the language of the contract reveals no evidence of intent of only several liability, the presumption of joint and several liability governs.

Second, as to the surrounding [*40] circumstances, the only evidence that Elliott has proffered to rebut the presumption of joint and several liability is that he and McGrath signed the guaranty successively and independently of each other. Even if they signed successively and independently of each other, n15 that is not enough to rebut the presumption of joint and several liability. Elliott relies upon language in *Lamson v. Habbart, 42 Del. 600, 43 A.2d 249 (Del. 1945),* which held that "if each indorser successively and independently indorsed, then their obligation is several. . . and distinct." *43 A.2d at 250.* However, *Lamson* involved the liability of successive indorsers on a negotiable instrument. In finding successive indorsers only severally liable, the court relied upon a holding that the Delaware statutory presumption in favor of joint and several liability does not apply to negotiable instruments. n16 *See id.* Since this Lease and Rider are not negotiable instruments, the exception to *6 Del. Code § 2701* for successive indorsement does not apply. Thus, Elliott has proffered no evidence sufficient to prove that he and McGrath had any intent other than the presumed intent of joint and several [*41] liability.

n15 This could be a difficult proposition in itself since they both signed on the same date.

n16 This decision was actually based on a precursor to *6 Del. Code § 2701*, which provides, with identical language, that "an obligation, or written contract, of several persons, shall be joint and several, unless otherwise expressed." *Id.* (citing Section 3108 of Revised Code of 1935).

Although the Court finds Elliott and McGrath jointly and severally liable, Elliott also requests a special jury interrogatory to apportion damages between him and McGrath. The cases cited by Elliott are all inapplicable as they are tort cases, from other jurisdictions, which hold that an apportionment instruction is appropriate only when the defendants are severally, but not jointly, liable. *See Higginbotham v. Ford Motor Co., 540 F.2d 762, 772-773 (5th Cir. 1976); In re Thirteen Chapter 7 Cases of Former Trustee Germain, 182 B.R. 375, 378 (Bank.D.Conn. 1995); Reilly v. DiBianco, 6 Conn. App. 556, 507 A.2d 106, 113 (Conn.App. 1986).* [*42] In contrast, this is a contract case where the defendants are jointly and severally liable. Moreover, [HN20] under Delaware law, if parties to a contract are jointly liable, the jury must make only one award and may not apportion damages between the parties. *See Willard F. Deputy & Co. v. Hastings, 32 Del. 345, 123 A. 33, 35 (Del. Super. 1923).*

Accordingly, the Court will enter an order that, if liable for the amounts due under the guaranty, Elliott and McGrath are jointly and severally liable. The Court will not permit a special jury interrogatory to apportion damages between Elliott and McGrath in conjunction with joint and several liability.

## D. Whether Invoices are Hearsay

Elliott objects to three sets of invoices which Falco seeks to admit into evidence: (1) invoices from Falco to Defendants for work allegedly performed on the premises by Falco (F0006, 0010, 0021, 0042, 0045) (the "Falco invoices"); (2) invoices from third parties to Falco for work allegedly performed on the premises by third parties, such as pest control experts, plumbers, locksmiths, and electricians (F0007, 0012, 0018, 0048) (the "third party invoices"); and (3) invoices from Falco's attorneys [*43] to Falco for legal services (F0011, 0013-0014, 0019-0020, 0047, 0049-0067) (the "attorney invoices"). Falco seeks to admit these invoices as evidence of operating expenses chargeable to Defendants under the terms of the lease. Elliott challenges the admissibility of these documents as being hearsay and therefore inadmissible under *Fed. R. Evid. 802*. n17 D.I. 30 at 11. Falco concedes, and the Court agrees, that each invoice contains hearsay. n18

n17 [HN21] Rule 802 provides: "Hearsay is not admissible except as provided by these rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress." *Fed. R. Evid. 802*. Rule 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *Fed. R. Evid. 801(c).*

n18 Each invoice contains out of court statements which are being offered the truth of those statements. *See Fed. R. Evid. 801(c).* For example, F0012 is an invoice from Anthony M. Buzas, Apiculturist to Falco, containing out of court statements by Buzas that he charged $ 600.00 for removing two colonies of bees from the premises. This document is being offered to prove that Buzas removed the bees from the premises and that the charge for the removal was $ 600.00.

[*44]

Falco asserts these invoices are admissible pursuant to the business records exception to the hearsay rule, *Fed. R. Evid. 803(6)*, which provides:

> [HN22]
> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

[HN23] To obtain admission under Rule 803(6), a custodian of records or other qualified witness must provide testimony sufficient to lay a foundation that: (1) the person who wrote the records had personal knowledge of the contents of the records; (2) the records were made

contemporaneously [*45] with the actions recorded; (3) the records were made in the ordinary course of business; and (4) the records were regularly kept by the business. *See United States v. Pelullo, 964 F.2d 193, 200 (3d Cir. 1992)*.

[HN24] Falco, the party seeking to introduce the testimony into evidence, bears the burden of establishing its admissibility. *See In re Japanese Elec. Prod. Antitrust Litig., 723 F.2d 238, 288 (3d Cir 1983).* [HN25] If the custodian of records or other qualified witness provides testimony that the invoices fulfill each requirement of the rule, the Court has discretion whether to admit them into evidence. *See United States v. Furst, 886 F.2d 558, 571 (3d Cir. 1989).* Falco proffers that a representative of Falco will be able to provide sufficient testimony to fulfill the requirements of Rule 803(6). D.I. 55 at 9. n19

> n19 "A representative of Falco will testify that these various services were ordered by Falco in the ordinary course of business, were generally supplied, the invoices were routinely received and paid substantially contemporaneous with the services that were provided and it was Falco's regular practice to keep a copy of the invoice in a file for each building owned by Falco so that the costs could be documented and billed to the individual tenants." *Id.*

[*46]

Elliott counters with three arguments as to why the invoices do not fall under the Rule 803(6) business records exception. First, as to all three groups of the invoices, Elliott asserts they are inadmissible because they were not prepared in the ordinary course of business, but rather in anticipation of litigation. Second, as to one Falco invoice, F0042, Elliott contends that it was not prepared contemporaneously with the work performed and it lacks trustworthiness. Finally, as to the third party invoices and attorney invoices, Elliott asserts that a Falco representative cannot serve as the witness to lay the foundation for admission of these documents.

The Court declines to make any ruling on the admissibility of the challenged attorney invoices because they are not relevant to the issues to be tried to the jury. n20 However, if Falco introduces testimony sufficient to fulfill the requirements of Rule 803(6), as discussed in more detail below, the Court holds that the Falco invoices and the third party invoices will be admissible.

> n20 The parties stipulated that "all proof of attorney's fees and costs incurred shall be severed from the jury trial." D.I. 66.

[*47]

**1. All Invoices: Whether Prepared in Ordinary Course of Business**

[HN26] One of the requirements of Rule 803(6) is that the records be prepared in the ordinary course of business. *See Pellullo, 964 F.2d at 200.* Records that are prepared in anticipation of litigation do not fulfill this requirement. *See United States v. Casoni, 950 F.2d 893, 911, n.10 (3d Cir. 1991).* Elliott asserts all of the invoices were prepared in anticipation of litigation. He argues the third party invoices are based on work ordered by Falco in anticipation of litigation. In addition, Elliott asserts one Falco invoice (F0042) for supervision work in December and January, 1996, was prepared in anticipation of litigation because it is dated February 9, 1996. D.I. 61 at 8. However, if Falco can adduce credible testimony at trial that all invoices were prepared in the ordinary course of business, the invoices will fulfill this requirement of Rule 803(6).

**2. Falco Invoice F0042**

This is an invoice, dated February 9, 1996, from Falco to Alpha for supervision and labor during the months of December 1995 and January 1996.

**a. Contemporaneousness**

Rule 803(6) requires that [*48] the business record be "made at or near the time" of the time the acts in the record are performed. Elliott argues that this invoice, prepared February 9, 1996, was not contemporaneous with work performed in December 1995-January 1996. He may or may not be correct. This objection to Falco Invoice F0042 will have to be resolved at trial.

**b. Trustworthiness**

Rule 803(6) provides that otherwise admissible business records are inadmissible if they "indicate lack of trustworthiness." Elliott contends that this invoice is not trustworthy because there is no way of verifying the figures on the invoice or whether the acts were actually done. To indicate a lack of trustworthiness, Elliott points out that 56 hours to "turn out the lights" is excessive.

However, the invoice charges Falco $ 3,360.00 for 56 hours of supervision at $ 60.00/hour in December and January to do more than just turn out the lights:

> To oversee contractors removing equipment from the building from auction sale. Open building, lock up building control security, turn off lighting, control heating systems, watch for damage to doors etc. during removal; oversee and supervise

clean up work same duties as above. [*49] Have drums of ink and other hazardous waste material removed.

The invoice also charges $ 864.00 for 32 hours of labor at $ 27.00/hour "to remove studs left in concrete floor to bolt down printing press equipment." The Court finds nothing untrustworthy on the face of the document. So long as Falco can adduce credible testimony from the custodian of records or other qualified witness that the work was actually performed and that the amounts charged are accurate, the invoice will be deemed trustworthy.

### 2. Third Party Invoices: Whether Falco Representative Can Serve as Custodian or Other Qualified Witness

Rule 803(6) requires that the "custodian or other qualified witness" provide testimony sufficient to lay a foundation for admissibility of the records. Elliott argues that because the third party invoices were prepared by third parties, they are not the business records of Falco and a Falco representative cannot serve as the "custodian or other qualified witness" needed to provide the foundation for the invoices.

[HN27] However, the custodian or other qualified witness need not be the person that created the records. *See Pellulo, 964 F.2d at 201.* Moreover, the [*50] phrase "other qualified witness" should be given its broadest possible interpretation. *See id.* The witness need not be a member or employee of the entity that created the records. *See id.* Circumstantial evidence of the elements of Rule 803(6) is sufficient to lay a foundation for admissibility. *See Furst, 886 F.2d at 572.* Under certain circumstances, Rule 803(6) permits the admission of business records through the testimony of a witness not affiliated with the third party entity that created the records. *See United States v. Sokolow, 91 F.3d 396, 403 (3d Cir. 1996); United States v. Reilly, 33 F.3d 1396, 1414 (3d Cir. 1994).*

[HN28] In a series of cases, the Third Circuit Court of Appeals has examined the admissibility of third party created records and defined the contours of testimony required to lay a foundation for admission of those records. This line of cases permits the admission of third party records incorporated into the business records of an entity, under Rule 803(6), if a "custodian or other qualified witness" from that entity testifies to three requirements. First, the entity must regularly incorporate the third party [*51] records into its own records kept in the regular course of business activity. Second, the entity must rely on the accuracy of the third party records. Third, and most important, the witness must be able to vouch for the accuracy of the third party records.

For example, in *Sokolow*, the Court admitted the records of an insurance claims adjuster that were, in large part, derived from records supplied to the claims adjuster by a third party insurer. *See Sokolow, 91 F.3d at 404-04.* The records were supported by testimony of an employee of the adjuster who was familiar with the process of incorporating and verifying the records. *See id. at 403.* In admitting the records, the Court stressed three factors: the adjuster's ordinary business practice of incorporating the insurers records into its own records; the reliance of the adjuster on the records; and, the "adequate verification or other assurance of accuracy" of the insurer's records. *See id. at 403.*

Similarly, in *United States v. Console*, the Court admitted an Accident Book which contained a list of a physician's patients and the dates of their first visit to his office. *See* [*52] *13 F.3d 641, 656-58.* According to the custodian of records for the physician's office, this information was based upon statements made by patients which were incorporated into the records. *See id. at 657-58.* The Court held that, because the office relied on the accuracy of the Accident Book and because the office used procedures to verify patient statements, the incorporated records were admissible pursuant to Rule 803(6). *See id.*

In addition, in *Reilly*, the Court admitted a set of radio telegrams that were received by a ship from third party sources. *See Reilly, 33 F.3d at 1414.* The records were supported by testimony of a radio operator for the ship who was responsible for receiving, decoding, and documenting all incoming messages. *See id.* Although the Court found the incoming telegrams independently admissible under another exception, the Court emphasized that they would be admissible under Rule 803(6) if a representative of the ship could verify their accuracy. *See id.*

Also, in *Furst*, the Court refused to admit commodity trade records generated by a commodity trader based upon testimony of two representatives [*53] of banks that had incorporated these records into their own records. *See Furst, 886 F.2d at 570-72.* Each witnesses testified that his bank had a regular business practice of incorporating the records into its own records and relying on the accuracy of the records in generating its own reports. *See id. at 570-71.* However, the Court excluded the evidence because neither witness could testify as to the accuracy of the commodity trade records in that neither witness could vouch for the fact that the trades as reported actually occurred. *See id. at 570-72.*

Finally, in *Pellulo*, the Court rejected the admission of certain bank records based on testimony by a govern-

ment agent who had investigated wire transfers in the bank. *See Pellulo, 964 F.2d at 201.* The rejection occurred because the agent could not vouch for the underlying accuracy of the records. *See id.*

The Third Circuit Court of Appeals cases may be synthesized as generally requiring a showing of incorporation, reliance, and verification of trustworthiness of the incorporated records. Moreover, other circuits have recognized similar criteria, under Rule 803(6), [*54] for when third party records are admissible. n21 Two of these cases from other circuits are particularly analogous to the facts of this case. First, in *Falcon Jet Corp. v. King Enterprises, Inc.*, a construction company introduced third party invoices for work done on the premises in order to prove the amount of work done so that it could hold the defendant liable for the work. *See 678 F.2d 73, 77 (8th Cir. 1982).* The Court admitted the evidence under Rule 803(6) because the invoices were "sufficiently trustworthy." *See id.*

> n21 *See United States v. Doe, 960 F.2d 221, 223 (1st Cir. 1992)* (business must show (1) incorporation into its own records and (2) reliance on the third party records); *United States v. Jakobetz, 955 F.2d 786, 801 (2d Cir. 1992)* (witness must show: (1) regular incorporation of third party records; and (2) reliance upon records in day to day operations); *United States v. Ullrich, 580 F.2d 765, 771 (5th Cir. 1978)* (witness must show (1) incorporation of third party records; (2) reliance on third party records; and (3) taking steps to confirm their accuracy); *Falcon Jet Corp. v. King Enterprises, Inc., 678 F.2d 73, 76 (8th Cir. 1982)* (third party records admissible if witness can demonstrate trustworthiness); *MRT Construction, Inc. v. Hardrives, 158 F.3d 478, 483 (9th Cir. 1998)* (witness must show: (1) incorporation of third party records in the ordinary course of business, (2) reliance upon the records for their accuracy; and (3) substantial interest in the records' accuracy); *United States v. Parker, 749 F.2d 628, 633 (11th Cir. 1984)* (witness must show (1) incorporation of third party records and (2) trustworthiness of records); *Air Land Forwarders, Inc. v. United States, 172 F.3d 1338, 1343 (Fed. Cir. 1999)* (incorporating entity must prove: (1) reliance upon accuracy of incorporated records and (2) circumstantial evidence of the records' trustworthiness).

[*55]

Similarly, in *United States v. Doe*, the government sought to introduce an invoice for a gun, generated by a gun manufacturer, found in the files of a gun shop, and containing a handwritten notation "Received 12-11-86." *See 960 F.2d 221, 222-23 (1st Cir. 1992).* The gun shop owner testified that he saved all gun receipts, that the handwriting was his, and that he relied on gun receipts to prove that he had actually received the guns. *See id.* The Court found his testimony sufficient to lay a foundation for admissibility under Rule 803(6). *See id.*

In this case, Falco has proffered that a Falco representative will testify that the third party invoices were regularly incorporated into Falco's files and that Falco relied upon these records to bill its tenants for work done on the property. If Falco adduces such testimony, it will meet the first two requirements for incorporated third party business records under Rule 803(6). Falco also proffers that the witness will testify that the services billed were performed, that the amounts billed were accurate, and that the invoices were routinely received and paid contemporaneous with the services being performed. If [*56] Falco does all it represents it will do, the third party invoices will be admissible pursuant to Rule 803(6).

## E. Whether Rescission Counterclaim Is Decided by Jury

Elliott requests the Court to order that his counterclaim for rescission of the guaranty obligation be submitted to the jury by special interrogatory. Falco counters that there is no right to have this equitable claim go to the jury. The Court holds that facts underlying the rescission claim will be decided by the jury, but that the decision whether to rescind will be decided by the Court.

Count IV for Rescission incorporates all of the allegations of Counts I-III and demands rescission of any personal guaranty obligation he may have under the lease. Underlying Count IV are allegations that: Falco made fraudulent or material misrepresentations which induced Elliott to sign the guaranty, D.I. 12 at P 27; Falco fraudulently failed to disclose material information to Elliott during the course of the lease to allow him to fulfill his guaranty obligations, *id.* at PP 28-35; Falco breached the lease by failing to provide written notice of default, termination, cure, or sale of collateral, *id.* at P 39; and, [*57] Falco breached the implied covenant of good faith and fair dealing implicit in the lease, *id.* at PP 42-43.

[HN29] The Seventh Amendment provides that "in suits at common law, where the amount in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. Const. Amend. VII. [HN30] *Rule 38(a) of the Federal Rules of Civil Procedure* is coextensive with the Seventh Amendment, providing that "the right of trial by jury as declared by the Seventh Amend-

ment to the Constitution . . . shall be preserved to the parties inviolate." *Fed. R. Civ. P. 38(a)*. The phrase "suits at common law" means that the jury trial right attaches only in cases involving legal, as apposed to equitable, claims. *See Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 41, 106 L. Ed. 2d 26, 109 S. Ct. 2782 (1989); Billing v. Ravin, Greenberg & Zackin, P.A., 22 F.3d 1242, 1245 (3d Cir. 1994).* [HN31] Determining whether a claim is legal or equitable involves a two part test:

> First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine [*58] whether it is legal or equitable in nature. The second stage of this analysis is more important than the first.

*Billing, 22 F.3d at 1245* (quoting *Granfinanciera, 492 U.S. 33 at 42*).

[HN32] In a diversity action asserting state law claims, the right to trial by jury is to be determined according to federal law. *See Simler v. Conner, 372 U.S. 221, 222, 9 L. Ed. 2d 691, 83 S. Ct. 609 (1963); In re City of Phila. Litig., 158 F.3d 723, 726 (3d Cir. 1998).* [HN33] The Third Circuit Court of Appeals has held that an action for rescission of a contract is an equitable, not a legal, remedy for which there is no right to a jury trial. *See Plechner v. Widener College, Inc., 569 F.2d 1250, 1257 (3d Cir. 1977);* n22 *accord Cigna Property and Cas. Ins. Co. v. Polaris Pictures Corp., 159 F.3d 412, 419 (9th Cir. 1998); Scheurenbrand v. Wood Gundy Corp., 8 F.3d 1547, 1551 (11th Cir. 1993); Schuyt v. Rowe Price Prime Reserve Fund, Inc., 835 F.2d 45, 46 (2d Cir. 1987).* It follows Elliott has no right to have the jury decide his counterclaim for rescission.

> n22 In *Plechner*, the relevant claim was for "replevin of the stock issued to defendant Widener College and ordering its delivery to plaintiff for cancellation." *569 F.2d at 1256.* The Court held that this claim for replevin and cancellation was really a mislabeled claim for rescission. *See id. at 1257.*

[*59]

Since this case contains counterclaims sounding at law, for fraud, breach of contract, and breach of the duty of good faith, triable to the jury, Elliott urges that the equitable counterclaim for rescission should also be de-

cided by the jury. n23 The Court agrees with Elliott that many, but not all, of the alleged facts underlying the equitable counterclaim are the same as that underlying the counterclaims triable to the jury. The equitable counterclaim for rescission also alleges deficiencies in notice and impairing collateral. [HN34] However, when, as here, there are three counterclaims sounding at law underlying the equitable counterclaim seeking rescission, the jury first decides the questions of fact and then the judge decides whether rescission is an appropriate remedy. *See Dollar Sys., Inc. v. Avcar Leasing Sys., Inc., 890 F.2d 165, 170 (9th Cir. 1989); accord Horbach v. Kaczmarek, 988 F. Supp. 1126, 1127 (N.D.Ill. 1997)* (in a rescission claim under Illinois law, the underlying factual matter of whether there was substantial nonperformance is a question for the trier of fact). n24 Accordingly, in this case, the jury will decide the counterclaims [*60] sounding at law underlying the rescission counterclaim and the Court will then decide whether rescission is an appropriate remedy. *See Dairy Queen, Inc. v. Wood, 369 U.S. 469, 479-80, 8 L. Ed. 2d 44, 82 S. Ct. 894 (1962).*

> n23 Although not raised by either party, the Court is somewhat troubled that Elliott has maintained claims for fraud, breach of contract, and rescission of the contract in the same action. [HN35] A cursory review of Delaware law indicates that, although remedies may be pursued in the alternative, at some point, the plaintiff must make an election of remedies. If the plaintiff has a claim for fraudulently inducing entry into a contract, the plaintiff must elect between a tort action for fraud or an action for rescission of the contract. *See E. I. duPont Nemours and Co. v. Florida Evergreen Foliage, 744 A.2d 457, 1999 WL 1219961* at *1, *9 (Del. 1999); *Tam v. Spitzer, 1995 Del. Ch. LEXIS 116, 1995 WL 510043,* at *10 (Del.Ch. 1995). Likewise, if the contract is breached, the non-breaching party must elect from affirming the contract and suing for damages or bringing an action to rescind the contract. *See Brand v. Ogden Power Co., 31 Del. 88, 111 A. 370, 374 (Del.Super. 1920).*

[*61]

> n24 In *Horbach*, the Court fails to mention who decides the ultimate question of whether to rescind. *See 988 F. Supp. at 1127.*

Elliott also relies on *Canning v. Star Publishing Co., 138 F. Supp. 843 (D.Del. 1956),* to argue that the equita-

2000 U.S. Dist. LEXIS 7480, *

ble counterclaim for rescission should be tried to the jury since the other counterclaims sounding at law are being tried to the jury. However, in *Canning*, decided prior to *Simler v. Conner, 372 U.S. 221, 9 L. Ed. 2d 691, 83 S. Ct. 609 (1963),* the court relied upon Rule 42(b), regarding consolidation of separate trials, not the right to trial by jury under Rule 38(a). *See 138 F. Supp. at 846-47* (citing *Fed. R. Civ. P. 42(b)*). The court held, because a rescission claim would require a separate trial from the legal claims, the court should exercise its powers under Rule 42(b) and have a single trial on all claims to the jury. *See id.* The prospect of a separate trial is not present in this case. After the facts underlying the counterclaims

sounding at law are tried to the jury, the Court will decide whether [*62] rescission is an appropriate remedy.

For the foregoing reasons, the Court will enter an order that the facts underlying the fraudulent non-disclosure, breach of contract, and breach of good faith and fair dealing be tried to the jury and that the issue of whether to rescind the guaranty obligation be tried to the Court.

**IV. Conclusion**

The Court will enter an order consistent with the holdings rendered in this memorandum opinion.

**Exhibit 5**

LEXSEE 1990 U.S. DIST. LEXIS 19986

**IN RE: FRED HAWES ORGANIZATION, INC., Debtor. WILLIAM B. LOGAN, TRUSTEE, Plaintiff/Appellee, vs. BASIC DISTRIBUTION CORP., Defendant/Appellant.**

**Case C-2-89-471**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION**

*1990 U.S. Dist. LEXIS 19986*

**October 17, 1990, Filed**

**JUDGES:** [*1] HOLSCHUH

**OPINION BY:** JOHN D. HOLSCHUH

**OPINION:**

### MEMORANDUM AND ORDER

This appeal arises from the chapter 7 proceeding of Fred Hawes Organization, Inc. (hereinafter "debtor"). The duly appointed chapter 7 Trustee for the debtor's bankruptcy estate, William B. Logan (hereinafter "appellee") filed an adversary proceeding against Basic Distribution Corp. (hereinafter "appellant") seeking to avoid certain transfers made by the debtor to appellant as either preferences under *11 U.S.C. § 547* or fraudulent transfers under *11 U.S.C. § 548.* Following a trial to the court, the bankruptcy court issued an opinion and order finding that the transfers were preferential and recoverable by appellee pursuant to *11 U.S.C. § 547.* Appellant filed a timely notice of appeal, and the matter is now before the Court for review.

### BACKGROUND

The preliminary facts are set out in the bankruptcy court's opinion and order and are not disputed by the parties. The debtor was an electrical subcontractor. Appellant was, and still is, an electrical parts supplier and distributor. In the fall of 1985, appellant approved an open account for debtor with a credit limit of $ 10,000.00. During the course of the parties' subsequent [*2] relationship, three separate accounts were set up: a "general" account, the "Honda" account, and the "Mann Trailer" account. Debtor made voluminous purchases against each of these accounts. The credit terms for such purchases, as stated in the parties' written agreement and the individual sales invoices, were "net 30 days."

Debtor made no significant payments on any of the accounts until March, 1986. By that time, they were all past due, although the actual amounts that were past due are disputed by the parties. Debtor made a payment of $ 5,864.04 to appellant on March 5, 1986, and a second payment of $ 15,896.28 to appellant on March 28, 1986. Appellant applied these amounts to the general and Honda accounts.

On May 14, 1986, debtor filed his chapter 7 bankruptcy petition. Appellee was appointed as chapter 7 trustee for debtor's bankruptcy estate. On June 13, 1988, appellee filed a complaint against appellant seeking to avoid the two payments made on March 5, 1986, and March 28, 1986, respectively, as either preferential transfers under *section 547 of the Bankruptcy Code* or fraudulent transfers under *section 548 of the Bankruptcy Code.* Appellant denied that the payments were preferential [*3] or fraudulent. While it is not clear from the record, it appears that at some point, appellee elected to proceed upon only the preference claim. The parties subsequently filed joint stipulations of fact as to that claim.

The matter was tried to the bankruptcy court, and the parties submitted post-trial briefs. The only testimony at the trial came from Andrew W. Kerr, appellant's current president. On April 14, 1989, the bankruptcy court entered judgment for appellee for $ 21,760.32 based on its determination that the two payments made by debtor to appellant did not fall within the "ordinary course of business" exception of *11 U.S.C. § 547*(c)(2). This appeal followed.

### DISCUSSION

Section 547, Title 11, United State Code provides in pertinent part:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property --

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made--

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety  [*4]  days and one year before the date of the filing of the petition if such creditor was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if --

(A) the case were a case under Chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

*11 U.S.C. § 547*(b).

The joint stipulations of fact filed by the parties established, inter alia, that appellant was a creditor of debtor at the time the payments were made; that the payments were made to or for the benefit of appellant, for or on account of an antecedent debt which debtor owed appellant; that debtor was insolvent at the time of such payments; that such payments were made within 90 days before the filing of debtor's Chapter 7 petition; and that such payments enabled appellant to receive more than it would have if such payments had not been made and appellant received payment of such debt to the extent provided by Title 11, United States Code. These stipulations satisfy the elements set forth in *11 U.S.C. § 547*(b). Therefore, unless these payments fall within one of the exceptions [*5]  in subsection (c), namely the "ordinary course of business" exception, appellee is entitled to avoid them.

Section 547, Title 11, United States Code further provides that:

(c) the trustee may not avoid under this section a transfer --

. . . .

(2) to the extent that such transfer was --

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

. . . .

*11 U.S.C. § 547*(c)

The bankruptcy court concluded that the first element of the ordinary course of business defense was not disputed. What was disputed, according to the bankruptcy court, was whether the two payments made by debtor to appellant were in the ordinary course of business as between them and whether those payments were typical and ordinary in the industry in which they were engaged.

Whether a payment is made in the ordinary course of business and according to ordinary business terms is a factual determination which should not be set aside unless clearly erroneous. *Yurika Foods Corp. v. United Parcel Service (In re Yurika Foods Corp.), 888 F.2d 42, 45 (6th Cir. 1989).* [*6]  Therefore, this Court will apply the clearly erroneous standard of *Fed. R. Civ. P. 52(a).* Under this standard, a finding of fact is "clearly erroneous" when, "'although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. Bessemer City, 470 U.S. 564, 573 (1985)* (quoting *United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)).*

The bankruptcy court initially determined that under the terms of the parties' agreement, payments must be made within thirty days of purchase; and, therefore, by the terms of the agreement, both payments were late and, hence, not "ordinary." Thus, in the bankruptcy court's view, the transfers fell outside the scope of section 547(c)(2)'s protection. The bankruptcy court implicitly acknowledged that a course of conduct between debtor and appellant could override the express terms of their agreement. Opinion and Order p. 8. The bankruptcy court believed, however, that given these terms and the parties' short-term open account relationship, appellant failed to prove by a preponderance of the evidence that the payments [*7]  were made in the ordinary course of the parties' business.

1990 U.S. Dist. LEXIS 19986, *

The bankruptcy court further concluded that appellant failed to prove that the transfers were made according to ordinary business terms. It interpreted this requirement as relating to the ordinary course of business within the parties' industry. Although Mr. Kerr testified that he believed appellant's credit policies were consistent with those of the electrical parts supply industry, the bankruptcy court gave little weight to his testimony. The bankruptcy court found that the only independent evidence that supported Mr. Kerr's opinion was the National Association of Electrical Distributors ("NAED") report upon which he relied. The court ruled that the report was hearsay, admissible only for the limited purpose of indicating that it was respected by Mr. Kerr. The inadmissibility of this report to establish the credit and collection practices of the electrical parts supply industry, and the lack of any other evidence concerning this subject, effectively meant that appellant had failed to satisfy section 547(c)(2)(C).

Because, in its opinion, appellant had not met its burden of proof with respect to the second and third prongs [*8] of section 547(c)(2), the bankruptcy court ruled that the transfers did not fall within the ordinary course of business exception. Therefore, the $ 21,760.32 paid by debtor to appellant was recoverable by appellee pursuant to section 547(b).

Appellant presents the following four questions for review:

1. Did the bankruptcy court err in holding that the payments made by debtor to appellant during the preference period were not in the ordinary course of business exception of *11 U.S.C. § 547*(c)(2) because they were not made within the literal terms of appellant's preprinted forms?

2. Did the bankruptcy court err in holding that appellant's president was not qualified to testify as to the ordinary practices of the industry, and that appellant adduced insufficient evidence as to the industry practices?

3. Did the bankruptcy court err in refusing to admit as competent and qualified evidence a report of an industry trade association?

4. Did the bankruptcy court err in failing to realize that, in any event, some of the subject payments were made within the literal terms of appellant's preprinted forms, and that it awarded judgment for $ 1,872.22 too much?

Questions 1 and 4 involve [*9] factual determinations by the bankruptcy court that certain transfers were not made within the ordinary course of business or according to ordinary business terms. The Court will review these findings under a clearly erroneous standard.

*Yurika Foods, 888 F.2d at 45.* Questions 2 and 3 essentially involve evidentiary rulings by the bankruptcy court pursuant to *Fed. R. Evid. 104(a)*. Such decisions are generally left to the trial judge's sound discretion. Kelly's Auto Parts. No. 1. *Inc. v. Boughton, 809 F.2d 1247, 1254 (6th Cir. 1987).* Therefore, the Court will apply an abuse of discretion standard in reviewing the bankruptcy court's rulings as to Mr. Kerr's competency and the NAED report's admissibility. Abuse of discretion is defined as a definite and firm conviction that the trial court has committed a clear error of judgment. *Logan v. Dayton Hudson Corp., 865 F.2d 789, 790 (6th Cir. 1989).* Because these evidentiary rulings, if erroneous, could undermine the bankruptcy court's principal determination that the payments fell outside the ordinary course of business exception, the Court will first address questions 2 and 3.

Contrary [*10] to appellant's framing of the issue, the bankruptcy court did not find Mr. Kerr incompetent to testify regarding industry practice. It simply found his testimony unrevealing as to how and why the payments received by appellant were usual, ordinary and customary in the absence of any independent evidence on the business customs of the electrical parts supplier industry. Opinion and Order p. 9. The bankruptcy court's findings that Mr. Kerr was not a member of any trade association nor had ever been employed by or associated with any other electrical supplier companies went to the weight and not the admissibility of his testimony concerning industry practices. Moreover, notwithstanding appellant's assertion that Mr. Kerr was, in fact, a member of NAED, these findings appear to be correct. Mr. Kerr testified only that he was appellant's alternate delegate to NAED, and there is nothing further in the record to indicate that, as an alternate, he ever attended NAED meetings or performed any duties related to being a delegate. Under these circumstances, this Court cannot conclude that the bankruptcy court abused its discretion in giving little weight to Mr. Kerr's testimony.

The bankruptcy [*11] court did find Mr. Kerr incompetent to testify as to the veracity of the NAED report. Appellant argues that Mr. Kerr was sufficiently competent to so testify because he was a delegate to NAED and, as appellant's president, he received such report from that organization. A review of the record reveals that appellant has again misconstrued the ruling below. The bankruptcy court allowed Mr. Kerr to testify that appellant submits collection data to NAED and that NAED somehow uses that data together with other information to create its report. The bankruptcy court further allowed Mr. Kerr to testify that he relies on and respects the NAED report. It even permitted the introduction of the report into evidence for the limited purpose of showing that it was respected by him. Apart from the same arguments presented here, appellant offered no

proof to the bankruptcy court that Mr. Kerr was qualified to render an opinion regarding the veracity of the NAED report. Consequently, the bankruptcy court did not abuse its discretion in declaring him incompetent to render such an opinion.

Appellant argues that even if Mr. Kerr was not competent to establish the veracity of the NAED report, the report [*12] should have been admitted under *Fed. R. Evid. 803(17)* or *804(b)(5)*. *Rule 803 of the Federal Rules of Evidence* provides in pertinent part:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(17) **Market reports, commercial publications.** Market quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations.

. . . .

*Fed. R. Evid. 803*.

Rule 804(b) states in pertinent part as follows:

**Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(5) **Other exceptions.** A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstances of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the evidence. [*13] However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

*Fed. R. Evid 804(b)*.

It should be noted that plaintiff relied on neither of these rationales for admitting the NAED report at trial. Instead, appellant relied solely on the testimony of Mr. Kerr for its admission. Thus, it is unclear whether appellant has even preserved these issues for appeal.

In any event, the Court finds no merit to either of appellant's contentions. Although Rule 803(17) allows the introduction of market reports, commercial publications and the like, there is the additional requirement that they be generally used or relied on by the public or a particular occupation. Appellant presented no evidence concerning the use of or reliance on the NAED report by the electrical suppliers industry generally, but merely Mr. Kerr's use and reliance personally. Therefore, it was not an abuse of discretion for [*14] the bankruptcy court not to admit the report pursuant to Rule 803(17).

It is also clear that the bankruptcy court did not err in refusing to admit the report under Rule 804(b)(5). Hearsay may not be admitted under this exception merely because a proponent is unable or unwilling to comply with the foundational requirements of Rule 803(17). Cf. *Clifton v. Gusto Records, Inc., 1988 U.S. App. LEXIS 10169*, slip op. No. 86-6177 at 17 (6th Cir. Aug. 1, 1988) (construing the nearly identical provision in Rule 803(24)). Furthermore, appellant has not demonstrated the requisite "unavailability" under this rule. Nor is there any evidence that appellant complied with the notice provision of 804(b)(5). Therefore, it is unnecessary for the Court to consider whether appellant has met the other factors under this exception.

Appellant also raises in its second question presented for review that the bankruptcy court erred in ruling that appellant adduced insufficient evidence as to industry practices. To the extent appellant's argument depends on consideration of the NAED report and Mr. Kerr's testimony regarding the veracity of that report, the question has already been resolved. [*15] Appellant further contends, however, that industry practices are not as important as the practices between the parties, and that, where there is no evidence to suggest that the parties' practices differ from industry practices, the creditor's burden of showing industry practices is very light. Appellant cites *Waldschmidt v. Ranier (In re Fulghum Construction Corp.), 872 F.2d 739 (6th Cir. 1989)*, in support of this contention.

The Court does not agree with appellant's interpretation of Fulghum Construction Corp. In Fulghum, the Sixth Circuit noted that the applicability of industry practices was not argued by the trustee and expressly held open the possible relevancy of such practices to section 547(c)(2)(C). *Id. at 743 n.5*. In a subsequent case, the Sixth Circuit upheld the need to examine industry practices in just such a situation. *Yurika Foods, 888 F.2d at 45*. Therefore, the bankruptcy court did not err in ruling that appellant adduced insufficient evidence of industry practices where the relevancy of such practices was argued by appellee. This Court believes that an examination of industry practices is particularly [*16] important where the creditor relationship between the parties is

1990 U.S. Dist. LEXIS 19986, *

short-term and, as a result, no clear pattern exists as to their own practices.

In its first question presented for review, appellant advances two principal arguments. First, it asserts that the bankruptcy court erred in relying on the literal terms of the parties' agreement to reach the conclusion that the transfers were not made in the ordinary course of business. Second, it contends that the bankruptcy court should have construed the "due date" under their terms to mean the date after which a customer of appellant would incur a penalty and not the literal "due date" of thirty days after purchase. For the following reasons, neither of these arguments has merit.

The Court first of all notes that the bankruptcy court did not rely solely on the terms of the parties' written agreement. It made the additional finding that each of the two payments received by appellant from debtor was greater than had been received in the parties' prior dealings. Opinion and Order p. 3. Further, the context of these transfers is also important. If the parties had engaged in a long-term credit account relationship with the debtor making [*17] comparable payments throughout, the bankruptcy court might have concluded that such payments were "ordinary" notwithstanding the written credit terms. See *Newton v. Ed's Supply Co. (In re White), 58 B.R. 266, 269-70 (E.D. Tenn. 1986).* Because in this case, the parties' relationship was less than six months and the two payments were greater than any prior payments received, the bankruptcy court properly relied on the parties' written credit agreement. Cf. *Matter of Xonics Imaging, 837 F.2d 763, 767 (7th Cir. 1988); Marathon Oil Co. v. Flatau (In re Craig Oil Co. ), 785 F.2d 1563, 1567 (11th Cir. 1986).* Moreover, the bankruptcy court agreed with appellant that the short-term nature of the parties' relationship should not per se deprive appellant of section 547(c)(2)'s protection. Opinion and Order p. 8. Appellant, thus, had the opportunity also to show that the payments were "ordinary" under an industry standard. That it failed to do so is evident from the previous discussion.

Appellant cites no authority in support of its second argument that payments should be considered "past due" and not "ordinary" only when a penalty [*18] would be imposed under the terms of the credit agreement. Assuming that appellant's construction of "past due" is a reasonable one, the bankruptcy court's interpretation still is not clearly erroneous. "Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." *Anderson, 470 U.S. at 574.*

Appellant's fourth argument that the bankruptcy court awarded $ 1,872.22 too much fails for the same reason. Although the bankruptcy court could have accepted Mr. Kerr's convoluted testimony concerning appellant's billing practices as determinative of when an invoice is due, its finding that all of the invoices were past due based on the plain language of the credit terms is not clearly erroneous. Furthermore, appellant's assertion that appellee conceded the $ 1,872.22 was not past due at the time the payment was made is not supported by the record and is amply refuted by appellee's brief.

Lastly, appellant filed an update of citations on August 29, 1990 in which it suggested that *Gosch v. Burns (In re Finn), 909 F.2d 903 (6th Cir. 1990),* might be germane to the question of "ordinary course of [*19] business." The Court has reviewed Finn and concludes that it is inapplicable to any of the issues herein. Finn deals with the determination of when a debt is incurred within the ordinary course of a debtor's business or financial affairs under *11 U.S.C. § 547*(c)(2)(A). *Id. at 906-08.*

**JUDGMENT IN A CIVIL CASE** - October 17, 1990, Filed

**Decision by Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED that the decision of the Bankruptcy Court is AFFIRMED.

October 17, 1990

Exhibit 6

LEXSEE 1990 U.S. DIST. LEXIS 19207

**IN RE DUAL-DECK VIDEO CASSETTE RECORDER ANTITRUST LITIGATION; GO-VIDEO, INC., Plaintiff, v. MATSUSHITA ELECTRIC INDUSTRIAL CO., et al., Defendants**

**Nos. MDL-765, CIV 87-987 PHX RCB**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA**

*1990 U.S. Dist. LEXIS 19207; 1990-2 Trade Cas. (CCH) P69,141*

**July 25, 1990, Decided**
**July 26, 1990, Filed**

**PRIOR HISTORY:** *Go-Video, Inc. v. Akai Electric Co., 885 F.2d 1406, 1989 U.S. App. LEXIS 13242* (9th Cir. Ariz., 1989)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent owner brought an action against defendant Japanese electronic products manufacturers that alleged violations of the Sherman Act, specifically *15 U.S.C.S. § 1,* and interference with prospective advantage. The manufacturers sought summary judgment and challenged certain evidence, and the patent owner sought reconsideration of a judgment for one manufacturer.

**OVERVIEW:** The patent owner could not market its dual-deck videocassette recorder (VCR) because the manufacturers controlled critical components and conspired to keep dual-deck VCRs out of the United States. The court held that fact issues precluded summary judgment on the conspiracy claim and that the tort claim was time barred. Evidence of a common understanding that the manufacturers were expected to refrain from producing dual deck VCRs was highly probative that a conspiracy was solicited and contemplated. Issues of material fact also remained concerning the patent owner's purported demand to deal on at least one member of the conspiracy and as to whether the manufacturers' acts showed consciously parallel conduct or good faith business judgment. Newspaper articles about the Motion Picture Association of America's (MPAA) opposition to the dual-deck VCR were admissible to show an initiating event and motive for the alleged conspiracy, but MPAA officials' statements were inadmissible hearsay due to insufficient evidence that the MPAA was a coconspira-

tor. The manufacturers had no standing to raise, and failed to present a justiciable case or controversy, on the issue of patent invalidity.

**OUTCOME:** The manufacturers were denied summary judgment on the Sherman Act issues of conspiracy, concerted refusal to deal, and patent validity. The tort action was dismissed as to all manufacturers on statute of limitations grounds, as the claim accrued when the tortious conduct was discovered and not when it ended. The patent owner's motion to reconsider was denied, as the case did not meet the enumerated criteria for granting reconsideration.

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Pendent Claims*
*International Law > Authority to Regulate > Anticompetitive Activities*
*Torts > Business Torts > Commercial Interference > Prospective Advantage > General Overview*
[HN1] Section 1 of the Sherman Act, codified at *15 U.S.C.S. § 1,* provides that every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal.

*Evidence > Hearsay > Rule Components > General Overview*
[HN2] Newspaper articles are by their very nature hearsay evidence and are thus inadmissible if offered to prove the truth of the matter asserted.

1990 U.S. Dist. LEXIS 19207, *; 1990-2 Trade Cas. (CCH) P69,141

*Contracts Law > Negotiable Instruments > Dishonor & Presentment > Protests*
*Evidence > Demonstrative Evidence > Visual Formats*
*Evidence > Hearsay > Exemptions > Statements by Party Opponents > Adopted Statements*
[HN3] The law on adoptive admissions is set forth in Fed. R. Evid. 801(d)(2)(B), which provides that neither an oral or written statement is hearsay if the statement is offered against a party and is a statement of which the party has manifested an adoption or belief in its truth. The possibility of an adoption by silence is recognized under Fed. R. Evid. 801(d)(2)(B) under the theory that the person would, under the circumstance, protest the statement made in his presence if untrue.

*Evidence > Hearsay > Exceptions > Market Reports & Commercial Publications > General Overview*
[HN4] Fed. R. Evid. 803(17) provides that market quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations are not excluded by the hearsay rule even though the declarant is available.

*Evidence > Hearsay > Exceptions > Market Reports & Commercial Publications > Trustworthiness*
*Evidence > Hearsay > Exceptions > Market Reports & Commercial Publications > Necessity & Reliability*
*Evidence > Inferences & Presumptions > General Overview*
[HN5] The type of publications contemplated by Fed. R. Evid. 803(17) are those which deal with compilations of objective facts not requiring for their statement, a subjective analysis of other facts. Fed. R. Evid. 803(17) does not contemplate that newspaper articles are the type of publication which incorporate or rely solely on objective facts and thus fall within the purview of the rule. Publications upon which persons in a particular trade rely but which do not necessarily compile only objective facts must be shown to be trustworthy.

*Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > General Overview*
*Evidence > Hearsay > Exemptions > Statements by Party Opponents > General Overview*
*Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > General Overview*
[HN6] Substantive conspiracy law provides that a conspirator is liable for the acts of a co-conspirator when those acts are taken in furtherance of the conspiracy. Fed.

R. Evid. 801(d)(2)(E) is an evidentiary counterpart that permits the admission against a party of out-of-court statements of a co-conspirator when the statements are made during the course of and in furtherance of a conspiracy. Fed. R. Evid. 801(d)(2)(E).

*Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > Elements*
*Evidence > Hearsay > Exemptions > Statements by Party Opponents > General Overview*
*Evidence > Procedural Considerations > Preliminary Questions > General Overview*
[HN7] The admissibility of statements under Fed. R. Evid. 801(d)(2)(E) is a preliminary question for the Court. The Court may admit statements of co-conspirators under Fed. R. Evid. 801(d)(2)(E) if it finds, by a preponderance of the evidence that: (1) a conspiracy existed; (2) the declarant and the defendant against whom the declarations are offered were members of the conspiracy; and (3) the statements were made during the course of and in furtherance of the conspiracy.

*Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > Elements*
*Evidence > Hearsay > Exemptions > Statements by Coconspirators > General Overview*
*Evidence > Hearsay > Exemptions > Statements by Party Opponents > General Overview*
[HN8] The court can consider the proffered conspirator's statements in determining whether the party seeking admission of this evidence under Fed. R. Evid. 801(d)(2)(E) has established the existence of a conspiracy and the nonoffering parties' participation in the conspiracy. However, a co-conspirator's out-of-court statement, standing alone, is insufficient to establish that the defendant had knowledge of and participated in a particular conspiracy. Where some additional proof is offered, the court must determine whether such proof, viewed in light of the co-conspirator's statement itself, demonstrates by a preponderance of the evidence that defendant knew of and participated in the conspiracy.

*Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington Doctrine > Sherman Act*
*Antitrust & Trade Law > Sherman Act > General Overview*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > Interference With Protected Activities*
[HN9] Efforts to influence the government to take anti-competitive action cannot be made the basis of antitrust liability. No violation of the Sherman Act can be predi-

1990 U.S. Dist. LEXIS 19207, *; 1990-2 Trade Cas. (CCH) P69,141

cated upon mere attempt to influence a passage or enforcement of laws. Such petitioning activity is protected regardless of intent or purpose.

***Evidence > Hearsay > Exemptions > Statements by Coconspirators > General Overview***
***Evidence > Hearsay > Exemptions > Statements by Party Opponents > General Overview***
[HN10] Coconspirators need not be a party a conspiracy lawsuit to fall within the purview of Fed. R. Evid. 801(d)(2)(E). Statements by non-defendant members of a conspiracy are not inadmissible merely because the declarant is not a defendant in the action.

***Evidence > Demonstrative Evidence > Visual Formats***
***Evidence > Hearsay > Exceptions > Business Records > Normal Course of Business***
[HN11] Under Fed. R. Evid. 803(6), the "business records" exception to the hearsay rule, a hearsay statement is admissible as a business record if the following foundational facts are proved: (1) the writing is made or transmitted by a person with knowledge at or near the time of the incident recorded; (2) the record is kept in the course of regularly conducted business activity. These facts must be shown by the testimony of the custodian or other qualified witness.

***Civil Procedure > Judicial Officers > Judges > Discretion***
***Evidence > Procedural Considerations > Exclusion & Preservation by Prosecutor***
***Evidence > Relevance > Prior Acts, Crimes & Wrongs***
[HN12] The admissibility of evidence of other unlawful conduct is within the discretion of the trial judge.

***Antitrust & Trade Law > Sherman Act > General Overview***
***Evidence > Relevance > Relevant Evidence***
***Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > General Overview***
[HN13] Evidence of conspiracy in other markets is relevant and admissible as proof of a single overall conspiracy. The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.

***Antitrust & Trade Law > Monopolization > Conspiracy to Monopolize > General Overview***
***Evidence > Relevance > Relevant Evidence***

[HN14] Evidence regarding the history and practices of a particular industry is relevant and admissible in cases alleging a conspiracy to monopolize business in that industry.

***Evidence > Scientific Evidence > General Overview***
***Evidence > Testimony > Experts > Helpfulness***
***Evidence > Testimony > Experts > Qualifications***
[HN15] Fed. R. Evid. 702 provides that if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

***Civil Procedure > Summary Judgment > Supporting Materials > General Overview***
***Evidence > Testimony > Experts > General Overview***
[HN16] Where an expert is not obviously unqualified, questions at the summary judgment stage as to the expert's qualifications should rarely be resolved by exclusion of the evidence.

***Civil Procedure > Discovery > General Overview***
***Civil Procedure > Trials > Depositions***
[HN17] Fed. R. Civ. P. 32(a) provides that a deposition may only be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof.

***Antitrust & Trade Law > Monopolization > General Overview***
***Antitrust & Trade Law > Price Fixing & Restraints of Trade > General Overview***
***Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview***
[HN18] In addressing summary judgment motions in antitrust cases, courts proceed with caution in granting such motions. Summary judgment procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot.

***Civil Procedure > Summary Judgment > Standards > Legal Entitlement***
***Civil Procedure > Summary Judgment > Standards > Materiality***
[HN19] To grant summary judgment, a court must find that the record clearly establishes that there exists no

Case 1:04-cv-12457-PBS    Document 77-5    Filed 09/22/2006    Page 4 of 30

Page 4

1990 U.S. Dist. LEXIS 19207, *; 1990-2 Trade Cas. (CCH) P69,141

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN20] In determining whether summary judgment should issue, the facts and inferences from the alleged facts are viewed in the light most favorable to the non-moving party and the initial burden is placed on the moving party to establish both that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. The moving party may discharge this burden by showing there is an absence of evidence to support the non-moving party's case. The burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense. The party opposing a motion for summary judgment cannot rest upon the mere allegation or denials of its pleadings, but must set forth specific facts showing there is a genuine issue for trial.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN21] The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. The requirement is that there be no genuine issue of material fact. A material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party.

*Civil Procedure > Judicial Officers > Judges > General Overview*
*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Scintilla Rule*
*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*
[HN22] At the summary judgment stage, the trial judge's function is to determine whether there is a genuine issue for trial. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, the judge may grant summary judgment.

*Antitrust & Trade Law > Sherman Act > General Overview*
*Civil Procedure > Summary Judgment > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > General Overview*
[HN23] In antitrust cases, once a defendant rebuts the allegations of conspiracy with probative evidence supporting an alternative interpretation of a defendant's conduct, the plaintiff must come forward with specific factual support of its conspiracy allegations to avoid summary judgment. A defendant may rebut an allegation of conspiracy by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice. Once a defendant has met this initial burden, a plaintiff must provide specific factual support for its allegations of conspiracy tending to show that the defendant was not acting independently. Failure on the part of the plaintiff to produce evidence from which a jury could reasonably infer that conduct was conspiratorial, not unilateral, will lead to summary judgment for the defendant.

*Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > Elements*
*Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > General Overview*
[HN24] A civil conspiracy occurs when the parties have reached a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement.

*Antitrust & Trade Law > Sherman Act > General Overview*
*Evidence > Inferences & Presumptions > General Overview*
*Evidence > Relevance > Circumstantial & Direct Evidence*
[HN25] The antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective. It is not necessary for a plaintiff to show an explicit agreement among defendants in support of a Sherman Act conspiracy because concerted action may be inferred from circumstantial evidence of the defendant's conduct and course of dealings.

*Antitrust & Trade Law > Monopolization > Conspiracy to Monopolize > General Overview*
*Antitrust & Trade Law > Sherman Act > General Overview*

1990 U.S. Dist. LEXIS 19207, *; 1990-2 Trade Cas. (CCH) P69,141

*Evidence > Inferences & Presumptions > General Overview*
[HN26] Federal courts grant wide latitude in concluding conspiracy or collusion from parallel conduct and the inferences drawn from the circumstances.

*Civil Procedure > Summary Judgment > Standards > General Overview*
*Evidence > Inferences & Presumptions > General Overview*
[HN27] On summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.

*Antitrust & Trade Law > Monopolization > Conspiracy to Monopolize > General Overview*
*Antitrust & Trade Law > Price Fixing & Restraints of Trade > Horizontal Refusals to Deal > General Overview*
*Antitrust & Trade Law > Sherman Act > General Overview*
[HN28] Under the doctrine of conscious parallelism, an agreement or conspiracy may be inferred if each participant knew that concerted action was contemplated and invited, gave its adherence to and participated in the scheme, and understood that cooperation was essential to the plan. The crux of the doctrine of conscious parallelism in concerted refusal-to-deal cases is that the fact that competitors have made the same decision is sought to be used as proof that they did so in collaboration with or among each other.

*Antitrust & Trade Law > Monopolization > Conspiracy to Monopolize > General Overview*
*Antitrust & Trade Law > Price Fixing & Restraints of Trade > Horizontal Refusals to Deal > General Overview*
*Antitrust & Trade Law > Sherman Act > General Overview*
[HN29] Two elements must be established by a plaintiff relying on a theory of conscious parallelism: (1) that the defendants engaged in consciously parallel action; (2) which was contrary to their economic self-interest so as not to amount to a good faith business judgment.

*Antitrust & Trade Law > Price Fixing & Restraints of Trade > Horizontal Refusals to Deal > General Overview*
*Antitrust & Trade Law > Sherman Act > General Overview*

*Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > Elements*
[HN30] Since mere parallel behavior can be consistent with independent conduct, a plaintiff must show the existence of additional circumstances, some independent proof of agreement, or what are termed "plus factors," which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy rather than independent action. Such factors and circumstances include common motive to conspire, acts contrary to self-interest, noncompetitive performance, and collaborative actions among defendants.

*Antitrust & Trade Law > Sherman Act > General Overview*
*Contracts Law > Types of Contracts > General Overview*
*Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > General Overview*
[HN31] It is not necessary to find an express agreement in order to find a conspiracy. It is enough that a concert of action is contemplated and that the defendants conformed to the arrangement. An otherwise unexplained period of clearly noncompetitive behavior occurring in a market otherwise characterized by intense competition could lead a jury to reasonably infer that such uniformity of behavior would not occur without collusion.

*Antitrust & Trade Law > Monopolization > Conspiracy to Monopolize > General Overview*
*Antitrust & Trade Law > Sherman Act > General Overview*
*Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > General Overview*
[HN32] Proof of a motivation for common action can support an inference of conspiracy from parallel behavior.

*Antitrust & Trade Law > Monopolization > Conspiracy to Monopolize > General Overview*
*Antitrust & Trade Law > Sherman Act > General Overview*
*Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > General Overview*
[HN33] To find a conspiracy, evidence of conscious parallelism can be joined with evidence of coercion in further support of an inference of agreement.

*Antitrust & Trade Law > Monopolization > Conspiracy to Monopolize > General Overview*

1990 U.S. Dist. LEXIS 19207, *; 1990-2 Trade Cas. (CCH) P69,141

*Antitrust & Trade Law > Sherman Act > General Overview*

*Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > General Overview*

[HN34] Another category of plus factor which may be considered is evidence of collaborative actions among defendants in civil conspiracy actions include regular meetings, discussions, and exchange of trade information between competitors.

*Antitrust & Trade Law > Sherman Act > General Overview*

*Civil Procedure > Eminent Domain Proceedings > Jury Trials*

*Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > General Overview*

[HN35] It remains a question for the trier of fact in a civil conspiracy action to consider and determine what inference appeals to it as most logical and persuasive, after it has heard all the evidence as to what the alleged competitors had done before such meetings, and what actions they took thereafter, or what actions they did not take.

*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*

*Governments > Legislation > Statutes of Limitations > General Overview*

[HN36] Federal courts apply state statute of limitations rules to state law claims.

*Governments > Legislation > Statutes of Limitations > Time Limitations*

*Torts > Business Torts > Commercial Interference > Prospective Advantage > Defenses*

*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*

[HN37] Arizona's statute of limitations for tort claims such as interference with prospective advantage is two years. Ariz. Rev. Stat. § 12-542. A cause of action begins to accrue when a plaintiff knows or by the exercise of reasonable diligence should know that a claim exists.

*Antitrust & Trade Law > Price Fixing & Restraints of Trade > Horizontal Refusals to Deal > General Overview*

*Antitrust & Trade Law > Sherman Act > General Overview*

[HN38] A demand by the plaintiff and subsequent refusal by the defendants is a prerequisite for finding liability in a concerted refusal to deal claim under § 1 of the Sherman Act, codified at *15 U.S.C.S. § 1*. Mere refusal by a group of defendants to deal with a plaintiff, however, is not itself sufficient evidence of conspiracy or concerted conduct. There must, at minimum, be proof of some "joint collaborative action" by the defendants in order to satisfy the "agreement" element of the Sherman Act.

*Antitrust & Trade Law > Price Fixing & Restraints of Trade > Horizontal Refusals to Deal > General Overview*

*Antitrust & Trade Law > Sherman Act > General Overview*

[HN39] The elements of a concerted refusal to deal claim are: (1) a firm demand by the plaintiff to deal with the defendants and subsequent refusal by the defendants to deal with plaintiff; and (2) evidence of a conspiracy, concerted decision or agreement by the defendants not to deal with the plaintiff.

*Antitrust & Trade Law > Price Fixing & Restraints of Trade > Horizontal Refusals to Deal > General Overview*

*Antitrust & Trade Law > Sherman Act > General Overview*

[HN40] A refused demand is often the best evidence of causation in a refusal to deal claim and the absence of a demand in the circumstances of a particular case may be fatal to plaintiff's ability to show causation.

*Antitrust & Trade Law > Price Fixing & Restraints of Trade > Horizontal Refusals to Deal > General Overview*

*Antitrust & Trade Law > Sherman Act > General Overview*

[HN41] Exceptions do exist to the demand requirement in a refusal to deal claim. One exception is that a demand is not required if the demand would have been a futile gesture.

*Antitrust & Trade Law > Price Fixing & Restraints of Trade > Horizontal Refusals to Deal > General Overview*

*Antitrust & Trade Law > Sherman Act > General Overview*

*Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > Elements*

[HN42] An exception to the general rule that a demand must be made on each defendant arises when there is sufficient evidence of the existence of a conspiracy among defendants. A conspiracy reduces the strict de-

1990 U.S. Dist. LEXIS 19207, *; 1990-2 Trade Cas. (CCH) P69,141

mand requirement on each defendant to one requiring only that a demand be made on at least one conspirator to find other coconspirators liable in a claim under § 1 of the Sherman Act, codified at *15 U.S.C.S. § 1.* An antitrust plaintiff is not required by any rigid or mechanical formula to both demand materials from all defendants and to exhaust all other sources.

***Antitrust & Trade Law > Monopolization > Conspiracy to Monopolize > Sherman Act***
***Antitrust & Trade Law > Sherman Act > General Overview***
***Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > Elements***
[HN43] In a claim under § 1 of the Sherman Act, *15 U.S.C.S. § 1,* the action of any of the conspirators to restrain or monopolize trade is, in law, the action of all and thus all conspirators were jointly liable for the acts of their co-conspirators.

***Antitrust & Trade Law > Sherman Act > General Overview***
***Business & Corporate Law > Agency Relationships > Causes of Action & Remedies > Burdens of Proof***
***Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > Elements***
[HN44] If evidence exists of a concerted refusal to deal, a merchant is liable for the overt acts of any member in furtherance of the plan even though the merchant's individual refusal to deal may be explainable as a reasonable business decision. This is but an application of the general law of conspiracy. It is based upon the principle that a conspiracy creates an agency relationship, and that therefore each member is authorized by the other members to perform acts in furtherance of the common objective. If a conspiracy is found to exist, all the defendants are charged with the refusal of some to comply with plaintiff's demand.

***Antitrust & Trade Law > Sherman Act > General Overview***
***Civil Procedure > Summary Judgment > Evidence***
***Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > Elements***
[HN45] In order to find a defendant liable in a concerted refusal to deal action under § 1 of the Sherman Act, codified at *15 U.S.C.S. § 1,* there must be evidence of a conspiracy among defendants and a demand to deal by the plaintiff and subsequent refusal by each defendant unless plaintiff can show that such a demand was made upon and refused by at least one member of the conspiracy or that such a demand would be futile.

***Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview***
***Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend***
[HN46] Arguments raised for the first time in motions for reconsideration are insufficient, even if meritorious, to compel the court to reconsider an earlier decision.

***Civil Procedure > Pleading & Practice > Motion Practice > General Overview***
***Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend***
[HN47] Motions seeking reconsideration of previous orders should be granted only where: (1) the court has patently misunderstood a party; (2) the court has made a decision outside the adversarial issues presented to the court; (3) the court has made error not of reasoning but of apprehension; or (4) there is a controlling significant change in the law or facts since the submission of the issue to the courts.

***Civil Procedure > Declaratory Judgment Actions > General Overview***
***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview***
***Patent Law > Remedies > Declaratory Relief***
[HN48] An action for declaratory relief is available only in "a case of actual controversy. " *28 U.S.C.S. § 2201.*

***Civil Procedure > Justiciability > Case or Controversy Requirements > Actual Disputes***
***Civil Procedure > Declaratory Judgment Actions > General Overview***
***Patent Law > Remedies > Declaratory Relief***
[HN49] In a declaratory judgment suit to declare a patent invalid, an "actual controversy" exists only if the party seeking declaratory relief has been charged with infringement or has a reasonable apprehension of an infringement suit.

***Patent Law > Inequitable Conduct > General Overview***
***Patent Law > Infringement Actions > Burdens of Proof***
***Patent Law > Remedies > Declaratory Relief***
[HN50] In declaratory judgment actions concerning patents, there are two prerequisites to establishment of an actual controversy. First, the defendant must have engaged in conduct giving rise to a reasonable apprehension on plaintiff's part that it will face an infringement suit or the threat of one if it commences or continues the

1990 U.S. Dist. LEXIS 19207, *; 1990-2 Trade Cas. (CCH) P69,141

activity in question. Second, the plaintiff must have actually produced the accused article or have engaged in preparations for production such that but for a finding that the product infringes or for extraordinary and unforeseen contingencies, the plaintiff would and could begin production immediately.

**Civil Procedure > Summary Judgment > Opposition > General Overview**
**Civil Procedure > Sanctions > Baseless Filings > General Overview**
**Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview**
[HN51] *28 U.S.C.S. § 1927* provides that an attorney who "unreasonably and vexatiously" multiplies the proceedings may be liable for excessive costs, expenses, and attorneys' fees incurred because of such conduct.

**JUDGES:** [*1]

Robert C. Broomfield, United States District Judge.

**OPINION BY:**

BROOMFIELD

**OPINION:**

MEMORANDUM AND ORDER

Plaintiff Go-Video, Inc. ("Go-Video") is an Arizona corporation with its principal place of business in Scottsdale, Arizona. Go-Video is the developer and owner of patent rights in the United States to the dual-deck VCR (also referred to as the "VCR-2"). The dual-deck VCR is a videocassette recorder ("VCR") that contains two video tape decks rather the single deck currently available on nearly all VCRs marketed in the United States. n1

n1 The basic function of the dual-deck VCR is to play one tape while recording on another tape at the same time. Two decks allow the user to record two TV programs at once, watch a rented movie while recording a TV program, or copy one tape onto another.

Defendants are all Japanese consumer electronic products manufacturers of videocassette recorders. [*2] n2 Go-Video alleges that since 1984, it has been unable to manufacture, market and/or license the dual-deck VCR because of a conspiracy among defendants not to deal with Go-Video or to allow the introduction of dual-deck VCRs into the United States. According to Go-Video, defendants have precluded Go-Video from developing and marketing its dual-deck VCR because defen-

dants control critical VCR components through ownership of patent rights.

n2 Go-Video originally named as defendants eleven motion picture companies, the Motion Picture Association of America ("MPAA"), fourteen Japanese consumer electronic manufacturers, the Electronic Industries Association of Japan ("EIAJ"), three Korean manufacturers and one American subsidiary of a Japanese manufacturer. All but six of the original defendants have now settled and/or been completely dismissed from this action. The remaining defendants at this time are Matsushita Electric Industrial Co., Ltd., Victor Company of Japan, Ltd., Sony Corporation, Sanyo Electric Co., Ltd., NEC Corporation and Sharp Corporation. Sharp Corporation previously moved for partial summary judgment on Go-Video's § 1 Sherman Act claim on the ground that no refusal to deal could be established by Go-Video since it failed to make a firm demand to deal on Sharp. The Court granted Sharp's motion by Order dated March 10, 1989. Go-Video subsequently filed a motion for reconsideration which is currently pending. Sharp also filed two separate motions to dismiss and a motion for summary judgment directed at Go-Video's common law tort claim for interference with prospective advantage. These motions are also currently pending.

[*3]

Go-Video filed this lawsuit on June 22, 1987. In its second amended complaint, Go-Video alleges two causes of action. The first claim arises under [HN1] § 1 of the Sherman Act which provides that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. " *15 U.S.C. § 1.* The second cause of action is a pendent state law claim for interference with prospective advantage.

Presently before the Court are a slew of motions filed by both Go-Video and by defendants. Foremost among these motions are the various motions for summary judgment filed by the remaining defendants in this action. These include a joint motion for summary judgment by defendants Matsushita, Victor, NEC and Sanyo directed at Go-Video's § 1 Sherman Act conspiracy claim and the state law claim; separate individual motions for summary judgment with respect to the refusal to deal issue filed by Victor, Matsushita, NEC and Sanyo; two motions for summary judgment filed by Sony, the

Case 1:04-cv-12457-PBS    Document 77-5    Filed 09/22/2006    Page 9 of 30

Page 9

1990 U.S. Dist. LEXIS 19207, *; 1990-2 Trade Cas. (CCH) P69,141

first directed at the conspiracy issue and the refusal to deal issue and the second directed at the state law claim; a [*4] motion to strike certain evidence submitted in opposition to defendants motions for summary judgment filed by Matsushita, Victor, Sony, NEC and Sanyo; two motions for summary judgment on the issue of patent invalidity, one filed by Sony and the other by Matsushita, Victor, and NEC; a motion to strike affidavits submitted in opposition to certain defendants' motions for summary judgment re: patent invalidity filed by Matsushita, Victor and NEC; a motion by Go-Video for sanctions against Matsushita, Victor and NEC; a motion for leave to take additional discovery also filed by Go-Video; and finally, also on the Court's agenda, are the pending motions involving Sharp Corporation including Go-Video's motion for reconsideration of this Court's earlier Order granting Sharp's motion for partial summary judgment; Sharp's motion to dismiss on statute of limitations grounds; Sharp's motion to dismiss for lack of personal jurisdiction and Sharp's motion for summary judgment on the state law claim.

The facts of this case have been set forth in summary fashion in previous Orders of this Court. For the record, however, and to facilitate proper understanding of the motions and issues presently before [*5] the Court, a brief review of the history and background of this lawsuit is necessary.

Go-Video was founded by R. Terren Dunlap and Richard Lang in 1982 as American Videogram, Inc., a video market research firm. In May 1984, the company was incorporated as Go-Video and engaged primarily in developing and marketing mobile video production services to individuals for special events. In September 1984, Dunlap and Lang filed a patent application with the United States Patent and Trademark Office for the dual-deck VCR. On August 30, 1988, Go-Video obtained United States Patent No. *4,768,110* for its dual-deck VCR.

Go-Video did not have the capability to manufacture or produce the dual-deck VCR itself. As a result, Go-Video contends that in 1984, it began searching for a manufacturer who would either manufacture the dual-deck VCR for Go-Video, manufacture the dual-deck VCR under a licensing agreement with Go-Video or else sell Go-Video essential component parts to the dual-deck VCR. Go-Video was unsuccessful in its search for a manufacturer. On June 22, 1987, Go-Video filed its initial complaint setting forth the terms of the alleged conspiracy among defendants to withhold dual-deck VCRs [*6] from the United States. On April 20, 1988, Go-Video filed a second amended complaint adding as defendants, Sony Corporation and Sony Corporation of American. n3 On March 1, 1989, Go-Video and Samsung Corporation stipulated to the dismissal of all claims

against Samsung and entered into an agreement for the manufacture of the dual-deck VCR. The Court understands that on June 30, 1990, Go-Video began retail sale of the dual-deck VCR in the United States.

n3 Sony Corporation of America was dismissed from the lawsuit pursuant to this Court's Order of January 5, 1989, granting Sony Corporation of America's motion for summary judgment.

## 1. MOTION TO STRIKE CERTAIN EVIDENCE SUBMITTED IN OPPOSITION TO DEFENDANTS MOTIONS FOR SUMMARY JUDGMENT

Moving Parties: Defendants Matsushita, Victor, NEC, Sanyo, Sony.

In response to defendants' joint and separate motions for summary judgment, Go-Video submitted a 238 page statement of facts and 11 volumes of exhibits. Thereafter, all five defendants filed this collective motion to [*7] strike certain evidence submitted by Go-Video in opposition to defendants' motions for summary judgment. In their motion to strike, defendants set forth five general categories of evidence presented by Go-Video to which defendants object. The Court will discuss each category in order of presentation.

### A. Category 1 - Newspaper Articles

Go-Video sets forth a host of newspaper articles which disclose and/or discuss the existence of an alleged agreement among defendants not to manufacture or market a dual-deck VCR in the United States. Defendants move to strike these articles on the grounds that they constitute hearsay evidence and are thus inadmissible under *Fed. R. Evid. 802*.

The first group of newspaper articles at issue are articles containing statements by or reaction from various officials of the Motion Picture Association of America ("MPAA") which are critical of the dual-deck VCR. Representative of these articles is one appearing in The Wall Street Journal on January 30, 1985 in which Jack Valenti, President of the MPAA, states that the sale of dual-deck VCRs "is like selling a skeleton key that can open the front door to any home in America." Continuing in the same vein, [*8] Valenti writes in a March 6, 1985 New York Times op-ed piece:

The cruelest blade of all is about to be unsheathed. Sharp, the Japanese electronic giant, is marketing in the Middle East a machine that is, quite simply, a brazen call

Case 1:04-cv-12457-PBS     Document 77-5     Filed 09/22/2006     Page 10 of 30

Page 10

1990 U.S. Dist. LEXIS 19207, *; 1990-2 Trade Cas. (CCH) P69,141

to thievery. It is what Sharp calls 'the world's first double-cassette' video machine.

A second group of newspaper articles, appearing principally and preliminarily in the Japanese press, can be generally characterized as reporting or discussing the existence of an alleged conspiracy or agreement among defendants. First and foremost among these reports is one contained in Dempa Shimbun on February 27, 1985 which purportedly states that "According to information disclosed on the 26th [of February] by the home electronics industry, each manufacturer of VTRs n4 has agreed to voluntarily restrain production and sales of double deck VTRs." Other articles expressing the same theme subsequently appeared in both Japanese and American newspapers and magazines. n5

n4 In Japan, the common term for video cassette recorders is video tape recorders or "VTR".

n5 For example, an article in the March 29, 1985 edition of Nikkei Sangyo containing the headline "Self Control of Sales of Double Cassette Video Tape Recorders," discusses the existence of a purported "gentlemen's agreement" among manufacturers to voluntarily restrain domestic sales of double cassette recorders. Other articles containing reports along the same lines appeared in the Dempa Digest, March 11, 1985 and Billboard, April 27, 1985.

[*9]

It is axiomatic to state that [HN2] newspaper articles are by their very nature hearsay evidence and are thus inadmissible if offered to prove the truth of the matter asserted, i.e., in this instance the existence of a conspiracy. See *Pan-Islamic Trade Corp. v. Exxon Corp., 632 F.2d 539, 556-57 (5th Cir. 1980); De La Cruz v. Dufresne, 533 F. Supp 145, 149 (D. Nev. 1982); Zenith Radio Corp. v. Matsushita Elec. Indus. Co., 513 F.Supp 1100, 1232, n.198 (E.D. Pa. 1981).* Go-Video, however, contends that it is offering such newspaper articles to show knowledge and intent. Although not clearly articulated, Go-Video evidently relies upon the "state of mind" exception to the hearsay rule. Go-Video cites *Lawlor v. Loewe, 209 F. 721, 726 (2d Cir. 1913),* aff'd, *235 U.S. 522 (1915)* for the proposition that newspaper articles are admissible to demonstrate an antitrust defendant's knowledge of a conspiracy and its consequences and the defendants' intent to participate therein. Go-Video argues that in this case, the newspaper [*10] articles were an intended and principal medium through which the defendants first solicited the conspiracy, subsequently communicated its acceptance, and thereafter confirmed its continuing effectiveness.

To allow the articles to be offered as evidence of the existence of an agreement among defendants to conspire to withhold dual-deck VCRs from the U.S. marketplace stretches the bounds of the Lawlor decision and the hearsay rule. However, the articles may be admissible as evidence of the medium by which defendants allegedly coordinated their activities. "While . . . newspaper reports are arguably admissible as public announcements enabling co-conspirators to coordinate their activity . . . , these reports are nevertheless inadmissible to prove the truth of the existence of a boycott . . . ." *Pan-Islamic, 632 F.2d at 556-57.*

Accordingly, to the extent that the newspaper articles are offered by Go-Video as evidence of the existence of a conspiracy among defendants, they are inadmissible for purposes of summary judgment. As such, the articles appearing in the Japanese press and subsequently in publications circulated in the United States regarding the existence [*11] of an alleged agreement among Japanese manufacturers to voluntarily restrain production of dual-deck VCRs are inadmissible.

Conversely, the articles which discuss the MPAA's opposition toward the dual-deck VCR are admissible and will be considered for purposes of the summary judgment motions. These articles are admissible by virtue of the testimony in the record from various employees of defendants and former defendants that their companies were aware of the MPAA's opposition to the dual-deck VCR through articles appearing in the United States press. These witnesses testified that defendants were afraid that Congress would enact royalty legislation on VCRs at the prompting of the motion picture industry if dual-deck VCRs were marketed in the United States. n6 Thus, the newspaper articles reporting the MPAA's opposition to the dual-deck VCR are admissible as possible evidence of an initiating event and motive for defendants' alleged conspiracy. See *Pan-Islamic, 632 F.2d at 556-57.*

[FOOTNOTE 6 REDACTED BY THE COURT]

Go-Video's alternative arguments in favor of the unlimited admissibility of newspapers articles are unpersuasive. First, Go-Video contends that defendants' failure [*12] to publicly deny or denounce published reports of an alleged conspiracy or agreement constitutes an admission of guilt by defendants based upon their silence. [HN3] The law on adoptive admissions is set forth in *Fed. R. Evid. 801(d)(2)(B)* which provides that a statement (either oral or written) is not hearsay if the statement is offered against a party and is a statement of which the party has manifested an adoption or belief in its truth. The Advisory Committee Notes to 801(d)(2)(B) recognize the possibility of an adoption by silence and

Case 1:04-cv-12457-PBS    Document 77-5    Filed 09/22/2006    Page 11 of 30

Page 11

1990 U.S. Dist. LEXIS 19207, *; 1990-2 Trade Cas. (CCH) P69,141

state that "the theory is that the person would, under the circumstance, protest the statement made in his presence if untrue." The Notes caution, however, that the inference is a fairly weak one. See *Zenith Radio Corp. v. Matsushita Electric Industrial Co., 505 F.Supp 1190, 1245 (E.D. Pa. 1980),* aff'd in part and rev'd in part, *723 F.2d 238 (3rd Cir. 1983),* rev'd *475 U.S. 574 (1986).*

In the context of this case, the Court declines to find for purposes of summary judgment that the newspaper articles are admissible as admissions by silence. To require a [*13] defendant to deny each and every allegation of alleged wrongdoing which is reported in the press or else be subject to potential liability on that basis alone, is too great a responsibility and burden to place on any defendant.

Go-Video also argues that the newspaper articles are admissible pursuant to the hearsay exception established under [HN4] *Fed. R. Evid 803(17).* This rule provides that market quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations are not excluded by the hearsay rule even though the declarant is available. Go-Video contends that the news articles, some of which appeared in Japanese newspapers which closely cover the electronics industry, are within the purview of Rule 803(17) since they come from publications that are of the type relied upon by defendants in their trade and business. [HN5] The type of publications contemplated by Rule 803(17) are those which deal with compilations of objective facts not requiring for their statement, a subjective analysis of other facts. *White Industries, Inc. v. Cessna Aircraft Co., 611 F. Supp 1049, 1069 (W.D. Mo. 1985);* [*14] see also J. Weinstein & M. Berger, Weinstein's Evidence para. 803 (17)[01]. The Rule does not contemplate nor does case law provide, that newspaper articles are the type of publication which incorporate or rely solely on objective facts and thus fall within the purview of the Rule. Furthermore, publications upon which persons in a particular trade rely but which do not necessarily compile only objective facts must be shown to be trustworthy. Id. Go-Video does not provide a sufficient evidentiary foundation upon which this Court may make a determination of the inherent trustworthiness of the news articles Go-Video seeks to admit into evidence. As a result, the newspaper articles do not fall within the hearsay exception under Rule 803(17) for market reports and commercial publications.

The Court finds that the newspaper articles offered by Go-Video which discuss an alleged conspiracy and agreement among defendants not to manufacture or market dual-deck VCRs in the United States and upon which Go-Video relies in opposing defendants' summary judgment motions are inadmissible for the purposes of show-

ing the existence of an alleged conspiracy. Defendants' motion to strike is [*15] granted with respect to these articles. n7 Those articles reporting the MPAA's opposition to the dual-deck VCR are admissible for the purpose of showing, if Go-Video can do so, a possible motive and impetus for the alleged conspiracy. Thus, these articles will not be subject to defendants' motion to strike.

n7 Absent additional information or an alternative basis for their unlimited admissibility, they will not be admissible at trial except as otherwise noted.

*B. Category II - Statements by the MPAA and EIA as Statements of Co-Conspirators under Fed. R. Evid. 801(d)(2)(E).*

In its opposition to defendants' motion for summary judgment on the conspiracy issue, Go-Video relies upon a number of hearsay statements by officials of the MPAA and Electronics Industries Association ("EIA") as evidence that a conspiracy existed among defendants. Go-Video contends that the statements of these officials are admissible despite their hearsay nature as statements of co-conspirators pursuant to *Fed. R. Evid. 801(d)(2)(E).*

[HN6] Substantive [*16] conspiracy law provides that a conspirator is liable for the acts of a co-conspirator when those acts are taken in furtherance of the conspiracy. Rule 801(d)(2)(E) is an evidentiary counterpart that permits the admission against a party of out-of-court statements of a co-conspirator when the statements are made "during the course of and in furtherance of a conspiracy." *Fed. R. Evid. 801(d)(2)(E).*

[HN7] The admissibility of statements under Rule 801(d)(2)(E) is a preliminary question for the Court. *Bourjaily v. United States, 483 U.S. 171, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987).* The Court may admit statements of co-conspirators under Rule 801(d)(2)(E) if it finds, by a preponderance of the evidence that (1) a conspiracy existed, (2) the declarant and the defendant against whom the declarations are offered were members of the conspiracy, and (3) the statements were made during the course of and in furtherance of the conspiracy. *Id. at 181, 107 S.Ct. at 2782.* Previous to Bourjaily, in determining admissibility, a court was required to consider evidence independent of the proffered co-conspirator's [*17] statements to find the existence of and membership in a conspiracy. Presently, however, [HN8] the court can consider the proffered conspirator's statements in determining whether the party seeking admission of this

Case 1:04-cv-12457-PBS    Document 77-5    Filed 09/22/2006    Page 12 of 30

Page 12

1990 U.S. Dist. LEXIS 19207, *; 1990-2 Trade Cas. (CCH) P69,141

evidence under Rule 801(d)(2)(E) has established the existence of a conspiracy and the nonoffering parties' participation in the conspiracy. *E.W. French & Sons, Inc. v. General Portland Inc, 885 F.2d 1392, 1397 (9th Cir. 1989).* However, a co-conspirator's out-of-court statement, standing alone, is insufficient to establish that the defendant had knowledge of and participated in a particular conspiracy. *U.S. v. Silverman, 861 F.2d 571, 576-79 (9th Cir. 1988).* Where some additional proof is offered, the court must determine whether such proof, viewed in light of the co-conspirator's statement itself, demonstrates by a preponderance of the evidence that defendant knew of and participated in the conspiracy. *Id. at 578.*

Among the statements Go-Video seeks to admit into evidence, are statements purportedly made by MPAA officials such as James Bouras, Jack Valenti, and Barbara Dixon regarding and/or acknowledging an agreement [*18] by Japanese VCR manufacturers to withhold dual-deck VCRs from the United States. Other statements include those made during a meeting between EIA general counsel Gary Shapiro and James Bouras of the MPAA in August, 1986 in Las Vegas, Nevada in which Shapiro allegedly indicated that the VCR manufacturers were eager to introduce the dual-deck VCR to the United States market but would being willing to discuss and/or adhere to a timetable for the introduction of dual-deck VCRs starting in 1991 or 1992. In moving to strike these statements, defendants contend that Go-Video has not offered sufficient evidence or made the requisite showing of a conspiracy involving the MPAA and EIA to justify admission of statements made by their representatives.

With respect to statements by MPAA officials, there is insufficient evidence linking the MPAA to the alleged conspiracy to satisfy the requirements of Rule 801(d)(2)(E) for the admission of these statements. As an example, in attempting to show that the MPAA was a part of the alleged conspiracy, Go-Video sets forth an internal Paramount Picture Inc. memorandum dated February 1, 1985 which states that the dual-deck VCR is considered a top priority [*19] by the MPAA and that the MPAA will consider, among other actions, "signalling to the Japanese manufacturers through various means that this will not be kindly looked at by the Congress, most of the video dealers and the motion picture industry."

This evidence, however, does not tend to show that the MPAA entered into an agreement with defendants to withhold dual-deck VCRs from the United States market. In fact, the evidence indicates that the MPAA undertook an aggressive publicity campaign designed to both warn defendants and influence Congress to enact royalty legislation should defendants proceed to market dual-deck VCRs in the United States. Both James Bouras and Bar-

bara Dixon, MPAA vice-presidents, testified during their depositions that statements made by Jack Valenti and other MPAA officials were intended to reach both the U.S. Congress and VCR manufacturers. Rather than being an invitation to enter into an unlawful agreement to withhold dual-deck VCRs, the MPAA's activity in opposition to the dual-deck VCR was protected petitioning and lobbying activity under the Noerr-Pennington doctrine. [HN9] Efforts to influence the government to take anti-competitive action cannot be made [*20] the basis of antitrust liability. *Eastern Railroad President's Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 135, 81 S.Ct. 523, 528, 5 L.Ed.2d 464 (1961).* "No violation of the [Sherman] Act can be predicated upon mere attempt to influence a passage or enforcement of laws." *Id. at 135, 81 S.Ct at 528.* Such petitioning activity is protected "regardless of intent or purpose." *United Mine Workers v. Pennington, 381 U.S. 657, 679, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965).*

As further support of its contention that the MPAA was a co-conspirator, Go-Video offers statements made by MPAA officials acknowledging the existence of an alleged conspiracy. For example, on March 8, 1985, James Bouras informed Jack Valenti that "it now appears pretty obvious that Japanese VCR manufacturers have reached agreement not to manufacture or market NTSC models [of dual-deck VCRs] in either the U.S. or Japan." On March 14, 1985, an internal Warner Communications memo reported that Warner "learned that the Japanese electronics association agreed to total ban on manufacture [*21] of dual-deck machine. . . ." Review of the evidence, however, indicates that the MPAA's information concerning the alleged conspiracy among defendants did not derive from an actual agreement or deal between the MPAA and the defendants, but rather the information came from news articles in the press. When asked at his deposition how he knew there was an agreement among the defendants, Bouras explained that he received a telex from an MPAA lawyer in Tokyo concerning a report in a Japanese trade publication of an agreement among Japanese manufacturers that dual-deck VCRs would not be put on the market in Japan for the time being. n8 Essentially the same testimony, i.e., that his information came from press reports, is given by the Warner executive who authored the memo concerning the alleged agreement among defendants. Consequently, because there has been an insufficient showing that the MPAA is a co-conspirator, statements made by MPAA officials are not admissible under *Fed. R. Evid. 801(d)(2)(E).* n9

[FOOTNOTE 8 REDACTED BY THE COURT]

n9 Furthermore, the Court has already ruled that news articles reporting the existence of a

Case 1:04-cv-12457-PBS    Document 77-5    Filed 09/22/2006    Page 13 of 30

Page 13

1990 U.S. Dist. LEXIS 19207, *; 1990-2 Trade Cas. (CCH) P69,141

conspiracy among defendants are inadmissible. It follows that statements made by MPAA officials derived from these same news articles are equally inadmissible since they involve multiple hearsay. In other words, it would be inappropriate to allow otherwise inadmissible new articles to be offered into evidence under *Fed. R. Evid. 801(d)(2)(E)* simply because alleged co-conspirators, without any independent or personal knowledge, made statements incorporating the contents of the news articles.

[*22]

As for the EIA, Go-Video has offered evidence suggesting that the EIA was, in effect, an agent for defendants and the Electronics Industries Association of Japan ("EIAJ") for purposes of satisfying the co-conspirator admissibility standard under Rule 801(d)(2)(E). Although based in the United States, the EIA's membership consists primarily of American subsidiaries of foreign manufacturers of consumer electronics products. With respect to VCRs, these manufacturers are primarily if not exclusively Japanese and Korean. Go-Video offers evidence showing that at the very least, a close working relationship existed between the EIA and the EIAJ. In fact, it appears that beginning in 1984, EIAJ delegations met with the EIA and its members companies both in Japan and the United States to formulate and coordinate efforts to combat possible royalty legislation by the Congress.

The EIA [HN10] need not be a party to this lawsuit to fall within the purview of *Fed. R. Evid. 801(d)(2)(E)*. Statements by non-defendant members of a conspiracy are not inadmissible merely because the declarant is not a defendant in the action. *Clune v. United States, 159 U.S. 590, 593, 16 S.Ct. 125, 126, 40 L.Ed. 269 (1895).* [*23]

As a result, defendants motion to strike is granted with respect to statements by the MPAA but denied as to the EIA on grounds that such statements qualify as statements of co-conspirators under *Fed. R. Evid. 801(d)(2)(E)*.

## C. Category III - Evidence of Go-Video's Contacts with Defendants

Defendants move to strike Go-Video's evidence that it attempted to or actually contacted defendants through third party agents in an effort to obtain manufacture of its dual-deck VCR. Defendants object to admission of this evidence on the basis that evidence of such contacts is inadmissible hearsay in the form of (1) letters to and from Go-Video agents; and (2) memoranda and testimony of Go-Video executives as to what its agents reported regarding such contacts. The admissibility of this

evidence is especially relevant to defendants' separate motions for summary judgment on the demand issue.

Defendants position as set forth in their motion to strike is threefold. First, defendants argue that oral statements allegedly made by third party agents to Go-Video executives constitute classic hearsay in the absence of sworn declarations, affidavits or deposition testimony from the declarants themselves. [*24] The statements at issue concern the agents alleged contacts with defendants and purportedly detail the agents offers to or "demands" upon defendants to do business with Go-Video.

Second, defendants maintain that statements by Go-Video's agents as reported or memorialized in writing by Go-Video executives are equally inadmissible.

Third, defendants contend that written correspondence from Go-Video's agents to Go-Video executives also constitute inadmissible hearsay.

The basis of defendants' objections to all three types of evidence is that they are out-of-court statements being offered to prove the truth of the matter asserted - e.g., that Go-Video agents actually contacted defendants on Go-Video's behalf.

In opposition to defendants motion to strike, Go-Video asserts that it is not offering this evidence solely to prove the truth of the matters asserted therein as defendants contend but rather the evidence is offered as proof of Go-Video's efforts to contact defendants and to obtain manufacture of its dual-deck VCR.

Go-Video also contends that this evidence is admissible on other grounds including several hearsay exceptions. Go-Video argues that the written communications fall within [*25] the "business records" exception to the hearsay rule under *Fed. R. Evid. 803(6)*. Go-Video further maintains that both the oral and written communications by or to its agents may be admissible under the "catch-all" exception to the hearsay rule set forth in *Fed. R. Evid. 803(24)*.

To the extent that Go-Video offers this evidence as proof of its efforts in hiring agents to contact defendants in an attempt to obtain manufacture of the dual-deck VCR, it is admissible. But to the extent the evidence is offered to prove the substance of these contacts, it is hearsay under *Fed. R. Evid. 801* and thus subject to defendants motion to strike.

[HN11] Under *Fed. R. Evid. 803(6)*, the "business records" exception to the heasay rule, Go-Video has failed to provide a proper foundation for the admission of evidence concerning Go-Video's alleged contacts with defendants. A hearsay statement is admissible as a business record if the following foundational facts are

Case 1:04-cv-12457-PBS    Document 77-5    Filed 09/22/2006    Page 14 of 30

Page 14

1990 U.S. Dist. LEXIS 19207, *; 1990-2 Trade Cas. (CCH) P69,141

proved: (1) The writing is made or transmitted by a person with knowledge at or near the time of the incident recorded; (2) the record is kept in the course of regularly conducted business activity. *United States v. Ordonez, 737 F.2d 793, 805 (9th Cir. 1984).* [*26] These facts must be shown by the testimony of the custodian or other qualified witness. *Id. at 805.* In this instance, Go-Video fails to lay the proper foundation to authenticate or verify that the contacts were made. Go-Video does not offer the declarations, affidavits or deposition testimony of any of its purported agents who made the alleged contacts with defendants on Go-Video's behalf. As a result, no evidence is presented to demonstrate that the persons who made the contacts and thus made the communications to Go-Video were truthful and had clear recollections of the facts. Consequently, this evidence is inadmissible under *Fed. R. Evid. 803(6)* at this time because of Go-Video's failure to establish a proper foundation for its admissibility.

The Court finds that evidence of Go-Video's alleged contacts through its third party agents may be admissible under *Fed. R. Evid. 803(24)* although Go-Video has not established why affidavits or declarations from these agents cannot be produced even in light of the fact that these agents are purportedly outside the United States and thus the Court's jurisdiction. However, for purposes of summary judgment, the Court assumes [*27] that Go-Video will be able to produce these agents at trial or else establish why these agents are unavailable and that the agents' statements are more probative on the point of establishing Go-Video's contacts with and demands upon defendants then any other evidence which Go-Video could procure through reasonable efforts. *Fed. R. Evid. 803(24).*

As a result, Go-Video's evidence is sufficient to indicate that contacts were made with some of the defendants for purposes of summary judgment although such evidence in its current form will not be admitted at trial without the establishment of a proper foundation for its admissibility. This ruling pertains only to letters purportedly written by Go-Video's agents detailing their efforts in contacting defendants and attempting to secure a manufacturing agreement on behalf of Go-Video. Examples of this evidence are the letters written by Advanced Technology Associates regarding its contacts with former defendant Akai Corporation. These letters describe in some detail the contacts made with Akai, Akai's responses and the issues discussed by both Go-Video and Akai. The Court's ruling does not apply to notes and memoranda prepared by Go-Video [*28] personnel summarizing the details of their conversations with Go-Video's agents which are inadmissible hearsay.

*D. Category IV - Evidence of an Alleged Conspiracy in Another Market as Evidence of the Conspiracy Alleged Herein under the "Kindred Acts" Doctrine*

Go-Video offers deposition testimony concerning discussions at Japan-EC Round Table meetings at which digital audio tape ("DAT") was discussed, as evidence that defendants entered into a conspiracy with respect to dual-deck VCRs. Defendants move to strike this evidence on the basis that it is irrelevant, unduly prejudicial and does not show any unlawful conduct or conspiracy on the part of defendants to withhold dual-deck VCRs from the United States.

Go-Video contends that where issues of motive, intent, common plan or scheme, knowledge, or absence of mistake are present, an antitrust plaintiff may offer evidence of similar conduct or agreement under the "kindred acts" doctrine. *Fed. R. Evid. 404(b)*; *Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).*

[HN12] The admissibility of evidence of other unlawful conduct is within the discretion [*29] of the trial judge. However, evidence of a conspiracy in other geographic markets or products has been deemed relevant and admissible in many cases. See e.g., Continental Ore; *Panotex Pine Line Co. v. Phillips Petroleum Co., 457 F.2d 1279 (5th Cir. 1972).* In Continental Ore, the Supreme Court ruled that [HN13] evidence of conspiracy in other markets was relevant and admissible as proof of a single overall conspiracy. The Court stated that the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole. Id. at 699, 82 S.Ct. at 1410.

Consequently, the Court will deny defendants' motion to strike with respect to evidence of discussions among defendants concerning DAT for purposes of summary judgment. In all candor, however, the Court does not view Go-Video's proffered DAT evidence as especially significant or probative. If Go-Video plans to offer such evidence at trial, a proper foundation for its admissibility must be established.

*E. Category V - Evidence Relating to the Background and History of the Japanese Electronic Industry*

In response to defendants' summary judgment [*30] motions, Go-Video offers substantial evidence in the form of affidavits, declarations and deposition testimony regarding the background of the Japanese consumer electronics industry. The purpose and gist of this evidence is to show that the history, organization, customs and practices of Japanese industries dictate cartelization and/or the formation of conspiracy's among and between competitors in major industries such as the electronic indus-

Case 1:04-cv-12457-PBS     Document 77-5     Filed 09/22/2006     Page 15 of 30

Page 15

1990 U.S. Dist. LEXIS 19207, *; 1990-2 Trade Cas. (CCH) P69,141

try. Go-Video contends that such evidence is admissible pursuant to *American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946)* and *Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).* In both American Tobacco and Continental Ore, the Supreme Court ruled that [HN14] evidence regarding the history and practices of a particular industry was relevant and admissible in cases alleging a conspiracy to monopolize business in that industry.

Defendants object to such evidence on the ground that Go-Video's alleged experts on Japanese business practices are unqualified to give such expert [*31] testimony and as such their opinions lack foundation. Defendants specifically object to the affidavits of Marvin Wolf and David Feir.

[HN15] *Fed. R. Evid. 702* provides that if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. For purposes of summary judgment, the Court will liberally construe the qualifications of Go-Video's "expert" witnesses. See *California Steel and Tube v. Kaiser Steel Corp., 650 F.2d 1001, 1003 (9th Cir. 1981)* [HN16] ("where an expert is not obviously unqualified, questions at the summary judgment stage as to the expert's qualifications should rarely be resolved by exclusion of the evidence"). Go-Video has set forth sufficient evidence regarding Messrs. Wolf and Feir's knowledge and experience with respect to Japanese business practices so as not to render either witness as "obviously unqualified" at this juncture. This ruling does not, however, absolve Go-Video from its obligation at trial of setting forth a proper [*32] foundation for the admissibility of all expert testimony including the testimony of Messrs. Wolf and Feir. In other words, this ruling is without prejudice to defendants raising the issue of Wolf and Feir's qualifications as expert witnesses in this case at the time of trial.

The Court notes that evidence with respect to the history of Japanese industry as a whole, other Japanese industries or general Japanese business practices and customs goes beyond the bounds of the type of evidence contemplated by the Supreme Court in American Tobacco and Continental Ore and thus will not be considered by the Court in ruling upon defendants summary judgment motions.

*2.    OBJECTION TO CERTAIN DEPOSITION TESTIMONY OFFERED BY GO-VIDEO IN OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT*

Moving Party: Sony

Sony objects to 22 of Go-Video's statements of fact on the basis that those statements are based on facts derived from deposition testimony of witnesses who were deposed before Sony became a party to the action. Sony contends that these particular statements of fact are inadmissible against Sony under [HN17] *Fed. R. Civ. P. 32(a)* which provides that a deposition may only "be used against any party [*33] who was present or represented at the taking of the deposition or who had reasonable notice thereof . . ." Sony cites the case of *Hoover v. Switlik Parachute Co., 663 F.2d 964 (9th Cir. 1981)* in which depositions taken prior to joinder of a parachute manufacturer in a products liability action were inadmissible as depositions for purpose of a summary judgment motion by a second manufacturer.

For purposes of this summary judgment proceeding, the deposition testimony will be admitted as affidavits. In Hoover, the Ninth Circuit ruled that the depositions, although inadmissible as depositions for purposes of summary judgment, were admissible as affidavits under *Fed. R. Civ. P. 56* since they were made on personal knowledge and set forth facts that were admissible in evidence. *Id. at 966-67.* If Sony maintains it will be prejudiced by admission of this evidence at trial, it may seek to reopen discovery to retake the depositions of those witnesses deposed before Sony became a party to this action. Sony has thirty (30) days from the date of filing of this Order to seek to reopen discovery.

Sony also contends that Go-Video violated this Court's orders [*34] by taking merit discovery in the form of witness depositions, some of which form the basis of the statement of facts to which Sony objects, during the pendency of a Court ordered stay on all merit discovery from December 23, 1987 to March 30, 1988. Sony raises this argument for the first time in its reply brief filed on August 28, 1989. Why Sony or any other defendant did not object to these depositions at the time they occurred is unclear. Accordingly, to paraphrase the adage, Sony is a day late and a dollar short with respect to this argument. Sony's failure to raise this issue previously renders its current objection untimely.

*3.    MOTION FOR SUMMARY JUDGMENT RE: CONSPIRACY ISSUE*

Moving Parties: Defendants Matsushita, Victor, NEC, Sanyo, Sony

The crux of Go-Video's action under Section 1 of the Sherman Act is set forth in paragraphs 61 and 62 of the second amended complaint.

Case 1:04-cv-12457-PBS    Document 77-5    Filed 09/22/2006    Page 16 of 30

Page 16

1990 U.S. Dist. LEXIS 19207, *; 1990-2 Trade Cas. (CCH) P69,141

61. Commencing at least as early as 1984, at a time and place unknown to plaintiff, and continuing through the present, the defendants have entered into an agreement, combination and conspiracy that the Manufacturing Defendants not make for anyone else for sale in the United States, or sell themselves [*35] in the United States, a dual-deck VCR, and boycott and collectively refuse to deal with anyone seeking to license, contract, or subcontract the manufacture of dual-deck VCRs to be marketed in the United States. The Manufacturing Defendants have assured and guaranteed the Motion Picture Defendants that the Manufacturing Defendants will absolutely not break the ban and boycott on the dual-deck VCR in the United States. Further, they have agreed not even to supply parts to any other manufacturer who might build dual-deck VCRs to be marketed in the United States.

62. Pursuant to the agreement among all defendants to withhold dual-deck VCRs from the United States and to boycott anyone seeking to license, contract, or subcontract the manufacture of dual-deck VCRs to be marketed in the United States, the Manufacturing Defendants have withheld dual-deck VCRs from commerce in the United States, and, despite repeated requests by Go-Video and its potential business partners and co-venturers have jointly refused to deal with and collectively boycotted Go-Video in its efforts to obtain a manufacturer for the VCR-2, thereby preventing Go-Video from manufacturing the VCR-2, and from marketing, [*36] selling, or licensing for manufacture and sale, the VCR-2 in commerce in the United States.

Defendants Matsushita, Victor, NEC and Sanyo collectively filed a joint motion for summary judgment on the basis that Go-Video has produced no evidence to satisfy the conspiracy element of an antitrust claim under Section 1 of the Sherman Act. These parties also moved for summary judgment on Go-Video's pendent state claim for interference with prospective advantage. Sony filed two separate motions, one for summary judgment on the conspiracy and refusal to deal issues and the other for summary judgment on the state law claim.

*Summary Judgment Standard*

[HN18] In addressing summary judgment motions in antitrust cases, courts have traditionally proceeded with caution in granting such motions. *Poller v. Columbia Broadcasting System Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962)*("summary judgment procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot"). Recently, however, in a [*37] trio of cases including one involving

antitrust litigation, the Supreme Court clarified the standards for granting summary judgment motions. See *Matsushita Electric Industrial Co., v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).*

[HN19] To grant summary judgment, this Court must find that the record clearly establishes that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. [HN20] In determining whether summary judgment should issue, the facts and inferences from these facts are viewed in the light most favorable to the non-moving party and the initial burden is placed on the moving party to establish both that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. *Matsushita, 475 U.S. at 586-87, 106 S.Ct. at 1356-57.* [*38] The moving party may discharge this burden by showing that there is an absence of evidence to support the non-moving party's case. *Celotex Corp., 477 U.S. at 322, 106 S.Ct. at 2552.* The burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense. The party opposing a motion for summary judgment cannot rest upon the mere allegation or denials of its pleadings, but must set forth specific facts showing there is a genuine issue for trial. *Liberty Lobby, 477 U.S. at 257, 106 S.Ct. at 2514.*

[HN21] The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. The requirement is that there be no genuine issue of material fact. Id. A material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id. at 248, 106 S. Ct. at 2510.*

[HN22] At the summary judgment stage, the trial judge's function is to determine whether there is a genuine issue for trial. There is no issue [*39] for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, the judge may grant summary judgment. *Id. at 249, 106 S. Ct. at 2511.*

It should be noted that while summary judgment is a valuable means for avoiding unnecessary trials, and recent Supreme Court cases have tended to encourage its use in complex antitrust cases such as this one, see e.g., Matsushita, it should not be regarded as a substitute for trial. The Ninth Circuit continues to advise district courts to proceed cautiously in antitrust cases. "We grant summary judgment less frequently in the antitrust context, in part because the alleged conspirators control the proof."

Case 1:04-cv-12457-PBS    Document 77-5    Filed 09/22/2006    Page 17 of 30

Page 17

1990 U.S. Dist. LEXIS 19207, *; 1990-2 Trade Cas. (CCH) P69,141

*Community Electric Service, Inc. v. National Electrical Contractors Asso, 869 F.2d 1235, 1246 (9th Cir. 1989).* [HN23] In antitrust cases, once a defendant rebuts the allegations of conspiracy with probative evidence supporting an alternative interpretation of a defendant's conduct, the plaintiff must come forward with specific factual support of its conspiracy allegations [*40] to avoid summary judgment. *Movie 1 & 2 v. United Artists Communications, Inc., F.2d , 1990-1 Trade Cas., para. 69,029* (9th Cir. May 14, 1990). A defendant may rebut an allegation of conspiracy by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice. *Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987).* Once a defendant has met this initial burden, a plaintiff must provide specific factual support for its allegations of conspiracy tending to show that the defendant was not acting independently. *Id. at 902.* Failure on the part of the plaintiff to produce evidence from which a jury could reasonably infer that conduct was conspiratorial, not unilateral, will lead to summary judgment for the defendant. *Id. at 902.*

*Agreement Not to Manufacture Dual-Deck VCR*

Defendants contend that they did not enter into an agreement or conspiracy or engage in "parallel" conduct in refusing to or failing to manufacture a dual-deck VCR for Go-Video. Furthermore, defendants claim that only two of the five defendants were ever even approached [*41] by Go-Video and that each had independent and legitimate business reasons for deciding against manufacturing and/or marketing a dual-deck VCR. These reasons include the high cost of making a dual-deck VCR in relation to a single-deck VCR, the possibility of legal action against defendants by the MPAA, the threat of royalty legislation by the United States Congress, copyright concerns, and in NEC's case, the failure of Go-Video to offer satisfactory commercial terms.

Defendants have met their burden of proffering a plausible justification for their conduct consistent with proper business judgment. The burden then shifts to Go-Video to provide specific factual support for its allegations of conspiracy which tend to show that the defendants did not act independently.

Go-Video position on summary judgment is basically twofold. First, Go-Video contends that there is sufficient evidence with respect to the existence of an actual agreement or conspiracy among defendants to withhold dual-deck VCRs from the United States marketplace to defeat summary judgment on that issue. Second, Go-Video maintains that defendants' parallel conduct in failing to manufacture or market a dual-deck VCR in the [*42] United States is sufficient inference of a concerted refusal to deal to justify denying defendants' motion for summary judgment.

According to Go-Video, the origins of the conspiracy began in 1984 when Go-Video and several of the present and former manufacturing defendants began planning and developing dual-deck VCRs although implementation of an actual agreement to withhold dual-deck VCRs from the United States market did not occur until February or March of 1985. In the second amended complaint, Go-Video alleges that the motion picture industry was instrumental in bringing about this alleged agreement among the manufacturing defendants because of a belief that dual-deck VCRs would enjoy the same popularity as dual-deck audio equipment, with a resulting proliferation of video cassette copying from which the motion picture studios would receive no revenues. Go-Video further alleges that the manufacturing defendants implemented the agreement because of a concern that the sale of dual-deck VCRs in the United States would revive lobbying efforts by the MPAA and the recording industry for legislation imposing royalties on single-deck VCRs and audio recorders. The conspiracy or boycott [*43] allegedly arose through a series of meetings and communications involving the defendants, their trade association - the EIAJ, its American counterpart - the EIA, and the motion picture industry and its trade association - the MPAA.

With respect to evidence of an actual agreement or conspiracy among defendants, Go-Video offers the following:

(1) The background of the Japanese electronics industry dictates cartelization and the formation of agreements among competitors. Go-Video cites as an example the fact that "the Japanese control the worldwide VCR market because they control the basic patents" which are freely licensed to and among each other but not with outsiders.

(2) Evidence with respect to Digital Audio Tape ("DAT") under the "kindred acts" doctrine.

(3) Go-Video negotiations with NEC, Funai and Akai regarding manufacture of a dual-deck VCR on an OEM basis which were unsuccessful.

(4) Sanyo's intent to manufacture a dual-deck VCR with VHS and Beta capacity which was abandoned purportedly at the request of Sony.

(5) Sharp's decision not to market its dual-deck VCR in the United States after it had begun marketing the product in the Middle East.

(6) The Japanese Video Association's [*44] ("JVA") concern as communicated to the EIAJ of the possible adverse reaction by the United States Congress with respect to royalty legislation directed at VCRs if a dual-deck VCR came to market in the United States.

Case 1:04-cv-12457-PBS     Document 77-5     Filed 09/22/2006     Page 18 of 30

Page 18

1990 U.S. Dist. LEXIS 19207, *; 1990-2 Trade Cas. (CCH) P69,141

(7) Discussions at the February 5, 1985 meeting of the EIAJ concerning the dual-deck VCR.

(8) Discussion at the February 6, 1985 meeting of the Overseas Copyright Committee of the EIAJ of possible royalty legislation on single-decks VCRs if a dual-deck VCR was manufactured and marketed in the U.S.

(9) Press reports in Japanese newspapers beginning in late February, 1985 regarding an agreement among VCR manufacturers to "voluntary restrain production and sales of double-deck" VCRs.

(10) A written request dated February 28, 1985 from the Video Copyright Protection and Surveillance Organization of the JVA to the EIAJ that EIAJ members not proceed with a dual-deck VCR.

(11) Distribution of the same request at a Video Business Committee meeting of the EIAJ on March 29, 1985.

(12) "Admissions" of a conspiracy by the MPAA in the form of statements and communications made by MPAA officials such as James Bouras, Jack Valenti, and Barbara Dixon regarding an agreement by Japanese [*45] VCR manufacturers to withhold dual-deck VCRs from the United States.

(13) Samsung's failed attempts in 1986 to manufacture a dual-deck VCR because of alleged pressure from defendants and the MPAA.

(14) Meetings between officials of the MPAA and the Electronics Industry of America ("EIA") purportedly concerning the agreement to withhold dual-deck VCRs from the U.S.

(15) Go-Video's own failure to obtain a manufacturer or licensing arrangement for its dual-deck VCR.

In determining defendants motion to strike, the Court has already held certain of the evidence Go-Video relies upon to be inadmissible. This includes articles in the press and statements by MPAA officials reporting the existence of an agreement among defendants.

As for that evidence offered by Go-Video which is admissible, the Court considers the meetings and actions of the EIAJ, JVA and various subcommittees of those organizations in February and March of 1985 to be highly probative on the issue of the existence of a conspiracy among defendants. These meetings and actions were allegedly in response to newspaper articles reporting the MPAA's opposition to the dual-deck VCR following Sharp's manufacture and marketing of a [*46] dual-deck VCR in the Middle East. Apparently concerned about the possible marketing of the dual-deck VCR in the United States, the MPAA began a publicity campaign designed to generate opinion against the dual-deck VCR. n10

> n10 The most widely published news articles concerning the MPAA's position on the dual-deck VCR appeared in the Wall Street Journal, and USA Today. See "Latest Advance in VCRs Angers Movie Industry", Wall St. J., Jan. 30, 1985, at 29, col. 3; "2-tape VCRs: New concern over piracy", USA Today, Jan. 30, 1985, at 1D, col. 3. At his deposition, MPAA vice-president James Bouras testified that his intention in making statements about the Sharp dual-deck VCR was to reach two audiences, the U.S. Congress and the manufacturers of VCRs. when asked why he wanted to reach VCR manufacturers, Bouras replied: "Because we wanted to let them know immediately that the MPAA was going to oppose, through all legal means available, the introduction of dual-cassette VCR's."

On January 31, 1985, the president of the Japan [*47] Video Association met with the staff vice president of the EIAJ and his assistants. At the meeting, the president of the JVA expressed the video industry's concern over the dual-deck VCR and asked the EIAJ representatives to transmit this concern to the VCR manufacturers. On February 5, 1985, at a meeting of the Video Business Committee of the EIAJ, the JVA's concerns were conveyed to the members present including representatives of Sony, Sanyo, Matsushita, JVC, Sharp and NEC. The English translation of notes taken during the meeting by the Sony representative reads:

On February 6, 1985, at a meeting of the MITI Overseas Copyright Committee, the subject of the dual-deck VCR was again addressed in the context of a discussion concerning the budget for lobbying activities in the United States for the coming year. Copies of articles from the U.S. press were circulated reporting on the appearance of Sharp's dual-deck VCR in the Middle East and the MPAA's strong opposition to the product. A representative of Matsushita expressed his concern to the Sharp representative at the meeting that the marketing of a dual-deck VCR would cause problems in Japan-U.S. trade relations [*48] and lead to possible royalty legislation by the Congress. The Sharp representative again explained that the dual-deck VCR would not be sold in the United States. The discussion ended when the EIAJ representative informed those present that the EIAJ's policy during these meetings was not to have any discussion of members' sales or production plans.

On February 28, 1985, the Video Copyright Protection and Surveillance Organization of the JVA delivered

Case 1:04-cv-12457-PBS    Document 77-5    Filed 09/22/2006    Page 19 of 30

Page 19

1990 U.S. Dist. LEXIS 19207, *; 1990-2 Trade Cas. (CCH) P69,141

to the EIAJ a written request that the members not proceed with dual-deck VCRs. The letter specifically requested "that the member companies of your Association understand the import of the above, that the company now producing the double cassette VTR desist from doing so, and that the other manufacturers will not produce such a unit now or later." n11 This letter was distributed to all members of the EIAJ.

[FOOTNOTE 11 REDACTED BY THE COURT]

The letter was again distributed at the March 29, 1985 meeting of the Video Business Committee. The English translation of the minutes of this meeting read:

Apparently no other discussion on the subject of the dual-deck VCR took place during the meeting.

Further probative evidence on the existence [*49] of a conspiracy among defendants is contained in a memo by James Bouras of the MPAA reporting a discussion between Bouras and Gary Shapiro, general counsel of the EIA, in August of 1986. According to the memo, Shapiro stated that the VCR manufacturers would like to introduce dual-deck VCRs to the market, would agree to include anticopying technology in dual-deck VCRs, and that the EIA was prepared to discuss a timetable for the introduction of dual-deck VCRs in 1991 or 1992. Although this conversation may be susceptible to more than one interpretation, at least one inference which a reasonable jury could draw is that there was some type of collective action among defendants with respect to the introduction of dual-deck VCRs in the United States.

The issue for the Court is whether Go-Video has provided sufficient factual evidence of a conspiracy among defendants to defeat summary judgment. [HN24] A civil conspiracy occurs when the parties have reached "a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement." *American Tobacco Co. v. United States, 328 U.S. 781, 809-10, 66 S.Ct. 1125, 1138-39, 90 L.Ed. 1575 (1946);* [*50] *Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1021 (9th Cir. 1985).* [HN25] The antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective. *Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984).* It is not necessary for a plaintiff to show an explicit agreement among defendants in support of a Sherman Act conspiracy, "concerted action may be inferred from circumstantial evidence of the defendant's conduct and course of dealings." *Harkins Amusement Enterprises, Inc. v. General Cinema Corp., 850 F.2d 477, 484 (9th Cir. 1988).*

The request by the JVA to the EIAJ that each member refrain from producing a dual-deck VCR is evidence of a common design and understanding among defendants, all of whom received the request. The common understanding is that all other defendants received and were expected to act in conformity with the request. Although perhaps not direct evidence of a conspiracy [*51] among defendants, the JVC request is direct evidence that an agreement was at least solicited and contemplated. [HN26] Federal courts grant wide latitude in concluding conspiracy or collusion from parallel conduct and the inferences drawn from the circumstances. *Community Elec. Service, 869 F.2d at 1246.*

The Court finds that there exist genuine issues of material fact concerning whether defendants entered into a conspiracy in violation of Section 1 of the Sherman Act so as to preclude summary judgment at this juncture. Go-Video has offered sufficient evidence of an agreement among defendants not to manufacture and market dual-deck VCRs so that a reasonable jury could infer that defendants conduct was more indicative of collusion and conspiracy than of legitimate independent business practice. The Court does not express any opinion whatsoever on the merits of Go-Video's claim or on the nature of the evidence since more than one reasonable but competing inference can be drawn from the evidence in the record. Since [HN27] on summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion, *Matsushita, 475 U.S. at 587-88, 106 S.Ct. at 1357,* [*52] the Court cannot rule as a matter of law that no Section 1 violation occurred in this case. As a result, genuine issues of material fact remain to be resolved by the jury at trial.

*Conscious Parallelism*

Go-Video's second theory in support of its Section 1 refusal to deal claim is based on the [HN28] doctrine of conscious parallelism. Under this doctrine, an agreement or conspiracy may be inferred if each participant knew that concerted action was contemplated and invited, gave its adherence to and participated in the scheme, and understood that cooperation was essential to the plan. See generally *Interstate Circuit, Inc. v. United States, 306 U.S. 208, 222-27, 59 S.Ct. 467, 83 L.Ed. 610 (1939).* The crux of the doctrine of conscious parallelism in concerted refusal-to-deal cases is that the fact that competitors have made the same decision is sought to be used as proof that they did so in collaboration with or among each other. [HN29] Two elements must be established by a plaintiff relying on a theory of conscious parallelism: (1) that the defendants engaged in consciously parallel action; (2) which was contrary to their economic self-interest [*53] so as not to amount to a good faith business judgment.

Case 1:04-cv-12457-PBS    Document 77-5    Filed 09/22/2006    Page 20 of 30

Page 20

1990 U.S. Dist. LEXIS 19207, *; 1990-2 Trade Cas. (CCH) P69,141

*Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954); Zoslaw v. MCA Distributing Corp., 693 F.2d 870, 884 (9th Cir. 1982).*

As is apparent, the fact of parallel conduct is only the starting point in finding possible concerted action. [HN30] Since mere parallel behavior can be consistent with independent conduct, courts have held that a plaintiff must show the existence of additional circumstances, some independent proof of agreement, i.e., what has been termed "plus factors," which, when viewed in conjunction with the parallel acts, can serve to allow a factfinder to infer a conspiracy rather than independent action. *C-O-Two Fire Equip. Co. v. United States, 197 F.2d 489, 497* (9th Cir.), cert. denied *344 U.S. 892, 73 S.Ct. 211, 97 L.Ed. 690 (1952); Ralph C. Wilson Industries, Inc. v. Chronicle Broadcasting Co., 794 F.2d 1359, 1365, n.5 (9th Cir. 1986).* Such factors and circumstances might include & common motive to conspire; acts contrary [*54] to self-interest; noncompetitive performance; and collaborative actions among defendants. See generally, P. Areeda, Antitrust Analysis 371-82 (3rd ed. 1981).

*1. Parallel Conduct*

It is undisputed that all defendants received notice of and/or were at the March 29, 1985 meeting in which was circulated the JVA's request that EIAJ members refrain from proceeding with the dual-deck VCR. Thereafter, none of the defendants undertook to actually manufacture and market a dual-deck VCR for consumer use until Samsung agreed to do so as part of a settlement in this lawsuit. [HN31] "It is not necessary to find an express agreement in order to find a conspiracy. It is enough that a concert of action is contemplated and that the defendants conformed to the arrangement." *United States v. Paramount Pictures, Inc., 334 U.S. 131, 142, 68 S.Ct. 915, 922, 92 L.Ed. 1260 (1948).* Furthermore, an otherwise unexplained period of clearly noncompetitive behavior occurring in a market otherwise characterized by intense competition could lead a jury to reasonably infer that such uniformity of behavior would not occur without collusion. *Beatrice Foods Co. v. United States, 312 F.2d 29, 43 (8th Cir. 1963)* [*55] (conviction for otherwise unexplained noncompetitive bidding where vigorous price competition had both preceded and followed it).

*A. Common Motive to Conspire*

[HN32] Proof of a motivation for common action can support an inference of conspiracy from parallel behavior. *Bogosian v. Gulf Oil Corp., 561 F.2d 434, 446 (3rd Cir. 1977),* cert. denied, *434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978).* In this instance, defendants readily admit that they were afraid that introduction of

the dual-deck VCR in the United States would result in royalty legislation being imposed on single-deck VCRs. n12 During this time period, EIAJ records show that in 1985, Japanese producers exported approximately 25 millon VCRs with 12 million of those units being sold in the United States at an estimated sales revenue of $ 4.7 billion. Imposition of royalties on VCRs being imported into the United States would potentially result in reduced sales and profits for defendants. Thus, defendants had a strong economic motive to heed the warnings of the MPAA and avoid the possibility of royalties being imposed on the sale of single-deck VCRs by withholding [*56] the dual-deck VCR from the United States market. [HN33] "Evidence of conscious parallelism can be joined with evidence of coercion in further support of an inference of agreement." *Ambook Enterprises v. Time Inc., 612 F.2d 604, 616 (2nd Cir. 1979).*

n12 See supra note 6, at p. 9.

*B. Collaborative Actions Among Defendants*

[HN34] Another category of plus factor which may be considered is evidence of collaborative actions among defendants. Such actions might include regular meetings, discussions and/or exchange of trade information between competitors. *C-O-Two Fire Equipment, 197 F.2d at 493:*

It is uncontroverted that this committee held meetings at which Laswell, as well as representatives of the other defendant corporations, was present during the period covered by the indictment. That an opportunity was thus afforded to discuss and agree upon prices and pricing policies on a industry-wide basis, cannot be denied. Appellants seek to destroy any probative value from such a stipulation [*57] by pointing out that there is no direct evidence of what transpired at those meetings. But the trial court, sitting as the trier of the facts, regarded this evidence as being another one in a series of "plus factors" which, when standing alone and examined separately, could not be said to point directly to the conclusion that the charges of the indictment were true beyond a reasonable doubt, but which, when viewed as a whole, in their proper setting, spelled out that irresistible conclusion.

Likewise, in this action, it is uncontroverted that defendants met on a fairly regular basis at trade association and committee meetings under the purview of the EIAJ. In the two month period of February and March 1985, representatives of defendants met on at least three occasions during meetings of the EIAJ, the Overseas Copyright Committee and the Video Business Committee. Although these meetings do not necessarily compel an

Case 1:04-cv-12457-PBS    Document 77-5    Filed 09/22/2006    Page 21 of 30

Page 21

1990 U.S. Dist. LEXIS 19207, *; 1990-2 Trade Cas. (CCH) P69,141

inference that defendants entered into an agreement to conspire, neither can it be said, as a matter of law, that an inference of no agreement is compelled. *Esco Corporation v. United States, 340 F.2d 1000, 1007 (9th Cir. 1965)*("it [HN35] remains a question [*58] for the trier of fact to consider and determine what inference appeals to it (the jury) as most logical and persuasive, after it has heard all the evidence as to what these competitors had done before such meetings, and what actions they took thereafter, or what actions they did not take").

## 2. Good Faith Business Judgment

The second element which must be established by a plaintiff relying on a theory of conscious parallelism is that defendants conduct was contrary to their economic self-interest so as not to amount to a good faith business judgment. *Zoslaw, 693 F.2d at 884.* Plaintiff must produce evidence tending to exclude the possibility that the defendants acted for independent business reasons. *Richards v. Neilsen Freight Lines, 810 F.2d 898, 902-4 (9th Cir. 1987).*

Defendants each offer separate reasons for not manufacturing or marketing dual-deck VCRs in the United States themselves or on behalf of Go-Video. Matsushita contends that it was never asked by Go-Video to make or sell a dual-deck VCR. Matsushita claims it never seriously considered the idea on its own because its video strategy focused on producing new products whose [*59] technology would advance the state of the art on single-deck VCRs.

NEC negotiated with Go-Video to make a dual-deck VCR but contends that negotiations were broken off by mutual agreement when the parties were unable to reach agreement on critical terms such as price, delivery schedule, payment guarantees, and indemnification from copyright liability. Indeed, evidence in the record in the form of testimony from Go-Video's President, R. Terren Dunlap, indicates that negotiations between Go-Video and NEC broke off because Go-Video's own agent, Kanematsu-Gosho Ltd ("KG"), backed out on the financing of the deal.

In 1984, Sanyo considered making a dual-deck VCR incorporating both Beta and VHS formate technology as a bridge to a VHS recorder. Sanyo claims it decided not to go forward at that time because of an industry wide movement away from the Beta format, advice from counsel that introduction of a dual-deck VCR in the United States could lead to costly and protracted litigation, and doubts as to the profit potential of the dual-deck VCR. Sanyo also contends that it was never contacted by Go-Video.

Sony contends that it considered making a dual-deck VCR for consumer use in late 1983 [*60] and early 1984 but determined at the time that it was not feasible because of cost, marketing and other considerations. Sony was not approached by Go-Video until after the filing of the original complaint but declined to enter into an agreement because of "commercial reasons." In 1988, Sony began marketing a dual-deck VCR for commercial use in the United States.

Victor Company claims it never seriously considered making a dual-deck VCR because its product development efforts emphasized maximizing new uses for VCRs such as video camera and camcorders and improving existing VCR technology. In addition, Victor contends it was never approached by Go-video prior to the lawsuit.

The business related reasons advanced by defendants concerning their decisions not to manufacture and/or market dual-deck VCRs in the United States are all plausible and legitimate explanations for their conduct. This is especially true with respect to NEC which submitted evidence tending to indicate that it was Go-Video, rather than NEC, which refused to enter into a deal. Equally plausible, however, is the inference that defendants conduct was motivated not by legitimate and good faith business judgments but by [*61] unlawful collective action. Although NEC and Go-Video might have concluded their negotiations prior to the formation of the alleged conspiracy among defendants - evidence which might support NEC's contention that its failure to deal with Go-Video was not because of a conspiracy - it is also true that NEC was present at all relevant committee meetings of the EIAJ in February and March of 1985 in which the events leading to the formation of the alleged conspiracy are purported to have occurred.

Each possibility being equally strong, a question of fact remains for the jury to decide whether the actions of NEC and the other defendants were indicative of consciously parallel conduct or good faith business judgments.

Accordingly, defendants motion for summary judgment re: conspiracy issue is denied.

## 4. MOTIONS FOR SUMMARY JUDGMENT AND/OR TO DISMISS RE: STATE LAW CLAIM

Moving Parties: Defendants Matsushita, Victor, NEC, Sanyo, SOny and Sharp

Paragraph 68 of the second amended complaint alleges a claim for interference with Go-Video's prospective advantage in violation of the common law of the State of Arizona. Matsushita, Victor, NEC and Sanyo included a motion for summary judgment [*62] on this state law claim in their joint motion for summary judgment on the conspiracy issue. Sony filed a separate

Case 1:04-cv-12457-PBS    Document 77-5    Filed 09/22/2006    Page 22 of 30

Page 22

1990 U.S. Dist. LEXIS 19207, *; 1990-2 Trade Cas. (CCH) P69,141

summary judgment motion directed solely at the state law claim. Sharp filed three separate motions with respect to the state law claim, a motion to dismiss on statute of limitations grounds; a motion to dismiss for lack of personal jurisdiction; and a motion for summary judgment.

All defendants move for summary judgment and/or to dismiss the state law claim for interference with prospective advantage on both substantive and procedural grounds. Because the Court finds one of these procedural grounds to be meritorious, i.e., the tort claim is barred by the statute of limitations, it is unnecessary to address the elements of the tort of interference with prospective advantage.

[HN36] Federal courts apply state statute of limitations rules to state law claims. *Walker v. Armco Steel Corp., 446 U.S. 740, 100 S.Ct. 1978, 1986, 64 L.Ed.2d 659 (1980).* [HN37] Arizona's statute of limitations for tort claims such as interference with prospective advantage is two years. Ariz. Rev. Stat. § 12-542; see also *Clark v. Airesearch Mfg. Co., 138 Ariz. 240, 673 P.2d 984 (App. 1983)* [*63] (actions for tortious interference with contract are controlled by statute of limitations relating to torts). A cause of action begins to accrue when plaintiff knows or by the exercise of reasonable diligence should know that a claim exists. *Kenyon v. Hammer, 142 Ariz. 69, 76 n.6, 688 P.2d 961, 968 n.6 (1984).*

The deposition testimony of Go-Video's President, R. Terren Dunlap, indicates that Go-Video was aware of the events which it contends constitutes the conspiracy by April of 1985.

Q. In terms of Go-Video, by the end of April 1985, you realized that this voluntary restraint agreement would impact and impede Go-Video's efforts in manufacturing and marketing its dual-deck VCR?

A. I realized it would have an impact.

Q. An adverse impact I presume?

A. Yes.

Go-Video filed this lawsuit on June 22, 1987, more than two years after Go-Video, by its own admission, was aware of the existence of an alleged agreement among defendants. Consequently, the claim is barred by the statute of limitations set forth in *A.R.S. § 12-542.*

Go-Video argues that the proper accrual date in this case is not the date of discovery but rather when the tortious conduct ends. [*64] Go-Video contends that under the common law continuing tort doctrine, when a tort involves continuing injury, the cause of action accrues and the limitation period begins to run, at the time the

tortious conduct ceases. In its second amended complaint, Go-Video alleges that the conspiracy began in 1984 and continued through the date of the filing of the complaint. Consequently, Go-Video's position is that the statute of limitations on its state law claim had not yet begun to accrual at the time of the filing of the complaint.

Arizona, however, does not recognize the doctrine of continuing tort. In *Morrison v. Acton, 68 Ariz. 27, 33-34, 198 P.2d 590, 594-595 (1948),* the Arizona Supreme Court specifically declined to adopt the continuing tort rule.

Another group of courts holds . . . that where the tort is continuing, the right of action is also continuing, as respects time when cause of action accrued . . . . This court, however, adopted a rule which we believe is far more consonant with justice . . . wherein plaintiff's allegations of fraud and concealment were held sufficient to toll the running of the statute until the date of discovery of the fraudulent [*65] conduct.

As a result, Go-Video's cause of action for interference with prospective advantage is dismissed as to all defendants.

## 5. DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT RE: DEMAND ISSUE AND GO-VIDEO'S MOTION FOR RECONSIDERATION OF ORDER GRANTING SUMMARY JUDGMENT TO SHARP CORPORATION

Moving Parties: Motions for Summary Judgment - Defendants Matsushita, Victor, NEC, Sanyo and Sony; Motion for Reconsideration - Go-Video

Defendants Matsushita, Victor, NEC and Sanyo filed separate motions for summary judgment on the issue of whether Go-Video made sufficient demands to these defendants for the manufacture of its dual-deck VCR to be held liable under a Section 1 refusal to deal claim. Sony incorporated its motion for summary judgment on the demand issue in its motion for summary judgment on the conspiracy issue. These motions were precipitated by the Court's Order of March 10, 1989, granting Sharp's motion for summary judgment on the Section 1 refusal to deal claim based on Go-Video's failure to make a sufficient demand on Sharp to manufacture the dual-deck VCR. On March 17, 1989, Go-Video filed a motion for reconsideration of the Sharp Order.

Generally, [HN38] a demand by plaintiff [*66] and subsequent refusal by the defendants is a prerequisite for finding liability in a Section 1 concerted refusal to deal claim. *Cleary v. National Distillers & Chemical Corp., 505 F.2d 695, 697 (9th Cir. 1974).* Mere refusal by a

Case 1:04-cv-12457-PBS    Document 77-5    Filed 09/22/2006    Page 23 of 30

Page 23

1990 U.S. Dist. LEXIS 19207, *; 1990-2 Trade Cas. (CCH) P69,141

group of defendants to deal with a plaintiff, however, is not itself sufficient evidence of conspiracy or concerted conduct. There must, at minimum, be proof of some "joint collaborative action" by the defendants in order to satisfy the "agreement" element of the Sherman Act. *United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966).* Thus, [HN39] the elements of a concerted refusal to deal claim are: (1) a firm demand by the plaintiff to deal with the defendants and subsequent refusal by the defendants to deal with plaintiff; and (2) evidence of a conspiracy, concerted decision or agreement by the defendants not to deal with the plaintiff. *Gulliver's Periodicals, Ltd. v. Chas. Levy Circulating Co., 562 F.Supp. 539, 541 (N.D. Ill. 1981);* see also *Lawlor v. National Screen Service Corp., 270 F.2d 146, 154 (3rd Cir. 1959),* cert. [*67] denied, *362 U.S. 922, 80 S.Ct. 676, 4 L.Ed.2d 742 (1960)* (plaintiff failed to make a demand on any defendant, conspiracy alone does not satisfy requirements of a concerted refusal to deal claim). [HN40] A refused demand is often the best evidence of causation, and the absence of a demand in the circumstances of a particular case may be fatal to plaintiff's ability to show causation. *Out Front Productions, Inc. v. Magid, 748 F.2d 166, 179 (3rd Cir. 1984).*

[HN41] Exceptions do exist to the demand requirement. One exception is that a demand is not required if the demand would have been a futile gesture. *Hanover Shoe v. United Shoe Machinery Corp., 377 F.2d 776, 781 (3rd. Cir. 1967)* (exception exists where demand "amounts to a futile gesture which the law does not require"), aff'd in part and rev'd in part, *392 U.S. 481, 487 n.5, 88 S.Ct. 2224, 2228 n.5, 20 L.Ed.2d 1231 (1968).* In *Ostrofe v. H.S. Crocker Co., 740 F.2d 739 (9th Cir. 1984),* the Ninth Circuit considered the propriety of granting summary judgment to defendants in a concerted refusal to deal case [*68] where the plaintiff had failed to make a demand. In granting summary judgment to defendants, the district court ruled that a demand to deal was a prerequisite to a cause of action for concerted refusal to deal. The Ninth Circuit, in reversing the district court's decision, held that "[a] request or demand is not always necessary to establish injury from a boycott in an antitrust suit." *Id. at 743.* The Ninth Circuit stated that an exception existed where the failure to obtain the product was not attributable to a failure to make a request but rather where such a demand would be futile. *Id. at 744.*

Go-Video contends that in this case, evidence of the futility of its demands upon defendants is provided by the widespread reporting in both the United States and Japanese press in early 1985 of an alleged agreement to withhold dual-deck VCRs. In *Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 120 n.15, 89 S.Ct. 1562, 1575 n.15, 23 L.Ed.2d 129 (1969),* the Supreme Court stated that an antitrust plain-

tiff's failure to make a formal request for a patent license from a patent pool [*69] was attributable to plaintiff's recognition that such a request would have been futile. The pool had made its position entirely clear and under these circumstances the Court held that the absence of a formal request was not fatal to Zenith's case.

[HN42] A second exception to the general rule that a demand must be made on each defendant arises when there is sufficient evidence of the existence of a conspiracy among defendants. A conspiracy reduces the strict demand requirement on each defendant to one requiring only that a demand be made on at least one conspirator to find other coconspirators liable in a Section 1 claim. See *Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962)* (an antitrust plaintiff is not required by any rigid or mechanical formula to both demand materials from all defendants and to exhaust all other sources). In *Beltz Travel Service, Inc. v. International Air Transport Ass'n, 620 F.2d 1360, 1367 (9th Cir. 1980),* the Ninth Circuit held that [HN43] in a Section 1 claim, the action of any of the conspirators to restrain or monopolize trade was, in law, the [*70] action of all and thus all conspirators were jointly liable for the acts of their co-conspirators. Similarly, in *Standard Oil Co. of California v. Moore, 251 F.2d 188, 211 (9th Cir. 1957),* the Ninth Circuit ruled that [HN44] if evidence exists of a concerted refusal to deal, a merchant is liable for the overt acts of any member in furtherance of the plan even though the merchant's individual refusal to deal may be explainable as a reasonable business decision. "This is but an application of the general law of conspiracy. [citation omitted] It is based upon the principle that a conspiracy creates an agency relationship, and that therefore each member is authorized by the other members to perform acts in furtherance of the common objectiive [sic]." Id. Thus, if a conspiracy is found to exist, all the defendants are charged with the refusal of some to comply with plaintiff's demand. See *Milwaukee Towne Corp. v. Loew's, Inc., 190 F.2d 561, 566 (7th Cir. 1951).*

In summary, [HN45] in order to find a defendant liable in a Section 1 concerted refusal to deal action, there must be evidence of a conspiracy among defendants and a demand to deal by the plaintiff [*71] and subsequent refusal by each defendant unless plaintiff can show that such a demand was made upon and refused by at least one member of the conspiracy or that such a demand would be futile.

As the Court has ruled in conjunction with defendants motion for summary judgment on the conspiracy issue, there is sufficient evidence in which a jury could find the existence of an alleged agreement among defendants to withhold dual-deck VCRs to survive summary judgment. Thus, Go-Video satisfies one element of a

concerted refusal to deal claim. The issue is whether Go-Video satisfies the other element, i.e., that there must be a demand on all defendants and subsequent refusal or else falls within one of the two exceptions to the demand rule, futility of demand or demand on and refusal by any member of the conspiracy.

The admissible evidence in the record before the Court fails to support, let alone create a genuine issue of material fact respecting, Go-Video's contention that it made firm demands on all the defendants. Go-Video contends it hired several consultants, representatives and agents with contacts in the Japanese and Korean consumer electronics industries to assist in locating a [*72] manufacturer. These include ZOM International, Inc. ("ZOM"), Kanematsu-Gosho ("KG"), THT Lloyd's, Inc. ("Lloyd's"), and Advance Technology Associates, Inc. ("ATA"). However, review of the evidence of Go-Video's purported contacts with many of the defendants through these third party agents reveals either that the evidence is inadmissible hearsay or insufficient to indicate that a firm demand was made on these defendants. For instance, Go-Video claims that in early 1987, ATA allegedly contacted and requested manufacture of the dual-deck VCR on behalf of Go-Video from current or former defendants Toshiba, Sharp and JVC. The evidence set forth by Go-Video regarding this contact consists of a transcript of a March 17, 1987 telephone conversation between a representative of ATA and a representative of Go-Video, and handwritten notes by the Go-Video representative concerning the telephone conversation.

Close scrutiny of these correspondences reveals no evidence of direct contacts or communications from ATA, let alone Go-Video, to Toshiba, Sharp and JVC. Rather, this evidence shows only that ATA claims to have attempted some sort of contact, either directly or indirectly, with Toshiba, Sharp [*73] and JVC or their affiliates. For instance, the handwritten note by the Go-Video representative regarding his telephone conversation with the ATA representative lists Sharp, Toshiba and JVC next to which is written "requests for quotes to suppliers of these companies. Expects answers in 2-4 days." Requesting quotes from suppliers of these companies does not rise to the level of a request or demand to deal. Furthermore, this is the type of hearsay evidence which the Court previously ruled inadmissible in defendants' motion to strike.

Go-Video also relies upon a September 30, 1987 facsimile message from ATA to Go-Video indicating that ATA "directly and indirectly contacted and inquired following companies [including JVC, Hitachi, Sanyo, Sharp, Akai, Funai and Matsushita] for supply of your requirements." This message, however, fails to present significant evidence of direct contacts between Go-Video and any of the defendants. Which of these companies was contacted directly or indirectly, the nature of the purported contact, and whether an actual demand or offer to do business was made cannot be determined. Consequently, Go-Video fails to provide sufficient competent evidence that it [*74] made demands or requests to deal on many of the defendants.

The Court next turns to whether one of the two exceptions to the demand rule, futility of demand or demand and refusal on any member of the conspiracy, is applicable.

The Court declines to adopt Go-Video's futility argument. The factual evidence presented to this Court does not warrant a finding that during the relevant time period, Go-Video was acting under the assumption that a formal demand on each of the defendants was unnecessary because of an alleged conspiracy among defendants. Although newspaper articles reported the existence of an alleged agreement among defendants, Go-Video continued its efforts to find a manufacturer for the dual-deck VCR, most notably with former defendant Akai Corporation. The fact that Go-Video continued its efforts to locate a manufacturer indicates that at the time, Go-Video was not laboring under the belief that further demands on other defendants would be futile. The Court is therefore reluctant to declare in hindsight that a demand on each defendant was unnecessary because of futility when apparently during the relevant time period, Go-Video's actions were inconsistent with the belief that [*75] such demands would be useless.

The Court also believes that the futility exception to the demand rule should be construed narrowly and only in exceptional circumstances. Indiscriminate application of the futility exception in Section 1 refusal to deal actions would allow any individual who could achieve standing to bring an action against any defendant or group of defendants involved in an alleged antitrust conspiracy whether or not that individual was ever prepared or desired to do business with those defendants.

However, application of the second exception to the demand rule, demand and refusal on any member of the conspiracy, results in a determination that genuine issues of material fact remain concerning Go-Video's purported demand upon at least one member of the conspiracy to require denial of defendants motions for summary judgment on the demand issue. It is apparent from the evidence presented to the Court that Go-Video and Akai Corporation conducted negotiations from April to July, 1987 with respect to the manufacture of the dual-deck VCR or the supplying of component parts. On April 10, 1987, Go-Video received a letter from ATA stating:

1990 U.S. Dist. LEXIS 19207, *; 1990-2 Trade Cas. (CCH) P69,141

We are pleased to inform you that [*76] we can provide continuously 40K-50K each of the "transport and tape head assembly" as we have been working on AKAI and could convinced them last week to supply a large number of unit like your requirement with special arrangement so that they may supply without interfering their distributor's people who are reluctant to supply such component level items as other prime people do. (emphasis in original)

On May 5, 1987, Go-Video wrote to ATA requesting ATA to confirm a price quote made by Akai for transport head and tape assembly units, requesting price quotes on other items, seeking clarification of certain matters and expressing interest in pursuing an OEM manufacturing arrangement with Akai. Subsequently, on May 21, 1987, ATA informed Go-Video that Akai was now only interested in quoting Go-Video an OEM price for the dual-deck VCR rather than prices for individual component parts. On May 29, 1987, Go-Video wrote to ATA and listed the key components Go-Video wished to purchase from Akai and expressed interest in obtaining an OEM quote from Akai. Thereafter, in June of 1987, Go-Video received two letters from AKA indicating that Akai was delaying in responding to Go-Video's request [*77] for price quotations. One of the letters, dated June 24 states: "Akai's decision to quote at management is still dragging. The real problem for their delay is for a solution so that they may not interfere an agreement among VHS system's group companies, such as PANASONIC, Victor, Sanyo, etc." Finally, on July 7, 1987, Go-Video received a letter from ATA stating:

We regret to inform you that it would not be worthwhile for you to visit on Akai as their top management decided to withdraw positive marketing policy to export to U.S.A. and accordingly their plant people can not set up an arrangement for such an OEM production volume as required by you. This is an official reason that they wrote in the letter attached. There seems to be much more complicated reasons because of VHS allied group.

This evidence of contacts with Akai is significantly more probative of the existence of negotiations and a possible request to deal than any of the evidence presented by Go-Video with respect to contacts with any other defendant save for NEC. One reasonable inference which may be derived from this evidence is that Akai terminated discussions with Go-Video for legitimate business reasons. However, [*78] another reasonable inference which could be derived is that Akai was very interested in doing business with Go-Video but could not do so because of the existence of an alleged agreement among defendants to withhold dual-deck VCRs from the U.S. market. It is important to note that Akai is one of the companies

identified as having attended the February 5, 1985 and March 29, 1985 meetings of the Video Business Committee in which discussions were held and a letter circulated requesting a voluntary restraint on the production of dual-deck VCRs. It is the existence of these competing and conflicting inferences which prevents the Court from ruling as a matter of law that Go-Video did not make a sufficient demand upon Akai. The existence of sufficient evidence by which a jury might find that Go-Video made a demand and was refused by at least one member of the alleged conspiracy satisfies one of the exceptions to the rule that a demand must be made on all defendants. Because serious factual issues remain concerning Go-Video's contacts with Akai and Akai's subsequent refusal to do business with Go-Video, the Court must deny defendants motion for summary judgment on the demand issue.

The Court [*79] realizes that this ruling is not completely consistent with its prior Order granting summary judgment to Sharp on the same issue. That Order was decided prior to defendants filing of summary judgment on the conspiracy issue and thus the Court did not have the benefit of Go-Video's evidence concerning the alleged conspiracy among defendants. The bulk of Go-Video's argument in response to the Sharp summary judgment motion involved the issue of whether Go-Video made a sufficient demand on Sharp or, in the alternative, whether such demand was excused because of futility. In granting Sharp's motion, the Court found insufficient evidence of a demand upon Sharp and declined to absolve Go-Video of the obligation to make such a demand on futility grounds. Because the Court now has substantially more evidence with respect to an alleged conspiracy, plus sufficient evidence of a demand on at least one alleged coconspirator, the exception to the demand rule which allows evidence of a demand on and refusal by any member of the conspiracy to satisfy the demand requirement in a concerted refusal to deal claim, dictates a different result than before.

With respect to Go-Video's motion for reconsideration [*80] of the Sharp Order, the operative issue is whether Go-Video raised in its original response to Sharp's summary judgment motion the argument that a demand on any member of the conspiracy satisfies the demand requirement in a concerted refusal to deal claim. [HN46] Arguments raised for the first time in motions for reconsideration are insufficient, even if meritorious, to compel the Court to reconsider an earlier decision. The Court in *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc., 99 F.R.D. 99 (E.D. Va. 1983)* held that [HN47] motions seeking reconsideration of previous orders should be granted only where (1) "the court has patently misunderstood a party"; (2) the court "has made a decision outside the adversarial issues presented to the

Case 1:04-cv-12457-PBS      Document 77-5      Filed 09/22/2006      Page 26 of 30

Page 26

1990 U.S. Dist. LEXIS 19207, *; 1990-2 Trade Cas. (CCH) P69,141

court"; (3) the court "has made error not of reasoning but of apprehension"; or (4) there is a "controlling significant change in the law or facts since the submission of the issue to the courts." *Id. at 101*. Sound reasons underlie the bias against motions for reconsideration. when such motions are brought, the parties and the court already have spent considerable time and resources addressing the issues. Motions for reconsideration [*81]  are not designed to provide a dissatisfied litigant with an additional opportunity to sway the court or to raise an issue or argument which should have been raised originally. *Frito-Lay of Puerto Rico, Inc. v. Canas, 92 F.R.D. 384, 390 (D.C. Puerto Rico 1981)*.

Review of Go-Video's original response to Sharp's motion for summary judgment filed on November 29, 1988 indicates that Go-Video failed to raise the argument that a demand on any member of the conspiracy satisfied the demand rule in concerted refusal to deal actions. Go-Video's response focuses on its evidence of purported contacts with Sharp which it contends satisfies the demand rule and alternatively, on the issue of futility of demand. Consequently, the circumstances of this case do not fall within one of the four enumerated criteria for granting motions for reconsideration as set forth in Above the Belt. Go-Video's failure to meet the Above the Belt standard is sufficient cause for denying its motion for reconsideration of this Court's Order of March 10, 1990 granting Sharp's motion for partial summary judgment.

The Court finds that there is no just reason for delay in the entry of judgment in [*82]  favor of Defendant Sharp and the clerk of the court is directed to enter judgment in favor of Sharp on plaintiff's Second Amended Complaint.

## 6. MOTION TO STRIKE AFFIDAVITS SUBMITTED IN OPPOSITION TO CERTAIN DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT re: PATENT INVALIDITY

Moving Parties: Matsushita, Victor and NEC

At approximately the same time defendants filed their motions for summary judgment on the antitrust issues, they also filed motions for summary judgment on the grounds that the patent issued to Go-Video for its dual-deck VCR is invalid as a matter of law. Go-Video's patent, U.S. Patent No. *4,768,110* ( *"110* Patent"), entitled "Video Cassette Recorder Having Dual Deck For Selective, Simultaneous Functions", was issued on August 30, 1988.

Defendants filed two motions for summary judgment on the issue of patent invalidity. The first motion was filed by Sony. The second was filed by Matsushita

and Victor with NEC filing a notice of joinder therein. Sanyo then filed a notice of joinder in both motions. The crux of both summary judgment motions is that the *"110* Patent" is invalid both under *35 U.S.C. § 102* because it was identically described in prior art references and under [*83]  *35 U.S.C. § 103* because the subject matter of the *"110* Patent" would have been obvious to one of ordinary skill in the art at the time it was made. Go-Video filed one response in opposition to both motions. In support of its response, Go-Video submitted the affidavits of R. Terren Dunlap, Chief Executive Officer of Go-Video and co-inventor of the *"110* Patent"; John Berkheimer, director of engineering for Go-Video; and purported experts Robert Solomon and David Fehr.

Matsushita, Victor and NEC move to strike in their entirety, the affidavits of Solomon and Berkheimer, and to strike certain portions of the affidavits of Dunlap and Fehr. Review of these affidavits indicate that they go directly to the heart of the patent invalidity motions by providing evidence and testimony with respect to the prior art and obviousness issues. However, as will be more fully discussed, the Court need not reach the underlying merits of the patent invalidity motions in light of the fact that this is not the correct set of procedural circumstances for resolving the issue of patent invalidity nor is patent invalidity essential to or determinative of the outcome of the antitrust issues in this case. As a [*84]  result, the affidavits defendants seek to strike are not necessary to the Court's ruling on the patent invalidity motions. Therefore, defendants motion to strike affidavits submitted in opposition to certain defendants' motions for summary judgment re: patent invalidity is denied as moot.

## 7. MOTIONS FOR SUMMARY JUDGMENT re: PATENT INVALIDITY

Moving Parties: Sony, Sanyo; Matsushita, Victor, NEC, Sanyo

Go-Video raises three arguments in opposition to defendants' motions for summary judgment of the issue of the validity of the *"110* Patent." First, Go-Video argues that the defendants are not entitled to judgment because defendants lack standing to raise the issue of patent invalidity and because this Court lacks subject matter jurisdiction to resolve this issue inasmuch as defendants fail to present a justiciable case or controversy for this Court's decision.

Second, Go-Video contends that the specific items of prior art relied on by defendants do not anticipate the invention claimed in the *"110* Patent" within the meaning of *35 U.S.C. § 102*.

Case 1:04-cv-12457-PBS     Document 77-5     Filed 09/22/2006     Page 27 of 30

Page 27

1990 U.S. Dist. LEXIS 19207, *; 1990-2 Trade Cas. (CCH) P69,141

Third, Go-Video argues that the invention claimed in the *110* Patent" is not obvious to a person skilled in the relevant art under the references [*85] cited by defendants within the meaning of *35 U.S.C. § 103*.

The Court need not address the merits of Go-Video's latter two arguments since Go-Video's arguments with respect to the standing and jurisdiction issue are meritorious and thus preclude a granting of defendants motion for summary judgment with respect to the issue of patent invalidity.

Defendants seek a judgment from this Court that Go-Video's *110* Patent" is invalid as a matter of law. Because such a judgment would not dispose of the larger antitrust issues in this case, in a sense, what defendants are seeking is a declaratory judgment. Defendants assert several reasons for why a judgment that the *110* Patent" is invalid is relevant to this case. First, defendants contend that validity or invalidity of Go-Video's patent is germane to the issue of damages should Go-Video prevail on its antitrust claims. Second, defendants maintain that patent invalidity is pertinent to the issue of whether defendants conduct in allegedly refusing to deal with Go-Video was motivated by a conspiracy or by independent business justification. Indeed, these justifications were recognized by this Court in its earlier Order of February 6, 1989 granting [*86] defendants motion for leave to file an amended answer alleging patent invalidity as an affirmative defense and the Order of September 27, 1988 granting defendants motion to compel information with respect to Go-Video's patent and technology.

Allowing discovery on the *110* Patent" and allowing patent invalidity to be raised as a defense to the alleged conspiracy charged is not equivalent to this Court declaring the *110* Patent" invalid as a matter of law. [HN48] An action for declaratory relief is available only in "a case of actual controversy." *28 U.S.C. § 2201*; see also *Societe de Conditionnement en Aluminum v. Hunter Engineering Co., 655 F.2d 938, 942-44 (9th Cir. 1981).* [HN49] In a suit to declare a patent invalid, an "actual controversy" exists only if the party seeking declaratory relief has been charged with infringement or has a reasonable apprehension of an infringement suit. *C.R. Bard, Inc. v. Schwartz, 716 F.2d 874, 880 (Fed. Cir. 1983); International Harvester Co. v. Deere & Co., 623 F.2d 1207, 1211 (7th Cir. 1980).* In International Harvester, the Seventh Circuit stated:

[HN50]

In declaratory judgment actions concerning [*87] patents, there are two prerequisites to establishment of an actual controversy. First, the defendant must have engaged in conduct giving rise to a reasonable apprehension on plaintiff's part that it will face an infringement suit or the threat of one if it commences or continues the activity in question. [Citations omitted.] Second, the

plaintiff must have actually produced the accused article or have engaged in preparations for production such that "but for a finding that the product infringes or for extraordinary and unforeseen contingencies, the plaintiff would and could begin production immediately. [Citations omitted.]

*Id. at 1210.* Applying this standard to the facts of this case, for there to exist an "actual controversy" so that the Court could declare or render a judgment on the validity or invalidity of the *110* Patent", Go-Video must have engaged in conduct that created in defendants a reasonable apprehension of facing an infringement suit. Second, defendants must have actually produced an alleged infringing device, or have actually prepared to produce such a device. *Jervis B. Webb Co. v. Southern Systems, Inc., 742 F.2d 1388, 1398 (Fed. Cir. 1984);* [*88] see also *Societe de Conditionnment, 655 F.2d at 944* ("An action for a declaratory judgment that a patent is invalid . . . is a case or controversy if the plaintiff has a real and reasonable apprehension that he will be subject to liability if he continues to manufacture his product.")

Except with respect to Sharp, there is no evidence that defendants currently manufacture or have done so in the past, a dual-deck VCR for consumer use such as is described in the *110* Patent." Nor is Go-Video currently asserting or threatening to assert a claim for infringement of the *110* Patent" against defendants. Clearly, defendants would not have standing to seek a declaratory judgment of patent invalidity in a separate action. Nor should they be allowed to do so in this action, especially in light of the fact that no counterclaim has been asserted.

The cases cited by defendants in support of their motion do not dictate a different result. Although *Jones Knitting Corp. v. Morgan, 244 F. Supp. 235 (E.D. Pa. 1965),* rev'd on other grounds, *361 F.2d 451 (3d Cir. 1966),* was previously cited by this Court for the proposition [*89] that patent invalidity could be relevant to the measure of damages in this action, it does not hold as defendants contend, that if a patent is invalid, Go-Video has no Sherman Act claim, even as the target of a boycott. Rather, the Jones Knitting court specifically found the existence of a group boycott. "Since the Supreme Court has declared such group boycotts illegal per se, this Court must find that plaintiffs have restrained trade in violation of § 1 of the Sherman Act." *Id. at 239.* The court merely found that the patent holder suffered no damage caused by the group boycott as a result of the court's finding that the patent was invalid.

It is important to note the procedural posture of the parties in Jones Knitting. Plaintiffs were manufacturers of circular knit thermal underwear. Defendant was the holder of a patent covering a "knitted fabric" which de-

Case 1:04-cv-12457-PBS    Document 77-5    Filed 09/22/2006    Page 28 of 30

Page 28

1990 U.S. Dist. LEXIS 19207, *; 1990-2 Trade Cas. (CCH) P69,141

fendant claimed gave him proprietary rights to "knitted circular thermal fabric and garments made from same." Plaintiffs entered into an agreement that none of them would enter into separate or individual agreements with defendant regarding licensing until after the outcome of a declaratory judgment action against defendant. [*90] Subsequently, plaintiffs brought a declaratory judgment action to declare the patent invalid. Defendant counterclaimed for patent infringement. Defendant then requested leave of the court to add a second counterclaim charging violation of the antitrust laws and unfair competition which was granted. Consequently, Jones Knitting was primarily a patent case in which plaintiffs, the parties seeking a determination of patent invalidity, manufactured garments which imitated the patented fabric. As manufacturers of allegedly infringing products, they had standing to pursue a declaratory judgment that the patent in question was invalid. The antitrust claim was added only as a counterclaim by the patent holder. In this instance, defendants do not manufacture a product which allegedly infringes upon Go-Video's "110 Patent." This case was not brought as a patent case nor has it become one in absence of any counterclaim by defendants attacking the validity of the patent. The reason for this is simple, defendants do not have standing to assert such a counterclaim. Consequently, defendants do not have standing to seek a declaratory judgment regarding the validity or invalidity of the "110 Patent" [*91] in this antitrust action absent a final determination of damages should they be found liable of violations of § 1 of the Sherman Act.

Other cases cited by defendants are similarly factually distinguishable from this case. *Lear, Inc. v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969)* involved an action by an inventor against a licensee of the patent for breach of a patent licensing agreement. On appeal, the Supreme Court held that the licensee was not estopped from attacking the validity of the patent and that the licensee was entitled to avoid payment of all royalties accruing after the patent issued if licensee could prove the invalidity of the patent. Unlike in Lear, none of the defendants in this case have entered into a licensing agreement for the "110 Patent" with Go-Video.

In *Massillion-Cleveland-Akron Sign Co. v. Golden State Advertising Co., 444 F.2d 425,* (9th Cir. 1971), cert. denied, *404 U.S. 873 (1971),* a patent owner threatened legal action against defendants for alleged infringement of the patent. The threatened legal action was forestalled when the parties entered into [*92] a written agreement settling the controversy. Defendants agreed not to infringe upon the patent, acknowledged the validity of the patent and covenanted not to contest the patent's validity. Six years later, the patent holder again accused defendants of infringement and brought suit for breach of the settlement agreement and conspiracy to induce breach of the settlement agreement. Defendants answer raised the issue of the patent's invalidity by way of affirmative defenses and counterclaim. Relying on the Supreme Court's holding in Lear, the Ninth Circuit ruled that the covenant not to contest the validity of the patent was void and unenforceable. Furthermore, certain of the defendants charged with inducing breach of the settlement agreement, although not actual parties to the settlement agreement, could raise the issue of patent invalidity. "We are of the opinion that a valid patent is a prerequisite to recovery for inducing the breach of a contract not to infringe, as well as a prerequisite to recovery for the breach itself." *Massillon, 444 F.2d at 428.* As in Lear, defendants in Massillon either produced, manufactured or sold an allegedly infringing [*93] product or had some comparable interest in the product. In this instance, no defendants produce, manufacture or sell a dual-deck VCR for consumer use nor has there been any threatened or actual patent infringement action by Go-Video. As a result, defendants in this action are in much different procedural circumstances then the parties seeking a determination of patent invalidity in Jones, Lear, and Massillon.

Sony contends that it presently manufactures and markets a dual-deck VCR in the United States and that Go-Video has in the past threatened to aggressively litigate against anyone using the "110 Patent" without a license. Thus, Sony argues that an actual controversy exists so as to give it standing to seek judicial determination of the validity of Go-Video's patent. Nothing in the record tends to show that Sony's purported dual-deck VCR is similar or comparable to Go-Video's VCR. The information provided to this Court in the past has been that Sony is marketing an 8 mm dual-deck VCR for the business market rather than for consumers. However, whether the Sony dual-deck VCR and the Go-Video dual-deck VCR are comparable or even whether they are competitors in the marketplace [*94] is unclear. Furthermore, Sony has not produced any evidence that it has been specifically targeted or threatened by Go-Video with & patent infringement action. Mere generalized statements such as those contained in Go-Video's SEC filings, without greater specificity, are not the types of "threats" which this Court believes are contemplated under the "real and reasonable apprehension of facing an infringement suit" standard set forth in *Jervis B. Webb, 742 F.2d at 1398,* or *Societe de Conditionnment, 655 F.2d at 944.*

The Court's ruling denying defendants motion for summary judgment on the grounds that defendants do not have standing at this juncture to contest the validity of Go-Video's patent is not inconsistent with this Court's prior Orders. Patent invalidity may be relevant to the

1990 U.S. Dist. LEXIS 19207, *; 1990-2 Trade Cas. (CCH) P69,141

determination of damages. However, the issue of damages has not yet arisen. Consequently, a declaration that the *"110* Patent" is invalid is premature at this time and would, in effect, constitute an advisory opinion. when and if the issue of damages arises because of a determination of liability on the antitrust charges, defendants may reurge the Court to consider [*95] the issue of patent invalidity. In addition, to the extent that the Court previously stated that patent invalidity may be relevant to the defendants' independent business justification defense, no evidence has been presented which indicates that defendants refused to deal with Go-Video because of a concern over the validity of the *"110* Patent." while that does may not preclude defendants from presenting such evidence at trial, at this stage it only means that it provides no basis for the Court to declare the *"110* Patent" invalid in a motion for summary judgment.

## 8. MOTION FOR SANCTIONS AGAINST MATSUSHITA, VICTOR AND NEC

Moving Party: Go-Video

Go-Video moves for sanctions against Matsushita, Victor and NEC for their filing of the Motion to Strike Affidavits Submitted in Opposition to Certain Defendants' Motions for Summary Judgment re: Patent Invalidity. Go-Video contends that the motion to strike the affidavits of Robert Solomon and John Berkheimer, which were submitted by Go-Video in opposition to defendants patent invalidity summary judgment motions, was not made in good faith within the meaning of *Fed. R. Civ. P. 11* and thus violated [HN51] *28 U.S.C. § 1927* which provides that [*96] an attorney who "unreasonably and vexatiously" multiplies the proceedings may be liable for excessive costs, expenses, and attorneys' fees incurred because of such conduct.

The Court denied defendants motion to strike as moot in light of the ruling denying defendants motion for summary judgment re: patent invalidity based on defendants lack of standing to bring such a motion. Consequently, the Court did not reach a decision on the underlying merits of the motion, i.e., whether to strike the Solomon and Berkheimer affidavits. Thus, the Court did not have reason or a real opportunity to address the legal sufficiency of defendants motion to strike to determine whether it was "well grounded in fact and . . . warranted by existing law . . . and . . . not interposed for any improper purpose . . . ." *Fed. R. Civ. P. 11*. As a result, the Court will deny Go-Video's motion for sanctions but with the sole observation that based upon the motion for sanctions filed by Go-Video and the response filed by the defendants and the comments made during oral argument, defendants came very close to sanctionable behav-

ior in filing their motion to strike with respect to the affidavits of Solomon and [*97] Berkheimer.

## 9. MOTION FOR LEAVE TO TAKE ADDITIONAL DISCOVERY

Moving Party: Go-Video

The discovery cutoff date in this case was March 24, 1989. On August 25, 1989, Go-Video filed a motion for leave to take additional discovery with respect to information contained in an August 4, 1989 Japanese newspaper article regarding an agreement among Japanese VCR manufacturers setting production volumes and prices on VCRs sold in Japan in 1989.

The Court has previously denied discovery with respect to an alleged conspiracy in the single-deck VCR market. Go-Video has failed to show good cause why the Court should now reconsider its previous ruling. The discovery Go-Video seeks concerns an alleged agreement in 1989 with respect to the sale of single-deck VCRs in Japan. This case involves an alleged agreement in 1985 with respect to the sale of dual-deck VCRs in the United States. Consequently, the information Go-Video seeks leave to discover is not relevant to the facts in this case and Go-Video's motion is denied.

IT IS ORDERED denying as moot, Go-Video's motion to compel discovery from defendant Sharp (Doc. # 1059).

IT IS FURTHER ORDERED denying Go-Video's motion for reconsideration of [*98] Order granting summary judgment to Sharp (Doc. # 1155).

IT IS FURTHER ORDERED granting Sharp's motion to dismiss common law tort claim re: statute of limitations (Doc. # 1199).

IT IS FURTHER ORDERED vacating as moot, Sharp's motion to dismiss for lack of personal jurisdiction (Doc. # 1202).

IT IS FURTHER ORDERED vacating as moot, Sharp's motion for summary judgment re: common law tort claim (Doc. # 1232).

IT IS FURTHER ORDERED denying defendant JVC's motion for summary judgment re: demand issue (Doc. # 1277).

IT IS FURTHER ORDERED denying defendant Matsushita's motion for summary judgment re: demand issue (Doc. # 1285).

IT IS FURTHER ORDERED denying defendants Matsushita, JVC, NEC and Sanyo's motion for summary judgment re: conspiracy issue (Doc. # 1294).

1990 U.S. Dist. LEXIS 19207, *; 1990-2 Trade Cas. (CCH) P69,141

IT IS FURTHER ORDERED denying defendant Sanyo's motion for summary judgment re: demand issue (Doc. # 1304).

IT IS FURTHER ORDERED denying defendant NEC's motion for summary judgment re: demand issue (Doc. # 1313).

IT IS FURTHER ORDERED denying Sony's motion for summary judgment re: conspiracy issue and demand issue (Doc. # 1506).

IT IS FURTHER ORDERED granting Sony's motion for summary judgment re: common law tort claim (Doc. # 1510). [*99]

IT IS FURTHER ORDERED denying Sony's motion for summary judgment re: patent invalidity (Doc. # 1518).

IT IS FURTHER ORDERED denying defendants Matsushita, JVC, NEC and Sanyo's motion for summary judgment re: patent invalidity (Doc. # 1532).

IT IS FURTHER ORDERED denying as moot, certain defendants' motion to strike affidavits submitted in opposition to defendants' motion for summary judgment re: Patent Invalidity (Doc. # 143 in 88-MDL-765).

IT IS FURTHER ORDERED denying as moot, Funai Electric Co.'s motion to modify the confidentiality order (Doc. # 1598).

IT IS FURTHER ORDERED granting in part and denying in part defendants' motion to strike certain evidence submitted in opposition to defendants' motions for summary judgment (Doc. # 1628).

IT IS FURTHER ORDERED denying plaintiff's motion for sanctions against Matsushita, JVC and NEC (Doc. # 178 in 88-MDL-765).

IT IS FURTHER ORDERED denying plaintiff's motion for leave to take additional discovery (Doc. # 182 in 88-MDL-765).

IT IS FURTHER ORDERED directing the clerk of the court to enter judgment in favor of defendant Sharp Corporation on plaintiff's Second Amended Complaint.

IT IS FURTHER ORDERED directing the clerk of the court [*100] to file this Memorandum and Order under seal until further order of the Court.

IT IS FURTHER ORDERED setting a telephonic hearing with all counsel for 3:00 p.m., July 25, 1990, for the purpose of considering the immediate lifting of the order sealing this Memorandum and Order.

IT IS FURTHER ORDERED directing the clerk of the Court to make a copy of the Memorandum and Order available immediately upon filing to a representative of Victoria Lewis, coordinating counsel for defendants, pursuant to the stipulation signed by counsel for Go-Video and defendants' coordinating counsel and filed May 12, 1989.

DATED this 25th day of July, 1990.

**Exhibit 7**

LEXSEE 1999 US DIST LEXIS 7056

**TRIPLE CROWN AMERICA, INC. v. BIOSYNTH AG and BIOSYNTH INTERNATIONAL, INC.**

**CIVIL ACTION NO. 96-7476**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*1999 U.S. Dist. LEXIS 7056; 38 U.C.C. Rep. Serv. 2d (Callaghan) 746; 51 Fed. R. Evid. Serv. (Callaghan) 898*

**May 13, 1999, Decided**
**May 14, 1999, Filed, Entered**

**DISPOSITION:** [*1] Plaintiff's Motion for Partial Summary Judgment DENIED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff moved for partial summary judgment on its claim for breach of contract in an action asserting various claims under state law arising out of the alleged breach of an exclusive dealing contract, which plaintiff claimed provided that it would be the exclusive distributor of goods in the United States.

**OVERVIEW:** Plaintiff claimed to have an exclusive dealing contract with defendant that provided it would be the exclusive distributor of melatonin, a food supplement, in the United States. The contract was not in writing and was evidenced by a number of written communications. When defendant began to sell to other entities in the U.S. market, plaintiff sued defendant on various theories of recovery under state law arising out of the alleged breach of the agreement. Plaintiff moved for partial summary judgment on the breach of contract claim. The court denied the motion, finding that a reasonable juror could conclude, based on the evidence, that no contract was ever formed between the parties. Moreover, the court held that plaintiff did not present evidence from which a reasonable juror could conclude there was a breach of the alleged agreement.

**OUTCOME:** The court denied plaintiff's motion for summary judgment on the breach of contract claim, finding there was a disputed issue of fact as to whether the parties ever formed a binding exclusive dealing contract, and plaintiff presented no evidence from which a reasonable juror would be compelled to find that defendant breached such an agreement.

**LexisNexis(R) Headnotes**

*Commercial Law (UCC) > Sales (Article 2) > Subject Matter > Goods > General Overview*
*Contracts Law > Breach > General Overview*
*Contracts Law > Sales of Goods > Breach, Repudiation & Excuse > General Overview*
[HN1] Distributor agreements involving goods are governed by Article 2 of the Uniform Commercial Code, *13 Pa. Cons. Stat. Ann. § 2101*, et seq.

*Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview*
*Contracts Law > Formation > Execution*
*Contracts Law > Sales of Goods > General Overview*
[HN2] A contract may be formed in any manner sufficient to show agreement including conduct by both parties which recognizes the existence of such a contract and even though the moment of its making is undetermined. See *13 Pa. Cons. Stat. Ann. § § 2204(a) -2204(b)*. A contract for the sale of goods at a price exceeding $ 500, however, requires a writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought. See § 2201(a).

*Evidence > Hearsay > Exceptions > Market Reports & Commercial Publications > General Overview*
*Evidence > Hearsay > Rule Components > General Overview*
[HN3] Newspaper articles are hearsay and inadmissible to prove truth of statements contained therein. *Fed. R.*

1999 U.S. Dist. LEXIS 7056, *; 38 U.C.C. Rep. Serv. 2d (Callaghan) 746;
51 Fed. R. Evid. Serv. (Callaghan) 898

*Evid. 803(17)* is limited to a published tabulation, compilation or collection of objective factual data such as stock market closings, currency exchange rates, bank interest rates, weights and measurements or similar information.

**Commercial Law (UCC) > Sales (Article 2) > Contract Terms > Gap-Filler Provisions > General Overview**
**Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview**
**Commercial Law (UCC) > Sales (Article 2) > Subject Matter > General Overview**
[HN4] Under the Uniform Commercial Code, a contract requiring ongoing or successive performance with an indefinite duration is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party. See *13 Pa. Cons. Stat. Ann. § 2309(b)*. Termination, however, requires reasonable notification. See § 2309(c). Application of principles of good faith and sound commercial practice normally call for such notification of the termination of a going contract relationship as will give the other party reasonable time to seek a substitute arrangement. See § 2309, comment 8.

**Contracts Law > Remedies > Restitution**
**Contracts Law > Types of Contracts > Implied-in-Law Contracts**
[HN5] Pennsylvania permits a party to recover just compensation in circumstances in which it would be inequitable to retain such benefit without compensation. This is sometimes characterized as a "contract implied in law."

**COUNSEL:** For TRIPLE CROWN AMERICA, INC., PLAINTIFF: RICHARD T. ABELL, FORT WASHINGTON, PA USA. JAMES E. TYRRELL, JR., PITNEY, HARDIN, KIPP & SZUCH, MORRISTOWN, NJ USA. SCOTT LOUIS WEBER, LATHAM & WATKINS, NEWARK, NJ USA.

For BIOSYNTH AG, BIOSYNTH INTERNATIONAL, INC., DEFENDANTS: MICHELE LANGER, TOLL, EBBY, LANGER & MARVIN, PHILA, PA USA. R. MARK HALLIGAN, WELSH AND KATZ, LTD., CHICAGO, IL USA.

**JUDGES:** JAY C. WALDMAN, J.

**OPINION BY:** JAY C. WALDMAN

**OPINION:** MEMORANDUM ORDER

Plaintiff has asserted various state law claims against defendant Biosynth AG including breach of contract, trade libel, fraud and intentional interference with prospective business relations. Presently before the court is plaintiff's motion for summary judgment on the breach of contract claim.

Plaintiff alleges that it entered into an exclusive dealing contract with Biosynth AG whereby plaintiff was to be Biosynth AG's exclusive distributor of melatonin to the U.S. "natural food" market. This exclusive distributor agreement allegedly derived from a series of written and oral communications and through the parties' conduct during 1993 and 1994. The essence of plaintiff's [*2] breach of contract claim is that Biosynth AG breached the agreement by selling to other entities in the U.S. market, by failing to use its best efforts to supply plaintiff and by terminating the agreement without reasonable notice.

[HN1]
Distributor agreements involving goods are governed by Article 2 of the Uniform Commercial Code, *13 Pa. C.S.A. § 2101* et seq. See *Weilersbacher v. Pittsburgh Brewing Co., 421 Pa. 118, 218 A.2d 806, 808 (Pa. 1966)* (applying U.C.C. to claim for breach of brewer's agreement to supply distributor); *Eastern Dental Corp. v. Isaac Masel Co., 502 F. Supp. 1354, 1363 (E.D. Pa. 1980)* (U.C.C. statute of frauds provision applied to distributor contract); *Artman v. International Harvester Co., 355 F. Supp. 482, 486 (W.D. Pa. 1973)* ("Pennsylvania courts have repeatedly held that dealership or distribution franchises fall within the sales section of the Uniform Commercial Code"). n1 See also *American Suzuki Motor Corp. v. Bill Kummer, Inc., 65 F.3d 1381, 1386 (7th Cir. 1995)* ("virtually every" jurisdiction to address the issue has concluded that a dealership agreement is "predominantly for the sale of goods").

n1 Each party relies upon Pennsylvania law and U.C.C. principles.

[*3] [HN2]
A contract may be formed "in any manner sufficient to show agreement including conduct by both parties which recognizes the existence of such a contract" and "even though the moment of its making is undetermined." See *13 Pa. C.S.A. § § 2204(a)-* 2204(b). A contract for the sale of goods at a price exceeding $ 500, however, requires a "writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." See *13 Pa. Stat. § 2201(a)*.

The principal evidence of record that Biosynth AG expressed an intent to make plaintiff its exclusive U.S. dealer are statements in its telefaxes of March 11, 1994, July 8, 1994 and December 19, 1994. None contains an explicit statement of intent to create an exclusive dealer relationship. On March 11, 1994, Biosynth AG stated

that "we only want to supply through your company to the US-market." On July 8, 1994, it stated "we can assure you that you are the company we work [sic] together in the Nutritional US-market." On December 19, 1994, it suggested plaintiff tell an Israeli seller which acquired defendant's product from an Israeli trading company that "you sell [*4] exclusively our Ultra-Pure material in the U.S." n2 In an exchange of telefaxes the first week of November 1993, plaintiff had stated categorically "we are not asking for exclusivity" and defendant had advised "you will have competition." From the competent evidence of record construed most favorably to the non-movant, a reasonable juror could conclude that the parties never formed a binding exclusive dealing contract.

n2 The telefaxes suggest that there were related oral communications between the parties. The content and context of such communications, however, are not provided in any competent evidentiary form or otherwise.

Moreover, even assuming the existence of an exclusive dealing contract, plaintiff has not presented evidence from which a reasonable juror would be compelled to find that Biosynth AG breached such an agreement. Plaintiff presents no competent evidence that Biosynth AG at any pertinent time supplied melatonin to other distributors for the United States market, refused to fill orders placed [*5] by plaintiff or failed to use its best efforts to supply plaintiff.

Plaintiff submits a letter of September 4, 1995 from former employees of Biosynth AG stating that it was supplying directly to other companies in the United States. This letter, however, is hearsay and proof of the truth of the content of the statement has not been presented in competent form. n3

n3 In response to Biosynth AG's motion to strike, plaintiff acknowledged that the letter was hearsay and inadmissible to show Biosynth AG in fact sold to other U.S. distributors.

Plaintiff also relies on a November 6, 1995 Chemical Marketing Reporter article in which an unidentified "spokeswoman" is quoted as stating that Biosynth AG had no exclusive dealing arrangement with plaintiff and does business with U.S. customers directly and through an American subsidiary. Plaintiff presents no affidavit from the reporter or other evidence to show the statement was actually made by someone with authority to bind the defendant under *Fed. R. Evid. 801(d)(2)*. [*6] The article itself is hearsay and not competent to prove the statement was made as quoted or was true. See *In re Dual-Deck Video Cassette Recorder Antitrust Litigation, 1990 U.S. Dist. LEXIS 19207, 1990 WL 126500, *3 (D. Ariz. July 25, 1990)* ([HN3] newspaper articles are hearsay and inadmissible to prove truth of statements contained therein).

Plaintiff argues that the article falls into the hearsay exception for market reports and commercial publications under *Fed. R. Evid. 803(17)*. Rule 803(17), however, is limited to a published tabulation, compilation or collection of objective factual data such as stock market closings, currency exchange rates, bank interest rates, weights and measurements or similar information. Id. at *4 (rule contemplates compilation of objective facts); *White Indus., Inc. v. Cessna Aircraft Co., 611 F. Supp. 1049, 1068 (W.D. Mo. 1985)* (rule requires publication to be collection of factual data); M. Graham, Federal Practice and Procedure: Evidence § 6768 (1997).

Plaintiff also contends that the article itself is an admission by a party-opponent and thus not hearsay under *Fed. R. Evid. 801(d)(2)*. Plaintiff's theory is that Biosynth AG chose the Chemical Marketing Reporter to [*7] act as its agent for the purpose of disseminating information about its marketing of melatonin. The problem with plaintiff's theory is that it assumes that which has to be proved. Carried to its logical extension, plaintiff's theory would render admissible for the truth of the matter asserted almost any statement published in a magazine on a presumption that the purported declarant or reporter was authorized to speak for the party to whom the statements are attributed.

As to the allegation of termination without reasonable notice, plaintiff acknowledges that the alleged agreement does not specify any duration or method of termination. [HN4] Under the U.C.C., a contract requiring ongoing or successive performance with an indefinite duration "is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party." See *13 Pa. C.S.A. § 2309(b)*. Termination, however, "requires reasonable notification." See *13 Pa. C.S.A. § 2309(c)*. "Application of principles of good faith and sound commercial practice normally call for such notification of the termination of a going contract relationship as will give the other party reasonable time to seek a substitute [*8] arrangement." See *13 Pa. C.S.A. § 2309* comment 8.

Plaintiff cites *Jo-Ann, Inc. v. Alfin Fragrances, Inc., 731 F. Supp. 149 (D.N.J. 1989)* (applying similar New Jersey U.C.C.) for the proposition that the termination of the agreement by Biosynth AG was per se unreasonable because it took effect immediately and provided no warning. See *id. at 160* (notice was unreasonable where it occurred simultaneously with termination of exclusive

1999 U.S. Dist. LEXIS 7056, *; 38 U.C.C. Rep. Serv. 2d (Callaghan) 746;
51 Fed. R. Evid. Serv. (Callaghan) 898

distributorship agreement). The competent evidence of record, however, does not reasonably compel a finding that Biosynth AG terminated any agreement without sufficient warning. Plaintiff points to a letter of November 16, 1995 in which Biosynth AG denied that plaintiff was ever its exclusive U.S. agent. Biosynth AG points to a statement on May 10, 1995 by its president, Hans Spitz, that there was no exclusive distributorship contract. Plaintiff has not demonstrated that either statement necessarily would have provided insufficient notice because it has not shown when, if ever, any termination was effectuated. There is no competent evidence of record to show that Biosynth AG stopped supplying plaintiff or began selling to other U.S. customers.  [*9]

Plaintiff's argument for summary judgment based upon an unjust enrichment theory is similarly unavailing. [HN5] Pennsylvania permits a party to recover just compensation in circumstances in which it would be inequitable to retain such benefit without compensation. See *Schenck v. K.E. David, Ltd., 446 Pa. Super. 94, 666 A.2d 327, 328 (Pa. Super. 1995),* alloc. denied, *676 A.2d 1200 (Pa. 1996); Styer v. Hugo, 422 Pa. Super. 262, 619 A.2d 347, 350 (Pa. Super. 1993),* aff'd, *535 Pa. 610, 637 A.2d 276 (Pa. 1994).* This is sometimes characterized as a "contract implied in law."

Plaintiff has not pled an alternative claim for unjust enrichment. It is difficult to grant summary judgment on a claim which has not been pled. Moreover, a reasonable jury would not be compelled to find from the competent evidence of record viewed most favorably to the non-movant that Biosynth AG sold melatonin directly to others in the U.S. market during the relevant period. Thus, plaintiff has not shown that Biosynth AG unfairly benefitted from any advertising or other marketing activity of plaintiff.

**ACCORDINGLY**, this 13th day of May, 1999, upon consideration of plaintiff's Motion for Partial Summary [*10]  Judgment (Doc. # 72) and the response of defendant Biosynth AG, **IT IS HEREBY ORDERED** that said Motion is **DENIED**.

**BY THE COURT:**

**JAY C. WALDMAN, J.**

**Exhibit 8**

LEXSEE 2004 U.S. DIST. LEXIS 6341

**THERMAL DESIGN, INC. and SPORTS INTERIORS, INC., Plaintiffs, v. INDOOR COURTS OF AMERICA, INC. and THE CINCINNATI INSURANCE COMPANY, Defendants.**

**03-C-249-C**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WISCONSIN**

*2004 U.S. Dist. LEXIS 6341; 2004-1 Trade Cas. (CCH) P74,457*

**April 9, 2004, Decided**

**SUBSEQUENT HISTORY:** Costs and fees proceeding at, Motions ruled upon by *Thermal Design, Inc. v. Indoor Courts of Am., Inc., 2004 U.S. Dist. LEXIS 14133 (W.D. Wis., July 20, 2004)*

**DISPOSITION:** [*1] Motion for summary judgment filed by defendants was granted. Plaintiffs' motion for summary judgment was denied. Judgment was entered.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, a ceiling insulation manufacturer and installer sued defendants, a competitor and its insurer, alleging unfair competition, fraudulent representation, and false advertising under the Lanham Act and state law, and tortious interference with a prospective contract, disparagement, and defamation under state law. The competitor and insurer moved for summary judgment. The manufacturer and installer moved for partial summary judgment.

**OVERVIEW:** The manufacturer and installer claimed, inter alia, that the competitor's advertisements were literally false. The court initially held that the manufacturer and installer failed to adduce evidence from which a jury could find that any of the competitor's advertisements, or press release and video contained a false statement, caused actual consumer deception, or produced actual or likely injury to them in violation of 15 U.S.C.S. § 1125(a)(1)(B). The court further held that the manufacturer and installer waived their claims under 15 U.S.C.S. § 1125(a)(1)(A) due to their failure to develop an argument that the mark at issue was not generic, and that the manufacturer's and installer's unfair competition and fraudulent representation claims under state common law and Wis. Stat. § 100.18 failed because the manufacturer and installer failed to prove that the competitor's state-

ments at issue were untrue. The court finally held that the disparagement and defamation claims failed because none of the competitor's statements at issue were untrue, and that the tortious interference with a contract claim was waived as undeveloped.

**OUTCOME:** Summary judgment was granted for the competitor and insurer. The manufacturer's and installer's motion was denied.

**LexisNexis(R) Headnotes**

*Civil Procedure > Justiciability > Case or Controversy Requirements > General Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Same Case & Controversy*
*Trademark Law > Federal Unfair Competition Law > False Advertising > General Overview*
[HN1] Where the state claims appear to be so related to claims in the action that they form part of the same case or controversy, supplemental jurisdiction attaches under 28 U.S.C.S. § 1367(a).

*Civil Procedure > Summary Judgment > Supporting Materials > Affidavits*
*Evidence > Testimony > Lay Witnesses > Personal Knowledge*
[HN2] Fed. R. Civ. P. 56(e) requires supporting and opposing affidavits to be made on personal knowledge, to set forth such facts as would be admissible in evidence, and to show that the affiant is competent to testify to the matters stated in the affidavit. Proposed facts that are supported only by the testimony of a witness who lacks personal knowledge of the matters about which he testi-

2004 U.S. Dist. LEXIS 6341, *; 2004-1 Trade Cas. (CCH) P74,457

fies are disregarded when the court makes findings of undisputed fact.

***Civil Procedure > Summary Judgment > Supporting Materials > General Overview***
[HN3] See Fed. R. Civ. P. 56(e).

***Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview***
***Civil Procedure > Summary Judgment > Supporting Materials > Affidavits***
[HN4] See Rule I(C)(1)(e) of the United States District Court for the Western District of Wisconsin's Procedure to be Followed on Motions for Summary Judgment.

***Civil Procedure > Summary Judgment > Evidence***
***Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview***
***Evidence > Authentication > General Overview***
[HN5] For summary judgment purposes, the court will not search the record for evidence. Rule I(C)(1) of the United States District Court for the Western District of Wisconsin's Procedure to be Followed on Motions for Summary Judgment.

***Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview***
***Civil Procedure > Summary Judgment > Standards > General Overview***
***Civil Procedure > Judgments > Entry of Judgments > Enforcement & Execution > General Overview***
[HN6] The United States Court of Appeals for the Seventh Circuit has stated that it, along with the other twelve circuits, has in the past recognized and will continue to recognize the importance of enforcing its procedural rules for filing and responding to motions for summary judgment; if it did not, it would essentially be left with a court in chaos. An entry of summary judgment will be sustained where the nonmovant has failed to submit a factual statement in the form called for by the pertinent rule and thereby conceded the movant's version of the facts, if on the basis of the factual record the movant is entitled to judgment as a matter of law.

***Trademark Law > Federal Unfair Competition Law > False Advertising > General Overview***
***Trademark Law > Federal Unfair Competition Law > False Designation of Origin > Elements***
***Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > General Overview***

[HN7] To make out a claim of false or deceptive advertising under § 43(a)(1)(B) (15 U.S.C.S. § 1125(a)(1)(B)) of the Lanham Act, plaintiffs must show all of the following: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products.

***Antitrust & Trade Law > Consumer Protection > False Advertising > Lanham Act***
***Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > General Overview***
***Trademark Law > Likelihood of Confusion > Consumer Confusion > Surveys***
[HN8] For purposes of a claim of false or deceptive advertising under § 43(a)(1)(B) (15 U.S.C.S. § 1125(a)(1)(B)) of the Lanham Act, generally, the first prong of deceptiveness, "false statement," covers two categories: 1) statements that are literally false as a factual matter; and 2) statements that may be literally true or ambiguous, but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers. When the statement in question is actually false, the plaintiff need not show that the statement either actually deceived customers or was likely to do so. However, when a statement is literally true or ambiguous, the plaintiff must prove that the statement is misleading in context by showing actual consumer confusion. Actual confusion can be shown by either direct evidence or survey evidence.

***Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview***
[HN9] For purposes of a claim of false or deceptive advertising, even in the absence of a confidential relationship, fraud may be based on a failure to disclose, which together with an affirmative statement or act is misleading.

***Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview***
[HN10] For purposes of a claim of false or deceptive advertising, to show literal falsity, plaintiffs must either show that defendant's test does not prove the proposition or offer affirmative proof that the advertisement is false.

2004 U.S. Dist. LEXIS 6341, *; 2004-1 Trade Cas. (CCH) P74,457

*Trademark Law > Federal Unfair Competition Law > False Advertising > General Overview*
*Trademark Law > Federal Unfair Competition Law > False Designation of Origin > Elements*
*Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > General Overview*
[HN11] For purposes of a claim of false or deceptive advertising under § 43(a)(1)(B) (15 U.S.C.S. § 1125(a)(1)(B)) of the Lanham Act, plaintiffs bear the burden of showing that the defendant's advertisement contains a false statement of fact.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
[HN12] Although on summary judgment the defendants bear the burden of showing that the plaintiffs cannot prove their claim as a matter of law, the plaintiffs must show that they have sufficient evidence to put each issue into dispute.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
[HN13] Summary judgment is the "put up or shut up" moment in a lawsuit. At this stage, the plaintiffs are obliged to produce some evidence to support their claims.

*Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview*
[HN14] For purposes of a claim of false or deceptive advertising, although plaintiffs do not need to show actual deception, they have to prove at trial that they have been injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products.

*Trademark Law > Federal Unfair Competition Law > False Advertising > General Overview*
*Trademark Law > Infringement Actions > Burdens of Proof*
*Trademark Law > Infringement Actions > Determinations*
[HN15] A plaintiff may bring a claim for infringement of an unregistered trademark under § 43(a) (15 U.S.C.S. § 1125(a)) of the Lanham Act. To prevail on such a claim, the plaintiff must show both that the mark is entitled to protection and that it has been infringed.

*Trademark Law > Protection of Rights > Registration > Degree of Protection*
*Trademark Law > Subject Matter > Distinctiveness > Inherent Distinctiveness*
*Trademark Law > Subject Matter > Names > Generic Names > General Overview*
[HN16] A term is entitled to protection as a trademark if it specifically identifies and distinguishes one company's goods or services from those of its competitors. In order to designate a product or service, a mark must be distinctive. Marks occupy a spectrum of inherent distinctiveness, starting at the bottom end with generic terms, such as shoe or car, which commonly designate a type of good or service and do not identify the source of a particular product. Generic terms cannot qualify as trademarks; thus they receive no protection. When the mark at issue is not federally registered, the burden is on the claimant to establish that it is not an unprotectable generic mark.

*Civil Procedure > Discovery > Relevance*
*Trademark Law > Subject Matter > Names > Generic Names > General Overview*
[HN17] Generic marks designate products themselves rather than any particular maker.

*Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation*
[HN18] Arguments not developed in any meaningful way are waived.

*Torts > Business Torts > Fraud & Misrepresentation > Negligent Misrepresentation > General Overview*
[HN19] The common elements of intentional and negligent misrepresentation are: 1) the representation must be one of fact and made by the defendant; 2) the representation of fact must be untrue; and 3) the plaintiff must believe such representation to be true and rely on it to his damage. The gravamen of the wrong is the nature of the false words used and the reliance which they may reasonably induce.

*Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Fraud > Securities Fraud > Elements*
*Real Property Law > Landlord & Tenant > Lease Agreements > General Overview*
[HN20] Wis. Stat. § 100.18 prohibits a defendant from making, publishing, disseminating, circulating or placing before the public an advertisement, announcement, statement, or representation of any kind relating to the

2004 U.S. Dist. LEXIS 6341, *; 2004-1 Trade Cas. (CCH) P74,457

purchase, sale, hire, use or lease of real estate, merchandise, securities, service or employment, that contains any assertion, representation or statement of fact which is untrue, deceptive, or misleading.

***Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > General Overview***
***Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview***
[HN21] For purposes of Wis. Stat. § 100.18(1), a statement is untrue which does not express things exactly as they are.

***Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > General Overview***
***Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview***
***Torts > Business Torts > Fraud & Misrepresentation > General Overview***
[HN22] Wis. Stat. § 100.18 permits a person to sue for fraudulent representation if he or she suffers a pecuniary loss because of a violation of Wis. Stat. § 100.18. Wis. Stat. § 100.18(11)(b).

***Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview***
***Civil Procedure > Summary Judgment > Supporting Materials > Memoranda of Law***
[HN23] See Rule I(B)(4) of the United States District Court for the Western District of Wisconsin's Procedure to be Followed on Motions for Summary Judgment.

***Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > General Overview***
***Torts > Business Torts > Fraud & Misrepresentation > General Overview***
***Torts > Business Torts > Unfair Business Practices > General Overview***
[HN24] Evidence of injury is a requirement for an unfair competition and fraudulent representation claim under both the common law and Wis. Stat. § 100.18(11)(b).

***Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > General Overview***
***Torts > Business Torts > Fraud & Misrepresentation > General Overview***
***Torts > Business Torts > Unfair Business Practices > General Overview***
[HN25] For purposes of an unfair competition and fraudulent representation claim under both common law

and Wis. Stat. § 100.18, mere implication does not amount to the use of false words as required under Wisconsin common law or fail to express things exactly as they are as required under Wis. Stat. § 100.18(1).

***Torts > Intentional Torts > Defamation > Elements > General Overview***
[HN26] A common element for claims of disparagement and defamation is a false statement of fact that causes harm. A communication is defamatory if it tends so to harm the reputation of another as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him or her.

***Contracts Law > Third Parties > General Overview***
***Torts > Business Torts > Commercial Interference > Prospective Advantage > Defenses***
***Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements***
[HN27] To prevail on a tortious interference with a contract claim under Wisconsin law, a plaintiff must satisfy five elements: (1) an actual or prospective contract existed between the plaintiff and a third party; (2) the defendant interfered with that contract or prospective contract; (3) the interference was intentional; (4) the interference caused the plaintiff to sustain damages; and (5) the defendant was not justified or privileged to interfere.

**COUNSEL:** For Indoor Courts of America, Inc, DEFENDANT: Thomas A Cabush, Kasdorf, Lewis & Swietlik, SC, Milwaukee, WI.

For Indoor Courts of America, Inc, DEFENDANT: Thomas A Cabush, Kasdorf, Lewis & Swietlik, SC, Kansas City, MO USA.

For The Cincinnatti Insurance Company, DEFENDANT: Mark W Rattan, Litchfield Cavo, Milwaukee, WI USA.

**JUDGES:** BARBARA B. CRABB, District Judge.

**OPINION BY:** BARBARA B. CRABB

**OPINION:**

OPINION AND ORDER

In this civil action for injunctive and monetary relief, plaintiffs Thermal Design, Inc. and Sports Interiors, Inc. are suing defendants Indoor Courts of America, Inc. and The Cincinnati Insurance Company for 1) tortious interference with a prospective business contract; 2) unfair competition and fraudulent representation under Wisconsin law; 3) unfair competition and false advertis-

ing under § 43(a)(1)(A) of the Lanham Act (15 U. S.C. § 1125(a)); 4) unfair competition and false advertising under § 43(a)(1)(B) [*2] of the Lanham Act (15 U. S.C. § 1125(a)); 5) disparagement under Wisconsin law; and 6) defamation under Wisconsin law. This court has subject matter jurisdiction over the federal claims pursuant to 28 U.S.C. § § 1331 and 1338. [HN1] Because the state claims appear to be "so related to claims in the action . . . that they form part of the same case or controversy," supplemental jurisdiction attaches under 28 U.S.C. § 1367(a).

Presently before the court are defendants' motion for summary judgment on all of plaintiffs' claims and plaintiffs' motion for summary judgment on its claim under § 43(a)(1)(B) of the Lanham Act. I will grant defendants' motion as to plaintiffs' claims for unfair competition and false advertising under § 43(a)(1)(B) of the Lanham Act and as to plaintiffs' claims for unfair competition and fraudulent representation, disparagement and defamation under Wisconsin law because plaintiffs have adduced no evidence from which a reasonable jury could find that any of the statements in defendant Indoor Courts' advertisements, press release or video are false, except the phrase "Cook County fire marshal." With [*3] respect to this single exception, plaintiffs have adduced no evidence to show an injury resulting from Indoor Courts' use of that phrase. Therefore, I will grant defendants' motion as to plaintiffs' claim that use of that phrase violates § 43(a)(1)(B) of the Lanham Act and Wisconsin law regarding unfair competition and fraudulent representation, disparagement and defamation. Because plaintiffs have failed to develop their arguments regarding § 43(a)(1)(A) of the Lanham Act and tortious interference with contract, I consider those claims waived and will grant defendants' motion with respect to them.

For the purpose of deciding these motions for summary judgment, I have looked to the parties' proposed findings of fact to determine whether there are any material facts in dispute. Because the parties have proposed so few facts supported by admissible evidence for the court to consider, it is a challenge to reach the merits of this case. [HN2] Fed. R. Civ. P. 56(e) requires supporting and opposing affidavits to be made on personal knowledge, to set forth such facts as would be admissible in evidence, and to show that the affiant is competent to testify [*4] to the matters stated in the affidavit. Proposed facts that are supported only by the testimony of a witness who lacks personal knowledge of the matters about which he testifies are disregarded when the court makes findings of undisputed fact.

Much of plaintiffs' evidence is inadmissible. In addition to ignoring citation rules in Rule I(B)(2) in this court's Procedure to be Followed on Motions for Summary Judgment, plaintiffs' attorney attempts to introduce

documents about which he has no personal knowledge. One proposed fact will illustrate the problems plaintiffs' proposed facts present. Plaintiffs state that the "Simple Saver System" does not use "faced" insulation. Plts.' Amended Reply to Dfts.' Resp. to PPFOF, dkt. # 158, P6. Plaintiffs cite "Exhibit 5" as support for this fact. Exhibit 5 is an advertisement by plaintiffs, introduced through an affidavit by plaintiffs' attorney. Defendants object to the admission of this evidence on hearsay grounds. Plaintiffs respond by stating that Exhibit 5 is not being offered to prove the truth of the matters asserted in the brochure, "but to demonstrate components of the Simple Saver System as advertised to potential customers." [*5] Id.

Plaintiffs' assertion makes no sense. Plaintiffs have no reason to offer the advertisement except to show that their Simple Saver System does not use a certain kind of insulation. This is "the truth of the matter." What plaintiffs advertise to potential customers is immaterial to any issue in this case. Plaintiffs propose other facts to show that defendant's Energy Miser System uses faced insulation, Id. at P23, and that a key assumption in an article referred to in one of Indoor Courts' advertisements is that "faced insulation is used." Id. at P53. Plaintiffs seem to be trying to use Exhibit 5 to show that the Simple Saver System does not use faced insulation. Plaintiffs' attorney has not established that he is in a position to testify to this fact. See Fed. R. Civ. P. 56(e) [HN3] ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."); Rule I(C)(1)(e) of this court's Procedure to be Followed on Motions for Summary Judgment [HN4] ("Affidavits must be [*6] made by persons who have first hand knowledge and must show that the person making the affidavit is in a position to testify about those facts."). As another illustration, to support their assertion that defendant Indoor Courts' Energy Miser System uses faced insulation, plaintiffs cite "Exhibit 11," which is a brochure concerning the Energy Miser System. Id. at P23. Defendants object to this exhibit on hearsay grounds. Id. Plaintiffs concede that the brochure is hearsay, but argue that it is admissible under the party admission exception, Fed. R. Evid. 801(d)(2)(B), and "has been authenticated by Mike Thomas, an employee of [Indoor Courts of America]." Id. However, plaintiffs fail to cite any evidence of authentication by Mike Thomas. The parties were warned in the Procedure to be Followed on Motions for Summary Judgment that [HN5] "the court will not search the record for evidence." Rule I(C)(1).

[HN6] The Court of Appeals for the Seventh Circuit has stated:

2004 U.S. Dist. LEXIS 6341, *; 2004-1 Trade Cas. (CCH) P74,457

This Court, along with the other twelve circuits has in the past recognized and will continue to recognize the importance of enforcing its procedural rules for filing and responding [*7] to motions for summary judgment; if we did not, we would essentially be left with a court in chaos. An entry of summary judgment will be sustained 'where the nonmovant has failed to submit a factual statement *in the form called for by the pertinent rule* and thereby conceded the movant's version of the facts, if on the basis of the factual record the movant is entitled to judgment as a matter of law.

*Johnny Blastoff, Inc. v. Los Angeles Rams Football Co., 188 F.3d 427, 439 (7th Cir. 1999).*

There are a number of other proposed facts that I have rejected because plaintiffs' attorney failed to follow the citation rules or because he failed to demonstrate personal knowledge about the proposed fact. See, e.g., Plts.' Amended Reply to Dfts.' Resp. to Plts.' PFOF, dkt. # 158, PP 4, 5, 6, 21, 22, 23, 24, 31 (no citation at all), 36, 37, 38, 39, 40, 41, 43, 46, 50, 52, 59, 60, 61, 63, 64, 65, 68, 69, 88 (no citation at all), 90, 92, 93, 96 and 102. Even when plaintiffs cite admissible evidence, the evidence does not always support the fact proposed. See, e.g., Plts.' Responses to DPFOF, dkt. # 142, P 38. Rule(1)(B)(4) of this court's procedures advises the [*8] parties that "the court will not consider facts contained only in a brief." Finally, I have not considered any of the proposed findings of fact and supporting evidence submitted by plaintiffs in conjunction with their reply brief. Plts.' PFOF, dkt. # 154. Not only are such supplemental submissions not in accordance with this court's procedures, but consideration of those facts would be unfair to defendants, who have not had a chance to respond to them.

From the parties' proposed findings of fact and the record, I find that the following facts are material and not in dispute.

UNDISPUTED FACTS

Plaintiff Thermal Design, Inc. is a Nebraska Corporation that manufactures and sells the Simple Saver System, a type of ceiling insulation system. Plaintiff Sports Interiors, Inc. sells and installs Thermal Design's Simple Saver system with a specialized fabric. In addition, plaintiff Sports Interiors sells an indirect lighting fixture for indoor tennis facilities. Thermal Design has sold over 6,000 Simple Saver Systems in the past five years, resulting in millions of dollars in sales.

One of plaintiff Sports Interior's primary competitors for the sale of insulation systems and indirect light [*9] fixtures is defendant Indoor Courts of America. Defendant sells insulation systems under the trade name Energy Miser. The different insulation systems developed by defendant are called the Energy Miser, the Tube System and the EconoCeil. Defendant sells the Energy Miser system nationwide. Defendant, The Cincinnati Insurance Company is in this suit only as defendant Indoor Courts' insurer. It took no part in the allegedly defamatory acts. Therefore, I will use "defendant" in the singular for the remainder of this opinion, referring to Indoor Courts of America.

Defendant has developed advertisements and a press release and accompanying video about its products. In one of its advertisements, defendant claims that "Energy Miser Outperforms Simple Saver by 33%!" The advertisement includes a table for the Simple Saver system and the Energy Miser System, comparing the R-values, a measure of thermal performance. The table indicates that the nine inches of insulation material used in both the Simple Saver System and Energy Miser System have an R-value of 29 but "in-place" the systems have R-values of 24 and 32 respectively. Also, the advertisement states that "[a] recent study by the North [*10] American Insulation Manufacturers Association (NAIMA), published in Metal Construction News (February 2000, pp. 58-61) confirms that, when using the same material R-values, the in-place Energy Miser System outperforms the in-place Simple Saver System by 33%." The Metal Construction News article referred to in the advertisement does not identify the Energy Miser or the Simple Saver System. However, those who conducted the study assumed that faced insulation is used when calculating the test results of the system described in the article.

Defendant distributed another advertisement that compares its TurboCandle light fixture to plaintiff Sports Interiors' Sun Series light fixture. In the advertisement, defendant states that it has been asked frequently to explain the difference in the light output between its TurboCandle product and plaintiff Sports Interiors' Sun Series product. The advertisement reads: "Based on Sports Interiors' published data, [defendant] asked an independent lab to run a photometric study on [defendant]'s TurboCandle fixture using the same building data." In the advertisement, defendant concludes that its product outperformed plaintiff's Sun Series product [*11] by "18% using 10 fixtures per court, and 16% using 8 fixtures per court, making the TurboCandle system the lowest cost system to own and operate!" Defendant's TurboCandle product outperformed plaintiff Sports Interiors' Sun Series fixture by 18%. (Plaintiffs attempted to dispute this proposed fact, Plts.' Response to DPFOF,

Case 1:04-cv-12457-PBS    Document 77-7    Filed 09/22/2006    Page 7 of 14

Page 7

2004 U.S. Dist. LEXIS 6341, *; 2004-1 Trade Cas. (CCH) P74,457

dkt. # 142, P31, but failed to cite admissible evidence to refute it, so I consider the fact undisputed.)

Defendant distributed the advertisement in competitive bidding situations. Defendant's president faxed the advertisement to Stan Clark of Eastern Hills Tennis Facility, a potential customer with a project on which both plaintiff Sports Interiors and defendant were bidding. Clark did not purchase plaintiff Sports Interiors' fixture. Defendant is no longer using this advertisement on its website.

In 2003, defendant developed a press release and accompanying video. The video displays a flame test of two fabrics, one of which was labeled "Simple Saver System Sports Interiors." The press release reads:

Prior to the Rhode Island nightclub fire, in December 2002, Northwestern University, located in Evanston, Ill., contacted Indoor Courts of America to install [*12] its Energy Miser system in the university's new five-court tennis facility. A competitive product -- the Simple Saver insulating system, manufactured by Thermal Design -- was specified, and subsequently rejected, by the Cook Co. fire marshal after field tests found that in the event of fire this product supported a flame and dripped molten plastic from the ceiling. Indoor Courts of America's proprietary TC-120 reflective material, a key component of the Energy Miser system, passed the fire marshal's test and was therefore specified for installation.

As a result of this experience, Indoor Courts of America conducted its own flame test of each of the two products. The test was repeated numerous times and simultaneously videotaped. We have enclosed a CD-ROM featuring a video clip of our flame test for your review.

It is unfortunate that inferior and unsafe components ever get used in a sports facility. We should all do everything we can to keep our clients, customers and children safe while they enjoy recreation facilities," notes Lex Kessler, Indoor Courts of America president.

Chuck Bennett, Jr., the architect and general contractor for the Northwestern University project [*13] referred to in this press release, provided Chief Alan Berkowsky, fire marshal for the City of Evanston, Illi-

nois, a sample of plaintiff Sports Interiors' fabric specified for use in the Northwestern facility. Chief Berkowsky told Bennett that he had performed a flame test on plaintiffs' material and that the results were not favorable. Berkowsky did not approve of the use of plaintiff Sports Interiors' fabric in the Northwestern facility after his flame test showed that the material "burnt violently," supported a flame and dripped molten plastic. Northwestern University did not select plaintiff Sports Interiors to install a system for a number of reasons, one of which was Bennett's concerns regarding the fire rating of the material. Another was that plaintiff's system did not match the roof lines of the building, creating more expense to install plaintiff's system.

Bennett contacted defendant to find out whether it would be interested in bidding on the Northwestern project. Defendant provided Berkowsky with its TC-120 product so that he could perform the same flame test that he had performed on plaintiff Sports Interiors' product. Berkowsky found that defendant's material "responded [*14] as he would have expected a fire retardant material to respond." Berkowsky approved defendant's material for use at the Northwestern tennis facility. Plaintiffs do not know of any misrepresentations by defendant that caused Sports Interiors to lose the Northwestern project and consequently, plaintiff Thermal Design to lose the sale of its Simple Saver System. Plaintiffs do not know whether defendant misrepresented anything about the quality and character of plaintiff Thermal Design's products to the general contractor or architects on the Northwestern project.

Some of plaintiffs' fabrics tested under an ASTM 84 test displayed dripping and burning. Defendant's fabric is self-extinguishing and does not burn in a violent manner under the National Fire Protection Association 705 test. However, the 705 test is not determinant of all fire characteristics of a material.

Plaintiff Thermal Design never registered the following trademark:

[SEE FIGURE IN ORIGINAL]

Plaintiffs have not conducted written or oral surveys to discover whether the relevant target group identifies the depiction with plaintiff Thermal Design as the single source for the product.

Defendant uses the following [*15] depiction in connection with its EconoCeil system:

[SEE FIGURE IN ORIGINAL]

Defendant has not sold its EconoCeil product for over seven years. Defendant has never sold more than two or three EconoCeil units.

OPINION

Plaintiffs have moved for summary judgment on one issue: whether defendant's advertisements and press release violated *§ 43(a)(1)(B) of the Lanham Act*. (Plaintiffs have withdrawn their motion for summary judgment under *§ 43(a)(1)(A) of the Lanham Act*. Plts.' Reply Br., dkt. # 153, at 1.) Defendant has moved for summary judgment on all of plaintiffs' claims: 1) tortious interference with contract; 2) unfair competition under *Wisconsin Stat. § 100.18* and common law; 3) unfair competition and false advertising under *§ 43(a)(1)(A) of the Lanham Act*; 4) unfair competition and false advertising under *§ 43(a)(1)(B) of the Lanham Act*; 5) disparagement under Wisconsin state law; and 6) defamation under Wisconsin state law.

A. Unfair Competition and False Advertising under *§ 43(a)(1)(B)*

At the outset, I note that the "[Federal Trade Commission] believes that consumers gain from comparative advertising, and to make the comparison vivid [*16] the Commission 'encourages the naming of, or reference to competitors.'" *August Storck K.G. v. Nabisco, Inc., 59 F.3d 616, 618 (7th Cir. 1995)* (quoting *16 C.F.R. § 14.15(b)*). At times, however, comparative advertisements cross the line of helpfulness into the area of deceit. To establish that this has happened and [HN7] to make out a claim of false or deceptive advertising under *§ 43(a)(1)(B) of the Lanham Act*, plaintiffs must show all of the following: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products." *Hot Wax, Inc. v. Turtle Wax, Inc., 191 F.3d 813, 819 (7th Cir. 1999)*.

[HN8] Generally, the first [*17] prong of deceptiveness, "false statement," covers two categories: 1) statements that are "literally false" as a factual matter; and 2) statements that may be "literally true or ambiguous, but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers." *Id. at 820*. "When the statement in question is actually false, the plaintiff need not show that the statement either actually deceived customers or was likely to do so." *Id*. However, when a statement is literally true or ambiguous, the plaintiff must prove that the statement is misleading in context by showing actual consumer confusion. Id. Actual confusion can be shown by either direct evidence or survey evidence. *Rust Environment & Infrastructure, Inc. v. Teunissen, 131 F.3d 1210, 1218 (7th Cir. 1997)*.

1. Energy Miser outperforms Simple Saver by 33%

Plaintiffs contend that the print advertisement in which defendant claims that its Energy Miser product outperforms the Simple Saver product by 33% is literally false because: 1) defendant failed to disclose the particular configuration of its product compared to plaintiffs' product; 2) it failed [*18] to disclose that its product had three additional inches of insulation, creating false test results; 3) defendant's expert confirmed that plaintiffs' product outperforms defendant's product; 4) plaintiffs' product performs better than the typical cavity-filled system identified in defendant's advertisement; and 5) the North American Insulation Manufacturers Association did not conduct a study that determined the material R-value of plaintiffs' Simple Saver product.

With respect to plaintiffs' first assertion, the failure to disclose the configuration of defendant's product is not literally false. At the most it is misleading or ambiguous. Cf. *General Motors Acceptance Corp. v. Central National Bank, 773 F.2d 771, 778 (7th Cir. 1985)* [HN9] ("Even in the absence of a confidential relationship, fraud may be based on a failure to disclose, which together with an affirmative statement or act is *misleading*) (emphasis added); *Emery v. American General Finance, Inc., 71 F.3d 1343, 1346 (7th Cir. 1995)* (half-truth may be *misleading*) (emphasis added). Therefore, plaintiffs must demonstrate actual consumer confusion. *Hot Wax, Inc., 191 F.3d at 820*. [*19]

Plaintiffs have not adduced any evidence of actual consumer deception resulting from defendant's advertisement. (To support their claim of consumer deception, plaintiffs cite exhibits 22 and 23 in their brief, Plts.' Br., dkt. # 118 at 16, which are copies of defendant's balance sheet and plaintiffs' financial data. Even if these exhibits had been submitted in accordance with this court's summary judgment procedures, which they were not, it is unclear how this information would demonstrate consumer deception or confusion.)

Plaintiffs fail to adduce any admissible evidence to support their second assertion that defendant's advertisement is literally false because the actual results relied on three additional inches of insulation material. Plts.' Br., dkt. # 153, at 5. For support, plaintiffs cite a deposition of Steven Wright and an Owens/Corning Sweets advertisement. Plts.' Amended Reply to Dfts.' Resp. to Plts.' PFOF, dkt. # 158, P34. The cited deposition is missing some of the pages to which plaintiffs cite. Furthermore, the deposition page that does exist fails to support the proposed fact. Plaintiffs' citation to the

2004 U.S. Dist. LEXIS 6341, *; 2004-1 Trade Cas. (CCH) P74,457

Owens/Corning Sweets advertisement does not help them; the [*20] truth of the matter asserted in the advertisement is inadmissible because it is hearsay. Plaintiffs' attorney introduced the document, but he does not have personal knowledge to testify to the truth of the document's contents. (Plaintiffs ask the court to consider the market report and commercial publications exception to the hearsay rule, *Fed. R. Evid. 803(17)*, because, they claim, the Owens/Corning Sweets advertisement is "relied upon by contractors for product information." Plaintiffs fail to adduce any evidence to support that claim. Therefore, the document is not exempt from the hearsay rule.)

Generally speaking, plaintiffs have not adduced admissible evidence to support their remaining three arguments that defendant's advertisement is literally false. Plaintiffs rely on reports and articles about which their attorney has no personal knowledge, see, e.g., Plts.' Amended Reply to Dfts.' Resp. to Plts.' PFOF, dkt. # 158, PP43, 49, or they fail to cite any evidence at all, see id. at P48. Plaintiffs fail to show that their product outperforms defendant's product, that their product performs better than [*21] the typical cavity-filled system identified in defendant's advertisement or that the North American Insulation Manufacturers Association conducted a study that helped determine the material R-value of plaintiffs' Simple Saver product. Plaintiffs argue the admissibility of "Exhibit 19," a report by Owens-Corning Fiberglass from 1980, under the ancient document exception to the hearsay rule, *Fed. R. Evid. 803(16)*. Plts.' Amended Reply to Dfts.' Resp. to Plts.' PFOF, dkt. # 158, P36. Further, plaintiffs state that under *Fed. R. Evid. 901(b)(8)*, a document may be authenticated as ancient by evidence that it: 1) is in such condition as to create no suspicion concerning its authenticity; 2) was in a place where if authentic, it would likely be; and 3) has been in existence 20 years or more at the time it is offered. Id. However, plaintiffs have not introduced the document in the manner suggested under *Fed. R. Evid. 901(b)(8)* or any other satisfactory manner.

In addition, plaintiffs argue that their Simple Saver product was not part of the study by the North American Insulation Manufacturers [*22] Association, referred to in defendant's advertisement, because the product in the study used faced insulation and the Simple Saver System does not. Therefore, plaintiffs conclude, the study does not provide a basis for defendant's assertion that its product outperforms plaintiffs' Simple Saver System by 33%. However, as noted earlier, plaintiffs adduce no admissible evidence to show that their product does not use faced insulation. Plaintiffs fail to show that the Energy Miser System does not outperform plaintiffs' product by 33%.

2. TurboCaindle outperforms Sun Series by 18%

For the following reasons, plaintiffs argue that defendant's advertisement about its TurboCaindle product is literally false: 1) defendant tested its fixture using additional undisclosed fixtures, thereby creating false results; 2) defendant compared its best court to the average court of plaintiff Sports Interiors; and 3) defendant compared its fixture to a discontinued Sun Series fixture. Plaintiffs contend that the advertisement is false because the independent lab referred to in the advertisement tested 42 light fixtures rather than 40 light fixtures, as shown in the advertisement, thereby inflating [*23] the performance number of defendant's product. Plts.' Br., dkt. # 118, at 18. Plaintiffs buttress these arguments by citing exhibits 24 and 25, which are the test results from the independent lab and an analysis of the test by Robert Van Dixhorn, General Manager of plaintiff Sports Interiors. Plts.' Amended Reply to Dfts.' Resp. to Plts.' PFOF, dkt. # 158, PP59, 65. This evidence is inadmissible because it has not been properly attested to by someone with personal knowledge of its contents. Aff. of Thaddeus C. Stankowski, dkt. # 120, PP25, 26. Plaintiffs have failed to meet their burden to show that defendant's advertisement used additional undisclosed fixtures.

Plaintiffs aver that defendant's advertisement is literally false because defendant compared its best court to the average court of plaintiff Sports Interiors, rather than the average courts of both companies. [HN10] To show literal falsity, plaintiffs must either show that defendant's test does not prove the proposition or offer affirmative proof that the advertisement is false. *BASF Corp. v. Old World Trading Co., Inc., 41 F.3d 1081, 1091 (7th Cir. 1994)* ("If the challenged advertisement makes implicit or explicit [*24] references to tests, the plaintiff may satisfy its burden by showing that those tests do not prove the proposition; otherwise, the plaintiff must offer affirmative proof that the advertisement is false."). Plaintiffs fail to adduce admissible evidence to call defendant's test into question. Plaintiffs cite "Exhibits 24 and 25," which I have determined are inadmissible. Plts.' Amended Reply to Dfts.' Resp. to Plts.' PFOF, dkt. # 158, P67. Also, plaintiffs cite deposition testimony to support their position that the advertisement does not offer a fair comparison. Id. Even if I assume that the deposition testimony shows that defendant compared its best court to plaintiffs' average court, such testimony does not make the advertisement literally false or even misleading. Plaintiffs point to no language in the advertisement that would cause consumers to believe that defendant is comparing its average court to plaintiffs' average court. The advertisement states that defendant used plaintiffs' "published data" as the basis for comparison. Defendant did not misrepresent that fact.

Case 1:04-cv-12457-PBS    Document 77-7    Filed 09/22/2006    Page 10 of 14

Page 10

2004 U.S. Dist. LEXIS 6341, *; 2004-1 Trade Cas. (CCH) P74,457

Similarly, plaintiffs argue that literal falsity is shown by defendant's failure to disclose their use of [*25] a discontinued model of plaintiffs' product as the basis of the comparison in the advertisement. Plaintiffs fail to adduce admissible evidence to show that the Sun Series model used by defendant is discontinued. Plaintiffs cite exhibit 25, the report from Robert Van Dixhorn, the general manager of plaintiff Sports Interiors, to support their proposed fact that plaintiff Sports Interiors has not sold the fixture for over four years, Plts.' Amended Reply to Dfts.' Resp. to Plts.' PFOF, dkt. # 158, P68, but I have found exhibit 25 inadmissible. Contrary to what plaintiffs state in their brief, Plts.' Br., dkt. # 153, at 13, [HN11] plaintiffs bear the burden of showing that defendant's advertisement contains a false statement of fact. *Hot Wax, Inc., 191 F.3d at 819* (to establish claim under false or deceptive advertising prong of § 43(a) of Lanham Act, plaintiff must prove false statement of fact); *BASF Corp., 41 F.3d at 1091* (under *Lanham Act, plaintiff* bears burden of proving literal falsity). [HN12] Although on summary judgment defendants bear the burden of showing that plaintiffs cannot prove their claim as a matter of law, plaintiffs must show that they [*26] have sufficient evidence to put each issue into dispute. Plaintiffs have not met their burden. Because it is undisputed that defendant's TurboCaindle product outperformed plaintiff Sports Interior's Sun Series fixture by 18% and because plaintiffs fail to adduce evidence to put the literal falsity of defendant's advertisement into dispute, I cannot find that the advertisement asserts a false statement of fact in its comparison of the TurboCaindle and Sun Series products.

3. Press release and video: fire safety of the energy-miser insulation system

Plaintiffs argue that defendant's video is false because the fabric used in the video and labeled "Simple Saver System Sports Interiors" is not one of plaintiffs' fabrics. According to plaintiffs, they do not sell the "Nova-Thene 9700" type of fabric burned in the video. Plts.' Br., dkt. # 118, at 25. For support, plaintiffs cite "Exhibit 27," a deposition of Russ Cain, defendant's Vice President and "Exhibit 30," a deposition of Dan Harkins, a principal of plaintiff Thermal Design. Plts.' Amended Reply to Dfts.' Resp. to Plts.' PFOF, dkt. # 158, PP82, 83, 84, 85. Although this evidence is admissible, it does not support plaintiffs' [*27] argument that they never sold or supplied the Nova-Thene 9700 fabric or that this was the type of fabric used in the video. In fact, in his deposition, Harkins admits to purchasing one batch of Nova-Thene 9700 presumably for inclusion into plaintiffs' system. Dkt. # 126, exh. 30, p. 91. [HN13] Summary judgment is the "put up or shut up" moment in a lawsuit, see, e.g., *Johnson v. Cambridge Industries, Inc., 325 F.3d 892, 901 (7th Cir. 2003)*. At this stage, plain-

tiffs are obliged to produce some evidence to show how defendant's video is false. Plaintiffs have not met this burden.

Plaintiffs object to defendant's press release for two reasons: 1) it contains a false statement that the "Cook County fire marshal" rejected plaintiffs' Simple Saver product; and 2) it implies that plaintiffs' product is unsafe. Plaintiffs argue that the *City of Evanston* fire marshal, Chief Berkowsky, would have approved their product for the Northwestern University tennis facility project had Bennett, the architect for the project, provided him with additional information. Plts.' Br., dkt. # 118, at 30-32. This argument does nothing to advance plaintiffs' case. It is undisputed that Berkowsky [*28] did not approve of the use of plaintiff Sports Interior's fabric in the Northwestern facility after his flame test found that plaintiff's material "burnt violently," supported a flame and dripped molten plastic. To not approve something is essentially to reject it. As a result, plaintiffs fail to show that they have any evidence that would allow a jury to find that the word "rejected" makes the statement false. However it is undisputed that the press release should read "a fire marshal in Cook County." Because this statement is literally false, plaintiffs are not required to show actual deception of customers.

[HN14] Although plaintiffs do not need to show actual deception, they would have to prove at trial that they have been "injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products." *Hot Wax, Inc., 191 F.3d at 819*. Plaintiffs attribute the loss of the Northwestern University project to defendant's undercutting of plaintiffs' price when it knew the fire marshal had not "fully" rejected plaintiffs' product. Plts.' Br., dkt. # 118, at 32-33; Plts.' Br., dkt. # 153, at 18. [*29] In effect, plaintiffs concede that the loss did not result from the false statement in the press release, but to defendant's competitive business practices. See, e.g., *Speakers of Sport, Inc. v. ProServ, Inc., 178 F.3d 862, 865 (7th Cir. 1999)* (competition, though painful, fierce, frequently ruthless, sometimes Darwinian in its pitilessness, is cornerstone of our highly successful economic system; "Competition is not a tort.").

Plaintiffs adduce deposition testimony by Robert Van Dixhorn and Tom Van Dixhorn of plaintiff Sports Interiors to show that consumers expressed concerns about plaintiffs' product as a result of defendant's advertisements and press release. Plts.' Response to DPFOF, dkt. # 142, P38; PPFOF, dkt. # 143, P15. The deposition of Tom Van Dixhorn does not support the proposition that consumers expressed concerns about plaintiffs' product. Rather, Tom Van Dixhorn discusses interference with contracts. In his deposition, Robert Van Dixhorn discusses consumers' expression of concern about

plaintiffs' products as a result of defendant's "letter" and video, (I note that page 217 of the deposition, to which plaintiffs cite, PPFOF, dkt. # 143, P15, is missing [*30] from "exhibit S.") but, nothing in the record shows that the "Cook County fire marshal" statement injured plaintiffs either economically or by loss of goodwill. Plaintiffs have not shown that a more accurate statement would have made a difference.

As to plaintiffs' second objection to defendant's press release, plaintiffs contend that the press release implies that their product is unsafe because it mentions their product in the context of a discussion on fire safety. Plaintiffs argue that had the National Fire Protection Association 286 test been performed on plaintiffs' product, it would have shown plaintiffs' product to be safe. Plts.' Br., dkt. # 153, at 18; Plts.' Br., dkt. # 118, at 35. However, plaintiffs adduce no admissible evidence from which a jury could find that plaintiffs' product passed the National Fire Protection Association 286 test or that it would have passed had it been tested. Plts.' Amended Reply to Dfts.' Resp. to Plts.' PFOF, dkt. # 158, P102 (citing "Exhibit 43," which is a letter to Dan Harkins from Jeff Simmons, introduced by plaintiffs' attorney and which provides no indication that plaintiffs' product "passed" the test). Furthermore, it is undisputed [*31] that some of plaintiffs' fabrics tested under an ASTM 84 test displayed dripping and burning and that Berkowsky's flame test found that plaintiff's material supported a flame, "burnt violently" and dripped molten plastic. Plaintiffs have failed to adduce any evidence that would enable a reasonable jury to find a false implication in defendant's press release that plaintiffs' Simple Saver product is unsafe.

Because plaintiffs have not met their burden of adducing evidence from which a jury could find that any of defendant's advertisements or press release and video contained a false statement, caused actual consumer deception or produced actual or likely injury, I will grant defendant's motion for summary judgment on plaintiffs' claim of unfair competition and false advertising under § 43(a)(1)(B) of the Lanham Act and deny plaintiffs' motion as to that claim.

B. Unfair Competition and False Advertising under § 43(a)(1)(A)

[HN15] A plaintiff may bring a claim for infringement of an unregistered trademark under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). See Zazu Designs v. L'Oreal S.A., 979 F.2d 499, 502 (7th Cir. 1992). To prevail on [*32] such a claim, the plaintiff must show both that the mark is entitled to protection and that it has been infringed. Platinum Home Mortgage Corp. v. Platinum Financial Group. Inc., 149 F.3d 722, 726 (7th Cir. 1998); Echo Travel, Inc. v. Travel Associates, Inc., 870 F.2d 1264, 1266 (7th Cir. 1989). [HN16] A term is entitled to protection as a trademark if it "specifically identifies and distinguishes one company's goods or services from those of its competitors." Platinum Home Mortgage, 149 F.3d at 726. In order to designate a product or service, a mark must be distinctive. Marks occupy a spectrum of inherent distinctiveness, starting at the bottom end with generic terms, such as "shoe" or "car," which commonly designate a type of good or service and do not identify the source of a particular product. Id. at 727; Mil-Mar Shoe Co. v. Shonac Corp., 75 F.3d 1153, 1156 (7th Cir. 1996). Generic terms cannot qualify as trademarks; thus they receive no protection. When the mark at issue is not federally registered, the burden is on the claimant to establish that it is not an unprotectible generic mark. Mil-Mar Shoe Co., 75 F.3d at 1156. [*33]

It is undisputed that the mark at issue in this case is not federally registered. Therefore, plaintiffs must adduce enough evidence to allow a reasonable jury to conclude that the mark is not generic. In their brief, plaintiffs assert that plaintiff Thermal Design has used its mark for over 20 years to sell and promote its Simple Saver System and that defendant cannot provide evidence that any company other than plaintiff Thermal Design and defendant uses the same depiction to sell and promote a liner fabric system. Plts.' Br., dkt. # 141, at 13. Plaintiffs fail to develop this argument. A two-sentence argument concerning the length of time plaintiffs have used the mark at issue is insufficient to show distinctiveness of the mark. Furthermore, it is undisputed that plaintiffs have not conducted written or oral surveys to discover whether the relevant target group identifies the depiction with plaintiff Thermal Design as the single source for the product. See, e.g., Bliss Salon Day Spa v. Bliss World LLC, 268 F.3d 494, 497 (7th Cir. 2001) [HN17] (generic marks designate products themselves rather than any particular maker). As a result of their failure to develop an argument [*34] that the mark at issue is not generic, plaintiffs have waived their claim under § 43 (a)(1)(A) of the Lanham Act. See Central States, Southeast & Southwest Areas Pension Fund v. Midwest Motor Express, Inc., 181 F.3d 799, 808 (7th Cir. 1999) [HN18] ("Arguments not developed in any meaningful way are waived."). I will grant defendant's motion for summary judgment on this claim.

C. Unfair Competition and Fraudulent Representation Under Wisconsin Law

Defendant has moved for summary judgment on plaintiffs' claim for unfair competition and fraudulent representation under Wisconsin common law and Wis. Stat. § 100.18(1). Plaintiffs argue that defendant both intentionally and negligently misrepresented facts in its advertisements and press release. Plts.' Br., dkt. # 141, at 3. [HN19] The common elements of intentional and neg-

Case 1:04-cv-12457-PBS    Document 77-7    Filed 09/22/2006    Page 12 of 14

Page 12

2004 U.S. Dist. LEXIS 6341, *; 2004-1 Trade Cas. (CCH) P74,457

ligent misrepresentation are: 1) the representation must be one of fact and made by the defendant; 2) the representation of fact must be untrue; and 3) the plaintiff must believe such representation to be true and rely on it to his damage. *Ollerman v. O'Rourke Co., Inc., 94 Wis. 2d 17, 25, 288 N.W.2d 95, 99 (Wis. 1980).* [*35]   "The gravamen of the wrong is the nature of the false words used and the reliance which they may reasonably induce." *Id. at 26, 288 N.W.2d at 99* (noting difference between "false words" and failure to disclose, which is not intentional misrepresentation unless seller has duty to disclose).

[HN20] *Wis. Stat. § 100.18* prohibits defendant from making, publishing, disseminating, circulating or placing before the public an advertisement, announcement, statement or representation of any kind relating to the purchase, sale, hire, use or lease of real estate, merchandise, securities, service or employment, that contains any assertion, representation or statement of fact which is untrue, deceptive *or* misleading. See *Tim Torres Enterprises, Inc. v. Linscott, 142 Wis. 2d 56, 65, 416 N.W.2d 670, 673 (Wis. Ct. App. 1987)* (analogizing statute to Lanham Act and stating that "since the statute lists three separate alternatives, [untrue, deceptive or misleading], the fact-finder only has to determine that a statement is untrue to find a violation of the statute."). [HN21] "A statement is untrue which does not express things exactly as they are." [*36] *Id. at 65, n. 3, 416 N.W.2d at 673, n. 3* (defining "untrue" as used in *Wis. Stat. § 100.18(1)*). [HN22] The statute permits a person to sue for fraudulent representation if he or she suffers a pecuniary loss because of a violation of the statute. *Wis. Stat. § 100.18(11)(b).*

In their complaint, plaintiffs list fifteen statements derived from defendant's advertisements and press release that they allege are false. Plaintiffs no longer dispute the truth of one statement, that defendant "had a product that passed." Therefore, fourteen statements remain in dispute.

In order to survive summary judgment on their claim of unfair competition and fraudulent representation under Wisconsin common law and *Wis. Stat. § 100.18(1)*, plaintiffs must adduce enough evidence to allow a reasonable jury to find that the fourteen disputed statements contain words that are untrue or that the statements are deceptive or misleading and that the plaintiff suffered a loss as a result of the statement.

### 1. Northwestern University contacted defendant Indoor Courts of America

Plaintiffs pull this statement from defendant's [*37] press release. Plaintiffs argue that this statement is false because it was Chuck Bennett, the architect and general contractor for the Northwestern University tennis facility project, and not Northwestern University, who contacted defendant. I do not view these words as untrue. It is undisputed that *Northwestern University* did not select plaintiff Sports Interiors to install a system for a number of reasons, including the fact that the roof lines of the building did not match up, that it would cost more money to install plaintiffs' system than to install some other system and that Bennett had concerns about the fire rating of plaintiffs' product. The undisputed facts show that Northwestern University relied on Bennett's recommendations. Plaintiffs have not proposed any admissible evidence showing that Bennett did not act as on behalf of Northwestern University when he contacted defendant. (Plaintiffs assert in their brief that Northwestern University, and not Bennett, wanted and originally specified the Simple Saver System. Plts.' Br., dkt. # 141, at 5. This fact is not proposed in any of plaintiffs' proposed findings of fact. Rule I(B)(4) of the court's Procedures to be Followed [*38]  on Motions for Summary Judgment states that the [HN23] "court will not consider facts contained only in a brief.") A reasonable jury could not find that these words are false.

### 2. Thermal Design Inc.'s Simple Saver System was rejected by the Cook County fire marshal

Plaintiffs argue that this statement, derived from defendant's press release, is false because: 1) the City of Evanston, not the Cook County fire marshal 2) did not reject 3) the Simple Saver *System*. Plaintiffs point out that the fire marshal examined only swatches of material, not plaintiffs' entire system.

As noted earlier, although the phrase "Cook County fire marshal" is not accurate, plaintiffs fail to adduce evidence that the phrase injured them. Because [HN24] evidence of injury is a requirement for both the common law and *Wis. Stat. § 100.18(11)(b)*, I cannot find that defendant's phrase violates Wisconsin law.

I have concluded that the undisputed facts show that Berkowsky did not approve of the use of plaintiff Sports Interior's fabric in the Northwestern facility and that plaintiffs fail to adduce any evidence to show that use of the word "rejected" makes the statement false.

Finally, [*39]  plaintiffs fail to adduce any evidence that rejecting a swatch of fabric from the Simple Saver System is different from rejecting the whole system. Without any admissible evidence showing that Berkowsky would have acted differently had he tested the whole system rather than a swatch of fabric, I cannot conclude that a reasonable jury would find the use of the word "system" a misrepresentation. Therefore, I do not find this statement to be untrue.

Case 1:04-cv-12457-PBS     Document 77-7     Filed 09/22/2006     Page 13 of 14

Page 13

2004 U.S. Dist. LEXIS 6341, *; 2004-1 Trade Cas. (CCH) P74,457

3. Proper field tests were performed

This statement does not appear anywhere in defendant's advertisements or press release. (The term "field tests" was used in the press release but not the entire phrase, "proper field tests were performed.") Because the allegedly false statement does not exist in any of defendant's advertisements or press release, a jury could not find that the advertisements or press release use false words as required under Wisconsin common law or expresses things exactly as they are as required under *Wis. Stat. § 100.18(1)*. As a result, this is not a false statement.

4. Field tests were performed on the Simple Saver System

This statement appears in defendant's press release, [*40] though not in this exact form. Plaintiffs argue that this statement is untrue because Berkowsky did not perform field tests on the entire Simple Saver System but only on the fabric used in the system. Plaintiffs fail to adduce any evidence that field tests on plaintiffs' fabric are different from field tests conducted on plaintiffs' entire system. Without more evidence, a reasonable jury could not conclude that testing the fabric is different from testing the entire system.

5. The fire marshal found that the Simple Saver System supported a flame and dripped molten plastic from the ceiling

Plaintiffs derive this statement from defendant's press release. According to plaintiffs, this statement is untrue because the fire marshal never concluded that their material would drip plastic *from the ceiling*. Plaintiffs fail to adduce any evidence in their proposed findings of fact that would make it unreasonable for a jury to find that a fabric that dripped plastic in a test would not drip plastic when attached to the ceiling. (Plaintiffs make factual assertions to support their position that such a jury finding would be unreasonable but they make the assertions only in their brief, [*41] Plts.' Br., dkt. # 141, at 7, and as I have noted, the Procedures to be Followed on Motions for Summary Judgment state that the "court will not consider facts contained only in a brief.") Therefore, I cannot find this statement untrue.

6-11. The following statements do not appear anywhere in defendant's advertisements or press release:

. Thermal Design, Inc. sells and distributes an inferior product

. Sports Interiors sells and distributes an inferior product

. Thermal Design, Inc.'s products are unsafe

. Sports Interior's products are unsafe

. Indoor Courts of America conducted an accurate test on Thermal Design, Inc.'s system

. Indoor Courts of America conducted an accurate test on its product as installed

Plaintiffs do not argue that these statements are made in defendant's advertisements and press release, but that they are implied. [HN25] Mere implication does not amount to the use of false words as required under Wisconsin common law or fail to express things exactly as they are as required under *Wis. Stat. § 100.18(1)*. As a result, these are not false statements.

12. North American [*42] Insulation Manufacturers Association evaluated Thermal Design, Inc.'s Simple Saver System

Plaintiffs argue that this statement is false because the study conducted by the North American Insulation Manufacturers Association does not identify either the Simple Saver System or Energy Miser System. As noted earlier, plaintiffs have adduced no admissible evidence from which a jury could find that their product is not the functional equivalent of the products that the association evaluated. Therefore, plaintiffs fail to show that the Association did not evaluate the Simple Saver System.

I have concluded earlier in this opinion that plaintiffs have failed to show the falsity of the statement that the Energy Miser System outperforms plaintiffs' product by 33% (statement no. 13) and that Indoor Courts of America's TurboCaindle outperformed Sports Interiors' Sun Series Fixture by 18% (statement no. 14).

Because I find that none of the statements at issue are untrue, I will grant defendants' motion for summary judgment on plaintiffs' claim of unfair competition and fraudulent representation under Wisconsin common law and *Wis. Stat. § 100.18*.

D. Disparagement [*43] and Defamation

Both sides agree that [HN26] a common element for claims of disparagement and defamation is a false statement of fact that causes harm. Plts.' Br., dkt. # 141, at 23-24; Dfts.' Br., dkt. # 122, at 39, 51; see also *Bauer v. Murphy, 191 Wis. 2d 517, 523, 530 N.W.2d 1, 3 (Ct. App. 1995)* ("A communication is defamatory 'if it tends so to harm the reputation of another as to lower him [or

her] in the estimation of the community or to deter third persons from associating or dealing with him [or her].'"). At issue are the same statements at issue in plaintiffs' claim of unfair competition and fraudulent representation under Wisconsin common law and *Wis. Stat. § 100.18*. I have determined that none of these statements is false, except for "Cook County fire marshal," and that as to this statement, plaintiffs are unable to show an injury. Therefore, I will grant defendant's motion for summary judgment on plaintiffs' disparagement and defamation claims.

E. Tortious Interference with Contract

[HN27] "To prevail on a tortious interference [with contract] claim under Wisconsin law, a plaintiff must satisfy five elements: (1) an actual or [*44] prospective contract existed between the plaintiff and a third party; (2) the defendant interfered with that contract or prospective contract; (3) the interference was intentional; (4) the interference caused the plaintiff to sustain damages; and (5) the defendant was not justified or privileged to interfere." *Shank v. William R. Hague, Inc., 192 F.3d 675, 681 (7th Cir. 1999)*.

Plaintiffs offer a two-sentence argument in opposition to defendants' argument on this claim. Plaintiffs state: "[Defendant] has refused to identify recipients of [defendant]'s false advertisements. Without the identification, plaintiffs are unable to identify specific prospective contracts that [defendant] interfered with." To the extent that plaintiffs argue that they are unable to support their claim because defendant is not cooperating with discovery,

plaintiffs should have moved to compel discovery, not use "lack of cooperation" as a response to a motion for summary judgment. Because plaintiffs' argument on this claim is undeveloped, it is deemed waived. *Central States, Southeast and Southwest Areas Pension Fund, 181 F.3d at 808* ("Arguments not developed in any meaningful [*45] way are waived."). Accordingly, I will grant defendants' motion for summary judgment on plaintiffs' claim of tortious interference with contract.

ORDER

IT IS ORDERED that

1. The motion for summary judgment filed by defendants Indoor Courts of America and The Cincinnati Insurance Company is GRANTED as to each claim alleged by plaintiffs Thermal Design, Inc. and Sports Interiors;

2. Plaintiffs' motion for summary judgment is DENIED;

3. The clerk of court is directed to enter judgment in favor of both defendants and close this case.

Entered this 9th day of April, 2004.

BY THE COURT:

BARBARA B. CRABB

District Judge

Page 252

1              UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS          **Exhibit 9**

3                 C.A. NO. 04-12457 PBS

4     _____x

5     DePUY-MITEK, INC.,

6         A Massachusetts Corporation,

7              Plaintiff,

8         vs.                              **READ & SIGN COPY**

9     ARTHREX, INC.,

10        A Delaware Corporation,

11            Defendants.

12    _____x

13                  DAY 2 OF 2

14       CONTINUED VIDEOTAPED DEPOSITION

15            OF DR. MATTHEW HERMES

16         Philadelphia, Pennsylvania

17               July 25, 2006

18

19

20    Reported by:

21

22    PAMELA HARRISON, RMR, CRR, CSR

23

24

25

Deposition of:
Dr. Matthew Hermes, Vol. II

July 25, 2006

Page 321

1    A.   Excuse me.                          12:45:16p
2    Q.   I sensed that there might be a bit of    12:45:16p
3    confusion in the record.                 12:45:19p
4    A.   Have I heard the term conventional   12:45:20p
5    polyethylene? I don't know. Perhaps. I don't  12:45:25p
6    know.                                    12:45:30p
7    Q.   Do you have an understanding of the   12:45:31p
8    term?                                    12:45:32p
9         MR. BONELLA: Objection. Asked        12:45:33p
10   and answered.                            12:45:34p
11        THE WITNESS: I expect that in        12:45:35p
12   1956, when I took my first polymer course, Bill  12:45:37p
13   Bailey said there's conventional polyethylene   12:45:42p
14   and now there's high density polyethylene as   12:45:44p
15   invented by Ziegler and Natta and they had   12:45:47p
16   showed a little bit of -- it showed a great deal  12:45:50p
17   of difference in crystallinity and chain      12:45:51p
18   branching. So he might well have said it was   12:45:54p
19   conventional --                          12:45:58p
20   BY MR. SABER:                            12:45:58p
21   Q.   Do you have -- I'm sorry.           12:45:58p
22   A.   -- but I'm sure that definition has --   12:45:58p
23   that definition can be whatever the authors would  12:46:00p
24   like to have it.                          12:46:02p
25   Q.   Do you have an understanding of what   12:46:02p

Page 322

1    the authors of this document mean when they use   12:46:03p
2    the term conventional polyethylene or        12:46:07p
3    conventional PE?                          12:46:09p
4    A.   Well, they -- it appears that they   12:46:11p
5    have chosen to identify a molecular weight range   12:46:14p
6    of 50,000 to several hundred thousand and call it   12:46:17p
7    conventional. It's their choice.          12:46:21p
8    Q.   Now, you said this document was      12:46:24p
9    undated. I just want to correct the record or at   12:46:25p
10   least ask you a question. Could you turn to the   12:46:28p
11   page before?                              12:46:30p
12   A.   Certainly.                          12:46:31p
13   Q.   Do you see in the copyright it says   12:46:32p
14   1988?                                    12:46:35p
15   A.   Oh, thank you. Okay.                12:46:35p
16        MR. BONELLA: That's the             12:46:38p
17   copyright date. That's -- I mean, that's --   12:46:38p
18   you're -- now you're testifying as to what the   12:46:39p
19   date of this document is. That's totally     12:46:41p
20   improper. That's a copyright date. A copyright   12:46:42p
21   date is totally different than any other date   12:46:46p
22   and for you to represent that that's some type   12:46:48p
23   of date other than what a copyright date means   12:46:50p
24   is totally misleading. That's the date it was   12:46:52p
25   copyrighted. It means nothing more, nothing   12:46:55p

Page 323

1    less, absent other proof in the record.    12:46:58p
2         MR. SABER: I just wanted to --      12:47:02p
3    I don't want to argue with you. I want to move   12:47:02p
4    on.                                      12:47:04p
5    BY MR. SABER:                            12:47:04p
6    Q.   Do you have an -- I want to turn back   12:47:04p
7    to the page we were discussing --         12:47:08p
8    A.   Mm-hmm.                            12:47:10p
9    Q.   -- the third page of the exhibit.    12:47:10p
10        Do you have an understanding that     12:47:12p
11   the specific structure of ultra high molecular   12:47:23p
12   weight PE contributes to the high strength of the   12:47:28p
13   product?                                 12:47:32p
14        MR. BONELLA: What product?          12:47:33p
15        Object to form.                     12:47:39p
16        THE WITNESS: In the chemical         12:47:41p
17   world the word structure has -- carries many   12:47:52p
18   meanings. What specific structure are you   12:47:55p
19   referring to?                             12:47:57p
20   BY MR. SABER:                            12:47:57p
21   Q.   This refers to a specific structure   12:47:57p
22   for the ultra high molecular weight PE, doesn't   12:47:59p
23   it?                                      12:48:01p
24   A.   Where are you taking me on this      12:48:03p
25   document?                                12:48:09p

Page 324

1    Q.   In the portion Chemistry.           12:48:09p
2    A.   Okay, Chemistry.                    12:48:11p
3    Q.   Yeah.                              12:48:12p
4    A.   (Witness reviewing document.) If     12:48:17p
5    you're asking me to base a scientific opinion on   12:48:29p
6    the words a simplistic view of the structure on a   12:48:32p
7    molecular scale could be described as a bundle of   12:48:37p
8    rods, with occasional entanglement points, and   12:48:39p
9    then describing conventional PE containing chain   12:48:43p
10   folds of short length that don't make a       12:48:46p
11   contribution to strength, I would say that that   12:48:48p
12   description is quite inadequate in describing the   12:48:52p
13   structure of -- the relationship of structure and   12:48:55p
14   properties for the material. This is a sales   12:48:58p
15   brochure and it's being presented as a sales   12:49:02p
16   brochure.                                12:49:04p
17   Q.   Would you agree with me that this    12:49:04p
18   document is -- is asserting that the specific   12:49:06p
19   chemical structure of ultra high molecular weight   12:49:12p
20   PE is different from the specific chemical      12:49:15p
21   structure of conventional PE?             12:49:19p
22        MR. BONELLA: Object to the form.    12:49:21p
23        What do you mean by chemical         12:49:22p
24   structure?                               12:49:24p
25        THE WITNESS: I would very much       12:49:26p

19 (Pages 321 to 324)

Deposition of:
Dr. Matthew Hermes, Vol. II

July 25, 2006

Page 325

1  disagree with that comment. This is not                12:49:29p
2  asserting different chemical structure.                 12:49:31p
3  BY MR. SABER:                                            12:49:35p
4      Q.   When -- how do you read the sentence            12:49:35p
5  where it says, Conventional PE, on the other            12:49:37p
6  hand, contains a number of chain folds of short         12:49:39p
7  length which do not make a contribution to              12:49:41p
8  strength?                                               12:49:43p
9          MR. BONELLA:  Object.                            12:49:46p
10         THE WITNESS:  That is -- that --                 12:49:47p
11 I interpret that as a crystalline -- as the             12:49:48p
12 description of a crystalline region which is a           12:49:52p
13 physical phenomena and is not generally                 12:49:55p
14 considered an item of chemical structure.               12:49:58p
15 BY MR. SABER:                                            12:50:01p
16     Q.   Would you agree that this is saying             12:50:01p
17 the conventional PE contains a number of chain          12:50:03p
18 folds of short length?                                  12:50:06p
19     A.   I agree that it's saying that, yes.            12:50:08p
20     Q.   And that ultra high molecular weight           12:50:11p
21 PE does not have chain folds of short length?           12:50:15p
22     A.   It doesn't say that.                            12:50:27p
23     Q.   Is it your understanding that that's           12:50:29p
24 what's -- what's meant by this document?                12:50:32p
25         MR. BONELLA:  Object to form.                    12:50:36p

Page 326

1          THE WITNESS:  I guess I would                    12:50:39p
2  need to know a lot more about what the author's         12:50:43p
3  intent was in going beyond -- this is a sentence        12:50:46p
4  in fact that begins, as I pointed, a simplistic         12:50:50p
5  view.  And you're asking questions which are far        12:50:54p
6  from simplistic.  And I have to comment that it         12:50:59p
7  says what it says.  It says that molecular scale        12:51:03p
8  could be considered as a series of rods.  But it        12:51:09p
9  nowhere in there does it -- does that eliminate         12:51:11p
10 the possibility that it would have short-length         12:51:14p
11 chain folds, and likely it does.                        12:51:18p
12 BY MR. SABER:                                            12:51:20p
13     Q.   Did you read the sentence before, it           12:51:20p
14 says, ECPE fibers, on the other hand, are               12:51:22p
15 manufactured by a process where most of the             12:51:28p
16 molecules are fully extended and oriented in the        12:51:30p
17 fiber direction, resulting in a dramatic increase       12:51:33p
18 in physical properties?                                 12:51:35p
19     A.   I did read that, yes.                           12:51:38p
20     Q.   Does that indicate to you that's               12:51:39p
21 a different manner of arranging the molecules for       12:51:41p
22 ECPE compared to conventional PE?                       12:51:47p
23         MR. BONELLA:  Object to form.                    12:51:49p
24         THE WITNESS:  Ice and water or                   12:51:51p
25 ice and steam are both water --                          12:51:54p

Page 327

1  BY MR. SABER:                                            12:51:57p
2      Q.   Sir, I'm just asking --                         12:51:57p
3      A.   -- and they are a different                     12:51:57p
4  arrangement of molecules.                               12:52:00p
5          Ice and steam are different                      12:52:00p
6  molecules, but they -- but are arranged                  12:52:00p
7  differently but they're the same material.              12:52:02p
8      Q.   Right.  And ice and steam start with           12:52:05p
9  the same materials but they're arranged                  12:52:07p
10 differently; is that what you're trying to say?         12:52:11p
11     A.   Yes.                                            12:52:13p
12     Q.   And is that the analogy you're drawing         12:52:13p
13 to what's being said here about conventional PE         12:52:15p
14 to ultra high molecular weight PE?                       12:52:17p
15         MR. BONELLA:  Object to form.                    12:52:21p
16         THE WITNESS:  The physical                       12:52:22p
17 properties of ultra high molecular weight PE are        12:52:22p
18 the results of a larger higher crystallinity and        12:52:32p
19 being more fully extended, that's correct.  This        12:52:41p
20 is a continuum of properties that one would see         12:52:43p
21 across the molecular weight spectrum from 50,000        12:52:46p
22 up through the top end 5 million.                        12:52:51p
23 BY MR. SABER:                                            12:52:55p
24     Q.   Is this document, in your opinion,             12:52:55p
25 explaining that the strength of conventional PE         12:52:58p

Page 328

1  is different than the strength of ultra high           12:53:02p
2  molecular weight PE?                                    12:53:06p
3          MR. BONELLA:  Object to the form.               12:53:10p
4          THE WITNESS:  It's purporting to                12:53:11p
5  describe a -- something called ECPE as one of          12:53:38p
6  the strongest fibers made pound for pound, which       12:53:42p
7  is density considered, of course.                       12:53:45p
8  BY MR. SABER:                                            12:53:49p
9      Q.   Do you agree that ECPE is one of the          12:53:49p
10 strongest materials made pound for pound?              12:53:52p
11     A.   I can't comment on that right                   12:53:58p
12 offhand.  I expect it probably is, but I'm              12:54:01p
13 certainly not sure.  Having not read this, I           12:54:06p
14 can't -- I can't tell you what's been developed        12:54:09p
15 as of today that might be stronger pound for           12:54:13p
16 pound.                                                  12:54:16p
17     Q.   Is it your understanding that this            12:54:26p
18 document is explaining that what they call             12:54:29p
19 conventional PE is not one of the strongest            12:54:32p
20 fibers pound for pound ever made?                       12:54:37p
21         MR. BONELLA:  And you're asking                 12:54:51p
22 about the document.  You had him read two               12:54:51p
23 paragraphs while asking a couple of questions          12:54:53p
24 about the document.  Do you want him to read the       12:54:56p
25 whole document?                                         12:54:58p

20 (Pages 325 to 328)

Page 329

1    MR. SABER: No.                    12:54:58p
2    MR. BONELLA: Okay.                12:54:58p
3    Well, I'll just make the record     12:55:00p
4  clear that up until now you've only asked him to   12:55:02p
5  read section one, History, and section two,    12:55:04p
6  Chemistry.                        12:55:07p
7    MR. SABER: That's correct.        12:55:07p
8    THE WITNESS: The document         12:55:08p
9  doesn't give any properties -- the document    12:55:09p
10 doesn't give any properties to evaluate it. It   12:55:11p
11 represents itself as claiming to show ECPE     12:55:16p
12 fibers as having no worthy strength as compared  12:55:23p
13 to -- and it implies as compared to lower      12:55:28p
14 molecular weight fibers, and that's a trend that  12:55:32p
15 fiber scientists would expect across all fiber   12:55:36p
16 compositions.                     12:55:39p
17 BY MR. SABER:                      12:55:41p
18   Q.  It says that conventional PE does not   12:55:41p
19 make a contribution, does not make a contribution  12:55:46p
20 to strength, correct?              12:55:50p
21   MR. BONELLA: Object to form.       12:55:51p
22   THE WITNESS: No, it doesn't say    12:55:55p
23 that.                             12:55:56p
24 BY MR. SABER:                      12:55:56p
25   Q.  It says, Conventional PE, on the other  12:55:56p

Page 330

1  hand, contains a number of chain folds of short   12:55:58p
2  length which do not make a contribution to     12:56:02p
3  strength, correct?                12:56:04p
4    A.  It says that, but your use of the    12:56:05p
5  sentence as you did just shows how easy it is to  12:56:09p
6  misinterpret documents of this kind.      12:56:13p
7    It doesn't say that conventional    12:56:15p
8  PE doesn't contribute to strength; it says that   12:56:16p
9  it tries to break down in a simplistic way a   12:56:19p
10 little bit the structure of conventional PE, and  12:56:23p
11 claims that short-fold lengths or non -- perhaps  12:56:26p
12 non-crystalline regions don't contribute to    12:56:30p
13 strength.                         12:56:34p
14   I would say they do contribute     12:56:34p
15 to strength. All the material that's there    12:56:35p
16 contributes to strength. So I very much       12:56:37p
17 disagree with this -- both with this sentence    12:56:40p
18 as it reads and very much with the sentence as   12:56:41p
19 you presented it.                 12:56:43p
20   Q.  Is it your opinion that conventional   12:56:45p
21 PE and Spectra have the same strength?      12:56:47p
22   MR. BONELLA: Object to form.       12:56:53p
23   What's conventional PE?           12:56:54p
24   THE WITNESS: The document         12:57:01p
25 claims that ECPE or ultra high molecular weight  12:57:01p

Page 331

1  polyethylene -- it's not clear what they're    12:57:09p
2  trying to do -- has a -- that PE fibers from --   12:57:11p
3  by conventional technology don't possess      12:57:14p
4  outstanding physical properties and it may     12:57:17p
5  include strength in that.          12:57:19p
6    So I -- I've only read these       12:57:20p
7  two paragraphs and that would be my -- that    12:57:23p
8  would be my understanding.  If I knew what    12:57:29p
9  conventional PE was.               12:57:31p
10 BY MR. SABER:                      12:57:35p
11   Q.  You're familiar with the term high   12:57:35p
12 density polyethylene?              12:57:39p
13   A.  I am, indeed.                 12:57:39p
14   Q.  You're familiar with the term low    12:57:41p
15 density polyethylene?              12:57:42p
16   A.  I am.                        12:57:43p
17   Q.  Is ultra high molecular strength    12:57:43p
18 polyethylene stronger than high density     12:57:47p
19 polyethylene?                     12:57:48p
20   A.  Would you repeat the question?     12:57:50p
21 Because you used a word out of place.      12:57:51p
22   Q.  I apologize if I did.          12:57:54p
23   MR. SABER: Could you read it       12:57:55p
24 back, please.                     12:57:56p
25   (The court reporter read the       12:58:03p

Page 332

1  record as follows:                12:58:03p
2    "QUESTION: Is ultra high          12:58:03p
3  molecular weight (sic) polyethylene stronger    12:58:03p
4  than high density polyethylene?")        12:58:03p
5    THE WITNESS: The recording is      12:58:04p
6  correct. I didn't hear you say that. Okay.    12:58:10p
7    MR. BONELLA: Object to form.       12:58:15p
8    THE WITNESS: In some test         12:58:16p
9  methods.                          12:58:18p
10 BY MR. SABER:                      12:58:19p
11   Q.  Is ultra high molecular weight     12:58:19p
12 polyethylene stronger than low density     12:58:22p
13 polyethylene?                     12:58:26p
14   MR. BONELLA: Object to form.       12:58:27p
15   THE WITNESS: In some test         12:58:27p
16 methods it is, in some test methods it isn't.   12:58:28p
17   MR. SABER: Could you mark this     12:58:40p
18 with the next exhibit number.        12:58:41p
19   (Whereupon a document was         12:59:05p
20 marked, for identification purposes, as     12:59:05p
21 Defendant's Exhibit-193.)           12:59:06p
22 BY MR. SABER:                      12:59:15p
23   Q.  Dr. Hermes, let me hand to you what's  12:59:15p
24 been marked as Defendant's Exhibit-193 which is  12:59:18p
25 one of the documents that your counsel gave us at  12:59:21p

21 (Pages 329 to 332)



**Exhibit 10**

LEXSEE 2005 US DIST LEXIS 16479

**STOWE WOODWARD, L.L.C., Plaintiff, v. SENSOR PRODUCTS, INC., Defendant.**

**Civil Action Nos. 5:04CV00001, 5:04CV00079**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIA, HARRISONBURG DIVISION**

*2005 U.S. Dist. LEXIS 16479*

**August 11, 2005, Decided**

**SUBSEQUENT HISTORY:** Motion granted by, Dismissed by, in part *Stowe Woodward, L.L.C. v. Sensor Prods., 230 F.R.D. 463, 2005 U.S. Dist. LEXIS 19313 (W.D. Va., Sept. 7, 2005)*

**DISPOSITION:** [*1] Defendant's motion for partial summary judgment of noninfringement of '285 Patent denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent holder filed suit against defendant alleged infringer for patent infringement with regard to two of the holder's patents (the '285 patent and the '314 patent). The infringer filed a motion for partial summary judgment of noninfringement of the '285 patent.

**OVERVIEW:** The patents at issue described a nip width sensor. The sensors described in the '285 patent measured nip width directly when multiple sensors were mounted on a strip, which was defined as a strip, plate or layer of coherent material, such as a film of flexible plastic material, having a relatively small thickness as compared to its width and length dimensions. The infringer claimed that the holder could not meet its burden of demonstrating literal infringement because the first sensor in the '285 patent was limited to one composed exclusively of carbon, and the infringer's nip sensor had a strip composed of other material, in addition to carbon, or graphite. The court found that, as a matter of law, it could not hold that the infringer's proposed construction of the '285 patent was supported by the intrinsic evidence. Instead, the intrinsic evidence, as well as the extrinsic evidence of the inventor's use of the term "carbon," supported a construction of the '285 patent wherein the conductive material in the first sensor was carbon.

**OUTCOME:** The infringer's motion was denied.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Standards > Legal Entitlement*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN1] Under *Fed. R. Civ. P. 56*, summary judgment is properly granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be such that a reasonable jury could return a verdict for the non-moving party. In deciding a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party.

*Patent Law > Claims & Specifications > Enablement Requirement > General Overview*
*Patent Law > Infringement Actions > Burdens of Proof*
*Patent Law > Infringement Actions > Claim Interpretation > Fact & Law Issues*
[HN2] When a court analyzes a case of patent infringement, it must follow two steps. First, the court must determine the meaning and scope of the patent claims asserted to be infringed. This step is commonly known as claim construction. Second, the court must compare the properly construed claims to the device accused of infringing. While the second step entails questions of fact, claim construction is a matter of law for the court. In any case, the patentee has the burden of proving infringement by a preponderance of the evidence.

*Patent Law > Claims & Specifications > Enablement Requirement > General Overview*
*Patent Law > Infringement Actions > Claim Interpretation > Aids*

[HN3] When construing a patent claim, a court must first consider the intrinsic evidence: the claims themselves, the specification, and the prosecution history. Claims should generally be read in accordance with their ordinary meaning, that is, the meaning that would be ordinary to those skilled in the art at the time the patent was applied for. The claims must also be read in view of the specification, of which they are a part. The specification may, in fact, be dispositive, in that it is the single best guide to the meaning of a disputed term. Nevertheless, claims are not to be interpreted by adding limitations appearing only in the specification.

*Patent Law > Infringement Actions > Claim Interpretation > Aids*

[HN4] When construing a patent claim, a court may consider extrinsic evidence, in its discretion, including expert and inventor testimony, dictionaries, and learned treatises, in order to explain scientific principles, the meaning of technical terms, and terms of art that appear in the patent and prosecution history as well as the state of the prior art at the time of the invention. Nevertheless, the intrinsic record is the primary source for determining claim meaning, and extrinsic evidence cannot alter any claim meaning discernible from intrinsic evidence.

*Patent Law > Infringement Actions > Claim Interpretation > Construction Preferences*

[HN5] The United States Court of Appeals for the Federal Circuit has stated that a claim construction that does not encompass a disclosed embodiment is rarely, if ever, correct.

*Patent Law > Infringement Actions > Doctrine of Equivalents > Limits on Equivalence*
*Patent Law > Infringement Actions > Prosecution History Estoppel > Abandonment & Amendment*
*Patent Law > U.S. Patent & Trademark Office Proceedings > General Overview*

[HN6] If a patent claim is not literally infringed, there can still be liability under the doctrine of equivalents. Prosecution history estoppel may serve as a bar to use of the doctrine of equivalents, however, with regard to subject matter surrendered by the patentee during prosecution. In other words, prosecution history estoppel limits infringement by otherwise equivalent structures, by bar-

ring recapture by the patentee of scope that was surrendered in order to obtain allowance of the claims. Thus, by actions taken during patent prosecution the patentee can be estopped from reaching subject matter that otherwise meets the criteria of equivalency.

**COUNSEL:** For Stowe Woodward, LLC, Plaintiff: Anna R. Carr, Richard P. Vitek, MYERS BIGEL SIBLEY & SAJOVEC PA, Raleigh, NC; Daniel Leroy Fitch, WHARTON, ALDHIZER & WEAVER, PLC, HARRISONBURG, VA.

For Sensor Products, Inc, Defendant: Brian Keith Brake, KEELER OBENSHAIN PC, CHARLOTTESVILLE, VA; Raymond B. Churchill, Jr., Roy H. Wepner, LERNER DAVID LITTENBERG, KRUMHOLTZ & MENTLIK LLP, WESTFIELD, NJ.

For Sensor Products, Inc, Counter Claimant: Brian Keith Brake, KEELER OBENSHAIN PC, CHARLOTTESVILLE, VA; Raymond B. Churchill, Jr., Roy H. Wepner, LERNER DAVID LITTENBERG, KRUMHOLTZ & MENTLIK LLP, WESTFIELD, NJ.

For Stowe Woodward, LLC, Counter Defendant: Anna R. Carr, Richard P. Vitek, MYERS BIGEL SIBLEY & SAJOVEC PA, Raleigh, NC; Daniel Leroy Fitch, WHARTON, ALDHIZER & WEAVER, PLC, HARRISONBURG, VA.

**JUDGES:** Glen E. Conrad, United States District Judge.

**OPINION BY:** Glen E. Conrad

**OPINION:**

### MEMORANDUM OPINION

By: Hon. Glen E. Conrad

United States District Judge

The plaintiff Stowe Woodward, L.L.C. ("Stowe") brings two separate actions charging defendant Sensor Products, Inc. ("SPI") with patent infringement [*2] with regard to two of Stowe's patents which describe a nip width sensor, United States Patent Nos. 6,769,314 and 6,568,285. These actions have been consolidated by order of this court. This case is before the court on the defendant's motion for partial summary judgment of noninfringement of United States Patent No. 6,568,285 ("the '285 Patent"). SPI contends that all of the claims of the '285 Patent are limited to a sensor with a resistive measuring strip made entirely of carbon. Considering the patent with that limitation, SPI concludes that its own E-Nip(R) ("E-Nip") system, the nip width sensor system accused by Stowe, does not infringe any claim of the

'285 Patent. For the reasons set forth below, the defen-dants's motion will be denied.

### FACTUAL BACKGROUND

A nip width sensor is used to electronically measure the contact width between the surfaces of two rollers, such as the rollers used in a printing machine. The sen-sors described in the '285 Patent measure nip width di-rectly when multiple sensors are mounted on a strip, which is defined as a strip, plate or layer of coherent ma-terial, such as a film of flexible plastic material, having a relatively small thickness as [*3] compared to its width and length dimensions. See Exhibit A to SPI's motion for partial summary judgment (hereinafter Ex. A) 11:66-12:2. The strip is then placed between the rollers when the nip is stationary to measure the nip width. The length of the sensors is greater than the nip width. Thus, when the electrically conductive strips of the sensor come into contact with the rollers, the sensor strips flex and come into contact with one another over the nip width. The change in resistance due to the contact of the sensor strips is measured and converted into a length, i.e. the nip width.

The '285 Patent describes several different construc-tions, or embodiments, that can be used as the sensors that can be mounted on a strip and used to create a multi-sensor system. In the version illustrated in Figures 13-16 of the '285 Patent, Stowe used a membrane sensor com-posed of two separate strips. The specification indicates the following:

> With reference to FIGS. **13-16,** a mem-brane sensor **50** according to a third em-bodiment of the present invention is shown therein. According to the third em-bodiment, the sensors **4** of the sensing system **1** are membrane sensors [*4] **50.** The sensor **50** has an effective sensing length SL and an effective sensing width SW, preferably having dimensions as de-scribed above with respect to the sensor **40.** Each sensor **50** includes a plate or strip **52** and an opposed plate or strip **54.** Preferably the strips **52** and **54** are both flexible and resilient. The strips **52, 54** are separated by a gap **56** and are coupled to-gether by electrically insulative edge sup-ports (not shown) in parallel relation.
>
> . . .
>
> The strip **52** is preferably formed of a homogeneous, constant property material

having a measurable resistance. Each of the strips **52, 54** preferably has a uniform thickness and a uniform width SW. The per unit length electrical resistance of the material should be uniform so that the to-tal resistance of the strip **52** varies linearly with its length. Preferably, the strip **52** is formed of carbon. The strip **54** is prefera-bly formed of a homogeneous material having a resistance substantially less than the material of the strip **52.** More prefera-bly, the strip **54** is formed of silver, gold or some other highly conductive material. [*5] Alternatively, both strips may be formed of a resistive material such as car-bon.

Ex. A 23:13-24, 34-46. The specification goes on to de-scribe the two strips as follows:

> Because the silver strip **54** has substan-tially less resistance per unit length than the carbon strip **52,** between the end points of the nip width NW most of the current between leads L1 and L2 flows through the portion of the silver plate in the nip width NW, as indicated by the double arrow. A relatively small amount of current may also flow through the por-tion of the carbon strip **52** in the nip width NW as indicated by the single arrow. Thus, the carbon strip **52** is effectively short-circuited or bypassed in the nip width and the resistance value Rf is re-duced proportionally to the size of the nip width.

Ex. A 23:58-24:1. The embodiment described above is the one for which Stowe ultimately elected to seek patent protection.

In the original patent application, Stowe submitted its Claim 1 as follows:

> A device for measuring a nip width be-tween two rolls of a press nip, said device comprising:
> (a) a sensor assembly, said sensor assem-bly including:
> (1) a first strip [*6] formed of a first elec-trically conductive material having a re-sistance, said first strip having a first end

and a second end and a first measuring zone between said first and second ends;
(2) a second strip disposed adjacent said first strip and formed of a second electrically conductive material, said second strip having a second measuring zone disposed adjacent and substantially coextensive with said first measuring zone; . . .

Exhibit B to SPI's motion for partial summary judgment (hereinafter Ex. B) at 117. On January 16, 2001, the claim examiner rejected Claim 1, and Stowe's other claims, based on the prior art. Ex. B at 189-92. The patent examiner first cited the Goldman patent which described a device for measuring nip width with first and second strips of electrically conductive materials. Ex. B at 190-91. The patent examiner then noted that the Goddin patent described a device including strips connected to electrical circuitry. Ex. B at 191. The patent examiner went on to reject Stowe's claims because "it would be obvious to one of ordinary skill in the art at the time the invention was made to modify Goldman et al according to the teachings of Goddin for the purpose [*7] of, providing a pressure sensing element to obtain the pressure developed between two opposing surfaces one of which is of roll form and another of which is of resiliently deformable material." Ex. B at 191-92.

After Stowe submitted argument in defense of its claims, the patent examiner again rejected the claims by adding prior art in the form of the Webb patent, which had described an electrical circuit connected to a series of conductive strips. Ex. B at 206-08. Stowe's attorneys then arranged a meeting with the patent examiner at which they discussed two issues: (1) the merits of Claim 1 with regard to the applicant's proposed amendment entailing the specific materials of the electrically conductive or resistive materials; and (2) the prior art introduced by the attorney. Ex. B at 210. Stowe's attorneys followed this meeting by submitting a revised Claim 1 which added the following language to the end of Claim 1(a)(1): "the first material being carbon." Ex. B at 220. It also added the following language to the end of Claim 1(a)(2): "the second material being selected from the group consisting of silver and gold." Id. In the letter accompanying the amended claims, the attorney [*8] included the following statement: ". . . Applicants submit that neither of these references can fairly suggest strips of the materials recited in amended Claim 1, i.e. that the first electrically conductive material is carbon and the second electrically conductive material is selected from the group consisting of silver and gold." Ex. B. at 217.

Regardless of the amendment, however, the claim examiner rejected the claims once again stating:

it is the Examiner's position that in Goldman et al., the length of each layer 302, 309 for strip 500 and layers 402, 409 for strip 600, constitutes the measuring area of each strip measured by element 202 in Fig. 6. Also, since layers 302, 402 may be silver deposited from a silver-based ink and layers 309, 409 may be a carbon based material, the measuring area may be silver, carbon or any suitable conductive pattern of material thus the reference still stands.

Ex. B at 235. Stowe then submitted yet another amendment to its claims stating that the invention did represent a substantial improvement over the prior art because the measuring zones of both strips exceed the nip width, whereas in Goldman, the sensing elements are considerably [*9] less than the nip width. Thus, Claim 1(a)(1) was amended to read as follows:

a first strip formed of a first electrically conductive material having a resistance, said first strip having a first end and a second end and a first measuring zone between said first and second ends, the first measuring zone having a first length that exceeds the nip width, the first material being carbon.

Ex. B at 242. Claim 1(a)(2) was amended to read as follows:

a second strip disposed adjacent said first strip and formed of a second electrically conductive material, said second strip having a first end and a second end and a second measuring zone disposed adjacent and substantially coextensive with said first measuring zone, the second measuring zone having a second length that exceeds the nip width, the second material being selected from the group consisting of silver and gold.

Ex. B at 242.

The amended claims were rejected once more, however, based on the doctrine of double patentability be-

cause of a previous patent, the '230 Patent, also credited to Robert Moore, the inventor of the sensor described in the '285 Patent. The attorneys for Stowe submitted a response [*10] to this rejection which stated:

> Applicants respectfully disagree with this conclusion. All of the pending claims recite, inter alia, "a first strip formed of a first electrically conductive material . . ., the first material being carbon" and "a second strip disposed adjacent said first strip and formed of a second electrically conductive material . . ., the second material being selected from the group consisting of silver and gold." These recitations are absent from the claims of Moore, which do not specify any material for the systems and methods recited therein. As such, the current claims do not have "similar limitations" as stated in the Action. Moreover, Moore does not at any point disclose the use of carbon, silver or gold as materials for the sensor . . .

Ex. B at 258-59. After the patent office received Stowe's response, the claims asserted in the '285 patent, as amended, were allowed. Ex. B at 261. Claim 1 includes the language stated above with regard to the materials used in the first and second sensor. Claim 6 of the '285 patent includes identical language with regard to the sensor materials. The remaining claims of the '285 patent (Claims 2-5 and [*11] 7-11) depend from either Claim 1 or Claim 6.

SPI's E-Nip system is the allegedly infringing system. That system includes a sensor which has two electrical layers. One layer may be considered a "shunt" electrode because it has a relatively low resistance to the conduction of electrical current. Another layer may be considered a "resistive" electrode because it has a relatively higher resistance to the conduction of electrical current. The configuration of the resistive electrode in conjunction with the shunt electrode provides a device which may be utilized to determine a linear distance along the resistive electrode. The linear distance depends on the positions of contact between the shunt electrode and the resistive electrode.

In the E-Nip system, the resistive electrode is made by a printing process which prints resistive ink onto a backing sheet. The ink is provided by one of two suppliers, Acheson Colloids Company or Ercon Incorporated. The Acheson mixture includes approximately 70% of titanium dioxide ink and 30% of graphite ink. Graphite is a polymorph of carbon. The Ercon mixture includes titanium dioxide, aluminum trihydroxide and carbon inks, which results in a resistive [*12] electrode having a resistive material that has no more than 15% carbon. The patent which describes certain elements of the E-Nip system states that the titanium dioxide ink is a resistive ink but is also the non-conductive ink in the resistive electrode. See United States Patent 6,370,967 14:21-24.

## DISCUSSION

### I. The Legal Standard for Summary Judgment

[HN1] Under *Rule 56 of the Federal Rules of Civil Procedure*, summary judgment is properly granted if "there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. In deciding a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party. *Terry's Floor Fashions, Inc. v. Burlington Industries, Inc., 763 F.2d 604, 610 (4th Cir. 1985)*.

### II. [*13] The Legal Standards for Claim Interpretation

[HN2] When a court analyzes a case of patent infringement, it must follow two steps. First, the court must determine the meaning and scope of the patent claims asserted to be infringed. *Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995)* (en banc), aff'd *517 U.S. 370, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996)*. This step is commonly known as claim construction. Id. Second, the court must compare "the properly construed claims to the device accused of infringing." Id. While the second step entails questions of fact, claim construction is a matter of law for the court. *Id. at 970-71*. In any case, the patentee has the burden of proving infringement by a preponderance of the evidence. *S. Bravo Systems, Inc. v. Containment Technologies Corp., 96 F.3d 1372, 1376 (Fed. Cir. 1996)*.

[HN3] When construing a patent claim, a court must first consider the intrinsic evidence: the claims themselves, the specification, and the prosecution history. *Markman, 52 F.3d at 979*. Claims should generally be read in accordance with their ordinary meaning, that is, the meaning that would be ordinary [*14] to those skilled in the art at the time the patent was applied for. See *Electro Med. Sys. S.A. v. Cooper Life Scis., Inc., 34 F.3d 1048, 1054 (Fed. Cir. 1994)*. The claims must also be read "in view of the specification, of which they are a part." Id. The specification may, in fact, be dispositive, in

that "it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)*. Nevertheless, "claims are not to be interpreted by adding limitations appearing only in the specification." *Electro Med. Sys., 34 F.3d at 1054*.

[HN4] A court may also consider extrinsic evidence, in its discretion, including expert and inventor testimony, dictionaries, and learned treatises, in order to "explain scientific principles, the meaning of technical terms, and terms of art that appear in the patent and prosecution history" as well as "the state of the prior art at the time of the invention." *Markman, 52 F.3d at 980*. Nevertheless, "the intrinsic record is the primary source for determining claim meaning," and "extrinsic evidence cannot alter any claim meaning discernible [*15] from intrinsic evidence." *C. R. Bard, Inc. v. U. S. Surgical Corp., 388 F.3d 858, 861-62 (Fed. Cir. 2004)*.

III. Whether the Claim In the '285 Patent Is Limited to a "First Strip" Formed Only of Carbon

SPI's motion for partial summary judgment essentially states that Stowe cannot meet its burden of demonstrating literal infringement because the first sensor in the '285 Patent is limited to one composed exclusively of carbon, and SPI's E-Nip sensor has a strip composed of other material, in addition to carbon, or graphite. SPI contends that the language used in the claim and the specification should be construed to require the first strip to be formed of carbon. SPI also contends that amendments made to the claims during the prosecution of the '285 Patent limit the strip to a carbon-only strip. Stowe responds that neither the claim, the specification, nor the prosecution history of the '285 Patent dictate a construction requiring the material of the first strip to be 100% carbon.

A. The Claims and Specification

SPI contends that the claims in the '285 Patent contain a common limitation. Both Claim 1 and Claim 6, the only independent claims in the [*16] patent, include a description of the material of the first strip as follows: "a first strip formed of a first electrically conductive material having a resistance, . . ., the first material being carbon." SPI argues that the only proper interpretation of this language is that the strip must be formed of carbon and nothing else. Stowe concedes that the claims should be construed to require the conductive material in the first strip to be carbon. However, Stowe contends that nothing in the claims or specification requires that the entire first strip be formed only of carbon.

In addition to the language in the claims themselves noted above, SPI points to language in the specification in support of its suggested construction. The specification describes the first strip as "preferably formed of a homogeneous, constant property material" and states "preferably, the strip is formed of carbon." SPI concludes that this language must mean that the strip is formed of carbon, and no other material.

Stowe responds that SPI is attempting to import the term "formed entirely of" into this claim and its specification. As Stowe points out, it did use the term "formed entirely of" in other portions [*17] of the specification which described embodiments of the invention that were not pursued with the patent office. For example, in describing an embodiment in Fig. 11 and Fig. 12 of the '285 Patent, the specification states: "The ink traces **43** and **45** are formed entirely of highly conductive material such as silver." Ex. A 22:17-18. The specification goes on to state: "According to one embodiment, the ink traces **47** and **49** may be formed entirely of force sensitive resistive material having a low saturation value relative to the anticipated nip load." Ex. A 22:37-40. Thus, the term "formed entirely of" was used in other portions of the specification, while only the term "formed of" was used in the specification for the pursued embodiment. Based on this distinction, it would be understood that there was no intent for the claim to include such a limitation.

With regard to its use of the term homogenous in the specification, Stowe asserts that it used that term to describe the conductive material alone, rather than the material of the entire strip. More importantly, however, Stowe contends that one of ordinary skill in the art would know that carbon inks, and thus carbon [*18] strips, must contain more than just carbon. First, Stowe attempts to introduce several excerpts from the book *Polymer Thick Film*, published in 1996 by Ken Gilleo in an attempt to help "the court understand the technology and how one of ordinary skill uses terms." The court finds, however, that these excerpts are inadmissible hearsay evidence in that Stowe has failed to present a witness to testify that a person skilled in the art would consider the text to be authoritative. See *Fed. R. Evid. 803(18)*.

Stowe next points to the use of the term "carbon" by Constantin Trantzas, an employee of CIR Systems, Inc., the supplier of the accused E-Nip device for SPI. Stowe notes that in certain pre-litigation documents, Trantzas, who invented certain of the components of the E-Nip system, referred to one of the strips used in the E-Nip device as the "carbon" strip and the material used on the strip as the "carbon mixture." SPI responds that Stowe is improperly attempting to refer to the alleged infringing product to define what Stowe meant in its claims. See *SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1118 (Fed. Cir. 1985)* [*19] (en banc). The court disagrees. The reference to "carbon" by Trantzas simply indicates how someone skilled in the art, as Trantzas

presumably is, would describe such a strip made of carbon as well as other materials. Though Trantzas does refer to the material as a "carbon mixture," he also describes it as only "carbon," though the strip in the E-Nip device is composed primarily of other materials in addition to a smaller percentage of carbon. Such a reference supports Stowe's argument that a person of ordinary skill in the art would understand that the first strip described in the '285 Patent would include carbon as the key conductive material, but that it could contain other materials as well.

With regard to the claim and specification, Stowe finally contends that SPI's proposed claim construction would not cover the preferred embodiments in the '285 Patent. [HN5] The Federal Circuit has stated that a "claim construction that does not encompass a disclosed embodiment is . . . rarely, if ever, correct." *Medrad, Inc. v. MRI Devices Corp.,* 401 F.3d 1313, 1320 (Fed. Cir. 2005) (quoting *Johns Hopkins Univ. v. CellPro,* 152 F.3d 1342, 1355 (Fed. Cir. 1998)). [*20] Stowe asserts that carbon itself is not an ink and is not able to adhere to a plastic surface. Thus, because it must have some adhesive to stick to the strips of the invention, carbon in its pure form could not be used. In addition, carbon itself is not flexible and would break if used on the sensor alone, even if it could adhere to the plastic. Therefore, Stowe concludes that a claim construction that required a sensor made only of carbon would not cover the preferred embodiment.

SPI contends that, even if Stowe's assertions are true, the patent would be invalid for failure to disclose the best mode, that is, the use of carbon plus an adhesive. See *35 U.S.C. § 112,* P1 ("The specification . . . shall set forth the best mode contemplated by the inventor of carrying out his invention."). In the '285 Patent, however, the claims appear to be identifying only the crucial conductive material and those skilled in the art would understand that an adhesive is needed to get that material, carbon, to stick to the strip. Thus, the adhesive would not necessarily be key to the invention or part of the best mode of its application, rather the key would be the use of carbon [*21] as the crucial conductive material.

B. Prosecution History

Along with the claims and the specification, a court may also properly consider the prosecution history of a patent in construing a claim. As previously described, Stowe's original patent application included a broader description of the first and second strips and failed to specify the materials of which the sensors would be composed. After the patent examiner rejected Stowe's patent claims based on the prior art, including the Goldman patent, Stowe amended its claims to specify the material for both strips. SPI contends that this amendment

was made solely to distinguish Stowe's claims from the Goldman patent, which disclosed a mixed carbon material sensor that combined carbon with other materials. Though SPI acknowledges that Stowe was compelled to make an additional amendment related to the sensor width to obtain final approval, it points to the earlier amendment as well as Stowe's response in regard to the patent office's later action based on double patentability to support its contention that Stowe had narrowed its claims to include a sensor material for the first strip composed entirely of carbon.

Specifically, [*22] SPI points to the language of the amendment itself: "the first material *being* carbon." Ex. B at 220 (emphasis added). This language remains in the final claims of the '285 Patent. SPI also notes Stowe's attorney's statement during prosecution that "applicants submit that neither of these references can fairly suggest strips of the materials recited in amended Claim 1, i.e. that the first electrically conductive material *is carbon* and the second electrically conductive material is selected from the group consisting of silver and gold." Ex. B. at 217 (emphasis added). Finally, SPI cites Stowe's attorney's defense to the issue of double patentability: "All of the pending claims recite, inter alia, 'a first strip formed of a first electrically conductive material . . ., the first material *being carbon.*'" Ex. B at 258 (emphasis added). SPI contends that, throughout the prosecution history, Stowe took pains to describe the material as carbon and nothing else, both to distinguish its claims from those in the Goldman patent and from its own claims in the previous patent. n1 Thus, SPI concludes that this history supports its proposed construction of the claims in the '285 [*23] Patent to include a first strip with a material of 100% carbon and forecloses any of Stowe's present assertions to the contrary.

n1 The court recognizes that, even if the narrowing amendments were not actually necessary to overcome the prior art, plaintiff would nevertheless remain bound by the narrower scope. See *Springs Window Fashions LP v. Novo Indus., LP,* 323 F.3d 989, 995 (Fed. Cir. 2003).

Stowe first responds that SPI has incorrectly read the prosecution history. Stowe admits that it added the specific materials to its claims to distinguish them from those of the Goldman patent. Stowe contends, however, that the distinction is not between pure carbon and a carbon-based material but between two strips composed of the same material, as in Goldman, and two strips composed of different materials with different conductivity, as in the '285 Patent. In Goldman, the specification describes two thin, flexible backing sheets or substrates,

each of which is provided with a suitable conductive electrode [*24] pattern. U.S. Patent 5,821,433 at 2:44-48. That conductive pattern "may be silver deposited from a silver-based ink that may be screen-printed, for example, on the substrates." U.S. Patent 5,821,433 at 2:48-51. Then,

> A layer of pressure sensitive resistive material **309, 409** is deposited over each of the conductive patterns **302, 402.** The pressure sensitive resistive material may be a carbon molybdenum disulfide material in a polyester binder. Other pressure sensitive resistive materials and high temperature thermoplastic binders may be used as well.

U.S. Patent 5,821,433 at 2:56-61. Thus, Stowe contends that it amended its claims to state that the first material was composed of carbon and the second of silver or gold to distinguish from Goldman which described two conductive patterns where both are composed of silver and the layer of pressure sensitive resistive material in between is composed of a carbon-based material.

Stowe also asserts that its comments to the patent office in regard to the issue of double patentability did not state that the material at issue was entirely carbon. Instead, Stowe contends that it was noting that Moore's prior patent had [*25] failed to mention any materials, whereas the current claims did include a description of the materials.

The court finds Stowe's arguments compelling. First, the attorney's statement during prosecution, "the first electrically conductive material is carbon," simply seems to indicate that the conductive material in the first strip is carbon, not necessarily that the entire strip must be made of 100% carbon. Moreover, the patent examiner stated the following in comparing the proposed claims to the Goldman patent:

> Also, since layers 302, 402 may be silver deposited from a silver-based ink and layers 309, 409 may be a carbon based material, the measuring area may be silver, carbon or any suitable conductive pattern of material thus the reference still stands.

With this language, the patent examiner rejected the application. The patent examiner may have failed to see the distinction raised by Stowe between the two strips

formed of the same material in the Goldman patent and the two strips in the proposed invention which were formed of different conductive materials, i.e. carbon and either silver or gold. Regardless, the court believes that this language indicates [*26] that the patent examiner also failed to see a distinction between a material described as carbon based and one described simply as carbon.

In conclusion, the court finds that, as a matter of law, it cannot hold that SPI's proposed construction of the '285 Patent is supported by the intrinsic evidence. Instead, the intrinsic evidence, as well as the extrinsic evidence of Trantzas's use of the term "carbon," supports a construction of the '285 Patent wherein the conductive material in the first sensor is carbon. The language of the claims states the following: "a first strip formed of a first electrically conductive material having a resistance . . ., the first material being carbon." The "first material" refers to the first electrically conductive material, not to the entire first strip which may also include adhesives, fillers, or other materials, so long as they are not the primary conductive material.

Nevertheless, SPI's E-Nip sensor is composed of more than simply carbon and an adhesive. In fact, the sensor is composed of approximately 70% titanium dioxide in addition to either carbon or graphite. Constantin Trantzas has previously testified that titanium dioxide as well as [*27] graphite are the components that determine the resistivity of the resistive electrode in the E-Nip sensor. Thus, because titanium dioxide is not simply an adhesive, but acts in conjunction with the conductive carbon, SPI concludes that the accused infringing device does not infringe on the '285 Patent. Stowe responds, however, that the titanium dioxide is used only to counter the conductive qualities of the carbon on the more resistive electrode. Thus, according to Stowe, the primary conductive material in the E-Nip sensor is still carbon, which would infringe upon the claims of the '285 Patent. Though the construction of the '285 Patent claims is a matter of law for the court, this dispute regarding literal infringement raises factual questions that are not appropriate on a motion for summary judgment. Furthermore, even if SPI is correct that there is no literal infringement based on its use of titanium dioxide in the E-Nip sensor, there could still be a claim for infringement under the doctrine of equivalents, unless it were deemed barred by prosecution estoppel.

The court notes that SPI has claimed that, because Stowe has not presented any specific evidence of literal infringement [*28] or infringement under the doctrine of equivalents, Stowe cannot meet its burden of demonstrating infringement and, in fact, has conceded the issue. The court does not believe that Stowe was required to present evidence of infringement under either theory in

responding to SPI's motion for partial summary judgment. Such evidence would have been properly submitted had Stowe filed its own cross motion for partial summary judgment of infringement of the '285 Patent. Yet, Stowe did not file such a motion. SPI's motion for partial summary judgment of noninfringement was based solely on the theory that the material of the first strip should be construed to be carbon alone. Stowe has properly responded to that issue. To the extent that SPI briefly addressed the issue of whether carbon plus titanium dioxide is equivalent to carbon plus adhesive or filler, Stowe's response raises factual issues to be decided at a later time, as noted above. Therefore, Stowe remains free to pursue its claims of infringement under either doctrine.

IV. Whether Prosecution Estoppel Bars Stowe's Use of the Doctrine of Equivalents

[HN6] If a claim is not literally infringed, there can still be liability under the [*29] doctrine of equivalents. Prosecution history estoppel may serve as a bar to use of the doctrine of equivalents, however, with regard to subject matter surrendered by the patentee during prosecution. See *Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1460 (Fed. Cir. 1998).* In other words,

> Prosecution history estoppel limits infringement by otherwise equivalent structures, by barring recapture by the patentee of scope that was surrendered in order to obtain allowance of the claims. Thus, by actions taken during patent prosecution the patentee can be estopped from reaching subject matter that otherwise meets the criteria of equivalency.

*California Medical Products, Inc., v. Technol Medical Products, Inc., 921 F. Supp. 1219, 1249 (D. Del. 1995).*

SPI contends that Stowe narrowed its claims during the prosecution history as described above, both in the amendment made to include the materials for the first and second strips and through the argument made by Stowe's attorney during the prosecution. SPI also asserts that the amendment was made to overcome the prior art. SPI finally argues that the materials used in the E-Nip sensor's resistive [*30] electrode, i.e. titanium dioxide and either carbon or graphite, were well known at the time of the prosecution and amendment and thus were plainly foreseeable at the time of the amendment. See *Glaxo Wellcome, Inc. v. Impax Labs, Inc., 356 F.3d 1348, 1352 (Fed. Cir. 2004)* (patentee's narrowing amendment bars foreseeable equivalents existing at the

time of amendment). Thus, if the court had construed the material in the claims of the '285 Patent to be 100% carbon based upon Stowe's amendment and statements during prosecution of the patent, SPI's product could not be deemed infringing under the doctrine of equivalents, even if the change in its product is unimportant and insubstantial when compared to that described in the '285 Patent, so long as the material used is not 100% carbon.

For the reasons stated previously, however, the court has construed the material in the first strip described in the '285 Patent to be carbon plus some adhesive, filler or other material, so long as carbon is the primary conductive material. The court agrees that Stowe would be estopped by the prosecution history of the '285 Patent to claim that a product infringed under the doctrine of [*31] equivalents if carbon was not the primary conductive material in one strip or electrode of an allegedly infringing product. However, Stowe would not be barred from making such a claim with regard to a strip wherein carbon is the primary conductive material, even if it is not composed entirely of carbon.

**CONCLUSION**

Therefore, for the foregoing reasons, the defendant's motion for partial summary judgment of noninfringement of the '285 Patent will be denied. The court will proceed to consider the proper construction of the remaining claim terms in the '285 Patent and the related *United States Patent No. 6,769,314* at a Markman hearing currently scheduled for September 21, 2005.

The Clerk is directed to send certified copies of this Memorandum Opinion and the accompanying Order to all counsel of record.

ENTER: This 11th day of August, 2005.

/s/ Glen E. Conrad

United States District Judge

**ORDER**

By: Hon. Glen E. Conrad

United States District Judge

For the reasons set forth in the accompanying Memorandum Opinion, it is hereby

ORDERED

that the defendant's motion for partial summary judgment shall be and hereby is DENIED.

The Clerk is directed to [*32] send certified copies of this Order to all counsel of record.

ENTER: This 11th day of August, 2005.

2005 U.S. Dist. LEXIS 16479, *

/s/ Glen E. Conrad                                         United States District Judge

**Exhibit 11**

LEXSEE 2000 US DIST LEXIS 14200

**CHARLES E. HILL & ASSOCIATES, INC., Plaintiff, v. COMPUSERVE, INC. and COMPUSERVE INTERACTIVE SERVICES, INC., Defendants.**

**CAUSE NO. IP 97-0434-C M/S**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF INDIANA, INDIANAPOLIS DIVISION**

*2000 U.S. Dist. LEXIS 14200; 57 U.S.P.Q.2D (BNA) 1021*

**August 24, 2000, Decided**

**SUBSEQUENT HISTORY:** Vacated by, in part, Affirmed in part and reversed in part by, *Remanded by Charles E. Hill & Assocs. v. Compuserve, Inc., 33 Fed. Appx. 527, 2002 U.S. App. LEXIS 6895 (2002)*

**PRIOR HISTORY:** *Charles E. Hill & Assocs. v. Compuserve, Inc., 65 F. Supp. 2d 924, 1999 U.S. Dist. LEXIS 6170 (S.D. Ind., 1999)*

**DISPOSITION:** [*1] Hill's December 13th motion to strike and January 7, 2000, motion to strike Johnson-Laird's affidavit DENIED. CompuServe's December 22nd conditional motion to strike WITHDRAWNED. Hill's January 7th motion to strike CompuServe's three replies, Court DENIED in part and GRANTED in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants filed for summary judgment on plaintiffs' patent infringement claims.

**OVERVIEW:** Plaintiffs filed an action against defendants for patent infringement involving the patent for an electronic catalog system. Defendants filed for summary judgment, asserting the following grounds: non-infringement based on the absence of the element of storing, which was common to all claims; non-infringement based on the absence of classifying product information into "constant" and "variable" data; invalidity of the patent in suit based on anticipation by a single prior art reference; and non-infringement based on the absence of proof of indirect infringement. The court found that plaintiffs had not produced sufficient evidence to create a genuine issue of material fact about the absence of the element of storing, and defendants' motion based on that ground was granted. Nor did plaintiffs succeed in raising a genuine issue of material fact on the issue of whether defendants' system included the classification of constant and variable data, and defendants' motion for summary judgment on that ground was also granted.

**OUTCOME:** Defendants' motion for summary judgment granted in part and denied in part. Plaintiffs had not produced sufficient evidence to create a genuine issue of material fact about the absence of the element of storing, and defendants' motion based on that ground was granted.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Standards > Legal Entitlement*
*Civil Procedure > Summary Judgment > Standards > Materiality*
*Civil Procedure > Summary Judgment > Supporting Materials > Affidavits*
[HN1] Summary judgment is granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the opposing party. A disputed fact is material only if it might affect the outcome of the suit in light of the substantive law.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Evidence*
[HN2] On a motion for summary judgment, the moving party has the initial burden to show the absence of genuine issues of material fact. This burden does not entail

Case 1:04-cv-12457-PBS    Document 77-10    Filed 09/22/2006    Page 2 of 37

Page 2

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

producing evidence to negate claims on which the opposing party has the burden of proof. The party opposing a summary judgment motion bears an affirmative burden of presenting evidence that a disputed issue of material fact exists. The opposing party must go beyond the pleadings and set forth specific facts to show that a genuine issue exists. This burden cannot be met with conclusory statements or speculation, but only with appropriate citations to relevant admissible evidence. Evidence sufficient to support every essential element of the claims on which the opposing party bears the burden of proof must be cited.

***Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview***
***Civil Procedure > Summary Judgment > Standards > General Overview***
[HN3] In considering a summary judgment motion, a court must draw all reasonable inferences in the light most favorable to the opposing party. If a reasonable fact finder could find for the opposing party, then summary judgment is inappropriate. When the standard embraced in *Fed. R. Civ. P. 56(c)* is met, summary judgment is mandatory.

***Criminal Law & Procedure > Appeals > Standards of Review > Harmless & Invited Errors > General Overview***
***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview***
***Patent Law > Infringement Actions > Infringing Acts > General Overview***
[HN4] There are three ways in which a person can be held liable for patent infringement. First, a person who without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent. *35 U.S.C.S. § 271*(a). This provision of the patent statute governs instances of direct infringement of a patent, either literally or by equivalents. Second, an alleged infringer could be found liable for actively inducing direct infringement by others, which is an indirect infringement. *35 U.S.C.S. § 271*(b). Finally, a person may indirectly infringe by knowingly providing components of a patented machine, combination, or material or apparatus for use in a patented process, thereby contributing to the direct infringement of the patent by others. *35 U.S.C.S. § 271*(c). All three types of infringement, however, lead to a judgment of liability.

***Patent Law > Infringement Actions > Infringing Acts > Contributory, Indirect & Induced Infringement***

[HN5] Liability for indirect infringement depends on the existence of direct infringement. In some cases, the patentee accuses the alleged infringer of both direct and indirect infringement, and the court has found no direct infringement while acknowledging that its ruling did not preclude finding that the defendant induced or contributed to infringement of the patent. Nevertheless, the plaintiff must still prove the existence of direct infringement, even if not by the defendant.

***Patent Law > Infringement Actions > Burdens of Proof***
***Patent Law > Infringement Actions > Infringing Acts > General Overview***
[HN6] Ordinarily, to prove infringement of a patent, the plaintiff must show by a preponderance of the evidence that every limitation of the claim asserted to be infringed has been found in an accused device or process, either literally or by an equivalent. With a method or process patent, however, the focus is on whether all of the claimed steps of the process or method are performed, either as claimed or by an equivalent step. This is because a method or process patent is only infringed when the alleged infringer practices or performs the claimed method or process.

***Patent Law > Date of Invention & Priority > General Overview***
***Patent Law > Infringement Actions > Infringing Acts > General Overview***
[HN7] The determination of infringement requires two steps. First, the court must interpret the disputed claims, from a study of all relevant patent documents, to determine their scope and meaning. Second, the court must determine if the accused device, system or method comes within the scope of the properly construed claims. Infringement of process inventions is subject to the all-elements rule whereby each of the claimed steps of a patented process must be performed in an infringing process, literally or by equivalent of that step, with due attention to the role of each step in the context of the patented invention.

***Criminal Law & Procedure > Trials > Examination of Witnesses > General Overview***
***Patent Law > Infringement Actions > Claim Interpretation > General Overview***
[HN8] The purpose of claim construction is to elaborate the normally terse claim language in order to explain and understand, but not change, the scope of the claim. Unless evidence pertinent to the interpretation of a claim is in dispute, claim interpretation may be resolved by the court as a matter of law. To determine the intended

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

meaning of a claim, courts look to the claim language in context of the specification and the prosecution history. When the meaning of key terms of the claim is in dispute extrinsic evidence, including testimony of witnesses, may be used and reference may be had to the specification, the prosecution history, the prior art and other claims, may be used.

**Patent Law > Infringement Actions > Doctrine of Equivalents > Elements > Equivalence**
**Patent Law > Infringement Actions > Doctrine of Equivalents > Equitable Aspects**
[HN9] Absent a finding of literal infringement, a court could find that an accused device infringes by applying the judicially-created equitable doctrine of equivalents. Under this doctrine, an accused device may infringe a claim if it performs substantially the same function in substantially the same way to obtain the same result. With method or process patents, the plaintiff must demonstrate the unauthorized performance of substantially the same process steps in substantially the same way to accommodate substantially the same result. In fact, a method patent is not dependent on the form of apparatus used, and infringement is not avoided by making only slight changes in the apparatus disclosed in the patent.

**Patent Law > Infringement Actions > Doctrine of Equivalents > General Overview**
**Patent Law > U.S. Patent & Trademark Office Proceedings > General Overview**
[HN10] Courts limit the doctrine of equivalents by refusing to extend it to cover the prior art, or to allow the patentee to recapture, through equivalence, what was abandoned during prosecution of the patent. Moreover, application of the doctrine of equivalents does not allow a court to erase or ignore claim limitations.

**Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > General Overview**
[HN11] See Fed. R. Civ. P. 12(f).

**Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > General Overview**
[HN12] Generally, motions to strike are considered a drastic remedy, and are strongly disfavored. Accordingly, such motions are ordinarily not granted unless the language in the pleading at issue has no possible relation to the controversy and is clearly prejudicial. A trial court, however, has discretion to grant a well-taken motion to strike.

**Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview**
**Civil Procedure > Summary Judgment > Supporting Materials > Affidavits**
**Civil Procedure > Summary Judgment > Supporting Materials > Memoranda of Law**
[HN13] Motions, briefs, affidavits, and evidentiary matters submitted in support of, or in response to, a motion for summary judgment are not "pleadings" within the meaning of Fed. R. Civ. P. 12(f).

**Civil Procedure > Summary Judgment > Evidence**
**Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview**
**Civil Procedure > Summary Judgment > Supporting Materials > General Overview**
[HN14] Fed. R. Civ. P. 56(e) requires that affidavits supporting or opposing a motion for summary judgment be made on personal knowledge, and set forth facts that would be admissible in evidence, and show affirmatively that the affiant is competent to testify to the matters presented. Although the evidence presented. in opposition to or support of a summary judgment does not have to be in admissible form, it must be admissible in content. For example, exhibits to a summary judgment motion may include attested testimony, such as depositions or affidavits, even though at trial oral testimony ordinarily would be substituted for the affidavit or deposition. Thus, if the grounds for asking the court to exclude or disregard motions, briefs, or evidentiary matters relate to this or another rule of procedure or evidence, such rule should be cited to the court.

**Civil Procedure > Summary Judgment > Evidence**
**Civil Procedure > Summary Judgment > Standards > Materiality**
**Governments > Legislation > Vagueness**
[HN15] The consequence of submitting "vague or conclusory" evidence is that it will not suffice to oppose the adequately-supported factual allegations by the opposing party, or to create a genuine issue of material fact, and summary judgment may be entered against the proponent of such evidence. Fed. R. Civ. P. 56(e).

**Evidence > Hearsay > Exceptions > Learned Treatises > Limitations**
**Evidence > Hearsay > Rule Components > Statements**
**Evidence > Scientific Evidence > General Overview**
[HN16] The "learned treatises" exception to the hearsay rule allows statements contained in published treatises, periodicals, or pamphlets on a subject of science to be

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

read into evidence. *Fed. R. Evid. 803(18).* For such hearsay to be admissible, an expert must have relied on the statements and vouched for the reliability of the publication.

*Evidence > Testimony > Lay Witnesses > Opinion Testimony > General Overview*
*Evidence > Testimony > Lay Witnesses > Personal Knowledge*
[HN17] When a witness testifies as to matters on which he or she has personal knowledge developed though his or her own work, such testimony is admissible.

*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN18] See U.S. Dist. Ct., S.D. Ind., R. 56.1(f)(2).

*Patent Law > Claims & Specifications > Definiteness > General Overview*
*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN19] When construing claim terms, the court considers the context for the claims, the patent specification, the prosecution history, expert commentary from those skilled in the art, and other relevant extrinsic evidence. Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN20] The context for a disputed claim terms is provided in part by the patentee's description of the purpose for the invention in the specification, and an understanding of the problem identified in the prior art that the inventor was trying to solve.

*Evidence > Testimony > Experts > Ultimate Issue*
*Patent Law > Infringement Actions > Summary Judgment > General Overview*
[HN21] A party cannot create a genuine issue of material fact by pointing to the unsupported conclusion of an expert regarding the ultimate issue of infringement.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN22] The expert must set forth the factual foundation for his opinion--such as a statement regarding the struc-

ture found in the accused product--in sufficient detail for the court to determine whether that factual foundation would support a finding of infringement under the claim construction adopted by the court, with all reasonable inferences drawn in favor of the nonmovant.

*Patent Law > Infringement Actions > Doctrine of Equivalents > Elements > General Overview*
*Patent Law > Infringement Actions > Doctrine of Equivalents > Limits on Equivalence*
[HN23] In the context of a method patent, the doctrine of equivalents does not focus on equivalent structure or apparatus for accomplishing the result, but on equivalent steps in the method or process. All of the claimed steps of the process or method must be performed either as claimed or by an equivalent step. To determine equivalence, courts look at whether the process contains elements identical or equivalent to each claimed element of the patented invention. Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole.

*Patent Law > Infringement Actions > Doctrine of Equivalents > Limits on Equivalence*
[HN24] Courts apply the doctrine of equivalents using an array of legal limitations, formulations, and tests. Behind this array are two animating concepts. First, the doctrine of equivalents is limited. It cannot allow a patent claim to encompass subject matter that could not have been patented; nor can it be used to ignore the actual language of the patent. Second, the doctrine cannot be used to allow a patentee to recover subject matter that was surrendered during prosecution of the patent. In sum, the doctrine of equivalents must remain within the boundaries established by the prior art, the scope of the patent claims themselves, and any surrendered subject matter. Moreover, application of the doctrine requires a focus on individual elements and a special vigilance against allowing the concept of equivalence to eliminate completely any such elements.

*Patent Law > Infringement Actions > Doctrine of Equivalents > Elements > General Overview*
*Patent Law > Infringement Actions > Doctrine of Equivalents > Fact & Law Issues*
[HN25] The most common "test" used for determining equivalence is referred to as the "triple identity" test, which focuses on the function served by a particular claim element, the way that element performs that function, and the result obtained thereby. In the context of a

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

method or process patent, the inquiry is whether the accused process performs substantially the same steps as the patented process, in substantially the same way, to obtain the same result. This variation of the equivalence test suggests the applicability of another test that has been used, determining whether there is proof of insubstantial differences between the claimed and the accused products or processes. Regardless of the test used, the inquiry is a question of fact. Thus, it requires the court to consider the facts offered by the parties in support of or opposition to application of the doctrine of equivalents.

*Patent Law > Infringement Actions > Doctrine of Equivalents > General Overview*
[HN26] Equivalence must be determined in the context of the entire patent.

*Patent Law > Infringement Actions > Doctrine of Equivalents > General Overview*
[HN27] The "conscious" element of choosing requires that a user know exactly what he or she is doing and can predict the consequence of such choice. That cannot be met without a reliable means of informing the user that an action he or she is about to take may delete some stored data. Arguably, the user should also be able to choose what data will be removed.

*Patent Law > Claims & Specifications > General Overview*
*Patent Law > Infringement Actions > Claim Interpretation > Claim Differentiation*
[HN28] The doctrine of claim differentiation creates a presumption that each claim in a patent has a different scope. There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims. To the extent that the absence of such difference in meaning and scope would make a claim superfluous, the doctrine of claim differentiation states the presumption that the difference between claims is significant. This is a doctrine based on the common sense notion that different words or phrases used in separate claims have different meanings and scope.

*Patent Law > Anticipation & Novelty > General Overview*
*Patent Law > Inequitable Conduct > General Overview*
*Patent Law > Nonobviousness > Evidence & Procedure > General Overview*
[HN29] An anticipation or obviousness defense is based on the requirement that an invention be novel or new. The novelty requirement lies at the heart of the patent

system. If the invention is novel, then further inquiry must be made into whether it is new enough to be patented. A successful defense of anticipation requires that the same invention, including each element and limitation of the claims, was known or used by others before it was invented by the patentee. A challenger cannot prove anticipation by combining more than one reference to show the elements of the claimed invention. Thus, a prior patent or device must contain all of the elements and limitations in the disputed patent as arranged in the patented device.

*Patent Law > Nonobviousness > Elements & Tests > Ordinary Skill Standard*
*Patent Law > Nonobviousness > Elements & Tests > Prior Art*
*Patent Law > Nonobviousness > Elements & Tests > Secondary Considerations*
[HN30] The determination of whether an invention is obvious is a legal conclusion, dependent on underlying factual inquiries. Those factual inquiries include: (1) the scope and content of the prior art; (2) the level of ordinary skill in the field of the invention; (3) the differences between the claimed invention and the prior art; and (4) any objective evidence of nonobviousness, such as long-felt need, commercial success, the failure of others, or evidence of copying. In other words, obviousness calls on the court to consider the patent in light of multiple prior art references.

*Civil Procedure > Pleading & Practice > Pleadings > Counterclaims > General Overview*
*Civil Procedure > Declaratory Judgment Actions > Federal Judgments > Appellate Review*
*Civil Procedure > Appeals > Appellate Jurisdiction > Lower Court Jurisdiction*
[HN31] When validity arises in a counterclaim seeking a declaratory judgment of invalidity, the United States Court of Appeals for the Federal Circuit retains jurisdiction over an appeal of the district court's ruling on the counterclaim.

*Civil Procedure > Pleading & Practice > Pleadings > Counterclaims > General Overview*
*Civil Procedure > Declaratory Judgment Actions > Federal Judgments > General Overview*
*Patent Law > Infringement Actions > Defenses > Patent Invalidity > General Overview*
[HN32] When validity is challenged only by means of an affirmative defense, and the district court has found non-infringement, the court need not consider the validity of the patent.

Case 1:04-cv-12457-PBS     Document 77-10     Filed 09/22/2006     Page 6 of 37

Page 6

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

*Patent Law > Claims & Specifications > Enablement Requirement > Standards & Tests*
*Patent Law > Infringement Actions > Burdens of Proof*
*Patent Law > Infringement Actions > Defenses > Patent Invalidity > Validity Presumption*
[HN33] Patent claims are presumed to be valid, absent clear and convincing evidence of invalidity presented by the alleged infringer. Anticipation of specific patent claims requires a showing that a single prior art reference disclosed every limitation or element in the patent claim. To anticipate a claim, a reference must disclose every element of the challenged claim and enable one skilled in the art to make the anticipating subject matter. The burden of persuasion remains at all times on the challenger to the patent's validity, who must meet the clear and convincing standard of evidence to overcome the statutory presumption of validity.

*Patent Law > Anticipation & Novelty > Elements*
*Patent Law > Claims & Specifications > Enablement Requirement > General Overview*
[HN34] The determination of anticipation involves a factual inquiry about whether there is any difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention. A finding of anticipation requires that all aspects of the claimed invention were already described in a single reference. Extrinsic evidence, such as expert testimony, could help educate the decision-maker about the prior reference's meaning to a person of ordinary skill in the field of the invention.

*Patent Law > Anticipation & Novelty > Elements*
*Patent Law > Claims & Specifications > Claim Language > Multiplicity*
[HN35] Determining anticipation requires examining whether every step of the claimed method is disclosed in the prior art reference.

*Patent Law > Infringement Actions > Infringing Acts > Contributory, Indirect & Induced Infringement*
*Patent Law > Infringement Actions > Infringing Acts > Intent & Knowledge*
[HN36] An alleged infringer could be found liable for actively inducing direct infringement by others, which is an indirect infringement. *35 U.S.C.S. § 271*(b). A person may also indirectly infringe by knowingly providing components of a patented machine, combination, or material or apparatus for use in a patented process, thereby contributing to the direct infringement of the patent by others. *35 U.S.C.S. § 271*(c).

*Patent Law > Infringement Actions > Infringing Acts > Contributory, Indirect & Induced Infringement*
[HN37] Common to both of the indirect infringement theories is the requirement that the patentee prove some type of direct infringement.

**COUNSEL:** For CHARLES E HILL & ASSOC INC, plaintiff: DONALD KNEBEL, BARNES & THORNBURG, INDIANAPOLIS, IN.

For COMPUSERVE INCORPORATED, COMPUSERVE INTERACTIVE SERVICES, defendants: THOMAS E O'CONNOR JR, ARTER & HADDEN LLP, COLUBMUS, OH.

For COMPUSERVE INCORPORATED, COMPUSERVE INTERACTIVE SERVICES, defendants: JAY G TAYLOR, ICE MILLER, INDIANAPOLIS, IN.

**JUDGES:** LARRY J. McKINNEY, JUDGE, United States District Court, Southern District of Indiana.

**OPINION BY:** LARRY J. McKINNEY

**OPINION:**

### ORDER ON SUMMARY JUDGMENT MOTIONS

Four summary judgment motions have been filed in this case by defendants CompuServe, Inc. and CompuServe Interactive Services, Inc. (collectively "CompuServe"), each of which seeks judgment as a matter of law on the plaintiffs' patent infringement claims. CompuServe asserts different grounds for each motion: 1) non-infringement based on the absence of the element of storing, which is common to [*2] all claims; 2) non-infringement based on the absence of classifying product information into "constant" and "variable" data; 3) invalidity of the patent in suit based on anticipation by a single prior art reference; and 4) non-infringement based on the absence of proof of indirect infringement. Three of the motions, if decided in CompuServe's favor, would resolve the entire action, and the Court will address those motions first. The fourth motion, relating to indirect infringement, depends on the outcome of the other three, and will be treated last.

In addition to these pending dispositive motions, the parties have filed four motions to strike. On December 13, 1999, plaintiff Charles E. Hill & Associates, Inc. ("Hill") moved to strike certain evidence relied on by

Case 1:04-cv-12457-PBS    Document 77-10    Filed 09/22/2006    Page 7 of 37

Page 7

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

CompuServe in its summary judgment motions. Compu-Serve responded on December 22, 1999, with a "conditional" motion to strike certain evidence relied on by Hill, that condition being if the Court granted Hill's first motion to strike. On January 7, 2000, Hill filed two more motions to strike, one aimed at the affidavit of Andrew Johnson-Laird that was filed by CompuServe on December 22, 1999, to provide a foundation for the [*3] evidence Hill asked the Court to strike in its December 13th motion. The other was a motion to strike CompuServe's December 22, 1999, filing of three replies to Hill's responses to CompuServe's statements of material facts.

As further explained below, the Court has **DENIED** Hill's December 13th motion to strike, and its January 7, 2000, motion to strike Johnson-Laird's affidavit. As a result, CompuServe's December 22nd conditional motion to strike is deemed **WITHDRAWN**. With respect to Hill's January 7th motion to strike CompuServe's three replies, the Court has **DENIED, in part** and **GRANTED in part**, the relief sought.

## I.    FACTUAL    AND    PROCEDURAL BACKGROUND

### A. Undisputed Facts n1

> n1 These facts have been taken from the Court's previous *Markman* order, dated April 9, 1999, and from the parties' Joint Pre-Summary Judgment Statement filed on August 30, 1999.

United States Patent No. *5,528,490,* for an electronic catalog system and method, is assigned to Charles E. Hill and [*4] Associates, by the inventor, Charles E. Hill (the "Hill Patent" or " *'490* Patent"). Dfs.' Ex. 1, "Hill Patent" at 1. It issued on June 18, 1996, from Application Serial No. 866,867, filed with the U.S. Patent and Trademark Office on April 10, 1992. *Id.* The patented invention includes a combination of methods and corresponding apparatus whereby up-to-date information related to a selected product is transmitted from a main computer to a remote computer. *'490* Patent, Abstract. It was designed "to reduce the problems associated with" the two common types of electronic catalog systems in existence at the time of the invention. *Id.*, Summary of the Invention, Col. 1, *ll.* 40-42. One, a "dial-up system," featured a remote computer at the customer's location, with a modem, and a main computer at the vendor's location. *Id.*, Background of the Invention, Col. 1, *ll.* 14-17. The remote computer would connect via the modem to the main computer, allowing the customer to log-on to the main computer and browse the catalog menu as a user of that computer. *Id., ll.* 17-19. When the customer selected a product for which more information was needed, the information about that product [*5] would be transmitted through the modem to the customer. *Id., ll.* 20-25. This system took a large amount of time to transmit graphics data over the modem, especially high-resolution graphics, which could not be transmitted "in a meaningful time frame." *Id.* Because of this, the dial-up system was not practical for catalogs with text and graphics. *Id., ll.* 25-26.

The other prior art system did not involve any connection between the vendor and customer computers. *Id.*, Col. 1, *ll.* 27-36. Instead, the catalog was loaded onto the customer's computer from a disk, and periodically updated by the vendor sending new disks to the user. *Id.* Although the customer was able to view both text and graphics on his or her own computer, the disadvantage of this system was that the data was rarely up to date. "The accuracy of the data depends on the vendor sending updated data disks to the customer. In addition, the customer must also take the time to install the latest updated data disk onto his [or her] computer." *Id.* For these reasons -- outdated information and delays and inconvenience involved with updating -- the totally-resident catalog system was not considered a practical [*6] alternative.

Accordingly, the electronic catalog system of the *'490* invention was designed to reduce the problems of delay, inconvenience, and outdated information associated with both of these prior systems. *Id.*, Summary of the Invention, Col. 1, *ll.* 40-45. It contemplates use of software on both the customer's (remote) computer and on the vendor's (main) computer that handles all communication between the two computers. *Id.* The two computers "cooperate" so that the customer is provided with accurate updated catalog information each time the system is used. *Id.*, Col. 1, *ll.* 45-50. A key feature of the patented system is that it "combines the techniques of a distributed data system with a parametric design system to minimize time required for a customer to access vendor's computer **12** on a real time basis." *'490* Patent, Col. 9, *ll.* 30-34. Catalog data is stored on both the remote and the main computers, with all "constant" and "variable" data being stored and maintained on the main computer, and constant data being stored on the remote computer. *Id.*, Col. 3, *ll.* 11-14.

Variable data is described as "data that can change at any time." *Id.*, [*7] Summary of the Invention, Col. 1, *ll.* 53-54. If the variable data changes, the vendor "corrects the variable data entered into" the main computer, and it is automatically provided to the remote computer, "without the need to load new data disks onto the customer's computer." *Id.*, Col. 1, *ll.* 65-67, Col. 2, *ll.* 1-2. "The customer's computer contains all constant data related to the catalog products." *Id.*, Col. 1, *ll.* 56-58. Constant data may include both graphics and text. *Id., ll.* 58-59. When

Case 1:04-cv-12457-PBS    Document 77-10    Filed 09/22/2006    Page 8 of 37

Page 8

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

variable data is transmitted from the main computer to the remote computer, it may be accompanied by a map that allows the remote computer "to integrate the variable data received . . . with constant data related to the selected product stored in the customer's computer." *Id.*, Col. 2, *ll.* 17-22. The "constant data residing on the customer's computer and variable data downloaded from vendor's computer" merge to create a "completely updated data sheet for the selected product." *Id.*, Col. 2, *ll.* 23-25.

According to its summary, the Hill invention has three primary "objects," and ten "aspects." *'490* Patent, Cols. 1-6. The objects of the invention include, [*8] 1) providing customers with instant access to the most up-to-date product information available; 2) minimizing computer on-line time; and 3) increasing product security. *Id.*, Col. 2. The ten aspects described in the specification correlate to the method and apparatus claims of the patent. *Id.*, Cols. 3-6. A key teaching of the Hill Patent is that by partitioning information into "constant" data (which may include graphics) and "variable" data, the system can work more efficiently and quickly to provide accurate product information. *See Hill v. CompuServe, Inc.*, IP 97-434, Jan. 6-7, 1999, Claim Construction Hearing Transcript (hereafter "Tr."), Vol. I, at 27-29. Both the constant and the variable data are stored and maintained on the vendor's main computer, and constant data is stored on the customer's remote computer. *'490* Patent, Col. 1, *ll.* 51-55. When a customer wants to obtain information about a given product, he or she selects that product from a list that is resident on his or her computer. *Id.*, Col. 2, *ll.* 8-9. At this point the remote computer automatically calls the main computer and the catalog system compares the "revision status" of the constant data [*9] on the remote computer with the revision status of the constant data in the main computer memory. *Id.*, *ll* 10-14. If any of the remote computer's constant data is out of date, the main computer will automatically update it. *Id.*, *ll* 14-16.

Once the constant data has been updated the main computer transmits the variable data relating to the selected product and a map that permits the remote computer to integrate the variable data with the constant data stored in the remote computer. *Id.*, *ll.* 16-22. The customer's updated constant data and the incoming variable data are then integrated to create a data sheet for the desired product, containing the most up-to-date information available. *Id.*, *ll.* 22-26. Using this system provides a customer with "instant access to changes in variable data related to the products in the electronic catalog system." *Id.*, *ll.* 30-33. In this way, the invention's object of providing for the most up-to-date information about a product is achieved. *See Id.*, Col. 2, *ll.* 3-7.

Another object of the invention, minimizing computer "on-line" time, is accomplished by two elements of the invention: 1) the system controls when a customer logs on [*10] or off the main computer; and 2) normal browsing of the catalog is accomplished on the customer's computer, on which resides "all of the general catalog data." *'490* Patent, Summary, Col. 2, *ll.* 41-56. Not only does this prevent a customer from logging on to the vendor's computer and not logging off, but graphics and other data that change infrequently will not have to be transmitted each time a customer wants to see a product's information, reducing on-line time by 70-80%. *See Id.*, Col. 2, *ll.* 55-59. The third object of the invention, increasing "system security," is accomplished in part because the invention's software controls when the remote computer logs on and off the main computer, which reduces customer access to the main computer. n2 *Id.*, Col. 3, *ll.* 2-8. It is also accomplished by a system for detecting pirated copies of a serialized software program. Id., Col. 6, *ll.* 22-54.

n2 None of the claims relating to the system security object of the patented invention are alleged to be infringed.

[*11]

Defendant CompuServe Incorporated ("CSI") provided certain on-line services to subscribers and to members of the general public prior to February 2, 1998, and after that date, defendant CompuServe Interactive Services, Inc. ("CIS") took over the provision of those services. Joint Statement of Undisputed Material Facts ("Joint Statement") P 2. The two are sometimes referred to collectively herein as "CompuServe." *Id.* Hill is asserting that CSI infringed prior to February 2, 1998, and from February 2, 1998, to the present, CIS has infringed the following claims of the Hill Patent: (i) independent claim I and its dependent claims 2-5 and 8-11; (ii) independent claim 15 and its dependent claims 16-18 and 21-26; (iii) independent claim 30 and its dependent claims 31-32; and (iv) independent claim 35 and its dependent claims 36-39 (collectively the "Asserted Claims."). *Id* P 3. Each independent claim of the Hill Patent contains the following elements which occur on the main computer: 1) storing constant data and variable data; 2) comparing the remote revision status when retrieved from the remote computer with the revision status stored on the main computer (or in cases of Independent [*12] claims 15 and 35, comparing the constant data to the main constant data); 3) receiving the remote revision status or the remote constant data (the latter in the instances of Claims 15 and 35); 4) transmitting to the remote computer the data needed for updating the constant data; and 5) transmitting the variable data from the main computer to the

Case 1:04-cv-12457-PBS     Document 77-10     Filed 09/22/2006     Page 9 of 37

Page 9

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

remote computer. *Id.* P 23. By using the term "main computer" as used in the Hill Patent, the plaintiff is including the web server computers (those of CompuServe and those not owned by CompuServe) described in plaintiff's infringement claims. *Id.* P 24.

All of the Asserted Claims contain the element of "storing constant data . . . in a memory of a remote computer ("remote storing"). *Id.* P 5. For that reason, the first basis for summary judgment offered by CompuServe is that its on-line services, which operate through a "Web browser," do not infringe because there is no element of remote storing. A "browser" is software loaded on a personal computer ("PC") that allows the PC to send and retrieve information over the Internet. *Id.* P 6. The most common browsers are Microsoft's Internet Explorer and Netscape's Navigator. *Id.* [*13] Browsers place information in certain files, retrieved from the Internet, onto a special section of the PC's hard disk "cache" memory so that the file can be easily accessed by the PC. n3 *Id.* Microsoft calls files stored by the browser in cache memory "Temporary Internet Files," while Netscape calls them "Local Cache" files. *Id.*

n3 Memory located on a computer's "hard disk" is considered non-volatile, in that it is retained when the computer is shut down and will be present when it is restarted. Ex. 11, Gregor Dep. at 76; Ex. 2, Resp. by Hill to CompuServe's First Set of Interrogs. (Nos. 1-11) at 20; Ex. 5, Reply Rep. of Dr. Dunsmore, PP 15-16.

The part of the Internet known as the World Wide Web ("WWW" or the "Web") may be accessed through cable or other communication lines. The Web consists of, among other things, individual PCs, local Internet Service Providers ("ISPs"), On-Line Service Providers n4 (such as America Online ("AOL"), CompuServe, or Prodigy), a vast array of networked computers spanning [*14] the globe, including "server" computers owned or controlled by, among others, retailers for banner advertising delivery and tracking services, and Web browsers. *Id.* P 17. A browser is software loaded on a PC that implements communication and facilitates the transmission of data and files between these various networked computers. Id. Individuals using their home PCs typically access the information on the WWW over telephone lines by a modem. *Id.* At the request of the PC users, the local ISP or an ICP provides a communication path to other computers on the WWW. *Id.* The ICPs also provide certain proprietary "content" or information services, and allow access to other parts of the WWW by use of the browser, which communicates or browses the WWW to find specific information. *Id.*

n4 On-Line Service Providers are referred to as Internet Content Providers ("ICPs") by the parties. Joint Statement P 17.

The browser software communicates through the Internet with "server computers" containing information [*15] (whether or not related to products) requested by the PC user and allows the user to review the information by presenting the information as a "screen" or "page" that appears on the PC monitor. *Id.* P 18. Pages are "HTML" documents, documents written in accordance with a certain uniform programming format so they can be accessed and transmitted by the communication software. *Id.* "HTML" stands for hypertext mark-up language, which is a language adopted by computer programmers to create "pages" in a uniform manner so that the information can be accessed by the communication language between networked computers. *Id.* The communication language currently in use is called "HTTP," or hypertext transfer protocol. *Id.*

The Web was developed in the late 1980s and early 1990s by the W3 Organization, an organization affiliated with the Computer Sciences Department at Massachusetts Institute of Technology, and other groups and international standards committees. Aff. of CompuServe Vice-President Elizabeth Sibbring ("Sibbring Aff.") P 3. The W3 Organization and one of its pioneers, Tim Berners-Lee, worked for years to create the modem Web, which today consists of an interconnected [*16] network of computers. *Id.* The Web browser technology and Internet protocols and methods used to communicate via the Web existed and were in wide use by June 18, 1996, when the Hill Patent issued. *Id.* Anyone with a PC may access the Web as long as the PC has a Web browser and the user has an Internet access account with an Internet Access Provider, such as AOL, CompuServe or Prodigy, or a local ISP. Joint Statement P 17.

Information on the WWW is organized and located on "Web sites" having specific addresses, such as "http://www.cnn.com." Joint Statement P 20. When "visiting" a Web site, a user typically first views a "home" page, containing general information about the site. *Id.* Pages with more specific information are reached by "clicking" on the information category of interest on the home page. *Id.* Each "page" of a Web site is an HTML document. *Id.* HTML documents consist of text files, in-line image files adopted by reference, and instructions as to the location of text and graphics files within the HTML document for display on the PCs monitor. *Id.* P 19. The WWW delivers HTML documents to a PC by using the HTTP communication protocol. *Id.*

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

In early [*17] 1997, CompuServe switched its on-line shopping services to a Web-based technology. Sibbring Aff. P 3. Prior to switching to the Web, CompuServe had offered its on-line shopping through a completely proprietary system. *Id.* Now, CompuServe's on-line services use and access pages that conform to WWW standards (used by the W3 Organization) for the delivery of Web-based content. Joint Statement P 19. This includes use of Active Server Page ("ASP") files, which facilitate the combining of content or objects to create a page. *Id.* P20. ASP files are sent every time the browser requests that updated files be sent by the main computer or Web server to the remote computer or user's PC, unless the ASP file contains a Last-Modified header (and the page has not been modified), an Expires header (and the number of minutes specified have not elapsed), or an Express-Absolute header (and the date and time specified are still in the future). *Id.* P 16. Files with a Last Modified Unknown (Internet Explorer) or Last Modified None (Netscape) "date" are sent every time the browser accesses a Web page from a Web server containing the files. *Id.* P 15

Prior to the time CompuServe began using [*18] Web-based protocols and technology for its on-line services, it received transaction fees whenever its members bought products or services through CompuServe's proprietary servers, which were the servers used before CompuServe switched to the WWW. *Id.* P 27. Now, CompuServe derives revenue from its shopping service in a variety of ways, one of which is when retailers pay CompuServe a monthly fee for simply having a link from the CompuServe shopping site to the retailer's site. *Id.* P 28. Another is when retailers pay CompuServe a combination of a fixed fee and a percentage of sales generated to CompuServe members. *Id.* In addition, advertisers pay CompuServe a fee based on the number of times a particular CompuServe Web page on which their ad appears is accessed by people using the WWW. *Id.*

Hill asserts that the following Web sites infringed the Asserted Claims in the past:

> a)
> http://mall.compuserve.com/mall/index.asp
>
> b)
> http://www.compuserve.com/member_specials
>
> c)
> http://mall.compuserve.com/mall/spring_catalog
>
> d)
> http://mall.compuserve.com/mall/index.asp/mall/apparel.htm

Joint Statement P 21. In addition, Hill contends that the following Web sites infringe [*19] the Asserted Claims as of August 5, 1998, and to the extent still active, to the present:

> a)
> http://www.compuserve.com/shopping (still active)
>
> b)
> http://www.compuserve.com/shopping/booksmusic.asp (inactive)
>
> c)
> http://www.compuserve.com/shopping/apparel.asp (still active)
>
> d) Indirect "links" from, e.g., http://www.intimo.com (inactive)
>
> e) http://www.computingshop.com (inactive).

*Id.* Hill also refers to the operation of Web browsers as an allegedly infringing activity. *Id.* P 22.

Web browsers place information in files onto, and have the ability to retain files in, a PC's "cache" section of hard disk memory created by the browser. *Id.* PP 6, 10. Documents or pages in a browser's cache are subject to being automatically deleted or removed by the browser if necessary to make room for more recently accessed data. *Id* P 7. This means the data in the cache is subject to being deleted or removed by the browser from the user's PC without the user's issuing a "delete" command, such as by clicking on a delete button or on a delete scroll-down menu. *Id.* The user may or may not be aware that data is being removed by the browser. *Id.* When a user of a PC "visits" [*20] (retrieves from the Internet and displays a page on his or her monitor) a page for the very first time, the constant data revision status is not transmitted by the remote computer to the main computer, and there is no comparing of the constant data or updating it. *Id.* P 8. Since June 18, 1996, CompuServe has packaged Microsoft's browser software known as Internet Explorer with its software. *Id* P 9.

As of February 2, 1998, AOL owns one hundred percent of CompuServe. *Id.* P 11. On August 19, 1999, the "Welcome" screen for AOL included a hyperlink labeled "Improve Your Computer's Performance." *Id.* Clicking on this hyperlink caused the following text to appear on the screen:

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

Your Web browser comes with a cache, or temporary storage place. When you visit a Web page the images and text are stored on your hard drive. This allows the pages to load more quickly the next time you visit. However, as your cache fills up, your computer's performance can slow down.

*Id.* The text concluded with instructions on "How to Empty Your Browser's Cache." *Id.* CompuServe's browser software, Internet Explorer, comes with a default setting for the disk cache memory of two [*21] percent (2%) of the available disk space. *Id.* P 12. This setting can be modified to increase or decrease the size of the disk cache memory. *See* Ex. 11, Gregor Dep. at 63.

**B. Procedural Posture**

The parties have chosen to bifurcate the process of determining whether CompuServe's accused services infringe the Hill Patent. On January 6-7, 1999, a two-day *Markman* hearing was held, following which the Court issued a fifty-four page *Markman* ruling, dated April 9, 1999 ("*Markman* Order"). In that ruling, the Court construed the meaning of seven disputed claim terms and addressed the issue of whether the steps of the claimed method must be performed in the exact order recited in the claims. Claim construction is the first step of a two-part inquiry to determine whether infringement has occurred.

The second part of the inquiry, determining whether the properly-construed claims read on the accused method, is further segregated by the parties into three summary judgment motions. The fourth summary judgment motion relates to a counterclaim brought by CompuServe, seeking a declaratory judgment that the Hill Patent is invalid. CompuServe has suggested that the Court [*22] need not address all of the pending motions if it finds non-infringement, for example, on the basis of one of the proposed grounds. n5 As Hill observed, if the Court were to resolve only one of the four motions, and that ruling was appealed and overturned, the case would be remanded for consideration of the other motions. This piecemeal approach would be an inefficient use of judicial resources and CompuServe's invitation to bifurcate the Court's summary judgment rulings is declined. In this order, the Court has addressed each of the pending motions for summary judgment, using the standards that follow.

n5 Specifically, in its motion based on the alleged absence of storing, CompuServe wrote,

"the instant motion is case dispositive. A second summary judgment motion of non-infringement . . . and a third motion demonstrating the patent's invalidity, are being contemporaneously filed, but need not be addressed if the instant motion is granted." Mem. in Supp. of Defs.' Mot. for Sum. J. Based on the Absence of Storing on the Remote Computer at 1.

[*23]

**II. STANDARDS**

**A. Summary Judgment**

[HN1] Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the opposing party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* A disputed fact is material only if it might affect the outcome of the suit in light of the substantive law. *Id.*

[HN2] The moving party has the initial burden to show the absence of genuine issues of material fact. *See Schroeder v. Barth, 969 F.2d 421, 423 (7th Cir. 1992).* This burden does not entail producing evidence to negate claims on which the opposing party has the burden of proof. *See Green v. Whiteco Indus., Inc., 17 F.3d 199, 201 & n.3 (7th Cir. 1994).* The party opposing a summary judgment motion bears an affirmative burden of presenting evidence that a disputed issue of [*24] material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986); Scherer v. Rockwell Int'l Corp., 975 F.2d 356, 360 (7th Cir. 1992).* The opposing party must "go beyond the pleadings" and set forth specific facts to show that a genuine issue exists. *See Hong v. Children's Mem. Hosp., 993 F.2d 1257, 1261 (7th Cir. 1993), cert. denied, 511 U.S. 1005, 128 L. Ed. 2d 48, 114 S. Ct. 1372 (1994).* This burden cannot be met with conclusory statements or speculation, *see Weihaupt v. American Med. Ass'n, 874 F.2d 419, 428 (7th Cir. 1989),* but only with appropriate citations to relevant admissible evidence. *See* Local Rule 56.1; *Brasic v. Heinemann's Inc., Bakeries, 121 F.3d 281, 286 (7th Cir. 1997); Waldridge v. American Hoechst Corp., 24 F.3d 918, 923-24 (7th Cir. 1994).* Evidence sufficient to support every essential element of the claims on which the opposing party bears the burden of proof must be cited. *See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* [*25]

Case 1:04-cv-12457-PBS     Document 77-10     Filed 09/22/2006     Page 12 of 37

Page 12

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

[HN3] In considering a summary judgment motion, a court must draw. all reasonable inferences "in the light most favorable" to the opposing party. *Spraying Sys. Co. v. Delavan, Inc., 975 F.2d 387, 392 (7th Cir. 1992).* If a reasonable fact finder could find for the opposing party, then summary judgment is inappropriate. *Shields Enters., Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992).* When the standard embraced in Rule 56(c) is met, summary judgment is mandatory. *Celotex Corp., 477 U.S. at 322-23; Shields Enters., 975 F.2d at 1294.*

**B. Patent Infringement**

[HN4] There are three ways in which a person can be held liable for patent infringement. First, a person who "without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent." *35 U.S.C. § 271(a).* This provision of the patent statute governs instances of *direct* infringement of a patent, either literally or by equivalents. *See Joy Technologies, Inc. v. Flakt, Inc., 6 F.3d 770, 773 (Fed. Cir. 1993).* Second, an alleged infringer [*26] could be found liable for actively inducing direct infringement by others, which is an *indirect* infringement. *See 35 U.S.C. § 271(b).* Finally, a person may indirectly infringe by knowingly providing components of a patented machine, combination, or material or apparatus for use in a patented process, thereby contributing to the direct infringement of the patent by others. *See 35 U.S.C. § 271(c).* All three types of infringement, however, lead to a judgment of liability. *See Serrano v. Telular Corp., 111 F.3d 1578, 1584 (Fed. Cir. 1997)* (although court erred in finding direct infringement, error was harmless because the accused device contributorily infringed claim).

[HN5] Liability for indirect infringement, however, depends on the existence of direct infringement. *Kendall Co. v. Progressive Medical Tech., Inc., 85 F.3d 1570, 1573 (Fed. Cir. 1996)* (citing *Aro Mfg. Co. v. Convertible Top Replacement Co., Inc., 365 U.S. 336, 341, 5 L. Ed. 2d 592, 81 S. Ct. 599 (1961)); see also Arthur A. Collins, Inc. v. Northern Telecom Ltd., 216 F.3d 1042, 1048 (Fed. Cir. 2000),* [*27] *reh'g denied* Aug. 1, 2000; *Serrano, 111 F.3d at 1583.* In some cases, the patentee accuses the alleged infringer of both direct and indirect infringement, and the court has found no direct infringement while acknowledging that its ruling did not preclude finding that the defendant induced or contributed to infringement of the patent. *See, e.g., IMS Technology, Inc. v. Haas Automation, Inc., 206 F.3d 1422, 1437 (Fed. Cir. 2000); Serrano, 111 F.3d at 1584; Joy Tech., Inc., 6 F.3d at 773.* Nevertheless, the plaintiff must still prove the existence of direct infringement, even if not by the defendant. For example, in *IMS Technology,* the court affirmed the district court's ruling of no direct infringe-

ment by the defendant's systems, noting the absence of a claimed storage device to perform the function of transferring and recording data. *206 F.3d at 1437.* The defendant, however, could still be liable for inducing or contributory infringement, the court wrote, if one of its customers connected its system to an external storage device. *Id.*

[HN6] Ordinarily, to prove infringement of a patent, the plaintiff [*28] must show by a preponderance of the evidence that every limitation of the claim asserted to be infringed has been found in an accused device or process, either literally or by an equivalent. *Becton Dickinson and Co. v. C.R. Bard, Inc., 922 F.2d 792, 796 (Fed. Cir. 1990); Pennwalt Corp. v. Durand-Wayland, Inc., 833 F.2d) 931, 935 (Fed. Cir. 1987), cert. denied, 485 U.S. 961, 108 S. Ct. 1226, 99 L. Ed. 2d 426* and *485 U.S. 1009, 99 L. Ed. 2d 703, 108 S. Ct. 1474 (1988).* With a method or process patent, however, the focus is on whether all of the claimed steps of the process or method are performed, either as claimed or by an equivalent step. *EMI Group North Amer., Inc. v. Intel Corp., 157 F.3d 887, 896 (Fed. Cir. 1998), cert. denied, 526 U.S. 1112, 143 L. Ed. 2d 788, 119 S. Ct. 1756 (1999); Williams Gold Ref Co. v. Semi-Alloys Inc., 434 F. Supp. 453, 454 (W.D.N.Y. 1977)* ("it is the series of steps comprising the process that is central and only a replication of every step . . . constitutes infringement"). This is because a method or process patent is only infringed when the alleged infringer practices or [*29] performs the claimed method or process. *See Joy Tech., 6 F.3d at 775; Giese v. Pierce Chemical Co., 29 F. Supp. 2d 33, 36 (D. Mass. 1998).*

[HN7] The determination of infringement requires two steps. First, the court must interpret the disputed claims, "from a study of all relevant patent documents," to determine their scope and meaning. *Dolly, Inc. v. Spalding & Evenflo Companies, Inc., 16 F.3d 394, 397 (Fed. Cir. 1994); Becton, 922 F.2d at 796.* Second, the court must determine if the accused device, system or method comes within the scope of the properly construed claims. *Dolly, 16 F.3d at 397; Smithkline Diagnostics v. Helena Laboratories Corp., 859 F.2d 878, 889 (Fed. Cir. 1988).* "Infringement of process inventions is subject to the 'all-elements rule' whereby each of the claimed steps of a patented process must be performed in an infringing process, literally or by equivalent of that step, with due attention to the role of each step in the context of the patented invention." *Canton Bio-Medical, Inc. v. Integrated Liner Tech., Inc., 216 F.3d 1367, 1369 (Fed. Cir. 2000).* [*30]

[HN8] The purpose of claim construction is to elaborate the normally terse claim language in order to explain and understand, but not change, the scope of the claim. *Scripps Clinic & Res. Found. v. Genentech, Inc., 927 F.2d 1565, 1580 (Fed. Cir. 1991).* Unless evidence

Case 1:04-cv-12457-PBS    Document 77-10    Filed 09/22/2006    Page 13 of 37

Page 13

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

pertinent to the interpretation of a claim is in dispute, claim interpretation may be resolved by the court as a matter of law. *Markman v. Westview Inst., Inc., 517 U.S. 370, 387, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996); Markman v. Westview Inst., Inc., 52 F.3d 967, 970 (Fed. Cir. 1995); Lantech, Inc. v. Keip Mach. Co., 32 F.3d 542, 546 (Fed. Cir. 1994); Becton, 922 F.2d at 796.* "To determine the intended meaning of a claim, [courts] look to the claim language in context of the specification and the prosecution history." *Lantech, 32 F.3d at 546.* When the meaning of key terms of the claim is in dispute extrinsic evidence, including testimony of witnesses, may be used and reference may be had to the specification, the prosecution history, the prior art and other claims, may be used. *Scripps, 927 F.2d at 1580.* [*31]

[HN9] Absent a finding of literal infringement, a court could find that an accused device infringes by applying the judicially-created equitable doctrine of equivalents. *Becton, 922 F.2d at 797; ZMI Corp. v. Cardiac Resuscitator Corp., 844 F.2d 1576, 1581 (Fed. Cir. 1988); Pennwalt, 833 F.2d at 934.* Under this doctrine, an accused device may infringe a claim "if it performs substantially the same function in substantially the same way to obtain the same result." *Becton, 922 F.2d at 797* (citing *Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 608, 94 L. Ed. 1097, 70 S. Ct. 854 (1950)).* With method or process patents, the plaintiff must demonstrate the "unauthorized performance of substantially the same process steps in substantially the same way to accommodate substantially the same result." *Mooney v. Brunswick Corp., 663 F.2d 724, 736 (7th Cir. 1981).* In fact, a method patent is not dependent on the form of apparatus used, and infringement is not avoided by making only slight changes in the apparatus disclosed in the patent. *CMI Corp. v. Metropolitan Ent., Inc., 534 F.2d 874, 881 (10th Cir. 1976).* [*32]

[HN10] Courts limit the doctrine of equivalents, however, by refusing to extend it to cover the prior art, or to allow the patentee to recapture, through equivalence, what was abandoned during prosecution of the patent. *Conroy v. Reebok Intern. Ltd., 14 F.3d 1570, 1576-78 (Fed. Cir. 1994); Pennwalt, 833 F.2d at 934, n.1.* Moreover, application of the doctrine of equivalents does not allow a court to erase or ignore claim limitations. *Conopco, Inc. v. May Dept. Stores Co., 46 F.3d 1556, 1562 (Fed. Cir. 1994), cert. denied, 514 U.S. 1078, 131 L. Ed. 2d 582, 115 S. Ct. 1724 (1995)* (citing *Pennwalt, 833 F.2d at 935); Dolly, 16 F.3d at 398.*

## III. DISCUSSION

Having been presented with four alternative motions for summary judgment, the Court must resolve them in some logical order. The first two relate to the absence of claim elements in CompuServe's allegedly infringing

system, either literally or by equivalents, and the Court will resolve them before turning to an analysis of the patent's validity. As storing is one of the first claim terms mentioned in any of the claims at issue, the [*33] motion based on its alleged absence will be addressed first. Next, the Court will consider the motion regarding the classification of constant and variable data as claimed by the patent and construed by the Court. This motion also seeks at least partial summary judgment on grounds that CompuServe's system does not compare constant data, as required by Claims 15 and 35 of the Hill Patent.

The third motion that will be considered is the one claiming that Hill's patent is invalid because it was anticipated by a single prior art reference, U.S. Patent Number *5,347,632,* titled a "Reception System for an Interactive Computer Network and Method of Operation." Ex. 18 (the "Prodigy Patent"). CompuServe specifically claims that only one prior art reference anticipated Hill's patent, so the Court will not include a discussion of obviousness in its validity analysis. Finally, the Court will determine whether sufficient evidence has been presented to bring the issue of indirect infringement before a jury. Before considering any of these dispositive motions, however, the Court must determine what evidence and documents on which to rely, in light of the parties' four motions to strike. It is to [*34] that determination that the Court now turns.

### A. Motions to Strike

Four motions to strike have been filed in this matter. According to [HN11] *Rule 12(f) of the Federal Rules of Civil Procedure*:

> Upon motion made by a party within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.

[HN12] Generally, motions to strike are considered a drastic remedy, and are strongly disfavored. *Western Pub. Co., Inc. v. MindGames, Inc., 944 F. Supp. 754, 755, n.1 (E.D. Wis. 1996), aff'd 218 F.3d 652 (7th Cir. 2000)* ("information will not be stricken unless it is evident that it has no bearing upon the subject matter of the litigation"); *Federal Nat'l Mortgage Assn v. Cobb, 738 F. Supp. 1220, 1224 (N.D. Ind. 1990).* Accordingly, such motions "are ordinarily not granted unless the language in the pleading at issue has no possible relation to the controversy and is clearly prejudicial." *Cobb, 738 F.*

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

*Supp. at 1224.; Abdulrahim v. Gene B. Glick Co., 612 F. Supp. 256, 260 n.1 (N.D. Ind. 1985).* [*35] A trial court, however, has discretion to grant a well-taken motion to strike. *Mirshak v. Joyce, 652 F. Supp. 359, 370 (N.D. Ill. 1987); F.D.I.C. v. Niblo, 821 F. Supp. 441 (N.D. Tex. 1993).*

[HN13] Motions, briefs, affidavits, and evidentiary matters submitted in support of, or in response to, a motion for summary judgment are not "pleadings" within the meaning of Rule 12(f). *See Sellers v. Henman, 41 F.3d 1100, 1101 (7th Cir. 1994)* (affidavits are not pleadings); *York v. Ferris State Univ., 36 F. Supp. 2d 976, 980 (W.D. Mich. 1998)* (same); *Meredith v. Allsteel, Inc., 814 F. Supp. 657, 660 (N.D. Ill. 1992)* (Rule 12(f) permits motions to strike matters at the pleading stage, not at the summary judgment stage); *see also Hrubec v. National Railroad Pass. Corp., 829 F. Supp. 1502, 1506 (N.D. Ill. 1993)* (courts are unwilling to construe "pleading" so broadly as to include motions and their accompanying memoranda. Although some courts have used Rule 12(f) to strike affidavits or other evidentiary matters, such a practice is inconsistent with the Federal Rules of Civil Procedure. *International Longshoremen's Assoc. v. Virginia Intern. Term., Inc., 904 F. Supp. 500, 504 (E.D. Va. 1995)* [*36] (noting that *Fed. R. Civ. P. 7(a)* defines pleadings as complaints, answers and replies to counterclaims). The better practice is for a moving party to supply the court with some other basis in the Federal Rules for striking filings that are not pleadings. *See Lombard v. MCI Telecomm. Corp., 13 F. Supp. 2d 621, 625 (N.D. Ohio 1998)* (suggesting that courts are to *disregard* inadmissible evidence, not strike it). Nevertheless, at any time that a court is presented with exhibits that are hearsay, not based on personal knowledge, irrelevant or otherwise inadmissible, it may exclude such exhibits from its consideration of a dispositive motion. *Id.*

[HN14] Rule 56(e) requires that affidavits supporting or opposing a motion for summary judgment be made on personal knowledge, and set forth facts that would be admissible in evidence, and show "affirmatively that the affiant is competent to testify to the matters" presented. *Fed. R. Civ. P. 56(e).* Although the evidence presented. in opposition to or support of a summary judgment motion does not have to be in admissible form, it must be admissible in content. *See Winskunas v. Birnbaum, 23 F.3d 1264, 1267-68 (7th Cir. 1994)* [*37] (evidence must be of "evidentiary quality," meaning that a change in form but not in content would make the evidence admissible at trial). For example, exhibits to a summary judgment motion may include attested testimony, such as depositions or affidavits, even though at trial oral testimony ordinarily would be substituted for the affidavit or deposition. *Id. at 1267.* Thus, if the grounds for asking the court to exclude or disregard mo-

tions, briefs, or evidentiary matters relate to this or another rule of procedure or evidence, such rule should be cited to the court.

Hill has filed two motions to strike evidentiary matters offered by CompuServe. The first targets excerpts from the *Microsoft Internet Explorer 4 Book*, Exhibit 9 offered by CompuServe in support of summary judgment on the basis of the absence of storing. According to Hill, this exhibit should be excluded because it is "vague and conclusory." Hill's Mot. to Strike Cert. Alleged Evid. P 3. The most troublesome aspect for Hill about the book is the statement about the Internet Explorer browser's cache memory filling up quickly, which Hill asserts is "so conclusory and vague as to be meaningless." [*38] *Id.* In support of this argument, Hill cites a section of a procedural treatise for the proposition that "conclusory facts . . . cannot be utilized on a summary judgment motion." *Id.* (citing 10B CHARLES A. WRIGHT, et al., FEDERAL PRACTICE AND PROCEDURE § 2738, at 346-56 (3d ed. 1998)).

The sentence immediately preceding the cited text in this treatise makes it clear that the quoted statement is referring to the content of an affidavit, not to documentary evidence, such as the Microsoft manual. *Id.* at 345 ("Rule 56(e) further limits the matter to be properly included in an affidavit to facts . . . ."). A clause at the beginning of that sentence indicates the writer was addressing limitations "in addition to the admissibility requirements" that had just been discussed. *Id.* ("In addition to the admissibility requirements just discussed, Rule 56(e) further limits. . . ."). Considered in context, the quoted statement from WRIGHT & MILLER indicates that conclusory facts are not necessarily inadmissible. *Id.* Nor did Hill cite a particular Federal Rule that supports striking this evidence on the basis of vagueness or being conclusory, and the Court cannot discern one. Instead, [HN15] [*39] the consequence of submitting "vague or conclusory" evidence is that it will not suffice to oppose the adequately-supported factual allegations by the opposing party, or to create a genuine issue of material fact, and summary judgment may be entered against the proponent of such evidence. *See Fed. R. Civ. P. 56(e).*

Hill's second argument for striking this exhibit is that it is hearsay and does not meet any of the hearsay exceptions. Hill's Mot. to Strike, P 5. The challenged statement comes from a handbook or manual purporting to instruct users of the Internet Explorer software about its attributes and use. In the context of explaining how to increase the size of the cache that is set up by the browser, the author stated that the cache "fills up quickly." Ex. 9, *Microsoft Internet Explorer 4 Book* at 104. To the extent that CompuServe offers excerpts from the Microsoft publication as proof of the statements made therein, they should be considered hearsay. *Fed. R.*

Case 1:04-cv-12457-PBS    Document 77-10    Filed 09/22/2006    Page 15 of 37

Page 15

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

*Evid. 801(c)*. The only hearsay exception within which such statements could fall is [HN16] the "learned treatises" exception, which allows "statements contained in published treatises, periodicals, or pamphlets on a subject [*40] of . . . science" to be read into evidence. *Fed. R. Evid. 803(18)*. For such hearsay to be admissible, an expert must have relied on the statements and vouched for the reliability of the publication. *Id.* According to Hill, the excerpts from the Microsoft book were not submitted as an exhibit to an expert's report or affidavit, and therefore they do not overcome the hearsay objection. *See Fed. R. Evid. 703*, *803(18)*; Hill Mot. to Strike P 7.

In response, CompuServe points to language in the parties' Joint Pre-Summary Judgment Statement indicating an agreement that "they can rely on any evidence contained in any of the exhibits referenced in this Pre-Summary Judgment statement." Joint Statement at 52. The Microsoft publication was referenced in the Joint Statement. Because of this agreement, CompuServe thought it could rely on the Microsoft publication in support of its summary judgment motion, and that Hill would not object to its admissibility. Def.'s Mem. in Oppos. to Hill's Mot. to Strike Certain Evid. at 4. Although acknowledging the ambiguity of the word "rely" in the parties' agreement, Hill rejoins that "the parties intended that either could cite any evidence in the exhibits" [*41] in the Joint Pre-Summary Judgment Statement, not that it was all admissible. Hill's Reply Brf. in Supp. of Mot. to Strike at 4. As support for this interpretation, Hill points to the fact that the parties had segregated their Joint Statement of facts into three sections, one that is joint, one controlled by CompuServe, and one by Hill. *Id.* According to Hill, if the parties had agreed that all fifty-three exhibits were admissible, then they would not have needed separate sections. *Id.*

Hill's argument leads to some confusion. For the parties to agree, for purposes of a motion for summary judgment, not to challenge the admissibility of each other's evidence, does not mean they agree to its accuracy, validity, relevance, or to the inferences that could be drawn therefrom. It is entirely possible for a plaintiff and defendant to point to the same piece of evidence and draw different conclusions from it about the facts it supports. Thus, it is not surprising that the Joint Statement contained a separate section for the material facts as CompuServe sees them, and one for Hill's alleged facts. Hill's explanation for its interpretation of the Joint Statement's agreement does not lead [*42] to logical harmony. In fact, it creates disharmony. Juxtaposed with the disputed agreement language is a passage by which the parties specifically reserved "the right to present additional facts in support of or in opposition to *any motion for summary judgment*." Joint Statement at 52 (emphasis added). Not only does this passage suggest that the refer-

ence to relying on exhibits noted in the Joint Statement meant relying on them in connection with a summary judgment motion, it also indicated the agreement was not meant to limit the parties only to those exhibits. They concluded by stating, "in order to avoid burdening the Court with documents at this time, exhibits referenced to herein above shall be filed along with any summary judgment motions that are served and fully briefed." *Id.* Again, this language suggests that the parties were not just referring to the exhibits that could be cited in the Joint Statement, but to the exhibits they contemplated using with their summary judgment filings.

Nevertheless, given that the language of the Joint Statement is less than clear, the Court is disinclined to interpret it as an express manifestation that the parties had agreed not to [*43] challenge the admissibility of each other's exhibits for purposes of summary judgment, although such an interpretation is certainly a reasonable one. That CompuServe drew such a conclusion explains why it submitted the Microsoft publication independent of its expert's report or affidavit. When responding to Hill's motion to strike the exhibit, CompuServe acted quickly to remedy the defect by attaching an affidavit from its expert, Andrew Johnson-Laird ("Johnson-Laird"), in which Johnson-Laird quoted the excerpted language and opined on its accuracy. Aff. of Andrew Johnson-Laird, Dec. 20, 1999, PP 5, 6. In light of the ambiguity of the parties' agreement about the exhibits, the reasonableness of CompuServe's understanding, and the fact that such an interpretation could lull a party into submitting a software manual without including an affidavit establishing its foundation, the Court finds that CompuServe has adequately overcome Hill's hearsay objection to this exhibit. Hill's motion to strike Exhibit 9, the *Microsoft Internet Explorer 4 Book*, is **DENIED**. n6

n6 Hill also filed a motion to strike the affidavit of Andrew Johnson-Laird that CompuServe produced to overcome any hearsay problems with the Microsoft publication. The grounds for the motion are that the affidavit was not referenced in the parties' Joint Pre-Summary Judgment Statement, as required by the case management plan, nor was it served on Hill along with initial motion for summary judgment. Under the circumstances, however, the Court will excuse the irregularity and untimeliness represented by CompuServe's filing of the Johnson-Laird affidavit with its reply brief. Hill's motion to strike the affidavit of Andrew Johnson-Laird is **DENIED**.

[*44]

Case 1:04-cv-12457-PBS    Document 77-10    Filed 09/22/2006    Page 16 of 37

Page 16

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

Among the other evidence targeted by Hill's motion to strike are three paragraphs in the affidavit of Douglas L. House ("House"), the Managing Director of Compu-Serve Interactive Services, Inc.'s Production and Design Team. Ex. 42, House Aff. P 1. The reason offered for striking paragraph eight from this affidavit is that it is "hopelessly vague and conclusory." Mot. to Strike PP 8-9. That paragraph stated that "current Web pages are typically in multimedia form and contain much more data than Web pages of five years ago." Ex. 42, House Aff. P 8. Hill particularly objects to the fact that the specific quantity of data on current Web pages compared to those from five years ago cannot be determined based on House's statement. As a result, Hill claims that House's statement cannot prove the fact for which it is offered -- that current, presumably larger, caches fill up just as quickly as before -- and consequently, it is so vague and conclusory as to be inadmissible.

Just as with the statement from the Microsoft publication, House's statement about the relative size of Web pages is not inadmissible even if the Court were to find it vague or conclusory. At the least, its character might [*45] subject it to cross-examination that would affect the weight given it by a jury, and at most, it may not even suffice to create a genuine issue of material fact that would get to a jury. In either case, the consequence of its alleged vagueness is not inadmissibility.

Hill takes issue with two other paragraphs from House's affidavit for violating the rule that affidavits must be "made on personal knowledge" and must "show affirmatively that the affiant is competent to testify to the matters stated therein." *Fed. R. Civ. P. 56(c)*. The statements in paragraphs six and seven about how third parties design their Web sites, Hill argues, are not accompanied by foundational facts demonstrating House's competence to testify about such matters. Hill is mistaken. The affidavit contains several facts that would establish a foundation for House's personal knowledge of the work of third parties. First, the affidavit begins with House's statement that he is testifying, "having been first duly sworn, and having personal knowledge of the matters stated herein." Ex. 42, House Aff. at 1. Second, he described fifteen years of experience working in Compu-Serve's interactive services division, the last [*46] three of which he spent as the Managing Director of Compu-Serve's Production and Design Team. *Id.* P 1. In that position, he is responsible for "overseeing the release and publication of the content on [CompuServe's] on-line services," *Id.*, and maintaining the "shopping Web sites available through [CompuServe]." *Id.* P 2. Finally, in the accused paragraphs House stated that as managing director of the Production and Design Team, he "frequently work[s] with vendors' Web page designers . . . to ensure that the content and design of [CompuServe's] own Web sites accommodate the needs and preferences of those vendor's." *Id.* P 6. Through this work, House claims he has developed a "personal understanding of the factors that drive the design of vendors' Web sites and the techniques that those designers use to build and design their Web pages." *Id.*

All of these facts combined invite the reasonable inference that House has acquired personal knowledge about the design elements, techniques, needs and preferences of CompuServe's vendors, the third parties to which his affidavit referred. As CompuServe identified for the Court, the rules of evidence allow a lay witness [*47] to give opinions or draw inferences as long as they are rationally based on his or her perception and are helpful to a clear understanding of his or her testimony or determination of a fact in issue. *Fed. R. Evid. 701*. [HN17] When a witness testifies as to matters on which he or she has personal knowledge developed though his or her own work, such testimony is admissible. *See United States v. Fidelity and Dep. Co. of Md., 986 F.2d 1110, 1118 (7th Cir. 1993)*. Here, House was testifying about the design of third parties' Web pages based on what he observed and knew from working with those designers and their designs. Hill was looking for more, however, and argues that House did not show that he had personal knowledge of the "thought processes of these third parties while they designed their web pages." Hill's Mot. to Strike, P 10. The Court is not convinced that such knowledge is necessary to show that House is competent to testify about the bases upon which Compu-Serve's vendors design their Web pages. For these reasons, Hill's motion to strike certain paragraphs of House's affidavit is **DENIED**.

For similar reasons, Hill's objection to the admissibility of the testimony [*48] of Mark G. Gregor ("Gregor"), CompuServe's Manager of Product Production, cannot be sustained. Hill pointed to Gregor's deposition testimony and argued that it makes clear that Gregor did not have personal knowledge of the facts asserted in his affidavit about how CompuServe or third parties design their Web pages. Hill's Mot. to Strike P 11. Upon a review of that testimony, the Court learned that within the department Gregor managed was found the Production and Design Team, managed by House. Ex. 11, Gregor's Dep. at 86. As already noted, that design group is responsible for maintaining the content of CompuServe's on-line shopping services. Its manager, House, works with the Web page designers for vendors, and is familiar with their design goals. Gregor's duties as manager of Product Production include managing the building of content for CompuServe's on-line content services. Ex. 7, Gregor Aff. P 1.

The deposition testimony alleged by Hill to demonstrate Gregor's lack of personal knowledge includes a

Case 1:04-cv-12457-PBS     Document 77-10     Filed 09/22/2006     Page 17 of 37

Page 17

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

response to a question about who would have designed a specific page. Gregor stated, "I don't know the exact person but it would have come out of the design group." *Id.* at 88-89. He [*49] explained that the design group decides where to use graphics on the Web pages, after design meetings held between the designer and a builder from Product Production. *Id.* at 89-90. Both of these groups fall within Gregor's area of management. At another point, Gregor described a specific Web page as being designed by the "design group." *Id.* at 97. Another question about how a vendor's Web page "came to be designed," drew the response by Gregor that he did not know as the vendor is a separate company. *Id.* at 134. Yet, he subsequently explained that he just did not want to speak for the vendor who created the page, and that the page would have been designed as he described in paragraph ten of his affidavit. *Id.* at 158. Finally, referring to a specific Web page, Gregor stated that based on his experience he knew "generally" how this kind of page was "put together." *Id.* at 157-58.

At most, Gregor's deposition testimony reveals that he was not directly involved in designing Web pages for CompuServe, just that the design group was a part of the department he managed. It also reveals that he did not claim to have knowledge about the specific design of certain Web pages, [*50] but described the collaboration that occurred between the designers and the builders. Rather than demonstrating that Gregor had no basis for personal knowledge of Web page design, these facts tend to show that he had oversight of designers, builders and the design group, but he could not identify the specific designer of a page by looking at the design. This testimony does not provide a reason to strike Gregor's affidavit statements about how CompuServe and third parties design their Web pages. As with House, it is not necessary that Gregor actually designed the Web pages he was shown in order for him to have a basic knowledge about how such pages are designed. At the time of his affidavit, Gregor had been involved with building the content for CompuServe's on-line content services for five years. Ex. 7, Gregor Aff. P 1. It is reasonable to infer that his experiences familiarized him with the design, construction and operation of CompuServe's "shopping services," as well as other on-line shopping services, through which customers could purchase products on the WWW. *Id.* Again, the deposition testimony to which Hill alludes does not provide grounds to strike anything to which Hill [*51] objected in Gregor's affidavit. Hill's motion to strike portions of Gregor's affidavit is **DENIED**.

CompuServe filed a "conditional" motion to strike certain evidence offered by Hill, to be considered only if the Court granted Hill's motion to strike "certain alleged evidence." Specifically, CompuServe stated it would object on similar grounds to certain affidavit statements

of Hill's expert, H. E. Dunsmore, Ph.D. ("Dr. Dunsmore"), if the Court were to strike the Microsoft publication and portions of the House and Gregor affidavits. Mem. in Supp. of. Def.'s Cond. Mot. to Strike at 5. However, should the Court not strike these pieces of evidence, CompuServe stated that its conditional motion should be considered withdrawn. *Id.* at 4. Because the Court has **DENIED** Hill's motion to strike certain alleged evidence, it will consider CompuServe's December 22, 1999, conditional motion to strike **WITHDRAWN**.

The last motion to strike asks the Court to disregard three "replies," filed by defendant CompuServe on December 22, 1999, to Hill's responses that were filed on December 10, 1999, to CompuServe's statements of material facts in relation to its three summary judgment [*52] motions. According to Hill, the replies do not comply with Local Rule 56.1 in that they consist of legal argument rather than "concise, numbered sentences . . . limited as far as practicable to a single factual proposition." S.D. Ind. L.R. 56.1(f). Also, Hill contends that two of the three "replies" are duplicative, and that some of the alleged facts are not supported with citations to evidence. In response, CompuServe recites the entire history of the summary judgment briefing in this matter, beginning with a February 1999 pretrial conference in which the Court and counsel discussed the applicability of 1998's Local Rule 56.1, given that it was just amended in 1999. According to CompuServe, the Court told the parties to follow the 1998 rule and file a joint pre-summary judgment statement, which they did on August 30, 1999. Correspondingly, CompuServe's briefs in support of its three motions for summary judgment contained fact sections that cited paragraphs in the Joint Statement, rather than following the 1999 Local Rule's requirement of separately-numbered paragraphs with citations to the evidence supporting each fact asserted.

In its memoranda in opposition to CompuServe's summary [*53] judgment motions, Hill had noted CompuServe's alleged noncompliance with Local Rule 56.1(f) and stated that as a result Hill could not provide parallel numbered responses. *See, e.g.,* Hill's Mem. in Oppos. to CompuServe's Mot. for Sum. J. Based on Absence of Storing at 3, n.3. CompuServe reacted by including in its reply memoranda appendices purporting to comply with Local Rule 56.1(f). The filings, however, were not separated clearly into a statement of material facts section and one with CompuServe's reply to Hill's additional material facts. *See, e.g.,* Reply Brf. of Defs. in Supp. of Mot. for Sum. J. of Non-Infringement Based on the Absence of "Storing" on the Remote Computer, App. A. Hill's responses to CompuServe's appendices were then included in the parties' joint summary judgment filings of December 10, 1999. CompuServe claims it filed the "replies" at issue in response to Hill's response

Case 1:04-cv-12457-PBS    Document 77-10    Filed 09/22/2006    Page 18 of 37

Page 18

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

to CompuServe's statement of material facts in its reply briefs.

Upon review of CompuServe's December 22nd filings, the Court agrees with Hill that they do not comport with the spirit behind Local Rule 56.1(f), which is to facilitate the Court's efficient identification of the facts [*54] that are in dispute. That rule provides that

> Each material fact set forth in a Statement of Material Facts . . . Statement of Additional Evidence on Reply, or Surreply to Additional Material Facts must consist of concise, numbered sentences with the contents of each sentence limited as far as practicable to a single factual proposition. Each stated material fact shall be substantiated by specific citation to record evidence.

[HN18] S.D. Ind. L.R. 56.1(f)(2). If a party responding to a statement of material facts or additional material facts has an objection to the fact or cited evidence, the party "shall . . . set forth the grounds for the objection in a concise, single sentence, with citation to appropriate authorities." *Id.* 56.1(f)(3).

The first eight pages of CompuServe's eleven page Rule 56.1 "reply" included with its "storing" summary judgment motion, contain only general responses to Hill's numbered paragraphs, followed by lengthy legal argument. Only the last three pages, containing a section entitled "Specific Responses," appear consistent with the format required by Rule 56.1. Moreover, CompuServe even admits that its replies to Hill's responses to its statements [*55] of material facts contain legal argument, explaining that such conduct is appropriate when "a few comments will assist the Court in assessing whether . . . there is any *genuine* material factual dispute." Defs.' Resp. to Mot. to Strike Defs.' Three December 22, 1999 Replies, P 7 (emphasis in original). CompuServe's memorandum in response to this motion to strike also contained approximately two and one-half pages of legal argument. This type of repetition adds to the volume of materials the Court must review before rendering a decision, and slows down the process rather than makes it more efficient. n7

> n7 Many of Hill's "additional material facts" are duplicates of the agreed portion of the parties' Joint Statement filed before the summary judgment motions. For example, Additional Material Fact number sixteen states "the most common

browsers are Microsoft's Internet Explorer and Netscape's navigator." Hill's Resp. to Def.'s Statement of Mat. Facts at 3. This statement is a direct quote from the parties' Joint Statement paragraph six. As a result, Hill also did not comply with the spirit of the Local Rules, and filed duplicative materials that tend to slow rather than facilitate the dispute resolution process.

[*56]

In a strategy suggested by CompuServe itself, the Court will strike those sections of CompuServe's submissions containing general responses and legal arguments. *See* Def.'s Resp. to Mot. to Strike Def.'s Three Dec. 22, 1999 Replies, P 7. By including additional argumentation in its filing, CompuServe appears to have attempted to circumvent the page limitations of Local Rule 7.1. In fact, Hill has accused CompuServe of "flaunting" the local rules and has asked for sanctions. It is not evident to the Court, however, that CompuServe's conduct should be so characterized. Hill's request for sanctions is **DENIED.**

It is understandable that there may have been some confusion among the parties about which version of the local rules governed their summary judgment filings. Yet, the remedy for that situation would be to seek clarification, preferably in writing, from the Court. By guessing about the proper format, CompuServe placed itself in a position where its opponent could engage in a procedural exercise that lead to a prolonged, collateral dispute about the form of the filings. In the future, parties who need guidance about which version of the local rules should apply to their [*57] case should seek specific clarification from the Court in writing, and the Court will endeavor to provide that guidance in a written form as well.

In light of these circumstances, Hill's motion to strike CompuServe's three replies to Hill's response to CompuServe's statements of material facts is **DENIED, in part,** and **GRANTED, in part,** as described above. Having resolved the extent of the evidence, briefing, and other filings it will use, the Court now turns to a full consideration of the merits of the four pending summary judgment motions.

### B. Absence of Storing

#### 1. *Markman* Ruling

Guided by the Supreme Court in *Markman, 517 U.S. at 388-90 ("Markman II")*, and the Federal Circuit in *Markman, 52 F.3d 967 ("Markman I")*, the Court held a hearing on January 6 and 7, 1999, to receive and consider the parties' evidence and arguments with respect to the disputed claim language. The parties submitted post-

Case 1:04-cv-12457-PBS    Document 77-10    Filed 09/22/2006    Page 19 of 37

Page 19

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

hearing briefs to further guide the Court's analysis of the meaning of the claim terms and language in dispute. In an order and memorandum opinion issued on April 9, 1999, the Court construed each of those claim terms, [*58] one of which was the term "storing." In doing so, [HN19] the Court considered the context for the claims, the patent specification, the prosecution history, expert commentary from those skilled in the art, and other relevant extrinsic evidence. *See Eastman Kodak Co. v. Goodyear Tire & Rubber Co., 114 F.3d 1547, 1552 (Fed. Cir. 1997).* "Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Renishaw PLC v. Marposs Societa' Per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998)* (citing *Markman II, 517 U.S. 370, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996)*).

[HN20] The context for the disputed claim terms is provided in part by the patentee's description of the purpose for the invention in the specification, and an understanding of the problem identified in the prior art that the inventor was trying to solve. *Eastman Kodak Co., 114 F.3d at 1554.* Crucial information about this problem is contained in the specification, in addition to descriptions of how the claimed invention solves the problem. *See Id.* [*59] "These teachings provide valuable context for the meaning of the claim language." *Id.* Using this context, the Court framed the issue surrounding the meaning of the claim term "storing" as whether storing must be defined to include a temporal element. *Markman* Order dated Apr. 9, 1999 ("*Markman* Order") at 17. Finding that it did, the Court held that, in light of the purpose and description of the invention disclosed in the specification, "constant data must be recorded with the expectation that it would remain until the user removes it of his or her own volition." *Markman* Order at 23-24. Thus, the Court construed the claim term "storing" as "recording in a storage device so that it will not be involuntarily removed or deleted." *Id.* at 24.

### 2. Literal Infringement

Given the *Markman* construction of the claim term "storing," CompuServe argues that no storing occurs in connection with its accused on-line shopping service because, to the extent data from a Web server is recorded in the disk cache memory, it is subject to involuntary deletion by the Web browser. Hill counters that there is substantial evidence that Web browsers store data on the remote computer [*60] with the expectation that it will remain until the user removes it, and that there is a genuine issue of material fact regarding whether CompuServe's system meets this claim element. The evidence Hill cites includes CompuServe's request for Hill to admit "that a web browser may cause files from a web site to be stored on a hard disk of a remote computer." Ex.

46, Resp. of Hill to First Req. for Admissions (Nos. 1-16), No. 7. Next, Hill cites CompuServe's own admissions to requests by Hill that used the word "store" in relation to Web browsers recording data on remote computers. n8 Ex. 38, CompuServe's Resp. to Hill's Revised First Set of Req. for Admissions (No. 1-62), Nos. 2, 3, 7, 8, 10, 11, 22, 30, 34; Ex. 39, CompuServe's Resp. to Hill's Second Set of Req. for Admissions, Nos. 87, 88, 93, 94, 98. Each of these admissions, however, were made subject to CompuServe's general, and in some cases specific, objection that the request contained a disputed claim term that had not yet been defined or construed by the Court. Ex. 38, Gen. Obj. (F); Ex. 39, Gen. Obj.

n8 Hill's citations are to the Joint Statement, PP 109-26 and evidence cited therein, rather than to the specific admissions that support this point. This practice was not helpful in that among the cited paragraphs were those referring to the issue of storing and those referring to other claim elements. The better practice would be to cite the specific admission that supports the point. By citing to the Joint Statement, Hill forces the Court to consult two or more documents before it can review the evidence that is offered in support of its assertions. In some cases, the brief cited a paragraph in the Joint statement, which cited a party's deposition with no exhibit number, which required the Court to consult the list of exhibits to determine the exhibit number for that deposition, before the deposition itself could be reviewed. A needless expenditure of time and effort could have been avoided by a more direct method of citing evidence.

[*61]

Hill also cites statements by CompuServe's witnesses, which Hill argues constitute admissions that Web browsers store data on remote computers. For example, Stephen E. Wilhite ("Wilhite"), CompuServe's chief software architect at the time, stated at his deposition in August 1998 that Microsoft's Internet Explorer stores, or "caches," HTML files in the cache on the hard disk of a remote computer. Ex. 15, Wilhite Dep. at 6, 74, 117-19. Consequently, when the Web site is visited again, if the browser "can find the image files located in the cache and it has the right information, it would try to get it off the local cache. . . ." *Id.* at 119. Hill also cited the deposition testimony of Paul Lamber, Chief Technical Officer for CompuServe, who stated that a Web browser will store certain information locally and "if through the protocol definitions it is determined that the version on the remote computer is current, it will display the version

Case 1:04-cv-12457-PBS    Document 77-10    Filed 09/22/2006    Page 20 of 37

Page 20

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

that is on the remote computer rather than bring a new version from the host computer." Ex. 52, Lamber Dep. at 44. The browser compares what is stored on the remote computer with what is stored on the main computer to see if new information has [*62] been added, and if there is it will transmit the new information from the host computer to the remote. *Id.* at 45.

Further evidence offered by Hill to support its contention that Web browsers meet the claim element of "storing" includes excerpts from an opinion letter by CompuServe's former counsel, Jeff Standley. In that letter, Standley wrote:

> A standard feature of web browsers is caching of the graphics or image files that may be referenced in a HTML document. Caching of graphics files improves performance by reducing the amount of information transmitted between users' computers and the various web servers with which a user may interact. When the user selects a HTML document to display, the web browser queries the cache of graphics files to determine if a particular graphics file referenced in the HTML document is present in the cache. If the user has accessed the HTML document previously, the graphics file identified in the HTML document may be present in the cache. If the referenced file is present in the cache, the web browser uses the local graphics file to display the image.

Ex. 54, Standley Letter dated Apr. 13, 1998, at 3. Finally, Hill points to the [*63] parties' Joint Statement in which they agreed that on August 19, 1999, AOL included a hyperlink in its "Welcome" screen that allowed users to improve their computers' performance by deleting files from their disk cache memory. Joint Statement P 11. When a user clicks on the hyperlink, he or she is taken to a Web site that explains "when you visit a Web page the images and text are stored on your hard drive. This allows the pages to load more quickly the next time you visit." *Id.* According to Hill, this last fact expressly admits that Web browsers store data on remote computers and that the purpose of the storing is to reduce the time it takes to create a screen full of data about a selected product, as claimed in the Hill Patent. Hill's Mem. in Oppos. to CompuServe's Mot. for Sum. J. of Non-Infringement - Storing at 21.

The point Hill is attempting to make with these citations is that CompuServe, two of its employees, and its

attorney *admitted* that the CompuServe shopping service, which depends on the use of a Web browser, meets the claim element of "storing." Yet, the evidence Hill has offered does not serve that purpose. First, none of the discovery "admissions" contemplated [*64] the same meaning for the claim term "storing" as the Court gave it after the *Markman* hearing. While it is true that a *Markman* hearing does not redefine the English language, *Snuba Inter., Inc. v. Dolphin World, Inc., 2000 U.S. App. LEXIS 16946, 2000 WL 961363, *4* (Fed. Cir. Jul. 11, 2000), the claim term being construed here was found to have a narrower meaning than the ordinary meaning of the verb "storing." In particular, the Court found that the term, as used in the patent and in keeping with the key teachings of the patent, necessarily incorporates the idea that the stored data will remain until the user removes it. The *Markman* ruling emphasized this point in the following passage:

> In the specification's summary of the invention, the term "storing" or "stored" is used to reflect the notion of data being "contained" on the remote and main computer. [Hill Patent], Col. 1, *ll.* 51-53 ("Catalog data is stored on both the vendor's computer and the customer's computer . . . . vendor's computer contains variable data"), *ll.* 56-58 ("customer's computer contains all constant data"). It is also used to suggest some degree of permanence, as when the summary describes the [*65] customer browsing "through general catalog data *residing* on the customer's computer." *Id.*, Col. 2, *ll.* 5-7 (emphasis added).

*Markman* Order at 18-19. In essence, the Court found that "'storing' suggests a temporal element in that, as long as a remote user wants to take advantage of the invention (*i.e.*, the distributed data electronic catalog system), constant data must be available on the remote computer." *Id.* at 19.

For the alleged admissions to be taken as such, any claim terms for which the Court has construed narrower meanings, that were used in the requests, depositions, or other communications, would need to have been so defined at the time. In Hill's response to CompuServe's request for admissions, Hill objected to CompuServe's "failure to provide its definitions to key terms used in these requests. . . ." Ex. 46, Resp. of Hill to First Req. for Admissions (Nos. 1-16) at 2. Similarly, CompuServe had objected to Hill's use of disputed claim terms in its re-

Case 1:04-cv-12457-PBS    Document 77-10    Filed 09/22/2006    Page 21 of 37

Page 21

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

quests for admissions before the Court had construed the terms. These objections weaken the effect of statements given by the parties prior to the *Markman* Order that are claimed to be evidence [*66] of admissions about whether the CompuServe system includes the construed claim term "storing."

With respect to Wilhite's deposition testimony, the Court notes that Wilhite used the verb "cached," instead of "stored," when referring to what browsers do to an HTML file sent from the Web server to the remote computer. Ex. 15, Wilhite Dep. at 74 ("They will cache this somewhere on the disk."). At no point did Wilhite testify that the HTML pages would be recorded in the cache of the hard disk so that it will not be involuntarily removed or deleted. Absent language like this to provide context clues for the person being deposed, it would be difficult for the Court to find that Wilhite admitted that Compu-Serve's system meets the claim element of storing as it has been construed. A similar defect weakens the plain-tiff's argument about Lambert's deposition testimony, which the Court finds does not constitute an admission that the CompuServe system meets the claim term of storing.

In the passage quoted from CompuServe's attorney's letter, Standley does not even use the word "storing," but uses "caching" instead. It is not clear what the verb "caching" means to Standley in comparison to what [*67] the Court has determined that "storing" means in the context of the Hill Patent. Moreover, Standley's opin-ion was that CompuServe would not infringe the Hill Patent, in part because

caching of graphics files by a web browser at the remote computer may not be construed to be storing of constant data at the remote computer. Stored data in the Hill patent refers to data that supports off-line browsing. Constant data for the entire electronic catalog is transmitted so that a user can review information for all avail-able products in the catalog. . . . If the web browser attempts to cache a graphics file and determines the cache is full, it will replace graphics files that have not been referenced recently with the more recently referenced graphics files. Conse-quently, graphics files do not necessarily remain at the remote computer between on-line sessions . . . and therefore, are not stored at the remote computer.

Ex. 54, Standley's Letter at 9. Given the substance of Standley's opinion regarding whether CompuServe's sys-tem infringed, it would be peculiar and incongruous for the Court to find that the same letter included an admis-sion that the storing claim term were met. [*68]

Finally, the AOL "Welcome" page and hyperlink do not constitute an admission that CompuServe's system meets the storing claim term because the word "store" is not being used in the context of discussing the Compu-Serve system in relation to the Hill Patent. Instead, it is used in an informational context to assist AOL customers with improving the efficiency of their computers. As such, it is presumably written with the broader, common meaning of "storing" in mind, and not the narrower meaning given to the term in the context of the Hill Pat-ent. Thus, instead of proving that CompuServe has "re-peatedly admitted" that Web browsers store data on re-mote computers, and therefore literally infringe that claim element, this evidence does not even raise a genu-ine issue of material fact about it. n9

n9 In his report, Dr. Dunsmore noted that Microsoft's Internet Explorer refers to data placed on the hard disk by stating "Pages you view on the Internet are stored in a special folder for quick viewing later." Ex. 3, Dunsmore May 21, 1999, Rep. on Pat. Inf. at 6. Because CompuServe in-cludes the Internet Explorer in its own software, Hill argues that this statement by Microsoft is "virtually another admission of storing by Web browsers." Hill Mem. in Oppos. at 22. This ar-gument fails for the same reason that the other al-leged admissions were defeated--there is no evi-dence that would demonstrate that Microsoft's use of the word "stored" is the same as the Court has determined the Hill Patent's to be.

[*69]

Hill also relies on its own expert's opinion on patent infringement, in which Dr. Dunsmore described the Internet Explorer's handling of constant data as being "stored on the disk of the remote computer until it is *vol-untarily* removed or deleted by the Web browser." Ex. 3, Dunsmore May 21, 1999, Rep. on Pat. Inf. at 6 (empha-sis added). That storing, Dr. Dunsmore asserted, "is not subject to *involuntary* deletion because this data is re-tained by the Web browser to be kept for use the next time the Website is visited. . . ." *Id.* Aside from being circular, Dr. Dunsmore's opinion that data "deleted by the Web browser" is not subject to involuntary deletion ignores the perspective from which voluntariness is de-termined in the context of this patent. As noted, the pat-ent teaches that the constant data is recorded on the re-

Case 1:04-cv-12457-PBS     Document 77-10     Filed 09/22/2006     Page 22 of 37

Page 22

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

mote computer "with the expectation that it would re-main until the user removes it of his or her own volition." *Markman* Order at 23-24. The relevant expectation is the user's, not the Web browser's. This is so because the pur-pose of the patented method is met only if, for "as long as a remote user wants to take advantage of the invention (*i.e.*, the distributed [*70] data electronic catalog sys-tem), [the] constant data [remains] available on the re-mote computer." *Id.* at 19.

Moreover, [HN21] a party cannot create a genuine issue of material fact by pointing to the unsupported con-clusion of an expert regarding the ultimate issue of in-fringement. *See Arthur A. Collins, 216 F.3d at 1046.* Like the expert in *Collins*, Dr. Dunsmore offered no facts that would explain or support his opinion that deletion by the Web browser is not involuntary.

> [HN22]
> The expert must set forth the factual foundation for his opinion--such as a statement regarding the structure found in the accused product--in sufficient detail for the court to determine whether that factual foundation would support a find-ing of infringement under the claim con-struction adopted by the court, with all reasonable inferences drawn in favor of the nonmovant.

*Id.* at 1047. Nor can a party avoid summary judgment "by simply framing the expert's conclusion as an asser-tion that a particular critical claim limitation is found in the accused device." *Id.*

Here, the critical claim limitation is the element of storing as the Court has defined it, which [*71] means recording so that the data will not be involuntarily de-leted. There is no dispute that when the cache memory on the remote computer's hard disk gets full the Web browser automatically deletes some of the data stored therein, using a formula or algorithm developed by the software programmer. n10 There is also no dispute that this action can be, and often is, performed without knowledge or awareness of the user of the remote com-puter. If the user is unaware that data is being deleted from his or her hard disk, then such removal cannot be deemed voluntary from the user's perspective. Dr. Dunsmore has merely asserted that this process is volun-tary without providing sufficient detail about the process to enable the court to determine if a reasonable fact finder could see it the same way. A Web browser is a software program, an inanimate object, and cannot be described as doing anything "voluntarily," using any common meaning for the word voluntary. At most, the

act might be described as voluntary or intended on the part of the software designer, but such volition is so indi-rect and attenuated that it does not come close to meeting the court's definition of storing.

> n10 According to Hill's expert, the Internet Explorer versions 3.0 and 4.0 use the Least Re-cently Used ("LRU") algorithm and therefore do not provide random deletion. Ex. 44, Dunsmore Aff. P 10. His research did not reveal that the use of the LRU algorithm has changed in the latest version, Internet Explorer 5.0, released in March of 1999. *Id.* P 13. No evidence was offered, how-ever, to show the relevance of the lack of random deletion.

[*72]

Hill also argues that because the recording of data in the cache memory of the hard disk by the Web browsers "satisfies the objective of the Hill patent to minimize on-line time," it must be sufficiently permanent to satisfy the Court's definition of storing. Hill's Mem. in Oppos. at 22. Not so. The Court did not define the term as recording data so that it can be used again the next time the user needs it, but recording so that it will not be involuntarily deleted. The focus is not on the fact that the data will be present for some period of time that might coincide with the user's need for it, but on its presence until the user decides he or she no longer needs it and decides to re-move it. In other words, the Hill Patent teaches that con-trol of the presence of the constant data on the remote computer remains in the hands of the remote computer user. This is true regardless of the relative size of the disk cache as the size of computer hard disks increases, because the risk of data being deleted by the Web browser without the user being aware of it or being able to control it will still exist. For all of these reasons, a method in which the constant data is placed on the re-mote computer [*73] by a Web browser and then de-leted when the Web browser determines that the cache is full, does not literally infringe the claim term "storing."

### 3. Doctrine of Equivalents

[HN23] In the context of a method patent, the doc-trine of equivalents does not focus on equivalent struc-ture or apparatus for accomplishing the result, but on equivalent steps in the method or process. *EMI Group, 157 F.3d at 896.* All of the claimed steps of the process or method must be performed either as claimed or by an equivalent step. *Id.* To determine equivalence, courts look at whether the process contains elements identical or equivalent to each claimed element of the patented invention. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 40, 137 L. Ed. 2d 146, 117 S. Ct. 1040*

Case 1:04-cv-12457-PBS    Document 77-10    Filed 09/22/2006    Page 23 of 37

Page 23

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

*(1997).* "Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole." *Id. at 29.*

[HN24] Courts apply the doctrine using an "array of legal limitations, formulations, and tests. . . ." *K-2 Corp. v Salomon S.A., 191 F.3d 1356, 1366* [*74] (Fed. Cir. 1999). Behind this array are two "animating concepts." *Id.* First, "the doctrine of equivalents is *limited*. It cannot allow a patent claim to encompass subject matter that could not have been patented; nor can it be used to ignore the actual language of the patent." *Id. at 1366-67.* Second, the doctrine cannot be used to allow a patentee to recover subject matter that was surrendered during prosecution of the patent. *Id. at 1367.* In sum, the doctrine of equivalents must "remain within the boundaries established by the prior art, the scope of the patent claims themselves, and any surrendered subject matter." *Id. at 1368.* Moreover, application of the doctrine requires a "focus on individual elements and a special vigilance against allowing the concept of equivalence to eliminate completely any such elements. . . ." *Warner-Jenkinson, 520 U.S. at 40.*

[HN25] The most common "test" used for determining equivalence is referred to as the "triple identity" test, which focuses on the function served by a particular claim element, the way that element performs that function, and the result obtained thereby. *Id. at 39.* [*75] In the context of a method or process patent, the inquiry is whether the accused process performs "substantially the same steps as the patented process, in substantially the same way, to obtain the same result." *Fromson v. Anitec Printing Plates, Inc., 132 F.3d 1437, 1446 (Fed. Cir. 1997), cert. denied, 525 U.S. 817, 142 L. Ed. 2d 43, 119 S. Ct. 56 (1998).* This variation of the equivalence test suggests the applicability of another test that has been used, determining whether there is proof of insubstantial differences between the claimed and the accused products or processes." *Insituform Tech., Inc. v. CAT Contracting, 99 F.3d 1098, 1107 (Fed. Cir. 1996), cert. denied, 520 U.S. 1198, 137 L. Ed. 2d 703, 117 S. Ct. 1555 (1997).* Regardless of the test used, the inquiry is a question of fact. Thus, it requires the Court to consider the facts offered by the parties in support of or opposition to application of the doctrine of equivalents.

Hill uses the triple identity test in its analysis. First, Hill describes the "function" as recording information in a remote memory so that, if current, it will be available for use [*76] on subsequent visits. However, the Court has construed the remote storing element to mean placing or recording in a storage device so that it will not be involuntarily removed or deleted. Consequently, the function of the remote storing element is to record in-

formation in a remote memory until the user decides to remove it. This function serves the purpose of efficiency by allowing for the partitioning of data between the main and remote computers, and the purpose of reducing online time by allowing the user to browse the catalog information on the remote computer. *See* Ex. 1, Hill Patent, Col. 2, *ll.* 41-59. Hill has pointed to no evidence that would convince a rational finder of fact that a Web browser meets this function. From Hill's conclusory assertion, it appears the plaintiff is suggesting that recording in a remote memory so that it is available for use on subsequent visits is the equivalent of recording so that it will not be involuntarily deleted. The Court cannot perceive the equivalency. In fact, the difference between the two functions appears substantial.

Second, Hill argues that the way the Web browser records data in the remote memory is the same as in the Hill [*77] Patent, that is, it is recorded in non-volatile memory. [HN26] Equivalence must be determined in the context of the entire patent, *Warner-Jenkinson, 520 U.S. at 40,* and the Hill Patent contemplates the data residing in the remote memory until the user decides to remove or delete it. As Hill readily acknowledges, the data recorded by the Web browser will remain in the memory "unless the LRU algorithm . . . subsequently removes the least recently used data." Hill Mem. in Oppos. at 34. According to Hill the LRU algorithm is a feature added to the Hill Patent to allow the efficient management of the data in the cache. *Id.* Given the sizable capacity of the disk cache, Hill asserts, "for all practical purposes . . . one can expect the data to remain there until he or she removes the data." *Id.* Yet, Hill does not explain or reconcile these facts with the requirement that constant data should be recorded so that it will not be involuntarily removed. A key feature of this element, as construed from the entire context of the patent, is that the user remains in control of the constant data. It is not clear exactly how the accused method, which creates the risk that data will [*78] be deleted without the user's knowledge, is equivalent to a method by which the data is placed in a storage device until the user decides to remove it.

Hill's expert attempts to explain how recording subject to deletion by the LRU algorithm is "equivalent" to recording so that it will not be involuntarily deleted. He emphasized the Court's rationale for its definition of storing: "it is much more sensical, in light of the purpose and description in the specification, that the constant data be recorded with the expectation that it would remain until the user removes it of his or her own volition." Ex. 5, Reply Report of Dr. Dunsmore ("Reply Rep.") P 18. Dr. Dunsmore agreed with CompuServe's expert's definition for volition as "1. An act of willing, choosing, or deciding. 2. A conscious choice; decision. 3. The power or capability of choosing; will." *Id.* (citing Ex. 4, "In-

Case 1:04-cv-12457-PBS    Document 77-10    Filed 09/22/2006    Page 24 of 37

Page 24

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

fringement Report--Storing" by Andy Johnson-Laird, P 15). The way Dr. Dunsmore rationalizes his claim that automatic deletion by a Web browser is equivalent to the Hill Patent's remote storing element is by focusing on the word "volition." In a system that uses the "LRU storage management algorithm," Dr. Dunsmore [*79] opined, "the human user by his or her own volition (act of will, choosing, conscious choice, decision) performs an action that causes the removal of some stored data." Ex. 5, Reply Rep. P 18. What Dr. Dunsmore does not explain, however, is how the user is making a "*conscious choice*" to delete the least recently used data from the disk cache, when it is undisputed that users may be unaware that stored data is being removed. *See id.* P 5 ("The human user may or may not be aware of what algorithm is being used or even that some stored data is being removed.").

[HN27] The "conscious" element of choosing requires that a user know exactly what he or she is doing and can predict the consequence of such choice. That cannot be met without a reliable means of informing the user that an action he or she is about to take may delete some stored data. Arguably, the user should also be able to choose what data will be removed. Dr. Dunsmore has described two common types of storage systems available for storing data, one of which gives the user a choice. That system is one in which,

> when the user performs an action that would cause the removal of stored data, the software poses the question, [*80] 'Are you sure that you want to remove this stored data?' or some variation thereof. The human user is given the option to say Yes (in which case the information is removed) or No (in which case the information is not removed). Such a system certainly meets Judge McKinney's requirements that information "remain until the user removes it of his or her own volition."

Ex. 5, Reply Rep. P 4. The other system Dr. Dunsmore described is one in which there are no questions posed to the user prior to the software deleting stored data. *Id.* P 5. That system is the one used by the accused Web browser. In it, the user may choose to perform some action that causes the deletion of some stored data. But that action is taken without the user knowing the exact consequence of his or her decision. Dr. Dunsmore does not explain how users will know that, for example, visiting another Web site will cause the deletion of some stored data. Nor does he address the fact that a user may not want to delete the least recently used stored data, but may instead have

some other criteria he or she would like to use when deciding which data to delete. The Hill Patent contemplates this degree of autonomy and [*81] control by the user over the constant data residing on a remote computer in the claimed electronic catalog method and apparatus patent. The Court does not see how Dr. Dunsmore's opinion can suffice to create a genuine issue of material fact about whether the Web browser's LRU algorithm deletion mechanism is equivalent to the way the claimed remote storing element performs.

In a further effort to demonstrate infringement, Hill described the LRU algorithm deletion mechanism as an added feature that enhances a "system in which the remote computers have a fixed amount of memory." Hill Mem. in Oppos. at 26; Joint Statement P 135. In the abstract, Hill's contention seems logical. Citing cases for the proposition that claims using the term "comprising" are open claims that "read on devices which add additional elements," *Stiftung v. Renishaw PLC, 945 F.2d 1173, 1178 (Fed Cir. 1991),* Hill contends that CompuServe cannot avoid infringement merely by adding a data management system, which it views as an additional element. *See Vivid Tech., Inc. v. American Sci. & Eng., Inc., 200 F.3d 795, 811 (Fed. Cir. 2000); Suntiger, Inc. v. Scientific Res. Fund. Grp., 189 F.3d 1327, 1336 (Fed. Cir. 1999).* [*82] While this may be an accurate representation of the law, its application to the facts in this case does not yield the result Hill intends. Instead, the Court is further guided by the analysis in a recent decision in which the Federal Circuit explored whether the additional element in an accused process was excluded by the claim term in the patent. *See Northern Telecom Ltd. v. Samsung Elec. Co., Ltd., 215 F.3d 1281, 1292 (Fed. Cir. 2000).*

In *Northern Telecom*, the patent described "an initial step of plasma etching," which is a chemical process whereby electrical power is applied to a gas which creates a "plasma of chemically-active radicals" that etch the work piece. *Id.* Samsung argued that this language specifically excluded all other forms of etching, including the process used in its accused system--reactive ion etching (a combination of plasma and ion bombardment). *Id.* After considering the claim language, the specification and the prosecution history, the court did not agree with Samsung that the step of plasma etching necessarily excluded reactive ion etching. *Id. at 1296.* Although it was clear that the patentee preferred plasma etching, [*83] and that plasma etching and reactive ion etching were different, that was not enough to narrow the meaning of "plasma etching" to require the exclusion of any ion bombardment. *Id.* As the court explained, "if a patent requires A, and the accused device or process uses A and B, infringement will be avoided only if the patent's definition of A excludes the possibility of B." *Id.* This is so

Case 1:04-cv-12457-PBS     Document 77-10     Filed 09/22/2006     Page 25 of 37

Page 25

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

because the addition of features does not avoid infringement as long as all of the elements are present. *Northern Telecom, Inc. v. Datapoint Corp., 908 F.2d 931, 945 (Fed. Cir.), cert. denied, 498 U.S. 920, 112 L. Ed. 2d 250, 111 S. Ct. 296 (1990).*

Informed by this reasoning, the Court notes that the alleged added element in the CompuServe system, the LRU algorithm deletion of data when the cache gets full, is not merely an additional element. Instead, it is mutually exclusive of the remote storing element as the Court has construed it in the context of the Hill Patent. In other words, remote storing is recording so that the data will not be involuntarily deleted (A) and the LRU algorithm in the Internet Explorer Web browser causes involuntary deletion (B). [*84] Logically, A could also be defined as "not B," which means that A and B are mutually exclusive. The existence of B, the involuntary deletion by the Web browser, negates the existence of A, recording so that it will not be involuntarily deleted. The Court's construction of the claim element of remote storing has created a special circumstance that evades the general rule that "infringement is not avoided by the presence of elements or steps in addition to those specifically recited in the claim." *Vivid Tech., 200 F.3d at 811* (the signal "comprising" implements the general rule "absent some special circumstance or estoppel").

Finally, Hill contends that the result of the "storing" element in the accused service is the same as that in the Hill Patent: the data is available for later use and it minimizes on-line time. This assertion, however, ignores the undisputed fact that when the Web browser determines that the disk cache is full, it will delete data from the cache, and that data will no longer be available for later use. According to Hill, this is not a real threat, given the size of disk cache. Yet, it is a threat nonetheless, and it demonstrates that the accused [*85] service's remote storing method does not produce the *same* result. Moreover, even if it did produce the same result, that fact would not suffice to show infringement of this element under the doctrine of equivalents if the method used to achieve that result is not substantially the same as in the claim element. *Mooney, 663 F.2d at 736.*

Regardless of the test applied, the Court finds that the accused service does not perform substantially the same function, in substantially the same way, to obtain the same result, and therefore does not infringe the Hill Patent under the doctrine of equivalents.

### C. Absence of Classification of Data

#### 1. *Markman* Ruling

In its *Markman* ruling, the Court defined variable data in accord with its common meaning, with the exception of acknowledging that the Hill Patent contemplated

some classification of a set of data into variable and constant. The Court wrote:

> Hill's patent is not about the proper classification of data for an electronic catalog system. It is about distributing that data between two different computers, a main and a remote, establishing a system for updating the data left on the remote [*86] computer, and transmitting the updated variable data to the remote to create the most current product information available. It presumes some sort of classification of the data, but does not limit how that is accomplished. Thus, the Court finds that the definition for "variable data" that is most true to the claim language and in alignment with the patent's description of the invention is "product information classified as capable of changing at any time." The definition that best conveys the meaning of "constant data" is "product information classified as likely to change less often than variable data."

*Markman* Order at 46 (citation omitted). The classification of data into those two categories facilitates a key aspect of the Hill invention: "distributing the data needed to obtain complete information about a product on two different computers, the main computer, which contains all of the product information data for the electronic catalog, and the remote computer which holds a subset of that data. This is the essence of the distributed data design technique employed by the inventor to accomplish his design objectives." *Id.* at 38.

Implicit in the Court's construction [*87] of these claim terms is the notion that the product data is classified according to its relative likelihood of changing. For that reason, CompuServe argues that its accused service does not infringe this claim because it neither uses or contains product data that is classified on this basis. CompuServe offers a second ground for at least partial summary judgment relating to independent claims 15 and 35, which comprise the step of "comparing constant data." Mem. in Sup. of CompuServe's Second Mot. for Sum. J. at 2. In response, Hill argues that CompuServe's argument relies on two faulty premises. First, that information has to be classified by the Web page designer based on how likely it is to change. Second, that all text must be variable data and all graphics constant. The Court will address the specifics of these arguments in the following sections.

Case 1:04-cv-12457-PBS     Document 77-10     Filed 09/22/2006     Page 26 of 37

Page 26

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

### 2. Literal Infringement

To literally infringe independent claims 1, 15, 30, and 35, the CompuServe on-line shopping service must include the elements of constant data and variable data. The Court has construed variable data as "product information classified as capable of changing at any time." *Markman* Order at 46. Constant [*88] data means "product information classified as likely to change less often than variable data." *Id.* Although the Court found that it was not necessary to limit the claims with respect to who would classify the data, or exactly how and when it would be classified, it was convinced that in order for the patented method to work as intended by the inventor, all product information had to be classified in one category or the other. Hill argues that the Court's interpretation of this term does not require the Web page designer to have classified the data according to how likely it is to change, and Hill is partly correct. There is no limitation as to who will do the classifying of the data. However, that the data must be classified according to its relative likelihood of changing is evident from the context of the entire patent.

The patented method's objectives are met by the distribution of data between a main computer, which stores all constant and variable data, and the remote computer on which the constant data is stored. As the Court has already found, a key teaching of the Hill Patent is that by partitioning information into "constant" data (which may include graphics) and "variable" [*89] data, the system can work more efficiently and quickly to provide accurate product information. This efficiency is achieved in part because the constant data resides on the remote computer and, if such data on the remote computer is not at a different revision level than the constant data on the main computer, it does not need to be transmitted each time a user wants product information. For such a system to work, at some point prior to operation of the patented method, the data must have been separated into classes, and the Court has found that those classes are determined based on the relative likelihood that the data will be changing. The reason for this classification criteria is efficiency.

This concept is reinforced by the fact that the electronic catalog system contemplates storing only the constant data on the remote computer and transmitting the variable data each time product data is required. Ex. 1, Hill Patent, Col. 1, *ll.* 52-67, Col. 2, *ll.* 1-2. The summary of the invention in the specification indicates that variable data is "data that can change at any time." *Id.*, Col. 1, *ll.* 53-54. The fact that variable data is transmitted every time the customer wants [*90] product information, and that it is expressly defined as being capable of changing at any time, leads to the conclusion that variable data is so classified because of its likelihood of

changing. Such a classification is consistent with the goal of efficiency. The system handles that type of information differently from information classified as not likely to change as often, which the system contemplates only transmitting if it has actually changed. Thus, by teaching the partitioning of data on the basis of how often it is expected to change, the patented invention creates an internally efficient system for transmitting the most up to date data in the least amount of time. Hill's contention that the data need not be classified before operation of the system is incorrect.

Hill is also partly correct with respect to the second premise to CompuServe's argument that Hill labeled as "faulty." There is no requirement based on the claims or the specification that all constant data should be graphics or image files, and all variable data a text file. In fact, the summary of the invention specifically described constant data as including "both graphics data and textual data." *Id.*, Col. [*91] 1, *ll.* 58-59. CompuServe has cited evidence, however, by which Hill implied that its theory of infringement related to text files being classified as variable data and graphics files as constant. For example, in its August 1998 answers to CompuServe's interrogatories, Hill added an explanatory clause stating, "e.g., product information that appears as text within the HTML file" or "textual product information in an HTML file," each time it mentioned variable data. *See* Ex. 2, Hill's 8/10/98 Answers to Interrogatories, pp. 19, 22, 24, 25, 27, 29, 30, 32, 34, 36, 37, 38, 40. Correspondingly, whenever Hill referred to constant data it added an explanatory clause, such as "e.g., graphic product information in one or more separate files incorporated by reference from an HTML file, such as inline image files." *See* Ex. 2, pp. 19, 20, 21 ("constant data file incorporated by reference in a Web page"), 22 (same), 24, 25, 26 ("such as an inline image file"), 27 ("e.g., graphic files incorporated by reference from an HTML file"), 29, 30, 32, 34, 37, 38, 41.

This theme was repeated in Hill's expert witness's infringement report, in which Dr. Dunsmore opined that the claim terms "constant [*92] data" and "variable data" were met in the accused system. "All text that is not part of an image file is information related to at least one product . . . . This textual information is capable of changing at any time. . . . Notice the 'Last Modified: Unknown' denotation with this *variable* data--which will inform the Web browser to reload it each time this page is visited." Ex. 3, Dunsmore 5/21/99 Infringement Rep. at 3 (emphasis added). Dr. Dunsmore specifically concluded that "by giving the textual information a 'Last Modified: Unknown' denotation, the text is treated as variable data." *Id.* With respect to "constant data," Dr. Dunsmore stated, "all images are information related to at least one product. . . . These images are likely to

Case 1:04-cv-12457-PBS    Document 77-10    Filed 09/22/2006    Page 27 of 37

Page 27

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

change less often than the textual information." *Id.* He concluded with, "by giving the image data their actual 'Last Modified' dates (rather than 'Unknown'), the images are treated as *constant* data. These can still be changed, but are less likely to need to be updated each time when visited by the Web browser." *Id.* at 3-4 (emphasis added).

As a result of these assertions, CompuServe argued that Hill cannot prove infringement unless [*93] it can prove that all of CompuServe's textual information is treated as variable data and all of its graphic information as constant. As the Court has noted, the claims do not require that constant data be only one type of information, just that it be classified as less likely to change than variable data. Correspondingly, variable data does not have to be just one type of information as long as it is data classified as likely to change at any time. In light of this teaching, what must be shown is that the accused system classifies data files on the basis of their relative likelihood of changing and then treats those files consistently with the way the Hill Patent treats constant and variable data.

Hill argues that it does. Citing Dr. Dunsmore's May 1999 Infringement Report, Hill asserts that evidence of classification is found in the "Last Modified" dates or headers associated with data files or Active Server Page ("ASP") files in the CompuServe online services system. For example, when a data file has a "Last Modified: Unknown" date, it will be sent every time the browser accesses a Web page from the server containing that file. *See* Joint Statement P 15. Similarly, ASP files [*94] are sent every time the browser asks for information with which they are associated, unless the ASP file contains a "Last Modified" header (and the page has not been modified), the Expires header (and the number of minutes specified have not passed), or the Expires-Absolute header (and the date and time specified are still in the future). *See* Joint Statement P 16. Although these facts are not disputed, Hill and CompuServe reach different conclusions from them. CompuServe has identified instances in which data files with a "Last Modified" date of unknown or none actually contained boilerplate text that was not likely to change at all, as well as graphics files containing information that is likely to change at any time, such as price. *See* Ex. 7, Gregor Aff. PP 8-9; Ex. 42, House Aff. PP 5, 7; Ex. 6, Dunsmore Dep. at 162-63. Hill, on the other hand, sees the modification designations as proof of classification of data on the CompuServe system.

Hill's emphasis, however, on the data that make up specific Web pages that its expert has reviewed only serves to prove that there is data on any given Web page that changes at a relatively faster pace than other data on the page. It does [*95] not prove that all of the product

information data has been classified for use in the system in accordance with how often it is likely to change. This fact is significant given that there is no dispute that all of the data from a Web page is "cached" on the remote computer, not just the alleged constant data. Thus, the Court cannot use the fact that data is being "cached" on a remote computer as evidence that it has been classified as constant and is being treated as constant data in the Hill Patent. Other evidence must be offered to allow the Court to discern classification in the accused system on the basis of the data's likelihood of changing. In its surreply, Hill argues that evidence of such classification between constant and variable data on CompuServe's Web sites is found in the fact that some files have a "Last Modified: Unknown" date (variable data) and others have a specific date associated with the "Last Modified" header (constant data), which represents the data's revision status. Hill's Surreply at 2. According to Hill, this classification is done for the same reason as in the Hill Patent--to reduce transmission time. *Id.*

Yet, this evidence fails to provide the necessary [*96] connection between the meaning of constant data and variable data as the Court has construed them, and the alleged classification on the accused system. In other words, Hill has no evidence that a file is designated "Last Modified: Unknown or None" because it contains data that is likely to change at any time. Hill relies on its expert's report in which Dr. Dunsmore stated that "by giving the textual information a 'Last Modified: Unknown' denotation, the text is treated as variable data." Ex. 3, Dunsmore 5/21/99 Infringement Rep. at 3. What Dr. Dunsmore did not say, however, is that the text was given that unknown modification date because it is classified as likely to change at any time. Nor did he offer any facts that would demonstrate that all of the data with modification dates of "unknown" or "none" comprises data that is classified as likely to change at any time. Instead, the only clear connection that can be made between the modification designation in the CompuServe system and the Hill method is that data that does not have a specific modification date will be sent every time the Web page is visited. No evidence has been provided to show that such treatment occurs because [*97] that data is likely to change at any time. n11 The simple fact that some data on a few Web pages with an unknown modification date could be capable of changing at any time does not speak to whether that is the reason it was given such a modification designation. As with Dr. Dunsmore's testimony on the issue of storing, his opinion here will not suffice to create a genuine issue of material fact. *See Collins, Inc., 216 F.3d at 1047* ("expert must set forth the factual foundation for his opinion. . . in sufficient detail for the court to determine whether that factual foundation would support a finding of infringement under the claim construction adopted by the court, with

Case 1:04-cv-12457-PBS    Document 77-10    Filed 09/22/2006    Page 28 of 37

Page 28

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

all reasonable inferences drawn in favor of the non-movant.").

  n11 Moreover, the data that Hill alleges is constant data, data that has a specific modification date, is not treated identically to constant data in the Hill Patent. Some of that data may contain "Expires" dates, by which the Web browser is able to discern whether it should re-load those files from the Web server. Unlike in the Hill Patent, when the data has an "expires" date, there is no "comparison" of revision status at the main computer. Instead, the Web browser is able to determine the revision status of such data by comparing its expiration date with the current date on the remote computer.

[*98]

  As further support for its contention that the CompuServe system infringes the claim terms of constant and variable data, Hill points to an article by Nancy Cluts, an employee of Microsoft Corporation. In it, Ms. Cluts observed that

  Most Web pages combine content that is static with content that is dynamic. The dynamic content can change every 30 seconds or every week--it depends on the Web site. . . . The static content will change so infrequently that you know it will always be on the page. . . .

  As a result, it would certainly make sense that you could speed up your Web site's responsiveness by downloading only the content that changed (i.e., the dynamic content). That way, the static content would not have to be downloaded every time the page was displayed; instead it would be retrieved swiftly from the cache. . . . In fact, many sites on *www.microsoft.com* . . . have taken the time to cache their static items and have reaped the benefit of a noticeable performance increase.

Ex. 44, Dunsmore Aff. P. 12, Ex. A. According to Hill, by substituting the words constant for static data, and variable for dynamic, "it is easy to see that the web pages described [*99] by Ms. Cluts incorporate the technology of the Hill patent." Hill's Resp. to CompuServe's Second Mot. for Sum. J. at 16. This article, Hill contends, raises

a genuine issue of material fact about CompuServe's claim that data on the Web is not classified into constant and variable categories based on their relative likelihood of changing.

  The Court cannot agree. First, there is no evidence that Ms. Cluts' article is referring to any of the methods used in connection with CompuServe's online shopping service. Second, the article was dated March 18, 1999, and refers to a new version of the Internet Explorer that "offers an even greater enhancement of caching that improves the responsiveness of Web sites. . . ." Ex. 44, Ex. A at 1. The writer cautions, however, that "the features discussed in this article are supported in Internet Explorer 5, and were not available in previous versions" of Internet Explorer. *Id.* Hill does not offer any evidence to connect Ms. Cluts' reference to Internet Explorer 5 with the CompuServe online services. Finally, from the informational tone of the article it seems intended to inform those who design Web sites about a new development or discovery (according [*100] to Ms. Cluts) that may assist with the performance of their Web sites. It does not provide specific evidence that anyone is actually using the described method of caching static data so that only dynamic data need be downloaded, and even if it did, there is no evidence that the person using the method is associated with CompuServe. For all of these reasons, Hill's effort to prove that CompuServe online services classify data according to the relative likelihood the data will be changing using Ms. Cluts' article contains a few significant gaps and does not raise an issue of fact.

  CompuServe is also seeking at least partial summary judgment of non-infringement on Independent Claims 15 and 35 and their dependent claims, because the accused system includes no step by which constant data in the memory of the remote computer is compared with the constant data stored in the memory of the main computer. The parties agree that the CompuServe system does not compare constant data in the memory of the remote with constant data on the main computer. Joint Statement PP 29-30. Further evidence of this fact is provided by Hill's expert, Dr. Dunsmore, who emphasized that in the accused service "remote [*101] data is compared only by comparing its revision status with the revision status on the main computer." Ex. 3, Dunsmore 5/21/99 Infringement Report at 14-15, 22-23. Hill's response to this aspect of the second motion for summary judgment makes clear that it considers the comparison of remote revision status with the revision status on the main computer to be the same as, or equivalent to, comparing constant data from the remote with constant data on the main computer. CompuServe objects to this interpretation on the basis that it violates the rule against im-

Case 1:04-cv-12457-PBS    Document 77-10    Filed 09/22/2006    Page 29 of 37

Page 29

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

porting limitations into the claims and the doctrine of claim differentiation.

While it is true that in construing a claim the Court is not to import extraneous limitations, the circumstances here do not result in a limitation of Claims 15 and 35, but an interpretation of their scope to include a comparison of the remote revision status with the revision status for constant data on the main computer. Hill does not argue that Independent Claims 15 and 35 should be limited to that act in meeting the element of comparing constant data; rather it contends that the scope of the broader claim elements in Claims 15 and 35 of "comparing [*102] constant data" could include the narrower act of comparing the revision statuses, as described in their dependent claims. Hill is correct. Both the prohibition against importing extraneous limitations into claims and the doctrine of claim differentiation are aimed at preventing the same wrong: unduly narrowing a claim that is written in broader language. Noting that narrower language is found in another claim, and presuming that it has a distinct meaning from the broader language of the claim being interpreted, is one way of preventing this.

[HN28] The doctrine of claim differentiation creates a presumption that each claim in a patent has a different scope. *Comark Comm., Inc. v. Harris Corp., 156 F.3d 1182, 1187 (Fed. Cir. 1998).* "There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims. To the extent that the absence of such difference in meaning and scope would make a claim superfluous, the doctrine of claim differentiation states the presumption that the difference between claims is significant." *Id.; Modine Mfg. Co. v. United States Internat. Trade Com'n, 75 F.3d 1545, 1551* (Fed. Cir.), [*103] *cert. denied, 518 U.S. 1005 (1996).* This is a doctrine based on the "common sense notion" that different words or phrases used in separate claims have different meanings and scope. *Karlin Tech., Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 971 (Fed. Cir. 1999).*

The Court finds that interpreting the claim element of comparing constant data to include the act of comparing the revision status of constant data in a memory of the remote computer with the revision status of constant data on the main computer, does not violate the doctrine of claim differentiation. This is because the broader term "comparing constant data" in the independent claim may be accomplished by the narrower one, comparing the revision statuses of constant data on the remote with the constant data on the main computer. Yet, the broader term may also be accomplished in other ways, such as the direct comparison of constant data on the two computers. Interpreting the broader term to include the narrower one, revision status comparison, does not render the narrower claim superfluous. That claim is limited to

only one way of comparing constant data -- by comparing revision statuses. [*104] Such a claim has a different meaning and scope, a narrower one, than the broader claim term that allows for constant data to be compared directly, by comparing revision statuses, or by other ways.

For these reasons, CompuServe's argument that it is entitled to partial summary judgment of non-infringement of Claims 15 and 35 must fail. That failure however, is not fatal, for the Court has already found that the CompuServe online shopping service does not include the claim elements of storing, constant data or variable data, as the Court has construed them. Even though the motion for partial summary judgment of non-infringement of independent Claims 15 and 35 based on the alleged absence of comparing constant data stored on the remote with constant data on the main computer, must be **DENIED**, the Court has found these claims not to be infringed based on other grounds. The denial of this partial summary judgment motion does not mean the issue need be decided at a trial.

### 3. Doctrine of Equivalents

Essentially, Hill's argument that CompuServe infringes the constant and variable data claim elements depends on Hill's belief that it only has to point to data that is capable of [*105] changing at any time to satisfy the definition of variable data, and to data that is likely to change less often than variable data to satisfy the definition of constant data. As noted above, this belief is mistaken. There must be some proof of a classification of all product information data on the basis of its relative likelihood of changing to meet these claim elements. By pointing to Web pages containing data that is capable of changing at any time, such as the mall marquee or the dates of special events, Hill is not identifying variable data as the Court has defined it. Such evidence only suggests that the data on Web pages is likely to change at different rates, which says nothing about whether it has been deliberately divided into classes based on the relative rates of change expected, so that the constant data can be stored on a remote computer. Because a key aspect of the definition of constant and variable data is missing, the evidence Hill offers does not suffice to raise a genuine issue of material fact about infringement under the doctrine of equivalents.

### D. Invalidity Based on Anticipation

[HN29] An anticipation or obviousness defense is based on the requirement [*106] that an invention be novel or new. "The novelty requirement lies at the heart of the patent system." I DONALD S. CHISUM, *CHISUM ON PATENTS § 3.01* (Rel. No. 71, Sept. 1999) (hereafter "CHISUM ON PATENTS"). If the invention is novel, then "further inquiry must be made into

Case 1:04-cv-12457-PBS    Document 77-10    Filed 09/22/2006    Page 30 of 37

Page 30

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

whether it is new enough" to be patented. *Id.* A successful defense of anticipation "requires that the same invention, including each element and limitation of the claims, was known or used by others before it was invented by the patentee." *Hoover Group, Inc. v. Custom Metalcraft, Inc., 66 F.3d 299, 302 (Fed. Cir. 1995). See also C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d 1340, 1349 (Fed. Cir. 1998); Hupp v. Siroflex Am., Inc., 122 F.3d 1456, 1461 (Fed. Cir. 1997).* A challenger cannot prove anticipation "by combining more than one reference to show the elements of the claimed invention." *CHISUM ON PATENTS § 3.02.* Thus, a prior patent or device must contain all of the elements and limitations in the disputed patent as arranged in the patented device. *See C.R. Bard, 157 F.3d at 1349; Hoover Group, 66 F.3d at 303.*

Although Hill [*107] has addressed the issue of obviousness with respect to the Hill Patent, CompuServe made clear in its reply brief that it was relying on only one prior art reference to challenge the validity of the Hill Patent. CompuServe Reply Brf. at 20-21. For that reason, the Court finds that anticipation is the only basis for CompuServe's invalidity challenge. n12 Moreover, CompuServe has specifically stated that it considers the issues raised in its anticipation defense to be *conditional*, that condition being that the Court has denied either of its summary judgment motions on the issues of noninfringement. Hill, on the other hand, repeatedly takes the position that the Court should rule on all of the pending motions, to avoid multiple appeals and undue delay.

n12 [HN30] The determination of whether an invention is obvious is a legal conclusion, dependent on underlying factual inquiries. *WMS Gaming Inc. v. International Game Technology, 184 F.3d 1339, 1355 (Fed. Cir. 1999).* Those factual inquiries include: 1) the scope and content of the prior art; 2) the level of ordinary skill in the field of the invention; 3) the differences between the claimed invention and the prior art; and 4) any objective evidence of nonobviousness, such as long-felt need, commercial success, the failure of others, or evidence of copying. *Id.; C.R. Bard, 157 F.3d at 1351.* In other words, obviousness calls on the Court to consider the patent in light of multiple prior art references. Because CompuServe only points to one prior art reference, its invalidity defense does not involve obviousness.

[*108]

The Court has found that CompuServe's online shopping service does not infringe the Hill Patent because it does not include the claim elements of storing or constant and variable data as the Court has defined them.

As a result of these findings of noninfringement, the Court is faced with the decision of whether to also undertake an analysis of the patent's validity. It is guided in making this decision by several relevant cases. The Supreme Court has addressed the issue of whether the Federal Circuit, after affirming a finding of noninfringement, may properly find the district court's ruling on the issue of validity moot. *Cardinal Chemical Co. v. Morton Internat., Inc., 508 U.S. 83, 95, 124 L. Ed. 2d 1, 113 S. Ct. 1967 (1993).* Prior to this decision, the Federal Circuit had routinely found these appeals to be moot once it affirmed the district court's finding of noninfringement. The Supreme Court disagreed with that practice, holding that [HN31] when validity arises in a counterclaim seeking a declaratory judgment of invalidity, the Federal Circuit retains jurisdiction over an appeal of the district court's ruling on the counterclaim. *Id.* It explained that "[a] party [*109] seeking a declaratory judgment of invalidity presents a claim independent of the patentee's charge of infringement," which means that even if the appellate court affirms the finding of noninfringement it still must consider the counterclaim. *Id.*

This decision is a narrow one, however, relating only to the issue of whether an affirmed finding of noninfringement, without more, justifies a reviewing court's refusal to reach the issue of validity in a declaratory judgment counterclaim. *Super Sack Mfg. Corp. v. Chase Pkg. Corp., 57 F.3d 1054, 1060 (Fed. Cir. 1995), cert. denied, 516 U.S. 1093, 133 L. Ed. 2d 760, 116 S. Ct. 815 (1996); Brunswick Corp. v. United States, 34 Fed. Cl. 532, 556 (Fed. Cl. 1995), aff'd 152 F.3d 946 (Fed. Cir. 1998).* The Supreme Court made clear that the decision related only to the jurisdiction of the intermediate appellate court, and not to a trial court. *Cardinal Chemical, 508 U.S. at 95.* In doing so, it left open the possibility that a finding of noninfringement by the trial court, in the proper case, may justify the court's refusal to consider the issue of validity.

Courts [*110] considering whether to issue a ruling on validity after a finding of noninfringement have consistently distinguished the *Cardinal Chemical* case on the basis that it considered validity in the context of a counterclaim for declaratory judgment, not in the context of an affirmative defense. *See Hill-Rom Co., Inc. v. Kinetic Concepts, Inc., 209 F.3d 1337, 1344 (Fed. Cir. 2000); Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1481 (Fed. Cir. 1998)* (Supreme Court in *Cardinal* "drew a dispositive distinction between an affirmative defense and a counterclaim for a declaratory judgment"); *Brunswick Corp., 34 Fed. Cl. at 557* (noting that Supreme Court made it clear that its ruling in *Cardinal* was limited to counterclaims challenging validity brought under Declaratory Judgment Act). Thus, it appears that [HN32] when validity is challenged only by means of an

Case 1:04-cv-12457-PBS    Document 77-10    Filed 09/22/2006    Page 31 of 37

Page 31

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

affirmative defense, and the district court has found non-infringement, the court need not consider the validity of the patent.

Here, the issue of the validity of the Hill Patent has been raised as a counterclaim for declaratory relief that was asserted by CompuServe in response [*111] to Hill's complaint of infringement. For that reason, it is incorrect for CompuServe to state, "if the Court grants summary judgment on either of the first two 'non-infringement' motions, there would be no need to consider the instant 'validity' motion." CompuServe's Mot. for Sum. J. of Invalidity at 1. Even if the Court granted CompuServe's motions for summary judgment of noninfringement, the counterclaim on the issue of validity would still remain. n13 For that reason, the Court will proceed with a review of the patent's validity in light of the one prior art reference cited by CompuServe.

> n13 The Court notes that CompuServe's counterclaim also seeks a declaratory judgment of noninfringement and unenforceability. The Court's ruling with respect to the other summary judgment motions adequately resolves the issues of noninfringement, but the issue of unenforceability has not been raised in any of the motions. As a result, the Court deems that issue waived.

[HN33] Patent claims are presumed to be valid, absent clear [*112] and convincing evidence of invalidity presented by the alleged infringer. *Monarch Knitting Mach. Corp. v. Sulzer Morat GMBH, 139 F.3d 877, 881 (Fed. Cir. 1981).* Anticipation of specific patent claims requires a showing that a single prior art reference disclosed every limitation or element in the patent claim. *General Elec. Co. v. Nintendo Co., Ltd., 179 F.3d 1350, 1356 (Fed. Cir. 1999).* "To anticipate a claim, a reference must disclose every element of the challenged claim and enable one skilled in the art to make the anticipating subject matter." *PPG Indus., Inc. v. Guardian Indus. Corp., 75 F.3d 1558, 1566 (Fed. Cir. 1996).* The burden of persuasion remains at all times on the challenger to the patent's validity, who must meet the clear and convincing standard of evidence to overcome the statutory presumption of validity. *See Monarch Knitting Mach., 139 F.3d at 881* (citing *35 U.S.C. § 282).*

CompuServe suggests that its burden is lessened because it has pointed to a prior art reference that was not considered by the Patent Office during its consideration of the Hill Patent. CompuServe's Mem. [*113] in Sup. of Mot. for Sum. J. on Invalidity at 11-12 (citing *American Hoist & Derrick Co. v. Sowa & Sons, 725 F.2d 1350, 1360* (Fed. Cir.), *cert. denied, 469 U.S. 821, 83 L. Ed. 2d 41, 105 S. Ct. 95 (1984)).* The case CompuServe

cited does not exactly support this contention. In *American Hoist,* the court specifically stated that the fact that the prior art reference was not considered by the Patent Office may serve as evidence toward meeting the challenger's burden, but it does not shift it, lighten it, or otherwise change the burden of convincing the court by clear evidence that the patent is invalid. *Id.; see also Newell Window Furn., Inc. v. Springs Window Fashions Div., Inc., 1999 U.S. Dist. LEXIS 17273, 1999 WL 1077882, *2* (N.D. Ill. Oct. 7, 1999). In light of this holding, the Court, at most, will consider this fact along with the other evidence offered regarding validity.

[HN34] The determination of anticipation involves a factual inquiry about whether there is any "difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention." *Scripps, 927 F.2d at 1576.* "[A] finding [*114] of anticipation requires that all aspects of the claimed invention were already described in a single reference. . . ." *Id.* Extrinsic evidence, such as expert testimony, could help educate the decision-maker about the prior reference's meaning to a person of ordinary skill in the field of the invention. *Id.* Here, CompuServe has offered only the prior art reference itself, which is a sixty-five page patent disclosure, containing forty-three claims and written in highly technical language, an appendix to its motion containing an element by element comparison between the Hill Patent and the Prodigy Patent claimed to anticipate it, n14 and a declaration from one of the inventors of that patent. This evidence does not suffice to show in a clear and convincing manner that any of the claims of the Hill Patent were anticipated by the single prior art reference, the Prodigy Patent.

> n14 Hill challenges this appendix as an "unsworn and unauthenticated chart purporting to compare the elements of some of the Asserted Claims to disclosures in the Prodigy Patent." Hill's Mem. in Oppos. at 15. Hill suggested that the chart must have been prepared by CompuServe's counsel. CompuServe did not deny this, but instead suggested that the chart was somehow supported by the Gordon Affidavit, without describing how. The Court assumes CompuServe meant the Gordon Declaration.

[*115]

CompuServe further conditioned this motion on the Court's precise ruling on the infringement issues. CompuServe's Mem. in Sup. of Mot. for Sum. J. of Invalidity at 1. If that ruling accepted Hill's argument that the claim element of storing could be met by the browser's recording of data in the cache of the remote computer,

Case 1:04-cv-12457-PBS     Document 77-10     Filed 09/22/2006     Page 32 of 37

Page 32

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

subject to involuntary deletion, then the validity issues would be narrowed. *Id.* Specifically, CompuServe noted that the Prodigy Patent discloses the temporary recording of data, subject to involuntary deletion. For that reason, the Court would only need to determine if the other elements of the Asserted Claims were present. If they are, then the Prodigy Patent anticipated the Hill Patent. By implication, the converse would seem to negate a finding of anticipation. In other words, CompuServe has framed the issues in such a way that if the Court rules in favor of Hill on the infringement issues, then it should find that the Prodigy Patent anticipated the Hill Patent, but if the Court rules against Hill, there may not be any anticipation by the Prodigy Patent. *Id.* at 1-2.

The parties agree to the following facts about the state of the art at the time of [*116] the Hill Patent. At the earliest possible date of invention for the Hill Patent, April 10, 1991, distributed and replicated databases and file systems were known in the art. Joint Statement PP 31, 33. Networks linking a plurality of remote personal computers with a main or host computer were also widely known. *Id.* P 34. In addition, those skilled in the art knew about version control of files in a distributed or replicated database system. *Id.* PP 35, 36. They also knew about electronic catalogs, online shopping, and integrating or merging data on a remote computer. *Id.* PP 37-39. The Prodigy Patent, filed July 28, 1989, and issued September 13, 1994, referred to "shopping events" and described the capabilities of a version of the Prodigy online service. *Id.* PP 41-42. When the Patent Office reviewed the Hill Patent application for an electronic catalog system and method, it did not consider the Prodigy Patent. *Id.* P 42. Given these agreed facts and the Court's findings with respect to noninfringement, the burden of determining whether the Hill Patent was anticipated by the Prodigy Patent is somewhat lightened.

Nevertheless, the Court's task is complicated by the [*117] fact that both parties tended to overstate their positions in their arguments. For example, in its comparison of the Prodigy Patent with the Hill Patent, CompuServe has paraphrased the disclosures of the Prodigy Patent in language that echoes the Hill Patent claims. With regard to how the Prodigy Patent anticipated the first step of Claim 1 of the Hill Patent, n15 CompuServe stated "the Prodigy Patent discloses a central delivery system which stores all of the data used by the service, including product information and associated version control information." CompuServe Mem. in Sup. at 17. It hastened to add that the Prodigy "delivery system" supports an online shopping service and is "equivalent to Hill's main computer." *Id.* The portion of the Prodigy Patent CompuServe cited for this point, however, described the preferred embodiment this way:

As shown in FIG. 1, interactive network 10 uses a layered structure that includes an information layer 100, a switch/file server layer 200, and cache/concentrator layer 300 as well as reception layer 401. This structure maintains active application databases and delivers requested parts of the databases on demand to the plurality [*118] of RS 400's, shown in FIG. 2.

Ex. 18, Prodigy Patent, Col. 4, *ll.* 20-25. CompuServe's paraphrasing is allegedly further supported by another description of the preferred embodiment. "Server unit 205 is seen to be connected to information layer 100 and its various elements, which act as means for producing, supplying and maintaining the network databases and other information necessary to support network 10." *Id.* Col. 4, *ll.* 31-35. No further evidence or argument is contained in CompuServe's brief to assist the Court with understanding how the quoted portions of the description of the preferred embodiment in the Prodigy Patent anticipated step one of Claim 1 of the Hill Patent.

n15 Step 1 of the Hill Patent calls for "storing and maintaining variable data and constant data related to at least one product and a main revision status in a memory of a main computer, the main revision status indicating the revision level of the constant data stored in the main computer." Ex. 1, Hill Patent, Col. 21, *ll.* 56-60.

[*119]

Aside from the vast differences in language used in the two patents, the Court is perplexed by the fact that CompuServe argues that Claim 1, a method claim referring to a main and a remote computer and their cooperation, is anticipated by a method describing multiple layers of structure and steps. Moreover, the cited text does not specifically refer to maintaining or updating any specific type of data that is related to at least one product in a memory of a main computer. As with the determination of infringement in a method patent, [HN35] determining anticipation requires examining whether every step of the claimed method is disclosed in the prior art reference. *Glaverbel Societe Anonyme v. Northlake Marketing, 45 F.3d 1550, 1554 (Fed. Cir. 1995)* ("Anticipation requires identity of the claimed process and a process of the prior art . . . including each step thereof . . . described or embodied . . . in a single reference."). The interaction between the various computers in the Prodigy Patent appears to be very different from that disclosed in the Hill Patent, and these differences hinder a finding that the

Case 1:04-cv-12457-PBS    Document 77-10    Filed 09/22/2006    Page 33 of 37

Page 33

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

first step of Claim 1 was anticipated by the Prodigy Patent.

In [*120] an effort to identify constant and variable data in the Prodigy Patent, CompuServe pointed to another portion of the specification relating to "Reception System Software." *See* Ex. 18, Col. 82 *l.* 15, Col. 85, *ll.* 48-63. Therein is disclosed

> Cacheable objects can be retained during the current user session, but cannot be retained between sessions. These objects usually have a moderate update frequency. Object storage facility 439 retains objects in the cache according to the LRU storage retention algorithm. Object storage facility 439 uses the LRU algorithm to ensure that objects that are least frequently used forfeit their storage to objects that are more frequently used.
>
> Trashable objects can be retained only while the user is in the context of the partitioned application in which the object was requested. Trashable objects usually have a very high update frequency and must not be retained to ensure that the user has access to the most current data.

Ex. 18, Col. 85, *ll.* 48-63. According to CompuServe, the treatment of cacheable and trashable objects in the Prodigy Patent is equivalent to the storage and maintenance of variable data in the Hill Patent. CompuServe [*121] Mem. in Sup. at 18. Yet, CompuServe does not explain the difference between retention for a current session and retention while the user is in the context of a partitioned application, or how these two categories can be the same as variable data.

Hill's expert, however, considered the same portions of the Prodigy Patent and opined that some "objects" are "somewhat like variable data," while others are "somewhat like constant data." Ex. 43, Dunsmore Rep. on Validity at 2. Still other objects, he noted, were in a category that was not like either type of data in the Hill claims. *Id.* Those objects "permitted staging between sessions," making them unlike variable data, and had no version checking, making them unlike constant data. *Id.* Further, Dr. Dunsmore noted that the Hill Patent's claims all relate constant and variable data to an electronic catalog and products, whereas the Prodigy Patent's references to objects are not so limited. *Id.* In response, CompuServe points to the Court's *Markman* rulings about constant and variable data, emphasizing the aspect of how such data is classified (*i.e.*, in accordance with its relative likelihood of changing). The Prodigy Patent's [*122]

objects, CompuServe argues, are similarly classified. Overlooked in this counter-argument is the part of the Court's definition that coincides with Dr. Dunsmore's opinion. Constant data is "*product information* classified as likely to change less often than variable data," and variable data is "*product information* classified as capable of changing at any time." *Markman* Order at 46 (emphasis added). The Court can discern no language in the Prodigy Patent that limits classification on the basis of the changeability of objects to data related to products in an electronic catalog.

Constant data in the Hill Patent, the defendant argues, is equivalent to the "stageable" objects of the Prodigy Patent. *Id.*

> Stageable objects must not be subject to frequent change or update. They are retained between user sessions on the system, provided storage space is available and the object has not discarded [sic] by a least-recently-used (LRU) algorithm of a conventional type . . . which, in accordance with the invention, operates in combination with the storage candidacy value to determine the object storage priority, thus rendering the stage self-configuring as described more fully [*123] hereafter. Over time, the self-configuring stage will have the effect of retaining within local disk storage those objects which the user has accessed most often. The objects retained locally are thus optimized to each individual user's usages of the applications in the system. Response time to such objects is optimized since they need not be retrieved from the interactive computer system.

*Id.* Col. 85, *ll.* 30-47. As with the variable data element, the passage describing what CompuServe claims is constant data in the Prodigy Patent is missing a key limitation relating the term to product information in an electronic catalog. Without this limitation, the Prodigy Patent cannot be seen as having anticipated the Hill Patent's concept of constant and variable data. Moreover, the description of "staging" seems different from storing constant data on a remote, in that staging is said to have the effect over time of "retaining within local disk storage" the objects the user accesses the most. It is also not clear from the quoted description where on the system the objects are retained. These difference lead away from a finding of anticipation.

As evidence that the alleged equivalents [*124] to constant and variable data in the Prodigy Patent are

Case 1:04-cv-12457-PBS     Document 77-10     Filed 09/22/2006     Page 34 of 37

Page 34

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

stored and maintained on a main computer, CompuServe identifies, in the "System Configuration" section of the Prodigy specification, a statement that "all active objects reside in file server." *Id.* Col. 7, l. 64. It interprets this brief statement to mean that the Prodigy network's file server operates in the same manner as the main computer of the Hill Patent. No further explanation, evidence, or argument is offered to justify this interpretation. The Court finds it insufficient.

The parties also dispute the meaning of "objects" itself, and whether the term is the same as "data" in the elements of constant and variable data in the Hill Patent. In the "Object Language" section of the Prodigy specification, CompuServe located an explanation of what is contained in "objects." According to CompuServe, objects contain text and graphics. Ex. 18, Prodigy Patent, Col. 39, *ll.* 37-43; Col. 10, *ll.* 66-68. It is true that the Prodigy Patent discloses objects that "specify format and provide content; *i.e.*, the text and graphics, displayed on the user's screen so as to make up the pages that constitute the application." [*125] *Id.*, Col. 39, *ll.* 40-43. However, upon further review, the Prodigy Patent also discloses that objects function to divide pages into partitions, describe windows that can be opened on pages, and contain applications that facilitate the data processing necessary to present pages. *Id.*, Col. 39, *ll.* 39-49. With all these tasks to accomplish, the objects of the Prodigy Patent are not the same as or similar to the Hill Patent's "data."

Another example of CompuServe's creative paraphrasing relates to Claim 1, step one of the Hill Patent, which discloses a main revision status indicating the revision level of the constant data stored on the main computer. Ex. 1, Hill Patent, Col. 21, *ll.* 58-61. According to CompuServe, this claim element is "identical in form and substance to what is referred to as object storage and version identification control bytes" in the Prodigy Patent. CompuServe Mem. in Sup. at 18. As evidence of this statement, CompuServe points to several sections of the Prodigy specification, which disclose

> object header 551 in preferred form is 18 bytes in length and contains a prescribed sequence of information which provides data regarding the object's [*126] identification, its anticipated use, association to other objects, its length and its version and currency.
>
> * * *
>
> Thereafter, a single byte . . . is allocated to identify the storage characteristic for the object; *i.e.*, the criterion which establishes

at what level in network 10 the object will be stored, and the basis upon which it will be updated. At least a portion of this byte; i.e., the higher order nibble (first 4 bits reading from left to right) is associated with the last byte . . . in the header which identifies the version of the object, a control used in determining how often in a predetermined period of time the object will be updated by the network.

> * * *
>
> Finally, and as noted above, header 551 includes a byte . . . which identifies the version of the object. Particularly the object version is a number to establish the control for the update of the object that are [sic] resident at reception system 400.

Ex. 18, Prodigy Patent, Col. 12, *ll.* 31-35; Col. 13, *ll.* 4-15, 19-23.

In a subsequent section, the specification adds detail to the preferred embodiment with respect to the coding of the objects. It discloses

> Additionally, to assure [*127] currency of the information and transaction support provided at RS 400, objects are further coded for version identification and checking in accordance with a system of priorities that are reflected in the storage candidacy coding.
>
> Specifically, to effect object storage management, objects are provided with a coded version id made up of the storage control byte and version control bytes identified above as elements of the object header, specifically bytes 16 and 18 shown in FIG. 4*b*. In preferred form, the version id is comprised of bytes 16 and 18 to define two fields, a first 13 bit field to identify the object version and a second three bite field to identify the object storage candidacy.

Ex. 18, Col. 86, *ll.* 24-37.

From this disclosure, the Court learns that objects have a complicated code that enables the disclosed software system of the Prodigy Patent to determine what to do with them. Objects may be placed on the reception

Case 1:04-cv-12457-PBS    Document 77-10    Filed 09/22/2006    Page 35 of 37

Page 35

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

system, which appears to be a user level, and either used only during one session, kept between sessions without being version checked, or kept between sessions and checked for currency. The objects' coding may also direct the software to [*128] keep them at a different level within the network called the "cache concentrator," which is further up the hierarchy of the disclosed delivery system. In other words, the coding system contains more and different information than is contemplated by the term "revision status" in the Hill Patent. CompuServe has not made it clear to the Court how the Prodigy Patent's coding system is the same as the Hill "revision status indicating the revision level of the constant data stored in the main computer."

Rather than meet CompuServe's challenge of its patent head on, Hill first attacks the Appendix included with CompuServe's brief that purports to perform a step by step comparison of the Hill and the Prodigy patents. The trouble with CompuServe's chart is that it does not offer any indicia of reliability with respect to its origin, and is best approached as an illustrative exhibit. As such, it serves as a finding tool, rather than as evidence. The Court has made limited use of this document, relying instead on the Prodigy Patent itself and the experts' testimony about it. For example, CompuServe's own expert enumerated the claims he saw as anticipated by the Prodigy Patent, and the list did [*129] not include Claims 3, 4, 15-18, 21-26, or 35-39. Ex. 41, Johnson-Laird Rep. on Validity P 71. No evidence or testimony contradicts this opinion, and Dr. Dunsmore corroborates it, which negates a finding of anticipation with respect to any of these seventeen claims.

That the remaining Asserted Claims are not anticipated by the Prodigy Patent, Hill contends, is also supported by Dr. Dunsmore's report. Specifically, Dr. Dunsmore found six limitations in the Hill Patent claims that are missing from the Prodigy Patent. Those six limitations include constant and variable data, selecting a product prior to transmitting the remote revision status, automatic connection and disconnection between the remote and the main computers, and transmitting a map with the variable data. Hill's Brf. in Oppos. to Def.'s Mot. for Sum. J. on Validity at 21. The Court has already found insufficient evidence to show that the Prodigy Patent anticipated constant and variable data as claimed in the Hill Patent, or that it disclosed a revision status term the same as or similar to how that term is used in the Hill Patent. Because the terms "constant and variable data" are common to all of the Asserted Claims, and [*130] "revision status" is common to all except Claims 15-18 and 35-37, the Court's findings suggest that CompuServe's evidence is insufficient to meet its burden of proving by clear and convincing evidence that the Hill Patent was anticipated by the Prodigy Patent.

Hill also points to Johnson-Laird's deposition as support that the Prodigy Patent discloses a system based on expiration dates, rather than version checking. This overstates Johnson-Laird's testimony. When asked about a section of the Prodigy Patent, Johnson-Laird agreed that it described an "expiree system," which is a system in which the data is checked to see how long it has resided on the remote computer, not whether it has changed. Ex. 22, Johnson-Laird Dep. at 246, 248-250. His specific response was it "certainly describes the expiree system. I think it may also describe some version related system." Id. at 248. After being asked to confirm that the revision status system in the Hill Patent was different from an expiree system, Johnson-Laird then clarified his earlier response by saying, "my earlier response was, it describes both an expiree system and also a version of the checking system." Id. at 251. Although [*131] Johnson-Laird's testimony was not a model of clarity on this point, he certainly did not state that the Prodigy Patent only used the expiree system, as Hill suggested.

As the Court has observed, CompuServe's briefing set out a step by step comparison of the Hill Patent with the Prodigy Patent. While it was not considered as evidence, the comparison chart could have been a useful means of organizing the parties' analysis of the invalidity issue. At no point in its brief did Hill specifically counter any of those comparisons. Instead, Hill relied on general or global rebuttals pointing to its own and CompuServe's experts' testimony. It would have been of greater assistance to the Court for Hill to have addressed CompuServe's comparisons more directly, given the technicality of the language in the Prodigy Patent.

Nevertheless, because there are so many gaps and unexplained differences between the Prodigy disclosures and those in the Hill Patent, the Court will not belabor the point or further lengthen this opinion with recitations of the other disclosures that do not lead to a finding of anticipation. Suffice it to say that the Court is not convinced that the claim element of storing [*132] is disclosed in the Prodigy Patent at all, as its descriptions of storing all contemplate involuntary removal of the stored objects. n16 Nor is there sufficient evidence of an identifiable step of transmitting a remote revision status to the main computer for comparison with the revision status of the relevant constant data that is stored there. Moreover, Hill's expert specifically identified the lack of constant and variable data in the Prodigy Patent as a significant difference between the two and as evidence that the Prodigy reference did not anticipate Claims 1-5, 8-11, 15-18, 21-26, 30-32 and 35-39 of the Hill Patent (the Asserted Claims). Ex. 43, Dunsmore Report on Validity at 1-2. The only evidence CompuServe has to counter this is its own interpretation of the Prodigy Patent, which

Case 1:04-cv-12457-PBS    Document 77-10    Filed 09/22/2006    Page 36 of 37

Page 36

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

the Court has found insufficient to meet CompuServe's burden with respect to validity.

n16 CompuServe points to one place in the Prodigy Patent specification it suggests discloses "permanent" storing, but the Court is not convinced the patent discloses the storing required by the Hill Patent. In a discussion of how the Prodigy system will handle "dead objects," the description states, "a sweeper control segment in the control object noted above can be used to act as a switch to turn the sweep of dead objects on and off." Ex. 18, Prodigy Patent, Col. 88, *ll.* 66-68. The context for this passage, however, refers to circumstances in which there is "deployment of new versions of the reception system software containing new objects not yet supported on delivery system 20." *Id.* The concern appears to be that new objects loaded on the reception system that do not correspond to any objects on the delivery system, may be treated as "dead" and prematurely "swept" off the reception system. *Id.* This is so unlike the Hill claims regarding storing constant data that it needs no further analysis.

[*133]

For all of these reasons, the Court finds that CompuServe has failed to offer sufficient proof from which to find by clear and convincing evidence that the Prodigy Patent anticipated any of the Asserted Claims of the Hill Patent. This finding, however, does not mean that the Court has issued an opinion with respect to the Hill Patent's actual validity. Instead, it has found that CompuServe has failed to meet the burden of proof necessary to obtain a declaratory judgment of invalidity based on the Prodigy Patent. The difference is important. Adequate grounds for entering a judgment in favor of CompuServe in this case exist in the Court's findings of noninfringement. Thus, its finding that the defendant's counterclaim has failed to produce sufficient evidence to rebut the presumption of the Hill Patent's validity, is not necessary to the judgment. *See Hill-Rom, 209 F.3d at 1344* (noting that district court's ruling on the invalidity defense was not incorporated in the judgment and would have no binding effect). As a result, CompuServe's motion for summary judgment on the issue of invalidity is **DENIED**, which defeats CompuServe's counterclaim for a declaratory judgment. [*134]

**E. Indirect Infringement**

The parties have fully litigated the issue of CompuServe's alleged direct infringement of the Hill Patent, and the Court has found that the patent was not infringed by CompuServe, either literally or by equivalents. That finding relied on the absence of the claim elements of storing and constant and variable data, as the Court has defined them. As noted, however, [HN36] an alleged infringer could be found liable for actively inducing direct infringement by others, which is an *indirect* infringement. *See 35 U.S.C. § 271*(b). A person may also indirectly infringe by knowingly providing components of a patented machine, combination, or material or apparatus for use in a patented process, thereby contributing to the direct infringement of the patent by others. *See 35 U.S.C. § 271*(c). CompuServe's fourth motion for summary judgment addresses the issues of indirect infringement.

[HN37] Common to both of the indirect infringement theories is the requirement that the patentee prove some type of direct infringement. *See Aro Mfg. Co. v. Convertible Top Replacement Co., Inc., 365 U.S. 336, 341, 5 L. Ed. 2d 592, 81 S. Ct. 599 (1961)* [*135] ("there can be no contributory infringement in the absence of direct infringement."); *Serrano, 111 F.3d at 1583* (same). In other words, Hill cannot succeed in proving indirect infringement without also proving that users of the CompuServe online shopping service directly infringe the Hill Patent. *See Sage Products, Inc. v. Devon Indus., Inc., 45 F.3d 1575, 1577 (Fed. Cir. 1995); C.R. Bard v. Advanced Cardiovascular Systems, Inc., 911 F.2d 670 at 673.* In fact, that is the "dispositive question" in the analysis of this fourth motion for summary judgment. *Kendall Co. v. Progressive Med. Tech., Inc., 85 F.3d 1570, 1573 (Fed. Cir. 1996)* (noting that dispositive question is whether purchasers of the defendant's system directly infringed the patent when they used the system). Neither form of "dependent infringement" can occur without an act of direct infringement. *Joy Tech., 6 F.3d at 774.*

Although the Court has considered and rejected the claims by Hill that CompuServe has directly infringed its patent by the sale and use of its online shopping service, that does not prevent Hill from attempting to prove that CompuServe either actively induced, or [*136] knowingly contributed to the direct infringement by its customers. For contributory, infringement, in addition to the requirement of proving that CompuServe subscribers directly infringe its patent, Hill must also show that CompuServe provides its Internet access software and service for use in practicing the Hill Patent's electronic catalog method and system. That showing involves proof that CompuServe's subscribers' use of its online service constitutes a material part of the invention, that CompuServe sold its software and service knowing that it is especially adapted for use in practicing the invention, and that the software and service are not "a staple article or commodity of commerce suitable for substantial noninfringing use." *See C.R. Bard, 911 F.2d at 673.* To show active inducement, Hill must demonstrate that Compu-

Case 1:04-cv-12457-PBS   Document 77-10   Filed 09/22/2006   Page 37 of 37

Page 37

2000 U.S. Dist. LEXIS 14200, *; 57 U.S.P.Q.2D (BNA) 1021

Serve had the actual and specific intent of causing the direct infringement of the Hill Patent. *See Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 553 (Fed. Cir. 1990); Hewlett-Packard Co. v. Bausch & Lomb, Inc., 909 F.2d 1464, 1469 (Fed. Cir. 1990).*

The parties have both argued and provided evidence [*137] relating to the elements of each of these indirect infringement theories, but the dispositive question remains whether Hill has shown any direct infringement. Had the Court found that CompuServe did not directly infringe the Hill Patent because it did not perform some of the steps of the patented method, there might have been some reason for a thorough analysis of the parties' arguments and consideration of their evidence. Instead, the Court has found that CompuServe does not infringe the Hill Patent because the accused system does not include the element of storing that is common to all of the Asserted Claims. Whether the Court is just looking at CompuServe's conduct, or at its contribution to or inducement of the conduct of its subscribers and the vendors who pay for space on the "electronic mall," it would not matter. The absence of a critical claim element is fatal to any finding of direct infringement. Without a finding of direct infringement, there can be no indirect infringement.

Equally detrimental to Hill's claims is the fact that the Court found that the CompuServe online shopping service does not include the claim elements of constant and variable data, which also defeats [*138] a finding of direct infringement by CompuServe's subscribers or any other third party using any part of CompuServe's system. There has been no evidence offered that any of CompuServe's subscribers supplied the missing claim elements, nor can the Court comprehend how an individual user could do so. Given these facts, the Court finds it unnecessary to address any of the specific issues raised by either party with respect to contributory infringement or the active inducement of infringement by others. Thus, CompuServe's motion for summary judgment on the issues related to indirect infringement is **GRANTED.**

### IV. CONCLUSION

Before turning to the merits of this patent infringement case, the Court considered and decided four motions to strike. Hill's motion to strike filed on December 13, 1999, targeting certain evidence relied on by CompuServe in its summary judgment motions, has been **DENIED.** CompuServe's December 22, 1999, "conditional" motion to strike, that condition being if the Court granted Hill's first motion to strike, was considered **WITHDRAWN** because the Court denied Hill's first motion. Hill's January 7, 2000, motion to strike the affi-

davit of Andrew [*139] Johnson-Laird has been **DENIED.** The final motion sought to strike CompuServe's December 22, 1999, filing of three replies to Hill's responses to CompuServe's statements of material facts. Finding some aspects of those replies not in compliance with local rules, the Court has **GRANTED, in part** and **DENIED, in part,** the relief sought.

CompuServe filed four different summary judgment motions: 1) non-infringement based on the absence of the element of storing; 2) non-infringement based on the absence of classifying product information into "constant" and "variable" data; 3) invalidity of the patent in suit based on anticipation by a single prior art reference; and 4) non-infringement based on the absence of proof of indirect infringement. The Court has found that Hill has not produced sufficient evidence to create a genuine issue of material fact about the absence of the element of storing, and CompuServe's motion based on that ground is **GRANTED.** Nor did Hill succeed in raising a genuine issue of material fact on the issue of whether the CompuServe system included the classification of constant and variable data, and CompuServe's motion for summary judgment on that [*140] ground is also **GRANTED.**

The Court also considered CompuServe's motion for summary judgment on the issue of the Hill Patent's validity, which is a motion seeking the entry of a declaratory judgment of invalidity on CompuServe's counterclaim. Finding that CompuServe failed to produce sufficient evidence to meet its burden in overcoming the presumption of the patent's validity, the Court has decided that the Hill Patent was not anticipated by the Prodigy Patent, and has **DENIED** CompuServe's motion for summary judgment on its counterclaim. This ruling has the effect of defeating the counterclaim, but does not constitute a specific finding of validity of the Hill Patent.

Finally, the Court considered the issues relating to whether CompuServe indirectly infringed the Hill Patent by inducing or contributing to infringement by others. Because there can be no indirect infringement without a proof of direct infringement, and because the Court has found that CompuServe does not directly infringe the Hill Patent, CompuServe's motion for summary judgment on this issue has been **GRANTED.**

IT IS SO ORDERED this 24th day of August, 2000.

LARRY J. McKINNEY, JUDGE

United States District [*141] Court

Southern District of Indiana

**Exhibit 12**

**Browndorf, Marisa (Woodcock Washburn)**

| | |
|---|---|
| **From:** | Hill, Lisa (Woodcock Washburn) |
| **Sent:** | Friday, September 22, 2006 11:51 AM |
| **To:** | Browndorf, Marisa (Woodcock Washburn) |
| **Subject:** | FW: DePuy Mitek v. Arthrex |

-----Original Message-----
**From:** Saber, Charles [mailto:SaberC@dicksteinshapiro.com]
**Sent:** Friday, August 04, 2006 2:55 PM
**To:** Malinoski, Lynn A. (Woodcock Washburn)
**Cc:** Bonella, Michael J. (Woodcock Washburn); Tamburo, Salvatore
**Subject:** RE: DePuy Mitek v. Arthrex

Lynn

We will prepare the Joint Motion and get it to you later today (although it may be after business hours).  From your email, I assume the Joint Motion should request 25 pages for Markman and 30 pages for summary judgemnt for both sides.  If this is not correct, please let me know.

Chuck

---

**From:** Malinoski, Lynn A. (Woodcock Washburn) [mailto:malinosk@woodcock.com]
**Sent:** Friday, August 04, 2006 2:42 PM
**To:** Saber, Charles
**Cc:** Bonella, Michael J. (Woodcock Washburn); Tamburo, Salvatore
**Subject:** RE: DePuy Mitek v. Arthrex

Hi Chuck: I am not sure why you are confused. I was just trying to make a reasoned decision as to page limits with some meaningful information about the issues to be briefed within the confines of the page limits.  Nonetheless, we are fine with 30 pages for the summary judgment brief.  We would like to request 25 pages for the Markman briefs.  After you prepare the Joint Motion, please send it to me and I will take a look at it.

Thx
Lynn


Lynn Malinoski
Woodcock Washburn LLP
1 Liberty Place 46th Floor
Philadelphia, PA 19103
215 568-3100  telephone
215 568-3439  facsimile
malinosk@woodcock.com

-----Original Message-----
**From:** Saber, Charles [mailto:SaberC@dicksteinshapiro.com]
**Sent:** Friday, August 04, 2006 12:50 PM
**To:** Malinoski, Lynn A. (Woodcock Washburn)
**Cc:** Bonella, Michael J. (Woodcock Washburn); Tamburo, Salvatore
**Subject:** RE: DePuy Mitek v. Arthrex

Hi Lynn

Frankly, I'm a bit confused.  I was just trying to see if it is appropriate to file a joint motion to extend the page limit, an action that I thought would be in both of our interests.  As I told you when we spoke, I was not seeking to find out what issues you were going to raise as I thought that was imappropriate.  I still do.  Scores of times I have asked for extension of page limits or opposing counsel has asked me.  Never once has such a discussion gotten into an identification of the issues to be raised.  This case is no different.

I still believe that it would be best if we can agree on page limits per side for the summary judgment motion (whether it be one brief or more).  And I remain willing to do that.   If not, we will file a motion to extend the limit to 30 pages and I ask if you will consent.  If you prefer to file a separate motion, let me know and I will not unreasonably withhold consent.  You should be aware that if you choose to file a series of motions without a motion to extend the page limit, we may take the position that it is an unfair attempt to circumvent the page limitation requirements.

Please give me a call this afternoon or let me know your position.

Chuck

---

**From:** Malinoski, Lynn A. (Woodcock Washburn) [mailto:malinosk@woodcock.com]
**Sent:** Thursday, August 03, 2006 2:51 PM
**To:** Saber, Charles
**Cc:** Bonella, Michael J. (Woodcock Washburn)
**Subject:** Re: DePuy Mitek v. Arthrex

Chuck: I am not trying to be difficult, but it is hard to agree to page limits without knowing what issues are going to be briefed. Also, we have conferred with other attorneys who practice in Boston and they are not aware of the one brief issue. We are still waiting to hear from our local, however, so I am not sure I will have an answer for you today.

Lynn
-------------------------
Lynn Malinoski
Woodcock Washburn LLP
One Liberty Place - 46 Floor
Philadelphia, PA 19103
Phone: 215 564 8945
Fax: 215 568 3439

-----Original Message-----
From: Saber, Charles
To: Malinoski, Lynn A. (Woodcock Washburn)
CC: Bonella, Michael J. (Woodcock Washburn); Tamburo, Salvatore
Sent: Wed Aug 02 18:04:21 2006
Subject: RE: DePuy Mitek v. Arthrex

Lynn

We haven't made a decision on the number of issues yet.  What I am trying to see is if we are in the same ballpark of number of pages in

total for summary judgment (aside from Markman), understanding that you do not yet know if you will submit one brief or a group of briefs.  As I understood Mike, he thought that your side would only need 20 pages (or something close to that) regardless of whether you submit one brief or more than one.  As I told you, I don't think that 20 is sufficient for our brief, but that we hope it is not a whole lot more.  If we are in the same ballpark and on the same wavelength, I thought that we might be able to submit a joint motion.

Chuck

_____

From: Malinoski, Lynn A. (Woodcock Washburn) [mailto:malinosk@woodcock.com]
Sent: Wednesday, August 02, 2006 4:42 PM
To: Saber, Charles
Cc: Malinoski, Lynn A. (Woodcock Washburn); Bonella, Michael J. (Woodcock Washburn)
Subject: RE: DePuy Mitek v. Arthrex

Chuck: In terms of the page limits we discussed yesterday, do have something specific in mind to propose?  It would also be helpful in deciding this matter to know how many different issues Arthrex intends to bundle in to one brief.  We have not had a chance to speak with local yet, but plan to do so.

Thx

Lynn Malinoski
Woodcock Washburn LLP
1 Liberty Place 46th Floor
Philadelphia, PA 19103
215 568-3100  telephone
215 568-3439  facsimile
malinosk@woodcock.com