IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **DePuy Mitek, Inc.**<br>    a Massachusetts Corporation<br><br>        **Plaintiff,**<br><br>        v.<br><br>**Arthrex, Inc.**<br>    a Delaware Corporation and<br><br>**Pearsalls Ltd.**<br>     a Private Limited Company<br>     of the United Kingdom<br><br>        **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil No. 04-12457 PBS<br>)<br>)<br>)<br>)<br>)<br>) |

**UNOPPOSED MOTION TO FILE SUBSTITUTE EXHIBIT TO
DEPUY MITEK'S MEMORANDUM IN OPPOSITION TO ARTHREX'S
MOTION FOR SUMMARY JUDGMENT**

Plaintiff DePuy Mitek, Inc. ("Mitek") discovered a minor error in connection with one exhibit cited in its memorandum in opposition to Defendants Arthrex, Inc.'s and Pearsalls' Ltd motion for summary judgment filed on September 1, 2006. Exhibit 6 cited in plaintiff's memorandum in opposition to Arthrex's motion for summary judgment, is incomplete in that it is missing pages 217-219 of Dr. Mukherjee's deposition testimony. Mitek seeks leave to file a substitute exhibit 6 that includes pages 217-219 of that testimony.

In accordance with Local Rule 7.1(a)(2), counsel for plaintiff certifies that they conferred with counsel for defendants regarding the above-identified correction on September 27, 2006 and counsel for defendants do not oppose this motion.

Accordingly, Mitek moves the Court for an Order granting leave to file the above identified substitute exhibit attached hereto.

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated: September 27, 2006 | DEPUY MITEK, INC.,<br>By its attorneys, |
|  | /s/ Erich M. Falke_____<br>Dianne B. Elderkin<br>Lynn A. Malinoski<br>Michael J. Bonella<br>Erich M. Falke<br>WOODCOCK WASHBURN LLP<br>One Liberty Place - 46th Floor<br>17th and Market Streets<br>Philadelphia, PA 19103<br>(215) 568-3100 |
|  | Daniel J. Gleason (BBO #194900)<br>Heather Ripicky (BBO # 663347)<br>Nutter McClennen & Fish LLP<br>World Trade Center West<br>155 Seaport Boulevard<br>Boston, MA. 02210-2604<br>617-439-2000 |

**CERTIFICATE OF SERVICE**

I certify that I am counsel for DePuy Mitek, Inc. and that true and correct copies of:

**UNOPPOSED MOTION TO FILE SUBSTITUTE EXHIBIT TO DEPUY MITEK'S MEMORANDUM IN OPPOSITION TO ARTHREX'S MOTION FOR SUMMARY JUDGMENT**

were served on counsel for Defendants Arthrex, Inc. and Pearsalls Ltd. on this date via the Court's e-mail notification with the following recipients being listed as filing users for Defendants:

>Charles W. Saber
>Dickstein Shapiro
>1825 Eye Street, NW
>Washington, DC 2006
>saberc@dicksteinshapiro.com
>
>Raymond P. Ausrotas
>Todd & Weld LLP
>28 State Street, 31st Floor
>Boston, MA 02109
>rausrotas@toddweld.com

Dated: September 27, 2006                    _/s/ Erich M. Falke_____
                                             Erich M. Falke

# MITEK'S SUBSTITUTE EXHIBIT 6

# (in support of DePuy Mitek's Memorandum in Opposition to Arthrex's Motion for Summary Judgment)

```
                                                              1
 1          IN THE UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF MASSACHUSETTS

 3

 4    DEPUY MITEK, INC., a          )

 5    Massachusetts corporation,    )

 6              Plaintiff,          )  Civil Action

 7         vs.                      )  04-12457 PBS

 8    ARTHREX, INC., a Delaware     )

 9    corporation,                  )

10              Defendant.          )

11

12

13              -     -     -     -     -

14         The deposition of DEBI PRASAD

15    MUKHERJEE was taken on Tuesday, June 13,

16    2006, commencing at 9:08 a.m., at the

17    offices of Dickstein Shapiro Morin &

18    Oshinsky LLP, 2101 L Street, N.W.,

19    Washington, D.C., before Susanne Bergling,

20    Registered Merit Reporter and Notary Public.

21              -     -     -     -     -

22

23

24

25
```

*Confidential Copy* / *Condensed Copy*

182

```
1    Q. Okay. Do you understand this is the
2  prosecution history of a -- of an Arthrex patent,
3  right?
4    A. Yes, that's what it says.
5    Q. Okay. If you would turn to DMI 41091.
6    A. 41091, yes.
7    Q. Okay. At the top paragraph, do you see it
8  says, "The suture of Example 7 of Chesterfield, et
9  al., '575, uses a Spectra 1000 core surrounded by
10 a hollow sheath --" I'm sorry, "a hollow braided
11 sheath made of a single type of yarn"?
12     Do you see that?
13   A. No, where are you, starting in the middle?
14   Q. Right here. Right here, first paragraph.
15   A. First paragraph.
16   Q. This says --
17   A. Suture Example 7, is that what you're
18 reading from?
19   Q. Yes, the suture --
20   A. Okay.
21   Q. Do you see that?
22   A. Yes, I see it.
23   Q. It says, "The suture of Example 7 of
24 Chesterfield, et al., '575, uses a Spectra 1000
25 core surrounded by a hollow braided sheath made of
```

183

```
1  a single type of yarn."
2     Do you see that?
3    A. Um-hum.
4    Q. Do you agree with that statement?
5    A. Yeah.
6    Q. Okay. And then if you go down later in the
7  third paragraph --
8    A. Third paragraph, yeah.
9    Q. -- it says, the second sentence says, "As
10 noted above, Chesterfield, et al., '575, does not
11 disclose an example of a braided sheath that
12 includes a blend of both -- of both ultra high
13 molecular weight polyethylene and polyester."
14     Do you see that?
15   A. Yes.
16   Q. Do you agree with that statement?
17   A. Yes.
18   Q. Okay. When you were referring to the
19 claims of the '575 patent -- I'd like to turn to
20 those now.
21   A. Are you done with this or --
22   Q. Yes.
23   A. Number 4, the '575.
24   Q. It claims that it's a method for repairing
25 split portions of body tissue. Do you see that?
```

184

```
1    A. Yes.
2    Q. It goes on, it says, "comprising looping a
3  flexible elongated member about the body tissue."
4     Do you see that?
5    A. Um-hum.
6    Q. Okay. What significance do you give to the
7  meaning of going "about" the body tissue? What
8  does that mean?
9    A. It --
10     MR. TAMBURO: Objection, vague.
11     THE WITNESS: "About the body tissue" is
12 kind of funny language. Through the tissue,
13 that's what it normally will do to produce --
14     BY MR. BONELLA:
15   Q. You mean going through the tissue?
16   A. That's what I would think.
17   Q. Okay.
18   A. Whether soft or hard, doesn't matter.
19   Q. Do you think the -- where the claim says
20 "looping a flexible elongated member about the
21 body tissue," do you think that FiberWire is used
22 in going about body tissue as that's used in the
23 claim?
24   A. You're asking about FiberWire?
25   Q. Yes.
```

185

```
1      MR. TAMBURO: Objection, vague, and he's
2  not an expert on how FiberWire is used in surgery.
3      THE WITNESS: Again, I may not know what's
4  in surgery, but I have myself used in meniscal
5  repair with a surgeon through the body tissue.
6      BY MR. BONELLA:
7    Q. Okay. So, is FiberWire -- to the extent
8  you know, if FiberWire is used in surgery, is it
9  used to go about body tissue?
10   A. To attach something, yes.
11   Q. It is? Okay. Would that be a pretty
12 standard understanding?
13   A. I don't know what is standard. It's new
14 suture, so nobody might not know that it's
15 available. It cannot be standard.
16   Q. Well, no, not the FiberWire. Are
17 sutures --
18   A. You asked me for FiberWire first, then you
19 changed --
20   Q. The use of FiberWire, not the construction,
21 how it's used.
22   A. Yeah.
23   Q. FiberWire, is it your understanding that
24 it's normally used to go about body tissue?
25     MR. TAMBURO: Objection, vague, and he's
```

47 (Pages 182 to 185)

214

1  A. Yeah.
2  Q. And then there's also one from John
3 Schmieding to Steve Soffen? Right here
4 (indicating).
5  A. Oh, yeah, okay.
6  Q. December 4th, 2003.
7  A. Okay.
8  Q. So, the -- and do you see how it's a
9 discussion of the '688 patent in the email?
10  A. You're talking about the '688 patent here,
11 yes.
12  Q. Is discussed, right?
13  A. Is discussed, yeah.
14  Q. Okay. So, it's December 4th, 2003.
15  A. Right.
16  Q. And then if you go to Exhibit 209, it's
17 December 23rd, 2003.
18  A. Right.
19  Q. So, it's a -- so, the Exhibit 209 was about
20 a week and a half after -- or I'm sorry, about --
21 Exhibit 209 was about three weeks after Exhibit
22 198.
23     Do you see that?
24  A. Okay.
25  Q. Exhibit 209, if you look at the bottom on

215

1 Exhibit 209 --
2  A. Yeah.
3  Q. -- the last paragraph, do you see it's an
4 email from Steve Soffen to John Schmieding?
5  A. Yeah.
6  Q. Okay, and the last paragraph says, "An
7 assertion of non-infringement is always more
8 palatable than an assertion of invalidity." Then
9 he says, "Since we have not yet found 'knock-out'
10 prior art, my inclination is to respond to Ethicon
11 with the above if Ethicon provides evidence
12 pre-dating Chesterfield."
13     Do you see that?
14  A. Yeah.
15  Q. Okay. Did you consider, in forming your
16 opinions, that Mr. Soffen had said that he had not
17 yet found knock-out prior art in December of 2003
18 but at that time was aware of the '688 patent?
19  A. No, because I don't even know this thing at
20 that time frame, 2003.
21  Q. You didn't consider that?
22  A. No, because I -- I didn't get this thing.
23  Q. Would you like to know why Mr. Soffen
24 didn't think he had found knock-out prior art as
25 of December --

216

1  A. No, I don't -- I don't want to know.
2  Q. You don't want to know?
3  A. Yeah.
4  Q. Okay. And do you see where he also
5 references the Chesterfield patent there?
6  A. Yes.
7  Q. But he -- Mr. Soffen said he had not yet
8 found knock-out prior art. Do you see that?
9  A. He says that, yeah.
10  Q. Did -- did anyone tell you why Mr. Soffen
11 said he did not find knock-out prior art even
12 though he was aware of the Chesterfield patent?
13  A. No.
14  Q. Okay. Would you like to know why?
15  A. No.
16  Q. Would it affect your opinion if Arthrex
17 believed that they had not found knock-out prior
18 art even though they were aware of both the
19 Chesterfield patent and the '688 patent?
20  A. What's the question?
21  Q. Would it affect your opinions at all if
22 Arthrex believed that it had not found knock-out
23 prior art even though it was aware of the '688
24 patent and the Chesterfield patent?
25  A. No.

217

1  Q. It wouldn't?
2  A. It does not.
3  Q. Okay. I'd like to talk about braiding for
4 a minute. You're familiar with braiding machines?
5  A. Yes.
6  Q. Okay. And you're familiar with the term
7 "sheath" and "core"?
8  A. Yes.
9  Q. And a suture or sheath generally goes
10 around a core?
11  A. Around the core, yes.
12  Q. Okay. And would you refer to a sheath/core
13 arrangement as a braided construction?
14  A. Yes.
15  Q. Okay. And a sheath material -- if the
16 sheath materials are different than the core
17 material --
18  A. Not necessarily.
19  Q. No, I didn't say necessarily. I didn't
20 even ask a question.
21  A. Oh, you didn't ask a question?
22  Q. Let me ask a question.
23     If the sheath materials --
24  A. Yeah.
25  Q. -- are different -- I'm sorry, if there

218

1 are -- let me rephrase the question.
2     If there are different materials in the
3 sheath material --
4    A. Different material in the sheath material?
5    Q. In the sheath.
6    A. Okay.
7    Q. -- and one of the materials in the sheath
8 is the same as the core, would you refer to that
9 or would one of ordinary skill in the art refer to
10 that as a braided construction?
11    MR. TAMBURO: Objection, vague.
12    THE WITNESS: Yeah, if they are braided.
13    BY MR. BONELLA:
14    Q. Okay. If the sheath material is all one
15 type of material and the core material is another
16 type of material, would one of ordinary skill in
17 the art refer to that as a braided construction?
18    A. If they are braided, yes.
19    Q. If the sheath is braided?
20    A. The sheath is braided to the core, then --
21    Q. The sheath is braided about the core?
22    A. Yeah, um-hum.
23    Q. So, if the sheath is braided about the core
24 and the sheath is all one type of material and the
25 core is all another type of material, would one of

219

1 ordinary skill in the art refer to that as a
2 braided construction?
3    A. Yeah.
4    Q. And would one of ordinary skill in the art
5 refer to that as a braided construction between
6 1988 and 1992?
7    A. Yes.
8    Q. In analyzing the prior art, did you
9 consider in your opinions whether the prior art
10 taught one of ordinary skill in the art how to
11 make and use whatever was described in the prior
12 art references without undue experimentation?
13    MR. TAMBURO: Objection, vague.
14    THE WITNESS: No, but the idea comes from
15 this prior art, then you improvise or use other
16 means to get there.
17    BY MR. BONELLA:
18    Q. I'd like to turn to the Burgess reference.
19    A. Which -- which report?
20    Q. It's Exhibit 5, I believe, to your first
21 report.
22    A. First report, 239.
23    Q. 239.
24    A. Okay.
25    Q. Do you recall the Burgess reference?

220

1    A. Yes.
2    Q. Okay. Now, the Burgess reference doesn't
3 describe knot strength, right?
4    A. Except there is a -- some reference here on
5 the page 2 where, very last line, they are saying,
6 "In very cold conditions, such as fishing through
7 holes in ice, water having worked its way into the
8 braid will freeze and impart a brittleness that
9 can lead to breakage."
10    Now, whether this is straight breakage or
11 loop breakage, it is not clear, but there is some
12 reference there.
13    Q. Is there any other thing that could
14 potentially be a reference to knot strength in the
15 Burgess reference?
16    A. No.
17    Q. And doesn't the Burgess reference describe
18 how to solve that problem by putting a
19 polyurethane coating, the reference you talk
20 about -- the problem about water getting in and
21 breaking, put it -- I'm sorry, let me rephrase
22 that question.
23    Doesn't the Burgess reference describe how
24 to solve the problem of water getting into the
25 braid and freezing and breaking by putting a

221

1 polyurethane coating on the braid?
2    A. I think they also talk about two kinds of
3 filaments, high tensile polyurethane thread and
4 another filament being a polyester and a nylon.
5    Q. Right, but see where it says --
6    A. It doesn't say --
7    Q. (Indicating), page 2, it says, "The braid
8 may be coated with a thin, supple and smooth
9 sheath of polyurethane and this may be carried out
10 by a simple immersion process in liquid
11 polyurethane. It will alter the characteristics
12 (such as buoyancy and strength) in a predictable
13 matter, but its main purpose is to prevent
14 saturation of the interstices of the braid. In
15 very cold conditions, such as fishing through
16 holes in ice, water having worked its way into the
17 braid will freeze and impart a brittleness that
18 can lead to breakage."
19    Do you see that?
20    A. No, I read it, that it is -- he is talking
21 about in general, buoyancy and strength, they are
22 two properties.
23    Q. Right.
24    A. And the -- they say one of the ways -- I
25 don't read this that it solves that problem with

56 (Pages 218 to 221)

238
1  A. Then polypropylene is twice, polyester is
2 about twice -- I mean polyester -- polyethylene is
3 twice, then -- ultra high molecular weight
4 polyethylene is twice than polypropylene and twice
5 than polyester, so they are probably significantly
6 higher for the ultra high molecular weight
7 polyethylene, knot pull strength.
8  Q. Do you know if -- does he provide the
9 standard deviation for the knot pull strength?
10  A. He didn't, but just looking at the figures,
11 I mean, I can say that, looking at 1.35 or 1.44,
12 you have to say that.
13  Q. Okay. So, he did not provide standard
14 deviation in this chart.
15  A. Not in this chart.
16  Q. Now, for the knot configuration four equals
17 one equals one, do you see that?
18  A. Yes.
19  Q. The polyethylene failed at 0.35
20 gigapascals, which is lower than the failure value
21 for the nylon, polypropylene and polyester for the
22 four equals one equals one configuration, right?
23  A. Yes.
24  Q. Okay. And that's because the polyethylene
25 slipped, right?

239
1  A. I don't use the word "sucked."
2  Q. I said "slipped."
3  A. Slipped, okay. I thought I heard...
4 sorry.
5  Q. So, the polyethylene failed at the 0.35
6 gigapascal level for the four equals one equals
7 one configuration because of the polyethylene
8 slipping, right?
9  A. Right.
10  Q. Okay. Polyethylene, including ultra high
11 molecular weight polyethylene, is a lubricious
12 material, right?
13  A. Yes.
14  Q. Okay.
15  A. It's also polypropylene -- excuse me.
16  Q. Sure.
17  A. Polypropylene is also a lubricious
18 material.
19  Q. It is?
20  A. Yes, it is.
21  Q. Okay. How about nylon or polyester, are
22 they lubricious?
23  A. Nylon is also -- again, is lubricious.
24  Q. How about polyester?
25  A. Polyester will be less.

240
1  Q. And nylon is less lubricious than
2 polypropylene and polyethylene, right?
3  A. Probably.
4  Q. Okay. Now, in that chart, do you see how
5 going across there's different knot
6 configurations, two equals two, three equals two
7 equals one, four equals one equals one, four
8 equals four and four equals four equals four?
9  A. Yes.
10  Q. So, going from left to right, two equals
11 two to four equals four equals four, the two
12 equals two is a simpler knot than the four equals
13 four equals four, right?
14  A. It's not simple or complex. It depends on
15 what the surgeon wants to do. So, he can put more
16 knots to make sure, and in general, they do. They
17 will not stop at two by two. They will probably
18 go to four by four by four to make sure it is
19 there, especially ophthalmic use.
20  Q. Okay. And if you turn to page ARM 25137 --
21  A. Thirty-seven, yeah.
22  Q. Okay, of Cohan, the last paragraph of the
23 first column --
24  A. Yeah.
25  Q. -- do you see the sentence beginning

241
1 "Although"? The first column --
2  A. Did you say first column?
3  Q. First column, last paragraph.
4  A. Last paragraph.
5  Q. The sentence beginning, "Although."
6  A. "Although," yes.
7  Q. Cohan states, "Although laboratory testing
8 showed that the polyethylene fiber has a somewhat
9 lower knot holding strength with simpler knots
10 than the other three polymers, more complex knots
11 than are commonly used would realize
12 polyethylene's great knot pull strength."
13   Do you see that?
14  A. Yes.
15  Q. Okay. So, Cohan was calling the more --
16 the additional knot configurations more complex,
17 right?
18  A. That's what -- if he meant by that.
19  Q. Well, did you understand that's what he
20 means when you read this reference?
21  A. Well, I -- I think that normally for a
22 surgeon, they will put as many knots they can to
23 make sure it's secure, and it's nothing complex or
24 simple about it.
25  Q. Well, if you look at the author, the author

294
1 in the monomer?
2   A. Yeah -- well, it's not a monomer, in the
3 polymer.
4   Q. In the polymer?
5   A. Yeah.
6   Q. I'm confused. Are you saying that the
7 monomer unit in all types of polyethylene is the
8 same or different?
9   A. Mostly same, yeah.
10  Q. Mostly same, okay.
11      Would one of ordinary skill in the art
12 between 1988 and 1992 think that the term
13 "polyethylene" refers to low-density polyethylene
14 or includes -- should I say includes low-density
15 polyethylene?
16  A. Yeah, it would.
17  Q. It would? But not ultra high? Is that
18 your opinion?
19  A. Ah, they will also include ultra high,
20 because there are different properties, so they
21 will include also ultra high, as well as
22 low-density.
23  Q. Okay. I'd like to turn to polypropylene as
24 used in the '446 patent, Exhibit 3 to your first
25 report. Do you see the '446 patent?

295
1   A. Yeah.
2   Q. Exhibit 3?
3   A. Exhibit 3.
4   Q. Right.
5   A. Yeah, I'm at this.
6   Q. No, Exhibit 3. I'm sorry, that's Exhibit
7 3. I'm sorry. Yeah, if you would go to column 4,
8 please.
9   A. Yeah.
10  Q. Okay. Beginning at line 9 through 32, do
11 you see that?
12  A. Nine through 32, yeah.
13  Q. Okay. That paragraph says, "Preferably,
14 the continuous filaments which make up the first
15 and second set of yarns are derived from
16 nonabsorbable polymers."
17      Do you see that?
18  A. Yes.
19  Q. Is ultra high molecular weight polyethylene
20 a nonabsorbable polymer?
21  A. Yes.
22  Q. Okay. Then it says, "In a preferred
23 embodiment, the first set of yarns acts as
24 lubricating yarns to improve the pliability, or
25 compliance, and surface lubricity of the

296
1 heterogenous braid."
2       Do you see that?
3   A. That is correct.
4   Q. Ultra high molecular weight is a
5 lubricating yarn, right?
6   A. Yes.
7   Q. Okay. Then it says -- further down it
8 says, "Such fiber forming polymers include
9 perfluorinated polymers," and describes some of
10 those, and then it says, "as well as
11 non-perfluorinated polymers," and refers to
12 polyethylene and PE, right?
13  A. Right.
14  Q. Okay. Ultra high molecular weight
15 polyethylene came as fibers before 1992, right?
16  A. Yes.
17  Q. Okay. Now, do you see where in the end it
18 says, "The preferred polymers for the first set
19 are PTFE, PETFE, FEP, PE and PP"?
20      Do you see that?
21  A. Yes.
22  Q. Okay. That's column 4, lines 28 to 31.
23      Did you understand that sentence to refer
24 to all types of polypropylene or just certain
25 types of polypropylene?

297
1       MR. TAMBURO: Objection, vague.
2       THE WITNESS: This is general purpose
3 polyethylene, which it provides the lubricity and
4 as well as pliability and compliance, not ultra
5 high molecular weight polyethylene.
6       BY MR. BONELLA:
7   Q. Okay, that wasn't my question. Listen to
8 the question.
9       Did you understand that sentence to refer
10 to all types of polypropylene?
11      MR. TAMBURO: Objection, vague.
12      THE WITNESS: The fiber-forming
13 polypropylene, yes.
14      BY MR. BONELLA:
15  Q. All types, okay.
16      Did you understand -- do you see where it
17 refers to PVDF?
18  A. Yes.
19  Q. Did you understand this paragraph to be
20 referring to all types of polyvinylidene fluoride?
21  A. Yes.
22  Q. Okay. Do you see where it refers to PTFE
23 in that paragraph?
24  A. Yes.
25  Q. Did you understand it to be referring to

Page 417

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF MASSACHUSETTS
 3                 Civil Action No. 04-12457 PBS
 4       _____
 5       DEPUY MITEK, INC., a Massachusetts              )
 6       Corporation,                                    )
 7                                  Plaintiff,           )
 8           v.                                          )
 9       ARTHREX, INC., a Delaware Corporation           )
10                                  Defendant.           )
11       _____)
12
13
14         Videotaped Deposition of DEBI PRASAD MUKHERJEE
15                         - VOLUME TWO -
16                         Washington, DC
17                     Wednesday, June 14, 2006
18
19       The videotaped deposition of DEBI PRASAD MUKHERJEE,
20       Volume Two, was held on Wednesday, June 14, 2006,
21       commencing at 9:12 a.m., at the offices of Dickstein
22       Shapiro Morin & Oshinsky LLP, 2101 L Street,
23       Northwest, Washington, DC, before Mary Ann Payonk,
24       RDR, Certified Realtime Reporter, Registered Diplomate
25       Reporter and Notary Public.
```

Page 550

1   Q   But for known suture materials, the
2   sterilization parameters for ethylene oxide are
3   well-known to one of ordinary skill in the art?
4   A   For the suture that are currently used.
5   But new suture like the ones described '446, there
6   isn't, at least my opinion. One has to run the test
7   to find out if there is or there isn't.
8   Q   Well, sterilization of -- of PET was
9   known, right, in 1988, of PET for fibers for sutures
10  was well-known with ethylene oxide, right?
11      MR. TAMBURO: Objection, vague.
12  A   Yes.
13  BY MR. BONELLA:
14  Q   Okay. And sterilization procedures for
15  PTFE were -- with sterile -- with ethylene oxide were
16  well-known in 1988, right?
17      MR. TAMBURO: Objection, vague.
18  A   It's also known, yes, but it -- it is also
19  known that PTFE properties are affected by gamma
20  radiation.
21  BY MR. BONELLA:
22  Q   But ethylene oxide was known in 1988 that
23  they are --
24  A   Yes.
25  Q   -- generally substantially not affected?

Page 551

1   A   Yes.
2       MR. TAMBURO: Objection, vague.
3   BY MR. BONELLA:
4   Q   I'd like to turn to your rebuttal report,
5   which is Exhibit 356. Page 18, you talk about the
6   Harpell patents.
7   A   Yes.
8   Q   Did you consider in your analysis whether
9   the Harpell patents disclose a coated suture?
10      MR. TAMBURO: Take your time to read the
11  report if you need to.
12  A   To best of my recollection, it didn't.
13  BY MR. BONELLA:
14  Q   Okay. Well, if the Harpell patents did
15  describe coated sutures, would that change your
16  opinion?
17  A   Yeah.
18  Q   Why?
19  A   Because was refer -- I mean, the coating
20  is an issue, whether coating does or does not change
21  properties of this material.
22      MR. BONELLA: Okay. I'd like to ask you
23  about some other issues. Let's take a quick break. I
24  need to organize myself.
25      THE VIDEOGRAPHER: You're now going off

Page 552

1   the video record at 12:01 p.m.
2       (A recess was taken from 12:02 p.m.
3       through 12:14 p.m.)
4       THE VIDEOGRAPHER: We're now back on the
5   video record. The time is 12:14 p.m.
6   BY MR. BONELLA:
7   Q   Dr. Mukherjee, did the three reports that
8   you provided in this case contain all the opinions
9   that you have in this case?
10  A   At this moment, yes.
11  Q   Okay. Have you been asked to develop any
12  other opinions?
13  A   No.
14  Q   Okay. Are you an expert in the area of
15  suture design?
16      MR. TAMBURO: Objection, vague.
17  A   Yes.
18  BY MR. BONELLA:
19  Q   And what -- what's your basis for saying
20  that?
21  A   I work in suture industry more than 13
22  years.
23  Q   Okay. And when -- you stopped working in
24  the suture industry in the '80s?
25  A   '87.

Page 553

1   Q   Okay. And are you still expert in the
2   area of suture design today?
3       MR. TAMBURO: Objection, vague.
4   A   Yes.
5   BY MR. BONELLA:
6   Q   Even though you haven't worked in the
7   industry?
8   A   But I have worked on projects involving
9   sutures in LSU.
10  Q   Okay. Going back to sterilization for a
11  minute, the Cohen reference, remember Cohen?
12  A   Yes.
13  Q   Does Cohen describe how to sterilize the
14  suture that he made?
15  A   Yes, he did.
16  Q   In the -- in the document? So would -- so
17  would --
18      MR. TAMBURO: If you need to review it,
19  review it.
20  BY MR. BONELLA:
21  Q   So is that a sterilization for an -- the
22  ultra high molecular weight polyethylene monofilament
23  suture that he described?
24  A   That was one of -- let me look at that.
25  Q   Excuse me?

Page 562

1  MR. TAMBURO: Objection, vague.
2  A  Enough information for a scanning
3  microscopy is not very conclusive. They may or may
4  not be.
5  BY MR. BONELLA:
6  Q  You don't know?
7  A  I don't know.
8  Q  Okay. Does the coating on FiberWire
9  prevent the PET yarns and the PTFE yarns from each
10 providing their individual properties to FiberWire?
11      MR. TAMBURO: Objection, vague.
12      THE WITNESS: Now please correct me.
13      MR. TAMBURO: And -- and -- and -- and --
14      THE WITNESS: FiberWire does not contain a
15 PTFE.
16 BY MR. BONELLA:
17 Q  Oh, I'm sorry. Did I misspeak?
18 A  You just said that.
19 Q  I'm sorry.
20     Does the coating on FiberWire prevent the
21 PET fibers, PET or ultra high molecular weight
22 polyethylene fibers from providing contribution to
23 FiberWire's properties?
24     MR. TAMBURO: Objection, vague.
25 A  No.

Page 563

1  BY MR. BONELLA:
2  Q  Okay. I'd like to go to your first
3  report, invalidity, Exhibit 239. If we go to tab --
4  tab 9 --
5  A  Tab 9.
6  Q  There's an excerpt from Dr. Steckel's
7  report.
8  A  Right.
9  Q  It's only a -- a one-page excerpt from his
10 laboratory notebook.
11 A  Yes.
12 Q  Okay. Did you select that one page to put
13 in your report out of his entire notebook, or were you
14 given that one page?
15 A  No, I have the entire notebook.
16 Q  Okay. Why'd you pick -- did you consider
17 the remainder of his notebook when -- when you select
18 that individual page to attach to your report?
19     MR. TAMBURO: Objection. Well, not an
20 objection, but if you need -- to the extent you need
21 to read the context of why you cited this, please do
22 so.
23 A  Because it is very clear that he was
24 talking about difficulties in core popping and braid
25 looseness.

Page 564

1  BY MR. BONELLA:
2  Q  Okay. Do you know what samples on that
3  page he was talking about, when -- when they were
4  made?
5  A  Well, according to the lab, his notebook
6  page signed was date of '89 -- I mean '89.
7  Q  Right.
8  A  That's what it says here.
9  Q  Okay. Do you know when those samples were
10 made that are discussed on that page?
11 A  It's February 2, 1989 at the top. That's
12 when the lab entry is.
13 Q  Okay.
14 A  I assume that's when the samples were
15 made.
16 Q  Okay. I'd like you to turn to Exhibit 26
17 to Exhibit 359, the report of Dr. Matthew Hermes,
18 which contains a larger excerpt of Dr. Steckel's
19 report right here. And if I could draw your attention
20 to page DMI002617, okay?
21 A  Right here.
22 Q  Right here. 17. Okay --
23 A  1617.
24 Q  Here's an entry on DMI002617 is June 6,
25 1988?

Page 565

1  A  That's correct.
2  Q  Okay. And if you look at the next page,
3  shows a chart of samples, composite braid evaluation,
4  braid constructions. Do you see that?
5  A  Yes.
6  Q  Did you consider that, those
7  constructions?
8      MR. TAMBURO: Take your time,
9  Dr. Mukherjee.
10 A  I believe I did.
11 BY MR. BONELLA:
12 Q  Okay. CBE15, do you see CBE15 sample?
13 A  Yeah.
14 Q  Do you know what the construction of that
15 sample was?
16     MR. TAMBURO: Objection, vague.
17 A  Was PTFE, 11049 in the denier and the
18 fiber. This column on these other things are not
19 there.
20 BY MR. BONELLA:
21 Q  Do you know what the construction of CB15
22 was?
23     MR. TAMBURO: Objection, vague.
24 A  If I understood, you are asking the --
25 BY MR. BONELLA: