IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DePuy Mitek, Inc. a Massachusetts Corporation | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 04-12457 PBS |
| Arthrex, Inc. a Delaware Corporation, *et al.* | ) ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANTS' OPPOSITION TO DEPUY MITEK'S MOTION TO STRIKE ARTHREX'S RELIANCE ON ITS OWN INTERROGATORY CONTENTIONS AND DR. MUKHERJEE'S TIGERWIRE OPINIONS IN OPPOSITION TO DEPUY MITEK'S MOTION FOR SUMMARY JUDGMENT OF INFRINGEMENT AND NO INEQUITABLE CONDUCT**

Dated: October 4, 2006

Charles W. Saber
Stephen A. Soffen
Salvatore P. Tamburo
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, D.C. 20006-5403
Telephone: (202) 420-3116
Facsimile: (202) 420-2201

Christopher Weld, Jr. (BBO # 522230)
Raymond P. Ausrotas (BBO # 640315)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
Telephone: (617) 720-2626
Facsimile: (617) 227-5777

Counsel for Defendants
Arthrex, Inc. and Pearsalls Ltd.

DSMDB-2148005v01

# TABLE OF CONTENTS

Page No.

I.    INTRODUCTION...........................................................................................................1

II.   DEPUY MITEK FAILED TO COMPLY WITH LOCAL RULE 7.1(a)(2), AND
      THEREFORE, ITS MOTION SHOULD BE STRICKEN...............................................1

      A.   DePuy Mitek's Motion is Another Transparent Attempt to Circumvent The Page Limit
           Set Forth in Local Rule 7.1(b)(4)..........................................................................2

III.  SHOULD THE COURT CONSIDER DEPUY MITEK'S MOTION ON THE
      MERITS, THE MOTION SHOULD STILL BE DENIED................................................2

      A.   Defendants' Citation to Their Interrogatory Responses Was For Non-Hearsay Purposes.2

           1.   Tipping materially affects FiberWire's handleability......................................3

           2.   The Reverse Doctrine of Equivalents applies because FiberWire operates in a manner
                opposite to that of the '446 patent.............................................................4

      B.   DePuy Mitek Cannot Strike the Additional Evidence That Shows That the Addition of
           Nylon to FiberWire Materially Affects the Basic and Novel Characteristics of the
           Claimed Invention...................................................................................................6

      C.   In Any Event, TigerWire Does Not Infringe for the Same Reasons That FiberWire Does
           Not Infringe............................................................................................................7

IV.   CONCLUSION ...........................................................................................................8

# TABLE OF AUTHORITIES

## FEDERAL CASES

**Page No.(s)**

*Amgen, Inc. v. Hoecht Marion Roussel, Inc.*, 314 F.3d 1313 (Fed. Cir. 2003) ...................5

*Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404 (1st Cir. 1985)........3, 4

*Del Maritime Avionics, Inc. v. Quinton Instr. Co.*, 836 F.2d 1320 (Fed. Cir. 1987)...........5

*Graver Tank & Manufacturing Co. v. Linde Air Prod. Co.*, *339* U.S. *605 (1950)*..............5

*Novosteel SA v. United States*, 284 F.3d 1261 (Fed. Cir. 2002) ..........................................2

*PPG Industrial v. Guardian Industrial Corp.*, 156 F.3d 1351 (Fed. Cir. 1998).................8

*Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565 (Fed. Cir. 1991) ...................................................................................................................5

*Smithkline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011 (N.D.Ill. March 3, 2003) ...............................................................................................................................5

## I.        INTRODUCTION

Defendants Arthrex, Inc. ("Arthrex") and Pearsalls, Ltd. ("Pearsalls") (together, "defendants") submit this Opposition to DePuy Mitek's Motion to Strike Arthrex's Reliance on its Own Interrogatory Contentions and Dr. Mukherjee's TigerWire Opinions in Opposition to DePuy Mitek's Motion for Summary Judgment of Infringement and No Inequitable Conduct ("Mitek Mot. to Str."). For the reasons described hereinbelow, DePuy Mitek's motion should be denied.

## II.        DEPUY MITEK FAILED TO COMPLY WITH LOCAL RULE 7.1(a)(2), AND THEREFORE, ITS MOTION SHOULD BE STRICKEN

Local Rule 7.1(a)(2) of the U.S. District Court for the District of Massachusetts requires that "[n]o motion shall be filed unless counsel certify that they have conferred and have attempted in good faith to resolve or narrow the issue." In what has become a rather disturbing trend, for the second time in as many motion filings, DePuy Mitek made no attempt to comply with this local rule before filing its motion.

Just as was the case with the last motion filed by DePuy Mitek, prior to being served with the motion, defendants had no idea that DePuy Mitek objected to defendants' citation of their interrogatory responses in their Opposition to DePuy Mitek's Motion for Summary Judgment, or that DePuy Mitek objected to Dr. Mukherjee's opinions related to TigerWire. Here again, had DePuy Mitek made *any* effort to comply with the local rules, defendants would have had the opportunity to explain why their interrogatory responses were used for non-hearsay purposes and why Dr. Mukerjee's opinions on TigerWire are admissible. However, since DePuy Mitek did not contact defendants regarding its objections, this Court is once again forced to address the entirety of DePuy Mitek motion.

DSMDB-2148005v01

     A.    DePuy Mitek's Motion is Another Transparent Attempt to Circumvent The Page Limit Set Forth in Local Rule 7.1(b)(4)

Just as transparent as its last motion, this DePuy Mitek motion has all the trappings of an attempt to circumvent the Court's page limit. The issues raised by this motion could have, and should have, been raised in DePuy Mitek's Reply to its Summary Judgment Motion. The combined pages of this motion and the Reply was 26 pages, well in excess of the page limitation for motion papers. By filing a separate motion instead of including these arguments in its Reply, DePuy Mitek was able to extend the page limit of the Reply without seeking the defendants' consent or the permission of the Court. DePuy Mitek has now used this tactic twice and it should not be tolerated. On this basis alone, DePuy Mitek's motion should be denied without leave to refile.

**III.     SHOULD THE COURT CONSIDER DEPUY MITEK'S MOTION ON THE MERITS, THE MOTION SHOULD STILL BE DENIED**

     A.    Defendants' Citation to Their Interrogatory Responses Was For Non-Hearsay Purposes

In an error that should prove to be fatal to its summary judgment motion for infringement, DePuy Mitek ignored two defenses raised by defendants in their interrogatory responses – *i.e.,* that the ends of FiberWire suture are tipped, thereby restricting the fiber mobility of the two dissimilar materials and the reverse doctrine of equivalents. As defendants explained in their summary judgment opposition, DePuy Mitek's omission of any arguments addressing these two defenses should be fatal to DePuy Mitek's summary judgment motion since it has effectively waived those arguments. Defendants' Opposition to DePuy Mitek's Motion for Summary Judgment of Infringement and No Inequitable Conduct ("Def's SJ Opp.") at 8-9. To find otherwise would be unfair to defendants since they do not have an opportunity to respond to DePuy Mitek's new arguments, raised for the first time in its reply. *See, e.g., Novosteel SA v. United States,* 284 F.3d 1261, 1273-74 (Fed. Cir. 2002) (holding "as a matter of litigation

fairness and procedure" arguments that did not appear in movant's original summary judgment motion but did appear in movant's reply brief were waived).

With regard to defendants' identification of their two defenses, DePuy Mitek asserts that "Arthrex's reliance on its contention interrogatory responses should be stricken," since these responses are "not admissible by Arthrex because they are hearsay."  Mitek Mot. to Str. at 1. DePuy Mitek apparently misunderstands the reasons that defendants cited to the interrogatory answers.  Defendants plainly did not offer their interrogatory responses for the truth of the matter asserted, but rather, the purpose was to alert the Court to the fact that there are two non-infringement defenses of which DePuy Mitek was aware (because they were raised in the interrogatory answers), but chose to ignore in its summary judgment motion.  Such use is *not* hearsay because the interrogatory answers are not offered for the truth of the matter asserted.  2 MCCORMICK ON EVID. §§ 249, 295 (6th ed.).

1.     Tipping materially affects FiberWire's handleability

Apparently, DePuy Mitek is trying to create a world where it can neglect to raise appropriate issues in its motion, present evidence in a Reply only after its neglect is called to its attention, and then contend that defendants should not be permitted to file a substantive response. Even if the Court were to rule that DePuy Mitek's failure to raise these issues in its original summary judgment motion was not a waiver, surely fairness demands that defendants be permitted to respond.  *See, e.g., Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.,* 754 F.2d 404, 410 (1st Cir. 1985).

DePuy Mitek engages in such gamesmanship because it knows full-well that multiple witnesses in this case -- including witnesses for both Arthrex and DePuy Mitek -- have testified that the ends of suture are tipped in order to stiffen the ends so as to facilitate attachment to instruments, including needles, and/or to insert the suture through tissue -- all handleability

purposes. This was the testimony of Kevin Grieff, Shelby Cook, Ilya Koyfman and Gary McAlister. Ex. 1 at 53:23-54:2; Ex. 2 at 119:24-120:10; Ex. 3 at 106:5-10; Ex. 4 at 53:24-54:6. Thus, to the extent DePuy Mitek is not found to have waived its argument with regard to tipping -- as it rightfully should be -- the testimony of these several witnesses creates an issue of fact and DePuy Mitek's motion for summary judgment of infringement should be denied.[1]

> 2.   The Reverse Doctrine of Equivalents applies because FiberWire
>      operates in a manner opposite to that of the '446 patent

As DePuy Mitek is also well aware, Dr. Mukherjee stated that the '446 patent specification describes that the first fiber-forming material is a lubricious material, and that the second fiber-forming material is added for strength. Ex. 5 at 7. Dr. Mukerjee also stated that the fact that the first fiber-forming materials are lubricious but too weak for most suture applications is further made clear by the specification which states that "a volume fraction [of lubricating yarns] above about 80% may adversely affect the overall strength of the braid." *Id*. He also noted that "there is a tradeoff between the properties of the two materials – one being lubricious but weak, the other being added for strength," and that "the specification further recognizes that gains in handleability/pliability outweigh and loss of strength." *Id*. Likewise, Dr. Mukherjee stated that, in 1992, UHMWPE -- as used in FiberWire -- was a well-known, highly specialized fiber material with strength properties that are far superior to those of general purpose PE. Ex. 6

---

[1]      DePuy Mitek also asserts that it is irrelevant whether FiberWire's ends infringe as long as the remainder of the suture infringes and cites two cases. Mitek's Reply in Support of its Motion for Summary Judgment of Infringement and No Inequitable Conduct ("Mitek's SJ Reply") at 4-5. Those cases, however, are inapposite since they address "comprising" claims and not "consisting essentially of" claims. It is well-known that one can not avoid infringement of a "comprising" claim simply by adding additional materials to the accused infringing product. The facts of this case are entirely different, however, since the transitional phrase is not "comprising," but "consisting essentially of." Thus, the question is not simply whether an unlisted ingredient has been added to an otherwise infringing product, but rather, whether the addition of that unlisted ingredient materially affects the handleability of the suture (*e.g.,* facilitating its insertion into needles, tissue, etc.). As demonstrated above, the adhesive does have such a material affect on the suture.

at 22.  Further, as Dr. Brookstein acknowledged, UHMWPE is added to FiberWire for its strength, whereas PET is added for its flexibility.  Ex. 7 at ¶ 56.

Having found this disclosure in the '446 patent, and with this explanation of the purposes of the materials used to make FiberWire, Dr. Mukherjee opined that "[t]he specification of the '446 patent describes that the first fiber-forming materials are added to improve suture handleability and that such materials are too weak for most suture applications.  It is the second fiber-forming materials that are added for increased strength.  The way in which the individual materials act in FiberWire is the opposite.  UHMWPE that is added for strength and the PET is added to improve knot tying – a well-known handleability characteristic."  Ex. 5 at 18.  This testimony establishes a defense under the reverse doctrine of equivalents.  Thus, to the extent DePuy Mitek is not found to have waived its argument with regard to the reverse doctrine of equivalents -- as it rightfully should be -- Dr. Mukherjee's statements create an issue of fact and DePuy Mitek's motion for summary judgment of infringement should be denied.[2]

---

[2]    DePuy Mitek stated that "it is not clear whether the reverse doctrine of equivalents is even a viable defense."  Mitek's SJ Reply at 1.  The Federal Circuit, however, has confirmed that it is a viable defense.  For example, in *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1351 (Fed. Cir. 2003), although the facts did not support a finding of reverse doctrine of equivalents, the Federal Circuit endorsed it as a viable defense and cited the Supreme Court in *Graver Tank & Mfg. Co. v. Linde Air Prod. Co.  339 U.S. 605, 608-09 (1950),* cited Donald S. Chisum, 5A CHISUM ON PATENTS § 18.04 (1999), and also cited two other Federal Circuit opinions (*Scripps Clinic & Research Foundation v. Genentech, Inc.,* 927 F.2d 1565, 1581 (Fed. Cir. 1991), and *Del Mar Avionics, Inc. v. Quinton Instr. Co.,* 836 F.2d 1320, 1325 (Fed. Cir. 1987)).

Since *Amgen*, Judge Posner (N.D.Ill.) also recognized the doctrine of equivalents as a viable defense in *Smithkline Beecham Corp. v. Apotex Corp.,* 247 F.Supp.2d 1011, 1044-45 (N.D.Ill. March 3, 2003).  He cited the Federal Circuit decision in *Amgen* and stated that the present case was a good case for the reverse doctrine of equivalents defense but since the defendant did not invoke it, he could not rely on it.

      B.     DePuy Mitek Cannot Strike the Additional Evidence That Shows That the
Addition of Nylon to FiberWire Materially Affects the Basic and Novel
Characteristics of the Claimed Invention

DePuy Mitek has apparently taken the position that since Dr. Mukherjee could not recall
at his deposition every detail of every suture he evaluated in connection with this case, then that
means Dr. Mukherjee did not review any sutures.  Mitek Mot. to Str. at 4-5.  That, of course, is
not the law.  A deposition is not a memory test, nor should it be treated as one.  Dr. Mukherjee
stated in his Responsive Expert Report that he "held a sample of both commercial FiberWire and
TigerWire and the TigerWire felt stiffer and more coarse than the same sized FiberWire."  Ex. 5
at 30-31.  Dr. Mukherjee also opined that "the coarse feel [of TigerWire] would suggest that the
addition of the nylon would adversely affect knot tie-down."  Ex. 5 at 31.  Dr. Mukherjee spent
decades working in the suture industry and is highly qualified to opine on whether one suture
feels stiffer and more coarse than another suture and what affect, if any, such coarseness would
have on knot tie-down.

Unwilling to address this evidence head-on, DePuy Mitek's tactic was to subject Dr.
Mukherjee to a memory test at his deposition.  The fact that Dr. Mukherjee did not recall every
detail of every test he conducted while sitting for his deposition is unremarkable.  What is
notable, however, is the fact that DePuy Mitek intentionally did not ask Dr. Mukherjee about the
specific statements he made in his expert report regarding his test of the stiffness and courseness
of TigerWire compared with FiberWire -- even after Dr. Mukherjee referred DePuy Mitek to his
report where he says that nylon does affect pliability.  Ex. 8 at 526:4-13.  Rather, DePuy Mitek
simply concludes, with a wave of the hand, that the tests were not conducted because Dr.
Mukherjee did not remember every single test that he performed to support his opinions.  Try as
it may, DePuy Mitek can not sweep Dr. Mukherjee's report under the rug in the hopes that it will
disappear.  Of course, Dr. Mukherjee conducted his test and his opinions were as stated in his

report.  DePuy Mitek does not challenge Dr. Mukherjee's test as unscientific, nor does it challenge Dr. Mukherjee's qualifications to render any such opinion.  The only attack on Dr. Mukerjee's test is a baseless conclusory statement that he did not conduct it.  As explained above, that is simply not true.

DePuy Mitek spends four pages attacking Dr. Mukherjee's "drape" test as unscientific. Mitek Mot. to Str. at 5-8.  But Dr. Mukherjee readily acknowledged that the drape test was not scientific and that his opinions in this case were not based solely on the drape test.  Rather, the drape test was consistent with Dr. Mukerjee's other tests and merely served to confirm his opinions regarding TigerWire's pliability.

C.    In Any Event, TigerWire Does Not Infringe for the Same Reasons That FiberWire Does Not Infringe

It is important to note that the addition of nylon to TigerWire simply provides defenses beyond those available for FiberWire.  The infringement defenses applicable to FiberWire apply equally to TigerWire.  Like FiberWire, TigerWire is also made of UHMWPE and PET (with nylon as a substitute for one of the PET filaments).  Thus, TigerWire does not infringe because UHMWPE is not "PE" within the meaning of the '446 patent.

Similarly, TigerWire, just like FiberWire, is coated and the addition of the coating materially affects the basic and novel characteristics of the claimed invention.  DePuy Mitek can not create a genuine issue of material fact on TigerWire by pointing to the testimony of Dr. Brookstein or Dr. Burks.  Dr. Brookstein did no tests on TigerWire coating.  Moreover, even if his 4.8% coating measurement[3] on FiberWire applied to TigerWire, there is absolutely no

---

[3]    Defendants note that in their Reply Memorandum in Support of their Motion for Summary Judgment ("Def's Reply SJ Br."), they inadvertently misstated Dr. Brookstein's coating measurement.  Instead of 3.4% coating by weight, Dr. Brookstein actually measured even more of a coating content on FiberWire -- 4.8% coating by weight.

support for Dr. Brookstein's opinion that 4.8% is a "very small amount of coating." In fact, all the evidence is to the contrary. *See* Def's Reply SJ Br. at 13-14.

Likewise, Dr. Burks' testimony can not create a genuine issue of fact. First, he did no tests on TigerWire. Second, his assertion (with respect to FiberWire) that differences were "subtle" has nothing to do with how FiberWire (or TigerWire) is used in a surgical environment. For his report, Dr. Burks tested FiberWire both "dry" and "wet." He explained that "wet" is how FiberWire is used in a surgical environment (Ex. 9 at ¶ 7) and that, with respect to all of his tests, "the difference between the two samples *was even more pronounced* when they were wet, which is how I am accustomed to using FiberWire." Ex. 9 at ¶¶ 11, 12. [Emphasis added.] Dr. Burks' comments about a subtle difference related *only* to "dry" FiberWire. Ex. 10 at 87:7-13.[4] Notably, at his deposition, Dr. Burks was *not* asked a single question about his opinions on wet FiberWire, which is how it is used in the surgical environment. All of DePuy Mitek's questions were directed to his opinions on "dry" FiberWire. Thus, Dr. Burks' opinion that the differences were "more pronounced" when wet, as the product is actually used, remains unrebutted. As defendants previously stated, if the affect of the unlisted material is of importance or of consequence to those of ordinary skill in the art -- here Dr. Burks believes there is a "pronounced" difference -- it is a "material" affect. *PPG Indus. v. Guardian Indus. Corp.* 156 F.3d 1351, 1354 (Fed. Cir. 1998).

## IV.    CONCLUSION

For all the foregoing reasons, DePuy Mitek's motion should be denied.

---

[4]    At his deposition, Dr. Burks was only asked to perform tests on "dry" FiberWire, where the differences are less pronounced. Even here, he got the answer correct each time.

Dated: October 4, 2006                    Respectfully submitted,


By: _____/s/Charles W. Saber_____
Charles W. Saber
Stephen A. Soffen
Salvatore P. Tamburo
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, D.C.  20006-5403
Telephone:  (202) 420-3116
Facsimile:  (202) 420-2201
Christopher Weld, Jr. (BBO # 522230)
Raymond P. Ausrotas (BBO # 640315)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
Telephone:  (617) 720-2626
Facsimile:  (617) 227-5777
Counsel for Defendants
Arthrex, Inc. and Pearsalls Ltd.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing DEFENDANTS'

OPPOSITION TO DEPUY MITEK'S MOTION TO STRIKE ARTHREX'S RELIANCE ON

ITS OWN INTERROGATORY CONTENTIONS AND DR. MUKHERJEE'S TIGERWIRE

OPINIONS IN OPPOSITION TO DEPUY MITEK'S MOTION FOR SUMMARY

JUDGMENT OF INFRINGEMENT AND NO INEQUITABLE CONDUCT was served, via the

Court's email notification system on the following counsel for Plaintiff on the 4th day of October

2006:

Lynn A. Malinoski
Woodcock Washburn, LLP
One Liberty Place, 46th Floor
Philadelphia, PA. 19103
Telephone:  (215) 568-3100
Facsimile:  (215) 568-3439

Daniel J. Gleason
Nutter McClennan & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
Telephone:  (617) 439-2000
Facsimile:  (617) 310-9000

                        /s/Charles W. Saber

# EXHIBIT 1

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DePuy Mitek, Inc., a
Massachusetts Corporation,

    Plaintiff,

    vs.

Arthrex, Inc., a Delaware
Corporation,

    Defendant.

_____/

COPY

CIVIL ACTION
NO. 04-12457 PBS

DEPOSITION OF:        KEVIN GRIEFF

DATE:              September 15, 2005

TIME:              9:15 a.m. to 11:23 a.m.

LOCATION:         The Ritz Carlton Golf Resort
                      2600 Tiburon Drive
                      Naples, FL  34112

TAKEN BY:         Plaintiff

REPORTER:         Deborah A. Krotz, RPR, CRR

VIDEOGRAPHER:     Les Smoak, CLVS

53

1    A.    I don't know how it would be different at

2  Pearsalls, but, obviously, there would be a difference

3  because it's a loop.  I have no knowledge of how that's

4  done.

5    Q.    So is it your understanding that Pearsalls loops

6  the FiberWire used to make the Arthrex FiberLoop product?

7    A.    Pearsalls is the manufacturer of that.  How they

8  do it, I don't know.

9    Q.    Now how does the manufacturing of Arthrex's

10 FiberStick differ than -- strike that.

11           How does the manufacturing of Arthrex's

12 FiberStick product differ than the manufacturing of

13 Arthrex's FiberWire product?

14    A.    It does not.  It goes through the same processes

15 with the same entities.

16    Q.    Okay.  Then how -- how is the FiberStick product

17 different than the FiberWire product?

18    A.    It has a longer tipping.

19    Q.    And who does the tipping?

20    A.    R.K. Manufacturing.

21    Q.    And is the tipping just a longer portion of --

22 well, strike that.

23           What is the tipping process used for

24 manufacturing Arthrex's FiberStick?

25    A.    I'm not sure of the exact process, but tipping is

54

1  to make the suture rigid so you can pass it through

2  instruments.

3      Q.   Mmm-hmm.

4      A.   The FiberStick just may have I believe 8 or

5  9 inches of tipping versus 1 inch of tipping.

6      Q.   So other than the tipping for FiberStick, there's

7  no other difference in the manufacturing process between

8  FiberStick and FiberWire?

9      A.   No, sir.

10     Q.   How does the manufacturing of Arthrex's

11  FiberSnare product differ than Arthrex's manufacturing of

12  the FiberWire product?

13          MR. TAMBURO:   Objection to form.

14     A.   I'm not that familiar with the FiberSnare

15  product, but I do not believe it's any different.  It goes

16  through -- it definitely goes through Pearsalls and R.K.

17     Q.   Do you know what product number the FiberSnare is

18  or what part number the FiberSnare?

19     A.   7209.  AR-7209.

20          That's incorrect.  That was the FiberStick.  The

21  FiberSnare, 7209SN.

22     Q.   So AR-7209 SN is the FiberSnare product?

23     A.   Correct.

24     Q.   And that product, FiberSnare, is listed on Page

25  ARM 18537 of Exhibit 101.  And I believe that's Page 12-5

EXHIBIT 2

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

3               C.A. No. 04-12457 PBS

4    *   *   *   *   *   *   *   *   *   *   *   *   *

**COPY**

5    DePUY MITEK, INC.,

6               Plaintiff                    *

7    v.                                      *

8    ARTHREX, INC., a Delaware              *

9    corporation,                           *

10              Defendant                    *

11   *   *   *   *   *   *   *   *   *   *   *   *   *

12                   VOLUME I

13               PAGES 1-245

14

15        DEPOSITION OF DePUY MITEK, INC. by

16   SHELBY COOK KORNBLUTH, a witness called on

17   behalf of the Defendant, pursuant to the

18   Federal Rules of Civil Procedure, before

19   Jessica L. Williamson, Registered Merit

20   Reporter, Certified Realtime Reporter and

21   Notary Public in and for the Commonwealth of

22   Massachusetts, at the Hilton Hotel, 25

23   Allied Drive, Dedham, Massachusetts, on

24   Tuesday, November 15, 2005, commencing at

25   9:01 a.m.

Confidential Deposition of:
Shelby Cook Kornbluth

November 15, 2005

Page 119

1   A.   Correct.

2   Q.   -- of the whole concentrate?

3   A.   Correct.

4   Q.   Okay.  And then what actually sticks is the

5        .07 to the .15 percent, and that's the

6        vol -- that's measured as a percentage of

7        the volume of the suture?

8   A.   Yes.

9   Q.   And is that range, the .07 to .15, the same

10       for the violet and blue?

11  A.   Yes.

12  Q.   Are there any other components of the

13       Orthocord -- we've mentioned the ultra high

14       molecular weight PE, the PDS, the two

15       fibers, the coating.  I think you mentioned

16       the dye earlier --

17  A.   Uh-huh.

18  Q.   -- right?  One's a blue dye, one's a violet

19       dye.  Anything else?

20  A.   The suture is -- has a tip at each end.

21  Q.   And what is the tip made of?

22  A.   God, it's a combination of four different

23       materials.  They escape me right now.

24  Q.   Okay.  What is the purpose of tipping the

25       suture?

Confidential Deposition of:
Shelby Cook Kornbluth                    November 15, 2005

Page 120

```
 1    A.    The original intent of tipping the suture is

 2          so that you can -- that the end of the

 3          suture is stiff enough to insert into a

 4          needle to attach or for a surgeon to put

 5          through a free needle so that they can use a

 6          suture without a needle on it.

 7    Q.    So it's stiff enough to put it on the

 8          needle?  Is that part of the manufacturing

 9          process, the first thing you described --

10    A.    Yeah.

11    Q.    -- what Ethicon or one of these other

12          companies does?

13    A.    When they attached the suture to the

14          needle --

15    Q.    Yes.

16    A.    -- if you don't have a tip on there, you

17          can't get it into the needle hole.

18    Q.    Right.  So that's part of the manufacturing

19          process?  That's the first purpose --

20    A.    Yes.

21    Q.    -- of tipping?

22              And the second purpose has to do with

23          the surgeon?

24    A.    Yeah, over -- I mean, over the years suture

25          companies have added a tip to the tips of
```

# EXHIBIT 3

Page 1

1

2                 UNITED STATES DISTRICT COURT

3                 DISTRICT OF MASSACHUSETTS

4                   C.A. No. 04-12457 PBS

5       ------------------------------x

6    DePUY MITEK, INC.,

7         A Massachusetts Corporation,

8                     Plaintiff,

9                 v.

10   ARTHREX INC.,

11        A Delaware Corporation,

12                 Defendants.

13      ------------------------------x

14

15           * * *CONFIDENTIAL* * *

16        DEPOSITION OF ILYA KOYFMAN

17        Somerset, New Jersey

18           February 22, 2006

19

20   Reported by:

21   MARY F. BOWMAN, RPR, CRR

22   JOB NO.:  SE232

23

24

25

Confidential Deposition of:
Ilya Koyfman

February 22, 2006

Page 106

1                    KOYFMAN - Confidential

2    core.  You have an internal core and then you have

3    a sheath which is braided sheath, right?  So if

4    you have a suture which -- you cut the suture

5    length and you tip it, the tipping is a relatively

6    rigid polymeric substance which allows for

7    insertion of a suture into the needle.  So you

8    need this tip.  So if you have a tip on both ends

9    like in the case with Orthocord, you basically

10   anchor two ends.

11            So if you have sheath too mobile, you

12   know, you can displace some of that amount of

13   sheath over the core and you can -- and you can

14   accumulate it in one part.  That's -- that has

15   to be -- the amount of how much you can

16   accumulate or the relationship to the initial

17   diameter has to be specified.

18            This phenomena is called bunching, so

19   basically you bunch up, bunch it.

20        Q.    A part of the suture at one end?

21        A.    Yes.

22        Q.    That is a characteristic you are

23   trying to avoid, bunching?

24        A.    You try to minimize it.

25        Q.    Why do you try to minimize bunching?

EXHIBIT 4

Confidential Deposition of:
Gary B. McAlister                                    December 22, 2005

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT

 2          FOR THE DISTRICT OF MASSACHUSETTS

 3              C.A. No. 04-12457 PBS

 4     *   *   *   *   *   *   *   *   *   *   *   *

 5   DePUY MITEK, INC.,

 6              Plaintiff

 7   v.

 8   ARTHREX, INC., a Delaware

 9   corporation,

10              Defendant

11     *   *   *   *   *   *   *   *   *   *   *   *

12                  VOLUME I

13                PAGES 1-197

14

15        DEPOSITION OF GARY B. McALISTER, a

16   witness called on behalf of the Defendant,

17   pursuant to the Federal Rules of Civil

18   Procedure, before Jessica L. Williamson,

19   Registered Merit Reporter, Certified

20   Realtime Reporter and Notary Public in and

21   for the Commonwealth of Massachusetts, at

22   the Four Points Sheraton, 1125 Boston

23   Providence Turnpike, Norwood, Massachusetts,

24   on Thursday, December 22, 2005, commencing

25   at 8:59 a.m.
```

Confidential Deposition of:
Gary B. McAlister

December 22, 2005

Page 53

1         me about learning from the Orthocord team?

2  A.   No, not -- what I also -- already said was

3         about making it a carrier for other kinds of

4         antimicrobials or other kinds of drugs.

5  Q.   Is that something that you learned from the

6         Orthocord team, or is that --

7  A.   I learned that at Mitek.

8  Q.   But was that from something other than the

9         Orthocord team?

10  A.   It was related as we talked about new suture

11         products going on and other things that

12         might be of interest in the suture line to

13         Mitek.  We were informed of that project and

14         that product that was released through

15         Ethicon.

16  Q.   With respect to the Orthocord product, do

17         you have any knowledge with respect to the

18         tipping of the Orthocord product, the

19         materials used for tipping?

20  A.   No.

21  Q.   Do you have any knowledge as to why the --

22         is the product tipped?

23  A.   Yes.

24  Q.   Okay.  Do you have any knowledge as to why

25         the product's tipped?

Confidential Deposition of:
Gary B. McAlister                                    December 22, 2005

Page 54

1   A.   Yes.

2   Q.   **Okay.  And what is that?**

3   A.   It makes it easier to thread through --

4        either through an anchor or through tissue.

5   Q.   **Through a needle as well?**

6   A.   Yes.  Through anything, yeah.

7   Q.   **Anything else about why the products are**

8        **tipped?**

9   A.   No.

10  Q.   **And what is the basis of your knowledge of**

11       **the -- why the Orthocord suture is tipped?**

12  A.   It came from the Orthocord team.

13  Q.   **Same people we talked about or any others?**

14  A.   Same people.

15  Q.   **Do you have any direct experience with**

16       **tipping of suture?**

17  A.   No.

18  Q.   **Do you have any other source of knowledge as**

19       **to why suture is tipped other than through**

20       **the Orthocord team?**

21  A.   The only other member from the Orthocord

22       team might be one of the marketing people

23       who has direct contact with the customer.

24  Q.   **Okay.  And who would that be?**

25  A.   Jon Grange most likely.

# EXHIBIT 5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DePuy Mitek, Inc.<br>　　　a Massachusetts Corporation<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>Arthrex, Inc.<br>　　　a Delaware Corporation<br><br>　　　　　　Defendant. | Civil Action No. 04-12457 PBS |

## RESPONSIVE EXPERT REPORT OF DR. DEBI PRASAD MUKHERJEE CONCERNING NON-INFRINGEMENT OF U.S. PATENT NO. 5,314,446 AND OTHER MATTERS

Pursuant to the provisions of Rule 26(a)(2) of the Federal Rules of Civil

Procedure, the Joint Case Management Statement adopted by the Court on February 18,

2005, and agreement between the parties, the undersigned, Dr. Debi Prasad Mukherjee,

an expert witness for Defendants Arthrex, Inc. and Pearsalls, Limited (together,

"Defendants") hereby sets forth his responsive expert report concerning non-

infringement and other matters as follows.

that while such braids will be highly pliable, they will also be relatively weak and unusable for most suture applications. Ex. 3 at col. 2, ll. 22-25.

The proposed solution described in the '446 patent is a heterogeneous braid made up of two dissimilar materials. According to the specification, the braid is made up of a first fiber-forming material mechanically interlocked or weaved with a second fiber-forming material. The specification also states that the first fiber-forming material is a lubricious material, and that the second fiber-forming material is added for strength. The fact that the first fiber-forming materials are lubricious but too weak for most suture applications is further made clear by the specification which states that "a volume fraction [of lubricating yarns] above about 80% may adversely affect the overall strength of the braid." As described throughout the specification, there is a tradeoff between the properties of the two materials – one being lubricious but weak, the other being added for strength. The specification further recognizes that gains in handleability/pliability outweigh any loss of strength.

The specification also repeatedly states that the advantage of the above-described braid construction is that the braid exhibits improved handleability and pliability without appreciably sacrificing its physical properties. Ex. 3 at col. 2, ll. 32 – 37; ll. 62 – 66; col. 6, ll. 7 – 8.

Claim 1 of the '446 patent is to a surgical suture, the surgical suture consisting essentially of a heterogeneous braid composed of a first and second set of continuous

7

**C.**    **UHMWPE is used in FiberWire to impart strength and PET is used in FiberWire to improve handleability**

As I previously mentioned, the specification of the '446 patent describes that the first fiber-forming materials are added to improve suture handleability and that such materials are too weak for most suture applications. It is the second fiber-forming materials that are added for increased strength. The way in which the individual materials act in FiberWire is the opposite. UHMWPE that is added for strength and the PET is added to improve knot tying – a well-known handleability characteristic.

**D.**    **The basic and novel characteristics described in the '446 patent are a suture having two dissimilar yarns braided together to achieve improved handleability and pliability performance without significantly sacrificing its physical properties**

I have been asked to provide my opinion regarding what a person of ordinary skill in the art in February 1992 would understand to be the basic and novel characteristics described in the '446 patent. It is my opinion that a person of ordinary skill in the art, in February 1992, reading the specification of the '446 patent would understand the basic and novel characteristics to be a suture having two dissimilar yarns braided together to achieve improved handleability and pliability performance without significantly sacrificing its physical properties. This concept is repeated throughout the specification. Ex. 3 at col. 2, ll. 32 – 37; ll. 62 – 66; col. 6, ll. 7 – 8.

The specification also describes that there is a tradeoff between the two fiber-forming materials that make up the two dissimilar yarns – one being lubricious, but

18

Based on my review of the three micrographs, it appears that they are very different and that they are too unclear to draw any conclusions from them. Despite the lack of clarity, however, it appears that the individual braid filaments are grouped together to a much greater degree in the Tab G micrograph than they are in the Tab E micrograph. This is an indication that coating has permeated into the braid.

In any event, Dr. Brookstein's conclusions are inconsistent with the findings discussed below. In addition to the tests described above, CETR also conducted a scanning electron microscopy (SEM) examination of coated and uncoated FiberWire suture. My review of the scans performed to date appears to indicate that the coating does extend into the braid. Ex. 20 at Fig. 14. This is consistent with the effect coating has on FiberWire's pliability, as described above.

F.     The nylon added to TigerWire suture materially affects its pliability

I understand that Arthrex's TigerWire suture has the same construction as FiberWire suture except that one of the PET carriers is replaced with nylon 6,6. All the reasons discussed in connection with FiberWire also apply to TigerWire. Further, it is well known in the art of manufacturing and/or processing of fibers that nylon 6,6 fibers of the type used in TigerWire are generally more stiff (i.e., less pliable) than fibers made of PET, as used in FiberWire and TigerWire. Ex. 26. Therefore, the act of removing one PET carrier and replacing it with a nylon 6,6 carrier during the braiding process, as is done with TigerWire, introduces a less pliable material into the composite braid.

30

It is also my understanding from discussions with Bill Benavitz of Arthrex that the diameter of the nylon 6,6 fibers used in TigerWire is greater than that of the PET which it replaces. Therefore, the nylon 6,6 fiber makes up a greater percentage of the braid cross-section area than does the PET fiber it replaces. Mr. Benavitz also informed me that Arthrex has received customer feedback that TigerWire is more stiff than FiberWire. In addition, I held a sample of both commercial FiberWire and TigerWire and the TigerWire felt stiffer and more course than the same sized FiberWire. I also conducted the drape test on the two samples and found that the FiberWire conformed to the shape of my finger to a much greater degree than the TigerWire, indicating that the addition of the nylon appears to make TigerWire stiffer and less pliable. For these reasons, it is my opinion that the addition of nylon 6,6 in TigerWire materially affects its pliability. Moreover, the course feel would suggest that the addition of the nylon would adversely affect knot tie-down.

Dr. Brookstein stated that the purpose of the nylon included in TigerWire is for visual identification, and refers to Peter Dreyfuss's testimony to support his opinion. Brookstein Report at ¶ 46. Whether or not Dr. Brookstein's report is accurate, it does not change the fact that, as explained above, the addition of nylon materially affects TigerWire's pliability.

G.    Adding an adhesive to FiberStick suture materially affects its handleability

31

EXHIBIT 6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

DePuy Mitek, Inc.
    a Massachusetts Corporation

        Plaintiff,

      v.

Arthrex, Inc.
    a Delaware Corporation

        Defendant.

Civil Action No. 04-12457 PBS

## EXPERT REPORT OF DR. DEBI PRASAD MUKHERJEE
## CONCERNING INVALIDITY OF U.S. PATENT NO. 5,314,446

Pursuant to the provisions of Rule 26(a)(2) of the Federal Rules of Civil

Procedure, the Joint Case Management Statement adopted by the Court on February 18,

2005, and agreement between the parties, the undersigned, Dr. Debi Prasad Mukherjee,

an expert witness for Defendants Arthrex, Inc. and Pearsalls, Limited (together,

"Defendants") hereby sets forth his expert report as follows.

I have been informed by Mr. Witherspoon that in order for a patent to be valid, the specification must meet the "written description" requirement of 35 U.S.C. § 112, which means that it must reasonably convey to one skilled in the art that the inventor had possession of the claimed invention at the time the application was filed. I further have been informed that in order for a patent to be valid, it must also satisfy the "enablement" requirement of section 112. That is, I have been informed that one must determine whether the specification, viewed from the perspective of a person skilled in the art, teaches such a person how to make and use the claimed invention without having to resort to undue experimentation.

It is my opinion that the '446 patent specification as filed in 1992 does not reasonably convey to one of ordinary skill in the art that the inventors had possession of UHMWPE. There is no disclosure at all within the '446 patent of using UHMWPE as a suture material. In February 1992, UHMWPE was a well-known, highly specialized fiber material with strength properties that are far superior to those of general purpose PE. Consequently, the two materials are generally used for very different applications and one is not a substitute for the other. It has been my experience that, generally, when UHMWPE is intended to be included for a specified application, there is a special effort to make that fact known. For example, the '575 patent, the Burgess application, the Cohan article, Arthrex's U.S. Patent No. 6,716,234, covering its FiberWire suture, Plaintiff's patent application no. 2005/0149118, covering its Orthocord suture and

22

EXHIBIT 7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

DePuy Mitek, Inc.            )
    a Massachusetts Corporation   )
                               )
       **Plaintiff,**          )
                               )
       **v.**                )    **Civil No. 04-12457 PBS**
                               )
Arthrex, Inc.              )
    a Delaware Corporation and   )
                               )
Pearsalls Ltd.,          )
    a Private Limited Company   )
    of the United Kingdom,    )
                               )
       **Defendants.**     )

## Expert Report of Dr. David Brookstein

**I.     Background Information**

    **A.    Teaching Experience**

    1.    I am the Dean and Professor of Engineering at the School of Engineering and Textiles of Philadelphia University. I have held this position since 1994. In 2005, I also was appointed Executive Director of Research at Philadelphia University.

    2.    I was a Visiting Scholar at the Harvard University Center for Textile and Apparel Research (Division of Engineering and Applied Sciences) between 2002-2003.

    3.    I was an Adjunct Professor in Mechanical Engineering at Northeastern University in Boston, MA from 1981-1983. At Northeastern, I taught undergraduate courses in statics, dynamics, and mechanics of deformable bodies and material science.

    4.    I was Assistant Professor of Textile Engineering at Georgia Institute of Technology, College of Engineering from 1975 -- 1980. At Georgia Tech, I taught and

56.     It is my opinion that the UHMWPE in Arthrex's FiberWire™ and TigerWire™ products has the function as the claimed first fiber-forming material based on an examination of FiberWire™ and TigerWire™ and its manufacturing.  In my opinion, the UHMWPE contributes a property or properties that is/are different from the property or properties contributed by the PET.  For example, Mr. Hallet testified that, in the development of FiberWire™, he had constructed a 100% homogeneous UHMWPE braid, but Arthrex had requested a less stiff braid. Mr. Hallet then made a heterogeneous braid of UHMWPE and PET to get the strength of UHWMPE and the flexibility of PET (Hallet 1/12/06 Dep. at p. 306:17-307:14; DMI Ex. 324; *see also* Hallet 1/12/06 Dep. at p. 307:15-308:14; DMI Ex. 325).

57.     In my opinion, the "way" of the first fiber-forming material is the same as the "way" of UHMWPE in Arthrex's FiberWire™ and TigerWire™ suture products:

| Claims 1, 2, 8, 9, and 12 Limitation | "Way" of Limitation Under the Doctrine of Equivalents | Way UHMWPE performs its Function in FiberWire™ and TigerWire™ |
|---|---|---|
| a) each yarn from the first set is composed of a plurality of filaments of a first fiber-forming material selected from the group consisting of PTFE, FEP, PFA, PVDF, PETFE, PP and PE; and | The "way" is at least one yarn from the first set of yarns is in direct intertwining contact with at least one yarn from the second set. | At least one UHMWPE yarn is braided with at least one PET yarn in direct intertwining contact (Dreyfuss 9/16/05 Dep. at p. 99-107). |

58.     My opinion regarding the "way" of the "first fiber-forming" element is supported by the '446 Patent.  The '446 Patent explains that the way that the first-fiber forming material performs its function is by braiding it with a second dissimilar yarn in direct intertwining contact For example, the '446 Patent states in the "Summary of the Invention" section that the "the invention is a heterogeneous braid comprising a first and second set of discrete yarns in a sterilized, braided construction" and that the at least one yarn from the first set is in "direct

EXHIBIT 8

417

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF MASSACHUSETTS

3      Civil Action No. 04-12457 PBS

4   _____

5   DEPUY MITEK, INC., a Massachusetts              )

6   Corporation,                                    )

7                          Plaintiff,               )

8      v.                                           )

9   ARTHREX, INC., a Delaware Corporation           )

10                         Defendant.               )

11  _____)

12

13

14      Videotaped Deposition of DEBI PRASAD MUKHERJEE

15                    - VOLUME TWO -

16                    Washington, DC

17              Wednesday, June 14, 2006

18

19  The videotaped deposition of DEBI PRASAD MUKHERJEE,

20  Volume Two, was held on Wednesday, June 14, 2006,

21  commencing at 9:12 a.m., at the offices of Dickstein

22  Shapiro Morin & Oshinsky LLP, 2101 L Street,

23  Northwest, Washington, DC, before Mary Ann Payonk,

24  RDR, Certified Realtime Reporter, Registered Diplomate

25  Reporter and Notary Public.

526

1      A      Because that's not my decision to do what

2 test -- what samples to be tested so I didn't go to

3 TigerWire.

4      Q      Do you have an opinion about how -- do you

5 know that TigerWire has one nylon --

6      A      Yes.

7      Q      -- strand in it?

8            And do you have an opinion about how that

9 nylon strand affects TigerWire's pliability?

10      A      It's in my report.  The nylon will

11 affect --

12      Q      Okay.

13      A      -- the pliability.

14      Q      Did you do any -- why didn't Dr. Gitis do

15 some TigerWire pliability tests to determine the

16 effect of nylon?

17      A      I cannot answer.  I do not know.

18      Q      Is it required to -- for -- to have a

19 pliability test that Dr. Gitis did in order to

20 determine the effect of nylons on the pliability of

21 FiberWire?

22            MR. TAMBURO:  Objection, vague.

23      A      Probably.

24 BY MR. BONELLA:

25      Q      Okay.  Where were you given the -- the

EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DePuy Mitek, Inc.<br>　　　a Massachusetts Corporation )<br><br>　　　　　　　Plaintiff, )<br><br>　　v. )<br><br>Arthrex, Inc.<br>　　　a Delaware Corporation )<br><br>　　　　　　　Defendant. ) | Civil Action No. 04-12457 PBS |

## EXPERT REPORT OF ROBERT T. BURKS, M.D.

1.　　I am an orthopaedic surgeon with the University of Utah Orthopaedic Center. My office is at 590 Wakara Way, Salt Lake City, Utah 84108. I have been practicing for more than 23 years.

2.　　I received my M.D. from St. Louis University in 1974. I completed a residency in Orthopaedics at the University of California at San Diego in 1983. I completed a knee and sports medicine fellowship at Kaiser Permanente Hospital in San Diego in 1983, and sabbatical at Steadman Hawkins in Vail, Colorado in 1995

3.　　I am a Professor and Mary Scowcroft Peery Presidential Endowed Chair at the University of Utah Health Sciences Center. I am also the Director of Sports Medicine and Head Physician at the University of Utah. My curriculum vitae are attached as Exhibit 1.

4.     My specialties include arthroscopy of the shoulder, knee and ankle, and ligament reconstruction. My research interests include patella stability, cartilage defects, tendon healing to bone.

5.     I have reviewed Dr. Fenton's report and I understand he may provide testimony on certain subjects including human anatomy, surgical techniques and surgical devices. I may also provide testimony on these same subjects.

6.     I may describe the characteristics of a surgical suture that are generally important to an orthopaedic surgeon. I may also describe the specific features of FiberWire that I find beneficial in my practice.

7.     I have been using FiberWire suture in my surgical procedures since 2001. Most of my subjective use of FiberWire occurs during surgery and in the surgical environment, FiberWire is generally wet.

8.     Sometime in February 2006, I was contacted by attorneys for Arthrex, Inc. and asked to conduct a tactile feel analysis as well as a knot tie-down analysis of coated and uncoated FiberWire suture. I agreed to conduct the analysis.

9.     In March 2006, I received two samples of suture labeled "suture A" and "suture B." Each sample was on a spool and was approximately 3 meters in length. I was told by Arthrex's attorneys that one sample was coated US No. 2 FiberWire and that the other sample was uncoated US No. 2 FiberWire, however, I was not told which sample was coated and which was uncoated.

2

10.     I took the sutures and cut them into some lengths that are appropriate for

intraoperative tying and for intraoperative knot tying done arthroscopically.  This

allowed 5 strands from each spool.

11.     I conducted a tactile feel analysis of both suture samples ("suture A" and "suture

B").  During the analysis, I noticed that the sample labeled "suture A" generally felt

smoother than "suture B."  The difference between the two samples was even more

pronounced when they were wet, which is how I am most accustomed to using

FiberWire.

12.     I also conducted a knot tie-down analysis on the two suture samples.  I tied

several surgeons knots and found that the knots slid easier on the sample labeled

"suture A" as compared with the sample labeled "suture B."  I felt less friction when

sliding the knot on the sample labeled "suture A" as compared with the sample labeled

"suture B."  Here again, the difference between the two samples was most noticeable

when they were wet, as I am accustomed to using FiberWire.

13.     After conducting my analysis, I was informed that "suture A" was the coated

FiberWire and "suture B" was the uncoated FiberWire.

14.     If asked to testify at trial, I may use physical exhibits, as well as other

demonstrative exhibits, which have not yet been developed.

3

EXHIBIT 10

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-O-

COPY

| | |
|---|---|
| DEPUY MITEK, INC., a<br>Massachusetts Corporation, | : |
| | : Civil Action No.<br>: 04-12457 PBS |
| Plaintiff, | : |
| -vs- | : |
| ARTHREX, INC., a Delaware<br>Corporation, and PEARSALLS<br>LTD., a Private Limited<br>Company of the United<br>Kingdom, | : EXPERT DEPOSITION OF:<br><br>: ROBERT T. BURKS, M.D. |
| | : |
| Defendants. | |

-O-

Location:      Mariott University Hotel

Salt Lake City, Utah

Date:      June 7, 2006

3:00 p.m.

Reporter:      Denise Kirk, CSR/RPR

-O-

87

1  I described them.

2       Q.      Okay, so why did you use the particular

3  knots, then, that you used in the knot tie-down

4  analysis?

46:51  5       A.      I just tried to reproduce what I do in the

6  operating room.

7       Q.      In paragraph 11 in Exhibit 232 you state

8  that suture A generally felt smoother than suture B.

9  What do you mean by "generally"?

47:08  10       A.      The differences between the sutures were

11  subtle. I mean, they were not sharp, distinct. So I'm

12  meaning that in comparing them, my take was that it

13  was generally smoother.

14       Q.      Were there any of the sutures in the

47:45  15  tactile feel analysis where you couldn't tell the

16  difference between suture A and suture B?

17       A.      It was not my intent at the time in

18  looking at the sutures to compare each strand side to

19  side. My intent was to look at sort of spool A and

48:13  20  spool B. So it was to get a feel of, in general, how

21  do they feel between the two.

22            So I didn't take a strand and say is this

23  one different? And is this one different? And go

24  down through that five times, because I felt it was

4   `8  25  all the same suture.