IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DePuy Mitek, Inc. | ) | |
| a Massachusetts Corporation | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-12457 PBS |
| | ) | |
| Arthrex, Inc. | ) | |
| a Delaware Corporation, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' OBJECTIONS TO MAGISTRATE'S ORDER GRANTING DEPUY
MITEK, INC.'S MOTION TO PRECLUDE ARTHREX, INC. AND PEARSALLS, LTD.
FROM SUPPLEMENTING THEIR EXPERT REPORTS AND DEPOSITIONS**

Dated: November 2, 2006

Charles W. Saber
Stephen A. Soffen
Salvatore P. Tamburo
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, D.C.  20006-5403
Telephone:  (202) 420-3116
Facsimile:  (202) 420-2201

Christopher Weld, Jr. (BBO # 522230)
Raymond P. Ausrotas (BBO # 640315)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
Telephone:  (617) 720-2626
Facsimile:  (617) 227-5777

Counsel for Defendants
Arthrex, Inc. and Pearsalls Ltd.

**TABLE OF CONTENTS**

**Page No.**

I.   INTRODUCTION ........................................................................................................ 1

II.  FACTUAL BACKGROUND ..................................................................................... 2

III. THE MAGISTRATE CLEARLY ERRED BY TREATING ALL OF THE
     ERRORS IN DR. GITIS' REPORT AS IF THEY WERE BASED ON A
     COMPUTER VIRUS ................................................................................................. 4

     A.  The Law of Supplementing Expert Reports ................................................... 5

     B.  The Typographical Errors ................................................................................ 5

     C.  The Error in Reporting the Pliability Testing Methodology ......................... 6

IV.  CONCLUSION ........................................................................................................... 7

i

DSMDB-2167238v01

# TABLE OF AUTHORITIES

**Page No.(s)**

## FEDERAL CASES

*Minebea Co., Ltd. v. Papst*, 231 F.R.D. 3 (D. D.C. 2005)...................................................5

*Tracinda Corp. v. DaimlerChrysler AG*, 362 F. Supp. 2d 487 (D. Del. 2005)
    (Ex. 4) ..............................................................................................................5

*Shumacher v. Tyson Fresh Meats, Slip Copy*, 2006 WL. 47504 (D. S.D. 2006)
    (Ex. 3) ..........................................................................................................5, 6, 7

*Wilson v. Sundstrand Corp.*, 2003 WL. 22012673 (N.D. Ill. 2003) (Ex. 5).......................5

## FEDERAL STATUTES

Fed. R. Civ. P. 26(e)(1)...............................................................................................1, 2, 5

Fed. R. Civ. P. 72(a) ...........................................................................................................1

DSMDB-2167238v01

## I.     INTRODUCTION

Pursuant to Fed. R. Civ. P. 72(a), defendants Arthrex, Inc. ("Arthrex") and Pearsalls, Ltd. ("Pearsalls") (together, "defendants") submit these objections to the Magistrate's Order granting DePuy Mitek, Inc.'s motion to preclude Arthrex, Inc. and Pearsalls, Ltd. from supplementing their expert reports and depositions ("the Order"). From the Magistrate's comments at the hearing, it appears that the Magistrate's decision was based on her belief that defendants had not definitively proved that a computer virus was to blame for certain errors that appeared in Dr. Gitis' test report. But the Magistrate misunderstood the nature of Dr. Gitis' proposed supplemental report. As explained more fully below, only one correction in Dr. Gitis' report -- the friction test -- is related to a possible computer virus. The other errors have nothing to do with the computer virus issue. Thus, whether or not defendants can definitively prove there was a virus should have no bearing on Dr. Gitis' correction of those other errors, as is his duty under Fed. R. Civ. P. 26(e)(1).

According to Rule 72(a), the district judge "shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a). Defendants submit that the Magistrate clearly erred by treating all of the errors in Dr. Gitis' report the same -- *i.e.,* as if they are all related to a computer virus issue. As explained below, the errors are *not* all the same. Aside from the errors believed to be related to a computer virus, there are typographical errors as well as an error in reporting the actual testing methodology that was used. Defendants should not be precluded from correcting errors in Dr. Gitis' report based on the Magistrate's misconception that all of the corrections in Dr. Gitis' report are related to, in the Magistrate's view, an unproven computer virus.

Defendants do not object to the Order to the extent that it precludes Dr. Gitis from supplementing his report to include his new friction test, the correction related to the computer

1

DSMDB-2167238v01

virus issue.  Defendants do, however, object to the Order to the extent that it precludes Dr. Gitis from supplementing his report to make corrections that are unrelated to a computer virus, as required by Fed. R. Civ. P. 26(e)(1).

## II.     FACTUAL BACKGROUND

Dr. Gitis performed several different tests (pliability, knot slippage strength, knot run-down, friction, chatter and tissue drag) on coated and uncoated FiberWire suture and reported the results of those tests in his expert report dated March 23, 2006.  During his deposition, in June 2006, certain inconsistencies between the raw data collected during Dr. Gitis' tests and the test results as reported in his expert report were brought to Dr. Gitis' attention.  Dr. Gitis could not explain some of the inconsistencies while at his deposition.  Ex. 1 at ¶¶ 6-7.

After his deposition, Dr. Gitis conducted an initial investigation to determine the reason for the inconsistencies between the raw data and the test results included in his report.  Based on his initial investigation, including his discussions with testing and computer experts within his own company (CETR), his initial belief was that the data must have been corrupted due to a computer virus.  Ex. 1 at ¶¶ 10-15.  Defendants reported to DePuy Mitek Dr. Gitis' initial belief that the data was corrupted by a computer virus, that Dr. Gitis planned to repeat his testing and to supplement his expert report.

Counsel for DePuy Mitek insisted on a full explanation including details of the virus, the identity of the virus by name, the identity of the specific machines infected, an explanation of precisely what data are corrupted and how it affected Dr. Gitis' report.  DePuy Mitek also insisted that Dr. Gitis provide all information in his, and his testing lab's, possession regarding the virus, including any action taken to address the virus.

Counsel for defendants notified counsel for DePuy Mitek that, per DePuy Mitek's request, Dr. Gitis was conducting a more detailed investigation into the data corruption.  They

DSMDB-2167238v01

also provided DePuy Mitek with their understanding of the nature of the problem, based on their discussions with Dr. Gitis, and informed DePuy Mitek that Dr. Gitis would provide as much of the requested information as possible in his supplemental expert report.

Rather than waiting for the completion of Dr. Gitis' investigation and the receipt of his supplemental report, DePuy Mitek filed its motion seeking to prevent Dr. Gitis from issuing a supplemental report. The entire focus of DePuy Mitek's motion was based on its assertions that defendants had not definitively proved there was a virus, that Dr. Gitis may have delayed in raising the virus issue, and that defendants were using the virus as an excuse for Dr. Gitis to redo his tests.

As Dr. Gitis' investigation progressed, however, he was able to rule out a computer virus for all but one of the errors in his report. As defendants explained in their opposition, and at the hearing, *only one error* in Dr. Gitis' report -- an error in connection with his friction testing -- is believed to be due to a computer virus. Ex. 1 at ¶¶ 25-26. Although Dr. Gitis has expended much time and effort in an attempt to confirm that a computer virus was, indeed, the cause of that error in his report, he could only conclude that the friction test results were affected by a computer anomaly, possibly caused by a virus. Ex. 1 at ¶¶ 25-28.

Based on Dr. Gitis' investigation, he came to realize that, in addition to the one error believed to be related to a computer virus, his report contains two other types of errors -- typographical errors and an error in reporting the actual pliability testing methodology used. As described below, the typographical errors were in reporting the diameter of the suture tested (Ex. 1 at ¶ 34) and in reporting the speed with which the knot slippage strength testing was performed. Ex 2[1] at ¶ 3.1. The other error was in reporting that the pliability test was conducted

---

[1]    "Ex. 2" is a Supplemental Test Report on Comparative Suture Testing ("Supplemental Report") prepared by Dr. Gitis and which was sent to DePuy Mitek on October 17, 2006 -- prior to the hearing before the Magistrate on October 19, 2006. The Supplemental Report includes results of a new friction test conducted -- the only test believed to have been corrupted by a

DSMDB-2167238v01

using a "constant rate of loading" methodology, whereas a "constant rate of extension" methodology was actually used. Ex. 1 at ¶ 14. These corrections have nothing to do with whether a computer virus affected Dr. Gitis' tests.

## III. THE MAGISTRATE CLEARLY ERRED BY TREATING ALL OF THE ERRORS IN DR. GITIS' REPORT AS IF THEY WERE BASED ON A COMPUTER VIRUS

At the hearing, the Magistrate's ruling granting DePuy Mitek's motion was based on her conclusion that defendants could not definitively prove that a virus was responsible for errors found in Dr. Gitis' report. Defendants understand the Magistrate's stated concerns, and thus, do not object to the Magistrate's Order insofar as it precludes Dr. Gitis from reporting his new friction test -- the test that was related to the computer virus issue.

Yet, as defendants explained in their opposition and at the hearing, only one of the errors in Dr. Gitis' report is believed to be due to a computer virus. The other errors that are unrelated to a computer virus include two typographical errors (that relate to the pliability test and the knot slippage strength test) and an error in reporting the pliability testing methodology actually used. Ex. 1 at ¶¶ 14, 34. These other errors have *nothing* to do with the Magistrate's concerns regarding proof of a virus, and thus, defendants should not be precluded from complying with their duty under Rule 26(e)(1) and to supplement Dr. Gitis' report to correct these other errors.[2]

---

computer virus. Ex. 2 at ¶¶ 5.1-5.5. The Supplemental Report also corrects typographical errors in Dr. Gitis' original report regarding the speed with which the knot slippage strength testing was conducted (Ex. 2 at ¶ 3.1) and also regarding the diameter of the suture tested. Ex. 2 at ¶ 2.2. The Supplemental Report also corrects the error in reporting the methodology used to conduct the pliability test. Ex. 2 at ¶ 2.1. Lastly, the Supplemental Report addresses several of Dr. Brookstein's criticisms of Dr. Gitis' original report and explains why they are without merit. Ex. 2 at ¶¶ 3.2-3.4, 4.1-4.2 and 6.1.

[2]     As noted above, Dr. Gitis' proposed Supplemental Report also included some responses to Dr. Brookstein's criticisms. *See supra* at n.1. These comments only describe why some of Dr. Brookstein's criticisms are, in Dr. Gitis' view, unwarranted and do not relate to anything in Dr. Gitis' initial report that he considered to be inaccurate. As these comments do not correct

DSMDB-2167238v01

### A.    The Law of Supplementing Expert Reports

According to Rule 26(e)(1), "a party is under a *duty* to supplement" an expert report "if the party learns that in some material respect the information disclosed is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1).  [Emphasis added.]  *See, e.g., Shumacher v. Tyson Fresh Meats,* Slip Copy 2006 WL 47504 at *6 (D. S.D. 2006) (Ex. 3); *Tracinda Corp. v. DaimlerChrysler AG*, 362 F.Supp.2d 487, 506 (D. Del. 2005) (Ex. 4); *Wilson v. Sundstrand Corp.,* 2003 WL 22012673 at *8 (N.D. Ill. 2003) (Ex. 5).  Since Dr. Gitis has determined that his report does contain errors, defendants are under a duty to supplement his report under Rule 26(e)(1).  All the case law requires is that once the expert has "deemed" his report "to be inaccurate or incorrect," he must supplement the report under Rule 26(e)(1).  *See, e.g., Minebea Co., Ltd. v. Papst,* 231 F.R.D. 3 at 6 (D. D.C. 2005).

As for the timing of Dr. Gitis' supplement, Rules 26(e)(1) and 26(a)(3) provide that a party may comply with their duty to supplement their expert's report in order to correct such errors if it is done within 30 days from trial.  As of today, there is no trial date scheduled, thus, we are well outside of the 30 days permitted by the Rules.

### B.    The Typographical Errors

Dr. Gitis' report contains two typographical errors.  The first one has to do with the diameter of the coated and uncoated suture that Dr. Gitis tested.  Dr. Gitis' report erroneously states that the diameter was 0.65mm, however, the actual diameter Dr. Gitis intended to report was 0.56mm.  Ex. 1 at ¶ 34; Ex. 2 at ¶ 2.2.

The other typographical error is an error in reporting the speed at which the knot slippage strength testing was performed.  According to the raw data collected during Dr. Gitis' testing, the knot slippage strength test was performed at a constant speed of 0.134 mm/s.  Dr.

---

any errors, there is no need to include these comments in the Supplemental Report, should the Court permit a Supplemental Report.

5

Gitis' report, however, erroneously states that the tests were performed at a constant speed of 1mm/s. Ex. 2 at ¶ 3.1.

Correcting these types of typographical errors is well within the type of corrections contemplated under Rule 26(e)(1). For example, in *Shumacher,* the court allowed a damages expert to supplement his original report with new damages calculations merely based on the fact that the expert realized "upon further contemplation" that his original calculations were incorrect and that he should have used a different theory. *Shumacher,* 2006 WL 47504 at *6 (Ex. 3) Here, Dr. Gitis does not seek to change a thing with his original report based on "further contemplation." He merely seeks to correct typographical errors that appear within that report. Thus, defendants should not be precluded from complying with their duty to correct these errors in Dr. Gitis' report.

Notably, permitting this type of supplement is entirely consistent with DePuy Mitek's actions in this case. DePuy Mitek's expert, Dr. Brookstein, supplemented his expert report both to correct similar typographical errors and to add documents to the list of materials considered in preparing his report. Specifically, Dr. Brookstein's supplement corrects typographical errors that appeared in the table header at page 7 (Ex. 6 at 7) and also added three new documents to the "Amended List of Additional Materials Considered." Ex. 6 at "Amended List." DePuy Mitek plainly believed it had a right to supplement Dr. Brookstein's report and defendants did not object to DePuy Mitek's doing so since defendants understand it was DePuy Mitek's duty to supplement once it learned of the errors in Dr. Brookstein's report. The same right and obligation exists for Dr. Gitis.

## C.     The Error in Reporting the Pliability Testing Methodology

The other type of error contained in Dr. Gitis' report is an error in reporting the pliability testing methodology used. In his original report, Dr. Gitis reported that his pliability

DSMDB-2167238v01

was based on a "constant rate of loading." As Dr. Gitis observed in his proposed Supplemental Report, he understood that it was pointed out by DePuy Mitek's expert that the most common method of conducting these tests is at a "constant rate of extension." Ex. 2 at ¶ 2.1. After the deposition, Dr. Gitis checked the raw data (which had been produced to DePuy Mitek) and discovered that, in fact, he had performed the pliability test based on a "constant rate of extension" for each sample. *Id*. Accordingly, Dr. Gitis wants to correct this error so that his report correctly reflects the actual methodology used to conduct the test.

This correction, just as with the typographical errors described above, is well within the type of corrections contemplated by Rule 26(e)(1). For example, although Dr. Gitis' additional investigation may be akin to "further contemplation," unlike the expert in *Shumacher*, Dr. Gitis did not conclude he did the wrong test. He simply wants to correct his report to accurately reflect the methodology actually used to conduct the test. Thus, since the expert in *Shumacher* was not precluded from supplementing his report, Dr. Gitis also should not be precluded.

## IV.    CONCLUSION

For the foregoing reasons, the Magistrate's Order should be modified such that defendants are not precluded from supplementing Dr. Gitis' report to correct the above-described typographical errors and the error in reporting the actual pliability test methodology used.

DSMDB-2167238v01

Dated: November 2, 2006                    Respectfully submitted,


                                           By: _____/s/Salvatore P. Tamburo_____
                                           Charles W. Saber
                                           Stephen A. Soffen
                                           Salvatore P. Tamburo
                                           DICKSTEIN SHAPIRO LLP
                                           1825 Eye Street, N.W.
                                           Washington, D.C.  20006-5403
                                           Telephone:  (202) 420-3116
                                           Facsimile:  (202) 420-2201

                                           Christopher Weld, Jr. (BBO # 522230)
                                           Raymond P. Ausrotas (BBO # 640315)
                                           TODD & WELD LLP
                                           28 State Street, 31st Floor
                                           Boston, MA 02109
                                           Telephone:  (617) 720-2626
                                           Facsimile:  (617) 227-5777
                                           Counsel for Defendants
                                           Arthrex, Inc. and Pearsalls Ltd.

DSMDB-2167238v01

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing Defendants'

Objections to Magistrate's Order Granting DePuy Mitek, Inc.'s Motion to Preclude Arthrex, Inc.

and Pearsalls, Ltd. From Supplementing Their Expert Reports and Depositions was served, via

the Court's email notification system on the following counsel for Plaintiff on the 2nd day of

November 2006:


Lynn A. Malinoski
Woodcock Washburn, LLP
One Liberty Place, 46th Floor
Philadelphia, PA. 19103
Telephone:  (215) 568-3100
Facsimile:  (215) 568-3439

Daniel J. Gleason
Nutter McClennan & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
Telephone:  (617) 439-2000
Facsimile:  (617) 310-9000


                              /s/Salvatore P. Tamburo

# EXHIBIT 1

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DePuy Mitek, Inc.                    )
  a Massachusetts Corporation        )
                              )
      Plaintiff,               )
                              )
      v.                       )     Civil Action No. 04-12457 PBS
                              )
Arthrex, Inc.                        )
  a Delaware Corporation             )
                              )
      Defendant.               )
                              )

### DECLARATION OF DR. NORM GITIS

1.    My name is Dr. Norm Gitis and I am the founder and president of the Center for Tribology ("CETR"), a privately held testing laboratory located in Campbell, California.

2.    Tribology is the study of friction between interacting surfaces.

3.    CETR has conducted suture testing using its tribology testing equipment -- the same equipment used to test FiberWire sutures in this case -- for the leading suture manufacturers in the world, including Ethicon, DePuy Mitek's sister company.

4.    I am the same Dr. Norm Gitis who prepared the "Comparative Suture Testing" report dated March 23, 2006 ("the Gitis report").

5.    At the request of counsel for defendants, in late April 2006, CETR produced a computer disc containing the underlying raw data supporting the Gitis report. At the time, I believed that all of the raw data was accurate and supported the results in the Gitis report.

1

DSMDB-2134649v01

6.      I was deposed on June 21, 2006.  A large portion of my deposition was devoted to the

subject matter of the Gitis report, including questions directed to the methodologies I used in

conducting my tests as well as questions directed to the data points collected during my tests.

7.      During my deposition, there were also many questions regarding apparent inconsistencies

between the results reported in the Gitis report and the raw data contained on the disc produced

by CETR.

8.      During the suture testing I conducted, millions of data points were generated, all of which

were automatically generated by computer-operated testing equipment.

9.      When I testified at my deposition that I "checked most of the results," I was describing

the finite number of results included in the final Gitis report and not the accuracy of each of the

millions of data points automatically collected by computer during my testing.

10.     I was concerned about the apparent inconsistencies that surfaced during my deposition

and when I returned to CETR, I initiated an investigation into the possible reasons for those

inconsistencies.

11.     During my initial investigation, I also reviewed my deposition transcript and the

questions raised by counsel for DePuy Mitek regarding my test results and the raw data.  I also

discussed the apparent inconsistencies between the raw data and the Gitis report with Dr.

Michael Faynberg – CETR's Software Manager, and Michael Vinogradov – CETR's Manager of

Applications and Testing.

12.     My discussions with Dr. Faynberg centered around what type of computer malfunction

could have caused these apparent inconsistencies and my discussions with Mr. Vinogradov

centered more around the apparent inconsistencies themselves as they related to the testing that

was done.

2

DSMDB-2134649v01

13.     At the time, we found inconsistencies with the friction testing data collected.  The calculations for friction coefficient appeared to be correct for some samples and incorrect for others.  My initial belief was that the only reasonable explanation for the intermittent miscalculations was a computer malfunction, possibly caused by a virus.  As described below, this is still my belief.

14.     Some other issues we found during my initial investigation also had to do with the pliability testing.  The Gitis report states that a constant *loading* rate of 0.33kg/s was applied to the suture.  This did not appear to match the raw data on the disc and was part of the reason we believed there was a problem with the raw data, possibly caused by a virus.  Based upon my subsequent investigation, I have since learned that this issue has nothing to do with data corruption.  Rather, from my discussions with Mr. Vinogradov, I learned that the pliability of the samples was tested was by applying a constant *extension* rate of 0.11mm/s.  This constant extension rate is correctly reported by the underlying data.  Accordingly, the Gitis report should be corrected to properly state how the samples were tested.

15.     CETR, as most businesses, had experienced from time to time computer viruses that infiltrated its computer system.  CETR experienced these viruses both before and after I conducted suture testing for defendants.

16.     After forming my belief that the only reasonable explanation for the inconsistencies was a computer malfunction, possibly caused by a virus, I immediately informed counsel for defendants.

17.     Counsel for defendants discussed the issues with me in order to try to understand the scope and nature of the problem and to see if the data could be reconstructed as "un-corrupted" and then reported.

DSMDB-2134649v01

18.     Based on my initial observations, and the fact that at the time, I could not explain the inconsistencies, I informed counsel for defendants that it was my belief that the safest course of action was simply to redo the entirety of the tests.

19.     In late July 2006, counsel for defendants contacted me to tell me that counsel for DePuy Mitek was seeking detailed information regarding the virus, including the identity of the virus by name, the identity of the specific machines infected, an explanation of precisely what data are corrupted and how it affected the Gitis report.

20.     I was also informed that DePuy Mitek insisted that I provide all information in my possession and in CETR's possession regarding the virus, including any action taken to address the virus.

21.     I agreed to conduct this more detailed investigation into the data corruption as was being requested by DePuy Mitek.

22.     I had begun conducting the more detailed investigation into the data corruption when I was suddenly and unexpectedly called out of the country on a family-related emergency for approximately three weeks beginning on August 1, 2006.

23.     I immediately notified counsel for defendants of my emergency and told them that I would be back at CETR in approximately three-weeks.

24.     I returned to CETR on August 21, 2006, but I was called out of the office again for most of the remainder of the week due to the same family-related emergency.

25.     During my limited time in the lab the week of August 21, 2006, I conducted additional research into the data corruption and we now believe that only certain portions of one file of the data related to the suture testing was corrupted. Specifically, some of the data related to the friction testing was corrupted. As explained above, I now do not believe that the data related to the pliability test was corrupted.

4

DSMDB-2134649v01

26.     The way in which friction coefficient was calculated for some samples appears to correspond to the friction force whereas it does not appear to correspond to the friction force for other samples.

27.     My staff and I spent many hours attempting to determine the exact cause of these anomalies.  Since some of the calculations are correct and other are not, my staff and I do not believe it is likely that some sort of human error could have caused these intermittent miscalculations.

28.     Rather, my staff and I can only deduce that the intermittent calculations were caused by some sort of computer malfunction, which may have been caused by a virus.

29.     Since I was only able to devote limited time to the additional investigation last week, I will be continuing my investigation this week -- the week of August 28, 2006 -- while I am back at CETR.

30.     At this time, the only portion of my testing that appears to require repeating is the friction coefficient testing.

31.     I plan on redoing the friction coefficient testing the same way I did it in my first set of tests.  I will not change my test methods and I will be using samples manufactured in the same way as the samples used in my previous tests.  If subsequent investigation reveals that data of any other tests is corrupted, I will not change my test methods.

32.     In addition, during my additional investigation, other issues in the Gitis report were uncovered that do not appear to have anything to do with corrupt data.

33.     Other issues in the Gitis report include inconsistencies between the plot numbers in the raw data files and the data reported in the tables for the knot slippage, knot run-down and tissue drag testing.  These inconsistencies, however, are unrelated to data corruption.

5

DSMDB-2134649v01

34.    In addition, there appears to be a typographical error in the reporting of the suture diameter. It should read 0.56mm and not 0.65mm.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on:    8/28/06

_Norm Gitis_
Dr. Norm Gitis

6

DSMDB-2134649v01

# EXHIBIT 2



**Center For Tribology, Inc.**
1715 Dell Avenue
Campbell, CA 95008, USA
Tel: (408) 376-4040 ♦ Fax: (408) 376-4050

October 13, 2006

## Supplemental Test Report on Comparative Suture Testing
## (supplement to the Test Report of March 23, 2006)

### 1. Introduction

I signed the CETR Test Report of March 23, 2006, believing that both its data and conclusions were correct. Per the request of counselors for DePuy Mitek, on April 22 CETR submitted a CD with raw data and printouts with all data plots from the March tests.

During my deposition on June 21, the counselors for DePuy Mitek presented me with their analysis of the raw data used in the CETR March report, which supposedly showed several apparent inconsistencies. A month later, I received a Supplemental Expert Report of Dr. Brookstein of July 14, which summarizes what he believes were the issues and problems associated with my report in his paragraphs 12 to 49. Though the vast majority of these paragraphs represent his wrong interpretation of our correct test methodology and data, a few of them have given me an impulse to re-analyze our test data and re-do the friction tests. The results of both the re-analysis and re-test are presented in this Supplemental Test Report.

### 2. Pliability Tests

2.1. Our March report erroneously stated that the tests were performed at the continuously-increasing load (stress) at the rate of 0.33 kg/s. In fact, I agree with paragraph 13 of the Dr. Brooksten's Supplemental Report that the most common method of conducting these tests is at the continuously increasing deformation (strain). Actually, a careful analysis of the raw data shows that the tests were performed at a constant extension rate for each sample, which averaged 0.113 mm/s. Thus, all the coated and uncoated samples in our March tests underwent the same average amount of strain. The resultant loads were quite different. As stated in my March report, the difference in average stiffness, or pliability, between the uncoated and coated samples was as high as 1.64 times (9.93 vs 6.06). It was confirmed by calculations of Dr. Brookstein in his Supplemental Report, where he re-analyzed our data and came up with a slightly higher difference of 1.74 (108 vs. 62) in paragraph 16 and even slightly higher difference of 1.78 (8.18 vs. 4.59) in paragraph 25.

2.2. Our March report had a typo, stating the suture diameter as 0.65 mm instead of intended 0.56 mm. In fact, as the goal of the report was to compare coated and uncoated sutures as versus determining their "absolute" stiffness numbers, any perceived inaccuracy in the determination of suture diameter would not affect the conclusions, as long as the same diameter was used for stiffness calculations of all the coated and uncoated samples.

2.3. The above two inaccuracies in the March report do not change its conclusions that there is a statistically significant difference in stiffness and pliability between the tested coated and uncoated sutures.

**Center For Tribology, Inc.**
1715 Dell Avenue
Campbell, CA 95008, USA
Tel: (408) 376-4040 ♦ Fax: (408) 376-4050

### 3. Knot Slippage Strength Tests

3.1. Our March report erroneously stated that the tests were performed at the constant speed of 1 mm/s, while in fact, a careful analysis of the raw data shows they were performed at the constant speed of 0.134 mm/s. All sixteen samples were tested at the actual speeds within less than 2% of the average value.

3.2. Our raw-data tables show Z values decreasing during these tests, as the tester software allows for an operator to choose either the upper or lower Z position as its zero level. Thus, depending on the operator's preferences and test procedures, Z can be chosen to increase in either up or down direction. As I explained during my deposition on June 21, these testers are widely used for such diverse tests in the Z direction as compression, tension, stiction, adhesion, indentation, fatigue, elasticity, plasticity, creep, etc., with different industries having different preferences for choosing positive and negative Z directions.

3.3. During my deposition, I did not expect to see Fx and Ff columns in the raw-data tables for these tests. Upon coming back to CETR, I found out that these unneeded parameters were recorded by mistake. In fact, as I explained at the deposition, the tester can always monitor friction forces Fx (in X direction) and Fy (in Y direction) with software automatically calculating their vectorial sum as Ff (so that in the absence of Fy, Ff is equal to the absolute value of Fx). Again, these columns can be neglected during data analysis for the knot slippage strength.

3.4. In his Supplemental Report, Dr. Brookstein was confused with our sample numbering. As I confirmed at my deposition, the sample numbers in the raw-data tables correspond to the resultant tables in the March report, which can be easily checked. Neither the plots included in the original March report nor the plots in the April supplemental report had sample numbers. The plots fully correspond to both the raw-data files and tables in the report. Dr. Brookstein's confusion is related to the fact that in the raw-data files, some of the Excel plots have no numbers, some of them have meaningless numbers corresponding to their sequence and position in the file, but they do not correspond to the sample numbers. Thus, the irrelevant numbers on the Excel raw-data plots shall be ignored to eliminate Dr. Brookstein's confusion.

3.5. The inaccuracy in reporting a testing speed in the March report, as well as the later-submitted unneeded columns in the raw data tables, do not change the report conclusions that there is a statistically significant difference in knot slippage strength between the tested coated and uncoated sutures.

### 4. Knot Run-down Tests

4.1. Again, during my deposition I did not explain the unneeded *Fx* and *Ff* columns in the raw-data tables for these tests. In fact, as I explained at the deposition, the tester can always monitor friction forces *Fx* (in *X* direction) and *Fy* (in *Y* direction) with software automatically calculating their vectorial sum as *Ff* (so that in the absence of *Fy*, *Ff* is equal to the absolute value of *Fx*). Again, these columns can be neglected during data analysis for the knot run-down.

4.2. In his Supplemental Report, Dr. Brookstein was confused with our sample numbering. As I confirmed at my deposition, the sample numbers in the raw-data tables correspond to the resultant tables in the March report, which can be easily checked. Neither the plots included in the original March report nor the plots in the April supplemental report had sample numbers. The plots fully correspond to both the raw-data files and tables in the report. Dr. Brookstein's confusion is related to the fact that in the raw-data files, some of the Excel plots have no numbers, some of them have meaningless numbers corresponding to their sequence and position in the file, but they do not correspond to the sample numbers. Thus, the irrelevant numbers on the Excel raw-data plots shall be ignored to eliminate Dr. Brookstein's confusion.



**Center For Tribology, Inc.**
1715 Dell Avenue
Campbell, CA 95008, USA
Tel: (408) 376-4040 ♦ Fax: (408) 376-4050

4.3. The above-mentioned comments related to the correct analysis of the raw data do not change the report conclusions that there is a statistically significant difference in knot run-down between the tested coated and uncoated sutures.

## 5. Friction Tests

5.1. We have no reasonable explanation of the raw-data file corruption, reflected in the fact that for some data-points both friction coefficient and force corresponded to each other, while for others they did not correspond. Also, we have no knowledge when the corruption has taken place. So, we repeated the tests during August 30-31, 2006, utilizing exactly the same setup and methodology as in our earlier March tests.

5.2. Like for the earlier test, we received one spool of coated and one spool of uncoated brand new sutures from Pearsall. Their photos are presented in Figure 1 below. We un-spooled a part of each suture, put them into two clearly marked plastic bags as shown in Figure 2, and, like for the earlier tests, sent them for sterilization via FedEx to the same reputable sterilization lab Sterile Systems, division of Medtronic Inc. Again, after receiving them back, we handled them only in gloves.



**Fig. 1**. Spools of uncoated (left) and coated (right) FibreWire sutures



**Center For Tribology, Inc.**
1715 Dell Avenue
Campbell, CA 95008, USA
Tel: (408) 376-4040 ♦ Fax: (408) 376-4050



**Fig. 2**. Bags of coated (left) and uncoated (right) FibreWire sutures

5.3. We performed exactly the same friction tests of 8 coated and 8 uncoated sutures as in the earlier March tests. The resultant average values of the coefficient of friction per each test are presented in Table 1, which shows results similar to those in Table 4 on page 11 of our March report: coated suture samples have the average coefficient of friction of 0.09, uncoated suture samples have the average coefficient of friction of 0.17 (as measured now) or 0.16 (as measured in March).

Table 1: Coefficient of friction in suture-on-suture tests

| Exp # | Coefficient of Friction | |
| --- | --- | --- |
| | Coated suture | Uncoated suture |
| 1 | 0.092 | 0.171 |
| 2 | 0.090 | 0.175 |
| 3 | 0.093 | 0.179 |
| 4 | 0.088 | 0.169 |
| 5 | 0.088 | 0.172 |
| 6 | 0.088 | 0.164 |
| 7 | 0.091 | 0.164 |
| 8 | 0.094 | 0.167 |
| Average +- St.dev | 0.091 ± 0.003 | 0.170 ± 0.005 |

**Center For Tribology, Inc.**
1715 Dell Avenue
Campbell, CA 95008, USA
Tel: (408) 376-4040 ♦ Fax: (408) 376-4050

5.4. All the friction data versus time are plotted in Figure 3, which looks similar to the Figure 11 on page 10 of our March report.  Again, one can see dramatic difference in frictional characteristics of uncoated and coated sutures, with all the former ones being above 0.15 and all the latter ones being under 0.10.

5.5. Thus, the difference in friction levels between the coated and uncoated sutures is on average 1.83 (1.89 as measured now and 1.78 as measured in March). The results of re-testing fully confirm the conclusion of our March report that the tested coated and uncoated sutures have statistically significant differences in their frictional characteristics.

## 6. Drag Tests

6.1 In his Supplemental Report, Dr. Brookstein was confused with our sample numbering. As I confirmed at my deposition, the sample numbers in the raw-data tables correspond to the resultant tables in the March report, which can be easily checked. Neither the plots included in the original March report nor the plots in the April supplemental report had sample numbers. The plots fully correspond to both the raw-data files and tables in the report. Dr. Brookstein's confusion is related to the fact that in the raw-data files, some of the Excel plots have no numbers, some of them have meaningless numbers corresponding to their sequence and position in the file, but they do not correspond to the sample numbers. Thus, the irrelevant numbers on the Excel raw-data plots shall be ignored to eliminate Dr. Brookstein's confusion.



Center For Tribology, Inc.
1715 Dell Avenue
Campbell, CA 95008, USA
Tel: (408) 376-4040 ♦ Fax: (408) 376-4050

COF vs time



**Fig 3.** Coefficient of Friction curves for 8 uncoated (all of them are above 0.15)
and 8 coated (all of them are under 0.10) Sutures

### 7. Conclusions

I am confident that the results and conclusions of our March report are correct.

*Norm Gitis*

Dr. Norm Gitis
President, Center for Tribology, Inc.
STLE Fellow
Chairman, STLE Committee on Tribotesting

# EXHIBIT 3

*Westlaw.*

Not Reported in F.Supp.2d                                                                                          Page 1

Not Reported in F.Supp.2d, 2006 WL 47504 (D.S.D.), 69 Fed. R. Evid. Serv. 147
**(Cite as: Not Reported in F.Supp.2d)**

H Briefs and Other Related Documents

Schumacher v. Tyson Fresh Meats, Inc.D.S.D,2006.
United States District Court,D. South Dakota,
Northern Division.
Herman SCHUMACHER, Michael P. Callicrate,
and Roger D. Koch, Plaintiffs,
v.
TYSON FRESH MEATS, INC., Cargill Meat
Solutions Corporation, d/b/a/ Excel Corporation,
Swift Beef Company, and National Beef Packing
Company, L.L.C., Defendants.
**No. CIV 02-1027.**

Jan. 5, 2006.

David F. Herr, Elizabeth J. Anderson, Elizabeth
Snyder Poeschl, James Duffy O'Connor, Kirk O.
Kolbo, Matthew P. Lewis, R. Christopher Sur,
Maslon, Edelman, Borman & Brand, Minneapolis,
MN, Reed A. Rasmussen, Siegel, Barnett & Schutz,
Aberdeen, SD, Stephen O. Broghammer, Thomas
M. White, White, Wulff & Smart, Omaha, NE, for
Plaintiffs.
Brad P. Rosenberg, Mark W. Ryan, Michael E.
Lackey, Jr., Mayer Brown Rowe & Maw LLP,
Washington, DC, Kennith L. Gosch, Bantz, Gosch,
Cremer, Peterson, Sommers & Wager, Jack H. Hieb
, Richardson, Groseclose, Wyly, Wise & Sauck,
Aberdeen, SD, Christopher Wayne Madsen,
Thomas John Welk, Boyce Greenfield Pashby &
Welk, LLP, Sioux Falls, SD, Leo A. Knowles,
Patrick E. Brookhouser, Jr., Mcgrath North Mullin
& Kratz, PC LLO, Omaha, NE, Louis A. Huber, III,
Schlee Huber McMullen & Krause, Kansas City,
MO, Louis E. Fogel, Susan A. Weber, Sherry A.
Knutson, William H. Baumgartner, Jr., Sidley,
Austin, Brown & Wood, LLP, Chicago, IL, for
Defendants.

OPINION AND ORDER
KORNMANN, J.

INTRODUCTION

*1 The background for this case was set forth in
*Schumacher v. Tyson Fresh Meats, Inc.,* 2004 DSD
5, 221 F.R.D. 605 (D.S.D.2004), and is restated
here in condensed fashion as necessary for an
understanding of some of the disputes pending
before the court. Pursuant to the Livestock
Mandatory Reporting Act of 1999 ("LMRA"), 7
U.S.C. §§ 1635-1636h, on April 2, 2001, the United
States Department of Agriculture ("USDA") began
collecting and publishing twice daily the boxed beef
prices received by meat packers. On May 14, 2001,
USDA discovered that it was incorrectly reporting
the prices of "choice" and "select" boxed beef
because USDA erroneously included the price of
lower valued "no-roll" in computing choice and
select boxed beef prices. The result was that the
publicly reported prices of choice and select boxed
beef were substantially lower than the correct prices
which had been duly reported to USDA by the
packers.

Plaintiff cattle producers brought suit against the
four major packers claiming that they knowingly
used the inaccurate prices published by USDA to
negotiate the purchase of slaughter cattle from
plaintiffs (and proposed class members) at prices
substantially lower than would have been
economically justified had plaintiffs known the
accurate higher prices that defendants were
receiving for their boxed beef. Plaintiffs contend,
*inter alia,* that defendants' conduct constituted
unfair or deceptive practices, in violation of the
Packers and Stockyards Act ("PSA"), 7 U.S.C. §§
181-229. Plaintiffs also seek damages under
common law unjust enrichment principles, alleging
that cattle producers received many millions of
dollars less than they would have been entitled to
demand from defendants during that approximate
six week period of time. This matter was certified as
a class action.

Two of the issues for trial are whether the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 47504 (D.S.D.), 69 Fed. R. Evid. Serv. 147
**(Cite as: Not Reported in F.Supp.2d)**

defendants knew or should have known that the boxed beef prices were incorrectly under-reported by the USDA during the class period and whether the incorrectly under-reported boxed beef prices caused lower market prices to be received by members of the class. To prove these matters, plaintiffs retained the services of Ted C. Schroeder, an agricultural economist from Kansas State University. Professor Schroeder conducted a multiple regression analysis [FN1] to estimate the effect the USDA reporting errors had on fed cattle prices. He concluded that the meat packers had to have known that the USDA was under-reporting boxed beef prices and that the under-reported prices resulted in producers receiving over $22 million less for their cattle, which was retained as a windfall, according to plaintiffs, by the packers.

> FN1. A multiple regression analysis is a statistical tool that attempts to reveal relationships between explanatory variables and a dependent variable. *Morgan v. United Parcel Service of America, Inc.,* 380 F.3d 459, 466 (8th Cir.2004) (*citing* Federal Judicial Center, *Reference Manual on Scientific Evidence,* p. 181 (2nd ed.2000)).

Defendants hired Jerry A. Hausman, an econometrician at the Massachusetts Institute of Technology ("MIT"), to review Professor Schroeder's regression models. Professor Hausman concluded that Professor Schroeder's methodology was invalid and therefore his analysis does not provide a valid basis for concluding that the price reporting errors had an effect on fed cattle prices. Professor Hausman prepared what he called corrected regression models and concluded that there was no effect on fed cattle prices.

**\*2** Defendants hired Stephen R. Koontz, an agricultural economist at Colorado State University, to evaluate whether Professor Hausman's regression model "makes sense" from an agricultural economist viewpoint. Professor Koontz prepared charts based upon Professor Hausman's analysis which compare the relationship between fed cattle prices paid by packers and USDA boxed beef

prices. He concluded that there is no statistical basis for concluding that USDA reporting errors affected fed cattle prices. Obviously, if Professor Koontz is correct in his opinion, the LMRA is of no value to anyone. He also concluded that there is no reason to believe the packers should have know that the USDA was under-reporting boxed beef prices.

In response to the reports from Professors Hausman and Koontz, Professor Schroeder prepared a "rebuttal report" attacking the validity of their analysis. Professor Schroeder's rebuttal report also sets forth a revised estimate of damages to producers of over $42 million. Damages to producers is of no legal consequence here. The question is: What damages were allegedly suffered by class members?

Plaintiffs filed a motion (Doc. 461) to exclude the testimony of Professor Koontz under *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and Fed.R.Evid. 702. Defendants filed a motion (Doc. 466) to exclude the testimony of Professor Schroeder on the same basis. Defendants also filed a motion (Doc. 467) to exclude Professor Schroeder's rebuttal testimony pursuant to *Daubert* and because he allegedly changed his methodology, resulting in a doubling of damage estimates, which defendants contend is prejudicial. Hoping that the testimony of Professor Schroeder would be excluded, defendants filed a motion for summary judgment (Doc. 464).

The parties requested a "Daubert" hearing and a hearing was conducted in Minneapolis on November 22, 2005. Testimony was presented. All proposed expert witness as to the issues before the court were able to attend, testify, and be cross-examined.

After hearing the testimony and considering the arguments, the court expressed some thoughts and likely opinions on the record at the conclusion of the hearing in Minneapolis. A transcript of the hearing has been prepared and filed.

DECISION

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3

Not Reported in F.Supp.2d, 2006 WL 47504 (D.S.D.), 69 Fed. R. Evid. Serv. 147
**(Cite as: Not Reported in F.Supp.2d)**

The admissibility of expert opinions is governed by Fed.R.Evid. 702:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, or experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 requires a district court to act as a gatekeeper to ensure that expert testimony both rests on a reliable foundation and is relevant. *Daubert,* 509 U.S. 579, 589, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993).**3** Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Daubert,* 509 U.S. at 592-93, 113 S.Ct. at 2796. The district courts have "great latitude in determining whether expert testimony meets the reliability requisites of Rule 702." *First Union Nat. Bank v. Benham,* 423 F.3d 855, 861 (8th Cir.2005).

*Daubert* set forth factors which will bear on the inquiry but the Supreme Court cautioned that these factors are not to be considered a definitive checklist or test. *Daubert,* 509 U.S. at 593, 113 S.Ct. at 2796. One of the factors to consider is whether a theory or technique can be and has been tested. "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." *Id.*

Another factor is "whether the theory or technique

has been subjected to peer review and publication." *Id.*

Publication (which is but one element of peer review) is not a sine qua non of admissibility; it does not necessarily correlate with reliability ... and in some instances well-grounded but innovative theories will not have been published. Some propositions, moreover, are too particular, too new, or of too limited interest to be published. But submission to the scrutiny of the scientific community is a component of "good science," in part because it increases the likelihood that substantive flaws in methodology will be detected. The fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology.

*Daubert,* 509 U.S. at 593-94, 113 S.Ct. at 2797 (internal citations omitted).

"Additionally, in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error ... and the existence and maintenance of standards controlling the technique's operation." *Daubert,* 509 U.S. at 594, 113 S.Ct. at 2797 (internal citations omitted).

The final factor set forth in *Daubert* is general acceptance in the scientific community. " Widespread acceptance can be an important factor in ruling particular evidence admissible, and 'a known technique which has been able to attract only minimal support within the community,' may properly be viewed with skepticism." *Daubert,* 509 U.S. at 594, 113 S.Ct. at 2797 (internal citation omitted).

Defendants seek to exclude all testimony from Professor Schroeder as to his original regression analysis, this based upon Professor Hausman's conclusion that Schroeder's data was flawed because he failed to run two tests upon the data to determine the reliability of the results. In response, Professor Schroeder conducted the reliability tests and concluded that the adjustments Professor Hausman suggested were required did not appreciably change his results and that the Schroeder results were reliable.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4

Not Reported in F.Supp.2d, 2006 WL 47504 (D.S.D.), 69 Fed. R. Evid. Serv. 147
**(Cite as: Not Reported in F.Supp.2d)**

**\*4** The original Schroeder model testing for the effect of the boxed beef price on the price of fed cattle tested over a seven month period which started before the class period, encompassed the class period, and concluded after the class period. After he issued his initial report, Professor Schroeder reviewed his regression model and concluded that his data should be limited to the class period because the advent of mandatory reporting constituted a structural change. When he did so, his damages estimates doubled. The results of the more limited data analysis are the subject of Professor Schroeder's rebuttal report.

I. Admission of Professor Schroeder's Multiple Regression Analysis.

Expert witnesses are frequently called upon to use their specialized training and experience to render opinions as to liability in civil litigation. Under Rule 702, proposed expert testimony is admissible only if (1) it is based upon sufficient facts or data, (2) it is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Rule 702 is intended to weed out junk science. Many scientific techniques have already undergone Rule 702 scrutiny. For example, DNA, fingerprinting, and handwriting evidence are now generally accepted types of scientific evidence that are reliable and admissible while polygraph evidence is generally considered unreliable. *Daubert* set forth factors to consider in determining whether a particular type of evidence relied upon by an expert is reliable and therefore admissible.

The scientific evidence at issue here is mathematical evidence upon which Professor Schroeder relies in forming his expert opinions. Neither party disputes that regression analysis is the type of scientific evidence that, in the proper case, is admissible under Rule 702. The Seventh Circuit has pointed out that
Regression analysis is common enough in litigation to earn extended treatment in the Federal Judicial Center's Reference Manual on Scientific Evidence (2d ed.2000). Regression has its own chapter (Reference Guide on Multiple Regression, prepared

by Daniel L. Rubinfeld, at Reference Manual 179-228) and plays a leading role in two more: David H. Kaye & David A. Freedman, Reference Guide on Statistics, at Reference Guide 83-178, and Robert E. Hall & Victoria A. Lazear, Reference Guide on Estimation of Economic Losses in Damages Awards, at Reference Manual 277-332.

*Zenith Electronics Corp. v. WH-TV Broadcasting Corp.,* 395 F.3d 416, 419 (7th Cir.2005).

The focus of a *Daubert* analysis is "solely on principles and methodology, not on the conclusions that they generate." *Daubert,* 509 U.S. at 595, 113 S.Ct. at 2797. The *Daubert* factors and analysis have been applied to regression analysis and it has been found to be reliable and admissible. The issue here is not whether regression analysis is admissible because it is reliable but whether Professor Schroeder applied regression analysis reliably to the facts of this case.

**\*5** "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Larson v. Kempker,* 414 F.3d 936, 941 (8th Cir.2005) (*quoting Hose v. Chicago Northwestern Transp. Co.,* 70 F.3d 968, 974 (8th Cir.1995)). "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *First Union Nat. Bank v. Benham,* 423 F.3d 855, 862 (8th Cir.2005) (*citing Bonner v. ISP Tech., Inc.,* 259 F.3d 924, 929-30 (8th Cir.2001) ( *quoting Hose v. Chicago Northwestern Transp. Co.,* 70 F.3d 968, 974 (8th Cir.1995))).

Defendants do not contend that regression analysis is junk science. Indeed, one of the defense experts has himself conducted a regression analysis which is substantially similar to Professor Schroeder's analysis. Professor Hausman claims that a correctly run regression analysis does not show a correlation between boxed beef prices and fed cattle prices. He contends that Schroeder's analysis is faulty because he failed to account for certain variables. However, "the question of what explanatory variables should be included in a particular regression normally '

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 5

Not Reported in F.Supp.2d, 2006 WL 47504 (D.S.D.), 69 Fed. R. Evid. Serv. 147
**(Cite as: Not Reported in F.Supp.2d)**

affect[s] the analysis' probativeness, not its admissibility." ' *Morgan v. United Parcel Service of America, Inc.,* 380 F.3d 459, 468 (8th Cir.2004) ( *quoting Bazemore v. Friday,* 478 U.S. 385, 400, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986)). "[A] regression analysis does not become inadmissible as evidence simply because it does not include every variable that is quantifiable and may be relevant to the question presented ... [I]t is for the finder of fact to consider the variables that have been left out of an analysis, and the reasons given for the omissions, and then to determine the weight to accord the study's results." *Maitland v. Univ. of Minn.,* 155 F.3d 1013, 1017 (8th Cir.1998).

The defendants' objections to Professor Schroeder's two reports as they relate to whether he correctly ran his regression analysis relate to the weight to be given to Professor Schroeder's opinions. Professor Schroeder's opinions based upon the regression models he prepared will in general be admissible in evidence at trial. Of course, the court will at trial consider all objections as the testimony of all witnesses is offered.

### II. Admission of Professor Schroeder's Rebuttal Report.

Defendants contend that Professor Schroeder's opinions in his rebuttal report should be inadmissible because his rebuttal report is based upon new calculations. Professor Schroeder, upon further contemplation, determined that his calculations should be limited to the class period. He submitted a so-called rebuttal report wherein he limited the data used in his regression analysis. Defendants contend that the report constitutes improper rebuttal because his new calculations were not made in response to any criticisms raised by defendants' experts.

**\*6** Rule 26(a)(2)(B) and this court's scheduling order require that expert witnesses and their reports "intended solely to contradict or rebut evidence on the same subject matter identified by another party" be disclosed within 30 days after the disclosure made by the other party. Defendants contend that, since Professor Schroeder's report was not prepared

in rebuttal but rather to correct his initial report, it is improper and should be struck, as should any testimony consistent therewith. Defendants read the Rules far too rigidly. The discovery process set forth in the Federal Rules of Civil Procedure is geared toward a search for the truth. *Shelton v. American Motors Corp.,* 805 F.2d 1323, 1331 (8th Cir.1986) (Battey, District Judge, dissenting). If an expert discovers that he has erred, it is during the discovery process that such errors should be disclosed. Professor Schroeder's rebuttal report was disclosed two weeks prior to his deposition and over seven months before trial. Defendants are not prejudiced in any way by the amended regression analysis conducted by Professor Schroeder. It is true that his revised opinion may subject the defendants to much greater damages than previously claimed but that is no reason to exclude the rebuttal report.

In any event, Rule 26(a)(2)(C) and Rule 26(e)(1) specifically impose a duty upon the parties to supplement expert disclosures, including rebuttal disclosures
if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. With respect to testimony of an expert from whom a report is required ... the duty extends both to information contained in the report and to information provided through a deposition of the expert, and any additions or other changes to this information shall be disclosed by the time the party's [pretrial disclosures] are due.

Pursuant to Rule 26(a)(3), such pretrial disclosures are due 30 days prior to trial. Professor Schroeder's changes to his expert report were disclosed well before the deadline set forth in the Rules.

The Rules of Civil Procedure not only allow for disclosure of changes or corrections to expert reports but require such disclosure when the expert learns that his original calculations are or may be incorrect. Professor Schroeder's rebuttal report and any testimony based thereupon are not inadmissible as argued by defendants.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 6

Not Reported in F.Supp.2d, 2006 WL 47504 (D.S.D.), 69 Fed. R. Evid. Serv. 147
**(Cite as: Not Reported in F.Supp.2d)**

### III. Admission of Professor Koontz' Report.

Plaintiffs contend that Professor Koontz' report does not meet the Rule 702 standards for admissibility because the evidence would not assist the trier of fact and because the methodology used by Professor Koontz does not meet the *Daubert* standards. Koontz apparently, relying upon Professor Hausman's regression analysis, prepared charts which show whether Professor Hausman's report "makes sense" from an agricultural economist's point of view.

**\*7** Plaintiffs contend that Professor Koontz did not do his own regression analysis and cannot rely upon Professor Hausman's analysis because he did not test Professor Hausman's data. "[A]n expert may extrapolate from data supplied by other experts." *Larson v. Kempker*, 414 F.3d 936, 941 (8th Cir.2005).

Plaintiffs contend that Koontz admits that his models are not meant to show cause and effect but merely the relationship between boxed beef values and fed cattle prices and are therefore not helpful to the jury. Even the best regression equation cannot prove causation. The most it can show is a correlation that can give rise to an inference that causation exists. *Morgan v. United Parcel Service of America, Inc.*, 380 F.3d 459, 466 (8th Cir.2004). Professor Koontz prepared charts which he claims show that there is no correlation between boxed beef values and fed cattle prices. This is a proper subject for expert testimony.

The court is satisfied that the Daubert requirements are met as to the expert witnesses. The court is satisfied that there are genuine issues of material fact for trial and no basis to grant a summary judgment and that the motion for a summary judgment should be denied.

Now, therefore,

IT IS ORDERED:

1. Plaintiffs' motion (Doc. 461) to exclude the testimony of Professor Stephen R. Koontz is denied.

2. Defendants' motion (Doc. 466) to exclude the testimony of Professor Ted. C. Schroeder is denied.

3. Defendants' motion (Doc. 467) to strike the rebuttal testimony of Professor Ted C. Schroeder is denied.

4) Defendants' motion for a summary judgment (Doc. 464) is denied.

D.S.D,2006.
Schumacher v. Tyson Fresh Meats, Inc.
Not Reported in F.Supp.2d, 2006 WL 47504 (D.S.D.), 69 Fed. R. Evid. Serv. 147

Briefs and Other Related Documents (Back to top)

• 2006 WL 1465473 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of the Renewed Motion By Tyson, Cargill Meat Solutions, and Swift for Judgment as A Matter of Law (May 26, 2006) Original Image of this Document (PDF)
• 2006 WL 1408364 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Opposition to Renewed Motion by Tyson, Cargill and Swift for Judgment as a Matter of Law and to Additional Brief of Swift and Cargill in Support of Jmol (May 16, 2006) Original Image of this Document (PDF)
• 2006 WL 1354873 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of the Renewed Motion by Tyson, Cargill Meat Solutions, and Swift for Judgment as a Matter of Law (Apr. 26, 2006) Original Image of this Document (PDF)
• 2006 WL 1354872 (Trial Motion, Memorandum and Affidavit) Defendants' Brief in Support of Their Joint Motion to Set a Schedule for Approval of a Decertification Notice and to Require Plaintiffs to Issue the Notice (Apr. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 1006007 (Verdict, Agreement and Settlement) Verdict (Apr. 12, 2006) Original Image of this Document (PDF)
• 2006 WL 1006008 (Verdict, Agreement and Settlement) Verdict (Apr. 12, 2006) Original Image of this Document (PDF)
• 2006 WL 1354871 (Trial Motion, Memorandum and Affidavit) Defendants' Listing of Objections To Deposition Designations From Thomas Shires (Apr.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7

Not Reported in F.Supp.2d, 2006 WL 47504 (D.S.D.), 69 Fed. R. Evid. Serv. 147
**(Cite as: Not Reported in F.Supp.2d)**

12, 2006) Original Image of this Document (PDF)
• 2006 WL 1005608 (Trial Motion, Memorandum and Affidavit) Brief in Support of Defendant National Beef Packing Company, L.L.C.'s Motion for Judgment as A Matter of Law. (Apr. 7, 2006) Original Image of this Document (PDF)
• 2006 WL 1354870 (Trial Motion, Memorandum and Affidavit) Brief in Support of Defendant National Beef Packing Company, L.L.C.'S Motion for Judgment as a Matter of Law (Apr. 7, 2006) Original Image of this Document (PDF)
• 2006 WL 1005630 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Defendants' Joint Motion for Judgment as a Matter of Law (Apr. 6, 2006) Original Image of this Document (PDF)
• 2006 WL 1354869 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Defendants' Joint Motion for Judgment as a Matter of Law (Apr. 6, 2006) Original Image of this Document (PDF)
• 2006 WL 1354868 (Trial Motion, Memorandum and Affidavit) Response to Plaintiffs' Bench Memorandum Regarding Damages Proof (Apr. 5, 2006) Original Image of this Document (PDF)
• 2006 WL 1354867 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Bench Memorandum Regarding Damages Proof (Apr. 4, 2006) Original Image of this Document (PDF)
• 2006 WL 1026770 (Trial Motion, Memorandum and Affidavit) Defendants' Bench Memorandum Regarding Plaintiffs' Damages Proof (Mar. 30, 2006) Original Image of this Document (PDF)
• 2006 WL 1026769 (Trial Motion, Memorandum and Affidavit) Defendants' Objections to Plaintiffs' Proposed Jury Instructions (Mar. 22, 2006) Original Image of this Document (PDF)
• 2006 WL 1007607 () Affidavit of Dr. Ted C. Schroeder in Support of Plaintiffs' Motion for Class Certification (Mar. 16, 2006) Original Image of this Document (PDF)
• 2006 WL 1026763 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to Defendants' Joint Motion in Limine to Exclude the Lmpr Review Team's Report to the Secretary of Agriculture on the Livestock Mandatory Price Reporting System (Mar. 16, 2006) Original Image of this Document (PDF)
• 2006 WL 1026764 (Trial Motion, Memorandum

and Affidavit) Memorandum of Law in Opposition to Defendants' Joint Motion in Limine to Exclude Testimony, Evidence, and Argument Regarding Congressional Intent and Purpose in Enacting the Packers and Stockyards Act and the Livestock Mandatory Reporting Acts (Mar. 16, 2006) Original Image of this Document (PDF)
• 2006 WL 1026765 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to Defendants' Joint Motion in Limine to Permit Defendants to Present the Video Deposition Testimony of Gary Zuehlke to the Jury (Mar. 16, 2006) Original Image of this Document (PDF)
• 2006 WL 1026766 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law In Opposition to Defendants' Joint Motion In Limine to Exclude Testimony That Professor Ted C. Schroeder Was Previously Retained By Defendants As An Agricultural Economist On Other Matters (Mar. 16, 2006) Original Image of this Document (PDF)
• 2006 WL 1026767 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law In Opposition to Defendants' Joint Motion In Limine to Bar Expert Testimony That Defendants ""Knew" Or ""Must Have Known" of the Usda Reporting Error (Mar. 16, 2006) Original Image of this Document (PDF)
• 2006 WL 1026768 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum in Opposition to Plaintiffs' Motion in Limine to Exclude Evidence On Specific Subjects (Mar. 16, 2006) Original Image of this Document (PDF)
• 2006 WL 1026762 (Trial Motion, Memorandum and Affidavit) Response of Defendant Tyson Fresh Meats, Inc. to Plaintiffs' Motion in Limine to Limit the Opinion Testimony of Kimberly A. Walz (Mar. 9, 2006) Original Image of this Document (PDF)
• 2006 WL 1026744 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Motion in Limine to Limit the Opinion Testimony of Kimberly A. Walz (Mar. 6, 2006) Original Image of this Document (PDF)
• 2006 WL 1026745 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Trial Brief (Mar. 6, 2006) Original Image of this Document (PDF)
• 2006 WL 1026746 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Support of Their Motion in Limine to Exclude

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 47504 (D.S.D.), 69 Fed. R. Evid. Serv. 147
**(Cite as: Not Reported in F.Supp.2d)**

Evidence on Specific Subjects (Mar. 6, 2006) Original Image of this Document (PDF)
• 2006 WL 1026747 (Trial Motion, Memorandum and Affidavit) Defendants' Trial Brief (Mar. 6, 2006) Original Image of this Document (PDF)
• 2006 WL 1026748 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Defendants' Joint Motion in Limine to Exclude lay Opinion Testimony Regarding the Effect of the Usda Error on Fed Cattle Prices (Mar. 6, 2006) Original Image of this Document (PDF)
• 2006 WL 1026749 (Trial Motion, Memorandum and Affidavit) Defendant National Beef Packing Company, L.L.C.'S Brief in Support of Its Motion in Limine to Prohibit Facts or Argument Regarding U.S. Premium Beef Price Adjustments (Mar. 6, 2006) Original Image of this Document (PDF)
• 2006 WL 1026750 (Trial Motion, Memorandum and Affidavit) Defendant National Beef Packing Company, L.L.C.'s Brief in Support of Its Motion in Limine to Prohibit Facts or Argument Regarding Farmland Industries, Inc. Bankruptcy (Mar. 6, 2006) Original Image of this Document (PDF)
• 2006 WL 1026751 (Trial Motion, Memorandum and Affidavit) Defendants' Motion in Limine to Prohibit References to the Defendants as ""the Packers" (Mar. 6, 2006) Original Image of this Document (PDF)
• 2006 WL 1026752 (Trial Motion, Memorandum and Affidavit) Defendants' Brief in Support of their Motion in Limine to Prohibit References to the Defendants as ""the Packers" (Mar. 6, 2006) Original Image of this Document (PDF)
• 2006 WL 1026753 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Defendants' Joint Motion in Limine to Exclude Lay Opinion Testimony Regarding the Effect of the Usda Error on Fed Cattle Prices (Mar. 6, 2006) Original Image of this Document (PDF)
• 2006 WL 1026754 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Defendants' Joint Motion in Limine to Bar Reference Before the Jury to the Verdict in Pickett v. Tysonfreshmeats (Mar. 6, 2006) Original Image of this Document (PDF)
• 2006 WL 1026755 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Defendants' Joint Motion in Limine to Permit Defendants to Present the Video Deposition

Testimony of Gary Zuehlke to the Jury (Mar. 6, 2006) Original Image of this Document (PDF)
• 2006 WL 1026756 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Defendants' Joint Motion in Limine to Exclude the Lmpr Review Team's Report to the Secretary of Agriculture on the Livestock Mandatory Price Reporting System (Mar. 6, 2006) Original Image of this Document (PDF)
• 2006 WL 1026757 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Defendants' Joint Motion in Limine to Bar Expert Testimony That Defendants ""Knew" or ""Must Have Known" of the Usda Reporting Error (Mar. 6, 2006) Original Image of this Document (PDF)
• 2006 WL 1026758 (Trial Motion, Memorandum and Affidavit) Defendants' Brief in Support of Joint Motion in Limine to Exclude Testimony, Evidence, and Argument Regarding Congressional Intent and Purpose in Enacting the Packers and Stockyards Act and the Livestock Mandatory Reporting Acts (Mar. 6, 2006) Original Image of this Document (PDF)
• 2006 WL 1026759 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Defendants' Joint Motion in Limine Requesting That the Court Rule on Pending Objections to Designated Deposition Testimony from Jerry Adams, John Goetz, and Gary Zuehlke (Mar. 6, 2006) Original Image of this Document (PDF)
• 2006 WL 1026760 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Defendants' Joint Motion in Limine to Exclude Testimony That Professor Schroeder Has Previously Worked, Testified, or Consulted for the Defendants (Mar. 6, 2006) Original Image of this Document (PDF)
• 2006 WL 1026761 (Trial Motion, Memorandum and Affidavit) Defendants' Brief in Support of Their Joint Motion in Limine to Exclude Argument, Evidence, and Testimony Suggesting That a Defendant Had any Obligation Under the Psa to Inform Producers That Defendant's Internal Data Regarding Boxed Beef Prices or t o Suggest in any Way How Those Boxed Beef Prices Might Relate to the Usda Cutout Averages, or That Liability Could be Imposed Under Unjust Enrichment Principles for Failing to Do So. (Mar. 6, 2006) Original Image of this Document (PDF)
• 2006 WL 652989 (Trial Motion, Memorandum

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 9

Not Reported in F.Supp.2d, 2006 WL 47504 (D.S.D.), 69 Fed. R. Evid. Serv. 147
**(Cite as: Not Reported in F.Supp.2d)**

and Affidavit) Reply Memorandum in Support of Defendants' Joint Motion to Decertify Plaintiffs' Unjust Enrichment Classes (Feb. 9, 2006) Original Image of this Document (PDF)
• 2006 WL 652988 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Opposition to Defendants' Joint Motion to Decertify Plaintiffs' Unjust Enrichment Classes (Feb. 1, 2006) Original Image of this Document (PDF)
• 2006 WL 1976764 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Joint Motion to Decertify Plaintiffs' Unjust Enrichment Classes (Jan. 9, 2006) Original Image of this Document (PDF)
• 2005 WL 4170192 (Verdict, Agreement and Settlement) Stipulation and Motion to Amend Pretrial Schedule (Dec. 1, 2005) Original Image of this Document (PDF)
• 2005 WL 4170112 () Before the Honorable Charles B. Kornmann United States District Court Judge (Daubert Motions) (Nov. 22, 2005) Original Image of this Document (PDF)
• 2005 WL 4170196 () Before the Honorable Charles B. Kornmann United States District Court Judge (Daubert Motions) (Nov. 22, 2005) Original Image of this Document (PDF)
• 2005 WL 3635302 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Brief in Support of Their Joint Motion for Summary Judgment (Oct. 28, 2005) Original Image of this Document (PDF)
• 2005 WL 3635303 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Brief in Support of (A) Their Joint Motion to Exclude Testimony by Professor Ted C. Schroeder for Failure to Employ A Reliable Scientific Methodology, and (B) Their Joint Motion to Strike Improper Rebuttal Testimony (Oct. 28, 2005) Original Image of this Document (PDF)
• 2005 WL 3966296 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Brief in Support of Their Joint Motion for Summary Judgment (Oct. 28, 2005) Original Image of this Document (PDF)
• 2005 WL 3966297 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Brief in Support of (A) Their Joint Motion to Exclude Testimony by Professor Ted C. Schroeder for Failure to Employ a Reliable Scientific Methodology, and (B) Their Joint Motion to Strike Improper Rebuttal Testimony (Oct. 28, 2005) Original Image of this Document

(PDF)
• 2005 WL 3635301 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply Memorandum of Law in Support of Their Daubert Motion to Exclude the Testimony of Stephen R. Koontz (Oct. 17, 2005) Original Image of this Document (PDF)
• 2005 WL 3635299 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Opposition to Defendants' Joint Motion for Summary Judgment (Oct. 11, 2005) Original Image of this Document (PDF)
• 2005 WL 3635300 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law In Opposition to Defendants' Joint Motion to Strike Improper Rebuttal Testimony and Defendants' Joint Motion to Strike Testimony of Professor Ted C. Schroeder (Oct. 11, 2005) Original Image of this Document (PDF)
• 2005 WL 3966295 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Opposition to Defendants' Joint Motion to Strike Improper Rebuttal Testimony and Defendants' Joint Motion to Strike Testimony of Professor Ted C. Schroeder (Oct. 11, 2005) Original Image of this Document (PDF)
• 2005 WL 3966376 () Affidavit of Professor Ted C. Schroeder (Oct. 11, 2005) Original Image of this Document (PDF)
• 2005 WL 3635298 (Trial Motion, Memorandum and Affidavit) Defendants' Joint Brief in Response to Plaintiffs' Daubert Motion to Exclude the Testimony of Professor Stephen R. Koontz (Sep. 27, 2005) Original Image of this Document (PDF)
• 2005 WL 3966294 (Trial Motion, Memorandum and Affidavit) Defendants' Joint Brief in Response to Plaintiffs' Daubert Motion to Exclude the Testimony of Professor Stephen R. Koontz (Sep. 27, 2005) Original Image of this Document (PDF)
• 2005 WL 3635294 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Support of Its Daubert Motion to Exclude the Testimony of Stephen R. Koontz (Sep. 15, 2005) Original Image of this Document (PDF)
• 2005 WL 3635295 (Trial Motion, Memorandum and Affidavit) Defendants' Joint Motion for Summary Judgment (Sep. 15, 2005) Original Image of this Document (PDF)
• 2005 WL 3635296 (Trial Motion, Memorandum and Affidavit) Defendants' Brief in Support of Their

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 10

Not Reported in F.Supp.2d, 2006 WL 47504 (D.S.D.), 69 Fed. R. Evid. Serv. 147
**(Cite as: Not Reported in F.Supp.2d)**

Joint Motion for Summary Judgment (Sep. 15, 2005) Original Image of this Document (PDF)
• 2005 WL 3635297 (Trial Motion, Memorandum and Affidavit) Defendants' Brief in Support of (A) Their Joint Motion to Exclude Testimony by Professor Ted C. Schroeder for Failure to Employ A Reliable Scientific Methodology, and (B) Their Joint Motion to Strike Improper Rebuttal Testimony (Sep. 15, 2005) Original Image of this Document (PDF)
• 2005 WL 3966291 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Support of Its Daubert Motion to Exclude the Testimony of Stephen R. Koontz (Sep. 15, 2005) Original Image of this Document (PDF)
• 2005 WL 3966292 (Trial Motion, Memorandum and Affidavit) Defendants' Brief in Support of their Joint Motion for Summary Judgment (Sep. 15, 2005) Original Image of this Document (PDF)
• 2005 WL 3966293 (Trial Motion, Memorandum and Affidavit) Defendants' Brief in Support of (A) Their Joint Motion to Exclude Testimony By Professor Ted C. Schroeder for Failure to Employ A Reliable Scientific Methodology, and (B) Their Joint Motion to Strike Improper Rebuttal Testimony (Sep. 15, 2005) Original Image of this Document (PDF)
• 2005 WL 4170190 () Volume II Deposition (Aug. 31, 2005) Original Image of this Document (PDF)
• 2005 WL 3966388 () Volume I Deposition (Aug. 30, 2005) Original Image of this Document (PDF)
• 2005 WL 3966387 () Deposition of Stephen Koontz, Ph.D. (Aug. 25, 2005) Original Image of this Document (PDF)
• 2005 WL 3966386 () Deposition of Kimberly Walz taken on 8-23-05 at Sioux City, IA (Aug. 23, 2005) Original Image of this Document (PDF)
• 2005 WL 3635293 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Brief in Support of Their Joint Motion to (A) Extend the Opt-Out Period, and (B) Require Plaintiffs to Comply With the Court's Notice Plan (Aug. 1, 2005) Original Image of this Document (PDF)
• 2005 WL 3635292 (Trial Motion, Memorandum and Affidavit) Defendants' Brief in Support of Their Joint Motion to Compel an Interrogatory Answer and to Set a Schedule for Appropriate Supplementation of the Answer (May 13, 2005) Original Image of this Document (PDF)

• 2005 WL 3966290 (Trial Motion, Memorandum and Affidavit) Defendants' Brief in Support of Their Joint Motion to Compel an Interrogatory Answer and to Set a Schedule for Appropriate Supplementation of the Answer (May 13, 2005) Original Image of this Document (PDF)
• 2005 WL 3635290 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Support of its Motion for a Protective Order and in Response to Defendants' Joint Motion to Compel Expert Discovery and Revise the Expert Discovery Deadlines (May 5, 2005) Original Image of this Document (PDF)
• 2005 WL 3966288 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Support of Its Motion for A Protective Order and in Response to Defendants' Joint Motion to Compel Expert Discovery and Revise the Expert Discovery Deadlines Exhibits ""C" and ""D" Attached to the Affidavit of Elizabeth Sn yder Poeschl are Filed Under Seal Pursuant to A Protective Order of the Court (May 5, 2005) Original Image of this Document (PDF)
• 2005 WL 3635289 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum in Support of Their Joint Motion to Compel Expert Discovery and Revise the Expert Discovery Deadlines (Apr. 18, 2005) Original Image of this Document (PDF)
• 2005 WL 3635291 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Memorandum in Support of Their Joint Motion to Compel Expert Discovery and Revise the Expert Discovery Deadlines (Apr. 10, 2005) Original Image of this Document (PDF)
• 2005 WL 3966287 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum in Support of Their Joint Motion to Compel Expert Discovery and Revise the Expert Discovery Deadlines Exhibits ""A" and ""B" Hereof Are Filed Under Seal Pursuant to A Protective Order of the Court (Apr. 10, 2005) Original Image of this Document (PDF)
• 2005 WL 3966289 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Memorandum in Support of Their Joint Motion to Compel Expert Discovery and Revise the Expert Discovery Deadlines (Apr. 10, 2005) Original Image of this Document (PDF)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                  Page 11

Not Reported in F.Supp.2d, 2006 WL 47504 (D.S.D.), 69 Fed. R. Evid. Serv. 147
**(Cite as: Not Reported in F.Supp.2d)**

• 2005 WL 3635287 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Reply to Defendants' Response to Plaintiffs' Proposed Notice Forms and Plan (Feb. 14, 2005) Original Image of this Document (PDF)

• 2005 WL 3635288 (Trial Motion, Memorandum and Affidavit) Sur-Reply Brief of Tyson Fresh Meats, Inc., Cargill Meat Solutions Corporation D/B/A Excel Corporation, and National Beef Packing Company, L.L.C. in Response to Plaintiffs' Proposed Notice Forms and Plan (Feb. 14, 2005) Original Image of this Document (PDF)

• 2005 WL 3635286 (Trial Motion, Memorandum and Affidavit) Defendants' Brief in Response to Plaintiffs' Proposed Notice Forms and Plan (Jan. 21, 2005) Original Image of this Document (PDF)

• 2005 WL 4170191 (Verdict, Agreement and Settlement) Stipulation of Non-Waiver (Jan. 21, 2005) Original Image of this Document (PDF)

• 2005 WL 3635285 (Trial Motion, Memorandum and Affidavit) Defendants' Joint Supplemental Memorandum Regarding Plaintiffs' Proposed Unjust Enrichment Subclass Definitions (Jan. 18, 2005) Original Image of this Document (PDF)

• 2005 WL 3635230 (Trial Pleading) Defendant Swift Beef Company f/k/a Conagra Beef Company's Amended Answer to Plaintiffs' Amended Ccomplaint (Jan. 12, 2005) Original Image of this Document (PDF)

• 2005 WL 3635229 (Trial Pleading) First Amended Answer of Tyson Fresh Meats, Inc. (Jan. 11, 2005) Original Image of this Document (PDF)

• 2005 WL 3635228 (Trial Pleading) Amended Answer and Affirmative Defenses of Cargill Meat Solutions Corporation d/b/a Excel Corporation (Jan. 10, 2005) Original Image of this Document (PDF)

• 2004 WL 3650285 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Plaintiffs' Proposed Notice Forms and Plan (Dec. 30, 2004) Original Image of this Document (PDF)

• 2004 WL 3650284 (Trial Motion, Memorandum and Affidavit) Defendants' Joint Response to Plaintiffs' Proposed Unjust Enrichment Subclass Definitions (Nov. 24, 2004) Original Image of this Document (PDF)

• 2004 WL 3650283 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Plaintiffs' Response to Defendants' Proposal for Unjust Enrichment Class Definition (Nov. 14,

2004) Original Image of this Document (PDF)

• 2004 WL 3650281 (Trial Motion, Memorandum and Affidavit) Defendants' Joint Memorandum Regarding Unjust Enrichment Subclasses (Nov. 1, 2004) Original Image of this Document (PDF)

• 2004 WL 3650282 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Plaintiffs' Proposal for Unjust Enrichment Class Definition Pursuant to Court's Scheduling Order Dated October 19, 2004 (Nov. 1, 2004) Original Image of this Document (PDF)

• 2004 WL 3650280 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to Defendants' Joint Motion Requesting Certification for Interlocutory Appeal of the Court's June 7, 2004 Order (Jul. 7, 2004) Original Image of this Document (PDF)

• 2004 WL 3650279 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Defendants' Joint Motion Requesting Certification for Interlocutory Appeal of the Court's June 7, 2004 Order (Jun. 17, 2004) Original Image of this Document (PDF)

• 2004 WL 3650278 (Trial Motion, Memorandum and Affidavit) Excel's Supplemtal Memorandum in Opposition to Plaintiffs' Motion for Class Certification (May 17, 2004) Original Image of this Document (PDF)

• 2004 WL 3650277 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Defendants' Joint Motion to Strike (May 14, 2004) Original Image of this Document (PDF)

• 2004 WL 3650276 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Support of Plaintiffs' Motion for Class Certification (May 10, 2004) Original Image of this Document (PDF)

• 2004 WL 3768084 () Supplemental Affidavit of Dr. Ted C. Schroeder in Support of Plaintiffs' Motion for Class Certification (May 6, 2004) Original Image of this Document (PDF)

• 2004 WL 3650274 (Trial Motion, Memorandum and Affidavit) IBP, Inc.'s Reply Brief in Support of Motion to Sever (May 3, 2004) Original Image of this Document (PDF)

• 2004 WL 3650275 (Trial Motion, Memorandum and Affidavit) Excel Corporation's Opposition to Plaintiffs' Motion for Class Certification (May 3, 2004) Original Image of this Document (PDF)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 12

Not Reported in F.Supp.2d, 2006 WL 47504 (D.S.D.), 69 Fed. R. Evid. Serv. 147
**(Cite as: Not Reported in F.Supp.2d)**

• 2004 WL 3768083 () Declaration of Brian L. Buhr (May 3, 2004) Original Image of this Document (PDF)

• 2004 WL 3650273 (Trial Motion, Memorandum and Affidavit) IBP, Inc.'s Brief in Opposition to Plaintiffs' Motion for Class Certification (Apr. 27, 2004) Original Image of this Document (PDF)

• 2004 WL 3650271 (Trial Motion, Memorandum and Affidavit) Defendant National Beef Packing Company L.L.C.'s Memorandum in Opposition to Plaintiffs' Motion for Class Certification (Apr. 26, 2004) Original Image of this Document (PDF)

• 2004 WL 3650272 (Trial Motion, Memorandum and Affidavit) Swift Beef Company's Brief in Opposition to Plaintiffs' Motion for Class Certification (Apr. 26, 2004) Original Image of this Document (PDF)

• 2004 WL 3768090 () Deposition of Ted C. Schroeder Taken on Behalf of the Defendants (Apr. 26, 2004) Original Image of this Document (PDF)

• 2004 WL 3768082 () Affidavit of B. Wade Brorsen (Apr. 22, 2004) Original Image of this Document (PDF)

• 2004 WL 3650270 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Consolidated Memorandum of Law in Opposition to Defendant IBP, Inc.'s Motion to Sever (Apr. 21, 2004) Original Image of this Document (PDF)

• 2004 WL 3650269 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Plaintiffs' Motion for Class Certification (Apr. 14, 2004) Original Image of this Document (PDF)

• 2004 WL 4093626 () Deposition of Ted C. Schroeder (Apr. 7, 2004) Original Image of this Document (PDF)

• 2004 WL 3768081 () Affidavit of Dr. Ted C. Schroeder in Support of Plaintiffs' Motion for Class Certification (Mar. 31, 2004) Original Image of this Document (PDF)

• 2004 WL 3768085 () Affidavit of Dr. Ted C. Schroeder in Support of Plaintiffs' Motion for Class Certification (Mar. 31, 2004) Original Image of this Document (PDF)

• 2004 WL 4093625 (Verdict, Agreement and Settlement) Stipulation for Protective Order (Jan. 27, 2004) Original Image of this Document (PDF)

• 2004 WL 3650268 (Trial Motion, Memorandum and Affidavit) Joint Brief of All Defendants in Support of Motion for Protective Order (Jan. 20,

2004) Original Image of this Document (PDF)

• 2004 WL 3650267 (Trial Motion, Memorandum and Affidavit) Motion of All Defendants for Protective Order (Jan. 16, 2004) Original Image of this Document with Appendix (PDF)

• 2003 WL 24224099 (Trial Pleading) Defendant National Beef Packing Company, L.L.C.'s First Amended Answer to Plaintiffs' Amended Complaint (Nov. 7, 2003) Original Image of this Document (PDF)

• 2003 WL 24224098 (Trial Pleading) Defendant Swift Beef Company f/k/a Conagra Beef Company's Answer and Affirmative Defenses (Oct. 27, 2003) Original Image of this Document (PDF)

• 2003 WL 24224095 (Trial Pleading) Defendant National Beef Packing Company, L.L.C.'s Answer to Plaintiffs' Amended Complaint (Oct. 24, 2003) Original Image of this Document (PDF)

• 2003 WL 24224096 (Trial Pleading) Answer and Affirmative Defenses of Excel Corporation (Oct. 24, 2003) Original Image of this Document (PDF)

• 2003 WL 24224097 (Trial Pleading) IBP, Inc's Answer and Affirmative Defenses to Amended Complaint and Jury Demand (Oct. 24, 2003) Original Image of this Document (PDF)

• 2003 WL 24224139 (Trial Motion, Memorandum and Affidavit) Defendant Swift Beef Company f/k/a Conagra Beef Company's Reply Brief in Support of its Motion to Dismiss Plaintiffs' Amended Complaint (Jun. 19, 2003) Original Image of this Document (PDF)

• 2003 WL 24224096 (Trial Motion, Memorandum and Affidavit) Excel's Reply to Plaintiffs' Opposition to Excel's Motion to Dismiss the Amended Complaint (Jun. 12, 2003) Original Image of this Document (PDF)

• 2003 WL 24224137 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Consolidated Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Amended Complaint (May 27, 2003) Original Image of this Document (PDF)

• 2003 WL 24224136 (Trial Motion, Memorandum and Affidavit) Supplemental Brief in Support of IBP, Inc.'s Motion to Dismiss the Amended Complaint (May 6, 2003) Original Image of this Document (PDF)

• 2003 WL 24224135 (Trial Motion, Memorandum and Affidavit) Defendant, Swift Beef Company f/k/a Conagra Beef Company's Brief in Support of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 13

Not Reported in F.Supp.2d, 2006 WL 47504 (D.S.D.), 69 Fed. R. Evid. Serv. 147
**(Cite as: Not Reported in F.Supp.2d)**

its Motion to Dismiss Plaintiffs' Amended Complaint (May 5, 2003) Original Image of this Document (PDF)

• 2003 WL 24224134 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Excel Corporation's Motion to Dismiss the Amended Complaint (May 1, 2003) Original Image of this Document (PDF)

• 2003 WL 24224094 (Trial Pleading) Amended Complaint and Jury Demand (Apr. 22, 2003) Original Image of this Document (PDF)

• 2003 WL 24224140 (Trial Motion, Memorandum and Affidavit) IBP Inc.'s Brief in Support of its Motion to Sever (Apr. 2, 2003) Original Image of this Document (PDF)

• 2002 WL 32949514 (Trial Motion, Memorandum and Affidavit) Defendant Conagra Beef Company's Reply Brief in Support of its Motion to Dismiss (Dec. 23, 2002) Original Image of this Document (PDF)

• 2002 WL 32949511 (Trial Motion, Memorandum and Affidavit) Excel's Reply to Plaintiffs' Opposition to Excel's Motion to Dismiss (Dec. 20, 2002) Original Image of this Document (PDF)

• 2002 WL 32949512 (Trial Motion, Memorandum and Affidavit) Defendant Farmland National Beef Packing Company, L.P.'s Reply to Plaintiffs' Consolidated Memorandum of Law in Opposition to Defendants' Motion to Dismiss (Dec. 20, 2002) Original Image of this Document (PDF)

• 2002 WL 32949513 (Trial Motion, Memorandum and Affidavit) Defendant Tyson Foods, Inc.'s Reply Brief in Support of its Motion to Dismiss (Dec. 20, 2002) Original Image of this Document (PDF)

• 2002 WL 32949510 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Amended Consolidated Memorandum of Law in Opposition to Defendants' Motions to Dismiss (Dec. 11, 2002) Original Image of this Document (PDF)

• 2002 WL 32949509 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Consolidated Memorandum of Law in Opposition to Defendants' Motions to Dismiss (Nov. 21, 2002) Original Image of this Document (PDF)

• 2002 WL 32949477 (Trial Pleading) Defendant Farmland National Beef Packing Company L.P.'s First Amended Answer to Plaintiffs' Complaint (Sep. 18, 2002) Original Image of this Document (PDF)

• 2002 WL 32949507 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Excel's Motion to Dismiss (Sep. 6, 2002) Original Image of this Document (PDF)

• 2002 WL 32949506 (Trial Motion, Memorandum and Affidavit) Defendant Tyson Foods, Inc.'s Brief in Support of its Motion to Dismiss (Sep. 5, 2002) Original Image of this Document with Appendix (PDF)

• 2002 WL 32949508 (Trial Motion, Memorandum and Affidavit) Defendant Conagra Beef Company's Brief in Support of Motion to Dismiss (Sep. 5, 2002) Original Image of this Document (PDF)

• 2002 WL 32949476 (Trial Pleading) Defendant Farmland National Beef Packing Company L.P.'S Answer to Plaintiffs' Complaint (Sep. 4, 2002) Original Image of this Document (PDF)

• 2002 WL 33831944 () Volume I Deposition (Aug. 30, 2002) Original Image of this Document (PDF)

• 2002 WL 32949475 (Trial Pleading) Complaint and (Jury Demand) (Jul. 1, 2002) Original Image of this Document (PDF)

• 1:02cv01027 (Docket) (Jul. 1, 2002)

• 2002 WL 33832151 (Trial Motion, Memorandum and Affidavit) Trial Motion, Memorandum and Affidavit (2002) Original Image of this Document (PDF)

• 2002 WL 33832181 (Trial Pleading) Amended Complaint and Jury Demand (2002) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4



362 F.Supp.2d 487                                                                                    Page 1

362 F.Supp.2d 487
**(Cite as: 362 F.Supp.2d 487)**

**H**
Briefs and Other Related Documents
Tracinda Corp. v. DaimlerChrysler AGD.Del.,2005.
United States District Court,D. Delaware.
TRACINDA CORPORATION, a Nevada
Corporation, Plaintiff,
v.
DAIMLERCHRYSLER AG, a Federal Republic of
Germany corporation; Daimler-Benz AG, a Federal
Republic of Germany corporation; Jüergen
Schrempp, a citizen of the Federal Republic of
Germany; and Manfred Gentz, a citizen of the
Federal Republic of Germany, Defendants.
**No. CIV.A.00-993-JJF.**

March 30, 2005.

**Background:** Actions were brought against
German automobile manufacturer, alleging
securities violations in connection with acquisition
of American manufacturer. During bench trial,
judgment on several evidentiary objections raised
by the parties was reserved.

**Holdings:** Following trial, the District Court,
Farnan, J., held that:

(1) expert testimony regarding appropriate premium
to be paid in merger transaction was not based on
flawed methodology;

(2) statements made by chief executive officer
(CEO) of German manufacturer that were printed in
newspaper article were not hearsay;

(3) evidence related to a production dispute
between plaintiffs and newspaper was irrelevant;

(4) investment banker documents discussing
possible business combination between the
manufacturers were admissible;

(5) documents prepared by third-party public

relations and research firm were admissible;

(6) notes of meeting discussing merger were
admissible;

(7) failure to include charts in expert report did not
require exclusion of expert testimony; and

(8) plaintiff opened door to testimony concerning
advice given by attorney to American
manufacturer's board.

Ordered accordingly.
West Headnotes
**[1] Evidence 157 ☞555.6(1)**

157 Evidence
    157XII Opinion Evidence
        157XII(D) Examination of Experts
            157k555 Basis of Opinion
                157k555.6 Value
                    157k555.6(1) k. In General. Most
Cited Cases
Expert testimony regarding appropriate premium to
be paid in merger transaction was not based on
flawed methodology, and thus was admissible in
securities action challenging merger of German
automobile manufacturer with American
manufacturer; methodology and analysis used by
expert was a standard regression analysis that had
been used by other academic studies, and German
manufacturer's investment banker employed a
similar analysis in part of its valuation analyses of
the merger. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[2] Evidence 157 ☞555.6(1)**

157 Evidence
    157XII Opinion Evidence
        157XII(D) Examination of Experts
            157k555 Basis of Opinion
                157k555.6 Value

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

362 F.Supp.2d 487                                                                     Page 2

362 F.Supp.2d 487
**(Cite as: 362 F.Supp.2d 487)**

157k555.6(1) k. In General. Most Cited Cases

Expert's failure to consider other relevant factors and the prediction value of his methods used to determine appropriate premium to be paid in merger transaction went to weight to be afforded to expert's opinion in securities action challenging merger, rather than its admissibility. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[3] Evidence 157 ☞555.6(1)**

157 Evidence
    157XII Opinion Evidence
        157XII(D) Examination of Experts
            157k555 Basis of Opinion
                157k555.6 Value
                    157k555.6(1) k. In General. Most Cited Cases

Expert's fairness opinion with regard to merger transaction was admissible in securities action challenging merger of German automobile manufacturer with American manufacturer; expert used standard discounted cash flow analysis according to same procedures he followed in his practice, and his conclusions fell within the range of values produced by investment banks' analysis prepared prior to litigation. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[4] Evidence 157 ☞220(6)**

157 Evidence
    157VII Admissions
        157VII(A) Nature, Form, and Incidents in General
            157k220 Acquiescence or Silence
                157k220(6) k. Failure to Deny or Object to Written Statements in General. Most Cited Cases

**Evidence 157 ☞244(7)**

157 Evidence
    157VII Admissions
        157VII(D) By Agents or Other Representatives
            157k244 Corporate Officers or Agents
                157k244(7) k. Statements by Agents

and Employees in General. Most Cited Cases

Statements made by chief executive officer (CEO) of German automobile manufacturer that were printed in newspaper article were not hearsay and were admissible in securities action challenging merger of German manufacturer with American manufacturer as statements of party opponent, where the CEO adopted the statements. Fed.Rules Evid.Rule 801(d)(2)(B), 28 U.S.C.A.

**[5] Evidence 157 ☞318(1)**

157 Evidence
    157IX Hearsay
        157k315 Statements by Persons Other Than Parties or Witnesses
            157k318 Writings
                157k318(1) k. In General. Most Cited Cases

Although commentary about proposed merger in newspaper article was hearsay in securities action challenging merger of German automobile manufacturer with American manufacturer, article was admissible for the non-hearsay purpose of demonstrating that defendants were aware of the matters reported in it.

**[6] Evidence 157 ☞161.3**

157 Evidence
    157V Best and Secondary Evidence
        157k160 Contents of Writings
            157k161.3 k. Newspapers. Most Cited Cases

Newspaper article containing statements of chief executive officer (CEO) of German automobile manufacturer and commentary about manufacturer's proposed merger with American manufacturer was best evidence of article's contents in action challenging the merger; contents of the article, not recording on which it was based, were at issue. Fed.Rules Evid.Rule 1002, 28 U.S.C.A.

**[7] Evidence 157 ☞355(6)**

157 Evidence
    157X Documentary Evidence
        157X(C) Private Writings and Publications
            157k355 Private Memoranda and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

362 F.Supp.2d 487                                                                                                    Page 3

362 F.Supp.2d 487
**(Cite as: 362 F.Supp.2d 487)**

Statements in General
        157k355(6)    k.    Past    Recollection
Recorded. Most Cited Cases
Newspaper article quoting chief executive officer
(CEO) of German automobile manufacturer was
admissible in securities action challenging German
manufacturer's merger with American manufacturer
as a recorded recollection; interviewer and author of
the article testified that he had no independent
recollection of the article, but that it was written
while the interview was fresh in his mind, that he
had no incentive to misrepresent anything CEO said
to him, and that consistent with his general practice,
he checked his quotes against tape recording of the
interview. Fed.Rules Evid.Rule 803(5), 28 U.S.C.A.

**[8] Evidence 157 ☞355(6)**

157 Evidence
    157X Documentary Evidence
        157X(C) Private Writings and Publications
            157k355    Private    Memoranda    and
Statements in General
                157k355(6)    k.    Past    Recollection
Recorded. Most Cited Cases
For evidence to be admissible as a recorded
recollection, the party offering the evidence must
show that (1) the witness now has insufficient
recollection to enable him to testify fully and
accurately, and (2) the statement was made or
adopted at a time when the subject matter was fresh
in the witness's memory. Fed.Rules Evid.Rule
803(5), 28 U.S.C.A.

**[9] Evidence 157 ☞355(6)**

157 Evidence
    157X Documentary Evidence
        157X(C) Private Writings and Publications
            157k355    Private    Memoranda    and
Statements in General
                157k355(6)    k.    Past    Recollection
Recorded. Most Cited Cases
Rationale behind recorded recollection rule's
requirement that record be read into evidence rather
than admitted as an exhibit is to prevent the trier of
fact from being overly impressed by the writing.
Fed.Rules Evid.Rule 803(5), 28 U.S.C.A.

**[10] Evidence 157 ☞146**

157 Evidence
    157IV Admissibility in General
        157IV(D) Materiality
            157k146    k.    Tendency    to    Mislead    or
Confuse. Most Cited Cases
In the context of a bench trial, evidence should not
be excluded on the grounds that it is unfairly
prejudicial, because the Court is capable of
assessing the probative value of the article and
excluding    any    arguably    improper    inferences.
Fed.Rules Evid.Rule 403, 28 U.S.C.A.

**[11] Securities Regulation 349B ☞60.61**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.60 Evidence
                    349Bk60.61    k.    In    General;
Admissibility. Most Cited Cases
Evidence related to a production dispute between
plaintiffs and newspaper concerning production of
the audio tapes made in connection with interview
of chief executive officer (CEO) of German
automobile manufacturer was irrelevant in securities
action challenging merger of German manufacturer
with American manufacturer; CEO's consent to
production of the audiotape only after being ordered
by court to do so was not probative of defendants'
scienter. Fed.Rules Evid.Rule 401, 28 U.S.C.A.

**[12] Evidence 157 ☞318(8)**

157 Evidence
    157IX Hearsay
        157k315 Statements by Persons Other Than
Parties or Witnesses
            157k318 Writings
                157k318(8)    k.    Pleadings.    Most    Cited
Cases
Pleading of a party unrelated to securities action
challenging merger was inadmissible hearsay in the
securities action.

**[13] Evidence 157 ☞318(1)**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

362 F.Supp.2d 487                                                    Page 4

362 F.Supp.2d 487
**(Cite as: 362 F.Supp.2d 487)**

157 Evidence
   157IX Hearsay
     157k315 Statements by Persons Other Than
Parties or Witnesses
       157k318 Writings
         157k318(1) k. In General. Most Cited
Cases
Investment banker documents discussing possible
business combination between German automobile
manufacturer and American manufacturer had
sufficient guarantees of trustworthiness to be
admissible under the residual hearsay exception in
action challenging the manufacturers' merger;
documents were prepared as a result of discussions
between defendants and various investment
bankers, and German manufacturer's executives
shared and discussed the documents. Fed.Rules
Evid.Rule 807, 28 U.S.C.A.

**[14] Evidence 157 ☞373(1)**

157 Evidence
   157X Documentary Evidence
     157X(D) Production, Authentication, and
Effect
       157k369 Preliminary Evidence for
Authentication
         157k373 Form and Sufficiency in
General
           157k373(1) k. In General. Most
Cited Cases
Investment banker document discussing possible
business combination between German automobile
manufacturer and American manufacturer was
authenticated when defendants produced it in
securities action challenging manufacturers' merger.

**[15] Evidence 157 ☞220(6)**

157 Evidence
   157VII Admissions
     157VII(A) Nature, Form, and Incidents in
General
       157k220 Acquiescence or Silence
         157k220(6) k. Failure to Deny or
Object to Written Statements in General. Most
Cited Cases
Using a document supplied by another represents
the party's intended assertion of the truth contained

in that document. Fed.Rules Evid.Rule
801(d)(2)(B), 28 U.S.C.A.

**[16] Evidence 157 ☞220(6)**

157 Evidence
   157VII Admissions
     157VII(A) Nature, Form, and Incidents in
General
       157k220 Acquiescence or Silence
         157k220(6) k. Failure to Deny or
Object to Written Statements in General. Most
Cited Cases
"Adoptive admission" can be found in the
circumstances where a party forwards a document
to another in response to a request for information
contained in the document. Fed.Rules Evid.Rule
801(d)(2)(B), 28 U.S.C.A.

**[17] Evidence 157 ☞220(6)**

157 Evidence
   157VII Admissions
     157VII(A) Nature, Form, and Incidents in
General
       157k220 Acquiescence or Silence
         157k220(6) k. Failure to Deny or
Object to Written Statements in General. Most
Cited Cases
Document prepared by third-party public relations
and research firm was adoptive admission in
securities action challenging merger of German
automobile manufacturer with American
manufacturer; document was passed on to the
German manufacturer's communications
department, which produced a proposed action
program which incorporated many of the ideas and
issues outlined in the document. Fed.Rules
Evid.Rule 801(d)(2)(B), 28 U.S.C.A.

**[18] Evidence 157 ☞318(1)**

157 Evidence
   157IX Hearsay
     157k315 Statements by Persons Other Than
Parties or Witnesses
       157k318 Writings
         157k318(1) k. In General. Most Cited
Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

362 F.Supp.2d 487                                                                              Page 5

362 F.Supp.2d 487
**(Cite as: 362 F.Supp.2d 487)**

Documents prepared by third-party public relations and research firm, offered to show public's state of mind after the announcement of merger between German automobile manufacturer and American manufacturer, and to demonstrate that defendants were aware of the public's perceptions, were not hearsay in securities action challenging the merger.

**[19] Evidence 157 ☞123(2)**

157 Evidence
  157IV Admissibility in General
    157IV(B) Res Gestae; Excited Utterances
      157k120 Acts and Statements Accompanying or Connected with Transaction or Event
        157k123 After Transaction or Event
          157k123(2) k. Writings. Most Cited Cases

**Evidence 157 ☞268**

157 Evidence
  157VIII Declarations
    157VIII(A) Nature, Form, and Incidents in General
      157k268 k. Statements Showing Physical or Mental Condition; State of Mind. Most Cited Cases
Even if documents prepared by third-party public relations and research firm, offered to show public's state of mind after the announcement of merger between German automobile manufacturer and American manufacturer were hearsay in securities action challenging the merger, they were admissible to demonstrate the present sense impressions or state of mind of the surveyed participants.

**[20] Evidence 157 ☞244(7)**

157 Evidence
  157VII Admissions
    157VII(D) By Agents or Other Representatives
      157k244 Corporate Officers or Agents
        157k244(7) k. Statements by Agents and Employees in General. Most Cited Cases
Meeting notes containing statements made by employees or agents of American automobile

manufacturer and German manufacturer prior to merger were non-hearsay party admissions in action challenging merger.

**[21] Evidence 157 ☞121(1)**

157 Evidence
  157IV Admissibility in General
    157IV(B) Res Gestae; Excited Utterances
      157k120 Acts and Statements Accompanying or Connected with Transaction or Event
        157k121 In General
          157k121(1) k. In General. Most Cited Cases
Three requirements must be met to establish admissibility under present sense impression exception to the hearsay rule: (1) the declarant must have personally perceived the event described, (2) the declaration must be a factual description, and (3) the declaration and the event described must be contemporaneous. Fed.Rules Evid.Rule 803(1), 28 U.S.C.A.

**[22] Evidence 157 ☞123(2)**

157 Evidence
  157IV Admissibility in General
    157IV(B) Res Gestae; Excited Utterances
      157k120 Acts and Statements Accompanying or Connected with Transaction or Event
        157k123 After Transaction or Event
          157k123(2) k. Writings. Most Cited Cases
Notes of what transpired at corporate meeting were admissible under the present sense impression exception to the hearsay rule in securities action challenging merger of German automobile manufacturer with American manufacturer, although note-taker testified that the notes were "filtered" through his thinking; note-taker testified extensively as to his independent recollection of the meetings and conversations reflected in his notes, and did not suggest that his notes were inaccurate, untrustworthy or non-factual. Fed.Rules Evid.Rule 803(1), 28 U.S.C.A.

**[23] Evidence 157 ☞318(1)**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

362 F.Supp.2d 487                                                                    Page 6

362 F.Supp.2d 487
**(Cite as: 362 F.Supp.2d 487)**

157 Evidence
   157IX Hearsay
      157k315 Statements by Persons Other Than
Parties or Witnesses
         157k318 Writings
            157k318(1) k. In General. Most Cited
Cases
Notes of what transpired at corporate meeting were
sufficiently trustworthy to be admissible under the
residual hearsay exception in securities action
challenging merger of German automobile
manufacturer with American manufacturer; notes
were produced by American manufacturer's
working groups in connection with meetings held
by German manufacturer, and note-taker testified
that he maintained these notes in his own work
record and would have sent them to general
corporate files if he had not been concerned with
maintaining the secrecy of the merger negotiations.

**[24] Evidence 157 ☞244(7)**

157 Evidence
   157VII Admissions
      157VII(D) By Agents or Other
Representatives
         157k244 Corporate Officers or Agents
            157k244(7) k. Statements by Agents
and Employees in General. Most Cited Cases
Alleged statement made by chief executive officer
(CEO) of German automobile manufacturer to third
party was nonhearsay admission of party opponent
in securities action challenging merger of German
manufacturer with American manufacturer.
Fed.Rules Evid.Rule 801(d)(2)(A), 28 U.S.C.A.

**[25] Evidence 157 ☞244(7)**

157 Evidence
   157VII Admissions
      157VII(D) By Agents or Other
Representatives
         157k244 Corporate Officers or Agents
            157k244(7) k. Statements by Agents
and Employees in General. Most Cited Cases
Automobile manufacturer's former employment of
declarant, and separation agreement that prohibited
declarant from speaking negatively about the
manufacturer, made declarant an agent of the

manufacturer for purposes of hearsay exception for
statements made by a party's agent. Fed.Rules
Evid.Rule 801(d)(2)(D), 28 U.S.C.A.

**[26] Evidence 157 ☞575**

157 Evidence
   157XIII Evidence at Former Trial or in Other
Proceeding
      157k575 k. Grounds for Admission in
General. Most Cited Cases
Unavailable witness' deposition testimony was
sufficiently reliable to be admissible as former
testimony in securities action challenging merger of
German automobile manufacturer with American
manufacturer; testimony was given under oath, and
defendants had opportunity to challenge the
testimony. Fed.Rules Evid.Rule 804(b)(1), 28
U.S.C.A.

**[27] Witnesses 410 ☞37(2)**

410 Witnesses
   410II Competency
      410II(A) Capacity and Qualifications in
General
         410k37 Knowledge or Means of
Knowledge of Facts
            410k37(2) k. Source of Knowledge.
Most Cited Cases
Witness' 34 years of working with shareholder, his
testimony that he knew shareholder's working style
and business practices, and his personal awareness
of shareholder's views about automobile
manufacturer's management as a result of his
discussions with him provided adequate foundation
for witness' statement that shareholder was happy
with manufacturer's management.

**[28] Evidence 157 ☞244(7)**

157 Evidence
   157VII Admissions
      157VII(D) By Agents or Other
Representatives
         157k244 Corporate Officers or Agents
            157k244(7) k. Statements by Agents
and Employees in General. Most Cited Cases
Statements made by chief executive officer (CEO)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

362 F.Supp.2d 487                                                                                   Page 7

362 F.Supp.2d 487
**(Cite as: 362 F.Supp.2d 487)**

of American automobile manufacturer prior to its merger with German manufacturer qualified as admissions of successor corporation formed as result of merger. Fed.Rules Evid.Rule 801(d)(2), 28 U.S.C.A.

**[29] Federal Civil Procedure 170A ☜1278**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1278 k. Failure to Respond; Sanctions. Most Cited Cases
Plaintiff's failure to include book on its exhibit list did not preclude book's admission at trial, where plaintiff amended its exhibit list prior to the filing of opening briefs, and defendants suffered no undue prejudice as a result of plaintiff's delay in adding the book to its final exhibit list.

**[30] Witnesses 410 ☜379(4.1)**

410 Witnesses
    410IV Credibility and Impeachment
        410IV(D) Inconsistent Statements by Witness
            410k379 Inconsistency of Statements as Ground of Impeachment in General
                410k379(4) Written Statements or Instruments
                    410k379(4.1) k. In General. Most Cited Cases
Excerpts of book authored by witness were admissible as prior inconsistent statements, and could be used to impeach witness' testimony at trial. Fed.Rules Evid.Rule 613(b), 28 U.S.C.A.

**[31] Federal Civil Procedure 170A ☜1274**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1272 Scope
                170Ak1274 k. Evidentiary Matters. Most Cited Cases
The purpose of the initial disclosures provided for in expert report is to prevent a party from being unfairly surprised by the presentation of new evidence. Fed.Rules Civ.Proc.Rule 26, 28 U.S.C.A.

**[32] Federal Civil Procedure 170A ☜1278**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1278 k. Failure to Respond; Sanctions. Most Cited Cases
In determining whether to exclude evidence as sanction for failing to disclose witness, the court should consider such factors as: (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the court's order. Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A.

**[33] Federal Civil Procedure 170A ☜1278**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1278 k. Failure to Respond; Sanctions. Most Cited Cases
Defendants' failure to disclose chart including recent transactions used by expert witness to conclude that merger transaction was not unfair to shareholders did not require exclusion of expert's testimony as sanction in securities action challenging merger of German automobile manufacturer with American manufacturer; expert's report was not materially changed by use of additional, newer transactions, because those additions changed nothing regarding his underlying analysis and only served to make the report more current. Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A.

**[34] Federal Civil Procedure 170A ☜1278**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1278 k. Failure to Respond; Sanctions. Most Cited Cases
Plaintiff in action challenging merger was not prejudiced by use of undisclosed chart by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

362 F.Supp.2d 487                                                                                          Page 8

362 F.Supp.2d 487
**(Cite as: 362 F.Supp.2d 487)**

defendants' expert to explain flaws in share value calculation of plaintiff's expert; prior to expert's testimony, plaintiff produced exhibit that compared numbers generated by expert's correct share value calculations with the alternative numbers plaintiff calculated.

**[35] Federal Civil Procedure 170A** ☜1278

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1278 k. Failure to Respond; Sanctions. Most Cited Cases
Testimony by defense expert regarding three previously undisclosed tests he ran on data of plaintiff's expert to demonstrate its inaccuracy did not unduly surprise or prejudice plaintiff in action challenging merger; data underlying defense expert's testimony was either produced to plaintiff before trial or included in report of plaintiff's expert.

**[36] Federal Civil Procedure 170A** ☜1278

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1278 k. Failure to Respond; Sanctions. Most Cited Cases
Charts prepared by defense expert during recess containing data from regression analysis performed by plaintiff's expert were within scope of opinions made in expert's report regarding lack of predictive value of regression model used by plaintiff's expert; defense expert did not have the idea to make the charts until he reviewed testimony of plaintiff's expert, and charts were not created in bad faith to impede plaintiff's ability to confirm the analysis they contained.

**[37] Federal Civil Procedure 170A** ☜1278

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1278 k. Failure to Respond; Sanctions. Most Cited Cases
Chart of changes in corporation's board of directors following merger prepared by defense expert in

action challenging merger were consistent with the opinions contained in expert report and did not reflect a material change in expert's opinion; although chart was not based on same data that expert used in his report, he did not change his conclusion that changes in the board after the merger were consistent with characterization of the merger as a "merger of equals."

**[38] Federal Civil Procedure 170A** ☜1451

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(C) Depositions of Parties and Others Pending Action
            170AX(C)6 Failure to Appear or Testify; Sanctions
                170Ak1451 k. In General. Most Cited Cases
Failure of defendants to designate deposition testimony of plaintiff's expert did not preclude them from using the deposition at trial, where plaintiff did not inform defendants of its intention not to call the expert until after the deposition deadline passed.

**[39] Evidence 157** ☜268

157 Evidence
    157VIII Declarations
        157VIII(A) Nature, Form, and Incidents in General
            157k268 k. Statements Showing Physical or Mental Condition; State of Mind. Most Cited Cases
Shareholder's statement to third-party about acceptable merger premium was admissible under state of mind exception to hearsay rule in action challenging the merger. Fed.Rules Evid.Rule 803(3), 28 U.S.C.A.

**[40] Evidence 157** ☜268

157 Evidence
    157VIII Declarations
        157VIII(A) Nature, Form, and Incidents in General
            157k268 k. Statements Showing Physical or Mental Condition; State of Mind. Most Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

362 F.Supp.2d 487
**(Cite as: 362 F.Supp.2d 487)**

Testimony about what declarant said about shareholder's views on size of acceptable merger premium in connection with proposed merger was not hearsay in action challenging the merger; testimony was offered to show plaintiff's enthusiasm for the merger before learning about any corporate governance terms and its potential fear that too high a premium would preclude the transaction from being completed.

**[41] Witnesses 410 ☞198(1)**

410 Witnesses
  410II Competency
    410II(D)  Confidential  Relations  and Privileged Communications
      410k197 Communications to or Advice by Attorney or Counsel
        410k198 In General
          410k198(1) k. In General. Most Cited Cases
The attorney client privilege should not be used as both a sword and a shield.

**[42] Witnesses 410 ☞219(3)**

410 Witnesses
  410II Competency
    410II(D)  Confidential  Relations  and Privileged Communications
      410k219 Waiver of Privilege
        410k219(3) k. Communications to or Advice by Attorney or Counsel. Most Cited Cases
Plaintiff in action challenging merger opened door to testimony concerning advice given by attorney to corporation's board, permitting defendants to use attorney's testimony about that advice defensively to complete the record after they invoked attorney-client privilege, where plaintiff's use of attorney's opinion when questioning two witnesses was incomplete and misleading, because it did not include her reasons for her statement that the transaction did not involve a change of control.

**\*492** A. Glichrist Sparks, III, Esquire, Alan J. Stone , Esquire, and Natalie J. Watson, **\*493** Esquire of Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Of Counsel: Terry N. Christensen, Esquire, Mark

G. Krum, Esquire and Eric P. Early of Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP, Los Angeles, CA, William G. McGuinness, Esquire and Julie E. Kamps, Esquire of Fried, Frank, Harris, Shriver & Jacobson, New York, NY, for Plaintiff Tracinda Corporation.
Thomas J. Allingham II, Esquire, and Robert S. Saunders, Esquire, of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, DE. Of Counsel: Jonathan J. Lerner, Esquire, Lea Haber Kuck, Esquire and Joseph N. Sacca, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, for Defendants DaimlerChrysler AG, Daimler-Benz AG, Jüergen Schrempp and Manfred Gentz.

**MEMORANDUM OPINION ON
EVIDENTIARY ISSUES**
FARNAN, District Judge.
During the course of the bench trial in the above-captioned action, the Court reserved judgment on several evidentiary objections raised by the parties. The parties have briefed their respective positions, and this Memorandum Opinion constitutes the Court's rulings with regard to the pending evidentiary matters.

**I. DEFENDANTS' POST-TRIAL
EVIDENTIARY OBJECTIONS**

A. *Motion To Exclude Testimony And Reports Of
Tracinda's Experts, Professor William L. Silber
And H. Conrad Meyer, III,*

Defendants contend that the testimony of Tracinda's expert witnesses, Professor William L. Silber and H. Conrad Meyer, III, should be excluded under Federal Rule of Evidence 702. With regard to Silber, Defendants contend that Silber's opinion and underlying methodology are flawed. Defendants contend that Silber's methodology of using the allocation of board seats to determine the appropriate premium to be paid violates the basic statistical principle that correlation is not tantamount to causation and ignores other factors that go into the negotiation of a premium in a business combination. Defendants contend that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

362 F.Supp.2d 487                                                                                          Page 10

362 F.Supp.2d 487
**(Cite as: 362 F.Supp.2d 487)**

Silber's methodology is demonstrably unreliable, because it failed to accurately predict the premiums paid in sample transactions to which his methodology is applied. Defendants also point out that Silber himself testified that his model could only predict a premium within 20% of the actual premium and that it could only be that accurate two-thirds of the time, meaning that one-third of the time actual results would vary by more than 20% from a predication made based on Silber's model. Silber Tr. Vol. E 1120:15-24.

As for the opinion of H. Conrad Meyer, III, Defendants contend that Meyer's fairness opinion is flawed, because it (1) ignored the analysis of Credit Suisse First Boston ("CSFB"), (2) ignored the alternative discounted cash flow ("DCF") analysis of CSFB which included consideration of adverse risk factors like a downturn in the automotive industry, (3) included transactions which were not comparable to the Chrysler/Daimler-Benz Merger, and (4) failed to include other factors like whether Daimler-Benz was willing to pay more than it actually paid. Defendants also point out that Meyer never spoke with Tracinda's Jim Aljian or Jerry York to find out if they believed the risks identified in the CSFB analysis were likely to materialize. Defendants further point out that Meyer's analysis was prepared for litigation, and thus inherently more unreliable than CSFB's fairness opinion.

**\*494** The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,*

509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court directed the district courts to perform a "gatekeeping" function in determining the reliability of expert testimony. In this regard, courts should flexibly consider a number of factors, including but not limited to: (1) whether the theory or technique has been tested; (2) whether the technique or theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the general acceptance of the theory; (5) whether the method consists of a testable hypothesis; (6) the existence and maintenance of standards controlling the technique's operation; (7) the relationship of the technique to methods which have been established to be reliable; (8) the qualifications of the expert witness testifying based on the methodology; and (9) the non-judicial uses to which the methodology has been put. *Daubert,* 509 U.S. at 593-594, 113 S.Ct. 2786 (setting forth first four factors listed above); *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 742 n. 8 (3d Cir.1994) (identifying other relevant factors). In applying these factors, the court must " solely focus on the principles and methodology, not on the conclusions they generate." *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786.

[1] Considering these factors in light of the testimony of Silber and Meyer, the Court concludes that the testimony of Silber and Meyer is admissible. Silber's qualifications have not been challenged, and the methodology and analysis used by Silber is a standard regression analysis that has been used by other academic studies. Silber Tr. Vol. E 1115:21-1116:19. In addition, Defendants' investment banker, Goldman Sachs, employed a similar analysis in part of its valuation analyses of the Merger. PX 845. As such, this analysis was used in negotiating the Merger, prior to any talk of litigation. Thus, Silber's analysis has been used by others outside the context of litigation, and his methods have been subject to publication.

[2] Defendants' arguments concerning Silber's failure to consider other relevant factors and the prediction value of his methods in light of these other factors were appropriately discussed on cross-examination and go to the weight to be afforded to Silber's opinion. *See Matlin v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

362 F.Supp.2d 487
**(Cite as: 362 F.Supp.2d 487)**

*Langkow,* 65 Fed.Appx. 373, 384 (3d Cir.2003) (unpublished opinion) (admitting expert testimony where defendant's arguments concerned weight of the testimony rather than admissibility). Accordingly, the Court will deny Defendants' motion to exclude Silber's expert testimony.

[3] Similarly, the Court concludes that Defendants have not raised a valid challenge to the admissibility of Meyer's testimony. Defendants have not challenged Meyer's qualifications, and Meyer's analysis employed a standard DCF analyses according to the same procedures he follows in his practice. Meyer Tr. 919:18-920:2; PX 715 at 2,3. Meyer's conclusions also fell within the range of values produced by the CSFB and Goldman Sachs **495** analysis, both of which were prepared prior to any litigation. *Compare* PX 715 at Exh. II, 15 *with* PX 141 at CSFB-DC001612 and PX 277 at SC0000666. Whether Meyer's analysis appropriately considered certain factors like the analysis of CSFB, the risk of a downturn in the automotive industry, Daimler-Benz's willingness to pay more, and the views of Tracinda's executives, Jim Aljian and Jerry York, all go to the weight to be afforded to Meyer's opinions. Similarly, Defendants other criticisms that Meyer did not use comparable precedent transactions and improperly combined his comparable company analysis with his precedent transaction analysis also go to the weight to be afforded to Meyer's testimony. *See, e.g., Matlin,* 65 Fed.Appx. at 384. Accordingly, the Court will deny Defendant's motion to exclude the testimony of Meyer.

B. *The Financial Times Article Dated October 30, 2000 (PXs 601, 605)*

Defendants next contend that *The Financial Times* article dated October 30, 2000, is inadmissible hearsay, and does not fall within an exception to the hearsay rule. In addition, Defendants contend that the article violates the best evidence rule. In this regard, Defendants contend that the audio tape of Schrempp's interview with *The Financial Times* is the best evidence.

Tracinda contends that *The Financial Times* article

is not hearsay, because it constitutes an adoptive admission of a party-opponent under Federal Rule of Evidence 801(d)(2)(B), and apart from being offered for the truth of the matter asserted, the article was also offered to show (1) its affect on those who read it, and (2) that Defendants were aware of the article, but took no action to clarify it. Tracinda also contends that Federal Rule of Evidence 803(3) applies, because Schrempp's out-of-court statements to *The Financial Times* interviewer are admissible evidence of his state of mind.

[4][5] Schrempp adopted the statements he made during the interview that were printed in *The Financial Times* article. Schrempp Tr. Vol. G 1374:12-20. As such, those statements are not hearsay, but are admissions of a party opponent under Rule 801(d)(2)(B).[FN1] However, the article itself contains commentary beyond Schrempp's actual statements, and therefore, the article itself is hearsay. *See, e.g., Wright v. Montgomery County,* 2002 WL 1060528, *1 (E.D.Pa. May 20, 2002). T he Court is not persuaded that Defendants adopted the commentary in the article or the conclusions reached by the reporter, and therefore, the remaining text of the article itself does not constitute an admission of a party opponent. The article is **496** admissible, however, for the non-hearsay purpose of demonstrating that Defendants were aware of the matters reported therein. *See, e.g., Parham v. Johnson,* 126 F.3d 454, 460 (3d Cir.1997); *Blue Cross v. SmithKline Beecham Clinical Labs., Inc.,* 108 F.Supp.2d 116, 123 (D.Conn.2000).

FN1. In pertinent part Rule 801(d) provides:
(d) Statements which are not hearsay. A statement is not hearsay if-
* * * * * *
(2) Admission by party-opponent. The statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

362 F.Supp.2d 487
**(Cite as: 362 F.Supp.2d 487)**

authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy. The contents of the statement shall be considered but are not alone sufficient to establish the declarant's authority under subdivision (C), the agency or employment relationship and scope thereof under subdivision (D), or the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered under subdivision (E).
Fed.R.Evid. 801(d)(2).

[6] The Court is also not persuaded that the best evidence rule precludes admissibility of the article. Federal Rule of Evidence 1002 provides that "to prove the content of a writing, recording or photograph the original writing, recording or photograph is required, except as otherwise provided in these rules or by Act of Congress." In this case, the contents of the article, not the recording, are at issue, and therefore, the article itself is the best evidence of its contents. *See United States v. Gonzales-Benitez,* 537 F.2d 1051, 1053 (9th Cir.1976) (holding that best evidence rule did not preclude use of witness testimony relating substance of conversation despite existence of tape-recording); *see also United States v. Howard,* 953 F.2d 610, 612 (11th Cir.1992) ("Since the proffered testimony was offered not to prove the content of the tapes, but rather, the content of the conversations, the best evidence rule does not apply, and [witness'] testimonial recollection of the conversation was properly admitted.' ") (citing *Gonzales-Benitez,* 537 F.2d at 1051). Accordingly, the Court will overrule Defendants' objections to the admissibility of *The Financial Times* article.

C. *Barron's Article (PX 615) Dated November 6, 2000*

[7] Defendants object to the admissibility of the *Barron's* article on the same grounds advanced with respect to *The Financial Times* article. Defendants point out that unlike *The Financial Times* article which Schrempp admitted accurately quoted him, Schrempp was unable to recall whether he made the statements attributed to him in the *Barron's* article.

Tracinda contends that this article is not hearsay, but an admission of a party-opponent. Tracinda contends that even if the article is hearsay, it is admissible under Rule 803(3) as evidence of Schrempp's state of mind and under Rule 803(5) as a recorded recollection.

The Court concludes that the *Barron's* article is admissible to prove Schrempp's statements as a recorded recollection under Federal Rule of Evidence 803(5). In pertinent part, Rule 803(5) provides:
Recorded recollection. A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in his memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

[8] To satisfy the requirements of Rule 803(5), the party offering the evidence must show that (1) the witness now has insufficient recollection to enable him to testify fully and accurately; and (2) the statement was made or adopted at a time when the subject matter was fresh in the witness's memory. *Zenith Radio Corp. v. Matsushita Elec. Ind. Co.,* 505 F.Supp. 1190, 1228-1229 n. 48 (E.D.Pa.1980).

During his deposition, the interviewer and author of the *Barron's* article, Jay D. Palmer, testified that he had no independent recollection of the article, but that the article was written while the interview was fresh in his mind. Palmer also testified that he had no incentive to misrepresent anything Schrempp said to him and that **\*497** consistent with his general practice, he checked his quotes against a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

362 F.Supp.2d 487
**(Cite as: 362 F.Supp.2d 487)**

tape recording of the interview so that it correctly reflected Schrempp's statements.[FN2] Palmer Dep. 41:22-42:25; 58:11-59:15, 61:5-17, 66:4-23, 79:20-80:4.

> FN2. The tape recording of this interview was lost when the Barron's offices were abandoned after the September 11, 2001 terrorist attacks on the World Trade Center. Palmer Dep. 71:11-72:10.

Defendants direct the Court to several cases for the proposition that media articles are hearsay when they are used to prove the truth of their contents. In those cases, however, the courts specifically noted that the articles' authors were unavailable for cross-examination, and no exception to the hearsay rule applied. *Wright v. Montgomery County,* 2002 WL 1060528 (E.D.Pa. May 20, 2002); *Barnes Found. v. Township of Lower Merion,* 982 F.Supp. 970, 995-996 (E.D.Pa.1997). In this case, however, the article's author was deposed and subject to cross-examination, and the requirements of the recorded recollection exception to the hearsay rule have been satisfied.

Defendants also contend that the recorded recollection exception does not apply, because there is no evidence that Schrempp "made or adopted" the article. That Schrempp made or adopted the article is not a requirement for the recorded recollection exception. The article is Palmer's statement and it is his recorded recollection of what Schrempp said to him.

[9] Defendants further contend that the article cannot be admitted into evidence, because it was not "offered by an adverse party." Defendants construe this to mean that Tracinda is not an adverse party to the declarant, Palmer. However, Defendants cite no case law to support their position that the reference to "adverse party" means adverse to the declarant, and the Court has not been able to locate any case law substantiating Defendants' argument. Further, the rationale behind the rule's requirement that the article be read into evidence rather than admitted as an exhibit is to prevent the trier of fact from being overly impressed

by the writing. *See, e.g., U.S. v. Judon,* 567 F.2d 1289, 1294 (5th Cir.1978) (citing 11 J. Moore, *Federal Practice* § 803(5)(5) (1976)). Because this action was tried as a bench trial, the Court is persuaded that this rationale is inapplicable. Accordingly, in these circumstances, the Court concludes that the article is properly admitted as a recorded recollection of Schrempp's statements, and therefore Defendants' hearsay objection to the admissibility of the *Barron* 's article to prove Schrempp's statements will be overruled.[FN3]

> FN3. Tracinda does not offer the Barron's article for any non-hearsay purposes as it did with the *Financial Times* article. Accordingly, the article is only admitted as a recorded recollection of Schrempp's statements, and to the extent that the article contains any out-of-court commentary by Palmer, it is inadmissible hearsay.

[10] Likewise, the Court will overrule Defendant's Rule 403 objection that the article is unduly prejudicial. Courts have recognized that in the context of a bench trial, evidence should not be excluded under Rule 403 on the grounds that it is unfairly prejudicial, because the Court is capable of assessing the probative value of the article and excluding any arguably improper inferences. *See, e.g., Schultz v. Butcher,* 24 F.3d 626, 632 (4th Cir.1994); *Gulf States Utils. Co. v. Ecodyne Corp.,* 635 F.2d 517, 519 (5th Cir.1981); *see also Bic Corp. v. Far Eastern Source Corp.,* 23 Fed.Appx. 36, 39 (2d Cir.2001). Accordingly, the Court will overrule Defendants' **\*498** Rule 403 objection to the admissibility of the *Barron* 's article.

*D. Documents Relating To The Production Dispute Between Plaintiffs And The Financial Times Over Production Of The October 2000 Financial Times Interview Audiotape*

[11] Defendants object to the admission of evidence related to a production dispute between Plaintiffs and *The Financial Times* concerning the production of the audio tapes made in connection with Schrempp's October 2000 interview. Specifically,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

362 F.Supp.2d 487                                                    Page 14

362 F.Supp.2d 487
**(Cite as: 362 F.Supp.2d 487)**

the evidence referred to consists of the opinion of the British court regarding that dispute and the letter from Defendants' counsel to counsel for *The Financial Times* regarding its production of an off-the-record portion of the taped interview. Defendants contend that this evidence pertains to a collateral dispute and is irrelevant. Defendants also contend that the opinion of Master Yoxall stating that Defendants' behavior was "repugnant" in refusing to consent to the production of unredacted audiotapes is hearsay.

Tracinda contends that this evidence is relevant under Rule 401, because "Defendants' resistance to the production of the unredacted *Financial Times* audiotape has a tendency to make more probable the fact of Defendants' scienter and the fact of the reckless or malicious nature of Defendants' behavior." D.I. 1058 at 30. Tracinda contends that Master Yoxall's opinion is not hearsay, because it is not offered for the truth of the matter asserted, i.e. that Defendants' behavior was in fact repugnant, but "for the limited purpose of establishing the fact that it was said, i.e. that Master Yoxall found Defendants' behavior repugnant." *Id.* at 31.

Reviewing the evidence in question under the standards for admissibility, the Court concludes that this evidence is irrelevant to the issues presented in this case. Production disputes are a common part of litigation, and it is not extraordinary for a party to resist the production of documents it believes to be unwarranted. In this case, the Special Master ordered Schrempp to consent to the production of the interview's audiotape and Schrempp did so, but his lawyers reserved the right to proceed against *The Financial Times.* The Court does not believe this reservation of rights is evidence probative of Defendants' scienter insofar as it pertains to the claims raised in this litigation.

Similarly, the Court does not find the opinion of the British court as to Defendants' conduct with respect to this collateral evidentiary dispute to be probative or relevant with respect to the issues in this case. Further, as Defendants point out, they were not made a party to the dispute in the British court and did not have an opportunity to be heard there. Accordingly, the Court concludes that the

connection Tracinda seeks to draw between the proffered evidence and Defendants' scienter is tangential and irrelevant. Accordingly, the Court will sustain Defendants' objection to the admissibility of this evidence.

E. *Complaint in Glickenhaus v. DaimlerChrysler AG (PX 669)*

[12] Defendants next contend that the complaint in *Glickenhaus v. DaimlerChrysler AG,* Civ. Act. No. 01-004 (D. Del. Filed Jan. 3, 2001) should not be admitted into evidence, because it is irrelevant. In addition, Defendants contend that the *Glickenhaus* complaint constitutes inadmissible hearsay.

Tracinda contends that paragraph 22 of the *Glickenhaus* complaint, which states that Gentz was in New York on business on April 22, 1998, is relevant to establish Gentz's contacts with the United States for purposes of proving that the Court has **\*499** personal jurisdiction over Defendant Gentz. Tracinda also contends that the complaint is not hearsay, because Paragraph 22 was adopted under oath by James Glickenhaus who testified that he and his father were responsible for drafting the complaint and that Paragraph 22 was accurate.

Evaluating the admissibility of the *Glickenhaus* complaint in light of the parties' arguments and the applicable law, the Court concludes that the complaint is irrelevant and inadmissible hearsay. *United States v. Pelullo,* 964 F.2d 193, 199 (3d Cir.1992). The *Glickenhaus* and class actions were consolidated with this action for pre-trial and discovery purposes, but not for trial. The *Glickenhaus* action was settled and dismissed by the parties on September 4, 2003. Because the allegations in the complaint are a pleading of a party unrelated to the instant litigation, the Court cannot accept them for the truth of the matters they assert. *See, e.g., In re Brand Name Prescription Drugs Antitrust Litig.,* 1997 WL 201614, \*4 (N.D.Ill. Apr.8, 1997) (declining to accept as true allegations in complaint made in separate case); *T.I. Const. Co. v. Kiewit Eastern Co.,* 1992 WL 382306, \*4 (E.D.Pa. Dec.10, 1992) ("Complaints, and the charges and allegations they contain, are

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

362 F.Supp.2d 487
**(Cite as: 362 F.Supp.2d 487)**

hearsay under the Federal Rules of Evidence.”). Accordingly, the Court will sustain Defendants' objection to the admissibility of the *Glickenhaus* complaint.

### F. *Documents Authored By Third-Parties Regarding A Possible Business Combination Between Chrysler And Daimler-Benz*

Defendants next challenge the admissibility of certain investment banker documents, specifically, the Lehman Brothers analysis (PXs 35, 37), the Project Dutch Boy analysis by TransAtlantic Consulting (PX 26-32, 34, 36) and the Goldman Sachs “Project Blitz” Analysis (PXs 4, 33, 544, 45). Defendants contend that all three of these documents are irrelevant, because they do not pertain to the Merger at issue. Defendants also contend that these documents are hearsay, because they are offered by Tracinda to prove the truth of the matters discussed in the documents, i.e. that Defendants considered an acquisition of Chrysler. Defendants further contend that no hearsay exception applies. Specifically, Defendants contend that the documents are not admissions, because (1) they were prepared by third parties over whom Defendants exercised no control, (2) some of the documents like those prepared by Lehman Brothers and TransAtlantic were unsolicited, and (3) Defendants never adopted the documents. Defendants also contend that Tracinda has not established any of the requirements of demonstrating the business records exception, and the documents are not relevant under the state of mind exception, because they were prepared by a third party and not adopted by Defendants. In addition to their hearsay objection, Defendants also object to the Project Dutch Boy analysis on the grounds that the document has never been authenticated.

Tracinda contends that these documents are admissible as vicarious admissions under Rule 801(d)(2)(D), authorized admissions under Rule 801(d)(2)(C) and adoptive admissions under Rule 801(d)(2)(B). Tracinda also contends that the residual hearsay exception under Rule 807 applies.

#### 1. Whether the Investment Banker documents are hearsay

[13] The Court will admit the Investment Banker Documents under the residual hearsay exception provided in Rule 807. The Investment Banker Documents have sufficient guarantees of trustworthiness. In many instances, they were prepared, if **\*500** not by the express request of Defendants, as a result of discussions between Defendants and various investment bankers. In addition, Tracinda has advanced evidence that executives at Daimler-Benz shared and discussed these documents, which also supports their trustworthiness. The Court finds that these documents are also more probative on the point for which they are offered than any other evidence readily procurable by Tracinda, and the Court is persuaded that the interests of justice are served by the admission of these documents. Accordingly, the Court will overrule Defendants' hearsay objection to the Investment Banker Documents.

#### 2. Whether the Investment Banker documents have been authenticated

[14] As for the authentication question raised by Defendants in connection with PX 26, 27, 28, the Court will overrule that objection, as well. With respect to PX 26, the Court is persuaded that authentication has been established by the fact that Defendants produced the document. *See, e.g., McQueeney v. Wilmington Trust Co.,* 779 F.2d 916, 929 (3d Cir.1985) (holding that documents were authenticated when they were produced by the party against whom they were offered, even though testimonial evidence did not provide necessary foundation for authentication); *John Paul Mitchell Systems v. Quality King Distributors,* 106 F.Supp.2d 462, 472 (S.D.N.Y.2000) (recognizing that the act of production implicitly authenticated the documents). Defendants admit PX 27 is identical to PX 26, and therefore, that document is also authenticated. *See, e.g., Richardson Greenshields Sec., Inc. v. Lau,* 651 F.Supp. 929, 931 (S.D.N.Y.1986) (admitting documents that were nearly identical to those already authenticated). Lastly, PX 28 is a chart form

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

362 F.Supp.2d 487                                                                                    Page 16

362 F.Supp.2d 487
**(Cite as: 362 F.Supp.2d 487)**

summary of the contents of PX 26 and 27, and therefore, that document can also be authenticated by comparison to PX 26 and 27. *Id.* Accordingly, the Court will overrule Defendants' objection to PX 26-28 on authentication grounds.

### G. *Materials From Third-Party Public Relations/Research Firms (PXs 202, 265, 409, 425, 818, 880)*

Defendants next object to materials from third-party public relations and research firms. PXs 202, 265, 409 and 818 are materials provided to Chrysler from Peter D. Hart Research Associates, Inc. ("Hart "), and PXs 425 and 880 are identical documents provided to DaimlerChrysler by Bell Pottinger International ("Bell Pottinger"). Defendants contend that these documents are hearsay, and there is no evidence that Defendants authorized Hart or Bell Pottinger to speak for them as to the matters discussed in these documents.

[15][16][17] The Court concludes that the Bell Pottinger documents are admissible as an adoptive admission under Rule 801(d)(2)(B). "Adoption can be manifested by any appropriate means, such as language, conduct, or silence." *Horvath v. Rimtec Corp.,* 102 F.Supp.2d 219, 223 n. 3 (D.N.J.2000). Using a document supplied by another represents the party's intended assertion of the truth contained in that document. *Penguin Books U.S.A. Inc. v. New Christian Church of Full Endeavor,* 262 F.Supp.2d 251, 259 (S.D.N.Y.2003). An adoptive admission can be found in the circumstances where a party forwards a document to another in response to a request for information contained in the document. *Id.* In this case, Schrempp testified that PX 425 was passed on to the DaimlerChrysler communications department. Schrempp Dep. 353:2-11. The communications department then produced **\*501** a Proposed Action Program which incorporated many of the ideas and issues outlined in the Bell Pottinger document. *Compare* PX 425 *with* PX 439. Because Defendants adopted the statements in the Bell Pottinger document, the Court will overrule Defendants' hearsay objection to the admissibility of that document.

[18][19] With regard to the Hart studies, the Court concludes that those studies are not hearsay, because they are not offered for the truth of the matters asserted in them. Tracinda offers the Hart studies to show the public's state of mind after the announcement of the Merger and to demonstrate that Defendants were aware of the public's perceptions. *See, e.g., Pittsburgh Press Club v. United States,* 579 F.2d 751, 757-758 (3d Cir.1978) (recognizing that some polls are not hearsay because they are admitted to show the beliefs or attitudes of the respondent, or they fall within hearsay exceptions). Further, even if the Hart studies are considered hearsay, they are admissible to demonstrate the present sense impressions or state of mind of the surveyed participants. *Id.* at 757-758; *see also Schering Corp. v. Pfizer Inc.,* 189 F.3d 218, 225 (2d Cir.1999); *Zippo Mfg. Co. v. Rogers Imports, Inc.,* 216 F.Supp. 670, 683-684 (S.D.N.Y.1963). Accordingly, the Court will overrule Defendants' objection to the materials from the third-party public relations and research firms.

### H. *Notes Authored By Gary Valade (PXs 980-982, 984-988, 990, 992-998, 1004-1005, 1012, DX 828)*

Defendants next object to certain portions of the notes authored by Gary Valade. Defendants contend that the notes are hearsay, and they do not fall within any of the hearsay exceptions. Because Valade testified that he was not an official secretary at the meeting and his notes were "filtered through his thinking," Defendants contend that the notes do not qualify as a present sense impression. Defendants also contend that certain documents containing Valade's notes are not admissible, because the underlying text which Tracinda seeks to admit was not created by Valade. Defendants contend that these documents do not satisfy the business record exception, because Valade did not author or participate in the discussions reflected in the type written documents. Defendants also contend that other portions of the Valade notes are inadmissible, because Plaintiffs did not question any witnesses about those notes, and thus laid no foundation for their admissibility.

Tracinda contends that it is inappropriate for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

362 F.Supp.2d 487
**(Cite as: 362 F.Supp.2d 487)**

Defendants to challenge the admissibility of the notes on the basis of whether they were discussed by any witnesses at trial, because Defendants produced the notes the night before the last day of trial. As a result, Tracinda was unable to redepose Valade or any of the other witnesses implicated by the notes, and therefore, Tracinda could not test the statements in the notes and Valade's explanation of the meaning of the notes offered on direct examination.

[20] The Court concludes that the Valade notes are admissible. First, the statements in the notes made by Defendants, Valade and/or other employees or agents of Chrysler Corporation and Defendants constitute non-hearsay party admissions of Defendants. *See Sherif v. AstraZeneca,* 2002 WL 3235023, at *2–*3 (E.D.Pa. May 9, 2002) (holding that statements of employees/agents of predecessor company that were merged into defendant corporation prior to the merger were admissible as non-hearsay party admissions of defendant corporation).

**\*502** [21][22] In addition, the Court concludes that the notes are admissible under the present sense impression exception to the hearsay rule. Three requirements must be met to establish admissibility under Rule 803(1): (1) the declarant must have personally perceived the event described, (2) the declaration must be a factual description, and (3) the declaration and the event described must be contemporaneous. *United States v. Mitchell,* 145 F.3d 572, 576 (3d Cir.1998). Valade was present at these meetings and discussions, and while he was not asked to be a stenographer for the meeting, he contemporaneously recorded what transpired.

Defendants contend that the Valade notes do not fall within this exception because Valade testified that the notes were "filtered" through his thinking. In support of their position, Defendants cite to two cases, *Hospital Bldg. Co. v. Trustees of the Rex Hosp.,* 791 F.2d 288, 293 (4th Cir.1986) and *In re Cirrus Logic Sec. Litig.,* 946 F.Supp. 1446, 1469 (N.D.Cal.1996). In those cases, the respective courts declined to apply the present sense impression exception to notes taken during meetings. However, the Court finds the

circumstances of those cases distinguishable from the circumstances here. In *Hospital Building Co.,* the note-taker testified that he could not recall the meetings or conversations during which he took the notes and had no independent memory of the meetings and conversations, and in *Cirrus,* the note-taker testified at his deposition that the notes were subjective and inaccurate. In this case, Valade testified extensively as to his independent recollection of the meetings and conversations reflected in his notes, and Valade did not suggest that his notes were inaccurate, untrustworthy or non-factual. Accordingly, the Court is persuaded that the notes are admissible under the present sense impression exception to the hearsay rule.

[23] Further, the Court is mindful that the documents were produced on the eve of the last day of trial and Tracinda has not fully met the rigid requirements of the business record exception. However, the Court is persuaded that these notes are admissible, in the alternative, pursuant to the residual hearsay exception. Valade testified that the notes which were not prepared by him were produced by Chrysler working groups in connection with meetings held by Daimler Benz. Valade testified that he maintained these notes in his own work record and would have sent them to the general Chrysler corporate files if he had not been concerned with maintaining the secrecy of the merger negotiations. As such, the Court is persuaded that all the notes produced by Valade have the indicia of trustworthiness under Rule 807. Because the notes have indicia of trustworthiness, are probative and the interests of justice will be served by their admissibility, the Court also concludes that they are admissible under Rule 807.

I. *Deposition Testimony Of Kathleen Oswald*

Defendants contend that the deposition testimony of Kathleen Oswald offered by Tracinda is inadmissible. The testimony at issue is Ms. Oswald's statement that Eaton told her that he and Schrempp had a separate conversation in which Schrempp allegedly told Eaton that "it was time to retire." Defendants contend that this testimony is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

362 F.Supp.2d 487                                                                                    Page 18

362 F.Supp.2d 487
**(Cite as: 362 F.Supp.2d 487)**

inadmissible triple hearsay. Defendants also contend that this testimony is not admissible as an admission by a party opponent, because Oswald had no personal knowledge of the statement allegedly made by Schrempp to Eaton. Defendants also contend that Oswald's testimony is inherently unreliable, **\*503** because it conflicts with Eaton's testimony that he decided to retire voluntarily.

Tracinda contends that each out-of-court statement contained in Oswald's testimony constitutes an admission by a party opponent. Tracinda also contends that Ms. Oswald's deposition testimony is admissible under the former testimony exception of the hearsay rule, because her deposition was taken in compliance with the law, and Defendants had an opportunity to develop the testimony by producing Oswald at trial, but did not.

[24] To be admissible, Tracinda must demonstrate that each out-of-court statement is not hearsay or falls within an exception to the hearsay rule. *See* Fed.R.Evid. 805; *Leung v. SHK Mgmt., Inc.,* 1999 WL 1240961, \*8 (E.D.Pa. Dec.21, 1999). The first statement, which is Schrempp's alleged statement to Eaton is not hearsay, because it is an admission of a party opponent, being offered against that party opponent, under Rule 801(d)(2)(A). *See Blackburn v. UPS, Inc.,* 179 F.3d 81, 96 (3d Cir.1999) ( "Under Rule 801(d)(2)(A), a statement offered against a party is not hearsay if it is the party's own statement").

[25] The second statement which is Eaton's statement to Oswald regarding what Schrempp told him is also not hearsay under Rule 801(d)(2)(D), because Eaton is properly considered an agent of DaimlerChrysler as a result of his employment with DaimlerChrysler, and later through his Separation Agreement which prohibits him from speaking negatively about DaimlerChrysler. In addition, Eaton's statements were made during the existence of his agency or employment relationship and concern a matter within the scope of his agency or employment relationship.[FN4] *See, e.g., Nekolny v. Painter,* 653 F.2d 1164, 1172 (7th Cir.1981).

FN4. The Court observes that Defendants

made no argument concerning the level of hearsay constituting Eaton's statement to Oswald. Defendants' only argument against the admissibility of this testimony pertained to the level of hearsay involving Oswald's statements.

[26] As for the third out of court statement, which is Oswald's deposition testimony, the Court concludes that statement is admissible under Rule 804(b)(1) as former testimony. Oswald is unavailable, because she is resident of Michigan and thus, outside of the subpoena power of the Court. *See, e.g., AEL Industries, Inc. v. Alvarez,* 1989 WL 97394, \*2 (E.D.Pa. Aug.17, 1989). Oswald's testimony was taken at a deposition and Defendants had the opportunity to challenge her testimony if they so chose. In these circumstances, the Court is also persuaded that Oswald's testimony has guarantees of trustworthiness, because it was given under oath and Defendants had the opportunity to test the accuracy of her statements. 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 804.04[1][a] (Joseph M. McLaughlin, ed., 2d ed. 2004) ("The proffer of a deposition or testimony given at another trial raises a hearsay question .... However, the statement was given under oath, is usually in writing, was given under the circumstances suggesting the need for care and accuracy, and was subject to an adequate opportunity for cross-examination. Only the absence of an opportunity for the trier to observe the witness's demeanor detracts from the ideal conditions for giving testimony.") In these circumstances, Defendants' argument that Oswald's testimony is not reliable in light of Eaton's contradictory statements goes to the weight to be afforded to the evidence and not to its admissibility. Accordingly, the Court will overrule Defendants' objection to the admissibility of Oswald's testimony.

**\*504** J. *Portions Of Trial Testimony Of Anthony Mandekic*

Defendants object to the admissibility of portions of Mandekic's testimony including his statement that " Kirk was very happy with Chrysler management," and his testimony regarding other statements made

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

362 F.Supp.2d 487                                                                                           Page 19

362 F.Supp.2d 487
**(Cite as: 362 F.Supp.2d 487)**

by Kerkorian about what Eaton said to him. Defendants contend that Tracinda laid no foundation demonstrating that Mandekic had personal knowledge of Kerkorian's views, and Defendants contend that the statements concerning Kerkorian's conversations with Eaton are inadmissible hearsay.

Tracinda contends that ample testimony was offered to establish that Mandekic had personal knowledge of Kerkorian's views. Tracinda also contends that Mandekic's testimony about what Eaton told Kerkorian is admissible under Rule 801(d)(2) as an admission of a party opponent by virtue of the fact that Eaton was the Chief Executive Officer of Chrysler, the predecessor company that was merged into DaimlerChrysler. Tracinda also contends that the rationale for the hearsay rule does not apply to Mandekic's testimony, because both Eaton and Kerkorian testified after Mandekic and were adequately subject to cross-examination regarding the statements attributed to them by Mandekic.

[27] The Court concludes that the Mandekic testimony is admissible. Adequate foundation was established for Mandekic's personal knowledge of Kerkorian's views, including his 34 years of working with Kerkorian, his testimony that he knows Kerkorian's working style and business practices, and his personal awareness of Kerkorian's views about Chrysler's management as a result of his discussions with Kerkorian. Mandekic Tr. Vol. A 114:10-115:1, 120:5-9, 132:8-133:13; *see, e.g., Williams v. Borough of West Chester,* 891 F.2d 458, 466 n. 12 (3d Cir.1990) (recognizing that foundation was established when witness testified that he learned what others knew by discussing the matter with them).

[28] In addition, the Court concludes that Mandekic's testimony about Eaton's statement is not hearsay. Eaton's statements qualify as an admission under Rule 801(d)(2) given his role as Chief Executive Officer of Chrysler, one of the predecessors of DaimlerChrysler. *See, e.g., Sherif,* 2002 WL 32350023, at *2-3. In the alternative, even if Mandekic's testimony about Eaton's conversations with Kerkorian are hearsay, the Court concludes that they are admissible under Rule

803(3) as evidence of Tracinda's state of mind, which is relevant to Tracinda's reliance on Defendants' alleged oral and written representations. *See, e.g., Lo Bosco v. Kure Engineering, Ltd.,* 891 F.Supp. 1020, 1029 (D.N.J.1995) (concluding that testimony was admissible under Rule 803(3), "because it is evidence of the state of mind on one side of the transaction at the time of the alleged contracting" and is relevant to reliance). Accordingly, the Court will overrule Defendants' objection to the admissibility of certain portions of Mandekic's testimony.

K. *Book Entitled Getting Bigger By Growing Smaller And Testimony Regarding The Book*

Defendants next contend that the book, *Getting Bigger by Growing Smaller,* which contained the contributions of Thomas Stallkamp is inadmissible hearsay. Defendants contend that Tracinda circumvented the "ground rules" laid by the Court concerning the recall of Stallkamp to discuss Valade's notes by going outside of those notes and trying to impeach Stallkamp's prior testimony using excerpts of the book. Defendants also contend that the book is not admissible, because Tracinda did not **\*505** include it in its exhibit list following trial despite the Court's instructions at the close of trial to meet with its courtroom deputy to "be sure that [the Court] recorded ... the exhibits that you believe are in evidence in this case ... and then that will be the exhibit list ... that will form the exhibit record for your post-trial briefing." Tr. Vol. M 2859:5-16. Tracinda submitted its final Exhibit List on February 13, 2004, and did not seek to amend that list until two months later on April 19, 2004, to include the book. In addition, Defendants object to the admissibility of the book on hearsay grounds and contend that the book is not admissible as a prior inconsistent statement of Stallkamp, because Stallkamp's testimony was consistent with the book.

Tracinda contends that the rationale behind the inadmissibility of hearsay is not present with regard to the Stallkamp book, because Stallkamp was available to Defendants for further examination. In

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

362 F.Supp.2d 487
**(Cite as: 362 F.Supp.2d 487)**

addition, Tracinda contends that the book is admissible under the residual hearsay exception, and that the book was properly used as a prior inconsistent statement to impeach Stallkamp.

[29] As a threshold matter, the Court concludes that Tracinda is not precluded from seeking to admit the book because it failed to include it on its exhibit list. Tracinda amended its exhibit list prior to the filing of the Opening Briefs, and the Court finds that Defendants suffered no undue prejudice as a result of Tracinda's delay in adding the book to its final exhibit list. Accordingly, the Court will not preclude the book's admissibility on this procedural ground.[FN5]

> FN5. Further, for the reasons discussed *supra,* the Court concludes that the Stallkamp book is properly considered impeachment evidence, and impeachment evidence is not required to be disclosed pre-trial. Fed.R.Civ.P. 26(a)(3) (stating that "a party shall provide to other parties ... the following information regarding the evidence that it may present at trial other than solely for impeachment"); *see, e.g., DeBiasio v. Illinois Cent. R.R.,* 52 F.3d 678, 686 (7th Cir.1995) (holding that trial court abused its discretion in excluding impeachment evidence on grounds that evidence was not disclosed before trial).

[30] As for Defendants' hearsay objection, the Court will overrule the objection and admit the evidence as a prior inconsistent statement. In pertinent part, Rule 613(b) provides:
Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interest of justice otherwise require.

Stallkamp's book can be viewed as a prior inconsistent statement, and at trial, Stallkamp was afforded an opportunity to explain the views he espoused in the book. Whether Stallkamp effectively explained his prior views and whether

Tracinda was effective in its attempt to impeach his testimony has no bearing on the ultimate question of the book's admissibility. Accordingly, the Court will overrule Defendants' objection to the admissibility of the excerpts of the book *Getting Bigger By Growing Smaller.*

## II. PLAINTIFFS' EVIDENTIARY OBJECTIONS

### A. *Expert Testimony Of Daniel R. Fischel*

Tracinda contends that the testimony of Defendants' expert witness, Daniel R. Fischel, should be excluded because his testimony exceeds the scope of his report and included opinions not mentioned in his report or in his deposition. Tracinda also **\*506** contends that this "new" testimony was based on exhibits that were not part of his original report, not disclosed during discovery and only shown to Tracinda immediately prior to Fischel's testimony.

In response, Defendants contend that Fischel's testimony was consistent with his report and that the only "new" testimony by Fischel was in response to a claim made by Tracinda's expert, Silber, that was not contained in Silber's report. To the extent that Fischel's testimony differed from what was in his expert report, Defendants contend that those differences were either immaterial or in the form of demonstrative charts and graphics which summarized the opinions expressed in his report.

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), an expert report shall contain, among other things, "a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; [and] any exhibits to be used as a summary of or support for the opinions ...." Expert reports must also be supplemented when required in accordance with the provisions of Rule 26(e)(1), which provides, in pertinent part that:
[a] party is under a duty to supplement at appropriate intervals its disclosures under subdivision (a) if the party learns that in *some*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

362 F.Supp.2d 487                                                                            Page 21

362 F.Supp.2d 487
**(Cite as: 362 F.Supp.2d 487)**

*material respect the information disclosed is incomplete or incorrect* and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. With respect to testimony of an expert from whom a report is required under subdivision (a)(2)(B) the duty extends both to information contained in the report and to information provided through a deposition of the expert, and any additions or other changes to this information shall be disclosed by the time the party's disclosures under Rule 26(a)(3) are due.

[31][32] The purpose of the initial disclosures provided for in Rule 26 is to prevent a party from being unfairly surprised by the presentation of new evidence. *Astrazeneca AB v. Mutual Pharmaceutical Co.,* 278 F.Supp.2d 491, 510 (E.D.Pa.2003). Failure to comply with the disclosures required by Rule 26 may result in the exclusion of evidence pursuant to Rule 37. Rule 37 provides that unless the failure to disclose is harmless, a party who fails to disclose without substantial justification may not use the undisclosed evidence at trial. Fed.R.Civ.P. 37. In determining whether to exclude evidence under Rule 37, the court should consider such factors as: " (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the court's order." *Meyers v. Pennypack Woods Home Ownership Ass'n,* 559 F.2d 894, 904-905 (3d Cir.1977). Courts must also be mindful that the "exclusion of critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence." *Borden v. Ingersoll-Rand Co.,* 2003 WL 21488511, *2 (E.D.Pa. Jan.17, 2003) (quoting *Pennypack,* 559 F.2d at 905). With these standards in mind, the Court will turn to a discussion of each piece of evidence sought to be excluded by Tracinda.

### 1. DX 849 & Fischel Tr. 2653:4-2661:11

[33] DX 849 is a chart that was appended as Exhibit K to his report, but **\*507** modified as of February 9, 2005, to include more recent transactions that were announced after the date of Fischel's report on January 9, 2003. Using this exhibit, Fischel testified, among other things,
that Chrysler shareholders received a very substantial premium, regardless of how the ... transaction is characterized, even if one accepts plaintiff's claim that the transaction should not have been characterized as a merger of equals.... And secondly, their claim that if the transaction were characterized in some other way that you add some fixed premium onto the pre-transaction price. That simply and fundamentally is inconsistent with the data. There is no such thing as a set control premium, whether or not the transaction is characterized as a merger of equals.

Fischel Tr. Vol. M 2660:21-2661:11.

Reviewing the substance of Fischel's report, the Court concludes that Fischel's testimony and the use of DX 849 did not constitute a material change from his expert report. Fischel opined in his report that Tracinda's claim that "the purported fraud caused Chrysler shareholders to forsake an additional premium is speculative and implausible." D.I. 547, Fischel report ¶ 7. Fischel went on to opine that the way in which the merger was characterized did not affect the premium that Chrysler shareholder were paid, and that Tracinda had not demonstrated that Chrysler shareholders would have obtained a higher premium if the characterization had been characterized differently. *Id.* The exhibit attached to Fischel's report showed the premiums paid in comparable transactions that were stock-financed, had a single bidder, were larger than $10 billion and were labeled as "change of control" transactions. *Id.* at ¶ 35 & Exh. K. Commenting on this exhibit in his report, Fischel noted that many of these transactions had premiums lower than the actual premium received by Chrysler shareholders. *Id.* at ¶ 35. Because Fischel's trial testimony was consistent with and not materially different from the opinions contained in his expert report, the Court finds no justification for excluding his testimony.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

362 F.Supp.2d 487                                                                          Page 22

362 F.Supp.2d 487
**(Cite as: 362 F.Supp.2d 487)**

Further, the updates made to DX 849 were from public sources and were consistent with the types of examples contained in the original exhibit to the Fischel report. D.I. 547, Fischel report, Exh. K. In this regard, the Court concludes that the report was not materially changed by the use of additional, newer transactions, because those additions changed nothing regarding the underlying analysis and only served to make the report more current. [FN6] Accordingly, the Court will overrule Tracinda's objection to DX 849 and Fischel's related testimony.

> FN6. *See Stein v. Foamex Int'l, Inc.,* 2001 WL 936566, *6-*7 (E.D.Pa. Aug.15, 2001) (striking expert affidavit only where opinions contradicted those in expert's report and "materially alter[ed] his intended expert testimony at trial"); *Point Prods. A.G. v. Sony Music Entm't, Inc.,* 2004 WL 345551, *9-*10 (S.D.N.Y. Feb.23, 2004) (striking expert affidavit as untimely where affidavit "expound[ed] a wholly new and complex approach designed to fill a significant and logical gap in the first [expert] report").

2. DX 847 and Fischel Tr. Vol. M 2270:17-2772:4

[34] DX 847 was sent to Tracinda on December 15, 2003, and is a chart entitled Corrected Share Value Calculation which was used by Fischel during his testimony to explain the flaws in Meyer's "Share Value Calculation." Tracinda contends that Fischel's chart and testimony went beyond the bounds of his expert report by claiming that Meyer's calculations were incorrect. Although DX 847 was prepared based on Meyer's Trial Graphic 6, Tracinda contends that it was not based on new information, because Meyer's trial graphic *508 was based on data contained in Exhibit 5 to Meyer's report. Tracinda also contends that Fischel provided no explanation as to why Meyer's calculations were incorrect or how he arrived at his corrected figures.

Although DX 847 was not part of Fischel's original report, the Court concludes that DX 847 and

Fischel's testimony is within the scope of issues discussed in Fischel's report. In his report, Fischel discusses Silber's attempt to convert the premium he contends should have been paid in the Merger to a dollar value. The assumptions Silber used in his analysis were similar, if not identical, to the assumptions Meyer made in his calculations. Explaining the error in these assumptions, Fischel stated:

In a stock financed merger, a higher premium would have been obtained by having a higher Chrysler exchange ratio, thereby providing Chrysler shareholders with more DaimlerChrysler shares upon consummation of the Merger. Professor Silber's calculation represents the value of the assumed additional shares when the Merger was announced. But, the assumed additional shares could not have been issued until [the] merger was consummated. On November 12, 1998, the day the Merger was actually consummated, the value of the assumed additional shares would have been substantially less. And the value of these hypothetical additional shares would have been even lower on November 27, 2000, the day that Professor Silber's client, Tracinda, filed its suit.

D.I. 547, Fischel report ¶ 25 n. 20. Fischel used similar reasoning in describing the alleged errors in Meyer's calculation at trial, and the Court cannot conclude that the use of DX 847 as a demonstrative to respond to Meyer's trial graphic evidenced bad faith on the part of Defendants.[FN7] *See Fitz, Inc. v. Ralph Wilson Plastics Co.,* 184 F.R.D. 532, 538 (D.N.J.1999) (finding expert provided sufficient basis for opinion when he testified that he relied on established scientific principles and the opposing party's data, which "allow[ed] one to comprehend how he arrived [at] his opinion"). Further, just before Fischel was scheduled to testify, Tracinda produced PX 1025 entitled "Summary of Share Value Calculations" which compares the numbers generated by Fischel's correct share value calculations with the alternative numbers Tracinda calculated. The use of PX 1025 demonstrates that Tracinda understood Fischel's analysis, and also demonstrates that Tracinda was not prejudiced by the introduction of DX 847 and Fischel's related testimony. Because DX 847 and Fischel's related testimony was not presented in bad faith and was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

362 F.Supp.2d 487                                                                    Page 23

362 F.Supp.2d 487
**(Cite as: 362 F.Supp.2d 487)**

consistent with his opinions contained in his expert report and Tracinda was not prejudiced, the Court will overrule Tracinda's objection to DX 847 and Fischel's related testimony.

> FN7. The Court further notes that the parties agreed to exchange demonstrative exhibits the day before a witness testified. DX 847 was given to Tracinda on December 15, 2003 as DX 827. Trial then recessed because of the discovery production problem, and Defendants provided Tracinda with the same exhibit, marked as DX 847, on February 9, 2003. While it is true that the discovery problem was precipitated by Defendants, Tracinda did have several weeks to review the exhibit prior to its use which further supports the finding that Tracinda was not unduly prejudiced or unfairly surprised by Defendants' use of the exhibit and Tracinda had ample time to formulate a cross-examination in response to DX 847.

### 3. Fischel Tr. Vol. M 2732:6-2739:11

[35] During trial Fischel testified regarding five separate tests he ran on Silber's**509** data to demonstrate its inaccuracy. Tracinda contends that this testimony exceeded Fischel's report, because only two tests were disclosed in his report. Tracinda contends that these tests were available and could have been performed earlier and appended to Fischel's report, but for Defendants' desire to avoid the scrutiny of Tracinda's experts.

In response, Defendants contend that Fischel's testimony was a response to claims made by Tracinda's expert at trial which were not made in his report. As such, Defendants contend that Fischel did not have the opportunity to assess Silber's claim until after Silber testified. Defendants also contend that Tracinda improperly seeks to exclude Fischel's testimony regarding the two tests that were disclosed in his expert report.

Reviewing the subject testimony in light of the applicable legal standards and the testimony of

Tracinda's expert witness Silber, the Court concludes that Fischel's testimony is admissible as a response to Silber's trial testimony. Further, the data underlying Fischel's testimony was either produced to Tracinda before trial or included in Silber's own report. In these circumstances, the Court cannot conclude that Fischel's testimony unfairly surprised or prejudiced Tracinda. *Cf. Stich v. United States,* 730 F.2d 115, 118 (3d Cir.1984) (holding that district court did not abuse its discretion in allowing expert to rely on new article produced one week before trial testimony, because plaintiffs could adequately prepare for cross-examination of expert based on already available data). Accordingly, the Court will overrule Tracinda's objection to Fischel's trial testimony at Vol. M 2732:6-2739:11.

### 4. Fischel Tr. Vol. M 2723:24-2728:13; DX 842 & DX 843

[36] DX 842 and DX 843 are charts prepared by Fischel during the December recess of this case. DX 842 is a chart entitled "Application of Dr. Silber's Regression Analysis to Other Firms in His Sample: Predicted Premiums Using Board Composition Data at the Time of the Merger." In this chart, Fischel ran Silber's regression analysis on the sample of companies selected by Silber. DX 843 is a chart entitled "Application of Dr. Silber's Regression Analysis to Other Firms in His Sample: Predicted Premiums Using Board Composition Data Three Years After Completion of the Merger." This chart is similar to DX 843, except that it examines board composition data three years after completion of the merger.

Tracinda contends that these charts should have been excluded, because they contained data from Silber's regression analysis which was contained in Silber's report, and thus, should have been made available to Tracinda earlier. Because these charts were not contained in Fischel's report or in any supplements, Tracinda contends that it had no opportunity to check Fischel's findings.

The Court concludes that DX 842 and 843 and the related testimony of Fischel are within the scope of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

362 F.Supp.2d 487                                                                                                    Page 24

362 F.Supp.2d 487
**(Cite as: 362 F.Supp.2d 487)**

the opinions made in Fischel's report regarding the lack of predictive value of Silber's regression model. *Cf. Rogers v. Raymark Indus., Inc.,* 922 F.2d 1426, 1432-1433 (9th Cir.1991) (holding that even if court erred in permitting use of demonstrative exhibits, error was harmless, because demonstratives "did not introduce new evidence; they were simply a more graphic version of what [the expert] had said already"). Fischel testified that he did not have the idea to make these charts until he reviewed Silber's testimony, and the Court is persuaded that the charts were not created in bad faith to impede Tracinda's ability to confirm the analysis they contained. Further, the type of analysis performed by **\*510** Fischel in these charts was the type of analysis that Tracinda could have expected from its own expert. In these circumstances, the Court is not persuaded that Tracinda was prejudiced by Fischel's use of these demonstrative exhibits. Accordingly, the Court will overrule Tracinda's objection to DX 842 and 843 and Fischel's related testimony.

5. Fischel Tr. Vol. M 2715:12-2717:10; DX 840 & DX 841

[37] DX 840 is a chart entitled "Change in Composition of Board of Directors Subsequent to Mergers Analyzed by Professor Silber." This chart looks at the transactions shown in Exhibit 1 of Professor Silber's report to assess change in board composition after three years. DX 841 is entitled " Change in Composition of Inside Directors on Boards of Directors Subsequent to Mergers Analyzed by Professor Silber." This exhibit is similar to DX 840, but looks at the composition of inside directors on the boards of the sample companies and assesses change in the inside director board representation after three years.

Tracinda contends that these exhibits went beyond the scope of Fischel's report, because Fischel did not opine on Silber's sample of transactions and board composition. Tracinda contends that Silber's data was available since the date of his report, December 2, 2002, and Tracinda was unable to test Fischel's analysis because of its belated presentation.

In response, Defendants contend that Fischel discussed an identical analysis in his report using sample transactions relied upon by Tracinda's expert, Robert Stobaugh. Defendants point out that many of the transactions Stobaugh used overlapped with those used by Silber. Thus, Defendants contend that Tracinda was not surprised or prejudiced by Fischel's testimony and his use of DXs 840 and 841.

The Court concludes the exhibits are consistent with the opinions contained in Fischel's expert report and do not reflect a material change in Fischel's opinion. In his report, Fischel noted that, in every transaction, there was a change in the relative representation of predecessor company management on the Board of Directors. D.I. 547, Fischel report ¶ 21. However, Fischel opined that "[t]he disaggregate data demonstrate that changes in board representation after the completion of a merger are consistent with the characterization of the merger as a 'merger of equals.' " *Id.* With respect to DX 840 and 841, Fischel testified at trial that he " performed the exact same analysis with Professor Silber's sample that [he] did with Professor Stobaugh's sample, particularly once [he] learned that Professor Silber was going to testify at the trial and Professor Stobaugh was not." Fischel also testified that he received the same results from the analysis he performed. Further, several of the transactions Fischel used in his initial analysis of Stobaugh's transactions were repeated in Fischel's analysis of Silber's data.[FN8] In these circumstances, the Court is persuaded that Tracinda had sufficient notice of Fischel's opinion and the analysis he used such that Tracinda was not prejudiced by Fischel's use of DX 840 and 841.[FN9] *See, e.g.,* **\*511***DiPirro v. United States*, 43 F.Supp.2d 327, 341 (W.D.N.Y.1999). Because the demonstrative exhibits and Fischel's related testimony were consistent with Fischel's opinion and Tracinda was not unfairly prejudiced by the use of these demonstrative exhibits, the Court will overrule Tracinda's objection to DX 840 and 841 and Fischel's related testimony.

FN8. Specifically, four of the ten transactions used by Silber were used by

362 F.Supp.2d 487                                                                        Page 25

362 F.Supp.2d 487
**(Cite as: 362 F.Supp.2d 487)**

Stobaugh and contained in Fischel's initial expert report. *Compare* D.I. 547, Fischel report, Exh. G *with* DXs 840, 841.

FN9. The Court further notes that, in accordance with the parties' agreement, these exhibits were produced as demonstrative exhibits on December 15, 2003, marked as DX 823 and DX 824. Trial then recessed and the exhibits were produced again on February 9, marked as DX 841 and 840. Thus, as the Court noted in the context of DX 847, Tracinda had ample time to formulate its cross-examination to respond to these materials.

### B. *Deposition Testimony Of Tracinda's Expert Robert Stobaugh*

[38] Tracinda also objects to Defendants' use of the deposition testimony of an expert, Robert Stobaugh, who was hired by Tracinda, but whose testimony Tracinda decided not to use. Tracinda contends that Defendants failed to designate any portion of Stobaugh's deposition testimony in either their Designations, Counter-Designations, or Counter-Counter Designations. Tracinda contends that Defendants mischaracterize Stobaugh's deposition testimony, and that had Tracinda known that Defendants' would use Stobaugh's testimony, it would have designated lines 27:14-28:10 and 28:22-29:7 to complete the record and prevent Stobaugh's testimony from being used in a misleading manner. Because it was not properly designated by Defendants, Tracinda contends that Stobaugh's testimony should not be considered part of the record in this case and should be stricken.

In response, Defendants contend that Stobaugh is an expert witness and not a fact witness, and therefore, Stobaugh was not unavailable under the rules such that Defendants would have been required to designate his deposition testimony. Defendants further contend that Tracinda's own conduct of concealing its intention not to call Stobaugh until after the deadline for deposition designations had passed contributed to Defendants' failure to include Stobaugh in its designations. Defendants also

contend that if Stobaugh's testimony is excluded, then the Court should exclude some 20 citations to undesignated deposition testimony offered by Tracinda. D.I. 1061, Exh. A (list of undesignated deposition testimony cited by Tracinda).

Deposition testimony may be admitted into evidence through the use of a deposition designation, and courts have precluded the use of deposition testimony which is not properly designated by a party. In this case, Defendants did not designate the deposition testimony of Stobaugh; however, Tracinda did not inform Defendants of its intention not to call Stobaugh until after the deposition deadline passed. Stobaugh was included on Tracinda's list of trial witnesses in the parties' November 3, 2003 Joint Pre-Trial Order, and in a letter dated November 21, 2003 from its counsel, Tracinda listed the witnesses it planned to call at trial. However, Tracinda did not list its expert witnesses individually in its November 21, 2003 letter, but instead listed "Tracinda's damage experts." By letter dated November 24, 2003, Defendants asked Tracinda which experts would be testifying and specifically asked whether Stobaugh would be called. In a reply the same day, Tracinda informed Defendants that Stobaugh would not testify at trial. In these circumstances, the Court is reluctant to preclude Defendants from using Stobaugh's deposition; however, the Court will, in fairness to Tracinda, admit into evidence that portion of Stobaugh's testimony which Tracinda identified in its Opening Evidentiary Brief to complete the record and prevent any mischaracterization of Stobaugh's testimony. Accordingly,**\*512** Tracinda's objection to Defendant's use of Stobaugh's deposition testimony will be overruled.

### C. *Portion Of Testimony Of Gary Valade And Valade's Notes (Valade Tr. Vol. L at 2389:1-15; PX 991 at 243267)*

Tracinda next objects to a portion of Valade's testimony and one of his notes used by Defendants in their Post-Trial Brief. Specifically, Valade's note reads: "Aljian-send anything he had on MB, boss interested @ 20%." PX 991 at 243267.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

362 F.Supp.2d 487                                                      Page 26

362 F.Supp.2d 487
(Cite as: 362 F.Supp.2d 487)

Explaining the meaning of this note, Valade testified that Steve Koch told him that he spoke to Aljian that morning and that "Aljian had volunteered to send him anything that he had on the Mercedes-Benz in terms of analysis. And assured him that his boss [whom Valade understood to be Kerkorian] was interested at anything above 20 percent in terms of a premium." Valade Tr. Vol. L 2389:1-15. Tracinda contends that Valade's note and testimony is inadmissible triple hearsay as to what Kerkorian allegedly said and inadmissible double hearsay as to what Aljian allegedly said. Tracinda contends that Koch's statements are not admissible as an admission, because Koch was an investment banker employed by CSFB, and did not act or represent Tracinda. Tracinda also contends that the statements made by Kerkorian to Aljian and Aljian to Koch are also not admissions against interest, because Tracinda has consistently maintained that "if the Transaction had been as promised, a 'merger of equals' with shared, joint management control, the premium that was paid would have been acceptable." D.I. 1048 at 25. Tracinda further contends that these statements should be excluded under Rule 403 as confusing and misleading, because Defendants neglect to mention the context of Aljian's alleged statement, which included discussions of joint management of the new company.

Defendants contend that the aforementioned testimony and note of Valade are admissible, because they are not offered for the truth of the matter asserted. Rather, Defendants contend that Valade's testimony and note are offered to show Tracinda's state of mind, and therefore fall within the hearsay exception provided in Rule 803(3). Specifically, Defendants contend that the Valade notes and testimony demonstrate that "Tracinda was so enthusiastic about the Merger (before learning anything about its corporate governance aspects) that it feared that Chrysler would bargain for too high a price, causing Daimler-Benz shareholders to reject the transaction." D.I. 1061 at 27.

[39][40] Pursuant to Federal Rule of Evidence 805, "[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the

hearsay rule provided in these rules." Kerkorian's statement to Aljian and Aljian's repetition of that statement to Koch is admissible under the exception provided for in Rule 803(3) as a "statement of the declarant's then existing state of mind." As for Koch's statement to Valde about what Aljian said about Kerkorian's views, the Court concludes that statement is admissible because it is not hearsay. Defendants have not offered the statement to prove the truth of the matter asserted as required by the definition of hearsay in Rule 801(c), i.e. that Tracinda was interested at a 20% premium, but only to show Tracinda's enthusiasm for the merger before learning about any corporate governance terms and its potential fear that too high a premium would preclude the transaction from being completed. Accordingly, *513 the Court will overrule Tracinda's objection to Valade's notes and testimony.

D. *Evidence Concerning Meredith Brown's Advice*

Tracinda also objects to certain testimony concerning the advice of Meredith Brown. Specifically, Tracinda contends that Defendants invoked the attorney-client privilege with respect to Ms. Brown's advice to the Chrysler Board, yet Defendants questioned two witnesses, Lanigan and Stallkamp, about that advice. Lanigan Tr. Vol. I 2076:25-2078:2; Stallkamp Tr. Vol. K 2289:23-2292:6. Tracinda contends that, as a result of this line of questioning, Defendants improperly used the attorney-client privilege as a shield and a sword, and that if Defendants wished to waive the attorney-client privilege they should have done so during discovery.

Defendants contend that its invocation of the privilege did not shield Brown's advice from Tracinda, because Tracinda's Aljian heard Brown's advice directly at the Chrysler Board's meeting. Although Defendants produced a redacted version of the minutes of that meeting to claim the privilege with respect to Brown's advice, Tracinda produced from its own files an unredacted version of the meeting's minutes, which included the substance of Brown's advice. Defendants also contend that Tracinda first introduced Brown's advice at trial and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

362 F.Supp.2d 487                                                                                    Page 27

362 F.Supp.2d 487
**(Cite as: 362 F.Supp.2d 487)**

that it used Brown's advice in a misleading way. Defendants contend that they put into evidence the complete advice of Brown through their questioning of Stallkamp and Lanigan in order to correct the misleading impression Tracinda created by its initial use of Brown's advice.

[41] The attorney client privilege should not be used as both a sword and a shield. *See United States v. Rylander,* 460 U.S. 752, 758, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983). The rationale behind this rule is one of fairness. As courts in this district have explained, it is unfair to allow a party to "disclose only those facts beneficial to its case and refuse to disclose, on the grounds of privilege, related facts adverse to its position ...." *Hercules, Inc. v. Exxon Corp.,* 434 F.Supp. 136, 156 (D.Del.1977). Similarly, a party should not be permitted to use the privilege to shield information which it has deliberately chosen to use offensively.

[42] In this case, Defendants asserted the privilege with respect to Brown's advice. However, Defendants did not introduce Brown's testimony offensively. Rather, Tracinda used Brown's testimony in an offensive manner by questioning Stallkamp and Lanigan regarding Brown's opinion that the subject transaction did not involve a change of control. However, Tracinda's use of Brown's opinion was incomplete and misleading, because it did not include Brown's reasons for her statement that the transaction did not involve a change of control. As Defendants pointed out, Brown went on to say in her opinion that no change of control was present in the contemplated transaction, because there was no controlling shareholder or shareholder group and no person or group would be in a position to block the sale of DaimlerChrysler. In this regard, Defendants used Browns' advice to complete the record and prevent it from being possibly misleading. Because Tracinda opened the door to Brown's testimony and Defendants used it defensively to complete the record, the Court will overrule Tracinda's objection to the evidence related to Brown's advice.

**CONCLUSION**

For the reason's discussed, the Court will overrule and/or sustain the various **\*514** objections lodged by Tracinda and Defendants.

An appropriate Order detailing the Court's rulings on these evidentiary matters will be entered.

**ORDER**

At Wilmington, this 30th day of March 2005, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:

1. Defendants' Motion To Exclude The Testimony And Reports Of Tracinda's Experts, Professor William L. Silber And H. Conrad Meyer, III, is DENIED.

2. Defendants' objection to the admissibility of *The Financial Times* article dated October 30, 2000 is OVERRULED.

3. Defendants' objection to the admissibility of the *Barron's* article is OVERRULED.

4. Defendants' objection to the admissibility of documents relating to the production dispute between Plaintiffs and *The Financial Times* over production of the October 2000 *Financial Times* interview is SUSTAINED.

5. Defendants' objection to the admissibility of the complaint in *Glickenhaus v. DaimlerChrysler AG* is SUSTAINED.

6. Defendants' objection to the admissibility of documents authored by third-parties regarding a possible business combination between Chrysler and Daimler-Benz is OVERRULED.

7. Defendants' objection to the admissibility of materials from third-party public relations/research firms (PXs 202, 265, 409, 425, 818, 880) is OVERRULED.

8. Defendants' objection to the admissibility of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

362 F.Supp.2d 487                                                                 Page 28

362 F.Supp.2d 487
**(Cite as: 362 F.Supp.2d 487)**

notes authored by Gary Valade (PXs 980-982, 984-988, 990, 992-998, 1004-1005, 1012, DX 828) is OVERRULED.

9. Defendants' objection to the admissibility of the testimony of Kathleen Oswald is OVERRULED.

10. Defendants' objection to the admissibility of the testimony of Anthony Mandekic is OVERRULED.

11. Defendants' objection to the admissibility of the book, *Getting Bigger By Growing Smaller* is OVERRULED.

12. Plaintiff's objection to the admissibility of certain portions of the expert testimony of Daniel R. Fischel is OVERRULED.

13. Plaintiff's objection to the deposition testimony of Robert Stobaugh is OVERRULED.

14. Plaintiff's objection to portions of the testimony of Gary Valade and Valade's notes (Valade Tr. Vol. L 2389:1-15; PX 991 at 243267) is OVERRULED.

15. Plaintiff's objection to the evidence concerning Meridith Brown's advice is OVERRULED.

D.Del.,2005.
Tracinda Corp. v. DaimlerChrysler AG
362 F.Supp.2d 487

Briefs and Other Related Documents (Back to top)

• 2004 WL 1224637 (Trial Motion, Memorandum and Affidavit) Defendants' Responsive Post-Trial Brief (May 14, 2004)
• 2004 WL 1224635 (Trial Motion, Memorandum and Affidavit) Defendants' Post-Trial Memorandum of Law and Memorandum in Support of Their Motion for Judgment as a Matter of Law (Apr. 23, 2004)
• 2003 WL 24282958 () Consolidated Action (Feb. 10, 2003) Original Image of this Document (PDF)
• 2003 WL 24282959 () Expert Report of Frederick C. Dunbar (Jan. 10, 2003) Original Image of this Document (PDF)
• 2003 WL 24282957 () Report of Expert Witness Richard A. Wines (Jan. 9, 2003) Original Image of

this Document (PDF)
• 2002 WL 32991956 () Daimlerchrysler Ag Securities Litigation Preliminary Report of Anticipated Testimony (Dec. 2, 2002) Original Image of this Document (PDF)
• 1:00CV00993 (Docket) (Nov. 28, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5



Not Reported in F.Supp.2d                                                                 Page 1

Not Reported in F.Supp.2d, 2003 WL 22012673 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

▷
Briefs and Other Related Documents

Wilson v. Sundstrand Corp.N.D.Ill.,2003.Only the Westlaw citation is currently available.

United States District Court,N.D. Illinois, Eastern Division.

Lynda WILSON, et al., and Herry Rasyidin Harahap, et al., Plaintiffs,
v.
SUNDSTRAND CORP., Defendants.
**Nos. 99 C 6944, 99 C 6946.**

Aug. 25, 2003.

Donald J. Nolan, Floyd A. Wisner, Nolan Law Group, Chicago, IL, John Scott Hoff, Alejandro Herran, Law Offices of John Scott Hoff, P.C., Chicago, IL, Tom Leetz, Hoff & Collins, Chicago, IL, for Plaintiffs.

William F. DeYoung, Mark Allen Stang, Loretto M. Kennedy, James T. Mueller, Holland & Knight LLC, Chicago, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*
KENNELLY, J.

**\*1** These consolidated actions, which involve the crash of a Garuda Indonesia airliner in Indonesia in September 26, 1997, are set for trial in late September 2003. The case had originally been set for trial in late March 2003, but trial was deferred for six months at the request of both parties so that they could attempt to settle it. At that time, a number of pending motions were withdrawn and were therefore terminated by the Court with the understanding that they would be revived if the effort at settlement did not succeed. In late July, the parties advised the Court that they had not settled the case. Briefing on the motions has now been completed. The Court ruled on several of them in a Memorandum Opinion and Order dated August 18, 2003. In this order, the Court rules on the remaining pending motions.

A. Plaintiffs' motion to reconsider

Plaintiffs' motion to reconsider concerns the Court's December 19, 2002 order, which involved subpoenas that plaintiffs had served on representatives of P.T. Garuda Indonesia Airlines in the Central District of California and the District of Oregon. The order directed plaintiffs to withdraw the petitions on the grounds that they had failed to move to enforce the subpoenas within the time limit set by the Court. The motion is moot with regard to the Central District of California matter, as the petition plaintiffs filed in that District was denied on January 10, 2003. The Oregon matter is still pending, as the judge responsible for it has deferred ruling pending this Court's ruling on the motion to reconsider.

Plaintiffs have presented nothing new that warrants reconsideration of the Court's earlier ruling. It is true, as plaintiffs point out, that they served the Oregon subpoena prior to the fact discovery cutoff date. But when the matter came to the Court's attention, we set a deadline on plaintiffs' efforts to enforce the subpoena. This was done to avoid interference with the dates set for summary judgment, expert discovery, and trial, and because plaintiffs had unreasonably delayed attempting to enforce this and other related subpoenas. Plaintiffs knew what the deadline was and knew the Court was serious in setting it, yet they did not act with reasonable dispatch. Their motion to reconsider is denied.

B. Defendant's motion to compel depositions of Mary Trindle and Parlin Nainggolan

Mary Trindle and Parlin Nainggolan are the representatives of certain of the victims of the crash. On December 11, 2002, the Court ordered that they be produced for deposition. We directed that Nainggolan, who lives in Indonesia, be deposed by telephone, and that Trindle, who lives in Great

Not Reported in F.Supp.2d                                                                    Page 2

Not Reported in F.Supp.2d, 2003 WL 22012673 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Britain, be deposed in person at the time of a then-scheduled expert witness deposition, or if that could not be done, then by telephone. *See* Transcript, Dec. 11, 2002 at 57-59. The Court pointed out that if plaintiffs stipulated not to call these witnesses at trial, their depositions might not be required. *See id.* at 59-60. Plaintiffs have declined to stipulate not to call Nainggolan and Trindle, and thus they must produce them for deposition. Because neither Nainggolan nor Trindle represents any of the crash victims whose cases will be tried beginning on September 22, 2003, the parties agree that there is no need to take their depositions now. The Court agrees with Sundstrand, however, that it is appropriate to enter an order at this point compelling the depositions at a date certain. For these reasons, the Court grants Sundstrand's motion and orders plaintiffs to produce Trindle and Nainggolan for deposition in their home countries within 45 days after the completion of the upcoming trial. The parties have agreed that the depositions will be taken by video conference and have also agreed to the particular arrangements for Trindle's deposition. With regard to Nainggolan's deposition, the Court orders that it take place in Jakarta due to the presence of video conferencing facilities in that city.

### C. Defendant's motion to clarify the record with respect to proper corporate name

**\*2** Sundstrand Corporation exists no more; following its merger with another entity, the resulting entity is known as Hamilton Sundstrand Corporation. Defendant (we will continue to refer to it as "Sundstrand" because that is what it was called at the time the device at issue in this case was manufactured) asks the Court to "clarify the record" to reflect that the name of the defendant is Hamilton Sundstrand Corporation and to modify retroactively all of the Court's prior rulings to reflect this change.

Plaintiffs appear to be quite suspicious of the proposed change, and based on the conduct of the litigation thus far the Court cannot say that it blames them. It is likely that provision was made in the merger documents for how liabilities arising from the acts of the predecessor entities would be handled; but the Court has no idea whether plaintiffs have seen those documents and does not know what they provide. Defendant has not explained to the Court why it makes a difference what it is called in the caption. Conceivably it may affect insurance coverage or how a judgment is paid. But when plaintiff, in response to defendant's motion, raised these concerns, defendant made no effort to clear the matter up. Rather, it says (in substance) only that it does not like being referred to by the wrong name. But as defendant itself points out, Hamilton Sundstrand has defended the case from day one. All of this leaves the Court wondering why this is such an important issue. Unless and until defendant elects to explain itself better, its motion is granted only in part: the caption is ordered amended to identify the defendant as " Sundstrand Corporation, now known as Hamilton Sundstrand Corporation." The Court will not, however, modify any prior orders at this time.

### D. Sundstrand's motion to bar Indonesian plaintiff heirs from testifying at trial

At an earlier stage of this case, there was a dispute over whether the parties identified as representatives of the deceased passengers of the crashed aircraft had the capacity to file suit. At a point in time when the Court had questioned the adequacy of the evidence provided to show the Indonesian representatives' capacity to sue, plaintiffs were granted leave to file, and did file on March 26, 2002, a second amended complaint naming as plaintiffs each of the heirs of the deceased Indonesian passengers. Before the Court granted leave to file the second amended complaint, we pointed out that if plaintiffs chose this route, they would be "add[ing] six pages of deponents to the list," *see* Transcript, Mar. 26, 2002, p. 6, namely the heirs they were naming as plaintiffs.

In early June 2002, Sundstrand served plaintiffs' counsel with written discovery requests addressed to each of the fifty-nine newly named plaintiffs, as well as deposition notices for forty-one of them. Plaintiffs objected to Sundstrand's interrogatories, stating "none of the above individuals are parties to this action. Interrogatories may not be directed to a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3

Not Reported in F.Supp.2d, 2003 WL 22012673 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

non-party under Federal Rule of Civil Procedure 33. ” Dfdt. Motion, Ex. G at 3. Plaintiffs also advised defendants that the heirs would not appear for their noticed depositions and would have to be subpoenaed because they were non-parties. *Id.,* Ex. H. Sundstrand has now moved to bar the Indonesian heirs from testifying at trial because they did not respond to properly served discovery requests.

**\*3** Plaintiffs object that the addition of the heirs as parties was intended to be and announced to be a temporary state of affairs, to ensure that the capacity to sue existed on behalf of each of the deceased passengers while steps were being taken to obtain the necessary documentation regarding the originally-named representatives. Though that may be so, the newly-named plaintiffs were nonetheless plaintiffs until they were dismissed from the case, which was not requested until January 2003. If plaintiffs did not want them to be deposed, they should have moved to dismiss them much sooner, or alternatively they should have moved for a protective order precluding the requested discovery. Having failed to take either of these steps, the heir-plaintiffs did not have the right to ignore the discovery requests they received. Because these individuals failed to respond to discovery requests, the Court grants defendant's motion, and pursuant to Fed.R.Civ.P. 37(d) & 37(b)(2)(B) bars the heirs who were named as plaintiffs from testifying at trial in this case.

E. Sundstrand's motion to bar testimony of Glenn Haskins as sanction

Sundstrand has moved to bar certain testimony by Glenn Haskins, an expert retained by plaintiffs' counsel, as a sanction for allegedly improper “ speaking” objections by plaintiffs' counsel at Haskins' deposition. Federal Rule of Civil Procedure 30(d)(1) plainly prohibits “speaking” objections by providing that “[a]ny objection during a deposition must be stated concisely and in a non-argumentative and non-suggestive manner.” Just the other day, the Court sanctioned Sundstrand due in part to its attorney's repeated, prolonged, and successful effort to coach a witness, Deborah Pederslie, through improper speaking objections.

*See Wilson v. Sundstrand Corp.,* Nos. 99 C 6944 & 99 C 6946, slip op. at 11-25 (N.D.Ill. Aug. 18, 2003).

Sundstrand prefaces its motion by referring to plaintiffs' previously-made motion for sanctions regarding the Pederslie deposition; it says that “[i]f the Court is inclined to consider plaintiffs' motion, the defendant respectfully requests the Court to consider the same motion presented here as to the deposition of Glenn Haskins.” Dfdt. Motion at 1-2. In its reply, filed one day after the Court's previously referenced sanctions ruling, Sundstrand continues this tit-for-tat approach, suggesting that the Court could deny its motion regarding the Haskins deposition if only we would vacate the August 18 sanctions ruling:

In compromise, Hamilton Sundstrand suggests that the Court reverse Part 4 of its ruling on August 18, 2003 in which the Court precluded Hamilton Sundstrand from opposing the admission at trial of certain Allied Signal documents and imposed certain other sanctions for what this Court determined to be improper speaking objections by counsel for Hamilton Sundstrand at the Pederslie deposition. (See pp. 24-25 of Exhibit A). To use an imperfect analogy, this would essentially wash out what in football would be called offsetting penalties. This is the only fair outcome as it is wholly unjust for Plaintiffs' counsel to complain about speaking objections in the Pederslie deposition and successfully seek the same imposition of sanctions against Hamilton Sundstrand when he is performing the same activity, in a far more blatant manner. In the alternative, if this Court decides not to reverse its ruling in Part 4 of its August 18, 2003 decision, the Court should bar Haskins from testifying at trial regarding the relevant subjects as a sanction for the improper speaking objections.

**\*4** Dfdt. Reply at 4-5. To call this a display of chutzpah would be a gross understatement. The Court's rulings are not up for barter, and motions that have been filed are not an exercise in negotiation with the Court that calls for, as Sundstrand proposes, “compromise.” The Court will deal with each motion filed by the parties on its merits.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 4

Not Reported in F.Supp.2d, 2003 WL 22012673 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Sundstrand's proposal is also rejected for other reasons. First of all, as the Court's August 18 ruling makes clear, we imposed sanctions on Sundstrand not simply because of its counsel's conduct at the Pederslie's deposition, but first and foremost because of its improper withholding of relevant documents that it was under an obligation to produce. Second, Sundstrand complains of two very brief supposed speaking objections by counsel at the Haskins deposition (really just one, as will become clear in a moment), whereas plaintiffs complained of repeated and prolonged coaching by Sundstrand's counsel at the Pederslie deposition. Finally, Sundstrand's reference to "offsetting penalties" is misleading, as the harm caused by the conduct in the two instances is not the same. As the Court noted in the August 18 ruling, a sanction must be proportionate to the wrong; simply offsetting the two acts of misconduct because they both happen to involve speaking objections at depositions would violate that principle.

That said, the Court agrees with Sundstrand that one of the instances it cites from the Haskins deposition constituted improper coaching by plaintiffs' counsel in violation of Rule 30(d)(1). We quote from the transcript:
Dfdt. Atty.: Now, let me ask you, in the few minutes we have remaining before we break for this part one of your deposition, the reason the GPWS system didn't give an alert at any of the places that you said it should have, is there any part in your report where it says that the reason is?
Haskins: Yes.
Dfdt. Atty.: Where?
Haskins: I think that is the second item in there. The second item discusses that.
Dfdt. Atty.: Any other places besides item 2, or is that it?
Haskins: Item 2.
Dfdt. Atty.: I am not trying to encourage you to have more, I certainly don't want you to. I just want to be certain I extract it.
Pltf. Atty. 1: I want to make sure, too. I mean, Glenn, if your whole report goes to that -
Dfdt. Atty.: Objection. I think this is improper coaching of the witness.
Pltf. Atty. 1: I'm sorry. I don't want to coach him either.

Dfdt. Atty.: Let's just not even do this.
Pltf. Atty. 1: I want to make sure the witness understands the question.
Dfdt. Atty.: I don't want you to make sure anything about the witness. He can answer this question that is pending.
Pltf. Atty. 1: Let me note an objection, and I will let it go. Object to the form of the question.
Haskins: Item 2, item 3, item 4, I think discuss that, and, in general, you know, item 5 goes toward the systematic disregard of standard practices.

**\*5** Haskins Dep. at 181-82. In summary, Haskins identified one, and only one aspect of his report as explaining the reason why he believes the GPWS system did not give an alert. At that point, plaintiffs' attorney prompted Haskins to consider other aspects of his report. Haskins got the message and expanded on his answer. The action of plaintiffs' counsel was improper; this is exactly what Rule 30(d)(1) was designed to prevent.

The Court disagrees with Sundstrand, however, regarding the second matter it cites. Shortly after the exchange quoted above, Sundstrand's counsel proceeded to ask Haskins about the "item 4" that he had referenced. The following exchange occurred:
Dfdt. Atty.: Okay. Now, let me just here in the last few minutes go to this item 4.
In your listing of item 2, 3, and 4-let's take 4, for instances. Are you actually saying that that occurred at the time of this flight and that's why-one of the reasons why the GPWS did not sound an alert and you think it should have? I don't mean you to read it and analyze it now, but you answered my question once already, and I want to be sure you understood the question.
I am trying to extract from your report the actual failures that play a role in this occurrence, and that's what I am trying to finalize.
Haskins: Yes, and you are asking me whether or not the mode switching design error -
Dfdt. Atty.: Happened at the time of the accident, correct?
Haskins:-happened at the time of this accident.
And so I am going to read this and give myself a little bit of time to think about your question so I can properly give you an answer.
Dfdt. Atty.: Okay.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22012673 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Haskins: Is that all right?
Dfdt. Atty.: I understand now that you understand my question. Thank you.
(WHEREUPON, discussion was had off the record from 5:29 p.m. to 5:32 p.m.)
Haskins: Ask me the question again.
(WHEREUPON, the record was read by the reporter as requested.)
Haskins: This is indicative of some of the process problems associated with the way that this system was developed. If what was stated in his memo is true, then the design associated with this box is faulty. This crash and the performance of the GPWC, certainly, as a part of the GPWS, failed to provide a warning when it should have as a result of the faulty design that was put out by Sundstrand at the time. The most likely failure mechanism, the most systemic design problem, is item 2. Item 4 may well have contributed.
Pltf. Atty. 2: Is there more or is that your answer? Are you done?
Dfdt. Atty.: I wouldn't encourage any more.
Pltf. Atty. 2: I can't tell because he's thinking and-I didn't want him to step on your answer if you weren't done.
Haskins: I am done.
Pltf. Atty. 2: It is just hard to tell.

Haskins Dep., pp. 184-85. Sundstrand's complaint concerns the question by plaintiffs' attorney, "Is there more or is that your answer? Are you done?" That was not an improper speaking objection. Plaintiffs contend without contradiction (and both Haskins' preceding comments and the ensuing comments by plaintiffs' counsel circumstantially confirm) that Haskins is a soft-spoken individual who takes a good deal of time responding to a question, and that plaintiffs' attorney was simply trying to find out if he had finished his answer. In any event, even if this was an attempt to get Haskins to supplement his answer, Sundstrand was in no way harmed, as Haskins said he had completed his answer and did not supplement it.

**\*6** There remains for the Court to determine what sanction we should impose for the single improper speaking objection made by plaintiffs' counsel. As indicated above and in our August 18 ruling, a sanction for a discovery violation must be

proportionate to the wrong. Sundstrand asks the Court to completely bar Haskins from testifying on "the areas in which he was improperly coached." Sundstrand does not explain exactly what it means by this; on the face of it, Sundstrand seems to be asking the Court to entirely bar Haskins from testifying about the reasons why the GPWS system failed to give a proper alert. Such a sweeping sanction would be grossly overbroad and wildly disproportionate to the single violation of Rule 30(d)(1) committed by counsel and the limited harm actually caused to Sundstrand. What Sundstrand lost as a result of the coaching by plaintiffs' counsel was an answer-that the GPWS system failed only because of Haskins' "item 2"-that it could use to impeach Haskins if he gave a broader or different explanation at trial. The appropriate sanction in this situation returns the parties to the position they would have been in absent the acts of plaintiffs' counsel. The Court therefore strikes lines 16 through 19 on page 182 of Haskins' deposition, i.e., the supplemental answer he gave after the improper objection. If at trial Haskins testifies that there was more to it than item 2, Sundstrand will be permitted to impeach him by eliciting the questions and answers given at lines 8 through 20 on page 191 of the deposition, and the Court will preclude plaintiffs and Haskins from pointing out that he thereafter expanded on that answer. Plaintiffs are ordered to pay defendant a sanction of $750, which the Court finds is the reasonable expense involved in bringing this violation to the attention of the Court.[FN1]

> FN1. It is worth pointing out that when an attorney "defending" a deposition feels that the witness gave an incomplete answer, the attorney is not without a remedy: when the "defending" attorney's turn to asks questions arrives, he can ask the witness to clarify or expand on the earlier answer. If plaintiffs' counsel had simply done that, there would have been no occasion for the imposition of sanctions.

F. Sundstrand's motion to strike supplemental report of Haskins and bar testimony

Haskins' report pursuant to Fed.R.Civ.P. 26(a)(2)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6

Not Reported in F.Supp.2d, 2003 WL 22012673 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

was timely submitted on November 26, 2002. Sundstrand did not make, and does not now make, any objection to the sufficiency of that report. Haskins' deposition was scheduled for December 20, 2002. On December 16, 2002, plaintiffs' counsel advised Sundstrand's counsel that plaintiffs intended to supplement the reports of Haskins and another expert as soon as they received certain records; counsel suggested that Sundstrand defer taking Haskins' deposition until after the supplementation. Sundstrand's counsel agreed to do so. In the ensuing days, plaintiffs did not provide a supplemental report from Haskins. Sundstrand therefore rescheduled the deposition, which proceeded on January 11, 2003. This was two months before the then-scheduled trial date of March 10. As of January 11, defendants' rebuttal expert reports were not yet due.

Haskins' deposition began on January 11 as scheduled, but it was not completed on that date, and the parties agreed to finish the deposition on January 17. On January 16, plaintiffs produced a revised report by Haskins. Sundstrand has provided the Court with a copy of the report highlighted to show two differences with Haskins' original report. [FN2] *See* Dfdt. Motion, Ex. D. The first change was as follows, with the added material italicized:

> FN2. Sundstrand says that there were more than two changes, but it has not argued that it was prejudiced by any of the others. It is not the Court's job to compare Haskins' two reports, determine what differences exist, and try to divine their significance. Thus our consideration of Sundstrand's motion is confined to the two matters that it discusses in its motion and reply memorandum.

| Original report | Revised report |
| --- | --- |
| If aural and visual warnings were provided [by the GPWS] as they should have been before impact, the kinematics of the jet would have allowed the pilots enough time to avoid impact. | If aural and visual warnings were provided [by the GPWS], as they should have been before impact (*Mode 2, approximately 36, 26, 18 and 14 seconds before impact +/2 sec*), the kinematics of the jet would have |

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 7

Not Reported in F.Supp.2d, 2003 WL 22012673 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

allowed the pilots enough time to avoid impact.

**\*7** In short, Haskins supplemented his report to provide the specific intervals at which he contends the GPWS system should have provided warnings. This information was not in his original report. It had been addressed, however, during his first session of his deposition five days prior to the revised report. Specifically, under questioning by Sundstrand's counsel, Haskins had testified that the " Mode 2" warnings should have been "somewhere between 20 and 40 seconds" prior to impact. Haskins Dep. at 99. Sundstrand argues that Haskins' report was improperly supplemented "to react to defendant's deposition questions." Dfdt. Motion at 3.

Sundstrand first argues that a party may not supplement an expert report without first obtaining leave of court. The Court disagrees; the rule does not say this. In fact, Federal Rule of Civil Procedure 26(e)(1) imposes an *obligation* to supplement an expert disclosure "if the party learns that in some material respect the information disclosed is incomplete or incorrect." The Rule does not suggest that leave of court is required. Though there are no doubt some limitations on a party's ability to supplement prior disclosures, the Court sees no reason to impose upon the supplementing party the responsibility to seek leave of court, particularly when the drafters of the Rules chose not to do so. Most supplemental discovery answers go unchallenged, and thus there is no reason to impose upon district judges and magistrate judges supervising discovery the need to consider burdensome motions whenever a discovery response is supplemented. Rather, the onus is appropriately placed on the party that objects to a supplement to bring it to the court's attention in timely fashion.

Sundstrand argues that a party may supplement expert disclosures only if the information is newly obtained or the prior report was incorrect or incomplete. Dfdt. Motion, p. 7 (citing *Collier v. Bradley University,* 113 F.Supp.2d 1235, 1242 (C.D.Ill.2000)). That seems to be exactly what occurred here. During the initial session of his

deposition, when asked whether he had any materials that would allow him to determine the exact intervals at which warnings should have been given, Haskins said:
Yes, I do. The initial calculations that I did were based on more rough data than has currently become available. And there's more specific data available now, and so before I tie myself down to a very specific time, I want to go through that data that came from Barnett. Do you understand?

Haskins Dep. at 100-01.[FN3] This testimony, which Sundstrand does not attempt to refute in its motion, is sufficient to establish that the supplementation of Haskins' report with regard to the warning intervals was warranted because it was based on information he had received after his November 26, 2002 report and was not unreasonably delayed thereafter (Sundstrand says that the Barnett documents did not become available until, at the earliest, December 7, 2002).[FN4]

> FN3. There ensued a colloquy between counsel at which Sundstrand's counsel said he had a problem with continuing the deposition if Barnett intended to provide additional information. Eventually, however, counsel continued the deposition with the understanding that it would be resumed later.

> FN4. It is doubtful that Haskins actually had the Barnett documents until late December. *See* Dfdt. Motion, Ex. C.

**\*8** Even if Haskins' supplementation regarding the warning intervals was done as a direct or indirect result of the fact that defense counsel had pursued that matter at the deposition, that would not necessarily make it improper. This is not a case, unlike *Salgado v.. General Motors Corp.,* 150 F.3d 735, 743 (7th Cir.1988), cited by Sundstrand, where the expert's original report was deficient and the party attempted to cure the deficiency after discovery had closed. In this case, as noted earlier, no challenge was made (or is made now) to Haskins'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 8

Not Reported in F.Supp.2d, 2003 WL 22012673 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

original report. Moreover, Sundstrand had not yet completed Haskins' deposition at the time of the supplementation and thus had an additional opportunity to question him about the new information; and Sundstrand's own rebuttal expert reports had not yet been served and were not yet due. This case is therefore nothing like *In re Brand Name Prescription Drugs Antitrust Litigation,* No. 94 C 897, 2000 WL 748155 (N.D.Ill. June 5, 2000), cited by Sundstrand. In that case, the court struck expert disclosures that were submitted four years after the close of expert discovery that included entirely new opinions, based on information that had been available to them before expert discovery was closed. We also note that in *Brand Name,* the court indicated that it *had* authorized the supplementation of existing reports. *Id.* at *3.

For all of these reasons, the Court declines to strike the information in Barnett's revised report regarding the warning interval, or Barnett's testimony on that topic.

The second aspect cited by Sundstrand in which Haskins' report was changed was to add a paragraph in which he responded to the deposition of defense expert Wallace Ward. Though Ward was deposed on November 15, 2002, Sundstrand provides the Court with no information indicating that the transcript of his deposition (to which Haskins cites in his revised report) was available to Haskins before his initial report was prepared and served. Again, the supplementation was proper under the general rule as Sundstrand presents it: the information was newly obtained by the expert following the presentation of his report and was not unreasonably delayed. And Sundstrand had a fair opportunity to deal with this in its own expert disclosures, which were not yet due at the time of Haskins' supplementation.

To ensure that Sundstrand has a reasonable opportunity to address these points on their merits at trial, it may submit revised expert disclosures on the two topics discussed herein on or before August 31, 2003. Barnett must be presented for deposition for an additional hour on or before that same date, in person if he is reasonably available or by telephone if he is not reasonably available. Any

defense expert supplementing his or her report is to be presented for deposition on the same terms by September 7, 2003.

In its reply on this motion, Sundstrand seeks to preclude plaintiffs from relying on other allegedly late-disclosed materials. This is a separate matter which, if Sundstrand wishes to raise it, should be included in a motion *in limine* subject to the overall page limitations previously set.

Conclusion

**\*9** For the reasons stated above, plaintiffs' motion to reconsider [item # 253] is denied. Defendant's motion to compel depositions of Mary Trindle and Parlin Nainggolan is granted on the terms and conditions described above. Defendant's motion to clarify the record with respect to proper corporate name [# 242] is granted in part; the caption of the case is ordered amended to identify the defendant as "Sundstrand Corporation, now known as Hamilton Sundstrand Corporation." Defendant's motion to bar Indonesian plaintiff heirs from testifying at trial [# 203] is granted. Defendant's motion to bar testimony of Glenn Haskins as sanction [# 248] is granted in part as described above. Defendant's motion to strike supplemental report of Haskins and bar testimony [# 267] is denied. Defendant's emergency motion to strike all questions and answers in the Barnett deposition initiated after the court time limitation [# 252] was resolved by agreement and is therefore terminated. The ruling date of August 21, 2003 is vacated.

N.D.Ill.,2003.
Wilson v. Sundstrand Corp.
Not Reported in F.Supp.2d, 2003 WL 22012673 (N.D.Ill.)

Briefs and Other Related Documents (Back to top)

• 2003 WL 24241542 () (Partial Testimony) (Jan. 11, 2003) Original Image of this Document (PDF)
• 2003 WL 24243106 () (Partial Testimony) (Jan. 7, 2003) Original Image of this Document (PDF)
• 2002 WL 32986789 () (Report or Affidavit) (Nov. 26, 2002) Original Image of this Document (PDF)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 9

Not Reported in F.Supp.2d, 2003 WL 22012673 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**


• 2002 WL 32986791 () (Partial Testimony) (Nov.
26, 2002) Original Image of this Document (PDF)
• 2002 WL 32986790 () (Report or Affidavit) (Nov.
25, 2002) Original Image of this Document (PDF)
• 2002 WL 33009501 () (Report or Affidavit) (Nov.
25, 2002) Original Image of this Document (PDF)
• 1999 WL 33993471 () Expert Statement (1999)
Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DePuy Mitek, Inc.<br>    a Massachusetts Corporation | ) ) ) | |
|     Plaintiff, | ) ) | |
|     v. | ) ) ) | **Civil No. 04-12457 PBS** |
| Arthrex, Inc.<br>    a Delaware Corporation and | ) ) ) | |
| Pearsalls Ltd.,<br>    a Private Limited Company<br>    of the United Kingdom, | ) ) ) ) | |
|     Defendants. | ) ) | |

## Amended Supplemental Expert Report of Dr. David Brookstein

**I.  Background Information**

1.    Based on new information presented to me since my last report, I submit this supplemental report. Additional information that I have reviewed in forming my opinions is attached as Exhibit II.

**II.  Summary of Opinions**

2.    The samples tested by Dr. Gitis that he labeled "coated" and "uncoated" were manufactured differently. These manufacturing differences affect FiberWire's UHMWPE/PET braid. Therefore, it is my opinion that neither Dr. Gitis nor Dr. Mukherjee can make any scientifically reliable conclusions about the effect, if any, of FiberWire's coating based on Dr. Gitis' tests because they could not and did not determine what effects may be due to the coating and what effects may be due to the manufacturing differences between the samples (*e.g.*, the differences by which the UHMWPE/PET braids were made).

following results:

|  | Treated Sample Loading Rate, kg/sec | $R^2$ | Untreated Sample Loading Rate, kg/sec | $R^2$ |
|---|---|---|---|---|
| 1 | 0.094 | 0.9981 | 0.144 | 0.9984 |
| 2 | 0.060 | 0.9787 | 0.103 | 0.9931 |
| 3 | 0.074 | 0.9886 | 0.090 | 0.9947 |
| 4 | 0.050 | 0.9979 | 0.121 | 0.9988 |
| 5 | 0.036 | 0.9979 | 0.109 | 0.9968 |
| 6 | 0.073 | 0.9970 | 0.110 | 0.9890 |
| 7 | 0.053 | 0.9973 | 0.133 | 0.9905 |
| 8 | 0.058 | 0.9985 | 0.080 | 0.9925 |
| Avg. | 0.062 |  | 0.108 |  |

As can be seen from this table, the load rates varied significantly between individual samples and even among the treated and untreated samples. In fact, the average loading rate for the untreated samples is approximately 75% greater than the average loading rate for the treated samples. Further, since the TRENDLINE function uses a linear relationship and the $R^2$ values are greater than the 95% accepted confidence level, the determined loading rates are accurate.

17.     Consequently, no scientifically reliable "stiffness" conclusions can be drawn based on Dr. Gitis' tests because the loading rate for each of the individual samples was not the same. Neither Dr. Gitis nor Dr. Mukherjee accounted for the differences in loading rate. Therefore, any conclusions that they drew from this data and the "stiffness" values reported by Dr. Gitis are neither reliable nor comparable. In fact, Dr. Gitis testified that if the sample load rates were different, it would "jeopardize the results" (Ex. PP, Gitis Dep. at 163:17).

### 2.    Dr. Gitis' Pliability Tests Are Scientifically Unreliable Because He Used the Wrong Diameter

18.     In determining "stiffness," Dr. Gitis assumed a monofilament circular structure. He also determined stiffness based on the moment of inertia, which is a function of the diameter raised to

## Amended List of Additional Materials Considered

Deposition Transcript of Mr. Lewis with exhibits
Deposition Transcript of Mr. Hallet from June 30, 2006 with exhibits
Steven B. Warner, *Fiber Science* 1995
Deposition Transcript of Dr. Gitis with exhibits
Deposition Transcript of Dr. Mukherjee with exhibits
CETR Testing data
Pearsalls documents 008433-008473
CETR documents0001-79
FiberWire Samples Ex. 388, 390, 438, 429, 389, 428, 235, 236, 237
Dr. Burks Transcript with exhibits
 "An Experimental Method for Determining the heat Transfer Coefficient of Polymeric Fibers
and Yarns During Rapid Convective heating" by R. Brooks published in The Journal of the
Textile Institute 1984, No. 6, I then  pp. 398-404.
DM. Ex 430
DM. Ex. 433
DM. Ex. 434
ARM25591
PR08325-08382
TestWorks®4 "Continuing to set the standard for material, component, and subassembly testing
software"
Gordon Laboratory Seminar Series Lent 2006
ASTM International, Designation: D 638-03, "Standard Test Method for Tensile Properties of
Plastics"

surgery (Ex. AAA, Burks Dep. at 51:12-14).  Thus, Dr. Burks' testimony regarding the use of

gloves supports my opinion that the differences between the treated and untreated sutures are not

material.

Dated: July 24, 2006

David Brookstein, Sc.D.
Fellow-American Society of Mechanical Engineers

21