## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **DePuy Mitek, Inc.** )<br>    **a Massachusetts Corporation** )<br> )<br>        **Plaintiff,** )<br> )<br>    **v.** )<br> )<br>**Arthrex, Inc.** )<br>    **a Delaware Corporation and** )<br> )<br>**Pearsalls Ltd.** )<br>    **a Private Limited Company** )<br>  **of the United Kingdom** )<br> )<br>        **Defendants.** )<br> ) | **Civil No. 04-12457 PBS** |

**DePuy Mitek's Unopposed Motion For Leave To File a Sur-Reply To Defendants' Reply To DePuy Mitek's Response To Defendants' Objections To Magistrate's Order Granting DePuy Mitek, Inc.'s Motion To Preclude Arthrex, Inc. And Pearsalls, Ltd. From <u>Supplementing Their Expert Reports And Depositions</u>**

Plaintiff, Mitek submits this unopposed motion for leave to file a sur-reply to Defendants' Reply To DePuy Mitek's Response To Defendants' Objections To Magistrate's Order Granting DePuy Mitek, Inc.'s Motion To Preclude Arthrex, Inc. And Pearsalls, Ltd. From Supplementing Their Expert Reports And Depositions (D.I. 101). Pursuant to Local Rule 7.1(a)(2), the parties met and conferred on Tuesday, December 12, 2006 and Defendants' agreed not to oppose the filing of Mitek's sur-reply. Mitek's proposed sur-reply is attached to this motion. Accordingly, Mitek requests that its unopposed motion for leave be granted.

Date:  December 15, 2006

DEPUY MITEK, INC.,
By its attorneys,

 _/s/ Erich M. Falke_____
Dianne B. Elderkin
Lynn A. Malinoski
Michael J. Bonella
Erich M. Falke
WOODCOCK WASHBURN LLP
One Liberty Place - 46th Floor
17th and Market Streets
Philadelphia, PA 19103
(215) 568-3100


Daniel J. Gleason (BBO #194900)
Heather Repicky (BBO#663347)
NUTTER MCCLENNEN & FISH LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA. 02210-2604
(617) 439-2000

**CERTIFICATE OF SERVICE**

   I certify that I am counsel for DePuy Mitek, Inc. and that a true and correct copy of **DePuy Mitek's Unopposed Motion For Leave To File a Sur-Reply To Defendants' Reply To DePuy Mitek's Response To Defendants' Objections To Magistrate's Order Granting DePuy Mitek, Inc.'s Motion To Preclude Arthrex, Inc. And Pearsalls, Ltd. From Supplementing Their Expert Reports And Depositions** was served on counsel for Defendants Arthrex, Inc. and Pearsalls Ltd. on this date via the Court's e-mail notification with the following recipients being listed as filing users for Defendants:

       Charles W. Saber
       Dickstein Shapiro
       1825 Eye Street, NW
       Washington, DC 2006
       saberc@dicksteinshapiro.com

       Raymond P. Ausrotas
       Todd & Weld LLP
       28 State Street, 31st Floor
       Boston, MA 02109
       rausrotas@toddweld.com

Dated: December 15, 2006    /s/ Erich M. Falke
            Erich M. Falke

# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **DePuy Mitek, Inc.**<br>        **a Massachusetts Corporation**<br><br>                **Plaintiff,**<br><br>        **v.**<br><br>**Arthrex, Inc.**<br>        **a Delaware Corporation and**<br><br>**Pearsalls Ltd.**<br>         **a Private Limited Company**<br>**of the United Kingdom**<br><br>        **Defendants.** | )<br>)<br>)<br>)<br>)<br>)      **Civil No. 04-12457 PBS**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**Plaintiff DePuy Mitek's Sur-Reply to Defendants' Reply To Defendants' Objections to the Magistrate's Order Granting DePuy Mitek, Inc.'s Motion to Preclude Arthrex, Inc. From <u>Supplementing Their Expert Reports and Depositions</u>**

**I.    Arthrex's "Non-Virus" Reasons For Supplementing Were Heard & Rejected**

Mitek had the audio transcript of the hearing before Magistrate Bowler, which it was not aware of until Arthrex served it on December 5, 2006, transcribed (Ex. 1).   The hearing transcript puts to rest Arthrex's argument that Magistrate Bowler did not appreciate the issues because much of the hearing argument addressed Arthrex's so-called non-virus reasons for supplementing.  For example, Mitek explained (i) the prejudice that would result from supplementing for any of Arthrex's proposed reasons (*id.* at 3:3-4:17); (ii) Arthrex's failure to satisfy FED. R. CIV. P. 26(e)(1)'s condition precedent to supplementing of actually showing an error in the report regarding Dr. Gitis' diameter or "pliability" measurements (*id.* at 2:15-22; 11:24-12:18); and (iii) Arthrex had inexplicably delayed in raising these non-virus reasons (*id.* at 11:8-23).  Likewise, Arthrex pointed out on several instances that it had non-virus reasons for supplementing (*id.* at 15:8-11; 17:19-18:6).  Thus, the non-virus reasons for supplementing were argued.

Trying to spin its argument that the nonvirus reasons were not addressed at the hearing, Arthrex incorrectly states that Magistrate Bowler only asked two questions, that both questions related to the virus, and that first question related to evidence of the virus (D.I. 101 at 5).  Arthrex is wrong on all accounts.  Magistrate Bowler actually asked the following four questions: (1) what's the prejudice?; (2) do you have a trial date?; (3) where is the evidence?; and (4) what virus? (Ex. 1 at 3:2; 4:18-19; 13:2; 16:22).  Notably, the answer to Magistrate Bowler's question regarding prejudice involved the prejudice from all of Arthrex's proposed supplementation (*id.* at 3:3-4:17).

Arthrex takes one statement from the hearing out of context and treats it as a detailed opinion.  This is not a fair characterization of the ruling or the hearing.  When ruling, Magistrate Bowler actually stated:

> Well I am not satisfied that the explanation is good enough. He's saying there's a virus, but there's been no specific information or anything identifying a virus when or how or why. Motion to preclude granted.

(*id.* at 17:13-18). It is not clear whether the first statement was referring to just the virus reasons or the nonvirus reasons as well. But more importantly, after Magistrate Bowler ruled, Arthrex reargued its non-virus reasons for supplementing (*id.* at 17:19-18:6). After hearing Arthrex's "appeal," Magistrate Bowler reiterated, "I've already made a ruling" and did not elaborate on the basis for the Order (*id.* at 18:7-8). Thus, Arthrex's treatment of a snippet from the hearing as a detailed opinion is not a fair characterization of the proceedings. There is no detailed opinion addressing every point. To ascribe clear error based on a single statement is just not fair. Magistrate Bowler's Order is fully supported by the many reasons presented in the papers and at the hearing.

Also, although Mitek discussed the so-called diameter and pliability "errors" (*id.* at 10:1-19; 11:9-14), Arthrex chose not to mention these specific issues. But now Arthrex alleges that Magistrate Bowler clearly erred by not mentioning them. Arthrex's tactics are wrong. It is not fair for Arthrex to treat Magistrate Bowler's Order as a detailed opinion and require it to have mentioned these issues, when Arthrex failed to even discuss them.

## II.    Arthrex Has Not Shown Clear Error

FED. R. CIV. P. 26(e)(1) requires as a condition precedent to supplementing that Arthrex first prove an inaccuracy that it was entitled to correct. Thus, just as Arthrex's virus claims provided no basis for supplementing because Arthrex had not proven a virus, Arthrex's non-virus reasons also fail because Arthrex failed to prove any typos or reporting errors.

### A. Diameter: Arthrex Did Not Satisfy Rule 26(e)(1)'s Condition Precedent Requiring That Dr. Gitis' Reported Diameter Measurements Were Inaccurate

Arthrex alleges, based on ¶¶32 and 34 of Dr. Gitis' Affidavit (D.I. 101, Ex. 3), that Dr. Gitis' Report has a "typo" regarding his diameter measurements. But ¶32 of Dr. Gitis' Affidavit does not even mention diameter. Further, ¶34 of Dr. Gitis' affidavit actually states that "there *appears* to be a typographical error" (emphasis added), not that there *was* a "typo." Tellingly, Dr. Gitis was not willing to state under penalty of perjury that there was a typographical error. Nor could he because he had testified under oath that he measured the diameter with the wrong instrument, and he had testified in his Report and emphatically at his deposition that he measured 0.65 mm. numerous times (D.I. 93, Ex.3 at 3; Ex. 2 at 153:11-154:9; 165:1-4; & 172:23-173:7). Even when faced with evidence at his deposition -- that Arthrex submits for the first time here on reply -- that the measured diameter was out of range for a #2 size suture and different than what the manufacturer reported, Dr. Gitis confirmed his testimony (Ex. 2 at 168:10-173:7).

Thus, Dr. Gitis' report and deposition accurately describe his work, and contrary to Arthrex's assertions, the "*only* logical conclusion" is not a "typo" (D.I. 101 at 7). Rather, another logical conclusion fully supported by the record is that Dr. Gitis' Report is accurate regarding the work that he performed. To the extent Arthrex merely disagrees with a finding that was accurately portrayed in Dr. Gitis' Report, that is not clear error.[1]

### B. Pliability: Arthrex Did Not Satisfy Rule 26(e)(1)'s Condition Precedent Requiring That Dr. Gitis' Reported "Pliability" Test Was Inaccurate

In his Report and at his deposition, Dr. Gitis testified that he performed a "pliability" test at a constant rate of *loading*, *not extension* (D.I. 93, Ex. 3 at 3; Ex. 2 at 84:16-20; 152:1-9; and 175:1-176:11). In an attempt to change this sworn testimony, Arthrex cites to only Dr. Gitis'

---

[1] Arthrex argues that Dr. Gitis should be permitted to change his sworn testimony and that Mitek can just cross examine Dr. Gitis. But Arthrex's argument fails because Arthrex failed to first satisfy FED. R. CIV. P.'s 26 (e)(1)'s condition precedent to supplementation requirement.

conclusory affidavit at ¶14 (D.I. 101 at 7). But Dr. Gitis' last-minute, unsupported conclusion in light of the evidence to the contrary (D.I. 93 at 13-16) is insufficient to satisfy the condition precedent for supplementing. This is particularly true where, as explained in Mitek's Response, his "constant rate of extension" speculation arose after his virus excuse was shown to be irrelevant to his pliability testing methodology (*id*. at 15).

Arthrex incorrectly argues that Mitek stated that Dr. Gitis used a constant rate of extension (D.I. 101 at 8, 11). But Arthrex has no citation for this assertion because Mitek did not so state. Rather, Mitek's expert, Dr. Brookstein, pointed out that Dr. Gitis' data showed that he did not use the reported constant rate of loading of 0.33 kg./sec, but rather that the data were consistent with a *different rate of loading for each sample* (D.I. 93, Ex .14 at ¶¶16-17). Mitek has never said that a constant rate of extension was used.

### C.    Knot Slippage-Strength Test:  Arthrex Does Not Dispute That It Failed To Raise This Issue Before the Magistrate

There is no dispute that Arthrex did not raise its knot slippage-strength test issues before Magistrate Bowler and first raised them now, about eight months after Dr. Gitis prepared his report. Thus, Arthrex has waived its argument regarding the knot slippage-strength test, and there cannot have been clear error.[2,3]

### III.    Arthrex's Claims of No Prejudice Are Baseless

Magistrate Bowler specifically asked about the prejudice that would result from Arthrex's supplementation (Ex.1 at 3:2-4:17). Just because Arthrex disagrees with the prejudice,

---

[2]    *Fireman's Ins. Co., of Newark, N.J. v. Todesca Equip. Co., Inc.*, 310 F.3d 32, 38 (1st Cir. 2002) (holding that arguments first raised in objections to Magistrate's ruling were waived); *Paterson-Leitch Co., Inc. v. Mass. Municipal Wholesale Elec. Co.*, 840 F.2d 895, 990-1 (1st Cir. 1988) (holding "categorically that an unsuccessful party is not entitled as of right to de novo review by the Judge of an argument never seasonably raised before the magistrate").

[3]    Arthrex notes that Mitek did not dispute Dr. Gitis' new alleged methodology for his knot slippage strength tests. But Mitek did not dispute them because Arthrex first raised this issue on November 2, 2006, and Mitek has not had its experts analyze this new untimely speculation.

that is not clear error.   In any event, Arthrex basically claims that there is no prejudice because Dr. Gitis should simply be believed.  But Mitek has no basis for believing Dr. Gitis now, when he testified under oath contrary to what he now states; he stated that a virus infected all of his tests; he recanted his virus story; and now claims without any supporting documentation that the tests were conducted completely differently than originally stated.  Thus, if Arthrex is permitted to supplement, Mitek and its experts will be forced to analyze extensive data, possibly conduct forensic analysis of his equipment to determine whether it can provide insight into how it actually worked, prepare expert reports from Mitek's experts, and bear the expense of further depositions of Dr. Gitis and Mitek's experts.  Mitek should not be burdened with the expense of another round of expert discovery because of Dr. Gitis' sloppy work and untimeliness.

Arthrex also incorrectly contends that another round of expert discovery will not affect dispositive motions merely because it did not submit Dr. Gitis' work during the dispositive motion briefing.  But the issues presented by Dr. Gitis' supposed tests are related to Arthrex's claims that FiberWire's coating has a material affect on the novel and basic characteristics of the claimed invention.  This is a key issue to both summary judgment motions relating to infringement issues.  It is fantasy to think that the outcome of those reports and depositions, which will be discussing the very issues before the Court, will not impact summary judgment, particularly where the parties are cognizant of the summary judgment briefing.

## IV.    Conclusion

Arthrex should not be permitted to make substantive changes to expert reports that were due over eight months ago, after the close of expert discovery, and after summary judgment motions have been filed and argued.  After two rounds of briefing and a hearing, the facts remain the same; Arthrex did not satisfy the condition precedent to supplementation of showing an inaccuracy; there was no clear error.

Dated: December 15, 2006

DEPUY MITEK, INC.,
By its attorneys,
 /s/ Erich M. Falke
Dianne B. Elderkin
Lynn A. Malinoski
Michael J. Bonella
Erich M. Falke
WOODCOCK WASHBURN LLP
One Liberty Place - 46th Floor
Philadelphia, PA 19103
(215) 568-3100

Daniel J. Gleason (BBO #194900)
Heather Repicky (BBO #663347)
Nutter McClennen & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA. 02210-2604

# EXHIBIT 1

Page 1

```
           IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS


DePuy Mitek, Inc.              )  Civil No.
a Massachusetts Corporation,   )  04-12457 PBS
                               )
              Plaintiff,        )
                               )
              v.                )
                               )
                               )
Arthrex, Inc.                  )
   a Delaware Corporation and   )  Motion
                               )  Proceedings
Pearsalls Ltd.,                )
                               )
Private Limited Company of the  )
United Kingdom                 )
                               )
              Defendants        )
```

Page 2

1        THE COURT:  All right, well, it's
2   plaintiff's Motion so I'll hear you.
3        MR. BONELLA:  Thank you Your
4   Honor.
5        THE COURT:  Docket Entry No. 32
6   for the record.
7        MR. BONELLA:  Your Honor, we're
8   here for plaintiff's motion to preclude defendant
9   Arthrex from supplementing or redoing its expert
10  reports after the close of expert discovery.  And
11  the reason Mitek's motion should be granted is
12  basically for three reasons:  One, it's too late.
13  Expert discovery has closed and it's too late to
14  redo expert discovery now.
15       Number two, in order to supplement
16  expert discovery Arthrex was required as a
17  condition precedent, had the burden of showing
18  that there was an incorrect part of the report or
19  part of the report is inadequate or incomplete under
20  Rule 26(e)(1) for a reason that was not known to
21  them during expert discovery when the reports were
22  prepared.  They haven't satisfied that burden.
23       Third, Your Honor, to allow
24  supplementation at this late date would prejudice

Page 3

1   not only Mitek, but prejudice this Court.
2        THE COURT:  What's the prejudice?
3        MR. BONELLA:  Prejudice is
4   threefold.  One, it is going to be expensive.  We
5   are going to have to have another report from
6   their expert, which requires us to depose them.
7   We're also going to investigate the basis of that
8   report, which requires looking at all types of
9   data and analyses.  This is a highly technical
10  case, more so it is going to require attorney time
11  and expert time
12       Also, our expert is going to have
13  to analyze what he did and then prepare a report.
14  They're going to want to depose our expert.  And
15  the report that he is going to prepare in
16  response.  If either are allowed to supplement, we
17  are going to have more expert reports, more expert
18  depositions, lots of attorney time.
19       This is a patent infringement
20  case, highly technical and it's going to require a
21  lot of work.  That's one type of prejudice.
22       Another type of prejudice, Your
23  Honor, this is a patent infringement case about a
24  medical device, about a suture.  Yet we have these

Page 4

1   claims now that there was a virus that somehow
2   infected their expert's work, where they have
3   interjected a whole new issue into the case,
4   whether there was a virus or wasn't a virus.  I'd
5   like to talk a little bit about that, but that's a
6   new issue.  And if there was a virus, we would
7   like to know what the virus was and how it
8   affected his work.  It goes right to his
9   credibility, goes right to their expert's
10  credibility as to whether or not there even was a
11  virus and whether his data is accurate or
12  inaccurate.  And then this interjects an issue of,
13  we need computer experts, we need software experts,
14  we need virus experts to understand what this
15  virus was and how it supposedly affected his work.
16  So it interjects a whole new issue into a patent
17  infringement case about sutures.
18       THE COURT:  Do you have a trial
19  date?
20       MR. BONELLA:  We do not have a
21  trial date, Your Honor.  We had a hearing here in
22  September 26 on dispositive motions and on the
23  Markman issue.  In a patent infringement action,
24  there is a Markman hearing which construes the

Page 5

1   claims.  That Markman hearing --
2        THE COURT:  I know that much,
3   counselor.
4        MR. BONELLA:  Thank you, Your
5   Honor.
6        The Markman hearing was held on
7   September 26.  Dispositive motions were heard at
8   that time as well.  So that's the other prejudice.
9   If we're going to reopen expert discovery now,
10  Your Honor, we're going to have more reports, more
11  depositions.  Expert discovery has already been
12  briefed.  It's already been heard.  It's pending
13  before The Court, and we shouldn't have to deal
14  with experts now.
15       I would like to explain a little
16  bit as to how this fits into the case and where we
17  are in this case.  It's a patent infringement case
18  about sutures.  Our client, Mitek, has a patent,
19  and it covers sutures.  Arthrex claims it doesn't
20  infringe, and it provided these technical reports
21  from a Dr. Gitis and from a Dr. Mukherjee.
22       Dr. Gitis did tests comparing two
23  types of sutures, ones that are coated and ones he
24  says are uncoated.  He was trying to show that

47bc0e6d-663e-4927-ba09-4c44f08290d2

Page 6

1  coating had an effect on the suture and,
2  therefore, for legal reasons it took it outside
3  the scope of Mitek's patent.
4         Their other expert, Dr. Mukherjee,
5  relied on this report to say there was not
6  infringement.  That is how he fits into the case.
7         Where are we in this case?  The
8  case was filed November '04, fact discovery ended
9  February 1, '06.  Expert discovery went from March
10  '06 to July '06.  Immediately after that we had
11  the dispositive motion hearing and the briefing,
12  which has all been completed.  Now we are just
13  waiting for The Court's Order, after which we'll
14  immediately move to pretrial and trial.  That's
15  where we are in this case.
16         How did this issue arise?  When
17  did it arise?  That is the interesting part.  We
18  began expert discovery on March 4, '06 when
19  Mitek's expert put forth a report showing
20  infringement.  Arthrex's experts responded on
21  March 24, '06 showing what they've claimed to be
22  tests showing non-infringement.  Right after that
23  we got that report we said, we don't quite
24  understand all the work he's done.  We would like

Page 7

1  to see the data underlying the test.  We would
2  like to see more procedures from his tests.
3         Mitek's expert wanted more
4  information.  We didn't get that information until
5  May '06.  This information was on a CD.  It was
6  data that was fully readable.  There was no
7  evidence of any virus whatsoever.  We could fully
8  read all the data.  Our experts analyzed the data.
9  They came up with their opinions about it and we
10  received a supplemental report from Dr. Gitis on
11  June 14, '06.  He didn't address any of these
12  issues then.
13         We took his deposition on June 21,
14  '06.  Nothing about a virus came up at that time.
15  Expert discovery concluded in July '06.  They were
16  deposing our experts on the 26th and 27th, right
17  before we moved into dispositive motion briefing.
18  But on the 24th of July, we received an e-mail from
19  opposing counsel, that is Exhibit 7 to our opening
20  brief, saying that their expert had just informed
21  them that he had a computer virus and that they
22  were going to redo their entire reports.
23         This is the end of expert
24  discovery and were moving to the dispositive

Page 8

1  motion phase.  We were quite taken back from this.
2  We had no evidence there was any virus.  This
3  virus didn't come up at his deposition.  It didn't
4  come up in any way in any of the documents that
5  were produced.  All of the data was fully
6  readable.
7         We were surprised by this.  We
8  said, if you had a virus, let's see some of
9  evidence of this virus.  Show us the data, show us
10  what's the name of this virus, how did it work.
11  We received no information.
12         We had a meet and confer with
13  opposing counsel.  I said, well, if we don't have
14  any information about this, we'e going to file a
15  motion to preclude this.
16         Immediately after that we got a
17  communication saying that this expert, Dr. Gitis,
18  would be unavailable for several weeks and be out
19  of the country.  Well, that may be the case, but he
20  certainly has people working for him, he has his
21  own company, he has a testing lab, he has people
22  that ran these tests for him.  We received no
23  information, no information whatsoever.
24         To date we have received no

Page 9

1  information about this virus, we haven't received
2  the name of the virus, what equipment it affected,
3  how it affected them, how it affected the data
4  that's completely readable.  So, we filed our
5  motion.  And in response to the motion Arthrex
6  took a new tactic.  It said, well, the virus
7  affected only portions of our data.  It affected
8  one test, they say now, the friction test that
9  they did.  And they want to redo the friction
10  test.
11         One thing we pointed out in our
12  motion, Your Honor, was that Dr. Gitis did a lot
13  of work and a lot of work that didn't make sense,
14  that had nothing to do whatsoever with the virus.
15  So even if there was a virus, the virus provides
16  no excuse whatsoever for redoing his work.
17         And in response to that Arthrex
18  changed it tactic a little bit.  It says in
19  footnotes in its brief, it says in its opposing
20  brief, it says, well, we were going to redo other
21  things in our report, not for reasons of a virus,
22  but because there's things in this that we think
23  were just -- I don't know, appear to be
24  inconsistencies.

47bc0e6d-663e-4927-ba09-4c44f08290d2

1    If you look at Exhibit 3 to
2  Arthrex's opposition, it is a declaration from Dr.
3  Gitis and he says in paragraph 33, for example,
4  they want to change -- they measured the diameter
5  of the suture, but he measured it and he did a bad
6  job.  He used the wrong procedure to measure it.
7  And they want to come in now and say, oh, it was
8  just a typographical error in his report.  And
9  even though he testified at deposition that he
10  measured it and got what he got, it was a
11  typographical error.  But in his affidavit he
12  says, there appears to be a typographical error.
13    Pretty telling that in his
14  affidavit he wasn't even willing to say it was
15  actually a typographical error.  And look at the
16  evidence that they put forth for a virus in his
17  affidavit.  All he says is, in his report, I don't
18  understand my own data.  Therefore, it must have
19  been a computer virus.
20    Well, obviously the other issues
21  are, it could be he just doesn't understand his
22  data, they ran the test wrong.  There's lots of
23  reasons why the data isn't corrupt in any sense.
24  So Arthrex wants to take a new tactic now.

1  It wants to change other portions of the report
2  for other reasons unrelated to the virus.
3    And also Arthrex says, well, we'd
4  like to make garden variety changes.  That's the
5  word they used in their report, garden variety
6  changes. I don't know what a garden variety change
7  to an expert report is.  I am not aware of those.
8    So that is how this arose.  Now
9  where are we?  Arthrex wants to do a virus -- redo
10  a friction test because of a virus, wants to
11  change how their diameter measurements were done,
12  calling them typographical errors, and wants to
13  redo -- testify as to how its pliability tests
14  were done.  When their experts said it was done
15  one way, they want to come in with a new way now
16  and they want to make garden variety changes.
17  Well, none of this should be allowed.  One reason
18  it should not be allowed is because it is totally
19  untimely.  It's after expert discovery.  It should
20  have been raised during expert discovery, it was
21  not.  He's already supplemented.  He had three
22  or four months to figure this out.  He didn't do
23  it then, it's too late now.
24    Secondly, Rule 26(e)(1) requires

1  them to come forward and show as a condition
2  precedent to supplementing that the information
3  that they want to supplement with wasn't available.
4  I think the case law makes that clear.  The D.A.G.
5  Enterprises case 226 F.R.D. 95 says Rule 26 is not
6  a safe harbor for experts who don't do their work
7  right to come in later after the close of expert
8  discovery.  Likewise the St. Germaine Corp. Case
9  2006 U.S. Dist. LEXUS 28263 says Rule 26 does not
10  grant a party a right to ignore court deadlines,
11  reopen discovery and find new facts and generate
12  new expert reports.  The Avia v. Mazuna case 212
13  F.R.D. 306 and the Coles v. Perry case is also in
14  accord.
15    So the case law is clear that Rule
16  26(e)(1) does not permit supplementation just to
17  redo the expert's work when he does not do a good
18  job.
19    And that's what this is all about.
20  They want to do this friction test, but they
21  haven't come forward with evidence.  We asked for
22  an offer of proof.  Where is this evidence of a
23  virus?  We still have not received any.  They want
24  to change their diameter --

1    THE COURT:  All right, let me talk
2  to you about this.  Where is the evidence?
3    MR. TAMBURO:  Your Honor, if I may
4  just clarify some of the history.  Our expert,
5  Dr. Gitis, filed his expert report at the end
6  of March.  He wasn't deposed.  We received a
7  request for the underlying data.  That's all
8  correct.  We produced a disk with the data from
9  his files.  He gave it to us.  He had no reason to
10  believe there was anything inconsistent between
11  the data and his report.  We produced it to the
12  other side at Dr. Gitis' deposition a couple of
13  months down the road which wasn't until June 21st.
14  I believe they asked him questions about his
15  tests, of course, and they asked him about all
16  these inconsistencies between what was in his
17  report and what was in the underlying data.  At
18  the time, he had really next to no explanation
19  for these inconsistencies.  He was baffled at his
20  deposition.  He thought the test was going one
21  way.  He didn't understand why there were
22  different numbers in the raw data, and he didn't --
23  that's the way he testified.
24    When he got back from his

1  deposition, he went back to California.  His
2  deposition was in D.C..  He went back to
3  California and did an investigation, did an
4  initial investigation and he found that the data
5  that he had in his raw data didn't match the
6  report.  He asked around to the people that
7  actually did the tests, and he found that there
8  was at least one test that their calculations
9  were wrong, and he couldn't explain anything else
10 about the others, so he just figured it might have
11 been a virus.  He couldn't figure out what was
12 wrong.  He figured it might be a virus, that was
13 the information we had.  That's what we told
14 plaintiff.  That's what we had at the time.
15        Mr. Bonella asked us to do a whole
16 laundry list of things to investigate and we did.
17 We asked Dr. Gitis.  We said, Dr. Gitis, you have
18 to give us more detail, what happened.  He was
19 doing that.  He got called out of the country on
20 an emergency for family reasons.  I don't even
21 know what the details are.  It was very personal.
22 Three weeks he was out of the country, and he was
23 just out of pocket.  We asked him if anybody else
24 at the lab could help us during this time, and he

1  test were produced to the plaintiff, and I told
2  them this week we are going to be getting them the
3  underlying data.  We're going to make Dr. Gitis
4  available for deposition.  There is no trial date,
5  so that prejudice is not a factor anymore.  We are
6  going to expect their expert to make comments on
7  it.  We haven't said we are going to need to
8  depose their expert on supplement.  I would like
9  to see what he has say first.  We're offering Dr.
10 Gitis for deposition.  We understand they want to
11 take his deposition, but he's over blowing the
12 facts here.  It's not that big of a deal for
13 reworking.  It's one of seven tests.  The other
14 six there is nothing to talk about.  He explained
15 what went wrong.  And, Your Honor, it was their
16 deposition questions that prompted him to look at
17 this stuff, and now we're telling them reasonable
18 explanations for it, and they're, that's not good
19 enough.  Now we have to do all this work, and we
20 have to investigate, well, there is a virus, the
21 virus affected --
22        THE COURT:  What virus?
23        MR. TAMBURO:  To be honest, he is
24 not sure there is a virus, he can't explain it.

1  said he would prefer to do this himself because
2  of all these inconsistencies that were involved
3  already.  He didn't want anyone else getting
4  involved.
5        So, long story short, he did a
6  further investigation, and he found there was no
7  quote, unquote universal virus affecting the
8  entire testing.  There were logical and reasonable
9  explanations for the inconsistencies in 80 percent
10 to 85 percent of the report, which we told -- the
11 plaintiff is aware of that now.
12        There is one test, only, out of the
13 seven he did, that he is not sure what happened to
14 the data.  He had spent hours with his experts at
15 his own place, his software people and his testing
16 people.  They cannot identify what happened to the
17 calculations for the so-called friction tests.
18 That's one of seven tests.  The other six were
19 fine.  He has explanations for what happened, and
20 we actually supplemented his report this week
21 earlier in the week to plaintiffs, so they are
22 aware of the reasons why there were these
23 inconsistencies with these other tests.  He did
24 one test over, that's it.  And the results of that

1  His declaration for the one test, the friction
2  test, says, we are unable -- we cannot explain.
3  There is no reasonable explanation for the
4  inconsistencies.  There is a calculation that's
5  done and it's intermittent.  It's incorrect on an
6  intermittent basis, and so he cannot explain why
7  it's coming up wrong on an intermittent basis.
8  It's not wrong across the board.  So he doesn't
9  know what the answer is.  So that's why he redid
10 the test, and we produced the results of that
11 test, and they're entirely consistent with the
12 first test.
13        THE COURT:  Well, I am not
14 satisfied that the explanation is good enough.
15 He's saying there's a virus, but there's been no
16 specific information or anything identifying a
17 virus, when or how or why.  Motion to preclude is
18 granted.
19        MR. TAMBURO:  Your Honor, if I
20 may.  The virus really only went to one test.  The
21 other six tests we've already explained that there
22 was no virus.  We've given that to him, and we told
23 him what the explanation is.  In fact, the raw
24 data is correct and the report is incorrect.  And

Page 18

1   so all we did was say to the plaintiff, you're
2   correct, the raw data is inconsistent with what
3   was reported in the report.  So what we are doing
4   now is supplementing the report.  There is no
5   virus issue with respect to the other six tests at
6   all.  So we're just saying --
7           THE COURT:  I've already made a
8   ruling.
9           MR. TAMBURO:  Thank you, Your
10  Honor.
11          MR. BONELLA:  Thank you, Your
12  Honor.
13          THE COURT:  Please stand and
14  recess.
15          (Hearing concluded.)
16
17
18
19
20
21
22
23
24

Page 19

1           C E R T I F I C A T E
2           I hereby certify that the
3   foregoing is a true and accurate transcription, to
4   the best of my ability, of the recorded
5   proceedings submitted for transcription in the
6   aforesaid matter.
7           I further certify that I am not
8   employed by, nor related to any party to this
9   action.
10          In witness whereof I hereby sign
11  this date:
12
13  December 12, 2006
14
15          Brigitte A. Strain, RPR
16
17
18  _____
            Brigitte A. Strain, RPR
19      Dated:
20
21  (The foregoing certification of this transcript
22  does not apply to any reproduction of the same by
23  any means, unless under the direct control and/or
24  supervision of the certifying shorthand reporter.)

47bc0e6d-663e-4927-ba09-4c44f08290d2

# EXHIBIT 2

1

1    IN THE UNITED STATES DISTRICT COURT FOR THE

2              DISTRICT OF MASSACHUSETTS

3    ----------------------------x
     DEPUY MITEK INC., a              :
4    Massachusetts Corporation,       :
                                      :
5              Plaintiff,             :
                                      :
6         vs.                         :   Civil Action No.
                                      :
7    ARTHREX, INC., a Delaware        :      04-12457
     Corporation, and PEARSALLS      :
8    LIMITED, a Private Limited       :
     Company of the United            :
9    Kingdom,                         :
                                      :
10             Defendants.            :
     ----------------------------x

11

12                 Washington, D.C.

13             Wednesday, June 21, 2006

14
     Videotape Deposition of:
15

16              DR. NORM GITIS,

17     The witness, was called for examination by

18     counsel for the Plaintiff, pursuant to notice,

19     commencing at 8:15 a.m., at the law offices of

20     Dickstein Shapiro Morin & Oshinsky LLP, 2101 L

21     Street, Northwest, Washington, D.C., before

22     Dawn A. Jaques, Certified Shorthand Reporter

23     and Notary Public in and for the District of

24     Columbia, when were present on behalf of the

25     respective parties:

82

1    Q.   Thank you. The testing that you did in
2 connection with this case in your reports, who
3 actually did the testing?
4    A.   I did it together with two engineers in
5 my lab.
6    Q.   Okay. And what engineers?
7    A.   Michael Vinogradov and Vishal Khosla.
8    Q.   Can you spell their names, please?
9    A.   Michael V-I-N-O-G-R-A-D-O-V, Vinogradov,
10 and Vishal K-H-O-S-L-A, Khosla. One is from
11 Russia, one is from India.
12    Q.   I'm going to guess Mr. Vinogradov is
13 from Russia?
14    A.   Good guess.
15    Q.   What did Mr. Vinogradov do with respect
16 to the test? What was his role?
17    A.   He helped to set up the testers and
18 modules, and he did some of the tests together
19 with me.
20    Q.   What tests did Mr. Vinogradov do?
21    A.   Most of the tests, or maybe all of the
22 tests we kind of did together.
23    Q.   So Mr. Vinogradov was involved in all
24 the tests?
25    A.   Yeah, and same thing with Mr. Khosla.

83

1    Q.   How did their roles, Mr. Vinogradov and
2 Mr. Khosla's roles, differ?
3    A.   Vinogradov is a more senior member of
4 the team, and he was involved fully in all the
5 tests that we did for Ethicon and U.S. Surgical,
6 and he was the only one who remembered something
7 from those old tests.
8        So Michael was more senior. He was
9 helping mostly in setting up the tests, and Vishal
10 was helping mostly in running the tests, and I was
11 like in and out. I was not there hundred percent
12 of the time.
13    Q.   Okay. You weren't there 100 percent of
14 the time for the set-ups; is that right?
15    A.   For all of it, for the set-ups and the
16 test. So they will do the set-up, I would come
17 approve or not approve, and then we would start
18 running tests. I would come out, come back and
19 see what is happening.
20    Q.   Did you approve each set-up after it was
21 done before the test was run?
22    A.   Yeah, of course.
23    Q.   You visually looked at each set-up?
24    A.   Yes.
25    Q.   And in terms of when the tests were

84

1 running, most of these tests took less than a
2 minute, right, actual running time?
3    A.   Not really. Depends on what you call
4 the running. You have to set up the specimen, and
5 for some of them you have to make notes, so most
6 of them took several minutes. So, yeah, I was in
7 and out of the room during this test.
8    Q.   And what percentage of the test did you
9 actually see?
10    A.   Maybe between 25 and 50 percent.
11    Q.   Okay. Is there any of the tests that
12 you didn't actually witness the test being done of
13 the tests that were done? Let me ask a better
14 question.
15        There's pliability tests that you've
16 described. Were you present for at least some of
17 the actual testing of the pliability samples for
18 pliability?
19    A.   Yes, I was present in at least some of
20 each and every test, each type of test.
21    Q.   Okay. So you weren't present the whole
22 time for this set-up and loading of each sample;
23 is that right?
24    A.   That's correct.
25    Q.   And from the tests that were done, data

85

1 was generated, correct?
2    A.   Yes.
3    Q.   Okay. And all the data that was
4 generated, was that computer generated?
5    A.   Yes.
6    Q.   And then from the computer-generated
7 data, some calculations and results were
8 presented?
9    A.   Yes.
10    Q.   Who did the calculations?
11    A.   Two of them, Michael and Vishal.
12    Q.   Okay. What was your involvement in the
13 calculations?
14    A.   We discussed the formula used, and I
15 checked the results.
16    Q.   Did you check every result, or just kind
17 of spot check it?
18    A.   I checked most of the results.
19    Q.   Okay. Did you instruct Mr. Vinogradov
20 and Mr. Khosla as to how to -- as to what formulas
21 to use and how to generate the results from the
22 data?
23    A.   How to generate results, I don't have to
24 instruct them. They know how to do it.
25        What formula to use, maybe it was not my

22 (Pages 82 to 85)

150

1 right?
2    A.   Yes.
3    Q.   And then the second, is Z a zero?
4    A.   Yes.
5    Q.   Does that tell you this is where the
6 test started after the preload was applied?
7    A.   I'm sorry, I have to think much more how
8 to read this raw data.
9    Q.   Have you read the raw data before today
10 that was used for the test?
11   A.   In my life?  For this testing?  No.
12   Q.   No, okay.
13   A.   I was looking only at the results.
14   Q.   Okay.  Do you see the force column?
15   A.   Yes.
16   Q.   And at the time, .504 -- the force being
17 applied to the specimen is .55 kilograms, right?
18   A.   Yes.
19   Q.   In your paper, in your page 3 --
20   A.   Yes.
21   Q.   -- of your report, you say the suture
22 was preloaded with a tension of .5 kilograms.
23 Preloaded suture was then pulled at a force,
24 uniformly increasing at a rate of .33 kilograms
25 per second.

151

1    A.   Yes.
2    Q.   Now, the uniform increase in rate you're
3 talking about, is that uniform increase in the
4 load that's applied to the specimen?
5    A.   Yes.
6    Q.   So you applied a .5 kilogram preload to
7 specimen, right?
8    A.   Yes.
9    Q.   And then you increase that .5 kilogram
10 preload at a rate of .33 kilograms per second
11 uniformly, right?
12   A.   Yes.
13   Q.   Okay.  So at time --
14   A.   Uniform in time, yeah.
15   Q.   So at, say when the actual -- after the
16 preload is applied, if you call that time zero,
17 after the first second, the load applied should be
18 .5 --
19   A.   Plus .33.
20   Q.   Would be .83?
21   A.   Yes.
22   Q.   And then it goes up?
23   A.   Yes, that's correct.
24   Q.   And it goes up uniformly, so for each --
25   A.   Yes.

152

1    Q.   And how is that controlled by the
2 machine?
3    A.   It is the same servo-control as we
4 discussed before.
5    Q.   It's measuring the force applied?
6    A.   Yes.
7    Q.   And it's programmed into it to increase
8 it?
9    A.   Yes.
10   Q.   Okay.  So the column F sub Z, after the
11 preload was applied, should that be going up at a
12 rate of .33 kilograms per second?
13   A.   Yes.
14   Q.   What we're going to do is we have a CD
15 with the data on it, if that's easier for you to
16 look at.
17   A.   Yeah, it will be much easier.
18   Q.   It's Bates number ARM 25902.  It's
19 entitled CETR Raw Data.
20        Do you have a later flight option?
21   A.   I thought we already finished.
22   Q.   Not quite.
23   A.   Go on with the rest of your questions.
24   Q.   Let me ask you while he's loading that
25 up, I'll ask you a question.  Page 3 at the top

153

1 you say the suture of 50 millimeters in length.
2    A.   Yes.
3    Q.   So you used a 50 millimeter gauge line
4 for each sample?
5    A.   Yes.
6    Q.   Okay.  What device did you use to
7 measure the gauge lines?
8    A.   Caliper.
9    Q.   Caliper?
10   A.   Yeah.
11   Q.   Okay.  And the diameter you say is .65
12 millimeters.
13   A.   Measured this by caliper.
14   Q.   Did you measure the diameters?
15   A.   Yes.
16   Q.   Of each sample?
17   A.   Yes.
18   Q.   Every sample?
19   A.   Not every sample, but we measured it at
20 least 10, 12 times, yeah.
21   Q.   And you always got .65 millimeters?
22   A.   Pardon me?
23   Q.   And you always got .65 millimeters?
24   A.   Yes.
25   Q.   For each sample?

154

1   A.   Yes.
2   Q.   So the coated and uncoated, did you
3 measure the diameter?
4   A.   Yes.
5   Q.   And they were the same?
6   A.   Yes.
7   Q.   No difference?
8   A.   No difference as measured with a
9 caliper.
10   Q.   Okay.  I'm going to show you -- here's
11 the computer.  I think that your data is in files,
12 and there's one that says "Modulus Raw Plots."  Do
13 you see that?  I believe that's your --
14   A.   Yeah.
15   Q.   If you could open up that file of the
16 modulus raw plots file.  I think that's what we're
17 looking at here.  Is this coated or uncoated, or
18 is it both?
19   A.   No, it seems to be opening.  Hopefully
20 it will open.
21   Q.   That's the uncoated graph, right?
22   A.   Maybe I will reduce magnification.
23 Yeah.
24   Q.   Can you find -- we were looking at the
25 printouts of the coated.  Can you find the coated

156

1 explain for a second -- I'm sorry, did you ask me
2 a question, why it's every time 10.04 or 10.05 or
3 10.06?
4   Q.   No.
5   A.   Because of its servo-control, so it
6 always measures the real time.  It says go for 10
7 seconds, but it measures with the accuracy of
8 hundredths of a second, so every time it's 10.06,
9 10.05, 10.04.  Every time it's slightly different.
10   Q.   I'm just going to move it over.
11   A.   Yeah, sure, sure.
12   Q.   What's going on here?
13   A.   I don't know what Erich did to it.
14   Q.   Now we're all the way on the left-hand
15 side.  See it says radius minus 13.136, 10.05.
16 Looks like that's in the third column, right?
17   A.   Yeah, perfect.  This is what we see now,
18 right?
19   Q.   I don't know that we're seeing all the
20 digits in the spreadsheet.  Is there more digits
21 in there?
22   A.   Maybe if we increase the width of the
23 column.  Yeah, now we see.
24   Q.   So, for example, if this is Sample 2,
25 the test is actually starting at line 4694.

155

1 in that file?
2        Okay, there's the graph for the coated,
3 right?  Okay.  Now, if you go to the data for the
4 coated that we were looking at on the printouts,
5 there's the data, right?
6   A.   Yes.
7   Q.   Okay.  And we're looking at here part
8 way down.  If you go all the way to the top, right
9 there, that is the top, this is the setting of the
10 preload, right?
11   A.   Yes.
12   Q.   Okay.  Now, could you go down and find
13 where the preload stops and the test, if you will,
14 if you want to call it that, the test part of it
15 begins?
16   A.   Okay, one sec.  I was there, and I just
17 lost it.  Erich, we need you, only your hands can
18 work with this.  I just saw it a second ago.
19   Q.   So that's where the actual --
20   A.   You'll see 10 seconds.  10 seconds were
21 over, and preload was over.  I'm looking at time.
22   Q.   Right.  And -- okay.  I see on the
23 printout, see, for example, on column 2 it says
24 No. 2, radius, velocity, duration?
25   A.   Because you know what, because I will

157

1   A.   Right.
2   Q.   Right, which would be this line here for
3 Sample 2, see how it matches up 0.5, 13.629,
4 30.3790.  See that?
5   A.   Yeah.
6        (DePuy Mitek Exhibit No. 396 was marked
7        for identification.)
8        BY MR. BONELLA:
9   Q.   Okay.  I'm going to mark 396 as this
10 page where it looks like the preload had finished
11 and the testing is starting for at least
12 Samples 1, 2 and 3.  Do you see that?
13   A.   Yes.
14   Q.   Okay.  So let's just look at Sample 2.
15 Sample 2 at time zero, right --
16   A.   Yes.
17   Q.   -- the load is .5?
18   A.   Yes.
19   Q.   And time zero is measured in seconds,
20 right?
21   A.   Yes.
22   Q.   And you said the load is going up .33
23 uniformly per second?
24   A.   Yes.
25   Q.   So at time T equals 1, the load should

40 (Pages 154 to 157)

158

1 be .83, right?
2    A.   .83, that's correct.
3    Q.   Okay.  So let's scroll down and find
4 1 second.  That's in the I column, right, of the
5 spreadsheet?
6    A.   Yes.  Slowly, but surely.
7    Q.   Yes.  Column I looks like around line
8 5148 and 49 it reached about 1 second?
9    A.   Yes.
10    Q.   Okay.  And the load for line 5148 at
11 1 second is .541.
12    A.   Yeah.
13    Q.   Shouldn't it be .83?
14    A.   It looks like there is an error in
15 decimal.
16    Q.   In decimal?
17    A.   Yeah.  It looks like it's increasing
18 0.033 per second, not 0.33 per second.  So if
19 you --
20    Q.   Well, it's .541, so if that was the
21 case, it would be .533?
22    A.   Yeah.
23    Q.   But it's not .533, right?
24    A.   No, it's not.  Let's look at the area of
25 2 seconds.

159

1    Q.   Before you do that -- let's slow down a
2 little bit.  Before you do that, let's just find
3 the page of the printout of that.  Just hold that
4 1 second spot for a minute.
5       So we're looking at Sample 2, right?
6 I'm going to mark -- I think is the page, if we
7 can just verify that.  For Sample 2, we were at
8 1 second.  If you look -- if you could just look
9 at this -- before we get there, just slow down,
10 okay?
11       If we look at the page now, the
12 printout, doesn't it correspond with the 1 second
13 you were looking at on the graph?
14    A.   Yes.
15    Q.   See the time?  This is Sample 2.  Do you
16 see that?
17    A.   Yes.
18    Q.   And time is .99, .79, goes to -- next
19 one is 1.002.
20    A.   Yes.
21    Q.   And the loads are .541 and .546.
22    A.   Yes.
23    Q.   So this page is the data we were just
24 looking at for the 1 second for Sample 2.
25    A.   Yes.

160

1    Q.   I'm going to label that as DePuy Mitek
2 Exhibit 397, okay?
3    A.   Yes.
4       (DePuy Mitek Exhibit No. 397 was marked
5       for identification.)
6       BY MR. BONELLA:
7    Q.   And you'll agree with me for Sample 2,
8 after 1 second, the load was not .83?
9    A.   I agree.
10    Q.   Okay.  So you'll agree with me that the
11 sample -- the test was not being done in a uniform
12 increasing load rate of .33 kilograms --
13    A.   Yes.
14    Q.   -- per second?
15    A.   Yes.
16    Q.   Okay.  Now, if we go to 10 seconds,
17 let's go all the way down to the end.
18    A.   I brought it to 10 seconds, and at 10
19 seconds it's 114.
20    Q.   It's what?
21    A.   1.14.
22    Q.   The load is 1.14 at 10 seconds?
23    A.   Yes.
24    Q.   You're doing some math?
25    A.   Yes.

161

1    Q.   What did you come up with?
2    A.   It looks like the loading rate was
3 different from what is stated in the report.
4    Q.   And what did you calculate?
5    A.   I calculated more like 0.06 kilogram per
6 second.
7    Q.   Okay.  Let's go to the 10 second page.
8       Is this page the 10 second page that
9 you're looking at for Sample 2?
10    A.   Yes.
11    Q.   Okay.  Let's mark that one 398.
12       (DePuy Mitek Exhibit No. 398 was marked
13       for identification.)
14       BY MR. BONELLA:
15    Q.   Do you know if the load was actually
16 uniformly increasing in this test?
17    A.   We can plot -- we can do plot load
18 versus time in this Excel file and see how uniform
19 it was.
20    Q.   Okay.  When you set up this test, you
21 were measuring -- you were applying a force that
22 was programmed in, right?
23    A.   Yes.
24    Q.   And you were measuring strain; is that
25 right?

41 (Pages 158 to 161)

162

1   A.   Yes.
2   Q.   Is there an assumption in the test that
3 it's a uniform increase in --
4   A.   Yes.
5   Q.   And that assumption is wrong?
6   A.   No, I didn't say so.
7   Q.   I didn't say you did.  I said if the
8 assumption is wrong, how does that -- what does
9 that do to the results?
10   A.   It would have no result -- no effect on
11 the results.
12   Q.   Even if it wasn't uniform?
13   A.   Yes.
14   Q.   Why is that?
15   A.   Because we loaded sutures uniformly or
16 not, whether we loaded with -- at the rate of .3
17 kilogram per second or .03 kilogram per second, we
18 saw clear differences between coated and uncoated,
19 clear repeatable statistically different results
20 for coated and uncoated sutures.
21   Q.   If you didn't load them uniformly,
22 right, each one was loaded at a different rate --
23   A.   Yes.
24   Q.   -- you would generate different strains
25 per time, right?

163

1   A.   Yes.
2   Q.   So the graphs that generated would not
3 be correct?
4   A.   No, the graphs would still stay because
5 this graph is just one column versus another
6 column.  You have column -- we just looked with
7 you at the computer.  You have column force, and
8 you have column strain, and you just plot force
9 versus strain or strain versus force, and whether
10 it was increasing uniformly or not, it cannot
11 change this graph.
12   Q.   Let me ask you a different question.  If
13 the loads didn't increase at a uniform rate, at
14 the same uniform rate on each sample, you can't
15 really compare the graphs to each other?
16   A.   If for every sample the rates were
17 different, it would jeopardize the results.
18   Q.   Okay.  You assumed in this test that the
19 diameter was constant along the length of each
20 specimen, right?
21   A.   I didn't understand your question.
22   Q.   Each specimen, for the pliability test,
23 you assumed that the diameter --
24   A.   We recall specimens at 50 millimeter
25 from the suture.

164

1   Q.   Yeah.  You assumed that the diameter was
2 constant along those lengths?
3   A.   No, we didn't make this assumption.
4   Q.   You didn't?
5   A.   No.
6   Q.   Well, you used -- did you use 0.65
7 millimeters in calculating all the stiffness data
8 that's presented in Table 2?
9   A.   Yes.
10   Q.   So did you actually measure along every
11 point of the length of every suture?
12   A.   No.
13   Q.   Okay.  So you did some measurements?
14   A.   We assumed that this data is the average
15 diameter, but we did not assume -- we did not make
16 any assumptions on each cylinder being ideally --
17 ideally cylindrical because nothing is ideal in
18 this life.
19       If you want to characterize cross
20 section of the cylinder, you have to deal with
21 average parameters for the cylinder.
22   Q.   Well, doesn't the test assume that
23 applying a -- you measured diameters along the
24 length of some specimens for the pliability tests?
25   A.   Yes.

165

1   Q.   And you calculated an average diameter?
2   A.   This is what we planned to do, but we
3 didn't have to do it because many measurements
4 that we did produced the same result, .65.
5   Q.   Who measured the diameter?
6   A.   Michael Vinogradov.
7   Q.   How much experience does he have in
8 measuring suture diameters?
9   A.   In measuring suture diameters, his
10 experience is very, very limited, but in measuring
11 diameters of cylinders, he has plenty of
12 experience.
13   Q.   How about in measuring diameter of
14 specimens on the order of the size of a suture?
15   A.   We have lots of experience for this.
16   Q.   No, him personally.
17   A.   Him personally.
18   Q.   Does the device that you used to measure
19 diameter, specifically what was the device used?
20   A.   Caliper.
21   Q.   What's the type and name of the caliper?
22   A.   Made by a Japanese company called
23 Mitutoyo, but I don't remember the particular
24 model.
25   Q.   Was it ditigal or --

42 (Pages 162 to 165)

166

1    A.   Yeah, digital, sure.
2    Q.   Okay.  How many decimal places does it
3 read out in?
4    A.   I do not remember.
5    Q.   Okay.  Do you know what its accuracy or
6 sensitivity is?
7    A.   I do not remember.
8    Q.   Do you know if it's designed to measure
9 specimens on the order of sutures?  I'm sorry, do
10 you know if the caliper that was used is
11 specifically designed to measure suture diameters?
12   A.   I know that it was not designed
13 specifically for sutures.  It's just a general
14 engineering caliper that we use in our lab.  We
15 have several of them.  We ordered them together,
16 they are from the same bunch, Mitutoyo calipers,
17 but I don't believe that Mitutoyo targets suture
18 market with those calipers.
19   Q.   Okay.  Doesn't the test -- the tests
20 that you're doing -- well, are you saying that
21 you -- did you verify that the specimens that were
22 tested in the pliability tests were actually
23 circular in diameter?
24        MR. TAMBURO:  Objection, vague.
25        THE WITNESS:  No, we did not.

167

1        BY MR. BONELLA:
2    Q.   Okay.  So there was an assumption that
3 thy were circular in diameter?
4    A.   They looked circular.
5    Q.   Okay, but they're very small?
6    A.   Yes.
7    Q.   Okay.  And it was also assumed that
8 they're circular in diameter along the entire
9 length of the specimen, the 50 millimeters that
10 was tested in pliability tests?
11   A.   We did not need this assumption.  If you
12 are talking about our calculations of the moment
13 of inertia where we used diameter of the cylinder,
14 yes, it was assumed that average diameter was .65,
15 but we did not need to go and to measure each and
16 every cross section over the length of
17 50 millimeters, because in practical engineering,
18 you just need to have the average diameter for
19 your calculations of the moment of inertia.
20   Q.   Okay.  How many measurements did you
21 take of diameter?
22   A.   I believe I already answered.  We did
23 minimum 10, 12 on the coated, and minimum 10, 12
24 on the uncoated.
25        One of the -- why we did it separately

168

1 on coated and uncoated, because in the beginning
2 we were not sure whether coating would introduce
3 some thickness, so we did it very carefully.
4        MR. TAMBURO:  Do you want to break for
5 lunch soon?
6        MR. BONELLA:  Yeah.  Let's just finish
7 this up.
8        THE WITNESS:  It's about end.  Let's
9 finish.
10       (DePuy Mitek Exhibit Nos. 399 and 400
11       were marked for identification.)
12       BY MR. BONELLA:
13   Q.   I'm going to show you DePuy Mitek
14 Exhibit 399 and DePuy Mitek Exhibit 400.  I ask
15 you if you've ever seen these documents before?
16   A.   I don't remember ever seeing these
17 documents.
18   Q.   Okay.  Do you see where -- they're from
19 Pearsalls?
20   A.   Yes.
21   Q.   And they're dated February 17th, 2006.
22 Do you see that?
23   A.   Where shall we see the date?
24   Q.   Down the bottom on the left-hand side.
25   A.   Oh, yes.

169

1    Q.   And do you see on Exhibit 399, do you
2 see it says -- underneath here it says coated with
3 Nusil Med2174 Silicone?
4    A.   Yes.
5    Q.   And if you look at Exhibit 400, in the
6 product line, third line of the document, it says
7 Blue Fibre Wire Uncoated.  Do you see that?
8    A.   Yes.
9    Q.   You don't know if these documents
10 pertain to the samples that you tested, do you?
11   A.   I don't know.
12   Q.   They weren't provided to you?
13   A.   They have not been provided.
14   Q.   If you look at Exhibit 399 and look
15 under the diameter column or row, there's an
16 average/mid/max?
17   A.   Yes.
18   Q.   And the average diameter was .586,
19 minimum was .570, and the max was .599.
20       Do you see that?
21   A.   Yes.
22   Q.   This is for a coated sample.  It's
23 different than what you assumed -- or you used,
24 I'm sorry, .65?
25   A.   Yes.

43 (Pages 166 to 169)

170

1    Q.  Okay.  Can you explain why there would
2  be a difference if this applies to the same
3  suture?
4        MR. TAMBURO:  Objection, calls for
5  speculation.
6        THE WITNESS:  I cannot explain.  I don't
7  know --
8        BY MR. BONELLA:
9    Q.  And you agree that the .65 that you used
10  is above the maximum that was measured at least
11  for this sample in Exhibit 399?
12    A.  Yes.
13    Q.  If you look at Exhibit 400, for the
14  uncoated the diameter average was .600
15  millimeters, the min was .570, and the max was
16  .635.  Do you see that?
17    A.  Yes, I do.
18    Q.  And so for this uncoated sample in
19  Exhibit 400, the maximum diameter that was
20  measured is less than the diameter that you used,
21  right?
22    A.  Yes.
23    Q.  Can you explain that?
24    A.  No, I cannot.
25    Q.  And do you see how the uncoated in

171

1  Exhibit 400 and the coated in 399 had different
2  measurements for average/minimum/maximum
3  diameters?
4    A.  Yes -- no.  I see the same minimums, but
5  different averages and maximums.
6    Q.  Yes, I'm sorry, thank you.  But didn't
7  find any difference in the diameters when you
8  measured them?
9        MR. TAMBURO:  Objection,
10  mischaracterizes testimony.
11        BY MR. BONELLA:
12    Q.  I'm sorry, did you find differences in
13  diameters between the coated and uncoated samples
14  that you tested in the pliability tests?
15    A.  We specifically looked for it, and we
16  didn't find the differences.
17    Q.  Okay.  Now, are you familiar with the
18  USP sizing for diameters?
19    A.  No, I am not.
20    Q.  Okay.  Are you familiar with a No. 2
21  designation for suture?
22    A.  No.
23    Q.  Did you ever hear of a diameter range
24  for a No. 2 suture?
25    A.  No.  Maybe I heard about it either from

172

1  the deposition of Dr. Mukherjee or from some
2  rebuttal or report of Dr. -- of your expert
3  witness.
4    Q.  I'll show you the next exhibit.
5        THE VIDEOGRAPHER:  I need to change.  It
6  takes 20 seconds.
7        MR. BONELLA:  That's all right, keep
8  going.
9        (DePuy Mitek Exhibit No. 401 was marked
10        for identification.)
11        BY MR. BONELLA:
12    Q.  DePuy Mitek Exhibit 401 -- I'm sorry, I
13  labeled the inside page, but it's a 4-page
14  document.  Part of it is not from the same
15  document, but the last page is suture size and
16  diameter chart.  Do you see that?
17    A.  Yes, I do.
18        MR. TAMBURO:  I'm sorry, are you
19  representing this as a USP chart?
20        MR. BONELLA:  The last page is.
21        MR. TAMBURO:  The last page is.
22        BY MR. BONELLA:
23    Q.  Okay, if you go to -- one column says
24  non-absorbable and synthetic absorbable sutures,
25  and there's a number 2.  Do you see that?

173

1    A.  Yes.
2    Q.  And it has diameter limits of .5000 to
3  .599 for that.  Do you see that?
4    A.  Yes.
5    Q.  And the diameter you used of .655 is
6  above those diameter limits, right?
7    A.  Yes.
8    Q.  Did you test any sutures other than
9  No. 2 size suture?
10    A.  I did not test any sutures rather than
11  those spools I received from the law firm.
12    Q.  If the diameter of the coated and
13  uncoated were different, that would change the
14  pliability test data stiffness that's presented in
15  table -- on page 4 of your report, correct?
16    A.  That's correct.
17    Q.  Okay, you want to break for lunch?
18        MR. TAMBURO:  Sure.
19        THE VIDEOGRAPHER:  This is the end of
20  Tape 2, beginning of Tape 3.  Off the record at
21  12:45:46.
22        (Lunch break taken.)
23        THE VIDEOGRAPHER:  This is the beginning
24  of Tape 3 in the deposition of Dr. Norm V. Gitis.
25  On the record -- excuse me, can we go off the

44 (Pages 170 to 173)

174

1 record? Off the record at 1:43:13.
2     (Pause in the proceedings.)
3     THE VIDEOGRAPHER: This is Tape 3 in the
4 deposition of Dr. Norm V. Gitis. On the record at
5 1:44:58.
6     BY MR. BONELLA:
7   Q.  Were there any recordation of the
8 diameter measurements that you said were made? Is
9 there anywhere that was recorded?
10   A.  No, it was not.
11   Q.  According to the data, it shows for the
12 pliability tests that you had eight samples of
13 coated and uncoated that were reported in tests?
14   A.  Yes.
15   Q.  Okay. Other than the eight, did you do
16 any other samples that aren't recorded there?
17   A.  No.
18   Q.  Why did you choose eight?
19   A.  Because among the references we cited,
20 some people tested five, some seven, some ten, so
21 we saw eight as somewhere in the middle.
22   Q.  Okay. Any other reason?
23   A.  Huh?
24   Q.  Any other reason?
25   A.  That's about it.

175

1   Q.  Who actually wrote this report?
2   A.  I did.
3   Q.  You did? So you put the 0.33 kilogram
4 per second uniform increase in?
5   A.  Yes.
6   Q.  Where did you get that from?
7   A.  From my engineers. They gave me the
8 number.
9   Q.  You got that from them?
10   A.  Yeah.
11   Q.  Did you program yourself, did you put
12 into the machine the rate at which the load should
13 go up?
14   A.  No, I did not.
15   Q.  Do you have any documents where you
16 specified the parameters for the test that should
17 be inputted into the machine?
18   A.  Yes. If it's not provided in the Excel
19 files -- what documents do you mean?
20   Q.  Like, for example, if you wrote, either
21 typed up or handwritten, said to your assistant,
22 said, okay, the pliability tests, here is how I
23 want you to run it, 50 centimeter gauge length,
24 uniform increase of load at this rate, preload of
25 this. Did you make some kind of document?

176

1   A.  No.
2   Q.  You just orally told him?
3   A.  Yes.
4   Q.  Okay. And do you know how you arrived
5 at the .33 kilogram per second?
6   A.  It was from some -- again, from the same
7 references. From one of the references cited.
8   Q.  Either the --
9   A.  Rodeheaver or --
10   Q.  Bizwada patent?
11   A.  Yeah.
12   Q.  So this pliability test is actually --
13 the test you did is actually a tension test, isn't
14 it?
15   A.  It's a pliability test.
16   Q.  It's also a tension test, right?
17   A.  Yes.
18   Q.  And in order for it to be a pliability
19 test, certain assumptions have to be true, right?
20   A.  Yes.
21   Q.  Is one of the assumptions that the
22 compressive and tensile modulus of the specimen --
23 let me rephrase that.
24     Is one of the assumptions that the
25 compressive and tensile moduli are the same for

177

1 the specimen?
2   A.  It was not specifically the assumption
3 for this test.
4   Q.  You didn't assume that one way or the
5 other?
6   A.  No, we did not.
7   Q.  You didn't consider it?
8   A.  Again, as we discussed before lunch, we
9 just decided to use the same test as our
10 customers.
11   Q.  So you didn't use -- you didn't consider
12 whether that was an assumption that goes into
13 applying this test for stiffness then?
14     MR. TAMBURO: Objection, vague.
15     THE WITNESS: No, we did not spend much
16 time on considering assumptions of our customers.
17     BY MR. BONELLA:
18   Q.  If the compressive and tensile moduli
19 for the FiberWire specimens you tested are not the
20 same, how would it affect the pliability test
21 results that you've prepared?
22   A.  It's hard to say. Depends on their
23 levels.
24   Q.  If they're different, if the compressive
25 and tensile moduli for the FiberWire samples are

45 (Pages 174 to 177)