# HERMES DECLARATION
# EXHIBIT 8

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. No. 04-12457 PBS

- - -

DePUY MITEK, INC.,

a Massachusetts corporation,

Plaintiff,

v.

ARTHREX, INC.,

a Delaware corporation,

Defendant.


- - -

WEDNESDAY NOVEMBER 30, 2005

- - -


        Oral deposition of DENNIS D. JAMIOLKOWSKI, taken
pursuant to Notice, before Jeanne Cahill, RMR, CRR, at
the offices of Woodcock Washburn, LLP, One Liberty Place,
33th Floor, 1650 Market Street, Philadelphia,
Pennsylvania, commencing at 9:10 a.m.

**TRAVEL TRANSCRIPT**

Page 98

1  before.
2     A.  I don't believe that I have.
3     Q.  Can you look at the third page of the document
4  where it says Supplemental Response to Interrogatory
5  No. 6?
6     A.  Yes, sir.
7     Q.  Have you seen that response before, either in
8  this form or some other form?
9     A.  I don't believe I have, no.
10    Q.  Could you read the first paragraph of that
11 response?
12    A.  Certainly.
13       "Supplemental Response to Interrogatory No. 6.
14 Subject to its objections, based on information that is
15 currently in its possession, and with the understanding
16 that its investigation is still ongoing, DePuy Mitek
17 further states that the claimed inventions were conceived
18 at least as early as June 6, 1988, and reduced to
19 practice at least as early as February 2, 1989, at
20 Ethicon, Inc."
21    Q.  You can stop there. I just want to ask you
22 about that sentence.
23    A.  Certainly.
24    Q.  Does Ethicon agree with that sentence?
25    A.  Yes.

Page 99

1     Q.  And is June — We talked earlier this morning
2  about June 1988 is the document that you've seen that
3  showed work at least as of that date?
4     A.  That's right.
5     Q.  It was June 6, that date, or that document?
6     A.  Yes, sir.
7     Q.  What specifically was conceived as of June 6,
8  1988?
9     A.  That one could make a braided suture
10 constructed of two or more fiber types designed to
11 realize beneficial properties. The constructions
12 specifically mentioned include PET,
13 polytetrafluoroethylene combinations, PET and
14 polypropylene, and an absorbable construction of PDS and
15 Vicryl.
16       Four embodiments of this idea include carrier
17 blending, and what that means is that you take the
18 individual yarns that are placed on individual carriers
19 during the construction. And a second method includes
20 where the yarns of the two or more polymers are plied,
21 the plies then resulting on carriers, and then those
22 carriers used to make the braid.
23       It goes on to describe other ways of making
24 composites, including fiber commingling, and the use of
25 bicomponent fibers.

Page 100

1                     To tell you the truth, I forgot what you asked
2  me.
3     Q.  Well, I asked you what was conceived.
4     A.  And at the very least, that was conceived. And
5  I've taken that off of the first page.
6     Q.  First page of Defendant's Exhibit 35?
7     A.  That is correct.
8     Q.  And that's a document dated June 6, 1988?
9     A.  June 6, '98 correct.
10    Q.  88?
11    A.  '88.
12    Q.  I caught you that time.
13    A.  What is further conceived or what is further
14 described are various combinations and various proposals
15 for experiments to be done to help evaluate the merits of
16 these ideas.
17    Q.  I want to focus, my question was focused on
18 what was conceived as of that date.
19    A.  Okay.
20    Q.  Now, you mentioned three combinations of
21 materials, correct?
22    A.  There were three combinations that were
23 representative of the ideas, yes.
24    Q.  The third one was the absorbable one?
25    A.  That's correct.

Page 101

1     Q.  And the absorbable one, that's the PDS/Vicryl?
2     A.  That is correct.
3     Q.  And am I correct that the PDS/Vicryl ultimately
4  was not within the claims of the Hunter patent?
5        MR. BONELLA:  Object to the form.
6        THE WITNESS:  I believe that to be the case.
7  BY MR. SABER:
8     Q.  The PET/PTFE combination, is that within the
9  claims of the Hunter patent?
10       MR. BONELLA:  Object to the form.
11       THE WITNESS:  I believe that to be the case.
12 BY MR. SABER:
13    Q.  The PET/PP combination, is that within the
14 claims of the Hunter patent?
15       MR. BONELLA:  Object to the form.
16       THE WITNESS:  I believe that to be the case.
17 BY MR. SABER:
18    Q.  What does PP stand for?
19    A.  Polypropylene.
20    Q.  What does PET stand for?
21    A.  Polyethylene terephthalate.
22    Q.  And what does PTFE stand for?
23    A.  Polytetrafluoroethylene.
24    Q.  And you told me about Vicryl earlier today, but
25 what is PDS?

26 (Pages 98 to 101)

Page 102

1    A. PDS is polyparadioxanone. It is an absorbable
2 polyester. It has properties that are different than
3 Vicryl. And it is as a -- it is used as a suture
4 material, and that polymer is also used to make
5 injection-molded implantable absorbable medical devices.
6    Q. Is the PET/PTFE combination non-absorbable?
7    A. That is correct.
8    Q. Is the PET/PP combination non-absorbable?
9    A. Correct.
10    Q. As of June 6, 1988, were any other combinations
11 other than -- any other non-absorbable combinations other
12 than PET/PTFE or PET/PP conceived by Ethicon?
13    A. I believe that the compositions that you
14 mentioned were representative of an idea, which was laid
15 out here. So those were specific embodiments that were
16 mentioned, the idea being the combination of two or more
17 yarns that were selected from different groups.
18    Q. Were there any specific combinations other than
19 the two represented in Defendant's 35 that had been
20 conceived as of June 6, 1988?
21    MR. BONELLA: Object to form. Asked and
22 answered.
23    THE WITNESS: There are none that are recorded
24 in Defendant's 35.
25 BY MR. SABER:

Page 103

1    Q. Do you know of any? Does Ethicon know of any
2 as of June 6, 1988, any specific combinations?
3    A. At the present time, I would say no.
4    Q. Now, there are four methods of --
5    A. Right.
6    Q. -- direct blending, is that the right word, the
7 two yarns?
8    A. I certainly understand what you mean by that.
9    Q. Fine. Could you explain what method one is?
10    A. Certainly.
11    Q. Called carrier blending?
12    A. Correct.
13    In the course of producing a braid, that
14 manufacturing process is easily conducted using a machine
15 called a braider. Examples of this include a Butt
16 braider, B-U-T-T, named after the company, I believe in
17 Massachusetts.
18    The way this operation works or the way the
19 equipment works is that a plate is provided in which
20 gears are mounted which direct what are called carriers
21 in serpentine fashion. These carriers carry yarn.
22 They're, in fact, in spool form, and the fibers come off
23 the spool.
24    So what you're doing is you're doing what every
25 mother has done with a child with long hair, in terms of

Page 104

1 braiding, providing an interconnection between the
2 various yarns.
3    In the first method, again, called carrier
4 braiding, a carrier will hold a yarn of a given type,
5 let's call it A. Other carriers may contain A as well,
6 but in this setup, at least one of the carriers is
7 required to contain another type of yarn.
8    So in the diagram that's listed, there is an A
9 and B, and in this case, it is A, A, B, A, A, B, B,
10 indicating that these carriers then have either an A or a
11 B.
12    Q. Am I correct that on each individual carrier,
13 it's all of A or all of a B?
14    A. Yes.
15    Q. The method described in carrier blending, are
16 braids made by that method part of the invention of the
17 '446 patent?
18    A. Yes.
19    MR. BONELLA: Object to the form.
20 BY MR. SABER:
21    Q. Could you explain the second one?
22    A. Yes.
23    Q. Okay. What's called yarn blending.
24    A. In yarn blending, one would take a yarn, let's
25 say it's A, and take another yarn, and let's say it's B.

Page 105

1 They would be provided so as to meter out these yarns as
2 supply spools onto another spool. This operation is
3 called plying, P-L-Y-I-N-G.
4    These yarns can be combined with no twist, with
5 what is called a Z twist, or what is called an S twist,
6 the Z and the S depending upon whether it's right-handed
7 or left-handed.
8    The subsequent spool containing the plied yarns
9 is then used to supply the carrier spool. So an
10 individual spool may contain a combination of Yarns A and
11 B.
12    To read from the paperwork, Defendant's 35,
13 yarn blending: "Blending is accomplished prior to the
14 braiding by plying Yarns A and B together to form a
15 composite yarn."
16    Q. Does that mean that each of the braids on the
17 braider has a combination of A and B plied together?
18    A. No. You would wind up with only one braid.
19 You used the wrong terminology.
20    Q. Okay.
21    A. A carrier may contain --
22    Q. Let me rephrase the question. Thank you.
23    A. Please.
24    Q. Would each carrier have an A and a B plied
25 together?

27 (Pages 102 to 105)

Deposition of:
Dennis D. Jamiolkowski

November 30, 2005

Page 126

1  If you could, on what's marked as Page 8 there,
2  if you could read that last paragraph, and it flops over
3  to the next page, I'm going to ask you a question or two
4  about it.
5  A.  "At least as early as June 6, 1988, the
6  inventors conceived of the idea of a suture having a
7  heterogeneous braid as claimed in the '446 patent.
8  "For example, Dr. Steckel's laboratory notebook
9  describes the concept of a braided suture constructed of
10  two or more fiber types designed to realize the
11  beneficial properties of each polymer.
12  "Dr. Steckel's notebook further states that the
13  composites be evaluated using PET/PTFE and PET/PP. As
14  explained, the idea that the PET/PTFE and PET/PP
15  combinations of yarns could be blended by carrier
16  blending or dividing the yarns into two sets, Yarn A
17  residing on one set and Yarn B on the other, having been
18  developed.
19  "Dr. Steckel's notebook further describes
20  various composite braids that were evaluated. They
21  included a PET/PTFE braid and PET/PP braids that were
22  carrier blended, as noted by CB.
23  "Dr. Steckel's notebook also describes the
24  construction and evaluation of a braid that was formed
25  with a carrier braider, and a braid of PTFE and PET.

Page 127

1  "Documents describing the chronology of the
2  research and development include the documents bearing
3  Bates Nos. DMI 002269-2678 and DMI 002199-2268."
4  Q.  Thank you.
5  I want to ask you specifically about the
6  sentence that talks about, "Dr. Steckel's notebook
7  further describes various composite braids that were
8  evaluated," and then goes on to say, "These included a
9  PET/PTFE braid and a PET/PP braids that were carrier
10  blended as denoted by CB."
11  A.  Yes, sir.
12  Q.  Looking back at Exhibit 37, the June 6, '88
13  document that we were discussing before the break, is
14  there any disclosure of a PET/PP braid that was carrier
15  blended as denoted by CB?
16  A.  And the document you wish me to refer to is
17  Document --
18  Q.  Yes, the one that begins on 2617 from exhibit
19  37, and that entry goes on for four pages.
20  A.  Got it. Okay.
21  And we're speaking of yarn blending of PET and
22  polypropylene?
23  Q.  Yes, sir.  Is that shown in this document, and
24  if so, where?
25  MR. BONELLA:  When you say "document," just to

Page 128

1  clarify --
2  MR. SABER:  The four-page June 6 document.
3  MR. BONELLA:  All four pages?
4  MR. SABER:  Yes. sir.
5  THE WITNESS:  So starting with 2617, and CB --
6  carrier blending or yarn blending?
7  BY MR. SABER:
8  Q.  Carrier blending.  I think you said yarn
9  blending.
10  A.  You said yarn blending.
11  Q.  Did I?  I apologize if I did say yarn blending.
12  A.  We don't want to have to take a walk.
13  Q.  I meant to say carrier blending.
14  A.  Okay.  On those four pages of DMI 002617 to
15  2620, there are three carrier blending embodiments that
16  were noted for evaluation. and the combinations were PET
17  and polytetrafluoroethylene.
18  Q.  That's PTFE?
19  A.  PTFE.  As well as a Vicryl/PDS combination.  So
20  as far as what you asked for PET/polypropylene, they were
21  not part of the initial evaluation package.
22  Q.  Do you know of any support for the statement
23  that the braid -- that Dr. Steckel's notebook describes a
24  combination braid being evaluated of PET/PP by the
25  carrier blended method?

Page 129

1  A.  I mean, I didn't see it in this document
2  either.  Is there anything else that I'm missing?
3  MR. BONELLA:  What document are we talking
4  about?
5  MR. SABER:  The 6/6/88.
6  MR. BONELLA:  The four pages?
7  MR. SABER:  I didn't see it anywhere else, too,
8  by the way, but it's not in the four pages, which is what
9  the interrogatory is referring to.
10  MR. BONELLA:  Object to the form of the
11  question.
12  THE WITNESS:  In terms of being specifically
13  described on those four pages, I do not see any
14  description.  However, in the first paragraph of Page
15  2617, one includes PET/polypropylene combinations.  And
16  it's further stated that there are four methodologies
17  that can be employed to combine these different fiber
18  types, and carrier blending is one of the four ways of
19  doing it.
20  So in terms of reading, on Page 2617, it
21  certainly appears that PET/polypropylene combination by
22  carrier blending is described.
23  BY MR. SABER:
24  Q.  I understand, but as far as you can tell from
25  this document, does this document ever show that such a

33 (Pages 126 to 129)

# HERMES DECLARATION
# EXHIBIT 9

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
 2

 3   DePuy Mitek, Inc., a
     Massachusetts Corporation,
 4
          Plaintiff,
 5
          vs.                          CIVIL ACTION
 6                                     NO. 04-12457 PBS
     Arthrex, Inc., a Delaware
 7   Corporation,

 8        Defendant.
     _____/
 9


10
     DEPOSITION OF:      DONALD GRAFTON
11
     DATE:              March 14, 2006
12
     TIME:              8:38 a.m. to 1:23 p.m.
13
     LOCATION:          The Ritz Carlton Golf Resort
14                      2600 Tiburon Drive
                        Naples, FL  34112
15
     TAKEN BY:          Plaintiff
16
     REPORTER:          Deborah A. Krotz, RPR, CRR
17
     VIDEOGRAPHER:      Gene Howell, CLVS
18

19

20

21

22

23

24

25
```

**26**

1   Q. Let me back up to make sure this is clear. Knot
2 strength versus knot tiedown. In your mind, are they the
3 same thing or are they different?
4   A. I'm not sure I understand your question. Say
5 that again.
6   Q. Sure. Knot strength --
7   A. Mmm-hmm (affirmative).
8   Q. -- which I think you testified that you
9 understood to be tying a knot in a suture and pulling it
10 on a tensile machine -- tensile tester machine to
11 determine the strength at which the knot will break;
12 right?
13   A. Yes.
14   Q. Okay. Then there's another term called knot
15 tiedown, and I'm trying to understand whether, in your
16 mind, you think that's the same as knot strength or do you
17 use that term to mean something else?
18   A. They're closely related.
19   Q. And how are they related?
20   A. When you have a knot tiedown, you've tied a knot.
21 The strength of the knot is going to affect the ability to
22 hold -- to approximate the tissue in the tiedown area that
23 you're talking about.
24   Q. If the knot had a good tiedown or a bad tiedown,
25 what do you mean by that?

**27**

1   A. Its ability to approximate the tissue and hold it
2 in place through biomechanical forces.
3   Q. So that's related to knot strength, but it's not
4 necessarily the same thing; is that the way you're using
5 the term?
6   A. Yes.
7   Q. The way I heard you describe knot tiedown was you
8 said the ability to approximate the tissue and hold it
9 into place through biomechanical forces.
10   A. (Witness nods head affirmatively).
11   Q. When you say ability to approximate the tissue,
12 what do you mean by that?
13   A. Shift tissue in the position that the surgeon
14 would like for it to be on the bone.
15   Q. Shift tissue; did you say?
16   A. Yes.
17   Q. S-H-I-F-T?
18   A. Yes.
19   Q. So the knot's moving the tissue?
20   A. The suture is holding -- the suture loop with the
21 knot in it, is holding the tissue in the position that the
22 surgeon would like for it to be on bone.
23   Q. That's taking the place of the tissue? When you
24 say approximate the tissue, how is it approximating
25 tissue?

**28**

1   A. It's -- The tissue is here. The location the
2 surgeon wants it here. The suture loop as it is tied
3 moves the tissue into position.
4   Q. Holds it there?
5   A. Yes.
6   Q. And what -- what biomechanical forces were you
7 referring to?
8   A. Forces on the glenohumeral joint.
9   Q. In a knot strength test, it's the forces are
10 being applied and generally in one direction; correct?
11   A. Yes.
12   Q. The biomechanical force that you are referring to
13 in this knot tiedown, the forces are coming from different
14 directions; right?
15   A. Yes.
16   Q. Okay. When you are referring to knot tiedown
17 then, you're referring to -- you're referring to it in a
18 sense as a strength?
19   A. Are you finished? Is that the question?
20   Q. Right.
21   A. I don't believe -- Say it again then.
22   Q. Sure. Knot tiedown, the way you're referring to
23 it, it's a strength then? It's kind of like -- because
24 knot strength would be measured in p.s.i.
25   A. I said that's one of the attributes of it.

**29**

1 That's not the total attribute of it. I mean it's to
2 approximate tissue into position is knot tiedown.
3   Q. Well, what else would be included?
4   A. I just told you. Approximate tissue, strength.
5   Q. So the strength would -- I understand the --
6   A. The size of the knot bundle. You know, there's
7 --
8   Q. Size of the knot bundle?
9   A. Yes.
10   Q. What do you mean by that?
11   A. How large the knot is once it has been tied and
12 cut.
13   Q. So knot tiedown includes the size of the knot
14 bundle?
15   A. Yes. You know, the knot tiedown -- I want to say
16 this -- that's not a term that we specifically use, so
17 it's a little bit foreign. I mean I don't -- I've never
18 had a surgeon ask me about knot tiedown.
19   Q. Okay.
20   A. So I didn't -- your -- I'm not sure where you're
21 going with this, but there's -- we did knot testing and we
22 did straight pull testing of the suture so that your knot
23 tiedown, I'm -- I'm not real sure what you're asking for
24 there. I --
25   Q. Well --

8 (Pages 26 to 29)

**30**

1    A.   I said they are related.
2    Q.   Okay.  They're your terms.  I just want to
3  understand them because when we ask questions, I want to
4  make sure we're both on the same page, because there's a
5  lot of terms that we're throwing around, and some people
6  have different definitions and some people have different
7  understandings of what they mean, so I want to know that
8  when I ask you a question and I ask you a question about
9  knot tiedown that we're both talking about the same thing
10  so there's no misunderstanding what we're talking about.
11    A.   I've told you they were closely related.
12    Q.   Right.  But closely related doesn't tell me what
13  knot tiedown is in your mind, so I'm trying to figure out
14  what it means in your mind.  So now I've heard you say
15  that it's the ability to approximate the tissue and hold
16  it in place through biomechanical forces?
17    A.   (Witness nods head affirmatively).
18    Q.   I heard you say the size of the knot bundle is
19  part of knot tiedown?
20    A.   (Witness nods head affirmatively).
21    Q.   And by size of the knot bundle, you are referring
22  to how big the knot is when it's tied?
23    A.   Correct.
24    Q.   Anything else included within knot tiedown in
25  your mind?

**31**

1    A.   Not that I can think of right now.
2    Q.   Okay.  So in evaluating the Tevdek suture, did
3  you evaluate the Tevdek suture for knot tiedown
4  characteristics?
5    A.   Evaluated for knot strength and straight pull.
6    Q.   How about knot tiedown characteristics?
7    A.   There is no test report that would have knot
8  tiedown as -- as part of the characteristics that were
9  tested.
10    Q.   You said there's no test report.  And my question
11  -- that does not necessarily answer the question.
12         MR. SOFFEN:  I think he answered it no at the
13  beginning of the answer.
14    Q.   That's not what the record says.
15    A.   I told you it was a term that we didn't use
16  directly.  Knot tiedown -- "knot tiedown" was not used.
17  So the answer to your question then is no.
18    Q.   No?  Okay.  How about the Pearsalls suture that
19  was polyester?  Was that evaluated for knot tiedown
20  characteristics?
21    A.   No.
22    Q.   Okay.  How about the term "knot security"?  Are
23  you familiar with that term?
24    A.   Yes.
25    Q.   What does knot security mean to you?

**32**

1    A.   The ability of the knot to not slip and to
2  maintain the inner loop linear section that was tied with
3  the knot and hold -- and maintain that during
4  biomechanical forces without slippage.
5    Q.   What do you mean by the inner loop linear section
6  of the knot?
7    A.   When you tie a knot, you're tying it most of the
8  time to bone and tissue.  There's -- If you tie a knot,
9  then there's a loop; okay?  The knot slippage would be
10  measured as an increase in that loop diameter.
11    Q.   Is there a standard test for that?
12    A.   What do you mean standard test?
13    Q.   A test -- Well, let me rephrase the question.
14    A.   Is there any test for it?  Or I don't understand
15  the question.
16    Q.   Let me rephrase the question.  Was there a test
17  that you are familiar with that you generally used to
18  evaluate knot security?
19    A.   Not generally.  It was tested, but -- but not
20  every time.
21    Q.   And what test was that?
22    A.   There -- the -- What test?
23    Q.   Right.
24    A.   The test for the slippage of the knot.
25    Q.   And how was that test conducted?

**33**

1    A.   Pull tested with the inside i.d. of the suture
2  held and measured the strength before the increase in size
3  of the inner loop.
4    Q.   What type of machine was used for that?
5    A.   Tensile test machine.
6    Q.   Would you draw a picture of that test?
7    A.   (Witness complying).
8    Q.   Okay.  Can you label the components you've drawn.
9    A.   (Witness complying).
10    Q.   And can you describe what you have labeled -- I
11  see you have labeled the crosshead, two hooks, the knot,
12  and a suture loop; right?
13    A.   Yes.
14    Q.   Okay.  And the forces applied by -- Well, what
15  type of machine is this?  I'm sorry.  This is a tensile
16  test?
17    A.   Tensile test.
18    Q.   And force is applied to pull from each direction,
19  top and bottom, if you will?
20    A.   That's what the two arrows signify.
21    Q.   Okay.  Are there mandrels which that knot --
22  around that suture loop?  Does the suture loop go around
23  mandrels?
24    A.   Hooks or pins or some way to affix the suture.
25  So when you say a mandrel, I mean there's a lot of

9 (Pages 30 to 33)

**34**

1 different types of mandrels.
2   Q.  Okay.
3   A.  I'm not sure what you mean.
4   Q.  Something with a hook that the loop wraps around,
5 goes around -- the suture loop goes around?
6   A.  I've got two hooks listed there, yes.
7   Q.  Okay.  And you labeled the knot; right?
8   A.  Yes.
9   Q.  And this test is measuring -- Can you explain to
10 me how this test is measuring --
11   A.  Yeah, once the crosshead moves --
12   Q.  Right.
13   A.  -- this is placed under a fixed tension to start
14 with to remove any -- any slack in the loop --
15   Q.  Correct.  Okay.
16   A.  -- and then once it's test -- once the crosshead
17 is moved, you measure the tensile strength which is
18 required to increase that loop opening.
19   Q.  Are you pulling on one of the parts of the knot?
20   A.  That's what -- What do you mean parts of the
21 knot?  No.  The knot's here on the side.  Pulling 90
22 degrees from the knot on both ends.
23      Here, I'll draw you a bigger picture.
24   Q.  Thank you.
25   A.  (Witness complying).

**35**

1   Q.  Well, the knot that you're describing here, is
2 this knot the same knot as, for example, that you would
3 tie your shoe?  You just go over?
4   A.  It's a square knot.
5   Q.  You're calling it a square knot?  Okay.
6   A.  Yes.  Now you can tie many different knots there.
7   Q.  Right.
8   A.  To determine which knot has the best efficiency
9 with use with that particular type of suture -- there's 30
10 or 40 different types of knots.
11   Q.  Okay.
12   A.  The test calls for a square knot.
13   Q.  Okay.  And when the force is applied, it's
14 measuring -- you want it -- the object here is to
15 determine how much -- or I'm sorry -- the object is to
16 determine when the suture that's tied in this knot starts
17 slipping out of the knot?
18   A.  Yes.
19   Q.  And the force at which it does that is considered
20 the knot -- it's the knot security?
21   A.  Yes.
22   Q.  Okay.  Did you analyze the Pearsalls polyester
23 suture for knot security?
24   A.  Yes.
25   Q.  How about the Tevdek suture?  Did you analyze

**36**

1 that for knot security?
2   A.  Yes.
3   Q.  Okay.  So in selecting sutures in your
4 experience, knot security, knot strength, tensile strength
5 are all important considerations?
6   A.  Yes.
7      MR. SOFFEN:  Are you going to label that as an
8 exhibit?
9      MR. BONELLA:  Sure.  If you would date that and
10 initial that, Mr. Grafton.
11      We'll mark that as DePuy Mitek Exhibit 421.  And
12 that's Mr. Grafton's drawing of the knot security
13 test.
14      (DePuy Mitek Exhibit No. 421, Mr. Grafton's
15 drawing of the knot security test, was marked for
16 identification.)
17   Q.  The Tevdek suture, was that also polyester?
18   A.  Yes.
19   Q.  And Size 2?
20   A.  Yes.
21   Q.  Any other sizes?
22   A.  Possibly.
23   Q.  But you don't remember?
24   A.  No.
25   Q.  Was the Tevdek suture braided?

**37**

1   A.  Yes.
2   Q.  Did the Tevdek suture have a core?
3   A.  I have no idea.
4   Q.  Why was there a shift -- Let me back up.  When
5 Arthrex began selling the Tevdek polyester suture, did it
6 stop selling the Pearsalls polyester suture?
7   A.  Yes.
8   Q.  Why was there a shift from the Pearsalls
9 polyester suture to the Tevdek polyester suture?
10   A.  I answered that question already.
11   Q.  You did?  I'm sorry.  I missed it.  What was the
12 reason?
13   A.  The stiffness and compliance of the suture.
14   Q.  So the Tevdek suture was more compliant --
15   A.  That's correct.
16   Q.  Let me finish the question.  The Tevdek suture
17 was more compliant than the Pearsalls polyester suture?
18   A.  That's correct.
19   Q.  Did the Tevdek suture have a coating?
20   A.  Yes.
21   Q.  Do you know what the coating was?
22   A.  No.
23   Q.  And the Pearsalls suture, was the braid
24 constructed on a carrier braider machine?
25   A.  Yes.

10 (Pages 34 to 37)

**42**

1  A.  What's the date on this?

2  Q.  The date on this is -- the last page is dated
3 November 4th, 2005.

4  A.  Okay. I want to quantify this then, because
5 you're talking about a time period after I worked for the
6 company, so when you -- when it says in here that I'm
7 familiar with these products, it would be at the time I
8 had left the company. And this is -- this was written
9 after I left the company. So I can't totally say that I
10 am familiar with those products under that.

11  Q.  So you would agree that you were familiar with
12 the state-of-the-art for surgical suture products as of
13 the date you left Arthrex?

14  A.  Define state-of-the-art, sir.

15  Q.  State-of-the-art? Well, the general -- You don't
16 have an understanding of what that means?

17  A.  I want to understand what you mean in the context
18 of this state-of-the-art.

19  Q.  Okay.

20  A.  I mean there's -- there's -- there's --

21  Q.  This is from Pearsalls, so I can't tell you
22 exactly what they mean, so ... Let me back up. When you
23 were --

24  A.  I was -- I was familiar with the competitive
25 products on the market and what we offered and how they

**43**

1 compared to the competitive products.

2  Q.  Okay. And that was as of the date you left
3 Arthrex?

4  A.  Yes.

5  Q.  Okay. And how long were you familiar with
6 Arthrex's suture products and the competitive suture
7 products that are in the marketplace?

8  A.  When we started marketing the product, the
9 sutures, until the time I left.

10  Q.  Okay. So sometime when Arthrex began selling the
11 suture from the supplier from New Mexico?

12  A.  Yes.

13  Q.  Okay. When Arthrex shifted from the Pearsalls
14 suture to the Tevdek suture, was there any consideration
15 to -- or for Arthrex designing its own suture?

16  A.  No.

17  Q.  Why not?

18  A.  Because we could find a suture OEM that was
19 available already. Why manufacture the suture when
20 there's a readily available source?

21  Q.  Now you said you tested for the Tevdek suture
22 before it was selected; right?

23  A.  Of course.

24  Q.  And then it came back after it was selected, the
25 response from surgeons was that it had low knot strength

**44**

1 and tensile strength; right?

2  A.  Yes.

3  Q.  Didn't that come up in your testing?

4  A.  I don't recall.

5  Q.  What was your involvement in the development of
6 FiberWire?

7  A.  It was my idea.

8  Q.  When you say it was your idea, what do you mean
9 by that?

10  A.  I'll give you -- Would you like the story on how
11 FiberWire came about?

12  Q.  Sure.

13  A.  We were having issues from customers with the
14 Tevdek suture being low tensile strength as compared to
15 competitors' suture anchors with suture, primarily
16 Ethicon.

17  Q.  Ethibond?

18  A.  Ethibond. This was numerous complaints from
19 friendly surgeons, not -- not a massive amount of
20 complaints, but it was determined that the tensile
21 strength of the suture was not as good as the Ethicon
22 Ethibond suture.

23  Q.  When you say friendly, do you mean friendly to
24 Arthrex?

25  A.  Yes. And I had gotten a phone call from a Dr.

**45**

1 Deberdino who was a surgeon at Fort Sam Houston, San
2 Antonio. His -- his comments were that he had tied three
3 knots the previous afternoon using the FASTak product of
4 Arthrex -- that's a glenoid labrum device -- and had broke
5 the knots on all three of them. And -- you know -- he
6 said it kind of jokingly. He said, "And I didn't even
7 work out the day before."

8  And so he was trying to be nice about it, but
9 bottom line was your suture sucks. Okay?

10  And so -- you know -- we're in a position where
11 we need to find a suture that will be competitive. I had
12 been to Pearsalls many times working on bioabsorbable
13 products. This was the time that you referred to earlier
14 where I said three to five, and was familiar with suture
15 manufacturing, the steps required to manufacture a suture.

16  One of the trips there, Mr. Lyon had pointed out
17 to me a -- the other products they manufactured, which was
18 fishing line and silk used in decorated drapes. The
19 fishing line used a ultra-high molecular weight
20 polyethylene material that was very strong, and I -- at
21 some point, it was decided that we would try some of that
22 for a suture.

23  I had Pearsalls, mainly through Brian, as being
24 the manufacturing person --

25  Q.  Brian Hallett?

12 (Pages 42 to 45)

46

1   A.   That's correct -- make some Size 2 braided
2 material, send to me, and at the -- coincidentally, at the
3 same time, I had a Dr. Steve Burkhart from San Antonio and
4 a Dr. Casey Chan, who is a R & D guy in knot testing and
5 suture. They were -- they were at Arthrex at the time
6 when this material showed up.
7        We tested the material. The strength was
8 excellent. The knot slippage was very poor, would not
9 hold a knot.
10       So at that point in time, it looked like we would
11 not be able to use an alternative material of ultra-high
12 molecular weight polyethylene because the slippage of the
13 material -- because of the slippage of the material tested
14 with Casey Chan -- Dr. Chan and Dr. Burkhart. And so at
15 that point in time, the -- the product was -- was on hold.
16       I was on a trip to Chicago to the national sales
17 meeting, and I had this idea of adding PET to the
18 ultra-high molecular weight polyethylene to enhance the or
19 reduce the knot slippage of the product. I sent an e-mail
20 to Dr. Steve Burkhart and suggesting that since he was
21 familiar with the testing we had done very recently with
22 just the ultra-high molecular weight PE, of adding the
23 PET, and his -- I'll never forget the e-mail. He thought
24 that was a killer idea.
25       And so I had asked then at that time for Brian

47

1 Hallett to make me samples up of using those two materials
2 and -- and send to me. And we tested the materials, and
3 now we had a product that had superior tensile strength
4 and greater knot strength than any competitive product out
5 on the market.
6   Q.   Okay. If I could just back up to a couple of
7 points that you mentioned to make sure I understand what
8 happened here. The -- You said the idea began -- or I'm
9 sorry. Back up. You said when this idea came up, you had
10 already been to Pearsalls several times?
11   A.   Mmm-hmm (affirmative).
12   Q.   And you were familiar with --
13   A.   Yes.
14   Q.   And when this idea came up, you were familiar
15 with how sutures were manufactured?
16   A.   Yes.
17   Q.   Okay. And what did you mean by that?
18   A.   One of the products -- projects that I worked on
19 was a bioabsorbable suture similar to what Ethicon sells
20 as Panacryl, and the difference being this was 100 percent
21 PLLA material. The -- so we worked on this for about a
22 year -- I don't know the exact time -- with many trips
23 over to Pearsalls to change the construct of the yarn to
24 enhance the tensile properties of the material. And so at
25 that time, I became familiar with how a suture is

48

1 processed to make a braid.
2   Q.   Okay. And how many times were you over in
3 England?
4   A.   I told you already. Three to five.
5   Q.   Three to five.
6   A.   Approximate.
7   Q.   Is that total lifetime?
8   A.   That's an approximate number total lifetime, yes.
9   Q.   Have you been to other manufacturing facilities
10 for sutures?
11   A.   Jenzyme Tevdek.
12   Q.   And how many times have you been there?
13   A.   Once, I believe.
14   Q.   And when you were at Jenzyme Tevdek, did you see
15 the manufacturing processes for Tevdek?
16   A.   It was a dog and pony quick courtesy through the
17 facility.
18   Q.   So when you came up with the idea for using
19 ultra-high molecular weight polyethylene in a suture, did
20 you -- you say you are familiar with how sutures are made?
21   A.   I'm also a fisherman. There's -- you know --
22 fishing line is -- uses ultra-high molecular weight
23 polyethylene as a material that's used for sport fishing,
24 very high strength.
25       Pearsalls made fishing line. And so they had

49

1 this material already available as a fishing line. So it
2 was an easy conversion -- you know -- conclusion,
3 conversion to say what if this is used as a suture
4 material, because ultra-high molecular weight polyethylene
5 is a totally inert material.
6   Q.   When you saw that Pearsalls had been using
7 ultra-high molecular weight polyethylene in fishing
8 line --
9   A.   Yes.
10   Q.   -- do you know how it was being used in fishing
11 line, what the construction was?
12   A.   No.
13   Q.   Was it a braided construction? Was it --
14   A.   I can't tell you for sure, sir.
15   Q.   You don't know?
16   A.   I wasn't interested in buying fishing line, so I
17 didn't look at the details of it.
18   Q.   So you had -- Sitting here today, you can't tell
19 me anything at all about how the fishing line that
20 Pearsalls was making with ultra-high molecular weight
21 polyethylene was constructed?
22   A.   It went through their manufacturing processes in
23 their company, but specifically how it was made, the
24 constructs, I have no idea or the size.
25   Q.   In other words, you have no idea if it was all

13 (Pages 46 to 49)

**50**

1 ultra-high molecular weight polyethylene or if it was
2 braided or --
3  A.  It's been too long ago.  I can't tell you that.
4  Q.  And your idea was to use the ultra-high molecular
5 weight polyethylene as a suture?
6  A.  Yes.
7  Q.  Okay.  And you had Mr. Hallett make a Size 2, I
8 think you said?
9  A.  Yes.
10  Q.  Okay.  Can you describe the construction of that
11 first --
12  A.  I don't remember now.  It's been too long.
13  Q.  Was it all ultra -- ultra-high molecular weight
14 polyethylene?
15  A.  Initially, yes, as a test prototype material.
16  Q.  Was it braided?
17  A.  Yes.
18  Q.  Was it an eight-carrier or a sixteen-carrier?
19  A.  I don't remember.
20  Q.  You said it was a Size 2 though?
21  A.  Yes.
22  Q.  So it was a Size 2 ultra-high molecular weight
23 polyethylene braided suture that did not have PET?
24  A.  For the initial prototype material, that's
25 correct.

**51**

1  Q.  Okay.  And it didn't have nylon or any other
2 material braided with it?
3  A.  No.
4  Q.  So the initial prototype was a ultra-high
5 molecular weight polyethylene braided suture prototype, if
6 you will?
7  A.  Yes.  Size 2.
8  Q.  Size 2.  And was the initial prototype, was it
9 coated?
10  A.  I don't remember.
11  Q.  Okay.  Do you know if the initial prototype went
12 through any other manufacturing process like stretching or
13 heating, twisting?
14  A.  I don't recall.
15  Q.  Was the initial prototype 100 percent ultra-high
16 molecular weight polyethylene?
17  A.  For the fourth time, yes.
18  Q.  Okay.  And you tested the initial prototype that
19 was 100 percent ultra-high molecular weight polyethylene
20 with Dr. Burkhart and Dr. Chen?
21  A.  Dr. Casey Chen, correct.
22  Q.  Okay.  And the test that you conducted with Dr.
23 Burkhart and Dr. Chen on the ultra-high molecular weight
24 polyethylene was a knot strength test?
25  A.  Knot security.

**52**

1  Q.  Knot security test?
2  A.  Yes.
3  Q.  Was that the test we drew in Exhibit Number 421?
4  A.  That's correct.
5  Q.  Okay.  And you said the strength was excellent. I
6 believe, of the initial prototype, but the knot slippage
7 was poor; is that right?
8  A.  Yes.
9  Q.  Okay.  When you say the slippage was poor of the
10 initial prototype, what do you mean?
11  A.  Less than the tensile strength capability of the
12 existing Arthrex product.
13  Q.  So the knot slippage was less than the Tevdek
14 suture?
15  A.  Yes.
16  Q.  And it was -- knot slippage was such that it was
17 determined that the 100 percent ultra-high molecular
18 weight polyethylene suture prototype wasn't suitable to be
19 developed?
20  A.  That's correct.  Yes.
21  Q.  Okay.  Ultra-high molecular weight polyethylene,
22 you said the knot slippage was poor?
23  A.  (Witness nods head affirmatively).
24  Q.  Ultra-high molecular weight polyethylene, is that
25 a lubricious material?

**53**

1  A.  Yes.
2  Q.  And was the knot slippage of this ultra-high
3 molecular weight polyethylene poor security because of the
4 lubricity of polyethylene?
5  A.  Yes.
6  Q.  Yes?
7  A.  Yes.
8  Q.  So then you came up with the idea to braid PET
9 with the ultra-high molecular weight polyethylene to
10 reduce the knot slippage?
11  A.  Yes.
12  Q.  And when you say knot slippage, we're referring
13 to this knot security test?
14  A.  Yes.
15  Q.  So are we using the terms knot slippage and knot
16 security interchangeably here?
17  A.  You are, yes.
18  Q.  In your testimony?
19  A.  Yes.
20  Q.  So the knot security of the 100 percent
21 ultra-high molecular weight polyethylene was poor, the
22 prototype; right?
23  A.  Yes.
24  Q.  And your idea was to add the PET and to improve
25 the knot security?

14 (Pages 50 to 53)

54

```
 1      MR. SOFFEN: Objection; asked and answered.
 2   You've asked him the same thing multiple times. But
 3   you can answer.
 4   A.  I've lost count, it's been so many times, but the
 5 answer again is yes.
 6   Q.  Okay. And Dr. Burkhart said that was a killer
 7 idea?
 8   A.  What was a killer idea?
 9   Q.  The killer idea was that your idea of adding
10 PED -- PET -- I'm sorry. I'll rephrase that question.
11      Did Dr. Burkhart say that your idea to braid PET
12 with the ultra-high molecular weight polyethylene to
13 improve knot security was a killer idea?
14   A.  Yes.
15   Q.  Okay. And then you said you had Pearsalls
16 manufacture a prototype that had PET and ultra-high
17 molecular weight polyethylene braided?
18   A.  Yes.
19   Q.  And you tested that prototype?
20   A.  Yes.
21   Q.  And you said that that prototype had good knot
22 strength?
23   A.  Correct.
24   Q.  And the prototype of PET braided with ultra-high
25 molecular weight polyethylene had good knot security?
```

55

```
 1   A.  Yes.
 2   Q.  And the prototype of PET and ultra-high molecular
 3 weight polyethylene braided together also had good tensile
 4 strength?
 5   A.  Yes.
 6   Q.  And after you tested this second prototype, if
 7 you will, of the PET braided with ultra-high molecular
 8 weight polyethylene, was then the decision made to pursue
 9 trying to commercially develop this idea?
10   A.  Yes.
11   Q.  Did you -- when you made -- Who made the decision
12 to go forward and try to commercialize this idea?
13   A.  Myself and Reinhold, surgeons that we
14 collaborated with, marketing people. You know, it wasn't
15 just myself.
16   Q.  Okay. Was this prototype that had the PET
17 braided with the ultra-high molecular weight polyethylene,
18 was it -- did it have a coating on it?
19   A.  Yes.
20   Q.  It did?
21   A.  (Witness nods head affirmatively).
22   Q.  And what was the coating?
23   A.  I forget the name. It's like an MED2174s.
24   Q.  That was on the prototype?
25   A.  Which prototype are you referring to now?
```

56

```
 1   Q.  I'm talking about the --
 2   A.  The second prototype with the PET?
 3   Q.  Correct.
 4   A.  Yes.
 5   Q.  The second prototype that had the coating on it?
 6   A.  Yes.
 7   Q.  And was that part of your initial idea, or was
 8 that -- because I thought you said your initial idea was
 9 to add the PET. Was it also to coat it, or was that
10 something that came later?
11   A.  If you're going to market the product, it needs
12 the coating on it, sir.
13   Q.  Okay. But the prototype that was manufactured
14 that you asked --
15   A.  Most likely, it was coated, because it needed to
16 be as the final product would be marketed.
17   Q.  You said most likely. Do you remember or you
18 don't remember whether the prototype that had the PET and
19 the ultra-high molecular weight polyethylene was coated?
20   A.  I can't tell you for sure that it was at that
21 prototype stage.
22   Q.  Okay. Was this prototype that you had -- after
23 you tested the prototype with PET with ultra-high --
24   A.  Excuse me. I want to change that.
25   Q.  Okay.
```

57

```
 1   A.  I never got samples of constructions from
 2 Pearsalls without a coating unless I specifically asked
 3 for it not to be coated. So there's a very high
 4 probability that the suture came as -- the second
 5 prototype -- as coated.
 6   Q.  That was standard for them to coat it, in other
 7 words?
 8   A.  Yes.
 9   Q.  Okay. So the initial prototype that was
10 ultra-high molecular weight polyethylene, did you ask for
11 that not to be coated?
12   A.  No.
13   Q.  So chances are that that one was coated?
14   A.  Quite possibly.
15   Q.  After you tested the prototype of PET and
16 ultra-high molecular weight polyethylene braided together,
17 did you believe that it would then work as a suture?
18   A.  Yes.
19   Q.  Okay. Is there anything else you think you
20 needed to do in order to determine whether it would work
21 as a suture?
22   A.  Yes.
23   Q.  What did you need to do?
24   A.  Biocompatibility toxicity testing, bioburden
25 levels, all the design control GNP items that need to be
```

15 (Pages 54 to 57)

**58**

1 done on any product. Obviously, there needed to be a
2 check -- there's a checklist -- okay -- so I'm going by
3 memory, that it needed to be looked at from a patent
4 standpoint to see if there was any infringing as well as
5 whether the product was compatible, along with the GNP
6 items that are required for the product.
7   Q.  Okay. Those things you are describing to me,
8 those were all kind of commercial considerations. My
9 question is a little different. Maybe my question wasn't
10 clear. My question was more along the lines of once you
11 had the prototype of the ultra-high molecular weight
12 polyethylene and PET braided together and you tested it
13 and you believed that it would work as a suture, I
14 understand there's things you needed to do to make it a
15 commercial product.
16      Was there anything else you needed to do in your
17 mind to clarify whether it needed to -- whether it could
18 work as a suture?
19   A.  We needed to have a surgeon look at it that would
20 actually be tying knots with it to get their understanding
21 of -- of how they felt about the suture.
22   Q.  Okay. Anything else though?
23   A.  Not that I recall.
24   Q.  Okay.
25      MR. SOFFEN:  Is it time for a break? In a few

**59**

1 minutes?
2      MR. BONELLA:  Yeah. Just give me five. Let me
3 just finish this line of questions.
4   Q.  Was the initial prototype that was ultra-high
5 molecular weight polyethylene, was that sterile?
6   A.  I don't remember.
7   Q.  How about the prototype that was PET and
8 ultra-high molecular weight polyethylene braided together?
9 Was that sterile?
10   A.  I don't remember.
11   Q.  Would it have to have been sterile? Would the
12 prototypes have to have been sterile?
13   A.  Not to test on the tensile test machine.
14   Q.  Why not?
15   A.  Because it's not going into a human. You
16 don't -- The bioburden levels at that point is not a
17 factor that was wrong.
18   Q.  Was sterilization another process at that time?
19 Was that something you really didn't have to account for?
20   A.  Say the question again.
21   Q.  I'm just making sure that what you're saying is
22 that sterilization is just to -- was just to -- it's
23 really for biocompatibility? It's not to change the
24 properties of the material; is that right?
25      MR. SOFFEN:  Objection; vague.

**60**

1   A.  I don't know. I don't know. That's really a
2 weird question.
3   Q.  I understand you are saying they weren't sterile.
4   A.  No. I didn't say -- I said I don't recall, sir.
5   Q.  You don't recall?
6   A.  Yes.
7   Q.  Okay. And my question was would they have had to
8 have been, and you said, I think, no because they were
9 testing them for mechanical properties.
10   A.  Yes.
11   Q.  Okay. Did you -- Would the sutures have had to
12 have been sterile when you tested them for mechanical
13 properties?
14   A.  I already answered that.
15      MR. SOFFEN:  Objection; asked and answered.
16   A.  I said no. It didn't have to be to tested on
17 a tensile test machine.
18   Q.  And why is that?
19   A.  I already answered that also. It's not being
20 used for human or animal use, so the biocompatibility
21 issues of the suture at that time were not looked at. The
22 mechanical features of the suture were all that were
23 looked at at that portion of the prototype stage.
24   Q.  Did sterilization have a big effect on the
25 mechanical properties of the suture, the tensile?

**61**

1      MR. SOFFEN:  Objection.
2   A.  I -- I can't answer that question.
3   Q.  You don't know?
4   A.  No.
5   Q.  But when you made the decision to go forward with
6 this, you can't remember whether they were sterile or not?
7   A.  You asked me -- You're -- you're kind of putting
8 a couple of things together, so that's why you're --
9   Q.  Okay. Maybe I'm getting confused.
10   A.  You asked me if the prototypes were sterile, and
11 I said no.
12   Q.  Okay.
13   A.  The decision to go forward with the product,
14 obviously, there has to be sterilization done before the
15 product can be marketed.
16   Q.  Absolutely. And are you saying that the decision
17 to go forward with it was made before you tested a sterile
18 product?
19   A.  I can't say that.
20   Q.  Do you recall testing a sterile product before
21 the decision was decided to make -- decided to go forward
22 with the PET and the --
23   A.  I don't remember.
24   Q.  -- ultra-high molecular weight polyethylene?
25   A.  I don't -- It depends on what point in time you

16 (Pages 58 to 61)

94

1   A.  I don't recognize this particular exhibit, but it
2 looks like a test report.
3   Q.  Is that your signature on the first page?
4   A.  Yes, it is.
5   Q.  And you signed it on February 13th, 2003?
6   A.  Right.
7   Q.  And the test objective stated was to evaluate
8 US -- I'm sorry -- FiberWire US 3/4 sutures, construction
9 numbers DTPS 21 and DTPS 34 for knot pull, straight pull,
10 and diameter.  Do you see that?
11  A.  Yes.
12  Q.  And the previous exhibit, 175, refers to DTPS 21
13 and 34 and that was in January of '03; right?
14  A.  Yes.
15  Q.  Okay.  Looking at Exhibit 422, does that refresh
16 your memory at all as to why Arthrex was evaluating a 100
17 percent polyester -- I'm sorry.  I will rephrase the
18 question.
19      Looking at Exhibit 422, does that refresh your
20 memory at all as to why Arthrex was evaluating a construct
21 that had 100 percent polyester in the sheath?
22  A.  I don't remember.
23  Q.  You don't remember?  In the Observations and
24 Conclusions section of Exhibit 422 on the front, it said,
25 "Also, both the sutures had similar strength in straight

95

1 pull, but knot pull const. DTPS 34 had more strength than
2 DTPS 21.  Hence, only construction DTPS 34 is approved for
3 production."  Do you see that?
4   A.  Yes.
5   Q.  Do you recall reaching that conclusion?
6       MR. SOFFEN:  Objection.  There's no evidence that
7   it's Mr. Grafton's conclusion here, but ...
8       MR. BONELLA:  It's coming.
9   A.  I don't remember the circumstances of this
10 document, so I can't really answer that.
11  Q.  Would you turn to Page ARM 25664.
12  A.  Is that in this document?
13  Q.  Yes.  In Exhibit 422.  Do you see it's a
14 Pearsalls Limited Certificate of Conformity?
15  A.  Yes.
16  Q.  Do you see that?
17  A.  Yes.
18  Q.  Do you recall seeing these types of documents
19 before from Pearsalls?
20  A.  Yes.
21  Q.  What was your understanding of the purpose of a
22 Certificate of Conformity that Pearsalls would send?
23  A.  It's a cert that goes with the product to give
24 the certifications of how it was tested and what the
25 conformance of it is.

96

1   Q.  And that's according -- and those certs are
2 according to the U.S. Pharmacopeia?
3   A.  Yes.
4   Q.  Now does Pearsalls sterilize the products for
5 Arthrex?
6   A.  No.
7   Q.  So these Certificates of Conformity are issued
8 without sterilization?
9   A.  That's correct.  In this particular one, yes.
10  Q.  In general, were the Pearsalls --
11  A.  In general, Pearsalls, yes.  That was -- that was
12 prior to sterilization when we received the product from
13 Pearsalls.
14  Q.  Did Arthrex do a new Certificate of Conformity
15 after the products have been sterilized?
16  A.  It was tested after sterilization.
17  Q.  Does Arthrex do a new Certificate of Conformity?
18  A.  There was quality control records that would show
19 the test result after sterilization.
20  Q.  And how were those tests -- how were those tests
21 done?
22  A.  Same type of tests, knot, straight pull.
23  Q.  Okay.  And were they done for each batch of
24 FiberWire, or did you select a certain sample from each
25 batch?  Like how were the tests done after sterilization?

97

1   A.  Early on, I'm sure every batch was done.  After
2 that, probably not every batch.
3   Q.  Do you recall the results of those tests?
4   A.  No.
5   Q.  What type of sterilization procedure does Arthrex
6 use for FiberWire?
7   A.  ETO and gamma.
8   Q.  And those are known procedures?  Are they -- I
9 will ask a better question.
10      Did Arthrex develop those procedures, the
11 sterilization of ETO and gamma, or were those known
12 procedures in the art?
13  A.  What do you mean by known?  ETO and gamma are
14 sterilization methods used in medical products.  If that's
15 your definition of known, the answer to that is yes.
16  Q.  Did Arthrex develop anything special about
17 applying those techniques to FiberWire?
18  A.  They depended on how the product was sold.
19 Whether it was sold in an envelope or with a suture
20 anchor, there would be different types of sterilization
21 that Arthrex would have been involved in the development.
22  Q.  What do you mean by depending upon the -- how the
23 product was sold?
24  A.  Whether it was sold with a suture anchor, metal
25 or bioabsorbable, those require different types of

25 (Pages 94 to 97)

**146**

1 uncoated but that had gone through the scouring and dye
2 process?
3    A.  I don't remember.
4    Q.  When you tested the coated versus uncoated, do
5 you know whether the coated one that you tested was one
6 that had been dyed --
7    A.  I don't remember that.
8    Q.  -- or undyed?  Okay.  If it's a -- Okay.  Do you
9 recall like any invoices that came back with the samples
10 that you asked for for testing in relation to the Ethicon
11 patent?
12    A.  No.  There may not have been invoices.
13    Q.  Do you see inside these packages, there's -- it
14 looks like, at least for this one --
15    A.  Ah, okay.  Here.  You see this little round
16 section?
17    Q.  Yes.
18    A.  This is most likely the information that was on
19 the round 2-inch spool.
20    Q.  Okay.
21    A.  And this is where somebody xeroxed it on the
22 machine, it looks like, and cut it out, the silhouette of
23 it, and that's what we're looking at there, now that I see
24 it closer.
25    Q.  Okay.  Do you see where it says batch?  Coated

**147**

1 MED.  At least this one says Coated MED.  And it says
2 Batch on it.  And it's Exhibit 428.
3    A.  I see the information, yes.
4    Q.  Okay.  Do you see the uncoated one has a -- it
5 has a batch number there.  Do you see that for the
6 uncoated?
7    A.  Yes.
8    Q.  Is that a Pearsalls batch number?
9    A.  Yes.
10    Q.  And do you see the other number there?  There's a
11 -- on the -- it has the number 38A500500?  Do you see that
12 number?
13    A.  Yes.
14    Q.  Do you recognize that number?
15    A.  No.  It's not an Arthrex number.
16    Q.  Okay.  How about the L51211 number?  Do you
17 recognize that number?
18    A.  No.  Those are all Pearsalls' internal numbers.
19    Q.  Okay.  Did you keep any records of the samples
20 that you got from Pearsalls for testing uncoated versus
21 uncoated with respect to the 44 -- with respect to the
22 Ethicon patent of how samples were to be maintained or
23 kept?
24    A.  I'm sure I turned the samples over to our test
25 group.  I don't recall any -- and probably any certs or

**148**

1 information that were with them, but I didn't keep any of
2 that.
3    Q.  Okay.  When you say you turned them over to the
4 test group, do you mean when you left or was that when you
5 completed the coated versus uncoated testing that you did?
6    A.  At the time that the testing was to be done, I
7 would give them the samples and the certifications so they
8 would know which is coated and which is uncoated.
9    Q.  Okay.  And did you get the samples back after the
10 testing, or did they remain with the test group?
11    A.  I don't remember.
12    Q.  Okay.  I think the question kind of came out
13 fuzzy.  I have to reask one of the questions.  I misspoke.
14        Did you keep any records of the samples that you
15 got from Pearsalls for testing coated versus uncoated with
16 respect to the Ethicon patent?
17    A.  Keep any copies of the records?
18    Q.  Yeah.
19    A.  The test results?
20    Q.  No, the records in terms of maintaining the
21 samples, of how the samples were to be maintained or --
22    A.  I turned all of that over to the test department.
23    Q.  Okay.
24    A.  Because they would need that to be able to write
25 up the test report, any information I had.

**149**

1    Q.  Do you know if any of the samples that -- when
2 you tested the coated versus uncoated in relation to the
3 testing for the Ethicon patent, had any of those undergone
4 sterilization?
5    A.  I don't think they had.
6    Q.  Okay.  Now in the coating process that Pearsalls
7 uses, there's an oven, and there's some tension applied
8 during that process?
9    A.  Yes.
10    Q.  Right?  Do you know if the uncoated sample that
11 you tested in relation to the Ethicon patent had undergone
12 that heat process and the tensioning?
13    A.  They both -- The coated or both?
14    Q.  No, the uncoated.
15    A.  Uncoated?
16    Q.  Right.
17    A.  I'm sure it did not.
18    Q.  Okay.
19    A.  When you are saying heat process, it's to flash
20 off the solvents with -- with the amount of heat is used
21 for.
22    Q.  Are you aware of the temperatures that are used?
23    A.  No.
24    Q.  Are you aware of how long the FiberWire is in the
25 ovens?

38 (Pages 146 to 149)

**150**

1    A.  I have seen their equipment, and it's
2  approximately a 50-foot long zoned oven.
3    Q.  Do you know how fast the FiberWire is moving
4  through there?
5    A.  I -- At one time, I had that information, but I
6  don't recall what it is now, how many feet per minute went
7  through.
8    Q.  Have you ever done any analysis as to whether
9  that heating process and the -- whatever tension is
10 applied has any effect on the material properties of the
11 suture?
12   A.  Well, it's hard to separate that from the
13 coating, because the coating is -- what you're trying to
14 accomplish there is put the coating on it which increases
15 the lubricity of the product.
16   Q.  Right.
17   A.  So that that's not separated.
18   Q.  Okay.  Now the tests that you did or that you --
19 well, what was -- There was a test done in relation to
20 this Ethicon patent of a coated versus an uncoated sample;
21 right?
22   A.  Yes.
23   Q.  Do you recall that test?
24   A.  To some extent.  I know the people that worked on
25 it.

**151**

1    Q.  Okay.  Did you personally witness the test?
2    A.  I think I went back there a couple of times, but
3  I don't remember the test that well.
4    Q.  Okay.  I just wanted to know whether you -- not
5  necessarily whether you remember the test, but whether you
6  personally witnessed it being done or you just kind of saw
7  the results?
8    A.  Well, it was over a long period of time, and I
9  was in and out of the test lab.
10   Q.  Okay.
11   A.  So I did not witness the total time that the
12 suture was being tested.
13   Q.  What do you mean by over a long period of time?
14   A.  A couple of days.  It takes a while to set up
15 fixtures and get the test working so that you can see the
16 results.
17   Q.  Okay.  The testing that you saw --
18   A.  It was a new test that we had never done before,
19 so it's -- you know -- it takes a while to be able to get
20 your test set up correctly.
21   Q.  Okay.  So you were involved in designing the
22 test?
23   A.  Ashley -- to some extent.  I think Ashley and
24 James Thomas were probably the two that were more involved
25 with it.

**152**

1    Q.  Okay.  And --
2    A.  I was more involved with determining the test
3  samples and what we were looking for as a theorem at that
4  time to -- to determine the difference between the two.
5    Q.  And what were you -- what were you looking for?
6  What was the theorem?
7    A.  That adding the coating increased the lubricity
8  of the suture.
9    Q.  Okay.  And so you -- You were involved to some
10 extent in helping them to design this test to prove that
11 point?
12   A.  I explained that already.  I was involved in
13 providing the samples --
14   Q.  Okay.
15   A.  -- and what we were looking for.  And how it was
16 set up -- you know -- I don't recall any specific things
17 that I told them to do there.
18   Q.  Okay.  So did you -- so did you approve the
19 test --
20   A.  Yes.
21   Q.  -- before it was conducted?
22   A.  Yes.
23   Q.  Okay.  And then you looked at the results
24 afterwards?
25   A.  Yes.

**153**

1    Q.  And what did you conclude from the results?
2    A.  That the coated suture increased the lubricity of
3  the suture.
4    Q.  Okay.  And did you convey that to Mr. Soffen?
5    A.  Yes.
6    Q.  Did you convey any other results to Mr. Soffen in
7  this testing of the coated versus uncoated samples?
8    A.  I don't recall.
9    Q.  Okay.  How about Mr. John Schmieding?  Did you
10 convey to him the results?
11   A.  I'm sure he was -- knew the results also.
12   Q.  And the results being that the lubricity of the
13 coating affected the lubricity of the product?
14   A.  Increased the lubricity.
15   Q.  Increased the lubricity.  Okay.
16       Now you said the hypothesis or theorem was to
17 test for coating effects?  Is that -- Am I saying that
18 right?  I'm not trying to put words in your mouth.  I'm
19 just trying to set up a foundation for the next question.
20   A.  To see if there was a difference.
21   Q.  Okay.
22   A.  And to be able to measure the difference.
23   Q.  Okay.  And who -- whose idea was it to do that?
24   A.  I don't recall.
25   Q.  Okay.  Do you know -- Did Mr. Soffen tell you

**39 (Pages 150 to 153)**

# HERMES DECLARATION
# EXHIBIT 10

# ENCYCLOPEDIA
# OF POLYMER
# SCIENCE AND
# ENGINEERING

## VOLUME 10

**Molecular Weight Determination
to
Pentadiene Polymers**

A WILEY-INTERSCIENCE PUBLICATION

**John Wiley & Sons**

NEW YORK · CHICHESTER · BRISBANE · TORONTO · SINGAPORE

Copyright © 1987 by John Wiley & Sons, Inc.

All rights reserved. Published simultaneously in Canada.

Reproduction or translation of any part of this work
beyond that permitted by Section 107 or 108 of the
1976 United States Copyright Act without the permission
of the copyright owner is unlawful. Requests for
permission or further information should be addressed to
the Permissions Department, John Wiley & Sons, Inc.

**Library of Congress Cataloging in Publication Data:**
Main entry under title:

Encyclopedia of polymer science and engineering.

 Rev. ed. of: Encyclopedia of polymer science and
technology. 1964–
 "A Wiley-Interscience publication."
 Includes bibliographies.
 1. Polymers and polymerization—Dictionaries.
I. Mark, H. F. (Herman Francis), 1895–
II. Kroschwitz, Jacqueline I.   III. Encyclopedia
of polymer science and technology.

TP1087.E46  1985    668.9    84-19713
ISBN 0-471-80942-X (v. 10)

**Printed in the United States of America**

49. A. Yoneda, K. Hayashi, M. Tanaka, and N. Murata, *Kobunshi Kagaku* **29**, 87 (1972).
50. U.S. Pat. 3,986,629 (Oct. 19, 1976). H. M. Singleton (to Southland Corp.).
51. U.S. Pat. 3,886,106 (May 27, 1975), D. F. Lohr, E. L. Kay, and W. R. Hausch (to the Firestone Tire & Rubber Co.).
52. Ger. Offen. 3,006,743 (Sept. 4, 1980), U. Katsuji and M. Takashi (to Sumitomo Chemical Co., Ltd.).
53. A. Yoneda, K. Sugihara, K. Hayashi, and M. Tanaka, *Kobunshi Kagaku* **30**, 180 (1973).
54. Jpn. Kokai Tokyo Koho 79 53,689 (Apr. 27, 1979) and 79 53,690 (Apr. 25, 1979), T. Kawai, K. Haraguchi, and S. Inou (to Central Glass Co., Ltd.).
55. S. Sherratt in A. Standen, ed., *Kirk-Othmer Encyclopedia of Chemical Technology*, 2nd ed., Vol. 9, Wiley-Interscience, New York, 1966, pp. 807–812.
56. *VANAX-PY, Material Safety Data Sheet*, R. T. Vanderbilt Co., Inc., Norwalk, Conn., Feb. 4, 1985.

D. K. DANDGE
New Mexico Institute of Mining and Technology


L. G. DONARUMA
University of Alabama in Huntsville

# NOMENCLATURE

Nomenclature, as used in this article, refers to the naming of polymeric materials. The nomenclature of scientific communication is emphasized, although there is generally little reason for differences between scientific and other, eg, commercial, usage.

Since the publication of the first edition of this Encyclopedia, the International Union of Pure and Applied Chemistry (IUPAC) has established the Commission on Macromolecular Nomenclature, which is now the leading nomenclature body in the polymer field. The Commission is promulgating a series of rules and definitions that are placing polymer nomenclature on a much more systematic basis than had previously been the case (Table 1) (1–21). The International Standardization Organization (ISO), primarily through its Technical Committee TC/61 Plastics, and various national nomenclature bodies (such as that of the American Chemical Society) are also helping to shape the field. Recent issues of *Chemical Abstracts* are additional authoritative sources of polymer nomenclature.

At the present time, the IUPAC Commission on Macromolecular Nomenclature is developing a set of definitions for many of the basic terms dealing with polymer molecules, assemblies of polymer molecules, polymer solutions, polymer crystals, polymer melts and solids, polymerization reactions, etc. It is also extending existing nomenclature to more complicated cases, such as cross-linked polymers. When this phase of the work is completed by the late 1980s, the naming of polymers and polymer terminology will have become largely systematized and, following the IUPAC practice in other fields of chemistry, a compendium of polymer nomenclature rules will be published.

**Table 1. IUPAC Publications on Polymer Nomenclature**

| Title | Comment | Refs. |
|---|---|---|
| Report on Nomenclature in the Field of Macromolecules | obsolete | 1 |
| Report on Nomenclature Dealing with Steric Regularity in High Polymers | superseded by Ref. 2 | 3 |
| Revised Report on Nomenclature Dealing with Steric Regularity in High Polymers | superseded by Ref. 4 | 2,5 |
| Report of the Committee on Nomenclature of the International Commission on Macromolecules | obsolete | 6 |
| Basic Definitions of Terms Relating to Polymers | | 7,8 |
| List of Standard Abbreviations (Symbols) for Synthetic Polymers and Polymer Materials (1974) | superseded by Ref. 9 | 10 |
| Use of Abbreviations for Names of Polymeric Substances | Recommendations 1986 | 9 |
| Nomenclature of Regular Single-Strand Organic Polymers | | 11 |
| Stereochemical Definitions and Notations Relating to Polymers | Provisional Recommendations 1980 | 12 4 |
| Nomenclature for Regular Single-Strand and Quasi Single-Strand Inorganic and Coordination Polymers | Provisional Recommendations 1984 | 13 14 |
| Note on the Terminology for Molar Masses in Polymer Science | | 15–17 |
| Source-Based Nomenclature for Copolymers | | 18 |
| Definitions of Terms Relating to Individual Macromolecules, Their Assemblies, and Dilute Polymer Solutions | | 19 |
| Definitions of Terms Relating to Crystalline Polymers | | 20 |
| A Classification of Linear Single-Strand Polymers | | 21 |

## Basic Definitions

No nomenclature document is more fundamental to a given science than the definitions of basic terms used in that area. The IUPAC Commission on Macromolecular Nomenclature published a document in 1974 (8) that offers definitions of 52 terms, including polymer, constitutional unit, monomer, polymerization, regular polymer, tactic polymer, block polymer, graft polymer, monomeric unit, degree of polymerization, addition polymerization, condensation polymerization, homopolymer, copolymer, bipolymer, terpolymer, copolymerization, and many others. Both structure-based and process-based definitions are given.

## Source-based Nomenclature

Traditionally, polymers have been named by attaching the prefix poly to the name of the real or assumed monomer (the "source") from which it is derived.

Case 1:04-cv-12457-PBS Document 106-37 Filed 09/06/2007 Page 24 of 58

Thus polystyrene is the polymer made from styrene and will often be found in an index under "styrene, polymer of." When the name of the monomer consists of two or more words, parentheses should be used (1), as in poly(vinyl acetate), poly(methyl methacrylate), poly(sodium styrenesulfonate), etc. Failure to use parentheses can lead to ambiguity: polychlorostyrene can be the name of either a polychlorinated (monomeric) styrene molecule or a polymer derived from chlorostyrene; polyethylene oxide can refer to polymer (1), polymer (2), or the macrocycle (3).

$$HO(CH_2CH_2O)_nH \qquad \begin{matrix} H(CH_2CH_2)_n \\ \\ H(CH_2CH_2)_n \end{matrix}O \qquad \begin{matrix} CH_2(CH_2CH_2)_nCH_2 \\ | \qquad\qquad | \\ CH_2 \!-\!\!-\! O \!-\!\!-\! CH_2 \end{matrix}$$
$$(1) \qquad\qquad (2) \qquad\qquad\qquad (3)$$

These problems are easily overcome with parentheses; names such as poly(chloro)styrene, poly(chlorostyrene), and poly(ethylene oxide) clearly indicate the part of the name to which the prefix poly refers. The omission of parentheses is, unfortunately, quite common.

The principal deficiency of source-based nomenclature is that the chemical structure of the monomeric unit in a polymer is not identical with that of the monomer, eg, $-CH_2-CHX-$ vs $CH_2\!=\!CHX$; thus the name polymonomer is actually a misnomer. The structure of the repeating unit is also not specified in this scheme; for example, polyacrolein does not indicate whether the vinyl or the aldehyde group has polymerized (see ACROLEIN POLYMERS).

$$n\ CH_2\!=\!CH\!-\!CH\!=\!O \qquad \begin{cases} \left(\!\!\begin{matrix} CH_2-CH- \\ | \\ CH\!=\!O \end{matrix}\!\!\right)_n & \text{vinyl addition} \\ & \text{(1,2-addition)} \\[6pt] \left(\!\!\begin{matrix} CH-O- \\ | \\ CH\!=\!CH_2 \end{matrix}\!\!\right)_n & \text{carbonyl addition} \end{cases}$$

Different types of polymerization can take place with many other monomers, depending on the polymerization conditions. Furthermore, a name such as poly(vinyl alcohol) refers to a hypothetical source, since this polymer is obtained by hydrolysis of poly(vinyl acetate). In spite of these serious deficiencies, source-based nomenclature is still firmly entrenched in industrial literature and, to a lesser extent, in scientific communication. It originated at a time when polymer science was less developed and the structure of most polymers ill-defined. The rapid advances now being made in structural determination of polymers will gradually shift the emphasis of polymer nomenclature away from starting materials and toward the structure of the macromolecules.

**Copolymers.** Copolymers are polymers that are derived from more than one species of monomer (8). Because this is a process-based definition, source-based nomenclature can be easily adapted to the naming of copolymers (18). However, the arrangement of the various types of monomeric units must be specified. Seven types of arrangements have been defined and are shown in Table 2, where A, B, and C represent the names of monomers. The monomer names are linked through a connective (infix), such as -co-, to form the name of the copolymer, as in poly(styrene-co-acrylonitrile). The order of citation of the mono-

mers is arbitrary, except for graft copolymers where the backbone monomer is named first.

An equally acceptable alternative scheme utilizes the prefix copoly followed by citation of the names of the monomers used, separated from each other by an oblique stroke. Parentheses are also needed. For example, copoly(styrene/butadiene) denotes an unspecified copolymer of styrene and butadiene. The other connectives of Table 2 are placed before such names to provide additional structural information, as in

> *stat*-copoly(styrene/butadiene)
> *ran*-copoly(ethylene/vinyl acetate)
> *alt*-copoly(styrene/maleic anhydride)
> *per*-copoly(ethylene phenylphosphonite/methyl acrylate/carbon dioxide)
> *block*-copoly(styrene/butadiene/methyl methacrylate)
> *graft*-copoly(styrene/butadiene)

It is not necessary to use parentheses to enclose vinyl acetate, maleic anhydride, methyl acrylate, etc, even though the name of each of these monomers consists of two words; the names of the polymers, as written here, are unambiguous.

The names of copolymers, derived either from the main scheme or the alternative, can be further modified to indicate various structural features. For example, the chemical nature of end groups can be specified as follows:

> $\alpha$-X-$\omega$-Y-poly(A-*alt*-B)
> $\alpha$-butyl-$\omega$-carboxy-*block*-copoly(styrene/butadiene)

Whereas subscripts placed immediately after the name of the monomer or the block designate the degree of polymerization or repetition, mass and mole fractions and molar masses, which in most cases are average quantities, are expressed by placing corresponding figures after the complete name of the copolymer. The order of citation is as for the monomeric species in the name. Unknown quantities are designated by $a$, $b$, etc. Some examples follow.

A block copolymer containing 75 mass % of polybutadiene and 25 mass % of polystyrene is

> polybutadiene-*block*-polystyrene (0.75:0.25 $w$) or
> *block*-copoly(butadiene/styrene) (75:25 mass %)

A graft copolymer, consisting of a polyisoprene backbone grafted with isoprene and acrylonitrile units in an unspecified arrangement, containing 85 mol % of isoprene units and 15 mol % of acrylonitrile units is

> polyisoprene-*graft*-poly(isoprene-*co*-acrylonitrile) (0.85:0.15 $x$) or
> *graft*-copoly[isoprene/(isoprene;acrylonitrile)] (85:15 mol %)

A graft copolymer consisting of 75 mass % of polybutadiene with a relative molecular mass of 90,000 as the backbone and 25 mass % of polystyrene in grafted chains with a relative molecular mass of 30,000 would be

> polybutadiene-*graft*-polystyrene (75:25 mass %; 90,000:30,000 $M_r$)

**Table 2. IUPAC Nomenclature of Copolymers[a]**

| Type | Arrangement of monomeric units | Structure | Connective | Example |
|---|---|---|---|---|
| unspecified | unknown or unspecified | (A-co-B) | -co- | poly[styrene-co-(methyl methacrylate)] |
| statistical | obeys known statistical laws | (A-stat-B) | -stat- | poly(styrene-stat-acrylonitrile-stat-butadiene) |
| random | obeys Bernoullian statistics | (A-ran-B)$_n$ | -ran- | poly[ethylene-ran-(vinyl acetate)] |
| alternating | alternating sequence | (AB)$_n$ | -alt- | poly[(ethylene glycol)-alt-(terephthalic acid)] |
| periodic | periodic with respect to at least three monomeric units | (ABC)$_n$<br>(ABB)$_n$<br>(AABB)$_n$<br>(ABAC)$_n$ | -per- | poly[(formaldehyde-per-(ethylene oxide)-per-(ethylene oxide)] |
| block | linear arrangement of blocks | —AAAAA—BBBBBB— | -block-[b] | polystyrene-block-polybutadiene |
| graft | polymeric side chain different from main chain[c] | —AAAAAAAAAAAA—<br>   \|<br>   B<br>   B<br>   B<br>   B | -graft-[d] | polybutadiene-graft-polystyrene |

[a] Main system of the IUPAC document (18); an alternative scheme is described in the text.
[b] The connective -b- has also been used.
[c] Main chain (or backbone) is specified first in the name.
[d] The connective -g- has also been used.

195

A graft copolymer in which the polybutadiene backbone has a DP of 1700 and the polystyrene grafts have an unknown DP is named

*graft*-copoly(butadiene/styrene) (1700:*a* DP)

The published IUPAC copolymer document (18) should be consulted for the names of more complex copolymers, eg, those having a multiplicity of grafts or having chains radiating from a central atom (see also BLOCK COPOLYMERS; CO-POLYMERS, ALTERNATING; COPOLYMERIZATION; GRAFT COPOLYMERS).

## Structure-based Nomenclature

For organic polymers that are regular, ie, have only one species of constitutional unit in a single sequential arrangement, and consist only of single strands, the IUPAC has promulgated a structure-based system of naming polymers (11). As originally devised by the Polymer Nomenclature Committee of the American Chemical Society (22), it consists of naming a polymer as poly(constitutional repeating unit), wherein the repeating unit is named as a bivalent organic radical according to the usual nomenclature rules for organic chemistry. It is important to note that in structure-based nomenclature the name of the constitutional repeating unit has no relationship to the source from which the unit was prepared. The name is simply that of the largest identifiable unit in the polymer, and locants for unsaturation, substituents, etc are dictated by the structure of the unit.

The steps involved in naming the constitutional repeating unit are (*1*) identification of the unit, taking into account the kinds of atoms in the main chain and the location of substituents; (*2*) orientation of the unit; and (*3*) naming of the unit. Examples of names for some common polymers are given in Table 3. Note that in this system parentheses are always used to enclose the repeating unit.

Structure-based nomenclature can be utilized to name polymers with great complexity, provided only that they be regular and single-stranded. Among these are polymers with constitutional repeating units which consist, themselves, of a series of smaller subunits; polymers with heteroatoms or heterocyclic ring systems in the main chain; and polymers with substituents on acyclic or cyclic subunits of constitutional repeating units. Structure-based nomenclature is also applicable to copolymers having a regular structure, regardless of the starting materials used, eg, poly(oxyethyleneoxyterephthaloyl). In principle, it should be possible to extend the existing structure-based nomenclature beyond regular, single-strand polymers to polymers that have reacted, cross-linked polymers, ladder polymers, and other more complicated systems.

Structure-based nomenclature has gained acceptance in the scientific literature, eg, *Chemical Abstracts*, because it overcomes many of the deficiencies of source-based nomenclature.

**Inorganic and Coordination Polymers.** The nomenclature of regular single-strand inorganic and coordination polymers (qv) is governed by the same

CaSase0404-d2487H7EBS DoDomement06327 FileFile09/02/09/2007 Pagege02f 6858

ndamental principles as that for single-strand organic polymers (14). The name
f such a polymer is that of the smallest structural repeating unit prefixed by
ne terms poly, *catena* (for linear chains) or other structural indicator, and des-
rnations for end groups. The structural units are named by the nomenclature
les for inorganic and coordination chemistry. Some examples are



*catena*-poly[dimethyltin]



*catena*-poly[titanium-tri-$\mu$-chloro]



*catena*-poly[nitrogen-$\mu$-thio]



$\alpha$-ammine-$\omega$-(amminedichlorozinc)-
*catena*-poly[(amminechlorozinc)-$\mu$-chloro]



*catena*-poly[(diphenylsilicon)-$\mu$-oxo]



*catena*-poly[silver-$\mu$-(cyano-$N$:$C$)]

**Stereochemical Definitions and Notations.** Structure-based nomenclature
r regular polymers (4) can denote stereochemical features if the repeating unit
ed is the configurational unit, ie, a constitutional unit having one or more sites
defined stereoisomerism (8). Structure-based names are then derived in the
ual fashion. The various stereochemical features that are possible in a polymer
ust be defined.

Natta and co-workers introduced the concept of tacticity, ie, the orderliness
he succession of configurational repeating units in the main chain of a polymer.
r example, in poly(propylene), possible steric arrangements are shown in Fischer
ojections displayed horizontally:



d the corresponding polymers have the following structures:



   isotactic       syndiotactic            atactic

The isotactic polymer has only one species of configurational unit in a single
uential arrangement and the syndiotactic polymer shows an alternation of
figurational units that are enantiomeric, whereas in the atactic polymer the

Case 1:04-cv-12457-PBS Document 106-27 Filed 09/04/2007 Page 29 of 58

**Table 3. Examples of Systematic Structure-based Names for Polymers[a]**

| Structure | Structure-based name | Common (source-based) name |
|---|---|---|
| —(CH₂CH₂)ₙ— | poly(methylene) | polyethylene |
| —(CHCH₂)ₙ— CH₃ | poly(propylene) | polypropylene |
| —(C—CH₂)ₙ— CH₃ / CH₃ | poly(1,1-dimethylethylene) | polyisobutylene |
| —(C=CHCH₂CH₂)ₙ— CH₃ | poly(1-methyl-1-butenylene) | polyisoprene |
| —(CHCH₂)ₙ— (phenyl) | poly(1-phenylethylene) | polystyrene |
| —(CHCH₂)ₙ— Cl | poly(1-chloroethylene) | poly(vinyl chloride) |
| —(CHCH₂)ₙ— CN | poly(1-cyanoethylene) | poly(acrylonitrile) |
| —(CHCH₂)ₙ— OOCCH₃ | poly(1-acetoxyethylene) | poly(vinyl acetate) |
| —(CCH₂)ₙ— F / F | poly(1,1-difluoroethylene) | poly(vinylidene fluoride) |

198

$-(CF_2CF_2)_n-$     poly(difluoromethylene)     polytetrafluoroethylene

poly[(2-propyl)-1,3-dioxane-4,6-diylmethylene]     poly(vinyl butyral)

$-(C-CH_2)_n-$, COOCH$_3$, CH$_3$     poly[1-(methoxycarbonyl)-1-methylethylene]     poly(methyl methacrylate)

$-(OCH_2CH_2)_n-$     poly(oxyethylene)     poly(ethylene oxide)

$-(O-C_6H_4)_n-$     poly(oxy-1,4-phenylene)     poly(phenylene oxide)

$-(OCH_2CH_2O-C(=O)-C_6H_4-C(=O))_n-$     poly(oxyethyleneoxyterephthaloyl)     poly(ethylene terephthalate)

$-(NH-C(=O)(CH_2)_4C(=O)-NH(CH_2)_6)_n-$     poly(iminoadipoyliminohexamethylene)     poly(hexamethylenediamine-co-adipic acid) or poly(hexamethylene adipamide)

poly[2,5-dioxotetrahydrofuran-3,4-diyl(phenylethylene)]     poly(maleic anhydride-co-styrene)

199

* Ref. 6. Courtesy of *Pure and Applied Chemistry.*

**200    NOMENCLATURE**

molecules have equal numbers of the possible configurational units in a random sequence distribution. This can be generalized as follows:

*Isotactic:*



*Syndiotactic:*



*Atactic:*



Further examples of tactic polymers are

$$\left( O-\underset{\underset{H}{\overset{\overset{CH_3}{|}}{C}}-CH_2 \right)_n$$

isotactic poly(oxypropylene)

$$\left( \underset{\underset{H}{\overset{\overset{CH_3}{|}}{C}}}{C} \right)_n$$

isotactic poly(ethylidene)

$$\left( \underset{\underset{H}{\overset{\overset{CH_3}{|}}{C}}}{C} - \underset{\underset{CH_3}{\overset{\overset{H}{|}}{C}}}{C} \right)_n$$

syndiotactic poly(ethylidene)

Case 0:04-cv-02487-PBS Document 106-27 Filed 09/04/2007 Page 32 of 58



erythrodiisotactic polymer

threodiisotactic polymer

disyndiotactic polymer

isotactic poly(3-methyl-*trans*-1-butenylene) or  transisotactic poly(3-methyl-1-butenylene)

diisotactic poly[*threo*-3-(methoxycarbonyl)-4-methyl-*trans*-1-butenylene] or
transthreodiisotactic poly[3-(methoxycarbonyl)-4-methyl-1-butenylene]

The concept of a stereoblock is illustrated in the following example of a
regular poly(propylene) chain, in which the stereoblocks are denoted by ⌐‾‾‾⌐.
The sequence of identical relative configurations of adjacent units that charac-
terizes a stereoblock is terminated at each end of the block. The dashed line
⌐----⌐ encloses a configurational sequence, which may or may not be identical
with a stereoblock.



The published IUPAC document (4) should be consulted for more complex cases and for the notations used to designate conformations of polymer molecules (bond lengths, bond angles, torsion angles, helix sense, isomorphous and enantiomorphous structures, line repetition groups and symmetry elements, etc) as well as for the various stereochemical definitions (see also MICROSTRUCTURE; STEREOREGULAR POLYMERS).

## Trade Names and Abbreviations

Because the systematic names of polymers can be cumbersome, trade names and abbreviations are frequently used as a shortcut in industrial literature and

**Table 4.  List of Abbreviations from the 1986 IUPAC Recommendations[a]**

| | |
|---|---|
| PAN | polyacrylonitrile |
| PCTFE | polychlorotrifluoroethylene |
| PEO | poly(ethylene oxide) |
| PETP[b] | poly(ethylene terephthalate) |
| PE | polyethylene |
| PIB | polyisobutylene |
| PMMA | poly(methyl methacrylate) |
| POM | poly(oxymethylene); polyformaldehyde |
| PP | polypropylene |
| PS | polystyrene |
| PTFE | polytetrafluoroethylene |
| PVAC | poly(vinyl acetate) |
| PVAL | poly(vinyl alcohol) |
| PVC | poly(vinyl chloride) |
| PVDC | poly(vinylidene dichloride) |
| PVDF | poly(vinylidene difluoride) |
| PVF | poly(vinyl fluoride) |

[a] Ref. 9.
[b] The abbreviation PET is commonly used in the literature.

oral communication. For example, the simpler generic name nylon-6.6 for a poly-amide, where the first number refers to the number of carbon atoms of the diamine and the second number to that of the diacid fragment, appears often in the literature rather than the systematic name poly(iminoadipoyliminohexamethylene). Useful compilations of trade names for polymers can be found in Refs. 23 and 24.

       Perhaps the most widely used shortcut is the use of abbreviations for common industrial polymeric materials. The IUPAC recognizes that there may be advantages in some cases to use abbreviations, but urges that each abbreviation be fully defined the first time it appears in the text and that no abbreviation be used in titles of publications. Because there are inherent difficulties in assigning systematic and unique abbreviations to polymeric structures, only a short list has the IUPAC's official sanction (9,10) (Table 4). ISO has published a more extensive list (25), and the American Chemical Society has compiled a master list of all known abbreviations in the polymer field (26).

## BIBLIOGRAPHY

"Nomenclature" in *EPST* 1st ed., Vol. 9, pp. 336–344, by Robert B. Fox, U.S. Naval Research Laboratory, and Chairman (1963–1967), Polymer Nomenclature Committee of The American Chemical Society.

1. IUPAC, *J. Polym. Sci.* **8**, 257 (1952).
2. M. L. Huggins, G. Natta, V. Desreux, and H. Mark, *Pure Appl. Chem.* **12**, 645 (1966).
3. *Ibid., J. Polym. Sci.* **56**, 153 (1962).
4. IUPAC, *Pure Appl. Chem.* **53**, 733 (1981).
5. M. L. Huggins, G. Natta, V. Desreux, and H. Mark, *Makromol. Chem.* **82**, 1 (1965).
6. M. L. Huggins, P. Corradini, V. Desreux, O. Kratky, and H. Mark, *J. Polym. Sci. Part B* **6**, 257 (1968).
7. *Appendices on Tentative Nomenclature, Symbols, Units and Standards, No. 13, IUPAC Information Bulletin,* IUPAC, Oxford, UK, 1971.
8. IUPAC, *Pure Appl. Chem.* **40**, 479 (1974).
9. IUPAC, *Pure Appl. Chem.* **59**, 691 (1987).
10. IUPAC, *Pure Appl. Chem.* **40**, 475 (1974).
11. IUPAC, *Pure Appl. Chem.* **48**, 373 (1976).
12. IUPAC, *Pure Appl. Chem.* **51**, 1101 (1979).
13. IUPAC, *Pure Appl. Chem.* **53**, 2283 (1981).
14. IUPAC, *Pure Appl. Chem.* **57**, 149 (1985).
15. IUPAC, *Makromol. Chem.* **185** (appendix to No. 1) (1984).
16. IUPAC, *J. Polym. Sci. Polym. Lett. Ed.* **22**, 57 (1984).
17. IUPAC, *J. Colloid Interface Sci.* **101**, 277 (1984).
18. IUPAC, *Pure Appl. Chem.* **57**, 1427 (1985).
19. IUPAC, *Pure Appl. Chem.,* in press.
20. IUPAC, *Pure Appl. Chem.,* in press.
21. IUPAC, *Pure Appl. Chem.,* in press.
22. Polymer Nomenclature Committee, American Chemical Society, *Macromolecules* **1**, 193 (1968).
23. M. Ash and I. Ash, *Encyclopedia of Plastics, Polymers, and Resins,* Chemical Publishing Co., Inc., New York, 1982.
24. H-G. Elias and R. A. Pethrick, eds., *Polymer Yearbook,* Harwood Academic Publishers GmbH, New York, 1984, p. 113.
25. *Plastics—Symbols and Codes—Part 1: Symbols for Basic Polymers and Their Modifications and*

for Plasticizers, *International Standard ISO 1043-1984*, The International Standardization Organization, New York, 1984.

26. Polymer Nomenclature Committee, American Chemical Society, *Polym. News* **9**, 101 (1983); **10** (Pt. 2), 169 (1985).

NORBERT M. BIKALES
National Science Foundation
Secretary (1978–1987), IUPAC Commission on Macromolecular Nomenclature

## NONAQUEOUS DISPERSIONS. See COATINGS.

## NONCOMBUSTIBLE FABRICS. See FLAMMABILITY.

## NONDESTRUCTIVE TESTING. See TEST METHODS.

## NON-NEWTONIAN FLOW. See VISCOELASTICITY.

## NONWOVEN FABRICS

Survey, 204
Spunbonded, 227

## SURVEY

Nonwoven fabrics are porous, textilelike materials, usually in flat she
form, composed primarily or entirely of fibers assembled in webs (1–3). The
fabrics, also called bonded fabrics, formed fabrics, or engineered fabrics, are ma
ufactured by processes other than spinning, weaving, or knitting. The thickne
of the sheets may vary from 25 μm to several centimeters, and the weight fr
10 g/m² to 1 kg/m². A sheet may resemble paper or a woven or knitted fabric
appearance and may have a unique texture or pattern. It may be as compact a
crisp as paper or supple and drapable as a conventional textile; it may be resili
or limp. Its tensile properties may be barely self-sustaining or so high that i
impossible to tear, abrade, or damage the sheet by hand. The fiber componer
one or several types, may be natural or synthetic, from 1–3-mm long to endl
The tensile properties may depend on frictional forces or a film-forming polym
additive functioning as an adhesive binder. All or some of the fibers may
welded by heat or solvent. A scrim, gauze, netting, yarn, or other conventic
sheet material may be added to one or both faces, or embedded within as r
forcement. The nonwoven fabric may be incorporated as a component in a c
posite structure.

Felted fabrics from animal hairs, eg, wool (qv), are not included even tho

**an·hy·drous** \(')an;hīdrəs\ *adj* [modif. (influenced by *hydr-*,
*hydro-*) of Gk *anvdros* waterless, fr. *an-* + *-ydros* (fr. *hydōr*
water) — more at WATER ] : destitute of water — used of water of
crystallization, dissolved or combined water, adsorbed water

# HERMES DECLARATION
# EXHIBIT 11

*Pure Appl. Chem.*, Vol. 73, No. 9, pp. 1511–1519, 2001.
© 2001 IUPAC

INTERNATIONAL UNION OF PURE AND APPLIED CHEMISTRY

MACROMOLECULAR DIVISION
COMMISSION ON MACROMOLECULAR NOMENCLATURE*

# GENERIC SOURCE-BASED NOMENCLATURE FOR POLYMERS

## (IUPAC Recommendations 2001)

*Prepared by a Working Group consisting of*

R. E. BAREISS (Germany), R. B. FOX (USA), K. HATADA (Japan), K. HORIE (UK),
A. D. JENKINS (UK), J. KAHOVEC (Czech Republic), P. KUBISA (Poland),
E. MARÉCHAL (France), I. MEISEL (Germany), W. V. METANOMSKI (USA),
I. MITA (Japan), R. F. T. STEPTO (UK), AND E. S. WILKS (USA)

*Prepared for publication by*
E. MARÉCHAL[1] AND E. S. WILKS[2,†]

[1]*Université Pierre et Marie Curie (Paris VI), Laboratoire de Synthèse Macromoléculaire, Boîte 184,
4 Place Jussieu F-75252, Paris Cédex 05, France;* [2]*113 Meriden Drive, Canterbury Hills, Hockessin,
DE 19707 USA*

*Membership of the Commission during the preparation of this report (1993–1999) was as follows:
**Titular Members:** R. E. Bareiss (Germany, 1983–1993); M. Barón (Argentina, from 1996, Secretary from 1998);
K. Hatada (Japan, 1989–1997); M. Hess (Germany, from 1998); K. Horie (Japan, from 1997); J. Kahovec (Czech
Republic, to 1999); P. Kubisa (Poland, from 1999); E. Maréchal (France, from 1994); I. Meisel (Germany, from
2000); W. V. Metanomski (USA, 1994–1999); C. Noël (France, to 1997); V. P. Shibaev (Russia, to 1995);
R. F. T. Stepto (UK, 1989–1999, Chairman to 1999); E. S. Wilks (USA, from 2000); W. J. Work (USA,
1987–1999, Secretary, 1987–1997); **Associate Members:** M. Barón (Argentina,1991–1995); K. Hatada (Japan,
1998–1999); J.-I. Jin (Korea, from 1993); M. Hess (Germany, 1996–1997); K. Horie (Japan, 1996–1997);
O. Kramer (Denmark, from 1996); P. Kubisa (Poland, 1996–1998); E. Maréchal (France, 1991–1993); I. Meisel
(Germany, 1997–1999); S. Penczek (Poland, from 1994); L. Shi (China, 1987–1995); V. P. Shibaev (Russia,
1996–1999); E. S. Wilks (USA, 1998–1999).

†Corresponding author

*Republication or reproduction of this report or its storage and/or dissemination by electronic means is permitted without the
need for formal IUPAC permission on condition that an acknowledgment, with full reference to the source, along with use of the
copyright symbol ©, the name IUPAC, and the year of publication, are prominently visible. Publication of a translation into
another language is subject to the additional condition of prior approval from the relevant IUPAC National Adhering
Organization.*

E. MARÉCHAL AND E. S. WILKS

# Generic source-based nomenclature for polymers

# (IUPAC Recommendations 2001)

*Abstract*: The commission has already published two documents on the source-based names of linear copolymers and nonlinear polymers; however, in some cases this nomenclature leads to ambiguous names. The present document proposes a generic source-based nomenclature that solves these problems and yields clearer source-based names. A generic source-based name comprises two parts:
1)    polymer class (generic) name followed by a colon
2)    the actual or hypothetical monomer name(s), always parenthesized in the case of a copolymer

The formula, the structure-based name, the source-based name, and the generic source-based name of the polymer are given for each example in the document. In some cases, only generic source-based give unambiguous names, for example, when a polymer has more than one name or when it is obtained through a series of intermediate structures. The rules concern mostly polymers with one or more types of functional group or heterocyclic system in the main chain, but to some extent they are also applicable to polymers with side-groups, carbon-chain polymers such as vinyl or diene polymers, spiro and cyclic polymers, and networks.

**CONTENTS**

1.   INTRODUCTION
2.   SOURCE-BASED NOMENCLATURE FOR HOMOPOLYMERS
3.   GENERIC NOMENCLATURE
     3.1   Fundamental principles
     3.2   General rules
4.   FURTHER APPLICATIONS OF GENERIC NAMES
5.   REFERENCES

**1. INTRODUCTION**

The IUPAC Commission on Macromolecular Nomenclature has published three documents [1–3] on the structure-based nomenclature for polymers that enable most polymers, except networks, to be named. The Commission has also produced two documents [4,5] on the source-based nomenclature of linear copolymers and nonlinear polymers. In general, source-based names are simpler and less rigorous than structure-based names. However, there are cases in which the simplicity of the source-based nomenclature leads to ambiguous names for polymers. For example, the condensation of a dianhydride (A) with a diamine (B) gives first a polyamide-acid, which can be cyclized to a polyimide; however, both products have the same name poly(A-*alt*-B) according to current source-based nomenclature. If the class name of the polymer "amide-acid" or "imide" is incorporated in the name, differentiation is easily accomplished. Even in cases where only a single product is formed, use of the class name (generic name) may help to clarify the structure of the polymer, especially if it is very complex.

   Examples of ambiguous names exist also for homopolymers. The source-based name "polybutadiene" does not indicate whether the structure is 1,2-, 1,4-*cis*-, or 1,4-*trans*-; supplementary information is needed to distinguish between the possibilities.

Case 1:04-cv-1467-RBS2457-RBS ent Doc 6-27 6Filed FU4/06/2007200Page 40 ef 58f 10

It is the objective of the present document to introduce a generic nomenclature system to solve these problems, and to yield better source-based names.

Most trivial names, such as polystyrene, are source-based names. Hitherto, the Commission has not systematically recommended source-based names for homopolymers because it considered that the more rigorous structure-based names were more appropriate for scientific communications. However, since the publication of "Nomenclature of Regular Single-Strand Organic Polymers" in 1976, scientists, in both industry and academia, have continued to use trivial names. Even the Commission itself adopted (1985) a source-based nomenclature for copolymers owing to its simplicity and practicality. Based on these facts, the Commission has now decided to recommend source-based nomenclature as an alternative official nomenclature for homopolymers. In this document, the rules for generating source-based names for homopolymers are described. Consequently, source-based and structure-based names are available for most polymers.

Names of the monomers in the source-based names of polymers should preferably be systematic but they may be trivial if well established by usage. Names of the organic groups, as parts of constitutional repeating units (CRU) in structure-based names, are those based on the principles of organic nomenclature and recommended by the 1993 *A Guide to IUPAC Nomenclature of Organic Compounds* [6].

## 2. SOURCE-BASED NOMENCLATURE FOR HOMOPOLYMERS

### *RULE 1*

The source-based name of a homopolymer is made by combining the prefix "poly" with the name of the monomer. When the latter consists of more than one word, or any ambiguity is anticipated, the name of the monomer is parenthesized.

*Example 1.1*



Source-based name:
> polystyrene

Structure-based name:
> poly(1-phenylethylene)

*Example 1.2*



Source-based name:
> poly(vinyl chloride)

Structure-based name:
> poly(1-chloroethylene)

## 3. GENERIC NOMENCLATURE

### 3.1 Fundamental principles

The basic concept for generic source-based nomenclature is very simple; just add the polymer class name to the source-based name of the polymer. Addition of the polymer class name is frequently

E. MARÉCHAL AND E. S. WILKS

OPTIONAL; in some cases, the addition is necessary to avoid ambiguity or to clarify. However, the addition is undesirable if it fails to add clarification.

The system presented here can be applied to almost all homopolymers, copolymers, and others, such as networks. However, generic source-based nomenclature should not be considered as a third nomenclature system to be added to the other two systems of nomenclature; it must be considered as an auxiliary system and a simple extension of current source-based nomenclature. When the generic part of the name is eliminated from the name of a polymer, the well-established source-based name remains.

## 3.2 General rules

### RULE 2

A generic source-based name of a polymer has two components in the following sequence: (1) a polymer class (generic) name (polyG) followed by a colon and (2) the actual or hypothetical monomer name(s) (A, B, etc.), always parenthesized in the case of a copolymer. In the case of a homopolymer, parentheses are introduced when it is necessary to improve clarity.

polyG:A    polyG:(B)           polyG:(A-*co*-B)          polyG:(A-*alt*-B)

| | |
|---|---|
| **Note 1** | The polymer class name (generic name) describes the most appropriate type of functional group or heterocyclic ring system. |
| **Note 2** | All the rules given in the two prior documents on source-based nomenclature [4,5] can be applied to the present nomenclature system, with the addition of the generic part of the name. |
| **Note 3** | A polymer may have more than one name; this usually occurs when it can be prepared in more than one way. |
| **Note 4** | If a monomer or a pair of complementary monomers can give rise to more than one polymer, or if the polymer is obtained through a series of intermediate structures, the use of generic nomenclature is essential (see examples 2.1, 2.3, and 2.4). |

*Example 2.1*



Generic source-based name:
    I.  polyalkylene:vinyloxirane
    II. polyether:vinyloxirane
Source-based names:
    I and II have the same source-based name: poly(vinyloxirane).
Structure-based names:
    I.  poly(1-oxiranylethylene)
    II. poly[(oxy(1-vinylethylene)]

*Example 2.2*



Generic source-based name:
>    polyoxadiazole:(4-cyanobenzonitrile *N*-oxide)

Structure-based name:
>    poly(1,2,4-oxadiazole-3,5-diyl-1,4-phenylene)

*Example 2.3*





Generic source-based name:
>    I.  polyamide:[(terephthaloyl dichloride)-*alt*-benzene-1,2,4,5-tetramine]
>    II. polybenzimidazole:[(terephthaloyl dichloride)-*alt*-benzene-1,2,4,5-tetramine]

Source-based name:
>    I and II have the same source-based name:
>    poly[(terephthaloyl dichloride)-*alt*-benzene-1,2,4,5-tetramine]

Structure-based names:
>    I.  poly[imino (2,5-diamino-1,4-phenylene)iminoterephthaloyl]
>    II. poly[(1,5-dihydrobenzo[1,2-*d*:4,5-*d'*]diimidazole-2,6-diyl)-1,4-phenylene]

*Example 2.4*





Generic source-based names:
>    I. polyhydrazide:[hydrazine-*alt*-(terephthalic acid)]
>    II. polyoxadiazole:[hydrazine-*alt*-(terephthalic acid)]

© 2001 IUPAC, *Pure and Applied Chemistry* 73, 1511–1519

E. MARÉCHAL AND E. S. WILKS

Source-based name:
    I and II have the same source-based name: poly[hydrazine-*alt*-(terephthalic acid)]
Structure-based names:
    I.  poly(hydrazine-1,2-diylterephthaloyl)
    II.  poly(1,3,4-oxadiazole-2,5-diyl-1,4-phenylene)

*Example 2.5*



Generic source-based names:
    polyurethane:[butane-1,4-diol-*alt*-(hexane-1,6-diyl diisocyanate)]-*block*-polyester:
    [(ethylene glycol)-*alt*-(terephthalic acid)]
Structure-based name:
    poly(oxybutane-1,4-diyloxycarbonyliminohexane-1,6-diyliminocarbonyl)-*block*-poly(oxyethyle-
    neoxyterephthaloyl)

*Example 2.6*



Generic source-based name:
    polyamide:[hexane-1,6-diamine-*alt*-(adipic acid)]-*graft*-polyether:(ethylene oxide)

**Note 5**      It is assumed that this reaction is limited to only one graft for each CRU.

## RULE 3

When more than one type of functional group or heterocyclic system is present in the polymer struc-
ture, names should be alphabetized; for example, poly(GG′):(A-*alt*-B).

**Note 6**      It is preferable, but not mandatory, to cite all generic classes.

*Example 3.1*



Generic source-based name:
    polyesterurethane:{α,ω-dihydroxyoligo[(ethylene glycol)-*alt*-(adipic acid)]-*alt*-(2,5-tolylene
    diisocyanate)}
Structure-based name:
    poly{[oligo(oxyethyleneoxyadipoyl)]oxyethyleneoxycarbonylimino(x-methyl-1,4-phenylene)
    iminocarbonyl)}

© 2001 IUPAC, *Pure and Applied Chemistry* 73, 1511–1519

*Example 3.2*



Generic source-based name:

  polyetherketone:(4,4′-difluorobenzophenone-*alt*-hydroquinone)

Structure-based name:

  poly(oxy-1,4-phenyleneoxy-1,4-phenylenecarbonyl-1,4-phenylene)

## RULE 4

Polymer class names relevant only to the main chain are specified in the name; names of side-chain functional groups may also be included after a hyphen if they are formed during the polymerization reaction.

*Example 4.1*



Generic source-based names:

  I.  poly(amide-acid):[(pyromellitic dianhydride)-*alt*-(4,4′-oxydianiline)]
  (Both carboxy groups result from the polymerization reaction.)
  II. polyimide:[(pyromellitic dianhydride)-*alt*-(4,4′-oxydianiline)]

Structure-based names:

  I.  poly[oxy-1,4-phenyleneiminocarbonyl(4,6-dicarboxy-1,3-phenylene)carbonylimino-1,4-phenylene]
  II. poly[(5,7-dihydro-1,3,5,7-tetraoxobenzo[1,2-*c*:4,5-*c*′]dipyrrole-2,6(1*H*,3*H*)-diyl)-1,4-phenyleneoxy-1,4-phenylene]

*Example 4.2*



Generic source-based names:

  poly(ether-alcohol):(epichlorohydrin-*alt*-bisphenol A)

Structure-based name:

  poly[oxy(2-hydroxypropane-1,3-diyl)oxy-1,4-phenylene(1-methylethane-1,1-diyl)-1,4-phenylene]

© 2001 IUPAC, *Pure and Applied Chemistry* 73, 1511–1519

E. MARÉCHAL AND E. S. WILKS

## *RULE 5*

In the case of carbon-chain polymers such as vinyl polymers or diene polymers, the generic name is to be used only when different polymer structures may arise from a given monomeric system.

*Example 5.1*

Generic source-based name:
    polyalkylene:(buta-1,3-diene)
Source-based name:
    poly(buta-1,3-diene)
Structure-based name:
    poly(1-vinylethylene)

*Example 5.2*

Generic source-based name:
    polyalkenylene:buta-1,3-diene
Source-based name:
    poly(buta-1,3-diene)
Structure-based name:
    poly(but-1-ene-1,4-diyl)

*Example 5.3*

Generic source-based name:
    polyalkylene:acrylamide
Structure-based name:
    poly[1-(aminocarbonyl)ethylene]

*Example 5.4*

Generic source-based name:
    polyamide:acrylamide
Structure-based name:
    poly[imino(1-oxopropane-1,3-diyl)]

**Note 7**    The terms polyalkylene and polyalkenylene have been defined in ref. 7, p. 149.

## 4. FURTHER APPLICATIONS OF GENERIC NAMES

Generic source-based nomenclature can be extended to more complicated polymers such as spiro and cyclic polymers and networks.

*Example 6.1*



Generic source-based name:

polyspiroketal:{[2,2-bis(hydroxymethyl)-propane-1,3-diol]-*alt*-cyclohexane-1,4-dione}
or polyspiroketal:(pentaerythritol-*alt*-cyclohexane-1,4-dione)

Structure-based name:

poly[2,4,8,10-tetraoxaspiro[5.5]undecane-3,3,9,9-tetrayl-9,9-bis(ethylene)]

*Example 6.2*



Generic source-based name:

*cyclo*-polyester:[(ethylene glycol)-*alt*-(terephthalic acid)]

**Note 8**          There is no IUPAC nomenclature for cyclic polymers.

*Example 6.3*



Generic source-based name:

polyester:{butane-1,4-diol-*alt*-[(maleic anhydride);(phthalic anhydride)]}-*net*-polyalkylene:(maleic anhydride)-*co*-styrene]

## 5. REFERENCES

1. "Nomenclature of regular single-strand organic polymers, 1975", *Pure Appl. Chem.* **48**, 373–385 (1976). Reprinted as chapter 5 in Ref. 7.
2. "Nomenclature of regular double-strand (ladder and spiro) organic polymers 1993", *Pure Appl. Chem.* **65**, 1561–1580 (1993).
3. "Structure-based nomenclature for irregular single-strand organic polymers 1994", *Pure Appl. Chem.* **66**, 873–889 (1994).
4. "Source-Based Nomenclature for Copolymers 1985", *Pure Appl. Chem.* **57**, 1427–1440 (1985). Reprinted as chapter 7 in Ref. 7.
5. "Source-based nomenclature for non-linear macromolecules and macromolecular assemblies", *Pure Appl. Chem.* **69**, 2511–2521 (1997).
6. *A Guide to IUPAC Nomenclature of Organic Compou*nds, R. Panico, W. H. Powell, J-C. Richer (Eds.), Blackwell Scientific Publications, Oxford (1993).
7. *Compendium of Macromolecular Nomenclature*, W. V. Metanomski (Ed.), Blackwell Scientific Publications, Oxford (1991).

# HERMES DECLARATION
# EXHIBIT 12

# SALES BULLETIN

DATE **01/05/05**    SUBJECT    **High Strength Sutures**    NUMBER **UE133**

## A Biomechanical Analysis of High Strength Sutures

Recently, Stephen S. Burkhart, M.D., conducted a biomechanical analysis of new high strength sutures used primarily for arthroscopic shoulder surgery. The purpose of the study was to determine the type of braided suture that produces the optimal knot configuration maximizing both knot and loop security. The high strength sutures tested were #2 FiberWire®, #2 OrthoCord™, Herculine™, MaxBraid, UltraBraid™, and Ethibond™ (2 mm FiberTape™ was also included in this study).

### Conclusions

- Tying a surgeon's knot with #2 FiberWire significantly increases knot security compared to #2 OrthoCord, #2 Herculine, #2 MaxBraid, #2 UltraBraid, and #2 Ethibond.

- Tying a surgeon's knot or sliding knot with #2 FiberWire provides the optimum balance of loop and knot security compared to #2 OrthoCord, #2 Herculine, #2 MaxBraid, #2 UltraBraid, and #2 Ethibond.

- #2 FiberWire provides the greatest loop security when tying a Weston or Roeder knot compared to #2 OrthoCord, #2 Herculine, #2 MaxBraid, #2 UltraBraid, and #2 Ethibond.

- #2 FiberWire has the greatest knot security when tying a surgeon's knot compared to #2 Herculine, #2 MaxBraid, #2 UltraBraid, and #2 Ethibond. Although #2 OrthoCord had the smallest loop circumference when tying a surgeon's knot the difference between the loop circumference of #2 FiberWire and #2 OrthoCord was not statistically significant.

- In straight pull-testing, #2 FiberWire had the highest ultimate strength compared to #2 OrthoCord, #2 Herculine, #2 MaxBraid, #2 UltraBraid, and #2 Ethibond.

- #2 FiberWire had the smallest percentage of elongation compared to #2 OrthoCord, #2 Herculine, #2 MaxBraid, #2 UltraBraid, and #2 Ethibond.

### Methods & Materials

CONFIDENTIAL - NON-PATENT PROSECUTION COUNSEL ONLY

Six #2 sutures were tested, FiberWire (polyethylene & polyester), Ethibond (polyester), OrthoCord (polydioxnone & polyester), Herculine (polyethylene), MaxBraid (polyethylene), and UltraBraid (polyethylene with & without a monofilament polypropylene marker). Three knots were used, the Roeder & Weston knots with three reversing half-hitches on alternating posts as well as a static surgeon's knot. Additionally, 2 mm FiberTape (polyethylene & polyester) were tied using four alternating throws. All total 133 knots were tied.

All knots were tied around a 30 mm circumference post to assure consistent loop circumference by Stephen S. Burkhart, M.D., a senior arthroscopic surgeon (Figure 1). Before testing, the knot stack was measured using calipers (Figure 2).

ARM 002188

This information is provided for internal use only. It is not intended for general distribution. Arthrex, Inc., Naples, FL



Figure 1: Knot tied over 30 mm pin.



Figure 2: Measuring knot stack.

Each loop was mounted on an Instron materials testing system (model 5544, Instron, Canton, MA) to test knot and loop security. Fixtures were mounted to the base and crosshead of the Instron with two 3.95 mm diameter rods held parallel. Each loop was placed around the rods with the knots centered between the two rods (Figure 3). A 5N preload was applied at 1 mm/s and then pulled to failure at 1 mm/s. Data was collected at 500 Hz.



The loop circumference was measured at the 5N preload to assess each knot's ability to maintain a tight loop without slippage (loop security). The loop circumference was calculated based on equation 1 where $C_l$ = loop circumference, d = rod diameter, and x = crosshead displacement measured for the center of each rod.

Equation 1: $C_l = \pi d \times 2(x)$

Figure 3: Instron test set up.

Knot security was measured as the maximum force to failure at 3 mm of crosshead displacement or suture breakage during single pull load testing (force to failure and failure mode were recorded). Three millimeters of elongation was selected as the failure mode because 3 mm or more is generally accepted in the literature. For statistical analysis one way analyses of variance (ANOVA) were used. *Post hoc* pairwise multiple comparisons were made using a Biferroni t-test. A significance level of 0.05 was used for all analyses.

CONFIDENTIAL - NON-PATENT
PROSECUTION COUNSEL
ONLY

ARM 002189

# HERMES DECLARATION
# EXHIBIT 13

Arthrex, Inc., Naples, FL
Test Report Summary and Sign-Off Sheet

Ref: RAF-04.16-1
Rev: 3
Date: 01/08/04
Approved DCN: 03310

**Test Report: # TEST021104**

| Part number: DT PS05 (T2) | Rev: N/A | Description: #2 Fiberwire MED2174 Coated and Uncoated USIPG Dyed | Material: Polyethylene, Polyester |
|---|---|---|---|
| Vendor Name: Pearsalls _Brian Hallet._ | | Lot Numbers: N/A | Number Tested: 3/2 |
| Performed by: Ashley Holloway | | Type of Test: Knot Tiedown | Date: 02/16/04 |

**Test Objective:**

To determine the peak force required to advance a single half hitch using coated and uncoated Fiberwire suture.

**Materials and Methods:**

The 50lb load cell was attached to the MTS Sintech 1/S and calibrated. A custom fixture as shown was used to simulate knot tying that would occur clinically. The top end of the suture was clamped in a custom fixture that was attached to the load cell, and then a single half hitch was tied around a guide block such that the loop length was consistent between samples. A weight of .375 kg was then attached to the free end of the suture in order to tension the loop. Care was taken to tension the legs of the suture consistently. The loop was then loaded at 12 in/min for 30mm and data was collected at 200 Hz. The peak load required to cause the half hitch to slip was recorded and used for data analysis purposes.

DEPUY MITEK
EXHIBIT 343
04cv12457

Arthrex, Inc., Naples, FL
Test Report Summary and Sign-Off Sheet

Ref: RAF-04.16-1
Rev: 3
Date: 01/08/04
Approved DCN: 03310



**Data Analysis/Conclusions:**

A mean peak force of 12.7 N was recorded for the coated suture. This force represents the force required to initiate slippage of the half hitch. A mean peak force of 32.9 N was recorded for the uncoated suture. A significantly greater amount of force was required to advance the uncoated suture.

Page 2 of 2

2/16/04

Sample ID: coated_uncoated suture_1_021004.mss
Method: Suture Test.msm

Test Date: 2/11/04
Operator: Ashley Holloway

**Sample Information:**

| Name | Value |
|---|---|
| Lot Number | n/a |
| Part Number | Coated/Uncoated suture test |
| Revision Level | #2 Fiberwire |

**Specimen Results:**

| Specimen # | Peak Load Coated (N) | | Specimen # | Peak Load Noncoated (N) |
|---|---|---|---|---|
| 1 | 12.43 | | 4 | 34.04 |
| 2 | 13.08 | | 5 | 31.71 |
| 3 | 12.64 | | | |
| Mean | 12.72 | | | 32.88 |
| Std. Dev. | 0.33 | | | 1.65 |
| Minimum | 12.43 | | | 31.71 |
| Maximum | 13.08 | | | 34.04 |

**Calculation Inputs:**

**Test Inputs:**

| Name | Value | Units |
|---|---|---|
| Break Threshold | 5.620 | lbf |
| Brk Sensitivity | 95 | % |
| Data Acq. Rate | 200.0 | Hz |
| Ext Limit HI | 30.0 | mm |
| Initial Speed | 300.00 | mm/min |
| Load Limit HI | 150 | N |
| MaxSpecimens | 999 | |
| Outer Loop Rate | 100 | Hz |
| Slack Pre-Load | 5.00 | N |
| Slowdown Extension | 0.000 | in |
| Slowdown Load | 0.000 | lbf |
| Slowdown Strain | 0.000 | % |
| Test Speed | 305.00 | mm/min |



# HERMES DECLARATION
# EXHIBIT 14

(12) UK Patent Application (19) GB (11) 2 218 312 A

(43) Date of A publication 15.11.1989

(21) Application No 8911055.6

(22) Date of filing 15.05.1989

(30) Priority data
(31) 8811495 (32) 14.05.1988 (33) GB

(71) Applicant
Fly Fishing Technology Limited

(Incorporated in the United Kingdom)

Units 3/4, Ffrwdgrech Industrial Estate, Brecon,
Powys, LD3 8LA, United Kingdom

(72) Inventor
Paul David Burgess

(74) Agent and/or Address for Service
Wynne-Jones Laine & James
Morgan Arcade Chambers, 33 St. Mary Street, Cardiff,
Glamorgan, CF1 2AB, United Kingdom

(51) INT CL⁴
A01K 91/00, D04C 1/12

(52) UK CL (Edition J)
A1A A19
D1K K14
U1S S1022

(56) Documents cited
None

(58) Field of search
UK CL (Edition J) A1A, D1K
INT CL⁴ A01K, D04C

(54) Improvements relating to fishing lines

(57) A fishing line of braided construction has some filaments of high tensile polythene. The other filaments are of polyester
and/or nylon, and the braid may be coated with a sheath of polyurethane.

GB 2 218 312 A

DePuy Mitek, Inc. v. Arthrex, Inc.
C.A. No.04-12457 PBS
DMI000122

2218312

-1-

**"Improvements relating to Fishing Lines"**

This invention relates to fishing lines.

Fishing lines require many qualities, such as high tensile strength, while having a small diameter, non-stretchability, resistance to abrasion, smooth

5 running and suppleness.  It is the aim of this invention to provide a line embodying most of these not usually very compatible properties.

According to the present invention there is provided a fishing line of braided construction, some

10 braid filaments being of high tensile polythene thread and other filaments being of polyester and/or nylon.

The high tensile polythene gives the line minimal stretchability and will preferably be a high molecular weight polythene, melted in a solvent and drawn at high

15 speed into extremely fine strands. This produces almost perfect alignment of all the molecules in long chains. A suitable product is that sold under the Registered Trade Mark DYNEEMA.

With polyester, multifilaments will generally be

20 used, and the more there are of them in proportion to the polythene the stiffer the line will be.  With nylon, monofilaments will preferably be used and the principal effect will be a low coefficient of friction.

-1-

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000123**

-2-

It would be possible for certain applications to combine both polyester and nylon with the polythene thread.

The braid may be coated with a thin, supple
5   and smooth sheath of polyurethane and this may be carried out by a simple immersion process in liquid polyurethane.   It will alter the characteristics (such as buoyancy and strength) in a predictable manner, but its main purpose is
10   to prevent saturation of the interstices of the braid.  In very cold conditions, such as fishing through holes in ice, water having worked its way into the braid will freeze and impart a brittleness that can lead to breakage.

SL/SCS
-2-

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000124**

-3-

## CLAIMS

1. A fishing line of braided construction, some braid filaments being of high tenaxile polythene thread and other filaments being of polyester and/or nylon.

5  2. A line as claimed in Claim 1,, wherein the other filaments include polyester multi-filaments.

3. A line as claimed in Claim 1 or 2, wherein the other filaments include nylon monofilaments.

4. A line as claimed in Claim 1., 2 or 3, wherein 10  the braid is coated by a sheath of polyurethane.

5. A line as claimed in any preeceding Claim, wherein the polythene is that sold under the Trade Mark DYNEEMA.

-3-

Published 1989 at The Patent Office, State House, 66/71 High Holborn, London WC1R 4TP. Further copies may be obtained from The Patent Office Sales Branch, St Mary Cray, Orpington, Kent BR5 3RD. Printed by Multiplex techniques ltd, St Mary Cray, Kent, Con. 1/87

DePuy Mitek, Inc. v. Arthrex, Inc.
C.A. No.04-12457 PBS
DMI000125