# EXHIBIT 8

Page 252

1            UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3                C.A. NO. 04-12457 PBS

4    _____x

5    DePUY-MITEK, INC.,

6        A Massachusetts Corporation,

7              Plaintiff,

8        vs.

9    ARTHREX, INC.,

10       A Delaware Corporation,

11           Defendants.

12   _____x

13              DAY 2 OF 2

14       CONTINUED VIDEOTAPED DEPOSITION

15          OF DR. MATTHEW HERMES

16         Philadelphia, Pennsylvania

17            July 25, 2006

18

19

20   Reported by:

21

22   PAMELA HARRISON, RMR, CRR, CSR

23

24

25

**READ & SIGN COPY**

Deposition of:
Dr. Matthew Hermes, Vol. II

July 25, 2006

Page 333

1 the last deposition.    12:59:24p
2    A.   Mm-hmm.    12:59:26p
3    Q.   Are you familiar with this document,    12:59:28p
4 sir?    12:59:29p
5    A.   I am.    12:59:29p
6    Q.   What is it?    12:59:30p
7    A.   This is — well, let me make sure that    12:59:31p
8 — let me go through it to make sure that...    12:59:34p
9 (Witness reviewing document.) I'm not sure I am    12:59:40p
10 certain as to what that document is.    01:00:05p
11    Q.   Have you seen it before?    01:00:08p
12    A.   I've seen the — the front page and    01:00:08p
13 the rear page, but I'm — I don't recall that —    01:00:11p
14 I don't recall handing counsel the entire    01:00:22p
15 document as such.    01:00:25p
16    Did I do that?    01:00:27p
17    Q.   This is just what was given to us, so    01:00:28p
18 it's —    01:00:31p
19    A.   Okay, fine.  Okay, fine.    01:00:31p
20    If this is — this is material    01:00:33p
21 that I handed to my counsel, that's correct.    01:00:37p
22    Q.   Well, generally what is it?  You said    01:00:38p
23 you did know what the first page is, so what is    01:00:41p
24 the first page?    01:00:43p
25    A.   What this is, is some notes that I —    01:00:44p

Page 334

1    MR. BONELLA:  Object.  I think    01:00:46p
2 you just mischaracterized what he said.    01:00:47p
3    But go ahead.    01:00:49p
4    THE WITNESS:  If your question    01:00:51p
5 is what is this first page, this is a copy of    01:00:53p
6 Dr. Mukherjee's expert report and some notes    01:00:59p
7 that I made regarding it when I initially    01:01:03p
8 received it.    01:01:08p
9 BY MR. SABER:    01:01:09p
10    Q.   Is the handwritten — there's some    01:01:09p
11 handwritten materials on this page?    01:01:12p
12    A.   Yes, sir.    01:01:14p
13    Q.   Is that your handwriting?    01:01:14p
14    A.   On the first page, the handwriting,    01:01:18p
15 except for down in the corner, is my handwriting,    01:01:21p
16 yes.    01:01:23p
17    Q.   Down in the corner meaning the    01:01:24p
18 marks —    01:01:29p
19    A.   The exhibit mark, yes.    01:01:30p
20    Q.   The exhibit mark.    01:01:31p
21    And when did you make these    01:01:33p
22 notes?    01:01:34p
23    A.   I made these notes — it's marked    01:01:36p
24 March 6th.  Probably March 6th.    01:01:43p
25    Q.   And you think that's — this was    01:01:47p

Page 335

1 your — you made them the first time you reviewed    01:01:49p
2 the report, if I understood your answer    01:01:51p
3 correctly?    01:01:53p
4    MR. BONELLA:  Object to form.    01:01:54p
5    THE WITNESS:  I believe so, but    01:01:55p
6 I'm not certain.    01:02:02p
7 BY MR. SABER:    01:02:05p
8    Q.   Okay.  I want to ask you about near —    01:02:05p
9 on the bottom there you have numbers one, two,    01:02:09p
10 three, and four?    01:02:11p
11    A.   Yes, sir.    01:02:12p
12    Q.   I want to ask you about number three,    01:02:12p
13 if I could, please.  Could you read the first    01:02:14p
14 sentence there, just to make sure that it's —    01:02:19p
15    A.   This is my note, Mr. Saber, is that    01:02:22p
16 right?    01:02:24p
17    Q.   Yes, sir.    01:02:24p
18    A.   You want me to read my note.    01:02:25p
19    Q.   Yes, sir.  The first sentence.    01:02:27p
20    A.   I'll be glad to.    01:02:28p
21    "446 — '446 teachings on    01:02:29p
22 offsetting properties of yarn A with yarn B may    01:02:45p
23 seem to teach away from ultra high molecular —    01:02:50p
24 UHMWPE, but the critical principle is mixing    01:02:57p
25 yarns and getting better than accepted    01:03:04p

Page 336

1 properties."    01:03:08p
2    Q.   When you used the —    01:03:10p
3    A.   I'm not finished.    01:03:12p
4    Q.   Okay.  I'm sorry, sir.    01:03:13p
5    A.   It doesn't — I'm not finished.    01:03:14p
6    "It doesn't LIMIT," in capital    01:03:18p
7 letters, "A, strength, or B, lubricity, just    01:03:20p
8 suggests it."    01:03:27p
9    Q.   When you used the nomenclature I think    01:03:27p
10 you said UHMWPE?    01:03:32p
11    A.   Yes.    01:03:35p
12    Q.   Does that mean ultra high molecular    01:03:35p
13 weight PE?    01:03:37p
14    A.   That did mean ultra high molecular    01:03:38p
15 weight polyethylene, yes.    01:03:39p
16    Q.   Right.  When you wrote at the end, you    01:03:41p
17 said, just suggests it, A, strength, and B,    01:03:46p
18 lubricity, what did you mean by that?    01:03:50p
19    A.   I meant — I meant specifically that    01:03:51p
20 the teachings in the preferred embodiment in    01:03:54p
21 which — in which the preferred embodiment    01:03:58p
22 mentions the relationship of — the preferred    01:04:02p
23 embodiment discussing PTFE, that — in which we    01:04:05p
24 talk about the strength of the braid and the    01:04:11p
25 relationship of strength to the braid, that that    01:04:17p

22 (Pages 333 to 336)

Deposition of:
Dr. Matthew Hermes, Vol. II

July 25, 2006

Page 337

1  may seem to be or may mislead others to think          01:04:23p
2  that that's a description of the entire          01:04:28p
3  invention, where it is not, where it is limited          01:04:30p
4  only to the preferred embodiment.          01:04:33p
5       Q.   I want to make sure I understand your          01:04:37p
6  answer. Could you go back and look at the '446          01:04:40p
7  patent?          01:04:41p
8       A.   Of course.          01:04:45p
9       Q.   When you talked about just suggests          01:04:57p
10  it, were you talking about in Column 4, the          01:05:00p
11  Paragraph 9 through 31 which talks about          01:05:03p
12  lubricity and then Paragraph 33 through 40 that          01:05:06p
13  talks about strength —          01:05:11p
14       MR. BONELLA: Object to the form.          01:05:12p
15  BY MR. SABER:          01:05:13p
16       Q.   — in the most preferred embodiments          01:05:13p
17  that you were talking about?          01:05:15p
18       MR. BONELLA: Object to form.          01:05:17p
19  Mischaracterizes testimony.          01:05:18p
20       THE WITNESS: No, I was speaking          01:05:46p
21  in terms of the most preferred embodiment          01:05:47p
22  starting on Page 41 — starting on Line 41 —          01:05:52p
23  please correct that — Line 41 of Column 4.          01:05:59p
24  BY MR. SABER:          01:06:07p
25       Q.   That's what you think that note          01:06:07p

Page 338

1  referred to, and not to the paragraphs above?          01:06:09p
2       MR. BONELLA: Objection. Asked          01:06:11p
3  and answered.          01:06:12p
4  BY MR. SABER:          01:06:13p
5       Q.   Is that right?          01:06:13p
6       A.   Yes, that's correct.          01:06:14p
7       Q.   You don't say PTFE and PET in your          01:06:17p
8  note, do you, sir?          01:06:21p
9       A.   No, I don't say PTFE in my note.          01:06:28p
10       Q.   Or PET?          01:06:31p
11       A.   No, I don't.          01:06:32p
12       Q.   You'd say strength and lubricity,          01:06:33p
13  correct? Is that correct?          01:06:40p
14       A.   I say that it doesn't LIMIT, in          01:06:42p
15  capitals, strength and lubricity.          01:06:45p
16       Q.   Now, earlier on in that note you say,          01:06:49p
17  may seem to teach away from ultra high molecular          01:06:51p
18  weight PE.          01:06:54p
19       Do you see that, sir?          01:06:57p
20       A.   Yes.          01:06:57p
21       Q.   What did you mean by that?          01:06:58p
22       A.   I meant that the comments in Line 41          01:07:01p
23  could be — could be misinterpreted as being          01:07:04p
24  expanded to the entire set of yarns that appear          01:07:07p
25  in section — in the list A in the patent, just          01:07:11p

Page 339

1  as you've done.          01:07:19p
2       Q.   Well, the beginning part of your note          01:07:22p
3  says '246 teachings — '446 teachings are          01:07:24p
4  offsetting properties of yarn A with yarn B,          01:07:30p
5  correct?          01:07:31p
6       A.   That's what the note says, yes.          01:07:33p
7       Q.   Is it your testimony that you're only          01:07:34p
8  referring to one embodiment by that note?          01:07:36p
9       A.   Yes, it is.          01:07:39p
10       Q.   You weren't talking generally about          01:07:40p
11  the patent?          01:07:41p
12       A.   No, I was talking about that          01:07:42p
13  embodiment.          01:07:44p
14       Q.   When you say, critical principle is          01:07:46p
15  mixing yarns and getting better than accepted          01:07:52p
16  properties, you were only talking about one          01:07:54p
17  embodiment; is that your testimony?          01:07:56p
18       MR. BONELLA: I object to form.          01:07:59p
19  It mischaracterized what he just said.          01:08:00p
20       THE WITNESS: I was speaking of          01:08:17p
21  the whole patent there.          01:08:18p
22  BY MR. SABER:          01:08:19p
23       Q.   Okay. Well, is just the back part of          01:08:19p
24  the sentence talking about the whole patent, or          01:08:22p
25  the whole sentence talking about the whole          01:08:24p

Page 340

1  patent?          01:08:26p
2       MR. BONELLA: Objection. Asked          01:08:27p
3  and answered.          01:08:28p
4       THE WITNESS: The back part of          01:08:34p
5  the sentence is talking about the whole patent.          01:08:35p
6  BY MR. SABER:          01:08:36p
7       Q.   I just want to make sure I understand          01:08:36p
8  your testimony. The first part of the patent,          01:08:38p
9  '446 teachings are offsetting properties of yarn          01:08:41p
10  A with yarn B may seem to teach away from ultra          01:08:45p
11  high molecular weight PE, refers only to Column          01:08:50p
12  4, Lines 41 to 59 —          01:08:54p
13       MR. BONELLA: Objection. Asked          01:08:59p
14  and answered. He already —          01:08:59p
15  BY MR. SABER:          01:09:00p
16       Q.   — but the rest of the sentence refers          01:09:00p
17  to the patent in its entirety?          01:09:02p
18       MR. BONELLA: Objection. Asked          01:09:04p
19  and answered three times.          01:09:04p
20  BY MR. SABER:          01:09:05p
21       Q.   Is that your testimony, sir?          01:09:05p
22       A.   It's important to note that the note          01:09:11p
23  reads '446 teachings on offsetting properties,          01:09:14p
24  not — that is my testimony —          01:09:18p
25       Q.   Okay.          01:09:21p

23 (Pages 337 to 340)

# EXHIBIT 9

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-O-

| | |
|---|---|
| DEPUY MITEK, INC., a Massachusetts Corporation, | :    Civil Action No. |
| | :    04-12457 PBS |
| Plaintiff, | : |
| -vs- | : |
| ARTHREX, INC., a Delaware | :    EXPERT DEPOSITION OF: |
| Corporation, and PEARSALLS LTD., a Private Limited | |
| Company of the United | :    ROBERT T. BURKS, M.D. |
| Kingdom, | |
| | : |
| Defendants. | |

-O-

Location:        Mariott University Hotel

                  Salt Lake City, Utah

Date:            June 7, 2006

                  3:00 p.m.

Reporter:       Denise Kirk, CSR/RPR

-O-

**6**

1 court reporter can transcribe them as opposed to
2 shaking your head or nodding your head; do you
3 understand that?
4    A.   Yes.
5    Q.   Also, if you'll allow me to finish the
6 question before you answer, it will make for a better
7 transcript. Even though you may even be able to
8 anticipate the end of my question by what I say in the
9 beginning, if you'd allow me to finish and then answer
10 it will allow the reporter to make a clear transcript;
11 do you understand that?
12    A.   I do.
13    Q.   Also, if I ask you a question and you
14 don't understand, I'll ask that you tell me you don't
15 understand the question. Otherwise, I'll assume that
16 you did understand the question; is that fair?
17    A.   Fair.
18    Q.   Are you being represented today by
19 counsel?
20    A.   Yes.
21    Q.   Who is your counsel?
22    A.   Sal Tamburo.
23    Q.   Do you know when Sal or the law firm
24 Dickstein Shapiro Morin & Oshinsky began representing
25 you for purposes of this case?

**7**

1    A.   In February.
2    Q.   Is that when Arthrex or Dickstein
3 contacted you with respect to your role in this case?
4    A.   Yes.
5    Q.   Are you being compensated for the time you
6 spend on this lawsuit?
7    A.   Yes.
8    Q.   How are you being compensated?
9    A.   How much?
10    Q.   Yes.
11    A.   $400 an hour.
12    Q.   Was that a negotiated fee or was that your
13 standard fee for doing expert consulting?
14    A.   I don't really have a standard fee, so I
15 guess you could call it negotiated.
16    Q.   Other than money, is there any other
17 compensation you are receiving for work on this case?
18    A.   No.
19    Q.   Were you given any dollar amount that you
20 should not exceed in performing work for Arthrex in
21 this case?
22    A.   No.
23    Q.   I'm going to hand you DePuy Mitek Exhibit
24 231 and ask you if you recognize this document,
25 Exhibit 231?

**8**

1    A.   Yes.
2    Q.   What is Exhibit Number 231?
3    A.   A subpoena for me.
4    Q.   Did you understand that be Exhibit 231 was
5 a subpoena on you for certain documents and things
6 listed in schedule A of Exhibit 231?
7    A.   Yes.
8    Q.   Today are you producing any documents or
9 things in response to the subpoena, Exhibit 231?
10    A.   No.
11    Q.   If you could turn to page two of Exhibit
12 Number 231, please. Do you see request number one for
13 documents there, being all communications between any
14 of Arthrex, you, Dr. Mukherjee and Dickstein Shapiro
15 Morin & Oshinsky concerning the lawsuit commenced by
16 the plaintiff attached as Exhibit 1?
17    A.   Yes.
18    Q.   Did you perform any search that might be
19 responsive to request number one in Exhibit Number
20 231?
21    A.   Yes.
22    Q.   Did you find any?
23    A.   No.
24    Q.   Request number two in Exhibit 231 is all
25 documents concerning this lawsuit, including, but not

**9**

1 limited -- well, hold on. Strike that.
2       Did you perform a reasonable search for
3 documents in response to request number two in
4 Schedule A of Exhibit 231?
5    A.   I guess I don't see the difference. There
6 aren't any documents that I'm aware of in the lawsuit.
7    Q.   Under things to be produced on page two of
8 Exhibit Number 231, request number one is all tested
9 and untested samples referred to in Expert Report of
10 Robert T. Burks, MD dated March 24, 2006, including,
11 but not limited to suture A and suture B. Do you see
12 that?
13    A.   I do.
14    Q.   Did you perform a search for things
15 responsive to request number one?
16    A.   No.
17    Q.   You did not?
18    A.   I knew it didn't exist.
19    Q.   You knew what didn't exist?
20    A.   The suture.
21    Q.   You mean the tested and untested samples?
22    A.   The pieces that I had I had disposed of
23 when I was done. I knew there wasn't anything to look
24 for.
25    Q.   Under request number two on things to be

3 (Pages 6 to 9)

---

**10**

1 produced on page two of Exhibit 231 is all equipment
2 used to test the samples as described in paragraphs
3 nine through 13 of Expert Report of Robert T. Burks,
4 MD dated March 24, 2006, including, but not limited to
5 the equipment that was used to cut and wet the samples
6 and to conduct the tactile feel analysis and knot
7 tie-down analysis; do you see that?
8    A.    I do.
9    Q.    Did you perform a search for the materials
10 requested in request number 2?
11    A.    No.
12    Q.    Why not?
13    A.    The equipment that was used was a pair of
14 scissors just to cut it, something from home, I felt
15 like it didn't have relevance.
16    Q.    What about the solution that was used to
17 wet these tested samples?
18    A.    I used tap water.
19    Q.    Did you use anything else in performing
20 the tests described in paragraphs nine through 13 of
21 your expert report other than tap water and scissors
22 and the sutures?
23        MR. TAMBURO:  It might help if the witness
24 had his report in front of him to refer to.
25    A.    The things used, like a pair of gloves,

---

**11**

1 are disposed of after and they're just a generic set.
2 There wasn't anything used that would be unique that I
3 felt would be worthwhile to produce.
4    Q.    So you used gloves when you performed the
5 tactile feel analysis and knot tie-down analysis?
6    A.    I did both. I used and didn't use gloves.
7    Q.    Is there any reason why you decided not to
8 bring gloves today?
9    A.    No.
10    Q.    Did your counsel advise you to bring
11 gloves?
12    A.    No.
13    Q.    Did you go over -- did you have a chance
14 to go over Exhibit 231 with your counsel before coming
15 to today's deposition?
16    A.    Yes, we looked at it.
17    Q.    Dr. Burks, could you please describe your
18 formal education post-high school for me, please.
19    A.    I did medical school at St. Louis
20 university. I guess after high school I did college
21 at Southern Methodist University, medical school at
22 St. Louis university, orthopedic training at
23 University of California San Diego.
24    Q.    When did you graduate from undergrad?
25    A.    Undergrad college was '74.

---

**12**

1    Q.    What about medical school?
2    A.    '78.
3    Q.    Then, after medical school, where did you
4 go?
5    A.    To residency training.
6    Q.    When did you finish your residency
7 training?
8    A.    '83.
9    Q.    Where was your residency training?
10    A.    University of California San Diego.
11    Q.    Did you have a specialty there?
12    A.    Yes. Well, there's no specialty in
13 training per se, but I did do a fellowship during that
14 time with Dale Daniel at Kaiser Permanente.
15    Q.    What was that fellowship in?
16    A.    Knee and sports medicine.
17    Q.    When did you finish your fellowship in
18 knee and sports medicine?
19    A.    '83.
20    Q.    Other than those programs or degrees you
21 mentioned, are there any other -- is there any other
22 formal education that you've gone through?
23    A.    No.
24    Q.    Once you completed your fellowship in knee
25 and sports medicine in 1983, what did you do?

---

**13**

1    A.    I went into private practice in St. Louis,
2 Missouri.
3    Q.    What was the focus of your private
4 practice in St. Louis?
5    A.    Sports medicine, general orthopedics.
6    Q.    Did you focus on any particular parts of
7 the body within sports medicine and general
8 orthopedics?
9    A.    Knee and shoulder were the big focus.
10    Q.    And when did you leave private practice in
11 St. Louis?
12    A.    I was there three years; I believe it was
13 '86.
14    Q.    Then what did you do in 1986?
15    A.    I went to Wayne State University in
16 Detroit.
17    Q.    What did you do at Wayne State?
18    A.    I was on the academic staff there and was
19 the head of sports medicine.
20    Q.    Your time spent at Wayne State, was that
21 strictly in an academic environment or did that also
22 include a clinical practice?
23    A.    Yes. I mean, it was a clinical practice,
24 but it was as a full-time faculty member.
25    Q.    Can you explain how that works, your role

---

4 (Pages 10 to 13)

14

1 at Wayne State, how it was spent between full-time
2 faculty member and participating in a clinical
3 practice?
4     A.     Well, there's really no distinction. I
5 mean, my job was to take care of patients and people.
6 And so the education was for residents and that's what
7 they were training to do was take care of people.
8         So there really wasn't a distinction
9 between a clinical practice and what you are doing
10 academically as far as your work goes.
11    Q.     So did you teach in a classroom setting?
12    A.     No.
13    Q.     So I think I understand.  What type of
14 medicine did you practice at Wayne State as a
15 full-time faculty member and in a clinical practice?
16    A.     It was orthopedic surgery with an emphasis
17 in sports medicine.
18    Q.     Again, did you focus on the knee and
19 shoulder areas?
20    A.     Yes.
21    Q.     When you were at Wayne State what were the
22 -- generally what were the procedures that you would
23 perform for shoulder surgeries?
24    A.     Perform shoulder instability operations,
25 rotator cuff operations, things that we do for what we

15

1 call impingement, shoulder pain procedures, procedures
2 that revolve around the clavicle.
3     Q.     Anything else you can think of?
4     A.     I mean, it's a pretty wide area, but those
5 are the main things.
6     Q.     What about when you were at Wayne State,
7 what were the procedures that you would perform for
8 knee surgeries?
9     A.     Ligament reconstructions, operations for
10 instability of the knee cap, cartilage procedures,
11 meniscus procedures.
12    Q.     When you were at Wayne State, did you
13 perform any ankle surgeries?
14    A.     Sure.
15    Q.     What ankle surgeries? What procedures
16 would you perform doing ankle surgeries?
17    A.     The main procedures revolved around
18 arthroscopy, and then I would do some procedures that
19 revolved around loose ankle joints where people have
20 chronic ankle sprains and tightening those up.
21    Q.     Then, I take it, at some point you left
22 Wayne State?
23    A.     Correct.
24    Q.     What year was that?
25    A.     '88.

16

1     Q.     In 1988 after leaving Wayne State, what
2 did you do?
3     A.     I came here to the University of Utah.
4     Q.     What position did you enter the University
5 of Utah in 1988?
6     A.     I was an assistant professor in orthopedic
7 surgery.  And we didn't really have a true division,
8 but I was part of the sports medicine team.
9     Q.     Can you generally describe your duties as
10 an assistant professor in the orthopedic surgery
11 department at the University of Utah?
12    A.     Duties were to take care of standard
13 patients that we would see, to instruct residents in
14 clinical evaluation of patients and surgical treatment
15 of patients, to be involved in some areas of research
16 and produce academically, and were involved with
17 taking care of the athletic teams.
18    Q.     While at the University of Utah, I take it
19 from 1988 to the present you've remained at the
20 University of Utah?
21    A.     Yes.
22    Q.     From 1988 to the present, do you perform
23 any classroom teaching?
24    A.     Minimally.  Occasionally it comes up, but
25 not very much.

17

1     Q.     What classes would you teach when it comes
2 up?
3     A.     It's usually just an isolated lecture, not
4 like a class series.  So it would be lectures to the
5 residents or to medical students on a specific topic,
6 sometimes to physical therapy students.
7     Q.     Since 1988, how have your duties and
8 responsibilities at the University of Utah changed?
9     A.     I don't think they've changed much.
10    Q.     Okay.  At some point you did become head
11 of the sports medicine division, though, right?
12    A.     Correct.
13    Q.     Do you know when that happened?
14    A.     I'd be guessing a little.  I'm not sure of
15 the exact year.
16    Q.     How about 1992, does that sound familiar?
17    A.     That's probably close.
18    Q.     Dr. Burks, I'm going to hand you Exhibit
19 Number 233.  This is a printout of a web page from the
20 University of Utah.  If you could just please look at
21 that.
22        MR. TAMBURO:  Do you have another copy?
23    Q.     No.  Just let me know if that's generally
24 accurate.
25    A.     Yes.

5 (Pages 14 to 17)

---

**18**

1  Q.  Dr. Burks, can you describe for me your
2 relationship with Arthrex, Inc.?
3        MR. TAMBURO:  Objection, vague.
4  A.  I am a consumer. Over the years I have
5 been an advisor for different products. That's it.
6  Q.  You say you are a consumer of Arthrex
7 products. What Arthrex products do you use?
8  A.  Well, we use things like drill guides, use
9 suture anchors and sutures, drill bits. That's it.
10  Q.  Do you use any Arthrex knee fixation
11 devices?
12  A.  I have used Arthrex knee fixation devices
13 but don't currently use any.
14  Q.  What did you use?
15  A.  They have an interference screw that is
16 metal and one that is absorbable that I used to use
17 that I don't use now.
18  Q.  Earlier you said things like we used
19 things like drill guides, suture anchors, and sutures,
20 drill bits. Who were you referring to when you said
21 "we"?
22  A.  I guess it was the generic "we" of the
23 sports medicine service.
24  Q.  Do you personally use those Arthrex
25 products?

---

**19**

1  A.  Oh, yes.
2  Q.  Do you have any consulting agreements with
3 Arthrex?
4  A.  To be honest, I'm not sure of the direct
5 answer to give you on that. I have a couple of pieces
6 of equipment that I have worked with them on in
7 developing, so that might be considered a consulting
8 agreement.
9        I'm not a consultant, just a generic like
10 on a board of advisors or something like that.
11  Q.  I don't understand when you say "I have a
12 couple of pieces I equipment I worked with them on in
13 developing so that might be considered a consulting
14 agreement", could you explain that?
15  A.  Well, I went to them to develop a guide
16 for a knee ligament reconstruction. They liked the
17 idea. They made the guide. They have the guide as one
18 of the products that they sell, and then I get some
19 royalty from their sales.
20  Q.  Okay. So other than services you performed
21 for this case, have you received money from Arthrex
22 for other services such as, for example, this work you
23 did with the guide?
24  A.  I think I just said I get royalties for
25 that.

---

**20**

1  Q.  Other than royalties and other than money
2 for your work you've performed in this lawsuit, do you
3 receive any other money from Arthrex?
4  A.  No.
5  Q.  How many different pieces of Arthrex
6 equipment to you receive royalties on?
7  A.  There is a knee ligament guide system that
8 has a few different pieces in it. So I can't give an
9 exact number. It's sort of a guide system with four
10 or five different pieces, parts of it.
11      There is a screw that we use for
12 augmenting ligament fixation that I get some royalties
13 on along with those guides.
14  Q.  Do you know what the trade name is for the
15 knee ligament guides that you receive royalties from
16 Arthrex on?
17  A.  It's kind of silly that I wouldn't be able
18 to give you that. It's for posterior cruciate
19 ligament reconstruction.
20  Q.  And do you know what the trade name is on
21 the screw that you receive royalties from Arthrex on?
22  A.  I don't.
23  Q.  For what area of the body is this screw
24 used on?
25  A.  It could be used anywhere, but I think the

---

**21**

1 large majority would be at the knee.
2  Q.  Are you the named inventor on any patents?
3  A.  No.
4  Q.  The screw that you developed with Arthrex,
5 is that used for the ACL or PCL?
6  A.  Can be either.
7  Q.  Is that an interference screw?
8  A.  No. It's a screw they typically refer to as
9 a post. And what that means is that suture from a
10 ligament or tendon gets tied around this to help hold
11 it while it's healing in.
12  Q.  You also said, in describing your
13 relationship with Arthrex, you used the word
14 "advisor". We've just been talking about you
15 developing certain equipment. Is that what you meant
16 by advisor?
17  A.  Yes.
18  Q.  Do you advise Arthrex in any other way
19 other than what we've just talked about with respect
20 to developing equipment?
21  A.  No.
22  Q.  Do you know Dr. Paul Fenton from Toledo,
23 Ohio?
24  A.  I don't.
25  Q.  What about Dr. Marlow Goebel?

---

6 (Pages 18 to 21)

**50**

1   A.    Poor wording. I guess it was to say that
2 my sense of how FiberWire works and handles, that
3 subjective feel of that is in that environment.
4   Q.    So you don't use FiberWire in any
5 non-surgical environment, do you?
6   A.    Well, I've used FiberWire in laboratory
7 studies when we do cadaveric studies or other things.
8 But I don't use it for non-medically related things.
9   Q.    When you say "most of my subjective use of
10 FiberWire occurs during surgery", were you referring
11 to the surgical environment versus non-surgical
12 environment like you just described?
13   A.    Right.
14   Q.    Then you say "FiberWire is generally wet
15 in the surgical environment", what does that mean?
16   A.    Well, in the environment where I work
17 arthroscopically we work with fluids, so it's hard for
18 a suture not to be wet.
19       Obviously, there are times where we work
20 in a dry air environment and the suture may get wet
21 passing through tissue, but it's not necessarily
22 intentionally wetted like it is with arthroscopy.
23   Q.    During surgery, do you wet FiberWire
24 before is it's introduced into the body?
25   A.    Not deliberately, no.

**51**

1   Q.    Earlier you said the suture may get wet
2 passing through tissue, but it's not necessarily
3 intentionally like it is with arthroscopy. I don't
4 know what that means.
5   A.    In an arthroscopic environment we have a
6 microscope in a joint and we distend the joint so we
7 can see with fluid.
8       So any time we introduce suture into that
9 environment it's under water, if you will. So no
10 matter what we do with it, by the time we start to use
11 it, it's wet.
12   Q.    When using FiberWire in a surgical
13 environment, do you always wear gloves?
14   A.    Yes.
15   Q.    What about in the -- let me rephrase the
16 question. In a nonsurgical environment, do you always
17 wear gloves when using FiberWire?
18   A.    No.
19   Q.    What determines whether you wear gloves?
20   A.    Either sterility for a patient or
21 protection for myself.
22   Q.    If it's a nonsurgical environment, how
23 does sterility of the patient matter?
24   A.    It doesn't.
25   Q.    In a nonsurgical environment, what

**52**

1 determines whether you wear gloves?
2   A.    In a nonsurgical environment it would be
3 protection for me.
4   Q.    Okay. Protection from what?
5   A.    Well, if we do cadaveric surgery some
6 cadavers have diseases so we may want to have gloves
7 on when we work with them.
8   Q.    What about in the laboratory environment,
9 when you are using FiberWire, do you wear gloves?
10   A.    I guess it depends on what you mean by the
11 laboratory environment.
12   Q.    By laboratory environment, I mean anything
13 other than a surgical or nonsurgical environment like
14 we've been talking about.
15   A.    Well, we do, for example, cadaveric
16 surgery in the laboratory, so we would consider that a
17 laboratory environment, and I would use gloves for
18 self-protection in that setting.
19   Q.    Let me ask you a better question. Outside
20 of a surgical environment or nonsurgical environment,
21 do you wear gloves when using FiberWire?
22   A.    I guess I would say no.
23   Q.    Dr. Burks, if you could turn in Exhibit
24 232 to paragraph eight, you state: "Sometime in
25 February 2006 I was contacted by attorneys for

**53**

1 Arthrex, Inc., and asked to conduct a tactile feel
2 analysis as well as a knot tie-down analysis of coated
3 and uncoated FiberWire suture. I agreed to conduct the
4 analysis." Do you see that?
5   A.    I do.
6   Q.    Who contacted you in February of 2006?
7   A.    Sal Tamburo.
8   Q.    Anyone else?
9   A.    No.
10   Q.    Do you remember the substance of the
11 conversation you had with Sal in February of 2006?
12   A.    Yes.
13   Q.    What was that substance?
14   A.    He said that Arthrex and more, in
15 particular, FiberWire was involved in a patent
16 infringement lawsuit and he was wondering, since I've
17 had experience of using FiberWire, if I would be
18 willing to talk about FiberWire and how its used,
19 etc., and if I'd be willing to look at FiberWire in a
20 couple of different states and give him feedback on
21 what I thought about that.
22   Q.    What were those couple different states?
23   A.    My understanding was that it was a coated
24 suture and a not-coated suture.
25   Q.    Anything else?

14 (Pages 50 to 53)

70

1  A.  I'll try to clarify again. I didn't, in my
2 mind, view it as a pure test A/test B. So when you
3 handle suture tying knots and doing things with it,
4 you have a tactile feel. So I didn't -- so that's part
5 of the knot tying. So I didn't segregate it out as two
6 isolated separate things.
7  Q.  So in your report, Exhibit 232, are you
8 making two conclusions based on a conclusion of the
9 tactile feel analysis and a conclusion based on the
10 knot tie-down analysis?
11  A.  I'll try to clarify again. A knot tie-down
12 analysis I view as having a tactile aspect to it as
13 well, you are feeling the suture as you tie it. So I
14 don't view them as totally isolated.
15  Q.  Okay. So how many analyses did you
16 perform as reflected in Exhibit 232?
17  A.  I used all the strands and tied multiple
18 knots on all the strands. So I'm not, I guess, quite
19 sure -- I can't tell you I did 20 knots on each strand
20 or 30, but they were each used for multiple knot
21 tying.
22  Q.  My question might have been unclear. Not
23 how many times did you perform the analysis, but how
24 many different analyses did you do in coming to the
25 conclusions as expressed in Exhibit Number 232?

71

1  MR. TAMBURO:  Objection, vague.
2  A.  I felt the suture and I tied knots with
3 the suture.
4  Q.  But earlier you testified that that's all
5 encompassed in the knot tie-down analysis. So I'm
6 wondering did you do a knot tie-down analysis and
7 that's it and that had two subparts or two different
8 analyses and then come up with a conclusion -- come up
9 with two different conclusions?
10  MR. TAMBURO:  Objection, mischaracterizes
11 the testimony.
12  A.  Again, I'm not trying to characterize in
13 this that these are segregated separate tests, but
14 this was a tactile feel and knot tying. It was a
15 length subjective feel on both of those.
16  So when you tie knots, you get a tactile
17 feel. So I was making the statement that on the
18 tactile feel, how it feels to me, it felt this way and
19 when I tied knots, it also felt that way. It's
20 sometimes hard to do one without doing the other.
21  Q.  When you were doing -- when you did the
22 tactile feel analysis and the knot tie-down analysis
23 as expressed in Exhibit 232 were you wearing gloves?
24  A.  Not always.
25  Q.  Can you explain the breakdown?

72

1  A.  I tried to try knots partly with gloves to
2 see if I felt that there was a difference and partly
3 without gloves to see if I could feel a difference.
4  Q.  Did using gloves in the tests in Exhibit
5 232 affect your ability to distinguish between suture
6 A and suture B?
7  A.  I think, clearly, using gloves makes the
8 feel of the suture a little different. I guess I can't
9 answer directly to say if it makes the difference but,
10 yes, it probably makes a difference.
11  Q.  What difference does it make?
12  A.  You are covering your skin with the
13 gloves, so, you know, as you feel suture, your
14 absolute sensation of the suture probably changes
15 some.
16  Could you have reached the same
17 conclusions you reached in Exhibit 232 if you solely
18 used gloves in performing the tests?
19  A.  I didn't do it that way, so I guess I
20 can't answer that and say yes or no.
21  Q.  Did not using gloves help you to
22 distinguish between suture A and suture B?
23  A.  Potentially, yes.
24  Q.  Did it or -- I'm asking you if, in fact,
25 it did?

73

1  A.  And I'm telling you my answer is it
2 potentially did.
3  Q.  I don't think I understand that. How could
4 it potentially? I mean either it did or didn't,
5 right?
6  A.  No.
7  MR. TAMBURO:  Objection, argumentative.
8  Q.  Why do you say "potentially"?
9  A.  I'm trying to be honest. I did feel
10 without gloves and I know there's a pile A and a pile
11 B, so there is potential that feeling suture without
12 gloves made me feel that A was a little different than
13 B that had I been gloved the entire time, I might not
14 have detected.
15  Q.  So from start to finish then after you cut
16 the suture samples until the time you made your
17 conclusions expressed in Exhibit Number 232, how long
18 was that?
19  A.  I'll give you the same answer:  45 minutes
20 or so.
21  Q.  So the 45 minutes encompassed roughly ten
22 minutes you spent on the tactile feel analysis?
23  A.  No.
24  Q.  So 45 minutes plus ten minutes or just 45
25 minutes?

19 (Pages 70 to 73)

**86**

1 it was my overall take from looking at them.
2    Q.    Do you remember how many -- strike that.
3          Does a suture that has less friction when
4 sliding that knot mean that the suture has better knot
5 tie-down performance?
6    A.    Not necessarily.
7    Q.    Why?
8    A.    Well, if you envision a perfectly smooth
9 suture, for example, if you slide a knot it might
10 slide very easily but it might also tend to not hold
11 as well because there's not as much inherent friction
12 in it.
13    Q.    Does a smoother suture mean it has better
14 tactile feel than a suture that is not as smooth?
15    A.    I would say no, I don't know that I'd say
16 it's a better tactile feel.
17    Q.    Why did you use a surgeon's knot when you
18 did the knot tie-down analysis in Exhibit 232?
19    A.    I think what I would do is say that --
20 again, maybe my critique of the verbiage would be at
21 fault. So I guess I wouldn't -- you know, we talked
22 earlier about what a surgeon's knot is.
23    Q.    Uh-huh?
24    A.    And I probably didn't focus on it enough
25 to say that they're not necessarily surgeons' knots as

**87**

1 I described them.
2    Q.    Okay, so why did you use the particular
3 knots, then, that you used in the knot tie-down
4 analysis?
5    A.    I just tried to reproduce what I do in the
6 operating room.
7    Q.    In paragraph 11 in Exhibit 232 you state
8 that suture A generally felt smoother than suture B.
9 What do you mean by "generally"?
10    A.    The differences between the sutures were
11 subtle. I mean, they were not sharp, distinct. So I'm
12 meaning that in comparing them, my take was that it
13 was generally smoother.
14    Q.    Were there any of the sutures in the
15 tactile feel analysis where you couldn't tell the
16 difference between suture A and suture B?
17    A.    It was not my intent at the time in
18 looking at the sutures to compare each strand side to
19 side. My intent was to look at sort of spool A and
20 spool B. So it was to get a feel of, in general, how
21 do they feel between the two.
22          So I didn't take a strand and say is this
23 one different? And is this one different? And go
24 down through that five times, because I felt it was
25 all the same suture.

**88**

1    Q.    But were there any where you couldn't tell
2 a difference? I mean, it was pretty close?
3    A.    Sure, it was pretty close.
4    Q.    Let me rephrase. Were there any where you
5 couldn't tell the difference between suture A and
6 suture B?
7          MR. TAMBURO:  Objection, asked and
8 answered.
9    A.    I don't remember specifically having ones
10 that I would say I clearly feel a difference on this
11 one and I clearly don't on the next one. It was a
12 general feel of all of them.
13    Q.    Dr. Burks, how would you describe your
14 relationship with Ethicon?
15    A.    I guess none.
16    Q.    None? So you would say that you have a
17 closer relationship with Arthrex?
18    A.    Yes.
19    Q.    What about could you describe your
20 relationship with DePuy Mitek?
21    A.    I have been a consultant with DePuy Mitek.
22 Just this week I was helping on an educational course
23 for DePuy Mitek reps. But I've had no product or
24 anything like that with DePuy Mitek.
25    Q.    You mean development product work?

**89**

1    A.    Yes.
2    Q.    What was the educational course this last
3 week that you helped with DePuy Mitek?
4    A.    It was educating reps who go into the
5 operating room and, you know, are helping surgeons
6 with their materials, sutures, implants, what not, and
7 how to handle the operating room environment, be
8 appropriate and be helpful.
9    Q.    The course was not on a particular DePuy
10 Mitek technique or anything like that, it was --
11    A.    It was not focused on a particular product
12 but it was focused on helping reps better sell DePuy
13 Mitek products.
14    Q.    By being more professional in the
15 operating room?
16    A.    Correct.
17    Q.    Is this the first time you have done that
18 for DePuy Mitek?
19    A.    This is the second.
20    Q.    Other than those two courses, have you
21 consulted with DePuy Mitek in any other courses?
22    A.    Yes.
23    Q.    What are those?
24    A.    There was an educational course in Chicago
25 and you are going to say when and I'm going to guess

23 (Pages 86 to 89)

90

1 four years ago. It was a cadaver course where they
2 were doing DePuy Mitek products and they asked me to
3 come give a couple of talks and help in the lab using
4 those products with the doctors who were there.
5    Q.   Do you remember what those products were?
6    A.   Not specifically. They were suture
7 anchors, suture passing instruments, but I don't
8 remember a specific product.
9    Q.   Are you a consumer of DePuy Mitek
10 products?
11    A.   Sure.
12    Q.   What DePuy Mitek products do you use?
13    A.   Well, I mentioned earlier I use OrthoCord.
14 I use some DePuy Mitek anchors. They make an electric
15 cautery unit that we use, in every case we use
16 electric cautery.
17    They have some suture-passing instruments
18 that we use. I use one of their drill guides and
19 fixation sets for ACL surgery.
20    Q.   When you do an ACL fixation, what product
21 do you use?
22    A.   It depends on the type of ACL that we're
23 doing. If I use a bone/tendon/bone graft which is a
24 common graft, on the femoral side, I fix it with a
25 DePuy Mitek device which is a couple of absorbable

91

1 pins, and on the tibial side I fix it with either a
2 DePuy Mitek screw or a screw from a different company
3 depending on upon quality.
4    On the hamstring, I typically on the
5 femoral side use a Smith and Nephew product --
6    Q.   EndoButton?
7    A.   EndoButton. On the tibial side I
8 typically use a Milagro screw and frequently for the
9 post use that Arthrex screw.
10    Q.   When you say hamstring, that's soft
11 tissue?
12    A.   Correct.
13    Q.   Semitendonosis?
14    A.   Very good.
15    MR. TAMBURO: We're all half doctors here.
16    MR. FALKE: Let's take a break.
17    THE VIDEOGRAPHER: Off the record, 5:54.
18    (Brief recess.)
19    THE VIDEOGRAPHER: On the record, 6:02.
20    Q.   (By Mr. Falke) Dr. Burks, I'm going to
21 hand you DePuy Mitek Exhibit 286, DePuy Mitek Exhibit
22 284 and DePuy Mitek 285. These are FiberWire samples
23 that were produced to us from Pearsalls who is a
24 company that makes FiberWire for Arthrex.
25    I covered up on those exhibits the

92

1 manufacturing state that those sutures have gone
2 through. And I'm wondering if you can look at those,
3 analyze them, do whatever you have to do, but tell me
4 which ones are coated and which ones are not coated,
5 if any?
6    A.   So these are three separate types of
7 suture?
8    Q.   They're three different sutures. Well,
9 I'm going to take that back. I don't know if they're
10 three different sutures.
11    MR. TAMBURO: You are not sure what they
12 are.
13    MR. FALKE: We know what they are, yeah. I
14 mean, based on Pearsalls' representations of what they
15 are. If you need to cut them and get you a glass of
16 water, if you want to wet them.
17    MR. TAMBURO: Are they in the same form in
18 which they were produced?
19    MR. FALKE: Yes, we did not alter them.
20    MR. TAMBURO: Do we have Bates numbers?
21    Slow down. Just for the record, so the
22 record is clear, what did you just do, Dr. Burks?
23    A.   I just opened the suture that was in the
24 bag.
25    Q.   What Exhibit Number is that?

93

1    A.   That is 286.
2    Q.   You cut a piece off of the suture in
3 Exhibit 286?
4    A.   Right.
5    Q.   And --
6    MR. TAMBURO: There's no Bates numbers on
7 these?
8    MR. FALKE: There were no Bates numbers.
9    Q.   Would you put that on the suture you cut
10 from Exhibit 286 and mark with a pen Exhibit 286.
11 Now, can you explain what you are doing now, Dr.
12 Burks? First, can you put the suture that you took out
13 of 286 back in the bag?
14    A.   (Witness complies.)
15    Q.   Thank you, and then proceed. Can you
16 explain for the record what you are doing now?
17    A.   I'm opening 285.
18    Q.   You are cutting suture sample from Exhibit
19 285, right?
20    A.   Yes.
21    Q.   Could you please mark with the tape
22 Exhibit 285 that you've cut? Proceed. Can you state
23 what for the record what you are doing now?
24    A.   I'm opening number 284.
25    Q.   And cutting a suture from Exhibit 284?

24 (Pages 90 to 93)

**94**

1   A.   Yes.
2   Q.   And now you are going to mark the suture
3 sample that you took from Exhibit 284 with a flag?
4   A.   Correct.
5   Q.   Can you hand me the original sample sets
6 back?
7   A.   (Witness complies.)
8   Q.   Also, I'm going to hand you DePuy Mitek
9 Exhibit 234 which is a chart I'd like you to fill out
10 if you could, please, and under the suture column put
11 the numbers corresponding to the suture samples you've
12 just cut, just 284, 285 and 286?
13   A.   Fair enough?
14   Q.   Fair enough.
15   A.   Have we got a while?
16   Q.   However long it takes you.
17   MR. TAMBURO:  Are you representing that
18 one of them is coated, one of them is not coated?
19   MR. FALKE:  I'm not making any
20 representations. They could all be coated, they could
21 all be uncoated, could be a mix?
22   A.   Can I use your notebook?
23   Q.   Of course. What do you need?
24   A.   I was going to use one of those metal
25 rings.

**95**

1   Q.   Sure. First, can you do a tactile feel
2 analysis on it? Can you tell the difference?
3   A.   Kind of -- like I said, when you tie knots
4 you combine that together.
5   Q.   Can you explain what you are doing now?
6   A.   I don't want to knock your little deal
7 off, you know? I'm just getting a sense for how it
8 slides and trying to put down a couple of throws.
9   Q.   Which Exhibit Number are you working on?
10   A.   I'm on 285.
11   Q.   Okay. What type of knots are you throwing?
12   A.   Half hitches.
13   Q.   Now, can you explain what you are doing,
14 Dr. Burks?
15   A.   Same thing.
16   Q.   With which exhibit?
17   A.   286.
18   Q.   Are you doing the same thing you did with
19 the previous one?
20   A.   Yes.
21   Q.   Same knot configurations?
22   A.   Uh-huh.
23   Q.   Can you tell a difference between the
24 first two sutures, Dr. Burks, Exhibit 285 and --
25   A.   286.

**96**

1   Q.   And 286? Can you explain for the record
2 please what you are doing now, Dr. Burks?
3   A.   I'm tying 284.
4   (Discussion off the record.)
5   A.   Okay. So where is my little sheet here?
6   Q.   Based on what you've done so far, Dr.
7 Burks, can you tell any difference between the
8 sutures?
9   A.   I feel like I do feel a difference.
10   Q.   Okay. How would you describe that
11 difference?
12   A.   Well, I would say at the moment 285 seems
13 a little smoother to me than 284. So I would say 285
14 is coated and 284 isn't coated.
15   Q.   How sure are you of that?
16   A.   I would not put my children's lives on it,
17 but given the subjective feel.
18   Q.   Is it a subtle difference?
19   A.   It's a subtle difference.
20   Q.   Can you explain, Dr. Burks, what you are
21 doing now?
22   A.   Just throwing knots. I would say 286 seems
23 coated as well.
24   Q.   If you had gloves on right now, would that
25 change the confidence level you have in determining

**97**

1 whether those are coated or uncoated sutures?
2   MR. TAMBURO:  Objection, calls for
3 speculation.
4   A.   I think gloves can make a difference,
5 yeah.
6   Q.   How do they make a difference? The
7 difference between the sutures is more subtle, right,
8 with gloves because you don't have the contact like
9 you described earlier with the skin?
10   A.   Yeah. Again, this is obviously a very
11 subjective feel test. Some of that feel comes from how
12 the suture feels and some of it comes from how you
13 feel when you slide a knot. So we're not talking rocks
14 and water as far as differences and so. . .
15   Q.   How would you qualify the difference that
16 you just observed, based on your test?
17   A.   When you say "qualify" are you asking for
18 like an amount?
19   Q.   How would you characterize the difference
20 between the sutures?
21   A.   Well the difference is, I think, subtle
22 and there's no doubt in my mind that I could line up,
23 you know, a hundred sutures and have error where I
24 would say, you know, I think this one is one way or
25 the other and make a mistake.

25 (Pages 94 to 97)

**98**

1 So there's certainly not enough difference
2 to clearly say that I know every time exactly how that
3 feels.
4 Q. Okay. Could you just initial, please, the
5 chart that you did?
6 A. This right here?
7 Q. Yes.
8 A. Okay.
9 Q. And put the date.
10 A. (Witness complies.)
11 Q. Okay. For the record, I have to mark the
12 exhibits, the sutures that you tied onto my binder.
13 Can you untie those?
14 A. I can just open the binder.
15 Q. How confident were you that 286 was
16 coated?
17 MR. TAMBURO: Objection, vague.
18 A. I guess I've said that differences are
19 subtle. So I'm going by a subjective feel. So I feel
20 like there's a difference. Am I going to bet a lot of
21 money on it? No, but that's my take.
22 MR. FALKE: Okay. For the record I'm
23 going to mark the suture that Dr. Burks tested with
24 Exhibit 235 -- I'm going to state that over again.
25 For the record, I'm going to mark with

**99**

1 Exhibit 235 the suture Exhibit 284 that Dr. Burks just
2 tested, and I'm going to mark Dr. Burks' tested suture
3 286 with DePuy Mitek Exhibit 236, and I'm going to
4 mark Dr. Burks' tested suture 285 with DePuy Mitek
5 Exhibit 237.
6 I have no further questions.
7 EXAMINATION
8 BY MR. TAMBURO:
9 Q. Dr. Burks, there was some discussion about
10 work you had performed on behalf of DePuy Mitek; do
11 you recall that?
12 A. Yes.
13 Q. Were you compensated by DePuy Mitek for
14 the work you performed?
15 A. Yes.
16 MR. TAMBURO: I have no further questions.
17 MR. FALKE: Okay, thank you for your time.
18 THE VIDEOGRAPHER: End of deposition,
19 6:18.
20 -O-
21
22
23
24
25

**100**

1 Deponent's Certificate
2
3 I, ROBERT T. BURKS, M.D., deponent herein,
4 do hereby certify and declare the within and foregoing
5 transcription to be my deposition in said action taken
6 on June 7, 2006; that I have read, corrected, and do
7 hereby affix my signature to said deposition.
8
9 DATED this _____ day of _____,
10 2006.
11
12
Deponent
13
)
14 STATE OF UTAH ) ss.
)
15
16 SUBSCRIBED AND SWORN to before me this
17 _____ day of _____, 2006.
18
19
20 Notary Public residing in
21 _____
22
My Commission Expires:
23
_____
24
25

**101**

1 Reporter's Certificate
2 State of Utah )
County of Salt Lake )
3
4 I, Denise Kirk, Certified Shorthand
5 Reporter, Registered Professional Reporter, and Notary
6 Public for the State of Utah, do hereby certify:
7 THAT the foregoing proceedings were taken
8 before me at the time and place set forth herein; that
9 the witness was duly sworn to tell the truth, the
10 whole truth, and nothing but the truth; and that the
11 proceedings were taken down by me in shorthand and
12 thereafter transcribed into typewriting under my
13 direction and supervision;
14 THAT the foregoing pages contain a true
15 and correct transcription of my said shorthand notes
16 so taken.
17 IN WITNESS WHEREOF, I have subscribed my
18 name and affixed my seal this 11th day of June, 2006.
19
20
DENISE KIRK, CSR/RPR
21
22 My commission expires:
23 August 30, 2006
24
25

26 (Pages 98 to 101)

# EXHIBIT 10

*Johnson & Johnson*

| Office Of<br>GENERAL COUNSEL | NEW BRUNSWICK, N.J. |
|---|---|

February 3, 1992

SUBJECT: <u>ETH 782 - Entitled "Sterilized Heterogeneous Braids"</u>

B. Schwartz

Barbara, I wanted to let you know that I have been unable to complete this application for filing. It relates to composite braid sutures.

I sent a substantially complete draft, including examples and drawings, to Mark Steckel for review and comment. I then received comments from Chuck Fritz, and I understand that Mark received comments from the remaining coinventors.

I left two voice mail messages for Mark during the first week of January, requesting that he call me to discuss changes to the draft. Dennis Jamiolkowski also requested Mark to contact me. Our requests have gone unanswered.

I'm very sorry that this seems to be a continuing problem. Unfortunately, there is nothing I can do without full cooperation from Mark.

Matthew S. Goodwin

MSG/sc
cc: C. Fritz

CONFIDENTIAL - OUTSIDE
ATTORNEYS EYES ONLY

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI095016**



EXHIBIT
Steckel 79
2-3-06

1 129-216

# EXHIBIT 11

# ETHICON, INC.

a *Johnson-Johnson* company
P.O. BOX 151
SOMERVILLE • NEW JERSEY • 08876-0151

RECEIVED

FEB 11 1992

MATTHEW S. GOODWIN

February 10, 1992

Mr. M. Steckel

cc: Mr. M. Banik
Mr. M. Goodwin

Mark, the attached memo has been of great concern to me. I would appreciate your responding to Matt Goodwin's request, and communicating to me your timing with respect to this response.

As far as I am concerned, the work involved is extremely important to the suture business, and given your history with this subject, requires your immediate attention. We are already long past due in filing this patent.

Please contact me as quickly as possible regarding this matter.

Barbara Schwartz, Ph.D.

pak

CONFIDENTIAL - OUTSIDE
ATTORNEYS EYES ONLY

*DePuy Mitek, Inc. v. Arthrex, Inc.*
C.A. No.04-12457 PBS
*DMI095017*



EXHIBIT
Steckel 88
2-3-06

# EXHIBIT 12

# OSTROLENK, FABER, GERB & SOFFEN, LLP

1180 AVENUE OF THE AMERICAS, NEW YORK, NEW YORK 10036-8403
TEL 212 382 0700  FAX 212 382 0888  FAX 212 398 0681  TELEX 236925
email@ostrolenk.com

**PARTNERS**

SAMUEL H. WEINER
ROBERT C. FABER
EDWARD A. MEILMAN
STANLEY H. LIEBERSTEIN
STEVEN I. WEISBURD
MAX MOSKOWITZ
STEPHEN A. SOFFEN
JAMES A. FINDER

WILLIAM O. GRAY, III
LOUIS C. DUJMICH
CHARLES P. LAPOLLA
DOUGLAS A. MIRO
ALFRED R. FABRICANT

**ASSOCIATES**

PETER MCGEE*
MARC LIEBERSTEIN
CHARLES C. ACHKAR, Ph.D.
MICHAEL J. SCHEER
ELLEN S. TAO*
PETER S. SLOANE
MARY G. FONTENOT
STEVEN S. RUBIN

WILLIAM A. BONK, III**
MARK D.TORCHÉ
JOEL J. FELBER***
BRENDAN J. KENNEDY***
KOUROSH SALEHI***
RICHARD LACAVA
LAWRENCE C. DRUCKER

**OF COUNSEL**

MARVIN C. SOFFEN
JEROME M. BERLINER
MARTIN PFEFFER
LEON ZITVER*
LAWRENCE A. HOFFMAN
*DC BAR
**MICHIGAN BAR
***CONNECTICUT BAR

*Please reply to:*
WASHINGTON OFFICE
1725 K STREET, N.W.
WASHINGTON, D.C. 20006
TEL 202 457 7785
FAX 202 429 8919

November 14, 2000

Mr. Don Grafton
Arthrex, Inc.
2885 South Horseshoe Drive
Naples, FL  34104

    Re:  OFGS Ref:  3/1493-372
        U.S. Patent No. 5,318,575 -- Infringement

Dear Don:

    In accordance with your request, we conduct a study to determine if Arthrex's proposed PolyBlend suture (a suture with a reinforced jacket formed of polyester braided with Dyneema®, an ultra high strength polyethylene fiber) infringes U.S. Patent No. 5,318,575 issued to Chesterfield, et al., assigned to U.S. Surgical Corporation (the "U.S. Surgical patent").

    Briefly, for the reasons set forth below, it is our opinion that Arthrex's PolyBlend suture, and the method of using the suture for surgical suturing, does not infringe the claims of the U.S. Surgical patent.

The U.S. Surgical Patent:

    The U.S. Surgical patent has 12 claims, one of which is independent.  Independent claim 1 recites a method of repairing split portions of body tissue.  A flexible member (i.e., suture) is looped about the body tissue to hold the split portions together.  The suture is made by braiding fibers of an ultra high molecular weight high tenacity material and fibers of another, non-absorbable material.

    The prosecution history of the U.S. Surgical patent reveals that the applicants submitted claims drawn to a surgical product comprising an elongated member (suture) formed of fibers of a ultra high molecular weight extended chain high tenacity material braided with fibers of

00037679;1



**CONFIDENTIAL**

**ARM 25128**

OSTROLENK, FABER, GERB & SOFFEN, LLP

Mr. Don Grafton
November 14, 2000
Page 2

a different material, the "different material" being defined (in some claims) as being non-absorbable. All of these claims were rejected by the Examiner as being unpatentable over U.S. Patent No. 4,819,458 to Kavesh et al. and U.S. Pat. No. 4,792,336 to Hlavacek et al. (copies enclosed). These claims ultimately were canceled by the Applicants. Accordingly, U.S. Surgical relinquished patent coverage of the braided surgical product, and opted to proceed solely with claims directed to the method of using the suture.

As issued, independent method claim 1 recites a method of repairing body tissue by looping the braided surgical product (as described above) "about" split portions of body tissue. Since the braided surgical product was determined to be unpatentable (and the applicant acquiesced in this determination by canceling the product claims), the patentable feature of method claim 1 resides in the step of looping the braided surgical product about the split portions of tissue.

The prosecution history of the U.S. Surgical patent precludes the claimed step of looping the braided surgical product about the split portions of tissue from being construed to include inserting the braided suture product through soft tissue. Significantly, the U.S. Surgical patent discloses the method of looping the suture about tissue (described at col. 4, lines 58 et seq. and shown in Fig. 1) and the method of inserting the surgical product through soft tissue (described at col. 5, lines 41 et seq.) as alternative embodiments. However, the latter embodiment was never claimed. Claims cannot be interpreted in a manner which "recaptures" subject matter which is disclosed in the specification but not claimed. In any event, insertion through soft tissue of a surgical product that contains high strength/modulus polyethylene is not patentable, since it is disclosed in a cited reference, U.S. Patent No. 4,987,665, issued to Dumican et al. (copy enclosed). See col. 6, lines 54-55, col. 13, lines 39-46, and Fig. 3 of Dumican et al. The claims of the U.S. Surgical patent cannot be construed to encompass subject matter in the prior art.

For the foregoing reasons, we conclude that Arthrex's proposed PolyBlend suture and its use in surgical suturing (inserting the suture through soft tissue) does not infringe the claims of the U.S. Surgical patent.

Very truly yours,

OSTROLENK, FABER, GERB & SOFFEN, LLP

Stephen A. Soffen

SAS/PFM:tj
Enclosure

00037679;1

CONFIDENTIAL

ARM 25129

# EXHIBIT 13

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| DePuy Mitek, Inc.<br>　　a Massachusetts Corporation | ) ) ) |  |
| 　　　Plaintiff, | ) ) |  |
| 　　v. | ) ) | Civil Action No. 04-12457 PBS |
| Arthrex, Inc.<br>　　a Delaware Corporation | ) ) ) |  |
| 　　　Defendant. | ) ) |  |

## RESPONSIVE EXPERT REPORT OF DR. DEBI PRASAD MUKHERJEE CONCERNING NON-INFRINGEMENT OF U.S. PATENT NO. 5,314,446 AND OTHER MATTERS

Pursuant to the provisions of Rule 26(a)(2) of the Federal Rules of Civil

Procedure, the Joint Case Management Statement adopted by the Court on February 18,

2005, and agreement between the parties, the undersigned, Dr. Debi Prasad Mukherjee,

an expert witness for Defendants Arthrex, Inc. and Pearsalls, Limited (together,

"Defendants") hereby sets forth his responsive expert report concerning non-

infringement and other matters as follows.

Further, when Arthrex and Pearsalls developed the FiberWire suture, Arthrex created an entirely new category of medical products called high-strength suture. Prior to FiberWire, there was no such product on the market. It is the UHMWPE that makes FiberWire so strong. As I previously mentioned, there is no indication at all within the '446 patent that a high-strength suture was even contemplated by the inventors. To the contrary, the inventors had conceded the fact that there was a tradeoff necessary in having a suture that had better handleability and pliability – that tradeoff was lower strength. That is why the specification repeatedly states that the object of the invention is to achieve better handleability and pliability without appreciably sacrificing physical characteristics, including most specifically, strength. Nowhere is there any description or teaching within the '446 patent that the resulting suture will have strength that is far superior to the prior art sutures identified in the patent. In my opinion, this is another substantial difference.

Putting it in terms of the function/way/result test, as did Dr. Brookstein, it is my opinion that the difference between the function performed by the UHMWPE in FiberWire is very different than that of the first fiber-forming materials of claim 1 of the '446 patent. As I stated above, the function performed by UHMWPE in FiberWire is to impart tremendous strength to the FiberWire suture, whereas the function performed by the first fiber-forming materials is to add lubricity with the recognition that these materials will detract from the strength of the resulting suture. For these same reasons,

16

Dated: March 24, 2006

Debi P. Mukherjee

Debi Prasad Mukherjee, Sc./D.

DSMDB.2056173.1