# EXHIBIT 10

Case 1:04-cv-12457-PBS   Document 106-47   Filed 04/06/2007   Page 1 of 8

1

```
 1           IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF MASSACHUSETTS
 3
 4     DEPUY MITEK, INC., a            )
 5     Massachusetts corporation,      )
 6                Plaintiff,           )  Civil Action
 7        vs.                          )  04-12457 PBS
 8     ARTHREX, INC., a Delaware       )
 9     corporation,                    )
10                Defendant.           )
11
12
13              -    -    -    -    -
14        The deposition of DEBI PRASAD
15   MUKHERJEE was taken on Tuesday, June 13,
16   2006, commencing at 9:08 a.m., at the
17   offices of Dickstein Shapiro Morin &
18   Oshinsky LLP, 2101 L Street, N.W.,
19   Washington, D.C., before Susanne Bergling,
20   Registered Merit Reporter and Notary Public.
21              -    -    -    -    -
22
23
24
25
```

Page 238

1  A. Then polypropylene is twice, polyester is
2 about twice -- I mean polyester -- polyethylene is
3 twice, then -- ultra high molecular weight
4 polyethylene is twice than polypropylene and twice
5 than polyester, so they are probably significantly
6 higher for the ultra high molecular weight
7 polyethylene, knot pull strength.
8  Q. Do you know if -- does he provide the
9 standard deviation for the knot pull strength?
10  A. He didn't, but just looking at the figures,
11 I mean, I can say that, looking at 1.35 or 1.44,
12 you have to say that.
13  Q. Okay. So, he did not provide standard
14 deviation in this chart.
15  A. Not in this chart.
16  Q. Now, for the knot configuration four equals
17 one equals one, do you see that?
18  A. Yes.
19  Q. The polyethylene failed at 0.35
20 gigapascals, which is lower than the failure value
21 for the nylon, polypropylene and polyester for the
22 four equals one equals one configuration, right?
23  A. Yes.
24  Q. Okay. And that's because the polyethylene
25 slipped, right?

Page 239

1  A. I don't use the word "sucked."
2  Q. I said "slipped."
3  A. Slipped, okay. I thought I heard...
4 sorry.
5  Q. So, the polyethylene failed at the 0.35
6 gigapascal level for the four equals one equals
7 one configuration because of the polyethylene
8 slipping, right?
9  A. Right.
10  Q. Okay. Polyethylene, including ultra high
11 molecular weight polyethylene, is a lubricious
12 material, right?
13  A. Yes.
14  Q. Okay.
15  A. It's also polypropylene -- excuse me.
16  Q. Sure.
17  A. Polypropylene is also a lubricious
18 material.
19  Q. It is?
20  A. Yes, it is.
21  Q. Okay. How about nylon or polyester, are
22 they lubricious?
23  A. Nylon is also -- again, is lubricious.
24  Q. How about polyester?
25  A. Polyester will be less.

Page 240

1  Q. And nylon is less lubricious than
2 polypropylene and polyethylene, right?
3  A. Probably.
4  Q. Okay. Now, in that chart, do you see how
5 going across there's different knot
6 configurations, two equals two, three equals two
7 equals one, four equals one equals one, four
8 equals four and four equals four equals four?
9  A. Yes.
10  Q. So, going from left to right, two equals
11 two to four equals four equals four, the two
12 equals two is a simpler knot than the four equals
13 four equals four, right?
14  A. It's not simple or complex. It depends on
15 what the surgeon wants to do. So, he can put more
16 knots to make sure, and in general, they do. They
17 will not stop at two by two. They will probably
18 go to four by four by four to make sure it is
19 there, especially ophthalmic use.
20  Q. Okay. And if you turn to page ARM 25137 --
21  A. Thirty-seven, yeah.
22  Q. Okay, of Cohan, the last paragraph of the
23 first column --
24  A. Yeah.
25  Q. -- do you see the sentence beginning

Page 241

1 "Although"? The first column --
2  A. Did you say first column?
3  Q. First column, last paragraph.
4  A. Last paragraph.
5  Q. The sentence beginning, "Although."
6  A. "Although," yes.
7  Q. Cohan states, "Although laboratory testing
8 showed that the polyethylene fiber has a somewhat
9 lower knot holding strength with simpler knots
10 than the other three polymers, more complex knots
11 than are commonly used would realize
12 polyethylene's great knot pull strength."
13    Do you see that?
14  A. Yes.
15  Q. Okay. So, Cohan was calling the more --
16 the additional knot configurations more complex,
17 right?
18  A. That's what -- if he meant by that.
19  Q. Well, did you understand that's what he
20 means when you read this reference?
21  A. Well, I -- I think that normally for a
22 surgeon, they will put as many knots they can to
23 make sure it's secure, and it's nothing complex or
24 simple about it.
25  Q. Well, if you look at the author, the author

294
1 in the monomer?
2   A. Yeah -- well, it's not a monomer, in the
3 polymer.
4   Q. In the polymer?
5   A. Yeah.
6   Q. I'm confused. Are you saying that the
7 monomer unit in all types of polyethylene is the
8 same or different?
9   A. Mostly same, yeah.
10   Q. Mostly same, okay.
11     Would one of ordinary skill in the art
12 between 1988 and 1992 think that the term
13 "polyethylene" refers to low-density polyethylene
14 or includes -- should I say includes low-density
15 polyethylene?
16   A. Yeah, it would.
17   Q. It would? But not ultra high? Is that
18 your opinion?
19   A. Ah, they will also include ultra high,
20 because there are different properties, so they
21 will include also ultra high, as well as
22 low-density.
23   Q. Okay. I'd like to turn to polypropylene as
24 used in the '446 patent, Exhibit 3 to your first
25 report. Do you see the '446 patent?

295
1   A. Yeah.
2   Q. Exhibit 3?
3   A. Exhibit 3.
4   Q. Right.
5   A. Yeah, I'm at this.
6   Q. No, Exhibit 3. I'm sorry, that's Exhibit
7 3. I'm sorry. Yeah, if you would go to column 4,
8 please.
9   A. Yeah.
10   Q. Okay. Beginning at line 9 through 32, do
11 you see that?
12   A. Nine through 32, yeah.
13   Q. Okay. That paragraph says, "Preferably,
14 the continuous filaments which make up the first
15 and second set of yarns are derived from
16 nonabsorbable polymers."
17     Do you see that?
18   A. Yes.
19   Q. Is ultra high molecular weight polyethylene
20 a nonabsorbable polymer?
21   A. Yes.
22   Q. Okay. Then it says, "In a preferred
23 embodiment, the first set of yarns acts as
24 lubricating yarns to improve the pliability, or
25 compliance, and surface lubricity of the

296
1 heterogenous braid."
2     Do you see that?
3   A. That is correct.
4   Q. Ultra high molecular weight is a
5 lubricating yarn, right?
6   A. Yes.
7   Q. Okay. Then it says -- further down it
8 says, "Such fiber forming polymers include
9 perfluorinated polymers," and describes some of
10 those, and then it says, "as well as
11 non-perfluorinated polymers," and refers to
12 polyethylene and PE, right?
13   A. Right.
14   Q. Okay. Ultra high molecular weight
15 polyethylene came as fibers before 1992, right?
16   A. Yes.
17   Q. Okay. Now, do you see where in the end it
18 says, "The preferred polymers for the first set
19 are PTFE, PETFE, FEP, PE and PP"?
20     Do you see that?
21   A. Yes.
22   Q. Okay. That's column 4, lines 28 to 31.
23     Did you understand that sentence to refer
24 to all types of polypropylene or just certain
25 types of polypropylene?

297
1     MR. TAMBURO: Objection, vague.
2     THE WITNESS: This is general purpose
3 polyethylene, which it provides the lubricity and
4 as well as pliability and compliance, not ultra
5 high molecular weight polyethylene.
6     BY MR. BONELLA:
7   Q. Okay, that wasn't my question. Listen to
8 the question.
9     Did you understand that sentence to refer
10 to all types of polypropylene?
11     MR. TAMBURO: Objection, vague.
12     THE WITNESS: The fiber-forming
13 polypropylene, yes.
14     BY MR. BONELLA:
15   Q. All types, okay.
16     Did you understand -- do you see where it
17 refers to PVDF?
18   A. Yes.
19   Q. Did you understand this paragraph to be
20 referring to all types of polyvinylidene fluoride?
21   A. Yes.
22   Q. Okay. Do you see where it refers to PTFE
23 in that paragraph?
24   A. Yes.
25   Q. Did you understand it to be referring to

358
1 why the inventors should be precluded from
2 covering coated sutures with their patent?
3    A. No, I don't have any opinion.
4    Q. Okay. Do you have patents?
5    A. Yes.
6    Q. Okay. And in your patents, do you list
7 things that are claimed?
8    A. In my patent, yes, I do.
9    Q. Okay. Do you describe things in your
10 patents that may or may not be included within the
11 invention, in the description of the invention?
12   A. I don't remember what my -- I don't have
13 the patent in front of me.
14   Q. Well, in the claims, do you list every
15 possible feature of the invention?
16      MR. TAMBURO: Objection, vague.
17      THE WITNESS: I tried to.
18      BY MR. BONELLA:
19   Q. But do you list -- don't you try to get as
20 broad a claim as you can to cover as broad a
21 concept of your invention?
22      MR. TAMBURO: Objection, vague. He's not a
23 patent attorney.
24      THE WITNESS: I write what I -- my
25 invention is, and patent attorney actually

359
1 formalize all of this.
2      BY MR. BONELLA:
3    Q. Okay. And --
4    A. So, I cannot say anything more than that.
5    Q. You didn't want the broadest protection
6 possible on your patents?
7    A. Whatever the patent attorney wants --
8      MR. TAMBURO: Objection, misrepresents the
9 testimony. Give me a chance to object, Debi.
10     BY MR. BONELLA:
11   Q. But the patent attorney does?
12   A. Yes.
13   Q. Okay. So, it's not what you want in your
14 patents; it's what the patent attorney wants in
15 terms of protection?
16   A. Well, I provide the information, it's a
17 back and forth --
18   Q. Right.
19   A. -- and I might say, well, it should be
20 included in this, but patent attorney is the final
21 one --
22   Q. Right.
23   A. -- who decides on the claims and the
24 writing part of the -- as you know.
25   Q. Right. And isn't it the goal with your

360
1 invention, don't you want to try to protect as
2 broadly as possible?
3    A. Again, I may want something, but patent
4 attorney might come out with something different,
5 and Patent Office may come out with another
6 determination.
7    Q. If there's things in your patent that you
8 say may or may not be included within your
9 invention, but they're not listed in the claims,
10 do you think they should be excluded from the
11 claims in your patent?
12      MR. TAMBURO: Objection, calls for a legal
13 conclusion of a patent that we're not even -- that
14 we don't have in front of us and asking him to
15 interpret claim language of a patent we don't have
16 in front of us. This is ridiculous.
17      THE WITNESS: It's so hypothetical, I
18 cannot answer that question.
19      BY MR. BONELLA:
20   Q. You cannot answer it?
21   A. No.
22   Q. Okay. Do you see in the claim, claim 1 --
23   A. Uh-huh.
24   Q. -- it says, "A surgical suture consisting
25 essentially of a heterogenous braid," do you see

361
1 that?
2    A. Yes.
3    Q. Is FiberWire a surgical suture?
4    A. FiberWire is a surgical suture, yes.
5    Q. Does FiberWire consist essentially of a
6 heterogenous braid?
7    A. Yes.
8    Q. Is FiberWire composed of a first and second
9 set of continuous and discrete yarns in a
10 sterilized, braided construction wherein at least
11 one yarn from the first set is in direct
12 intertwining contact with a yarn from the second
13 set?
14   A. Their construction is quite different from
15 this described here for FiberWire, what I know of
16 FiberWire.
17   Q. Well, FiberWire has a heterogenous -- has a
18 sheath that's a braid of ultra high molecular
19 weight polyethylene and PET, right?
20   A. Sheath of those two materials, yes.
21   Q. Braided together.
22   A. Right.
23   Q. Okay. Well, is that sheath of FiberWire,
24 is that a heterogenous braid?
25   A. Yeah, they are two different materials.

VERITEXT CORPORATE SERVICES (800) 567-8658

362
1  Q. Okay. And is the FiberWire heterogenous
2 braid composed of a first and second set of
3 continuous and discrete yarns?
4  A. Yes.
5  Q. Okay. And is the FiberWire heterogenous
6 sheath braid composed of discrete yarns in a
7 sterilized braided construction?
8  A. Yes.
9  Q. And does the FiberWire heterogenous braided
10 sheath have a braided construction where at least
11 one yarn from the first set is in direct
12 intertwining contact with a yarn from the second
13 set?
14  A. There is intertwining contact, yes.
15  Q. Okay. And in the next column, it says,
16 "Each yarn from the first set is composed of a
17 plurality of filaments of a first fiber-forming
18 material selected from the group consisting of
19 PTFE, FEP, PFA, PVDF, PETFE, PP and PE."
20     Do you see that?
21  A. I see it.
22  Q. Does the FiberWire sheath have a yarn that
23 meets that criteria?
24  A. No.
25  Q. Why?

363
1  A. Because it has ultra high molecular weight
2 polyethylene for its strength, and this PE does
3 not include that ultra high molecular weight
4 polyethylene.
5  Q. And that's your opinion?
6  A. Yes.
7  Q. Okay. And the next part says, "Each yarn
8 from the second set is composed of a plurality of
9 filaments of a second fiber-forming material
10 selected from the group of PET, nylon and aramid."
11     Do you see that?
12  A. Yes.
13  Q. Does FiberWire meet that criteria?
14  A. It has the PET in it.
15  Q. So, it meets that criteria?
16  A. Uh-huh.
17  Q. And then it says, "Optionally a core."
18     FiberWire optionally has a core, right?
19  A. Right.
20  Q. Okay. If the Court defines PE, as used in
21 that claim, to mean ultra high molecular weight
22 polyethylene, if the Court defines PE to mean
23 ultra high molecular weight polyethylene --
24  A. Not in this patent.
25  Q. No, if the Court --

364
1  A. But that's -- the -- the FiberWire has
2 ultra high molecular weight polyethylene core.
3  Q. Right.
4  A. Yes.
5  Q. If the Court says that PE, as used in the
6 claims of the '446 patent, means ultra high
7 molecular weight polyethylene, does FiberWire meet
8 that clause (a) in column 9 of claim 1?
9  A. That's a hypothetical question. I cannot
10 answer that.
11  Q. You can't answer it?
12  A. No.
13  Q. You can't provide an opinion one way or the
14 other?
15  A. No.
16  Q. Okay. Claim 2, it says, "The surgical
17 suture of claim 1 wherein the suture is attached
18 to a needle."
19     Do you see that?
20  A. Yes.
21  Q. Is FiberWire sold attached to a needle?
22  A. Yes.
23  Q. Okay.
24  A. Not always, but I have seen the suture -- a
25 needle with -- I mean a suture with a needle.

365
1  Q. Okay, claim 8 says, "The surgical suture of
2 claim 1 wherein the second set of yarns is PET."
3     FiberWire meets that criteria, right?
4  A. Yes.
5  Q. Claim 9 says, "The surgical suture of claim
6 8 wherein the volume fraction of the first set of
7 yarns in the braided sheath and core ranges from
8 about 20 to about 80 percent."
9     Do you see that?
10  A. I don't know at what percentage of PET and
11 the ultra high molecular weight polyethylene is in
12 the FiberWire.
13  Q. So, you don't have an opinion whether
14 FiberWire meets that limitation?
15  A. No.
16  Q. Then in claim 12, it says, "The surgical
17 suture of claim 8 wherein the suture is attached
18 to the needle."
19     Do you see that?
20  A. Yes.
21  Q. FiberWire meets -- when FiberWire is sold
22 attached to a needle, it meets that limitation?
23  A. Most of the time, but there is another
24 non-needle part, too.
25  Q. Okay. You reviewed the prosecution history

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 04-12457 PBS

---

DEPUY MITEK, INC., a Massachusetts         )
Corporation,                               )
                         Plaintiff,        )
     v.                                    )
ARTHREX, INC., a Delaware Corporation      )
                         Defendant.        )
_____)

Videotaped Deposition of DEBI PRASAD MUKHERJEE

- VOLUME TWO -

Washington, DC

Wednesday, June 14, 2006

The videotaped deposition of DEBI PRASAD MUKHERJEE, Volume Two, was held on Wednesday, June 14, 2006, commencing at 9:12 a.m., at the offices of Dickstein Shapiro Morin & Oshinsky LLP, 2101 L Street, Northwest, Washington, DC, before Mary Ann Payonk, RDR, Certified Realtime Reporter, Registered Diplomate Reporter and Notary Public.

Page 562

1    MR. TAMBURO: Objection, vague.
2    A    Enough information for a scanning
3 microscopy is not very conclusive. They may or may
4 not be.
5 BY MR. BONELLA:
6    Q    You don't know?
7    A    I don't know.
8    Q    Okay. Does the coating on FiberWire
9 prevent the PET yarns and the PTFE yarns from each
10 providing their individual properties to FiberWire?
11    MR. TAMBURO: Objection, vague.
12    THE WITNESS: Now please correct me.
13    MR. TAMBURO: And -- and -- and -- and --
14    THE WITNESS: FiberWire does not contain
15 PTFE.
16 BY MR. BONELLA:
17    Q    Oh, I'm sorry. Did I misspeak?
18    A    You just said that.
19    Q    I'm sorry.
20        Does the coating on FiberWire prevent the
21 PET fibers, PET or ultra high molecular weight
22 polyethylene fibers from providing contribution to
23 FiberWire's properties?
24    MR. TAMBURO: Objection, vague.
25    A    No.

Page 563

1 BY MR. BONELLA:
2    Q    Okay. I'd like to go to your first
3 report, invalidity, Exhibit 239. If we go to tab --
4 tab 9 --
5    A    Tab 9.
6    Q    There's an excerpt from Dr. Steckel's
7 report.
8    A    Right.
9    Q    It's only a -- a one-page excerpt from his
10 laboratory notebook.
11    A    Yes.
12    Q    Okay. Did you select that one page to put
13 in your report out of his entire notebook, or were you
14 given that one page?
15    A    No, I have the entire notebook.
16    Q    Okay. Why'd you pick -- did you consider
17 the remainder of his notebook when -- when you select
18 that individual page to attach to your report?
19    MR. TAMBURO: Objection. Well, not an
20 objection, but if you need -- to the extent you need
21 to read the context of why you cited this, please do
22 so.
23    A    Because it is very clear that he was
24 talking about difficulties in core popping and braid
25 looseness.

Page 564

1 BY MR. BONELLA:
2    Q    Okay. Do you know what samples on that
3 page he was talking about, when -- when they were
4 made?
5    A    Well, according to the lab, his notebook
6 page signed was date of '89 -- I mean '89.
7    Q    Right.
8    A    That's what it says here.
9    Q    Okay. Do you know when those samples were
10 made that are discussed on that page?
11    A    It's February 2, 1989 at the top. That's
12 when the lab entry is.
13    Q    Okay.
14    A    I assume that's when the samples were
15 made.
16    Q    Okay. I'd like you to turn to Exhibit 26
17 to Exhibit 359, the report of Dr. Matthew Hermes,
18 which contains a larger excerpt of Dr. Steckel's
19 report right here. And if I could draw your attention
20 to page DMI002617, okay?
21    A    Right here.
22    Q    Right here. 17. Okay --
23    A    1617.
24    Q    Here's an entry on DMI002617 is June 6,
25 1988?

Page 565

1    A    That's correct.
2    Q    Okay. And if you look at the next page,
3 shows a chart of samples, composite braid evaluation,
4 braid constructions. Do you see that?
5    A    Yes.
6    Q    Did you consider that, those
7 constructions?
8    MR. TAMBURO: Take your time,
9 Dr. Mukherjee.
10    A    I believe I did.
11 BY MR. BONELLA:
12    Q    Okay. CBE15, do you see CBE15 sample?
13    A    Yeah.
14    Q    Do you know what the construction of that
15 sample was?
16    MR. TAMBURO: Objection, vague.
17    A    Was PTFE, 11049 in the denier and the
18 fiber. This column on these other things are not
19 there.
20 BY MR. BONELLA:
21    Q    Do you know what the construction of CB15
22 was?
23    MR. TAMBURO: Objection, vague.
24    A    If I understood, you are asking the --
25 BY MR. BONELLA: