# EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


DePUY MITEK, INC.,            )
a Massachusetts Corporation  )
                             )
            Plaintiff        )
                             )
          -VS-               ) CA No. 04-12457-PBS
                             ) Pages 1 - 87
ARTHREX, INC.,               )
a Delaware Corporation, et al,)
                             )
            Defendant        )



MARKMAN HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:

    DIANNE B. ELDERKIN, ESQ., LYNN A. MALINOSKI, ESQ., and
MICHAEL J. BONELLA, ESQ., Woodcock Washburn, One Liberty
Place, 47th Floor, Philadelphia, Pennsylvania, 19103,
for the Plaintiff.

    CHARLES W. SABER, ESQ. and SALVATORE P. TAMBURO, ESQ.,
Dickstein Shapiro, LLP, 1825 Eye Street, N.W., Washington,
D.C., 20006-5403, for the Defendants.


                        United States District Court
                        1 Courthouse Way, Courtroom 19
                        Boston, Massachusetts
                        September 26, 2006, 2:00 p.m.


                LEE A. MARZILLI
            OFFICIAL COURT REPORTER
        United States District Court
        1 Courthouse Way, Room 3205
            Boston, MA  02210
            (617)345-6787

1        P R O C E E D I N G S

2        THE CLERK:  The case of DePuy Mitek, Incorporated

3   V. Arthrex, Incorporated, et al, Civil Action No. 04-12457,

4   will now be heard before this Court.  Will counsel please

5   identify themselves for the record.

6        MS. ELDERKIN:  Yes, your Honor.  I'm Dianne

7   Elderkin on behalf of DePuy Mitek.  I have my colleagues

8   Michael Bonella and Lynn Malinoski with me here.

9        THE COURT:  All right.

10        MR. SABER:  Good afternoon, your Honor.  My name is

11   Charles Saber from Dickstein Shapiro for defendants Arthrex

12   and Pearsalls, and with me is my colleague Sal Tamburo.

13        THE COURT:  Thank you.

14        MR. SABER:  Thank you, your Honor.

15        THE COURT:  So we should begin with claim

16   construction.  I'm thinking we'll go at least two hours.  I

17   don't know if you had any evidence that either of you were

18   going to be putting on.

19        MS. ELDERKIN:  No, just argument today, your Honor.

20        MR. SABER:  That's right.  We had discussed this

21   beforehand and had agreed it was just going to be

22   argumentation.

23        THE COURT:  Okay.

24        MS. ELDERKIN:  I'm prepared to argue the claim

25   construction for DePuy Mitek.  We have copies of our

1   Powerpoint slides.  May I --

2             THE COURT:  That would be wonderful.  Do you have

3   an extra one for the law clerk who would be working on this?

4             MS. ELDERKIN:  I don't think I have quite that

5   many.

6             THE COURT:  Let me say, I'm not that familiar with

7   all of you, but it's the practice here -- and I know it's

8   extremely confusing when you file electronically -- when

9   there are records of the volume that this was, is to also

10  provide courtesy copies.  So I apologize.  As I started to

11  prepare last week, it occurred to me that it would consume my

12  printers for all of a week if I tried to print everything

13  out, and I only recently -- well, I think someone submitted

14  Friday and someone on Monday, so I by no means have had time

15  to go through this record.

16            MS. ELDERKIN:  We understand.

17            MR. SABER:  And we perfectly understand, your

18  Honor.

19            THE COURT:  I don't know what they're doing in

20  other districts, but here it's pretty much the standard.

21            MS. ELDERKIN:  It's certainly understandable.

22            MR. SABER:  I think, with the electronic filings

23  now, we're all just kind of getting used to the rules.

24            THE COURT:  All right, so if there's doubt again,

25  just give Mr. Alba a call, but in general, I'm happy to do

1    all your normal filings, you know, the routine stuff.  But

2    when it's this big, you really need to give me a courtesy

3    copy.  But we've got it.  I think I've got both sides, so

4    here we go.

5            MS. ELDERKIN:  Your Honor, again, I'm Dianne

6    Elderkin.  If we get to any of the summary judgment motions

7    today, my colleagues are going to be prepared to argue the

8    inequitable conduct and the validity motion as well.

9            THE COURT:  Fine.

10           MS. ELDERKIN:  But I'm going to start with claim

11   construction at your suggestion.

12           The patent in suit here is the Hunter '446 patent,

13   and, just briefly, it has to do with a surgical suture.  And

14   if you look at the background of the Hunter patent, it talks

15   about the desire to produce an improved suture with improved

16   properties.  And there's some talk in the background section

17   of what was done in the prior art, and there were braided

18   sutures known in the prior art.

19           THE COURT:  When you say "background," do you mean

20   the specification?

21           MS. ELDERKIN:  Yes, the background part of the

22   specification.  There were sutures made from certain braided

23   constructions known in the prior art, but they were not

24   ideal, and there was a desire to prepare an improved suture,

25   and that's what the Hunter '446 patent discloses and claims.

1      Now, the claims, the patent instructed to a

2   surgical suture that is made from a heterogenous braid.  And

3   what's this heterogenous braid?  Well, the claims in the

4   disclosure talk about this braid having first and second sets

5   of continuous and discrete yarns.  So you can see the red

6   lines here going to one set of the yarns, the other red line

7   going to the second set of the yarns.  Those lines are

8   discrete, they're separate; and that you have in this braided

9   construction at least one yarn from the first set that's in

10  direct intertwining contact with a yarn from the second set.

11      And you might think, well, gee it says braided, it

12  says intertwining contact, wouldn't anything in a braided

13  construction be an intertwining contact?  And the answer is

14  "no, not necessarily."  There are prior art sutures

15  disclosed that have a core of one material and then a braid

16  around it of another material that's a braided construction,

17  but the yarns are not in direct intertwining contact with one

18  another.

19      The claims also specify the materials from which

20  this first and second set of yarns should be constructed, and

21  as is shown here, those are polymeric materials.  Those two-,

22  three-, and four-letter abbreviations stand for different

23  polymeric materials.  The first set of yarns is made from

24  that one group of materials.  The second group of yarns are

25  made from the second group of materials.  And, importantly,

Page 6

1    the yarn is made of a plurality of filaments of those

2    materials.  So it's like a yarn that you might be knitting a

3    sweater with.  Each yarn, you can take it apart, it has many,

4    many filaments in it, as opposed to being a monofilament, a

5    single large filament making up the yarn.  So that's like the

6    very broad summary of the invention in the Hunter '446

7    patent.

8         This is a recitation of Claim 1 of the patent.

9    There's only one independent claim, and, fortunately, there

10    are only two claims here that are in dispute.  They're

11    highlighted in red here.  Those terms are "consisting

12    essentially of" and "PE."  And this claim recites pretty much

13    what I've just gone through, that it's a surgical suture --

14         THE COURT:  Right.

15         MS. ELDERKIN:  -- a heterogenous braid.  Okay, I

16    won't go through that again.

17         When you read the patent, it makes it clear that an

18    important aspect of this invention is mechanically blending

19    these yarns of different materials so that you can achieve

20    the beneficial properties of both of the yarns.  This is

21    stated in the specification at Column 2 where it talks about

22    tailoring the physical and biological properties of the braid

23    by using these different materials and varying the types and

24    proportions of materials.  It's referred to again in Column 3

25    where it talks about direct mechanical blending of these

1    individual and dissimilar yarns to achieve maximum degree of

2    mechanical blending.  And so that's an important aspect of

3    the invention.

4         Now, if you've had a chance to look at any of the

5    briefs, you know that an issue that pervades the claim

6    construction dispute, and also the infringement dispute, is

7    the parties' disagreement over whether the materials recited

8    in the claim, those polymeric materials, must have specific

9    properties.  Mitek says they do not have to have specific

10   properties; Arthrex says that they do.  So before I even get

11   into specifics of claim construction, I want to look at the

12   specification for you and show you, what does the

13   specification say?

14        THE COURT:  Well, let me just say that it strikes

15   me that there are two completely different kinds of issues

16   here.  One is what "PE" means, which strikes me as a much

17   more straightforward kind of analysis than what "consisting

18   essentially of" means.

19        MS. ELDERKIN:  Yes, we would agree that the

20   analysis of what "PE" means is very straightforward, and that

21   it has a plain and ordinary meaning to one of skill in the

22   art, and that there's no need to try to read in properties.

23        THE COURT:  So, as I understand it, you've referred

24   to scientific texts which refer to it as a generic --

25        MS. ELDERKIN:  Correct.

1      THE COURT:  -- what would you call it, a polymer?

2      MS. ELDERKIN:  Right, right.

3      THE COURT:  A generic name that picks up light

4 molecule, heavy molecule, et cetera.

5      MS. ELDERKIN:  Right.

6      THE COURT:  And you essentially say through two

7 experts that that's what someone of ordinary skill in the art

8 would have felt, and you pick that up in a textbook kind of

9 way.

10      MS. ELDERKIN:  Right.

11      THE COURT:  And, as I see it, there's no opposing

12 expert on that particular issue.  Did I miss it, because I

13 have this thick volume, that someone of ordinary skill in the

14 art would have understood it to mean something else?  I'm

15 just turning because I want to get to the one that I think is

16 a whole lot harder, which is the "consisting essentially of."

17      MR. SABER:  Well, there is a dispute, your Honor,

18 about what's shown in those textbooks because it's not at all

19 clear.

20      THE COURT:  I got this huge crate from you

21 yesterday.

22      MR. SABER:  I understand.

23      THE COURT:  Is there something in there?  Is there

24 an expert who disagrees with what a person of ordinary skill

25 in the art would have thought the initials "PE" meant?

1          MR. SABER:  Well, certainly, your Honor, there is.

2          THE COURT:  All right, because as I understand it,

3     I think you can look at dictionaries.  I disagree that you

4     can't.  It just doesn't have the glorified, exalted position

5     that it had under Texas Digital, but it is still an

6     appropriate form to look at.  So who is your expert of

7     ordinary skill in the art who says that it doesn't mean a

8     generic term, that it had a specific term?

9          MR. SABER:  Well, Dr. Mukherjee, who in his reports

10    opined that, you know, from his review of the specification,

11    that what the term "PE" would mean would be something that is

12    not this generic term, and --

13         THE COURT:  So where is that attached to?  There's

14    a whole --

15         MR. SABER:  Yes, and I can't cite you exactly where

16    it is.

17         THE COURT:  So you're saying he says that PE means

18    what to someone -- what is the time frame?  Right, it's the

19    time of the filing of the application?  Is that what it is?

20         MR. SABER:  That's correct.

21         MS. ELDERKIN:  Yes, your Honor.

22         THE COURT:  Which was when?

23         MR. SABER:  '92.

24         THE COURT:  1992.  So in 1992, at the time of the

25    filing of the application, does he say it is not a generic

75dfde02-80e8-47f0-9b78-7f6cb47f3776

1   term?

2        MR. SABER:  Well, he doesn't get into the

3   dictionary except --

4        THE COURT:  I'm not talking about dictionary.  I'm

5   talking about a person of ordinary skill in the art in

6   1992.

7        MR. SABER:  Right, and he does that by reading the

8   specification.  It's his understanding of what it means in

9   the specification.  So I'm not sure if that's being

10  responsive to your question, your Honor.

11       THE COURT:  So, in other words, he's basically not

12  disagreeing that if you just took the term "PE" in 1992, that

13  a person of ordinary skill in the art would have understood

14  it to be a generic term.  What he's trying to say is, in the

15  context of the specification, I should understand it

16  differently?

17       MR. SABER:  Well, two things.  He says that latter

18  thing.  With respect to the former thing, it's not like he

19  offers his own dictionary definitions.  He doesn't do that.

20       THE COURT:  You keep saying dictionary, but these

21  people have their -- I'm assuming he's a chemist, right?

22       MR. SABER:  His background is in suture, that's

23  correct.

24       THE COURT:  So he knows what a polymer is and --

25       MR. SABER:  Of course, of course.

1       THE COURT:  Right, all right, so he knows what PE

2    is, I'm assuming.  So he's not offering an alternative, that

3    polyethylene in 1992 did not include -- what do you call it?

4       MR. SABER:  Ultra-high molecular weight PE, right.

5       THE COURT:  He doesn't say that.  What he's simply

6    saying is, "I understand the term based on the specification

7    to mean something different."

8       MR. SABER:  Right, he does that, your Honor, and he

9    also looks at the evidence that the other side presented on

10   whether there's an ordinary meaning and says it doesn't show

11   that.  That's the point I guess I was trying to say, so he

12   disagrees with it in that sense.

13      THE COURT:  Well, does he give some other

14   dictionary meaning?

15      MR. SABER:  No, he doesn't.

16      THE COURT:  Because I actually went online myself

17   yesterday to see if there was any other meaning.  I looked in

18   my own little scientific dictionary they give the judges.  I

19   looked even in Wickapedia.  I looked everywhere to see if

20   there was some separate meaning that I could find, and I

21   looked at these attachments as well as the various expert

22   reports, and it has a generic meaning, unless it was

23   disclaimed somewhere.

24      MR. SABER:  Yes, the evidence that the other side

25   put in we don't believe establishes that, and that's what

Page 12

1    Dr. Mukherjee talked about, but he did not offer an

2    alternative meaning of the term "PE" apart from the patent.

3                THE COURT:  It's a molecule, right, with carbons

4    and hydrogen atoms and like I learned in science?  That's all

5    it is, and it just depends on how long the chain is?  Do I

6    have that basic rudimentary understanding down?

7                MR. SABER:  To a point, your Honor, that's

8    correct.  The problem, and, again, I don't want to interrupt

9    Ms. Elderkin --

10               THE COURT:  But am I right, the longer the chain

11   is, the heavier it is?  Is it basic like that?

12               MR. SABER:  Like anything else, I'm sure it's more

13   complicated than that.  But the problem was that the material

14   that their expert relied upon used what was called

15   source-based identification.  He offered two, but only one

16   talked about it, and that one said, well, the source-based

17   name would include all of these things.  But the very, very

18   same reference said that's not the end of the story because

19   to use just a source-based identification could be really

20   confusing as to what we're talking about.

21               THE COURT:  Sure, because there are subtypes.

22   There are light weight and heavy weight, and then, I mean, I

23   saw five others.

24               MR. SABER:  That same publication says, we really

25   think you should do this based upon the molecular structure

1  of the product, which, of course, is exactly what the issue

2  is here.  So the very piece of evidence that they rely upon

3  to establish this ordinary meaning says it all depends on how

4  you look at it.

5          THE COURT:  All right, thank you.  So his basic

6  point, as I read his briefs, are, look -- you can disagree

7  with this -- there is a generic meaning to it, but given what

8  the purpose is for this, which is flexibility, that when you

9  deal with the higher-weight stuff, it's not flexible.  In

10  fact, it's known for its tensile ability.  And so he's saying

11  that I shouldn't construe "polyethylene" as a broad term

12  because it actually doesn't fulfill the function that's set

13  forth in the specification.  Did I get that right?

14          MR. SABER:  Pretty good.

15          THE COURT:  So how do you respond to that?

16          MS. ELDERKIN:  Well, it's legally wrong, and it's

17  factually wrong.  Legally it's wrong because the law is

18  clear.  Phillips make it clear, we construe the claim term

19  according to how one skilled in the art would construe it.

20  Its plain and ordinary meaning should take precedence.

21          There is evidence, which we believe is undisputed,

22  that the plain and ordinary meaning of "polyethylene" is just

23  poly-ethylene.  There's no reference in the specification to

24  anything else.

25          THE COURT:  By the way, none of you defined this

Page 14

1    term for me, "lubricious."  Okay, you must all assume I know

2    what it is, but when you look it up, it actually means

3    different things.

4             MS. ELDERKIN:  Oh, really.

5             THE COURT:  It can mean wet.  It can also just be

6    smooth or slippery.  So do you know what it means in this

7    context?

8             MS. ELDERKIN:  My understanding is, it means smooth

9    and slippery.

10            MR. SABER:  I would agree with that, your Honor.

11            THE COURT:  Not necessarily wet?

12            MR. SABER:  That's correct.

13            MS. ELDERKIN:  Right, right, right.  So

14   polyethylene has this plain and ordinary meaning to one

15   skilled in the art.  And there is nothing, as we know again

16   from Phillips and other cases, to alter the plain and

17   ordinary meaning.  There has to be a very clear and

18   unambiguous disavowal in the patent specification to change

19   that meaning.  There is no special definition of PE in the

20   patent.  The one place it's used, I believe it's in Column 3,

21   the word "polyethylene" is spelled out and in parens "PE,"

22   polyethylene.  That's what it means.

23            THE COURT:  All right, can we jump to part two

24   which is what I found incredibly -- I do a lot of these

25   patent cases, and I've actually not had occasion to deal with

1    the "consisting essentially of" term.  And we tried to read

2    some cases on it, and there actually aren't that many, and I

3    had a hard time understanding whether it was a claim

4    construction issue or an infringement issue.  In fact, one

5    case says it's some hybrid between the two.

6            MS. ELDERKIN:  And, your Honor, I believe it's

7    both.  There certainly is a claim construction issue.  We

8    believe it's for the Court.  Of course, what "consisting

9    essentially of" means, as you know, it means there can be

10   elements in an infringing device that are not expressly

11   recited in the claim, as long as they don't alter, materially

12   change, the basic and novel characteristics of the invention.

13           THE COURT:  And how am I supposed to know what

14   those are?

15           MS. ELDERKIN:  Well, we believe that the novel and

16   basic characteristics of the invention, that that is a claim

17   construction issue, and I'm prepared to explain to you -- you

18   know, the parties have competing definitions of what those

19   novel and basic characteristics are.  And then it will be an

20   issue for the jury, or for you on summary judgment, to

21   determine whether -- and the issue here is the coating on

22   FiberWire suture -- materially affects those basic and novel

23   characteristics.

24           THE COURT:  When you say "materially affect," I was

25   having trouble understanding it because primarily we're

Page 16

1    talking about the coatings, right?

2              MS. ELDERKIN:  Right.

3              THE COURT:  And the coatings make it more slippery,

4    maybe.

5              MS. ELDERKIN:  Purportedly, maybe.

6              THE COURT:  Okay, and lubricous.  So they

7    essentially enhance the invention.

8              MS. ELDERKIN:  Right.

9              THE COURT:  All right?  So originally I had thought

10   "materially affect the novel and basic characteristics"

11   meant somehow change them.  You used the word "alter," and

12   one case uses the word "alter," but the case law doesn't

13   consistently use the word "alter."  They usually use the word

14   "materially affect."

15             MS. ELDERKIN:  Materially affect, right.

16             THE COURT:  So if it significantly improves on the

17   invention, materially improves on, let's say, the

18   flexibility, would that be improving the novel and basic

19   characteristics?

20             MS. ELDERKIN:  Well, it's obviously so

21   fact-intensive; you know, how much change is there, how much

22   alteration?

23             THE COURT:  But if it's materially improved, you'd

24   say that that fell within this "consisting essentially of,"

25   even if it's not a detracting from?

1          MS. ELDERKIN:  It certainly could.  And a lot

2     obviously depends on, what are those novel and basic

3     characteristics?  Now, Arthrex argues that those

4     characteristics are flexibility, handleability, and not

5     diminishing the strength of the suture.  But our position is

6     that that is much too narrow a definition, that the basic and

7     novel characteristics of this invention encompass this

8     concept that I discussed earlier about mechanical blending of

9     the properties of the two discrete sets of yarns.

10          Now, it may very well be that the effects of those

11     yarns, one enhances pliability and one enhances strength, but

12     the patent specification is not limited to that.  The

13     preferred embodiments are talked about in terms of, well, gee

14     in some preferred embodiments, you might take a weak material

15     that's slippery or lubricous and --

16          THE COURT:  Well, is there evidence that just the

17     yarn piece of it, you know, the braiding of the yarn, is

18     novel and basic?

19          MS. ELDERKIN:  That the braiding of the yarn --

20          THE COURT:  In other words, what makes this novel,

21     this invention?

22          MS. ELDERKIN:  Well, I don't mean to be trite, but

23     everything in the claim, which is the concept of a braided

24     construction, two discrete yarns.

25          THE COURT:  So no suture before it ever had that?

1          MS. ELDERKIN:  Not everything in the claim, no

2     suture before this had a braided construction where the yarns

3     were in intertwining contact, and the yarns were the

4     materials we cited in this claim, and the yarns were made of

5     the multifilaments as recited in this claim.  And I don't

6     want to mislead you.  There were certainly a lot of braided

7     sutures in the prior art, but none having this particular

8     configuration, and this concept of mechanical blending where

9     I can take a yarn of one material and a yarn of another

10    material, if I put them together in this particular

11    configuration --

12          THE COURT:  So no other suture had this blending of

13    different materials?

14          MS. ELDERKIN:  None that we're aware of, your

15    Honor, none that have been cited in the Patent Office and

16    none that Arthrex has cited in this lawsuit.

17          THE COURT:  So no matter what the materials are,

18    there are none that had dissimilar braids?

19          MS. ELDERKIN:  In this particular configuration and

20    with these materials.  I don't want to misspeak.  I can't say

21    that there's none that have them.

22          THE COURT:  So are you going to walk me through

23    what -- I don't want to go through PE.  I mean, that really

24    seems more straightforward, but I must say, this I found

25    difficult.  And then I'll give you --

1        MR. SABER:  Sure.

2        MS. ELDERKIN:  Okay, if I may, I'm going to stay

3   with this slide.  It relates to both PE and "consisting

4   essentially of."  But it's important to understand what is in

5   the specification on which Arthrex is relying to try to pull

6   out this requirement that the first materials have to be weak

7   and the second materials have to be strong, so that the novel

8   and basic characteristics of the invention are the strong yet

9   pliable suture.

10        Now, we don't disagree that the patent

11  specification does disclose that the first material, the

12  materials in the first set, can be lubricious.  And that's

13  what you talked about, they can be somewhat slippery.  And it

14  says here -- this is in Column 4 -- that they can act as

15  lubricating yarns to improve the overall pliability.  But not

16  just pliability, or compliance, and surface lubricity of the

17  heterogenous braid, but just because the first fiber-forming

18  materials, those materials in the first class, can be

19  lubricious doesn't mean that they also have to be weak or

20  that they have to produce a pliable braid.  Let's see --

21        THE COURT:  Well, what's the difference between

22  pliable and lubricious?

23        MS. ELDERKIN:  A lubricious material is something

24  that's slick and slippery.  A pliable material is something

25  that bends easily.

1          THE COURT:  So at least you would say

2     conceivably -- well, I suppose that's right, you could have

3     something slippery that you can't bend, all right.

4          MS. ELDERKIN:  Right.  Arthrex says in its brief,

5     they talk about these first seven polymers, and it says that

6     they're lubricious.  And it says, the specification

7     unambiguously states that "A braid that's made solely of

8     these lubricious yarns will result in a highly pliable

9     braid," and they repeat this over and over again as a basis

10    for their argument that the novel and basic characteristics

11    include this concept that the braid must be pliable.  But

12    that's not what the specification says.  If you look at where

13    the specification talks about this in Column 2, it says, "If

14    fibers composed of highly lubricious polymers are used in the

15    traditional manner -- i.e., not necessarily according to this

16    invention -- then a highly pliable braid can be prepared."

17    But there's nothing definitive in the patent that says, if

18    you have a lubricious first fiber-forming material, you will

19    get a pliable braid.

20          And again elsewhere in their brief Arthrex says,

21    "The specification teaches that while this braid made

22    entirely of lubricious materials would make a highly pliable

23    braid, the braid will be weak and unusable."  But, again,

24    that's not what the specification says.  If you look at

25    Column 4, it says, "In most cases, these braids will be

Page 21

1  relatively weak and unusable."  It's not a definitive

2  statement that the braids made with these materials will

3  necessarily be weak and unusable.

4          And then, finally, Arthrex tries to read into this

5  a requirement that this first material which is lubricious

6  must also be relatively weak; that is, weaker than the second

7  group of materials.  But that again is not the case.  There

8  is no such disclosure in the patent.  And indeed other

9  materials that are recited in that list of the first

10  fiber-forming materials -- for example, the PVDF and the PP,

11  which is the polypropylene --

12          THE COURT:  How do I know that?  How do I know

13  that?

14          MS. ELDERKIN:  I'll get the cite for you.  It's in

15  our expert testimony.  And indeed other materials in this

16  first group -- for example, polypropylene which is cited in

17  the first group -- also comes in ultrahigh molecular weight

18  form, and Arthrex's expert agrees that that material would be

19  within the scope of the claim.  And we'll get the cite for

20  those.

21          THE COURT:  But apart from what Arthrex says, could

22  you just point me to where in the specification you say is

23  the novel and basic characteristics of the invention.

24          MS. ELDERKIN:  Sure.  This is what I pointed to

25  right at the beginning when I was talking about the --

Page 22

1            THE COURT:  That's Column 2.

2            MS. ELDERKIN:  Column 2, Lines 49 to 62.  You have

3    heterogeneous braids that exhibit a combination of

4    outstanding properties attributable to the specific

5    properties of the dissimilar fiber-forming materials which

6    make up the braided yarns.  You pick materials that have the

7    properties you want, and you put them together in this

8    particular construction, and you get a braided suture that

9    benefits from the properties of both of those materials.  So

10   that's at Column 2, Lines 49 to 62.  And then there's also

11   discussion of that at Column 3, Lines 40 to 51, this concept

12   of mechanical blending.

13           And in answer to your question about where can you

14   find evidence with respect to the fact that these other

15   polymers, PVDF and PP, are also strong materials, that's in

16   Paragraph 37 of Dr. Brookstein's declaration.

17           THE COURT:  So you're saying that the novel and

18   basic characteristics is the braiding of dissimilar yarns?

19           MS. ELDERKIN:  The braiding of dissimilar yarns --

20           THE COURT:  And that's all it is?

21           MS. ELDERKIN:  -- in a way, in such a way that you

22   can achieve benefit of the properties, of the dissimilar

23   properties of the yarns.  And that's because they are in

24   intertwining contact in the particular configuration recited

25   in these claims.

1          THE COURT:  In your view, so sometimes that will be

2     pliability and strength, and sometimes it won't?

3          MS. ELDERKIN:  Right, right, that's exactly it, and

4     that Arthrex is improperly trying to -- first of all, is

5     misreading the spec, is overstating what the specification

6     says, and then is improperly trying to read aspects of

7     preferred embodiments into the claims.  And what they say

8     is --

9          THE COURT:  You know, that works for PE, but it

10    doesn't work so well for this because when you look at the

11    case law, I am supposed to go into the specifications to

12    understand the novel and basic characteristics.  So it's not

13    reading in a limitation; it's actually understanding what's

14    novel about it.  It's an odd analysis.  It's different than a

15    normal claim construction.

16         MS. ELDERKIN:  Yes, I agree.  And what we're saying

17    is, if you read the specification, the general description of

18    the invention has nothing to do -- is not so specific.  It's

19    just pliability and strength.  It's the idea of mechanical

20    blending of discrete and disparate yarns with different

21    properties, and that Arthrex's reliance on this discussion of

22    pliability and strength is improperly focusing on discussion

23    of certain preferred embodiments and is too narrowly defining

24    the basic and novel characteristics of the invention.

25         THE COURT:  And why do you add the limitation that

Page 24

1    it can't be bioabsorbable?

2          MS. ELDERKIN:  We add that because it's also

3    important to look -- I agree with the case law -- as to why

4    the "consisting essentially of" language was added to the

5    claims to begin with.  And if I can get to that slide, the

6    claims during prosecution were rejected at one point over

7    prior art that did disclose braided sutures.  We argue they

8    didn't disclose the braids of this type configuration.  The

9    examiner didn't agree with that.  But the prior art, this

10   Kaplan and Doddi patents, disclosed sutures, but they had

11   bioabsorbable materials in the sutures.  And to help avoid,

12   help to get around that prior art, we made the claim

13   amendment that's shown on the screen here.  We added the

14   "consisting essentially of" language because otherwise it

15   was "comprising" language.  And, as you know, "comprising"

16   means you could add anything under the sun to that claim

17   regardless of what it might do.  So with the "comprising"

18   language, the claim would have been broad enough to include

19   bioabsorbable materials, and we were arguing our claim

20   doesn't include that.

21         THE COURT:  And what does "bioabsorbable" mean?

22         MS. ELDERKIN:  It means that once it's in the body,

23   it absorbs into the body.  You don't have to, like, take the

24   stitches out later.  They ultimately just absorb into the

25   body and disappear.

1        So we made this claim amendment where we added the

2   "consisting essentially of" language as well as the specific

3   recitation of the polymeric materials in response to the

4   rejection over Doddi and Kaplan.  And when you look at the

5   amendment in which we did that, which is our Exhibit 3 to our

6   Markman brief, it couldn't be clearer that that's the case.

7   We argued, the attorney argued, you know, this claim as

8   amended no longer claims bioabsorbable materials.

9        THE COURT:  Because those patents had braided,

10  bioabsorbable, discrete yarns?  Is that what they had?

11       MS. ELDERKIN:  As I recall, they had discrete

12  yarns.  They were not, as we argued, in direct intertwining

13  contact as we claim here.  We made that argument to the

14  examiner.  The examiner, for whatever reason, did not agree.

15  We think he was wrong about that, but to proceed and to get

16  the patent allowed, we then made this amendment to remove

17  bioabsorbable materials, and then he withdrew the rejection

18  over that prior art.

19       So because the "consisting essentially of" language

20  was so clearly added for the purpose of eliminating

21  bioabsorbable materials, we say, "Well, that's a material and

22  basic characteristic of the invention too, bioabsorbable

23  materials.  You said that you're different from the prior art

24  because you don't have bioabsorbable materials, so we say

25  that that is a part of the basic and novel characteristics of

1    the invention that it cannot include bioabsorbable

2    materials."

3           THE COURT:  All right, thank you very much.  And

4    you want me to do what now?  You want me to -- you think it

5    sort of morphs into the same analysis because as soon as I

6    adopt, if I adopt yours, you say, bang, there's an

7    infringement?  Is that all there is to it?

8           MS. ELDERKIN:  Pretty much, your Honor.  We have

9    obviously --

10          THE COURT:  And if I say, bang, no, this isn't it,

11   then they win?

12          MS. ELDERKIN:  No.  We say, bang, if you go for us,

13   we think there are no disputed issues of fact, and you should

14   grant summary judgment of infringement.  But if you were to

15   find for them on either issue, there are genuine issues of

16   material fact about infringement that would preclude summary

17   judgment and would --

18          THE COURT:  Like what?  You're talking about

19   equivalents?

20          MS. ELDERKIN:  Yes.

21          THE COURT:  So not to get ahead of ourselves --

22          MS. ELDERKIN:  I'm sorry.  Not just equivalents,

23   but also under the "consisting essentially of," whether the

24   coating materially affects the basic and novel

25   characteristics.  So even under their definition of what

1    those basic and novel characteristics are, there's a fact

2    issue under their definition of whether the coating

3    "materially affects" those basic and novel properties.

4            THE COURT:  Just getting to the coating for a

5    minute, though, suppose I went with their view and there was

6    evidence that the coating substantially improves the

7    handleability -- would that be it?

8            MR. SABER:  Handleability.

9            THE COURT:  So you would say, at the very least,

10   that gets a jury claim?

11           MS. ELDERKIN:  Yes, your Honor.

12           THE COURT:  So you would agree with their legal

13   analysis, which is what I was actually struggling with a

14   little bit, which is, if something like a coating materially

15   improves on the invention, then that would qualify as taking

16   you out of infringement?

17           MS. ELDERKIN:  I'm not sure that it would, your

18   Honor, and one of the reasons --

19           THE COURT:  As opposed to detracting or defeating

20   the invention?

21           MS. ELDERKIN:  In this case, I'm not sure that it

22   would because the patent even says you can put a coating on

23   these sutures to enhance the pliability, to enhance the

24   lubricity.  I forget the exact term that they use.

25           THE COURT:  Right, I noticed that the coatings were

Page 28

1    mentioned, unlike some of the cases that we looked at where

2    different sulfur contents or whatever.  So I'm just trying to

3    understand the legal question.  So suppose they acknowledge

4    coatings can improve flexibility, so you would say therefore

5    what, what legally?  So that is part of the invention?

6            MS. ELDERKIN:  Legally, is it a material change to

7    the basic and novel properties?  A, you have a patent that

8    says, hey, you can add a coating to these if you want to make

9    them more lubricious or slippery to enhance those properties,

10   if you want, so --

11           THE COURT:  So that makes it part of the invention,

12   the coating?

13           MS. ELDERKIN:  Well, yes.  Query:  How would it

14   materially affect the basic and novel properties if the

15   patent says, hey, you can do this?  And then there's also the

16   issue of fact about, A, of course, whether they've proven

17   that there is an improvement,  but even if there is some

18   improvement, is it a material effect?

19           THE COURT:  Well, their expert I assume says that,

20   right?

21           MS. ELDERKIN:  Well, what their expert says is

22   that, when he was questioned at deposition, is, "Well, I can

23   tell an effect here, but it's subtle.  And, you know, if I

24   were a surgeon and I actually had my gloves on, I don't know

25   if I'd be able to tell the difference."

1           THE COURT:  Does your expert say that it would not

2    be a material improvement?

3           MS. ELDERKIN:  Yes.

4           THE COURT:  All right, so what you're saying is,

5    give it to a jury.

6           MS. ELDERKIN:  Right.

7           THE COURT:  So that's where you would say it goes

8    from claim construction into an infringement fact analysis?

9           MS. ELDERKIN:  Right, if their construction of

10   "consisting essentially of" is adopted.

11          THE COURT:  Thank you.

12          All right, you're up at bat.

13          MR. SABER:  Thank you, your Honor.

14          THE COURT:  You can give a stab at PE, even if you

15   think I'm wrong, but I'm just, as you know, as you can tell,

16   I'm struggling more with part two.

17          MR. SABER:  I will, and I'm going to be short on

18   the PE.  We also, of course, have a Powerpoint presentation.

19          THE COURT:  That's why I love these cases.

20          MR. SABER:  But I have a feeling we're probably not

21   going to look at very much of it today.  Thank you.

22          THE COURT:  Well, I had a chance to read the

23   briefs.  It was really the appendices that I didn't get

24   through, so thank you.

25          (Discussion off the record.)

1          MS. ELDERKIN:  Your Honor, we have a number of

2     guests here.  Would you have any objection if they sat in the

3     jury box where they could see the screens better?

4          THE COURT:  Oh, no, that would be fine.  No vote,

5     though.  You don't get a vote.

6          MS. ELDERKIN:  Thank you.

7          MR. SABER:  I'll take a vote.  If my guy gets veto

8     power, that would be fine.

9          THE COURT:  It's like a jury, a hung jury.  It's

10    all over.  For those in the back row, you'll notice there's

11    like a tray table right next to the --

12         MR. SABER:  Well, your Honor, I gave it to you.  I

13    can tell you the slide numbers that we're on, and you've got

14    the paper version.

15         THE COURT:  Sure.

16         (Discussion off the record.)

17         MR. SABER:  Okay, thank you, your Honor.

18         THE COURT:  It's show time.

19         MR. SABER:  I think that was our seventh inning

20    stretch, a little bit early, though.

21         First, I want to thank Ms. Elderkin and her team.

22    The parties actually worked very hard together to try and

23    limit the claim construction issues, so we got it down to the

24    two that I think are the nub of the case.

25         THE COURT:  I wish you all would stop being so

1    friendly.  It makes me think it's not a real patent case.

2    But I appreciate it from all of you, as you know.

3                MR. SABER:  Well, I respect them, and I'm sure they

4    respect us, even though I know sometimes the papers can get a

5    little nasty, but that's, I guess, the nature of our

6    business.

7                THE COURT:  Not compared to what I've seen.

8                MR. SABER:  I understand that your Honor is more

9    interested in the "consisting essentially of" issue, but if I

10   could just spend a couple of minutes --

11               THE COURT:  Sure, go ahead.  This is your time to

12   do it.

13               MR. SABER:  My time.  I want to start actually, and

14   I'm going to get to the nub of it, a bit on what the Phillips

15   case did for claim construction because I think that this in

16   many ways is the kind of case that they had in mind, because

17   what the Phillips case said at its core is, you've got to

18   look to the specification to understand the invention.

19               They cited -- actually, I'm very proud -- they

20   cited very enthusiastically to a case that I did, which is

21   the Renishaw V. Marposs case, which stood for the proposition

22   that the meaning that best fits what the specification was

23   all about is usually the correct meaning.  And that case has

24   been cited a lot, and we were on the side that was advocating

25   that position, so I guess perhaps that's why I passionately

Page 32

1    believe it.

2             THE COURT:  I know that since the Phillips case, I

3    saw some statistics that there have been more splits in claim

4    construction than there were before.

5             MR. SABER:  Your Honor, I haven't seen that, but

6    it's --

7             THE COURT:  So rather than clarifying, I think

8    there's still a divide in the Federal Circuit.

9             MR. SABER:  That statement doesn't surprise me,

10   knowing the Federal Circuit.  But it is why we believe so

11   strongly in our position, because we do believe that the

12   whole notice function of claims will be served.  But you have

13   to understand what the term here "PE" would mean to someone

14   of ordinary skill in the art reading this patent, and that's

15   why we spent so much time on it, and we do believe that it's

16   the appropriate analysis.

17            It's very interesting, the other side, the first

18   thing they do is cite their expert for his opinion.  Yet one

19   of the very cases that they cite, the University of Florida

20   case, calls expert opinion on the meaning of the claim the

21   least favored type of extrinsic evidence and calls it

22   extremely disfavored.

23            THE COURT:  The problem we run into is, I don't

24   know what "polyethylene" means.  I haven't had chemistry in

25   many years.  So at some level it has a chemical meaning in

Page 33

1    the art, and it's not a defined term, and for me to

2    understand it --

3              MR. SABER:  Right, you have to start somewhere.

4              THE COURT:  You have to start somewhere, so a

5    dictionary makes sense, a technical dictionary.

6              MR. SABER:  And, as I say, you know, despite the

7    fact that we're accused of it, I think our papers were very

8    clear.  We never said you can't look at the dictionary.  We

9    just said you shouldn't start with the dictionary and then

10   only look to the specification to see if there's a disavowal

11   or something like that.  That's exactly what Phillips said

12   you shouldn't do.  Phillips, I mean, said it, it's okay to

13   look at a dictionary, and we said in our papers, it's okay to

14   look at a dictionary.  But what problem is in the fundamental

15   difference of the approach of the two parties.  They start

16   with Dr. Hermes' opinion and the dictionary's and kind of end

17   there.  And I think Ms. Elderkin said it.  She said, was

18   there a disavowal in the specification?  That's just simply

19   not the analysis.  The analysis is, to determine the ordinary

20   meaning, you have to in every case look to the specification

21   and the prosecution history, to the extent that that's

22   relevant, to try and understand the notice that the patentee

23   gave to the world as to what it means.  And we think that

24   when one does that, does that exercise that the Federal

25   Circuit told us that we have to do, that the answer comes

Page 34

1    screaming out to us.  The specification --

2            Sal, if you could go to Slide 10, I believe.  This

3    is where it starts to talk about what this patent is all

4    about.  And I agree with Ms. Elderkin that it starts by

5    talking about what was known and what was done, and it says,

6    if fibers composed of highly lubricious polymers are used in

7    the traditional sense -- and she's right, they're talking

8    about what was known for these lubricious fibers -- then

9    you're going to get a highly pliable braid.  And then it

10   explains that in most instances, that highly pliable

11   lubricious braid will be weak and unusable.  And then the

12   next sentence, which of course she didn't quote, really in

13   many ways leaves no doubt.  It says, "Hence, a trade-off

14   between braid strength and pliability exists in the design of

15   conventional braided multifilaments."

16           It couldn't say it any clearer, your Honor, that

17   you have to trade off.  If you want it pliable, use these

18   lubricious things that are pliable, you're going to have a

19   strength problem.  Or if you go with the strong ones, you're

20   going to have a pliability problem.  And that's the

21   trade-off.  That's the teaching that's given to us.

22           I'm going to skip over the next one because that

23   one really goes more to the "consisting essentially of," and

24   if you could go to the next slide --

25           THE COURT:  Yes, that's what I was just going to

1    say.  Isn't that your big point on what's novel about this?

2         MR. SABER:  When we get to the "consisting

3    essentially of" --

4         THE COURT:  Isn't this it?  This would be your

5    passage?

6         MR. SABER:  The second passage, that's correct,

7    your Honor, the second passage.  I was trying to just keep

8    the two issues straight.  I'll come back to this, if I may.

9         THE COURT:  Exercising your strong points here,

10   that's true.

11        MR. SABER:  Well, I think they're both strong

12   points.  We wouldn't have moved if we didn't think that they

13   were.

14        And then we get to the description of the very

15   materials that are in the claim, and here again it's made

16   very, very clear what we're talking about.  Now, Ms. Elderkin

17   likes to call this a preferred embodiment, and in many ways

18   this is a fundamental but, I think, very, very simple issue,

19   your Honor.  This is not, as the claims came out, is not a

20   preferred embodiment.  This is the claims.  It's very, very

21   important to understand in the prosecution history of this

22   patent what happened.

23        THE COURT:  So this is Column --

24        MR. SABER:  This is Column 4 starting at Line 9.

25   As Ethicon first filed this patent application, your Honor,

1    it had a very, very broad claim.  All it required was -- I'm

2    paraphrasing -- were two dissimilar yarns braided together in

3    the direct intertwining contact.  It didn't talk about any

4    specific materials.  It didn't have the "consisting

5    essentially of" language either, but it was just two

6    different materials.  That claim was rejected, and they

7    amended the claim.

8          And they did a couple things in the claim, and one

9    of the things that's pertinent to the PE discussion is, they

10    limited it to the specific materials, as you can see at the

11    bottom of this passage, the seven materials that are listed

12    starting with PTFE and going through PE and PP for the first

13    yarn, and then for the second yarn it talks about the PET,

14    nylon and aramid.  So this passage that we're looking at

15    here, this isn't about a preferred embodiment.  It's about

16    the claims, and that's very, very critical to, we think, the

17    answer to this question because these are the materials that

18    are specifically identified in the claims.

19          THE COURT:  Right.

20          MR. SABER:  And that's why we talk about them.  And

21    what does it say?  It says that the first yarn is

22    lubricious.  It says that it's pliable.  And then it says

23    it's there to improve overall pliability, compliance, and

24    surface lubricity.  Then in the second paragraph it goes on

25    to say that these lubricated yarns in the first set are

1    mechanically blended with the yarns of the second set, which

2    act to provide improved strength to the heterogeneous braid.

3              So there's no question what this patent is

4    teaching.  It's teaching, it told us these lubricious yarns

5    are too weak and you have the trade-off:  Pliability, great,

6    but you have braid strength is a problem.  And here, they're

7    saying, is the way we solved that problem:  We took those

8    weak lubricious yarns, which were very pliable, and then we

9    had to add a yarn to it for braid strength.

10             Now, I think the teaching is clear as a bell, and

11   that's why, your Honor, when you look at those passages, we

12   think that there's no question that to just take this term

13   "PE" and blithely apply it to anything that has an ethylene

14   molecule in it would just be so counter to what's being

15   taught in this patent.

16             It's very important, there's not a single word in

17   this patent about this being a high-strength suture.  It's

18   quite the opposite.  It says:  We want to improve the

19   handleability of the suture, we want to improve the

20   pliability of the suture, and we don't want to hurt the

21   strength too much.  So this is the polar opposite of what

22   ultra-high molecular weight PE is, which is, if not the

23   strongest, one of the strongest substances --

24             THE COURT:  But you're essentially asking me to

25   import extrinsic evidence into the claim construction.

1      MR. SABER:  I don't think so.  I'm asking your

2  Honor to look at the passages that are in the patent.

3      THE COURT:  No, because I don't know what

4  ultra-high molecular weight PE is.  So you're basically

5  asking me to take your expert testimony as to what it is, and

6  to say it doesn't have characteristics, and therefore it

7  couldn't possibly fall generically within the concept of PE.

8      MR. SABER:  Well, actually, to look at it the way

9  your Honor says is, of course, that would be the infringement

10  question, is, what is ultra-high molecular weight PE, which

11  is one way to look at it.  It would be an appropriate way to

12  look at it, I believe.

13      THE COURT:  But as I'm understanding, polyethylene

14  can be all of these things.  Almost undisputed, it can be all

15  of these things.  And what you're saying is, but if you took

16  your kind, it wouldn't meet with this limitation in the

17  preferred embodiment.

18      MR. SABER:  Again, let's talk about the evidence of

19  the case because I think that's always a great place to

20  start, and the only evidence that the defendants put in to

21  support the notion that PE can mean anything --

22      THE COURT:  Well, I mean, you have that --

23      MR. SABER:  Well, anything that has an ethylene

24  molecule, or polymer -- I'm not sure what word they used --

25  is the two technical dictionaries.  With respect to the

1  second one, the expert admitted that he made an error, it

2  didn't say it.  And that happens, we all make mistakes.  The

3  first one did say it, but the first one also says:  Well, if

4  you look at it as a source-based definition, yes, it's there,

5  but we don't think source-based definitions are the way to

6  go, right in the same publication.  And when I asked

7  Dr. Hermes about --

8          THE COURT:  What do you mean by "source-based"?

9          MR. SABER:  Source-based means it's just the

10  material that you start with, as opposed to molecular-based,

11  which is, what is it really, how is it really made?

12          THE COURT:  And how many ends are there?

13          MR. SABER:  Well, in this case, that would be it.

14  It could be other things too, but in this case, that's

15  right.  And when I showed him what the authors of the very

16  thing they're relying upon said about this, he said, "I don't

17  have any information to disagree with the authors."  That's

18  what he said.  That's what Dr. Hermes said.  So we're left

19  with very, very little.

20          THE COURT:  Yes, but you're attacking theirs.  What

21  do I have from yours?  Do you have any dictionary, any

22  scientific treatise, or any expert who says that polyethylene

23  would not be understood to include the concept of ultra-high

24  molecular weight polyethylene?

25          MR. SABER:  What we have is really the same

Page 40

1  evidence.

2          THE COURT:  You don't have anything different from

3  what they have?

4          MR. SABER:  No.  I think that's what I just said.

5  Our expert did not offer a treatise that says the opposite of

6  what --

7          THE COURT:  So you're trying to have me import a

8  limitation from the specification and to limit polyethylene

9  to a certain kind of polyethylene?

10          MR. SABER:  Well, I'm trying to understand what the

11  term "PE" when it's used in this patent, what --

12          THE COURT:  I understand your position, and I think

13  we need to move on because we still have the motion for

14  summary judgment left.

15          MR. SABER:  Sure, sure.

16          THE COURT:  So on "consisting essentially of," now,

17  let's say I took your passage.  So then you would say that

18  coating did what?  If I assumed you were right, which is what

19  I think is the hard issue in this, and, you know, whether

20  it's just any blending or whether it's a blending that

21  accomplishes certain purposes --

22          MR. SABER:  Right.

23          THE COURT:  -- so then I've got your coating, and

24  the coating is specifically referred to in the specification.

25          MR. SABER:  That's correct.  Could I go back to the

1    first question first?

2            THE COURT:  Sure.

3            MR. SABER:  And I'll get to the coating issue

4    first.

5            THE COURT:  Sure.

6            MR. SABER:  The first step is, what are the basic

7    and novel characteristics?

8            THE COURT:  Right.

9            MR. SABER:  You know, the parties call it

10   "consisting essentially of."  We actually all agree on what

11   the law of "consisting essentially of" is, that there's no

12   infringement if an unlisted material, which coating of course

13   is, if it materially affects the basic and novel

14   characteristics.

15           THE COURT:  And you would say "materially affects"

16   includes materially improves?

17           MR. SABER:  Absolutely.  And, I mean, I heard

18   Ms. Elderkin to agree with that, even though their papers say

19   the opposite.  But I absolutely believe that that's correct,

20   and it was good to hear her say that today.

21           But the first step and where the parties do

22   disagree is, what are the basic and novel characteristics?

23   And, Sal, if we can go back to the slide before, the

24   paragraph that I told you I'd get back to, Slide 10, and this

25   paragraph that starts at 29:  "In view of the deficiencies of

Page 42

1  the prior art, it would be desirable to prepare multifilament

2  sutures exhibiting improved pliability and handleability

3  characteristics."  And then it goes on to say that "The

4  fiber-forming materials contribute significantly to the

5  enhanced pliability without appreciably sacrificing its

6  physical properties."

7          Now, the dispute between the parties on whether to

8  adopt this or the broader language that the other side

9  suggested really comes down to the same issue of the

10  amendment to the claim, because the law is one hundred

11  percent crystal clear that what you're looking for is the

12  basic and novel characteristics of the claimed invention,

13  which means you look to the language of the claims.

14          Once again, the amendment that I told you about I

15  believe answers this question one hundred percent.  You

16  started with the broad claim that just had two dissimilar

17  fibers.  The language that they read fairly went to just two

18  dissimilar fibers, but the claims at issue is to the seven

19  specific materials for the first yarn and the three specific

20  materials for the second yarn.  And when you look at that,

21  then you get to the next slide again, and I won't go over

22  this in detail, but here it's talking about --

23          THE COURT:  And not bioabsorbable?

24          MR. SABER:  I'll get to the -- bioabsorbable is

25  really a side issue that I don't think really has much --

1          THE COURT:  You don't have a problem with that,

2     right?

3          MR. SABER:  I don't have a problem with that.

4          THE COURT:  All right, so we can add that in.

5          MR. SABER:  You can add that in, that's fine.

6     That's not what this case is about.  It's about this.  And

7     here when you're talking about the characteristics of the

8     specific materials, again it's talking about handleability

9     and pliability characteristics that are improved.  And then

10    you add the strength yarn so you're not appreciably hurting

11    the strength.

12          Again, I think the answer to here is very simple

13    and very straightforward:  When you focus on the claim

14    language and you look to see what the specification says

15    about the language in the claims, it becomes clear that what

16    we offered is, we believe, the correct interpretation.  And

17    that's it.  I mean, I think it's that simple.

18          Now, the coating issue, frankly, and what you talk

19    about in the patent, I don't think has any impact here on the

20    claim interpretation issue.  I think it does have an impact

21    when we get to the infringement issue, but I'll answer your

22    question.

23          If we could go to the paragraph that has the

24    coating.  I don't know if I have a slide on it.  It's at

25    Column 6.  And there's several answers to the question, your

1    Honor.  It's at Column 6.  It starts on Line 5.  It says, "If

2    desired, the surface of the heterogeneous braid can be coated

3    to further improve the handleability and knot tie-down

4    performance of the braid."  Then it goes on to talk about the

5    coating.

6             THE COURT:  Now, which line are we at?

7             MR. SABER:  Line 5 at Column 6.  This is the

8    paragraph where it talks about that you can add coating.  So

9    that's the first sentence, and then if I can go further down

10   into the paragraph starting at Line 14, it says, "However, if

11   the surface of the heterogeneous braid is engineered to

12   possess a significant fraction of lubricious yarn system, the

13   conventional coating may be eliminated, saving expense as

14   well as avoiding the associated braid stiffening."

15            Well, there's three answers to your question.

16   First of all, legally -- legally -- the fact that the patent

17   says you can add something means nothing to the analysis of

18   whether it affects the basic and novel characteristics.

19   You've got to look to the patent to understand what they are,

20   and then you look to the evidence to see whether the unlisted

21   ingredient affects those basic and novel characteristics.

22   And we cited two cases in our brief which stood for that

23   proposition where, again, the patent says you can do this,

24   and nonetheless a court went through the analysis, does in

25   fact the thing that was added, the thing the patent said you

Page 45

1    could add?

2              THE COURT:  And those were trial court opinions,

3    right?

4              MR. SABER:  One was Federal Circuit, and one was

5    trial court, I believe.  I believe that's right.  I think one

6    is in the Federal Circuit, and one is in the trial court.

7              You know, I sympathize with your frustration

8    because it's not like you're going to look at either one of

9    these cases and you're going to see a big bold holding that

10   says, even though the patent says you can add this material,

11   it could still affect the basic and novel characteristics.

12   It's not the way these cases are written.  I know that.  But

13   when you look and see what happened in those cases, that's

14   exactly what happened.  So the first answer is, legally, it

15   just doesn't matter.

16             THE COURT:  So you're saying it has no legal

17   significance?

18             MR. SABER:  That's right, it has no legal

19   significance.

20             Secondly, the prosecution history here is, again,

21   very relevant because as the claim originally was filed, it

22   was just a regular old "comprising" claim.  If this were a

23   "comprising" claim, your Honor, we wouldn't have an argument

24   because if you added an additional ingredient on a

25   "comprising" claim, you still infringe.  But once they did

Page 46

1    the amendment, and I think Mitek cited a case, if they're

2    right, that said it automatically invokes the "materially

3    affects" analysis.  And that's it.

4          So you had language that was in the specification

5    that might have described something before you added the term

6    "consisting essentially of," but once you added the term

7    "consisting essentially of," the question and the only

8    question becomes, what are the basic and novel

9    characteristics of the claimed invention, and does the added

10   ingredient affect those basic and novel characteristics?

11          THE COURT:  In which case it does not infringe?

12          MR. SABER:  In which case it does not infringe.

13          THE COURT:  Even though it facilitates, it doesn't

14   defeat?

15          MR. SABER:  That's right, and I think the law is

16   pretty clear on that point too, and I heard Ms. Elderkin

17   agree with that, that improving what the patent is all about

18   also can affect the basic and novel characteristics.

19          THE COURT:  But what she would disagree with is

20   that the coating really has that dramatic impact.

21          MR. SABER:  I understand that, and that, of course,

22   is exactly the summary judgment question.  It's not the claim

23   construction question.

24          THE COURT:  And she says, well, one expert says one

25   thing, one expert says another.

1          MR. SABER:  Well, that's not correct, but I can

2     deal with that now, or I can deal with it later.

3          THE COURT:  Sure, jump into it now.  So if I accept

4     your theory as to what basic and novel is and I agree that

5     "materially affecting" includes improving on what you say is

6     the novelty here, she says that your expert says, yeah, the

7     coating substantially improves, what is it, pliability?

8          MR. SABER:  Right.

9          THE COURT:  The ability to make knots, I guess.

10    And she says her expert says, no, it sort of has some more

11    subtle effect.

12         MR. SABER:  Well, let's look at what their expert

13    said, what the evidence is.

14         THE COURT:  Which expert are we talking about?

15         MR. SABER:  This is Dr. Brookstein who is the one

16    who gave testimony on this.  Dr. Brookstein's analysis was

17    not what Ms. Elderkin said today.  Dr. Brookstein's analysis

18    was, to affect the basic and novel characteristics of the

19    claimed invention means that you have to -- and I know it was

20    a little flowery language -- you have to miraculously change

21    it into something else or magically transform it so that it's

22    not offering the two things anymore.  That's just not the law

23    and not right.  That was his analysis, and that's what his

24    evidence went to principally.

25         The only other thing that he did, the entirety of

1    Dr. Brookstein's evidence to try and show that there's no

2    material affect on the coating was to say, he said, "Well,

3    it's only 3.4 percent," which he called a small amount.

4    Well, whether 3.4 percent is a small amount --

5                THE COURT:  What did 3.4 percent refer to?

6                MR. SABER:  That the coating constitutes

7    3.4 percent of the volume of the suture, the weight of the

8    suture, and he says that's a small amount.

9                THE COURT:  In terms of weight or in terms of

10   improvement?

11               MR. SABER:  In terms of weight.  He says the

12   coating constitutes 3.4 percent of the weight.  That's a

13   number he got from us.  He didn't do anything.  That's

14   correct.  And he says, "Well, that's a small amount."

15               THE COURT:  So what did the coating do, decrease

16   the lubricity?

17               MR. SABER:  The coating actually does several

18   things.  The principal things -- and, again, describing what

19   coating does is a little bit like saying the world is round.

20   Everyone in this business knows what coating does.  That's

21   why it's on a lot of sutures.  I know you don't, and neither

22   did I, your Honor.  The principal thing it does is, it helps

23   what's called "knot tie-down."  Knot tie-down is the ability

24   of the knot to slide down the suture.

25               THE COURT:  So it actually decreases lubricity?

1      MR. SABER:  No.  It actually probably makes it more

2  lubricious because, you see, to back up --

3      THE COURT:  For knot tie-down, smoothness helps or

4  it --

5      MR. SABER:  Yes, it makes it more smooth.  Here's

6  the problem --

7      THE COURT:  When I think of a nylon tie, sometimes

8  the smoother it is, the harder it is to tie.

9      MR. SABER:  Well, the stiffer it is, the harder it

10 is to tie.

11     THE COURT:  Well, both.  Sometimes if there's

12 roughness, it can grab it.

13     MR. SABER:  That's exactly right, and that's where

14 we're going.  Braided sutures, just by definition, you think

15 about it, it's a braid.  Think of a rope because it's much

16 bigger, it's easier to talk about it, right?  A rope, right,

17 when it's braided, you know, there are bumps all over the

18 place, it's not smooth at all.  Well, a braided suture is

19 much smaller, but the principle is exactly the same.  It's

20 rough because it's a braid as opposed to the monofilaments

21 which are not a braid.

22     So what the coating does, the principal thing the

23 coating does is, it smooths out the rough spots.  And by

24 smoothing out the rough spots, now when that surgeon makes

25 the knot, the knot will slide nicely down the suture.  That's

1    the principal thing that coating does.

2           Every witness in this case when asked, what does

3    coating do, lay witness, expert witness, they said, well,

4    it's for knot tie-down.  It also makes it smoother.  They all

5    said that too.  Pliability there's a little bit of a debate

6    about.  That's why we didn't raise it in the papers.  But as

7    far as the handleability aspects of knot tie-down, no

8    dispute.

9           THE COURT:  So you would say it improves

10   handleability?

11          MR. SABER:  Absolutely.  It also improves

12   pliability, but that's not raised by this motion.  The

13   handleability aspects, every witness, every witness agreed

14   with it.  We put in patent after patent after patent that

15   said that.  Ethicon patents, Ethicon is the largest suture

16   company in the world, and all of their patents say that's why

17   you have coating, every one of them that we found that talked

18   about it, right?  I showed those to Dr. Brookstein.  He says,

19   "I don't know.  I don't know whether that's right.  I don't

20   know if that's not right.  I don't have a background to do

21   that."

22          That's why and one of the things we don't think

23   he's qualified even to testify to this subject, but he

24   couldn't agree or disagree when he was shown the very

25   teachings.  So it's one of those things, everyone knows that

1    coating is there for that purpose.  Frankly, this is a simple

2    case, your Honor.  That's why coating is there.  Everyone

3    knows that's why coating is there.  All the evidence shows --

4              THE COURT:  Your expert says it anyway, right?

5              MR. SABER:  Our expert says --

6              THE COURT:  So the expert -- I got some intuitive

7    feel from --

8              MR. SABER:  It's not just the expert, your Honor.

9    That's the point that I wanted to make.

10             THE COURT:  Well, I don't know that, though.  So

11   how do I know that a person of ordinary skill in the art

12   believes that coating improves handleability because it

13   facilitates knotting?

14             MR. SABER:  Well, as I say, two reasons, and this

15   is a very important point:  One is, our expert says it, as

16   your Honor said.  Secondly, the evidence that he bases it on

17   is all this evidence that I just told you about.

18             Very interesting, when I asked Dr. Brookstein, do

19   you disagree with that, "I don't know."  He never disagreed

20   with that.  He never disagreed with that.  You know, the man

21   never worked on coating of sutures, so when shown that, he

22   said, "I don't know."  So his answer is, "I don't know."

23   That's not a material fact.  So he doesn't disagree that --

24             THE COURT:  Well, the specification itself suggests

25   it.

Page 52

1          MR. SABER:  Absolutely it does.  I mean, that's how

2  well known this thing is.  And, again, that's why this case,

3  frankly, in our opinion, never should have been filed because

4  "consisting essentially of" is a term of art.  The basic and

5  novel characteristics I think are easy to define when one

6  understands it's the claims.  And then the coating affects it

7  is so universally known, that's why this case should end.

8          But I do want to talk about what Dr. Brookstein

9  doesn't --

10         THE COURT:  So suppose there's consensus that it

11  improves knot tie-down.  How do I know it improves it a lot?

12         MR. SABER:  That's why everyone puts it on, your

13  Honor.  That's why everyone puts it on.

14         THE COURT:  I know, but I don't know that.  I'm not

15  a suture woman.  So where does it say that it improves it

16  materially?

17         MR. SABER:  Well, that's why people get patents on

18  it, your Honor.  I mean, no one's going to use the word

19  because that's a legal word.  You've just got to look to what

20  happens.

21         THE COURT:  No, but I understand, though.  So your

22  expert says it improves it substantially.

23         MR. SABER:  Well, it's a material effect.

24         THE COURT:  Right, fair enough.  And the

25  specification acknowledges it improves it.

Page 53

1          MR. SABER:  That's correct.

2          THE COURT:  Their expert says what?  "No."

3          MR. SABER:  Their expert doesn't disagree with

4    that.  What their expert says is two things:  One, he says

5    it's 3.4 percent, and that's a small amount.  He doesn't say

6    why.  He says that's a small amount, 3.4 percent of the total

7    volume is a small amount.  But he never says -- you know,

8    whether something is small or big of course only has meaning,

9    you know, depending upon what you need.  The evidence in the

10   case, the evidence --

11         THE COURT:  In other words, 3.4 percent is your

12   product?

13         MR. SABER:  That's correct, that's correct, because

14   now we are getting into the infringement aspect.

15         THE COURT:  So he's saying that amount of coating

16   wouldn't improve it a lot.

17         MR. SABER:  That's what he says.  Well, no, he

18   doesn't say that.  He just says it's a small amount.  He

19   doesn't say why that's relevant or not.  He just says it's a

20   small amount.

21         The evidence in the case, the evidence is that much

22   less than that, and one of the patents of the two patents,

23   one of them it's, I think, .01 to .1 percent is what's needed

24   to get the handleability improvements.  The other one --

25         THE COURT:  That's your patent?

75dfde02-80e8-47f0-9b78-7f6cb47f3776

1           MR. SABER:  No, that's not our patent.  These are

2      patents in the field teaching what it is about coating, how

3      much coating you need.  The other one I think is .02 to

4      .2 percent.  This is 3.4 percent.  There's absolutely no

5      basis, no basis at all for his testimony that 3.4 percent is

6      a small amount.  He says it, but he never shows about it.

7           There's a burden of proof issue here, your Honor.

8      They're the plaintiffs in this case, and once the issues of

9      material effect are shown, it's their burden to show, to come

10     forward with evidence that it doesn't have a material effect.

11          THE COURT:  Good, I understand your position.  Let

12     me jump back to her on this.  Then hopefully we'll get to

13     unethical conduct.

14          I need you to -- first of all, I find it, as you

15     can tell from my comments, a difficult issue about what's the

16     novel and basic.  I think both sides have a good argument,

17     and there's a strong argument for Arthrex on this as well.

18     If I went with that argument, you said, well, if I go with

19     that, you've got evidence that the coating doesn't materially

20     improve it.

21          MS. ELDERKIN:  Exactly, your Honor.

22          THE COURT:  And could you read me -- do you have

23     it?  Do you have it somewhere?  Because this is the piece I'm

24     weakest on because I just got all the documents yesterday,

25     so --

1          MS. ELDERKIN:  Sure.  It actually is out of their

2    own expert.  They had a surgeon, Dr. Burks, look at a suture

3    that purportedly was coated and then purportedly not coated.

4    And there's a whole other issue there, but let's assume for

5    the sake of today that the suture that Dr. Burks looked at,

6    one was the coated suture and one was the same suture without

7    the coating, and he looked at it to see if he could tell the

8    difference in its handleability and the ability to tie a

9    knot.  And he looked at it, and in the cases where he looked

10   at it, he was able to tell the difference.  But when he was

11   asked, "Okay, well, tell me about that difference --" and

12   this is Dr. Burks' testimony.  It's Mitek Exhibit 9.  It's on

13   our Slide 34.

14          THE COURT:  Let me just go with you.

15          MS. ELDERKIN:  Sure.

16          THE COURT:  And you say this is their guy?

17          MS. ELDERKIN:  It's their guy on whom they rely for

18   this argument that there's a material difference.  So he was

19   able to tell the two apart, but we asked him, "Well, how

20   would you characterize the difference between the sutures?"

21   And he said, "Well, the difference, I think, is subtle, and

22   there's no doubt in my mind that I could line up, you know, a

23   hundred sutures and have error where I would say, you know, I

24   think this one is one way or the other and make a mistake.

25   So there's certainly not enough difference to clearly say

Page 56

1    that I know every time exactly how that feels."

2         And then he also admitted that he was doing these

3    tests with bare hands.  He said he didn't do the tests with

4    his surgical gloves on.  He said, "I can't tell you, if I had

5    my gloves on, if I'd be able to tell the difference between

6    these sutures or not."

7         THE COURT:  So are you basically conceding that it

8    improves the tieability but just not by a lot?

9         MS. ELDERKIN:  I'm conceding that a coating on a

10   suture of this particular type can improve the

11   handleability.  It's not material here.  And I do want to

12   correct the record.  If the impression was left that I said

13   that even in a material improvement here in pliability or in

14   handleability would remove the FiberWire from the claims

15   under the "consisting essentially of" language, that's not

16   what I intended.

17        The reason for that is -- well, two reasons.  First

18   of all, as Mr. Saber said, everybody coats sutures.  Now,

19   there are a lot of different coatings.  They're not all

20   silicone coatings like here.  Everybody coats sutures.  Why

21   on earth would Mitek put an amendment in its claim that's

22   going to remove all sutures because they're all coated,

23   number one?

24        And, number two, where the patent itself says

25   optionally you can coat this if you want, and maybe that will

1    enhance your handleability a little bit more, so that can't

2    be a major or material change in the basic and novel

3    properties of this invention if the patent says:  It's

4    optional.  Do it if you want.  Do it if you don't want.

5             So the evidence either way, under either of the

6    parties' --

7             THE COURT:  Do you have any case law that might

8    discuss this where it's an option in the specification but

9    it's not included within the terms of the claim, how I would

10   understand?  Because I'm having trouble legally with what to

11   do with it, where it's plainly disclosed.  In fact, it says

12   that there's some improvement that comes from coating, so

13   wouldn't --

14            MS. ELDERKIN:  Right, my colleagues here are

15   scurrying.

16            THE COURT:  I'm sort of struggling with whether or

17   not that affects my analysis.

18            MS. ELDERKIN:  This is a very old case we cited in

19   one of our briefs.  It's the ex parte Boukidis case,

20   B-o-u-k-i-d-i-s.  It's at 154 USPQ, 444.  It's old, and it's

21   from the Board of Appeals.  It's 1967.  But the Board there

22   did say that "Consisting essentially of does not necessarily

23   limit claims to exclude other things when the specification

24   clearly indicates that the other constituents may be present

25   as well."  Other than that, I agree, your Honor, there's not

1    a lot of jurisprudence on it.

2           THE COURT:  Chisum doesn't speak about it?  Has

3    anyone looked at the treatise on patents?

4           MS. ELDERKIN:  I don't believe so.

5           THE COURT:  It's just one of the areas I haven't

6    had a chance to address in particular terms.  All right,

7    well, thank you.

8           Now, did you want to address anything else before

9    we moved on to inequitable conduct?

10          MS. ELDERKIN:  I think unless your Honor has any

11   questions --

12          THE COURT:  Do you want to respond?  So Burks says

13   it's subtle.

14          MR. SABER:  Well, if I could just respond, first of

15   all, to give you some case cites because we do cite cases for

16   the proposition that whether it's in the patent or not, you

17   can still affect the basic and novel characteristics.

18          THE COURT:  And is that already in your brief?

19          MR. SABER:  It is, your Honor.

20          THE COURT:  Okay, and the cases are?

21          MR. SABER:  It's the AFG case and the

22   American Machine case, and they are cited in our brief.  And

23   I just will notice that what Ms. Elderkin said, even the one

24   that she cited says, "Well, not necessarily."  And that's

25   right, of course it's not necessarily.  You just have to do

1    the analysis.

2              THE COURT:  Good.  Thank you.

3              MR. SABER:  With respect to Dr. Burks, first of

4    all, Dr. Burks was just brought in to do one limited test.

5    That's all it was.  He wasn't the expert to speak about all

6    the evidence of what coating does.  So they just ignore all

7    the evidence of that on Dr. Burks.  And it's very

8    interesting, they leave out -- well, Ms. Elderkin did cite

9    where he said, "If I got a hundred, I might get it wrong."

10   That's right, if you got a hundred, you might get it wrong.

11   But what did happen is -- you know, they tried at the

12   deposition, because he had done it for his report, and, of

13   course, he got those right, they said, "Well, we're going to

14   trick him.  We'll make him do it at the deposition again."

15   Guess what, he got them all right.  That doesn't establish a

16   genuine material fact.

17             Also, the law is, your Honor --

18             THE COURT:  But he did use the word "subtle."

19             MR. SABER:  He did, he did.  And, you know, these

20   are differences that of course they're not -- these are

21   things that make things better, and it's important -- the

22   reason why many, many people coat sutures is precisely

23   because it's what the marketplace wants.  It's of importance

24   to the marketplace.  That's the test of materiality, as we

25   cited to your Honor in the case law, and he's very, very

Page 60

1    consistent with that.

2            The other thing too is that the law is -- again,

3    this is on summary judgment -- they cannot create a material

4    fact simply by criticizing our evidence.  This is our

5    evidence.  They have to come forward with their own, and they

6    haven't done it, your Honor.

7            THE COURT:  Well, I don't know if that's true.  If

8    you yourself have two competing sets of statements, I don't

9    know that they couldn't rely on that.

10           MR. SABER:  Well, as I say, you know, the law does

11   say they're the ones that have to come forward with

12   affirmative evidence.

13           THE COURT:  Yes, they're coming forward first.

14           MR. SABER:  Right.  And, as I say --

15           THE COURT:  Okay, I mean, does your expert address

16   this at all?  You said it did in your other case.

17           MR. SABER:  I'm sorry?

18           THE COURT:  Does Brookstein?

19           MS. ELDERKIN:  Yes, Brookstein does address it.  He

20   didn't do his own test, but he does address the whole --

21           THE COURT:  Does he really have a miracle

22   standard?

23           MS. ELDERKIN:  No, not at all, your Honor.

24           MR. SABER:  It's what he testified to.  You know, I

25   asked him what he meant, and that's what he said, that's what

1    it is.  So what we're left with is Dr. Burks who got it

2    right, and we have all the evidence of what coating does.

3    That's the --

4              THE COURT:  Okay, thank you.  All right, so what's

5    the issue on inequitable conduct?

6              MS. ELDERKIN:  Mr. Bonella will address this for

7    your Honor.

8              MR. BONELLA:  Your Honor, Mitek moved for summary

9    judgment of no inequitable conduct, to dismiss Arthrex's

10   defenses of inequitable conduct, and that motion should be

11   granted for several reasons.  First, Arthrex's allegations

12   are based on an incorrect, overruled legal standard.  Second,

13   the references that we're talking about here were not

14   withheld from the Patent Office, your Honor.  In fact, they

15   were the subject of prosecution.  Third, Arthrex cannot show

16   a misrepresentation, and, fourth, they cannot show the

17   threshold level of intent to deceive by clear and convincing

18   evidence.

19             Your Honor I'm sure knows there are two prongs

20   essentially to the inequitable conduct analysis --

21             THE COURT:  What page are you on?

22             MR. BONELLA:  Slide 37, your Honor.  Do you have

23   it?

24             There's two prongs to the inequitable conduct

25   analysis. First is whether there was a material omission, a

1    withholding, or a material misrepresentation, or, secondly,

2    whether there was intent to deceive.  Arthrex cannot show

3    either with respect to either of those two allegations.

4         First, let's talk about the proper standard.

5    Arthrex's inequitable conduct defense should be dismissed on

6    summary judgment because it's become clear in their response

7    papers that they're relying on an incorrect legal standard.

8    Arthrex on Page 10 of its brief cites to --

9         THE COURT:  So just remind me.  What was the basic

10   claim of inequitable conduct, failure to disclose

11   references?  Was that it?

12        MR. BONELLA:  No, it's not, your Honor.  That's not

13   it at all, and that's the interesting point.  This wasn't

14   about failure to disclose.  In fact it's about the references

15   that were the very subject of the office actions and

16   prosecutions in front of the Patent Office.

17        Arthrex makes two allegations.  First, they say

18   there was a reference, the the Kaplan reference.  And they

19   say the claims were rejected over the Kaplan reference, and

20   the patent attorney came back and tried to distinguish the

21   Kaplan reference.  Again the claims were rejected over the

22   Kaplan reference, and the patent attorney came back and he

23   distinguished the claims as a result by adding the

24   "consisting essentially of" language to remove bioabsorbable

25   materials.

Page 63

1    Arthrex disagrees with the interpretation of the
2   reference that the prosecuting attorney took.  During the
3   prosecution, the prosecuting attorney said the sheath in the
4   Kaplan patent was a semiabsorable or fully absorbable
5   sheath.  And what we're claiming here by adding the
6   "consisting essentially of" language is, that we're claiming
7   a nonabsorbable sheath, and the Patent Office ultimately
8   agreed with that position and allowed the patent.
9    What Arthrex is saying is, that interpretation of
10   the patent Arthrex disagrees with.  They say, "The patent
11   attorney got it wrong, and because he got it wrong, he
12   committed inequitable conduct."  That's essentially the
13   argument.
14    The second allegation they have is about another
15   reference that was the subject of prosecution.  This
16   reference is the Burgess reference.  The claims were
17   initially rejected over the Burgess reference.  The Burgess
18   reference is the European patent application.  It's a page
19   and a half long with no drawings, and it's about fishing
20   line.
21    In responding to that rejection, the patent
22   attorney came back and said, "That's about fishing line, not
23   about suture.  Fishing line is not analogous art, and because
24   it's not analogous art, it's not within the circle of art
25   that you look to in determining the validity and the

1   obviousness analysis," and made statements about why fishing

2   line and the Burgess reference were not analogous art.

3   Arthrex argues those statements were misrepresentations.

4           So this isn't about withholding references.  In

5   fact, the Burgess reference was disclosed early on in

6   prosecution by the prosecuting attorney, and now he's being

7   accused of thinking inequitable conduct with respect to the

8   very reference he disclosed.  So it's not your typical case

9   where there's --

10          THE COURT:  More of a misdescription or --

11          MR. BONELLA:  That's what they're trying to allege,

12   your Honor, yes.

13          THE COURT:  All right, thank you.  Did want to

14   finish up?

15          MR. BONELLA:  Yes, I have more.

16          THE COURT:  All right.

17          MR. BONELLA:  Okay.  They say -- we look in their

18   briefs, and say, well, what -- we submitted our motion, and

19   what did they say in response?  They said, Arthrex's argument

20   was, we're relying on a gross negligence standard, citing to

21   Reactive Metals and Alloys V. ESM from the Federal Circuit in

22   1985.  Page 10 of Arthrex's brief says, "Gross negligence may

23   constitute sufficient wrongful intent to support a holding of

24   inequitable conduct."  But that is just wrong.  That case was

25   overruled by Kingsdown in 1988.  And lest there be any doubt,

1    in 2003 in the Ulead case, the Federal Circuit said,

2    specifically referring to this Reactive Metals case that

3    Arthrex relies on, said, "To the extent that Reactive

4    suggested that a finding of gross negligence standing alone

5    is sufficient to satisfy the intent prong of inequitable

6    conduct, has been overruled."  That standard is just wrong.

7    They're relying on the wrong standard.  Their allegations

8    fail as a matter of law.

9            But even if we look to what Arthrex is alleging

10   about Kaplan, they say, well, there was a misrepresentation.

11   Arthrex's litigation counsel disagrees with the prosecuting

12   attorney's interpretation of the reference.  Well, what

13   evidence is there that there was a misrepresentation based on

14   Kaplan?  We have no testimony from Arthrex's technical

15   experts about Kaplan.  They didn't ask him to opine about

16   Kaplan.  No testimony from their technical expert.

17           Arthrex's patent law expert, he likewise was not

18   asked to testify about Kaplan and did not provide any

19   opinions about Kaplan.  Telling.

20           The only evidence we have is Arthrex's litigation

21   counsel's interpretation of Kaplan in its briefs, but

22   Arthrex's litigation counsel is not one of ordinary skill in

23   the art who is able to construe a technical reference and

24   explain what it means.  So Arthrex lacks the requisite

25   evidence to even show a material misrepresentation with

Page 66

1    respect to Kaplan.

2            And the Akzo case from the Federal Circuit is right

3    on point here.

4            THE COURT:  Well, I don't need to go through all.

5    Let me ask you this:  So I don't need to address this, right,

6    if I find there's no infringement?

7            MR. BONELLA:  If you find that there's no

8    infringement as a matter of law, then --

9            THE COURT:  So this only comes up -- you would only

10   need a ruling if I find there's an infringement because then

11   you don't want to be thrown out on some sort of inequitable

12   conduct?

13           MR. BONELLA:  Right, if there's infringement or if

14   there is going to be a trial, if there's dispute of fact.

15           THE COURT:  Well, it goes to me anyway, right?

16           MS. ELDERKIN:  Yes.

17           THE COURT:  This usually isn't sent to a jury,

18   right?

19           MR. BONELLA:  Inequitable conduct is for you,

20   that's correct.  It's purely an issue of law.

21           THE COURT:  Why do I have to do this?

22           MR. BONELLA:  Why do we have to do it?  To narrow

23   the work for trial, we know our witnesses, we know how to

24   prepare everything.

25           THE COURT:  Well, this isn't going to go to a jury

75dfde02-80e8-47f0-9b78-7f6cb47f3776

1    trial anyway.  So what you really need right now is a ruling

2    on claim construction, right?

3              MR. BONELLA:  That's correct, your Honor.

4              THE COURT:  So that's what you need right away.

5    This can go on a slower boat.

6              MR. BONELLA:  That's correct, your Honor.

7              THE COURT:  I understand why it's important because

8    no one likes to be just hanging out there.

9              MR. BONELLA:  That's correct.

10             THE COURT:  So what you really need right now is a

11   decision because then we'd make a decision as to whether we

12   go to trial on infringement/validity.  This is a "me" issue

13   later on, right?

14             MR. BONELLA:  That's correct.

15             THE COURT:  Okay, this won't go to a jury under any

16   theory, as I understand it.

17             MR. BONELLA:  That's Mitek's position.

18             THE COURT:  Is that right?  It's still the law,

19   right?

20             MR. SABER:  That's right.  It's an equitable issue,

21   so it can go to the jury, but your Honor can do it too.

22             THE COURT:  Okay, good, thank you very much.  So

23   why are trying to -- they say every patent case now, you

24   can't have one without a claim of inequitable conduct.

25             MR. SABER:  Right.  Your Honor, I wouldn't blame

1    him for citing that law.  I cite that law when I'm on the

2    other side.  And if I thought that this was just a case like

3    that, we wouldn't have filed it.  That's the bottom line.

4           I just want to address a few things Mr. Bonella has

5    said.  I'm not going to give a long argument on here.  First

6    of all, on this wrong standard thing, it's an oversell if

7    I've ever heard it.  Should we have cited that case?

8    Probably not.  What has happened is that on the knowledge

9    thing, the test really is, you don't have to show actual

10   knowledge; you can show that they knew or should have known.

11          THE COURT:  Yes, the reckless disregard kind of

12   standard.

13          MR. SABER:  Well, you have to have an intent to

14   deceive, but you can show the intent to deceive by showing

15   that they knew what they did was wrong or they should have

16   known what they did was wrong.

17          THE COURT:  But it is more or a recklessness or a

18   willful blindness kind of thing rather than a negligence.

19          MR. SABER:  Yes, but, you know, we probably

20   shouldn't have used the word "gross negligence."  It was just

21   an alternative theory on the intent piece.

22          THE COURT:  All right, we're getting out of it,

23   right?  Let's get to the merits.

24          MR. SABER:  That's all it was.

25          Mr. Bonella is correct that this was not a

1   withholding of the reference case.  But it's not, and

2   particularly with respect to the Burgess reference, it was

3   not a question of just fighting about what the reference

4   says.  That's not the inequitable conduct that's alleged.

5   See, Burgess was a fishing line, a braided fishing line of

6   ultra-high molecular weight PE and polyester and nylon, the

7   same thing that their claim is, if one were to conclude that

8   PE falls within the claim.  And Mr. Bonella is correct that

9   there was an issue of not analogous art there, but that's not

10  all they said.  What they said is, they talked about -- what

11  the attorney did is, the attorney talked about that

12  combination, the Burgess combination of ultra-high molecular

13  weight PE and polyester and nylon and what it would be.  And

14  in describing what it would be as a braid for a suture,

15  that's the misrepresentation; not about what Burgess teaches

16  but what that braid would work as a suture.  And he said two

17  very important things:  He said it would make a bad suture.

18  It would make a bad suture, particularly because it has

19  ultra-high molecular weight polyethylene in it, which has low

20  stretchability and minimal elongation -- I might have got

21  that backwards -- right, and it would be terrible material to

22  use for a suture.  By the way, part of the record and part of

23  the reason why PE shouldn't be construed to include

24  ultra-high molecular weight PE, the thing that they told the

25  world would work poorly for a suture, but here it is, they

Page 70

1    said it would work poorly for a suture, it would have bad

2    knotting characteristics if you used it for a suture.  And

3    then they said -- here was the punch line -- even if one

4    looked to the teachings of the fishing line art -- and, of

5    course, what was the teaching of the fishing line art that

6    was there, Burgess, right? -- if a suture designer looked

7    there, one would inevitably design an unacceptable suture.

8    Those were the statements that Ethicon made to get over this

9    rejection, and they got over this rejection.

10             THE COURT:  But why would you even look at Burgess

11   if it was a fishing line?

12             MR. SABER:  Because it is the same kind of thing.

13   It's the same thing, and you always do this in patent law.

14   You look at analogous things.  Like, for instance, they

15   talked about Kaplan.  Kaplan wasn't a suture, by the way.  It

16   was a prosthesis, and they looked to it because it was close.

17             THE COURT:  What does that mean?

18             MR. SABER:  That's an artificial --

19             THE COURT:  Like a leg?

20             MR. SABER:  Yes, it is.  It's not a leg in that

21   case, but that's what it could be.

22             THE COURT:  Well, why would that be anything like

23   a --

24             MR. SABER:  A suture?

25             THE COURT:  Yes.

1        MR. SABER:  Because it's the same kind of problems

2   that you're trying to do, where people would look.

3        THE COURT:  For the whole leg or --

4        MR. SABER:  First of all, it wasn't a whole leg.

5   It was an internal piece like a ligament.  It's an artificial

6   ligament, I think is what it was in that case.  And that's

7   why you always are looking to these other areas all the

8   time.  There's nothing unusual about that at all and --

9   because the question is, would you look there --

10       THE COURT:  But these are the gray areas as to

11  whether you'd look to --

12       MR. SABER:  Excuse me?

13       THE COURT:  These are somewhat gray areas.  I get

14  into these fights all the time whether something should be

15  considered prior art or not.

16       MR. SABER:  Well, this is not a question of whether

17  it's prior art.  It is.

18       THE COURT:  But why would you ever need to knot or

19  have handleability on a fishing line?

20       MR. SABER:  Well, because you do have very, very

21  similar kinds of things.

22       THE COURT:  You just tie it onto a hook and throw

23  in the line, says a non-fisherwoman.  But, I mean, it's not

24  the same kind of thing.

25       MR. SABER:  It's not exactly the same, of course

75dfde02-80e8-47f0-9b78-7f6cb47f3776

Page 72

1  not.  In fact, Pearsalls is the company that makes the

2  suture.  They make the fishing line too, not this fishing

3  line, but they make fishing line out of this product too.  I

4  mean, it's what people in the industry do, and that's where

5  you get your ideas about as to what to do, and that's why it

6  was cited against them by the examiner.  And what they said

7  is, if you did that, you'd get a bad suture.  So it isn't a

8  fight about what Burgess says.  The fight is, they said you'd

9  get a bad suture if you made it out of this material.  If you

10  looked to the fishing line art, if you looked to the Burgess

11  braid, it would be a bad suture.

12        Here's where the inequitable conduct comes in.  We

13  took Dr. Steckel, one of the inventor's, testimony, and I

14  asked him, "Well, if you did this combination, did you

15  think --" this is when he was doing his invention -- "did you

16  think you'd get a good suture or a bad suture?"  He fought

17  me, he fought me, he fought me, but finally he said, "Yeah,

18  we thought it was a good idea.  You'd get a good suture with

19  ultra-high molecular weight PE and polyester," or PET I think

20  is what we were talking about but the same thing, the exact

21  opposite of what was said by Ethicon's attorneys to the

22  Patent Office.  They said it would be a bad suture.  They

23  said it would have bad knot characteristics.

24        Dr. Steckel said, "Mr. Hunter and I, the other

25  co-inventor, we thought it would have good knot-tying

1    abilities.  We thought it would make a fine suture," all

2    right?  They didn't disclose that to the patent office.  They

3    said, "No, no, no, if you followed these teachings, you'd

4    have a bad suture," without ever knowing that their inventors

5    allegedly, because this is what he testified to, said, "We

6    think the opposite."  That's inequitable conduct.  That's not

7    right, and that's what you shouldn't do, and that's why there

8    was a material misrepresentation here.

9              THE COURT:  All right, so how do you respond to

10   that?

11             MR. BONELLA:  If I may, your Honor?

12             THE COURT:  So your inventors, do they think you

13   could borrow from the fishing technology and make a good

14   suture?

15             MR. BONELLA:  Absolutely not.  I heard a lot of

16   talk up here, but I didn't see any evidence.  And if we look

17   at the evidence, what does the evidence really show?  These

18   are the three statements, your Honor, that Arthrex points to

19   in their brief.  There's a lot of talk up here about this

20   material and that material and what people thought about

21   certain materials, but the three statements Arthrex says in

22   their brief that were misrepresentations, number one, "The

23   fishing line of Burgess would have poor knot strength and

24   security properties."  Number two, "The property requirements

25   for fishing line yield a braid with poor knot strength and

1   security."  Number three, "Even if a medical designer did use

2   the teachings of the fishing line art to modify a suture,

3   then he would inevitably design an unacceptable suture."

4          All the three statements they actually point to,

5   the evidence in the record, are about fishing line or

6   Burgess.  So the question is, did Dr. Steckel say anything

7   inconsistent with those statements?  Because what they're

8   trying to set up is that the inventor knew something that was

9   inconsistent with this.

10         THE COURT:  He says that it did.  He said it would

11  make a fine suture.

12         MR. BONELLA:  That's right.  Are any of these about

13  suture?  No.  The one statement is about a fishing line of

14  Burgess, the second statement is about the property

15  requirements for fishing line, and the third statement is

16  what a medical designer would do if faced with the fishing

17  line art.  Dr. Steckel did not testify about fishing line.

18  Dr. Steckel did not testify about the fishing line

19  properties.  He didn't testify about what a suture designer

20  would do when faced with fishing line, and he didn't testify

21  about the teachings of Burgess.

22         If you look at the undisputed evidence, your Honor,

23  Mitek Fact No. 116:  There is no evidence that Dr. Steckel

24  was familiar with fishing line properties, undisputed.  Mitek

25  Fact 117:  There's no evidence that Dr. Steckel considered

Page 75

1    designing sutures from fishing lines, undisputed.  So the

2    actual statements that they're looking at, there's no

3    statements from Dr. Steckel that are inconsistent.

4           What Dr. Steckel did say was that he believed

5    braiding ultra-high molecular weight polyethylene with PET

6    would make an acceptable suture, not a fishing line, a

7    suture.  And the Burgess reference Mr. Saber says is the same

8    braid.  There's no evidence in the record about this.  He

9    does all these things about what fishing line --

10          THE COURT:  So you're saying that Steckel said in

11   the abstract, that those two braided together would be fine,

12   but wasn't looking at the Burgess patent?

13          MR. BONELLA:  I'm sorry, I didn't understand your

14   question, your Honor.

15          THE COURT:  You're saying that when he was

16   responding -- do you have the exact Q and A that's being

17   relied on?  Is it in the record?

18          MR. BONELLA:  The exact Q and A, if you want to

19   look at the exact Q and A from Dr. Steckel that they rely on,

20   it's on Page 2, Slide 48 of our brief, that he believes that

21   would make an acceptable suture.  He didn't testify anything

22   about fishing line, fishing line properties, or the teachings

23   of Burgess, or what one of skill in the art would do based on

24   fishing line art.  He said, "I would design the sutures, and

25   I thought these would make acceptable sutures.  Sutures are

Page 76

1  sterilized --"

2         THE COURT:  Wait, wait, you're going too fast.

3  Where?

4         MR. BONELLA:  I'm sorry, Slide 48.  This is the

5  only testimony that they cite from Dr. Steckel, Pages 179 to

6  180.

7         THE COURT:  All right it's just a little pale

8  because it's yellowed over.  I'm having trouble reading it.

9  "We had a belief that it could lead to --"

10        MR. BONELLA:  " -- an acceptable suture."

11        THE COURT:  What was the "it"?

12        MR. BONELLA:  The "it" is a braid of direct

13  intertwining contact of ultra-high molecular weight

14  polyethylene and PET.  And so he believed that that would

15  make an acceptable suture, but that's in no way inconsistent

16  with anything that was said to the Patent Office.

17        THE COURT:  Just help me.  "Did you have -- in

18  formulating this idea, did you have any sort of belief that

19  if you put --" what, Dyneema?

20        MR. BONELLA:  Dyneema is a trade name for

21  ultra-high molecular weight polyethylene.

22        THE COURT:  Okay, "-- with PET --"

23        MR. BONELLA:  Yes.

24        THE COURT:  And that's what you have in your second

25  set of filaments, right?

1          MR. BONELLA:  Correct, your Honor.

2          THE COURT:  " -- It would lead to an acceptable

3     suture?"

4          MR. BONELLA:  Right, which is what he thought he

5     disclosed in the patent, polyethylene PET.

6          THE COURT:  What's Ethibond?

7          MR. BONELLA:  Ethibond is an Ethicon suture.  It's

8     a polyester braided suture in direct intertwining contact.

9     It's a product that's been around for many years.

10         So Dr. Steckel, all he was saying was, "I thought

11    it would make an acceptable suture."  He's not saying

12    anything about fishing line, fishing line properties, what a

13    medical designer would do based on fishing line.  This

14    statement is in no way inconsistent with any of the three

15    statements they actually identified from the record.

16         And we disagree about what Burgess discloses, but I

17    don't think we even need to go there because there's no

18    inconsistency based on the evidence they cited.  And if you

19    look to try to find the evidence they cite from Dr. Steckel,

20    it's not even in their argument.  It's on Page 2 of their

21    brief, and you kind of have to infer this is what they're

22    relying on.  But Burgess discloses a fishing line.  It says

23    there's a braided construction, but it doesn't say what type

24    of braided construction.  It just says braided construction.

25    It's a page and a half long, double-spaced, no drawings.

Page 78

1          THE COURT:  Okay, I've got the gist of the

2    problem.  Thank you very much.

3          MR. SABER:  Your Honor, could I just briefly

4    respond, just very, very briefly?

5          THE COURT:  Yes.

6          MR. SABER:  I can't say this one sentence any more

7    clearly:  What Dr. Steckel said is that the Dyneema and

8    polyester together he thought would make an acceptable

9    suture.  What Ethicon said, that if you look to that

10   combination, you would inevitably design an unacceptable

11   suture.  They're the exact opposite.

12         THE COURT:  Where does it say that?

13         MR. SABER:  I'm looking -- the easiest place is,

14   I'm looking in Mitek's Powerpoint Slide 45.  It's an accurate

15   quote:  "Even if a medical designer did use the teachings of

16   the fishing line art to modify a suture, then he would

17   inevitably design an unacceptable suture."

18         You can't get any more opposite than that.

19         THE COURT:  What's that quote from?

20         MR. SABER:  That's from the response that Ethicon

21   filed in the Patent Office.  They said you would inevitably

22   design an unacceptable suture.  Dr. Steckel, the inventor, at

23   the time believed, with that same combination, you would

24   design an acceptable suture, the exact opposite.  And that's

25   why we have an inequitable conduct allegation here.

1        MR. BONELLA:  If I could just respond quickly?

2        THE COURT:  Do we know whether the braiding is the

3   same?

4        MR. SABER:  It has to be.  It says -- the

5   Burgess -- the Burgess they never -- the reason Burgess was

6   cited is that it was a braid of -- it's called Dyneema in the

7   claim, in the Burgess reference, which is ultra-high, as

8   Mr. Bonella correctly said.  It's polyester and nylon and --

9        THE COURT:  Polyester is PET?

10       MR. SABER:  Polyester, PET, the same thing.

11       THE COURT:  Okay.

12       MR. SABER:  Polyester or nylon together braided

13  with Dyneema.  It's a fishing line braided together.  That's

14  what it says.  There's no other thing other than a braid.  I

15  mean, that's what a braid is.

16       You know, Ms. Elderkin tried to talk about this

17  core thing.  There's no core in Burgess.  There's no talk

18  about it.  It just says a braid of these two materials.

19  That's it.  And, of course, that's what we're talking about.

20       THE COURT:  Do we know from looking at Burgess

21  whether it's the same kind of braid?

22       MR. SABER:  There is only one kind of braid.  If

23  you're braiding it together, if the two materials are braided

24  together, they're braided together.  I mean --

25       THE COURT:  There was some argument that there were

1    different kinds of braids.

2         MR. SABER:  Well, that's what Ms. Elderkin said.

3    There's no evidence to support that.  She said, well, you

4    could have a braid -- you know, she never disputed that the

5    braid is the two materials, you know, just like the hair

6    braided together, right?  What she said is, you could have a

7    braid where there's a core, and then you have what's called a

8    sheath in the art, or a cover in the art, on the outside

9    which was braided of a different material.  So the core would

10   be one, and then the braid on the outside would be

11   different.  That's Ms. Elderkin's interpretation.  Mind you,

12   there's no evidence to support that, but that's what she

13   says.

14        But even if we were to accept that, even if we were

15   to accept that, in Burgess, there's not a word about a core.

16   So the only thing that's left is a regular old braid that

17   anyone would understand is just the two materials braided

18   together.

19        THE COURT:  Okay, thank you.  Any quick response?

20   Then I'm going to let you go.

21        MR. BONELLA:  Just quickly, your Honor, two

22   points.  One was, I heard Mr. Saber reading the statement

23   that he was saying was a misrepresentation.  I heard him

24   paraphrase it, but then I heard him actually read it.  When

25   you actually read it, what it says is, "Even if he --" this

1   is DMI 196 which is a prosecution entry -- "Even if he,"

2   meaning a medical designer, "did use the teachings of the

3   fishing line art to modify a suture, then he would inevitably

4   design an unacceptable suture."  It's about using teachings

5   of fishing line art to modify sutures.  Dr. Steckel never

6   testified about using teachings of fishing line art.

7   Mr. Saber kept saying that this response is PET plus

8   ultra-high molecular weight is an unacceptable suture.  It

9   doesn't say that.

10          If I could just respond to one thing he said about

11  there's no evidence in the record about what a braided

12  construction is.  That's false.  Dr. Hermes testified that

13  the core sheath is a braided construction, but it's not in

14  direct intertwining contact as claimed.  Also Dr. Mukherjee

15  agreed that the term "braided construction" which is in the

16  Burgess application also (Inaudible) to the core sheath, and

17  there are many, many other examples of --

18          THE COURT:  You're saying Burgess had a core

19  sheath?

20          MR. BONELLA:  Burgess says it's a braided

21  construction, doesn't specify at all what the braided

22  construction is, how to make it, how it's constructed, just

23  says braided construction.  It could be an infinite number of

24  things.

25          THE COURT:  Thank you very much to all of you.  Let

Page 82

1    me just ask you.  I just want to understand the process.  If

2    I say no infringement, it's over.  You go up to the Federal

3    Circuit, right?

4             MS. ELDERKIN:  I believe that's right, your Honor.

5             THE COURT:  If I say disputed issue of fact, I

6    agree with your analysis of the basic and novel, but I am

7    confused about the subtle versus the material, then would you

8    want to go to trial just on infringement, or are there

9    validity issues?

10            MR. SABER:  There are many validity issues, your

11   Honor.

12            THE COURT:  So the thought would be one uniform

13   trial?

14            MS. ELDERKIN:  Yes.

15            THE COURT:  And what I would need to do is just set

16   up a trial date?

17            MS. ELDERKIN:  Yes.  Right now we're sitting with a

18   November 13 trial date.

19            MR. SABER:  Though we've been told by Mr. Alba

20   that --

21            THE COURT:  As a practical matter, unless my mega

22   pharmaceutical case settles, that looks unlikely, so I don't

23   want you flying people in.  It's more likely to be the new

24   year, if we should go that way, and, quite candidly, I'm not

25   sure this opinion will be out by then, so --

1          MR. SABER:  Your Honor, I appreciate that

2    because -- I think actually counsel probably may actually

3    agree with this -- we're all from out of town, and to have a

4    date certain is really important to us, if we can.

5          THE COURT:  I'm not sure I'll ever be able to give

6    you that because I've got drugs, guns, and child pornography.

7          MR. SABER:  Sure, but as close as you can.

8          THE COURT:  The criminal is always going to trump

9    it somewhat.

10          MR. SABER:  I completely understand that.

11          THE COURT:  But I can usually get you -- I think

12    the odds are against a November trial date unless my

13    pharmaceutical case either settles or gets continued, but

14    we're sure going to let you know a lot in advance, and we

15    won't pull the last-minute thing on you.

16          MR. SABER:  I appreciate that.

17          THE COURT:  But what you really are telling me is

18    that I need to -- if I say there's a fact question on

19    infringement, we should have a joint trial on infringement

20    and validity.

21          MR. SABER:  That's correct, your Honor.

22          MS. ELDERKIN:  Yes, your Honor.

23          THE COURT:  And the issues are what, obviousness?

24          MR. SABER:  There is anticipation and obviousness.

25          THE COURT:  Good.  Oh, we haven't even touched

Page 84

1   anticipation.

2           MR. SABER:  Well, you know, that's right, and we

3   could rely on our briefs on that.  We don't want to take your

4   Honor's time.  But as I'm sure you can appreciate, you know,

5   we tried -- I think both sides, frankly, tried to be

6   selective in what we presented to you on summary judgment.

7   If we go to trial, there are multiple other issues.

8           THE COURT:  What else?  Is there best mode or --

9           MR. SABER:  There are some 112 issues, not a best

10  mode issue, but there are some enablement issues --

11          THE COURT:  I'm most confused on enablement.  Don't

12  they usually want me to do that as a --

13          MR. SABER:  Well, those are fact issues for a jury,

14  and that's what the law is.  Now, again, we tried to pick and

15  choose --

16          THE COURT:  Right, so there's the usual --

17          MR. SABER:  And there are several different prior

18  art issues that are not in the papers.

19          THE COURT:  And what about damages?

20          MR. SABER:  There's those issues too.

21          THE COURT:  And these have all been teed up?

22  You've done discovery into them and all that kind of stuff?

23          MS. ELDERKIN:  Expert report, expert discovery is

24  completed, and everything's ready to go.

25          THE COURT:  All right.  And inequitable conduct --

1  in other words, what really needs speedy attention are the

2  claim construction and infringement, and I can maybe do

3  inequitable conduct or not on the paper record, but that's

4  not what's deciding the lockstep on all of this.

5           MS. ELDERKIN:  Right.  And as long as your Honor

6  agrees that inequitable conduct does not get presented to the

7  jury, there's no rush on that.

8           THE COURT:  No, no, I usually do that.  Sometimes

9  it takes as long as the jury trial, but -- and I like to do

10  it afterwards because by then I've totally understood the

11  technology a little bit better, although this has been a very

12  useful heads-up and well argued.  It's just I need to -- if I

13  get to it, I get to it.  If I don't, I don't.  I need to get

14  through your claim construction issues is the key piece of

15  this.

16           MR. SABER:  I agree.  Those, I think, are the most

17  important issues.

18           THE COURT:  And last but not least, have you

19  attempted a mediation on this?

20           MS. ELDERKIN:  Yes.

21           MR. SABER:  We did, your Honor.

22           MS. ELDERKIN:  We had a mediation about a month

23  ago.

24           THE COURT:  And it's hopeless until I start doing

25  some of this stuff?

1          MS. ELDERKIN:  I believe so, your Honor.

2          THE COURT:  Now, once I resolve it, let's assume I

3     said -- I'm not saying I'm saying -- "Well, here's what it

4     says the key inventive thing is, handleability,

5     blah-blah-blah, but I don't know about coating," would that

6     facilitate a settlement?  Would you want to go back?  Or you

7     basically think that this case is going to have to go on a --

8     you're not even close.  I want to understand, if I make a

9     ruling on claim construction, does it make sense to send you

10    to mediation?

11         MS. ELDERKIN:  Certainly if you rule in our favor,

12    your Honor.

13         THE COURT:  If I rule in your favor -- I'm assuming

14    if I rule in either side's favor completely, it's just going

15    up on appeal at some point.  But if I took this middle

16    ground --

17         MS. ELDERKIN:  Actually, you'll see in our papers,

18    even if you rule in their favor completely, we believe there

19    are still material issues of fact, genuine issues of material

20    fact that preclude summary judgment.

21         THE COURT:  On infringement.

22         MS. ELDERKIN:  On infringement.

23         THE COURT:  No, no, no, I understand that fully.

24    I'm just saying, but that would be the gray area for both of

25    you where there might be a possibility for additional

Page 87

1    settlement discussions or not?

2              MS. ELDERKIN:  It's always possible, your Honor.

3              MR. SABER:  That's a tough one to answer.  The

4    parties were very, very far apart.

5              THE COURT:  Are you head-on-head competitors?

6              MS. ELDERKIN:  Yes, your Honor.

7              THE COURT:  So this isn't --

8              MR. SABER:  Well, in fact these parties have

9    licensed each other in the past.  You know, there's actually

10   an interesting dynamic here.

11             THE COURT:  Why don't we go off the record for

12   this.

13             (Discussion off the record.)

14             (Adjourned, 4:00 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                 C E R T I F I C A T E

2

3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )
5

6

7

8           I, Lee A. Marzilli, Official Federal Court

9   Reporter, do hereby certify that the foregoing transcript,

10  Pages 1 through 87 inclusive, was recorded by me

11  stenographically at the time and place aforesaid in Civil

12  Action No. 04-12457-PBS, DePuy Mitek, Inc. V. Arthrex, Inc.,

13  and thereafter by me reduced to typewriting and is a true and

14  accurate record of the proceedings.

15          In witness whereof I have hereunto set my hand this

16  24th day of October, 2006.

17

18

19

20

21

22          _____
            LEE A. MARZILLI, CRR
23          OFFICIAL FEDERAL COURT REPORTER

24

25