# EXHIBIT 15

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-o-

DEPUY MITEK, INC., a Massachusetts Corporation,

Plaintiff,

-vs-

ARTHREX, INC., a Delaware Corporation, and PEARSALLS LTD., a Private Limited Company of the United Kingdom,

Defendants.

Civil Action No. 04-12457 PBS

EXPERT DEPOSITION OF:

ROBERT T. BURKS, M.D.

-o-

Condensed Copy

Location: Mariott University Hotel
Salt Lake City, Utah

Date: June 7, 2006
3:00 p.m.

Reporter: Denise Kirk, CSR/RPR

-o-

court reporter can transcribe them as opposed to shaking your head or nodding your head; do you understand that?
A. Yes.
Q. Also, if you'll allow me to finish the question before you answer, it will make for a better transcript. Even though you may even be able to anticipate the end of my question by what I say in the beginning, if you'd allow me to finish and then answer it will allow the reporter to make a clear transcript; do you understand that?
A. I do.
Q. Also, if I ask you a question and you don't understand, I'll ask that you tell me you don't understand the question. Otherwise, I'll assume that you did understand the question; is that fair?
A. Fair.
Q. Are you being represented today by counsel?
A. Yes.
Q. Who is your counsel?
A. Sal Tamburo.
Q. Do you know when Sal or the law firm Dickstein Shapiro Morin & Oshinsky began representing you for purposes of this case?



A. In February.
Q. Is that when Arthrex or Dickstein contacted you with respect to your role in this case?
A. Yes.
Q. Are you being compensated for the time you spend on this lawsuit?
A. Yes.
Q. How are you being compensated?
A. How much?
Q. Yes.
A. $400 an hour.
Q. Was that a negotiated fee or was that your standard fee for doing expert consulting?
A. I don't really have a standard fee, so I guess you could call it negotiated.
Q. Other than money, is there any other compensation you are receiving for work on this case?
A. No.
Q. Were you given any dollar amount that you should not exceed in performing work for Arthrex in this case?
A. No.
Q. I'm going to hand you DePuy Mitek Exhibit 231 and ask you if you recognize this document, Exhibit 231?



A. Yes.
Q. What is Exhibit Number 231?
A. A subpoena for me.
Q. Did you understand that be Exhibit 231 was a subpoena on you for certain documents and things listed in schedule A of Exhibit 231?
A. Yes.
Q. Today are you producing any documents or things in response to the subpoena, Exhibit 231?
A. No.
Q. If you could turn to page two of Exhibit Number 231, please. Do you see request number one for documents there, being all communications between any of Arthrex, you, Dr. Mukherjee and Dickstein Shapiro Morin & Oshinsky concerning the lawsuit commenced by the plaintiff attached as Exhibit 1?
A. Yes.
Q. Did you perform any search that might be responsive to request number one in Exhibit Number 231?
A. Yes.
Q. Did you find any?
A. No.
Q. Request number two in Exhibit 231 is all documents concerning this lawsuit, including, but not



limited -- well, hold on. Strike that.
Did you perform a reasonable search for documents in response to request number two in Schedule A of Exhibit 231?
A. I guess I don't see the difference. There aren't any documents that I'm aware of in the lawsuit.
Q. Under things to be produced on page two of Exhibit Number 231, request number one is all tested and untested samples referred to in Expert Report of Robert T. Burks, MD dated March 24, 2006, including, but not limited to suture A and suture B. Do you see that?
A. I do.
Q. Did you perform a search for things responsive to request number one?
A. No.
Q. You did not?
A. I knew it didn't exist.
Q. You knew what didn't exist?
A. The suture.
Q. You mean the tested and untested samples?
A. The pieces that I had I had disposed of when I was done. I knew there wasn't anything to look for.
Q. Under request number two on things to be

produced on page two of Exhibit 231 is all equipment used to test the samples as described in paragraphs nine through 13 of Expert Report of Robert T. Burks, MD dated March 24, 2006, including, but not limited to the equipment that was used to cut and wet the samples and to conduct the tactile feel analysis and knot tie-down analysis; do you see that?

A. I do.

Q. Did you perform a search for the materials requested in request number 2?

A. No.

Q. Why not?

A. The equipment that was used was a pair of scissors just to cut it, something from home, I felt like it didn't have relevance.

Q. What about the solution that was used to wet these tested samples?

A. I used tap water.

Q. Did you use anything else in performing the tests described in paragraphs nine through 13 of your expert report other than tap water and scissors and the sutures?

MR. TAMBURO: It might help if the witness had his report in front of him to refer to.

A. The things used, like a pair of gloves,



are disposed of after and they're just a generic set. There wasn't anything used that would be unique that I felt would be worthwhile to produce.

Q. So you used gloves when you performed the tactile feel analysis and knot tie-down analysis?

A. I did both. I used and didn't use gloves.

Q. Is there any reason why you decided not to bring gloves today?

A. No.

Q. Did your counsel advise you to bring gloves?

A. No.

Q. Did you go over -- did you have a chance to go over Exhibit 231 with your counsel before coming to today's deposition?

A. Yes, we looked at it.

Q. Dr. Burks, could you please describe your formal education post-high school for me, please.

A. I did medical school at St. Louis university. I guess after high school I did college at Southern Methodist University, medical school at St. Louis university, orthopedic training at University of California San Diego.

Q. When did you graduate from undergrad?

A. Undergrad college was '74.



Q. What about medical school?

A. '78.

Q. Then, after medical school, where did you go?

A. To residency training.

Q. When did you finish your residency training?

A. '83.

Q. Where was your residency training?

A. University of California San Diego.

Q. Did you have a specialty there?

A. Yes. Well, there's no specialty in training per se, but I did do a fellowship during that time with Dale Daniel at Kaiser Permanente.

Q. What was that fellowship in?

A. Knee and sports medicine.

Q. When did you finish your fellowship in knee and sports medicine?

A. '83.

Q. Other than those programs or degrees you mentioned, are there any other -- is there any other formal education that you've gone through?

A. No.

Q. Once you completed your fellowship in knee and sports medicine in 1983, what did you do?



A. I went into private practice in St. Louis, Missouri.

Q. What was the focus of your private practice in St. Louis?

A. Sports medicine, general orthopedics.

Q. Did you focus on any particular parts of the body within sports medicine and general orthopedics?

A. Knee and shoulder were the big focus.

Q. And when did you leave private practice in St. Louis?

A. I was there three years; I believe it was '86.

Q. Then what did you do in 1986?

A. I went to Wayne State University in Detroit.

Q. What did you do at Wayne State?

A. I was on the academic staff there and was the head of sports medicine.

Q. Your time spent at Wayne State, was that strictly in an academic environment or did that also include a clinical practice?

A. Yes. I mean, it was a clinical practice, but it was as a full-time faculty member.

Q. Can you explain how that works, your role

at Wayne State, how it was spent between full-time faculty member and participating in a clinical practice?
A. Well, there's really no distinction. I mean, my job was to take care of patients and people. And so the education was for residents and that's what they were training to do was take care of people.
So there really wasn't a distinction between a clinical practice and what you are doing academically as far as your work goes.
Q. So did you teach in a classroom setting?
A. No.
Q. So I think I understand. What type of medicine did you practice at Wayne State as a full-time faculty member and in a clinical practice?
A. It was orthopedic surgery with an emphasis in sports medicine.
Q. Again, did you focus on the knee and shoulder areas?
A. Yes.
Q. When you were at Wayne State what were the -- generally what were the procedures that you would perform for shoulder surgeries?
A. Perform shoulder instability operations, rotator cuff operations, things that we do for what we



call impingement, shoulder pain procedures, procedures that revolve around the clavicle.
Q. Anything else you can think of?
A. I mean, it's a pretty wide area, but those are the main things.
Q. What about when you were at Wayne State, what were the procedures that you would perform for knee surgeries?
A. Ligament reconstructions, operations for instability of the knee cap, cartilage procedures, meniscus procedures.
Q. When you were at Wayne State, did you perform any ankle surgeries?
A. Sure.
Q. What ankle surgeries? What procedures would you perform doing ankle surgeries?
A. The main procedures revolved around arthroscopy, and then I would do some procedures that revolved around loose ankle joints where people have chronic ankle sprains and tightening those up.
Q. Then, I take it, at some point you left Wayne State?
A. Correct.
Q. What year was that?
A. '88.



Q. In 1988 after leaving Wayne State, what did you do?
A. I came here to the University of Utah.
Q. What position did you enter the University of Utah in 1988?
A. I was an assistant professor in orthopedic surgery. And we didn't really have a true division, but I was part of the sports medicine team.
Q. Can you generally describe your duties as an assistant professor in the orthopedic surgery department at the University of Utah?
A. Duties were to take care of standard patients that we would see, to instruct residents in clinical evaluation of patients and surgical treatment of patients, to be involved in some areas of research and produce academically, and were involved with taking care of the athletic teams.
Q. While at the University of Utah, I take it from 1988 to the present you've remained at the University of Utah?
A. Yes.
Q. From 1988 to the present, do you perform any classroom teaching?
A. Minimally. Occasionally it comes up, but not very much.



Q. What classes would you teach when it comes up?
A. It's usually just an isolated lecture, not like a class series. So it would be lectures to the residents or to medical students on a specific topic, sometimes to physical therapy students.
Q. Since 1988, how have your duties and responsibilities at the University of Utah changed?
A. I don't think they've changed much.
Q. Okay. At some point you did become head of the sports medicine division, though, right?
A. Correct.
Q. Do you know when that happened?
A. I'd be guessing a little. I'm not sure of the exact year.
Q. How about 1992, does that sound familiar?
A. That's probably close.
Q. Dr. Burks, I'm going to hand you Exhibit Number 233. This is a printout of a web page from the University of Utah. If you could just please look at that.
MR. TAMBURO: Do you have another copy?
Q. No. Just let me know if that's generally accurate.
A. Yes.

50

A. Poor wording. I guess it was to say that my sense of how FiberWire works and handles, that subjective feel of that is in that environment.
Q. So you don't use FiberWire in any non-surgical environment, do you?
A. Well, I've used FiberWire in laboratory studies when we do cadaveric studies or other things. But I don't use it for non-medically related things.
Q. When you say "most of my subjective use of FiberWire occurs during surgery", were you referring to the surgical environment versus non-surgical environment like you just described?
A. Right.
Q. Then you say "FiberWire is generally wet in the surgical environment", what does that mean?
A. Well, in the environment where I work arthroscopically we work with fluids, so it's hard for a suture not to be wet.
Obviously, there are times where we work in a dry air environment and the suture may get wet passing through tissue, but it's not necessarily intentionally wetted like it is with arthroscopy.
Q. During surgery, do you wet FiberWire before is it's introduced into the body?
A. Not deliberately, no.

51

Q. Earlier you said the suture may get wet passing through tissue, but it's not necessarily intentionally like it is with arthroscopy. I don't know what that means.
A. In an arthroscopic environment we have a microscope in a joint and we distend the joint so we can see with fluid.
So any time we introduce suture into that environment it's under water, if you will. So no matter what we do with it, by the time we start to use it, it's wet.
Q. When using FiberWire in a surgical environment, do you always wear gloves?
A. Yes.
Q. What about in the -- let me rephrase the question. In a nonsurgical environment, do you always wear gloves when using FiberWire?
A. No.
Q. What determines whether you wear gloves?
A. Either sterility for a patient or protection for myself.
Q. If it's a nonsurgical environment, how does sterility of the patient matter?
A. It doesn't.
Q. In a nonsurgical environment, what

52

determines whether you wear gloves?
A. In a nonsurgical environment it would be protection for me.
Q. Okay. Protection from what?
A. Well, if we do cadaveric surgery some cadavers have diseases so we may want to have gloves on when we work with them.
Q. What about in the laboratory environment, when you are using FiberWire, do you wear gloves?
A. I guess it depends on what you mean by the laboratory environment.
Q. By laboratory environment, I mean anything other than a surgical or nonsurgical environment like we've been talking about.
A. Well, we do, for example, cadaveric surgery in the laboratory, so we would consider that a laboratory environment, and I would use gloves for self-protection in that setting.
Q. Let me ask you a better question. Outside of a surgical environment or nonsurgical environment, do you wear gloves when using FiberWire?
A. I guess I would say no.
Q. Dr. Burks, if you could turn in Exhibit 232 to paragraph eight, you state: "Sometime in February 2006 I was contacted by attorneys for

53

Arthrex, Inc., and asked to conduct a tactile feel analysis as well as a knot tie-down analysis of coated and uncoated FiberWire suture. I agreed to conduct the analysis." Do you see that?
A. I do.
Q. Who contacted you in February of 2006?
A. Sal Tamburo.
Q. Anyone else?
A. No.
Q. Do you remember the substance of the conversation you had with Sal in February of 2006?
A. Yes.
Q. What was that substance?
A. He said that Arthrex and more, in particular, FiberWire was involved in a patent infringement lawsuit and he was wondering, since I've had experience of using FiberWire, if I would be willing to talk about FiberWire and how its used, etc., and if I'd be willing to look at FiberWire in a couple of different states and give him feedback on what I thought about that.
Q. What were those couple different states?
A. My understanding was that it was a coated suture and a not-coated suture.
Q. Anything else?

62

remember any other marking on the spools?
A. No.
Q. Do you know who put the samples on the spools that you received in March 2006?
A. No.
Q. Could it be that there were other markings on the spools other than suture A and suture B?
MR. TAMBURO: Objection, asked and answered.
A. Certainly there could have been, you know, some marking or name, but I don't remember anything else that would be pertinent.
Q. When you received the samples in March 2006, did you have any indication of whether suture A or suture B was coated or uncoated?
A. No.
Q. So once you received the samples in the two plastic bags on the spools, what did you do next?
A. Took the suture out, cut the suture with just regular scissors to make some lengths, and sort of had an A pile and a B pile.
Q. Where were you when you received the suture samples in March of 2006?
A. I believe they came to my office.
Q. Did you perform the test in Exhibit 232 at

63

your office or at home?
A. I actually did it at home.
Q. Did you do any tests at the office?
A. No.
Q. So you received the samples in the office and then brought them home?
A. Yes.
Q. Did you cut them at home?
A. Yes.
Q. And then after you cut them, how did you segregate suture A and suture B?
A. I just put all the A's from the one spool in a single pile and the B's in a separate pile.
Q. How long were the lengths of suture when you cut them off the spool?
A. They were roughly a couple of feet.
Q. Was there anybody else present when you performed the tests in Exhibit 232?
A. No.
Q. Was there anybody else present when you cut the samples off the spools?
A. No.
Q. It also says in paragraph nine: I was told by Arthrex's attorney that one sample was coated and that the other sample was uncoated; however, I was

64

not told which sample was coated and which was uncoated.
Other than the coated versus uncoated distinction, were you told of any other differences between the two samples?
A. No.
Q. Once you cut the sutures off the spools, what did you do with the spools?
A. Ultimately I pitched them.
Q. At home?
A. Uh-huh.
Q. You threw them away?
A. Yes.
Q. What about the plastic bags that were used to hold the suture samples?
A. Same.
Q. You threw them away?
A. Uh-huh.
Q. So you cut five samples from each spool, right?
A. Correct.
Q. So you had five strands of suture A and five strands of suture B each segregated into their own pile, right?
A. Yes.

65

Q. What did you do next?
A. I spent a little time taking different sutures from one pile or from the other pile and just looked at them, felt them, handled them to see if I could tell much difference between them.
Then I put them around a small hook to be like a suture anchor environment, if you will, and I tied some knots down, some slip knots, to see how it would feel.
Then I wet it, immersed the sutures, and tied again to see if I could tell much of a difference.
Q. You said you spent a little time taking different sutures from one pile and the other and just looked at them, handled them, felt them to see if I could tell much difference between them.
What you just described there, is that the tactile feel analysis that you performed as reflected in Exhibit 232?
A. Yes.
Q. About how long did it take to perform the tactile feel analysis as reflected in Exhibit 232 from the time you cut the sutures until the time you concluded that there was a difference between suture A and suture B??

A. I'll try to clarify again. I didn't, in my mind, view it as a pure test A/test B. So when you handle suture tying knots and doing things with it, you have a tactile feel. So I didn't -- so that's part of the knot tying. So I didn't segregate it out as two isolated separate things.

Q. So in your report, Exhibit 232, are you making two conclusions based on a conclusion of the tactile feel analysis and a conclusion based on the knot tie-down analysis?

A. I'll try to clarify again. A knot tie-down analysis I view as having a tactile aspect to it as well, you are feeling the suture as you tie it. So I don't view them as totally isolated.

Q. Okay. So how many analyses did you perform as reflected in Exhibit 232?

A. I used all the strands and tied multiple knots on all the strands. So I'm not, I guess, quite sure -- I can't tell you I did 20 knots on each strand or 30, but they were each used for multiple knot tying.

Q. My question might have been unclear. Not how many times did you perform the analysis, but how many different analyses did you do in coming to the conclusions as expressed in Exhibit Number 232?



MR. TAMBURO: Objection, vague.

A. I felt the suture and I tied knots with the suture.

Q. But earlier you testified that that's all encompassed in the knot tie-down analysis. So I'm wondering did you do a knot tie-down analysis and that's it and that had two subparts or two different analyses and then come up with a conclusion -- come up with two different conclusions?

MR. TAMBURO: Objection, mischaracterizes the testimony.

A. Again, I'm not trying to characterize in this that these are segregated separate tests, but this was a tactile feel and knot tying. It was a length subjective feel on both of those.

So when you tie knots, you get a tactile feel. So I was making the statement that on the tactile feel, how it feels to me, it felt this way and when I tied knots, it also felt that way. It's sometimes hard to do one without doing the other.

Q. When you were doing -- when you did the tactile feel analysis and the knot tie-down analysis as expressed in Exhibit 232 were you wearing gloves?

A. Not always.

Q. Can you explain the breakdown?



A. I tried to try knots partly with gloves to see if I felt that there was a difference and partly without gloves to see if I could feel a difference.

Q. Did using gloves in the tests in Exhibit 232 affect your ability to distinguish between suture A and suture B?

A. I think, clearly, using gloves makes the feel of the suture a little different. I guess I can't answer directly to say if it makes the difference but, yes, it probably makes a difference.

Q. What difference does it make?

A. You are covering your skin with the gloves, so, you know, as you feel suture, your absolute sensation of the suture probably changes some.

Q. Could you have reached the same conclusions you reached in Exhibit 232 if you solely used gloves in performing the tests?

A. I didn't do it that way, so I guess I can't answer that and say yes or no.

Q. Did not using gloves help you to distinguish between suture A and suture B?

A. Potentially, yes.

Q. Did it or -- I'm asking you if, in fact, it did?



A. And I'm telling you my answer is it potentially did.

Q. I don't think I understand that. How could it potentially? I mean either it did or didn't, right?

A. No.

MR. TAMBURO: Objection, argumentative.

Q. Why do you say "potentially"?

A. I'm trying to be honest. I did feel without gloves and I know there's a pile A and a pile B, so there is potential that feeling suture without gloves made me feel that A was a little different than B that had I been gloved the entire time, I might not have detected.

Q. So from start to finish then after you cut the suture samples until the time you made your conclusions expressed in Exhibit Number 232, how long was that?

A. I'll give you the same answer: 45 minutes or so.

Q. So the 45 minutes encompassed roughly ten minutes you spent on the tactile feel analysis?

A. No.

Q. So 45 minutes plus ten minutes or just 45 minutes?

A. I would say it was probably 45 minutes plus ten minutes.
Q. Did you tie knots in each of the individual five sutures from suture A and suture B?
MR. TAMBURO: Objection, asked and answered.
A. Yes.
Q. After you performed the tactile feel analysis and knot tie-down, as reflected in Exhibit 232, what did you do with the sutures that you tested?
A. I pitched them with the spools.
Q. You threw them out?
A. Yes.
Q. Did counsel ever instruct you to not throw away the samples?
A. No.
Q. Did counsel give you any instructions at all what to do with the samples once you performed the tests on them?
A. No.
Q. Did you throw them away at home or at the office?
A. At home.
Q. And then once you completed the tactile feel analysis and knot tie-down analysis and once you



threw away the sutures, what did you do next?
A. Well, as it regards this, I sent an e-mail to Sal and said here's what I thought.
Q. Do you have a copy of that e-mail?
A. Nope.
Q. What did you do with the e-mail that you sent to Sal after you concluded the tests?
A. What did I do with the e-mail? I didn't do anything with the e-mail. I hit "send".
Q. It's still on your computer?
A. I would doubt it's on the computer. I mean, just due to the volume, they don't keep three months or four months or whatever.
Q. Did you send it from work or home, the e-mail?
A. I don't know for sure.
Q. You don't know for sure?
A. No.
Q. Did you delete the e-mail you sent to Sal after you finished performing the tests?
A. I'm not sure I understand deleting the e-mail. I sent him an e-mail. I didn't purposefully delete any e-mail.
Q. Do you use Microsoft Outlook for your e-mails?



A. No.
Q. What program do you use for your e-mails?
A. At home it's a Comcast e-mail and then here it's a Group-Wise.
Q. But do you use -- what e-mailing system do you use at home? Is it AOL or Lotus Notes or Microsoft Outlook or a Yahoo account?
A. It's a Comcast.
Q. That's done on a personal computer?
A. Yes.
Q. What about in the office? What kind of e-mailing system do you use?
A. We call it Group-Wise.
Q. Is the e-mail account you have at home different than the one you have at the office?
A. Uh-huh.
Q. Did you look for the e-mail in response to the subpoena, Exhibit Number 231?
A. Yes. The e-mail -- I mean, my awareness of the e-mails is that they go back two or three weeks or so and then after that they just go into cyberspace.
Q. So you did not look for the e-mail in response to the subpoena, Exhibit 231?
A. No, because that was like three months



ago.
Q. When you say the e-mails go back two or three weeks and then go into cyberspace, you are referring to work e-mail or your home e-mail?
A. Well, primarily, I guess I'm referring to the work one. I don't use the home as much. So I don't. . .
Q. Do you remember what the e-mail said that you wrote to Sal after you performed the tests in Exhibit 232?
A. Pretty much what's in here. I just said, you know, sample A to me felt this way compared to sample B.
Q. Felt -- what word did you use to describe how suture A felt in relationship to suture B?
A. I don't remember specifically but, I mean, I probably used a word like "smoother".
Q. But you are not sure?
A. I'm not sure of the word.
Q. Did Sal send an e-mail back to you once you sent him the e-mail after completing the tests in Exhibit 232?
A. Not that I remember specifically.
Q. When was the next time you spoke to Sal after sending the e-mail on which you completed the

(Brief recess.)
THE VIDEOGRAPHER: Back on the record on record 5:38.
Q. (By Mr. Falke) Dr. Burks, can you explain the knot tie-down analysis that you conducted as reflected in Exhibit 232, paragraph 12?
A. It was taking a strand, tying a knot on it, sliding the knot down and then putting another knot/half hitch, whatever you want to describe it, and sliding it down.
Q. What did you tie the suture samples on?
A. A hook.
Q. What type of hook was it?
A. Just a simple sort of brass hook.
Q. Did you use the same knot configuration for each comparison?
A. I used the same knots for the different groups, but I varied knots to see how different knots might feel.
Q. But for each knot that you tied on suture B, you did that same knot on suture A?
A. Right, right.
Q. About how many knots did you tie in total in the know tie-down analysis for each suture set, generally?



MR. TAMBURO: Objection, vague.
A. When you say suture set, you mean the group of sutures or the individual strand?
Q. The set of five.
A. Okay.
Q. So as an example, if you did 30 total knots is that 15 per suture A and suture B? Let me rephrase the question or repeat the question. About how many knots did you tie in total for each suture set when you did the knot tie-down analysis?
A. I think it would be, again, hard to give you a specific number. I'm not trying to be vague, it's just that when you say a knot, for example, I'm trying to say that I might throw a half hitch down which isn't technically a complete knot, and then I might throw another half hitch, so there might be multiple half hitches that you could consider one knot or you could consider it 20 throws and 20 knots.
Q. Let me try to help you out there then. How many comparisons then did you do in the knot tie-down analysis between suture A and suture B?
MR. TAMBURO: Objection, vague.
Q. Do you understand that?
A. I can tell you what I did and . . .
Q. Please.



A. I mean, I took each strand from each set and I tied multiple knots, if you will, in each strand so each strand may have had 20 throws in it and. . .
Q. So does that mean then you did five comparisons? You did a knot configuration for each of the suture samples?
MR. TAMBURO: Objection; mischaracterizes the testimony, asked and answered.
A. I guess I'm trying to go with you, I'm just not sure what you. . .
Q. When you say "comparisons", I mean, regardless of the knot configurations or how many particular knots were on the one suture, you compared that configuration, whatever it is, to the other suture set, right?
A. Correct.
Q. How many times did you do that?
MR. TAMBURO: Objection, vague.
A. I guess one would say that's five. So the five strands in one set got compared to the five strands in the other set.
Q. Right. Did you wet the suture when you did the knot tie-down analysis?
A. Yes.
Q. How did you wet the sutures?



A. With tap water.
Q. Can you explain that?
A. Sure, I just filled a glass with water and put the suture down in it and then tied the knots.
Q. Did you wet them one at a time?
A. Yes.
Q. How long did the suture stay submerged in water?
A. Briefly. Three or four seconds.
Q. But the same amount of time in the water for each suture?
A. Yes.
Q. Do you know if the sutures absorb water when they're wet?
A. No.
Q. You don't know?
A. No.
Q. Were each of the -- you come to the conclusion in paragraph number 12 of Exhibit 232 that when suture A -- there was less friction when sliding the knot on the sample labeled suture A as compared with sample labeled B. Was that true for all five suture samples?
A. That was a sum feeling on my part. So it might not be fair to say it's true on every strand but

it was my overall take from looking at them.
Q. Do you remember how many -- strike that.
Does a suture that has less friction when sliding that knot mean that the suture has better knot tie-down performance?
A. Not necessarily.
Q. Why?
A. Well, if you envision a perfectly smooth suture, for example, if you slide a knot it might slide very easily but it might also tend to not hold as well because there's not as much inherent friction in it.
Q. Does a smoother suture mean it has better tactile feel than a suture that is not as smooth?
A. I would say no, I don't know that I'd say it's a better tactile feel.
Q. Why did you use a surgeon's knot when you did the knot tie-down analysis in Exhibit 232?
A. I think what I would do is say that -- again, maybe my critique of the verbiage would be at fault. So I guess I wouldn't -- you know, we talked earlier about what a surgeon's knot is.
Q. Uh-huh?
A. And I probably didn't focus on it enough to say that they're not necessarily surgeons' knots as



I described them.
Q. Okay, so why did you use the particular knots, then, that you used in the knot tie-down analysis?
A. I just tried to reproduce what I do in the operating room.
Q. In paragraph 11 in Exhibit 232 you state that suture A generally felt smoother than suture B. What do you mean by "generally"?
A. The differences between the sutures were subtle. I mean, they were not sharp, distinct. So I'm meaning that in comparing them, my take was that it was generally smoother.
Q. Were there any of the sutures in the tactile feel analysis where you couldn't tell the difference between suture A and suture B?
A. It was not my intent at the time in looking at the sutures to compare each strand side to side. My intent was to look at sort of spool A and spool B. So it was to get a feel of, in general, how do they feel between the two.
So I didn't take a strand and say is this one different? And is this one different? And go down through that five times, because I felt it was all the same suture.



Q. But were there any where you couldn't tell a difference? I mean, it was pretty close?
A. Sure, it was pretty close.
Q. Let me rephrase. Were there any where you couldn't tell the difference between suture A and suture B?
MR. TAMBURO: Objection, asked and answered.
A. I don't remember specifically having ones that I would say I clearly feel a difference on this one and I clearly don't on the next one. It was a general feel of all of them.
Q. Dr. Burks, how would you describe your relationship with Ethicon?
A. I guess none.
Q. None? So you would say that you have a closer relationship with Arthrex?
A. Yes.
Q. What about could you describe your relationship with DePuy Mitek?
A. I have been a consultant with DePuy Mitek. Just this week I was helping on an educational course for DePuy Mitek reps. But I've had no product or anything like that with DePuy Mitek.
Q. You mean development product work?



A. Yes.
Q. What was the educational course this last week that you helped with DePuy Mitek?
A. It was educating reps who go into the operating room and, you know, are helping surgeons with their materials, sutures, implants, what not, and how to handle the operating room environment, be appropriate and be helpful.
Q. The course was not on a particular DePuy Mitek technique or anything like that, it was --
A. It was not focused on a particular product but it was focused on helping reps better sell DePuy Mitek products.
Q. By being more professional in the operating room?
A. Correct.
Q. Is this the first time you have done that for DePuy Mitek?
A. This is the second.
Q. Other than those two courses, have you consulted with DePuy Mitek in any other courses?
A. Yes.
Q. What are those?
A. There was an educational course in Chicago and you are going to say when and I'm going to guess

four years ago. It was a cadaver course where they were doing DePuy Mitek products and they asked me to come give a couple of talks and help in the lab using those products with the doctors who were there.
Q. Do you remember what those products were?
A. Not specifically. They were suture anchors, suture passing instruments, but I don't remember a specific product.
Q. Are you a consumer of DePuy Mitek products?
A. Sure.
Q. What DePuy Mitek products do you use?
A. Well, I mentioned earlier I use OrthoCord. I use some DePuy Mitek anchors. They make an electric cautery unit that we use, in every case we use electric cautery.
They have some suture-passing instruments that we use. I use one of their drill guides and fixation sets for ACL surgery.
Q. When you do an ACL fixation, what product do you use?
A. It depends on the type of ACL that we're doing. If I use a bone/tendon/bone graft which is a common graft, on the femoral side, I fix it with a DePuy Mitek device which is a couple of absorbable



pins, and on the tibial side I fix it with either a DePuy Mitek screw or a screw from a different company depending on upon quality.
On the hamstring, I typically on the femoral side use a Smith and Nephew product --
Q. EndoButton?
A. EndoButton. On the tibial side I typically use a Milagro screw and frequently for the post use that Arthrex screw.
Q. When you say hamstring, that's soft tissue?
A. Correct.
Q. Semitendonosis?
A. Very good.
MR. TAMBURO: We're all half doctors here.
MR. FALKE: Let's take a break.
THE VIDEOGRAPHER: Off the record, 5:54.
(Brief recess.)
THE VIDEOGRAPHER: On the record, 6:02.
Q. (By Mr. Falke) Dr. Burks, I'm going to hand you DePuy Mitek Exhibit 286, DePuy Mitek Exhibit 284 and DePuy Mitek 285. These are FiberWire samples that were produced to us from Pearsalls who is a company that makes FiberWire for Arthrex.
I covered up on those exhibits the



manufacturing state that those sutures have gone through. And I'm wondering if you can look at those, analyze them, do whatever you have to do, but tell me which ones are coated and which ones are not coated, if any?
A. So these are three separate types of suture?
Q. They're three different sutures. Well, I'm going to take that back. I don't know if they're three different sutures.
MR. TAMBURO: You are not sure what they are.
MR. FALKE: We know what they are, yeah. I mean, based on Pearsalls' representations of what they are. If you need to cut them and get you a glass of water, if you want to wet them.
MR. TAMBURO: Are they in the same form in which they were produced?
MR. FALKE: Yes, we did not alter them.
MR. TAMBURO: Do we have Bates numbers?
Q. Slow down. Just for the record, so the record is clear, what did you just do, Dr. Burks?
A. I just opened the suture that was in the bag.
Q. What Exhibit Number is that?



A. That is 286.
Q. You cut a piece off of the suture in Exhibit 286?
A. Right.
Q. And --
MR. TAMBURO: There's no Bates numbers on these?
MR. FALKE: There were no Bates numbers.
Q. Would you put that on the suture you cut from Exhibit 286 and mark with a pen Exhibit 286. Now, can you explain what you are doing now, Dr. Burks? First, can you put the suture that you took out of 286 back in the bag?
A. (Witness complies.)
Q. Thank you, and then proceed. Can you explain for the record what you are doing now?
A. I'm opening 285.
Q. You are cutting suture sample from Exhibit 285, right?
A. Yes.
Q. Could you please mark with the tape Exhibit 285 that you've cut? Proceed. Can you state what for the record what you are doing now?
A. I'm opening number 284.
Q. And cutting a suture from Exhibit 284?

A. Yes.
Q. And now you are going to mark the suture sample that you took from Exhibit 284 with a flag?
A. Correct.
Q. Can you hand me the original sample sets back?
A. (Witness complies.)
Q. Also, I'm going to hand you DePuy Mitek Exhibit 234 which is a chart I'd like you to fill out if you could, please, and under the suture column put the numbers corresponding to the suture samples you've just cut, just 284, 285 and 286?
A. Fair enough?
Q. Fair enough.
A. Have we got a while?
Q. However long it takes you.
MR. TAMBURO: Are you representing that one of them is coated, one of them is not coated?
MR. FALKE: I'm not making any representations. They could all be coated, they could all be uncoated, could be a mix?
A. Can I use your notebook?
Q. Of course. What do you need?
A. I was going to use one of those metal rings.



Q. Sure. First, can you do a tactile feel analysis on it? Can you tell the difference?
A. Kind of -- like I said, when you tie knots you combine that together.
Q. Can you explain what you are doing now?
A. I don't want to knock your little deal off, you know? I'm just getting a sense for how it slides and trying to put down a couple of throws.
Q. Which Exhibit Number are you working on?
A. I'm on 285.
Q. Okay. What type of knots are you throwing?
A. Half hitches.
Q. Now, can you explain what you are doing, Dr. Burks?
A. Same thing.
Q. With which exhibit?
A. 286.
Q. Are you doing the same thing you did with the previous one?
A. Yes.
Q. Same knot configurations?
A. Uh-huh.
Q. Can you tell a difference between the first two sutures, Dr. Burks, Exhibit 285 and --
A. 286.



Q. And 286? Can you explain for the record please what you are doing now, Dr. Burks?
A. I'm tying 284.
(Discussion off the record.)
A. Okay. So where is my little sheet here?
Q. Based on what you've done so far, Dr. Burks, can you tell any difference between the sutures?
A. I feel like I do feel a difference.
Q. Okay. How would you describe that difference?
A. Well, I would say at the moment 285 seems a little smoother to me than 284. So I would say 285 is coated and 284 isn't coated.
Q. How sure are you of that?
A. I would not put my children's lives on it, but given the subjective feel.
Q. Is it a subtle difference?
A. It's a subtle difference.
Q. Can you explain, Dr. Burks, what you are doing now?
A. Just throwing knots. I would say 286 seems coated as well.
Q. If you had gloves on right now, would that change the confidence level you have in determining



whether those are coated or uncoated sutures?
MR. TAMBURO: Objection, calls for speculation.
A. I think gloves can make a difference, yeah.
Q. How do they make a difference? The difference between the sutures is more subtle, right, with gloves because you don't have the contact like you described earlier with the skin?
A. Yeah. Again, this is obviously a very subjective feel test. Some of that feel comes from how the suture feels and some of it comes from how you feel when you slide a knot. So we're not talking rocks and water as far as differences and so. . .
Q. How would you qualify the difference that you just observed, based on your test?
A. When you say "qualify" are you asking for like an amount?
Q. How would you characterize the difference between the sutures?
A. Well the difference is, I think, subtle and there's no doubt in my mind that I could line up, you know, a hundred sutures and have error where I would say, you know, I think this one is one way or the other and make a mistake.

So there's certainly not enough difference to clearly say that I know every time exactly how that feels.

Q. Okay. Could you just initial, please, the chart that you did?

A. This right here?

Q. Yes.

A. Okay.

Q. And put the date.

A. (Witness complies.)

Q. Okay. For the record, I have to mark the exhibits, the sutures that you tied onto my binder. Can you untie those?

A. I can just open the binder.

Q. How confident were you that 286 was coated?

MR. TAMBURO: Objection, vague.

A. I guess I've said that differences are subtle. So I'm going by a subjective feel. So I feel like there's a difference. Am I going to bet a lot of money on it? No, but that's my take.

MR. FALKE: Okay. For the record I'm going to mark the suture that Dr. Burks tested with Exhibit 235 -- I'm going to state that over again.

For the record, I'm going to mark with



Exhibit 235 the suture Exhibit 284 that Dr. Burks just tested, and I'm going to mark Dr. Burks' tested suture 286 with DePuy Mitek Exhibit 236, and I'm going to mark Dr. Burks' tested suture 285 with DePuy Mitek Exhibit 237.

I have no further questions.

EXAMINATION

BY MR. TAMBURO:

Q. Dr. Burks, there was some discussion about work you had performed on behalf of DePuy Mitek; do you recall that?

A. Yes.

Q. Were you compensated by DePuy Mitek for the work you performed?

A. Yes.

MR. TAMBURO: I have no further questions.

MR. FALKE: Okay, thank you for your time.

THE VIDEOGRAPHER: End of deposition, 6:18.

-O-



Deponent's Certificate

I, ROBERT T. BURKS, M.D., deponent herein, do hereby certify and declare the within and foregoing transcription to be my deposition in said action taken on June 7, 2006; that I have read, corrected, and do hereby affix my signature to said deposition.

DATED this _____ day of ________________, 2006.

______________________________
Deponent

)
STATE OF UTAH ) ss.
)

SUBSCRIBED AND SWORN to before me this _____ day of ____________________, 2006.

___________________________
Notary Public residing in
___________________________

My Commission Expires:

_____________________



Reporter's Certificate

State of Utah )
County of Salt Lake )

I, Denise Kirk, Certified Shorthand Reporter, Registered Professional Reporter, and Notary Public for the State of Utah, do hereby certify:

THAT the foregoing proceedings were taken before me at the time and place set forth herein; that the witness was duly sworn to tell the truth, the whole truth, and nothing but the truth; and that the proceedings were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

THAT the foregoing pages contain a true and correct transcription of my said shorthand notes so taken.

IN WITNESS WHEREOF, I have subscribed my name and affixed my seal this 11th day of June, 2006.

_______________________
DENISE KIRK, CSR/RPR

My commission expires:
August 30, 2006