

⑲ BUNDESREPUBLIK    ⑫    **Offenlegungsschrift**

DEUTSCHLAND    ⑪ **DE    29 49 920    A 1**

    ⑤¹ Int. Cl. ³:

    A 61 F 1/00

DEUTSCHES

PATENTAMT

DE 29 49 920 A 1

㉑ Aktenzeichen:    P 29 49 920.5-41
㉒ Anmeldetag:    12. 12. 79
㊸ Offenlegungstag:    19. 3. 81    *T-1213*

㉚ Unionspriorität:  ㉜ ㉝ ㉛    ㉲ Erfinder:
31.08.79 JP P54-112151    Wada, Juro, Prof., Tokyo, JP

⑦¹ Anmelder:

Wada, Juro, Prof.; Kabushiki Kaisha Matsuda Ika Kogyo,
Tokyo, JP

㉴ Vertreter:

Pohlmann, E., Dipl.-Phys.; Schmidt, H., Dipl.-Ing. Dr.-Ing.,
Pat.-Anw., 8000 München

*Dr Fritz*
*Could you provide*
*a translation of summary please*

---

**Subject:**    GERMAN PATENT APPLICATION 29 49 920  AND
                "MATSUDA MEDICAL"

———————————————————————————————

The claims for this application are as follows:

1. A surgical suture characterized by the fact that it consists
   of a tubular weave (1) of fine synthetic fibers  (2) surrounding
   fine platinum fibers or pure gold fibers (3) swaged to at least
   one surgical needle (4).

2. A surgical suture characterized by the fact that the fine syn-
   thetic fibers (2) which form the woven (braided) tube (1) con-
   sist of polytetrafluoroethylene fibers.





*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000135**

C. C. FRITZ, Ph.D.

# F I G. I



# F I G. 2



# F I G. 3



*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000136**

Dr. Horst Schmidt (Dipl.-Ing.)
Eckart Pohlmann (Dipl.-Phys.)

Zugelassene Vertreter
beim Europäischen Patentamt

8000 München 40
Siegfriedstrasse 8
Telefon (089) 39 16 39
Telex 5 213 260 pspa d

DE  227/228

Juro Wada, Tokyo, Japan
Kabushiki Kaisha Matsuda Ika Kogyo, Tokyo, Japan

Chirurgisches Nahtmaterial

P A T E N T A N S P R Ü C H E

1.    Chirurgisches Nahtmaterial, g e k e n n z e i c h -
n e t  durch ein  rohrförmiges Geflecht (1) aus sehr
dünnen zusammengeflochtenen chemischen Faserfäden (2),
durch eine Anzahl von sehr dünnen Platinfäden oder reinen
Goldfäden (3), die in das rohrförmige Geflecht (1) über
dessen gesamte Länge eingesetzt sind, und durch wenigstens
eine chirurgische Nadel (4), die in einem Stück mit einem
Ende des rohrförmigen Geflechts (1) verbunden ist.

- 2 -

DePuy Mitek, Inc. v. Arthrex, Inc.
C.A. No.04-12457 PBS
DMI000137

- 2 -

T·1213

2.    Chirurgisches Nahtmaterial nach Anspruch 1, da-
durch  g e k e n n z e i c h n e t , dass die sehr
dünnen chemischen Faserfäden (2), die das rohrförmige
Geflecht (1) bilden, Polytetrafluoräthylen-Faserfäden
sind.

- 3 -

130012/0575

DePuy Mitek, Inc. v. Arthrex, Inc.
C.A. No.04-12457 PBS
DMI000138

2949920

T-1213

– 3 –

## Beschreibung

Die Erfindung betrifft ein chirurgisches Nahtmaterial.

Als Nahtmaterialien für chirurgische Eingriffe werden
bisher in üblicher Weise Materialien aus tierischen Fasern,
beispielsweise aus Seide, verwandt. Diese Nahtmaterialien
aus tierischen Fasern rufen jedoch eine Reibung mit den
inneren Organen bei Bauchoperationen hervor und bringen
die Gefahr mit sich, dass die verschiedenen Funktionen
der Organe beeinträchtigt werden, was manchmal zu einer
Abstossung führt.

Nach der Operation kann darüberhinaus das Nahtmaterial
selbst einen Kapillareffekt bewirken. Wenn weiterhin
ein künstliches Organ und ein natürliches Organ verbunden
werden, besteht die Gefahr, dass das Nahtmaterial selbst
mit dem natürlichen Organ verwächst und dessen normale
Funktion behindert. Wenn weiterhin eine Infektion auftritt,
ist es bisher mit dem Nahtmaterial aus tierischen Fasern
unmöglich, die Organfunktion wieder herzustellen, bis das
Nahtmaterial entfernt oder körperlich abgestossen ist.

Mit Nahtmaterialien aus Seide oder einem ähnlichen Ma-
terial war es weiterhin bisher unmöglich, röntgenologisch
die miteinander vernähten Teile nach der Operation zu be-
obachten, so dass es schwierig war, die Funktion des
Organs des Körpers nach der Operation zu verfolgen und
zu analysieren.

Aufgabe der Erfindung ist daher die Entwicklung eines
chirurgischen Nahtmaterials, das die oben beschriebenen
Nachteile der bekannten Nahtmaterialien nicht aufweist,
d.h. das  kein Blut oder andere Körperfluide, Bakterien

– 4 –

130012/0575

DePuy Mitek, Inc. v. Arthrex, Inc.
C.A. No.04-12457 PBS
DMI000139

2949920

- 4 -

T-1213

usw. überträgt und somit keinen Kapillareffekt zeigt,
und das ohne jede besondere Behandlung bei einer
chirurgischen Operation einsatzbereit ist.

Diese Aufgabe wird erfindungsgemäss durch ein chirurgi-
sches Nahtmaterial gelöst, das ein rohrförmiges Geflecht
aus sehr dünnen zusammengeflochtenen chemischen Faser-
fäden, eine Anzahl von sehr dünnen Platinfäden oder rei-
nen Goldfäden, die in das rohrförmige Geflecht über dessen
gesamte Länge eingesetzt sind, und wenigstens eine chirur-
gische Nadel aufweist, die in einem Stück mit einem Ende
des rohrförmigen Geflechts verbunden ist.

Ein besonders bevorzugtes Ausführungsbeispiel des er-
findungsgemässen chirurgischen Nahtmaterials zeichnet
sich dadurch aus, dass die miteinander vernähten Teile
des Körpers nach der Operation röntgenologisch beobachtet
werden können, so dass die Funktion des Organs des Körpers
nach der Operation verfolgt und analysiert werden kann.

Im folgenden wird anhand der zugehörigen Zeichnung ein
bevorzugtes Ausführungsbeispiel der Erfindung näher er-
läutert:

Fig. 1      zeigt eine teilweise weggebrochene Seitenan-
            sicht des Ausführungsbeispiels des erfindungs-
            gemässen Nahtmaterials.

Fig. 2      zeigt eine vergrösserte Teilvorderansicht des
            Ausführungsbeispiels des erfindungsgemässen
            Nahtmaterials, wobei die inneren Metallfäden
            teilweise durch Abschneiden und Weglassen des
            äusseren Geflechtes freigelegt sind.

- 5 -

130012/0575

DePuy Mitek, Inc. v. Arthrex, Inc.
C.A. No.04-12457 PBS
DMI000140

- 5 -

Fig. 3     zeigt eine Schnittansicht längs der Linie
3-3 in Fig. 2.

Wie es in der Zeichnung dargestellt ist, weist das Aus-
führungsbeispiel des erfindungsgemässen Nahtmaterials ein
rohrförmiges Geflecht 1 auf, das aus sehr dünnen zusammen-
geflochtenen chemischen Faserfäden 2 besteht. Eine An-
zahl von sehr dünnen Platinfäden oder reinen Goldfäden
3 ist in das rohrförmige Geflecht 1 über dessen gesamte
Länge eingesetzt. Eine chirurgische Nadel 4 ist in einem
Stück mit beiden Enden jeweils oder mit einem Ende des
rohrförmigen Geflechtes 1 verbunden, das die Platinfäden
oder die reinen Goldfäden 3 umschliesst, die in das Ge-
flecht 1 eingesetzt sind.

Als Faserfäden 2, die das rohrförmige Geflecht 1 bilden,
können solche Faserfäden, die eine glatte Oberfläche und
eine hohe Dauerhaftigkeit, Abbriebfestigkeit, Biegefestig-
keit und Zugfestigkeit haben, beispielsweise Polyfluor-
äthylen-Faserfäden oder Polyester-Faserfäden, verwandt
werden.

Das rohrförmige Geflecht 1 ist dadurch gebildet, dass
eine Anzahl von Faserfäden 2 mit einer längenbezogenen
Masse von $1/9 \cdot 10^2$ tex zusammengeflochten sind, wobei
bei dem in den Fig. 2 und 3 dargestellten Ausführungs-
beispiel 16 Fäden verwandt sind.

Die sehr dünnen Platinfäden oder die sehr dünnen reinen
Goldfäden 3, die in das rohrförmige Geflecht 1 eingesetzt
sind, haben eine Stärke von etwa 50 µm im Durchmesser, wobei
etwa 20 derartige Fäden verwandt werden. Diese Platinfäden
oder diese reinen Goldfäden 3 haben keinen Einfluss auf die

- 6 -

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
*DMI000141*

- 6 -

inneren Organe, wenn sie sich im Körper befinden.

Die chirurgische Nadel 4 besteht aus rostfreiem Stahl oder einem Spezialstahl.

Mit Hilfe des oben beschriebenen Nahtmaterials kann das Ausführen der Naht reibungslos erfolgen, ohne die inneren Organe unnötigerweise zu verletzen, da die Fäden 2, aus denen das Geflecht 1 besteht, glatte Oberflächen haben. Aufgrund der Art seines Materials überträgt das Nahtmaterial darüberhinaus kein Blut oder andere Körperfluide aufgrund des Kapillareffektes. Ohne jede besondere Behandlung des Nahtmaterials können daher ein Anhaften und Fortpflanzen von Bakterien verhindert werden und können selbst dann, wenn Bakterien übertragen werden, die infizierten Bereiche leicht ausgeheilt werden.

Nach dem chirurgischen Eingriff können weiterhin röntgenologische Beobachtungen der Gewebebildung des lebenden Körpers und der Ergebnisse einer Langzeitgewebebildung nach der postoperativen Behandlung, beispielsweise der Nahtbildung, erfolgen und ist es gleichfalls möglich, fortlaufend Änderungen im Zustand des Operationsbereiches mit dessen Wanderung und andere bisher unbekannte Funktionen der Organe des Körpers auf Röntgenfilmen zu beobachten, was für die medizinische Behandlung ausserordentlich nützlich ist.

Das erfindungsgemässe chirurgische Nahtmaterial ist somit am besten für den chirurgischen Einsatz künstlicher Organe geeignet.

DePuy Mitek, Inc. v. Arthrex, Inc.
C.A. No.04-12457 PBS
DMI000142

Int.                     A 61 L 17/00
Anmeldetag:              12. Dezember 1979
Offenlegungstag:         19. März 1981

- 7 -

2949920

# F I G. 1



# F I G. 2



# F I G. 3



130012/0575

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000143**

ALLEN TRANSLATION SERVICE

T1213              Translated from German                1
=============================================================

Federal Republic      PATENT          Int. Cl$^3$ A 61 L 17/00

  of Germany          DE 2949920 A1             A 61 F 1/00

German                File No. P2949920.5-41

Patent Office         Applic. Date 12/12/79

                      Public. Date 3/19/81

Union Priority:                   Inventor:

8/31/79 JP P54-112151             Wado, Juro, Prof., Tokyo,JP

Applicant:

Wado, Juro, Prof.; Kabushiki Kaisha Matsuda Ika Kogyo,

Tokyo, Japan

Representative:

Pohlmann, E.; Schmidt, H.

Patent Attorneys, 8000 Munich


Subject: German Patent Application 29 49 920 and

         "Matsuda Medical"


The claims for this application are as follows:

1. A surgical suture characterized by the fact that it
   consists of a tubular weave (1) of fine synthetic fibers
   or pure gold fibers (3) swaged to at least one surgiccal
   needle (4).

2. A surgica suture characterized by the fact that the fine
   synthetic fibers (2) which form the woven (braided) tube
   (1) consist of polytetrafluoroethylene fibers.

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000144**

2

2949920

POHLMANN & SCHMIDT

DE 227/228

Juro Wada, Tokyo, Japan
Kabushiki Kaisha Matsuda Ika Kogyo, Tokyo, Japan

## SURGICAL SUTURE MATERIAL

----------------------------------------------------------------

### PATENT CLAIMS

1. Surgical suture material characterized by a tubular braid
(1) made of very thin synthetic fibers braided together (2),
by a number of very thin platinum fibers or pure gold fibers
(3) that are inserted into the tubular braid (1) over its
entire length, and by at least one surgical needle (4) which
is joined integrally to one end of the tubular braid (1).

2. Surgical suture material according to Claim 1,
characterized by the fact that the very thin synthetic fibers
(2) that form the tubular braid (1) are
polytetrafluoroethylene fibers.



DePuy Mitek, Inc. v. Arthrex, Inc.
C.A. No.04-12457 PBS
DMI000145

3

## Description

The invention relates to a surgical suture material.

Up to now, materials made from animal fibers, for example silk, have commonly been used as suture materials for surgical operations. These suture materials made of animal fibers, however, cause friction with the internal organs during abdominal operations and are accompanied by a danger that the various functions of the organs will be impaired, which sometimes leads to rejection.

In addition, after the operation, the suture material itself can have a capillary effect. Further, when an artificial organ and a natural organ are joined there is a danger that the suture material itself will be overgrown by the natural organ and hinder its normal functioning. Moreover, when an infection occurs, it has up to now been impossible with animal fiber sutures to restore the organ function until the suture material is removed or physically rejected.

Further, with suture materials made of silk or a similar material, radiological observation of the parts sutured together has been impossible after the operation, so that it has been difficult to observe and analyse the functioning of the body organ after the operation.

The objective of the invention is therefore the development of a surgical suture material that does not have the above-described disadvantages of common suture materials, that is, which does not transport any blood or other body fluids, bacteria, etc., and thus does not display any capillary effect, and that is ready for use in a surgical operation without any special treatment.

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000146**

4

This objective is achieved according to the invention by a surgical suture material that has a tubular braid made of very thin synthetic fibers braided together, a number of very thin platinum fibers or pure gold fibers which are inserted into the tubular braid over its entire length, and at least one surgical needle that is joined integrally to one end of the tubular braid.

A particularly preferred example of a realization of the surgical suture material of the invention is characterized by the fact that the parts of the body sutured together can be observed radiologically after the operation, so that the functioning of the body organ can be observed and analysed after the operation.

A preferred realization of the invention is described in more detail below with the aid of the accompanying drawings:

Fig. 1   shows a partially cut away lateral view of the realization of the suture material of the invention..

Fig. 2   shows a magnified partial frontal view of the realization of the suture material of the invention, with the inner metal filaments partially exposed by cutting away or omitting the outer braid.

Fig. 3   shows a sectional view along the line 3-3 in Fig. 2.

As is shown in the drawing, the exemplary realization of the suture material of the invention shows a tubular braid 1, which is composed of very thin synthetic fibers braided together. A number of very thin platinum fibers or pure gold fibers 3 are inserted into the tubular braid 1 over its entire length. A surgical needle 4 is joined integrally with both ends or with one end of the tubular braid 1 which surrounds the platinum fibers or the pure gold fibers that are inserted into the braid 1.

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
*DMI000147*

As for fibers 2 that form the tubular braid 1, those fibers can be used that have a smooth surface and a high durability, resistance to abrasion, bending strength and tensile strength, for example, polyfluoroethylene fibers or polyester fibers.

The tubular braid 1 is formed by braiding together a number of fibers 2 with a lengthwise mass of $1/9 \times 10^2$ tex, with 16 fibers being used in the exemplary realization shown in Figs 2 and 3.

The very thin platinum fibers or the very thin pure gold fibers 3 that are inserted into the tubular braid 1 have a diameter of about 50 um, with about 20 fibers of this kind being used. These platinum fibers or these pure gold fibers have no effect on the internal organs when they are in the body.

The surgical needle 4 is composed of stainless steel or a special steel.

By means of the above described suture material, the realization of suturing can take place smoothly without injuring the internal organs unnecessarily, since the fibers 2 of which the braid 1 is composed have smooth surfaces. Furthermore, because of the type of material of which it is composed, the suture material does not transport any blood or other body fluid by capillary action. Adhesion and transmission of bacteria can therefore be hindered without any special treatment of the suture material and even when bacteria are transferred the infected region can be healed easily.

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000148**

6

Further, after the surgery, it is possible to make radiological observations of tissue formation in the living body and of the result of long-term tissue formation after the post-operative treatment, for example the formation of an anastomosis, and it is likewise possible to observe on x-ray film progressive changes in the state of the area operated on with its migration and other heretofore unknown functions of the body organs, which is extremely useful for the medical treatment.

The surgical suture material of the invention is thus best suited for the surgical implantation of artificial organs.

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000149**



**PCT**

WORLD INTELLECTUAL PROPERTY ORGANIZATI
International Bureau

## INTERNATIONAL APPLICATION PUBLISHED UNDER THE PATENT COOPERATION TREATY (PCT)

| (51) International Patent Classification [3] : | A1 | (11) International Publication Number: WO 86/00020 |
|---|---|---|
| A61L 17/00 | | (43) International Publication Date: 3 January 1986 (03.01.86) |

(21) International Application Number: PCT/US8 /00918

(22) International Filing Date: 14 June 1984 (14.06.84)

(71) Applicant: BIORESEARCH INC. [US/US]; 315 Smith Street, Farmingdale, NY 11735 (US).

(72) Inventors: KURTZ, Leonard, D., Dr. ; 46 Woodmere Boulevard, Woodmere, NY 11598 (US). ARONOFF, Marvin ; 161-18 65th Avenue, Flushing, NY 11365 (US).

(74) Agent: SARRO, Thomas, P.; Larson and Taylor, 727-Twenty-Third Street, South, Arlington, VA 22202 (US).

(81) Designated States: AU, DE (European patent), FR (European patent), GB (European patent), JP.

Published
— With international search report.

(54) Title: COMPOSITE SURGICAL SUTURES



(57) Abstract

A composite surgical suture of extraordinary high knot strength and capable of use over a range of United States Pharmacopeia (USP) suture sizes is prepared by coating or covering a core of a fiber-forming synthetic polymer material having a knot tenacity of at least 7 grams per denier with a conventional suture material. Illustrative of suitable core materials are Kevlar and high strength fully chain-extended crystalline polyethylene.

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000150**

**FOR THE PURPOSES OF INFORMATION ONLY**

Codes used to identify States party to the PCT on the front pages of pamphlets publishing international applications under the PCT.

| | | | | | |
|---|---|---|---|---|---|
| AT | Austria | GA | Gabon | MR | Mauritania |
| AU | Australia | GB | United Kingdom | MW | Malawi |
| BB | Barbados | HU | Hungary | NL | Netherlands |
| BE | Belgium | IT | Italy | NO | Norway |
| BG | Bulgaria | JP | Japan | RO | Romania |
| BR | Brazil | KP | Democratic People's Republic | SD | Sudan |
| CF | Central African Republic | | of Korea | SE | Sweden |
| CG | Congo | KR | Republic of Korea | SN | Senegal |
| CH | Switzerland | LI | Liechtenstein | SU | Soviet Union |
| CM | Cameroon | LK | Sri Lanka | TD | Chad |
| DE | Germany, Federal Republic of | LU | Luxembourg | TG | Togo |
| DK | Denmark | MC | Monaco | US | United States of America |
| FI | Finland | MG | Madagascar | | |
| FR | France | ML | Mali | | |

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
***DMI000151***

WO86/00020

PCT/US84/00918

1

## COMPOSITE SURGICAL SUTURES

## BACKGROUND OF THE INVENTION

### Field of the Invention

This invention relates to improved surgical sutures having extremely high knot strength and to methods for their preparation. More particularly, the invention is directed to composite surgical sutures having a knot strength that enables them to be used over a range of. suture sizes classified by the United States Pharmacopeia (USP).

### Brief Description of the Prior Art

Surgical sutures are generally divided into two broad classes: (1) absorbable sutures, either natural or synthetic, which are absorbed by the body and (2) non-absorbable sutures, which remain in the body for prolonged periods of time or are removed when the wound heals.

From the patient's viewpoint, whether an absorbable or non-absorbable suture is employed, assuming no toxicity of the suture implant, it is a surgical dictum that the finest suture should be used and that the knot should have the least mass. This dictum is based upon the belief that problems in suture implants are directly related to the size of the suture and the bulk of the mass, i.e., the larger the bulk, the greater the probability of trouble in healing.

Undoubtedly, this was the rational for the original establishment of the USP classification which divides non-absorbable sutures into seventeen sizes: 10/0, 9/0, 8/0, 7/0, 6/0, 5/0, 4/0, 3/0, 2/0, 0, 1, 2, 3, 4, 5, 6, 7. A few additional

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000152**



WO86/00020                                                          PCT/US84/00918

-2-

sizes are used which are not USP. Considering that
silk was the most widely used non-absorbable suture
in the mid-twenties and thirties, this size dif-
ferentiation was based upon manufacturing. These
seventeen sizes could be differentiated one from
another by eye. If a finer differentiation were
desired, it would not be accomplished becasue of
the variation in the raw material as extruded by
the silk worm. This classification has been quite
useful. Obviously, the number of sizes cannot be
considered "standardization" by any means. The
sizes are numerous. Unfortunately, it has not been
possible to coalesce size because the finer sizes
do not have the adequate knot break strength to
substitute for the next size.

A further long term problem in surgery is
post-operative hernia. It is a truism that scar
tissue never achieves the tensile strength of
normal tissue. Hernias have occurred many years
post-operably through the scar. If a suture were
developed which would leave as a residue a non-
absorbable suture to support that scar tissue, it
would undoubtedly decrease and most likely elim-
inate the post-operative hernia as a complication.

Composite sutures having a reinforcing core are
known in the prior art. None, however, achieve the
aforementioned characteristics desired in a suture.

Accordingly, it is an object of the invention
to provide a surgical suture with knot strengths so
great that suture of much less foreign material is
left in the body.

Another object of the invention is to provide a
surgical suture having a knot strength that renders
it useful over a range of surgical sizes within the
USP classification of graded suture sizes, and thus


*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000153**


-3-

having the ability to replace the USP graded scale
of sizes with just a few finer sutures whose
strength would cover the entire range.

A further object of the invention is to provide
a composite suture which leaves a residue of non-
absorbable suture to support scar tissue and,
therefore, decreases or eliminates post-operative
hernia as a complication.

Another object of the invention is to provide a
method of preparing surgical sutures having ex-
tremely high knot strength whose surface char-
acteristics can be tailored to meet desired
properties.

A further object of the invention is to provide
composite sutures capable of using needles which
more closely approximate the outer diameter of the
suture.

A further object of the invention is to provide
a composite suture having lateral strength, that
is, a suture stabilized against abrasion, kinking
and/or fibrillation during knotting.

## SUMMARY OF THE INVENTION

These and other objects of the invention are
obtained by a sterile, surgical suture having an
elongated core of a synthetic polymer having a knot
tenacity of at least 7 grams/denier coated with a
film and fiber-forming surgical material, said
coated core, when constructed into a surgical
suture of a particular USP grade size, having a
knot strength exhibited by surgical sutures of said
suture material at least two USP grade sizes larger.

The elongated core of the sutures of the inven-
tion can be formed of any fiber-forming synthetic
polymer, such as a polyamide, polyolefin, polyester

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
*DMI000154*



WO86/00020                                    PCT/US84/00918

-4-

and the like, having a straight pull tenacity of at
least 15 grams/denier, preferably up to 70 or more
grams/denier and a knot tenacity of at least 7
grams/denier, preferably up to 30 or more grams/-
denier. By "knot tenacity" as used herein and in
the appended claims is meant knot break strength
divided by the denier. Unless the synthetic pol-
ymer making up the suture core of the invention
meets the aforementioned knot tenacity properties,
the resulting coated core fails to provide a suture
which achieves the desired objects of the invention.

Illustrative of synthetic polymer materials
suitable for use as the core of the suture of the
invention are fiber-forming aromatic polyamides in
which the chain extending bonds from each aromatic
nucleus are essentially coaxial or parallel and
oppositely directed. The term "aromatic nucleus"
is used herein to include individual enchained
aromatic rings and fused-ring aromatic divalent
radicals. The preferred polymers include carbo-
cyclic aromatic polyamides containing up to 2
aromatic rings, including enchained non-fused rings
(e.g. 4, 4'-biphenylene) or fused rings (e.g. 1,
5-naphthalene) per amide linkage. The chain-
extending bonds from these aromatic rings are para-
oriented and/or essentially coaxial or parallel and
oppositely directed.

Highly preferred polyamides are characterized
by recurring units of the formula:

(I)

$$\begin{array}{ccccc} & O & O & H & H \\ & \| & \| & | & | \\ -C & - R & - C & - N & - R' & - N- \end{array}$$

wherein R and R' (when the chain extending bonds
are essentially coaxial) are selected from the
group of:



*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000155**

-5-

 1,4-phenylene, and

4,4'-biphenylene

and R and R' (when the chain extending bonds are
essentially parallel) are selected from the group
of:

1,5-naphthylene, and

2,6-naphthylene

R and R' may be the same or different and may
contain substituents on the aromatic nuclei.

Additional highly preferred polyamides of this
invention are characterized by recurring units of
the formula:

(II)

$$\begin{array}{cc} O & H \\ \| & | \\ -C - R'' - N - \end{array}$$

wherein R'' is selected from the group of:

Similarly R'' may contain substituents on the
aromatic nuclei.

As previously stated, the aromatic nuclei of
the polymers of this invention may bear substi-
tuents. These substituents should be non-reactive
during the polymerization and preferably also
should be non-reactive (e.g. thermally) during sub-
sequent processing of the polymer, e.g., heat
treating of a shaped fiber thereof. Such reac-
tivity is undesirable in that it may cause cross-

-6-

linking of the polymer and may adversely effect the
dope and/or fiber properties. Among the preferred
non-reactive substituents may be names halogens
(e.g., methoxy and ethoxy), cyano, acetyl, and
nitro. Other suitable substituents non-reactive
during the polymerization will be evident to those
skilled in the art and are contemplated herein pro-
vided such do not adversely affect the desired
properties of the dopes and/or fibers of this
invention, e.g., due to factors such as steric
hindrance. Generally, it is preferred that no more
than two (and more preferably no more than one)
suitable substituents be present per aromatic
nucleus. However, more than two such substituents
may suitably be present if the substituent is a
relatively small group e.g., methyl.

Both humo-and co-polyamides having substituted
or unsubstituted aromatic nuclei, as described
above, are well suited for the dopes and fibers of
this invention. Random copolymers are preferred
copolymers. By the term "random" is meant that the
copolymer consists of molecules containing large
numbers of units comprised of two or more different
types in irregular sequence. The units may be of
AB (e.g., from p-aminobenzoyl chloride hydro-
chloride), AA (e.g., from p-phenylenediamine or
2,6-dichloro-p-phenylene diamine), or BB (e.g.,
from terephthaloyl or 4,4'-bibenzoyl chloride) type
or mixtures of these, provided always that the
requirements of stoichiometry for high polymer
formation are met. It is not necessary that the
relative numbers of the different types of the unit
be the same in different molecules or even in
different portions of a single molecule.

One or more of these polymers may suitably be

*DePuy Mitek, Inc. v. Arthrex, Inc*
*C.A. No.04-12457 PBS*
**DMI000157**

-7-

used in the fibers of this invention, i.e., a
single homopolymer; a single copolymer; or homo-
polymer and/or copolymer blends are suitable herein.

While the polymer chains described above
consist essentially of amide links (- COHN -) and
aromatic ring nuclei as described above, the poly-
mers useful for preparing the core of this inven-
tion may also comprise up to about 10 percent (mole
basis) of units not conforming to the above-cited
description, e.g., aromatic polyamide-forming units
whose chain extending bonds are other than coaxial
or parallel and oppositely directed, e.g., they may
be metaoriented, or of linkages other than amide,
e.g., urea or ester groups.

Among the suitable aromatic polyamides may be
named poly(p-benzamide); poly(p-phenylene
terephthalamide); poly(2-chloro-p-phenylene
terephthalamide); poly(2,6-dichloro-p-phenylene
2,6-naphthalamide); poly(p-phenylene
p,p'-biphenyldicarboxamide); poly(p,p'-phenylene
benzamide); poly(1,5-naphthylene terephthalamide);
ordered aromatic copolyamides such as e.g.,
copoly(p,p'-diaminobenzanilide terephthalamide),
and random copolyamides such as, e.g.,
copoly(p-benzamide/m-benzamide) (95/5); and many
others.

These aromatic polyamides generally have an
inherent viscosity and preferably greater than
1.0. Inherent viscosity ($\eta_{inh}$) defined by the
following equation:

$$\eta_{inh} = [\ln (\eta_{rel})/C]$$

wherein ($\eta_{rel}$) represents the relative viscosity
and C represents a concentration of 0.5 gram of the
polymer in 100 ml of solvent. Exemplary of such
aromatic polyamides are those known as the "Kevlar"

DePuy Mitek, Inc. v. Arthrex, Inc.
C.A. No.04-12457 PBS

DMI000158

-8-

series, products of the DuPont corporation, which
generally have a straight pull tenacity of about 18
to 25 grams per denier and a knot tenacity of at
least about 7 grams per denier.  Further examples
of such aromatic polyamides and their methods of
preparation can be found, for instance, in U.S.
Patent Nos. 3,063,966, 3,300,350, 3,671,542 and
3,919,587 all incorporated herein by reference.

Another example of a synthetic polymer suitable
for use as the core of the suture of the invention
are high strength polyolefins such as polyethylene
which provides fibers having a straight pull tenac-
ity of about 25-50 grams/denier and a knot tenacity
of about 7 to 17 grams/denier.  These polyolefin
fibers are characterized by full chain extension
and high crystallization and can be prepared:  (1)
by ultradrawing of the solidified crystalline poly-
olefin material that is, by further development of
the traditional cold drawing process, and (2) by
extending the chains in random state (melt or solu-
tion) and inducing them to crystallize in the ex-
tended form subsequently.  Polyolefins having these
characteristics and their method of preparation are
described in Keller, A. and Barham, P.J. "High
Modulus Fibres", Plastics and Rubber International,
February, Volume 6, No. 1 (1981), herein incor-
porated by reference.

The core of the surgical suture of the in-
vention can be either a monofilament or of multi-
filament construction.  The latter is ordinarily
preferred since the coating of suture material
subsequently applied generally exhibits stronger
adhesion to multifilament cores.  The liquified
suture material coating tends to penetrate and fill
the interstices of a multifilament core as well as

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000159**

-9-

coating the core, thereby anchoring the coating
thereto. Multifilament cores can take the form of
braids, twisted polyfilaments, yarns and the like.*
It should be noted that while the synthetic polymer
materials contemplated for use as the core of the
composite sutures of the invention, have high axial
strength, they are not ordinarily suitable for use
as sutures since they do not possess the necessary
lateral strength and, therefore, tend to abrade,
kink and/or fibrillate during knotting. Coating of
the core with a suture material pursuant to the
present invention has been found to unexpectedly
stabilize, i.e. provide lateral strength resistance
against such action thereby rendering suitable for
use as sutures these synthetic polymer fibers nor-
mally unsuitable for such use.

The surgical suture material used to coat the
core can be any film-forming material commonly used
in the construction of absorbable and non-
absorbable sutures. In general these suture
materials when drawn into fibers exhibit straight
tensile strengths of about 4 to 10 grams/denier.
Examples of the non-absorbable type suture
materials are silk (fibroin), polyolefins, such as
polyethylene and polypropylene, polyesters such as
polyethylene terephthalate and nylon. Examples of
absorbable type materials useful as the coating for

* The suture material in the form of multi or
monofilament yarn may also be present initially as
a core around which the high strength yarn which
eventually becomes the core in the finished suture
is braided or twisted or it may be formed into a
plied, twisted, braided or co-mingled construction
with the high strength yarn.

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000160**



-13-

the core include collagen and the synthetic ab-
sorbable materials such as polylactide, poly-
glycolide and copolymers of lactide and glycolide
with each other and with other reactive monomers
such as those described, for instance, in U.S.
Patent Nos. 3,636,952 and 2,683,136, which patents
are herewith incorporated by reference. Such
synthetic absorbable polymers are sometimes
referred to herein as simply homopolymers and
copolymers of lactide and glycolide.

The amount of suture material coated onto the
core will vary depending upon the constructon of
the core, whether monofilament or multifilament,
the number and tightness of braid or twist, the
particular tensile strength and knot tenacity of
the core, the particular suture material used as
the coating and its nature, e.g. melt, solution or
solid. In general, when the coating is a non-
absorbable suture material, the coating will
constitute about 5 to about 10% by weight of the
coated core. On the other hand, when the coating
is an absorbable suture material, the coating may
constitute about 5 to 90% by weight of the coated
core.

The coatings can be applied by a variety of
suitable techniques well known in the coating art.
For example, the coatings can be applied to the
core by solution coating, melt coating, extrusion
coating and the like.

In melt coating, for example, the uncoated core
under tension is slowly passed through a melt of
the suture material and then through a die having
an orifice smaller than the upper diameter speci-
fication for the suture size desired, heated above
the melting point of the coating materials, to trim

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000161**

-11-

off excess coating material and shape the
composite. Multiple coatings may be applied if
necessary.

In solution coating, the suture material is
dissolved in a suitable solvent and the core is
slowly passed through the coating solution thus
formed. The treated core is then passed con-
tinuously through a tubular oven heated to an
elevated temperature to evaporate the solvent and
coalesce and solidify the suture material that
remains.

A preferred coating technique when the core
being coated is of multifilament construction
comprises initially either solution coating or melt
coating the multifilament core while the latter is
held under a suitable tension and allowing the
liquified coating material to penetrate or infil-
trate the interstices of the core, thereby forming
roots which help anchor the coating of the core. A
second layer of the same suture material may then
be applied to the impregnated core by any of the
conventional coating methods.

In a typical extrusion coating process the core
is passed through the cross-head die of a conven-
tional wire coating extrusion apparatus. Pellets
of the coating material are introduced into the
plastification zone of the extruder wherein they
are plasticized into a melt which is forced through
the annular die of the extruder and onto the core.

Which coating technique is employed will
usually depend upon the particular core utilized.
Aromatic polyamide cores, for example, lend them-
selves to melt or extrusion coating because of
their high melting points. The high strength
polyethylene cores, on the other hand, have

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000162**



-12-

relatively low melting points, e.g. about 145°C, and must be treated differently. With them, solution coating of the monoor multi-filament cores is the chief method.

According to a preferred embodiment of the invention, when the core being coated is an aromatic polyamide, it is subjected to both a precoating stage and finish coating stage, each of which will be discussed below in more detail.

## Impregnation/Precoating Stage

The impregnation/precoating operation of the invention can be conducted using a thread composed of a core made up of multifilaments of a suture material and a plurality of fibers of a synthetic polymer having a tenacity of at least 18 grams/-denier and knot tenacity of at least 7 grams/-denier. The thread can be formed in the usual manner as by twisting, braiding, etc., a plurality of the synthetic polymer fibers around the suture material core. The thread, that is, the covered core is then heated to temperatures above the melting point of the multifilament core material passing it through any suitable oven during which passage the suture material melts and under the tension developed and/or applied exudes upward through the polyfilamentous synthetic polymer component and onto its surface. The amount of coating employed should be sufficient to not only fill all the interstices of the multifilament core component during the melting period but to also coat the surface of the yarn or thread component. Any excess coating material which may have melted out is trimmed off. While the heating of the covered core mixed yarns can be effected with or

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000163**



WO86/00020                                           PCT/US84/00918

-13-

without stretching of the thread in some instances, a better final suture is obtained when the yarn is maintained under tension with little or no stretch applied at this stage. It is at this stage that the basic solid coated core structure is developed.

The impregnated and coated core is then passed through a heated dye which trims coating nubs from the core and otherwise smooths the external surface of the thread. Stretch may also be applied during the smoothing operation, but again, best results are obtained with no or minimum stretch. The thread may be passed through the heating oven or smoothing die as many times as is necessary to obtain a smooth, nub-free surface. Advantageously, in smoothing down the nubs not only should excess surface coating be removed, but some of it should be used to fill the ups and down of the thread's surface in order to obtain a sufficiently smooth undercoat structure. If this is not done, the coating remaining on the surface follows the contours of the thread and any subsequently applied coating will follow these contours.

The temperatures employed in the heating oven will vary depending on the coating employed, the proportions of coating material to core, the speed at which the core is passed through the oven and whether the heating and/or smoothing is conducted under stretch conditions. As aforementioned, the temperature should be raised above the melting point to a level at which the coating material exudes through the thread as a gelatinous mass which can then be seen on the surface of the thread when it cools. Excessively high temperatures which thin the coating material to a point where it runs off should be avoided as they tend to exude too

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
*DMI000164*



WO86/00020                                        PCT/US84/00918

-14-

much coating material and fail to produce a solid case structure.

Generally speaking, when the impregnation/ precoating operation is conducted under stretch conditions, distribution of the coating material throughout the thread and exudation to the surface occurs at lower temperatures than when no stretch is applied. It is important to note, however, that giving the core a high level of stretch in the impregnation/precoating operation reduces or eliminates the ability to apply stretch in the subsequent finish coating stage, in accordance with the preferred embodiment of the invention described below, where it may be used to adjust finished suture properties such as break elongation by additional heat treatment of the highly stretched precoated thread.

The optimum melting temperatures employed in the impregnation/precoating operation will depend primarily upon which suture coating material is employed. The smoothing die temperature will also be above the melting point of the coating material and below the melting point of the core. Usually it will conform closely to the temperature employed in the impregnation/precoating stage preferably about 5 to 15 degrees below that used in the impregnation/precoating stage.

Finish Coating Stage

In the preferred embodiment of the invention, the final stage in obtaining the composite suture structure is to melt extrude coating material onto the smoothed impregnated/precoated thread. Any of the conventional extrusion apparatuses can be employed for this purpose. The smooth precoated

DePuy Mitek, Inc. v. Arthrex, Inc.
C.A. No.04-12457 PBS
DMI000165

-15-

thread is simply fed through the extrusion coating
die and coated with additional coating material of
the same type as used in the impregnation/
precoating stage.  As aforementioned, it is
important to note that the smooth impregnated/
precoated thread subjected to the coating stage be
essentially free of an undulating surface.  The
extrusion temperatures employed in the impregnation/
precoating stage although it has been found that
the higher the extrusion coating temperature, other
conditions being equal, the greater the finished
suture diameter.  This is due to decreased melt
viscosity with increased temperature which results
in increased polymer flow under a given applied
force.

The following examples are included to further
illustrate the novel composite sutures of the
invention and their preparation.  In the examples,
reference is made to the following drawings
wherein:  Fig. 1 is a schematic drawing of an
apparatus useful in the impregnation/precoating
stage of the present invention; Fig. 2 is a
schematic drawing of an apparatus useful in the
extrusion coating of the suture impregnated and
precoated by use of the apparatus of Fig. 1; and
Fig. 3 is a cross-section of the extrusion die in
Fig. 2 on a larger scale.

### Example I

Directing attention to the drawings, using a
conventional New England Butt braider machine 4
strands of "Kevlar", a tradenamed material of
DuPont DeNemours, of 30-50 denier having a straight
pull tenacity of approximately 7.5 grams per denier
are braided around a single core of continuous 40
denier polypropylene having a straight pull tenac-

DePuy Mitek, Inc. v. Arthrex, Inc.
C.A. No.04-12457 PBS
*DMI000166*



-15-

ity of approximately 4 grams/denier. The raw braid
thus formed is wound around a reel 2, and fed
through a tensioner 4, about a feed roll (Godet) 6,
guide 8 and into a heated 10 cm long tubular oven.
The lumen of an extrusion coating die without feed
serve this purpose and is designated Heated Zone I
in Fig. 1. A draw roll (Godet) 13 pulls the raw
braid through the oven without stretch, that is, at
a stretch ratio (SR) of 1:1. The Heated Zone I is
maintained at a temperature of 230°C. Under these
conditions all the polypropylene melts and is
entirely distributed throughout the braid inter-
stices and onto the surface of the braid. No solid
polypropylene core residue remains.

As the braid emerges from Heated Zone I, large
quantities of excess polypropylene which have
melted off are trimmed off manually. The braid
then continues through a Guide 15 to Heated Zone II
which contains a smoothing die 17 having a 0.2 mm
diameter that trims and smooths down nubs that are
formed on the braid. Heated Zone II is maintained
at a temperature of about 220°C for the smoothing
operation. The smoothed braid is pulled through
Heated Zone II by a draw roll (Godet) 19 and onto
receiving reel 21. The speed at which the braid
passes through both Heated Zone I and II is
approximately 1-1.8 M/min. The precoated braid is
passed through the smoothing die 17 three times so
as to obtain an impregnated/precoated braid of the
desired smoothness.

Referring to Fig. 2, reel 31 of smooth
impregnated/precoated braid prepared as above is
passed through a tensioner 33, to feed roll (Godet)
35 which feeds the braid through guide 37 into
extrusion coating die apparatus indicated generally



DePuy Mitek, Inc. v. Arthrex, Inc.
C.A. No.04-12457 PBS
DMI000167

-17-

as 39.  Polypropylene chips are melted in heated
reservoir 41 maintained at a temperature of 260°C
and the melt is forced by means of extruding
weights 43 applied at a force of 0.233 kg to a
piston 45 into and through the extrusion coating
die.

Directing particular attention to Fig. 3, the
extruding coating apparatus is comprised of a
holder indicated generally as 47 which houses a
hollow lumen member 49 a spinneret 57 having an
outlet 52.  The lumen member 49 essentially
positioned within the holder 47 so as to provide an
annular chamber 53.  A gasket 55 seals one end of
the member 49 within the holder while the other end
is supported by slotted plate 60.  The lumen member
contains an inlet 59 and an outlet 61.  Between
outlet 61 and outlet 52 of the spinneret 57 is
positioned a hollow needle 63.  The impregnated/
precoated thread 65 passes consecutively through
lumen member 49, hollow needle 59, outlet 52 and is
coated with melt as it emerged from the die.  The
coating die is maintained at a coating temperature
of 235°C.

The coated filament is then taken up on draw
roll 48 which applies stretch.  Tension is let down
on draw roll 50 which is run more slowly than draw
roll 48.  The yarn velocity is 1.43 M/min. and the
total stretch ratio (SR) is 1.02.  The finished
suture is finally wound around receiving reel 51.

The result is a finished composite suture with
a 5/0 diameter "Kevlar" core accounting for approx-
imately 90% of the cross-sectional area and exhib-
iting a knot break strength of about 3.2 pounds.  A
knot break strength of 3.2 pounds is equivalent to
USP limits of size 2.0 monofilament suture.  Thus,



*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000168**

-13-

the composite suture prepared can be used as a 5/0,
4/0, or 3/0 suture.

### Example II

The process of Example I is repeated substi-
tuting a polyethylene terephthalate core for poly-
propylene core and extrusion coating in extrusion
coating die apparatus 39 with polyethylene ter-
ephthalate. The result is a composite suture
having a 5/0 diameter "Kevlar" core accounting for
approximately 90% of the cross-sectional volume
coated with polyethylene terephthalate exhibiting a
knot break strength of about 3.5 pounds which is a
knot brek strength above the USP limits for a 2/0
size suture. Therefore, the composite suture pre-
pared could be used for sizes 5/0, 4/0, 3/0 and 2/0
according to the physician's wishes.

### Example III

Fibroin (silk) is dissolved in a aqueous solu-
tion of 62% zinc chloride to give a solution having
fibroin weight % concentrations in the range of
5-20%. The resulting solution is maintained at
approximately its boiling point and "Kevlar" yarn
of Example I is pulled through the solution at a
constant rate as to fully impregnate and coat the
yarn. The impregnated and coated yarn is then
dried by passing it through a tubular oven main-
tained at heating temperatures up to 130°C. The
heat treatment evaporates the solvent and helps to
form a continuous fibroin film. The composite
suture is then washed with cold water to remove
residual zinc chloride.

The resulting composite suture with a size 5/0
"Kevlar" core containing approximately 5% by weight
fibroin exhibits a knot break strength of approx-
imately 3.5 pounds which is equivalent to a silk



*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000169**

-19-

suture of size 2.0. In other words, the silk-coated "Kevlar" composite suture could be used instead of silk in the following sizes: 5/0, 4/0, 3/0 and 2/0.

### Example IV

A size 5/0 high strength fully chain-extended polyethylene multifilament yarn having a straight pull tenacity of 50 grams/denier and a knot tenacity of 15 grams/denier is pulled through a 10% solution of polyethylene terephthalate in a solvent mixture of methylene chloride containing 31% by weight hexafluoroisopropanol and then passed through a die to trim off excess solution. The coated core is dried in air and the process repeated to build up the coating to a final composite suture containing 10% by weight polyethylene terephthalate. The composite is washed with water and dried again. The resulting composite suture could be used for sizes 5/0, 4/0, 3/0, 2/0 and 1/0.

### Example V

Example I is repeated substituting a polyglycolic acid (PGA) core for the polypropylene core and PGA resin for the polypropylene chips. The resulting "Kevlar"/polyglycolic acid composite has a minimum knot break strength in the range of 1550-1700 grams. Since commercial non-absorbable "Prolene" sutures of size 3/0 has a knot strength of 1550-1650 grams, this means that a size 3/0 "Kevlar"/polyglycolic acid suture will retain the knot break strength of 3/0 "Prolene" after absorption of all the polyglycolic acid. Thus, the "Kevlar"/polyglycolic acid suture prepared could be used for sizes 3/0, 4/0 and 5/0.

When 6/0 size "Kevlar" reinforcing core is used with a non-reinforcing PGA coating, the core by

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000170**



-20-

itself will give a knot strength midway between size 4/0 and 5/0 based on "Prolene" knot strength but above the USP standards for 4/0. Thus, PGA coated "Kevlar" composites with a 6/0 core could be used for size 6/0, 5/0 and possible size 4/0.

With size 7/0 reinforcing core and PGA non-supportive coating 6/0 strength is obtained. Thus, PGA coated, 7/0 core "Kevlar" can be used for sizes 6/0 and 7/0.

Using high strength, extended chain poly-ethylene having 50 gram/denier straight breaking tenacity, with approximately 1/3 of this converting to knot tenacity, a 5/0 size reinforcing high strength polyethylene core of about 0.140 mm in diameter will impart at least the knot strength of a 2/0 suture to the composite. Thus, a PGA-coated high strength polyethylene 5/0 core can be used to make sizes 2/0, 3/0, 4/0 and 5/0 absorbable, non-absorbable composite sutures.

With high strength polyethylene 6/0 size re-inforcing core of about 0.90 mm diameter and a non-supporting PGA coating, the core itself will pro-vide enough knot strength for sizes 4/0, 5/0 and 6/0 based on the knot strength of "Prolene".

With high strength polyethylene 7/0 size rein-forcing core of about .060 - .065 mm in diameter and non-reinforcing PGA coating, the core itself will give knot strength sufficient for 5/0, 6/0 and 7/0 composites based on the knot strengths of "Prolene".

With higher strength materials or by increasing the knot strength of the materials mentioned here, a wider spectrum of sizes could be covered with the same fine sized reinforcing core.

In commercial production, needles may be



*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000171**

-21-

attached to one end of the composite sutures of the
invention and the sutures may be packed in sterile
containers. Inasmuch as the sutures are stable for
long periods of time without a conditioning fluid,
the sutures may be dry packed in glass tubes or
plastic envelopes. Conditioning fluid may be used
to assure maintenance of sterility or as a rust
preventing medium for the needle. Eyeless needles
are preferred since they cause less tissue damage.
Conveniently, the composite sutures of the present
invention are formed at convenient lengths,
attached to eyeless needle, wound on reels if
desired, and placed in containers such as plastic
envelopes. The sutures may then be sterilized with
ethylene oxide or other conventional gaseous
sterilizing agents in accordance with known
practices. Alternatively, the sutures may be
sealed in the envelopes and then sterilized by
using heat and radiation including x-rays, gamma
rays, electrons, neutrons, etc.

Another advantage offered by the composite
sutures of the invention is that needles of smaller
diameter can be attached thereto. In accordance
with this feature of the invention the outside
cover or coating of suture material at the end of
the composite suture is removed by any suitable
means as, for instance, by dissolving the cover
using a solvent which solubilizes the cover but not
the core. The core at the end of the suture is
thereby exposed and onto the core is attached as,
for instance, by swagging a needle of smaller outer
diameter than would be used with a suture of the
same outer diameter. The following example
illustrates this feature of applicants' invention:

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000172**

PCT/US84/00918

-22-

### Example VI

The end of a composite suture prepared
according to the general procedure of Example I and
having an outer diameter of approximately 0.012
inch is dipped one-eighth inch into boiling xylene
until the polypropylene cover softens.  The poly-
propylene cover is then manually scrapped off to
expose the 5/0 "Kevlar" core.  A 0.014 inch diam-
eter needle is swagged onto the core to provide a
suture with a needle having a cross-sectional area
reduced approximately two-thirds that of needles
required for sutures having a 0.012 inch diameter.

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000173**



-23-

IT IS CLAIMED:

1.  A sterile, surgical suture comprising an elongated core of a synthetic polymer having a knot tenacity of at least 7 grams per denier coated with a filmand fiber-forming surgical suture material, said coated core, when constructed into a surgical suture of a particular USP grade size, having a knot strength exhibited by surgical sutures of said suture material at least two USP grade sizes larger.

2.  A sterile, surgical suture according to claim 1 wherein the synthetic polymer is an aromatic polyamide.

3.  A sterile, surgical suture according to claim 1 wherein the aromatic polyamide is poly(p-phenylene terephthalamide).

4.  A sterile, surgical suture according to claim 1 wherein the aromatic polyamide is poly(1,4-benzamide).

5.  A sterile, surgical suture according to claim 1 wherein the synthetic polymer is a fully chain-extended polyethylene having a straight pull tenacity of about 30 to 50 grams/denier.

6.  A sterile, surgical suture according to claim 1 wherein the surgical suture material is fibroin.

7.  A sterile, surgical suture according to claim 1 wherein the surgical suture material is polyester.

8.  A sterile, surgical suture according to claim 1 wherein the polyester is polyethylene terephthalate.

9.  A sterile, surgical suture according to claim 1 wherein the surgical suture material is polyolefin having a straight pull tenacity of about


DePuy Mitek, Inc. v. Arthrex, Inc.
C.A. No.04-12457 PBS
DMI000174



-25-

21. A sterile, surgical suture according to claim 2 wherein the core is a plurality of fibers of said synthetic polymer in a twisted yarn or braided construction.

22. A sterile, surgical suture according to claim 20 wherein the aromatic polyamide is poly(p-phenylene terephthalamide).

23. A sterile, surgical suture according to claim 1 wherein the coating of film-forming suture material comprises 5 to 10% by weight of the suture.

24. A sterile, surgical suture according to claim 13 wherein the coating of film-forming suture material comprises 5 to 90% by weight of the suture.

25. A method of producing a surgical suture having a knot strength rendering it useful over a range of USP suture grade sizes comprising coating an elongated core of a synthetic polymer having a knot tenacity of at least 7 grams/denier, with a fiberand film-forming surgical suture material, said coated core when constructed into a surgical suture of a particular USP grade size, having a knot strength exhibited by surgical sutures of said suture material at least two USP grade sizes larger.

26. A method according to claim 25 wherein said coating is effected by solution coating.

27. A method according to claim 25 wherein said coating is effected by melting coating.

28. A method according to claim 25 wherein the coating comprises heating under tension a thread comprised of a plurality of synthetic polymer fibers having a knot tenacity of at least 7 grams/denier in the form of a cover and at least one fiber of a meltable surgical suture material in the form of a core, at an elevated temperature sufficient to melt and liquify the fiber or fibers



*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000175**

WO86/00020                                      PCT/US84/00918

-24-

4 to 10 grams/denier.

10. A sterile, surgical suture according to claim 1 wherein the polyolefin is polyehtylene.

11. A sterile, surgical suture according to claim 1 wherein the polyolefin is polypropylene.

12. A sterile, surgical suture according to claim 1 wherein the surgical suture material is collagen.

13. A sterile, surgical suture according to claim 1 wherein the surgical suture material is a film-forming absorbable synthetic polymer.

14. A sterile, surgical suture according to claim 13 wherein the absorbable synthetic polymer is selected from the group consisting of film-forming homopolymers and copolymers of lactide and glycolide.

15. A sterile, surgical suture according to claim 14 wherein the absorbable synthetic polymer is a homopolymer of glycolide.

16. A sterile, surgical suture according to claim 14 wherein the absorbable synthetic polymer is a homopolymer of lactide.

17. A sterile, surgical suture according to claim 1 wherein the core is in monofilament construction.

18. A sterile, surgical suture according to claim 2 wherein the core is in monofilament construction.

19. A sterile, surgical suture according to claim 18 wherein the aromatic polyamide is poly(p-phenylene terephthalamide).

20. A sterile, surgical suture according to claim 1 wherein the core is a plurality of fibers of said snythetic polymer in a twisted yarn or braided constructon.

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000176**



-25-

of surgical suture material but not the fibers of
said cover, permitting the liquified surgical
suture material to distribute itself throughout the
interstices of the cover and onto the surface
thereof so as to form a coating on said cover,
which is thereby converted to the core of the
finished composite suture, then smoothing said
coating.

29. A method according to claim 28 wherein
said smoothing is effected by passing said heated
thread through a heated smoothing die.

30. A method according to claim 28 wherein the
surgical suture material is selected from poly-
olefin and polyester.

31. A method according to claim 25 wherein the
coating comprises heating under tension a thread
comprised of a plurality of synthetic polymer
fibers having a straight pull tensile strength of
at least 18 grams/denier and a knot tenacity of at
least 7 grams/denier in the form of a cover and at
least one fiber of a meltable surgical suture
material in the form of a core, at an elevated
temperature sufficient to melt and liquify the
fiber or fibers of surgical suture material but not
the fibers of said cover, permitting the liquified
surgical suture material to distribute itself
throughout the interstices of the cover and onto
the surface thereof so as to form a coating on said
cover, which is thereby converted to the core of
the finished composite suture, smoothing said
coating and melt extruding similar surgical suture
material onto said smoothed coating.

32. A method according to claim 31 wherein the
surgical suture material is selected from poly-
olefin and polyester.

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000177**

-27-

33. A method according to claim 25 wherein the coating is effected by solution coating.

34. A method of producing a surgical suture having a knot strength rendering it useful over a range of USP suture grade sizes comprising coating an elongated core of synthetic polymer having a knot tenacity of at least 7 grams/denier and a lateral strength insufficient to prevent abrasion, fibrillation or kinking on knotting with a film and fiber-forming surgical material in an amount sufficient to increase the lateral strength of said core and provide resistance against said abrasion, fibrillation or kinking on knotting, said coated core, when constructed into a surgical suture of a particular USP grade size, having a knot strength exhibited by surgical sutures of said suture material at least two USP grade sizes larger.

35. A sterile, surgical suture according to claim 1 having a needle attached to said core.

36. A sterile, surgical suture according to claim 35 wherein the synthetic polymer is an aromatic polyamide.

37. A sterile, surgical suture according to claim 35 wherein the aromatic polyamide is poly(p-Phenylene terephthalamide).

38. A sterile, surgical suture according to claim 35 wherein the aromatic polyamide is poly(1,4-benzamide).

39. A sterile, surgical suture according to claim 35 wherein the synthetic polymer is a fully chain-extended polyethylene having a straight pull tenacity of about 30 to 50 grams/denier.

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
***DMI000178***



WO86/00020

PCT/US84/00918

1/1

FIG. 1

FIG. 2

FIG. 3

DePuy Mitek, Inc. v. Arthrex, Inc.
C.A. No.04-12457 PBS
DMI000179



## INTERNATIONAL SEARCH REPORT

International Application No PCT/US84/00918

### I. CLASSIFICATION OF SUBJECT MATTER (if several classification symbols apply, indicate all) [6]

According to International Patent Classification (IPC) or to both National Classification and IPC

Int Cl [3] A61L  17/00
US CL  128/335.5

### II. FIELDS SEARCHED

| | Minimum Documentation Searched [4] |
|---|---|
| Classification System | Classification Symbols |
| US | 128/329R, 334R-335.5, Dig. 8, Dig. 18<br>28/140, 165, 166, 169 66/169R-170, 202 8/Dig. 21<br>8/490, 529-533, 115.5-115.7, 130.1-132, Dig. 3, |

Documentation Searched other than Minimum Documentation
to the Extent that such Documents are Included in the Fields Searched [5]

cont'd  Dig. 9

### III. DOCUMENTS CONSIDERED TO BE RELEVANT [14]

| Category * | Citation of Document, [16] with indication, where appropriate, of the relevant passages [17] | | Relevant to Claim No [18] |
|---|---|---|---|
| X, Y | US, A, 3,791,388 | 12 February 1974<br>HUNTER | 1, 6-9,<br>11-17, 20,<br>23-35 |
| Y | US, A, 4,014,973 | 29 March 1977<br>THOMPSON | 23, 24, 31 |
| Y | US, A, 3,359,983 | 26 December 1967<br>NORTHEY | 5, 10, 23,<br>24, 39 |
| Y | US, A, 3,630,205 | 28 December 1971<br>LISTNER | 5, 10, 23,<br>24, 39 |
| X, Y | US, A, 4,204,542 | 27 May 1980<br>BOKROS | 23, 24,<br>35-38 |
| X, Y | US, A, 4,336,357 | 22 June 1982<br>BARTOLI | 23, 24,<br>35-38 |

* Special categories of cited documents: [15]

"A" document defining the general state of the art which is not considered to be of particular relevance

"E" earlier document but published on or after the international filing date

"L" document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason (as specified)

"O" document referring to an oral disclosure, use, exhibition or other means

"P" document published prior to the international filing date but later than the priority date claimed

"T" later document published after the international filing date or priority date and not in conflict with the application but cited to understand the principle or theory underlying the invention

"X" document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step

"Y" document of particular relevance; the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art.

"&" document member of the same patent family

### IV. CERTIFICATION

| Date of the Actual Completion of the International Search [2] | Date of Mailing of this International Search Report [3] |
|---|---|
| 31 JULY 1984 | 17 AUG 1984 |
| International Searching Authority [1] | Signature of Authorized Officer |
| ISA/US | C. FRED ROSENBAUM |

Form PCT ISA/210 (second sheet) (October 1981)

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000180**

International Application No: PCT/US84/00918

FURTHER INFORMATION CONTINUED FROM THE SECOND SHEET

V. ☐ OBSERVATIONS WHERE CERTAIN CLAIMS WERE FOUND UNSEARCHABLE ¹⁰

This international search report has not been established in respect of certain claims under Article 17(2) (a) for the following reasons:

1. ☐ Claim numbers          , because they relate to subject matter ¹² not required to be searched by this Authority, namely:

2. ☐ Claim numbers          , because they relate to parts of the international application that do not comply with the prescribed require-
ments to such an extent that no meaningful international search can be carried out ¹³, specifically:

VI. ☒ OBSERVATIONS WHERE UNITY OF INVENTION IS LACKING ¹¹

This International Searching Authority found multiple inventions in this international application as follows:

Claims 1-24 and 35-39 are drawn to a surgical suture.

Claims 25-34 are drawn to a method of making a surgical
suture.

1. ☐ As all required additional search fees were timely paid by the applicant, this international search report covers all searchable claims
of the international application.

2. ☐ As only some of the required additional search fees were timely paid by the applicant, this international search report covers only
those claims of the international application for which fees were paid, specifically claims:

3. ☐ No required additional search fees were timely paid by the applicant. Consequently, this international search report is restricted to
the invention first mentioned in the claims; it is covered by claim numbers:

4. ☒ As all searchable claims could be searched without effort justifying an additional fee, the International Searching Authority did not
invite payment of any additional fee.

Remark on Protest

☐ The additional search fees were accompanied by applicant's protest.

☐ No protest accompanied the payment of additional search fees.

Form PCT/ISA/210 (supplemental sheet (2)) (October 1981)

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000181**

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000182**

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI000183**