**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **DePuy Mitek, Inc.** | ) | |
|     **a Massachusetts Corporation** | ) | |
| | ) | |
|     **Plaintiff.** | ) | |
| | ) | |
|     **v.** | ) | **Civil No. 04-12457 PBS** |
| | ) | |
| **Arthrex, Inc.** | ) | |
|     **a Delaware Corporation, and** | ) | |
| | ) | |
| **Pearsalls Ltd.** | ) | |
|     **a Private Limited Company** | ) | |
|     **of the United Kingdom** | ) | |
| | ) | |
|     **Defendants.** | ) | |
| | ) | |

**<u>Plaintiff DePuy Mitek's Memorandum In Support Of Motion *In Limine* (No. 3)
To Preclude Arthrex from Relying on U.S. Patents 4,074,713 and 4,074,366</u>**

Plaintiff, DePuy Mitek ("Mitek") moves the Court to exclude Arthrex from presenting

argument and evidence of two U.S. patents (U.S. Patents 4,074,713 and 4,074,366, attached as

Ex. 1 and Ex. 2) that:

- Arthrex never produced during discovery;

- no Arthrex expert discussed in any Rule 26 report; and

- were first identified in Arthrex's *reply* summary judgment papers filed on

   September 15, 2006.

Mitek respectfully requests an order precluding Arthrex from using these patents at trial

because: (1) they were not timely produced, and Mitek has not had a chance to have its experts

consider these patents; (2) no Arthrex expert witness can testify to their content because they

were not considered in any Rule 26 report; and (3) the patents are irrelevant to the proper question of infringement.

## I.    MITEK HAS NOT HAD THE OPPORTUNITY TO HAVE ITS EXPERTS CONSIDER THESE UNTIMELY PRODUCED PATENTS

Arthrex first disclosed these two patents in their summary judgment *reply* filed on September 15, 2006.[1]  At that time, all discovery was over.  Consequently, Mitek has not had the opportunity to allow its experts to consider them.  It would not be fair to allow Arthrex to use these patents at trial without giving Mitek the opportunity to allow its experts to consider them.  And with trial just a few weeks away, it would not be practical to re-open discovery.  Allowing Arthrex to use these patents would contradict the open disclosure policies behind FED. R. CIV. P 26.  Arthrex should not be permitted to rely on technical documents after discovery has closed and have its experts discuss them at trial because to do so directly violates FED. R. CIV. P. 26(a)(2) and this Court's Scheduling Order.  Further, to let Arthrex do so, permits Arthrex's experts to escape their deposition regarding these technical documents.

Furthermore, when Arthrex submitted these papers to the Court, they failed to submit a declaration from any expert or any fact witness explaining the patents; they provided only inadmissible attorney argument (D.I. 73 at 11, n. 8).  It appears that Arthrex has no connection to these patents.  But because Arthrex never produced them during fact discovery, Mitek has no way of knowing whether that is the case.  Therefore, Arthrex has no expert or fact witness that can explain the patents to the jury.  Consequently, Arthrex should not be permitted to introduce these patents under FED. R. EVID. 401, 402, and 403.

---

[1]    At the meet and confer for this motion, Arthrex argued that it was justified in raising these patents because Arthrex was rebutting an argument raised for the first time by Mitek in Mitek's summary judgment briefing.  As discussed more fully below, this is wrong.  Mitek raised the argument in Dr. Brookstein's April 13, 2006 expert report, well before summary judgment briefing (Ex. 3 at ¶54).

## II.     THE PATENTS ARE IRRELEVANT TO THE PROPER INFRINGEMENT ISSUE

The question of infringement has boiled down to whether the NuSil Med-2174 coating (a silicone coating) on FiberWire materially affects the basic and novel characteristics of Mitek's invention.  The issue is _NOT_ do coatings in general affect the properties of sutures.

Arthrex is apparently using the two patents to try to show that a silicone coating can affect the handling of a suture ("Surfaces can be coated with a silicone, beeswax, and the like to modify the handling or absorption rates.")(Ex. 1 at 9:41-43; Ex. 2 at 9:40-42).  Any evidence that coating, in general, can affect certain suture properties is irrelevant to the proper question of infringement.  The issue here is whether the specific coating on the specific FiberWire construction materially affects the basic and novel properties of the invention.  Mitek advanced this argument in Dr. Brookstein's April 13 expert report (Ex. 3 at ¶54), but rather then addressing that argument during expert discovery,[2] Arthrex waited until summary judgment briefing to produce these two patents.  The patents were not only untimely produced, they are not relevant as they have no relationship to the specific coating that is on FiberWire, NuSil Med-2174.

Consequently, these patents are irrelevant to the salient infringement issue, and Arthrex should be precluded from using them at trial.

## III.     CONCLUSION

For the foregoing reasons, Mitek requests that the Court enter an order precluding Arthrex from entering into evidence U.S. Patents 4,074,713 and 4,074,366.

---

[2]     For example, Arthrex had the opportunity to question Dr. Brookstein during his deposition in July 2006 about this argument advanced in his April 13 2006 report. But Arthrex failed to do so.

Dated: July 13, 2007

DEPUY MITEK, INC.,
By its attorneys,


_/s/ Michael J. Bonella_____
Dianne B. Elderkin
Lynn A. Malinoski
Michael J. Bonella
Erich M. Falke
WOODCOCK WASHBURN LLP
Cira Centre, 12th Floor
2929 Arch Street
Philadelphia, PA 19104
(215) 568-3100

Daniel J. Gleason (BBO #194900)
Heather Repicky (BBO #663347)
Nutter McClennen & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA. 02210-2604
617-439-2000

## CERTIFICATE OF SERVICE

I certify that I am counsel for DePuy Mitek, Inc. and that true and correct copies of:

**Plaintiff DePuy Mitek's Motion *In Limine* (No. 3) To Preclude Arthrex from Relying on U.S. Patents 4,074,713 and 4,074,366; and**

**Plaintiff DePuy Mitek's Memorandum In Support Of Motion *In Limine* (No. 3) To Preclude Arthrex from Relying on U.S. Patents 4,074,713 and 4,074,366**

were served on counsel for Defendants Arthrex, Inc. and Pearsalls Ltd. on this date via the Court's e-mail notification with the following recipients being listed as filing users for Defendants:

> Charles W. Saber
> Dickstein Shapiro LLP
> 1825 Eye Street, NW
> Washington, DC 20006
> saberc@dicksteinshapiro.com

> Raymond P. Ausrotas
> Todd & Weld LLP
> 28 State Street, 31st Floor
> Boston, MA 02109
> rausrotas@toddweld.com

Dated:  July 13, 2007                              _/s/ Erich M. Falke_____
                                                   Erich M. Falke

# EXHIBIT 1

# United States Patent [19]

**Capozza**

[11] **4,074,713**

[45] **Feb. 21, 1978**

[54] **POLY(N-ACETYL-D-GLUCOSAMINE) PRODUCTS**

[75] Inventor: **Richard Carl Capozza,** Norwalk, Conn.

[73] Assignee: **American Cyanamid Company,** Stamford, Conn.

[21] Appl. No.: **707,914**

[22] Filed: **July 22, 1976**

### Related U.S. Application Data

[62] Division of Ser. No. 558,525, March 14, 1975, Pat. No. 3,989,535, which is a division of Ser. No. 441,717, Feb. 11, 1974, abandoned.

[51] Int. Cl.² .................................................. A61F 5/04
[52] U.S. Cl. .................................................. 128/92 C
[58] Field of Search .......... 3/1; 128/92 C; 424/180

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,605,123 | 9/1971 | Hahn | 3/1 |
| 3,632,754 | 1/1972 | Balassa | 424/180 |
| 3,878,284 | 4/1975 | Schmitt et al. | 260/33.4 R |
| 3,879,377 | 4/1975 | Austin | 424/180 |
| 3,892,731 | 7/1975 | Austin | 424/180 |
| 3,903,268 | 9/1975 | Balassa | 424/180 |
| 3,914,413 | 10/1975 | Balassa | 424/180 |

*Primary Examiner*—Leland A. Sebastian
*Attorney, Agent, or Firm*—Charles F. Costello, Jr.

[57] **ABSTRACT**

Poly(N-acetyl-D-glucosamine) is soluble in hexafluoroisopropyl alcohol and hexafluoroacetone sesquihydrate. The solutions formed may be wet or dry spun into filaments, or cast into films or solid articles, which may be used as absorbable surgical sutures, or other absorbable surgical elements. Poly(N-acetyl-D-glucosamine) is enzymatically degradable in living tissue, and is resistant to hydrolytic degradation, and, therefore, surgical elements thereof have good storage characteristics under a wide variety of conditions.

**2 Claims, No Drawings**


DEFENDANT'S EXHIBIT

4,074,713

1

## POLY(N-ACETYL-D-GLUCOSAMINE) PRODUCTS

This is a division of application Ser. No. 558,525, filed Mar. 14, 1975, now U.S. Pat. No. 3,989,535, which is a division of application Ser. No. 441,717, filed Feb. 11, 1974, now abandoned. Another division of said Ser. No. 441,717 is application Ser. No. 558,526, filed Mar. 14, 1975, U.S. Pat. No. 3,988,411.

## BACKGROUND OF THE INVENTION

Poly(N-acetyl-D-glucosamine) is a known polymer which is a component of naturally occurring chitin. It is regarded as insoluble in conventional solvents, and, therefore, has been used as a powder. There is a demand for absorbable surgical elements, particularly sutures, which are strong enough of serve as a tissue retaining element during a healing process, and which then are absorbed by the living tissue. Requirements for the duration of useful strength vary widely with both the type of tissue and the surgical procedure. Some cosmetic purposes require strength for only a few hours or a few days. Other uses require strength for periods of months or even years. Advantageously, the surgical element should absorb promptly after it has served its useful function. Sutures have long been treated with dyes and therapeutic agents, poly(N-acetyl-D-glucosamine) sutures may be so treated.

Absorbable surgical elements usually start losing strength almost as soon as implanted, but a useful degree of strength is maintained for a much longer period. Complete absorption is, of course, much slower. Sharp changes in strength with time are not to be expected.

## DESCRIPTION OF THE PRIOR ART

U.S. Pat. No. 3,297,033, Schmitt and Polistina, January 10, 1967, SURGICAL SUTURES, discloses polyhydroxyacetic ester absorbable sutures. The material is also called polyglycolic acid, and is disclosed as permitting small quantities of comonomers to be present, such as dl-lactic acid, its optically active forms, homologs and analogs. A small quantity is recognized by the art as up to 15%, as shown by U.S. Pat. No. 2,668,162, Lowe, Feb. 2, 1954, PREPARATION OF HIGH MOLECULAR WEIGHT POLYHYDROXY-ACETIC ESTER.

Many uses of polyglycolic acid for surgical purposes are disclosed in said U.S. Pat. No. 3,297,033 and continuations-in-part thereof including: U.S. Pat. No. 3,463,158, Schmitt and Polistina, Aug. 26, 1969, POLY-GLYCOLIC ACID PROSTHETIC DEVICES; U.S. Pat. No. 3,620,218, Schmitt and Polistina, Nov. 16, 1971, CYLINDRICAL PROSTHETIC DEVICES OF POLYGOLYCOLIC ACID; U.S. Pat. No. 3,739,773, Schmitt and Polistina, June 19, 1973, POLY-GLYCOLIC PROSTHETIC DEVICES; and U.S. Ser. No. 365,656, Schmitt and Polistina, May 31, 1973, SURGICAL DRESSINGS OF ABSORBABLE POLYMERS.

U.S. Pat. No. 3,463,158, Schmitt and Polistina, Aug. 26, 1969, POLYGLYCOLIC ACID PROSTHETIC DEVICES, discloses surgical uses of polyglycolic acid, and incorporates definitions of some terms.

U.S. Pat. No. 3,620,218, Schmitt and Polistina, Nov. 16, 1971, CYLINDRICAL PROSTHETIC DEVICES OF POLYGLYCOLIC ACID, lists many surgical uses of polyglycolic acid.

u.S. Pat. No. 3,737,440, Schmitt and Bailey, June 5, 1973, POLYGLYCOLIC ACIDS IN SOLUTIONS,

2

discloses hexafluoroisopropyl alcohol and hexafluoroacetone sesquihydrate as solvents for the preparation of solutions of polyglycolic acid, and wet and dry casting of such solutions. Polyglycolic acid has many surgical uses as an absorbable to polymer.

Polyglycolic acid sutures are the only synthetic absorbable sutures that have met with commercial surgical acceptance to date.

Chitin has been estimated to be the second most abundant polysaccharide in nature with a synthesis in the neighborhood of a billion tons a year by marine organisms. See Chitin, N. V. Tracey, Reviews of Pure and Applied Chemistry, Royal Australian Chemical Institute, Vol. 7, No. 1, March, 1957, pages 1 to 14.

Carboxymethylchitin is disclosed in Carbohyd, Res. 7, 483-485 (1968), Ralph Trujillo.

This article mentions the hydrolysis of both chitin and carboxymethylchitin by lysozyme.

I. Joffe and J. R. Hepburn, "Observations on Regenerated Chitin Films", J. Materials Science, 8 (1973), 1751-1754, give values on the strength of films of regenerated chitin, from a chitin xanthate dispersion — including a comparison of strength after 30 years storage. Values as high as $9.31 \times 10^7 Nm^{-2}$ are given (calculates to $6.3 \times 10^3$ pounds/sq. inch).

Noguchi, Wada, Seo, Tokura and Nishi, "Studies on Chitin and Chitin-Cellulose Fibers", Kobunshi Kagaku, Vol. 30, No. 338, pp. 320-326 and 378, (June 1973) disclose chitin fibers spun by a xanthate process, analogous to the spinning of cellulose to form rayon. A 50% chitin-cellulose fiber is disclosed with a denier of 12.3 and a tenacity of 1.08 grams/denier dry and 0.13 grams/denier wet.

Poly(N-acetyl-D-glucosamine) differes from cellulose in that instead of a hydroxyl group in the 2 position on cellulose, there is an acetylamino group.

Prudden, Migel, Hanson, Freidrich and Balassa in "The Discovery of a Potent Pure Chemical Wound-Healing Accelerator", The American Journal of Surgery, Vol. 119, May 1970, pages 560 to 564, disclose that chitin containing n-acetyl glucosamine is useful to accelerate wound-healing. These authors postulate fibers of a long chain n-acetyl glucosamine as a nonabsorbable suture, and a shorter polymer length as an absorbable suture. Other prosthetic devices, such as hemostatic clips, vascular and joint prostheses, mesh and knit abdominal thoracic wall replacements are postulated for evaluation. No methods are postulated for the achievements of these objectives. incorporated by this reference thereto for background information on chitin, its properties and derivatives.

## SUMMARY OF THE INVENTION

This invention relates to solid surgical elements of poly(N-acetyl-D-glucosamine), methods of making them, and more particularly to polymers which are compatible with living mammalian tissue, particularly human tissue, and which can be used surgically, and are biologically degradable into tissue compatible components which are absorbed by living tissues. The primary degradation of the polymer is by enzymatic fission into products which can be carried away by the living tissue and which products are degradable to excretable components or are themselves excretable. Because of the surgical demand for sutures, absorbable fabrics, gauzes, bone pins, etc. whose absorption and strength characteristics vary, it is desirable that a spectrum of strength and absorbability characteritstics be provided to meet

4,074,713

3

surgical demands for various procedures. The enzyme lysozyme is particularly effective in the enzymatic degradation of poly(N-acetyl-D-glucosamine). Various forms of poly(N-acetyl-D-glucosamine) may have different degradation rates, and the degradation rate may vary with the location.

Poly(N-acetyl-D-glucosamin) has many advantages as a material of construction for sutures and other surgical elements. The poly(N-acetyl-D-glucosamine) in its own right tends to encourage wound healing rather than slow it down. Poly(N-acetyl-D-glucosamine) is biodegradable by enzymatic action with minimal tissue reaction.

Surgical elements of poly(N-acetyl-D-glucosamine) are not hydrolyzed by water and, hence, need not be kept bone dry but may be stored under ambient conditions of moisture for prolonging periods of time. The basic poly(N-acetyl-D-glucosamine) may be modified by treatment to introduce carboxymethyl, hydroxyethyl or O-ethyl substituents so that the polymer has linkages from acetyl-6-O-(carboxymethyl)-D-glucosamine units, acetyl-6-O-(2'-hydroxyethyl)-D-glucosamine units, or acetyl-6-O-(ethyl)-D-glucosamine units. Since modification by the introduction of these derivatives alters the rate of enzymatic degradation, such introduction provides a means for controlling the absorption rate as well as making the surgical element more hydrophilic or more hydrophobic to an extent desired.

Other side chains may be placed on the glucosamine ring, or its substituents because the side chains may vary from methyl to long chain alkyl, including branched chains, unsaturated chains, aryl or aralkyl, and which may include halogen, alkoxy, aryloxy, aralkoxy, ether, ester and amide groups, as substituents on the side chains, the relative distribution between aqueous and solvent components in a system can be varied as well as water solubility or oil and solvent solubility. Also, because the size and location of the side chains affects the rate of degradation and the acidity of the system, the rate of enzymatic degradation can be varied over wide limits to meet the requirements of a system and the desires of the operator. The less highly substituted materials are often preferred for medical uses. The broader range of substituents permits more flexibility in pH control, and in biodegradable polymers for use in packaging, etc. The use of side chains with unsaturated linkages permits cross-linked polymers to be formed. This uniformity results in greater strength, more crystallinity, and more readily reproducible and controllable characteristics, which are of interest to a surgeon during use.

Fibers made by extruding solutions of poly(N-acetyl-D-glucosamine) in polyfluorinated solvents such as hexafluoroisopropyl alcohol and hexafluoroacetone sesquihydrate or mixtures of such solvents permit dry or wet spinning of fibers which are of a convenient size for forming sutures.

4

The fibers are more pliable when wet with water. The enhanced pliability, when wet with water, is highly advantageous in that many surgeons are accustomed to handling catgut which must be wet with water to have adequate handleability and, hence, are using familiar techniques and procedures in surgery. Monofilaments are usable when wet. A dry braided construction of polyfilamentary character is frequently advantageous.

Poly(N-acetyl-D-glucosamine) has the formula:



Groups below the plane of the paper are shown by a dotted bond.

Poly(N-acetyl-D-glucosamin) has ascribed to it the formula (ring hydrogens omitted for clarity):



Poly(N-acetyl-D-glucosamine) is a major component of naturally occurring chitin. The naturally occurring material has not only the poly(N-acetyl-D-glucosamine) but also inorganic salts thought to be forms of calcium carbonate and proteinaceous material, the composition of which is not presently known. The term "chitin" is used herein to refer to the various naturally occurring forms of chitin including the protein and inorganic carbonate components. The term "purified" is used to refer to chitin after purification to remove calcium carbonate and other inorganic salts and various proteins which may be present and is essentially poly(N-acetyl-D-glucosamine). Some confusion exists in the literature because the name chitin is used as a name for poly(N-acetyl-D-glucosamine) whitout specifying whether it is a naturally occurring material containing inorganic salts and proteings or whether the term is intended to designate purified poly(N-acetyl-D-glucosamine) without specifying the degree of purity or the character of the impurities present.

The term "drug" is used to refer to a substance other than a food intended to affect the structure or function of the body of man or other animal. The term is somewhat broader than "medicine" in that the term "medicine" is sometimes considered to be restricted to an

4,074,713

5

agent which is administered to affect or control a pathogenic condition.

The term "enzymatically degradable" refers to a form of poly(N-acetyl-D-glucosamine) or its derivatives which is broken down into body fluid soluble components. The problem of retention by the body or disposal of the residual matrix is minimal or non-existent.

While other enzymes may also affect the enzymatic degradation of the poly(N-acetyl-D-glucosamine) matrix, the enzyme which is most widely distributed in the body and here very effective is lysozyme. Lysozyme occurs in practically all of the body fluids and effectively breaks down the polymer chain to water soluble or disposable components.

Poly(N-acetyl-D-glucosamine) is not readily hydrolyzed by water.

It is highly advantageous to have the degradation of the poly(N-acetyl-D-glucosamine) occur only by the action of an enzyme as the resistance to hydrolytic degradation markedly reduces problems of manufacture and storage in the presence of ambient moisture, and ensures a steady smooth surface erosion rather than a fragmentation process commonly experience by polymers which are hydrolyzed by small molecules.

The degradation rate of poly(N-acetyl-D-glucosamine) can be lowered by crosslinking, if a slower rate is preferred.

In general, the surgical uses of the polymers of the present invention are similar to those previously taught for polyglycolic acid and as set forth in U.S. Pat. Nos. 3,297,033; 3,463,158; 3,620,218; and 3,739,773, and U.S. Ser. No. 365,656, supra. These disclosures of uses as herein hereby incorporated by this reference thereto.

These uses are extremely varied. For clarity and explanation, certain terms are defined and representative uses given for the novel polymer forms.

A "filament" is a single, long, thin flexible structure of a non-absorbable or absorbable material. It may be continuous or staple.

"Staple" is used to designate a group of shorter filaments which are usually twisted together to form a longer continuous thread.

An absorbable filament is one which is absorbed, that is, digested or dissolved, in living mammalian tissue.

A "thread" is a plurality of filaments, either continuous or staple, twisted together.

A "strand" is a plurality of filaments or threads twisted, plaited, braided, or laid parallel to form a unit for further construction into a fabric, or used per se, or as a monofilament of such size as to be woven or used independently.

A "fabric" is a three dimensional assembly of filaments, which may be woven, knitted, felted or otherwise formed into a flexible sheet having two layer dimensions and a thinner thickness dimension. A fabric may be cut to a desired size before or at the time of use.

Except where limited specifically or by context, the word fabric includes both absorbable and non-absorbable cloth, or a fabric or cloth that is partially of absorbable polymer.

A "dressing" is a woven, knitted, felted or braided fabric, of at least one layer, which is designed to protect a wound and favor its healing. As used herein, the term dressing includes bandages, insofar as they contact the wound itself. The dressing may be entirely internal.

A "bandage" is a strip of gauze, or other material used to hold a dressing in place, to apply pressure, to immobilize a part, to obliterate tissue cavities or to check hemorrhage. Except insofar as the bandage comes in contact with a wound, or the exudate from a wound, there is no need for the bandage to be of absorbable polymer. If the bandage may be in a position where absorbability by living tissue of at least part of the bandage is desirable, at least that part should be of absorbable polymer.

6

The dressing may be in part directive of growth, as, for example, in nerve tissue, which grows slowly, and as a result has regeneration impaired by the more rapid growth of scar tissue which can block the growth of the nerve tissue. With a wrap-around sheath of absorbable polymer fabric or a split or solid tube used to support, place, hold and protect; regeneration of nerve tissue and function is greatly aided. Other factors may inhibit regeneration of nerve tissue or function, but with the exclusion of scar tissue, such other factors may be separately treated.

For different purposes and in different types of tissue the rate of absorption may vary. In general, an absorbable suture or solid load bearing prosthesis should have as high a portion of its original strength as possible for at least three days, and sometimes as much as thirty days or more, and preferably should be completely absorbed by muscular tissue within from 45 to 90 days or more depending on the mass of the cross-section. The rate of absorption in other tissues may vary even more.

For dressings, strength is often a minimal requirement. Some dressings, as for instance, on a skin abrasion, may need strength for only a few hours, until a scab forms, and rapid decrease of strength and absorption is an advantage so that when the scab is ready to fall off, the dressing does not cause a delay. For burns, and larger lesions, strength and reinforcement may be desired for a longer period.

In common with many biological systems, the requirements are not absolute and the rate of absorption as well as the short-term strength requirement varies from patient to patient and at different locations within the body, as well as with the thickness of the section of the polymer.

The absorbably polymer may be formed as tubes or sheets for surgical repair and may also be spun as thin filaments and woven or felted to form absorbable sponges or absorbable gauze, or used in conjunction with other compressive structures as prosthetic devices within the body of a human or animal where it is desirable that the structure have short-term strength, but be absorbable. The useful embodiments include tubes, including branched tubes or Tees, for artery, vein or intestinal repair, nerve splicing, tendon splicing, sheets for typing up and supporting damaged kidney, liver and other intestinal organs, protecting damaged surface areas such as abrasions, particularly major abrasions, or areas where the skin and underlying tissues are damaged or surgically removed.

In surgical techniques involving internal organs, hemorrhage may be a major problem. Some of the organs have such tissue characteristics that it is very difficult to use sutures or ligatures to prevent bleeding. For example, the human liver may suffer traumatic damage or exhibit tumors or for other reasons require surgery. In the past it has been very difficult to excise part of the liver or to suture the liver without the combined problems of the sutures cutting out and hemorrhage at the surface causing such major complications as to either prevent surgery or cause an unfavorable prognosis.

4,074,713

7

It is now found that a sponge or pad or velour of the present absorbable polymer may be used to protect the surface and permit new feats of surgical intervention. For instance, filaments may be formed into a woven gauzwe or felted sponge or a velour, preferably the construction is fairly tight by textile standards, and such sponge may be placed on the surface of the bleeding organ such as the liver or a lung with either gentle suturing or with ties in the nature of ligatures to hold the element in position with a certain amount of body fluids flowing into the sponge and being absorbed, which results in hemostasis and prevention of further loss of body fluids. If a liver or lung is so repaired, the organ may be replaced in the body cavity and the wound closed.

Where surgically useful, the sponge or fabric can be used as a bolster to prevent a suture from cutting out. For instance, if the liver is to be sutured, an absorbable polymer pad can be placed on the surfaces to reinforce the tissue and prevent the suture from cutting into rather than retaining the tissue. Such pads of gauze or felt protect tissue from cutting.

Absorbable pads, bandages or sponges are extremely useful in surgical techniques in which it is the intent to remove the major portion or all of such sponges, felt or pads but, through inadvertence or accident, part of it may remain. For instance, in a surgical operation one of the problems which arises is the lint from cotton sponges remaining in the wound. If absorbable polymer sponges are used, any small fragments which are accidentally displaced are absorbed without incident and even if a sponge is left in the wound, the deleterious effects are minimal.

The use of a synthetic absorbable polymer as a sponge or pad is particularly advantageous for surface abrasions. In the past it has been necessary to put on a dressing and avoid having the non-absorbable dressing grow into the tissue at all costs. If elements of an absorbable polymer gauze are beneath the regenerating tissue level, the tissue will regenerate and absorb the polymer with the residual polymer in the scab falling off when the scab is displaced.

The dressing that contacts tissue should be sterile. A strippable sterile package is a convenient storage system to maintain sterility between the time of manufacture and time of use.

Even in cosmetic surgery or skin surgery, where in the past it has been quite customary to use silk sutures and, after the tissue is regenerated sufficient to be self-retaining, remove the sutures so that they do not leave scars, the use of synthetic absorbable polymer sutures now permits implantaton of sutures through the skin with the part below the skin surface being absorbed and the part above the skin surface falling off. The resulting minimal degree of scarring at the skin surface is highly advantageous.

In surgery various tissues need to be retained in position during healing. Defects and wounds of the abdominal wall, chest wall and other such tissues need to be reconstructed. For a hernia, a permanent slice or reinforcement is often desired as shown in Usher, U.S. Pat. No. 3,054,406, SURGICAL MESH, or U.S. Pat. No. 3,124,136, METHOD OF REPAIRING BODY TISSUE. For some surgical procedures, a temporary reinforcing is desired to provide strength while body tissues are healing; and after the body tissues have assumed the load, foreign components are no longer desired. Tissue retention using the general techniques disclosed in the

8

Usher patents, supra, are readily accomplished using either an absorbable synthetic polymer monofilament or polyfilament fabric or mesh or by using a non-absorbable material such as polyethylene or polypropylene or polyester woven as a bicomponent mesh or kit with an absorbable synthetic polymer. The use of a bicomponent fabric has the advantage of giving additional early strength for holding the tissues in position during initial regeneration with the absorbable portions being absorbed, thus permitting body tissues to invade and reinforce the permanent mesh.

In common with other surgical procedures, it is often desirable that a bicomponent structure be used which provides the spacing desired for non-absorbable elements, with the absorbable synthetic polymer element holding the structure in a desired geometrical configuration at the start of the healing process. As the element is absorbed, regenerating tissue invades and replaces the dissolved synthetic polymer so that the non-absorbed element is left in a desired configuration, interlaced with living tissue in a stress-transferring relationship.

The choice of non-absorbable reinforcement, a partially absorbable reinforcement, or a completely absorbable reinforcement is a matter of surgical judgment, based upon the condition of the patient, the body structure under treatment, and other medical factors.

For instance, a synthetic absorbable polymer sponge may be used in a cavity after tooth extraction to stanch the flow of blood. The sponge is either absorbed by regenerating tissue, or disintegrates into the mouth, permitting improved recovery after extractions.

The medical uses of the polymers of the present invention include, but are not necessarily limited to:

A. Absorbable polymer alone

1. Solid Products, molded or machined
   a. Orthopedic pins, clamps, screws and plates
   b. Clips (e.g., for use as hemostat)
   c. Staples
   d. Hooks, buttons and snaps
   e. Bone substitute (e.g., mandible prosthesis)
   f. Needles
   g. Non-permanant intrauterine devices (spermicide)
   h. Temporary draining or testing tubes or capillaries
   i. Surgical instruments
   j. Vascular implants or supports
   k. Vertebral discs
   l. Extracorporeal tubing for kidney and heart-lung machines
2. Fibrillar Products, knitted or woven, including velours
   a. Burn dressins
   b. Hernia patches
   c. Absorbent paper or swabs
   d. Medicated dressings
   e. Facial substitutes
   f. Gauze, fabric, sheet, felt or sponge for liver hemostasis
   g. Gauze bandages
   h. Dental packs
   i. Surgical sutures
3. Miscellaneous
   a. Flake or powder for burns or abrasions
   b. Foam as absorbable prosthesis
   c. Substitute for wire in fixations
   d. Film spray for prosthetic devices

9

4,074,713

10

B. Absorbable polymer in Combination with other
Products

1. Solid Products, molded or machined
   a. Slowly digestible ion-exchange resin
   b. Slowly digestible drug release device (pill, pellet)
      as a repository, oral or implanted or intravaginal
   c. Reinforced bone pins, needles, etc.
2. Fibrillar Products
   a. Arterial graft or substituents
   b. Bandages for skin surfaces
   c. Burn dressings (in combination with other poly-
      meric films)
   d. Coated sutures (i.e., a coating on a suture of this
      polymer)
   e. A coating of the present polymer on a suture of
      other material
   f. A two component suture, one being the present
      polymer, the components being spun or braided
      together
   g. Multicomponent fabrics or gauzes, the other com-
      ponent of which may be non-absorbable, or more
      rapidly absorbable.

The synthetic character and hence predicatable form-
ability and consistency in characteristics obtainable
from a controlled process are highly desirable.

One convenient method of sterilizing synthetic ab-
sorbable polymer prosthesis is by heat under such con-
ditions that any microorganisms or deleterious materials
are rendered inactive. Another common method is to
sterilize using a gaseous sterilizing agent such as ethyl-
ene oxide. Other methods of sterilizing include radiation
by X-rays, gamma rays, neutrons, electrons, etc., or
high intensity ultrasonic vibrational energy or combina-
tions of these methods. The present synthetic absorb-
able polymers may be sterilized by any of these meth-
ods, although there may be an appreciable but accept-
able change in physical characteristics.

Other substances may be present, such as dyes, antibi-
otics, antiseptics, anaesthetics, and antioxidants. Sur-
faces can be coated with a silicone, beeswax, and the
like to modify handling or absorption rate.

The absorbable polymer can be spun into fibers and
used to form strands. Fibers of about 0.002 inch diame-
ter are particularly convenient for fabrication. Sheets,
or tubes from these absorbable polymer are wrapped
around nerves, traumatically severed, to protect such
nerves from invasive scar tissue growth, while the
nerve is regenerating.

The ends or edges of mono-component or bi-compo-
nent fabrics containing absorbable polymer may be
rendered rigid by modling such edges, with or without
additional solid absorbable polymer to a desired config-
uration. It is often easier to insert and retain flexible
fabric prosthetic tube if the end of the tube is of a size
and shape to be inserted into the severed end of a vessel.

In the case of extensive superficial abrasions, dress-
ings, frequently gauze, pads or wrappings absorb blood
or lymph and present a problem because the gauze
dressings stick to the wound or are infiltrated by regen-
erated tissue. In the past, it has been customary to
change dressings frequently to prevent such infiltration.
Removing an adherent dressing can be quite painful.

Extensive surface abrasions such as from sliding on a
concrete surface after falling off a motorcycle can be
debrided and wrapped with a gauze synthetic absorb-
able polymer. The wound shows a tendency to bleed

into the absorbable polymer gauze but the porosity of
the gauze aids in rapidly stopping the flow of blood. By
using several layers and permitting the blood to at least
partially harden, a minimum amount of the absorbable
polymer gauze is required and the main protective
dressing is of ordinary cotton gauze wrapped around
the injured area. A minimum of changing the dressing is
required. The outer cotton gauze may be removed for
inspection to be sure that infection does not occur, but
the absorbable polymer gauze is allowed to remain in
position, and partly heals into the tissue, and partly
remains above the tissue. Fewer manipulative steps aid
in preventing the entrance of new pathogens. After
healing, the gauze below the new skin surface absorbs in
the body and the non-absorbed gauze and the scab sepa-
rate readily.

Poly(N-acetyl-D-glucosamine) is reported to be in-
soluble in all solvents except 88% phosphoric acid
which badly degrades the polymer. Unexpectedly, it
has now been found that hexafluoroisopropanol (HIPA)
and hexafluoroacetone sesquihydrate (HFAS) are sol-
vents for poly(N-acetyl-D-glucosamine). The solutions
are quite viscous at 1.5% concentration and transparent.
Clear, transparent films that are tough and very pliable
when wet can be cast from these two fluorinated sol-
vents. The films are easily removed from glass when
wet. There is the appearance of crystalline regions as
indicated by birefringence under a polarizing micro-
scope. There was no indication of any polymer degra-
dation in these solvents by infrared spectroscopic and
nuclear magnetic resonance spectroscopic examination
of the films.

The concentration of solution employed depends in
part upon the desired thickness of a desired film. Thick-
nesses of anywhere from 0.5 mil to about 50 mils can be
readily prepared. The films are tough, self-supporting
films. The polyfluorinated solvents may be removed by
evaporation in air, under reduced pressure, or by using
a solvent, such as acetone, to wash out the polyfluori-
nated solvent. The casting surface is conveniently glass
but may be stainless steel, poly(tetra-fluoroethylene), or
other fluorinated polymer, on non-stick surface — even
a liquid.

Elevated temperatures may be used. Poly(N-acetyl-
D-glucosamine) decomposes on heating at about 220° C
but may be heated to lower temperatures to speed the
removal of the polyfluorinated solvent.

The solutions of poly(N-acetyl-D-glucosamine) in
hexafluoroisopolyl alcohol and hexafluoroacetone ses-
quihydrate may be spun into filaments by standard tech-
niques for wet or dry spinning. In a typical wet-spinning
operation a solution or spinning dope of poly(N-acetyl-
D-glucosamine) in hexafluoroisopropyl alcohol or
hexafluoroacetone sesquihydrate is extruded at a solu-
tion temperature from about room temperature up to
about 60° C. through an appropriate orifice into a coag-
ulated medium such as acetone or the solvents men-
tioned above. The coagulating liquid temperature may
conveniently be at a temperature below that of the
extrusion and may be very cold, well below 0° C. and
may be any solvent or system in which the polymer
coagulates and permits the ready removal of the solvent
in the spinning dope.

It should be noted that although the boiling point of
hexafluoroisopropyl alcohol is about 58° C. at atmo-
spheric pressure, the boiling point of solutions of po-
ly(N-acetyl-D-glucosamine) in hexafluoroisopropyl
alcohol will exceed 58° C. depending upon how much

4,074,713

11

polymer is dissolved in the solvent, and the pressure exerted on the system. Thus, solution temperatures and ranges of temperatures such as room temperature to 80° C. and similar ranges which appear throughout this specification contemplate the temperatures of solutions containing varying amounts of poly(N-acetyl-D-glucosamine) under pressures sufficient to elevate the boiling point of the solution into the upper limits of such temperature ranges.

Dilute solutions of poly(N-acetyl-D-glucosamine) in hexafluoroisopropyl alcohol and hexafluoroacetone sesquihydrate find utility as a vehicle for the measuring of viscosity and, hence, the determination of molecular weight and other physical characteristics of the polymer.

At the much thicker concentrations conveniently used for wet or dry spinning, the viscosity may become so high that extrusion is difficult and the extrudability with available equipment is a limiting factor on concentration.

The extrusion may be into the atmosphere, that is, dry spinning, with the hexafluoroisopropyl alcohol or hexafluoroacetone sesquihydrate being removed by evaporation. The fibers may be wound as they harden; care being used to insure that the surface of the fiber is sufficiently hard that spinning dope does not adhere to equipment. The final treatment stages may be at higher temperatures with the limiting factor being decomposition of the polymer. Drying under vacuum speeds removal of the last traces of the polyfluorinated solvents.

Poly(N-acetyl-D-glucosamine) may be obtained in fibrillar form by precipitating a solution thereof in toluene. For instance, a 1.5% solution of poly(N-acetyl-D-glucosamine) in hexafluoroacetone sesquihydrate is precipitated by pouring it into toluene. After drying the material is similar in appearance and handling to dried cellulose pulp and is fibrillar in nature.

Fibers suitable for sutures and fabrics are manufactured by extruding a viscous solution of poly(N-acetyl-D-glucosamine) dissolved in hexafluoroisopropyl alcohol or hexafluoroacetone sesquihydrate into a solvent bath. Solvents such as acetone, water, isopropanol, ether, other lower alcohols and other lower ketones are volatile, liquid at extrusion temperatures and low in cost.

The concentration of the poly(N-acetyl-D-glucosamine) in polyfluorinated solvent may be varied widely. Solutions as dilute as 0.01% may be used but to avoid the use of excess quantitites of the expensive polyfluorinated solvents, a concentration of about 0.5% to about 5% is usually preferred. Concentrations as high as 10% may be used, but at higher concentration, the solvent becomes quite viscous and it is often convenient to use a more dilute solution. Higher concentrations may be used if high pressure extruding equipment is available.

The extrusion is conveniently accomplished by wet extrusion into a solvent which aids in removing the hexafluoroisopropyl alcohol and hexafluoroacetone sesquihydrate from the polymer. By washing with solvent, particularly at above room temperature, the hexafluoroacetone sesquihydrate and hexafluoroisopropyl alcohol are removed from the filaments or films formed. Because both hexafluoroisopropyl alcohol and hexafluoroacetone sesquihydrate are known to be toxic, these should be washed out of polymers which are to be implanted in living tissue. Small quantities of the polyfluorinated solvents can be detected by gas chromatog-

12

raphy or mass spectrometry so that an accurate evaluation of the effectiveness of washing may be made.

It is found that films and fibers of poly(N-acetyl-D-glucosamine) cast from hexafluoroisopropyl alcohol or hexafluoroacetone sesquihydrate are not degraded by deionized water after 10 days exposure at ambient temperature. The same films immersed in a phosphate buffer containing 1500 units/ml of lysozyme at 37° C begin to degrade, although after 15 days, the films maintain their structure but are substantially degraded when observed by a microscope.

Both films and fibers of poly(N-acetyl-D-glucosamine) may be stretched, conveniently using heat, to orient the structure. Films and fibers of oriented structure are usually much stronger than unoriented films or fibers.

As the scope of this invention is broad, it is illustrated by the following typical examples in which temperatures are centigrade, and parts are by weight unless clearly otherwise specified.

## EXAMPLE 1

### Purification of Chitin

A commerical grade of chitin (Cal-Biochemicals) was finely ground in a ball mill overnight to pass a 6 mm screen and be retained by a 1 mm screen. 149 g. of this finely ground material was decalcified by extracting with 825 ml. of 2N HCl at 4° C for 48 hours, in a flask stirred with a magnetic stirrer. The material was collected by centrifugation and washed repeatedly with water until neutral. The ash content was 0.4–0.5%. The decalcified chitin was then stirred at room temperature with 1500 ml. of 90% formic acid overnight. The mixture was centrifuged and the residue repeatedly washed with water. The washed chitin was then suspended in 2 liters of 10% NaOH solution and heated at 90°–100° C. for 2.5 hours. The solution was filtered, the cake washed with water until neutral, washed several times with absolute ethanol and ether, and dried at 40° C. under reduced pressure; yield 66 g. of poly(N-acetyl-D-glucosamine). Infrared spectrum (KBr pellet) shows bands at 3500 cm⁻¹ (S), 2900 (W), 1652 (S), 1619 (S), 1550 (S), 1370 (S), 1300 (M), 1070 (Broad). (S is strong, M is medium, W is weak).

## EXAMPLE 2

### Poly(N-Acetyl-D-Glucosamine) Matrix

Membranes of poly(N-acetyl-D-glucosamine) were prepared by dissolving poly(N-acetyl-D-glucosamine) from Example 1 in each of hexafluoroacetone sesquihydrate (1.4% solution) and hexafluoroisopropanol (2% solution), and casting on a glass plate. The last traces of solvent were evaporated off in a vacuum. The films were tough, transparent, non-tacky, flexible and were quite pliable when hydrated yet retained adequate strength to resist manipulation. The membranes showed no hydrolysis after exposure to water for 5 days. In the presence of lysozyme, however, the films were degraded slowly. The films as cast are suitable for use as absorbable barrier layers in surgery. They may be split and twisted to form sutures.

## EXAMPLE 3

### Dry Spinning Sutures

A spinning solution is prepared by dissolving three parts by weight of the poly(N-acetyl-D-glucosamine)

4,074,713

13

from Example 1 in 97 parts by weight of hexafluoroiso-propyl alcohol. The solution is heated to about 55° C. with gentle stirring until the solution is accomplished. The thus formed solution is pumped through a spinner-ette having 16 capillaries 100 microns in diameter and the spun fibers are passed through a nitrogen atmo-sphere until at last partially cool, and self-sustaining. The yarn formed is wound on a bobbin and stored hot under vacuum for several days. The yarn is then stretched to insure orientation and braided into a suture, which is needled, wrapped on a reel, and stored in an open pack. The suture is sterilized by autoclaving at 30 lbs. steam for 15 minutes, and packaged in strippable envelopes.

### EXAMPLE 4

#### Wet Spinning Sutures

A 3% solution of poly(N-acetyl-D-glucosamine) from Example 1 is prepared in hexfluoroacetone ses-quihydrate by dissolving therein with heating and stir-ring. The resulting spinning dope is pumped through a 20 hole spinnerette having 100 microns capillary diame-ter into an acetone bath which is maintained below room temperature. The coagulated wet gel is pulled away from the spinning head and washed countercur-rently with acetone. The coagulated gel is washed with additional acetone, then wound on a reel and subjected to vacujm at 50° C. until substantially all of the solvent is removed.

The yarn is hot stretched, then braided into a size 2/0 suture, needled, sterilized by autoclaving as in the pre-ceding example, packaged and held for use.

Sutures from Examples 3 and 4, when used to sew up wounds in living tissue, are found to hold the tissues in

14

place until healing sufficient to be self-supporting has accrued, and the sutures are later absorbed.

The surgical elements of poly(N-acetyl-D-glucosa-mine) can be sterilzied by conventional techniques such as autoclaving in the presence of live steam, or by dry heat, or ethylene oxide diluted with enough halo-fluoroalkane or carbon dioxide to be non-explosive, or by radiation by X-rays, gamma rays from cobalt, etc.

For human use, all surgical elements are to be sterile at time of use. For animal use, sterility should be main-tained.

We claim:

1. A bone pin for the fixture of severed bone ends during regeneration after a traumatic or surgical frac-ture consisting essentially of a pin of poly(N-acetyl-D-glucosamine) of a diameter to fit into the medullary canal of a fractured bone end, either of natural size, or as drilled to a larger size, and a length of at least three times its diameter, whereby the bone pin is adapted to be a drive or friction fit in each bone end so that the bone ends are held in fixed relationship in juxtaposition during regeneration of the bone, and the poly(N-acetyl-D-glucosamine) bone pin is later absorbed by the body fluids, permitting regeneration of marrow in the medul-lary canal.

2. A bone reinforcing plate of poly(N-acetyl-D-glucosamine) having high flexural strength and modu-lus, and a physical size of at least 1/16 inch by ⅛ inch by 1 inch, and shaped to conform generally to the surface configuration of a bone, said plate having holes therein adapted to receive fasteners to hold the plate in adjacent reinforcing configuration to living bone, during a heal-ing process, and later be absorbed by living tissue.

* * * * *

# EXHIBIT 2

# United States Patent [19]

## Capozza

[11]    **4,074,366**

[45]    Feb. 21, 1978

[54] **POLY(N-ACETYL-D-GLUCOSAMINE) PRODUCTS**

[75] Inventor:    **Richard Carl Capozza,** Norwalk, Conn.

[73] Assignee:    **American Cyanamid Company,** Stamford, Conn.

[21] Appl. No.: **707,912**

[22] Filed:    **July 22, 1976**

### Related U.S. Application Data

[62]    Division of Ser. No. 558,525, March 14, 1975, Pat. No. 3,989,535, which is a division of Ser. No. 441,717, Feb. 11, 1974, abandoned, which is a division of Ser. No. 558,526, March 14, 1975, Pat. No. 3,988,411.

[51] Int. Cl.² ............................................. **A61F 1/00**
[52] U.S. Cl. ...................................... **3/1; 424/180**
[58] Field of Search ................. 3/1; 128/92 C; 424/180

[56]    **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,605,123 | 9/1971 | Hahn ........................................ 3/1 |
| 3,632,754 | 1/1972 | Balassa ................................ 424/180 |
| 3,878,284 | 4/1975 | Schmitt et al. .................. 260/33.4 R |
| 3,879,377 | 4/1975 | Austin .................................. 424/180 |
| 3,892,731 | 7/1975 | Austin .................................. 424/180 |
| 3,903,268 | 9/1975 | Balassa ................................ 424/180 |
| 3,914,413 | 10/1975 | Balassa ................................ 424/180 |

*Primary Examiner*—Leland A. Sebastian
*Attorney, Agent, or Firm*—Charles F. Costello, Jr.

[57]    **ABSTRACT**

Poly(N-acetyl-D-glucosamine) is soluble in hexafluoroisopropyl alcohol and hexafluoroacetone sesquihydrate. The solutions formed may be wet or dry spun into filaments, or cast into films or solid articles, which may be used as absorbable surgical sutures, or other absorbable surgical elements. Poly(N-acetyl-D-glucosamine) is enzymatically degradable in living tissue, and is resistant to hydrolytic degradation, and, therefore, surgical elements thereof have good storage characteristics under a wide variety of conditions.

3 Claims, No Drawings


DEFENDANT'S EXHIBIT

4,074,366

**1**

**2**

# POLY(N-ACETYL-D-GLUCOSAMINE) PRODUCTS

This is a division, of application Ser. No. 558,525, filed Mar. 14, 1975, U.S. Pat. No. 3,989,535, which is a division of application Ser. No. 441,717, filed Feb. 11, 1974 now abandoned. Another divisional of said Ser. No. 441,717 is application Ser. No. 558,526, filed Mar. 14, 1975, U.S. Pat. No. 3,988,411.

## BACKGROUND OF THE INVENTION

Poly(N-acetyl-D-glucosamine) is a known polymer which is a component of naturally occurring chitin. It is regarded as insoluble in conventional solvents, and, therefore, has been used as a powder. There is a demand for absorbable surgical elements, particularly sutures, which are strong enough to serve as a tissue retaining element during a healing process, and which then are absorbed by the living tissue. Requirements for the duration of useful strength vary widely with both the type of tissue and the surgical procedure. Some cosmetic purposes require strength for only a few hours or a few days. Other uses require strength for periods of months or even years. Advantageously, the surgical element should absorb promptly after it has served its useful function. Sutures have long been treated with dyes and therapeutic agents, poly(N-acetyl-D-glucosamine) sutures may be so treated.

Absorbable surgical elements usually start losing strength almost as soon as implanted, but a useful degree of strength is maintained for a much longer period. Complete absorption is, of course, much slower. Sharp changes in strength with time are not to be expected.

## DESCRIPTION OF THE PRIOR ART

U.S. Pat. No. 3,297,033, Schmitt and Polistina, Jan. 10, 1967, SURGICAL SUTURES, discloses polyhydroxyacetic ester absorbable sutures. The material is also called polyglycolic acid, and is disclosed as permitting small quantities of comonomers to be present, such as dl-lactic acid, its optically active forms, homologs and analogs. A small quantity is recognized by the art as up to 15%, as shown by U.S. Pat. No. 2,668,162, Lowe, Feb. 2, 1954, PREPARATION OF HIGH MOLECULAR WEIGHT POLYHYDROXY-ACETIC ESTER.

Many uses of polyglycolic acid for surgical purposes are disclosed in said U.S. Pat. No. 3,297,033 and continuations-in-part thereof including: U.S. Pat. No. 3,463,158, Schmitt and Polistina, Aug. 26, 1969, POLYGLYCOLIC ACID PROSTHETIC DEVICES; U.S. Pat. No. 3,620,218, Schmitt and Polistina, Nov. 16, 1971, CYLINDRICAL PROSTHETIC DEVICES OF POLYGLYCOLIC ACID; U.S. Pat. No. 3,739,773, Schmitt and Polistina, June 19, 1973, POLYGLYCOLIC PROSTHETIC DEVICES; and U.S. Ser. No. 365,656, Schmitt and Polistina, May 31, 1973, SURGICAL DRESSINGS OF ABSORBABLE POLYMERS.

U.S. Pat. No. 3,463,158, Schmitt and Polistina, Aug. 26, 1969, POLYGLYCOLIC ACID PROSTHETIC DEVICES, discloses surgical uses of polyglycolic acid, and incorporates definitions of some terms.

U.S. Pat. No. 3,620,218, Schmitt and Polistina, November 16, 1971, CYLINDRICAL PROSTHETIC DEVICES OF POLYGLYCOLIC ACID, lists many surgical uses of polyglycolic acid.

U.S. Pat. No. 3,737,440, Schmitt and Bailey, June 5, 1973, POLYGLYCOLIC ACIDS IN SOLUTIONS, discloses hexafluoroisopropyl alcohol and hexafluoroacetone sesquihydrate as solvents for the preparation of solutions of polyglycolic acid, and wet and dry casting of such solutions. Polyglycolic acid has many surgical uses as an absorbable polymer.

Polyglycolic acid sutures are the only synthetic absorbable sutures that have met with commercial surgical acceptance to date.

Chitin has been estimated to be the second most abundant polysaccharide in nature with a synthesis in the neighborhood of a billion tons a year by marine organisms. See Chitin, N. V. Tracey, Reviews of Pure and Applied Chemistry, Royal Australian Chemical Institute, Vol. 7, No. 1, March, 1957, pages 1 to 14.

Carboxymethylchitin is disclosed in Carbohyd, Res. 7, 483–485 (1968), Ralph Trujillo.

This article mentions the hydrolysis of both chitin and carboxymethylchitin by lysozyme.

I. Joffe and H. R. Hepburn, "Observations on Regenerated Chitin Films," J. Materials Science, 8 (1973), 1751–1754, give values on the strength of films of regenerated chitin, from a chitin xanthate dispersion — including a comparison of strength after 30 years storage. Values as high as $9.31 \times 10^7$ Nm$^{-2}$ are given (calculates to $6.3 \times 10^3$ pounds/sq. inch).

Noguchi, Wada, Seo, Tokura and Nishi, "Studies on Chitin and Chitin-Cellulose Fibers," Kobunshi Kagaku, Vol. 30, No. 338, pp. 320–326 and 378, (June 1973) disclose chitin fibers spun by a xanthate process, analogous to the spinning of cellulose to form rayon. A 50% chitin-cellulose fiber is disclosed with a denier of 12.3 and a tenacity of 1.08 grams/denier dry and 0.13 grams/denier wet.

Poly(N-acetyl-D-glucosamine) differs from cellulose in that instead of a hydroxyl group in the 2 position on cellulose, there is an acetylamino group.

Prudden, Migel, Hanson, Freidrich and Balassa in "The Discovery of a Potent Pure Chemical Wound-Healing Accelerator," The American Journal of Surgery, Vol. 119, May 1970, pages 560 to 564, disclose that chitin containing n-acetyl glucosamine is useful to accelerate wound-healing. These authors postulate fibers of a long chain n-acetyl glucosamine as a nonabsorbable suture, and a shorter polymer length as an absorbable suture. Other prosthetic devices, such as hemostatic clips, vascular and joint prostheses, mesh and knit abdominal thoracic wall replacements are postulated for evaluation. No methods are postulated for the achievement of these objectives.

The above patents and articles are herein hereby incorporated by this reference thereto for background information on chitin, its properties and derivatives.

## SUMMARY OF THE INVENTION

This invention relates to solid surgical elements of poly(N-acetyl-D-glucosamine), methods of making them, and more particularly to polymers which are compatible with living mammalian tissue, particularly human tissue, and which can be used surgically, and are biologically degradable into tissue compatible components which are absorbed by living tissues. The primary degradation of the polymer is by enzymatic fission into products which can be carried away by the living tissue and which products are degradable to excretable components or are themselves excretable. Because of the surgical demand for sutures, absorbable fabrics, gauzes,

4,074,366

3

bone pins, etc. whose absorption and strength characteristics vary, it is desirable that a spectrum of strength and absorbability characteristics be provided to meet surgical demands for various procedures. The enzyme lysozyme is particularly effective in the enzymatic degradation of poly(N-acetyl-D-glucosamine). Various forms of poly(N-acetyl-D-glucosamine) may have different degradation rates, and the degradation rate may vary with the location.

Poly(N-acetyl-D-glucosamine) has many advantages as a material of construction for sutures and other surgical elements. The poly(N-acetyl-D-glucosamine) in its own right tends to encourage wound healing rather than slow it down. Poly(N-acetyl-D-glucosamine) is biodegradable by enzymatic action with minimal tissue reaction.

Surgical elements of poly(N-acetyl-D-glucosamine) are not hydrolyzed by water and, hence, need not be kept bone dry but may be stored under ambient conditions of moisture for prolonging periods of time. The basic poly(N-acetyl-D-glucosamine) may be modified by treatment to introduce carboxymethyl, hydroxyethyl or O-ethyl substituents so that the polymer has linkages from acetyl-6-O-(carboxymethyl)-D-glucosamine units, acetyl-6-O-(2'-hydroxyethyl)-D-glucosamine units, or acetyl-6-O-(ethyl)-D-glucosamine units. Since modification by the introduction of these derivatives alters the rate of enzymatic degradation, such introduction provides a means for controlling the absorption rate as well as making the surgical element more hydrophilic or more hydrophobic to an extent desire.

Other side chains may be placed on the glucosamine ring, or its substituents because the side chains may vary

4

or wet spinning of fibers which are of a convenient size for forming sutures.

The fibers are more pliable when wet with water. The enhanced pliability, when wet with water, is highly advantageous in that many surgeons are accustomed to handling catgut which must be wet with water to have adequate handleability and, hence, are using familiar techniques and procedures in surgery. Monofilaments are usable when wet. A dry braided construction of polyfilamentary character is frequently advantageous.

Poly(N-acetyl-D-glucosamine) has the formula:



or



Groups below the plane of the paper are shown by a dotted bond.

Poly(N-acetyl-D-glucosamine) has ascribed to it the formula (ring hydrogens omitted for clarity):



from methyl to long chain alkyl, including branched chains, unsaturated chains, aryl or aralkyl, and which may include halogen, alkoxy, aryloxy, aralkoxy, ether, ester and amide groups, as substituents on the side chains, the relative distribution between aqueous and solvent components in a system can be varied as well as water solubility or oil and solvent solubility. Also, because the size and location of the side chains affects the rate of degradation and the acidity of the system, the rate of enzymatic degradation can be varied over wide limits to meet the requirements of a system and the desires of the operator. The less highly substituted materials are often preferred for medical uses. The broader range of substituents permits more flexibility in pH control, and in biodegradable polymers for use in packaging, etc. The use of side chains with unsaturated linkages permits crosslinked polymers to be formed. This uniformity results in greater strength, more crystallinity, and more readily reproducible and controllable characteristics, which are of interest to a surgeon during use.

Fibers made by extruding solutions of poly(N-acetyl-D-glucosamine) in polyfluorinated solvents such as hexafluoroisopropyl alcohol and hexafluoroacetone sesquihydrate or mixtures of such solvents permit dry

Poly(N-acetyl-D-glucosamine) is a major component of naturally occurring chitin. The naturally occurring material has not only the poly(N-acetyl-D-glucosamine) but also inorganic salts thought to be forms of calcium carbonate and proteinaceous material, the composition of which is not presently known. The term "chitin" is used herein to refer to the various naturally occurring forms of chitin including the protein and inorganic carbonate components. The term "purified chitin" is used to refer to chitin after purification to remove calcium carbonate and other inorganic salts and various proteins which may be present and is essentially poly(N-acetyl-D-glucosamine). Some confusion exists in the literature in that the name chitin is used as a name for poly(N-acetyl-D-glucosamine) without specifying whether it is a naturally occurring material containing inorganic salts and proteins or whether the term is intended to designate purified poly(N-acetyl-D-glucosamine) without specifying the degree of purity or the character of the impurities present.

The term "drug" is used to refer to a substance other than a food intended to affect the structure or function of the body of man or other animal. The term is somewhat broader than "medicine" in that the term "medicine" is sometimes considered to be restricted to an

4,074,366

5

agent which is administered to affect or control a pathogenic condition.

The term "enzymatically degradable" refers to a form of poly(N-acetyl-D-glucosamine) or its derivatives which is broken down into body fluid soluble components. The problem of retention by the body or disposal of the residual matrix is minimal or non-existent.

While other enzymes may also affect the enzymatic degradation of the poly(N-acetyl-D-glucosamine) matrix, the enzyme which is most widely distributed in the body and here very effective is lysozyme. Lysozyme occurs in practically all of the body fluids and effectively breaks down the polymer chain to water soluble or disposable components.

Poly(N-acetyl-D-glucosamine) is not readily hydrolyzed by water.

It is highly advantageous to have the degradation of the poly(N-acetyl-D-glucosamine) occur only by the action of an enzyme as the resistance to hydrolytic degradation markedly reduces problems of manufacture and storage in the presence of ambient moisture, and ensures a steady smooth surface erosion rather than a fragmentation process commonly experienced by polymers which are hydrolyzed by small molecules.

The degradation rate of poly(N-acetyl-D-glucosamine) can be lowered by crosslinking, if a slower rate is preferred.

In general, the surgical uses of the polymers of the present invention are similar to those previously taught for polyglycolic acid and as set forth in U.S. Pat. Nos. 3,297,033; 3,463,158; 3,620,218; and 3,739,773, and U.S. Ser. No. 365,656, supra. These disclosures of uses are herein hereby incorporated by this reference thereto.

These uses are extremely varied. For clarity and explanation, certain terms are defined and representative uses given for the novel polymer forms.

A "filament" is a single, long, thin flexible structure of a non-absorbable or absorbable material. It may be continuous or staple.

"Staple" is used to designate a group of shorter filaments which are usually twisted together to form a longer continuous thread.

An absorbable filament is one which is absorbed, that is, digested or dissolved, in living mammalian tissue.

A "thread" is a plurality of filaments, either continuous or staple, twisted together.

A "strand" is a plurality of filaments or threads twisted, plaited, braided, or laid parallel to form a unit for further construction into a fabric, or used per se, or as a monofilament of such size as to be woven or used independently.

A "fabric" is a three dimensional assembly of filaments, which may be woven, knitted, felted or otherwise formed into a flexible sheet having two layer dimensions and a thinner thickness dimension. A fabric may be cut to a desired size before or at the time of use.

Except where limited specifically or by context, the word fabric includes both absorbable and non-absorbable cloth, or a fabric or cloth that is partially of absorbable polymer.

A "dressing" is a woven, knitted, felted or braided fabric, of at least one layer, which is designed to protect a wound and favor its healing. As used herein, the term dressing includes bandages, insofar as they contact the wound itself. The dressing may be entirely internal.

A "bandage" is a strip of gauze, or other material used to hold a dressing in place, to apply pressure, to

6

immobilize a part, to obliterate tissue cavities or to check hemorrhage. Except insofar as the bandage comes in contact with a wound, or the exudate from a wound, there is no need for the bandage to be of absorbable polymer. If the bandage may be in a position where absorbability by living tissue of at least part of the bandage is desirable, at least that part should be of absorbable polymer.

The dressing may be in part directive of growth, as, for example, in nerve tissue, which grows slowly, and as a result has regeneration impaired by the more rapid growth of scar tissue which can block the growth of the nerve tissue. With a wrap-around sheath of absorbable polymer fabric or a split or solid tube used to support, place, hold and protect; regeneration of nerve tissue and function is greatly aided. Other factors may inhibit regeneration of nerve tissue or function, but with the exclusion of scar tissue, such other factors may be separately treated.

For different purposes and in different types of tissue the rate of absorption may vary. In general, an absorbable suture or solid load bearing prosthesis should have as high a portion of its original strength as possible for at least 3 days, and sometimes as much as 30 days or more, and preferably should be completely absorbed by muscular tissue within from 45 to 90 days or more depending on the mass of the cross-section. The rate of absorption in other tissues may vary even more.

For dressings, strength is often a minimal requirement. Some dressings, as for instance, on a skin abrasion, may need strength for only a few hours, until a scab forms, and rapid decrease of strength and absorption is an advantage so that when the scab is ready to fall off, the dressing does not cause a delay. For burns, and larger lesions, strength and reinforcement may be desired for a longer period.

In common with many biological systems, the requirements are not absolute and the rate of absorption as well as the short-term strength requirement varies from patient to patient and at different locations within the body, as well as with the thickness of the section of the polymer.

The absorbable polymer may be formed as tubes or sheets for surgical repair and may also be spun as thin filaments and woven or felted to form absorbable sponges or absorbable gauze, or used in conjunction with other compressive structures as prosthetic devices within the body of a human or animal where it is desirable that the structure have short-term strength, but be absorbable. The useful embodiments include tubes, including branched tubes or Tees, for artery, vein or intestinal repair, nerve splicing, tendon splicing, sheets for tying up and supporting damaged kidney, liver and other intestinal organs, protecting damaged surface areas such as abrasions, particularly major abrasions, or areas where the skin and underlying tissues are damaged or surgically removed.

In surgical techniques involving internal organs, hemorrhage may be a major problem. Some of the organs have such tissue characteristics that it is very difficult to use sutures or ligatures to prevent bleeding. For example, the human liver may suffer traumatic damage or exhibit tumors or for other reasons require surgery. In the past it has been very difficult to excise part of the liver or to suture the liver without the combined problems of the sutures cutting out and hemorrhage at the surface causing such major complications as to either prevent surgery or cause an unfavorable prognosis.

4,074,366

7

It is now found that a sponge or pad or velour of the present absorbable polymer may be used to protect the surface and permit new feats of surgical intervention. For instance, filaments may be formed into a woven gauze or felted sponge or a velour, preferably the construction is fairly tight by textile standards, and such sponge may be placed on the surface of the bleeding organ such as the liver or a lung with either gentle suturing or with ties in the nature of ligatures to hold the element in position with a certain amount of body fluids flowing into the sponge and being absorbed, which results in hemostasis and prevention of further loss of body fluids. If a liver or lung is so repaired, the organ may be replaced in the body cavity and the wound closed.

Where surgically useful, the sponge or fabric can be used as a bolster to prevent a suture from cutting out. For instance, if the liver is to be sutured, an absorbable polymer pad can be placed on the surfaces to reinforce the tissue and prevent the suture from cutting into rather than retaining the tissue. Such pads of gauze or felt protect tissue from cutting.

Absorbable pads, bandages or sponges are extremely useful in surgical techniques in which it is the intent to remove the major portion or all of such sponges, felt or pads but, through inadvertence or accident, part of it may remain. For instance, in a surgical operation one of the problems which arises is the lint from cotton sponges remaining in the wound. If absorbable polymer sponges are used, any small fragments which are accidentally displaced are absorbed without incident and even if a sponge is left in the wound, the deleterious effects are minimal.

The use of a synthetic absorbable polymer as a sponge or pad is particularly advantageous for surface abrasions. In the past it has been necessary to put on a dressing and avoid having the non-absorbable dressing grow into the tissue at all costs. If elements of an absorbable polymer gauze are beneath the regenerating tissue level, the tissue will regenerate and absorb the polymer with the residual polymer in the scab falling off when the scab is displaced.

The dressing that contacts tissue should be sterile. A strippable sterile package is a convenient storage system to maintain sterility between the time of manufacture and time of use.

Even in cosmetic surgery or skin surgery, where in the past it has been quite customary to use silk sutures and, after the tissue in regenerated sufficient to be self-retaining, remove the sutures so that they do not leave scars, the use of synthetic absorbable polymer sutures now permits implantation of sutures through the skin with the part below the skin surface being absorbed and the part above the skin surface falling off. The resulting minimal degree of scarring at the skin surface is highly advantageous.

In surgery various tissues need to be retained in position during healing. Defects and wounds of the abdominal wall, chest wall and other such tissues need to be reconstructed. For a hernia, a permanent splice or reinforcement is often desirable as shown in Usher, U.S. Pat. No. 3,054,406, SURGICAL MESH, or U.S. Pat. No. 3,124,136, METHOD OF REPAIRING BODY TISSUE. For some surgical procedures, a temporary reinforcing is desired to provide strength while body tissues are healing; and after the body tissues have assumed the load, foreign components are no longer desired. Tissue retention using the general techniques disclosed in the

8

Usher patents, supra, are readily accomplished using either an absorbable synthetic polymer monofilament or polyfilament fabric or mesh or by using a non-absorbable material such as polyethylene or polypropylene or polyester woven as a bicomponent mesh or kit with an absorbable synthetic polymer. The use of a bicomponent fabric has the advantage of giving additional early strength for holding the tissues in position during initial regeneration with the absorbable portions being absorbed, thus permitting body tissues to invade and reinforce the permanent mesh.

In common with other surgical procedures, it is often desirable that a bicomponent structure be used which provides the spacing desired for non-absorbable elements, with the absorbable synthetic polymer element holding the structure in a desired geometrical configuration at the start of the healing process. As the element is absorbed, regenerating tissue invades and replaces the dissolved synthetic polymer so that the non-absorbed element is left in a desired configuration, interlaced with living tissue in a stress-transferring relationship.

The choice of a non-absorbable reinforcement, a partially absorbable reinforcement, or a completely absorbable reinforcement is a matter of surgical judgment, based upon the condition of the patient, the body structure under treatment, and other medical factors.

For instance, a synthetic absorbable polymer sponge may be used in a cavity after tooth extraction to stanch the flow of blood. The sponge is either absorbed by regenerating tissue, or disintegrates into the mouth, permitting improved recovery after extractions.

The medical uses of the polymers of the present invention include, but are not necessarily limited to:

A. Absorbable polymer alone

1. Solid Products, molded or machined
a. Orthopedic pins, clamps, screws and plates
b. Clips (e.g., for use as hemostat)
c. Staples
d. Hooks, buttons and snaps
e. Bone substitute (e.g., mandible prosthesis)
f. Needles
g. Non-permanent intrauterine devices (spermicide)
h. Temporary draining or testing tubes or capillaries
i. Surgical instruments
j. Vascular implants or supports
k. Vertebral discs
l. Extracorporeal tubing for kidney and heart-lung machines.
2. Fibrillar Products, knitted or woven, including velours
a. Burn dressings
b. Hernia patches
c. Absorbent paper or swabs
d. Medicated dressings
e. Facial substitutes
f. Gauze, fabric, sheet, felt or sponge for liver hemostasis
g. Gauze bandages
h. Dental packs
i. Surgical sutures
3. Miscellaneous
a. Flake or powder for burns or abrasions
b. Foam as absorbable prosthesis
c. Substitute for wire in fixations
d. Film spray for prosthetic devices

4,074,366

9

**B. Absorbable polymer in Combination with other Products**

1. Solid Products, molded or machined
   a. Slowly digestible ion-exchange resin
   b. Slowly digestible drug release device (pill, pellet) as a repository, oral or implanted or intravaginal
   c. Reinforced bone pins, needles, etc.
2. Fibrillar Products
   a. Arterial graft or substituents
   b. Bandages for skin surfaces
   c. Burn dressings (in combination with other polymeric films)
   d. Coated sutures (i.e., a coating on a suture of this polymer)
   e. A coating of the present polymer on a suture of other material
   f. A two component suture, one being the present polymer, the components being spun or braided together
   g. Multicomponent fabrics or gauzes, the other component of which may be non-absorbable, or more rapidly absorbable

The synthetic character and hence predictable formability and consistency in characteristics obtainable from a controlled process are highly desirable.

One convenient method of sterilizing synthetic absorbable polymer prosthesis is by heat under such conditions that any microorganisms or deleterious materials are rendered inactive. Another common method is to sterilize using a gaseous sterilizing agent such as ethylene oxide. Other methods of sterilizing include radiation by X-rays, gamma rays, neutrons, electrons, etc., or high intensity ultrasonic vibrational energy or combinations of these methods. The present synthetic absorbable polymers may be sterilized by any of these methods, although there may be an appreciable but acceptable change in physical characteristics.

Other substances may be present, such as dyes, antibiotics, antiseptics, anaesthetics, and antioxidants. Surfaces can be coated with a silicone, beeswax, and the like to modify handling or absorption rate.

The absorbable polymer can be spun into fibers and used to form strands. Fibers of about 0.002 inch diameter are particularly convenient for fabrication. Sheets, or tubes from these absorbable polymer are wrapped around nerves, traumatically severed, to protect such nerves from invasive scar tissue growth, while the nerve is regenerating.

The ends or edges of mono-component or bi-component fabrics containing absorbable polymer may be rendered rigid by molding such edges, with or without additional solid absorbable polymer to a desired configuration. It is often easier to insert and retain a flexible fabric prosthetic tube if the end of the tube is of a size and shape to be inserted into the severed end of a vessel.

In the case of extensive superficial abrasions, dressings, frequently gauze, pads or wrappings absorb blood or lymph and present a problem because the gauze dressings stick to the wound or are infiltrated by regenerated tissue. In the past, it has been customary to change dressings frequently to prevent such infiltration. Removing an adherent dressing can be quite painful.

Extensive surface abrasions such as from sliding on a concrete surface after falling off a motorcycle can be debrided and wrapped with a gauze synthetic absorbable polymer. The wound shows a tendency to bleed into the absorbable polymer gauze but the porosity of

10

the gauze aids in rapidly stopping the flow of blood. By using several layers and permitting the blood to at least partially harden, a minimum amount of the absorbable polymer gauze is required and the main protective dressing is of ordinary cotton gauze wrapped around the injured area. A minimum of changing the dressing is required. The outer cotton gauze may be removed for inspection to be sure that infection does not occur, but the absorbable polymer gauze is allowed to remain in position, and partly heals into the tissue, and partly remains above the tissue. Fewer manipulative steps aid in preventing the entrance of new pathogens. After healing, the gauze below the new skin surface absorbs in the body and the non-absorbed gauze and the scab separate readily.

Poly(N-acetyl-D-glucosamine) is reported to be insoluble in all solvents except 88% phosphoric acid which badly degrades the polymer. Unexpectedly, it has now been found that hexafluoroisopropanol (HIPA) and hexafluoroacetone sesquihydrate (HFAS) are solvents for poly(N-acetyl-D-glucosamine). The solutions are quite viscous at 1.5% concentration and transparent. Clear, transparent films that are tough and very pliable when wet can be cast from these two fluorinated solvents. The films are easily removed from glass when wet. There is the appearance of crystalline regions as indicated by birefringence under a polarizing microscope. There was no indication of any polymer degradation in these solvents by infrared spectroscopic and nuclear magnetic resonance spectroscopic examination of the films.

The concentration of solution employed depends in part upon the desired thickness of a desired film. Thicknesses of anywhere from 0.5 mil to about 50 mils can be readily prepared. The films are tough, self-supporting films. The polyfluorinated solvents may be removed by evaporation in air, under reduced pressure, or by using a solvent, such as acetone, to wash out the polyfluorinated solvent. The casting surface is conveniently glass but may be stainless steel, poly(tetra-fluoroethylene), or other fluorinated polymer, or non-stick surface — even a liquid.

Elevated temperatures may be used. Poly(N-acetyl-D-glucosamine) decomposes on heating at about 220° C but may be heated to lower temperatures to speed the removal of the polyfluorinated solvent.

The solutions of poly(N-acetyl-D-glucosamine) in hexafluoroisopropyl alcohol and hexafluoroacetone sesquihydrate may be spun into filaments by standard techniques for wet or dry spinning. In a typical wet-spinning operation a solution or spinning dope of poly(N-acetyl-D-glucosamine) in hexafluoroisopropyl alcohol or hexafluoroacetone sesquihydrate is extruded at a solution temperature from about room temperature up to about 60° C. through an appropriate orifice into a coagulated medium such as acetone or the solvents mentioned above. The coagulating liquid temperature may conveniently be at a temperature below that of the extrusion and may be very cold, well below 0° C. and may be any solvent or system in which the polymer coagulates and permits the ready removal of the solvent in the spinning dope.

It should be noted that although the boiling point of hexafluoroisopropyl alcohol is about 58° C. at atmospheric pressure, the boiling point of solutions of poly(N-acetyl-D-glucosamine) in hexafluoroisopropyl alcohol will exceed 58° C. depending upon how much polymer is dissolved in the solvent, and the pressure

4,074,366

exerted on the system. Thus, solution temperatures and ranges of temperatures such as room temperature to 80° C. and similar ranges which appear throughout this specification contemplate the temperatures of solutions containing varying amounts of poly(N-acetyl-D-glucosamine) under pressures sufficient to elevate the boiling point of the solution into the upper limits of such temperature ranges.

Dilute solutions of poly(N-acetyl-D-glucosamine) in hexafluoroisopropyl alcohol and hexafluoroacetone sesquihydrate find utility as a vehicle for the measuring of viscosity and, hence, the determination of molecular weight and other physical characteristics of the polymer.

At the much thicker concentrations conveniently used for wet or dry spinning, the viscosity may become so high that extrusion is difficult and the extrudability with available equipment is a limiting factor on concentration.

The extrusion may be into the atmosphere, that is, dry spinning, with the hexafluoroisopropyl alcohol or hexafluoroacetone sesquihydrate being removed by evaporation. The fibers may be wound as they harden; care being used to insure that the surface of the fiber is sufficiently hard that spinning dope does not adhere to equipment. The final treatment stages may be at higher temperatures with the limiting factor being decomposition of the polymer. Drying under vacuum speeds removal of the last traces of the polyfluorinated solvents.

Poly(N-acetyl-D-glucosamine) may be obtained in fibrillar form by precipitating a solution thereof in toluene. For instance, a 1.5% solution of poly(N-acetyl-D-glucosamine) in hexafluoroacetone sesquihydrate is precipitated by pouring it into toluene. After drying, the material is obtained in the form of white fibers which cellulose pulp and is fibrillar in nature.

Fibers suitable for sutures and fabrics are manufactured by extruding a viscous solution of poly(N-acetyl-D-glucosamine) dissolved in hexafluoroisopropyl alcohol or hexafluoroacetone sesquihydrate into a solvent bath. Solvents such as acetone, water, isopropanol, ether, other lower alcohols and other lower ketones are volatile, liquid at extrusion temperatures and low in cost.

The concentration of the poly(N-acetyl-D-glucosamine) in polyfluorinated solvent may be varied widely. Solutions as dilute as 0.01% may be used but to avoid the use of excess quantities of the expensive polyfluorinated solvents, a concentration of about 0.5% to about 5% is usually preferred. Concentrations as high as 10% may be used, but at higher concentration, the solvent becomes quite viscous and it is often convenient to use a more dilute solution. Higher concentrations may be used if high pressure extruding equipment is available.

The extrusion is conveniently accomplished by wet extrusion into a solvent which aids in removing the hexafluoroisopropyl alcohol and hexafluoroacetone sesquihydrate from the polymer. By washing with solvent, particularly at above room temperature, the hexafluoroacetone sesquihydrate and hexafluoroisopropyl alcohol are removed from the filaments or films formed. Because both hexafluoroisopropyl alcohol and hexafluoroacetone sesquihydrate are known to be toxic, these should be washed out of polymers which are to be implanted in living tissue. Small quantities of the polyfluorinated solvents can be detected by gas chromatography or mass spectrometry so that an accurate evaluation of the effectiveness of washing may be made.

It is found that films and fibers of poly(N-acetyl-D-glucosamine) cast from hexafluoroisopropyl alcohol or hexafluoroacetone sesquihydrate are not degraded by deionized water after 10 days exposure at ambient temperature. The same films immersed in a phosphate buffer containing 1500 units/ml of lysozyme at 37° C begin to degrade, although after 15 days, the films maintain their structure but are substantially degraded when observed by a microscope.

Both films and fibers of poly(N-acetyl-D-glucosamine) may be stretched, conveniently using heat, to orient the structure. Films and fibers of oriented structure are usually much stronger than unoriented films or fibers.

As the scope of this invention is broad, it is illustrated by the following typical examples in which temperatures are centigrade, and parts are by weight unless clearly otherwise specified.

### EXAMPLE 1

#### Purification of Chitin

A commercial grade of chitin (Cal-Biochemicals) was finely ground in a ball mill overnight to pass a 6 mm screen and be retained by a 1 mm screen. 149 g. of this finely ground material was decalcified by extracting with 825 ml. of 2N HCl at 4° C for 48 hours, in a flask stirred with a magnetic stirrer. The material was collected by centrifugation and washed repeatedly with water until neutral. The ash content was 0.4-0.5%. The decalcified chitin was then stirred at room temperature with 1500 ml. of 90% formic acid overnight. The mixture was centrifuged and the residue repeatedly washed with water. The washed chitin was then suspended in 2 liters of 10% NaOH solution and heated at 90°-100° C. for 2.5 hours. The solution was filtered, the cake washed with water until neutral, washed several times with absolute ethanol and ether, and dried at 40° C. under reduced pressure; yield 66 g. of poly(N-acetyl-D-glucosamine). Infrared spectrum (KBr pellet) shows bands at 3500 cm$^{-1}$ (S), 2900 (W), 1652 (S), 1619 (S), 1550 (S), 1370 (S), 1300 (M), 1070 (Broad). (S is strong, M is medium, W is weak).

### EXAMPLE 2

#### Poly(N-Acetyl-D-Glucosamine) Matrix

Membranes of poly(N-acetyl-D-glucosamine) were prepared by dissolving poly(N-acetyl-D-glucosamine) from Example 1 in each of hexafluoroacetone sesquihydrate (1.4% solution) and hexafluoroisopropanol (2% solution), and casting on a glass plate. The last traces of solvent were evaporated off in a vacuum. The films were tough, transparent, non-tacky, flexible and were quite pliable when hydrated yet retained adequate strength to resist manipulation. The membranes showed no hydrolysis after exposure to water for 5 days. In the presence of lysozyme, however, the films were degraded slowly. The films as cast are suitable for use as absorbable barrier layers in surgery. They may be split and twisted to form sutures.

### EXAMPLE 3

#### Dry Spinning Sutures

A spinning solution is prepared by dissolving three parts by weight of the poly(N-acetyl-D-glucosamine) from Example 1 in 97 parts by weight of hexafluoroisopropyl alcohol. The solution is heated to about 55° C.

13

4,074,366

14

with gentle stirring until the solution is accomplished. The thus formed solution is pumped through a spinnerette having 16 capillaries 100 microns in diameter and the spun fibers are passed through a nitrogen atmosphere until at least partially cool, and self-sustaining. The yarn formed is wound on a bobbin and stored hot under vacuum for several days. The yarn is then stretched to insure orientation and braided into a suture which is needled, wrapped on a reel, and stored in an open pack. The suture is sterilized by autoclaving at 30 lbs. steam for 15 minutes, and packaged in strippable envelopes.

### EXAMPLE 4
#### Wet Spinning Sutures

A 3% solution of poly(N-acetyl-D-glucosamine) from Example 1 is prepared in hexafluoroacetone sesquihydrate by dissolving therein with heating and stirring. The resulting spinning dope is pumped through a 20 hole spinnerette having 100 microns capillary diameter into an acetone bath which is maintained below room temperature. The coagulated wet gel is pulled away from the spinning head and washed countercurrently with acetone. The coagulated gel is washed with additional acetone, then wound on a reel and subjected to vacuum at 50° C. until substantially all of the solvent is removed.

The yarn is hot stretched, then braided into a size 2/0 suture, needled, sterilized by autoclaving as in the preceding example, packaged and held for use.

Sutures from Examples 3 and 4, when used to sew up wounds in living tissue, are found to hold the tissues in place until healing sufficient to be self-supporting has accrued, and the sutures are later absorbed.

The surgical elements of poly(N-acetyl-D-glucosamine) can be sterilized by conventional techniques such as autoclaving in the presence of live steam, or by dry heat, or ethylene oxide diluted with enough halofluoroalkane or carbon dioxide to be non-explosive, or by radiation by X-rays, gamma rays from cobalt, etc.

For human use, all surgical elements are to be sterile at time of use. For animal use, sterility should be maintained.

We claim:

1. A surgical prosthesis comprising non-absorbable filaments shaped as a living tissue reinforcing element, and mixed with and coacting with said non-absorbable filaments, in at least a part of the element, a structure consisting essentially of poly(N-acetyl-D-glucosamine), whereby on implantation in living tissue, the poly(N-acetyl-D-glucosamine) is absorbed by the living tissue which replaces the poly(N-acetyl-D-glucosamine) and interlocks with the non-absorbable filaments, said prosthesis being sterile at time of implantation.

2. The prosthesis of claim 1 in which the reinforcing element comprises a non-absorbable strand fabric mesh section, and interwoven and graded thereinto, bicomponent strands in a graded transition portion, the individual strands of which are of proportionately increasing poly(N-acetyl-D-glucosamine) and decreasing non-absorbable filament composition, at increasing distances from said non-absorbable strand fabric mesh section.

3. An absorbable prosthesis for the anastomosis of vessels in the tissue of a living mammal consisting essentially of a hollow cylinder of poly(N-acetyl-D-glucosamine), having an inner diameter approximately the same as the inner diameter of the subject vessel, and a smooth outer surface of a diameter which is insertable in said vessel when stretched, whereby one end of a vessel from traumatic or surgical severance may be emplaced over each end of said cylinder, and fixedly positioned thereon, said cylinder being open to and permitting the flow of body fluids and being absorbable by living mammalian tissue.

* * * * *

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DePuy Mitek, Inc.     )
  a Massachusetts Corporation )
          )
  Plaintiff,     )
          )
   v.      )  Civil No. 04-12457 PBS
          )
Arthrex, Inc.      )
  a Delaware Corporation and )
          )
Pearsalls Ltd.,     )
  a Private Limited Company )
  of the United Kingdom,  )
          )
  Defendants.    )
          )

<u>Rebuttal Expert Report of Dr. David Brookstein</u>

**I. Background Information**

1. I previously submitted an expert report in this case on March 3, 2006. I have been asked

to opine on certain opinions expressed by Dr. Mukherjee in his report entitled the "Responsive

Expert Report of Dr. Debi Prasad Mukherjee Concerning Non-Infringement of U.S. Patent No.

5,314,446 and Other Matters."

2. I have reviewed the "Responsive Expert Report of Dr. Debi Prasad Mukherjee

Concerning Non-Infringement of U.S. Patent No. 5,314,446 and Other Matters," the documents

referenced in my prior report and those listed in Ex. H attached hereto.

**II. Summary of Opinions**

3. I disagree with Dr. Mukherjee's opinion that there is no infringement under the doctrine

of equivalents, if "PE," as used in the claims of the 446 Patent, is construed not to include

UHMWPE.

DEPUY MITEK
EXHIBIT 484
04cv12457

because, among other reasons, I cannot tell what he measured. Second, it appears that Dr.

Mukherjee is attempting to approximate FiberWire's pliability by determining FiberWire's

ability to bend by using his finger as a test rig. But this method is flawed because he did not

provide a true cantilever end support. Consequently, there is no defined position as to where

FiberWire begins its bending, and no definitive way to determine the degree of bending. Third,

diameter affects pliability, and Dr. Mukhejee does not provide any diameter measurements for

the samples that he compared. Therefore, based on what I can determine from his report, it is not

possible to scientifically compare the pliability of the uncoated and coated FiberWire using this

method.

54.     I note that Dr. Mukherjee relies on documents that refer to Ethicon and Mitek products in

his analysis (Mukherjee Res. Report at 23-24, Mukherjee Res. Report Exs. 14, 15, 17, & 18). I

disagree that these documents are relevant to the analysis because they discuss products and

coatings that are different than FiberWire. It is my opinion, that the effect of FiberWire's

coating on FiberWire cannot be determined with reference to other products.

### B.     If Dr. Mukherjee Is Correct Regarding The Meaning Of The Novel And Basic Characteristics, TigerWire's Nylon Does Not Materially Affect Them

55.     Dr. Mukherjee has opined that TigerWire does not infringe for the same reasons that he

expressed regarding FiberWire (Mukherjee Res. Report at 30). I disagree for the reasons stated

above with respect to FiberWire.

56.     I understand that the differences between TigerWire and FiberWire are that TigerWire is

not dyed blue and replaces one PET yarn strand with one black nylon yarn strand. Dr.

Mukherjee opines that TigerWire's nylon materially affects pliability (Mukherjee Res. Report at

30-31). I disagree. The purpose of the nylon strand is for visual identification (Ex. V at 74:21-

23). It is my opinion that replacing one PET yarn with one nylon yarn does not materially affect

31

68.    I reserve the right to comment further on Dr. Mukherjee's analyses and report when more information about the analyses becomes available.   I may use trial demonstratives to explain my opinions.

Dated: April 13, 2006

David Brookstein, Sc.D.
Fellow-American Society of Mechanical Engineers

37