IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DePuy Mitek, Inc. a Massachusetts Corporation Plaintiff, v. Arthrex, Inc. a Delaware Corporation, *et al*. Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 04-12457 PBS |

### DEFENDANTS ARTHREX, INC.'S AND PEARSALLS LTD.'S OPPOSITION TO DEPUY MITEK'S EMERGENCY MOTION TO PREVENT DEFENDANTS FROM PRESENTING WITNESSES AT TRIAL WHO WERE NOT DISCLOSED AS TRIAL WITNESSES DURING FACT OR EXPERT DISCOVERY

Dated: July 16, 2007

Charles W. Saber
Stephen A. Soffen
Salvatore P. Tamburo
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, D.C.  20006-5403
Telephone:  (202) 420-3116
Facsimile:  (202) 420-2201

Christopher Weld, Jr. (BBO # 522230)
Raymond P. Ausrotas (BBO # 640315)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
Telephone:  (617) 720-2626
Facsimile:  (617) 227-5777

Counsel for Defendants
Arthrex, Inc. and Pearsalls Ltd.

## TABLE OF CONTENTS

**Page No.**

I.    INTRODUCTION............................................................................................1

II.   DEFENDANTS SHOULD BE PERMITTED TO CALL DR. BURKHART
      AS A TRIAL WITNESS IF DEPUY MITEK RELIES ON HIS ALLEGED
      STATEMENTS DURING ITS CASE IN CHIEF ............................................1

III.  DEFENDANTS SHOULD BE PERMITTED TO CALL MR. BENAVITZ AS A
      TRIAL WITNESS...........................................................................................6

IV.   CONCLUSION ...............................................................................................8

i

## TABLE OF AUTHORITIES

**Page No.(s)**

### FEDERAL CASES

*Diomed, Inc. v. AngioDynamics, Inc.*, 450 F. Supp. 2d 130 (D. Mass. Aug. 30, 2006) ....................................................................................................5, 8

*Grajales-Romero v. American Airlines, Inc.*, 194 F.3d 288 (1st Cir. 1999).......................8

*Macaulay v. Anas,* 321 F.3d 45 (1st Cir. 2003) ...................................................5

### FEDERAL STATUTES

Fed. R. Civ. P. 37(c)(1).........................................................................5

ii

## I.    INTRODUCTION

In what has become an all-too-familiar strategy, DePuy Mitek wants to be able to make an assertion, to present evidence that purportedly supports its assertion, and then do anything in its power to prevent Defendants from responding to that assertion.  The instant motion, like several of its recently-filed *in limine* motions follows that precise pattern.

Further, there is nothing "emergency" about the motion.  The truth is that while DePuy Mitek tries to create the impression that it is surprised about Dr. Burkhart and Mr. Benavitz potentially testifying at trial for Defendants, it has known about their potential trial witness status since last September -- *that's 10 months ago*.[1]  Moreover, this is precisely the situation the parties anticipated when they agreed in the Joint Case Management Statement to make available for deposition any fact witnesses they intend to have testify at trial if the witness has not yet been deposed in the case.

## II.    DEFENDANTS SHOULD BE PERMITTED TO CALL DR. BURKHART AS A TRIAL WITNESS IF DEPUY MITEK RELIES ON HIS ALLEGED STATEMENTS DURING ITS CASE IN CHIEF

On September 25, 2006, Dr. Burkhart was named as a witness that "may be called at trial" on Defendants' trial witness list served on DePuy Mitek.  Ex. 3.  Dr. Burkhart is an independent surgeon who consults with Arthrex and uses FiberWire in his practice.  He allegedly had some conversations with Mr. Grafton -- one of the developers of FiberWire and an inventor on Arthrex's FiberWire patent -- during the development of FiberWire where, DePuy Mitek

---

[1]    DePuy Mitek asserts that it notified Defendants of its objections to these witnesses in November 2006 and attempted at that time to resolve the issues, but that Defendants "chose not to engage in any pretrial matters until trial was rescheduled."  That is not true, however. Defendants were simply reacting to the Court's prediction that it would probably not have decided the pending claim construction issues and summary judgment motions until after the new year.  Ex. 1 at 82:17-25.  Defendants did not suggest waiting until a new trial date was issued.  Rather, Defendants suggested it would be most efficient to "wait for the Court's rulings," as the Court had suggested. Ex. 2.

DSMDB-2289666v01

alleged, he stated that the idea to combine ultra-high molecular weight polyethylene and PE was a "killer" idea.[2]

Dr. Burkhart was put on Defendants' "maybe" list in response to DePuy Mitek's reliance on these and other statements allegedly made by him during the development of FiberWire in its summary judgment papers only a few weeks prior to that. Ex. 5 at ¶¶ 18, 20.[3] Since fact discovery had ended months before DePuy Mitek's reliance, the only option available to Defendants was to call Dr. Burkhart as a trial witness to explain what he actually meant when he made those alleged statements relied upon by DePuy Mitek. At the time DePuy Mitek relied upon Dr. Burkhart's alleged statements in their summary judgment papers, trial was scheduled for November 13, 2006.

Thus, Defendants put Dr. Burkhart on their "maybe" list at the time in case DePuy Mitek intended to rely upon its version of the FiberWire development story at trial in its case-in-chief. If it did, Dr. Burkhart would be able to explain to the jury what his role was. Of course, Defendants had no way of knowing ahead of time (and still do not know) what, if anything, DePuy Mitek will do to make Dr. Burkhart's testimony relevant. Accordingly, Dr. Burkhart was placed on Defendants' "maybe" list.

Fast-forwarding to April 2007, DePuy Mitek, once again, relied upon statements allegedly made by Dr. Burkhart during the development of FiberWire in its summary judgment papers. Ex. 6 at 19. In response to DePuy Mitek's assertions regarding Dr. Burkhart, and just as

---

[2] One of the purported bases for DePuy Mitek's motion to exclude Dr. Burkhart is that Mr. Grafton could testify about the same subject matter. But Mr. Grafton is currently out of the country and will not be available to testify at trial. Ex. 4 at ¶ 4.

[3] Dr. Brookstein also relied on those same statements allegedly made by Dr. Burkhart in his Rebuttal Expert Report dated April 13, 2007. But, since that was the last date for serving expert reports in the case, Defendants' experts could not respond to Dr. Brookstein's reliance on Dr. Burkhart's alleged statements.

DSMDB-2289666v01

they did in September, Defendants included Dr. Burkhart on their "maybe" list of trial witnesses just in case DePuy Mitek made Dr. Burkhart's role relevant.

Defendants' reasoning as to why they were including Dr. Burkhart on their witness list, as explained above, was made clear to DePuy Mitek in an email exchange on July 5 (Ex. 7 at 2) prior to a scheduled meet and confer and also during the July 6 meet and confer. Ex. 8 at ¶ 2. At that meet and confer, Defendants offered to remove Dr. Burkhart if DePuy Mitek would agree not to rely on Dr. Burkhart's role. Ex. 8 at ¶ 3. DePuy Mitek had no response to Defendants' reasoning or their offer except to say it would file its motion.

What is more, the parties have *already* provided for this very scenario where a witness who is to be called at trial will be made available for deposition to the extent the witness has not yet been deposed in the case. Specifically, in their Joint Case Management Statement filed on February 11, 2005 (Ex. 9 (Docket Entry 10) at 5-6), the parties anticipated this very same scenario when they stated:

> the parties have also agreed to produce any fact witnesses that they expect to have testify at trial for deposition (if that witness has not been previously deposed in the case).

Ex. 9 at 5-6. Thus, it is not clear why DePuy Mitek felt compelled to burden the Court with this issue since the parties had already dealt with it on their own.

In fact, during the email exchange and the meet and confer, Defendants reminded DePuy Mitek of the parties' agreement regarding trial witnesses who have not yet been deposed. Ex. 8 at ¶ 4. DePuy Mitek now asserts that it never intended to enter into the agreement it made. Rather, it intended to enter into some other, different agreement -- one that states "if the parties exceeded the deposition limit and the opposing party timely identified an additional witness, the party could still depose that additional witness," and also "if a fact witness that was previously not known, but later became known, the parties could depose that witness even though fact

DSMDB-2289666v01

discovery had been completed." Unfortunately for DePuy Mitek, none of its "wish list" of language is included in the actual agreement it did make. The parties' simple agreement contemplates this *exact* situation -- *i.e.,* where a witness expected to testify at trial is being made available for deposition if that witness has not yet been deposed in the case.

       Another purported basis for DePuy Mitek's "emergency" motion to exclude Dr. Burkhart is that he never served an expert report which would be required if Defendants intended to call Dr. Burkhart as an expert. But here DePuy Mitek is just being disingenuous since Defendants *already told* DePuy Mitek, both in an email on July 5 and also during the meet and confer on July 6, that Dr. Burkhart was *not* being called as an expert witness, but rather as a fact witness for the reasons explained above. Ex. 7 at 2-3; Ex. 8 at ¶ 6. Thus, DePuy Mitek knew at the time it filed its motion that Dr. Burkhart was not being called as an expert.

       Contrary to DePuy Mitek's assertions, Defendants *did* offer to make Dr. Burkhart available for deposition during the meet and confer on July 6, 2007, as provided in the parties' agreement. Ex. 8 at ¶ 5. At the time, there was still one-month before trial; plenty of time to depose a fact witness whom DePuy Mitek plans to use for only a single issue in their case. A deposition of Dr. Burkhart would not take more than a couple of hours. But, DePuy Mitek rejected Defendants offer to depose Dr. Burkhart, and instead filed its "emergency" motion. Thus, it is clear that DePuy Mitek was never really interested in deposing Dr. Burkhart at all. If it was, it would have agreed to take his deposition by now. Instead, it chooses to burden the Court with this matter while time ticks on and we get closer to trial. Thus, it is DePuy Mitek, and not Defendants, that are creating an "emergency" situation; not to mention that Defendants also have to spend time before trial responding to a motion that never should have been filed.

       Lastly, there is no prejudice to DePuy Mitek in having Dr. Burkhart testify at trial as long as DePuy Mitek has an opportunity to depose him. To the contrary, it would be Defendants,

DSMDB-2289666v01

*not* DePuy Mitek, who would be unduly prejudiced if DePuy Mitek were permitted to present evidence to the jury while relying on statements allegedly made by Dr. Burkhart when Dr. Burkhart is not permitted to testify and explain his statements.

DePuy Mitek's "legal" argument provides no assistance. Rule 37(c)(1) states that information that is not disclosed as required by Rule 26 should be excluded only if the party's failure to disclose that information is not "substantially justified or harmless." Fed. R. Civ. P. 37(c)(1). *Diomed, Inc. v. AngioDynamics, Inc.*, 450 F.Supp.2d 130, 136-37 (D. Mass. Aug. 30, 2006) recites factors for determining whether there is substantial justification or harmlessness (*e.g.,* history of the litigation, proponent's need for the evidence, justification for the late disclosure and the opponent's ability to overcome its adverse effects. *Id.* at 136-37 (citing *Macaulay v. Anas,* 321 F.3d 45, 51 (1st Cir. 2003)). *Diomed* also states that surprise and prejudice are also factors to be considered. *Id.* at 137.

As explained above, Defendants included Dr. Burkhart on their witness lists because of DePuy Mitek's reliance on his role in their summary judgment papers. Defendants had not planned on calling Dr. Burkhart as a trial witness prior to DePuy Mitek's making him an issue in the case; which is precisely the reason why he was not disclosed by Defendants earlier in the case as a potential witness. Thus, Defendants are substantially justified for not disclosing Dr. Burkhart during fact discovery.

Moreover, DePuy Mitek cannot claim it is being harmed or prejudiced. For example, there is no surprise with respect to Dr. Burkhart since it is DePuy Mitek, and *not* Defendants, that has been relying on his role when it was already too late for Defendants to respond. If anything, it is Defendants that are surprised by DePuy Mitek's late reliance on Dr. Burkhart's role in this case. It is Defendants, and not DePuy Mitek, that would be prejudiced if they are not permitted to put Dr. Burkhart on their "maybe" list to testify at trial.

5

Thus, whereas Dr. Burkhart should be allowed to testify if Defendants can show either one of "substantial justification" or "harmlessness," Defendants established both and therefore should be permitted to call Dr. Burkhart to testify at trial.

## III.    DEFENDANTS SHOULD BE PERMITTED TO CALL MR. BENAVITZ AS A TRIAL WITNESS

Mr. Benavitz is an Arthrex employee who is responsible for promoting and marketing FiberWire sutures.  Defendants included Mr. Benavitz on their trial witness lists -- both its current list and the witness list DePuy Mitek has had since September 2006 -- because he is currently the person most knowledgeable about how Arthrex promotes and markets FiberWire. While it is true that Mr. Sluss was an appropriate person to speak about how FiberWire is marketed at the time his deposition was taken in May 2005, much time has passed since then and Mr. Sluss' status within Arthrex has changed.[4]  Defendants should not be precluded from having the witness it believes is most knowledgeable about the marketing of the very product being accused of infringement.

As mentioned above, Mr. Benavitz is not only included on Defendants current trial witness list, but he was also included on Defendants' trial witness list which DePuy Mitek has had since September 2006.  Thus, DePuy Mitek let almost 10 months go by before filing its last minute "emergency" motion with regard to Mr. Benevitz.  Further, just as with Dr. Burkhart, Mr. Benavitz's deposition was already contemplated by the parties in their Joint Case Management Statement.  As DePuy Mitek was well aware when it filed its motion, Mr. Benavitz is a marketing person and is not being called to provide expert testimony.

---

[4]     At the time of his deposition, Mr. Sluss, who had been the Product Manager for upper extremities and was then a Product Manager for small joints, was quite knowledgeable about the marketing of FiberWire.  Mr. Sluss left Arthrex in early 2006.  While he has since returned, his status has changed.  He now has very little to do with FiberWire suture and he has no responsibility for how FiberWire suture is marketed today.  Ex. 4 at ¶ 3.

6

DSMDB-2289666v01

Further, while DePuy Mitek attempts to feign surprise at Mr. Benavitz being included on Defendants' trial witness list, it has absolutely no reason to be surprised. After all, Mr. Benavitz's name was mentioned at least 13 times during depositions of Arthrex witnesses as being a person with knowledge about FiberWire and how it is promoted and marketed. Ex. 10 at 21:24-22:8, 23:13-22; Ex. 11 at 176:22-177:2; Ex. 12 at 83:16-84:6; Ex. 13 at 128:25-129:7; Ex. 14 at 27:11-24, 55:24-56:4, 81:19-23; Ex. 15 at 29:25-30:7; Ex. 16 at 25:11-17, 29:18-23; Ex. 17 at 121:18-22; Ex. 18 at 516:11-17. In fact, on at least 3 of those occasions, it was DePuy Mitek who volunteered Mr. Benavitz's name to another witness. Ex. 14 at 81:19-23; Ex. 17 at 121:18-22; Ex. 18 at 516:11-17. Thus, as much as DePuy Mitek would like to tell the Court it was surprised to see Mr. Benavitz on Defendants' two separate trial witness lists, it cannot honestly do so.[5]

In addition, DePuy Mitek readily admits that Defendants *did* offer a date and location for Mr. Benavitz's deposition. In fact, in an effort to make matters most convenient for DePuy Mitek, Defendants offered to make Mr. Benavitz available for deposition on the same date and in the same location as Ms. Shaneville's deposition – another Arthrex trial witness -- which DePuy Mitek is taking on July 17 in Florida. Ex. 7 at 2 of 3; Ex. 8 at ¶ 8. Thus, there is no prejudice to DePuy Mitek as it will already be in Florida taking another deposition that same day. But DePuy Mitek rejected Defendants' offer and instead rushed to file its "emergency" motion that it waited almost a year to file.

---

[5] DePuy Mitek asserts that Defendants have a notice standard that would require them to depose every person identified in documents and at deposition for fear that Arthrex may call them at trial. But that is not Defendants' point at all. Mr. Benavitz's name did not simply just come up at deposition or show up on a few documents. Rather, as demonstrated above, DePuy Mitek has known about Mr. Benavitz and his role in connection with the marketing and promoting of FiberWire products since May 2005. Each witness must be taken on a case-by-case basis as to whether notice has been received. Here, there is no question that DePuy Mitek had plenty of notice of Mr. Benavitz and his significance in the case.

DSMDB-2289666v01

Finally, under *Diomed*, Defendants should be permitted to call Mr. Benzavitz as a trial witness. As demonstrated above, DePuy Mitek has known about Mr. Benavitz's role with FiberWire since May 2005 and it cannot now claim surprise. Further, Defendants should be permitted to call Mr. Benavitz as a trial witness to describe how FiberWire is promoted and marketed since he is the person at Arthrex that has direct responsibility for marketing the very product accused of infringement. Moreover, there is no prejudice, since Defendants offered to make Mr. Benavitz available for deposition while DePuy Mitek would already be in Florida taking another deposition.[6]

IV.     **CONCLUSION**

For the foregoing reasons, DePuy Mitek's motion should be denied.

---

[6]     DePuy Mitek relies on caselaw that simply does not apply here. For example, it cites *Grajales-Romero v. American Airlines, Inc.*, 194 F.3d 288 (1st Cir. 1999). But *Grajales* predates *Macaulay* which outlined the factors involved in determining whether there is substantial justification or harmlessness. Further, the facts in *Grajales* are *very* different than the facts in this case. For example, here there are no surprise witnesses. As explained above, DePuy Mitek, *not* Defendants, made Dr. Burkhart relevant to the case. As for Mr. Benavitz, DePuy Mitek has known his role with respect to promoting and marketing FiberWire suture since May 2005 and has even volunteered his name multiple times at depositions of other witnesses.

DSMDB-2289666v01

Dated: July 16, 2007                    Respectfully submitted,

By: __/s/Charles W. Saber_____
Charles W. Saber
Stephen A. Soffen
Salvatore P. Tamburo
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, D.C.  20006-5403
Telephone:  (202) 420-3116
Facsimile:  (202) 420-2201

Christopher Weld, Jr. (BBO # 522230)
Raymond P. Ausrotas (BBO # 640315)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
Telephone:  (617) 720-2626
Facsimile:  (617) 227-5777

Counsel for Defendants
Arthrex, Inc. and Pearsalls Ltd.

DSMDB-2289666v01

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing DEFENDANTS

ARTHREX, INC.'S AND PEARSALLS LTD.'S OPPOSITION TO DEPUY MITEK'S

EMERGENCY MOTION TO PREVENT DEFENDANTS FROM PRESENTING WITNESSES

AT TRIAL WHO WERE NOT DISCLOSED AS TRIAL WITNESSES DURING FACT OR

EXPERT DISCOVERY was served, via the Court's email notification system on the following

counsel for Plaintiff on the 16th day of July 2007:


Lynn A. Malinoski
Woodcock Washburn, LLP
Cira Centre, 12th Floor
2929 Arch Street
Philadelphia, PA  19104-2891
Telephone: (215) 568-3100
Facsimile: (215) 568-3439

Daniel J. Gleason
Nutter McClennan & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
Telephone:  (617) 439-2000
Facsimile:  (617) 310-9000



**_/s/Charles W. Saber_**

# Exhibit 1

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DePUY MITEK, INC.,            )
a Massachusetts Corporation  )
                             )
            Plaintiff         )
                             )
      -VS-                    ) CA No. 04-12457-PBS
                             ) Pages 1 - 87
ARTHREX, INC.,                )
a Delaware Corporation, et al,)
                             )
            Defendant         )


MARKMAN HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S :

    DIANNE B. ELDERKIN, ESQ., LYNN A. MALINOSKI, ESQ., and
MICHAEL J. BONELLA, ESQ., Woodcock Washburn, One Liberty
Place, 47th Floor, Philadelphia, Pennsylvania, 19103,
for the Plaintiff.

    CHARLES W. SABER, ESQ. and SALVATORE P. TAMBURO, ESQ.,
Dickstein Shapiro, LLP, 1825 Eye Street, N.W., Washington,
D.C., 20006-5403, for the Defendants.


                        United States District Court
                        1 Courthouse Way, Courtroom 19
                        Boston, Massachusetts
                        September 26, 2006, 2:00 p.m.


                LEE A. MARZILLI
            OFFICIAL COURT REPORTER
         United States District Court
         1 Courthouse Way, Room 3205
              Boston, MA  02210
               (617)345-6787

1 me just ask you.  I just want to understand the process.  If

2 I say no infringement, it's over.  You go up to the Federal

3 Circuit, right?

4          MS. ELDERKIN:  I believe that's right, your Honor.

5          THE COURT:  If I say disputed issue of fact, I

6 agree with your analysis of the basic and novel, but I am

7 confused about the subtle versus the material, then would you

8 want to go to trial just on infringement, or are there

9 validity issues?

10          MR. SABER:  There are many validity issues, your

11 Honor.

12          THE COURT:  So the thought would be one uniform

13 trial?

14          MS. ELDERKIN:  Yes.

15          THE COURT:  And what I would need to do is just set

16 up a trial date?

17          MS. ELDERKIN:  Yes.  Right now we're sitting with a

18 November 13 trial date.

19          MR. SABER:  Though we've been told by Mr. Alba

20 that --

21          THE COURT:  As a practical matter, unless my mega

22 pharmaceutical case settles, that looks unlikely, so I don't

23 want you flying people in.  It's more likely to be the new

24 year, if we should go that way, and, quite candidly, I'm not

25 sure this opinion will be out by then, so --

# Exhibit 2

**From:** Saber, Charles
**Sent:** Tuesday, December 05, 2006 5:10 PM
**To:** 'Bonella, Michael J. (Woodcock Washburn)'
**Cc:** Tamburo, Salvatore
**Subject:** RE: Mitek v. Arthrex

Mike

Thanks for your letter of November 30.

I have thought about whether there is a practical way to move pretrial matters forward without unduly wasting the parties' time and money. I do not believe it is possible. I simply do not agree with the observation in your letter the "we may have to revise the work slightly based on the Court's rulings." As I see it, there could be anything from a little change to no trial and just about everything in between. There are two claim construction issues and six issues raised in the dispositive motions papers (some with subparts where the Court could split the ruling). Thus, there are at least 12 possible outcomes (and maybe more), many of which will have different evidentiary requirements. In addition, there are several other motions pending that could affect the evidence. Thus, I really believe that the most efficient way to use our time and spend our clients' money is to wait for the Court's rulings.

I hope the move to your new offices went smoothly and that you are enjoying the new surroundings.

Best regards,

Chuck

**From:** Bonella, Michael J. (Woodcock Washburn) [mailto:bonella@woodcock.com]
**Sent:** Thursday, November 30, 2006 11:30 AM
**To:** Saber, Charles
**Subject:** Mitek v. Arthrex

# Exhibit 3

## Tamburo, Salvatore

| | |
|---|---|
| **From:** | Tamburo, Salvatore |
| **Sent:** | Monday, September 25, 2006 5:17 PM |
| **To:** | Verrecchio, Angela (Woodcock Washburn) |
| **Cc:** | 'Malinoski, Lynn A. (Woodcock Washburn)'; Saber, Charles |
| **Subject:** | DePuy Mitek v. Arthrex, et al. - Defendants' Exhibit List, Witness List and Proposed Stipulated Facts |

Angie:

Attached are defendants' Trial Exhibit list, Witness list and Proposed Stipulated Facts.

  

DSMDB-#2148497- DSMDB-#2147973- DSMDB-#2147975-
v1-DTEX-List-Dr... v1-Defendants_w... v1-Proposed_Sti...

Regards,
- Sal

**Sal Tamburo**
Dickstein Shapiro LLP
1825 Eye Street NW | Washington, DC 20006
Tel (202) 420-5164 | Fax (202) 420-2201
tamburos@dicksteinshapiro.com

1

**ARTHREX, INC.'S AND PEARSALLS, LTD.'S LIST OF WITNESSES
LIKELY TO BE CALLED AT TRIAL**

1)      Reinhold Schmieding

2)      R. Donald Grafton

3)      Robert Sluss

4)      D. Lawson Lyon

5)      Ashley Holloway

6)      John Schmieding

7)      Peter Dreyfuss

8)      Dr. Jeffrey Wyman, Director of Medical Education, Arthrex, Inc., 1370 Creekside Boulevard, Naples, Florida 34108, (800) 933-7001.

9)      Dr. Debi Prasad Mukherjee

10)     Dr. Robert Burks

11)     Dr. Norm Gitis

12)     John Witherspoon

13)     Rodney Bosco

**ARTHREX, INC.'S AND PEARSALLS, LTD.'S LIST OF WITNESSES THAT
MAY BE CALLED AT TRIAL IF THE NEED ARISES**

14)     Richard Ponton

15)     William Benavitz, Marketing, Arthrex, Inc., 1370 Creekside Boulevard, Naples, Florida 34108, (800) 933-7001.

16)     Jon Cheek, Vice President, Finance, Arthrex, Inc., 1370 Creekside Boulevard, Naples, Florida 34108, (800) 933-7001.

17)     Brian Hallet

18)     Lee Lewis

19)     Scott Giraud, Sterile Systems, Div. of Medtronic, 520 Watson St. S.W., Grand Rapids, MI 49504, (800) 875-5560.

20)    Stephen A. Soffen

21)    Dr. Stephen S. Burkhart, Arthrex Consulting Surgeon, 150 E Sonterra Boulevard, Suite 300, San Antonio, TX 78258, Tel.: (210) 489-7220

DSMDB-2147973v01

# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DePuy Mitek, Inc.                           )
  a Massachusetts Corporation        )
                               )
          Plaintiff,                )
                               )
       v.                            )     Civil Action No. 04-12457 PBS
                               )
Arthrex, Inc.                               )
  a Delaware Corporation, *et al.*     )
                               )
       Defendants.              )
                               )

## <u>DECLARATION OF JOHN W. SCHMIEDING, ESQ.</u>

1.    My name is John W. Schmieding.  I am general counsel of Arthrex, Inc., a defendant in the above-captioned matter.

2.    At the time of Mr. Sluss' deposition, Mr. Sluss was an appropriate witness for the promotion and marketing of FiberWire due to his involvement as a Product Manager for upper extremities and then as a small joint Product Manager.

3.    Mr. Sluss left the employ of Arthrex in early 2006.  Mr Sluss returned to Arthrex in late 2006, but since then, Mr. Sluss has had no responsibility for the promotion and marketing of FiberWire suture.

4.    Also, Donald Grafton, one of the developers of FiberWire, is currently outside of the country and is not available to testify at trial.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on: _7/16/07_

John W. Schmieding

2

DSMDB-2289741v01

# Exhibit 5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **DePuy Mitek, Inc.** | ) | |
|    **a Massachusetts Corporation** | ) | |
| | ) | |
|    **Plaintiff,** | ) | |
| | ) | |
|    **v.** | ) | **Civil No. 04-12457 PBS** |
| | ) | |
| **Arthrex, Inc.** | ) | |
|    **a Delaware Corporation and** | ) | |
| | ) | |
| **Pearsalls Ltd.,** | ) | |
|    **a Private Limited Company** | ) | |
|    **of the United Kingdom,** | ) | |
| | ) | |
|    **Defendants.** | ) | |
| | ) | |

### Declaration of Dr. David Brookstein In Support of DePuy Mitek's
### Claim Interpretation of the Hunter Patent and Summary Judgment of Infringement

**I.**    **Background Information**

    **A.**    **Teaching Experience**

1.    I am the Dean and Professor of Engineering at the School of Engineering and Textiles of Philadelphia University. I have held this position since 1994. In 2005, I also was appointed Executive Director of Research at Philadelphia University.

2.    I was a Visiting Scholar at the Harvard University Center for Textile and Apparel Research (Division of Engineering and Applied Sciences) between 2002-2003.

3.    I was an Adjunct Professor in Mechanical Engineering at Northeastern University in Boston, MA from 1981-1983. At Northeastern, I taught undergraduate courses in statics, dynamics, and mechanics of deformable bodies and material science.

4.    I was Assistant Professor of Textile Engineering at Georgia Institute of Technology, College of Engineering from 1975 – 1980. At Georgia Tech, I taught and conducted research in

18.     My opinion is supported by Mr. Grafton's testimony regarding the development of

FiberWire and by Arthrex's 234 patent.  As Mr. Grafton explained, he had developed a suture

having a homogeneous braid of UHMWPE (Ex. 3 at 51:15-17).  But he found this UHMWPE

braid to be unacceptable because it had poor knot holding strength properties (*id.* at 51:15-53:7).

As Mr. Grafton explained, the poor knot holding strength properties were attributable to

UHMWPE being a lubricous material, which causes the knot to slip (*id.* at 52:24-53:7).  To

increase the knot holding strength, Mr. Grafton braided UHMWPE with PET (*id.* at 53:20-54:5;

46:16-47:5).  Mr. Grafton tested the UHMWPE and PET braid and found that it had improved

knot holding strength properties as compared to the UHMWPE braid (*i.e.*, the heterogeneous

braid did not slip like the homogeneous UHMWPE braid) (*id.* at 54:24-55:1).  This type of

UHMWPE and PET braid ultimately became FiberWire.  Thus, as Mr. Grafton's experience

shows, FiberWire is a braid of UHMWPE (a lubricous yarn) with PET, and the PET increases

the knot holding strength of the braid.  This just like the 446 Patent because the 446 Patent

describes embodiments in which the first fiber-forming materials are lubricous and the second

fiber-forming materials impart strength.  Accordingly, FiberWire's braid is not, as Arthrex has

suggested, the opposite of what is described in the 446 Patent.

19.     Arthrex's 234 Patent also supports my opinion.  According to Mr. Grafton's 234 Patent,

UHMWPE, "while much stronger than ordinary surgical suture, does not have acceptable knot

tie down characteristics for use in surgical applications" (Ex. 4 at 1:19-21; Ex. 3 at 104:9-15).

Mr. Grafton defines knot tie down as a strength, namely the "ability to approximate the tissue

and hold [tissue] in place through biomechanical forces" in the body (Ex. 3 at 26:24-27:6).  Mr.

Grafton's definition of knot tie down is part of what I refer to as knot holding strength.

According to Arthrex's 234 patent, this problem was overcome by braiding UHMWPE with

polyester (Ex. 4 at 2:50-57). As the 234 patent explains, braiding polyester with UHMWPE improves knot tie down characteristics or the "ability to approximate the tissue and hold it in place through biomechanical forces" (Ex. 3 at 26:24-27:10). Thus, the 234 patent teaches that polyester, which includes materials such as PET, imparts knot tie down or knot holding strength to a braid of UHMWPE and polyester. Thus, Arthrex's 234 Patent further shows that the differences are insubstantial because UHMWPE is described as a lubricous yarn that with bad knot properties, and similarly embodiments of the first fiber-forming materials are described as lubricous.

20.     I understand that Arthrex has asserted that the differences between the first fiber-forming materials (if PE does not include UHMWPE) and UHMWPE are substantial because the purpose of UHMWPE in FiberWire is alleged to be to provide strength (Arthrex Br. at 11). I disagree with this statement because the 446 Patent describes embodiments in which the first set of yarns is lubricous and provides PE as an example of a lubricous yarn (Ex. 2 at 4:11-12). The UHMW PE in FiberWire is consistent with this description; FiberWire's UHMW PE is lubricous (Ex. 3 at 52:24-53:1). The 446 Patent also describes embodiments in which the claimed second fiber-forming yarns, including PET, are braided with the claimed first fiber-forming lubricous yarns, including PE, "to provide improved strength to the heterogeneous braid" (Ex. 2 at 4:33-36). FiberWire is consistent with this description; FiberWire's PET has a different lubricity than UHMWPE and adds improved strength to the FiberWire braid (Ex. 3 at 53:20-54:5; 46:16-47:5). Accordingly, PET increases certain knot strength properties, namely knot holding strength,[2] of

---

[2]     I use the term "knot pull strength" to refer to the force at which a suture having a knot tied in it fails when tested in a tension test. I use the term "knot holding strength" to refer to the force at which a knot fails by slipping, elongating to a certain extent, or breaking, which can be tested generally in a procedure similar to Exs. 26 and 27. Knot holding strength is an indication

64.    It is my expert opinion and observation that the coating only appears on the surface of the braid.

I declare under penalty of perjury that the foregoing is true and correct.

Date Executed:  September 1, 2006

_/s/_

# Exhibit 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DePuy Mitek, Inc.<br>    a Massachusetts Corporation | ) ) ) | |
|     Plaintiff, | ) ) | |
|     v. | ) ) | Civil No. 04-12457 PBS |
| Arthrex, Inc.<br>    a Delaware Corporation and | ) ) ) | |
| Pearsalls Ltd.<br>    a Private Limited Company<br>    of the United Kingdom | ) ) | |
|     Defendants. | | |

**DePuy Mitek's Memorandum in Support of Its Motion for Summary Judgment of
Infringement & Opposing Arthrex's Motion for Summary Judgment of Noninfringement**

second polyester (PET) suture broke when being handled and, at least according to one surgeon, "suck[ed]" (*id.* at 45:8-9). In other words, both sutures were homogeneous multifilament sutures of the type upon which the 446 Patent sought to improve (Ex. 2 at 2:65).

Originally, Mr. Grafton sought to solve the problem with a *homogeneous multifilament PE suture*. But Mr. Grafton found that this suture had a different problem; it would not hold a knot (Ex. 12 at 46:1-9; 51:4-53:5). Thus, Mr. Grafton decided to form a *heterogeneous multifilament braided suture* of PE and PET (*id.* at 46:10-19; 54:6-14), which is just what the 446 Patent claims and which therefore has the novel and basic characteristics of the invention (Ex. 2 at 8:62-9:8). He found that this heterogeneous suture, which became FiberWire, overcame the disadvantageous of the homogeneous sutures; it had good strength and handleability (Ex. 12 at 54:15-55:5). In fact, a surgeon recognized the dramatic improvement attributable to the claimed invention as "killer" (*id.* at 46:16-24; 54:11-14; 75:5-11). Further, Mr. Grafton admitted that he tried to optimize FiberWire's properties by mechanically blending the PE and PET (*id.* at 68:25-70:13), just at taught in the 446 Patent (Ex. 2 at 2:58-62). Thus, Arthrex's development of FiberWire shows that the braiding of the PE and PET yarns in direct intertwining contact with one another created a suture with substantially improved properties, just as the 446 Patent teaches (*id.* at 2:62-66).

The question then becomes: What effect, if any, does FiberWire's coating have on this suture that already has excellent properties? As Dr. Brookstein explained, because it is just a lubricant, FiberWire's surface coating has a minimal effect relative to the dramatically improved handleability properties attributable to the heterogeneous braid of the invention (Ex. 6 at ¶47). Thus, Arthrex's own technical experience and Dr. Brookstein's testimony establish that FiberWire's coating's effects are not material effects. Notably, Arthrex's experts did not

19

## CERTIFICATE OF SERVICE

I certify that I am counsel for DePuy Mitek, Inc. and that true and correct copies of:

**DePuy Mitek's Motion for Summary Judgment of Infringement & Opposing Arthrex's Motion for Summary Judgment of Noninfringement; and**

**DePuy Mitek's Memorandum in Support of Its Motion for Summary Judgment of Infringement & Opposing Arthrex's Motion for Summary Judgment of Noninfringement**

were served on counsel for Defendants Arthrex, Inc. and Pearsalls Ltd. on this date via the Court's e-mail notification with the following recipients being listed as filing users for Defendants:

> Charles W. Saber
> Dickstein Shapiro
> 1825 Eye Street, NW
> Washington, DC 20006
> saberc@dicksteinshapiro.com
>
> Raymond P. Ausrotas
> Todd & Weld LLP
> 28 State Street, 31st Floor
> Boston, MA 02109
> rausrotas@toddweld.com

Dated: April 6, 2007                           /s/ Erich M. Falke_____
                                               Erich M. Falke

# Exhibit 7

**From:**    Bonella, Michael J. (Woodcock Washburn) [bonella@woodcock.com]
**Sent:**    Friday, July 06, 2007 6:42 AM
**To:**      Saber, Charles
**Cc:**      Tamburo, Salvatore
**Subject:** RE: DePuy Mitek v. Arthrex

Chuck:

  Thanks for your email.

  We will depose Ms. Shaneville on July 17, 2007, assuming that we can start early enough to fly home that day.

  With respect to motions in limine, we propose that we exchange lists of the motions on Monday and meet and confer on Tuesday.

  We do not agree that Mitek had notice that Arthrex may call Mr. Benavitz and Dr. Burkhart as trial witnesses. Are you available to meet and confer on this issue this morning at 10:30?

  thanks,
  Mike

  Michael Bonella
  Partner
  Woodcock Washburn LLP
  Cira Centre, 12th Floor
  2929 Arch Street
  Philadelphia, PA 19104-2891
  215.564.8987
  Fax: 215.568.3439

This email message and any attachments are for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message and any attachments.
-------------------------------------------------------------------------------------------
IRS CIRCULAR 230 DISCLOSURE:
Pursuant to Treasury Regulations, any tax advice contained in this communication(including any attachments) is not intended or written to be used, and cannot be used or relied upon by you or any other person, for the purpose of: (i) avoiding penalties under the Internal Revenue Code; or (ii) promoting, marketing, or recommending to another party any tax advice addressed herein.

     -----Original Message-----
     **From:** Saber, Charles [mailto:SaberC@dicksteinshapiro.com]
     **Sent:** Thursday, July 05, 2007 7:07 PM
     **To:** Bonella, Michael J. (Woodcock Washburn)
     **Cc:** Tamburo, Salvatore
     **Subject:** DePuy Mitek v. Arthrex

     Mike

     This is in response to your letter and email of Tuesday.

     First, with respect to the motions in limine, we are agreeable to your proposal. I add a couple of comments. Our list may not be entirely complete as we are still contemplating the issues. We will, however, give you our good faith list of likely

motions, and ask the same from you. Also, as I discussed with Diane and Lynn, we do not believe it is necessary or appropriate to file an in limine motion on every possible evidentiary issue. Indeed, whether we will object to testimony or other evidence may well depend on the specific question asked or the specific context in which a document or other piece of evidence is offered. Rather, we believe that in limine motions should be reserved for larger and more basic evidentiary issues. Please let me know your thoughts on this issue.

Sal will contact you separately with respect to Dr. Gitis and Mr. Giruard.

Concerning Ms. Shaneville's deposition, I believe that the best day will be Tuesday, July 17. I have not yet finally confirmed the date, and I will let you know when the date is confirmed.

For Mr. Paul's deposition, I suggest that we conduct it on the morning of July 31 assuming that it will be in Massachusetts. We will be in Boston that day for the 4 p.m. pretrial conference and we should have plenty of time to take the deposition before the hearing. We can take the deposition in our local counsel's office (Todd and Weld). Please let me know if this works.

We disagree with your assertions about Dr. Burkhart and Mr. Benavitz. We understand your comments about experts, but Dr. Burkhart is not being called as an expert witness. In addition, we have made no decision as to whether we will call Dr. Burkhart (as you know, he is on our "maybe" list). Whether we call him will in large part depend upon the testimony put forth by DePuy Mitek. DePuy Mitek made Dr. Burkhart's testimony relevant in its summary judgment papers when it argued, in support of its position, that Dr. Burkhart stated that Fiberwire was a killer idea. Having made him relevant, DePuy Mitek surely cannot argue that Arthrex is not entitled to call him as a witness to respond to DePuy Mitek's argument and explain his role in the development of Fiberwire.

As far as Mr. Benavitz, we are mystified how DePuy Mitek could possibly claim surprise or prejudice. Mr. Benevitz's name came up in discovery on numerous occasions as a person with relevant knowledge of Fiberwire (including instances where DePuy Mitek's counsel volunteered his name). Surely DePuy Mitek knew about him and could have taken his deposition. Nor can DePuy Mitek claim prejudice. The parties specifically contemplated situations where fact witnesses were identified on the witness list but had not been deposed. A party can now take the depositon. Obviously, there is time for DePuy Mitek to take Mr. Benevitz's depositon (including in the trip where it takes Ms. Shaneville's depositon). Moreover, contrary to the assertion in your letter, there is simply no statement is the Joint Case Management Statement that limits depositons to "witness[es] generated after fact discovery closed."

We remain willing to discuss this issue with you as necessary.

Best regards,

Chuck

```
------------------------------------------------------
This e-mail message and any attached files are confidential
and are intended solely for the use of the addressee(s)
named above. This communication may contain material
protected by attorney-client, work product, or other
privileges. If you are not the intended recipient or person
responsible for delivering this confidential communication
to the intended recipient, you have received this
communication in error, and any review, use, dissemination,
forwarding, printing, copying, or other distribution of
this e-mail message and any attached files is strictly
prohibited. Dickstein Shapiro reserves the right to monitor
any communication that is created, received, or sent on its
network.  If you have received this confidential
communication in error, please notify the sender
immediately by reply e-mail message and permanently delete
the original message.

To reply to our email administrator directly, send an email
to postmaster@dicksteinshapiro.com
```

```
Dickstein Shapiro LLP
http://www.DicksteinShapiro.com

=============================================================================
```

# Exhibit 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DePuy Mitek, Inc.                        )
   a Massachusetts Corporation     )
                               )
        Plaintiff,                       )
                                 )
        v.                               )    Civil Action No. 04-12457 PBS
                                 )
Arthrex, Inc.                            )
   a Delaware Corporation, *et al.*    )
                                 )
        Defendants.                      )
                                 )

## <u>DECLARATION OF CHARLES W. SABER, ESQ.</u>

1.     My name is Charles W. Saber.  I am a partner with the law firm Dickstein Shapiro LLP located at 1825 Eye Street, N.W., Washington, DC 20006.  I am counsel for Defendants Arthrex, Inc. and Pearsalls, Ltd. in the above-captioned matter.

2.     On July 6, 2007, I participated in a meet and confer with counsel for DePuy Mitek. During the meet and confer, I explained to DePuy Mitek why Defendants believe it is necessary to have Dr. Burkhart listed as a "maybe" witness on Defendants' trial witness list.  Specifically, I explained to counsel that Defendants intended to use Dr. Burkhart, if necessary, to respond to DePuy Mitek's reliance on Dr. Burkhart's role in the development of FiberWire, a role which DePuy Mitek raised after the close of fact discovery.

3.     During the July 6, 2007 meet and confer, I offered to remove Dr. Burkhart from Defendants witness list if DePuy Mitek would agree not to rely on his role.  DePuy Mitek rejected that offer.

4.     During the July 6, 2007 meet and confer, I reminded DePuy Mitek that it had already entered into an agreement in the Joint Case Management Statement by which a witness who is to

be called at trial will be made available for deposition to the extent the witness has not yet been deposed in the case. DePuy Mitek disagreed that those were the terms of the agreement.

5.      Also during the July 6, 2007 meet and confer, I offered to make Dr. Burkhart available for deposition at a mutually convenient place and time. More specifically, I offered to make Dr. Burkhart available for deposition in Boston if DePuy Mitek made his role relevant. That way, DePuy Mitek would not have to take his deposition unless it became evident that his testimony would be necessary. When DePuy Mitek rejected that offer, I stated that I would contact Dr. Burkhart to arrange a date before trial. I told DePuy Mitek's attorneys that either method was acceptable. I left the choice to them. DePuy Mitek rejected that offer and indicated that they would file the motion.

6.      During the July 6, 2007 meet and confer, I also informed DePuy Mitek that neither Dr. Burkhart nor Mr. Benavitz were being called by Defendants to testify as an expert.

7.      During the July 6, 2007 meet and confer, I also informed DePuy Mitek that the reason why Mr. Benavitz was on Defendants' witness list was because he is currently the person at Arthrex with direct responsibility for promoting and marketing FiberWire suture.

8.      During the July 6, 2007 meet and confer, I also offered to make Mr. Benavitz available for deposition in Naples, Florida, on or about July 17, 2007, the same location and date DePuy Mitek would be taking the deposition of another one of Defendants' witnesses.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on: _7/16/07_

Charles W. Saber

2

# Exhibit 9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DePuy Mitek, Inc.<br>    a Massachusetts Corporation<br><br>        Plaintiff.<br><br>        v.<br><br>Arthrex, Inc.<br>    a Delaware Corporation<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)   No. 04-12457 PBS<br>)<br>)<br>)<br>)<br>)<br>) |

**Joint Case Management Statement**

Plaintiff and Counterclaim Defendant DePuy Mitek, Inc. ("DePuy Mitek") and Defendant and Counterclaimant, Arthrex, Inc. ("Arthrex") met and conferred on January 14, 2005 and January 25, 2005 pursuant to Federal Rule of Civil Procedure 26(f) and the Court's December 14, 2004 Order. The parties jointly submitt his Case ManagementS tatement.

I.    **Agenda of Matters to be Discussed at the Scheduling Conference**

    A.    **Proposed Scheduling Order & Discovery Limits**

The parties have agreed to a proposed schedule and discovery limits as set forth below in section IV and submit them for the Court's approval.

    B.    **Proposed Protective Order**

The parties believe that a Protective Order will facilitate discovery and trial proceedings in this matter. The parties have substantially agreed to the terms of a Protective Order and expect to submit it to the Court shortly.

1

### C.    Timing of Alternative Dispute Resolution

The parties agree that alternative dispute resolution, mostl ikely in the form of non-binding mediation,w ould most likely have the greatest chance of success after some liability and damages discovery.  (*See* section V).

### D.    Settlement Proposal

Pursuant to the Court's rules, DePuy Mitek served its settlementd emand on Arthrex and Arthrex is prepared to respond at the conference. (*See* section V).

## II.    Description of the Case

### A.    Parties' Claims

DePuy Mitek alleges that Arthrex is infringing United States Letters Patent No. 5,314,446 ("446 Patent") entitled "Sterilized Heterogeneous Braids" by its making, using, selling, and offering for sale braided sutures as claimed in the 446 Patent, including those sold under the trade name FiberWire™,a nd braided sutures products, such as those incorporating needles and anchors. DePuy Mitek also alleges that Arthrex's infringement has been and is willful.

Arthrex denies DePuy Mitek's allegations of infringement and willful infringement and asserts affirmative defenses that the 446 Patenti s invalid and unenforceable.  Arthrex also asserts as affirmative defenses laches and patent misuse,a nd has also filed a counterclaim for patent misuse.  Arthrex seeks a declaratory judgment that itd oes not infringe the 446 Patent and that the patent is invalid and unenforceable.  Arthrex further contends that the case is exceptional, meriting an award of attorneys' fees to Arthrex.

DePuy Mitek denies that Arthrex is entitled to a declaratory judgment of noninfringement, invalidity, and/or unenforceability.  DePuy Mitek asserts affirmative defenses

2

to those claims and denies Arthrex's laches and patent misuse allegations. DePuy Mitek also

pleads that Arthrex failed to state a claim upon which relief may be granted.

**B.    Claims For Relief**

**1.    DePuy Mitek**

DePuy Mitek is seeking damages sufficient to compensate it for Arthrex's infringement

and is requesting that any such damages be trebled and awarded to DePuy Mitek with interest.

Because the information thatDePu y Mitek needs to ascertain the extent of its damages is within

the possession, custody and control of Arthrex, DePuy Mitek is unable to provide more specific

information at this time. DePuy Mitek nonetheless contends that ith as experienced economic

injury as well as irreparable harm as a result of Arthrex's infringement of the 446 Patent.

Pursuant to 35 U.S.C. § 284, iti s entitled to no less than a reasonable royalty for the use made of

the patented inventions, together with interesta nd costs as fixed by the Court.

DePuy Mitek alleges that Arthrex has engaged in, and continues to engage in, willful

infringement of the 446 Patent,wh ich justifies an increase of three times the damages to be

assessed pursuant to 35 U.S.C. § 284. These circumstances also warrant a finding that this is an

exceptional case supporting the award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

Pursuant to 35 U.S.C. § 283, DePuy Mitek seeks the entry of an injunction enjoining and

restraining Arthrex from further infringement of the 446 Patent.

**2.    Arthrex**

Arthrex denies that DePuy Mitek is entitled to any relief. Moreover, Arthrex believes

that the circumstances support a finding that this is an exceptional case and thus, Arthrex should

be awarded reasonable attorney's fees pursuant to 35 U.S.C. § 285. In the event that it is found

that DePuy Mitek is entitled to monetary relief, Arthrex asserts that DePuy Mitek should only be

awarded a reasonable royalty recovery.

3

### III.    Jurisdiction And Parties

The parties agree that the Court has subject matter jurisdiction over DePuy Mitek's claims and Arthrex's counterclaims, subject to the matters pleaded in the complaint, answer and counterclaim, and reply to the counterclaim.  The bases for jurisdiction are set forth in the pleadings.  The parties agree that they are subject to the Court's jurisdiction.  All parties have been served.

### IV.    Discovery

#### A.    Generally

The parties presently intend to take discovery on at least the following issues:

- whether the accused FiberWire™ devices infringe claims of the 446 Patent;
- whether Arthrex's infringement has been and is willful;
- whether the claims of the 446 Patent are valid under applicable provisions of 35 U.S.C. §§ 102, 103 and 112;
- whether DePuy Mitek has engaged in patent misuse;
- whether persons involved in the prosecution of the 446 Patent committed inequitable conduct;
- the amount of damages owed on any claim where liability is found;
- construction of terms in the asserted claims of the 446 Patent;
- whether any damages should be enhanced if willful infringement is found;  and
- whether laches precludes DePuy Mitek's action against Arthrex or otherwise limits the damages to which DePuy Mitek is entitled.
- The parties have exchanged their initial disclosures.  The parties have agreed to exchange initial disclosure documents on February 25, 2005.

4

The parties intend to pursue both written and oral discovery, including requests for admission, requests for the production of documents and things, interrogatories, and depositions. The parties are not aware of any alternate methods available to obtain the necessary information.

The parties also discussed the option of phasing discovery. With the exception of expert discovery, DePuy Mitek does not believe that phasing discovery will be efficient. DePuy Mitek submits that the parties should engage in discovery on all issues so that the parties can develop fully all the issues and have them joined in a timely manner. DePuy Mitek also submits that engaging in discovery on all issues will minimize discovery disputes directed to categorizing in which phase particular discovery may properly fall (*e.g.,* should information relating to the commercial success of products covered by the patentb e categorized as liability discovery because it relates to the issue of obviousness, or as damages discovery?).

Arthrex believes that there is no current need for staged discovery (with the exception of expert discovery discussed below), but reserves the right to seek staged discovery should subsequent events demonstrate that staged discovery is the most efficient manner to prosecute this litigation.

**B.      Discovery Plan**

      **1.      Limitations on discovery**

The parties propose that the number of depositions and discovery requests be governed by the Federal Rules of Civil Procedure and Local Rule 26.1 (c), with the following modifications and clarifications:

- Each party shall be limited to fifteen (15) fact depositions, including 30(b)(6) depositions having reasonably related topics. The parties shall be entitled to take more than one 30(b)(6) deposition. Each seven hours of 30(b)(6) testimony (whether given by one or multiple witnesses) will count as one deposition. The

5

parties have also agreed to produce any factw itnesses that they expect to have testify at trial for deposition (if that witness has not been previously deposed in this case). The limito n the number of fact depositions excludes expert depositions.

- The parties shall be permitted to serve more than two separate sets of document requests.

## 2. Pretrial Schedule

The parties' proposed pretrial schedule is set forth below.

| Event | Date |
|---|---|
| Lastd ay to amend pleadings | April 1, 2005 |
| Lastd ay to add parties | April 1, 2005 |
| Parties exchange list of disputed terms and claim construction positions re:same | August 12, 2005 |
| Meet and confer re:disputed terms | August1 9,2005 |
| Parties serve Opening Claim Construction Briefs | September 16, 2005 |
| Parties serve Reply Claim ConstructionB riefs | October 14, 2005 |
| Claim Construction Hearing | Week of November 7, 2005[1] |
| Arthrex elects whether it will rely on advice of counsel | October 31, 2005 |
| Fact discovery cut-off | January 31, 2006 |
| Parties serve opening expert reports on the issues on which they bear the burden of proof | February 17, 2006 |

---

[1]    The Federal Circuith as agreed to hear, en banc, *Phillips v. AWH Corp.*, No. 03-1269, 1286, which raises significanti ssues regarding the proper methodology for construing claims. Oral argument was heard on February 8,2005 . Arthrex believes that the Federal Circuit decision in *Phillips* may significantly impach ow the claims should be construed in this case. Thus, if no decision in *Phillips* is rendered by the scheduled date of the *Markman* claim construction hearing, Arthrex believes that a postponement of the *Markman* hearing may be appropriate to avoid duplication of effort by the parties and the Court. DePuy Mitek disagrees with Arthrex to the extentA rthrex is proposing that the schedule be modified and/or linked to the timing of the *Phillips* decision.

| Event | Date |
|---|---|
| Responsive expert reports | March 17, 2006 |
| Close of expertd iscovery | April 28, 2006 |
| Opening Briefs on Summary Judgment (last day to file dispositive motions) | May 19, 2006 |
| Opposition Summary Judgment Briefs | June 9, 2006 |
| Reply Summary Judgment Briefs | June 21, 2006 |
| Summary JudgmentHea ring | Week of July 10, 2006 |
| Final Pretrial Conference | August9 , 2006 |
| Trial (5-7 days) | September 11, 2006 |

The parties agree that, to the extent they still exist, certain issues involving inequitable conducta nd patent misuse may be more properly resolvable by the Court rather than the jury.

**V.    Alternative Dispute Resolution & Settlement**

The parties have met and conferred regarding alternative dispute resolution procedures. DePuy Mitek, consistent with the Local Rules, submitted its settlement proposal to Arthrex. Arthrex will be prepared to respond at or before the scheduling conference.  Although the parties do not rule out alternative dispute resolution procedures as a means to resolve this dispute, the parties believe that alternative dispute resolution would not be effective until at leasts ome discovery regarding liability and damages issues has been taken.

The parties' certifications pursuant to Local Rule 16.1(d)(3) are being filed concurrently herewith.

**VI.    Other Matters**

The parties do not consent to trial before a magistrate judge.

Dated:  February 11, 2005                    DEPUY MITEK, INC.,
                                            By its attorneys,

                                             /s/  Michelle Chassereau Jackson
                                            Daniel J. Gleason (BBO #194900)
                                            Michelle Chassereau Jackson (BBO #654825)
                                            Nutter McClennen & Fish LLP
                                            World Trade Center West
                                            155 Seaport Boulevard
                                            Boston, MA. 02210-2604
                                            617-439-2000

                                            Dianne B. Elderkin
                                            Lynn A. Malinoski
                                            Michael J. Bonella
                                            Erich M. Falke
                                            WOODCOCK WASHBURN LLP
                                            One Liberty Place - 46th Floor
                                            17th and Market Streets
                                            Philadelphia, PA 19103
                                            (215) 568-3100


Dated:  February 11, 2005                    ARTHREX, INC.,
                                            By its attorneys,

                                             /s/  Christopher Weld, Jr.
                                            Christopher Weld, Jr. (BBO # 522230)
                                            Raymond P.A usrotas (BBO # 640315)
                                            TODD & WELD LLP
                                            28 State Street, 31st Floor
                                            Boston, MA 02109
                                            Telephone: (617) 720-2626
                                            Facsimile: (617) 227-5777

                                            Charles W. Saber
                                            Stephen A. Soffen
                                            Salvatore P. Tamburo
                                            DICKSTEIN SHAPIRO MORIN
                                            & OSHINSKY  LLP
                                            2101 L Street NW
                                            Washington, D.C.  20037-1526
                                            Telephone: (202) 785-9700
                                            Facsimile: (202) 887-0689

1403369.1

# Exhibit 10

**5/5/2005  Schmieding, John**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

DEPUY MITEK, INC., a                    )

Massachusetts corporation,              )

                                         )

    Plaintiff,                          )

                                         ) CIVIL ACTION

vs.                                      ) 04-12457 PBS

                                         )

ARTHREX, INC., a Delaware                )

corporation,                            )

                                         )

    Defendant.                          )

————————————————————————)

                851 Gulf Shore Boulevard

                Naples Beach Hotel & Golf Club

                Naples, Florida

                May 5, 2005

                Thursday, 4:37 p.m.

        VIDEOTAPED DEPOSITION

                OF

          JOHN SCHMIEDING

    Taken before Tanya Ward English, Registered

Professional Reporter, Certified Realtime Reporter

and Notary Public in and for the State of Florida at

Large, pursuant to notice of taking deposition.

5/5/2005  Schmieding, John

| | | |
|---|---|---|
| 1 | A | It is connected to our facility, right |
| 2 | | next to our facility here in Naples, Florida. |
| 3 | Q | Separate building? |
| 4 | A | Separated, yes. |
| 5 | Q | Separated how? |
| 6 | A | By a service drive. |
| 7 | Q | You mean a road? |
| 8 | A | A road. |
| 9 | Q | Is Arthrex Manufacturing, Inc. owned 100 |
| 10 | | percent by Arthrex, Inc? |
| 11 | A | Yes, it is. |
| 12 | Q | Who is the product manager -- I guess |
| 13 | | product manager, but it says product management. |
| 14 | | See that block? |
| 15 | A | I'm not sure where you're -- |
| 16 | Q | Right under the pres. |
| 17 | A | Product management.  That position is also |
| 18 | | not filled currently. |
| 19 | Q | A new position? |
| 20 | A | Correct. |
| 21 | Q | What are the intended job responsibilities |
| 22 | | in that position? |
| 23 | A | To oversee the product managers. |
| 24 | Q | And who is the team leader, elbow/shoulder |
| 25 | | on product management? |

5/5/2005  Schmieding, John

1        A     Bill Benavitz.

2        Q     Does he have responsibilities for

3   FiberWire products?

4        A     Yes.

5        Q     What are his responsibilities with respect

6   to FiberWire products?

7        A     To oversee the sale, marketing, and to

8   some degree the development of FiberWire products.

9        Q     Who is the team leader, knee and hip under

10  Product Management?

11       A     Tim Hoover.

12       Q     Does Mr. Hoover have any responsibilities

13  with respect to FiberWire products?

14       A     Some, yes.

15       Q     What are his responsibilities with respect

16  to FiberWire products?

17       A     Again, to oversee the sale, marketing and

18  to some degree development of some of those products

19  related to his area.

20       Q     Who is the team leader, small joint under

21  product --

22       A     Peter Denove.

23       Q     Does he have responsibility for FiberWire

24  products?

25       A     Yes, he does.

**5/5/2005  Schmieding, John**

1       Q    See the last box?  The last box says

2    "Product Managers" under product manufacturing.  See

3    that?

4       A    I do.

5       Q    What does that box signify?

6       A    I'm not quite sure.

7       Q    Where did Mr. Sluss fit into this tree?

8       A    Mr. Sluss fits in under the team leader

9    elbow and shoulder, which is not designated by a

10   box.  It would be a product manager, working under

11   that team leader elbow/shoulder group, which is a

12   recent position.

13      Q    But he works for Bill Benavitz?

14      A    Benavitz.  It's recently been structured

15   that way.  I don't know if "works for" is the

16   appropriate term.  He works with or in conjunction

17   with Mr. Benavitz.

18      Q    How are their job responsibilities

19   different?

20      A    Bill is focused on shoulder products

21   mainly; Robb focuses on FiberWire and hand and

22   wrist.

23      Q    When you say Robb focuses on FiberWire, do

24   you mean FiberWire products that don't have suture

25   anchors attached?

**5/5/2005  Schmieding, John**

```
1        A     That's correct.

2        Q     Who is the Vice President of Operations?

3        A     Kevin Grieff.

4        Q     And what is Mr. Grieff's role?

5        A     He oversees several departments, including

6   customer service, buyer/planners, the warehouse,

7   which is the labeled as inventory control.  He also

8   oversees another subsidiary which is in conjunction

9   with buyer/planning, which is Arthrex California,

10  Inc.

11       Q     Is Arthrex California, Inc. 100 percent

12  owned by Arthrex, Inc.?

13       A     Yes, it is.

14       Q     It's a separately incorporated company?

15       A     Yes, it is.

16       Q     What is Arthrex California, Inc.'s

17  function?

18       A     They manufacture what we term as hand

19  instruments.

20       Q     What do you -- what does Arthrex mean by

21  "hand instruments"?

22       A     Instruments that are utilized with the

23  hand for arthroscopic surgery.  That's not a good

24  definition, I guess.  They are metal instruments

25  that are machined and utilized for grasping tissue,
```

# Exhibit 11

VIDEOTAPE DEPOSITION
OF
ROBERT SLUSS

Taken before Tanya Ward English, Registered
Professional Reporter, Certified Realtime Reporter
and Notary Public in and for the State of Florida at
Large, pursuant to notice of taking deposition.

00002

APPEARANCES:
            On behalf of the PLAINTIFF:
                    WOODCOCK WASHBURN, LLP
                    One Liberty Place - 46th Floor
                    17th and Market Streets
                    Philadelphia, PA 19103
                    215-568-3100
                    By:  MICHAEL J. BONELLA, ESQUIRE
            On behalf of the Defendant:
                    DICKSTEIN, SHAPIRO, MORIN & OSHINSKY, LLP
                    2101 L. Street, NW
                    Washington, DC 20037-1526
                    202-785-9700
                    By:  CHARLES W. SABER, ESQUIRE
            TANYA WARD ENGLISH, RPR-CRR, Court Reporter
            DELORES SHERMAN, Videographer
                            INDEX

                                                    PAGE
        ROBERT SLUSS
        Direct by Mr. Bonella                        10
        Cross by Mr. Saber                          206
        Redirect by Mr. Bonella                     208
00003

                        EXHIBITS
        EXHIBIT         DESCRIPTION                 PAGE
        DePuy Mitek 1   Amended Notice of            12
                        Deposition
        DePuy Mitek 2   ARM 000691                   23
        DePuy Mitek 3   2003/2004 Product Catalog    41
        DePuy Mitek 4   Arthrex Supplemental         73
                        Objections and Responses
        DePuy Mitek 5   ARM 0001469                  94
        DePuy Mitek 6   ARM 3374 - ARM 3394          95
        DePuy Mitek 7   ARM 000298 - ARM 000307      99
        DePuy Mitek 8   ARM 001494                  105
        DePuy Mitek 9   ARM 001461                  111
        DePuy Mitek 10  ARM 001464                  114
        DePuy Mitek 11  ARM 001463                  117
00004

        DePuy Mitek 12  ARM 001462                  119
        DePuy Mitek 13  ARM 001477                  122
        DePuy Mitek 14  ARM 001465                  122
        DePuy Mitek 15  ARM 001466                  124
        DePuy Mitek 16  ARM 001467                  125
        DePuy Mitek 17  ARM 001468                  126
        DePuy Mitek 18  ARM 001478                  127
        DePuy Mitek 19  Waiting for New            128
                        Technology marketing
                        document
        DePuy Mitek 20  FiberWire marketing        130
                        document
        DePuy Mitek 21  Bioabsorbable Fixation     131
                        marketing document

9

**5/5/2005  Sluss, Robert**

1       A     That is correct.

2             (DePuy Mitek Exhibit 45, ARM 3601, was

3             marked for identification.)

4       BY MR. BONELLA:

5       Q     I show you DePuy Mitek Exhibit 45, ARM

6       3601, and ask you if that's the sales forecast

7       for -- I'm sorry.  The Initial Sales Forecast for

8       AR-7230-01 and 7230-02.

9       A     Yes.  I do recognize this.  Yes, it is.

10            (DePuy Mitek Exhibit 46, ARM 4585, was

11            marked for identification.)

12      BY MR. BONELLA:

13      Q     And Exhibit 46.  It's ARM 4585, and ask

14      you if it's the Initial Global Forecast for AR-7208?

15      A     I don't recognize this document.

16      Q     You can't testify as to whether it is or

17      isn't?

18      A     No.

19            (DePuy Mitek Exhibit 47, ARM 6204, was

20            marked for identification.)

21      BY MR. BONELLA:

22      Q     I hand you Exhibit 47, ARM 6204, and ask

23      you what this document is.

24      A     This is correspondence between Bill

25      Benavitz and Kevin Grieff, discussing the initial

**5/5/2005  Sluss, Robert**

1    12-month forecast for part number AR-7219, FiberWire

2    Suture Kit.

3                    (DePuy Mitek Exhibit 49, ARM 4625, was

4            marked for identification.)

5    BY MR. BONELLA:

6        Q    I show you Exhibit 49, ARM 4625, and ask

7    you what Exhibit 49 is.

8        A    I don't recognize this document.

9        Q    You can't testify as to whether Exhibit 49

10   is the Initial Sales Forecast for the Arthrex Needle

11   Punch product?

12       A    No.

13                   MR. BONELLA:  I skipped an exhibit number.

14                   (DePuy Mitek Exhibit 48, ARM 003280 -

15           003337, was marked for identification.)

16   BY MR. BONELLA:

17       Q    I hand you Exhibit 48.  It's ARM 003280,

18   and ask you if you recognize it.

19                   MR. SABER:  So you went back and just used

20           48?

21                   MR. BONELLA:  Yes.

22       A    No, I don't recognize this.

23   BY MR. BONELLA:

24       Q    Never seen it before?

25       A    No.

# Exhibit 12

8/24/2005  Waterhouse, Ann

0001
1                        IN THE UNITED STATES DISTRICT COURT
                        FOR THE MIDDLE DISTRICT OF FLORIDA
2
          DEPUY MITEK, INC.,
3         a Massachusetts corporation,
4
                  Plaintiff,
5
          v.                        Case No: CA-0412457-PBS
6
          ARTHREX, INC,  a
7         Delaware corporation,
8                  Defendant.
          _____/
9
10                  VIDEOTAPE DEPOSITION OF ANN WATERHOUSE
11        TAKEN:                 Pursuant to Notice by
                                 Counsel for the Plaintiff
12
          PLACE:                 Ritz Carlton Golf Resort
13                               2600 Tiburon Drive
                                 Naples, FL  34109
14
          DATE:                  Wednesday, August 24, 2005
15
          TIME:                  Began:  8:55 a.m.
16                               Ended:  1:00 p.m.
17        BEFORE:                TRACIE L. MOUNTAIN-THOMPSON
                                 Court Reporter
18                               Notary Public
                                 State of Florida at Large
19
20
21
22
23
24

                                                                    2

**8/24/2005 Waterhouse, Ann**

1    sizes are intended for use in approximation or ligation

2    of soft tissues, including allograft tissue," and our

3    reviewer wanted clarity on that statement.

4         Q    On that same page, the fourth paragraph it

5    says, Arthrex has a wealth of surgical knowledge which --

6    with which to rely on for assistance in technique

7    preparation and product development.  These sources have

8    suggested that the use of FiberWIRE with allograft and

9    autograft tissue would be ideal.

10        Do you see that?

11        A    Yes.

12        Q    Do you know who the sources were that suggested

13   that FiberWIRE be used with allograft and autograft

14   tissue?

15        A    Not specific names, no.

16        Q    Where did you -- what was your basis for

17   writing paragraph -- the fourth paragraph on ARM8383?

18        A    Our product managers.

19        Q    And who were they?

20        A    It's our marketing department and basically

21   they interact with our surgeons.

22        Q    Do you know any of the product managers in the

23   marketing department that you talked to in preparation of

24   the statements in the fourth paragraph on page ARM8383?

25        A    At the time that we first started the FiberWIRE

8/24/2005 Waterhouse, Ann

```
 1          there was a woman named Marjorie Martin, who was a

 2          product manager, and she was a part of that.  And Rob

 3          Sluss has been involved in that.  He's currently involved

 4          in FiberWIRE.

 5               Q     Anybody else?

 6               A     Bill Benavitz.  Basically, all of our product

 7          managers interact with our surgeons, so each one of them

 8          could have potential feedback.

 9               Q     Could you turn to page ARM8391, please?

10               MR. SABER:  What page?

11               MR. FALKE:  83 -- 8391.

12               THE WITNESS:  Got it.

13          BY MR. FALKE:

14               Q     Do you see that?

15               What is page 8391?

16               A     It's data from LifeNet Processed FiberWIRE

17          Testing.

18               Q     And who is LifeNet?

19               A     LifeNet is a tissue bank.

20               Q     And what were they asked to do with respect to

21          page ARM8391?

22               A     I think it's described here.

23               There is a description on ARM8384 as to the

24          steps taken to process allograft in the FiberWIRE

25          samples.  On 8385 there is an in-house procedure from
```

# Exhibit 13

**12/6/2005  Schmieding, Reinhold**

1

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
2
3     DePuy Mitek, Inc., a
      Massachusetts Corporation,
4
          Plaintiff,
5
          vs.                          CIVIL ACTION
6                                      NO. 04-12457 PBS
      Arthrex, Inc., a Delaware
7     Corporation,
8          Defendant.
      _____/
9
10
      DEPOSITION OF:      REINHOLD SCHMIEDING
11
      DATE:               December 6, 2005
12
      TIME:               9:03 a.m. to 12:36 p.m.
13
      LOCATION:           The Staybridge Suites
14                        4805 Tamiami Trail North
                          Naples, FL
15
      TAKEN BY:           Plaintiff
16
      REPORTER:           Deborah A. Krotz, RPR, CRR
17
      VIDEOGRAPHER:       Les Smoak, CLVS
18
19
20
21
22
23
24
25

**12/6/2005  Schmieding, Reinhold**

1     Q.   And it says, "We did this due to complaints of

2  suture breakage."

3     A.   Right.

4     Q.   Are you familiar with those complaints?

5     A.   Yeah.

6     Q.   Okay.  What was -- what was happening there?

7     A.   Well, I don't know exactly the reason.

8     Q.   Okay.  Did increasing the diameter solve the

9  breakage problem?

10     A.   I'm not sure it was determined it was the suture

11  or the suture passing method.

12     Q.   And you don't know what the determination was?

13     A.   It wasn't conclusive if it was the suture or the

14  suture passing method.

15     Q.   And did increasing the diameter USP #2 suture

16  diameter specification lower the amount of complaints?

17     It says here, "After the change, the complaints

18  dropped dramatically."

19     A.   Yeah, I'm not familiar with the complaint right

20  afterwards.

21     Q.   Okay.  And who would have the information?  The

22  QA Department?

23     A.   I would -- I would suspect, yes.

24     Q.   Okay.  Who would be the person that looked into

25  the -- well, do you know -- Let me ask you do you know the

**12/6/2005 Schmieding, Reinhold**

1    person who looked into the problems and whether the

2    diameter change would have an effect on performance?

3         A.    Bill Benavitz would be involved.

4         Q.    And who is Mr. Benavitz?

5         A.    He's a project manager at Arthrex.

6         Q.    For what?

7         A.    For shoulder -- shoulder products.

8         Q.    Okay.  I'd like to turn your attention back to

9    Exhibit 62.  Look on the back.  I asked you about some

10   needles before and whether they had recommended uses or --

11        A.    Mmm-hmm (affirmative).

12        Q.    -- the procedures they were typically in?

13        A.    Right.

14        Q.    I'm not sure if I exactly used those words, but

15   on the last page of Exhibit 62, it talks about recommended

16   uses for the various Arthrex products.  Do you see that?

17        A.    Mmm-hmm (affirmative).

18        Q.    AR-7207 it recommends for a rotator cuff repair;

19   do you see that?

20        A.    Right.

21        Q.    Is that how it's typically used?

22        A.    Yes.

23        Q.    How about AR-7204?  Is that typically used for a

24   rotator cuff repair?

25        A.    That would be one of the indications for it, yes.

# Exhibit 14

**12/7/2005  Dreyfuss, Peter**

1             IN THE UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF MASSACHUSETTS

2

3     DePuy Mitek, Inc., a

      Massachusetts Corporation,

4

          Plaintiff,

5

          vs.                          CIVIL ACTION

6                                       NO. 04-12457 PBS

      Arthrex, Inc., a Delaware

7     Corporation,

8         Defendant.

      _____/

9

10

      CONTINUATION

11    DEPOSITION OF:      PETER DREYFUSS

12    DATE:               December 7, 2005

13    TIME:               8:03 a.m. to 1:21 p.m.

14    LOCATION:           The Staybridge Suites

                          4805 Tamiami Trail North

15                        Naples, FL

16    TAKEN BY:           Plaintiff

17    REPORTER:           Deborah A. Krotz, RPR, CRR

18    VIDEOGRAPHER:       Michael Sturdevant, CLVS

19

20

21

22

23

24

25

1       A.   To be determined, to be done.

2       Q.   Okay.  Which is it?

3       A.   Oh, I -- actually -- I would have to say I don't

4    know.

5       Q.   Okay.

6       A.   Which one it is exactly.

7       Q.   Was a patent search ultimately done with respect

8    to the product described on Page ARM 933?

9       A.   I don't know.

10      Q.   Do you see under the patent search and royalties

11   section on ARM 933, it says royalties required and there's

12   a check mark no?

13      A.   Correct.

14      Q.   What does that mean?

15      A.   That check mark determines whether we would pay

16   royalties to someone on the finished product or not.

17      Q.   Was it determined that Arthrex -- that royalties

18   were not required with respect to Arthrex's FiberWire

19   suture?

20      A.   I -- on this form, it appears no, yes.  Correct.

21           MR. SABER:  Do you want to try that one again.

22           MR. FALKE:  I'm going to try that one again.  Was

23      it determined that Arthrex was not required to pay

24      royalties with respect to its FiberWire suture.

25      A.   On this form, direct.

12/7/2005  Dreyfuss, Peter

1      Q.    Okay.  Who made that determination?

2      A.    I don't know.

3      Q.    How was that determination made?

4      A.    I don't know.

5      Q.    Do you think Don Grafton would know that

6    information?

7      A.    Yes, I do.

8      Q.    Did Don Grafton prepare the market product

9    initiation shown on Page ARM 933 in Exhibit 138?

10     A.    Yes.

11     Q.    And at the bottom of the Page ARM 933, I see the

12   signatures of Reinhold Schmieding, Don Grafton and another

13   individual.  Who was that other individual?

14     A.    Bill Benavitz.

15     Q.    Who was Bill Benavitz?

16     A.    The product manager.

17     Q.    The product manager of what?

18     A.    At this date, he would have been the product

19   manager for upper extremity products.

20     Q.    Is Mr. Benavitz still with Arthrex?

21     A.    Yes, he is.

22     Q.    What's his position now?

23     A.    I think group manager for product managers for

24   upper extremity products.

25     Q.    Was that Mr. Grafton's role before he left

1    Arthrex?

2        A.    No.

3        Q.    And was I correct earlier when I said on the

4    bottom of Page ARM 933, there are signatures of Don

5    Grafton and Reinhold she'ding?

6        A.    Yes Schmieding.

7        A.    Yes, there are.

8        Q.    When Arthrex initially approached Pearsalls to

9    braid its FiberWire suture, what instructions were given

10   to Pearsalls to perform that task?

11       A.    I don't know.

12       Q.    Who at Arthrex would know that information?

13       A.    Don Grafton.

14       Q.    All right, but he's not at Arthrex; right?

15       A.    Correct.

16       Q.    Anybody else?

17       A.    No.

18       Q.    Turn to Page ARM 999 please in Exhibit 138.  And

19   it appears to me that from Page ARM 999 through 1139 are

20   various patents; is that right?

21       A.    You said through page --

22       Q.    To the end of the document, ARM 1139?

23       A.    Oh.  Apparently, yes yes.

24       Q.    Do you know how those documents got into Exhibit

25   138?  Well, strike that.  Do you know why those documents

12/7/2005  Dreyfuss, Peter

1   Arthrex's FiberWire suture currently has?

2        A.    I don't know.  I don't think so.

3        Q.    Did any of Arthrex's prototype sutures include a

4   sheath of only polyester and a core of ultra high

5   molecular weight polyethylene?

6        A.    I don't think so.

7        Q.    Does Arthrex know where he Don Grafton got the

8   idea of using ultra high molecular weight polyethylene in

9   a high strength suture?

10             MR. SABER:  Objection.

11       A.    No.

12             MR. SABER:  It assumes facts not in evidence.

13       A.    No.

14       Q.    Did Don Grafton have the idea of using ultra high

15  molecular weight polyethylene in a high strength suture?

16       A.    I don't know.

17             MR. SABER:  Objection.  Vague.

18       Q.    If it wasn't Don Grafton who had the idea of

19  using ultra high molecular weight polyethylene in a high

20  strength suture, who else at Arthrex had that idea?

21       A.    I don't know.

22       Q.    Did you have the idea?

23       A.    No, I did not.

24       Q.    Who was on the initial product team that

25  developed Arthrex's FiberWire suture?

12/7/2005  Dreyfuss, Peter

1        A.    The Debbie it would be Don Grafton and Bill

2    Benavitz.

3        Q.    Anyone else?

4        A.    No.

5        Q.    I'm going to hand you what's been marked DePuy

6    Mitek Exhibit 1401 Debbie 140.

7              (^ Plaintiff's ^ Defendant's Exhibit No. ^,

8        description, was marked for identification.)

9              MR. SABER:  Thanks.

10       Q.    Have you seen DePuy Mitek Exhibit 140 yet --

11   before?

12       A.    I can't recall it exactly.

13       Q.    Do you know what Exhibit 140 is?

14       A.    It looks to be sections of a design history file.

15       Q.    Does Exhibit 140 belong in the three volumes of

16   the design history file that we have discussed earlier?

17       A.    I don't know.

18       Q.    Do you have any reason to believe that it does?

19       A.    It appears to be a design -- sections of a design

20   history file.  And it appears to be sections related to

21   FiberWire development.

22       Q.    If you would turn to Page ARM 2692 in Exhibit

23   140, please.

24       A.    Yes.

25       Q.    What is shown on pages ARM 2692 and 2693?

1      A.    It appears to be a letter from new sill silicone

2   technology.

3      Q.    And NuSil is the provider of MED-2174 that's

4   applied replied that's aflied to Arthrex's FiberWire

5   sutures; is that rights?

6      A.    I believe so.

7      Q.    Does Arthrex have any reason to believe ARM 2692

8   and 2693 show that MED-2174 affects the strength of a

9   suture to which it would be applied?

10         MR. SABER:  Object to the form.

11     A.    Yeah, I don't know.

12     Q.    Do you see on Page ARM 2693, it says tensile

13   strength p.s.i. on the left-hand side of the page?

14     A.    Yes, I do.

15     Q.    What does that mean to you?

16     A.    The characteristic of the strength of whatever

17   item might be being tested.

18     Q.    What item is being tested on pages ARM 2693 of

19   Exhibit 140?

20     A.    The materials, the med. 2174.

21     Q.    So does that information represent the tensile

22   strength of the coating 2174 that's applied to Arthrex's

23   FiberWire suture?

24     A.    I would assume it does.

25     Q.    Do you know what units that tensile strength is

12/7/2005  Dreyfuss, Peter

1      Q.   I'm going to hand you Exhibit 147, ARM 7842

2    through 7940.  Can you identify that document, please.

3      A.   This appears to be the design history file for

4    FiberStick.

5      Q.   And what is FiberStick?

6      A.   FiberStick is a length of FiberWire with one end

7    ever it having a longer stiffened section.

8      Q.   Can you turn to Page ARM 7862?

9      A.   Yes.

10     Q.   Do you see the fourth bullet point there?  It

11   talks about braided with a loop in the middle or end.

12   Will this obsolete the shuttle and is it a patent

13   infringement.  Will ask Steve Soffen to look into it.

14   Bill B. Do you see that?

15     A.   Yes.

16     Q.   Did Arthrex ask Steve Soffen whether the

17   FiberStick product would infringe a patent?

18     A.   I don't know.

19     Q.   Do you know what patent Arthrex had in mind when

20   they asked -- allegedly asked Stephen Soffen if it was a

21   patent infringement?

22     A.   No, I don't.

23     Q.   Is Bill B. there Bill Benavitz?

24     A.   Yes, it is.

25     Q.   Do you know if it was the Hunter patent that

12/7/2005  Dreyfuss, Peter

1   Arthrex was looking at when it questioned whether the

2   FiberStick product would infringe a patent?

3       A.   No, I don't.

4       Q.   Do you know if Steve soften gave Arthrex legal

5   advice concerning whether FiberStick infringed a patent?

6       A.   No, I don't.

7            MR. SABER:  I just wanted to say these last few

8       questions are beyond the scope of the notice.

9       Q.   Did Arthrex perform a patent search to obtain a

10  GREEM to op a freedom to operate opinion with respect to

11  its FiberWire product?

12           MR. SABER:  Objection.  Beyond the scope and

13      asked and answered.

14      A.   I don't know.

15      Q.   Okay.  Does Arthrex typically do patent searches

16  before launching a product?

17      A.   Yes.

18      Q.   Who performs that patent search typically?

19           MR. SABER:  Beyond the scope objection.

20      A.   It can be the engineer.  It can be project

21  managers.  It can be the patent attorney.

22      Q.   Is someone assigned as a matter of routine when

23  Arthrex is developing and subsequently launching a product

24  the responsibility of doing a patent search?

25      A.   Not particularly.

12/7/2005  Dreyfuss, Peter

1       Q.    But you said it typically happens?

2       A.    It happens.

3       Q.    Okay.  What happens -- generally what happens

4    when whoever does the patent search uncovers a particular

5    patent that they determine might pose a problem?

6             MR. SABER:  Objection.  Beyond the scope and

7        overbroad.

8       A.    It might be discussed.

9       Q.    Have you ever uncovered a patent during the

10   course of your job that you considered to be a problem if

11   Arthrex launched the product you were working on?

12      A.

13            MR. SABER:  Objection.  Beyond the scope.

14      A.    In anything?

15      Q.    In anything?

16      A.    Yes.

17      Q.    And what do you do in those situations?

18            MR. SABER:  Objection.  Beyond the scope.

19      A.    Oh, try to design something that doesn't

20   infringe.

21      Q.    Do you tell anybody about it -- the patent?

22            MR. SABER:  Same objection.

23      A.    In general?  I mean yes, I would discuss it if it

24   came up as a point that would hold back a project

25   completion date.

# Exhibit 15

1                IN THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF MASSACHUSETTS

2

3     DePuy Mitek, Inc., a

      Massachusetts Corporation,

4

          Plaintiff,

5

          vs.                          CIVIL ACTION

6                                       NO. 04-12457 PBS

      Arthrex, Inc., a Delaware

7     Corporation,

8          Defendant.

      _____/

9

10

      DEPOSITION OF:        DANIEL HALL

11

      DATE:                 January 5, 2006

12

      TIME:                 4:08 p.m. to 6:21 p.m.

13

      LOCATION:             Naples Beach Hotel & Golf Club

14                          851 Gulf Shore Boulevard North

                            Naples, FL

15

      TAKEN BY:             Plaintiff

16

      REPORTER:             Deborah A. Krotz, RPR, CRR

17

      VIDEOGRAPHER:         Michael Sturdevant, CLVS

18

19

20

21

1/5/2006  Hall, Daniel

1     since January 2005?

2          A.    They have not.

3          Q.    They have not?  Do you know if Arthrex updates

4     its price list on a regular basis?

5          A.    To my knowledge, we have only increased prices

6     once during my tenure with Arthrex.

7          Q.    And when was that?

8          A.    January '05.

9          Q.    So before January '05, Arthrex prices were

10    constant for ten years?

11         A.    Yes.

12         Q.    Do you know why the prices were changed then in

13    January of '05?

14         A.    Generally, inflation.

15         Q.    Okay.  Do you know if Arthrex has in its

16    possession a price list that reflected the pricing before

17    January '05?

18         A.    Yes.

19         Q.    Okay.  Do you know if there was a standard

20    percentage increase in pricing across the board?

21         A.    There was not a standard percentage.

22         Q.    Do you know how it worked?

23         A.    It was on an item-by-item basis that they were

24    reviewed.

25         Q.    And what kind of things went into reviewing

**1/5/2006  Hall, Daniel**

1    whether the price would increase and how much it would

2    increase by?

3         A.    I was not involved in that.

4         Q.    Who would know that; do you know?

5         A.    Product management.

6         Q.    Who is the product manager?

7         A.    Rob Sluss or Bill Benavitz.

8         Q.    Is that the kind of thing that needs approval

9    from someone higher up in the company, as well?

10        A.    It was reviewed by John Cheek.

11        Q.    Do you know if the FiberWire products were the

12   subject of the increase?

13        A.    Yes.

14        Q.    And do you know if the Tevdek products were a

15   subject of the increase?

16        A.    Yes.

17        Q.    And do you know what the percentage of increase

18   to the FiberWire products was?

19        A.    No.

20              MR. SABER:  Objection; overbroad.

21        Q.    Do you know if the FiberWire products and the

22   Tevdek products were increased by the same percentage?

23        A.    I don't know.

24              MR. SABER:  Objection; overbroad.

25        Q.    Do you know if every Arthrex product was -- the

# Exhibit 16

**6/15/2006  Bosco, Rodney**

0001

1                IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF MASSACHUSETTS

3        DEPUY MITEK, INC., a          )

4        Massachusetts Corporation,    )

5                      Plaintiff,       )

6                 v.                    ) Civil Action

7        ARTHREX, INC. a               ) No. 04-12457 PBS

8        Delaware corporation,         )

9

10

11                              Thursday, June 15, 2006

12                              Washington, D.C.

13

14        VIDEOTAPED DEPOSITION OF RODNEY J. BOSCO

15

16            The videotaped deposition of RODNEY J.

17        BOSCO, was held on Thursday, June 15, 2006, at 9:08

18        a.m., taken at the offices of Williams & Connolly,

19        725 12th Street, NW, Washington, D.C., before Vicky

20        J. Stallsworth, Registered Merit Reporter, Certified

21        Realtime Reporter and Notary Public.

6/15/2006  Bosco, Rodney

```
1              MR. SABER:  Objection.

2     Mischaracterizes his testimony.  He told you

3     what he talked about.

4              MS. MALINOSKI:  I'm just asking him if

5     that's it.

6              MR. SABER:  That's not what he said,

7     Lynn, you know, and so your question is

8     inaccurate the way you asked it.

9              THE WITNESS:  That's basically all

10    that I can recall that we talked about.

11    BY MS. MALINOSKI:

12       Q    Did you speak to anyone at Arthrex in

13    preparation for your deposition today?

14       A    No.

15       Q    Did you speak with anyone at Arthrex

16    in connection with you being retained in this

17    matter from March?

18       A    No.

19       Q    You didn't speak to anyone at Arthrex?

20       A    I did not speak to anyone at Arthrex

21    regarding my retainer.

22       Q    I didn't mean retainer.  I should have

23    been a little bit clearer.

24              Since you've been retained in this

25    matter, did you speak with anyone at Arthrex
```

6/15/2006  Bosco, Rodney

1     about your opinions in this matter?

2         A     Not about my opinions.

3         Q     Did you speak with anyone at Arthrex

4     to assist you in reaching your opinions in this

5     matter?

6              MR. SABER:  Objection.  Vague.

7              THE WITNESS:  I did not have any

8     discussions with Arthrex in which the subject

9     matter was my opinions.

10    BY MS. MALINOSKI:

11        Q     Did you talk to people at Arthrex to

12    get information for your opinions?

13        A     Yes.  I did talk to people at Arthrex

14    to get information.

15        Q     Who did you talk to?

16        A     I talked to Mr. John Schmieding.  I

17    talked to Bill Benavitz.  I talked to Tara

18    Shaneville.  The last name is escaping me.  I

19    talked to Dan Hall.  Those are the ones I'm

20    certain I talked to.  I can't recall if I spoke

21    to Robert Sluss or not.  That would have been

22    the other person that I would possibly have

23    talked to.

24        Q     And did you take notes from your

25    conversations with any of these people?

6/15/2006  Bosco, Rodney

```
 1            A    I took notes with regard to some of

 2       these conversations, yes.

 3            Q    And were the notes provided to counsel

 4       in this matter?

 5            A    Yes, they were.

 6                 I would like to supplement one of my

 7       answers if I may.

 8            Q    Uh-huh.

 9            A    I also talked to Mr. Cheek.

10            Q    Mr.?

11            A    Cheek.  He's the CFO.

12                 MS. MALINOSKI:  I'm marking as DePuy

13       Mitek Exhibit 369 -- these are out of order

14       because I premarked some of them.  It's a

15       document bearing numbers NAV 00001 through NAV

16       000004.

17                 For some reason I only have two copies

18       of these.

19                 MR. SABER:  Okay.  I'll try and share.

20                 MS. MALINOSKI:  Okay.

21                 (Exhibit No. 369 was marked for

22       identification.)

23       BY MS. MALINOSKI:

24            Q    Do you recognize this document?

25            A    I do.
```

1    that?

2         A    I don't know if I can separate in my

3    mind what different construction options might

4    be with what we might have discussed in this

5    conversation.  So I don't want to speculate as

6    to what -- if we talked about what those

7    different construction options would be.

8         Q    So did she give you any documents that

9    discussed any of these other possible

10   construction options?

11        A    No, she did not.

12        Q    Did anyone give you any documents that

13   show these potential construction options?

14        A    As of March 7th, 2006?

15        Q    As of any time.

16        A    I think there's evidence in the record

17   that talks about different construction options.

18        Q    Okay.

19        A    But --

20        Q    Okay.  Sitting right here, you don't

21   remember anything specific?

22        A    Not in connection with this

23   conversation, no.

24        Q    Okay.  We'll get to some of that other

25   stuff.

6/15/2006  Bosco, Rodney

1       A    Okay.

2       Q    And when it says looking at different

3    polyesters with input from P, do you know what

4    that was about?

5       A    The P is Pearsalls.  But no, I did not

6    get into what kinds of polyesters they were

7    considering.

8       Q    Down here it talks about -- the very

9    last sentence on this first page on NAV 000001,

10   it says Steve Harrington, Reinhold, Rob Sluss

11   and Ashley would have input as to where to start

12   searching.  Searching for what?

13      A    You know, I don't know the answer to

14   that question.  I'm not sure what the searching

15   in this sentence is referring to.

16      Q    Okay.  Do you know Ashley is?

17      A    I want to say Ashley Holloway.

18      Q    And of the people that you listed,

19   John Schmieding, Mr. Benavitz, Tara Shaneville,

20   Dan Hall, Robert Sluss and Mr. Cheek, is Tara

21   the only person who was a technical person?

22      A    Of those individuals listed, I believe

23   Tara is the only technical person on that list.

24      Q    Okay.  Now, earlier you said you were

25   retained in this matter in March '06.

6/15/2006  Bosco, Rodney

```
 1          A    Correct.

 2          Q    Could it have been any earlier than

 3     that?  You think it was March '06?

 4          A    Well, the arrangement letter would be

 5     definitive.  I think it was March.  It wouldn't

 6     have been any later than that, obviously.  And

 7     it could have been late February, but I think

 8     the arrangement letter would be determinative as

 9     to when we were actually engaged.

10          Q    And is the arrangement letter one of

11     the documents that you produced responsive to

12     the subpoena?

13          A    It's one of the documents I gave to --

14     to Dickstein Shapiro.

15          Q    And do you think it may have been

16     January when you were retained?

17          A    No.  I don't believe it was January

18     when we were retained.  But I -- again, the

19     arrangement letter would say.

20          MS. MALINOSKI:  Since we just got this

21     this morning, I'm going to mark this.  I may

22     have some questions, but I need to look at it at

23     a break.  I don't want to use the record time.

24          I'm marking as DePuy Mitek Exhibit 371

25     document NAV 000160 through 165.
```

# Exhibit 17

```
0001
```

1                  IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF MASSACHUSETTS

3

4          DEPUY MITEK, INC., a          )

5          Massachusetts corporation,    )

6                    Plaintiff,          )   Civil Action

7               vs.                      )   04-12457 PBS

8          ARTHREX, INC., a Delaware     )

9          corporation,                  )

10                   Defendant.          )

11

12

13              -      -      -      -      -

14          The deposition of DEBI PRASAD

15     MUKHERJEE was taken on Tuesday, June 13,

16     2006, commencing at 9:08 a.m., at the

17     offices of Dickstein Shapiro Morin &

18     Oshinsky LLP, 2101 L Street, N.W.,

19     Washington, D.C., before Susanne Bergling,

20     Registered Merit Reporter and Notary Public.

21              -      -      -      -      -

22

23

24

25

**6/13/2006  Mukherjee, Debi**

1    in an hour a day?

2        A. Then I charge like $150 an hour.

3        Q. Okay.  And when do you charge the full rate

4    of a thousand dollars a day, how many hours do you

5    have to put in?

6        A. I -- I am on the old standard, eight hours

7    a day.

8        Q. So, when you put eight hours a day in for

9    this case, you a charge a thousand?

10       A. That's correct.

11       Q. And if it's less than eight, charge 150 an

12   hour?

13       A. Well, if it's whole day, if it's six and a

14   half or seven, I don't cut it that close, but

15   usually one day is eight hours, but I only divide

16   by hours for a day.  If I use one day, like this

17   here, it will be a thousand dollars a day.

18       Q. Okay.  If you work less than eight hours a

19   day on this case, what do you charge?

20       A. I do -- pro rate it based on hours I spent.

21       Q. Okay.  And do you know --

22       A. But I'm an independent expert, not hired by

23   anybody except by this -- this consulting fee.

24       Q. Right, you were hired by the law firm.

25       A. Well, they contacted me.  Again, I am

**6/13/2006 Mukherjee, Debi**

```
1          working as an independent expert.

2             Q. Okay.  And how much --

3                I think we need a break for the tape.

4                VIDEOGRAPHER:  This ends videotape number

5       one.  We're going off the record at 11:18.

6                (A brief recess was taken.)

7                VIDEOGRAPHER:  This begins videotape number

8       two.  We're back on the record at 11:20.

9                BY MR. BONELLA:

10            Q. Have you ever been to Pearsalls?

11            A. No.

12            Q. So, you have not inspected their

13      manufacturing facilities?

14            A. No.

15            Q. Did you ever speak with anyone from

16      Pearsalls?

17            A. No.

18            Q. Have you spoke with a Brian Benavitz from

19      Arthrex regarding this case?

20                MR. TAMBURO:  Objection.  Bill Benavitz?

21                MR. BONELLA:  I'm sorry, Bill Benavitz.

22                THE WITNESS:  Yes, I spoke to him.

23                BY MR. BONELLA:

24            Q. Okay.  Anybody else from Arthrex you spoke

25      to regarding this case?
```

```
 1          A. No.
 2          Q. Anyone else besides the lawyers that you've
 3     spoken to regarding this case?
 4              MR. TAMBURO:  Objection.  You mean with
 5     Arthrex or anybody at all?
 6              MR. BONELLA:  I'm sorry, I'll rephrase the
 7     question.
 8              BY MR. BONELLA:
 9          Q. Anybody besides Mr. Benavitz and the --
10     Mr. Tamburo's law firm, besides those people, have
11     you spoken with anyone else regarding this case?
12          A. No.
13          Q. Okay.  How about Dr. Gitis, have you ever
14     spoken with him?
15          A. Yes.
16          Q. Okay.  How about Dr. Burks, have you ever
17     spoken with him?
18          A. No.
19          Q. Okay.  You have spoken with Dr. Gitis.  How
20     many times have you spoken with Dr. Gitis?
21          A. Several times.
22          Q. Several times, okay.
23              You say you never spoke with an Ashley
24     Holloway?
25          A. No.
```

```
1              Q. How about a Tara Shaneville (ph), I think
2         it is, did you ever speak with her?
3              A. No, thought that I can --
4              Q. How about Don Grafton?
5              A. I knew Don Grafton before this case, but
6         during this case, I didn't spoke -- speak to him.
7              Q. Okay, all right.  Why did you speak with
8         Mr. Benavitz?
9              A. I saw him at the Academy of Orthopedic
10        Surgeons meeting, and I believe I looked at the
11        FiberWire suture or -- FiberWire suture, that's
12        all.  I don't remember exactly what I spoke, but I
13        am more interested in just to know what products
14        they have.
15             Q. Well, you referenced him in one of your
16        reports, that you had spoken with him, so --
17             A. Yeah.
18             Q. -- what conversation did you -- had you had
19        with him regarding this case?
20             A. Tell me where I said that.
21             Q. It's in your responsive report at page 5.
22             A. This is 239?
23                MR. TAMBURO:  240.
24                THE WITNESS:  240?
25                BY MR. BONELLA:
```

1       Q. Page 5.

2       A. Page 5.

3       Q. Section 3, Review and Use of Documents and

4    Other Materials, third line from the end of that

5    section.

6       A. If my memory serves me right, I think I

7    looked at the -- again, I'm not sure, the

8    FiberWire -- I mean, the Tiger (ph) suture, if I

9    remember correctly, that's where I saw it, and

10    that's all.  I probably did -- I don't know

11    whether I did any lab test or anything like that,

12    I don't remember exactly.  That was very small

13    conversation, less than five minutes.

14       Q. So, you spoke -- I'm getting confused.

15    Your conversations with Benavitz, you're talking

16    about the one you had with relevance to this case

17    as opposed to the discussion you had at the

18    conference?

19       A. Well, that's the discussion at the

20    conference.

21       Q. Is the one you're referencing?

22       A. That's what I'm talking about, yeah.

23       Q. Okay.  And was that academy conference, is

24    that March 22nd?

25       A. Academy of Orthopedic Surgeons meeting,

```
1          yeah --

2               Q. March 22nd?

3               A. -- in Chicago, yes.

4               Q. Of this year?

5               A. Uh-huh.

6               Q. And what -- do you recall what you

7          discussed with him?

8               A. Again, I -- you know, I remember, you know,

9          just -- I'm only interested in their products,

10         what they have, because we are interested in doing

11         orthopedic evaluation of their products.

12              Q. So, what do you remember about your

13         discussion with him?

14              A. That's all I remember, that --

15              Q. Did anything you discussed with him form or

16         impact your opinions at all?

17              A. No.

18              Q. Okay.  Did you ever speak with

19         Mr. Witherspoon?

20              A. Yes, I did.

21              Q. Okay.  How long did -- how many

22         conversations did you have with Mr. Witherspoon?

23              A. I think couple of times.

24              Q. Couple of times, two to three?

25              A. About that.
```

# Exhibit 18

**6/14/2006 Mukherjee, Debi**

0417

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MASSACHUSETTS

3                 Civil Action No. 04-12457 PBS

4        _____

5    DEPUY MITEK, INC., a Massachusetts              )

6    Corporation,                                     )

7                              Plaintiff,             )

8         v.                                          )

9    ARTHREX, INC., a Delaware Corporation            )

10                             Defendant.             )

11       _____)

12

13

14       Videotaped Deposition of DEBI PRASAD MUKHERJEE

15                    - VOLUME TWO -

16                   Washington, DC

17              Wednesday, June 14, 2006

18

19       The videotaped deposition of DEBI PRASAD MUKHERJEE,

20    Volume Two, was held on Wednesday, June 14, 2006,

21    commencing at 9:12 a.m., at the offices of Dickstein

22    Shapiro Morin & Oshinsky LLP, 2101 L Street,

23    Northwest, Washington, DC, before Mary Ann Payonk,

24    RDR, Certified Realtime Reporter, Registered Diplomate

25    Reporter and Notary Public.

6/14/2006  Mukherjee, Debi

1     always did when I was developing sutures.

2     BY MR. BONELLA:

3          Q     All right.

4          A     Not in this context, no.

5          Q     Let me ask a better question.  Did you do

6     a drape test of any other FiberWire or TigerWire

7     samples in forming your opinions?

8          A     No.

9          Q     No?

10         A     Only these samples.

11         Q     You didn't do a drape test of TigerWire

12    samples?

13         A     The only thing I did not remember at the

14    academy was that I saw a TigerWire suture with Mr. --

15    what's his name?  Bernard?

16         Q     Benovitz.

17         A     Benovitz.  I don't remember that.

18         Q     You saw a TigerWire suture, you said?

19         A     Yeah, it was shown there in the -- the --

20    the booth.

21         Q     But you didn't do a drape test --

22         A     No.

23         Q     -- of the TigerWire?

24                Did Mr. Tamburo give you TigerWire samples

25    to do a drape test?