# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DePuy Mitek, Inc. a Massachusetts Corporation | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 04-12457 PBS |
| Arthrex, Inc. a Delaware Corporation, *et al*. | ) ) ) | |
| Defendants. | ) ) ) | |

## DEFENDANTS ARTHREX, INC.'S AND PEARSALLS LTD.'S OPPOSITION TO PLAINTIFF DEPUY MITEK'S MOTION *IN LIMINE* (NO. 2) TO PRECLUDE ARTHREX FROM PRESENTING EVIDENCE THAT MITEK PERFORMED PRE-SUIT TESTING ON COATED VS. UNCOATED FIBERWIRE

Dated: July 24, 2007

Charles W. Saber
Stephen A. Soffen
Salvatore P. Tamburo
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, D.C. 20006-5403
Telephone: (202) 420-3116
Facsimile: (202) 420-2201

Christopher Weld, Jr. (BBO # 522230)
Raymond P. Ausrotas (BBO # 640315)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
Telephone: (617) 720-2626
Facsimile: (617) 227-5777

Counsel for Defendants
Arthrex, Inc. and Pearsalls Ltd.

**TABLE OF CONTENTS**

<u>**Page No.**</u>

I.      INTRODUCTION ...................................................................................................1

II.     DEPUY MITEK'S TESTS OF COATED VS. UNCOATED FIBERWIRE ARE
        PLAINLY RELEVANT .........................................................................................2

III.    DEPUY MITEK'S RELIANCE ON *KNORR-BREMSE* IS MISPLACED........................3

IV.     CONCLUSION.......................................................................................................5

DSMDB-2292910v01

# TABLE OF AUTHORITIES

**Page No.(s)**

## FEDERAL CASES

*E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.*, 24 F.R.D. 416 (D. Del. 1959) ...................................................................................................................1, 4

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 208 (Fed. Cir. 2004)..........................................................................................................1

*Loctite Corp. Fel-pro, Inc.*, 94 F.R.D. 1 (N.D. Ill. 1980), *aff'd*, 667 F.2d 577 (7th Cir. 1981) ...............................................................................................................1

*Resolution Trust Corp. v. Dabney*, 73 F.3d 262 .................................................................4

*Third Wave Technologies, Inc. v. Stratagene Corp.*, 405 F. Supp. 2d 991 (W.D. Wis. 2005), *citing*...........................................................................................................5

*U.S. v. Dentsply International, Inc.*, 186 F.R.D. 152 (D. Del. 1999) ..................................4

DSMDB-2292910v01

I.        **INTRODUCTION**

Plaintiff DePuy Mitek readily concedes that it performed tests on coated vs. uncoated FiberWire before the lawsuit began.  Yet in an argument that can only be described as "amazing," DePuy Mitek asserts that such tests are irrelevant to a lawsuit where the principal issue is what effect coating has on FiberWire.  Acting as prosecutor, judge and jury, DePuy Mitek contends that its pretrial tests are irrelevant.  DePuy Mitek reasons that it really did not test an uncoated and coated FiberWire because the coated FiberWire was also "heated and stretched."  Mitek Mem. at 2.

But DePuy Mitek fails to inform the court that the alleged "heating and stretching" *is part and parcel of the coating process.*  Stated another way, coated FiberWire is "heated and stretched" because that is the very way that the coating is applied to the suture.  Plainly, DePuy Mitek's tests were between coated and uncoated FiberWire.   But even if there were some merit to DePuy Mitek's contention – and there is absolutely none – this is a classic jury issue.  The jury can decide if this is a fair comparison between a coated and uncoated suture.

DePuy Mitek's second argument fairs no better.  Relying on *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.,* 383 F.3d 208 (Fed. Cir. 2004), DePuy Mitek contends that no adverse inference can apply because the test results were withheld on the basis of privilege.  Even if DePuy Mitek's analogy to *Knorr-Bremse* is correct,[1] that case does not apply for a very simple reason.  Courts have consistently held that where, as here, a plaintiff performs tests relevant to the infringement issue, those results simply are not privileged.  *See, e.g., Loctite Corp. Fel-pro, Inc.,* 94 F.R..D. 1, 3, 6 (N.D. Ill. 1980), *aff'd,* 667 F.2d 577 (7th Cir. 1981); *E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.,* 24 F.R.D. 416, 422 (D. Del.

---

[1]        *Knorr-Bremse* involved whether an adverse inference can be given where a defendant accused of willful infringement withholds an opinion based on attorney-client privilege.  *Knorr-Bremse* does not discuss a situation, like here, where a plaintiff withholds its own test results.

1

1959). Having no proper privilege claim, DePuy Mitek cannot hide behind *Knorr-Bremse*. But even if DePuy Mitek were correct about the applicability of *Knorr-Bremse*, it would only mean that no instruction of adverse inference should be given. *Knorr-Bremse* only states that no adverse inference instruction should be given to the jury. Neither *Knorr-Bremse* nor any authority cited by DePuy Mitek states that the underlying facts about the privilege are inadmissible.

## II.    DEPUY MITEK'S TESTS OF COATED VS. UNCOATED FIBERWIRE ARE PLAINLY RELEVANT

DePuy Mitek admits, as it must, that it performed tests on coated vs. uncoated FiberWire. It likewise does not contend that such comparative tests are irrelevant. Instead, it argues that its tests are not relevant because the coated samples also were "heated and stretched" while the uncoated samples were not. Mitek Mem. at 2. DePuy Mitek is not playing it straight with this Court. It knows full well that the "heating and stretching" is an integral part of the coating process. Over and over again, DePuy Mitek has been told in this litigation that the coating process includes what DePuy Mitek calls "stretching and heating." After the suture braid passes through a coating bath, it proceeds through pads (the alleged stretching) to remove excess coating and then is put through the oven to bond the coating to the suture braid and dry the coating. Ex. 1 at 127:16-128:7, 172:1-18; Ex. 2 at 81:17-82:24. Of course, a coated suture will go through the alleged "stretching and heating" -- it is part and parcel of the coating process. DePuy Mitek's makeweight argument cannot change these irrefutable facts.

Moreover, DePuy Mitek's actions in this case contradict its position in this motion and conclusively prove the duplicity of DePuy Mitek's contention. As this Court well knows, DePuy Mitek defeated defendants' summary judgment motion principally by relying upon an uncontrolled test on coated and uncoated FiberWire sutures that Dr. Burks performed at his deposition (even though Dr. Burks got the results correct). But just like the samples used in

DePuy Mitek's pretrial tests, the samples that DePuy Mitek's attorney handed to Dr. Burks at his deposition included coated suture that, of course, had been "heated and stretched" and an uncoated sample that had not. Ex. 2 at 36:19-37:23, 38:17-40:15. If DePuy Mitek truly believed in its position set forth in this motion, it should never had relied on Dr. Burks' test to oppose the summary judgment motion. In reality, DePuy Mitek's actions simply prove the obvious – its position here is completely and totally without merit.

Finally, even if there were an iota of merit to DePuy Mitek's position – and there is none – the most that could be said is that DePuy Mitek can present its evidence and make its arguments to the jury. It certainly cannot anoint itself as the sole decider of the facts and simply declare its tests irrelevant based on an alleged distinction in the samples that have no factual basis.

## III.     DEPUY MITEK'S RELIANCE ON *KNORR-BREMSE* IS MISPLACED

Relying upon *Knorr-Bremse*, DePuy Mitek argues that the Court should not give an adverse inference instruction to the jury because DePuy Mitek withheld the tests based on privilege. Mitek Mem. at 4-5. Assuming that *Knorr-Bremse* is applicable precedent to failure to disclose pretrial tests,[2] it can give no comfort to DePuy Mitek here. In *Knorr-Bremse*, the withheld opinion undisputedly fell within the asserted attorney-client privilege. In the current situation, there is no appropriate claim of privilege. Courts have routinely held that a plaintiff asserting a patent infringement claim cannot withhold test results based on a claim of attorney-client or work-product privilege. There cannot be an attorney-client privilege.[3] There also

---

[2]     As explained above*, supra* at 1, n.1, *Knorr-Bremse* does not discuss a situation, like here, where a plaintiff withholds its own test results.

[3]     It is hornbook law that the attorney-client privilege only protects the communications to the lawyer "and not the facts or matters that are embodied or expressed in communications with the lawyer, nor the client's knowledge of those facts or matters." 2 Mueller & Kirkpatrick, Federal Evidence § 5:17 (3d ed. 2007).

DSMDB-2292910v01

cannot be a work product privilege claim. That privilege is designed to protect against discovery of materials that would disclose matters involving the attorney's professional skill and experience. *E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co., supra,* 24 F.R.D. at 420. Importantly, the test results cannot include an attorney's mental impressions or the like. DePuy Mitek does not contend otherwise. Rather, they are merely underlying facts showing the results of the tests.

This precise question arose in *Loctite Corp. v. Fel-Pro, Inc., supra,* 94 F.R.D. at 3, 6, where the court unmistakably explained that the plaintiff must produce its prelitigation test results. The court explained that "Defendants have the right to refute plaintiff's evidence of infringement, and information on these [presuit] tests is clearly relevant for that purpose." *Id.* at 3. The court reiterated that "if a test has been made concerning [issues] relevant to the issues in the case, *it is part of the discovery and the defendants are entitled to access to the reports of that test." Id.* at 6 (emphasis added). Similarly, in *E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co., supra,* 24 F.R.D. 416, 422, the plaintiff, like DePuy Mitek here, tried to withhold production of its test results obtained before the filing of suit. The court rejected plaintiff's privilege claim and ordered production. *Id. See also, Resolution Trust Corp. v. Dabney,* 73 F.3d 262, 266 (10th Cir. 1995 ("[b]ecause the work product doctrine is intended only to guard against divulging the attorney's strategies and legal impressions, it does not protect facts concerning the creation of work product or facts contained within work product;" factual inquiries about the scope of the investigation must be disclosed); *U.S. v. Dentsply Int'l, Inc.,* 186 F.R.D. 152, 155-156 (D. Del. 1999) (work product protects from disclosure the legal strategies and mental impressions of an attorney formed in anticipation of or preparation for litigation; facts learned during investigation are not protected and must be disclosed).

DSMDB-2292910v01

The same result governs here.  DePuy Mitek cannot hide behind a bogus claim of privilege and avoid an adverse inference.  Having made the decision not to produce the results, it must live with its decision.[4]

Beyond asking that the Court not give an adverse inference instruction, DePuy Mitek's motion goes further and asks the Court for an Order to "preclude Arthrex from submitting any evidence or making any argument that Mitek performed pre-suit testing on coated and uncoated FiberWire . . . ."  Mitek Mem. at 1.  DePuy Mitek does not offer a shred of legal support for this unprecedented extension of *Knorr-Bremse*.  There is good reason why DePuy Mitek submitted no legal support.  Knorr-Bremse is limited to a ruling that there should be no instruction that there be an "adverse inference that an opinion of counsel was or would have been unfavorable flows from an alleged infringer's failure to obtain or produce an exculpatory opinion of counsel."  *See, e.g., Third Wave Technologies, Inc. v. Stratagene Corp.*, 405 F.Supp.2d 991,1016 (W.D. Wis. 2005), *citing Knorr-Bremse*.  It is quite different to contend that there can be no disclosure of the fact that DePuy Mitek did the tests and claimed privilege.  Accordingly, even if DePuy Mitek were correct that there should be no adverse inference instruction, the rest of its requested relief should be denied.

## IV.     CONCLUSION

For the foregoing reasons, DePuy Mitek's motion should be denied.

---

[4]     While DePuy Mitek asserts that Arthrex did not challenge DePuy Mitek's assertion of privilege, it makes no argument based on this assertion.  And for good reason.  It was DePuy Mitek's decision alone not to produce these facts, both in refusing to produce the documents or permit testimony about the results of the tests.  DePuy Mitek cannot escape the consequences of its decision by blaming Arthrex.

DSMDB-2292910v01

Dated: July 24, 2007

Respectfully submitted,

By: __/s/Charles W. Saber_____
Charles W. Saber
Stephen A. Soffen
Salvatore P. Tamburo
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, D.C.  20006-5403
Telephone:  (202) 420-3116
Facsimile:  (202) 420-2201

Christopher Weld, Jr. (BBO # 522230)
Raymond P. Ausrotas (BBO # 640315)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
Telephone:  (617) 720-2626
Facsimile:  (617) 227-5777

Counsel for Defendants
Arthrex, Inc. and Pearsalls Ltd.

DSMDB-2292910v01

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing DEFENDANTS ARTHREX,

INC.'S AND PEARSALLS LTD.'S OPPOSITION TO PLAINTIFF DEPUY MITEK'S

MOTION *IN LIMINE* (NO. 2) TO PRECLUDE ARTHREX FROM PRESENTING EVIDENCE

THAT MITEK PERFORMED PRE-SUIT TESTING ON COATED VS. UNCOATED

FIBERWIRE was served, via the Court's email notification system on the following counsel for

Plaintiff on the 24th day of July 2007:


Lynn A. Malinoski
Woodcock Washburn, LLP
Cira Centre, 12th Floor
2929 Arch Street
Philadelphia, PA  19104-2891
Telephone: (215) 568-3100
Facsimile: (215) 568-3439

Daniel J. Gleason
Nutter McClennan & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
Telephone:  (617) 439-2000
Facsimile:  (617) 310-9000


      **/s/Charles W. Saber**

# Exhibit 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MASSACHUSETTS

3

4    DEPUY MITEK, INC., a Massachusetts  )

5    Corporation,                        )

6                    Plaintiff,          )  Civil Action

7    v.                                  )  No. 04-12457 PBS

8    ARTHREX, INC., a Delaware           )

9    Corporation,                        )

10                   Defendant.          )

11              -     -     -     -     -

12         30(B)(6) VIDEO DEPOSITION OF LAWSON LYON

13                   Washington, D.C.

14            Wednesday, December 14, 2005

15

16        The videotaped deposition of LAWSON LYON was

17    convened on Wednesday, December 14, 2005, commencing

18    at 9:01 a.m., at the offices of Dickstein Shapiro

19    Morin & Oshinsky LLP, 2101 L Street, Northwest,

20    Washington, D.C., before Cynthia Simmons Ott,

21    Registered Merit Reporter, Certified Realtime

22    Reporter, and Notary Public.

23

24

25

**12/14/2005 Lyon, Lawson**

1    then, after it's braided, it's on a reel, so we

2    then convert it to a skein.  It goes down to

3    the dye house for scarring and dyeing, still in

4    the skein.

5        So it's wound back on to a bobbin or a

6    reel, where we -- it's got here pad stretch and

7    coat with med 2174.  2174 is NuSil.  That's

8    their product number, 2174.  Measured means

9    that it's -- it's our own term for when we take

10   it off the production reel and put it on to the

11   reel in which we sell it, and during that time,

12   we inspect it.  Yeah.

13   Q.    Okay.

14   A.    Then we put a label on the reel, and

15   we pack it.

16   Q.    What does pad stretch mean?

17   A.    That means we -- during the coating

18   process, it goes off the input reel into a bath

19   containing the coating solution, it comes up,

20   it goes through a pad which squeezes off the

21   excess coating, it goes through an oven, and it

22   is then taken up by another winding mechanism

23   and then taken up on to a reel.

24        That process of having a pad to grip

25   it and a roller to pull it through is called

**12/14/2005 Lyon, Lawson**

1    pad stretch.

2        Q.    Does the stretching have any effect on

3    the properties of the suture?

4        A.    No.  There is really very little

5    stretch in this process.  It's just the amount

6    of stretch you need to pull it through.  That's

7    not proper stretching.

8        Q.    And the heating, the heating process,

9    that happens while it's being stretched?

10       A.    Yes.  It goes through an oven.  That's

11   right.

12       Q.    And when you say the excess coating is

13   removed in that process, what exactly do you

14   mean?

15       A.    Well, when you put it through the

16   bath, in order to get the coating uniform,

17   that's why it goes through these pads, and that

18   squeezes off any excess.

19       Q.    And there's no way to determine how

20   much coating is actually on the suture after it

21   goes through this whole process?

22       A.    No.

23       Q.    Now, in terms of the flowcharts that

24   Pearsalls has, not the ones that we're talking

25   about now, do you have a separate flowchart for

128

1    A.    Yeah.  Well, there should be.  And

2    what I would venture is that we were asked to

3    supply some uncoated, and because we don't

4    supply uncoated as finished product, we had to

5    assign a development trial number to the

6    uncoated material that we supplied.

7    Q.    Okay.  And so you supplied both coated

8    and uncoated, according, according to this

9    document.  Now, the coated suture that you

10   would have supplied, would that have been put

11   through that step of the pad stretching and

12   through the heating and all that?

13   A.    If it's, it says, "coated," there, the

14   answer is yes.

15   Q.    But the uncoated suture would not have

16   been put through that stage of pad stretching

17   and heating?

18   A.    No.

19        MS. MALINOSKI:  I guess we'll add this

20   to our list, Chuck, of the particular samples

21   and the particular information about these,

22   about this prototype PS05.

23        MR. SABER:  Okay.  I'm not sure what

24   the question is, but you'll send, you'll send a

25   letter to me.

# Exhibit 2

1      IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

              IN AND FOR THE NEW CASTLE COUNTY
2      _____

       DEPUY MITEK, INC., a Massachusetts  )
3      Corporation,                         )
                            Plaintiff,      )   Civil Action
4      v.                                   )   No. 04-12457 PBS
       ARTHREX, INC., a Delaware            )
5      Corporation,                         )
                            Defendant.      )
6      _____)

7

           CONFIDENTIAL - NON-PATENT ATTORNEY'S EYES ONLY
8

                         deposition of:
9

                         BRIAN HALLETT
10

                          taken at:
11                     The Castle Hotel

                        Castle Green
12                        Taunton

                         Somerset
13                     UNITED KINGDOM
14                          on

                    11th January 2006
15

16

17

18

19

20

21

22

23

24

**1/11/2006  Hallett, Brian**

1    Q    Is it -- the Exhibit 284 sample underwent

2    the dyeing process and all the processes that are

3    before the dyeing process in Exhibit 279?

4    A    Correct.

5    Q    The Exhibit 282 -- 284 -- was the Exhibit

6    284 sample scoured?

7    A    Yes.  Scoured and dyed.

8    Q    The difference between exhibit --

9    A    That was taken out before it was dyed.

10    Q    I am sorry, say again?

11    A    It was taken out of the machine before it

12    gets dyed.  It just goes through a scouring process.

13    Q    Is there a scouring process before and

14    after the dyeing process or just before?

15    A    It is before.

16    Q    Exhibit 282 was taken after the scouring

17    but before the dyeing?

18    A    Yes.

19    Q    Exhibit 284 was taken after the scouring

20    and after the dyeing?

21    A    Yes.

22    Q    You have labeled them on the chart as 284

23    coming first, but that is not really right.  284

24    comes after --

25    A    Yes.  It is the other way around,

1    actually, as that is written down.

2        Q    DePuy Mitek Exhibit 285 is entitled, "US2

3    FiberWire, M/C state dyed/coated"?

4        A    Hmm hmm.

5        Q    Can you label where Exhibit 285 was taken?

6    (Pause)

7              Now, you have labeled Exhibit 285 as

8    the stretching coating block; correct?

9        A    Correct.

10       Q    Exhibit 285 FiberWire was -- underwent all

11   the processes before the final inspection measuring

12   process.  Is that correct?

13       A    Correct.

14       Q    So, Exhibit 285 was stretched and coated;

15   correct?

16       A    Correct.

17       Q    So, the differences between Exhibit 284

18   and 285 is Exhibit 285 was wound and then stretched

19   and then coated; correct?

20       A    Correct.

21       Q    Any other differences between Exhibit 284

22   and 285?

23       A    No.

24       Q    Exhibits 282, 283, 284 and 285, when were

25   they taken?

**1/11/2006  Hallett, Brian**

1     A    When?

2     Q    (Nods)

3     A    I don't follow.  What do you mean?

4     Q    As in time period.  Were they taken this

5    morning?  Two years ago?

6     A    Last week.

7     Q    Last week.

8     A    Hmm hmm.

9     Q    Are Exhibits 282, 283, 284 and 285 all

10   from the same batch?

11    A    No.

12    Q    Can you identify which batches exhibits

13   282, 283, 284 and 285 are from?

14    A    They are all from different batches,

15  I believe.  I haven't put the batch numbers down on

16  there, but I can get them for you.

17    Q    I would appreciate that.  I would like to

18  show you a sample that has been marked as DePuy

19  Mitek Exhibit 286.  It is labeled, "Braided

20  polyester sutcher 2B-F/W".  Do you recognize Exhibit

21  286?

22  (DePuy Mitek Exhibit 286 marked for identification)

23    A    I do.

24    Q    What is Exhibit 286?

25    A    It is US2 FiberWire.

1          Q      Has Exhibit 286 undergone all the

2    manufacturing processes in Exhibit 279?

3          A      Correct.

4          Q      Exhibit 286 is FiberWire that was sent to

5    Arthrex for testing?

6          A      Correct.

7          Q      Was Exhibit 286 FiberWire sent to Arthrex

8    for a knot slippage test?  Do you know that?

9          A      I have no idea.

10         Q      You don't know what test was done?

11         A      No.

12         Q      Do you know when the FiberWire that is in

13   Exhibit 286 was sent to Arthrex?

14         A      I think it was last year.

15         Q      The FiberWire in Exhibit 286 was sent to

16   Arthrex in the early part of 2004?

17         A      It could well be, yes.  I could soon find

18   out by the development number on it.

19         Q      Is there a batch that Exhibit 286 is

20   associated with?

21         A      No.

22         Q      There is not?

23         A      No.

24         Q      Do you have records that show what batch?

25         A      Development.  That was a development

1      trial.

2          Q      Was Exhibit 286 FiberWire?  Was that taken

3      from FiberWire that is commercially sold, or is that

4      a developmental sample?

5          A      That was a development sample.

6          Q      The batch number -- Exhibit 286 refers to

7      DTPS05T2.  What is that number, DTPS05T2?

8          A      That was the development number that

9      I gave it.

10         Q      Is this a prototype?

11         A      Yes.

12         Q      What is the difference between the

13     FiberWire that is in Exhibit 286 and

14     commercially-sold FiberWire?

15         A      None.

16         Q      None?

17         A      No.

18         Q      Why is it called a development version?

19         A      Because I had done a special run for

20     Arthrex.

21         Q      Just to make this?

22         A      Yes.

23         Q      Why did you do a special run?

24         A      It may not have been running at the time.

25         Q      Because they needed a sample and it wasn't

1      the protective Pearsall jackets.

2      A     It is all right.  You are welcome.

3      Q     We are here in the room where FiberWire is

4  stretched and coated.  Is that correct?

5      A     That's correct.

6      Q     And over here, these are the bobbins where

7  the FiberWire is wound before it is stretched and

8  coated?

9      A     That's correct.

10     Q     And the yellow material that you can see,

11 the yellow yarn is a leader that is connected to the

12 FiberWire?

13     A     That's correct.

14     Q     And the blue yarn on the bottom is the

15 blue FiberWire?

16     A     That's correct.

17     Q     Can you explain the process that happens

18 here from the bobbins to the machine?

19     A     The braid is going through some pad at the

20 end, and then run through a dip which is a glue seal

21 which is 2174.  It is run through the ovens over

22 a roller in the other end which actually dries it

23 and then it is wound on to a take-up bobbin on the

24 end of the machine.

25     Q     Where is the stretching done in the

**1/11/2006 Hallett, Brian**

1    process?

2        A    It is not a stretch as such, it is just --

3    we call it stretching because it is run through some

4    pads just to align all of the filaments in the yarn.

5        Q    What do you mean by that?

6        A    Well, it just pulls it straight.

7        Q    Pulls it straight?  The material isn't

8    stretched?

9        A    Very minute.

10       Q    Very minute.  And then the coating that we

11   see here, it goes through a bath or a dip of glue

12   seal and then the FiberWire is put through?

13       A    It is a bath.  We use it as a bath.

14       Q    "Bath".  Okay.  And what is the rate at

15   which the yarn passes through the bath?

16       A    20 metres per minute.

17       Q    Is that the same for all FiberWire?

18       A    Yes.

19       Q    And then this machine here dries it?

20       A    There are four (inaudible) which actually

21   dry it as it is going through.

22       Q    And then it is wound up to a bobbin at the

23   other end?

24       A    To that bobbin on the other end.

25       Q    Now, as the FiberWire yarn itself goes