# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DePuy Mitek, Inc. | ) | |
|   a Massachusetts Corporation | ) | |
| | ) | |
|        Plaintiff, | ) | |
| | ) | |
|      v. | ) | Civil Action No. 04-12457 PBS |
| | ) | |
| Arthrex, Inc. | ) | |
|   a Delaware Corporation, *et al*. | ) | |
| | ) | |
|        Defendants. | ) | |
| | ) | |

## DEFENDANTS ARTHREX, INC.'S AND PEARSALLS LTD.'S OPPOSITION TO PLAINTIFF DEPUY MITEK'S MOTION *IN LIMINE* (NO. 5) TO PRECLUDE ARTHREX AND PEARSALLS FROM MAKING IRRELEVANT AND PREJUDICIAL REMARKS ABOUT MITEK

Dated: July 24, 2007

Charles W. Saber
Stephen A. Soffen
Salvatore P. Tamburo
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, D.C.  20006-5403
Telephone:  (202) 420-3116
Facsimile:  (202) 420-2201

Christopher Weld, Jr. (BBO # 522230)
Raymond P. Ausrotas (BBO # 640315)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
Telephone:  (617) 720-2626
Facsimile:  (617) 227-5777

Counsel for Defendants
Arthrex, Inc. and Pearsalls Ltd.

TABLE OF CONTENTS

Page No.

I.    INTRODUCTION ...........................................................................................................1

II.   DEFENDANTS SHOULD NOT BE PRECLUDED *IN LIMINE* FROM
      PRESENTING EVIDENCE AT TRIAL THAT DEPUY MITEK NEVER
      COMMERCIALIZED THE PATENTED INVENTION ...................................................2

III.  DEFENDANTS SHOULD NOT BE PRECLUDED *IN LIMINE* FROM
      PRESENTING EVIDENCE AT TRIAL REGARDING THE DEVELOPMENT
      OF ORTHOCORD.............................................................................................................4

IV.   DEFENDANTS SHOULD NOT BE PRECLUDED *IN LIMINE* FROM
      PRESENTING EVIDENCE AT TRIAL REGARDING OWNERSHIP OF THE '446
      PATENT .........................................................................................................................6

V.    CONCLUSION..................................................................................................................8

DSMDB-2292994v01

TABLE OF AUTHORITIES

Page No.(s)

FEDERAL CASES

*Aerosol Research Co. v. Scovill Manufacturing Co.*, 334 F.2d 751 (7th Cir. 1964) ...........2

*Central Admixture Pharmacy Services, Inc. v. Advanced Cardiac Solutions, P.C.*, 482 F.3d 1347 (Fed. Cir. 2007).....................................................................................6

*Flebotte v. Dow Jones & Co., Inc.*, 2000 WL 35539238 at *6 (D. Mass. Dec. 6, 2000) ...........................................................................................................................7

*PPG Industrial v. Guardian Industrial Corp.*, 156 F.3d 1351 (Fed. Cir. 1998)..................4

*Special Equipment Co. v. Coe, Commissioner of Patents*, 324 U.S. 370 (1945)................2

*Sylvania Electric Products, Inc. v. Brainerd*, 369 F. Supp. 468 (D. Mass. Jan. 15, 1974), *aff'd,* 499 F.2d. 111 (1st Cir. 1974) ...................................................................3

DSMDB-2292994v01

## I.    INTRODUCTION

At first blush, it is difficult to disagree with the *title* of DePuy Mitek's motion *in limine* -- after all, no one should be able to present "irrelevant" or *unduly* "prejudicial" evidence to the jury.  As described below, the problem for DePuy Mitek, however, is that all of the evidence it seeks to preclude Defendants from presenting *is relevant to the infringement issue*.

This motion, like many of its other pretrial motions, is part of DePuy Mitek's pattern of reserving to itself the right to make at trial whatever arguments it chooses, while trying to obtain a pretrial ruling that Defendants cannot present responding evidence.  Such trial-by-ambush is simply not appropriate.  Despite DePuy Mitek's protestations, it is, at best for DePuy Mitek, virtually impossible for the Court to rule on these relevancy objections in the abstract before trial.  The ultimate relevancy of much of the evidence that DePuy Mitek seeks to exclude, as explained below, may well depend on what DePuy Mitek presents in its case-in-chief or otherwise seeks to develop at trial.

Accordingly, it is premature to preclude Defendants from presenting such evidence without knowing whether DePuy Mitek will make it relevant during trial.  And while DePuy Mitek would have the Court believe that it would be prejudiced if Defendants were not precluded from presenting the evidence it identifies in its motion, the fact of the matter is that in each instance, *it would be Defendants, and not DePuy Mitek, that would be unduly prejudiced* if the evidence were to be precluded at this time.

DePuy Mitek seeks a pretrial ruling that the following categories of evidence should be excluded: i) the '446 patent being a paper patent because DePuy Mitek does not sell a product covered by the patent; ii) DePuy Mitek's development of its competing Orthocord product; and iii) when and how DePuy Mitek learned about the '446 patent.[1]  As we show below, each of

---

[1]    Without a shred of explanation, DePuy Mitek identifies a laundry list of Exhibit numbers on its Trial Exhibit List which it arbitrarily states relate to the categories of evidence which it

1

these categories of evidence are admissible to the infringement issue, or at least are potentially

relevant depending upon the evidence that DePuy Mitek seeks to develop at trial.

## II.     DEFENDANTS SHOULD NOT BE PRECLUDED *IN LIMINE* FROM PRESENTING EVIDENCE AT TRIAL THAT DEPUY MITEK NEVER COMMERCIALIZED THE PATENTED INVENTION

DePuy Mitek does not deny, because it cannot, that it never commercialized any

product under the '446 patent and thus, that patent is nothing more than "a paper patent."

Accordingly, DePuy Mitek is left with little to say except that a patent owner has the right to not

commercialize the '446 patent invention.  But DePuy Mitek's recitation of that truism has

*absolutely nothing* to do with the issue it raised in its motion – *i.e.,* whether Defendants should

be precluded *in limine* from mentioning at trial the fact that DePuy Mitek never commercialized

a product covered by the '446 patent.

DePuy Mitek *does not cite to any authority* stating that such evidence is inadmissible.

That's because there is no such authority.[2]  DePuy Mitek also does not cite to any authority

---

seeks to exclude.  Since DePuy Mitek has given the Court no guidance, it is impossible at this
juncture for Defendants to respond on a document-by-document basis.  Suffice it to say,
however, that even if the Court were to rule certain types of evidence to be inadmissible, it
would be improper to rule out any particular exhibit at this time.  Rather, the ultimate
admissibility of any particular exhibit can only be made after careful review to determine if it is
relevant to an issue that is appropriate.  After all, it is quite common for a specific document to
be relevant for several purposes.

[2]     Apparently realizing there is no support for precluding such evidence from an
infringement trial *in limine*, DePuy Mitek tries to deflect attention from its lack of authority on
that real issue and instead tries to redirect the focus onto issues that are irrelevant for this trial;
invalidity and enforceability.  Mitek Mem. at 2-3.  For example, DePuy Mitek cites *Special
Equip. Co. v. Coe, Commissioner of Patents,* 324 U.S. 370, 378-79 (1945), which purportedly
supports the notion that evidence of the patentee's failure to commercialize the patented
invention "does not affect the validity of the patent."  *Id.*  But Defendants are not asserting
invalidity in this trial.  Thus, DePuy Mitek's authority is wholly inapposite.

In another example, DePuy Mitek cites *Aerosol Research Co. v. Scovill Mfg. Co.*, 334
F.2d 751, 756 (7th Cir. 1964) as purportedly supporting the notion that evidence of a patentee's
failure to commercialize the patented invention "does not of itself establish lack of invention or
preclude enforcement of a patent."  *Id.*  But, here too, even if this were true, Defendants are *not*
challenging in this trial DePuy Mitek's right to enforce the '446 patent.  What is more, even if
this authority *was* relevant, *it does not preclude such evidence at trial*, much less *in limine*.  It

stating that such evidence is irrelevant to the question of infringement.  In fact, *Sylvania Electric Products, Inc. v. Brainerd*, 369 F.Supp. 468 (D. Mass. Jan. 15, 1974), *aff'd,* 499 F.2d. 111 (1st Cir. 1974), addressed that same question and decided just the opposite.  *Id.* at 474.  Thus, contrary to DePuy Mitek's unsupported assertions, such evidence *is* relevant and admissible.

There could be countless other reasons why such evidence may be relevant at trial. Defendants, who will be responding to the evidence presented by DePuy Mitek, of course, have no way of knowing ahead of time what evidence DePuy Mitek may present.  Just by way of example, DePuy Mitek will presumably introduce the '446 patent and at least some evidence about the development of its alleged invention and/or its alleged benefits.

Defendants will have every right to rebut such evidence which may well include evidence that DePuy Mitek did not commercialize the alleged invention and the reasons why DePuy Mitek was never able to commercialize the alleged invention.  *Sylvania Electric* considered relevant to the question of infringement, the fact that the patentee never made a product covered under its patent to satisfy market need, whereas the accused product had met the market need and had done so successfully.  *Id*.  The facts in *Sylvania Electric* are identical to the facts in this case where FiberWire suture has enjoyed great success, whereas DePuy Mitek was never able to commercialize its alleged invention.  The jury has every right to know how "beneficial" the alleged "benefits" of the patent really are.

There could be countless other arguments that DePuy Mitek might make.  Depending upon what DePuy Mitek *does* argue, Defendants may need to rebut those arguments with evidence of DePuy Mitek's failure to commercialize the patented invention, among other things. Thus, the best that could be said of DePuy Mitek's request is that it is premature and should only

---

merely states that such evidence "does not of itself" prevent the patentee from enforcing the patent.  But Defendants are not pointing solely to this evidence.  It would be only one piece of evidence out of many to be presented to the jury which could be weighed together with and against all of the other evidence presented by the parties.

DSMDB-2292994v01

be decided in the context of trial. But if Defendants' evidence were ruled inadmissible now and they were not able to respond to those arguments at trial, Defendants, not DePuy Mitek, would be greatly prejudiced.

**III.     DEFENDANTS SHOULD NOT BE PRECLUDED *IN LIMINE* FROM PRESENTING EVIDENCE AT TRIAL REGARDING THE DEVELOPMENT OF ORTHOCORD**

DePuy Mitek's Orthocord suture is a direct competitor of Defendants' FiberWire suture. In fact, as DePuy Mitek admits, *the reason why Orthocord was developed was to compete with FiberWire*. Mitek Mem. at 4. As explained below, evidence of Orthocord's development is plainly relevant to the infringement issues in this case.

In an effort to misdirect the Court, DePuy Mitek's argument makes absolutely no mention of the fact that Ethicon and DePuy Mitek consciously considered coating issues during development of this directly competitive product. The reasons for DePuy Mitek's "omission" is obvious. Since Orthocord is a direct competitor of FiberWire, any evidence as to what DePuy Mitek and/or Ethicon (DePuy Mitek's sister company and co-developer of Orthocord) believed about the importance of Orthocord's coating -- and indeed, any evidence regarding their decision making process as to why a coating was needed and as to which coating to use and why -- are directly relevant to the issues in this case.

But there is more. As both sides acknowledge, the issue for the jury is whether the coating added to FiberWire materially affects the basic and novel properties of the invention. Both sides also agree that an effect on the basic and novel properties is "material" if the effect is of importance or of consequence to those of ordinary skill in the art. *See, e.g., PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1354-55 (Fed. Cir. 1998). Evidence of what persons of ordinary skill in the art at DePuy Mitek and Ethicon (the largest suture manufacturer in the world) believed about the coating they were seeking to apply to Orthocord is plainly relevant to what a

4

person of ordinary skill in the art may or may not believe about suture coatings in general, including the type of coating added to FiberWire. The jury should not be deprived of hearing this evidence.

Put in proper perspective, DePuy Mitek's argument has nothing to do with the admissibility of evidence. Rather, it is nothing more than its argument that the evidence about Orthocord development should be given little weight. To the extent DePuy Mitek has *arguments* against its probative value, it can present that during examination of the witnesses and let the jury decide how much weight it should be given.

The only "evidence" about Orthocord development that DePuy Mitek even bothers to cite concerns the reasons that it developed Orthocord, claiming that Defendants are trying to mislead the jury by arguing that Orthocord was developed as a "me too" suture in response to FiberWire's market entry. But even here, DePuy Mitek's argument does not go to admissibility, but only to weight. DePuy Mitek claims that it only "was responding to market conditions when it decided to develop Orthocord." Mitek Mem. at 4. The short answer is: tell it to the jury -- that is who should decide a dispute over the facts.[3] That should be the end of the matter.

In any event, it is, at best for DePuy Mitek, premature for the Court to decide at this juncture if this "reasons for development" evidence will be admissible. For example, according to its witness list, DePuy Mitek is planning on having two of the developers of the '446 patent -- Mark Steckel and Dennis Jamiolkowski -- testify at trial. While Defendants have no idea what these witnesses will say at trial, there is a good chance one, if not both, of them will testify about the development of the '446 patent and its purported advances over the prior art. If that is the case, then the jury should be able to weigh that testimony against evidence that the product

---

[3]    DePuy Mitek's assertion that "Orthocord is not covered by Mitek's Hunter 446 Patent because it contains certain bioabsorbable materials which are excluded from the patent claims" (Mitek Mem. at 4) is at best incomplete. DePuy Mitek knows full well that Orthocord does not contain the two different materials required by the claims.

DSMDB-2292994v01

DePuy Mitek developed in order to compete with FiberWire -- which DePuy Mitek obviously alleges is covered by the '446 patent -- is *not* covered by the '446 patent.[4]

Of course, whether DePuy Mitek makes any of these arguments at trial is yet to be seen. However, one thing is for certain -- if DePuy Mitek makes this Orthocord evidence relevant at trial, Defendants have every right to respond. If Defendants have already been precluded from presenting that evidence, it would be Defendants, and *not* DePuy Mitek that would be unduly prejudiced.

## IV.    DEFENDANTS SHOULD NOT BE PRECLUDED *IN LIMINE* FROM PRESENTING EVIDENCE AT TRIAL REGARDING OWNERSHIP OF THE '446 PATENT

It is almost beyond imagination that DePuy Mitek can contend that the correct ownership of the patent is not relevant. Of course it is -- there is no case if the correct party does not sue. *See, e.g., Central Admixture Pharmacy Services, Inc. v. Advanced Cardiac Solutions, P.C.*, 482 F.3d. 1347, 1352 (Fed. Cir. 2007) (stating only the patent owner, or the holder of all substantial rights under the patent, may sue for infringement). Once again, DePuy Mitek's argument is not one addressed to admissibility, but rather to weight. DePuy Mitek tells the Court its side of the story, but neglects to tell the Court the other side.

What DePuy Mitek neglects to tell the Court is that there are real questions as to whether the '446 patent *was ever properly assigned* to DePuy Mitek. The undisputed facts are

---

[4]    In addition, Defendants are asserting the reverse doctrine of equivalents as a defense. Thus, Defendants will be presenting evidence that its FiberWire suture includes ultra high molecular weight PE for adding very high strength to the suture and PET for improving the suture's handleability. With this combination of materials, FiberWire became the first high-strength suture on the market. DePuy Mitek asserts in its motion that it "was responding to market conditions when it decided to develop Orthocord." Mitek Mem. at 4. But, what DePuy Mitek fails to tell the Court is that it was responding to the market conditions *created by the introduction of FiberWire* into the market. That introduction created a demand for high-strength suture – a demand to which DePuy Mitek responded by developing Orthocord. Thus, evidence of DePuy Mitek's desire to introduce a "me too" suture, and its development of Orthocord, are directly relevant to the issues in this case.

DSMDB-2292994v01

that Ethicon, Inc. is listed on the face of the '446 patent as the assignee.  DePuy Mitek asserts that the '446 patent was assigned to it from Ethicon, Inc. in August 2004.  However, there is evidence that the assignment is invalid and DePuy Mitek is not the owner of the '446 patent.  For example, there is evidence that there was no consideration for the assignment, which is not surprising since there is also evidence that there was no legitimate business reason for the assignment.  Once again, the short and definitive answer is that DePuy Mitek and Defendants should tell both sides to the jury, who then can decide.

Just as with the other evidence which DePuy Mitek seeks to preclude Defendants from presenting, it is also premature to decide whether to preclude *this* evidence as well. Defendants have no way of knowing what evidence DePuy Mitek may put on during its case-in-chief.  Defendants will be reacting to that evidence at trial.  It is way to premature to preclude Defendants from presenting this evidence at this juncture since it would greatly prejudice Defendants if they were not able to properly respond to DePuy Mitek's arguments at trial.

With regard to all of the evidence DePuy Mitek seeks to exclude by its premature motion, to the extent DePuy Mitek has concerns under Rule 403, as this district has stated; "Normally, the balancing process contemplated by that Rule is best undertaken at the trial itself." *Flebotte v. Dow Jones & Co., Inc.*, 2000 WL 35539238 at *6 (D. Mass. Dec. 6, 2000). Ex. 1.

## V.    CONCLUSION

For the foregoing reasons, DePuy Mitek's motion should be denied.


Dated: July 24, 2007                                    Respectfully submitted,

                                                        By:___/s/Charles W. Saber_____
                                                        Charles W. Saber
                                                        Stephen A. Soffen
                                                        Salvatore P. Tamburo
                                                        DICKSTEIN SHAPIRO LLP
                                                        1825 Eye Street, N.W.
                                                        Washington, D.C.  20006-5403
                                                        Telephone:  (202) 420-3116
                                                        Facsimile:  (202) 420-2201

                                                        Christopher Weld, Jr. (BBO # 522230)
                                                        Raymond P. Ausrotas (BBO # 640315)
                                                        TODD & WELD LLP
                                                        28 State Street, 31st Floor
                                                        Boston, MA 02109
                                                        Telephone:  (617) 720-2626
                                                        Facsimile:  (617) 227-5777

                                                        Counsel for Defendants
                                                        Arthrex, Inc. and Pearsalls Ltd.

DSMDB-2292994v01

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing DEFENDANTS ARTHREX,

INC.'S AND PEARSALLS LTD.'S OPPOSITION TO PLAINTIFF DEPUY MITEK'S

MOTION *IN LIMINE* (NO. 5) TO PRECLUDE ARTHREX AND PEARSALLS FROM

MAKING IRRELEVANT AND PREJUDICIAL REMARKS ABOUT MITEK was served, via

the Court's email notification system on the following counsel for Plaintiff on the 24th day of

July 2007:


Lynn A. Malinoski
Woodcock Washburn, LLP
Cira Centre, 12th Floor
2929 Arch Street
Philadelphia, PA  19104-2891
Telephone: (215) 568-3100
Facsimile: (215) 568-3439

Daniel J. Gleason
Nutter McClennan & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
Telephone:  (617) 439-2000
Facsimile:  (617) 310-9000



                                      **/s/Charles W. Saber**

# Exhibit 1

Westlaw.

Slip Copy
Slip Copy, 2000 WL 35539238 (D.Mass.)
(Cite as: Slip Copy)

Page 1

**H**
Flebotte v. Dow Jones & Co., Inc.
D.Mass.,2000.
Only the Westlaw citation is currently available.
United States District Court,D. Massachusetts.
Janice FLEBOTTE, Patricia Jez, Robert
Miklasiewicz, and Gloria Gay, Plaintiffs
v.
DOW JONES & COMPANY, INC., Defendant
No. Civ.A. 97-30117-FHF.

Dec. 6, 2000.

Michael O. Shea, Law Office of Michael O. Shea,
Wilbraham, MA, for Plaintiffs.
Dennis M. Duggan, Jr., Donna Y. Porter, Nixon
Peabody, LLP, Boston, MA, Mark H. Burak, Robert
M. Shea, Morse, Barnes-Brown & Pendleton, P.C.,
Waltham, MA, for Defendant.

*MEMORANDUM AND ORDER*
FREEDMAN, Senior J.

## I. INTRODUCTION

*1 This employment discrimination case involves a
1994 reduction in workforce by the defendant, Dow
Jones & Company, Inc. ("defendant"). The plaintiffs,
employees of the defendant who were terminated in
1994, allege age discrimination pursuant to
Massachusetts General Laws, chapter 151B. The
parties now move to exclude their opponents'
statistical expert evidence.

## II. FACTS

The defendant operates a customer relations
department in Chicopee, Massachusetts with a call
center for customer service requests and complaints.
In 1994, the defendant staffed its call center with
three classifications of employees. First, the
"Customer Service Representative/Phone"
("CSR/phone") employees handled incoming
customer calls. The defendant employed both full-
and part-time CSR/phone employees. Part-time
employees generally worked twenty-five hours per
week or less and, typically, worked five three-hour
shifts between 7:00 a.m. and 10 a.m. Second, the
defendant also employed individuals in the position

of "Customer Service Representative/Special
Handling" ("CSR/special handling"). The individuals
in these positions generally handled written customer
correspondence, correspondence with corporate
accounts, and occasionally handled overflow
telephone calls. Additional training is usually
required to transfer from a CSR/phone position to a
CSR/special handling position because the latter
position requires written communications skills and
involves more complicated problems. The third and
final employee classification in the call center was
"Customer Service Representative II" ("CSR II"),
which had responsibilities similar to those of
CSR/phone employees.

Between 1989 and 1994, the defendant maintained
within its call center an "Intensive Care Unit"
("ICU") to handle repeat consumer complaints. The
ICU was staffed by a supervisor, four full-time
customer service representatives ("CSRs"), and three
part-time CSRs. The plaintiffs to this action were
employed as full-time CSRs in the ICU. In November
1994, the defendant eliminated the ICU and its full-
time employees, including the plaintiffs, as part of a
nationwide reduction-in-force aimed at balancing its
budget. The elimination of the ICU was only one of
many actions taken by the defendant to reduce its
1995 budget.

## III. DISCUSSION

### A. *Defendant's Motion to Exclude Plaintiffs' Expert Statistical Evidence*

The plaintiffs seek to admit the expert testimony of
Dr. Craig L. Moore ("Dr.Moore") and Dr. George W.
Cobb ("Dr.Cobb"). The defendant now moves to
exclude plaintiffs' statistical expert evidence as
inadmissible under Fed.R.Evid. 702 on the following
grounds: (1) the statistical data did not take account
of the defendant's nondiscriminatory explanation for
elimination of the ICU; (2) the plaintiffs' experts did
not compare similarly situated employees; (3) this
Court has already rejected the statistical expert
evidence as not probative of age discrimination; and
(4) the prejudicial effect of the plaintiffs' statistical
evidence outweighs its probative value. In addition,
the defendant contends that the evidence is
inadmissible because statistical data has little

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2000 WL 35539238 (D.Mass.)
**(Cite as: Slip Copy)**

probative value in disparate treatment cases, and the plaintiffs' statistical experts conclude only that the elimination of the ICU had a disparate *impact* on older workers, while only the disparate *treatment* claims remain.

**\*2** Dr. Moore conducted various statistical tests on a pool of 128 employees of the defendant in Chicopee, all of whom work in customer service and whose duties involve use of the telephone. Although he stated that a valid statistical study must be conducted only with a group of employees who are "similarly situated with regard to skill, effort, and responsibility," various differences are apparent among the employees included in his sample group. Defendant's Motion to Exclude Plaintiffs' Statistical Expert Evidence, Exhibit A, at 1. For instance, some employees were part-time and others were full-time. Some were supervisors and others non-supervisors. Finally, customer service employees with various levels of experience were also included in the sample. He concluded that the results of his tests provided data that "clearly shows that older workers were adversely impacted" by the defendant's termination decisions. *Id.* at 3.

Dr. Cobb's analysis compared the plaintiffs with 112 employees in Chicopee. Although Dr. Cobb did not include supervisory employees in four of his eight statistical tests, he apparently included both full-time and part-time employees in the sample group. In addition, his tests included non-supervisory employees with three position titles: (1) CSR/special handling; (2) CSR/phone; and (3) CSR II. He concluded that "the chance is less than 1 in 100 that an age-blind decision about terminations would produce a difference as large as the one that actually resulted from the decision at Dow Jones." Defendant's Motion to Exclude the Plaintiffs' Expert Statistical Evidence, Exhibit B, at 45.

### 1. Admissibility of Plaintiffs' Statistical Evidence Under Fed.R.Evid. 702

The defendant articulates two primary arguments for excluding the plaintiffs' statistical expert evidence under Rule 702. First, it contends that Dr. Moore and Dr. Cobb did not account for the defendant's nondiscriminatory explanation for terminating the plaintiffs-that it intended to reduce costs by eliminating full-time ICU employees. The inclusion of part-time employees and those not employed in the ICU in their analyses, the defendant complains, renders their results flawed and not probative of

discriminatory intent. Second, it argues that Drs. Moore and Cobb did not analyze similarly situated employees. By including in their study part-time employees, those employed outside the ICU, and special handling CSRs, they thus rendered their analyses flawed.

The plaintiffs counter that their experts did not fail to consider relevant variables. Inclusion of part-time employees in the studies, the plaintiffs argue, was appropriate because part-time employees were considered for termination by the defendant. In addition, the plaintiffs contend that the employees included in the study differ only slightly with regard to job training and responsibility and therefore are, for the purposes of their analyses, interchangeable.

"In *Daubert*, [the Supreme] Court held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to ensure that any and all scientific testimony is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). "Reliability" of scientific knowledge is determined by assessing a non-exclusive list of factors including: (1) whether it has been tested; (2) whether it has been peer reviewed or published; (3) the known or potential rate of error; and (4) whether it has received "general acceptance" within a relevant scientific community. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 593-94, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Rule 702 further requires the Court to evaluate the relevance of the proffered reasoning or methodology by assessing whether it can reasonably be applied to the facts at issue. *Id.* at 591. The purpose of the gatekeeper requirement in *Daubert* is to ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. Nevertheless, Rule 702 must be interpreted and applied in concert with "the liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony." *Daubert*, 509 U.S. at 588 (quotations omitted).

**\*3** In general, statistical expert evidence suitably designed to address a material issue will be held admissible under the Federal Rules of Evidence. *See* Federal Judicial Center, Reference Manual on Scientific Evidence 86 (2000) (most statistical methods "are capable of producing useful results when carefully and appropriately applied," and therefore "generally satisfy important aspects of the 'scientific knowledge' requirement articulated in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2000 WL 35539238 (D.Mass.)
**(Cite as: Slip Copy)**

Page 3

*Daubert* ....") Moreover, statistical analyses need not include all measurable variables to be admissible. *See, e.g., Bazemore v. Friday,* 478 U.S. 385, 400, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986). In *Bazemore,* the Supreme Court stated:

While the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be, it can hardly be said, absent some other infirmity, that an analysis which accounts for the major factors must be considered unacceptable as evidence of discrimination. Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.

*Id.* at 400. The First Circuit has recently echoed this approach, stating that "[statistical] analyses are admissible even in disparate treatment cases unless they are so incomplete as to be inadmissible as irrelevant." *McMillan v. Massachusetts Soc'y for Prevention of Cruelty to Animals,* 140 F.3d 288, 303 (1st Cir.1998), *cert. denied,* 525 U.S. 1104, 119 S.Ct. 870, 142 L.Ed.2d 772 (1999); *see Freeman v. Package Machinery Co.,* 865 F.2d 1331, 1338-39 (1st Cir.1988).

In this case, the defendant does not challenge the reliability of the particular statistical tests employed by the plaintiffs' experts, such as the "simple t test" and the "rank sum test." Instead, the defendant questions the relevance of the analyses used to the specific facts at issue in this case, and contends that the statistical tests used were executed so poorly that they were unreliable, and thus inadmissible. The Court concludes, however, that the proffered statistical evidence survives the *Daubert* inquiry. Although the disputed statistical analyses may be subject to the various flaws indicated by the defendant, such imperfections affect their probative value rather than their admissibility. *See Adams v. Ameritech Services, Inc.,* C.A. Nos. 98-1056, 98-2259, 98-2307, 98-2426, 98-2522, 2000 WL 1578314, at *12-13 (7th Cir. Oct.23, 2000) (in age discrimination case, failure of statistical analysis to take into account or control for non-age related variables goes to weight, not admissibility); *Scott v. Goodyear Tire & Rubber Co.,* 160 F.3d 1121, 1129 (6th Cir.1998) (in age discrimination case for termination arising in context of company restructuring, statistical analysis that included positions unaffected by the reorganization held admissible). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596.

*4 The defendant's first contention, that the plaintiffs' statistical evidence must be excluded because it fails to account for the defendant's nondiscriminatory explanation regarding alleged statistical disparities, presents the Court with a close question. The defendant explains that the sole criterion for termination during its reduction in force was whether an employee worked full-time in the ICU.[FN1] Dr. Moore and Dr. Cobb's inclusion in their analyses of employees whose positions were unaffected by the layoffs, argues the defendant, renders their analyses unreliable and, thus, inadmissible. The argument is persuasive, and courts that have considered this precise question are divided. *Compare Doan v. Seagate Technology,* 82 F.3d 974, 979 (10th Cir.1996) *cert. denied,* 519 U.S. 1056, 117 S.Ct. 684, 136 L.Ed.2d 608 (1997) (in age discrimination action arising out of reduction in force, statistical analysis excluded because it failed to compare similarly situated employees and ignored fact that only certain employees subject to terminations), *with Scott,* 160 F.3d at 1129 (statistical analysis showing that age of employees terminated was greater than age of those whose positions were retained held admissible although sample included employees whose positions not jeopardized by reduction in force). Based upon the First Circuit's instruction that statistical studies are admissible unless they are so incomplete as to be irrelevant, however, the Court concludes that the failure to account for the defendant's nondiscriminatory explanation for the terminations does not affect the admissibility of the proposed statistical evidence. *See McMillan,* 140 F.3d at 303. "[W]hile the statistics were not as probative as they perhaps may have been, they do reveal some startling age comparisons between persons occupying positions that were eliminated and those unaffected by the reorganization." *Scott,* 160 F.3d at 1129.

FN1. The plaintiffs, on the other hand, contend that part-time employees were subject to termination. For the purposes of this discussion only, the Court assumes, but does not now decide, that only full-time employees were subject to the defendant's reduction in force.

The Court also rejects the defendant's additional argument that the plaintiffs' experts compare employees who are not similarly situated by equating full-time employees with part-time employees, phone CSRs with special handling CSRs, and ICU employees with non-ICU employees.[FN2] It is true that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

there exist clear differences between these groups of employees in terms of responsibility and training. For instance, part-time employees are not identically situated with full-time employees, as they "work fewer hours and receive less pay and fewer benefits." *Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151, 1155 (7th Cir.1997). Nevertheless, the Court concludes that the differences cited by the defendant do not provide a sufficient distinction to warrant exclusion of the disputed evidence. *See Adams,* 2000 WL 1578314, at *2, 11, 13 (statistical evidence that compared 13 different job titles among vice-presidential salary range held admissible although different job titles signified varying levels of responsibility). Here, too, the Court is guided by the First Circuit's instruction that issues related to the "reliability of [statistical] analysis affect[s] not the *admissibility* of [the] testimony, but the *weight* which the jury might choose to give to it." *Freeman,* 865 F.2d at 1338-39 (in age discrimination action for wrongful termination, statistical evidence regarding departure rates for high-ranking employees admissible although pool of employees analyzed included both voluntary and involuntary departures).

> FN2. The defendant's additional argument that Patricia Jez, a supervisory employee, was incorrectly compared with non-supervisory employees, was rendered moot by this Court's decision to grant summary judgment to the defendant on Jez's claim.

*5 The defendant cites to numerous cases in which courts determined that proposed statistical analyses were entitled to zero weight because they compared employees who were not similarly situated. However, the differences between the employees compared by plaintiffs' experts in this case are not so stark as are the differences between employees in the cited cases. *See, e.g., Rea v. Martin Marietta Corp.,* 29 F.3d 1450, 1456 (10th Cir.1994) (statistical evidence not probative of discrimination where defendant company's policy was to terminate lowest-rated employees, and plaintiff "ranked last in the departmental ranking for her labor grade"). For instance, in *Sheehan v. Daily Racing Form, Inc.,* 104 F.3d 940, 942-43 (7th Cir.1997), *cert. denied,* 521 U.S. 1104, 117 S.Ct. 2480, 138 L.Ed.2d 989 (1997), the statistical analysis was ruled inadmissible in part because it compared the plaintiff, who was the newspaper's assistant editor and "number two man," with an employee sample in which only two of seventeen employees were supervisors, and included "unionized workers with no supervisory

responsibilities." *Id.* at 941, 942. By contrast, the employees included in Dr. Moore and Dr. Cobb's samples, like the plaintiffs, all worked in the customer services area. In addition, like the plaintiffs, the vast majority of these employees worked exclusively on the telephone, with no supervisory responsibilities. Accordingly, the relatively minor differences between the employees used in the plaintiffs' statistical study do not require that the evidence be ruled inadmissible.

The defendant's remaining citations are to cases in which courts excluded statistical expert evidence that shared the purported flaws of the plaintiffs' experts in this case and, *in addition,* were permeated by other problems. *See Munoz v. Orr,* 200 F.3d 291, 301 (5th Cir.2000), *cert. denied,* 531 U.S. 812, 121 S.Ct. 45, 148 L.Ed.2d 15 (2000) (statistical expert evidence excluded where it failed to control for other explanatory variables, expert demonstrated impermissible bias and mistakenly stated that statistical analysis could identify cause of numerical disparities); *Hollander v. American Cyanamid Co.,* 172 F.3d 192, 202-03 (2d Cir.1999), *cert. denied,* 528 U.S. 965, 120 S.Ct. 399, 145 L.Ed.2d 311 (1999) (in age discrimination case, statistical study excluded where it relied upon a "misleading age grouping that impermissibly skews the data"); *Bickerstaff v. Vassar College,* 196 F.3d 435, 450 (2d Cir.1999), *cert. denied,* 120 S.Ct. 2699 (2000) (statistical analysis inadmissible where it failed to account for nondiscriminatory explanations of disparity and was based on a statistically insignificant sample); *Fallis v. Kerr-McGee Corp.,* 944 F.2d 743, 746-47 (10th Cir.1991) (same). "Taken cumulatively," the multiple infirmities with the proffered evidence in these cases led to a conclusion that it was unreliable. *Munoz,* 200 F.3d at 302. Such is not the case here.

The defendant also argues that this Court has already rejected the plaintiffs' statistical expert evidence as not probative of age discrimination. In its Memorandum and Order dated June 10, 1999, the Court stated:

*6 Much of [the plaintiffs'] evidence does not strike the Court as significant. The plaintiffs' statistical evidence does not tend to prove the reduction in force at Dow Jones disproportionately affected older employees, as many CSRs and supervisors older than the plaintiffs did not suffer termination as part of the reduction in force.

*Flebotte v. Dow Jones & Co.,* 51 F.Supp.2d 36, 42 (D.Mass.1999). Contrary to the defendant's suggestion, the Court's order concluded neither that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2000 WL 35539238 (D.Mass.)
(Cite as: Slip Copy)

the plaintiffs' statistical evidence was entitled to zero weight nor that it was inadmissible on the ground of relevance. Indeed, the Court ultimately denied the defendant's motion for summary judgment only because all of the evidence considered together, including the statistical evidence, established a genuine issue of material fact with respect to pretext. *See Flebotte, 51 F.Supp.2d at 44* ("the plaintiffs' evidence *as a whole* suffices to establish a genuine issue of fact with respect to pretext....") (Emphasis added). Therefore, it is apparent that the Court's commentary on the limited probative value of the plaintiffs' statistical evidence was not intended to mean that it must be excluded from evidence at trial.

Finally, the Court rejects the defendant's argument that the prejudicial effect of the plaintiffs' expert reports outweighs its probative value, and should therefore be excluded pursuant to Fed.R.Evid. 403. *See Adams,* 231 F.3d 414, 2000 WL 1578314 at *13. "Normally the balancing process contemplated by that rule is best undertaken at the trial itself." *Id.* Based on the limited but important role the plaintiffs' statistical evidence can play at trial, the Court declines to rule at this time that such evidence will be unduly prejudicial to the defendant. However, "if the case goes forward to a trial, [the Court] will be free to re-weigh the admissibility question under Rule 403 and come to a fresh conclusion ." *Id.*

### 2. Use of Statistical Evidence in Disparate Treatment Case

The defendant's argument that statistical data has little probative value in disparate treatment cases is also without merit. The First Circuit has consistently held that statistics are relevant in disparate treatment cases even though they carry less probative value than in a disparate impact case. *See McMillan,* 140 F.3d at 303. Accordingly, statistical analyses are admissible in disparate treatment cases unless they are "so incomplete as to be inadmissible as irrelevant." *Id.* at 303. The Court concludes, based on the discussion regarding the admissibility of the plaintiffs' statistical expert evidence under the *Daubert* standard, that the reports of Dr. Moore and Dr. Cobb are not inadmissible as irrelevant, although they may contain flaws.

The defendant also contends that the statistical evidence is not relevant to this case because Drs. Moore and Cobb conclude only that the elimination of the ICU had a disparate impact on older workers, a conclusion that is not relevant to a case alleging

disparate treatment. However, Dr. Moore's affidavit dated July 13, 2000 responds that the analyses presented have probative value in evaluating a claim of disparate treatment. He contends that statistical evidence in support of the claim that older workers were disproportionately affected by the elimination of the ICU may be probative of a claim of disparate treatment. Thus, Dr. Moore does not concede, as the defendant suggests, that his analysis is not useful in evaluating a claim of disparate treatment. Accordingly, the Court concludes that the defendant's argument does not affect the admissibility of the disputed statistical evidence.

### B. *Plaintiffs' Motion to Exclude the Testimony of Defendant's Statistical Expert Evidence*

**\*7** The defendant seeks to admit the expert testimony and joint report of Dr. David S. Evans ("Dr.Evans") and Dr. Christopher Erath ("Dr.Erath"). Dr. Evans and Dr. Erath's joint report concluded that "Dow Jones made a decision to eliminate a unit and all full-time employees within it; therefore, in this case, statistics can play no role in assessing adverse impact by age because all such employees were terminated." Plaintiffs' Motion in Limine to Exclude the Testimony and Opinion Evidence of Mr. Evans and Mr. Erath, Exhibit 1, at 3. The defendant's experts offered a secondary conclusion that if statistical analyses were conducted despite the elimination of the ICU, such analyses do not support the contention that older workers were adversely impacted in the termination process. Drs. Evans and Erath intended to use only full-time customer service employees assigned to the telephones in their statistical analysis. During Dr. Erath's deposition, however, he admitted that the analysis included CSR II employees, who did not use the telephone as part of their responsibilities.

The plaintiffs move to exclude the testimony of the defendant's statistical experts on the following grounds: (1) both of the defendant's experts violated Fed.R.Civ.P. 26(a)(2)(B) by conducting tests not submitted with the report; (2) Dr. Evans violated Fed.R.Civ.P. 26(a)(2)(B) by failing to personally prepare his expert report; (3) Dr. Erath's statistical analysis relied upon incorrect factual assumptions; and (4) the defendant's experts lack the credentials in statistics to be qualified as experts in that field.

### 1. Fed.R.Civ.P. 26 Violations

The plaintiffs first argue that Dr. Erath violated Rule

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2000 WL 35539238 (D.Mass.)                                          Page 6
(Cite as: Slip Copy)

26(a)(2)(B) by conducting several tests but not including them in the report. The defendant contends that the rule requires no such disclosure.

Fed.R.Civ.P. 26(a)(2)(B) provides, in pertinent part: Except as otherwise stipulated or directed by the court, the [initial disclosure] shall, with respect to a witness who is retained ... to provide expert testimony in the case ... be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions....

"A party that without substantial justification fails to disclose information required by Rule 26(a) ... shall not, unless such failure is harmless, be permitted to use as evidence at a trial ... any witness or information not so disclosed." Fed.R.Civ.P. 37(c)(1). "Because the defendant seeks to strike the designation of the expert witness, the Court considers the motion as one for sanctions, pursuant to Fed.R.Civ.P. 37(c)." Marek v. Moore, 171 F.R.D. 298, 299 (D.Kan.1997).

The Court concludes that the plaintiffs' argument is based upon an interpretation of Rule 26(a)(2)(B) that is, at best, strained. The plain language of Rule 26(a)(2)(B) merely requires disclosure of a "written report stating the testimony the witness is expected to give during direct examination, together with the reasons therefor." Fed.R.Civ.P. 26(a)(2)(B) advisory committee's note. In addition, the primary purpose of Rule 26(a)(2) is "to require disclosure of expert testimony sufficiently in advance of trial so that opposing parties have a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." Mounger v. Goodyear Tire & Rubber Co., No. 99-2230-JWL, 2000 WL 1466198, at *1 (D.Kan. Sept.22, 2000). Therefore, neither the plain language of the rule nor its purpose compels disclosure of every calculation or test conducted by the expert during formation of the report. See Villalba v. Consol. Freightways Corp. of Delaware, No. 98-C-5347, 2000 WL 1154073, at *11 (N.D.Ill. Aug.14, 2000). Indeed, the defendant's expert disclosure provided the plaintiffs with a fair opportunity to adequately prepare a rebuttal to the defendant's expert testimony. Accordingly, the Court rejects the plaintiffs' argument that Drs. Erath and Evans violated Rule 26(a)(2)(B) by conducting several tests not contained in their reports.

*8 The plaintiffs also argue that Dr. Evans did not comply with the requirement of Rule 26(a)(2)(B) that the written report be "prepared and signed by the witness" because he did not personally prepare the statistical report.[FN3] The defendant counters that Dr. Erath's assistance in the preparation of Dr. Evans' report does not constitute noncompliance with the rule.

> FN3. The plaintiffs also argue that the defendant's experts violated Rule 26 by failing to sign their expert reports. This contention is inaccurate, as both experts signed their reports. Accordingly, the Court does not address this argument further.

Although Dr. Evans was unable to recall specifically the process by which the expert report submitted jointly by himself and Dr. Erath was drafted, he was able to describe how it was probably compiled based upon how his expert reports are usually produced. He testified in his deposition that Dr. Erath ordinarily supervised the input of the data and the statistical analysis, and wrote the first draft of the report. He added that the calculations were done by Dr. Erath or by one of the researchers on his staff. Drs. Evans and Erath typically discussed the report, and Dr. Evans subsequently made appropriate changes to it. Dr. Evans also specifically testified that he reviewed and relied upon various data for his analysis in this case, and that he and Dr. Erath collaborated in deciding which groups of employees to analyze.

Rule 26(a)(2)(B) states that expert reports must be prepared and signed by the expert witness. Although the advisory committee's note provides that others may assist in the preparation of such reports, it is generally accepted that the rule requires the expert to "substantially participate in the preparation of his report." Manning v. Crockett, No. 95-C-3117, 1999 WL 324715, at *3 (N.D.Ill. May 18, 1999). In addition, "the final report must be that of the expert." Coquillette, Daniel R. et. al., Moore's Federal Practice 3d § 26.23 [4]. The few reported cases interpreting Rule 26(a)(2)(B) indicate that the preparation and signing requirement is designed to ensure that expert reports express "what the expert has freely authorized and adopted as his own and not merely for appeasement or because of intimidation or some undue influence by the party or counsel that has retained him." Marek, 171 F.R.D. at 302.

In this case, the Court concludes that the defendant's experts' report complied with the threshold

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-12457-PBS     Document 142-2     Filed 07/24/2007     Page 8 of 9

Slip Copy
Slip Copy, 2000 WL 35539238 (D.Mass.)
(Cite as: Slip Copy)

Page 7

requirements of Rule 26(a)(2)(B). Although he received help from Dr. Erath as well as from other research assistants, Dr. Evans formulated the initial opinion, reviewed the source information, reviewed the draft report, and prepared and signed the final report. There is no bar to an expert relying on this type of assistance from others during the preparation of a report. *See United States v. Dalide,* 227 F.3d 385, 392 n. 6 (6th Cir.2000). A contrary ruling would mean that an expert could never be assisted by more junior colleagues in the preparation of an expert report without the potential of being precluded from testifying. The Court declines the plaintiffs' invitation to read Rule 26(a)(2)(B) in a manner that would compel such a result.

### 2. *Reliability of Dr. Erath's Statistical Report Under Daubert*

**\*9** The plaintiffs next argue that Dr. Erath's expert statistical report is unreliable under *Daubert* because it compares employees who are not similarly situated. Specifically, the plaintiffs complain that Dr. Erath's statistical analysis compared customer service employees who used the telephone in their usual responsibilities with those who did not so utilize the telephone. The defendant counters that the plaintiffs attack a secondary conclusion of Drs. Evans and Erath, but do not address their primary opinion that no statistical analysis is appropriate in this case.

The Court concludes that the plaintiffs' argument is without merit. First, it does not address the reliability of the defendant's experts' primary conclusion that statistical analysis is not appropriate in this case. Second, the dissimilarities among employees analyzed in the defendant's experts' statistical report are so slight that they affect only the weight, not the admissibility, of the statistical data. *See Adams,* 231 F.3d 414, 2000 WL 1578314, at \*12-13. This conclusion, moreover, is consistent with our ruling that the plaintiffs' statistical expert evidence is admissible despite similar dissimilarities among employees analyzed in the data pool.

### 3. Qualifications of Defendant's Experts

Finally, the plaintiffs argue that Drs. Evans and Erath are unqualified to provide expert testimony in the field of statistics because their training occurred primarily in the field of economics.[FN4] The defendant contends that its experts are abundantly qualified to testify as statistical experts in this case, as they apparently have in numerous cases before.

> FN4. The plaintiffs' additional argument that Drs. Evans and Erath are unqualified because they were not familiar with the "rank sum" test or the "standard deviation test" is not only frivolous, but misleading. The record clearly reflects that, when asked, both experts demonstrated familiarity with both concepts. Accordingly, the Court does not address this argument further.

Fed.R.Evid. 702 requires the trial court to "determine whether the putative expert is qualified by knowledge, skill, experience, training, or education." *Mitchell v. United States,* 141 F.3d 8, 14 (1st Cir.1998) (quotations omitted). The curriculum vitae submitted by both proposed experts indicates that they have been qualified as statistical experts in sex and age discrimination cases on many prior occasions. In addition, the plaintiffs make no credible argument that Drs. Evans and Erath are unqualified to testify based upon their knowledge, experience, or training. That their education was in the field of economics is not, by itself, sufficient to justify exclusion of the witnesses from trial. Accordingly, the Court rejects the plaintiffs' final argument.

The plaintiffs also attack Dr. Erath's evidence on damages. The Court will take this motion under advisement and address it when it addresses the defendant's Memorandum to Exclude Plaintiffs' Damages Expert Evidence. In addition, the Court determines that the plaintiffs' additional arguments are frivolous and do not warrant further consideration.

### IV. CONCLUSION

Accordingly, the Court DENIES the defendant's motion to exclude the plaintiffs' statistical expert evidence, and DENIES the plaintiffs' motion to exclude the defendant's statistical expert evidence. Finally, the Court DENIES the plaintiffs' motion to file a supplementary memorandum in support of their opposition to defendant's motion to exclude their statistical expert evidence.

**\*10** It is So Ordered.

D.Mass.,2000.
Flebotte v. Dow Jones & Co., Inc.
Slip Copy, 2000 WL 35539238 (D.Mass.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2000 WL 35539238 (D.Mass.)
**(Cite as: Slip Copy)**

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.