# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DePuy Mitek, Inc. | ) | |
| a Massachusetts Corporation | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-12457 PBS |
| | ) | |
| Arthrex, Inc. | ) | |
| a Delaware Corporation, *et al*. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS ARTHREX, INC.'S AND PEARSALLS, LTD.'S OPPOSITION TO DEPUY MITEK'S MOTION *IN LIMINE* (NO. 4) TO LIMIT THE TESTIMONY OF ARTHREX'S PATENT LAW EXPERT, MR. WITHERSPOON

Dated: July 24, 2007

Charles W. Saber
Stephen A. Soffen
Salvatore P. Tamburo
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, D.C. 20006-5403
Telephone: (202) 420-3116
Facsimile: (202) 420-2201

Christopher Weld, Jr. (BBO # 522230)
Raymond P. Ausrotas (BBO # 640315)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
Telephone: (617) 720-2626
Facsimile: (617) 227-5777

Counsel for Defendants
Arthrex, Inc. and Pearsalls Ltd.

TABLE OF CONTENTS

<u>Page No.</u>

I.   INTRODUCTION .......................................................................................................... 1

II.   MR. WITHERSPOON'S TESTIMONY SHOULD BE ALLOWED ............................... 2

III.   DEPUY MITEK'S MOTION IS AT BEST PREMATURE AND OVERBROAD ........... 5

IV.   CONCLUSION ............................................................................................................... 6

i

DSMDB-2292775v02

TABLE OF AUTHORITIES

Page No.(s)

FEDERAL CASES

*Askansase v. Fatjo*, 130 F.3d 657 (5th Cir. 1997) ............................................................3

*Aspex Eyewear, Inc. v. E'Lite Optik, Inc., No. CIV.A.398CV2996D*, 2002 U.S.
    Dist. LEXIS 14834 (N.D. Tex. Apr. 4, 2002)............................................................3, 4

*Burkhart v. Washington Metropolitan Area Transit Authority*, 112 F.3d 1207
    (D.C. Cir. 1997) ......................................................................................................2, 6

*Mars, Inc. v. Coin Acceptors, Inc.*, Civ. Act. No. 90-49 (JCL), 1996 U.S. Dist.
    LEXIS 21514 (D. N.J. July 27, 1996).......................................................................2, 3

*Pfizer Inc. v. Teva Pharms. USA, Inc.*, 2006 U.S. Dist. LEXIS 77966 (D.N.J. Oct.
    26, 2006) ......................................................................................................................4

*Reiffin v. Microsoft Corp.*, 270 F. Supp. 2d 1132 (N.D.Cal. 2003).....................................6

*Revlon Consumer Products Corp. v. L'Oreal S.A., Cosmair, Inc.*, C.A. No. 96-
    192 *MMS*, 1997 U.S. Dist. LEXIS 4117 (D. Del. Mar. 26, 1997)...........................4, 5

*Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567 (Fed. Cir. 1984) ...................3


FEDERAL RULES

FED. R. EVID. 402 ................................................................................................................6

FED. R. EVID. 403 ................................................................................................................6

FED. R. EVID. 702 ................................................................................................................1

DSMDB-2292775v02

## I.    INTRODUCTION

As the Court is well aware, this case involves the proper application of the patent term "consisting essentially of."  DePuy Mitek's motion to exclude testimony from Mr. Witherspoon is nothing more than part of a thinly veiled campaign to keep the jury in the dark as much as possible by precluding information that will aid the jury in understanding how the facts of this case are intertwined with this complex area of law.

First, DePuy Mitek proposes a bare bones jury instruction regarding "consisting essentially of" claims, objecting to Defendants' proposal to give the jury meaningful guidance on how to apply the "consisting essentially of" standard.  *Compare* DePuy Mitek's Proposed Jury Instruction 2.3.5 with Defendants' Proposed Jury Instructions 2.3.4 and 2.3.6.  Ex. 1.  And now, DePuy Mitek would have the Court exclude the testimony of Defendants' witness who can assist the trier of fact in understanding how the evidence relates to this complex area of law.  As we explain below, the law is well settled that expert legal testimony of a mixture of law and fact is admissible, particularly in the area of patent law.  That is precisely the purpose of Mr. Witherspoon's testimony, and why his testimony is admissible under FED. R. EVID. 702.

Like most of DePuy Mitek's *in limine* motions, the most that can be said is that it is premature.  Defendants, of course, cannot predict what testimony and arguments DePuy Mitek will proffer in their case-in-chief and whether it will be necessary to call Mr. Witherspoon to answer DePuy Mitek's arguments.  We do know, however, that DePuy Mitek has repeatedly obfuscated the issues as they relate to the "consisting essentially of" question.  During the course of this litigation, DePuy Mitek has advanced at least five misguided theories:  1) coating does not materially affect the basic and novel characteristics of the claimed invention because the specification teaches that coating can be used; 2) coating does not materially affect the basic and novel characteristics of the claimed invention because "everyone coats;" 3) the narrowing

1

amendment from "comprising" to "consisting essentially of" only results in the exclusion of bio-absorbable materials; 4) "materially affects" does not include material improvements;[1] and 5) requiring that the coating causes the yarns to be transformed into different substances (Dr. Brookstein's "magic and miracles" standard) which would eliminate specifically identified limitations from the asserted claims. Ex. 3 at 399:1-400:15.

DePuy Mitek seeks to broadly exclude paragraphs 1-12 and 15-19 of Mr. Witherspoon's March 24, 2006 expert report under the guise of legal conclusion and recitation of patent law; however, these paragraphs include a multitude of admissible testimony on mixed issues of fact and law, patent office practice and procedure, and factual information regarding the prosecution history of the '446 patent. Ex. 4 at ¶¶ 1-12 and 15-19. Mr. Witherspoon should be allowed to explain how the evidence relates to the Court's interpretation of "consisting essential of." Moreover, should DePuy Mitek attempt to distract the jury from the real issues of this case by presenting its unsound theories, Defendants should be permitted to respond with an expert patent practitioner who can help the jury understand the facts in the proper context.

## II.    MR. WITHERSPOON'S TESTIMONY SHOULD BE ALLOWED

"[A]n expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied …." *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1212-1213 (D.C. Cir. 1997). Further, there is "some evidence that in patent cases courts relax the rule that expert witnesses cannot testify about the state of the law, or the application of law to a specific factual controversy." *Mars, Inc. v. Coin Acceptors, Inc.*, Civ. Act. No. 90-49 (JCL), 1996 U.S. Dist. LEXIS 21514, at *3-4 (D. N.J. July

---

[1]     DePuy Mitek has made this assertion, although its counsel conceded that "materially improve" falls within "consisting essentially of." Ex. 2 at 16:16-17:15.

DSMDB-2292775v02

27, 1996).  Ex. 5.  This relaxation in the rule "may be because patent law is a discipline pregnant with so-called 'mixed questions of law and fact'…."  *Id.* at *4.

Mr. Witherspoon's proposed testimony is directed to these "mixed questions of law and fact" that "cross the neat boundary that typically separates fact testimony from legal conclusion."  *Id.* at *5.  "Consisting essential of" is a complex and rarely litigated area of patent law.  This Court itself recognized that even though the Court hears many patent cases, this is its first "consisting essentially of" case.  Ex. 6 at 14:23-15:5.  The facts must then be applied to this complex area of law to determine whether an accused infringing device does, or does not, include additional elements that materially affect the basic and novel characteristics of the claimed invention.  Mr. Witherspoon will testify about such mixed issues of fact and law as how to reconcile the Court's actual claim construction with the facts.  A patent lawyer's testimony on such mixed questions of law and fact is permissible.  *Aspex Eyewear, Inc. v. E'Lite Optik, Inc.*, No. CIV.A.398CV2996D, 2002 U.S. Dist. LEXIS 14834, at *103 (N.D. Tex. Apr. 4, 2002) (citing *Askansase v. Fatjo*, 130 F.3d 657, 669 (5th Cir. 1997)).  Ex. 7.

Like DePuy Mitek, the Plaintiff in *Aspex* sought to exclude Defendant's patent lawyer expert.  *Id.* at *102.  The *Aspex* court, however, permitted the patent lawyer's testimony about "such mixed issues of fact and law as how to reconcile the court's actual claim construction with certain prior art and what that reconciliation might have to say about … infringement."  *Id.* at *103.  In making its decision, the *Aspex* court explained that the Federal Circuit "permits reliance on the competent expert testimony of patent lawyers as to the interplay between legal issues such as claim construction and the facts of a particular case."  *Id.* at *103 (citing *Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567, 1570 (Fed. Cir. 1984)).  The court also allowed legal testimony on the prosecution history, stating that "[s]uch factual or mixed

3

testimony has the potential to assist the trier of fact in understanding what happened when and who made certain statements and at what point, and therefore is admissible." *Id.* at *105.[2]

Likewise, in this case, Mr. Witherspoon, a patent lawyer, should be allowed to testify about such mixed questions of law and fact that must be addressed before the *jury* can reach a final conclusion. Mr. Witherspoon is permitted to testify "as to the interplay between legal issues such as claim construction and the facts of [this] case." *Id.* at *103. As DePuy Mitek can raise timely objections to purely legal issues, should they arise at trial, there is no legitimate concern that the jury will be unduly influenced by Mr. Witherspoon's testimony.

In addition, as explained above, Mr. Witherspoon may be required to testify to put DePuy Mitek's misleading testimony into proper context. For example, DePuy Mitek may present argument that aspects of the patent specification or the prosecution history support its theory. To rebut such argument, Mr. Witherspoon's testimony, which would relate to patent office practice and procedure and the factual information in the prosecution history, is undoubtedly admissible. *Pfizer Inc. v. Teva Pharms. USA, Inc.*, 2006 U.S. Dist. LEXIS 77966, at *6 (D.N.J. Oct. 26, 2006). Ex. 8. Mr. Witherspoon's testimony in response to DePuy Mitek's often misguided theories -- mixed issues of fact and law -- is equally admissible. *See Aspex Eyewear, Inc.*, 2002 U.S. Dist. LEXIS 14834 at *103-106.

In short, Mr. Witherspoon's testimony may well be required to assist the jury in reaching a just and correct result.[3] The jury's knowledge of the law is presumptively limited to

---

[2]    Little weight, if any, was given to the fact that the expert was a patent lawyer, rather than a person of ordinary skill in the relevant art, because the patent lawyer would address the factual issues "that must be addressed before the court can reach a final conclusion regarding the legal issues." *Aspex*, 2002 U.S. Dist. LEXIS 14834, at *105-106. That court found that timely objections at trial would be sufficient to remedy any impermissible testimony about purely legal issues. *Id.* at *104.

[3]    DePuy Mitek places undue weight on the preclusion of Mr. Witherspoon's testimony in *Revlon Consumer Prods. Corp. v. L'Oreal S.A., Cosmair, Inc.*, C.A. No. 96-192 MMS, 1997

the instructions given by the Court and any expert legal testimony proffered by the parties. The jury does not have the benefit of law clerks or independent research. The jury cannot direct the parties to brief them on the law. In a case such as this, where the legal issues are complex and the atmosphere is ripe for the presentation of esoteric, irrelevant argument by DePuy Mitek, Mr. Witherspoon should be permitted to clarify these arguments through expert legal testimony to aid the jury in their analysis of the facts. The result is particularly appropriate here because DePuy Mitek wants to keep the jury largely in the dark -- and its misguided arguments alive -- by providing the jury with only the most basic and barebones instructions on the law of "consisting essentially of."

## III.    DEPUY MITEK'S MOTION IS AT BEST PREMATURE AND OVERBROAD

It would be premature to preclude Defendants from offering Mr. Witherspoon's testimony by a pretrial *in limine* motion. Until DePuy Mitek has presented its case, Defendants cannot know the scope of Mr. Witherspoon's testimony necessary to aid the trier of fact in understanding the relevant issues in this case. To hold otherwise would give DePuy Mitek latitude to present their case with misleading arguments, like those discussed above, without fear that Defendants could present a witness in response. Such a result would undoubtedly cause unfair prejudice to Defendants.

DePuy Mitek does not attack Mr. Witherspoon's competence to testify as an expert in patent law, nor does it argue his methods are unreliable. Further, an attorney need not have specific expertise regarding the technical field involved in the litigation. *Reiffin v. Microsoft*

---

U.S. Dist. LEXIS 4117 (D. Del. Mar. 26, 1997). Ex. 9. The *Revlon* jury was given special interrogatories on the facts of materiality and intent and the court weighed the findings "in light of all the circumstances" and decided the ultimate question of inequitable conduct. *Id.* at *8. By contrast, in this case, mixed questions of law and fact will be presented to the jury. Moreover, DePuy Mitek conveniently forgets to inform the Court that the Revlon court *allowed* Mr. Witherspoon's testimony as to matters of PTO practice and procedure. *Id.* at *9.

DSMDB-2292775v02

*Corp.*, 270 F. Supp. 2d 1132, 1145 (N.D. Cal. 2003).  Defendants do not propose that Mr. Witherspoon testify as a person of ordinary skill in the relevant art, but as a patent lawyer addressing the factual issues that must be assessed before the jury can reach a final conclusion regarding the legal issues.  As the legal issues in this case are extraordinarily complex, Mr. Witherspoon's testimony will assist the jury and help clarify the issues.

"The line between an inadmissible legal conclusion and admissible assistance to the trier of fact in understanding the evidence or in determining a fact in issue is not always bright." *Burkhart,* 112 F.3d at 1212.  To the extent necessary, DePuy Mitek's counsel can object to any questions calling for a pure legal conclusion.  Further, any objections that DePuy Mitek has to Mr. Witherspoon's testimony under FED. R. EVID. 402 and 403 can be raised at trial.  Mr. Witherspoon should be permitted to assist the trier of fact in understanding the evidence and in determining the facts in issue.

## IV.    CONCLUSION

For the foregoing reasons, the DePuy Mitek's motion should be denied and Mr. Witherspoon's testimony allowed.

DSMDB-2292775v02

Dated: July 24, 2007

Respectfully submitted,

By:   **/s/Charles W. Saber**
Charles W. Saber
Stephen A. Soffen
Salvatore P. Tamburo
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, D.C.  20006-5403
Telephone:  (202) 420-3116
Facsimile:  (202) 420-2201

Christopher Weld, Jr. (BBO # 522230)
Raymond P. Ausrotas (BBO # 640315)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
Telephone:  (617) 720-2626
Facsimile:  (617) 227-5777

Counsel for Defendants
Arthrex, Inc. and Pearsalls Ltd.

DSMDB-2292775v02

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing DEFENDANTS

ARTHREX, INC.'S AND PEARSALLS LTD.'S OPPOSITION TO PLAINTIFF DEPUY

MITEK'S MOTION *IN LIMINE* (NO. 4) TO LIMIT THE TESTIMONY OF ARTHREX'S

PATENT LAW EXPERT, MR. WITHERSPOON was served, via the Court's email notification

system on the following counsel for Plaintiff on the 24th day of July 2007:


Lynn A. Malinoski
Woodcock Washburn, LLP
Cira Centre, 12th Floor
2929 Arch Street
Philadelphia, PA  19104-2891
Telephone: (215) 568-3100
Facsimile: (215) 568-3439

Daniel J. Gleason
Nutter McClennan & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
Telephone:  (617) 439-2000
Facsimile:  (617) 310-9000


                    **/s/Charles W. Saber**

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DePuy Mitek, Inc.<br>    a Massachusetts Corporation | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
|     v. | ) | Civil No. 04-12457 PBS |
| | ) | |
| Arthrex, Inc.<br>    a Delaware Corporation and | ) | |
| | ) | |
| Pearsalls Ltd.<br>    a Private Limited Company<br>    of the United Kingdom | ) | |
| | ) | |
|     Defendants. | ) | |
| | ) | |

**PROPOSED JOINT JURY INSTRUCTIONS ON THE INFRINGEMENT ISSUES**

**[SUBMITTED JULY 13, 2007]**

NOTE: THIS SET OF JURY INSTRUCTIONS IS PRELIMINARY IN NATURE AND THE PARTIES RESERVE THEIR RIGHTS TO MODIFY THESE INSTRUCTIONS AND/OR TO PROPOSE ADDITIONAL INSTRUCTIONS

THE PARTIES HAVE AGREED TO A MAJORITY OF THE INSTRUCTIONS. WHERE THERE IS A DISAGREEMENT ABOUT AN ENTIRE INSTRUCTION, THAT IS NOTED AND SEPARATE INSTRUCTIONS ARE PROVIDED IN COLORED TEXT, COMMENTS ARE INCLUDED. MITEK IN BLUE AND THE DEFENDANTS IN GREEN .

IF THERE IS A DISAGREEMENT ABOUT A PARTICULAR PORTION OF AN INSTRUCTION THAT IS ALSO NOTED IN DIFFERENT COLORED TEXT AND UNDERLINED, COMMENTS ARE INCLUDED. BLUE IS USED FOR MITEK AND GREEN IS USED FOR THE DEFENDANTS.

THE PARTIES ALSO RESERVE THE RIGHT TO MAKE ADDITIONAL OBJECTIONS TO THESE INSTRUCTIONS, INCLUDING OBJECTIONS DEPENDING ON THE EVIDENCE THAT IS INTRODUCED AT TRIAL.

NOTE: DUE TO COMPETING PROPOSALS FOR CERTAIN INSTRUCTIONS THERE ARE FORMATTING ISSUES WITH THE TABLE OF CONTENTS PROVIDED.

**THE PARTIES HAVE PROPOSED DIFFERENT INFRINGEMENT INSTRUCTIONS AND THEY ARE SET FORTH SEPARATELY IN THE PAGES THAT FOLLOW.**

**MITEK'S PROPOSED INSTRUCTIONS**

**DEFENDANTS' DISAGREE TO MITEK'S PROPOSED INSTRUCTIONS BECAUSE IT OMITS IMPORTANT INFORMATION NECESSARY FOR THE JURY TO UNDERSTAND HOW IT SHOULD APPLY THE LAW OF THE "CONSISTING ESSENTIALLY OF" TEST AND ALSO TO BETTER FRAME THE ISSUES FOR THE JURY**

### 2.3.3 "Consisting Essentially of" Claims

The beginning portion, or preamble, of claim 1 has the transition phrase "consisting essentially of." A claim that uses this language is not limited to only what is recited in the claim, but can include additional elements that do not materially affect the basic and novel characteristics of the invention.

Federal Circuit Bar Association Model Patent Jury Instruction 7.5; *AFG Indus., Inc. v. Cardinal IG Co.*, 239 F.3d 1239, 1245 (Fed. Cir. 2001); *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1354-55 (Fed. Cir. 1998); *Atlas Powder Co. v. DuPont de Nemours & Co.*, 750 F.2d 1569, 1573-74 (Fed. Cir. 1984).

**2.3.4  Direct Patent Infringement: Knowledge of Patent or Intent to Infringe
is Immaterial**

A patent's claims define what is covered by the patent.  Arthrex's FiberWire products directly infringe Mitek's Hunter Patent if those products are covered by at least one claim of the patent.

Deciding whether a claim has been directly infringed is a two-step process.  The first step is to decide the meaning of the patent claim.  I have already made this determination, and have instructed you as to the meaning of the claims.  The second step is to decide whether Arthrex or Pearsalls has made, use, sold, offered for sale, or imported within the United States a product covered by claims 1, 2, 8, 9, and 12 of Mitek's Hunter Patent.  You, the jury, must make this determination.

There are two ways in which a patent claim may be directly infringed.  A claim may be "literally" infringed, or it may be infringed under the "doctrine of equivalents."  The following instructions will provide more detail on these two types of direct infringement.

In this case, Mitek asserts that Arthrex has directly infringed the patent.  Arthrex would be liable for directly infringing Mitek's Hunter Patent if you find that Mitek has proven by a preponderance of the evidence that Arthrex has made, used, offered for sale, sold, or imported into the United States the invention defined in at least one claim of Mitek's Hunter Patent.

A person can directly infringe a patent without knowing that what he is doing is an infringement of the patent.  He may also infringe even though in good faith he believes that what he is doing is not an infringement of any patent.

Model Patent Jury Instructions for the Northern District of California, Instruction 3.2; AIPLA Model Patent Jury Instruction, Claim Construction and Infringement No. 5; 35 U.S.C. § 271(a) (1984 & Supp. 2001); *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 645 (1999); *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 36 (1997); *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1330-31 (Fed. Cir. 2001); *Seal-Flex, Inc. v. Athletic Track & Court Constr.*, 172 F.3d 836, 842 (Fed. Cir. 1999); *Carroll Touch, Inc. v. Electo-Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993); *Atl. Thermoplastics Co. v. Faytex Corp.*, 974 F.2d 1299, 1300 (Fed. Cir. 1992).

### 2.3.5   Direct Patent Infringement

Mitek contends that Arthrex's making, offering for sale, sale, and use of its FiberWire products directly infringe claims 1, 2, 8, 9, and 12 of Mitek's Hunter Patent. Mitek also contends that Pearsalls' making, offering for sale, use, and importation into the United States of the braids that are sold as FiberWire are contributing to the infringement of Mitek's Hunter Patent.

To prove infringement, Mitek must prove that it is more probable than not that the FiberWire products literally contain each and every limitation of claims 1, 2, 8, 9, or 12 of Mitek's Hunter Patent

Arthrex does not dispute that FiberWire has a braided construction of two different materials, as called for in the Hunter Patent claims. The FiberWire sutures also have a silicone coating. The Hunter Patent claims do not recite a coating.

The Hunter Patent claims use a phrase, "consisting essentially of," that has special legal meaning.

Here, it means that the claim may encompass sutures that include components that are not expressly listed in the claim provided those components do not materially affect the basic and novel properties of the invention. An effect on the basic and novel characteristics of an invention is "material" if the effect is of importance or of consequence to those of ordinary skill in the art.

You will need to consider the evidence and decide whether the silicone coating on FiberWire has a material effect on the basic and novel properties of the suture. Mitek contends that it does not have a material effect, and Arthrex contends that it does have a material effect.

I have defined what the "basic and novel properties" of the invention described in the Hunter Patent are. The are: (1) a surgical suture, (2) composed of two dissimilar yarns from the lists in Claim One (those yarns including a first set of yarns selected from the group of PTFE, FEP, PFA, PVDF, PETFE, PP and PE; and a second set of yarns selected from the group of PET, nylon and aramid), (3) where at least one yarn from the first set is in direct intertwining contact with the yarn from the second set, (4) so as to improve pliability and handleability without significantly sacrificing the physical properties of the constituent elements of the suture.

*AFG Indus., Inc. v. Cardinal IG Co.*, 239 F.3d 1239, 1245 (Fed. Cir. 2001); *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1354-55 (Fed. Cir. 1998); *Atlas Powder Co. v. DuPont de Nemours & Co.*, 750 F.2d 1569, 1573-74 (Fed. Cir. 1984);Order on Claim Construction at 12; Order on Claim Construction at 18-19.

## DEFENDANTS' PROPOSED INSTRUCTIONS

**MITEK DISAGREES WITH DEFENDANTS' PROPOSED JURY INSTRUCTIONS BECAUSE THEY ARE ARGUMENTATIVE, IN PART, AND ATTEMPT TO SUGGEST FACTS TO THE JURY.**

**MITEK FURTHER OBJECTS TO THE INSTRUCTIONS RELATING TO TIPPING AND REVERSE DOCTRINE OF EQUIVALENTS BECAUSE PER THE COURT'S INDICATION AT THE JUNE 19, 2007 HEARING, THOSE MATTERS ARE NOT PART OF THE CASE OR ARE NOT EXPECTED TO BE PART OF THE CASE TO BE TRIED.**

**DEFENDANTS BELIEVE THAT THE INSTRUCTIONS RELATING TO TIPPING AND REVERSE DOCTRINE OF EQUIVALENTS ARE APPROPRATE BECAUSE THE ISSUES REMAIN IN THE CASE.**

### 2.3.3  Direct Patent Infringement

A patent's claims define what is covered by the patent.  Arthrex's FiberWire products directly infringe  the Hunter 446 Patent if those products are covered by at least one claim of the patent.

Deciding whether a claim has been directly infringed is a two-step process.  The first step is to decide the meaning of the patent claim.  I have already made this determination, and have instructed you as to the meaning of the claims.  The second step is to decide whether Arthrex or Pearsalls has made, use, sold, offered for sale, or imported within the United States a product covered by claims 1, 2, 8, 9, and 12 of the Hunter 446 Patent.  You, the jury, must make this determination.

To prove infringement, Mitek must establish that the accused FiberWire suture includes each and every limitation of the claims of the Hunter 446 Patent.  In doing your analysis, you must keep in mind that the claims also include the phrase "consisting essentially of," which has a special legal meaning.  I will now instruct you on that special legal meaning and how it impacts your analysis of the evidence and your decision whether there is infringement.

Model Patent Jury Instructions for the Northern District of California, Instruction 3.2; AIPLA Model Patent Jury Instruction, Claim Construction and Infringement No. 5; 35 U.S.C. § 271(a) (1984 & Supp. 2001); *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 645 (1999); *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 36 (1997); *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1330-31 (Fed. Cir. 2001);  *Seal-Flex, Inc. v. Athletic Track & Court Constr.*, 172 F.3d 836, 842 (Fed. Cir. 1999);  *Carroll Touch, Inc. v. Electo-Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993); *Atl. Thermoplastics Co. v. Faytex Corp.*, 974 F.2d 1299, 1300 (Fed. Cir. 1992).

### 2.3.4   "Consisting Essentially of" Claims

The beginning portion, or preamble, of the Hunter 446 Patent claims use a phrase, "consisting essentially of." This phrase has a special legal meaning.

Here, it means that the claim may encompass FiberWire sutures that include ingredients that are not expressly listed in the claim, provided those ingredients do not materially affect the basic and novel properties of the invention. To say it another way, the FiberWire sutures do not infringe the claims of the Hunter 446 Patent if the added ingredient which is not listed in the claims materially affects the basic and novel properties of the invention.

In this case, Arthrex does not dispute that FiberWire has a braided construction of ultra-high molecular weight PE and PET – two materials that are recited in the Hunter 446 Patent claims as construed by the Court. Likewise, Mitek does not dispute that the FiberWire sutures also have a coating. The Hunter 446 Patent claims do not recite a coating.

A significant issue in this case is whether the coating on FiberWire materially affects the basic and novel properties of the suture. You will need to consider the evidence and decide whether the coating on FiberWire sutures has a material effect on the basic and novel properties of the suture. Mitek contends that it does not have a material effect and therefore FiberWire infringes the Hunter 446 Patent. Defendants contend that the coating does have a material effect on the basic and novel preparations and, therefore, FiberWire does not infringe the Hunter 446 Patent.

In deciding whether the coating on FiberWire suture products materially affects the basic and novel properties of the invention, please keep in mind that an effect is "material" if the effect is of importance of or consequence to those of ordinary skill in the surgical suture art.

I have defined what the "basic and novel properties" of the invention described in the Hunter 446 Patent are. They are: (1) a surgical suture, (2) composed of two dissimilar yarns from the lists in Claim One, (3) where at least one yarn from the first set is in direct intertwining contact with the yarn from the second set, (4) so as to improve pliability and handleability without significantly sacrificing the physical properties of the constituent elements of the suture.

Again, to summarize, it is up to you to decide based upon the evidence you heard, whether the coating included on Fiberwire sutures materially affects the basic and novel properties of the invention as I just read them to you.

*AFG Indus., Inc. v. Cardinal IG Co.*, 239 F.3d 1239, 1245 (Fed. Cir. 2001); *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1354-55 (Fed. Cir. 1998); *Atlas Powder Co. v. DuPont de Nemours & Co.*, 750 F.2d 1569, 1573-74 (Fed. Cir. 1984);Order on Claim Construction at 12; Order on Claim Construction at 18-19.

### 2.3.6.  Materially Affecting Basic and Novel Properties of the Invention

Although there are four separate parts to the basic and novel properties of the invention, there is only one which you need to be concerned with on the question of whether that property is materially affected by the coating added to FiberWire suture. That one property is the last one -- "so as to improve pliability and handleability without significantly sacrificing the physical properties of the constituent elements of the suture."

In determining whether the coating added to FiberWire materially affects the basic and novel properties of the invention, it does not matter whether you determine that the coating has an improving effect or a worsening effect on those properties. The only thing that matters in your analysis is whether the effect is a material one. If you decide that the effect is not material, then you should find that adding coating does not avoid infringement. If you decide that the effect is material, then you should find no infringement.

Even if you believe that most commercially available sutures contain a coating that should not impact on your analysis as to whether the coating added to FiberWire sutures materially affects the basic and novel properties of the invention. That is, the addition of coating to FiberWire may materially affect the basic and novel properties of the Hunter 446 Patent even though most commercial sutures contain a coating. This is due to the legal effect of the "consisting essentially of" language included in the Hunter 446 Patent claims.

Finally, in determining whether the coating on FiberWire materially affects the basic and novel properties of the Hunter 446 Patent, it is not necessary that the coating eliminate other limitations of the claim, such as whether the coating changes the nature of the other materials in the suture or prevents the suture from being braided in "direct intertwining contact." Such a requirement would be contrary to law. Rather, all you should decide is whether the FiberWire coating materially affects the basic and novel properties under the test that I have explained to you.

*PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1354 (Fed. Cir. 1998); *AFG Indus., Inc. v. Cardinal IG Comp., Inc.*, 239 F.3d 1239, 1252 (Fed. Cir. 2001); Transcript of *Markman* Hearing (Sept. 26, 2006) at 16:6-17:1.

# Exhibit 2

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DePUY MITEK, INC.,                )
a Massachusetts Corporation       )
                                  )
          Plaintiff               )
                                  )
     -VS-                         ) CA No. 04-12457-PBS
                                  ) Pages 1 - 87
ARTHREX, INC.,                    )
a Delaware Corporation, et al,)
                                  )
          Defendant               )


MARKMAN HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:

    DIANNE B. ELDERKIN, ESQ., LYNN A. MALINOSKI, ESQ., and
MICHAEL J. BONELLA, ESQ., Woodcock Washburn, One Liberty
Place, 47th Floor, Philadelphia, Pennsylvania, 19103,
for the Plaintiff.

    CHARLES W. SABER, ESQ. and SALVATORE P. TAMBURO, ESQ.,
Dickstein Shapiro, LLP, 1825 Eye Street, N.W., Washington,
D.C., 20006-5403, for the Defendants.

                         United States District Court
                         1 Courthouse Way, Courtroom 19
                         Boston, Massachusetts
                         September 26, 2006, 2:00 p.m.


LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1 talking about the coatings, right?

2          MS. ELDERKIN:  Right.

3          THE COURT:  And the coatings make it more slippery,

4 maybe.

5          MS. ELDERKIN:  Purportedly, maybe.

6          THE COURT:  Okay, and lubricous.  So they

7 essentially enhance the invention.

8          MS. ELDERKIN:  Right.

9          THE COURT:  All right?  So originally I had thought

10 "materially affect the novel and basic characteristics"

11 meant somehow change them.  You used the word "alter," and

12 one case uses the word "alter," but the case law doesn't

13 consistently use the word "alter."  They usually use the word

14 "materially affect."

15          MS. ELDERKIN:  Materially affect, right.

16          THE COURT:  So if it significantly improves on the

17 invention, materially improves on, let's say, the

18 flexibility, would that be improving the novel and basic

19 characteristics?

20          MS. ELDERKIN:  Well, it's obviously so

21 fact-intensive; you know, how much change is there, how much

22 alteration?

23          THE COURT:  But if it's materially improved, you'd

24 say that that fell within this "consisting essentially of,"

25 even if it's not a detracting from?

1          MS. ELDERKIN:  It certainly could.  And a lot

2 obviously depends on, what are those novel and basic

3 characteristics?  Now, Arthrex argues that those

4 characteristics are flexibility, handleability, and not

5 diminishing the strength of the suture.  But our position is

6 that that is much too narrow a definition, that the basic and

7 novel characteristics of this invention encompass this

8 concept that I discussed earlier about mechanical blending of

9 the properties of the two discrete sets of yarns.

10          Now, it may very well be that the effects of those

11 yarns, one enhances pliability and one enhances strength, but

12 the patent specification is not limited to that.  The

13 preferred embodiments are talked about in terms of, well, gee

14 in some preferred embodiments, you might take a weak material

15 that's slippery or lubricous and --

16          THE COURT:  Well, is there evidence that just the

17 yarn piece of it, you know, the braiding of the yarn, is

18 novel and basic?

19          MS. ELDERKIN:  That the braiding of the yarn --

20          THE COURT:  In other words, what makes this novel,

21 this invention?

22          MS. ELDERKIN:  Well, I don't mean to be trite, but

23 everything in the claim, which is the concept of a braided

24 construction, two discrete yarns.

25          THE COURT:  So no suture before it ever had that?

# Exhibit 3

339

1          UNITED STATES DISTRICT COURT

2          DISTRICT OF MASSACHUSETTS

3            C.A. NO. 04-12457 PBS

4    ————————————————————————x

5    DePUY-MITEK, INC.,

6        A Massachusetts Corporation,

7            Plaintiff,

8        vs.

9    ARTHREX, INC.,

10       A Delaware Corporation,

11           Defendants.

12   ————————————————————————x

13

14            DAY 2 OF 2

15   DEPOSITION OF DR. DAVID S. BROOKSTEIN

16       Philadelphia, Pennsylvania

17          July 27, 2006

18

19

20   Reported by:

21

22   PAMELA HARRISON, RMR, CRR, CSR

**7/27/2006  Brookstein, David**

| | | |
|---|---|---|
| 1 | A.    It is my opinion that if the coating | 10:24:09a |
| 2 | in some miraculous way made those materials not | 10:24:11a |
| 3 | yarns anymore and they were no -- they were not | 10:24:15a |
| 4 | dissimilar anymore, that that would be a change. | 10:24:17a |
| 5 | If all of a sudden what was once a set of two | 10:24:22a |
| 6 | dissimilar yarns miraculously became, for | 10:24:26a |
| 7 | instance, a monofilament, that would be a change, | 10:24:29a |
| 8 | yeah. | 10:24:31a |
| 9 | Q.    And that would affect the basic and | 10:24:32a |
| 10 | novel characteristics? | 10:24:33a |
| 11 | A.    If the basic and novel characteristics | 10:24:34a |
| 12 | are two dissimilar yarns, yes, and all of a | 10:24:35a |
| 13 | sudden there weren't yarns in there anymore, it | 10:24:38a |
| 14 | was some new material that was -- that we don't | 10:24:41a |
| 15 | know about. | 10:24:43a |
| 16 | Q.    Or the yarns were the same yarns, made | 10:24:44a |
| 17 | the yarns into the same yarns? | 10:24:46a |
| 18 | A.    If they were not dissimilar, right. | 10:24:48a |
| 19 | Q.    Right.  So is it your opinion that if | 10:24:49a |
| 20 | the coating does not -- does not achieve the goal | 10:24:54a |
| 21 | that you just described, then it does not affect | 10:25:00a |
| 22 | the basic and novel characteristics of the | 10:25:02a |
| 23 | invention as Dr. Mukherjee defines it? | 10:25:05a |
| 24 | A.    Can you repeat the question. | 10:25:07a |
| 25 | Q.    Yeah, let me try and rephrase it. | 10:25:08a |

7/27/2006  Brookstein, David

| | | |
|---|---|---|
| 1 | Is it your opinion that the | 10:25:12a |
| 2 | coating -- if the coating does not transform | 10:25:15a |
| 3 | the braided material into another structure, | 10:25:20a |
| 4 | would you -- let me ask it this way.  What do | 10:25:24a |
| 5 | you mean when you say transform the braided | 10:25:27a |
| 6 | FiberWire materials into another structure? | 10:25:30a |
| 7 | A.    What do I mean? | 10:25:32a |
| 8 | Q.    Yes. | 10:25:33a |
| 9 | A.    I mean it's not dissimilar yarns | 10:25:34a |
| 10 | anymore, that would be an example of what I | 10:25:36a |
| 11 | mean.  That all of a sudden you had a set from A, | 10:25:38a |
| 12 | a set from B and now it was some magical | 10:25:41a |
| 13 | structure that wasn't yarns, it wasn't two sets, | 10:25:45a |
| 14 | they were all the same, that would be a | 10:25:48a |
| 15 | transformation. | 10:25:50a |
| 16 | Q.    Okay. | 10:25:52a |
| 17 | A.    It would be alchemy, but it would be a | 10:25:52a |
| 18 | transformation. | 10:25:56a |
| 19 | Q.    Okay.  If that transformation doesn't | 10:25:56a |
| 20 | occur by the coating, then is it your opinion | 10:25:58a |
| 21 | that the coating doesn't affect the basic and | 10:26:01a |
| 22 | novel characteristics of the invention? | 10:26:02a |
| 23 | MR. BONELLA:  Objection. | 10:26:04a |
| 24 | THE WITNESS:  That's not what I | 10:26:04a |
| 25 | said. | 10:26:05a |

# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DePuy Mitek, Inc.<br>a Massachusetts Corporation<br><br>Plaintiff,<br><br>v.<br><br>Arthrex, Inc.<br>a Delaware Corporation<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 04-12457 PBS |

## EXPERT REPORT OF JOHN F. WITHERSPOON
## WITH RESPECT TO ISSUES OF INFRINGEMENT

### INTRODUCTION

I am the same John F. Witherspoon who submitted an Expert Report in this litigation on March 3, 2006, with respect to issues on which the defendant Arthrex has the burden of proof, which report I incorporate herein by reference. I understand that I may also be called to present expert testimony at trial regarding issues of infringement, including willful infringement, and I have been asked to prepare a report with respect to that possible testimony.

I continue to reserve the right to file a report in rebuttal to those filed on behalf of the plaintiff, as well as the right to supplement my report(s) so as to accommodate the discovery of any additional information that may impact my testimony and opinions.

The bases for my testimony and opinions in this report are the materials identified in paragraphs 11 and 12 of my March 3 report, plus the following additional materials that I have now considered.

a) Expert Report of Martin J. O'Donnell dated March 3, 2006;

b) Expert Report of Dr. David Brookstein dated March 3, 2006;

c) Transcript of deposition testimony of Stephen A. Soffen given on January 4, 2006;

d) Transcript of deposition testimony of John Schmieding given on May 5, 2005, August 24, 2005 and January 5, 2006;

e) Transcript of 30(b)(6) Deposition of E. Richard Skula given on February 10, 2006;

f) Documents bearing Bates Nos. ARM 24283-407 and 24772-801;

g) Discussion with John Schmieding;

h) Discussion with Dr. Debi Prasad Mukherjee; and

i) Responsive Expert Report of Dr. Debi Prasad Mukherjee Concerning Non-Infringement of U.S. Patent No. 5,314,446 and Other Matters.

## GENERAL CONSIDERATIONS

1.  A claim of a patent may be infringed either literally or under the doctrine of equivalents. Literal infringement requires that an accused process, machine, manufacture or composition of matter (hereinafter collectively "product") possess every element or limitation of a given claim. The doctrine of equivalents permits a finding of infringement even where one or more limitations of a claim is not literally present in an accused product. Thus, infringement requires that each element or limitation of a claim be present either literally or equivalently in an accused product. This is sometimes called the "all elements" rule.

2

2.    Determining infringement entails a two-step analysis—first, a claim must be construed and then the properly construed claim is compared with the accused product. With respect to the first step, a claim must be interpreted in light of its language, other claims in the patent, the specification of the patent, and the prosecution history of the patent. Interpreting a claim in light of the specification should be distinguished from reading a limitation from the specification into the claim. That is, the specification can be used to interpret the meaning of terms in a claim, but cannot be used to read a limitation into the claim. The scope of a claim is normally not limited to the specific embodiment or embodiments disclosed in the specification and drawings. The prosecution history also may affect the meaning of a term in a claim. A claim must be interpreted the same way for purposes of validity and for purposes of infringement.

3.    With respect to the second step, a common practice for determining literal infringement is to carry out a "read on" test. This exercise entails reading the claim from beginning to end, but interrupting the reading after each element or limitation to ask: is this element or limitation present in the accused product? If upon completing the exercise, the answer to every question is "yes," then the claim is literally infringed. If any one answer is "no," then literal infringement does not exist.

4.    If the difference between a claim element and a corresponding element of an accused product is insubstantial, then infringement under the doctrine of equivalents may exist. In practice, this may be shown in any of a number of ways. For example, the element in question in the accused product may be shown to perform substantially the same function, in substantially the same way, to obtain substantially the same result as the element of interest in the claim. Evidence of the known interchangeability of the

3

element of interest in the claim with the element in question in the accused product is also relevant, as is evidence of copying. It is inappropriate to apply the doctrine of equivalents in such a way as to vitiate an element or limitation in a claim.

5. Application of the doctrine of equivalents is sometimes limited by a countervailing doctrine, known as prosecution history estoppel. This doctrine, simply stated, is that a patentee cannot assert a scope of protection under the doctrine of equivalents that is inconsistent with amendments, statements or arguments made by an applicant in the PTO. The public is entitled to rely on the prosecution history in deciding whether a given product is or is not outside the coverage of the patent. Application of the doctrine of equivalents is also limited by the prior art, *i.e.,* the range of equivalents cannot be extended to cover a product that is not patentable over the prior art.

6. Amending a claim to narrow its scope for a reason relating to patentability (for example, to overcome a rejection based on prior art) may give rise to prosecution history estoppel. An applicant's decision to narrow her claims through amendment is presumed to be a general disclaimer by the applicant of all subject matter encompassed by the original claim, but not encompassed by the amended claim. A patentee can overcome this presumption only by establishing (1) that the equivalent was unforeseeable at the time the application was filed, (2) that the rationale underlying the amendment bears no more than a tangential relation to the equivalent in question, or (3) that there is some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question.

7. Another doctrine, known as the "reverse doctrine of equivalents," applies in the situation where an accused product literally contains every element or limitation set forth in

4

a claim, but the product functions in accordance with a different mode of operation than what is described in the patent. Under those circumstances, the accused product is deemed under the reverse doctrine of equivalents not to be an infringing product.

8.    The kind of infringement discussed above is known as "direct" infringement. Infringement can also be "indirect". Indirect infringement may occur in one of two ways: (1) by actively inducing another to infringe a claim of a patent, *e.g.,* a manufacturer instructing a customer to use a product in a particular way, which, if done, would result in a direct infringement, and (2) by contributorily infringing the claim of a patent, *e.g.,* by selling a component of a patented product constituting a material part of the product, knowing the component to be especially made for use in an infringement of a claim of the patent, and which is not a staple article or commodity of commerce suitable for substantial non-infringing use. Whoever actively induces infringement is liable as an "infringer"; whoever engages in the second type of activity mentioned above is liable as a "contributory infringer."

9.    The concept of "willful infringement" is based on the notion that a party found to be an infringer did so with an intentional disregard of legal rights. The determination of willfulness must take into account the totality of the circumstances, which usually includes many factors that are evaluated and weighed by the trier of fact. Infringement is recognized as resulting from activity ranging from the unknowing or accidental to the deliberate or reckless disregard of a patentee's legal rights. Willful infringement focuses on the upper portion of that range. It must be proved by clear and convincing evidence.

10.    The phrase "consisting essentially of" in the transitional part of a claim closes the claim to the named elements that are recited in the claim and allows only for the

5

inclusion of non-recited elements or materials that do not materially affect the basic and novel characteristics of the invention. The material effect can be either beneficial or detrimental. The term "comprising" leaves a claim open to the inclusion of elements that are not expressly recited in the claim. Therefore, amending a claim by replacing the word "comprising" with the phrase "consisting essentially of" is a narrowing amendment and, when made for a reason relating to patentability, may give rise to prosecution history estoppel. The fact that an element or material is disclosed in the specification does not necessarily mean that it does not materially affect the basic and novel characteristics of the invention. The question must still be resolved as to whether in fact it materially affects the basic and novel characteristics of the invention. Thus, the discussion in paragraph 37 of Dr. Brookstein's report is based on an erroneous understanding of the law.

11. It is not unusual for an applicant not to claim all of the subject matter disclosed in the specification. Sometimes claims filed with the original application themselves do not cover all of the disclosed subject matter. Very frequently amendments made during prosecution limit a claim such that it does not cover subject matter disclosed in the specification.

12. Sometimes the body of a claim contains a so-called "Markush" expression. A Markush expression occurs most frequently in claims directed to chemical subject matter and is employed in a situation where alternative materials or ingredients (*e.g.,* ingredients A, B or C) are sought to be recited in a claim, but no generic term embracing these ingredients exists in the art. Under such circumstances, the drafter of the claim is permitted to recite language taking the form of: "a member [or similar language] selected

6

from the group consisting of A, B and C." This kind of language has come to be known as a "Markush" expression since it reflects a practice authorized by a 1925 decision of the Commissioner of Patents involving an application filed by an inventor named Markush. Amending a claim to ins ert a Markush expression usually amounts to a narrowing of the claim and, when this is done for a reason relating to patentability, the amendment may give rise to prosecution history estoppel.

## SPECIFIC CONSIDERATIONS

**Claim Construction**

13. I understand that the parties disagree about whether the term "PE" in the asserted claims covers UHMWPE, and that the Court will resolve this dispute. One valid reason for the Court not to construe PE to encompass UHMWPE can be found in the prosecution history of the '446 patent. As explained in my March 3 report, in an Amendment mailed to the PTO on August 6, 1992, the applicants argued that their claimed suture was totally different from the fishing line disclosed in the Burgess prior art reference, upon which the examiner had rejected the applicants' claims, because the braided combination of UHMWPE and polyester in Burgess would be an "unacceptable suture" and have "poor knot strength properties." Because of these arguments, the public would be entitled to conclude that PE in the applicants' claims was not intended to include UHMWPE.

14. I also understand that the parties disagree as to what constitutes the basic and novel characteristics of the claimed invention, *i.e.,* the scope of the expression "consisting essentially of."

7

**No Infringement**

15. If the Court construes PE not to include UHMWPE, then no claim is literally infringed by the FiberWire, TigerWire and FiberStick products for that reason alone. Nor would any claim be infringed under the doctrine of equivalents, because the differences in properties between UHMWPE and other materials in the first fiber-forming group are substantial. My testimony in this regard would be based upon the expected testimony of Dr. Mukherjee, as set forth in his report. Moreover, the prosecution history discussed in paragraph 13, *supra*, gives rise to an estoppel by argument with respect to UHMWPE, because the applicants made this argument to successfully overcome a prior art rejection.

16. In an Amendment mailed on August 4, 1993, the applicants deleted the word "comprising" and inserted the language "consisting essentially of." The applicants also amended their claims to require that each yarn from the first set is composed of filaments of "a first fiber-forming material selected from the group consisting of PTFE, FEP, PFA, PVDF, PETFE, PP and PE," and that each yarn from the second set is composed of filaments of "a second fiber-forming material selected from the group consisting of PET, nylon and aramid." These amendments are all narrowing amendments made to overcome rejections on prior art. Therefore, the applicants' decision to do so is presumed to be a general disclaimer of all subject matter covered by the unamended claims, but not covered by the amended claims. FiberWire, TigerWire and FiberStick are such products. The presumption is conclusive, unless the plaintiff can establish that one of the three conditions set forth in paragraph 6, *supra,* applies, and I do not presently understand that any of these conditions does apply.

17. As I explained above, the language "consisting essentially of" excludes the presence of a non-recited component which materially affects the basic and novel characteristics of the invention. I understand that the coating on FiberWire, TigerWire and FiberStick is such a component, and for this additional reason these products do not infringe. Further, I understand that the nylon in TigerWire is such a component, and constitutes yet another reason as to why this product does not infringe. Finally, I understand that the adhesive on FiberStick is such a component, and constitutes yet another reason as to why this product does not infringe. My opinions in this regard are based upon the expected testimony of Dr. Mukherjee, as set forth in his report.

18. I understand that Pearsalls only makes a braid, but not a suture as required by the claims of the '446 patent. I also understand that the braid itself is suitable for a substantial non-infringing use. Therefore, Pearsalls cannot properly be found to be a contributory infringer. My opinion in this regard is based upon the expected testimony of Dr. Mukherjee, as set forth in his report.

19. Further, if the Court construes PE to include UHMWPE, no claim is infringed by FiberWire, TigerWire or FiberStick by reason of the reverse doctrine of equivalents. I understand that these products function in a fundamentally different way than the teachings of the '446 patent. My opinion in this regard is based upon the expected testimony of Dr. Mukherjee, as set forth in his report.

**No Willful Infringement**

20. The extensive discussions between Mr. Soffen and representatives of Arthrex, after becoming aware of the '446 patent, clearly show that it was reasonable for Arthrex's management to continue its then ongoing FiberWire suture business, and that a

9

decision to do so does not amount to willful infringement. My reasons for this conclusion are set forth in the discussion below (wherein exhibit citations are to plaintiff's exhibits, unless otherwise indicated).

21. Mr. Skula, counsel for Johnson & Johnson, advised Mr. Soffen, counsel for Arthrex, of the existence of the '446 patent by telephone on December 1, 2003, and sent him a copy of the patent by letter dated that same day. Exh. 243.

22. Mr. Soffen advised John Schmieding, Arthrex's general counsel, of Mr. Skula's communication also on that day. Mr. Soffen indicated that he had not had a chance to review the patent, but that he had ordered its file history. Exh. 244. This was the beginning of a series of extensive communications, by e-mail and by telephone, between Mr. Soffen and Mr. Schmieding over the next several months. Mr. Grafton, Arthrex's then Head of Engineering and an inventor of FiberWire, was copied on many of these communications and in some instances participated in the discussions. Mr. Soffen also communicated with Mr. Skula on several occasions during this time period. Exh. 244.

23. On the very next day, Mr. Soffen sent an e-mail to Mr. Schmieding and Mr. Grafton reporting that he had undertaken an initial review of the patent that morning and went on to make a number of points that bear directly on the question of infringement. Thus, Mr. Soffen pointed out that claim 1 (the only independent claim in the patent) contained the language "consisting essentially of." He explained the legal definition of that language. He explained how this language is important in the consideration of whether the claim covers FiberWire, if FiberWire has a silicone coating,

which he understood to be the case, but which he asked Mr. Grafton to confirm. Exh. 245.

24. Later that day, Mr. Grafton sent an e-mail to Messrs. Soffen and Schmieding setting forth some of his thoughts about the '446 patent and how FiberWire is different. He also indicated that he was contacting Pearsalls in order to identify possible additional prior art. Exh. 246.

25. Two days later, on December 4, 2003, Mr. Soffen reported to Messrs. Schmieding and Grafton that his associate, Mr. McGee, had uncovered the Silvestrini patent "in the course of conducting a validity search on Ethicon Patent No. 5,314,446." A copy of Silvestrini was attached. Mr. Soffen reported that, apart from the fact that Silvestrini discloses a prosthesis, rather than a suture, the Silvestrini disclosure "meets the recited elements of claim 1" of the '446 patent. He demonstrated this in a claim chart attached to his e-mail. Mr. Soffen explained that a core is not required by claim 1. Exhs. 248 and 249.

26. On December 5, Mr. Soffen e-mailed Messrs. Schmieding and Grafton with an updated search report. He pointed out also that he needed to review the file history of the '446 patent. This was followed up by an e-mail on December 9 in which Mr. Soffen forwarded a memo prepared by Mr. McGee regarding the file history. Exh. 251.

27. On December 11, Mr. Soffen sent an e-mail to a Mr. Ellis, with a copy to Messrs. Schmieding and Grafton, thanking Mr. Ellis for the time in discussing matters involving a validity study of the '446 patent. Exh. 252.

28. On December 15, Mr. Soffen sent a letter to Mr. Skula acknowledging Mr. Skula's letter of December 1 and asked for documentation evidencing the date of

11

invention of the subject matter in the '446 patent in order that he might "accurately and fully evaluate" another reference, a U.S. patent to Chesterfield which has a filing date 16 days before the filing date of the '446 patent. Mr. Skula had access to such evidence. Exh. 253.

29. On December 23, Mr. Soffen reported to Messrs. Schmieding and Grafton that he had spoken to Mr. Skula that day to remind him that he was awaiting a response with respect to Chesterfield. He also reported to the client justification for "a strong position on non-infringement by relying upon the inclusion of a coating in FiberWire." In doing so, Mr. Soffen called attention to the fact that the claims of the '446 patent recite "consisting essentially of." In the e-mail Mr. Soffen also explained his understanding of what the '446 patent had to say about coatings. Exh. 254.

30. On January 5, 2004, Mr. Grafton responded by saying that he understood Mr. Soffen's "logic" and that it "sounds like a good additional avenue to pursue." A copy of the e-mail was sent to Mr. Schmieding. Exh. 255.

31. On January 9, Mr. Soffen wrote Mr. Skula to explain that he had now reviewed the file history and that, apart from the validity issue raised in his earlier letter of December 15 relating to the Chesterfield patent, he had determined that FiberWire does not infringe "because, among other reasons, it includes a coating (specifically a silicone coating)." Mr. Soffen elaborated on his thinking in this regard. Exh. 256.

32. On January 13, Mr. Soffen sent an e-mail to Messrs. Schmieding and Grafton. Exh. 260. It reads as follows:

> I spoke with Don G. this afternoon. Don is going to get samples of FiberWire from Pearsalls with and without the silicone coating, so that we can demonstrate that the coating affects the "basic and novel properties" (friction/pliability) of the suture.

33. By letter dated January 16, Mr. Skula told Mr. Soffen that Ethicon continues to assert infringement, notwithstanding the arguments presented in Mr. Soffen's letter of January 9. Mr. Skula explained that he also disagreed with Mr. Soffen's reading of the '446 patent. In addition, Mr. Skula said that "Ethicon has written documentation, which I have reviewed, that establishes a date of invention prior to the February 2, 1992 filing date of the Chesterfield patent." Finally, Mr. Skula stated, without explanation, that he believed that the disclosure of Chesterfield does not render the '446 patent invalid. Exh. 261.

34. On January 20, Mr. Soffen sent an e-mail to Mr. Schmieding, with copies to Messrs. Grafton, Price, and R. Schmieding, in which he forwarded a copy of Mr. Skula's January 16 letter. Mr. Soffen made two points. First, that although "obviously not reflected in his letter, Rich acknowledged orally to me that he understood Arthrex's position, and that the parties had a legitimate dispute (*i.e.,* he doesn't consider our position totally meritless)." Second, Mr. Soffen explained that

> The statement in Rich's letter that the disclosure of the Chesterfield patent, if prior art, does not render the Ethicon patent invalid is curious (perhaps overreaching), since the FiberWire structure is very close to the structure disclosed in the Chesterfield patent (although it does not infringe the claims, for reasons stated previously).

Mr. Soffen concluded the e-mail by saying that "We can discuss this at our meeting tomorrow afternoon." Later that day, Mr. Schmieding sent a return e-mail to Mr. Soffen to advise him that he had some coated and non-coated samples and that he would hold them until a decision is reached about testing. Mr. Schmieding called Mr. Soffen's attention to the fact that the DFU for FiberWire says "the coating acts as a lubricant for suture sliding, knot tying, and ease of passing suture through tissue." Exh. 262.

13

35. On January 22, Mr. Soffen sent an e-mail to Mr. Schmieding, with a copy to Messrs. Grafton, Price and R. Schmieding. ARM 24328. The first paragraph reads:

> When I spoke with Rich this evening, he asked me where Arthrex stood on the FiberWire infringement issue. I responded that Arthrex was arranging for tests to be conducted to quantify the effect of the coating on the "basic and novel properties" of the FiberWire suture, and that we expected to be able to get back to him in about three weeks. He accepted this as a valid course of action, and told me that he would report it to Ethicon.

36. On January 27, Mr. John Schmieding sent an e-mail to Mr. Soffen with some patents that he had found. He briefly discussed each patent. The e-mail was forwarded to Mr. McGee, and on January 29 Mr. McGee sent an e-mail to Mr. Soffen commenting on the patents. Mr. McGee's comments were forwarded to Mr. Schmieding. Exh. 263.

37. On February 3, Mr. Soffen sent an e-mail to Messrs. Schmieding and Grafton informing them that Mr. Skula "called today" for an update as to when Arthrex expects to receive the results of the FiberWire coating test. He went on to say:

> On the one hand, Rich states that Ethicon is anxious for the test results, and on the other hand, Rich states that Ethicon is convinced that the coating is meaningless since FiberWire has a heterogenous braid which serves the purpose and function stated in the patent. Rich emphasized that Ethicon is putting considerable pressure on him to push the matter along.

Mr. Grafton replied that he did not expect the results to be completed until late the next week, and Mr. Soffen said that would be fine. Also, Mr. Soffen asked Mr. Grafton that he be advised as to how the test is to be conducted in order that he could confirm that it would serve the purpose with respect to comparing the FiberWire coating to the claims of the '446 patent. Exh. 265.

38. On February 3, Mr. Soffen sent an e-mail to Mr. Schmieding, with a copy to Mr. McGee, in which Mr. Soffen explained the pertinence of the disclosure of the

14

Silvestrini reference, and indicated that he would order a copy of the thesis mentioned on the first page of the patent. Exh. 268.

39. On February 4, Mr. Soffen advised Mr. Skula, in response to Mr. Skula's status inquiry the day before, that he had been told that Arthrex expects that the FiberWire testing will be completed by the end of the following week. ARM 24295. The e-mail also said:

> As discussed, the tests are designed to determine whether the coating on FiberWire suture affects the "basic and novel properties" of the suture as claimed in the Ethicon patent at issue. We believe that, under the relevant case law, test results showing that the coating affects these properties would be highly significant, indeed determinative, with respect to the issue of infringement in light of the "consisting essentially of" language which was inserted in the claims of the Ethicon patent during prosecution.

40. On February 11, Mr. Grafton sent an e-mail to Mr. Soffen saying that "we are seeing a significant difference in our testing of coated versus non-coated FiberWire coefficient of friction. We had to tweak our test but it looks very good. We should have the report ready to send you by Friday." ARM 24294.

41. On February 13, Mr. Soffen e-mailed Mr. Skula to tell him that the test on the FiberWire product had been completed and that "the results as to the effect of the coating" are compelling. He also said that Arthrex will be sending him a report the following week, together with samples of the coated and uncoated suture. Further, Mr. Soffen advised Mr. Skula that samples of the suture had been sent for testing by a surgeon in a surgical environment. Exh. 269.

42. On February 20, Mr. Soffen wrote Mr. Skula enclosing a copy of the protocol and the results of the test conducted by Arthrex. He enclosed samples of the suture, both coated and uncoated, that were tested. He explained the test results and how those results

relate to the significance of the language "consisting essentially of" in the claims of the '446 patent. He also discussed the specification of the '446 patent and why "the braided strands of the Arthrex suture act in a reverse manner to the functions described in the specification…" Finally, Mr. Soffen reminded Mr. Skula that the braid in the FiberWire suture is similar to that described in Chesterfield and that even if Ethicon has evidence establishing a date of invention prior to the filing date of Chesterfield, which had not yet been provided, "there remains an issue of validity under 35 U.S.C. 102(g)." Mr. Soffen went on to say: "Based upon U.S. Surgical's earlier filing date, we assume that U.S. Surgical has an earlier date of invention, absent evidence to the contrary (and Ethicon has provided none)." Exh. 267.

43. On February 23, Mr. Soffen forwarded a copy of his February 20 letter to Mr. Skula to Messrs. Schmieding and Grafton. ARM 24286.

44. On March 4, Mr. Skula faxed Mr. Soffen a letter indicating that he had received the test results and arguments and that, although "your position is made clear, Mitek has not changed its position that the Arthrex FiberWire product is covered by the claims of the Hunter *et al.* patent." ARM 24285. Mr. Soffen then sent an e-mail to Messrs. Schmieding and Grafton with a copy of Mr. Skula's letter. ARM 24284.

45. In order to fully understand the significance and context of the communications described above, it is important to recognize several additional facts. Arthrex had received and relied on legal advice of Mr. Soffen on patent matters for many years. The advice was sometimes favorable and sometimes unfavorable to Arthrex's interests. Mr. Soffen visited the Arthrex facility and met with Arthrex's management frequently. He talked with Mr. Schmieding almost daily. Historically, much of the legal

16

advice that Arthrex receives from Mr. Soffen and relies on in the conduct of its affairs is not communicated in written form. Therefore, it is not surprising that oral communications and a series of e-mails formed the basis of Mr. Soffen's advice and were relied on by Arthrex in this matter.

46. Summarizing, upon learning of the '446 patent, Arthrex and its outside patent counsel of many years, Mr. Soffen, undertook an in depth investigation as to whether the patent was valid and infringed. The investigation began promptly. Mr. Soffen reviewed the patent and reported his initial thoughts to Arthrex within a matter of hours. He immediately ordered the file history. He immediately undertook a search of the prior art. He uncovered a very close reference, the Silvetrini reference, and laid out a claim chart for the client demonstrating its pertinence. The chart showed that all of the elements of claim 1 were disclosed except for a suture. The reference disclosed a prosthesis. Mr. Soffen uncovered another very good reference, the Chesterfield reference, but cautioned Arthrex that Chesterfield might be subject to being antedated. Mr. Soffen recognized the pertinent statutory basis upon which Chesterfield could qualify as prior art, *viz.*, 102(e) and 102(g). Mr. Soffen sought to ascertain facts as to a possible antedation by contacting Mr. Skula, who had access to those facts. Mr. Skula was not forthcoming, other than to say that he had reviewed evidence establishing that Chesterfield could be antedated.[*] No evidence was provided Mr. Soffen, however, either at that time or at any time prior to bringing this litigation, even though Mr. Soffen offered to hold the information in confidence. Mr. Soffen studied the prosecution history and explained to Arthrex the significance of certain amendments with respect to non-

---

[*] If Mr. Skula had in mind the evidence that I reviewed in the preparation of my March 3 report, he had an insufficient basis for making this representation.

17

infringement.   Mr. Soffen recognized the importance of the language "consisting essentially of" in the claims, and explained its meaning to Arthrex.  Arthrex conducted tests to demonstrate that the coating affects the basic and novel properties of its FiberWire suture.  The test results and protocol were sent to Mr. Skula.  Mr. Skula said they were unpersuasive.  All of this activity took place as part of an ongoing process entailing numerous discussions and reports, by telephone and by e-mail, between Mr. Soffen, Mr. Schmieding and/or Mr. Grafton over a period of several months.  T he dialogue involved matters relating to both validity and infringement.  The investigation was directed by an experienced, outside patent counsel  It was prompt.  It was thorough. It was legally sound.  It resulted in three separate grounds upon which Arthrex had good reason to believe that it was not infringing a valid patent.   The evidence, viewed as a whole, demonstrates the antithesis of willfulness.

47. Mr. O'Donnell's report neither recognizes nor discusses the vast majority of the evidence discussed in paragraphs 20-45, *supra*.  It is an incomplete analysis.  It fails to consider the totality of the circumstances, as required by law, and arrives at a wrong conclusion.


**EXHIBITS**

48. I have not at this time prepared any exhibits which I expect to use as summary of or support for my opinions.  However, I would expect to use during my testimony at trial at least some of the documents listed above.  I may also use demonstrative exhibits, summaries, or other exhibits that are not yet prepared, to further

18

illustrate my testimony.   I understand that such exhibits would be exchanged with opposing counsel at a time to be mutually agreed upon or required by the Court.

## COMPENSATION

49.  I am being compensated for my work on this case at my customary rate of $600 per hour, plus expenses.  My compensation is not based on the outcome of the litigation.

March **24**, 2006

John F. Witherspoon

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Expert Report of John F. Witherspoon With Respect to Issues of Infringement was served, via Fedex (Saturday delivery to Ms. Malinoski and regular delivery to Mr. Gleason), along with a courtesy copy of the text of this report (without exhibits), via email, on the following counsel for Plaintiff on the 24th day of March 2006:

Lynn A. Malinoski
Woodcock Washburn, LLP
One Liberty Place, 46th Floor
Philadelphia, PA. 19103
Telephone:  (215) 568-3100
Facsimile:  (215) 568-3439

Daniel J. Gleason
Nutter McClennan & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
Telephone:  (617) 439-2000
Facsimile:  (617) 310-9000

                                      s/Salvatore P. Tamburo

# Exhibit 5

LEXSEE 1996 US DIST LEXIS 21514



Positive
As of: Jul 19, 2007

**MARS, INCORPORATED, Plaintiff, v. COIN ACCEPTORS, INC., Defendant.
MARS ELECTRONICS INTERNATIONAL, INC., Plaintiff, v. COIN
ACCEPTORS, INC., Defendant. COIN ACCEPTORS, INC., Plaintiff, v. MARS
ELECTRONICS INTERNATIONAL, INC., and M & M/MARS,
INCORPORATED, Defendants.**

**CIVIL ACTION NO. 90-49 (JCL)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

*1996 U.S. Dist. LEXIS 21514*

**July 27, 1996, Decided
June 27, 1996, Filed; July 2, 1996, Entered**

**NOTICE:**     [*1] NOT FOR PUBLICATION

**DISPOSITION:**     Motion to exclude expert testimony granted as to testimony about patent law generally or legal conclusions that should or could be drawn from trial evidence.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff company moved to exclude the testimony of defendant owner's patent law experts from evidence in the impending patent infringement trial.

**OVERVIEW:** The company argued that the testimony was inadmissible because the experts planned to discuss general principles of patent law or to offer legal opinions on issues such as, but not limited to, obviousness, anticipation, and the appropriate scope of the doctrine of equivalents. The court agreed and limited the proposed testimony. If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of

an opinion or otherwise. *Fed. R. Evid. 702.* However, an expert's opinion on the ultimate legal conclusion is neither required nor indeed evidence at all. Accordingly, any patent expert testimony explicating the law or opining about legal conclusions was excluded, while testimony regarding technical issues or patent examination procedure was allowed.

**OUTCOME:** The company's motion to exclude expert testimony was granted regarding certain issues and the pretrial order was amended to permit the company to call a patent law expert.

**LexisNexis(R) Headnotes**

*Evidence > Scientific Evidence > General Overview*
*Evidence > Testimony > Experts > Helpfulness*
*Evidence > Testimony > Experts > Qualifications*
[HN1] The Federal Rules of Evidence permit relevant opinion testimony by a qualified expert if the court deems it helpful to the factfinder. As provided in *Fed. R. Evid. 702:* If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the

1996 U.S. Dist. LEXIS 21514, *1

evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. In civil cases, the rules even allow expert opinion testimony that embraces an ultimate issue to be decided by the trier of fact. *Fed. R. Evid. 704(a).* A non-exhaustive survey of non-patent cases reveals that courts jealously police the content of expert testimony to ensure that expert witnesses do not invade the province of the judge by instructing the fact finder about the applicable law.

*Evidence > Testimony > Experts > Admissibility*
[HN2] An expert's opinion on the ultimate legal conclusion is neither required nor indeed evidence at all.

**COUNSEL:** For MARS, INCORPORATED, PLAINTIFF: LANNY STEVEN KURZWEIL, MCCARTER & ENGLISH, NEWARK, NJ.

For MARS ELECTRONICS INTERNATIONAL INC., CONSOLIDATED, PLAINTIFF: LANNY STEVEN KURZWEIL, MCCARTER & ENGLISH, NEWARK, NJ.

For COIN ACCEPTORS INC., DEFENDANT: CLYDE A. SZUCH, PITNEY, HARDIN, KIPP & SZUCH, MORRISTOWN, NJ.

For M&M/MARS, INCORPORATED, COUNTER-DEFENDANT: LANNY STEVEN KURZWEIL, MCCARTER & ENGLISH, NEWARK, NJ.

For COIN ACCEPTORS, INC., COUNTER-CLAIMANT: CLYDE A. SZUCH, PITNEY, HARDIN, KIPP & SZUCH, MORRISTOWN, NJ.

**JUDGES:** John C. Lifland, United States District Judge.

**OPINION BY:** John C. Lifland

**OPINION**

**MEMORANDUM AND ORDER**

*Lifland, District Judge*

Before the Court is Mars' motion to exclude the

testimony of Coinco's patent law experts, Gregory E. Upchurch and Ronald L. Yin, from evidence in the impending trial. In the context of pre-trial preparation and motion practice, Coinco has submitted 21 declarations by Upchurch and Yin that offer opinions regarding technical questions (such as how a patented device functions or what a prior art reference teaches) and legal issues such as invalidity and prior-art [*2] limitations on the scope of the doctrine of equivalents. Early in the case, in conversations with Coinco's lead counsel, Mars objected to Coinco's use of attorney experts. Later, in a scheduling conference before Magistrate Judge Hedges, the Magistrate advised that such evidentiary objections should be pressed before this Court. *See* Pegram Decl. (June 20, 1996) at PP3-5. For reasons articulated below, the Court will exclude the testimony of Yin and Upchurch to the extent they planned to discuss general principles of patent law or to offer legal opinions on issues such as, but not limited to, obviousness, anticipation and the appropriate scope of the doctrine of equivalents.

**Discussion**

[HN1] The Federal Rules of Evidence permit relevant opinion testimony by a qualified expert if the court deems it helpful to the factfinder. As provided in *Fed. R. Evid. 702:*

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In civil [*3] cases, the Rules even allow expert opinion testimony that "embraces an ultimate issue to be decided by the trier of fact." *Fed. R. Evid. 704(a).* A non-exhaustive survey of non-patent cases reveals that courts jealously police the content of expert testimony to ensure that expert witnesses do not invade the province of the judge by instructing the fact finder about the applicable law. *See, e.g., United States v. Wells, 63 F.3d 745, 753 (8th Cir. 1995), cert. granted, 116 S. Ct. 1540 (1996); Molecular Technology Corp. v. Valentine, 925 F.2d 910, 919 (6th Cir. 1991); Specht v. Jensen, 853 F.2d 805 (10th Cir. 1988), cert. denied, 488 U.S. 1008, 102 L.*

*Ed. 2d 783, 109 S. Ct. 792 (1989); Marx & Co., Inc. v. Diners' Club, Inc., 550 F.2d 505, 510-511 (2d Cir.), cert. denied, 434 U.S. 861, 54 L. Ed. 2d 134, 98 S. Ct. 188 (1977); Lynch v. J.P. Stevens & Co., Inc., 758 F. Supp. 976, 1014 (D.N.J. 1991).*

With these cases in mind, Mars contends that it would be improper to have patent experts testify with respect to legal opinions and conclusions. But there is some evidence that in patent cases courts relax the rule that expert witnesses cannot testify about [*4] the state of the law, or the application of law to a specific factual controversy. *See, e.g., Beckman Instruments. Inc. v. LKB Produkter AB, 892 F.2d 1547 (Fed. Cir. 1989)* (reviewing a trial court's decision to not grant a new jury trial, the court did not criticize the lower court's allowance of such expert testimony); *Yarway Corp. v. Eur-Control USA, Inc., 775 F.2d 268, 274 (Fed. Cir. 1985)* (Reviewing a bench trial, the court explained that the trial court "was particularly persuaded by the expert testimony of Mr. Clark. [It further] noted that Mr. Clark [was] a patent lawyer, not an engineer. In the manner not unusual in patent cases, he testified about questions of patent law as if it were foreign law."); Howard G. Pollak, "The Admissibility and Utility of Expert Legal Testimony in Patent Litigation, 32 *Idea: J.L. & Tech.* 361 (1992) (citing cases). This may be because patent law is a discipline pregnant with so-called "mixed questions of law and fact", such as anticipation, obviousness, prior public use or sale and sufficiency of a specification's disclosure. *See Markman v. Westview Instruments, Inc., 52 F.3d 967, 989 n.1 (Fed. Cir. 1995)* (Mayer, J., concurring [*5] in the judgment), *aff'd, 134 L. Ed. 2d 577, U.S. , 116 S. Ct. 1384 (1996)*; Pollak at 364 (citing obviousness, claim construction and the inequitable conduct inquiry as examples). Testimony directed at these issues may understandably cross the neat boundary that typically separates fact testimony from legal conclusions. Perhaps another reason is that patent cases are, more often than other civil actions, tried without a jury, which means that the utility of the expert testimony is untarnished by the downside risk that the factfinder will confuse the roles of witness and judge. *Cf. Mendenhall v. Cedarapids, Inc., 5 F.3d 1557, 1574 n.17 (Fed. Cir. 1993)* ("The practice of using such experts developed in bench trials where they informed the judge, like a brief, on the intricacies of patent law."), *cert. denied, 511 U.S. 1031, 114 S. Ct. 1540, 128 L. Ed. 2d 192 (1994).*

In other cases, the Federal Circuit has indicated that a trial court can exercise its discretion and exclude patent expert testimony. As has been stated numerous times recently, [HN2] "an expert's opinion on the ultimate legal conclusion is neither required nor indeed 'evidence' at all." *Nutrition* [*6] *21 v. United States, 930 F.2d 867, 871 n.2 (Fed. Cir. 1991). See Markman, 52 F.3d at 991 n.4* (Mayer, J., concurring in the judgment) (quoting *Nutrition 21*); *Mendenhall, 5 F.3d at 1574 n.17* (In jury trials, "the spectacle of experts arguing over the legal conclusions of obviousness before the jury, even if not error, should be avoided inasmuch as such opinions are not substantive evidence."); *Avia Group Int'l, Inc. v. L.A. Gear California, Inc., 853 F.2d 1557, 1564 (Fed. Cir. 1988). See also Acoustical Design, Inc. v. Control Electronics Co., 932 F.2d 939, 942 (Fed. Cir.)* (holding that the district court did not abuse its discretion by excluding a patent expert's testimony about 1) how claims were drafted to avoid prior art and 2) the fact that the claims in suit read on the prior art), *cert. denied, 502 U.S. 863, 116 L. Ed. 2d 146, 112 S. Ct. 185 (1991); Argus Chemical Corp. v. Fibre Glass-Evercoat Co., 759 F.2d 10, 13 (1985)* (testimony of an attorney expert regarding the relevant standard for determining inequitable conduct was properly excluded since it concerned a legal issue).

The Court recognizes that the technical complexity of patent cases counsels [*7] in favor of admitting expert testimony to assist in reaching a just and correct result. However, expert testimony that extends beyond factual presentation and approximates legal argument will not help the Court, but will indeed hinder it as non-evidential testimony prolongs what is already anticipated to be a lengthy bench trial. *See Mendenhall, 5 F.3d at 1574; Nutrition 21, 930 F.2d at 871 n.2.* With the assistance of briefing and independent research, the Court can draw legal conclusions from the factual predicates presented through testimony and documentary evidence at trial. Thus, the Court will exercise its discretion and exclude from the trial evidence any patent expert testimony explicating the law generally or opining about the legal conclusions that inexorably follow from the facts established at trial. *See Seattle Box Co., Inc. v. Industrial Crating & Packaging, Inc., 731 F.2d 818, 826 (Fed. Cir. 1984)* ("A trial judge has sole discretion to decide whether or not he needs, or even just desires, an expert's assistance to understand a patent."). Patent expert testimony concerning technical issues or patent examination procedure will be allowed, [1] unless it becomes [*8] clear before or during trial that such

testimony would be cumulative and/or a waste of time. [2]

1  This Court has never been formally presented with an opportunity to assess whether to allow patent attorney expert testimony, so the fact that Coinco has retained the services of such experts "with the knowledge of the Court" is immaterial. Coinco's June 20, 1996 Letter-Brief at 4. Given this fact, the Court does not agree that total exclusion of patent expert testimony is unfair to Coinco since Coinco has always known exclusion was possible. In any event, this Memorandum and Order allows some patent expert testimony, unless Mars demonstrates at or before trial that *Fed. R. Evid. 403* justifies exclusion.

2  The Court cannot yet determine whether and to what extent portions of Yin's and Upchurch's testimony will be cumulative or a waste of time.

Accordingly, **IT IS** on this) 27th day of June, 1996, **ORDERED** that Mars' motion to exclude from the trial evidence the expert testimony of Messrs. [*9] Yin and Upchurch is granted as to testimony about patent law generally or legal conclusions that should or could be drawn from the trial evidence.

**IT IS FURTHER ORDERED** that the Pre-Trial Order be amended to permit Mars to call John F. Witherspoon, or some other patent law expert if Mr. Witherspoon is unavailable, to testify about patent examination procedures.

John C. Lifland

United States District Judge

# Exhibit 6

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DePUY MITEK, INC.,                )
a Massachusetts Corporation       )
                                  )
              Plaintiff           )
                                  )
        -VS-                      ) CA No. 04-12457-PBS
                                  ) Pages 1 - 87
ARTHREX, INC.,                    )
a Delaware Corporation, et al,)
                                  )
              Defendant           )


MARKMAN HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:

    DIANNE B. ELDERKIN, ESQ., LYNN A. MALINOSKI, ESQ., and
MICHAEL J. BONELLA, ESQ., Woodcock Washburn, One Liberty
Place, 47th Floor, Philadelphia, Pennsylvania, 19103,
for the Plaintiff.

    CHARLES W. SABER, ESQ. and SALVATORE P. TAMBURO, ESQ.,
Dickstein Shapiro, LLP, 1825 Eye Street, N.W., Washington,
D.C., 20006-5403, for the Defendants.


                        United States District Court
                        1 Courthouse Way, Courtroom 19
                        Boston, Massachusetts
                        September 26, 2006, 2:00 p.m.


LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

Page 14

1 term for me, "lubricious."  Okay, you must all assume I know

2 what it is, but when you look it up, it actually means

3 different things.

4          MS. ELDERKIN:  Oh, really.

5          THE COURT:  It can mean wet.  It can also just be

6 smooth or slippery.  So do you know what it means in this

7 context?

8          MS. ELDERKIN:  My understanding is, it means smooth

9 and slippery.

10          MR. SABER:  I would agree with that, your Honor.

11          THE COURT:  Not necessarily wet?

12          MR. SABER:  That's correct.

13          MS. ELDERKIN:  Right, right, right.  So

14 polyethylene has this plain and ordinary meaning to one

15 skilled in the art.  And there is nothing, as we know again

16 from Phillips and other cases, to alter the plain and

17 ordinary meaning.  There has to be a very clear and

18 unambiguous disavowal in the patent specification to change

19 that meaning.  There is no special definition of PE in the

20 patent.  The one place it's used, I believe it's in Column 3,

21 the word "polyethylene" is spelled out and in parens "PE,"

22 polyethylene.  That's what it means.

23          THE COURT:  All right, can we jump to part two

24 which is what I found incredibly -- I do a lot of these

25 patent cases, and I've actually not had occasion to deal with

1 the "consisting essentially of" term.  And we tried to read

2 some cases on it, and there actually aren't that many, and I

3 had a hard time understanding whether it was a claim

4 construction issue or an infringement issue.  In fact, one

5 case says it's some hybrid between the two.

6            MS. ELDERKIN:  And, your Honor, I believe it's

7 both.  There certainly is a claim construction issue.  We

8 believe it's for the Court.  Of course, what "consisting

9 essentially of" means, as you know, it means there can be

10 elements in an infringing device that are not expressly

11 recited in the claim, as long as they don't alter, materially

12 change, the basic and novel characteristics of the invention.

13            THE COURT:  And how am I supposed to know what

14 those are?

15            MS. ELDERKIN:  Well, we believe that the novel and

16 basic characteristics of the invention, that that is a claim

17 construction issue, and I'm prepared to explain to you -- you

18 know, the parties have competing definitions of what those

19 novel and basic characteristics are.  And then it will be an

20 issue for the jury, or for you on summary judgment, to

21 determine whether -- and the issue here is the coating on

22 FiberWire suture -- materially affects those basic and novel

23 characteristics.

24            THE COURT:  When you say "materially affect," I was

25 having trouble understanding it because primarily we're

# Exhibit 7


Caution
As of: Jul 23, 2007

**ASPEX EYEWEAR, INC., Plaintiff-counterdefendant, VS. E'LITE OPTIK, INC., Defendant-counterplaintiff.**

**Civil Action No. 3:98-CV-2996-D**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

*2002 U.S. Dist. LEXIS 14834*

**April 4, 2002, Decided
April 4, 2002, Filed, Entered**

**SUBSEQUENT HISTORY:** Later proceeding at *Aspex Eyewear, Inc. v. E'Lite Optik, Inc., 2002 U.S. Dist. LEXIS 27555* (N.D. Tex., May 8, 2002)

**PRIOR HISTORY:** *Aspex Eyewear, Inc. v. E'Lite Optik, Inc., 2001 U.S. Dist. LEXIS 2088* (N.D. Tex., Feb. 27, 2001)

**DISPOSITION:** [*1] Motions ruled upon.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff sublicensee sued defendant competitor, alleging that the competitor infringed a patent regarding spectacle frames that support an auxiliary frame. The parties filed nine motions regarding standing, proper parties, infringement, patent validity, expert testimony, and damages.

**OVERVIEW:** The patent rights owner entered into a license agreement with a first licensee, but the owner terminated the agreement. The owner granted a second licensee the same exclusive rights, and the second licensee granted the sublicensee a sublicense. The court determined that the sublicensee lacked standing to sue in its own name because the owner retained significant rights, but the sublicensee was an exclusive licensee and had standing to sue for infringement as a co-plaintiff. Thus, the court allowed the sublicensee to join necessary parties. The court also determined that the competitor failed to show that the patent was invalid based on anticipation

or obviousness. The sublicensee was entitled to partial summary judgment as to the competitor's affirmative defense of patent invalidity based on four statutory bars, the on sale bar, the clarity requirements, and the general anticipation doctrine. In addition, the sublicensee was entitled to summary judgment as to tortious interference with contract, unfair competition, unclean hands, laches, and estoppel. However, the literal infringement questions required resolution by trial. Finally, the experts' testimony was reliable.

**OUTCOME:** The court granted the sublicensee's motion to join additional parties and denied the sublicensee's motion to exclude expert testimony. The court denied the competitor's motions to preclude damages recovery, strike experts, and dismiss for lack of standing. The court granted in part and denied in part the parties' partial summary judgment motions.

**LexisNexis(R) Headnotes**

*Civil Procedure > Justiciability > Standing > General Overview*
[HN1] Before a federal court can consider the merits of a legal claim, the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue.

*Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > General Overview*

2002 U.S. Dist. LEXIS 14834, *

[HN2] See *35 U.S.C.S. § 281.*

***Civil Procedure > Justiciability > Standing > General Overview***
***Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > General Overview***
[HN3] The term "patentee" includes the successors in title to the patentee. *35 U.S.C.S. § 100*(d). Without the patentee as plaintiff, the remedies provided in the patent statute are unavailable except in extraordinary circumstances, such as when the patentee is the infringer and cannot sue himself. The plaintiff must have legal title to the patent at the time of the infringement.

***Patent Law > Infringement Actions > Exclusive Rights > Manufacture, Sale & Use***
***Patent Law > Ownership > Conveyances > Assignments***
***Patent Law > Ownership > Conveyances > Licenses***
[HN4] Courts examine the substance of an agreement to determine whether it has the effect of either an assignment or an exclusive license and thus satisfies the statutory requirement that the "patentee" must sue. Where a patentee makes an assignment of all significant rights under the patent, the assignee may be deemed the effective "patentee" under the statute and has standing to sue in his own name for infringement, without joining the actual patentee.

***Patent Law > Ownership > Conveyances > Assignments***
[HN5] There are three ways in which a patentee can assign to an assignee all significant rights under a patent: by conveying the entire patent, an undivided part or share of the entire patent, or all rights under the patent in a specified geographical region of the United States. A transfer of less than one of these three interests is a license, not an assignment of legal title, and it gives the licensee no right to sue for infringement in the licensee's own name.

***Patent Law > Infringement Actions > Infringing Acts > General Overview***
***Patent Law > Ownership > Conveyances > Assignments***
***Patent Law > Ownership > Conveyances > Licenses***
[HN6] Beyond assignees, only exclusive licensees have a rightful place in patent infringement suits. To be an exclusive licensee for standing purposes, a party must have received, not only the right to practice the invention within a given territory, but also the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory as well. Specifically, an exclusive licensee owns the right to exclude others from making, using, or selling the patented invention in a particular territory of the United States. A patent license that simply transfers some of the proprietary rights from the patentee to the licensee is a nonexclusive or bare license, which does no more than protect the licensee from an infringement suit by the patentee. The use of the word "exclusive" in a license agreement does not control the inquiry whether the license is exclusive; what matters is the intent of the parties and the substance of their agreement.

***Civil Procedure > Justiciability > Standing > General Overview***
***Patent Law > Ownership > Conveyances > Assignments***
***Patent Law > Ownership > Conveyances > Licenses***
[HN7] An exclusive licensee can sue as a co-plaintiff with the patentee, but only an assignee with all significant rights under the patent has standing to sue in its own name.

***Patent Law > Infringement Actions > Exclusive Rights > Export & Import***
***Patent Law > Infringement Actions > Infringing Acts > General Overview***
***Patent Law > Ownership > Conveyances > Licenses***
[HN8] The two keys to an exclusive license are the right to practice the invention in a given territory and the patentee's promise that others will be excluded from practicing the invention within that territory.

***Copyright Law > Civil Infringement Actions > Standing > General Overview***
***Patent Law > Infringement Actions > General Overview***
***Patent Law > Ownership > Conveyances > Licenses***
[HN9] The fact that an exclusive sublicensee derives interest in the patent through an intermediate exclusive licensee does not affect the exclusive sublicensee's status as a party with the proprietary right to exclude.

***Civil Procedure > Pleading & Practice > Motion Practice > Time Limitations***
***Civil Procedure > Parties > Joinder > Permissive Joinder***
[HN10] Under Fed. R. Civ. P. 21, the court may join additional parties on its own initiative at any stage of the action.

***Civil Procedure > Pleading & Practice > Pleadings > Counterclaims > General Overview***

2002 U.S. Dist. LEXIS 14834, *

*Evidence > Inferences & Presumptions > Presumptions*
*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
[HN11] A patent enjoys a presumption of validity. *35 U.S.C.S. § 282*. This presumption can be overcome only if the party seeking to invalidate the patent meets its burden of establishing invalidity by clear and convincing evidence. Because the party seeking to invalidate the patent will have the burden of proof at trial on its invalidity counterclaim and affirmative defense, to obtain summary judgment it must establish beyond peradventure all of the essential elements of the claim or defense.

*Civil Procedure > Summary Judgment > Partial Summary Judgments*
*Civil Procedure > Summary Judgment > Supporting Materials > Memoranda of Law*
[HN12] U.S. Dist. Ct., N.D. Tex., R. 56.5(a) requires that the motion be accompanied by a brief that sets forth the argument and authorities on which the party relies.

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
[HN13] See U.S. Dist. Ct., N.D. Tex., R. 56.6(a).

*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
*Civil Procedure > Appeals > Briefs*
[HN14] See U.S. Dist. Ct., N.D. Tex., R. 56.5(c).

*Civil Procedure > Summary Judgment > Evidence*
*Civil Procedure > Summary Judgment > Supporting Materials > Memoranda of Law*
*Civil Procedure > Appeals > Briefs*
[HN15] The court is not required to "comb the record" in search of summary judgment evidence. Nor will the court overlook U.S. Dist. Ct., N.D. Tex., R. 56.5(c), a valuable tool for busy trial courts that requires a party to place an issue clearly in focus by citing in its brief each page of the appendix that supports each assertion that it makes concerning the summary judgment evidence. Moreover, the court will not consider arguments supported for the first time with specific evidence in a movant's reply brief, because in doing so the court would be considering summary judgment on a ground not raised in the motion. It is error for the court to grant summary judgment on a ground that was not properly raised.

*Patent Law > Date of Invention & Priority > General Overview*
*Patent Law > Inequitable Conduct > General Overview*
*Patent Law > U.S. Patent & Trademark Office Proceedings > Interferences > General Overview*
[HN16] *35 U.S.C.S. § 101* requires that, to obtain a patent, the applicant be the first inventor. Additionally, *35 U.S.C.S. § 102* provides that a person shall not be entitled to a patent unless: he did not himself invent the subject matter sought to be patented, or during the course of an interference conducted under *35 U.S.C.S. §§ 135* or 291, another inventor involved therein establishes, to the extent permitted in *35 U.S.C.S. § 104*, that before such person's invention thereof the invention was made by such other inventor and not abandoned, suppressed, or concealed, or (2) before such person's invention thereof the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it.

*Patent Law > Nonobviousness > Elements & Tests > Claimed Invention as a Whole*
*Patent Law > Nonobviousness > Elements & Tests > Prior Art*
[HN17] See *35 U.S.C.S. § 103*(a).

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN18] Claim construction is a matter of law, and claims are construed by the court as they would be understood by persons of ordinary skill in the field of the invention. The court starts with the claim itself, read in light of the specification. Using these tools, the court construes only the claims that are in controversy, and only to the extent necessary to resolve the dispute.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN19] Nothing mandates the use of a Markman hearing in every patent case. Courts retain the discretion to construe the claims on the basis of a paper record alone. In a case where the technology is accessible to the court and the claims are relatively straightforward, a Markman hearing is unnecessary.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN20] In addition to the claim language, the prosecution history is often helpful in understanding the intended meaning as well as the scope of technical terms. The prosecution history includes the record of interference

Case 1:04-cv-12457-PBS    Document 144-8    Filed 07/24/2007    Page 5 of 34

Page 4
2002 U.S. Dist. LEXIS 14834, *

proceedings. In particular, the prosecution history is relevant in determining whether the patentee intends the language of the patent to be understood in its ordinary meaning.

***Evidence > Testimony > Experts > Helpfulness***
***Patent Law > Infringement Actions > Claim Interpretation > General Overview***
[HN21] Although a court should generally give the terms of a patent their ordinary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history. When this intrinsic evidence unambiguously describes the scope of a patented invention, reliance on extrinsic evidence is improper. Extrinsic evidence, including expert testimony, is not to be relied upon for purposes of claim construction, other than to aid the judge in understanding the technology. Where the technology involved is uncomplicated and the claims are unambiguous, expert testimony is not needed.

***Patent Law > Infringement Actions > Claim Interpretation > General Overview***
[HN22] The court may consider the specification in interpreting the claim.

***Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants***
***Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants***
***Civil Procedure > Summary Judgment > Evidence***
[HN23] When the summary judgment movant will not have the burden at trial concerning a cause of action, it can meet its summary judgment obligation by pointing the court to the absence of evidence to support the claim. Once the party does so, the nonmovant must then go beyond its pleadings and designate specific facts showing that there is a genuine issue for trial. Moreover, the summary judgment nonmovant must produce evidence to establish the existence of each element for which it bears the burden of proof. Summary judgment is mandatory where the nonmoving party fails to meet this burden. The nonmovant's failure to adduce proof as to any essential element renders all other facts immaterial.

***Patent Law > Anticipation & Novelty > General Overview***
***Patent Law > Statutory Bars > General Overview***
[HN24] See *35 U.S.C.S. § 102*(a).

***Patent Law > Anticipation & Novelty > General Overview***
***Patent Law > Date of Invention & Priority > General Overview***
[HN25] The date of invention by the patentee is critical to determining invalidity under *35 U.S.C.S. § 102*(a) because knowledge, use, patenting, or description by another before this date establishes invalidity under the statute. The date an inventor files his patent application is the presumed date of invention. A patentee may overcome this presumption based on evidence that shows an earlier date of invention.

***Patent Law > Date of Invention & Priority > Conception Date***
[HN26] The date of invention is the date the invention was introduced in the United States.

***Patent Law > Anticipation & Novelty > General Overview***
[HN27] Anticipation under *35 U.S.C.S. § 102*(a) must be proved by showing that each element of the claim in issue is found, either expressly or under principles of inherency, in a single prior art reference. In order for a claim to be inherent in the prior art it is not sufficient that a person following the disclosure sometimes obtain the result set forth in the claim, it must invariably happen. The aspects of a claimed invention that always flow naturally from that which is disclosed in a prior art reference are deemed to be inherent and therefore may be anticipatory.

***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview***
***Patent Law > Infringement Actions > General Overview***
***Patent Law > Nonobviousness > Elements & Tests > Prior Art***
[HN28] In the patent infringement context, merely asserting obviousness is insufficient.

***Patent Law > Date of Invention & Priority > General Overview***
***Patent Law > Statutory Bars > On Sale Bar > General Overview***
[HN29] Unlike *35 U.S.C.S. § 102*(a), which relates to the date of invention, *35 U.S.C.S. § 102*(b) relates to the critical date, which is the date one year before the filing of the patent application. Any sale or offer to sell an em-

2002 U.S. Dist. LEXIS 14834, *

bodiment of the invention in the United States before the critical date is an on sale bar under § 102(b).

***Patent Law > Claims & Specifications > Enablement Requirement > General Overview***
***Patent Law > Date of Invention & Priority > Reduction to Practice***
***Patent Law > Statutory Bars > On Sale Bar > General Overview***
[HN30] The on sale bar applies when two conditions are met before the critical date. First, the product must be the subject of a commercial offer for sale. Second, the invention must be ready for patenting. The second condition may be satisfied in two ways: by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention.

***Patent Law > Claims & Specifications > Definiteness > General Overview***
***Patent Law > Claims & Specifications > Enablement Requirement > Standards & Tests***
[HN31] *35 U.S.C.S. § 112* requires that a patent application enable one skilled in the art to make the invention and provide sufficiently clear claims that can be understood by those skilled in the art and not unknowingly be infringed.

***Patent Law > Inequitable Conduct > General Overview***
***Patent Law > U.S. Patent & Trademark Office Proceedings > Filing Requirements > Drawings***
***Patent Law > U.S. Patent & Trademark Office Proceedings > Patent Cooperation Treaty & Provisional Applications***
[HN32] See 37 C.F.R. § 183(a).

***Torts > Business Torts > Commercial Interference > Business Relationships > Elements***
***Torts > Business Torts > Commercial Interference > Contracts > Elements***
[HN33] A claim of tortious interference with existing contracts or business relationships requires (1) an existing contract subject to interference; (2) a willful and intentional act of interference with the contract; (3) that proximately caused the plaintiff's injury; and (4) caused actual damage or loss.

***Governments > Legislation > Effect & Operation > General Overview***
***Torts > Business Torts > Commercial Interference > Business Relationships > Defenses***
***Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements***
[HN34] The elements of tortious interference with prospective contractual relations are: (1) a reasonable probability that the parties would have entered into a contractual relationship; (2) an intentional and malicious act by the defendant that prevented the relationship from occurring with the purpose of harming the plaintiff; (3) the defendant lacked privilege or justification to do the act; and (4) actual harm or damage resulted from the defendant's interference. To recover for tortious interference with a prospective business relation a plaintiff must prove that the defendant's conduct was independently tortious or wrongful.

***Torts > Business Torts > Commercial Interference > Contracts > General Overview***
***Torts > Business Torts > Unfair Business Practices > General Overview***
[HN35] Texas law requires the commission of an independent tort or other illegal conduct aside from a simple allegation of unfair competition.

***Civil Procedure > Summary Judgment > Standards > Materiality***
***Patent Law > Infringement Actions > Defenses > General Overview***
[HN36] To prove unclean hands, the defendant must show that the plaintiff made an affirmative misrepresentation of material fact with an intent to deceive the United States Patent and Trademark Office.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses***
***Civil Procedure > Pretrial Judgments > Nonsuits > Voluntary Nonsuits***
[HN37] To prove either laches or estoppel, the defendant must show the common element that it was prejudiced by the plaintiff's conduct in either unduly delaying bringing its claims or taking affirmative action to induce belief that it had abandoned its claims.

***Patent Law > Infringement Actions > Claim Interpretation > Scope***
***Patent Law > Infringement Actions > Doctrine of Equivalents > Elements > Equivalence***

[HN38] Equivalence is present for a particular claim limitation if the allegedly infringing product performs substantially the same function, in substantially the same way, to obtain the same result as that described in the patent. Infringement requires that the allegedly infringing product contain each limitation of the claim or its equivalent. The doctrine of equivalents analysis must be applied to individual claim limitations rather than the invention as a whole.

**International Trade Law > Imports & Exports > General Overview**
**Patent Law > Infringement Actions > Defenses > Marking**
[HN39] See *35 U.S.C.S. § 287*(a).

**Patent Law > Infringement Actions > Defenses > Marking**
[HN40] A patentee, or one practicing the invention under the patentee, must give notice in order to recover damages for infringement. The notice may take the form of either a mark on the product or actual notice to the alleged infringer.

**Patent Law > Infringement Actions > Defenses > Marking**
**Patent Law > Ownership > Conveyances > Licenses**
[HN41] The part of *35 U.S.C.S. § 287*(a) that addresses actual notice option does not state what specific party must give notice; it merely provides that no damages shall be recovered unless the infringer "was notified" of the infringement and then continued to infringe. The portion of the statute that pertains to notice by marking addresses how patentees or those practicing the invention under the patentee "may" give notice.

**Evidence > Procedural Considerations > Preliminary Questions > Admissibility of Evidence > General Overview**
**Evidence > Testimony > Experts > Admissibility**
[HN42] The court may consider preliminary questions concerning the admissibility of evidence before trial. Fed. R. Evid. 104(a). In performing this function, the court must act as a gatekeeper in determining the admissibility of expert testimony. Fed. R. Evid. 702 guides the court in the screening process.

**Evidence > Testimony > Experts > General Overview**
[HN43] See Fed. R. Evid. 702.

**Evidence > Testimony > Experts > Admissibility**
[HN44] The court may admit proffered expert testimony only if the proponent, who bears the burden of proof, demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable.

**Evidence > Scientific Evidence > Daubert Standard**
**Evidence > Testimony > Experts > General Overview**
[HN45] Expert testimony must be based on scientific, technical, or other specialized knowledge. Fed. R. Evid. 702. It must rest on a reliable foundation. Because of the unique effect of an expert witness and the advantageous position he holds at trial, the proponent of the evidence must demonstrate that the principle supports what it purports to show. This ensures that the expert employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. Although Rule 702 does not require absolute certainty, it does mandate that the proffered knowledge be based on "good grounds." The testimony must constitute more than belief or unsupported speculation.

**Evidence > Testimony > Experts > General Overview**
[HN46] In fulfilling its gatekeeping role, the court must make an objective, independent validation of the principles and methods used by the expert to ensure that they have a sound and reliable basis in the knowledge and experience of the discipline at issue. The court is not to focus on the conclusions generated by the expert's methodology. Instead, the court must review only the reasonableness of the expert's use of such an approach, together with his particular method of analyzing the data so obtained, to draw a conclusion regarding the specific matter to which the expert testimony is directly relevant.

**Evidence > Testimony > Experts > Daubert Standard**
[HN47] When analyzing the reliability of an expert's testimony, the court may consider the following non-exclusive factors: (1) whether the expert's technique can be or has been tested; (2) whether the method has been subjected to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. The Daubert factors may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of the testimony.

*Evidence > Testimony > Experts > General Overview*
[HN48] Testimony on the ultimate issue of infringement is permissible in patent cases.

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Trials > Depositions*
*Civil Procedure > Appeals > Briefs*
[HN49] See U.S. Dist. Ct., N.D. Tex., R. 7.1(i)(1).

*Civil Procedure > Pleading & Practice > Motion Practice > Content & Form*
*Civil Procedure > Appeals > Briefs*
[HN50] See U.S. Dist. Ct., N.D. Tex., R. 7.2(e).

*Evidence > Testimony > Experts > Helpfulness*
*Patent Law > Claims & Specifications > Enablement Requirement > General Overview*
*Patent Law > Subject Matter > Processes > Computer Software & Mental Steps*
[HN51] The focus in construing disputed terms in claim language is on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean. Extrinsic evidence such as expert testimony may be helpful to explain scientific principles, the meaning of technical terms, and terms of art that appear in the patent and prosecution history. The law of claim construction thus directs the court to turn to the opinions of those skilled in the art; it does not require one skilled in the art also to be skilled in the law of claim construction.

*Evidence > Testimony > Experts > Admissibility*
*Evidence > Testimony > Experts > Daubert Standard*
[HN52] If an expert witness's opinion is otherwise reliable, it is not rendered unreliable under Daubert merely because another expert for the same party holds an opinion that can be viewed as inconsistent with that conclusion.

*Evidence > Testimony > Experts > General Overview*
[HN53] As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the trier of fact's consideration. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.

*Evidence > Testimony > Experts > General Overview*
*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN54] Claim construction is ultimately a question of law about which a patent attorney may not offer his legal opinion in the guise of expert testimony.

*Evidence > Testimony > Experts > Admissibility*
*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
*Patent Law > Infringement Actions > Claim Interpretation > Aids*
[HN55] Attorneys may testify as to mixed questions of law and fact.

*Criminal Law & Procedure > Trials > Examination of Witnesses > General Overview*
*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN56] The trial court is granted wide latitude in kinds of aids, including expert witness testimony, employed to assist in patent claim construction.

*Civil Procedure > Discovery > Disclosures > Mandatory Disclosures*
[HN57] Fed. R. Civ. P. 26(a)(2)(B) requires the party to provide a complete statement of all opinions to be expressed and the basis and reasons therefore.

**COUNSEL:** For ASPEX EYEWEAR INC, plaintiff: Dan Duncan Davison, Brett Christopher Govett, Attorneys at Law, Fulbright & Jaworski, Dallas, TX USA.

For ASPEX EYEWEAR INC, plaintiff: Michael A Nicodema, Barry J Schindler, Attorneys at Law, Dreier & Baritz, New York, NY USA.

For ELITE OPTIK INC, defendant: Bruce Steven Sostek, Jane Politz Brandt, [*2] Massimo Ciccarelli, Richard L Wynne, Jr, Attorneys at Law, Thompson & Knight, Robert M Mason, Attorney at Law, Mason & Petruzzi, Dallas, TX USA.

For ELITE OPTIK INC, defendant: James D Petruzzi, Attorney at Law, Mason & Petruzzi, Houston, TX USA.

For ELITE OPTIK INC, counter-claimant: James D Petruzzi, Attorney at Law, Mason & Petruzzi, Houston, TX USA.

**JUDGES:** SIDNEY A. FITZWATER, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** SIDNEY A. FITZWATER

**OPINION:**

MEMORANDUM OPINION AND ORDER

In this case involving U.S. Patent No. *5,568,207* ("the *'207* patent"), "Auxiliary Lenses for Eyeglasses," plaintiff-counterdefendant Aspex Eyewear, Inc. ("Aspex") and defendant-counterplaintiff E'Lite Optik, Inc. ("E'Lite") have filed nine motions that present questions about standing, proper parties, infringement, patent validity, expert testimony, and damages. The court decides these motions by this memorandum opinion and order. n1

> n1 All requests for oral argument of one or more of these motions are denied. *See* N.D. Tex. Civ. R. 7.1(g).

[*3]

I

The court has previously set out certain of the background facts of this case in an opinion that addressed claim construction. *See Aspex Eyewear, Inc. v. E'lite Optik, Inc., 2001 WL 204775,* at *1 (N.D. Tex. Feb. 27, 2001) (Fitzwater, J.). The court will add to that discussion the relevant facts and procedural history necessary to place today's decisions in context.

This case involves spectacle frames that support an auxiliary frame, enabling the user to securely fasten a second set of lenses (often sunglass lenses) onto the primary frame (often holding prescription lenses). Previous mechanisms for attaching additional lenses to eyeglasses relied either on clips or magnets mounted on the front of the primary frames. The design described by the *'207* patent allows for a more stable, secure attachment of the auxiliary frame through a structural arrangement included in the frames. The invention involves projections on the rear and side portions of the primary frames and arms on the side portions of the auxiliary frames. Magnets secured in the projections of the primary frames engage with magnets secured in the arms of the auxiliary frames when the arms of the auxiliary [*4] frames are extended over and supported on the upper side portions of the primary frames. This ensures that the auxiliary frames will not move downward relative to the primary frames. *Id.*

The *'207* patent issued to Richard Chao ("R. Chao") on October 22, 1996. He assigned his rights in the patent to Contour Optik, Inc. ("Contour") on January 24, 1997.

On February 1, 1997 Contour entered into a license agreement with Ira Lerner, Inc., d/b/a Manhattan Design Studio ("MDS"), under which MDS obtained the exclusive right to distribute, market, and sell in the United States eyewear protected by the *'207* patent. By letter dated March 23, 1998, Contour's legal counsel informed MDS' attorneys that, due to MDS' failure to take remedial action in response to Contour's previous notice of material breach and demand for cure, Contour was terminating the license agreement, effective immediately. On March 25, 1998 Contour informed the president of Chic Optic ("Chic") that the license agreement with MDS had terminated, and Contour granted Chic the same exclusive rights that MDS had held. On March 26, 1998 Chic granted Aspex what it termed an exclusive sublicense under the *'207* patent.

Contour eventually [*5] filed a demand for arbitration against MDS alleging breaches of the February 1, 1997 license agreement. On May 14, 1999 the arbitration panel ruled that MDS had breached the agreement. In December 1999 Contour and MDS entered into a written settlement agreement under which MDS was precluded from representing that it retained any rights in the *'207* patent except as may be expressly authorized in writing by the patent owners.

Meanwhile, the *'207* patent had become the subject of an interference proceeding in the United States Patent and Trademark Office ("PTO") between Contour and Asahi-Optical Co., Ltd. ("Pentax"), owner of another patent application. The purpose of the interference was to determine which invention--the one protected by the *'207* patent or the one protected by Pentax's patent application--was invented first. On March 30, 2000 Contour and Pentax resolved the interference proceeding by entering into a settlement agreement. Contour and Pentax agreed to a private means of determining which invention came first. They also agreed that they would co-own the patent or application that protected the invention, and the other patent or application would be terminated. The *'207* [*6] patent was declared the surviving patent and is now co-owned by Contour and Pentax.

Pentax had previously licensed its rights under its patent application to MDS. That license survived under the settlement agreement between Contour and Pentax, as did Aspex's sublicense under Chic's license of the *'207* patent. As of February 8, 2000 Aspex had purchased all outstanding shares of capital stock in MDS, and MDS is now a division of Aspex.

E'Lite also sells eyeglasses that allow the user to attach an auxiliary frame to a primary eyeglass frame. Aspex alleges that E'Lite's Smart Clip and Mac Eye models of eyewear infringe the *'207* patent. E'Lite de-

fends Aspex's infringement action on several grounds, and it seeks relief by way of a counterclaim.

II

Although the parties have filed nine motions that are the subject of this decision, it appears most logical to begin with E'Lite's motion to dismiss for lack of standing. "It is well established . . . that [HN1] before a federal court can consider the merits of a legal claim, the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue." *Whitmore v. Ark., 495 U.S. 149, 154, 109 L. Ed. 2d 135, 110 S. Ct. 1717 (1990).* [*7]

A

E'Lite contends that Aspex lacks Article III standing because it has no rights in the *'207* patent. It maintains that Aspex is neither the patentee, assignee, nor exclusive licensee. E'Lite asserts that Aspex is at best a nonexclusive licensee.

The Patent Act of 1952 provides that [HN2] "a patentee shall have remedy by civil action for infringement of his patent." *35 U.S.C. § 281.* [HN3] The term "patentee" includes the successors in title to the patentee. *See 35 U.S.C. § 100*(d). Without the patentee as plaintiff, the remedies provided in the patent statute are unavailable except in extraordinary circumstances, such as when the patentee is the infringer and cannot sue himself. *Crown Die & Tool Co. v. Nye Tool & Mach. Works, 261 U.S. 24, 40-41, 67 L. Ed. 516, 43 S. Ct. 254, 1923 Dec. Com'r Pat. 651 (1923)* (holding that plaintiff must have legal title to patent at time of infringement).

On March 16, 1998, while MDS was still Contour's exclusive licensee of the *'207* patent, Contour granted Chic the option to act as its exclusive licensee "immediately upon termination by [Contour] or any other party or tribunal of any existing agreement(s) of [Contour] [*8] related to [the *'207* patent] and goods made according to this patent." P. Standing App. 13. This option agreement included Chic's right to grant sublicenses to other parties. *Id.* In a March 25, 1998 letter, Contour informed Chic that on March 23 it had terminated its exclusive license agreement with MDS and that pursuant to its option agreement, Chic "had the right in the United States of America, to import, distribute and sell frames covered by [the *'207* patent]." *Id.* at 11. A panel of arbitrators ultimately decided that MDS had breached its contracts with Contour by entering into a distribution agreement with another company, *see* D. Standing App. 48, thereby legitimizing Contour's decision to terminate its exclusive license agreement with Chic. As of March 25, 1998 Chic, by virtue of the terms of its earlier option agreement with Contour, possessed rights as a licensee of the *'207* patent.

On March 26, 1998 Chic exercised its rights by sublicensing them to Aspex. *See* P. Standing App. 31. As of that date, Aspex possessed rights as a *'207* patent licensee. E'Lite emphasizes, however, a subsequent agreement between Contour and Chic, dated April 7, 1998. In this agreement, [*9] Contour and Chic "amend, re-state and supercede in their entirety" the "five prior written understandings" between the two parties, which include the March 16 option agreement. *Id.* at 17. According to E'Lite, this means the April 7 document is the one that actually grants Chic a license in the *'207* patent, which, in turn, means that the March 26 agreement between Chic and Aspex conveys no such rights to Aspex, since Chic possessed no such rights at that time. Under this logic, because there is on evidence of a sublicense agreement between Chic and Aspex after April 7, Aspex has no rights in the *'207* patent and thus no standing to sue E'Lite.

But E'Lite misapprehends the nature of the March 16 and April 7 agreements between Contour and Chic. On March 16 Contour granted Chic an option that would become a license immediately upon termination of Contour's agreement with MDS, which subsequently occurred on March 23. Chic thus possessed rights as a licensee of the *'207* patent as of March 23, 1998, and Contour confirmed as much in its March 25 letter to Chic. Chic's March 26 agreement with Aspex therefore conveyed rights in the *'207* patent. The final agreement between Contour and Chic [*10] merely combined and expanded on a series of prior agreements and in no way purported to alter the conveyance of the license to Chic or Chic's rights to convey in turn a sublicense to another party. The fact that this contract was signed on April 7 is therefore immaterial to the question of standing because, as of that date, Aspex already possessed the rights it seeks to enforce in the instant suit. E'Lite's contention that Aspex has no rights in the *'207* patent is therefore without merit.

B

E'Lite contends in the alternative that Aspex is a nonexclusive or bare licensee of the *'207* patent rather than an assignee or exclusive licensee. It maintains that Aspex lacks standing to sue either in its own name or as a coplaintiff with the patentee.

[HN4] Courts examine the substance of an agreement to determine whether it has the effect of either an assignment or an exclusive license and thus satisfies the statutory requirement that the "patentee" must sue. *See Ortho Pharm. Corp. v. Genetics Inst., Inc., 52 F.3d 1026, 1030 (Fed. Cir. 1995).* Where a patentee makes an assignment of all significant rights under the patent, the assignee may be deemed the effective "patentee" under [*11] the statute and has standing to sue in his own

name for infringement, without joining the actual patentee. *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A., 944 F.2d 870, 875 (Fed. Cir. 1991)* (holding transfer of substantially all rights to be assignment). [HN5] There are three ways in which a patentee can assign to an assignee all significant rights under a patent: by conveying the entire patent, an undivided part or share of the entire patent, or all rights under the patent in a specified geographical region of the United States. *Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1551 (Fed. Cir. 1995)* (citing *Waterman v. Mackenzie, 138 U.S. 252, 255, 34 L. Ed. 923, 11 S. Ct. 334, 1891 Dec. Comm'r Pat. 320 (1891))*. "A transfer of less than one of these three interests is a license, not an assignment of legal title, and it gives the licensee no right to sue for infringement . . . in the licensee's own name." *56 F.3d at 1551-52* (citing *Waterman, 138 U.S. at 255).*

[HN6] Beyond assignees, only exclusive licensees have a rightful place in patent infringement suits. "To be an exclusive licensee for standing purposes, a party must have received, not only [*12] the right to practice the invention within a given territory, but also the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory as well." *Id.* at 1552 (citing *Indep. Wireless Tel. Co. v. Radio Corp. of Am., 269 U.S. 459, 468-69, 70 L. Ed. 357, 46 S. Ct. 166, 1926 Dec. Comm'r Pat. 294 (1926))*. Specifically, an exclusive licensee owns the right to exclude others from making, using, or selling the patented invention in a particular territory of the United States. *Ortho Pharm., 52 F.3d at 1032.* A patent license that simply transfers some of the proprietary rights from the patentee to the licensee is a nonexclusive or bare license, which does no more than protect the licensee from an infringement suit by the patentee. *See id. at 1032.* The use of the word "exclusive" in a license agreement does not control the inquiry whether the license is exclusive; what matters is the intent of the parties and the substance of their agreement. *Textile Prods., Inc. v. Mead Corp., 134 F.3d 1481, 1484 (Fed. Cir. 1998).*

1

The court holds that Aspex is not an assignee of the '207 patent and therefore [*13] does not have standing to sue E'Lite in its own name. In its response to E'Lite's motion, Aspex refers to itself as "an 'exclusive' licensee with standing to sue in its own name." As discussed *supra*, [HN7] an exclusive licensee can sue as a coplaintiff with the patentee, but only an assignee with all significant rights under the patent has standing to sue in its own name. Aspex does not possess all significant rights under the '207 patent.

Under Chic's agreement with the patentee Contour, Contour retains the right to "take appropriate enforce-

ment actions" against any potential infringers if Chic does not do so within 30 days notice of potential infringement. P. Standing App. 23. Aspex thus "does not enjoy the right to indulge infringements, which normally accompanies a complete conveyance of the right to sue." *Abbott Labs. v. Diamedix Corp., 47 F.3d 1128, 1132 (Fed. Cir. 1995)* (holding right to indulge infringements to be significant right and therefore indication there was no assignment). n2 This retained right is of the sort commonly held sufficient to make a patentee who grants an exclusive license a necessary party to an infringement action brought by the licensee. [*14] *See, e.g., Grantham v. McGraw-Edison Co., 444 F.2d 210, 213-16 (7th Cir. 1971)* (holding licensing patentee retained right to sue infringers if licensee refused to do so); *Erbamont, Inc. v. Cetus Corp., 720 F. Supp. 387, 392-96 (D. Del. 1989)* (same).

N2 The Federal Circuit distinguished *Abbott Laboratories* in *Speedplay, Inc. v. Bebop, Inc., 211 F.3d 1245 (Fed. Cir. 2000).* In *Speedplay* the court held that the patentee's "right to sue an infringer if Speedplay does not is illusory, because Speedplay can render that right nugatory by granting the alleged infringer a royalty-free sublicense. Although the licensee in Abbott could grant sublicenses, its right to do so was not unfettered, because it was liable for annual royalties on the sales of the sublicensees." *Id. at 1251.* In the instant case, the agreement between Contour and Chic allows Chic to grant royalty-free sublicenses such as the one it granted Aspex, but that right is limited by the provision "that [Chic] shall be responsible for the operations of its sublicensees relevant to this Agreement as if such operations were carried out by [Chic]." P. Standing App. 19. Contour could argue that this limitation prevents Chic from granting a sublicense to any and all potential infringers, because such grants could be construed as violating Chic's obligations under the "Notice and Enforcement of Infringement" section of its agreement with Contour. This potentially valid interpretation of the agreement, which, if accepted by a court, would not render nugatory Contour's right to sue an infringer, indicates that Contour retains a significant interest in the '207 patent in a manner that could hinder Chic's full enjoyment of its patent rights. Moreover, even if Chic could legally grant a sublicense to any potential infringer, Contour would still maintain the right to sue that infringer for damages caused during the period from the beginning of the infringement to the granting by Chic of a sublicense to the infringer, since there is no provision in the agreement between Contour and

Chic allowing Chic retroactively to take away Contour's right to sue by granting sublicenses. The *Speedplay* holding thus does not provide a rationale for considering Aspex an assignee with all significant rights in the *'207* patent.

[*15]

Contour additionally retains the right to pay up to 50% of litigation costs against any potential infringers and therefore to recover a pro rata share of any proceeds received. *See* P. Standing App. 23. This, too, constitutes a significant right. *See Abbott Labs.*, *47 F.3d at 1132* (holding patentee's right to participate in suit brought by successor in interest to be indication there was no assignment). Because Contour has retained significant rights under the *'207* patent, Aspex does not have a sufficient interest to sue on its own as the "patentee" entitled by *35 U.S.C. § 271* to judicial relief for infringement.

2

The court concludes next that Aspex is an exclusive licensee of the *'207* patent who has standing to sue for infringement as a coplaintiff. [HN8] The two keys to an exclusive license are the right to practice the invention in a given territory and the patentee's promise that others will be excluded from practicing the invention within that territory. *Rite-Hite, 56 F.3d at 1552*. Under the terms of the license agreement between Contour and Chic, "[Contour] appointed [Chic] its exclusive licensee throughout the Territory [*16] to make, use, import, sell and distribute frames covered by the claims in the [*'207* patent]." P. Standing App. 18-19. Moreover, Contour agreed to "take all necessary steps to ensure that none of [its] other distributors sell any Frames in the Territory." *Id.* at 21. Because they provide for the two key rights associated with exclusive licensees, the specific terms of the license agreement between Contour and Chic indicate their intent that Chic serve as Contour's exclusive licensee in the United States, with the standing necessary to sue for patent infringement.

There are other provisions in the Contour-Chic license agreement that support Chic's status as an exclusive licensee. Contour granted Chic the right to sublicense the *'207* patent, *see id.* at 19, which is a factor that weighs strongly in favor of finding that Chic thereby acquired significant proprietary rights in the *'207* patent. *See, e.g., Prima Tek II, L.L.C. v. A-Roo Co., 222 F.3d 1372, 1380 (Fed. Cir. 2000); Zenith Elec. Corp. v. ExZec Inc., 876 F. Supp. 175, 179 (N.D. Ill. 1995).* Contour also granted Chic the right to enforce the *'207* patent against infringers, *see* P. Standing [*17] App. 22, which is "particularly dispositive" of the standing issue, *Vaupel Textilmaschinen KG, 944 F.2d at 875*. Because Chic received proprietary rights in the *'207* patent beyond a covenant not to be sued for infringement when practicing the invention, Contour made Chic the exclusive licensee of the *'207* patent.

Aspex is, in turn, Chic's exclusive sublicensee by virtue of their March 26, 1998 agreement. Chic granted Aspex "an exclusive license to make, use, sell, or have made any products" under the *'207* patent. P. Standing App. 31. Chic cannot make, use, sell, or have made in the United States any products under the *'207* patent without Aspex's express authorization. *Id.* Chic also transferred to Aspex the exclusive right to enforce the *'207* patent in the United States, even against Chic. *Id.* at 32-33. Chic has thus transferred its significant proprietary rights in the *'207* patent to Aspex, who as sublicensee steps into Chic's shoes as exclusive licensee for purposes of determining standing. [HN9] The fact that an exclusive sublicensee derives interest in the patent through an intermediate exclusive licensee does not affect the exclusive sublicensee's status as a [*18] party with the proprietary right to exclude. *See Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc., 761 F.2d 649, 651-52 (Fed. Cir. 1985)* (holding patentee, exclusive licensee, and exclusive sublicensee have joint standing to sue for infringement).

In denying the intent of Contour and Chic and, by implication, of Chic and Aspex shortly thereafter, to create an exclusive license arrangement, E'Lite points to two examples of subsequent practice among the parties to this series of agreements that it contends conflict with the interpretation that Aspex possesses the proprietary rights in the *'207* patent necessary for standing to sue.

First, E'Lite argues that "Contour exercised continued ownership control in granting MDS a limited license in December 1999, long after the time plaintiff claims exclusive rights." D. Standing Br. 5. The December 1999 arbitration settlement agreement between Contour and MDS expressly prevents MDS from "stating, suggesting, implying or otherwise communicating, either directly or indirectly, to any third party that [it] has any rights under [the *'207* patent], except insofar as may be expressly authorized in writing in any agreement between [*19] Contour and Pentax[.]" D. Standing App. 50. The settlement prevents MDS from "making, using, selling, offering for sale, distributing or importing into the United States any top-mounted magnetic optical frames other than Pentax brand name frames, except insofar as a court or administrative agency of competent jurisdiction may hereafter determine otherwise[.]" *Id.* These two provisions indicate that Contour was not granting MDS a limited license in the *'207* patent. Rather, it was ensuring that MDS agreed not to infringe the patent while recognizing that the ongoing dispute between certain Contour patents and certain Pentax patents could result in a mutual resolution wherein MDS would retroactively obtain

limited rights in the *'207* patent. In any case, the December 1999 agreement prevents MDS from practicing the invention at all, limited only by a future agreement between Contour and Pentax. Because that limitation had no effect as of the arbitration settlement agreement itself, Contour did not grant MDS a limited license in the *'207* patent in December 1999 and thereby exercise proprietary rights in that patent.

Second, E'Lite contends that Aspex lacks standing as an [*20] exclusive licensee because Contour assigned co-ownership rights in the *'207* patent to Pentax in May 2000. Contour and Pentax entered into their agreement because there had been an ongoing dispute between the two companies concerning which one had the right to practice certain inventions in certain parts of the world. There was an interference proceeding before the PTO Board of Appeals concerning the *'207* patent and a Pentax patent application. *See* P. Standing App. 95. Before the proceeding was resolved, Contour and Pentax agreed that they would co-own the invention embodied in both. *See id.* They ultimately decided to co-own the Contour patent and abandon the Pentax application. *See id.* Because this decision resulted in Contour's assigning a one-half undivided interest in the *'207* patent to Pentax, subject not only to Contour's exclusive license agreement with Aspex but also to an exclusive license agreement in the abandoned Pentax application between Pentax and MDS, E'Lite argues that Contour still possessed significant proprietary rights in the *'207* patent as of May 2000 and that Aspex is therefore not an exclusive licensee with standing to sue for infringement.

The May [*21] 2000 agreement does not necessarily indicate, however, that Contour and Chic did not intend to create an exclusive licensing arrangement in March 1998. E'Lite's specific position is that Contour's actions in negotiating the agreement with Pentax, and Aspex's failure to object to it, are indicative, as subsequent practice, that Chic was not intended to be an exclusive licensee. There is a way, however, for the court to read the May 2000 agreement between Contour and Pentax that would harmonize it with the intent of Contour and Chic to create an exclusive license arrangement in their earlier agreement. After March 1998, Aspex cared about the value of its exclusive license in the *'207* patent. At the same time, Contour and Pentax were involved in an interference proceeding that could have resulted in the *'207* patent's being superseded by Pentax's similar patent. When Contour and Pentax agreed to be retroactive co-patentees of the winning patent in the interference proceeding, Aspex had an interest in allowing such an arrangement because the alternative was the risk that its exclusive license in the *'207* patent could be rendered meaningless by an adverse ruling by the Board of Appeals. [*22] Under this plausible interpretation, the May

2000 agreement protected Aspex's interest in the value of its exclusive license; it did not indicate the lack of such a proprietary interest.

Moreover, even if the May 2000 agreement between Contour and Pentax, and Aspex's apparent acquiescence in it, contradicts the terms of the earlier agreement between Contour and Chic that clearly grants Chic an exclusive license in the *'207* patent, that fact does not strip Aspex of its rights as an exclusive licensee and of its standing in this case. There are a host of reasons, such as the risk determination discussed *supra,* that could have motivated Aspex to acquiesce in Contour's negotiations and ultimate resolution with Pentax. In determining whether Aspex has made a *prima facie* case for standing, it would be inappropriate for the court to reach the merits as to those reasons. Aspex has met its *prima facie* burden by providing a series of agreements among Contour, Chic, and itself that clearly establishes the intent of the parties to make Aspex the exclusive licensee of the *'207* patent. The fact that Contour may have violated the agreements at a later date by assigning rights in the [*23] patent to Pentax does not change the fact that Aspex legally obtained those rights in March 1998 and may attempt to vindicate them in an infringement suit against E'Lite.

Because the terms of the agreements among Contour, Chic, and Aspex in the spring of 1998 clearly indicate the parties' intent to make Aspex the exclusive licensee in the United States of the *'207* patent, and because E'Lite has not pointed to any significant exclusionary rights intended to be retained by Contour that contravene Aspex's exclusive licensing arrangement, the court holds that Aspex has coplaintiff standing to sue for patent infringement and denies E'Lite's motion to dismiss for lack of standing.

III

Aspex moves to join any additional parties needed for a just adjudication. n3 Specifically, Aspex requests that the court join Contour, Pentax, and MDS n4 if it determines they are necessary within the meaning of *Fed. R. Civ. P. 19* and *21.*

> n3 E'Lite has filed a motion on both procedural and evidentiary grounds to strike certain parts of Aspex's appendix to its motion. Because the court did not rely on any evidence in Aspex's appendix to its motion to join additional parties in deciding the motion, E'Lite's motion to strike is denied as moot.

[*24]

n4 Aspex refers to MDS in its motion by the shorthand term "Lerner." *See, e.g.,* P. Mot. Join Add'l Parties at 3.

Because the court has determined that Aspex has standing to sue as a coplaintiff with the patentee of the *'207* patent, and because under the assignment executed in the May 2000 agreement between Contour and Pentax both companies co-own the patent, the court orders that they should be joined as additional parties. Under the terms of the May 2000 agreement, MDS retains an exclusive license to practice the *'207* patent invention under the Pentax brand. Accordingly, the court holds that MDS "claims an interest relating to the subject of the action and is so situated that the disposition of the action in [its] absence may . . . impair or impede [its] ability to protect that interest," Rule 19(a), and orders that MDS be joined.

E'Lite objects to Aspex's motion, contending it has not made an adequate showing under Rule 19, the motion is untimely, Aspex must have standing to enforce the *'207* patent in order for the entire case not to be dismissed, and it will be prejudiced if this [*25] relief is granted. The court disagrees. [HN10] Under Rule 21, the court may join additional parties on "its own initiative at any stage of the action." Moreover, for E'Lite's timeliness argument to have merit, it must demonstrate that it will incur a hardship if the motion is granted and the three additional parties are added. E'Lite's argument in this regard is too general and conclusory, *see* D. Resp. Mot. Join Add'l Parties at 8-9, and it therefore has not made the required showing. n5 Finally, the court has already determined that Aspex has coplaintiff standing to sue for infringement. Because this determination requires joining Contour and Pentax as co-owners of the *'207* patent, and since the court holds that MDS is a necessary party, the court grants the motion and orders all three parties joined in this action.

n5 Aspex does not oppose E'Lite's conducting limited discovery regarding additional parties, provided it can demonstrate a genuine need to do so. *See* P. Mot. Join Add'l Parties at 2. Accordingly, if the parties cannot resolve this issue by agreement, E'Lite may move to take discovery that is necessary by reason of the addition of these parties.

[*26]

IV

E'Lite moves for partial summary judgment as to its invalidity counterclaim and affirmative defense. It contends the *'207* patent is invalid because it is anticipated by and obvious from prior inventions. E'Lite argues that

any *'207* patent claims covering back-mounted eyewear design are invalid because the patentee did not invent the back-mounted design; rather, such a design was anticipated by an earlier patent. It also contends the invention covered by the *'207* patent is obvious to a person of ordinary relevant skill at the time of invention in that it was contemporaneously made by Rony Ovadia ("Ovadia"), Julie Madison ("Madison"), Toshikayu Iwamoto ("Iwamoto"), David Chao ("D. Chao"), and R. Chao. Aspex responds that E'Lite has failed to produce clear and convincing evidence of either anticipation or obviousness.

A

[HN11] A patent enjoys a presumption of validity. *See 35 U.S.C. § 282; Hybritech Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1375 (Fed. Cir. 1986).* This presumption can be overcome only if the party seeking to invalidate the patent meets its burden of establishing invalidity by clear and convincing evidence. *Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 962 (Fed. Cir. 2001).* [*27] Because E'Lite will have the burden of proof at trial on its invalidity counterclaim and affirmative defense, to obtain summary judgment it "must establish 'beyond peradventure all of the essential elements of the claim or defense.'" *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am., 878 F. Supp. 943, 962 (N.D. Tex. 1995)* (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co., 780 F.2d 1190, 1194 (5th Cir. 1986)).*

B

Before turning to the merits of E'Lite's invalidity argument, the court must address a procedural issue that significantly impacts the resolution of this part of E'Lite's motion for partial summary judgment. [HN12] N.D. Tex. Civ. R. 56.5(a) requires that the motion "be accompanied by a brief that sets forth the argument and authorities on which the party relies[.]" Rule 56.6(a) states that [HN13] "[a] party who relies on affidavits, depositions, answers to interrogatories, or admissions on file to support or oppose a motion for summary judgment must include such evidence in an appendix." Rule 56.5(c) provides that [HN14] "[a] party whose motion or response is accompanied by an appendix must include in its brief citations to each page of the appendix that [*28] supports each assertion that the party makes concerning the summary judgment evidence." E'Lite supports its arguments with global citations to various tabs in its appendix rather than to particular supporting evidence on specific pages of the appendix. *See, e.g.,* D. MPSJ Br. at 7, 8, 9.

The court in deciding E'Lite's motion will not take into account summary judgment evidence that E'Lite has not cited in the manner required--that is, to each page of the appendix that supports each assertion that the party makes concerning the evidence. "Otherwise, [Rule 56.5(c)] would not mean what [it] says." *See Andrews v.*

*CompUSA, Inc.,* 2002 U.S. Dist. LEXIS 2953, 2002 WL 265089, at *3 (2002)(Fitzwater, J.). The court will not undertake a search of the appendix for evidence that would be sufficient to grant summary judgment in E'Lite's favor. [HN15] The court is not required to "comb the record" in search of summary judgment evidence. *See Doddy v. Oxy USA, Inc., 101 F.3d 448, 463 (5th Cir. 1996)* (citing *Jones v. Sheehan, Young & Culp, P.C., 82 F.3d 1334, 1338 (5th Cir. 1996)).* "Nor will the court overlook Rule 56.5(c), a valuable tool for busy trial courts [*29] that requires a party to place an issue clearly in focus by citing in its brief *each* page of the appendix that supports *each* assertion that it makes concerning the summary judgment evidence." *Andrews, 2002 U.S. Dist. LEXIS 2953,2002* WL 265089 at *3. Moreover, the court will not consider arguments supported for the first time with specific evidence in a movant's reply brief, because in doing so the court would be considering summary judgment on a ground not raised in the motion. *See John Deere Co. v. Am. Nat'l Bank, Stafford, 809 F.2d 1190, 1192 (5th Cir. 1987)* (holding that it is error for court to grant summary judgment on ground not properly raised); *Senior Unsecured Creditors' Comm. of First RepublicBank Corp. v. FDIC, 749 F. Supp. 758, 772 (N.D. Tex. 1990)* (Fitzwater, J.) (holding that court will not consider on summary judgment a new argument raised in a reply brief). "If the court disregards or "relaxes" the rules in this case, on what principled basis could it apply them again or justify why it has enforced them literally in prior cases?" *Andrews, 2002 U.S. Dist. LEXIS 2953, 2002 WL 265089* at *3. Therefore, to establish the elements of its invalidity counterclaim [*30] "beyond peradventure," E'Lite must, with the requisite specificity, cite in the brief accompanying its motion for partial summary judgment relevant evidence from its appendix.

C

E'Lite's anticipation argument--that the *'207* patent claims covering back-mounted designs are invalid because Contour represented to the PTO that such designs were not in fact protected by the patent--fails in that it does not shift the burden to Aspex to respond. [HN16] *35 U.S.C. § 101* requires that, to obtain a patent, the applicant be the first inventor. Additionally, *35 U.S.C. § 102* provides that a person shall not be entitled to a patent unless:

(f) he did not himself invent the subject matter sought to be patented, or

(g)(1) during the course of an interference conducted under section 135 or section 291, another inventor involved therein establishes, to the extent permitted in section 104, that before such person's invention thereof the invention was made by such other inventor and not abandoned, suppressed, or concealed, or (2) before such person's invention thereof the invention was made in this country by another inventor who had not abandoned, [*31] suppressed, or concealed it[.]

E'Lite makes no effort to indicate which of these statutory provisions the *'207* patent violates, nor does it attempt to establish each element of a violation of one of them. Rather, E'Lite's argument is constructed as a series of assertions about D. Chao's relationship with Contour and his testimony at a PTO hearing. The only citations E'Lite offers as evidence of these assertions are to "Appendix Tabs" G and I. *See* D. MPSJ Br. at 7. Tab G contains the entire record of a February 24, 1999 PTO interference hearing between R. Chao and Iwamoto, and tab I contains the entire U.S. Patent No. *6,109,747* ("the *'747* patent") for eyeglass frames with magnets in flanges. Because E'Lite does not tie the assertions it makes to the elements of an invalidity claim based on anticipation, and because it does not even make an effort to cite specific pages in its appendix that provide support for the assertions it makes in its argument, it has failed to raise an argument to which Aspex must respond, and summary judgment is inappropriate.

D

E'Lite's obviousness argument--that Ovadia, Madison, Iwamoto, R. Chao, and D. Chao simultaneously invented the invention [*32] covered by the *'207* patent--also fails and does not shift the burden to Aspex to respond. *35 U.S.C. § 103*(a) provides:

[HN17] A patent may not be obtained though the invention is not identically disclosed or described as set forth in Section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains[.]

E'Lite undertakes no attempt to link the assertions it makes about the work of Ovadia, Madison, and Iwamoto to the elements of invalidity based on obviousness set out

in this statute. Moreover, it fails to cite properly evidence for the assertions it does advance. In discussing Ovadia's work, E'Lite makes specific assertions as to the timing and nature of the work, but cites only to appendix tab J, *see id.* at 8, which contains several pages of Ovadia's deposition testimony. In discussing Madison's work, E'Lite offers her testimony that she invented both top-mounted and back-mounted eyewear designed at a particular time, [*33] but cites to the entirety of appendix tabs K and L. *See id.* at 9. Tab K contains a large portion of Madison's deposition testimony, and tab L is the entire patent for her invention. In discussing Iwamoto's work, E'Lite fails to cite supporting evidence for its assertions. *See id.* Because E'Lite does not tie the assertions it makes to the elements of an invalidity claim based on obviousness, and because it does not cite specific pages in its appendix that provide support for the specific assertions it makes in its argument, it has failed to raise an argument to which Aspex must respond, and summary judgment is unwarranted.

E'Lite has not established "beyond peradventure" the essential elements of anticipation or obviousness. The court therefore denies E'Lite summary judgment on its invalidity counterclaim and affirmative defense.

## V

E'Lite also moves for partial summary judgment as to Aspex's patent infringement claims.

## A

In considering E'Lite's motion, the court must first construe the meaning of certain key claims. n6 [HN18] Claim construction is a matter of law, and claims are construed by the court as they would be understood by persons of ordinary skill in the field of the [*34] invention. *See Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996).* The court starts with the claim itself, read in light of the specification. *See Vivid Techs., Inc. v. Am. Science & Eng'g, Inc., 200 F.3d 795, 804 (Fed. Cir. 1999).* Using these tools, the court construes only the claims that are in controversy, and only to the extent necessary to resolve the dispute. *Id. at 803.*

> n6 A *Markman* hearing is unnecessary in this case. *See Markman v. Westview Instruments, Inc., 517 U.S. 370, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996), aff'g Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995)* (en banc). In some patent cases, a claim construction hearing allows the court to question and evaluate attorney argument and/or witness testimony regarding the competing claim constructions. This

process may be helpful when the claims are ambiguous or the technology is complex. [HN19] Nothing, however, mandates the use of a *Markman* hearing in every patent case. Courts retain the discretion to construe the claims on the basis of a paper record alone. *See Interactive Gift Express, Inc., v. Compuserve Inc., 1998 WL 247485, at *1 n.3 (S.D.N.Y. May 15, 1998)* ("The court notes at the outset that no *Markman* hearing is needed in this case because the court does not require expert or other testimony to aid it in its claim construction."). In a case such as the present one, where the technology is accessible to the court and the claims are relatively straightforward, a *Markman* hearing is unnecessary.

[*35]

The *'207* patent has two claims. Claim I is an independent claim and states:

> An eyeglass device comprising:
>
> a primary spectacle frame for supporting primary lenses therein, said primary spectacle frame including two side portions each having an extension extended therefrom for pivotally coupling a leg means thereto, said primary spectacle frame including two rear and side portions each having a projection secured thereto, said primary spectacle frame including an upper side portion,
>
> a pair of first magnetic members secured in said projections respectively,
>
> an auxiliary spectacle frame for supporting auxiliary lenses therein, said auxiliary spectacle frame including two side portions each having an arm extended therefrom for extending over and for engaging with said upper side portion of said primary spectacle frame, and
>
> a pair of second magnetic members secured to said arms respectively for engaging with said first magnetic members of said primary spectacle frame so as to secure said auxiliary frame to said primary spectacle frame,
>
> said arms being engaged with and supported on said upper side portion of said primary spectacle frame so as to allow

said [*36] auxiliary spectacle frame to be stably supported on said primary spectacle frame and so as to prevent said auxiliary spectacle frame from moving downward relative to said primary spectacle frame and so as to prevent said auxiliary spectacle frame from being disengaged from said primary spectacle frame.

D. MPSJ App. 5. Claim 2 is a dependent claim and includes limitations on claim 1, stating:

An eyeglass device according to claim 1, wherein said projections and said first magnetic members are arranged lower than said upper side portion of said primary spectacle frame, and second magnetic members are extended downward toward said projections for hooking on said primary spectacle frame so as to further secure said auxiliary spectacle frame to said primary spectacle frame.

*Id.*

[HN20] In addition to the claim language, the prosecution history is "often helpful in understanding the intended meaning as well as the scope of technical terms." *Vivid Techs., 200 F.3d at 804.* The prosecution history includes the record of interference proceedings. *See Phillips Petroleum Co. v. Huntsman Polymers Corp., 157 F.3d 866, 872 (Fed. Cir. 1998).* In [*37] particular, the prosecution history is relevant in determining whether the patentee intends the language of the patent to be understood in its ordinary meaning.

[HN21] Although a court should generally give the terms of a patent their ordinary meaning, "a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." *Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).* When this intrinsic evidence unambiguously describes the scope of a patented invention, reliance on extrinsic evidence is improper. *See id. at 1583.* Extrinsic evidence, including expert testimony, "is not to be relied upon for purposes of claim construction, other than to aid the judge in understanding the technology[.]" *EMI Group N. Am., Inc. v. Intel Corp., 157 F.3d 887, 892 (Fed. Cir. 1998).* In the present case, where the technology involved is uncomplicated and the claims are unambiguous, expert testimony is not needed.

B

E'Lite interprets the *'207* patent claims to require that (1) the term [*38] "projection" refers to an area behind the frame that receives and holds the magnet; (2) the term "upper side portion of said primary frame" does not refer to the upper side of the projection; and (3) the term "arm" means an arm that is substantially straight and does not extend below the projection. Aspex contends that (1) the "projection" is part of the primary spectacle frame; (2) the term "upper side portion" of primary spectacle frame includes the top side of the projection; and (3) the "arm" is not limited to being substantially straight or being above the projection.

1

E'Lite argues that the *'207* patent claims limit the meaning of "projection" to the area behind the frame that receives and holds the magnet. Aspex contends the projection is part of the primary spectacle frame. To support its argument, E'Lite cites tab A of its appendix, which is simply the entire *'207* patent. E'Lite neither specifies language in the patent nor explains specifically how any of the patent language--whether in the claims themselves or the specification--favors its interpretation of the term. The general citation is insufficient because it does not assist the court in its claim construction [*39] analysis. E'Lite cites no prosecution history to support its interpretation.

Aspex points the court to the claim language and to the specification as evidence supporting its construction of the meaning of the term "projection." Claim 1 includes the limitation "said primary spectacle frame including two rear and side portions each having a projection secured thereto[.]" D. MPSJ App. 5. The plain language of this limitation favors Aspex's construction that the extensions, projections, and magnetic members are part of the primary spectacle frame. The specification, by stating plainly and directly that the primary spectacle frame includes the projections, provides even clearer evidence favoring such a construction: "The primary spectacle frame 10 *includes two projections* 13 secured to the rear and side portions thereof for supporting magnetic members 14 therein." *Id.* at 4 (emphasis added). [HN22] The court may consider the specification in interpreting the claim, *see Vivid Techs., 200 F.3d at 804,* and therefore construes the term "projections" to be part of the primary spectacle frame.

2

E'Lite asserts that the "upper side portion" of the primary spectacle frame [*40] does not refer to the upper side of the projections. Aspex posits that the term does include the top side of the projections.

E'Lite again cites only tab A of its appendix and does not offer into evidence any of the patent prosecution history favoring its proposed construction. Aspex points to the claim language and to the specification as evidence supporting its proposed construction. The *'207* patent claims an auxiliary spectacle frame "including two side portions each having an arm extended therefrom for extending over and for engaging with said upper side portion of said primary spectacle frame[.]" *Id.* at 5. In other words, whatever the auxiliary frame engages with is defined as part of the upper side portion of the primary frame. The patent also claims "a pair of second magnetic members secured to said arms respectively for engaging with said first magnetic members of said primary spectacle frame so as to secure said auxiliary spectacle frame to said primary spectacle frame[.]" *Id.* This means that the first magnetic members are the point of engagement between the auxiliary and primary frames. Reading these two cited portions of claim 1 together, it is clear that the [*41] first magnetic members are part of the upper side portion of the primary spectacle frame. Because the magnetic members are in the projections, *see id.* at 4 ("The primary spectacle frame 10 includes two projections 13 secured to the rear and side portions thereof for supporting magnetic members 14 therein."), the projections are also part of the upper side portion of the primary spectacle frame.

E'Lite argues in its reply brief that Aspex's proposed construction "does not take into account the plain language of the claim, the description of the primary frame and projections as described in the specification, nor Claim 2." D. MPSJ Rep. at 3. The court disagrees. The specification language also supports Aspex's construction. It states that "the primary spectacle frame 10 includes two projections 13 secured to the rear and side portions thereof for supporting magnetic members 14 therein." D. MPSJ App. 4. It also states that the auxiliary spectacle frame contains two arms "for extending over and for engaging with the upper portion of the primary spectacle frame 10." *Id.* Because the magnetic members are the point of engagement with the upper portion of the primary frame, and since [*42] the magnetic members are secured within the projections, the projections are part of the upper, or upper side, portion.

The language of claim 2 does not contradict Aspex's proposed construction. Because claim 2 refers to an eyeglass device "wherein said projections and said first magnetic members are arranged lower than said upper side portion of said primary spectacle frame," *id.* at 5, E'Lite appears to contend that the projections and the upper side portion are distinct and that the former are not part of the latter. But claim 2 simply refers to an eyeglass device wherein the auxiliary spectacle frame attaches to the primary spectacle frame at a lower point on the back

of the primary frame "for hooking . . . so as to further secure said auxiliary spectacle frame to said primary spectacle frame." *Id.* For this hooking effect to be accomplished, the two frames must engage at a lower point than that described in claim 1. It is this lower point of engagement that the language of claim 2 attempts to describe. Even though the claim uses the language "lower *than* said upper side portion" (emphasis added) rather than "lower *on* said upper side portion" (emphasis added), it [*43] is not essential to the meaning or purpose of claim 2 that the point of engagement be defined as below the upper side portion of the primary frame. The use of the word "than" rather than "on" does not change the meaning of claim 2. Therefore, it need not be read to contradict the clear language of claim 1 and the specification defining the projections as part of the upper side portion of the primary spectacle frame. The court construes the term "upper side portion" of the primary spectacle frame to include the upper side of the projections.

3

E'Lite asserts that the *'207* patent claims "arms" that are substantially straight and do not extend below the projections. Aspex contends the arms are not limited either to being substantially straight or to being situated above the projections.

E'Lite first cites generally to tabs A, B, and C of its appendix. As the court has already explained, it will not "comb the record" in search of support for E'Lite's proposed construction. *See Doddy, 101 F.3d at 463* (citing *Jones, 82 F.3d at 1338).* More specifically, E'Lite cites an incident from the prosecution history of the *'207* patent in which the patent examiner [*44] rejected the addition of a "Figure 8" as not being supported by the specification and as new matter. The proposed addition contained a downward extension, at a right angle, from the arm of the auxiliary spectacle frame past the top of both the projection and extension on the primary spectacle frame. *See* D. MPSJ App. 20. This proposal for Figure 8 was rejected, and the one that was ultimately accepted was substantially the same, except that the downward extension from the arm of the auxiliary spectacle frame was removed. *See id.* E'Lite cites the acceptance of the revised Figure 8 as evidence that the arms of the auxiliary spectacle frame must be substantially straight and not extend below the primary spectacle frame's projections.

The court rejects this interpretation of the prosecution history evidence. As Aspex points out, the downward extension depicted in the rejected Figure 8 is not necessarily part of the arm, as defined by the patent. Rather, it seems to be an additional flange component extending downward, at a right angle, from the arm. Its

rejection means that the term "arms" cannot include such a flange component, but it does not mean that the arms must be straight [*45] or that they cannot extend below the projections. The prosecution history that E'Lite cites does not establish such a limitation.

The claim language itself also fails to establish such a limitation. Claim 1 refers to an auxiliary spectacle frame that includes "an arm extended therefrom for extending over and for engaging with said upper side portion of said primary spectacle frame[.]" *Id.* at 5. This language does not limit the manner in which the arm may engage with the primary spectacle frame in a way that would prevent the arm from extending below the primary frame's projections. Nor is there language in the specification that would permit the court to construe such a limitation. In fact, the specification states that "the arms 21 and the magnetic members 22 may *hook on* the primary spectacle frame 10 [] such that the auxiliary spectacle frame 20 may further be stably supported and secured to the primary spectacle frame 10." *Id.* (emphasis added). For one object to "hook" onto another object, it usually requires that the hooking object not be substantially straight and that it wrap around or below the object to which it is being hooked. Because the claim language offers [*46] no evidence of the appropriateness of the limitation that E'Lite urges--that the arms must be substantially straight and not extend below the projections--and because the specification language at best suggests the opposite, the court declines to construe the claim as having such a limitation.

Having construed the claims necessary to resolve E'Lite's motion for partial summary judgment, the court now turns to the merits of the motion.

C

E'Lite moves for partial summary judgment that its Smart Clip models of eyeglasses do not infringe either claim of the *207* patent. It maintains that (1) the arm portions of the auxiliary frame do not rest upon the upper side portion of the primary frame; (2) during its inspection process, E'Lite ensures that the arm portion does not touch the upper side portion of the primary frame; (3) the magnetic force is the only force that holds the auxiliary frame of the Smart Clip models in the proper position relative to the primary frame; (4) the magnets in the Smart Clip design are designed so that they mate in a plane substantially parallel to the plane of the lenses, and the eyeglasses are of the back-mounted style; (5) Smart Clip models do not literally [*47] infringe claim 1 of the patent because they do not have arms that rest upon the upper side portion of the primary frame and do not have arms that extend below the projections; (6) Smart Clip models do not literally infringe claim 2 of the patent because they do not literally infringe claim 1, on which

claim 2 is dependent; (7) Smart Clip models do not literally infringe claim 2 because the claim requires that the projections be lower than the upper side portion of the primary frame and Smart Clip models do not have projections lower than the upper side portion of the primary frame; (8) Aspex is estopped from asserting that Smart Clip models literally infringe either claim based on representations made to the PTO during an interference proceeding that the patent does not cover a back-mounted design; (9) the doctrine of equivalents is not applicable because the examiner required, and the inventor consented to, an amendment to both claims inserting the word "side" between the words "upper" and "portion," and no range of equivalents can be asserted for the language; (10) because the Smart Clip models do not have arms touching the upper side portion of the primary frame, the doctrine of [*48] equivalents is not applicable because touching at other locations cannot be equivalent; (11) estoppel prevents application of the doctrine of equivalents to the Smart Clip models; and (12) if the doctrine of equivalents can apply, the Smart Clip models are not equivalent because the arms do not rest on the upper side portions of the primary spectacle frame and there is thus no structure that provides an equivalent to that limitation and the corresponding function, preventing the auxiliary frame from moving relative to the primary frame. n7

n7 Aspex also alleges in its complaint that E'Lite's Mac Eye models infringe claim 1 both literally and under the doctrine of equivalents. Because E'Lite does not move for summary judgment as to the Mac Eye models, the court need not address whether they infringe the *207* patent.

1

E'Lite's arguments relying on its own design and inspection procedures as proof that there is no literal infringement, and asserting that Aspex is estopped from alleging both literal infringement [*49] and infringement under the doctrine of equivalents, are inadequate. For its proof as to key assertions supporting the design and inspection argument, E'Lite cites generally to tabs E and F of its appendix. *See* D. MPSJ Br. at 4. For its proof as to essential allegations supporting the estoppel argument, it cites generally to the interference file in the PTO and tab G of its appendix. *Id.* at 5. It states that the interference file is "not included here due to being *too voluminous.*" *Id.* (emphasis added). The court will not search the record for evidence that E'Lite should have cited specifically concerning design and inspection or estoppel. Because E'Lite as the movant has failed to present evidence supporting its assertions, the burden has not shifted to

Aspex to respond to either argument. Summary judgment on each of these grounds is denied.

2

The court now turns to E'Lite's remaining arguments to support its contention that the Smart Clip models do not infringe. [HN23] When the summary judgment movant will not have the burden at trial concerning a cause of action, it can meet its summary judgment obligation by pointing the court to the absence of evidence to support the claim. [*50] *See Celotex Corp. v. Catrett, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* Once the party does so, the nonmovant must then go beyond its pleadings and designate specific facts showing that there is a genuine issue for trial. *See id. at 324; Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1995) (en banc) (per curiam).* Moreover, the summary judgment nonmovant must produce evidence to establish the existence of each element for which it bears the burden of proof. *See Dunn v. State Farm Fire & Cas. Co., 927 F.2d 869, 872 (5th Cir. 1991).* Summary judgment is mandatory where the nonmoving party fails to meet this burden. *Little, 37 F.3d at 1076.* The nonmovant's failure to adduce proof as to any essential element renders all other facts immaterial. *Celotex Corp., 477 U.S. at 323.*

E'Lite argues that Aspex lacks evidence of two limitations in claim 1. One supposed element--that the arms portions of the auxiliary frames must not extend below the projections--is not in fact present in the claim. *See supra* § V(B)(3). As to the second limitation--that the arms must [*51] rest on the upper side portion of the spectacle frame--Aspex has adduced sufficient evidence to allow a reasonable trier of fact to conclude that the Smart Clip models infringe the patent. Plaintiff's expert, Dr. Arun Kumar ("Dr. Kumar"), n8 examined six Smart Clip models from the Smart Clip 200-model series and concluded that each of them "revealed touching of the arm of the auxiliary frame (clip-on) at the rear corner of the upper side portion of the primary frame. The contact was between the inner radius of the arm of the auxiliary frame and the rear corner of the upper side portion of the primary frame." P. MPSJ App. 567. n9 Dr. Kumar reached the same conclusion after examining six other 200-model series devices and an 800-model series device. *See id.* at 568. A drawing that accompanies Dr. Kumar's report shows that what he refers to as the "upper side portion of the primary frame" comports with the court's construction of that term. *See supra* § V(B)(2). This is so because the point of contact in all the Smart Clip models examined is between magnets on the auxiliary and primary spectacle frames. *See* P. MPSJ App. 569. The court has determined that the magnets secured [*52] to the projections are part of the upper side portion of the primary spectacle frame. *See supra* § V(B)(2). Dr.

Kumar's expert opinion thus constitutes sufficient evidence from which a reasonable trier of fact could find that the Smart Clip 200 and 800-model series contain arms that rest on the upper side portion of the primary spectacle frame.

n8 Although E'Lite has moved to strike Dr. Kumar's testimony, the court denies the motion *infra* at § IX(C).

n9 Aspex did not file an appendix in support of its response to E'Lite's motion for partial summary judgment. Instead, it adopted the appendix it filed in support of its own motion for partial summary judgment. *See* P. MPSJ Resp. Br. at 4. Although this practice does not comply literally with the local civil rules, the court has allowed it where the citations in the party's brief contain the required specificity prescribed by Rule 56.5(c). *See Andrews, 2002 U.S. Dist. LEXIS 2953, 2002 WL 265089, at *3* ("To the extent that [plaintiff] has cited evidence in his own appendix in the manner required by Rule 56.5(c), the court will consider that proof in determining whether there is a genuine issue of material fact as to [defendant's] intent to create a binding compensation contract."). Accordingly, in deciding E'Lite's motion, the court will consider evidence in that appendix that Aspex cites with the required specificity.

[*53]

E'Lite's expert, David L. Hitchcock, Esquire ("Hitchcock"), n10 has also provided evidence that would allow a reasonable trier of fact to draw this conclusion. He admitted under cross-examination that "in some instances, there is contact between the inner radius of the arm [of the auxiliary spectacle frame] and the rear edge of the projection[.]" P. MPSJ App. 557. In other words, at least some of the Smart Clip models contain arms that rest on the projections, which are part of the upper side portion of the primary spectacle frame. Because E'Lite does not distinguish among the various Smart Clip model series, this general evidence provides a sufficient basis to deny summary judgment.

n10 Although Aspex has moved to strike Hitchcock's testimony, the court denies its motion *infra* at § X.

A reasonable trier of fact could find that E'Lite's Smart Clip eyeglasses have auxiliary spectacle frame arms that rest on the upper side portion of the primary

spectacle frame. Summary judgment in E'Lite's favor as to [*54] literal infringement of claim 1 of the *207* patent is denied. n11

> n11 E'Lite's argument in its reply brief that the models Dr. Kumar, and presumably Hitchcock, examined were "mutilated, contorted, and otherwise handled by a substantial number of people, many of [whom] represent [Aspex,]" D. MPSJ Rep. Br. at 4, is insufficient to warrant summary judgment. E'Lite has produced no evidence of such mutilation and contortion, nor would it be proper for the court to rule on whether mutilation or contortion occurred, and whether its occurrence is relevant, at the summary judgment stage. This is a fact issue to be resolved at trial.

3

E'Lite argues that its accused devices do not literally infringe claim 2 of the *207* patent. It maintains that Aspex lacks evidence that the Smart Clip models' projections are lower than the upper side portion of the primary frame. Aspex has neither responded to this contention nor does it appear to argue that any Smart Clip models infringe claim 2. The court therefore grants E'Lite's [*55] motion for partial summary judgment as to all claims that allege that Smart Clip eyeglasses literally infringe claim 2 of the patent.

E'Lite also moves for summary judgment as to infringement of claim 2 under the doctrine of equivalents. n12 It contends there is no range of equivalents that can be asserted in the case of the *207* patent, and, assuming *arguendo* that there is, the doctrine does not apply here. Both arguments rely. on the assertion that because the arms of the Smart Clip models' auxiliary spectacle frame do not rest on the upper side portion of the primary spectacle, the Smart Clip models cannot be equivalents of inventions made under the *207* patent. *See* D. MPSJ Br. at 5-6. Because the court has determined that there is sufficient evidence for a reasonable trier of fact to conclude that the Smart Clip models' arms do touch the upper side portion of the primary spectacle frame, *see supra* § V(C)(2), the court rejects E'Lite's arguments and denies summary judgment as to infringement of claim 2 under the doctrine of equivalents.

> n12 Because the court denies E'Lite's motion for partial summary judgment as to literal infringement of claim 1, its arguments in favor of summary judgment as to infringement of claim 1 under the doctrine of equivalents are also denied. Because E'Lite posits the same arguments under

the doctrine of equivalents as to claims 1 and 2, *see* D. MPSJ Br. at 5-6, the court's reasoning supporting denial of summary judgment as to infringement of claim 2 under the doctrine of equivalents would apply equally to claim 1.

[*56]

4

The court grants E'Lite's motion for partial summary judgment as to any claims by Aspex alleging that E'Lite's Smart Clip models literally infringe claim 2 of the *207* patent. The remainder of E'Lite's motion is denied.

VI

The court now turns to Aspex's motion for partial summary judgment. Aspex moves for summary judgment as to E'Lite's counterclaim and affirmative defense of patent invalidity. It argues that E'Lite generally has failed to adduce evidence that would allow a reasonable trier of fact to find that the *207* patent is invalid, that E'Lite has failed to produce the required evidence as to four statutory bases of invalidity, and that specific evidence that E'Lite may attempt to cite as proof of any of these statutory bases is insufficient. E'Lite argues that the inventions of Ovadia, Madison, and Iwamoto are adequate evidence of anticipation and obviousness under the statutory bases of invalidity, that the interference proceeding between R. Chao and Iwamoto established Iwamoto as the senior party in interest and therefore is sufficient proof of the invalidity of the *207* patent, that certain prior art references show obviousness, and that key terms in the *207* patent [*57] claims are unclear and vague and therefore render the patent invalid.

A

The court first examines Aspex's arguments as to each of the four statutory bases of invalidity at issue.

1

Aspex maintains that it is entitled to summary judgment establishing that the *207* patent is not invalid under *35 U.S.C. § 102*(a), which provides:

> [HN24] A person shall be entitled to a patent unless--(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before invention thereof by the applicant for the patent[.]

[HN25] The date of invention by the patentee is critical to determining invalidity under § 102(a) because knowledge, use, patenting, or description by another before this date establishes invalidity under the statute. The date an inventor files his patent application is the presumed date of invention. *Hybritech, 802 F.2d at 1376.* A patentee may overcome this presumption based on evidence that shows an earlier date of invention. *Dow Chem. Co. v. Halliburton Co., 631 F. Supp. 666, 704 (N.D. Miss. 1985), aff'd, 790 F.2d 93 (Fed. Cir. 1986).* [*58]

Aspex contends that, although R. Chao applied for the *'207* patent on November 7, 1995, the actual date of invention is March 25, 1995, when R. Chao's brother, D. Chao, brought a prototype of the eyeglass device to the United States. Aspex contends that, sometime in August or September 1994, while in Taiwan, R. Chao conceived the idea behind the invention ultimately protected by the *'207* patent. *See* P. MPSJ App. 612-13. He was dissatisfied with how easily front-mounted magnetic frames, or clip-on sunglasses, would disengage. After several months of discussing the idea with D. Chao, who had developed several sketches of it, R. Chao asked him to make a prototype of the invention using some components of Contour's front-mounted magnetic frames. D. Chao was in charge of product development at Contour. *See id.* at 613. He accepted the request and completed the prototype, *see id.* at 614-19, 254-59, in February or March 1995, *id.* at 240, 613. On March 25, 1995 D. Chao traveled from Taiwan to the United States taking eyewear samples, including the prototype, to show to Contour customers in this country. *Id.* at 240. According to Aspex, these facts demonstrate that the invention [*59] was reduced to practice on March 25, 1995, which therefore constitutes the date of invention. E'Lite neither disputes these facts nor does it address Aspex's argument as to the date of invention. The court therefore holds that the date of invention is March 25, 1995. n13

> n13 Although the facts indicate that R. Chao conceived the invention and reduced it to practice outside the United States earlier than March 25, 1995, [HN26] the date of invention is the date it was introduced in the United States. *See, e.g., Maxwell v. KMart Corp., 880 F. Supp. 1323, 1334 (D. Minn. 1995).*

Aspex argues that E'Lite bases its anticipation claim under § 102(a) on Madison's U.S. Patents No. *6,149,269* ("the *'269* patent"), for which she applied in April 1997. It contends there is no record evidence that Madison conceived her invention, or reduced it to practice, before March 25, 1995, that any admissible testimony from Madison is insufficient of itself to provide the clear and convincing evidence necessary for a reasonable [*60]

trier of fact to find patent invalidity, and that, in her patent application, Madison disclosed R. Chao's patent as prior art, and it is therefore presumably incapable of being anticipated by Madison. Aspex contends that assuming *arguendo* that Madison conceived her invention before March 25, 1995, there is no clear and convincing evidence that her invention was known or used by others or described in a printed publication before R. Chao's date of invention.

E'Lite's response brief, which is structured somewhat incoherently and does not clearly set out the summary judgment arguments to which it is responding, n14 does not respond specifically to Aspex's arguments under § 102(a). It does discuss, however, Madison's invention and argues that it is evidence of anticipation generally. E'Lite contends that Madison's date of invention was sometime during the summer of 1994--before R. Chao's date of invention--and cites tabs K, L, and O of its appendix for this proposition. *See* D. MPSJ Resp. Br. at 15, 18. Tab K contains a significant portion of Madison's deposition testimony in this case, and tab L is the entire *'269* patent. Because E'Lite fails to cite specifically to its appendix [*61] and to indicate particular evidence to support its assertion as to Madison's date of invention, the alleged evidence in tabs K and L is insufficient to create a genuine issue of material fact as to the timing issue.

> n14 E'Lite adopts in its response brief its motion for partial summary judgment, the brief in support of the motion, and the supporting appendix. *See* D. MPSJ Resp. Br. at 1. A majority of E'Lite's brief supporting its motion for partial summary judgment is identical to its brief in response to Aspex's motion, and there are no additional evidence citations in the former brief that bear on the arguments that Aspex proffers in favor of summary judgment. As the court explains *supra* at note 8, it will consider these materials insofar as E'Lite has properly cited the summary judgment evidence.

Tab O is the declaration of Lynne Smith ("Smith"), an eyewear marketer. *See* D. MPSJ Resp. App. 21. Although E'Lite's brief does not contain a specific citation beyond a general reference to the declaration, [*62] the court will consider its content. The document contains only two pages of text, and the court is capable of examining it in light of E'Lite's assertions without incurring an undue burden or having to comb the record in search of a genuine issue of material fact.

Smith states that when she visited Madison during the late spring or early summer of 1994, Madison

Case 1:04-cv-12457-PBS     Document 144-8     Filed 07/24/2007     Page 23 of 34

Page 22
2002 U.S. Dist. LEXIS 14834, *

showed her numerous drawings of new designs of magnetic eyewear that she had prepared for marketing potential eyewear products. *Id.* at 22. These drawings depicted auxiliary frames with "two arms, one on each side of the auxiliary frame, each arm having a magnet, that reached over the top of temple regions of the primary frame and connected with a magnet located either on the top or back side of the primary frame." *Id.* This evidence is offered to create a genuine issue of material fact concerning whether Madison's drawings anticipated R. Chao's later invention.

[HN27] Anticipation under § 102(a) must be proved by showing that "each element of the claim in issue is found, either expressly or under principles of inherency, in a single prior art reference." *Minn. Mining & Mfg. Co. v. Johnson & Johnson Orthopedics, Inc., 976 F.2d 1559, 1565 (Fed. Cir. 1992).* [*63] "In order for a claim to be inherent in the prior art it is not sufficient that a person following the disclosure sometimes obtain the result set forth in the claim, it must invariably happen." *Glaxo, Inc. v. Novopharm Ltd., 830 F. Supp. 871, 874 (E.D.N.C. 1993), aff'd, 52 F.3d 1043 (Fed. Cir. 1995).* The aspects of a claimed invention that always flow naturally from that which is disclosed in a prior art reference are deemed to be inherent and therefore may be anticipatory.

E'Lite has offered no evidence, however, that each element in either claim of the *'207* patent was expressly or inherently known as a result of Madison's 1994 drawings. Specifically, Smith's declaration as to the nature of the drawings does not explicitly mention the projections on the primary spectacle frame, which are an essential element of the *'207* patent. *See* D. MPSJ App. 6. And there is no evidence, much less evidence that could reasonably be considered clear and convincing, that drawings indicating an auxiliary arm "having a magnet" and "connected with a magnet located either on the top or back side of the primary frame" would *invariably* cause a person skilled in [*64] the art and following Madison's drawings to construct an eyeglass device with the connecting magnets secured to projections. This is in fact unlikely in view of evidence that Madison disclosed the *'207* patent as a prior art reference in her own patent application, *see* P. MPSJ App. 657, which would appear to indicate that she did not view the *'207* patent as invalid on the basis that it was anticipated by her drawings in 1994. Smith's declaration is therefore insufficient to allow a reasonable trier of fact to conclude that there is clear and convincing evidence that Madison's drawings anticipated R. Chao's invention and thus render the *'207* patent invalid. Because E'Lite offers evidence of no other prior art reference that could be viewed as anticipating R. Chao's invention and invalidating the *'207* patent under § 102(a), the court grants Aspex summary judgment as to

this ground of E'Lite's counterclaim and affirmative defense of invalidity.

2

Aspex also seeks summary judgment rejecting invalidity based on lack of inventorship. Under *35 U.S.C. § 102(f),* "[a] person shall be entitled to a patent unless . . . (f) he did not himself invent the subject matter [*65] sought to be patented[.]" Aspex contends that E'Lite's invalidity counterclaim and affirmative defense under this statutory bar are based on the allegation, for which it lacks evidence, that D. Chao was the sole or at least the joint inventor with R. Chao. E'Lite neither responds to this argument nor cites any supporting evidence in its response brief or its brief in support of its own motion for partial summary judgment. D. Chao denies having invented the magnetic eyeglass device at issue. *See* P. MPSJ App. 612-13. The court therefore concludes that a reasonable trier of fact could not conclude that D. Chao was the sole or joint inventor of the invention protected by the *'207* patent.

Although E'Lite does not respond specifically to Aspex's argument under § 102(f), it does mention in response to other arguments what it alleges to be the prior inventions of Madison, Ovadia, and Iwamoto. If any of these individuals in fact invented the invention at issue before R. Chao did, then the *'207* patent would be invalid under § 102(f). But for the reasons detailed *supra,* there is insufficient evidence to allow a reasonable trier of fact to find that Madison invented the device before R. Chao. [*66] The same is true of Iwamoto. *See infra.* As to Ovadia, E'Lite merely asserts that he alleges that he "came up with the idea to change the magnetic orientation to a top-mounted design as in the *'207* patent" at a meeting with D. Chao in July 1995. D. MPSJ Resp. Br. at 17. This evidence is immaterial because R. Chao's date of invention is March 25, 1995. And Ovadia's "idea" does not constitute a prior art reference for the purpose of an obviousness analysis, nor does E'Lite attempt to explain how Ovadia's idea made R. Chao's invention obvious. The court therefore grants Aspex summary judgment as to E'Lite's counterclaim and affirmative defense of invalidity under § 102(f).

3

The court next considers whether the patent is invalid under *35 U.S.C. § 102(g)(1),* which states:

> A person shall be entitled to a patent unless . . . (g)(1) during the course of an interference conducted under section 135 or section 291, another inventor involved therein establishes, to the extent permitted in section 104, that before such person's

invention thereof the invention was made by such other inventor and not abandoned, suppressed, or concealed[.]

Aspex contends [*67] that because of the May 2000 agreement between Contour and Pentax, E'Lite's argument that the interference between Iwamoto and R. Chao designated Iwamoto the senior party in interest does not support invalidity under this statutory bar, and that E'Lite has offered no evidence that does. E'Lite has not responded specifically to the § 102(g)(1) argument, but it does argue in its discussion of Iwamoto as a prior inventor that as a third party, it is not bound by the May 2000 agreement.

Although Iwamoto was designated the senior party in the interference, after the May 2000 agreement between Contour and Pentax, the administrative judge entered judgment against Iwamoto based on the two parties' May 26, 2000 joint motion for entry of adverse judgment against senior party Iwamoto. *See* P. MPSJ App. 202-04. He held that the "senior party is not entitled to its application claims." *Id.* at 203. The interference therefore did not establish that Iwamoto invented the eyeglass device protected by the *'207* patent before R. Chao did. E'Lite's argument that it is not bound by the agreement between Contour and Pentax is immaterial, because it is E'Lite's burden to establish Iwamoto as a prior [*68] inventor, and its purported evidence is an interference proceeding in which Iwamoto's claims were ultimately denied. Because E'Lite offers no evidence of a prior inventor being established in an interference, the court grants Aspex summary judgment as to E'Lite's counterclaim and affirmative defense of invalidity under § 102(g)(1).

4

Aspex seeks summary judgment rejecting invalidity based on obviousness 35 U.S.C. § 103(a) provides:

A patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains[.]

Aspex contends there is no evidence that the prior art references mentioned by E'Lite's expert Hitchcock--a German patent, a Japanese patent, and Frank Sadler's ("Sadler's") U.S. Patent No. *5,416,537* ("the *'537* patent")--made the *'207* patent claims obvious.

According to Aspex, the German patent that Hitchcock identified does not teach an auxiliary frame arm that both reaches back over the primary spectacle [*69] frame and contains a magnetic member. *See* P. MPSJ App. 484-85, 497-98. It also fails to disclose the projections holding the magnetic members in the primary spectacle frame. *Id.* The German patent simply teaches a front-mounted method of attaching an auxiliary to a primary frame. *Id.* Because E'Lite does not discuss the German patent and fails to offer evidence that it made R. Chao's invention obvious, the court concurs with Aspex's summary judgment argument that it did not.

According to Aspex, the Japanese patent that Hitchcock identified also fails to teach the same elements that the German patent fails to teach. *Id.* at 486, 538. It simply teaches a front-mounted magnetic attachment and a separate, non-magnetic ledge to rest on the bridge of the primary frame. *Id.* E'Lite responds that the Japanese patent "teaches a top-down mating . . . deals with eyeglass frames, and [deals] with mating primary and auxiliary frames at the temple region[.]" D. MPSJ Resp. Br. at 19. It cites tab Q in its appendix, which contains the entire Japanese patent, to support this general proposition. *See id.* But E'Lite neither explains how the Japanese patent makes the whole subject [*70] matter of the *'207* patent claims obvious, nor does it elucidate how the Japanese patent in combination with another prior art reference does so. It merely makes the *ipse dixit* assertion. Absent any evidence from E'Lite, the court holds that the Japanese patent does not make R. Chao's invention obvious.

According to Aspex, Sadler's *'537* patent was considered before the PTO issued the *'207* patent, and the *'207* patent's notice of allowance reflects that. *See* P. MPSJ App. 152. Moreover, the *'537* patent teaches a front-mounted magnetic frame that lacks the unique magnetic arms and projections of R. Chao's invention. *Id.* E'Lite counters by arguing that the *'537* patent teaches the use of magnets at the temple portions of the eyeglass device to mate the auxiliary spectacle frame to the primary spectacle frame. It supports this assertion by merely citing tab P of its appendix, *see* D. MPSJ Resp. Br. at 19, which contains the entire Sadler patent. Citing the entire patent to refute Aspex's specific citation to the PTO's reasons for allowing the *'207* patent in light of the *'537* patent is insufficient to create a genuine issue of material fact as to obviousness. The court therefore [*71] holds that the Sadler *'537* patent does not render the invention at issue obvious.

E'Lite appears to argue that the alleged prior inventions of Madison, Iwamoto, Ovadia, and D. Chao made R. Chao's invention obvious and thus render the *'207* patent invalid. It does not attempt, however, to explain how this is so in any of the three cases, either individually or in combination with other prior art references.

[HN28] Merely asserting obviousness, *see* D. MPSJ Resp. Br. at 20, is insufficient. Because E'Lite has offered no evidence of obviousness based on any prior art reference, the court grants Aspex summary judgment as to E'Lite's counterclaim and affirmative defense of invalidity under § 103(a).

5

Having granted Aspex summary judgment as to the four statutory bars in question, the court now turns to Aspex's argument in favor of summary judgment as to invalidity generally. Aspex argues that E'Lite has offered no clear and convincing evidence that would allow a reasonable trier of fact to find that the *207* patent is invalid. E'Lite offers evidence that it contends satisfies its summary judgment burden under three separate grounds for invalidity--the on sale bar, the clarity requirements [*72] of *35 U.S.C. § 112* and *37 C.F.R. § 1.83*, and general anticipation doctrine.

Although E'Lite does not specifically mention *35 U.S.C. § 102*(b), it does appear to allege the invalidity of the *207* patent based on that statute's on sale bar. *See* D. MPSJ Resp. Br. at 15 ("Madison not only invented the claims of the *207* patent before R. Chao . . . she put the invention 'on sale' under the statute."). [HN29] Unlike § 102(a), which relates to the date of invention, § 102(b) relates to the critical date, which is the date one year before the filing of the patent application. Any sale or offer to sell an embodiment of the invention in the United States before the critical date is an on sale bar under § 102(b). *See Milliken Research Corp. v. Dan River, Inc., 739 F.2d 587, 598 (Fed. Cir. 1984).* In this case the critical date is November 7, 1994, and any finding that the invention claimed by the *207* patent was on sale before that date leads to invalidation of the patent.

E'Lite's only evidence that an embodiment of all the limitations of either claim 1 or claim 2 of the *207* patent was on sale before November 7, 1994 is Smith's [*73] declaration regarding Madison's drawings. Smith avers that in approximately September or October 1994, she was present at a meeting between Madison and Bob Lapenna ("Lapenna"), an optical wholesaler, at which Madison showed her drawings to Lapenna. "The purpose of the meeting was to interest Mr. Lapenna in investing in a magnetic eyewear company to sell these designs." D. MPSJ Resp. App. 22. Smith also recalls that, at approximately the same time, she was present when Madison showed her drawings to a "Mr. Kimura" ("Kimura"), who worked for a Japanese eyewear company, and Dee Burghuys ("Burghuys"), who worked for eyewear marketer Carrera. "The purpose of these meetings was [to] interest them in manufacturing the designs." *Id.*

The initial problem with Smith's declaration as it relates to the on sale bar is that a reasonable trier of fact

could not conclude from it that the drawings constitute an embodiment of all the limitations of either claim 1 or claim 2 of the *207* patent. *See supra.* Because E'Lite offers no additional evidence that would allow a reasonable trier of fact to make this finding, summary judgment in Aspex's favor as to the on sale bar is warranted.

Even assuming [*74] *arguendo* that Smith's declaration is sufficient to establish Madison's drawings as an embodiment of all the limitations of either claim 1 or claim 2 of the *207* patent, it is inadequate to establish that Madison actually placed that embodiment "on sale" before the critical date. The standard for determining whether the requirements for imposition of the on sale bar have been met is set out in *Pfaff v. Wells Electronics, Inc., 525 U.S. 55, 67-68, 142 L. Ed. 2d 261, 119 S. Ct. 304 (1998).* In *Pfaff* the Supreme Court held that [HN30] the on sale bar applies when two conditions are met before the critical date. First, "the product must be the subject of a commercial offer for sale." *Id. at 67.* Second, "the invention must be ready for patenting." *Id.* The Court stated that the second condition may be satisfied in two ways: "by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Id. at 67-68.*

E'Lite has failed to adduce evidence [*75] of either *Pfaff* condition. Smith's declaration does not indicate that Madison offered to sell a product to Lapenna, Kimura, or Berghuys; it merely indicates that she showed her drawings to them to "interest" them in perhaps designing the product in the future. Her declaration also fails to speak to the issue whether Madison's drawings were sufficiently specific to enable a person skilled in the art to practice the invention they allegedly embodied. Although Smith states that practicing the invention in 1994 was technologically feasible, *see* D. MPSJ Resp. App. 23, she does not discuss the specificity of the drawings or the ability of a person skilled in the art to practice the invention with the drawings as an aid. Because E'Lite has adduced no evidence that would allow a reasonable trier of fact to conclude that the on sale bar applies to the *207* patent, the court grants Aspex summary judgment as to any § 102(b)-based counterclaim or affirmative defense.

6

E'Lite also argues that the *207* patent is invalid because it violates the clarity requirements of *35 U.S.C. § 112* and *37 C.F.R. § 1.83(a).* [HN31] Section 112 requires that a patent application enable [*76] one skilled in the art to make the invention and provide sufficiently clear claims that can be understood by those skilled in the art and not unknowingly be infringed. Section 1.83(a) states that [HN32] "the drawing in a non-provisional

application must show every feature of the invention specified in the claims." E'Lite contends the *207* patent application violated either or both of these provisions in four ways and that the *207* patent is therefore invalid.

E'Lite argues that claim 1 is unreadable and therefore invalid because it recites two separate sets of components with the single phrase "two side portions." It cites a patent practice manual in contending that such a recitation is impermissible. E'Lite makes no attempt, however, to show how this failure to follow the advice of a patent practice manual renders the patent legally invalid. The phrase "two side portions" is neither unclear nor vague, and because it is capable of being understood by one skilled in the art, it does not violate § 112.

E'Lite maintains that the phrase "upper side portion," which is used in the claim language, is neither used nor numbered in the specification. Again, the phrase is not unclear or vague, and [*77] it is capable of being understood by one skilled in the art, so its absence in the specification does not violate § 112.

E'Lite lists several terms it contends are features not identified by number in the specification or in the figures that accompany the *207* patent. E'Lite does not show, however, how the failure to identify and draw these terms as separate features renders the claim language unclear or vague, or incapable of being understood by one skilled in the art. This failure is therefore not a violation of § 112.

E'Lite posits that the term "portions" is vague, and it presents a list of terms it considers better and clearer. The existence of alternative phraseology that perhaps constitutes an improvement does not mean, however, that the wording of a patent application is sufficiently vague or unclear to render the patent invalid. E'Lite has presented no evidence that the term "portions" renders the patent incapable of being understood by one skilled in the art. The court grants Aspex summary judgment as to counterclaims or affirmative defenses of invalidity under § 112 and § 1.83.

### 7

E'Lite's final invalidity argument stems from general anticipation doctrine and rests [*78] on representations allegedly made by D. Chao to the PTO. E'Lite makes these two assertions: that D. Chao was a representative of the patentee, and that he represented to the PTO on the patentee's behalf that R. Chao was not the inventor of vertically mating, or back-mounted, frame design. From these two allegations, E'Lite appears to conclude that the patentee is estopped from claiming patent rights in vertically mating frame design, because D. Chao has admitted that any such claims were anticipated by other inventions. *See* D. MPSJ Resp. Br. at 16-17. E'Lite's evidence

in support of these assertions is inadequate, however, for the argument to survive summary judgment. It merely cites to tabs G and I of its appendix. *See id.* at 16. Tab G contains the entire transcript of an interference hearing, and tab I contains the entire *747* patent. E'Lite has thus failed to cite to specific pages of its appendix to support the assertions it makes in its brief. The court will not comb the record in search of evidence that will enable E'Lite to withstand summary judgment. The court therefore grants Aspex summary judgment as to E'Lite's general anticipation argument.

Because E'Lite has failed [*79] to adduce evidence sufficient for a reasonable trier of fact to conclude that the *207* patent is invalid, the court grants Aspex summary judgment as to E'Lite's counterclaim and affirmative defense of patent invalidity.

### B

Aspex next moves for summary judgment as to E'Lite's counterclaims for tortious interference with contract and unfair competition. Aspex contends that E'Lite has failed to adduce evidence of each of the required elements of a claim for tortious interference with contract; that both a tortious interference with contract claim and an unfair competition claim require proof of actual damages, which E'Lite's president has admitted do not exist because E'Lite in fact suffered no damages as a result of any wrongful conduct by Aspex; and that unfair competition, rather than being a specific cause of action, requires the commission of some independent tort or other illegal conduct, which in this case is tortious interference, and therefore the unfair competition claim must fail because it is dependent upon the tortious interference claim. E'Lite fails to address its tortious interference with contract and unfair, competition counterclaims in its response brief.

[HN33] A claim [*80] of tortious interference with existing contracts or business relationships requires (1) an existing contract subject to interference; (2) a willful and intentional act of interference with the contract; (3) that proximately caused the plaintiff's injury; and (4) caused actual damage or loss: *ACS Investors, Inc. v. McLaughlin, 943 S.W.2d 426, 430, 40 Tex. Sup. Ct. J. 346 (Tex. 1997).* [HN34] "The elements of tortious interference with prospective contractual relations are: (1) a reasonable probability that the parties would have entered into a contractual relationship; (2) an intentional and malicious act by the defendant that prevented the relationship from occurring with the purpose of harming the plaintiff; (3) the defendant lacked privilege or justification to do the act; and (4) actual harm or damage resulted from the defendant's interference." *Milam v. Nat'l Ins. Crime Bureau, 989 S.W.2d 126, 131* (Tex. App. 1999, no pet.) (citing *Garner v. Corpus Christi Nat'l*

*Bank*, 944 S.W.2d 469, 477 (Tex. App. 1997, writ denied). "To recover for tortious interference with a prospective business relation a plaintiff must prove that the defendant's conduct was independently [*81] tortious or wrongful." *Wal-Mart Stores, Inc. v. Sturges, 52 S.W.3d 711, 726, 44 Tex. Sup. Ct. J. 486 (Tex. 2001).* Aspex has pointed to the lack of evidence as to these elements, and E'Lite has offered no evidence of any of them in response. Accordingly, the court grants Aspex summary judgment as to E'Lite's counterclaim of tortious interference with contract.

[HN35] Texas law also requires the commission of an independent tort or other illegal conduct aside from a simple allegation of unfair competition. *See Taylor Publ'g Co. v. Jostens, Inc., 216 F.3d 465, 486 (5th Cir. 2000).* E'Lite's only other allegation here is tortious interference with contract, on which the court has granted Aspex summary judgment. The court therefore grants Aspex summary judgment as to E'Lite's counterclaim of unfair competition, as well.

C

Aspex next argues for summary judgment as to E'Lite's affirmative defenses to patent enforceability of unclean hands, laches, and estoppel. Aspex argues that E'Lite cannot prove unclean hands because it has offered no clear and convincing evidence of Aspex's having affirmatively misrepresented a material fact to the PTO with an intent to deceive, and that E'Lite cannot [*82] prove laches or estoppel because there is no evidence that E'Lite was prejudiced by Aspex's having unduly delayed in bringing its claims or induced belief that it had abandoned its claims. E'Lite fails to address its affirmative defenses as to enforceability of unclean hands, laches, and estoppel in its response brief.

[HN36] To prove unclean hands, E'Lite must show that Aspex made an affirmative misrepresentation of material fact with an intent to deceive the PTO. *See Micro Chem., Inc. v. Great Plains Chem. Co., 103 F.3d 1538, 1549 (Fed. Cir. 1997).* E'Lite has not adduced evidence of such a misrepresentation, and Aspex is therefore entitled to summary judgment as to unclean hands. [HN37] To prove either laches or estoppel, E'Lite must show the common element that it was prejudiced by Aspex's conduct in either unduly delaying bringing its claims or taking affirmative action to induce belief that it had abandoned its claims. *See Naxon Telesign Corp. v. Bunker Ramo Corp., 517 F. Supp. 804, 808 (N.D. Ill. 1981), aff'd, 686 F.2d 1258 (7th Cir. 1982).* E'Lite has not adduced evidence of its being prejudiced by Aspex's conduct, and Aspex is therefore [*83] entitled to summary judgment as to laches and estoppel. Because E'Lite has offered no evidence supporting any of its affirmative

defenses, the court grants Aspex summary judgment on the issue of patent enforceability.

VII

Aspex moves for summary judgment establishing that E'Lite's Smart Clip and Mac Eye models infringe the *'207* patent.

A

The court first considers infringement by the 200, 500, and 800 model series of the Smart Clip. While Aspex provides a chart that cites evidence supporting infringement of each element of claim 1 of the *'207* patent, *see* P. MPSJ Br. at 13-15, this evidence is not sufficient to establish beyond peradventure that such infringement occurred. The evidence cited, while it would allow a reasonable trier of fact to conclude that the Smart Clip model series infringe, is also consistent with E'Lite's argument that the frames upon which Aspex bases its allegations were manipulated into an appearance of infringement and were not representative of the models as manufactured by E'Lite. This issue must be resolved by trial. Moreover, Aspex has failed to distinguish among what evidence purports to establish infringement by the 200 model series, the 500 model [*84] series, and the 800 series. The court is therefore unable to find beyond peradventure that any model series infringes the *'207* patent. The court denies Aspex's motion as to literal infringement by the Smart Clip models.

The court also denies Aspex's motion as to infringement under the doctrine of equivalents by the Smart Clip models. [HN38] Equivalence is present for a particular claim limitation if the allegedly infringing product performs substantially the same function, in substantially the same way, to obtain the same result as that described in the patent. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 608, 94 L. Ed. 1097, 70 S. Ct. 854, 1950 Dec. Comm'r Pat. 597 (1950).* Infringement requires that the allegedly infringing product contain each limitation of the claim or its equivalent. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 40, 137 L. Ed. 2d 146, 117 S. Ct. 1040 (1997)* (noting that doctrine of equivalents analysis must be applied to individual claim limitations rather than invention as a whole). Aspex's evidence, while sufficient to allow a reasonable trier of fact to find in Aspex's favor at trial, is insufficient to establish infringement [*85] beyond peradventure. E'Lite has offered arguments disagreeing with Aspex's interpretations of what constitutes a difference in function or result, and this difference must be resolved by trial.

B

The court next considers infringement by Mac Eye model numbers 1 through 6. Aspex provides a chart that

cites evidence supporting infringement of each element of claim 1 of the *'207* patent. *See* P. MPSJ Br. at 18-19. This evidence is insufficient to establish beyond peradventure that such infringement occurred. For example, although Aspex alleges that it has established that the Mac Eye models violate the claim limitation requiring a projection secured to each rear and side portion of the primary spectacle frame, its only evidence of such projections, other than unlabeled and unexplained figures accompanying a report by D. Chao, is that E'Lite expert Hitchcock said "I believe so" when asked if they were part of the Mac Eye models. *See* P. MPSJ App. 562. This alleged "admission" by Hitchcock, while certainly probative that the Mac Eye models contain the specific limitation, does not establish it to the degree necessary to warrant summary judgment. Several other items of evidence that [*86] Aspex cites as proof that the Mac Eye models contain all of claim 1's limitations are similarly insufficient to meet the standard necessary for a movant with the burden of proof to obtain summary judgment. The court denies Aspex's motion as to literal infringement by the Mac Eye models.

For the same reasons discussed in its denial of summary judgment as to infringement under the doctrine of equivalents by the Smart Clip models, E'Lite also denies Aspex's motion as to infringement under the doctrine of equivalents by the Mac Eye models.

VIII

E'Lite moves to preclude Aspex from recovering damages before proper notice under *35 U.S.C. § 287*(a). It argues that, because the products produced under the *'207* patent do not bear the mark of the patent number, damages for infringement may only be recovered if the patentee has given specific notice of its belief that the alleged infringer has infringed. Based on the premise that neither Contour nor Pentax has given such notice in this case, E'Lite contends that Aspex should be precluded from recovering damages. Aspex argues that it has given E'Lite proper notice of the alleged infringement and that, as an exclusive [*87] licensee, the notice it has given is sufficient to meet the statutory requirement and overcome a motion to preclude damages.

*35 U.S.C. § 287*(a) states:

[HN39] Patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them or importing any patented article into the United States, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with

the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

In other words, [HN40] a patentee, or one practicing the invention under the patentee, must give notice in order [*88] to recover damages for infringement. The notice may take the form of either a mark on the product--which both parties agree was absent in this case--or actual notice to the alleged infringer. Given that both parties agree that Aspex gave actual notice of alleged infringement to E'Lite, the plain language of the statute indicates that Aspex is not precluded from recovering damages in this case.

[HN41] The part of the statute that addresses actual notice option does not state what specific party must give notice; it merely provides that no damages shall be recovered unless the infringer "was notified" of the infringement and then continued to infringe. The portion of the statute that pertains to notice by marking addresses how patentees or those practicing the invention under the patentee "may" give notice. This language, even viewed restrictively, must be read to allow Aspex to give proper notice in this case, because as the patentee's exclusive licensee, Aspex is "making, offering for sale, or selling within the United States" the products protected by the *'207* patent.

E'Lite contends that *Lans v. Digital Equipment Corp., 252 F.3d 1320 (Fed. Cir. 2001),* mandates a different [*89] conclusion from the one that is apparent from the language of the statute. In *Lans* the Federal Circuit concluded that "notice from someone closely associated with the patentee does not satisfy § 287(a)." *Id. at 1327.* Rather, "actual notice . . . 'must be an affirmative act on the part of the patentee[.]'" *Id.* (citing *Amsted Indus. Inc. v. Buckeye Steel Castings Co., 24 F.3d 178, 187 (Fed. Cir. 1994)).* E'Lite reads these holdings literally to mean that only a patentee, such as Contour, and not an exclusive licensee, such as Aspex, may give actual notice for purposes of the statute. But this reading misapprehends the reasoning in *Lans:*

The purpose of the actual notice requirement is met when the recipient is notified, with sufficient specificity, that the patent holder believes that the recipient of the notice may be an infringer." Besides alerting the alleged infringer to avoid further infringement, the notice requirement also permits the alledged infringer to contact the patentee about an amicable and early resolution of the potential dispute. . . In sum, knowledge of the patentee's identity facilitates avoidance of infringement with design changes, negotiations for licenses, and even early resolution of rights in a delaratory judgment proceeding.

*Id.* (citing *SRI Int'l, Inc. v. Advanced Tech. Labs., Inc., 127 F.3d 1462, 1470 (Fed. Cir. 1997)*) (citations omitted). The reason for requiring a patentee, not merely someone associated with a patentee, to give actual notice is so the alleged infringer knows with whom to deal in addressing and resolving the dispute. In this cse, because Aspex is the exclusive licensee with the right to sue for infringement and conduct the litigation process according to its own discretion, an alleged infringer must deal with Aspex. The rationale for requiring the patentee to be the party giving actual notice therefore supports allowing an exclusive licensee to serve as the "patentee" for purposes of § 287(a), similar to the way an exclusive licensee serves as the "patentee" for purposes of the right to sue as a coplaintiff under § 281. Such an interpretation has the added advantage of being consistent with the language of the statute. The court therefore denied E'Lite's motion to preclude Aspex from recovering damages before proper notice under *35 U.S.C. § 287*(a).

IX

E'Lite moves to strike Aspex's expert witnesses--D. Chao, Dr. Kumar, and Harry F. Manbeck, Jr., Esquire ("Manbeck")--and preclude them from testifying at trial. This is a *Daubert*-type n15 motion that presents the question whether the proposed testimony of each of these experts is reliable.

    n15 *Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993)*.

A

[HN42] The court may consider preliminary questions concerning the admissibility of evidence before trial. *See Fed. R. Evid. 104(a)*. In performing this function, the court must at times act as a gatekeeper in determining the admissibility of expert testimony. *See Watkins v. Telsmith, Inc., 121 F.3d 984, 988-89 (5th Cir. 1997);* [*90] *Garcia v. Columbia Med. Ctr. of Sherman, 996 F. Supp. 617, 620 (E.D. Tex. 1998)*. Rule 702 guides the court in the screening process. *See Cuevas v. E.I. DuPont De Nemours & Co., 956 F. Supp. 1306, 1308 (S.D. Miss. 1997)*. Rule 702 provides:

> [HN43] If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702. [HN44] The court may admit proffered expert testimony only if the proponent, who bears the burden of proof, demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable. *See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999); Watkins, 121 F.3d at 988-89.* [*91] E'Lite does not contest these experts' qualifications or the relevance of their testimony. The dispositive question is whether the evidence is reliable.

[HN45] Expert testimony must be based on "scientific, technical, or other specialized knowledge." Rule 702. It must rest on a reliable foundation. *See Kumho, 526 U.S. at 147*. Because of the unique effect of an expert witness and the advantageous position he holds at trial, the proponent of the evidence must demonstrate that "the principle supports what it purports to show." *United States v. Posado, 57 F.3d 428, 433 (5th Cir. 1995)*. This ensures that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho, 526 U.S. at 152; see Garcia, 996 F. Supp. at 620* (noting that reliability requirement ensures that knowledge offered is "supported by appropriate validation" and "establishes a standard of evidentiary reliability"). Although Rule 702 does not require absolute certainty, it does mandate that the proffered knowledge be

based on "good grounds." *Posada, 57 F.3d at 433* [*92] (quoting *Daubert, 509 U.S. at 590*). The testimony must constitute "more than belief or unsupported speculation." *Daubert, 509 U.S. at 590.*

[HN46] In fulfilling its gatekeeping role, the court must make an objective, independent validation of the principles and methods used by the expert to ensure that they have a sound and reliable basis in the knowledge and experience of the discipline at issue. *Garcia, 996 F. Supp. at 622.* The court is not to focus on the conclusions generated by the expert's methodology. *Watkins, 121 F.3d at 989.* Instead, the court must review only the reasonableness of the expert's use of such an approach, together with his particular method of analyzing the data so obtained, to draw a conclusion regarding the specific matter to which the expert testimony is directly relevant. *Kumho, 526 U.S. at 152; see Watkins, 121 F.3d at 989.*

[HN47] When analyzing the reliability of an expert's testimony, the court may consider the following non-exclusive factors: (1) whether the expert's technique can be or has been tested; (2) whether the method has been subjected to peer review and [*93] publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Daubert, 509 U.S. at 593-94.* "The factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of the testimony." *Kumho, 526 U.S. at 151.*

B

The court first considers the admissibility of D. Chao's testimony in light of *Daubert.* Neither party has briefed the *Daubert* factors individually, so the court resolves the motion based on Aspex's responses to E'Lite's specific arguments alleging deficiency and on its proof that the testimony complies with the general *Daubert* standards.

D. Chao's testimony relates to two issues--how one with ordinary skill in the art would interpret the terms of the '207 patent claims and his view whether the '207 patent has been infringed. E'Lite argues that D. Chao's opinions on both issues fail under *Daubert* because they are not based [*94] on any methodology his views on the meaning of the claim terms contradict Manbeck's testimony, and he is incompetent to provide an opinion on infringement because he has no background either in claim interpretation or in the law of claim construction. Aspex argues that D. Chao is competent to testify on claim interpretation and infringement as one with ordinary skill in the art, that he used an appropriate methodology in developing his opinions, and that E'Lite simply

misapprehends the portion of his testimony it contends contradicts Manbeck's.

E'Lite contends that instead of using a methodology, D. Chao based his determinations on what he called his "brain function." In response, Aspex points to the specific methodology detailed by D. Chao:

> In forming my opinions . . . I considered the language of the '207 patent, the prosecution history of the '207 patent, and the Smart Clip and Mac Eye products illustrated in exhibits 1 through 36 attached hereto.

D. Mot. Strike Experts Ex. B, P 5. n16 He provided his opinion as to the meaning of certain patent terms "based on [his] knowledge and experience in the eyewear industry and of eyewear design." *Id.* at P 6. The court [*95] considers this methodology--that of applying specialized knowledge and experience to the language and prosecution history of a specific patent in order to determine the meaning of its terms--to be reliable for determining how one with ordinary skill in the art would interpret the claim language of the '207 patent. Moreover, because [HN48] "testimony on the ultimate issue of infringement is permissible in patent cases," *Symbol Technologies, Inc. v. Opticon, Inc., 935 F.2d 1569, 1575 (Fed. Cir. 1991)* (citations omitted), the same methodology, supplemented by an examination of a number of Smart Clip and Mac Eye models, is admissible and reliable for determining whether those models infringe the '207 patent.

> n16 This motion should have been accompanied by an appendix that complies with Rule 7.1(i)(1), which provides that [HN49] "[a] party who relies on documentary (including an affidavit, declaration, deposition, answer to interrogatory, or admission) or non-documentary evidence to support or oppose a motion must include such evidence in an appendix." E'Lite's brief should have cited the appendix in the manner prescribed by Rule 7.2(e), which states that [HN50] "if a party's motion or response is accompanied by an appendix, the party's brief must include citations to each page of the appendix that supports each assertion that the party makes concerning any documentary or non-documentary evidence on which the party relies to support or oppose the motion." Although the court has disregarded this defect in connection with deciding the motion to strike, its discretionary decision to do so is not inconsistent with its rulings above in which it has

declined to comb the summary judgment record for evidence that has not been properly cited.

[*96]

The court also considers D. Chao competent to undertake this methodology and to render ultimate opinions based on it. E'Lite's argument that D. Chao has no background in claim interpretation and that he is unfamiliar with the law of claim construction is not dispositive. [HN51] "The focus in construing disputed terms in claim language . . . is on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean." *Markman, 52 F.3d at 986.* "Extrinsic evidence [such as expert testimony] may be helpful to explain scientific principles, the meaning of technical terms, and terms of art that appear in the patent and prosecution history[.]" *Id. at 980.* The law of claim construction thus directs the court to turn to the opinions of those skilled in the art; it does not require one skilled in the art also to be skilled in the law of claim construction. Given D. Chao's skills and extensive experience in the eyewear industry, *see* P. Mot. Strike Experts Resp. Br. at 2, he is competent to opine on both the meaning of claim language and infringement.

Finally, E'Lite argues that D. Chao testified that [*97] the *'207* patent claim terms have a specialized meaning whereas Manbeck said they have an ordinary meaning. Aspex contends, however, that D. Chao testified that the claim terms have an ordinary meaning. Neither party has presented evidence supporting its view regarding whether such a contradiction between D. Chao and Manbeck exists. In any event, the existence of such a contradiction does not mandate excluding D. Chao's opinion. [HN52] If an expert witness' opinion is otherwise reliable, it is not rendered unreliable under *Daubert* merely because another expert for the same party holds an opinion that can be viewed as inconsistent with that conclusion. Absent evidence from Manbeck's testimony indicating D. Chao's unreliability as an expert witness, E'Lite's inconsistency argument lacks sufficient force to justify striking his testimony. The court denies E'Lite's motion to strike and preclude D. Chao's testimony.

## C

The court next considers the admissibility of Dr. Kumar's testimony in light of *Daubert*. Neither party has briefed the *Daubert* factors individually. The court therefore decides the motion based on Aspex's responses to E'Lite's specific arguments alleging deficiency and [*98] on its proof that the testimony complies with the general *Daubert* standards.

Dr. Kumar's testimony relates to the issue of infringement, specifically, whether the allegedly infringing products' auxiliary frames touch the primary frames, as described in the claim limitations of the *'207* patent. E'Lite argues that because Dr. Kumar used force to make the frames touch, and because the eyewear models he tested for infringement were not representative of the products E'Lite sold, his opinion on infringement is unreliable. Aspex contends that Dr. Kumar tested a random and representative sample of E'Lite's Smart Clip and Mac Eye models, and that E'Lite's arguments about forcing the frames to touch is immaterial to a *Daubert* motion because it addresses the weight, not reliability, of Dr. Kumar's testimony.

Aspex has adduced evidence that Dr. Kumar's assistant bought each of the tested E'Lite products at a Sam's Club store in Long Beach, California, and that he purchased a random sample of six different products to ensure that different model numbers were available for testing. *See* P. Mot. Strike Experts Resp. App. 54. The court holds that this is an appropriate and reliable methodology [*99] to determine whether a product infringes the *'207* patent, because it involved a direct retail purchase without intervening use of the eyewear by others, and because it was performed randomly. As to Dr. Kumar's actual testing of the products to determine infringement, he testified that he used some force to make the frames touch to ensure that "the auxiliary frame was not hanging up somewhere," and that "in some cases there was almost no force required." *Id.* at 55. The court also considers this to be an appropriate and reliable methodology for testing infringement, because the force was used for a particular reason and its use was disclosed, thereby allowing the trier of fact to evaluate its reasonableness and its effect on Dr. Kumar's conclusions regarding infringement.

Aspex correctly asserts that E'Lite's arguments about the nature of Dr. Kumar's samples and his use of force in determining if auxiliary and primary frames touch go to the weight that should be afforded his testimony, not its reliability. [HN53] "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be [*100] left for the [trier of fact's] consideration." *Viterbo v. Dow Chem. Co., 826 F.2d 420, 422 (5th Cir. 1987).* "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert, 509 U.S. at 596.*

For instance, because the purchases of the products were made directly from a retailer and were random and representative of several models, they were reliable. E'Lite may still attempt to demonstrate at trial that they were in fact not representative of the models that it manufactured. Similarly, because Dr. Kumar proffered a good reason for his use of force to see if the frames

touch, and he disclosed this process, his infringement tests were reliable. E'Lite may still attempt to establish at trial that any necessity of force, for whatever reason, in making the frames touch is indicative of noninfringement. The court holds that Dr. Kumar's opinion testimony is reliable. It therefore denies E'Lite's motion to strike and preclude his trial testimony.

D

The court next considers the admissibility of Manbeck's testimony [*101] in light of *Daubert*. Neither party has briefed the *Daubert* factors individually. As before, the court resolves the motion based on Aspex's responses to E'Lite's specific arguments alleging deficiency and on its proof that the testimony complies with the general *Daubert* standards.

Manbeck is a patent attorney whose testimony relates to the issues of application of the court's claim construction and infringement. E'Lite argues that Manbeck's opinions in this case ignore the interference that is a part of the file history of the *'207* patent and also fail to take account the court's earlier claim construction. Aspex denies that these assertions are valid.

Aspex has adduced evidence that Manbeck testified at length regarding the interference involving the *'207* patent, *see* P. Mot. Strike Experts Resp. App. at 93-94, and that he took into account the court's claim construction when rendering his opinions, *id.* at 83-85. Because E'Lite has pointed to no other manner in which his testimony is unreliable under Rule 702, the court concludes that his testimony is reliable and consequently denies E'Lite's motion to strike and preclude his trial testimony.

E'Lite's motion to [*102] strike plaintiff's experts D. Chao, Dr. Kumar, and Manbeck is denied.

X

Aspex moves to exclude certain testimony from E'Lite's expert, Hitchcock, a patent lawyer. The parties have not briefed the *Daubert* factors individually. Aspex argues that as a matter of law, Hitchcock cannot testify on the legal issues of patent invalidity (anticipation, obviousness, and estoppel), proper claim construction, PTO procedures, and whether this is an "exceptional" case for purposes of attorney's fees. E'Lite contends that Hitchcock may testify as to each of these issues because they are mixed questions of law and fact. As with the prior motion, the court decides this motion to exclude based on E'Lite's responses to Aspex's specific arguments and on its proof that the testimony complies with the general *Daubert* standards.

The court denies as moot the part of Aspex's motion that relates to Hitchcock's validity testimony. This evidence is no longer necessary in view of the court's ruling,

*see supra* at § VI(A), granting summary judgment on that issue in Aspex's favor.

Aspex correctly argues that [HN54] claim construction is ultimately a question of law about which Hitchcock may not offer his [*103] legal opinion in the guise of expert testimony. *See, e.g., Endress + Hauser, Inc. v. Hawk Measurement Sys. Pty., Ltd., 122 F.3d 1040, 1042 (Fed. Cir. 1997)* (holding that claim construction is question of law and patent lawyers cannot testify as experts by opining regarding proper claim construction). E'Lite contends, however, that Hitchcock will not testify as to his legal opinion concerning how the claims of the *'207* patent ultimately should be construed. Instead, he will testify about such mixed issues of fact and law as how to reconcile the court's actual claim construction with certain prior art and what that reconciliation might have to say about future claim construction or infringement. *See* D. Exclude Expert Resp. Br. at 5. Such testimony is permissible, *see Askanase v. Fatjo, 130 F.3d 657, 669 (5th Cir. 1997)* (holding that [HN55] attorneys may testify as to mixed questions of law and fact), and the Federal Circuit permits reliance on the competent expert testimony of patent lawyers as to the interplay between legal issues such as claim construction and the facts of a particular case, *see, e.g., Union Carbide Corp. v. American Can Co., 724 F.2d 1567, 1570 (Fed. Cir. 1984)* [*104] (permitting reliance on patent lawyer's testimony as to mixed questions of law and fact but questioning weight that should be afforded such testimony absent specific expertise in relevant art). To the extent Hitchcock limits his testimony to such mixed questions of law and fact, Aspex's motion as to Hitchcock's testimony about claim construction is denied. If, at trial, Hitchcock is asked to testify impermissibly about purely legal issues, the court will either exclude his testimony in response to a timely objection or carry the objection, allow the testimony to be adduced, and disregard it (if it is inadmissible) during the decisionmaking process. n17

> n17 It should be noted by readers of this opinion who are not parties to this case that this lawsuit will be tried to the court rather than to a jury.

Aspex also argues that Hitchcock's opinions concerning estoppel and inequitable conduct go to the ultimate issue and usurp the role of, rather than assist, the trier of fact. E'Lite points out, however, that Hitchcock [*105] will not testify as to whether the patentee is estopped from making certain claims or has engaged in inequitable conduct. Instead, he will testify concerning the implications of the *'207* patent's prosecution history, which affects legal issues such as estoppel and inequitable conduct--on other questions. Such factual or mixed

testimony has the potential to assist the trier of fact in understanding what happened when and who made certain statements and at what point, and therefore is admissible. Moreover, if additional claim construction is required, Manbeck's testimony about prosecution history may be helpful. *See Markman, 52 F.3d at 979* [HN56] (granting trial court wide latitude in kinds of aids, including expert witness testimony, employed to assist in claim construction).

Aspex also contends that Hitchcock lacks knowledge or experience in the relevant art. E'Lite points out, however, that his lack of experience does not affect the reliability of his testimony on the issues for which the testimony will be offered. Hitchcock does not propose to testify as a person of ordinary skill in the relevant art, but as a patent lawyer addressing the factual issues--many of which [*106] stem from the arguably complicated prosecution history of the *'207* patent--that must be addressed before the court can reach a final conclusion regarding the legal issues. To the extent Hitchcock limits his testimony to the mixed issues of fact and law about which he possesses a special expertise as a patent attorney and does not offer expert opinions on questions that only someone in the eyewear industry would be qualified to answer, his testimony is admissible.

Aspex moves to exclude Hitchcock's testimony concerning PTO procedures based on what it alleges is a violation by E'Lite of [HN57] Rule 26(a)(2)(B), which requires it to provide a "complete statement of all opinions to be expressed and the basis and reasons therefore[.]" The court is not satisfied that a sanction greater than requiring E'Lite to supplement the report is warranted on the facts presented. The court therefore denies Aspex's motion as to this aspect of Hitchcock's testimony, without prejudice to Aspex's moving separately, within 15 days of the date this memorandum and order is filed, to compel supplementation if E'Lite does not agree to do so voluntarily.

Aspex also moves to exclude Hitchcock's testimony [*107] concerning whether this is an "exceptional" case concerning attorney's fees. Although this issue is a question of fact for the court to decide, *see Cybor Corp. v. FAS Technologies, Inc., 138 F.3d 1448, 1460 (Fed. Cir. 1998)* (en banc), it does not require precluding expert testimony on the matter since the expert may aid the factual inquiry. The court therefore denies Aspex's motion as to this aspect of Hitchcock's testimony. n18

> n18 The court notes that it will not consider attorney's fee evidence, including evidence pertaining to whether the case is "exceptional," during trial. As the court's October 25, 2000 trial docket setting order indicates, the matter of attor-

ney's fees is handled by motion, according to the procedure prescribed by Rule 54(d). *See* Oct. 25, 2000 Ord. at P 15. Therefore, this witness will not be heard during trial on the topic of attorney's fees or whether this case is "exceptional."

XI

E'Lite moves to strike the testimony of Marion B. Stewart, Ph.D. ("Dr. Stewart"), [*108] whom Aspex intends to call as an expert on damages. The court considers the admissibility of his testimony in light of *Daubert*. Absent briefing on the individual *Daubert* factors, the court resolves the motion based on Aspex's responses to E'Lite's specific arguments alleging deficiency and on its proof that the testimony complies with the general *Daubert* standards.

A

E'Lite argues that Dr. Stewart's damages testimony as to lost profits and reasonable royalties is unreliable because it is methodologically faulty. Specifically, E'Lite contends that in proffering his opinions on lost profits, Dr. Stewart did not consider the key factors of market demand for other products, noninfringing alternatives that could compete with the patented product, and alternative designs that E'Lite could sell if its current designs are deemed to infringe the *'207* patent. E'Lite maintains that, in proffering his opinions on reasonable royalties Dr. Stewart used a faulty hypothetical in his methodology, conducted an incorrect analysis of E'Lite's potential design alternatives, and skewed hypothetical royalty negotiations without a good reason. Aspex denies each of these allegations and contends [*109] generally that E'Lite's arguments go to the weight, not admissibility, of the evidence.

B

In discussing the proper methodology that a damages expert in a patent case must employ for his testimony on lost profits to be considered reliable, E'Lite identifies four key factors to be addressed: (1) demand for the patented product, (2) the absence of acceptable noninfringing substitutes, (3) the patentee's manufacturing and marketing capability to exploit the demand, and (4) the amount of profit the patentee would have made. D. Mot. Strike Dam. Exp. Stewart at 5. Aspex has pointed to evidence that Dr. Stewart considered each of these factors in employing his lost profits methodology. P. Resp. Mot. Strike Dam. Exp. Stewart at 3. Dr. Stewart detailed each factor at pages 4 through 9 of his report. *See* D. Mot. Strike Dam. Exp. Stewart Tab A at 4-9. n19

n19 This motion, too, should have been supported by an appendix that E'Lite cited by page in its brief. *See supra* note 16.

E'Lite challenges Dr. Stewart's testimony [*110] under two of the four factors set out in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1156 (6th Cir. 1977).* As to demand for the patented product, E'Lite argues that Dr. Stewart adduced no evidence other than the sales of the patented product itself. The court disagrees. The sales are sufficient to determine demand. Dr. Stewart's methodology regarding this first factor is therefore reliable. *See, e.g., BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc., 1 F.3d 1214, 1218-19 (Fed. Cir. 1993)* ("The first *Panduit* factor--demand for the patented product--presupposes that demand for the infringer's and patent owner's products is interchangeable. Under this assumption, evidence of sales of the infringing product may suffice to show *Panduit's* first factor, 'demand for the patented product.'"); *Gyromat Corp. v. Champion Spark Plug Co., 735 F.2d 549, 552 (Fed. Cir. 1984)* ("The substantial number of sales by Champion of infringing products containing the patented features itself is compelling evidence of the demand for the product.").

As to the absence of noninfringing substitutes, E'Lite asserts generally that [*111] Dr. Stewart failed to consider them properly, especially if the case of those made by an Aspex competitor, and that he relied on the instructions of Aspex's counsel in making his determinations under this factor. Dr. Stewart conducted an independent search of the magnetic eyewear industry for substitutes, and he detailed his specific opinions about the five suppliers of magnetic eyewear that he found and their products' relationship with the market for products protected by the *'207* patent. *See* D. Mot. Strike Dam. Exp. Stewart Tab A at 4-9. Accordingly, Dr. Stewart's methodology is sufficiently reliable to be admissible. Although E'Lite devotes considerable attention to detailing specific problems it has with Dr. Stewart's analysis of potential substitutes, these concerns relate to the weight to be afforded his trial testimony. The court denies E'Lite's motion to strike Dr. Stewart's damages evidence.

C

E'Lite's challenge to Dr. Stewart's reasonable royalties testimony fails for the same reasons. In his report, Dr. Stewart clearly details the appropriate methodology, based on the required factors, for making this type of

damages assessment. *See id.* at 9-18. E'Lite's challenges [*112] to his conclusions bear upon the weight of the evidence rather than its reliability. The court denies E'Lite's motion as to Dr. Stewart's reasonable royalties testimony.

XII

To summarize, the court

(1) grants Aspex's September 12, 2001 motion to join any additional parties needed for a just adjudication;

(2) denies E'Lite's September 20, 2001 motion to preclude damages recovery prior to proper notice under *35 U.S.C. § 287(a)*;

(3) grants in part and denies in part E'Lite's September 24, 2001 motion for partial summary judgment;

(4) denies as moot E'Lite's September 24, 2001 motion to strike;

(5) denies E'Lite's September 24, 2001 motion to strike damages expert Stewart;

(6) denies E'Lite's September 24, 2001 motion to strike plaintiff's experts D. Chao, Dr. Kumar, and Manbeck;

(7) denies E'Lite's September 24, 2001 motion to dismiss for lack of standing;

(8) denies Aspex's September 24, 2001 motion to exclude certain expert testimony from Hitchcock; and

(9) grants in part and denies in part Aspex's October 2, 2001 motion for partial summary judgment.

**SO ORDERED.**

April 4, 2002.

SIDNEY A. FITZWATER [*113]

UNITED STATES DISTRICT JUDGE

# Exhibit 8

LEXSEE 2006 U.S. DIST. LEXIS 77966



Positive
As of: Jul 11, 2007

### PFIZER INC., PHARMACIA CORP., PHARMACIA & UPJOHN INC., PHARMACIA & UPJOHN COMPANY, G.D. SEARLE & CO, G.D. SEARLE LLC, SEARLE LLC (DELAWARE) and SEARLE LLC (NEVADA), Plaintiffs, v. TEVA PHARMACEUTICALS USA, INC., Defendant.

### CIV. ACTION NO. 04-754 (JCL)

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

### *2006 U.S. Dist. LEXIS 77966*

### October 26, 2006, Decided

**SUBSEQUENT HISTORY:** Motion denied by *Pfizer Inc. v. Teva Pharms. USA, Inc., 2006 U.S. Dist. LEXIS 77967 (D.N.J., Oct. 26, 2006)*

**PRIOR HISTORY:** *Pfizer Inc. v. Teva Pharms. USA, Inc., 2006 U.S. Dist. LEXIS 74849 (D.N.J., Oct. 13, 2006)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In this patent infringement action, before the court was plaintiffs' motion in limine to preclude the trial testimony of defendant's proposed patent law expert.

**OVERVIEW:** The expert was a registered patent attorney with nearly forty years of experience in the field of patent law. According to his reports, the expert intended to offer testimony on a wide range of issues. The court found that expert testimony that extended beyond factual presentation and approximates legal argument would not help the court. Accordingly, the court precluded the expert's testimony explicating the law generally or offering legal conclusions that follow from the facts presented at trial. The expert may not testify regarding his opinion that plaintiffs' limited disclosure during prosecution of the patents-in-suit violated the best mode requirement, his opinion that plaintiffs violated their duty of disclosure and the restriction requirement, or his opinion that a certain patent was material to patentability and not cumulative to the other references considered during the

examination of the patents-in-suit. The court also found that the expert would be permitted to testify as to Patent and Trademark Office practice and procedure and factual information regarding the prosecution history of the applications that issued as the patents-in-suit.

**OUTCOME:** The court precluded the expert's testimony to the extent he planned to testify as to general principles of patent law or to offer legal opinions.

**LexisNexis(R) Headnotes**

*Evidence > Testimony > Experts > Admissibility*
*Evidence > Testimony > Experts > Helpfulness*
[HN1] See *Fed. R. Evid. 702.*

*Evidence > Testimony > Experts > Ultimate Issue*
[HN2] In civil cases, *Fed. R. Evid. 704* expressly permits expert opinion testimony that embraces an ultimate issue to be decided by the trier of fact. However, *Rule 704* was not intended to allow experts to offer opinions embodying legal conclusions. Indeed, the United States Court of Appeals for the Third Circuit has explicitly held that it is not permissible for a witness to testify as to the governing law, or as to legal conclusions.

*Evidence > Testimony > Experts > Ultimate Issue*

Case 1:04-cv-12457-PBS    Document 144-9    Filed 07/24/2007    Page 3 of 4

2006 U.S. Dist. LEXIS 77966, *                Page 2

[HN3] Expert testimony that extends beyond factual presentation and approximates legal argument will not help the court, but will indeed hinder it as non-evidential testimony prolongs what is already anticipated to be a lengthy bench trial.

**COUNSEL:** [*1] For PFIZER INC., PHARMACIA CORP., PHARMACIA & UPJOHN INC., PHARMACIA & UPJOHN COMPANY, G.D. SEARLE & CO., SEARLE LLC(DELAWARE), SEARLE LLC(NEVADA), G.D. SEARLE LLC, Plaintiffs: DAVID E. DELORENZI, SHEILA F. MCSHANE, GIBBONS, DEL DEO, DOLAN, GRIFFINGER & VECCHIONE, PC, NEWARK, NJ.

For TEVA PHARMACEUTICALS USA, INC., Defendant: MICHAEL E. PATUNAS, LITE DEPALMA GREENBERG & RIVAS, LLC, NEWARK, NJ.

**JUDGES:** John C. Lifland, U.S.D.J.

**OPINION BY:** John C. Lifland

**OPINION**

Pfizer's Motion In Limine No. 1

**LIFLAND, District Judge**

This case arises out of Teva Pharmaceuticals U.S.A., Inc.'s ("Teva" or "Defendant") alleged infringement of *U.S. Patent Nos. 5,466,823; 5,563,165;* and *5,760,068* (the "patents-in-suit"), which are held by Pfizer, Inc., Pharmacia Corp., Pharmacia & Upjohn Inc., Pharmacia & Upjohn Company, G.D. Searle & Co., G.D. Searle LLC, Searle LLC (Delaware), and Searle LLC (Nevada) (collectively "Pfizer" or "Plaintiffs"). The patents-in-suit are directed toward celecoxib, the active ingredient in Celebrex, and a broad genus of compounds that includes celecoxib, pharmaceutical compositions including such compounds, and methods of using such compounds.

Before the Court is Pfizer's [*2] motion in limine No. 1 to preclude the trial testimony of Teva's proposed patent law expert, Ronald H. Smith. For the reasons explained herein, the Court will preclude Mr. Smith's testimony to the extent he plans to testify as to general principles of patent law or to offer legal opinions.

Mr. Smith is a registered patent attorney with nearly forty years of experience in the field of patent law. He was employed as an examiner at the Patent and Trademark Office ("PTO") for 33 years, and later joined a law firm where he worked as a patent attorney prosecuting patent applications at the PTO on behalf of inventors. Mr. Smith's credentials are not in question. According to his reports, Mr. Smith intends to offer testimony on a wide range of issues, including: PTO Practice and Proce-

dure; the prosecution history of the applications that issued as the patents-in-suit; his opinion that Pfizer's limited disclosure during prosecution of the patents-in-suit violates the best mode requirement; his opinion that Pfizer violated its duty of disclosure and the restriction requirement; the use of objective indicia of obviousness at the PTO; PTO criteria for determining the weight and sufficiency of [*3] evidence purporting to demonstrate unexpected results in chemical cases; his opinion that Pfizer's expert's comparison of Celebrex and SC-58125 does not demonstrate unexpected results; his opinion that Pfizer's expert's comparison of Celebrex and Vioxx does not demonstrate unexpected results; and finally, his opinion that the Merck *U.S. patent No. 5,474,995* ("Merck '995 patent") is not cumulative to the other references considered during the examination of the patents-in-suit, and would be material to patentability. (Declaration of Daniel L. Reisner in Support of Pfizer's Memorandum of Law in Support of its Motion in Limine No. 1 (hereinafter, "Reisner Decl."), Ex. A, at 5; Reisner Decl., Ex. B, at 2; Reisner Decl., Ex. C, at 2.)

Teva contends that Mr. Smith's proposed testimony may assist the trier of fact, and is therefore admissible under *Federal Rule of Evidence 702*, which states:

> [HN] If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in [*4] the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

To the extent that Pfizer argues that the Court should exclude the testimony because it is improper for an expert witness to explain the law to the fact-finder or to offer opinions about legal conclusions, the Court agrees.

[HN] In civil cases, *Rule 704* expressly permits expert opinion testimony that "embraces an ultimate issue to be decided by the trier of fact." However, "*Rule 704* was not intended to allow experts to offer opinions embodying legal conclusions." *United States v. Scop, 846 F.2d 135, 139 (2d Cir. 1988)*; see also 4 *Weinstein's Federal Evidence § 704.04* ("In general, testimony about a legal conclusion, or the legal implications of evidence is inadmissible under *Rule 704.*"). Indeed, the Court of Appeals for the Third Circuit has explicitly held that "it

is not permissible for a witness to testify as to the governing law," *United States v. Leo, 941 F.2d 181, 196 (3d Cir. 1991)*, [*5] or as to legal conclusions, see, e.g., *Berckeley Inv. Group Ltd. v. Colkitt, 455 F.3d 195, 218 (3d Cir. 2006)*.

Ten years ago, when this Court addressed the same issue, it noted that there was "some evidence that in patent cases courts relax the rule that expert witnesses cannot testify about the state of the law, or the application of the law to a specific factual situation." *Mars, Inc. v. Coin Acceptors, Inc., 1996 U.S. Dist. LEXIS 21514, at *3-4, No. 90-49 (D.N.J. July 2, 1996)*. [1] This is equally true today. Indeed, Teva directs the Court to several patent cases wherein a court permitted expert legal testimony. See, e.g., *Princeton Biochemicals, Inc. v. Beckman Coulter Inc., 2004 U.S. Dist. LEXIS 11918, at *69-70, 144-45, No. 96-5541 (D.N.J. June 17, 2004)*; *see also generally* Howard G. Pollack, The Admissibility and Utility of Expert Legal Testimony in Patent Litigation, 32 IDEA J. L. & Tech. 361 (1992). Pfizer, on the other hand, directs the Court to an equal number of patent cases wherein courts have refused to allow expert legal testimony. See, e.g., *Bausch & Lomb, Inc. v. Alcon Lab., Inc., 79 F. Supp. 2d 252, 258 (W.D.N.Y. 2000)*. [*6]

1 This Court explained that this relaxation of the rule,

> may be because patent law is a discipline pregnant with so-called "mixed questions of law and fact," such as anticipation [or] obviousness .... Testimony directed at these issues may understandably cross the neat boundary that typically separates fact testimony from legal conclusions. Perhaps another reason is that patent cases are, more often than other civil actions, tried without a jury, which means that the utility of the expert testimony is untarnished by the downside risk that the fact finder will confuse the roles of witness and judge.

*Mars, 1996 U.S. Dist LEXIS 21514, at *4* (internal citations omitted).

Having reviewed several of these conflicting cases, this Court remains of the opinion that [HN] "expert testimony that extends beyond factual presentation and approximates legal argument will not help the Court, but will indeed hinder it as non-evidential testimony prolongs what is already anticipated to be a lengthy bench [*7] trial." *Mars, 1996 U.S. Dist LEXIS 21514, at *7*; see also *W. R. Grace & Co. v. Viskase Corp., 1991 U.S. Dist. LEXIS 14651, at *2-3, No. 90 C 5383 (N.D. Ill. Oct. 15, 1991)* ("Both parties are represented by numerous patent lawyers. [Therefore, the] proffered [expert] testimony offers no meaningful assistance to the court as the trier of fact."). Accordingly, the Court will exercise its discretion and preclude Mr. Smith's testimony explicating the law generally or offering legal conclusions that follow from the facts presented at trial. He may not testify regarding his opinion that Pfizer's limited disclosure during prosecution of the patents-in-suit violates the best mode requirement, his opinion that Pfizer violated its duty of disclosure and the restriction requirement, or his opinion that the Merck *'995 patent* is material to patentability and not cumulative to the other references considered during the examination of the patents-in-suit.

Mr. Smith will be permitted to testify as to PTO practice and procedure (including the PTO's use of objective indicia of obviousness and the PTO's criteria for determining the weight and sufficiency of evidence [*8] purporting to demonstrate unexpected results in chemical cases), factual information regarding the prosecution history of the applications that issued as the patents-in-suit, and his opinion that Pfizer's expert's comparison of Celebrex to SC-58125 and to Vioxx do not demonstrate unexpected results. See *Mars, 1996 U.S. Dist LEXIS 21514, at *7*; *Revlon Consumer Prods. Corp. v. L'Oreal S.A., 1997 U.S. Dist. LEXIS 4117, at *2, No. 96-192 (D. Del. March 26, 1997)*. [2]

2 Pfizer argues that portions of the allowed testimony should be precluded under *Federal Rules of Evidence 402* and *403*. As an initial matter, the Court is not persuaded that the proposed testimony is irrelevant. Moreover, the Court cannot yet determine whether and to what extent this testimony will be cumulative, or a waste of time. The Court will entertain further objections on these grounds at trial.

/s/ John C. Lifland, U.S.D.J.

Dated: October 26, 2006

# Exhibit 9

LEXSEE 1997 US DIST LEXIS 4117



Positive
As of: Jul 13, 2007

**REVLON CONSUMER PRODUCTS CORPORATION, Plaintiff, v. L'OREAL S.A., COSMAIR, INC., MAYBELLINE, INC., and MAYBELLINE SALES, INC., Defendants.**

**Civil Action No. 96-192 MMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1997 U.S. Dist. LEXIS 4117*

**March 26, 1997, Decided**

**NOTICE:** [*1] FOR ELECTRONIC PUBLICATION ONLY

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** After plaintiff consumer products company brought a patent infringement action against defendant competing companies, and after the competing companies counterclaimed, the consumer products company filed a motion to preclude the testimony of the patent law expert for the competing companies.

**OVERVIEW:** Alleging infringement of its patented composition for transfer resistant lipstick, a consumer products company brought an action against certain competing companies. The competing companies asserted a counterclaim seeking a declaratory judgment that the patent was invalid and that they had neither infringed nor induced infringement. The consumer products company filed a motion to preclude the testimony of a patent law expert for the competing companies. The parties agreed that the patent law expert could testify as to Patent and Trademark Office practice, but disagreed as to whether he could testify on the issue of inequitable conduct. The court ruled that he could not. The court opted to submit to the jury special interrogatories on the facts of materiality and intent, and then weigh the findings on those two elements in light of all the circumstances and decide the ultimate question of inequitable conduct. As a result, the court found that the jury would act as the sole fact-finder on the issue of inequitable conduct. The court concluded that, if it permitted expert testimony on inequitable conduct, it would usurp the respective functions of the jury and the court.

**OUTCOME:** The court ruled that it would admit testimony by the proffered patent law expert as to Patent and Trademark Office practice, but it would not admit testimony by the proffered patent law expert as to substantive issues of patent law, including inequitable conduct.

**LexisNexis(R) Headnotes**

*Patent Law > Inequitable Conduct > Burdens of Proof*
*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements*
*Patent Law > U.S. Patent & Trademark Office Proceedings > General Overview*
[HN1] Inequitable conduct has been defined by the Federal Circuit Court of Appeals as an affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive. Information is material when there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent. The proponent of a claim of inequitable conduct must prove the threshold elements of materiality and intent by clear and convincing evidence. The district court must then weigh the threshold findings of materiality and intent in light of all the circumstances to determine whether they warrant a conclusion that inequitable con-

Case 1:04-cv-12457-PBS    Document 144-10    Filed 07/24/2007    Page 3 of 5

1997 U.S. Dist. LEXIS 4117, *                                                    Page 2

duct occurred. A determination of inequitable conduct is committed to a district court's discretion.

*Evidence > Testimony > Experts > Helpfulness*
*Evidence > Testimony > Experts > Qualifications*
*Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > Appeals*

[HN2] *Fed. R. Evid. 702* states that if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. Because the admission of expert testimony is a procedural matter not unique to patent issues, the law of the circuit court of appeals governs a motion to preclude expert testimony, as opposed to the law of the Federal Circuit.

*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*
*Evidence > Testimony > Experts > Admissibility*
*Evidence > Testimony > Experts > Helpfulness*

[HN3] The decision whether to admit expert testimony is committed to the discretion of the district court. Several bases exist for excluding expert testimony. They are: (1) if the testimony will not assist the trier of fact, (2) if scientific or technical or other specialized evidence is not sufficiently reliable, and (3) if the particular expert does not have sufficient specialized knowledge to assist the jurors. The Third Circuit Court of Appeals adopts a broad interpretation of *Fed. R. Evid. 702*. Close calls on the admission of expert testimony are to be resolved in favor of admissibility. However, it is not permissible for a witness to testify as to the governing law since it is the district court's duty to explain the law to the jury.

*Civil Procedure > Trials > Jury Trials > Jury Instructions > General Overview*
*Criminal Law & Procedure > Jury Instructions > Particular Instructions > General Overview*
*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*

[HN4] There are a variety of ways in which the district court may choose to handle the issue of inequitable conduct during a jury trial. Some courts reserve the entire issue of inequitable conduct unto themselves; some submit special interrogatories to the jury on the facts of materiality and intent; and some instruct the jury to find and weigh the facts of materiality and intent and decide the ultimate question of inequitable conduct. Absent a clear showing of prejudice, or failure to achieve a fair trial, the district court's choice of procedure will not be disturbed.

**COUNSEL:** Jack Blumenfeld, Esq., and Jon E. Abramczyk, Esq., of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Of Counsel: Daniel J. Leffell, Esq., Elizabeth J. Holland, Esq., and Douglas A. Berman, Esq., of Paul, Weiss, Rifkind, Wharton & Garrison, New York, New York; and John W. Behringer, Esq., of Fitzpatrick, Cella, Harper & Scinto; attorneys for plaintiff.

Rudolph E. Hutz, Esq., and Stanley C. Macel, III, Esq., of Connolly, Bove, Lodge & Hutz, Wilmington, Delaware; Of Counsel: Norman H. Stepno, Esq., Frederick G. Michaud, Jr., David M. Schlitz, Esq., and Ronni S. Jillions, Esq., of Burns, Doane, Swecker & Mathis, L.L.P., Alexandria, Virginia; and Norman F. Oblon, Esq., Richard D. Kelly, Esq., Jean-Paul Lavallaye, Esq., and Frank J. West, Esq., of Oblon, Spivak, McClelland, Maier & Neustadt, P.C., Arlington, Virginia; attorneys for defendants.

**JUDGES:** Murray M. Schwartz, Senior District Judge

**OPINION BY:** Murray M. Schwartz

**OPINION**

**MEMORANDUM OPINION**

Submitted on Briefs

Dated: March 26, 1997

Wilmington, Delaware

**Schwartz, Senior District Judge**

**INTRODUCTION**

Revlon Consumer Products Corp. ("Revlon") filed this lawsuit against [*2] L'Oreal S.A., Cosmair Inc., Cosmair Canada, Inc., [1] Maybelline, Inc. and Maybelline Sales, Inc. (collectively "defendants") alleging infringement of Revlon's patented composition for transfer resistant lipstick. *See* Docket Item ("D.I.") 61 (Amended Complaint). Three defendants, Cosmair Inc., Maybelline Inc., and Maybelline Sales Inc., asserted a counterclaim seeking a declaratory judgment that Revlon's patent is invalid and they have not infringed nor induced infringement.

> 1 Cosmair Canada, Inc. has since been dismissed as a defendant. D.I. 24.

Before the Court is Revlon's motion to preclude the testimony of defendants' patent law expert, John Witherspoon. D.I. 147. According to his report, Mr. Witherspoon proposes to offer opinions on a wide range of issues, including Patent and Trademark Office ("PTO") practice and procedure as well as many substantive areas

of patent law. [2] *Id.*, Exh. A at 2. The parties agree Mr. Witherspoon may testify as to PTO practice and procedure. D.I. 154, at 1; D.I. 157 [*3] at 2. Revlon asserts, however, the remainder of Mr. Witherspoon's proposed testimony goes to topics inappropriate for expert testimony in a patent case. D.I. 157, at 2. In their answer to Revlon's motion, defendants indicate other than PTO practice and procedure, they wish only to introduce Mr. Witherspoon's testimony on the issue of inequitable conduct. D.I. 154, at 1. Thus, to resolve Revlon's motion, the Court must decide whether to admit testimony by a proffered patent law expert on the topic of inequitable conduct.

> 2 Specifically, these areas are: "patent infringement, both literal and under the doctrine of equivalents; principles of claim construction and interpretation; prosecution history estoppel; conditions for patentability, including novelty, utility and nonobviousness under *35 U.S.C. §§ 101, 102* and *103*; requirements for and purposes of patent specifications and claims under *35 U.S.C. § 112*; the prohibition regarding the addition of new matter under *35 U.S.C. § 132*; duties and responsibilities of an inventor, his or her attorney or agent, and others substantively involved in the preparation and prosecution of a patent application in the PTO; and the prosecution history of the patent in suit." D.I. 147, Exh. A, at 2.

## [*4] DISCUSSION

### I. Inequitable Conduct

[HN1] Inequitable conduct has been defined by the Federal Circuit Court of Appeals as "an 'affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive.'" *Micro Chemical, Inc. v. Great Plains Chemical Co., Inc., 103 F.3d 1538, 1549 (Fed Cir. 1997)* (citation omitted); *accord Refac International, Ltd. v. Lotus Development Corp., 81 F.3d 1576 (Fed Cir. 1996).* "Information is 'material' when there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent." *Refac International, 81 F.3d at 1581.*

The proponent of a claim of inequitable conduct must prove "the threshold elements of materiality and intent by clear and convincing evidence." *Micro Chemical, Inc., 103 F.3d at 1549.* "The district court must then weigh the threshold findings of materiality and intent in light of all the circumstances to determine whether they warrant a conclusion that inequitable conduct occurred." *Id.* "A

determination of inequitable [*5] conduct is committed to a district court's discretion." *Id.*

### II. Expert Testimony

Defendants assert Mr. Witherspoon's testimony as to inequitable conduct may assist the trier of fact and thus is admissible under *Federal Rule of Evidence 702.* [HN2] That rule states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

*Fed. R. Evid. 702.*

Because the admission of expert testimony is a "procedural matter" not unique to patent issues, the law of the Third Court of Appeals governs this motion, as opposed to the law of the Federal Circuit. *Panduit Corp. v. All States Plastic Manufacturing Co., 744 F.2d 1564, 1574-75 (Fed. Cir. 1984); accord National Presto Industries, Inc. v. The West Bend Co., 76 F.3d 1185, 1188 n.2 (Fed. Cir. 1996).*

[HN3] The decision whether to admit expert testimony is committed to the discretion of the district court. *United States v. Velasquez, 33 V.I. 265, 64 F.3d 844, 847-48 (3d Cir.* [*6] *1995).* As might be gleaned from the rule, several bases exist for excluding expert testimony. They are: "(1) if the testimony will not assist the trier of fact; (2) if scientific [or technical or other specialized] evidence is not sufficiently reliable; and (3) if the particular expert does not have sufficient specialized knowledge to assist the jurors." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1238 (3d Cir. 1993); see also Holbrook v. Lykes Bros. Steamship Co., Inc., 80 F.3d 777, 781 (3d Cir. 1996).*

The Third Circuit Court of Appeals has adopted a broad interpretation of *Rule 702*; close calls on the admission of expert testimony are to be resolved in favor of admissibility. *Dunn v. Hovic, 28 V.I. 526, 1 F.3d 1362, 1367 (3d Cir. 1993).* However, "it is not permissible for a witness to testify as to the governing law since it is the district court's duty to explain the law to the jury ...." *United States v. Leo, 941 F.2d 181, 196 (3d Cir. 1991).* As relevant to Revlon's motion, Mr. Witherspoon's testimony will be inadmissible either if it is not helpful to the trier of fact, or if it constitutes impermissible testimony before the jury [*7] as to the governing law.

Defendants have not provided the details of Mr. Witherspoon's proposed testimony on inequitable conduct, beyond the sentence: "Defendants request that Mr. Witherspoon be allowed to testify as to the inequitable conduct issue if the Court determines that Mr. Witherspoon's testimony as a legal expert would assist in its determination." D.I. 154, at 2. Defendants' answer to Revlon's motion places into issue the currently unsettled question of whether, in this case, the judge or the jury will act as fact-finder on the issue of inequitable conduct.

With respect to that question, the Federal Circuit recently explained:

> [HN4] There are a variety of ways in which the district court may choose to handle the issue of inequitable conduct during a jury trial .... Some courts have reserved the entire issue of inequitable conduct unto themselves; some have submitted special interrogatories to the jury on the facts of materiality and intent; and some have instructed the jury to find and weigh the facts of materiality and intent and decide the ultimate question of inequitable conduct .... Absent a clear showing of prejudice, or failure to achieve a fair trial, the district [*8] court's choice of procedure will not be disturbed.

*Hebert v. Lisle Corp., 99 F.3d 1109, 1114 (Fed. Cir. 1996).* The court noted in the last instance the parties agreed to submit the entire issue of inequitable conduct to the jury. *Id.*

Failing to achieve similar agreement of the parties in the present case, the Court will opt to submit to the jury special interrogatories on the facts of materiality and intent. The Court will then weigh the findings on these two elements "in light of all the circumstances," and decide the ultimate question of inequitable conduct. *See Micro Chemical, Inc., 103 F.3d at 1549; see also Akzo N.V. v. U.S. International Trade Commission, 808 F.2d 1471, 1481-82 (Fed. Cir. 1986)* ("Materiality and intent must ... be considered together: the more material the omission or misrepresentation, the less intent that must be shown to reach a conclusion of inequitable conduct.")

As the determination of the Court consists of a 'weighing' of the factual findings on materiality and intent, and then a determination in light of all the circumstances whether inequitable conduct occurred, *see Micro Chemical, Inc., 103 F.3d at 1549,* it follows that [*9] the jury will act as the sole fact-finder on the issue of ineq-

uitable conduct. The Court therefore cannot permit Mr. Witherspoon to testify as an expert on inequitable conduct; to do otherwise would usurp the respective functions of the jury and the Court. [3]

> 3   The Federal Circuit recently noted one of the hazards of permitting expert testimony on patent law:
>
> > We take note of the extent to which . . . incorrect law was announced by a patent law expert witness. We encourage exercise of the trial court's gatekeeper authority when parties proffer, through purported experts . . . markedly incorrect law.
>
> *Hebert, 99 F.3d at 1117.*

In accordance with the other cases in this District, the Court holds defendants' expert John Witherspoon may testify only as to matters of PTO practice and procedure. *See Lucas Aerospace, Ltd. v. Unison Industries, L.P.,* No. 93-525 (D. Del. March, 9, 1995); *General Battery Corp. v. Gould, Inc., 545 F. Supp. 731, 758 n.30 (D. Del. 1982); see also Thorn EMI North* [*10] *America Inc. v. Micron Technology, Inc.* No. 92-673 (D. Del. Nov. 23, 1993) (McKelvie, J.) (hearing transcript); *The Read Corporation v. Portec, Inc.,* No. 88-29 (D. Del. March 9, 1990) (Roth, J.) (hearing transcript); *RCA Corp. v. Data General Corp.,* No. 84-270 (D. Del. Dec. 17, 1986) (Farnan, J.) (hearing transcript); Guidelines: Legal Expert Testimony in Patent Cases (Robinson, J.). [4] Mr. Witherspoon may not testify as to substantive issues of patent law, including inequitable conduct. For purposes of clarity, it is noted this holding precludes, among other things, Mr. Witherspoon's proposed testimony regarding the "duties and responsibilities of an inventor, his or her attorney or agent, and others substantively involved in the preparation and prosecution of a patent application in the PTO ...." D.I. 147, Exh. A, at 2.

> 4   While this rule regarding patent experts is followed in this District, it is not uniform throughout the country. Several Federal Circuit cases refer, in passing, to expert testimony that was permitted on the topic of inequitable conduct, *see Hebert, 99 F.3d at 1115; Kingsdown Medical Consultants Ltd. v. Hollister, Inc., 863 F.2d 867, 872 (Fed. Cir. 1988).*

[*11]  An order will issue consistent with this opinion.