# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **DePuy Mitek, Inc.** | ) | |
|     **a Massachusetts Corporation** | ) | |
| | ) | |
|       **Plaintiff,** | ) | |
| | ) | |
|       **v.** | ) | **Civil No. 04-12457 PBS** |
| | ) | |
| **Arthrex, Inc.** | ) | |
|     **a Delaware Corporation and** | ) | |
| | ) | |
| **Pearsalls Ltd.** | ) | |
|     **a Private Limited Company** | | |
|     **of the United Kingdom** | | |
| | | |
|       **Defendants.** | | |

## TRIAL BRIEF

Submitted by:

DEPUY MITEK, INC.

## INTRODUCTION

Pursuant to this Court's Pretrial Order dated June 19, 2007, Plaintiff DePuy Mitek submits this Trial Brief.

The trial commencing on August 6 will solely address the issue of whether Defendants (collectively "Arthrex") infringe DePuy Mitek's Hunter 446 Patent.  Other issues such as the validity of the Hunter 446 Patent, damages, and whether Arthrex's infringement was willful are not being tried in this phase of the case.

This case specifically relates to whether Arthrex's sale of its FiberWire sutures and suture products infringe claims 1, 2, 8, 9, and 12 of the Hunter 446 Patent under 35 U.S.C. §271(a).  Also at issue is whether Pearsalls is liable for contributory infringement under 35 U.S.C. §271(c) by its making and importing of FiberWire sutures for Arthrex.  Mitek will prove that the answer to both these questions is yes.

## I.     STIPULATIONS AND FACTS ESTABLISHED BY THE PLEADINGS

The facts that the parties have stipulated to are attached hereto as Exhibit 1.

## II.    ADDITIONAL FACTS WHICH WILL BE PROVEN BY PLAINTIFF

1.     Mitek will prove that it owns the Hunter 446 Patent.  (Mitek is asking for a pretrial ruling that it owns the patent, as set forth in more detail below).

2.     Mitek will prove that the FiberWire suture has each and every element of the invention claimed in claims 1, 8, 9, and 12 of the Hunter 446 Patent.

3.     Mitek will prove that the surface coating on the FiberWire does not materially affect the basic and novel properties of the invention, as defined by the Court.  In particular, Mitek will prove that coating does not change that FiberWire is (1) a surgical suture, (2) composed of two dissimilar yarns from the lists in Claim One (those yarns including a first set of

yarns selected from the group of PTFE, FEP, PFA, PVDF, PETFE, PP and PE; and a second set of yarns selected from the group of PET, nylon and aramid) -  FiberWire has PE and PET, (3) where at least one yarn from the first set is in direct intertwining contact with the yarn from the second set, (4) so as to improve pliability and handleability without significantly sacrificing the physical properties of the constituent elements of the suture.

4.      Mitek will prove that the suture Pearsalls provides to R.K. Manufacture, for resale to Arthrex, is especially adapted for use in Fiberwire and does not have any substantial noninfringing uses.

5.      Mitek will prove that:

(1) Pearsalls sold or supplied;

(2) a material component of the patented invention that is not a staple article of commerce capable of substantial non-infringing use;

(3) with knowledge that the component was especially made or adopted for use in an infringing product.

In particular, Mitek will prove that:

(1) Pearsalls sells FiberWire suture to RK Manufacturing;

(2) The FiberWire suture that Pearsalls provides to RK Manufacturing (which is then sold to Arthrex for commercial sale as FiberWire) is a material component of FiberWire, and that RK Manufacturing does not alter the construction of the FiberWire suture provided to it by Pearsalls;

(3) Pearsalls knows that the suture it supplies to RK Manufacturing is especially made or adopted for use in the infringing FiberWire product.

6.    Mitek will prove that the FiberWire suture that Pearsalls supplies to RK Manufacturing is not a staple article of commerce capable of substantial non-infringing use.

7.    Mitek will also prove that Defendants' reverse doctrine of equivalents and tipping defenses have no merit, although Mite has requested a pre-trial ruling, as a matter of law, on these defenses.

## III.   PLAINTIFF MITEK'S CONTESTED ISSUES OF FACTS

1.    Whether the NuSil surface coating on the FiberWire sutures materially affects the basic and novel properties of the invention?

2.    Whether the suture that Pearsalls manufactures under an exclusive agreement with Arthrex knowing it to be specifically used for making commercial FiberWire sutures has any substantial noninfringing use?

## IV.   ARGUMENT

### A.    Mitek Will Prove that Arthrex Literally Infringes the Hunter 446 Patent

Direct patent infringement is the making, using, selling, offering to sell, or importing an invention covered by the claims of a valid patent without the authority of the patentee.  35 U.S.C. § 271(a).  Determining whether a patent has been literally infringed involves two steps: (1) claim construction, followed by (2) a determination whether the properly construed claim encompasses the accused structure.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc).  Claim construction is a question of law within the province of the Court.  *Id.* at 979. This Court has already ruled on the meaning of the two claim terms at issue in this case, "PE" and "consisting essentially of."

Whether the properly construed claim encompasses the accused product is a question of fact for the jury to decide. *LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc*., 275 F.3d 1347,

1353 (Fed. Cir. 2001). To establish infringement, Mitek must prove that each claim element is literally present in the accused product. *Dawn Equip. Co. v. Kentucky Farms Inc.*, 140 F.3d 1009, 1014 (Fed. Cir. 1998). Mitek will prove that Arthrex sells FiberWire sutures and that its FiberWire sutures and suture products literally contain each and every limitation of claims 1, 2, 8, 9, or 12 of Mitek's Hunter 446 patent.

Mitek will establish that FiberWire suture has every element recited in the asserted claims of the Hunter 446 Patent. It is a sterilized surgical suture, composed of a heterogeneous braids of two continuous and discrete yarns formed of first and second fiber-forming materials, PE and PET, braided in intertwining contact. Mitek will prove that the silicone surface coating on FiberWire does not materially affect the basic and novel properties of the invention.

The Court has construed the basic and novel properties of the invention to be:

(1) a surgical suture (2) composed of two dissimilar yarns from the lists in Claim One, (3) wherein at least one yarn from the first set is in direct intertwining contact with the yarn from the second set, (4) so as to improve pliability and handleability without significantly sacrificing the physical properties of the constituent elements of the suture.

Mitek will show that the silicone coating on FiberWire is a surface coating and does not cause the yarns in the braid to adhere to one another. The coating does not affect the ability of the constituent elements of the suture – the PET and the PE – to contribute their properties to the suture. As explained in the Hunter 446 Patent, the optional surface coating may be used to "further enhance" certain properties of the suture.

## B. Governing Law on Contributory Infringement

Defendant Pearsalls is also liable for contributory infringement of the Hunter 446 Patent under because it imports into the United States the braided PE/PET structure which is then sterilized and sold as FiberWire suture.

A finding of contributory infringement first requires a finding of direct infringement. Once direct infringement has been established, a party is liable for contributory infringement if the plaintiff can prove that: (1) the alleged contributory infringer sold or supplied; (2) a material component of the patented invention that is not a staple article of commerce capable of substantial non-infringing use; (3) with knowledge that the component was especially made or adopted for use in an infringing product. 35 U.S.C. §271(c).  A "staple article of commerce capable of substantial non-infringing use" is something that has uses other than as a part or component of the patented product and that those other uses that are not occasional, farfetched, impractical, experimental or hypothetical.  *MPT, Inc. v. Marathon Labels, Inc*., No. 1:04-cv-2357 , 2007 U.S. Dist. LEXIS 3992, *21 (N.D. Ohio Jan. 19, 2007) (Ex. 2).

Mitek will show that Pearsalls indirectly infringes the Mitek's Hunter 446 Patent. Specifically, Mitek will show that Pearsalls' manufacturing of braided sutures that are sold as FiberWire products constitutes a contributory infringement of Mitek's Hunter 446 Patent under 35 U.S.C. §271(c). *See, e.g., DynaCore Holdings Corp . v. U.S. Philips Corp.,* 363 F. 3d 1263, 1275 (Fed. Cir. 2004) (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 442 (1984)).  Specifically, Mitek will show that the unsterilized braided structure imported by Pearsalls is a material component of the accused FiberWire suture, that it has no substantial non-infringing use, and that Pearsalls imports it with the knowledge that it was especially made and adopted for use as a suture.

### C.    Governing Law on the Reverse Doctrine of Equivalents

Arthrex has suggested that, despite the Court's noted skepticism (Ex. 3 at 2-3) and the fact that Arthrex relegated it to a footnote in its summary judgment brief, it is may still pursue its "reverse doctrine of equivalents" defense.

The reverse doctrine of equivalents is a defense to patent infringement.  Under this doctrine, which has never been upheld by the Federal Circuit, Arthrex might avoid infringement of Mitek's Hunter 446 patent by establishing that its FiberWire sutures, while literally meeting every limitation of the claims, are so far changed in principle from the invention as to operate in a manner that is the opposite of what is described in the Mitek's Hunter 446 Patent. *Tate Access Floors, Inc. v. Interface Architectural Resources, Inc*., 279 F.3d 1357, 1368 (Fed. Cir. 2002) (*citing Graver Tank & Manufacturing Co. v. Linde Air Prods*., Co., 339 U.S. 605, 609 (1950)). Arthrex contends that, even though the Court expressly rejected its argument that "PE" as recited in the Hunter 446 Patent claims expressly includes ultra high molecular weight PE (UHMWPE), it uses PE in its FiberWire for a different purpose than the PE that is taught in the patent and, therefore, does not infringe under the reverse doctrine of equivalents.

Once Mitek proves literal infringement, Arthrex bears the burden of presenting a *prima facie* case that it does not infringe under the reverse doctrine of equivalents.  *Sri Int'l v. Matsushita Elec. Corp. of Am*., 775 F.2d 1107, 1123-24 (Fed. Cir. 1985).  The burden then is on Mitek to rebut this prima facie case and carry its burden of persuasion in establishing literal infringement.  *Id*. at 1124.  Mitek did so in its summary judgment brief (D.I. 106 at 10-12).

In accordance with its summary judgment briefing, Mitek is requesting a pre-trial ruling that this defense is without merit and is no longer part of this case.

## V.    OTHER OUTSTANDING ISSUES TO BE DECIDED BY THE COURT AND FOR WHICH MITEK REQUESTS RULINGS

### A.    Mitek Requests a Ruling That It Owns The Hunter 446 Patent

Mitek understands that Defendants are contesting that Mitek owns the Hunter 446 Patent. Based on the record evidence, there can be no dispute that Mitek owns the Hunter 446 Patent.

In February 1992, the inventors – Hunter, Taylor and Steckel, consistent with their employment obligation, assigned their rights in the invention to Ethicon, Inc. (Exs. 4-5).

Up until December 2003, Mitek was a subsidiary of Ethicon, Inc. (Exs. 6-7).  In August 2004, Ethicon formally assigned to Mitek U.S. Patent No. 5,314,446  -- the Hunter 446 Patent (Ex. 8).

Under the present record, there can be no dispute that Mitek owns the Hunter 446 Patent, and Mitek, respectfully requests a ruling regarding the same.

Further, because Defendants' did not raise the defense of patent ownership in response to Mitek's motion of summary judgment of infringement, they have waived their ability to raise patent ownership as a defense to Mitek's infringement claim. *Pandrol USA, LP v. Airboss Railway Prods., Inc.,* 320 F.2d 1354, 1366 (Fed. Cir. 2003).

> **B.**     **Mitek Requests A Ruling That Defendants' Failure To Preserve Evidence Entitles Mitek To An Adverse Inference Instruction That The Information Was Unfavorable to Arthrex**

The pivotal issue in this case is whether the coating on FiberWire sutures has a material effect on the basic and novel characteristics of the claimed suture.  Defendants retained at least two different experts and provided reports and testimony to support their position that the coating on FiberWire materially affects the novel and basic characteristics of the claimed invention.

- Dr. Gitis was retained to perform tests to evaluate the surface frictional properties of so-called "coated" and "uncoated" FiberWire.

- Dr. Burks was retained to perform a tactile feel test on so-called "coated" and "uncoated" FiberWire sutures.

As explained in more detail below, both experts failed to properly preserve data generated from or information relating to their tests.  Under the circumstances, Mitek is entitled to an adverse inference jury instruction that the destroyed testing data or information was

unfavorable to Arthrex's position, and respectfully requests that the Court instruct the jury as follows:

> You have heard testimony about evidence which has not been produced. Counsel for plaintiff has argued that this evidence was in defendant's control and would have proven facts material to the matter in controversy.
>
> If you find that the defendant could have produced the evidence and that the evidence was within his control, and that the evidence would have been material in deciding among the facts in dispute in this case, then you are permitted, but not required, to infer that the evidence would have been unfavorable to the defendant.

### 1.    The Law Supports Ruling That Mitek Is Entitled To An Adverse Inference Instruction

The Circuit has two prerequisites for showing entitlement to an adverse inference instruction – (a) knowledge about the litigation and (b) knowledge about the potential relevance of the destroyed information to the litigation. *Testa v. Wal-Mart Stores, Inc.*, 144 F.3d 173, 177 (1st Cir. 1998) (citing *Blinzler v. Marriott Int'l, Inc.*, 81 F.3d 1148, 1158 (1st Cir. 1996); *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 925 (1st Cir. 1988); *Nation-Wide Check Corp. v. Forest Hills Distributors, Inc.*, 692 F.2d 214, 217-18 (1st Cir. 1982)).   This Circuit has held "with some regularity" that a jury may infer from a party's "obliteration of a document relevant to a litigated issue that the contents of the document were unfavorable to that party." *Testa*, 144 F.3d at 177; *Blinzler*, 81 F.3d at 1159.   "This permissive negative inference springs from the commonsense notion that a party who destroys a document (or permits it to be destroyed) when facing litigation, knowing the document's relevancy to issues in the case, may well do so out of a sense that the document's contents hurt his position." *Testa,* 144 F.3d at 177.

### 2.    Defendants' Experts Conduct

Mitek satisfied the prerequisites for an adverse inference instruction.  The record demonstrates that both Dr. Gitis and Dr. Burks knew:

(a) about the litigation because they were specifically retained in this matter to provide Rule 26 expert reports and testimony; and

(b) that their testing of so-called "coated" and "uncoated" sutures was relevant to the litigation because they were retained to opine about the effect of FiberWire's coating on the novel and basic characteristics of the invention.

### a) Dr. Gitis' Test Data and Results Were Not Preserved

Dr. Gitis performed a series of tests that supposedly related to the surface friction properties of FiberWire so Defendants could purportedly show that FiberWire's coating materially affected the novel and basic characteristics of the Hunter 446 Patent's invention. Among the tests Dr. Gitis carried out, he performed two "tissue drag" tests, a clamp test and a needle test (Ex. 9 at 12). These tests were supposed to relate to the sutures' surface friction properties and to determine whether there were differences between the so-called "coated" and "uncoated" sutures. Dr. Gitis reported the results of the clamp test but did not report the results from his needle test in his expert report; nor were the data produced, as he testified that he destroyed the needle test data (Ex. 10 at 271:15-272:9). Dr. Gitis' explanation for destroying the needle test data is that the "results" were supposedly the "same" as the clamp test results (*id.* at 271:6-9; 271:23-272:5). But according to his testimony, he could not have compared them because he overwrote the data from the needle test with the clamp test data (*id.* at 271:10-272:9). Because Dr. Gitis destroyed the needle test data and results, Mitek did not have the opportunity to consider whether Dr. Gitis' needle test conflicted with his other tests or whether they supported Mitek's position rather than Defendants' position. Mitek is thus entitled to an adverse inference that the data were unfavorable to Arthrex's position.

### b) Dr. Burks's Communications With Defendants' Counsel Were Not Preserved

Dr. Burks was provided with samples of so-called "coated" and "uncoated" FiberWire sutures so that he could perform a tactile feel analysis of the samples. After the analysis, Dr.

Burks sent an email to Defendants' counsel discussing his results (Ex.11 at 74:24-75:3).  But

neither Dr. Burks nor Arthrex ever produced that email (*id.* at 74:24-75:5), despite it being

responsive to document requests and a subpoena served on Dr. Burks.

Under the circumstances, Mitek respectfully requests a ruling that the Court  instruct the

jury that it should draw an adverse inference from Arthrex's destruction of evidence.  *Testa*, 144

F.3d at 178 (affirming negative inference instruction where there was sufficient prove that

offender had notice of both a potential lawsuit and the destroyed documents relevance to the

suit).

### C.     Mitek Requests A Ruling That Dr. Gitis' Supplemental Expert Report Be Excluded

#### 1.     Mitek is seeking a ruling excluding Dr. Gitis' Supplemental Expert report for failing to comply with the Court's January 31, 2007 Order (D.I. 104)

Dr. Gitis is an Arthrex expert who carried out laboratory testing purporting to show that

the coating on FiberWire materially affects the basic and novel properties of the invention.  As

expert discovery was closing, and after Mitek's expert had exposed problems with Dr Gitis'

testing as set forth in his expert report, Arthrex's counsel informed Mitek's counsel that Dr. Gitis

was re-doing his testing as a computer virus may have affected his test results.  Mitek moved the

Court for an Order directing that Arthrex prove the existence of the virus, and that it had actually

affected Dr. Gitis' test data, before Arthrex could "re-do" Dr. Gitis' report.  After Mitek filed its

motion showing that the errors in Dr. Gitis' report could not have been virus related, Defendants

changed their position.  Defendants' counsel represented to the Court that some of the errors

were virus related but that there were also "typographical errors in reporting the diameter of the

suture tested . . . and in reporting the speed with which the knot slippage strength testing was

performed" (D.I. 91 at 3). Based on this, Defendants argued that Dr. Gitis should be permitted to supplement his report.

The Court's January 31, 2007 Order permitted Dr. Gitis to supplement his expert report but "only to the extent necessary to correct *typographical* and *computational errors* unrelated to the computer virus" (D.I. 104 at 2, emphasis added). Dr. Gitis did supplement his report, in June 2007. In the Supplemental Report, Dr. Gitis changed the stated diameter of the suture tested, the speed at which the knot slippage strength testing was performed, and the description of his pliability test. However, at his Court-ordered deposition last week, Dr. Gitis testified that his June 2007 Supplemental Report *did not correct typographical or calculation errors* (Ex.12 at 20:17-21:10; 25:15-26:5). Dr. Gitis testified that the reported speed for the knot slippage strength test in his original report was neither a typographical error nor a computational error but a mistake (*id.* at 28:23-30:7). Likewise, Dr. Gitis admitted that his description of the pliability test in his original report, as being performed with a uniform increasing load rate, was neither a typographical nor a computational error (*id.* at 20:17-21:10). In fact, he admitted that the mistake arose because he did not "pay enough attention" (*id.* at 24:9-23). Dr. Gitis also candidly testified that he could not say with certainty that the diameter measurement provided in his original report was a typographical error (*id.* at 25:15-27:13; 63:2-64:2). Yet, his June 2007 Supplemental Report changed each of these items, in contravention of the Court's January Order.

Mitek's counsel discussed these issues with Defendants' counsel on July 20, 2007, but could not resolve the matter.

Because Dr. Gitis' Supplemental Report is clearly outside the scope of what was allowed by the Court's January Order, Mitek requests an order excluding the Supplemental Report or any testimony about the data therein.

**D.** **Mitek Requests a Ruling that an Improperly Withheld Communication Between Defendants' Counsel And Dr. Gitis Be Produced**

At Dr. Gitis' deposition, a document involving Dr. Gitis was identified as being withheld for relevancy reasons or based on an objection to either Dr. Gitis' subpoenas or Mitek's document requests to Arthrex (Ex. 12 at 7:4-8:2; *see e.g.*, Exs. 13-14 and Ex. 15 at Request Nos. 48, 49, and 52).  Arthrex's counsel stated on the record that the document was a communication from counsel to Dr. Gitis and that it "goes directly to the virus" (Ex. 12 at 7:4-8:2).  Mitek is not aware of any basis for withholding a communication with a testifying expert on the basis of relevancy. In any event, the document is potentially highly relevant as it bears directly on the credibility of Dr. Gitis and his testing, since a year ago he was alleging that all of his data were potentially corrupted by a "virus," and he is now taking a contrary position, and apparently intends to produce test data he once represented was corrupt..

Mitek's counsel discussed this issue with Defendant's counsel on July 20, 2007, and asked counsel for legal authority to support their position.  But no authority was provided, nor has the document been provided to Mitek.  Mitek requests an order directing Arthrex to immediately produce the withheld communication.

**E.** **Mitek Requests a Ruling Limiting Arthrex's Proofs In View of Improper Instructions Not to Answer at Dr. Gitis' Deposition**

At his Court-ordered deposition on July 18, Dr. Gitis was instructed not to answer numerous questions pertaining to the credibility of the data and opinions in his opening expert report.  His July 18 deposition was Mitek's only opportunity to question Dr. Gitis about the alleged virus because Defendants failed to comply with Mitek's requests for evidence that a virus actually corrupted Dr. Gitis' data.  At the deposition, Mitek  posed various questions in response

to the allegations made by Arthrex a year ago that Dr. Gitis' data may have been corrupted by a

computer virus, but Dr. Gitis was only permitted to answer select questions.

Examples of the questions and instructions not to answer are:

Q.   What hardware was infiltrated by your --what specifically was it by this virus that you believe happened?  Was it hardware attached to the equipment that was running the test?

MR. TAMBURO:  Objection, outside the scope and asked and answered.

THE WITNESS:  Shall I answer?

MR. TAMBURO:  Asked and answered.

THE WITNESS:  So I -- first of all, it is not that I believed that there was a virus. It is a fact that there was a virus.  It is a fact that we had a virus.  It  is not a belief, but I do not know and I  didn't know at that time whether it  infiltrated lap computers or what computers  have been infiltrated inside the company, I do not know.

BY MR. BONELLA: What was the name of the virus?

 MR. TAMBURO:  Objection. Do not answer, beyond the scope.  I instruct him not to answer.

(Ex. 12 at 49:15 - 50:14).

BY MR. BONELLA:  Q.   Can you describe generally how the virus worked?

MR. TAMBURO:  Objection. Same objection.  Instruct him not to answer, since it is beyond the scope of the Court's order.

THE WITNESS:  I am not an expert in viruses.

BY MR. BONELLA:  Q.   Isn't it true that there was no virus that affected your data or your report?

MR. TAMBURO:  Objection, argumentative and beyond the scope of this deposition.  And I'm instructing you not to answer.

BY MR. BONELLA:  Q.   Sitting here today, do you believe you had a virus that infiltrated the data in the report or not?

MR. TAMBURO:  Same objection.  Instructing you not to answer, beyond the scope of the Court's order and the deposition.

(*id.* at 51:8-52:6).

> Q.   As of July 14, 2006, you thought you had a software virus that would cause you to want to redo all your tests; right?
>
> A.   That's correct.
>
> Q.   And you have no documentation or anything regarding that virus?
>
> MR. TAMBURO:  Objection, beyond the scope, instructing you not to answer.  I am instructing you not to answer.

(*id.* at 53:8-16).

> Q.   Did you ever provide specifics regarding the virus that you believe may have infected your system to counsel?
>
> MR. TAMBURO:  Objection, beyond the scope, instructing the witness not  to answer.

(*id.* at 68:4-9).

Because of these repeated, improper instructions not to answer, Mitek was denied the opportunity to test the veracity of Arthrex's representations about the computer virus allegedly infecting Dr. Gitis' data or to test the credibility of Dr. Gitis and his test data and opinions. Arthrex should not be permitted to come to trial and now allege that Dr. Gitis' data were untouched by a virus or, if they were affected, to try to present evidence of how they were affected.

Dr. Gitis was also instructed not to answer questions about information he was unable to explain at his first deposition (*See, e.g.,* Ex. 12 at 143:7-13; 229:16-20; 236:3-9; 237:8-12; 241:10-11; 242:16-243:4; 261:10-14; 263:14-265:6; 261:1-9; 268:1-269:5).  And Dr. Gitis' supplemental report did not address the unexplained information from his first deposition. Concerned that Dr. Gitis would attempt to "supplement" his explanations live at trial, Mitek asked Dr. Gitis about some of the unexplained information at his recent July 2007 deposition.

But Dr. Gitis was instructed not to answer Mitek's questions (*See, e.g.,* Ex. 12 at 64:3-66:25; 118:18-121:12; 132:8-19).

Mitek requests an Order directing that Dr. Gitis may not offer any explanation at trial regarding the virus allegations beyond the scope of his testimony at his July deposition, nor may he offer any testimony beyond the scope of his expert reports or depositions.

### F.     Mitek Requests Rulings On Defendants' Tipping And Reverse Doctrine Of Equivalents Defenses

At the June 19, 2007 summary judgment hearing, the Court indicated that it may resolve Arthrex's "tipping" and reverse doctrine of equivalents defenses on summary judgment (Ex. 3 at 3:2-5:7).

Because these defenses require additional proofs in rebuttal, particularly on the reverse doctrine of equivalents defense, Mitek respectfully requests a ruling as a matter of law on these matters so it can prepare accordingly for trial.

### G.     Mitek Requests Rulings On Its Motions in Limine

Presently before the Court are Mitek's Motions in *Limine*, including:

 (1)     Mitek's Motion *In Limine* (No. 1) and Memorandum in Support to Exclude Evidence Regarding CETR Testing (D.I. 117 and D.I. 118);

(2)     Mitek's Motion *In Limine* (No. 2) and Memorandum in Support to Preclude Arthrex from Presenting Evidence that Mitek Performed Pre-Suit Testing on Coated vs. Uncoated FiberWire (D.I. 127 and D.I. 128);

(3)     Mitek's Motion *In Limine* (No. 3) and Memorandum in Support to Preclude Arthrex from Relying on U.S. Patents 4,074,713 and 4,074,366 (D.I. 120 and D.I. 121);

(4)     Mitek's Motion *In Limine* (No. 4) and Memorandum in Support to Limit the Testimony of Arthrex's Patent Law Expert, Mr. Witherspoon (D.I. 124 and D.I. 126);

(5)     Mitek's Motion *In Limine* (No. 5) and Memorandum in Support to Preclude Arthrex and Pearsalls From Making Irrelevant and Prejudicial Remarks About Mitek (D.I. 129 and D.I. 130); and

(6)     Mitek's Emergency Motion to Prevent Defendants From Presenting Witnesses at Trial Who Were Not Disclosed as Trial Witnesses During Fact or Expert Discovery (D.I. 113 and D.I. 114).

**H.     Mitek Requests A Ruling That These Facts Be Established As Admitted**

In preparing the Pretrial Memo, the parties stipulated to a number of facts (D.I. 136 at Ex. A (also attached hereto as Ex. 1)), but could not reach agreement on the facts proposed below, many of which are simply foundational for testimony to be presented by Mitek's expert witnesses.  Because of the one-week time frame for the trial, Mitek hoped to streamline evidentiary issues so that it would not need to present designated testimony on documents and facts solely for authentication and foundation purposes.  Defendants, however, would not agree to the below facts despite the record support for the same (Ex. 16).

1.     PX-279 is a 2001 manufacturing flow chart for TigerWire and FiberWire. Pearsalls witness, Mr. Hallett, testified about this document.  Defendants have not objected to this document (D.I. 136 at Ex. D), but would not stipulate to this fact. Accordingly, Mitek requests a ruling that this fact be established for trial:

> FiberWire and TigerWire have been manufactured according to the procedures set forth in DePuy Mitek Ex. 279 (Ex. 17 at 12:21-13:9; 13:15-19; DMI Ex. 279).

2.     Pearsalls witness, Mr. Hallett, also testified about the details of the manufacturing process described in PX-279.  Mitek proposed various facts relating to the manufacturing processes, but the Defendants would not agree to the facts, objecting as "irrelevant and confusing" (Ex. 16 at Stipulated Facts 49-53).  Mitek advised the Defendants that because they

put FiberWire's coating in issue, the manufacturing processes for FiberWire are relevant.  They

disagreed.  Accordingly, Mitek requests a ruling that the following facts be established for trial.

> a.    Pearsalls' "dye stage" testing occurs after the dying and scouring process but before the winding, stretching and coating, and final inspection/measuring processes (Ex. 18 at 47:24-48:3; DMI Ex. 279).

> b.    Pearsalls' "intermediate" testing occurs after the stretching and coating processes in Mitek deposition Ex. 279 but before the final inspection/measuring processes (Ex. 18 at 49:14-16; DMI Ex. 279).

> c.    Pearsalls' final stage measuring test occurs after the stretching and coating processes in Mitek deposition Ex. 279 and when Pearsalls' has completed manufacturing the product (Ex. 18 at 53:18-25; DMI Ex. 279).

> d.    There should not be any construction or manufacturing difference between FiberWire samples from the same batch that are tested at Pearsalls' intermediate and final tests (Ex. 18 at 54:1-6; DMI Ex. 279).

> 3.    PX-281 is a 2005 manufacturing flow chart for TigerWire and FiberWire.

Pearsalls witness, Mr. Hallett, testified about this document.  Defendants have not objected to

this document (D.I. at 136 at Ex. D), but would not stipulate to this fact. Accordingly, Mitek

requests a ruling that this fact be established for trial:

> a.    FiberWire and TigerWire have been manufactured according to the procedures set forth in DePuy Mitek Ex. 281 (Ex. 19 at 14:8-16; 19:10-13).

> 4.    R.K. Manufacturing is the company to which Pearsalls sells the suture which is

ultimately sold as FiberWire (*see* Ex. 20 at Stipulated Fact #7).  Defendants objected to Mitek's

proposed fact because the language "'alter the construction' is undefined, confusing and

misleading " (Ex. 20 at Stipulated Fact Objection #10).  Mitek disagrees since it is clear from

Mr. Ponton's testimony what he was referring to in giving this testimony. Accordingly, Mitek

requests a ruling that the following fact be established for trial:

> RK Manufacturing does nothing to alter the construction of the braid it receives from Pearsalls and sells to Arthrex (Ex. 20 at 74:16-21).

5.      PX-282 is a FiberWire sample described by Pearsalls witness, Mr. Hallett, at his

deposition.  Defendants have not objected to this sample (D.I. 136 at Ex. D), but would not

stipulate to this fact. Accordingly, Mitek requests a ruling that this fact be established for trial:

> The FiberWire sample, denoted as DePuy Mitek Deposition Ex. 282, underwent
> all FiberWire manufacturing processes prior to the wind to skein process and the
> scouring process, but no other FiberWire manufacturing processes (Ex. 21 at
> 33:3-34:7; 36:16-18).

6.      PX-283 is a FiberWire sample described by Pearsalls witness, Mr. Hallett, at his

deposition.  Defendants have not objected to this sample (D.I. at 136 at Ex. D), but would not

stipulate to this fact. Accordingly, Mitek requests a ruling that this fact be established for trial:

> The FiberWire sample, denoted as DePuy Mitek Deposition Ex. 283, underwent
> the FiberWire braiding process and all FiberWire manufacturing processes that
> are before the braiding process, but no other FiberWire manufacturing processes
> (Ex. 22 at 35:10-13; DMI Ex. 279).

7.      PX-342 is a FiberWire sample described by Pearsalls witness, Mr. Hallett, at his

deposition.  Defendants have objected to this sample as irrelevant (D.I. at 136 at Ex. D).  Mitek

disagrees since this is relevant to the issue of whether the coating has a material effect on

FiberWire, and Mitek's expert, Dr. Brookstein, relied on this in his opinions.  Accordingly,

Mitek requests a ruling that this fact be established for trial:

> The FiberWire sample, denoted as DePuy Mitek Deposition Exhibit 342, under
> went all of the manufacturing process in DePuy Mitek Exhibit 279 before the
> stretching and coating processes, and once coated, stretched, and heated a single
> time (Ex. 23 at 349:7-13; 350:1-5; DMI Ex. 279).

8.      PX-316 is a FiberWire specification.  Pearsalls witness, Mr. Hallett, testified

about this document.  Defendants have not objected to this document (D.I. at 136 at Ex. D), but

would not stipulate to this fact. Accordingly, Mitek requests a ruling that this fact be established

for trial:

> DePuy Mitek Deposition Exhibit 316 sets forth specification tolerances for
> FiberWire (Ex. 24 at 237:9-11; 240:21-24).

9.    PX-318 is a matrix relating to FiberWire development.   Pearsalls witness, Mr. Hallett, testified about this document.  Defendants have not objected t this document (D.I. at 136 at Ex. D), but would not stipulate to this fact. Accordingly, Mitek requests a ruling that this fact be established for trial:

> DePuy Mitek Deposition Exhibit 318 is a matrix for the developmental and commercial FiberWire and TigerWire products (Ex. 25 at 245:21-25; DMI Ex. 318).

### I.    Jury Instructions

Mitek has not addressed specific issues relating to the jury instructions because certain of them depend on the evidence presented at trial, and may be addressed at the charge conference.

### J.    Materials Submitted With The Pretrial Memo

There are various outstanding issues relating to the exhibit lists, witnesses lists, and deposition designations that will need to be resolved.

## VI.    LENGTH OF TRIAL

Mitek understands that the present infringement trial will be one week beginning on August 6, 2007.  Mitek has scheduled its witnesses and accommodations based on this understanding and believes that it can be completed within this time frame.  Accordingly, Mitek respectfully requests that the Court consider splitting the parties' trial presentation based on a one week schedule.

Dated: July 24, 2007

DEPUY MITEK, INC.,
By its attorneys,


  /s/ Erich M. Falke
Dianne B. Elderkin
Lynn A. Malinoski
Michael J. Bonella
Erich M. Falke
WOODCOCK WASHBURN LLP
2929 Arch Street, 12th Floor
Cira Centre
Philadelphia, PA 19104
(215) 568-3100

Daniel J. Gleason (BBO #194900)
Heather Repicky (BBO #663347)
Nutter McClennen & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA. 02210-2604
617-439-2000

## CERTIFICATE OF SERVICE

I certify that I am counsel for DePuy Mitek, Inc. and that true and correct copies of:

## TRIAL BRIEF

were served on counsel for Defendants Arthrex, Inc. and Pearsalls Ltd. on this date *via* the Court's e-mail notification with the following recipients being listed as filing users for Defendants:

> Charles W. Saber
> Dickstein Shapiro LLP
> 1825 Eye Street, NW
> Washington, DC 20006
> saberc@dicksteinshapiro.com
>
> Raymond P. Ausrotas
> Todd & Weld LLP
> 28 State Street, 31st Floor
> Boston, MA 02109
> rausrotas@toddweld.com

Dated:  July 24, 2007                          /s/ Erich M. Falke
                                              Erich M. Falke

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| DePuy Mitek, Inc. | ) | |
|     a Massachusetts Corporation | ) | |
| | ) | |
|       Plaintiff, | ) | |
| | ) | |
|       v. | ) | **Civil No. 04-12457 PBS** |
| | ) | |
| Arthrex, Inc. | ) | |
|     a Delaware Corporation and | ) | |
| | ) | |
| Pearsalls Ltd. | ) | |
|     a Private Limited Company | | |
|   of the United Kingdom | | |
| | | |
|       Defendants. | | |

## JOINT PROPOSED STIPULATED FACTS

**Stipulated Fact #1**

Arthrex, Inc. received actual notice of U.S. Patent No. 5,134,446 on December 1, 2003 (J. Schmeiding 1/5/06 Dep. at 64:12-15).

**Stipulated Fact #2**

FiberWire and TigerWire are surgical sutures (FiberWire IFU)(Undisputed Mitek Fact #11; Arthrex Response to Mitek Request to Admit No. 3).

**Stipulated Fact #3**

RK Manufacturing has sold sterilized FiberWire and TigerWire to Arthrex, Inc. within the United States (Grieff Dep. at 37:23-38:8).

**Stipulated Fact #4**

Arthrex, Inc. sells FiberWire and TigerWire in the United States (ARM 3355)(Undisputed Mitek Fact #51).

**Stipulated Fact #5**

Pearsalls manufactures the braided products that are further processed and ultimately sold as FiberWire and TigerWire sutures (Grieff Dep. at 12:2-11; 12:18-23; 16:24-17:3; 17:9-12).

**Stipulated Fact #6**

Pearsalls has imported into the United States unsterilized braided products that are further processed and ultimately sold as FiberWire and TigerWire sutures (Grieff Dep. at 20:10-22).

**Stipulated Fact #7**

Pearsalls has sold unsterilized braided products to R.K. Manufacturing which are further processed and ultimately sold as FiberWire and TigerWire sutures and suture products (Grieff Dep. at 20:10-22).

**Stipulated Fact #8**

Arthrex, Inc. sells FiberWire and TigerWire sutures attached to a needle (DMI Ex. 5 at ARM 001469).

**Stipulated Fact #9**

Arthrex's FiberWire and TigerWire suture products include at least the products having the following Arthrex catalog product codes: AR-7200, AR-7201, AR-7202, AR-7203, AR-7204, AR-7205, AR-7205T, AR-7207, AR-7209, AR-7209SN, AR-7209T, AR-7210, AR-7211, AR-7219, AR-7220, AR-7221, AR-7222, AR-7223, AR-7225, AR-7227-01, AR-7227-02, AR-7228, AR-7229-12, AR-7229-20, AR-7230-01, AR-7230-02, AR-7232-01, AR-7232-02, AR-7232-03, AR-7237, AR-7250, AR-7251, AR-1320BNF, AR-1322BNF, AR-1322-75SF, AR-1322-752SNF, AR-1915SNF, AR-1920SNF, AR-1322SX, AR-1322SXF, AR-1324B, AR-1324BF, AR-1324BF-2, AR-1324BNF, AR-1324HF, AR-1324SF,AR-1934BF, AR-1934BF-2,AR-1934BFT, AR-1934BFX, AR-1934BNF, AR-1934BLF, AR-1915SF, AR-1920BF, AR-1920BF-37, AR-1920BFT, AR-1920BN, AR-1920BNF, AR-1920BNP, AR-1920BT, AR-1920SF, AR-1920SFT, AR-1925BF, AR-1925BFSP, AR-1925BNF, AR-1925BNP, AR-1925SF,AR1927-BF, AR-1927BNF, AR-1928SF, AR-1928SF-2, AR-1928SNF, AR-1928SNF-2, AR-2225S, and AR-2226S (DMI Ex. 101)(Undisputed Mitek Fact #26).

**Stipulated Fact #10**

      Arthrex's sells the following FiberWire and TigerWire suture product codes within the United States: AR-7200, AR-7201, AR-7202, AR-7203, AR-7204, AR-7205, AR-7205T, AR-7207, AR-7209, AR-7209SN, AR-7209T, AR-7210, AR-7211, AR-7219, AR-7220, AR-7221, AR-7222, AR-7223, AR-7225, AR-7227-01, AR-7227-02, AR-7228, AR-7229-12, AR-7229-20, AR-7230-01, AR-7230-02, AR-7232-01, AR-7232-02, AR-7232-03, AR-7237, AR-7250, AR-7251, AR-1320BNF, AR-1322BNF, AR-1322-75SF, AR-1322-752SNF, AR-1915SNF, AR-1920SNF, AR-1322SX, AR-1322SXF, AR-1324B, AR-1324BF, AR-1324BF-2, AR-1324BNF, AR-1324HF, AR-1324SF,AR-1934BF, AR-1934BF-2,AR-1934BFT, AR-1934BFX, AR-1934BNF, AR-1934BLF, AR-1915SF, AR-1920BF, AR-1920BF-37, AR-1920BFT, AR-1920BN, AR-1920BNF, AR-1920BNP, AR-1920BT, AR-1920SF, AR-1920SFT, AR-1925BF, AR-1925BFSP, AR-1925BNF, AR-1925BNP, AR-1925SF,AR1927-BF, AR-1927BNF, AR-1928SF, AR-1928SF-2, AR-1928SNF, AR-1928SNF-2, AR-2225S, and AR-2226S (ARM 3355).

**Stipulated Fact #11**

      FiberWire sutures and TigerWire sutures sold by Arthrex are sterilized (Arthrex Response to Mitek's Request to Admit No. 3)(DMI Ex. 3 at 13-1).

**Stipulated Fact #12**

      The cover in FiberWire suture is constructed of ultra high molecular weight polyethylene (UHMWPE) and polyethylene terephthalate (PET) (Arthrex Response to Mitek's Request to Admit No. 9).

**Stipulated Fact #13**

      FiberWire includes a heterogeneous braid composed of a first and second set of continuous and discrete yarns (Mukherjee Dep. at 362:1-4)(Undisputed Mitek Fact #13).

**Stipulated Fact #14**

      FiberWire includes a set of PET yarns made up of a plurality of PET filaments (Dreyfuss Dep. at 64:14-17).

**Stipulated Fact #15**

      Each FiberWire suture product has a set of yarns made of PET (*id.*)(Undisputed Mitek Fact #49).

**Stipulated Fact #16**

Each yarn of PET included in FiberWire is composed of a plurality of filaments (Mukherjee Dep. at 363:7-16)(Undisputed Mitek Fact #46).

**Stipulated Fact #17**

FiberWire includes a set of UHMW PE yarns made up of a plurality of UHMW PE filaments (Dreyfuss Dep. at 50:21-51:1)

**Stipulated Fact #18**

In FiberWire, at least one yarn of ultra high molecular weight PE is in direct intertwining contact with a PET yarn (Dreyfuss Dep. at 50:21-51:1).

**Stipulated Fact #19**

FiberWire includes a heterogeneous sheath braid composed of discrete yarns in a sterilized braided construction (Mukherjee Dep. at 362:5-8)(Undisputed Mitek Fact #13).

**Stipulated Fact #20**

The polyethylene terephthalate yarns in FiberWire and TigerWire are continuous and discrete (*id*. at 362:1-4)(Undisputed Mitek Fact #15).

**Stipulated Fact #21**

The ultra high molecular weight polyethylene yarns in FiberWire and Tiger Wire are continuous and discrete (*id.*)

**Stipulated Fact #22**

The PET used in Arthrex's FiberWire sutures is in the form of yarn, and that PET yarn is made up of several twisted monofilaments of PET (Dreyfuss 9/16/05 Dep. at 64:14-17)(Undisputed Mitek Fact #17).

**Stipulated Fact #23**

  No. 2 FiberWire suture, No. 5 FiberWire, No. 0 FiberWire suture, the No. 2-0 FiberWire suture, and the 3-0 FiberWire suture are braided using the same process (Dreyfuss 9/16/05 Dep. at 38:20-24)(Undisputed Mitek Fact #23).

**Stipulated Fact #24**

  Arthrex's FiberWire sutures have a core except for 4-0 FiberWire (DMI Ex. 318)(Undisputed Mitek Fact #47).

**Stipulated Fact #25**

  Notwithstanding the color of the yarns, TigerWire's yarns are identical to FiberWire's yarn with the exception that one PET yarn is replaced by one nylon yarn (DMI Ex. 318)(Undisputed Mitek Fact #9).

**Stipulated Fact 26**

  The addition of nylon to TigerWire does not materially affect the basic and novel characteristics of the invention.

**Stipulated Fact #27**

  TigerWire is braided in the same way as FiberWire (Dreyfuss 9/16/05 at 31:24– 32:2)(Undisputed Mitek Fact #10).

**Stipulated Fact #28**

  Every FiberWire and TigerWire construction has a ratio of the cross-sectional area of ultra high molecular weight PE in the sheath and core to the total cross sectional area of all the yarns in the surgical suture that ranges from 20 to 80 percent (Brookstein Op. Expert Rpt. at ¶49; DMI Ex. 318)(Undisputed Mitek Fact #50).

**Stipulated Fact #29**

  FiberWire size 4-0 does not have a core (*id*. at 55:21-23)(Undisputed Mitek Fact #25).

**Stipulated Fact #30**

The FiberWire size 4-0 suture has the same sheath configuration as the other size FiberWire sutures (*id*. at 104:17-105:9)(Undisputed Mitek Fact #24).

**Stipulated Fact #31**

Tevdek is a 100% braided polyester suture (Sluss Dep. at 35:17-22; *See* Grafton Dep. at 36:17-18).

**Stipulated Fact #32**

Mr. Grafton's idea was to add the PET and to improve the knot security of the suture (Undisputed Mitek Fact #30)(*id*. at 53:24-54:5).

**Stipulated Fact #33**

The FiberWire prototype suture that included PET braided with ultra-high molecular weight polyethylene had good knot security (*id*. at 54:24-55:1)(Undisputed Mitek Fact #31).

**Stipulated Fact #34**

The FiberWire sample, denoted as DePuy Mitek Deposition Ex. 284, underwent the FiberWire scouring and dying processes and all FiberWire manufacturing processes that are before the dying process, but no other FiberWire manufacturing processes (Hallett 1/11/2006 Dep. at 36:1-4; 36:19-12; DMI Ex. 279).

**Stipulated Fact #35**

The FiberWire sample, denoted as DePuy Mitek Deposition Ex. 285, underwent the FiberWire scouring and dying processes and all FiberWire manufacturing processes before the "final inspection/measuring" process (Hallett 1/11/2006 Dep. at 37:10-13; DMI Ex. 279).

**Stipulated Fact 36**

The FiberWire sample, denoted as DePuy Mitek Deposition Ex. 286, underwent the FiberWire scouring and dying processes and all FiberWire manufacturing processes before the "final inspection/measuring" process.  It is the same as US 2 commercial FiberWire(Hallett 1/11/2006 Dep. at 38:17-39:6; 39:12-18;40:2-9, 12-17; 41:5-11; DMI Ex. 279).

**Stipulated Fact #37**

DePuy Mitek Deposition Exhibit 317 sets forth specification acceptance criteria for FiberWire (Hallett 1/12/2006 Dep. at 241:15-18).

**Stipulated Fact #38**

Pearsalls' batch records were generated in the normal course of Pearsalls' business (Hallett 1/12/2006 Dep. at 269:5-11).

**Stipulated Fact #39**

Plaintiff DePuy Mitek, Inc. ("DePuy Mitek") is a corporation organized under the laws of the State of Massachusetts and maintains its principal place of business at 325 Paramount Drive, Raynham, Massachusetts 02767.

**Stipulated Fact#40**

Defendant Arthrex, Inc. ("Arthrex") is a corporation organized under the laws of the State of Delaware and maintains its principal place of business at 1370 Creekside Boulevard, Naples, Florida 34108.

**Stipulated Fact #41**

Defendant Pearsalls, Ltd. ("Pearsalls") is a corporation organized under the laws of the United Kingdom and maintains its principal place of business at Tancred Street, Taunton, Somerset, England.

**Stipulated Fact #42**

Ethicon, Inc. ("Ethicon") is a corporation organized under the laws of the State of New Jersey and maintains it principal place of business at U.S. Route 22 West, P.O. Box 151, Sommerville, New Jersey 08876-0151.

**Stipulated Fact #43**

Arthrex sells FiberWire suture in the United States, as stand-alone suture, and also attached to needles or suture anchors.

**Stipulated Fact #44**

Arthrex's FiberWire suture contains a braid of ultra high molecular weight polyethylene (UHMWPE) and PET.

**Stipulated Fact #45**

Arthrex's FiberWire suture includes a coating of NuSil Med 2174.

**Stipulated Fact #46**

Arthrex's TigerWire suture contains a braid of ultra high molecular weight polyethylene (UHMWPE) , PET, and one nylon yarn.

**Stipulated Fact #47**

Arthrex's TigerWire suture includes a coating of NuSil Med 2174.

**Stipulated Fact #48**

Arthrex's FiberWire sutures are tipped.

**Stipulated Fact #49**

Arthrex's TigerWire sutures are tipped.

**Stipulated Fact #50**

DePuy Mitek and Ethicon, Inc. are affiliated with Johnson & Johnson.

**Stipulated Fact #51:**

Before Dr. Gitis conducted the tests described in his report dated March 23, 2006, Dr. Gitis sent, via Fedex, two envelopes containing U.S. No. 2 FiberWire suture to Sterile Systems, in Grand Rapids, Michigan. One of the envelopes Dr. Gitis sent to Sterile Systems contained a plastic bag of suture and was labeled "coated." The other envelope Dr. Gitis sent to Sterile

Systems contained a plastic bag of suture and was labeled "uncoated."  The sutures were

sterilized in the envelopes at Sterile Systems.  The two envelopes of suture were then returned to

Dr. Gitis at CETR.

# EXHIBIT 2

1 of 7 DOCUMENTS

**MPT, Inc., Plaintiff, Vs. Marathon Labels, Inc., and Polymeric Converting, LLC, Defendants.**

**CASE NO. 1:04-cv-2357**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, EASTERN DIVISION**

*2007 U.S. Dist. LEXIS 3992*

**January 19, 2007, Decided**

**PRIOR HISTORY:** *MPT, Inc. v. Marathon Labels, Inc, 2006 U.S. Dist. LEXIS 47941 (N.D. Ohio, July 14, 2006)*

**COUNSEL:** [*1] For MPT, Inc., Plaintiff: Kyle B. Fleming, Thomas H. Shunk, LEAD ATTORNEYS, David E. Kitchen, John Edward Sullivan, Baker & Hostetler, Cleveland, OH.

For Marathon Labels, Inc., Defendant: Bruce H. Wilson, LEAD ATTORNEY, Akron, OH; Mark E. Miller, Miller & Associates, Evansville, IN.

For The Kennedy Group, Incorporated, Respondent: Thomas H. Shunk, LEAD ATTORNEY, Baker & Hostetler, Cleveland, OH.

For Marathon Labels, Inc., Counter-Claimant: Bruce H. Wilson, LEAD ATTORNEY, Akron, OH;  Mark E. Miller, Miller & Associates, Evansville, IN; Richard M. Klein, Fay, Sharpe, Fagan, Minnich & McKee, Cleveland, OH.

For MPT, Inc., Counter-Defendant: Thomas H. Shunk, LEAD ATTORNEY, David E. Kitchen, John Edward Sullivan, Kyle B. Fleming, Baker & Hostetler, Cleveland, OH.

For Marathon Durable Labeling Systems LLC, Counter-Claimant: Bruce H. Wilson, LEAD ATTORNEY, Akron, OH.

For Polymeric Converting LLC, Sunbelt Consulting Group, Inc., Counter-Claimants: Richard M. Klein, LEAD ATTORNEY, Christopher B. Fagan, Fay, Sharpe, Fagan, Minnich & McKee, Cleveland, OH; James V. Costigan, John F. Volpe, Kathleen A. Costigan, Hedman & Costigan, New York, NY.

**JUDGES:** Patricia A. Gaughan,  [*2]  United States District Judge.

**OPINION BY:** Patricia A. Gaughan

**OPINION**

**Memorandum Opinion and Order**

**INTRODUCTION**

A number of post-trial motions have been filed by the parties. Plaintiff MPT, Inc. ("MPT") has filed a Motion for Entry of Judgment Including Permanent Injunction (Doc. 272) and a Motion for Attorneys' Fees (Doc. 271). Defendants Marathon Labels, Inc. ("Marathon") and Polymeric Converting LLC ("Polymeric") have filed Renewed Motions for Judgment as a Matter of Law (Doc. 270, 273). MPT has filed a Motion to Strike Defendants' Motions (Doc. 277). These motions follow a jury verdict in favor of MPT on its claims that Defendants willfully infringed *United States Patent No. 5,417,790* (issued May 23, 1995) (the "'790 patent") and United States Patent No. RE 37,164 E (issued May 8, 2001) (the "'164 patent"). For the following reasons, the Court GRANTS in Part MPT's Motion for Entry of Judgment Including Permanent Injunction, GRANTS in Part MPT's Motion to Strike, GRANTS in Part Defendants' Motions for Judgment as a Matter of Law and DENIES MPT's Motion for Attorneys' Fees.

**BACKGROUND**

MPT holds the '790 and '164 patents, which generally claim a method for [*3]  the labeling and relabeling of reusable containers. MPT sued Defendants for contributory and induced infringement on Claims 1, 2, 3, 4 and 6 of the '790 *patent* and Claim 1 of the '164 patent. MPT claims that Marathon's customers infringe MPT's

patents when they use Marathon's Smart Surface Placard product. Polymeric manufactures the Teflon surface of the Smart Surface Placard product. Following a two-week jury trial a unanimous jury returned a verdict that both Defendants had contributed to the infringement of all of the patent claims at issue, that Marathon had induced infringement of all of the patent claims at issue, and that the infringement was willful. (Doc. 267, 269). Plaintiff now seeks entry of judgment, trebled damages, a permanent injunction and attorneys fees. Defendants oppose MPT's motions in part by reference to the arguments set forth in their renewed motions for judgment as a matter of law.

### DEFENDANTS' *RULE 50(B)* MOTIONS

#### a. Standard of Review - *Rule 50*

Defendants have filed renewed motions for judgment as a matter of law under *Rule 50(b)*. The Court of Appeals for the Federal Circuit generally decides *Rule 50(b)* issues under regional circuit law, since [*4] "JMOL is not a patent-law-specific issue . . . ." *Harris Corp. v. Ericsson Inc., 417 F.3d 1241, 1248 (Fed. Cir. 2005).* "Judgment as a matter of law is appropriate when 'viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party.'" *Jordan v. City of Cleveland, 464 F.3d 584, 594 (6th Cir. 2006)* (quoting *Noble v. Brinker Int'l, 391 F.3d 715, 720 (6th Cir. 2004)); see also Power-Tek Solutions Services, LLC v. Techlink, Inc., 403 F.3d 353, 358-59 (6th Cir. 2005)* (explaining that the verdict must be supported by "substantial evidence" and the motion should be granted "[o]nly when it is clear that reasonable people could come to but one conclusion"). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." *Jordan, 464 F.3d at 594* (quoting *Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)).*

MPT's motion to strike focuses [*5] on waiver of the right to file a post-trial JMOL motion. A party can waive its right to file a *Rule 50(b)* motion where the *Rule 50(a)* motions made at trial failed to "specify the judgment sought and the law and facts on which the moving party is entitled to judgment." *Fed. R. Civ. P. 50(a)(2).* Although JMOL issues are generally governed by regional circuit law, Federal Circuit law governs whether general arguments made in a pre-verdict JMOL motion are sufficient to preserve specific patent law issues for a post-verdict JMOL motion. *Duro-Last, Inc. v. Custom Seal, Inc., 321 F.3d 1098, 1106 (Fed. Cir. 2003).* The two standards are not appreciably different in any event. Both Circuits recognize the Rule's purpose to alert the

non-moving party and the court to the grounds of the motion prior to the submission of the case to the jury. *See Jordan, 464 F.3d at 595* (noting that the pre-verdict motion must state the grounds with sufficient certainty that the court and opposing counsel are aware of the movant's position); *Duro-Last, 321 F.3d at 1107* (explaining that "it would be constitutionally impermissible [*6] for the district court to re-examine the jury's verdict and to enter JMOL on grounds not raised in the pre-verdict JMOL").

#### b. Infringement

1. Failure to Comply with *Rule 50(a)(2)*

MPT argues in its Motion to Strike that Defendants have raised new noninfringement arguments in their renewed motions. The Court has reviewed the various motions and agrees that a number of noninfringement arguments in the *Rule 50(b)* motions were not stated in the pre-verdict motions: 1) MPT failed to prove that the direct infringers utilize "reusable" containers; 2) MPT provided no evidence that any Marathon customer placed and removed pressure sensitive adhesive labels on Marathon's product; 3) MPT failed to provide any evidence that a "first product," "first contents set," "another product" or a "second contents set" is placed in a reusable container; 4) MPT failed to prove that the labels included "product quantities," "indicia" or product "information"; 5) MPT failed to prove that a first product set was positioned "at a selected one of a time prior to and subsequent to the first label applying step"; and 6) MPT failed to prove infringement of Claims 2 and 3 of the *'790 patents* with respect [*7] to the printing and transparent surfaces.

Defendants point to excerpts of the trial transcript as supporting their post-verdict motions. However, the best that can be said for these excerpts and related written materials is that Defendants stated in the most general terms that MPT had failed to prove that all elements of the method claims were infringed. This characterization may be somewhat charitable, since most mentions of claim elements other than a "release coated," "placard" or "substantially permanent attachment" related to whether the method steps were performed in the United States, not whether they were performed at all. It is also notable that these subjects were not part of Defendants' trial brief, closing arguments, or trial strategy. The Court must therefore decide whether a general statement in a pre-verdict JMOL motion that the plaintiff has failed to prove that all elements of the claims were practiced by Defendants preserves the right to challenge specific elements (or dependent claims with respect to claims 2 and 3) that were never mentioned in the pre-verdict motion.

The Federal Circuit recently addressed a similar issue in *Duro-Last.* The *Duro-Last* defendant [*8] moved

2007 U.S. Dist. LEXIS 3992, *

for pre-verdict JMOL on inequitable conduct and the on-sale bar but failed to explicitly move on obviousness. *321 F.3d at 1106.* The defendant noted in its post-verdict motion on obviousness that the inequitable conduct motion discussed prior art references that were also relevant to obviousness. *Id. at 1107.* The Federal Circuit held that this was not adequate to preserve the issue for a *Rule 50(b)* motion. New prior art references were raised in the post-verdict motion and the pre-verdict motion lacked any discussion of the previously-disclosed prior art references with respect to obviousness factors. [1] *Id.*

> 1   The Federal Circuit also concluded that a pre-verdict JMOL on the on-sale bar was not sufficient to support a post-verdict motion on obviousness. *Duro-Last, 321 F.3d at 1107.*

This case is quite similar to *Duro-Last.* Just as the *Duro-Last* plaintiff was unable to address the new prior art, MPT never had an opportunity at trial to address [*9] Defendants' new noninfringement arguments. *See also W.S. Molnar Co. v. IKG Indus., 1996 U.S. App. LEXIS 6311, 39 U.S.P.Q.2d (BNA) 1219 (Fed. Cir. 1996)* ("A general reference to a count . . . is insufficient to meet the rule's requirements" (citing *Libbey-Owens-Ford Co. v Inc. of N. Am., 9 F. 3d 422, 426 (6th Cir, 1993)).* Other district courts have reached a similar conclusion in patent cases. *See, e.g., Am. Standard, Inc. v. York Int'l Corp., 244 F. Supp. 2d 990, 993 (W.D. Wisc. 2002)* (allowing a post-verdict motion to elaborate upon the pre-verdict anticipation argument but not to set forth arguments on a new claim element). The Court's conclusion is buttressed by the fact that the new arguments could not even be gleaned from Defendants' conduct or argument at trial. [2]

> 2
>
> Courts usually "take a liberal view of what constitutes a pre-verdict motion sufficient to support a post-verdict motion" where the purpose of the rule--alerting the nonmovant and the Court of deficiencies in the nonmovant's case--is met. *Kusens v. Pascal Co., 448 F.3d 349, 361 (6th Cir. 2006).* This explains cases like *Malta v. Schulmerich Carillons, Inc.,* which affirmed a post-verdict grant of JNOV where the attorney merely "moved for a directed verdict on claim 2 and claim 3 of the 082 patent on the grounds that the evidence is insufficient." *952 F.2d 1320, 1324-25 (Fed. Cir. 1991).* The post-verdict argument in *Malta* was related to the main infringement issue in the proceedings, not to new arguments that were never even addressed by Defendants as occurred in this case. In another case cited by Defendants, the Federal Circuit considered the motion because the moving party was

cut short by the Court in its pre-verdict motion. *Wilson Sporting Goods Co. v. David Geoffrey & Assoc., 904 F.2d 677, 683 (Fed. Cir. 1990).*

[*10]   Accordingly, the Court concludes that Defendants have waived certain noninfringement grounds which were never raised during pre-verdict JMOL motions. The Court will not consider any of the six arguments listed above. [3]

> 3   Many of the new arguments (e.g., regarding products sets and pressure sensitive labels) are conclusory and belied by clear trial testimony. Other new arguments that are given substantial attention by Defendants are completely frivolous. For example, Defendants argue that testimony regarding "returnable" containers failed to prove that "reusable" containers were used by direct infringers. However, witnesses testified in detail that the "returnable" containers were in fact "reused" many times over. Defendants also argue that the claim language "at a selected one of a time prior to and a time subsequent to the first label applying step positioning a first product set on the object" means that two first product sets must be positioned on the object--one at "a time prior to" and a second at "a time subsequent to" the first label applying step. This argument flatly ignores that the first product set is positioned "at a selected one of" these two times.

[*11]  **2. Testimony of Dr. Prahl**

Defendants generally ask the Court to disregard the testimony of MPT's expert, Dr. Prahl. The Court rejects these arguments for the same reasons it did at trial. As a threshold matter, Defendants did not object to Dr. Prahl's testimony in a timely manner. Moreover, even if they had objected properly the Court finds that Prahl's testimony was proper and that Defendants' objections merely go to weight to be given his testimony.

**3. Substantially Permanently**

Defendants argue that MPT failed to demonstrate that Marathon's customers "substantially permanently" attach the Smart Surface Placard to containers. First, they note that Richard Rizzi, the representative of a Marathon customer, testified that a specimen demonstrated to the jury was a poor example because it was placed over the residue of a previous placard rather than directly on the surface of the container. They also attack a video demonstration performed by Patrick Kennedy. They claim that "no direct evidence was offered as to: 1) when the testing was actually begun; 2) by what method the Smart Surface Placard was attached to the container; 3) where the container was obtained; 4) what type [*12] of container was utilized; 5) what the condition was of the container

prior to testing; 6) what conditions the container was subjected to from the time the Marathon Smart Surface Placard was attached to the container until it was removed; or 7) why the Marathon Smart Surface Placard was removed from the container and taken out of view during the video taping." They argue further that MPT failed to explain a connection between the container used in the demonstration and the containers used by Marathon customers. Finally, Defendants note that MPT has certain product tests performed by independent companies while the videotaped test was performed by Patrick Kennedy. From these observations they conclude that "Plaintiff's demonstrations are haphazard at best and are, therefore, entitled to no evidentiary weight" and that Plaintiff failed to meet its burden of proving literal infringement.

MPT responds that the jury was shown ample evidence that the Marathon placards substantially permanently attach to objects or containers. With respect to the testimony of Rizzi, the Marathon placards are sometimes placed over existing, damaged placards in their end use. With respect to the Kennedy demonstration, [*13] Patrick Kennedy did in fact testify as to the timing of the tests, the choice of substrates for testing, and the method used to adhere the Marathon placards. The jury could observe the conditions under which the test was performed. As for Kennedy's potential bias, the jury was well aware of his position with MPT.

MPT also points to Defendants' own tests. It notes that the jury could have concluded that the videotaped test Defendants demonstrated to the jury actually proved substantially permanent attachment. First, the test shown to the jury could reasonably demonstrate damage to the placards as required by the Court's claim construction. Second, the video demonstrator testified that he performed a first test in which he could not remove the Marathon placards from the container using his fingers. This test was recorded over by the demonstrator and could not be shown to the jury.

Finally, the jury was also provided with testimony regarding the Marathon adhesive, the strength with which it adheres to various substrates, and its classification as a permanent adhesive.

The Court concludes that reasonable jurors could find that the Smart Surface Placard substantially permanently attaches [*14] to the containers used to practice the method. Defendants' arguments go to the weight to be given the Rizzi and Kennedy demonstrations, and were fair game for argument before the jury. A jury could also reasonably observe that the Smart Surface Placards were substantially permanently attached in Defendants' own demonstration, particularly in light of the first test which was performed and then recorded over. [4]

Finally, the evidence regarding the adhesive provided further support that the placards are substantially permanently attached by end users.

> 4 Defendants note that the videographer testified that he could not remove the labels in the first test because he had short fingernails. However, this is just the sort of credibility determination that juries are supposed to resolve.

### 4. Release Coated - Placard

Defendants contend that the Court erred in ruling at trial that no reasonable juror could find that Marathon's Smart Surface Placard did not have the claim elements of a "placard" with a "release [*15] coated" face. They claim that the undisputed evidence demonstrates that the placard has two adhesive coated faces and thus cannot have a release coating. In this regard, the structure of the Marathon product was undisputed. At the center of the product are two attached polyester layers. The exterior surface of the first polyester layer has adhesive that is used to attach to containers. The exterior surface of the second polyester surface has a layer of adhesive that attaches the Teflon release surface.

The Court defined a "release coating" as "a covering that permits the easy and complete removal of pressure sensitive adhesive labels" and a "placard" as "a structure adapted for supporting a pressure sensitive adhesive backed label." The patents generally claim a "placard having a release coated face . . . ." Defendants argued in opposition to MPT's summary judgment motion on infringement that the adhesive layer between the second polyester layer and the Teflon release surface precluded a finding that the placard had a release coated face. The Court denied MPT's motion for summary judgment because MPT failed to provide any evidence as to the character of the adhesive that attached [*16] the Teflon release surface.

At trial MPT presented conclusive evidence and legal argument such that no reasonable juror could find that the placard lacked a release coated surface. With respect to the evidence, the adhesive is a thin layer with the sole purpose of attaching the Teflon to the polyester surface. Even if the polyester surface is the "face" of the placard, the Teflon still "covers" that face as required by the claims, since the Teflon can cover the placard even if it is not in direct contact with the placard. MPT also presented a correct legal argument that the claim term "placard" includes the adhesive layer, since the adhesive used to attach the Teflon is part of "a structure adapted for supporting a pressure sensitive adhesive backed label." Since the adhesive used to attach the Teflon is the exterior face of the placard, the Teflon is in direct contact with and thus covers the placard face.

2007 U.S. Dist. LEXIS 3992, *

The Court therefore concludes that its decision at trial was proper.

5. All Elements Rule - in the United States

Defendants also argue that MPT failed to prove that any Marathon customer performed all steps of the method in the United States. As the Court noted at trial, [*17] to prove infringement of the method claims MPT was required to prove that all steps of the method were performed by a customer in the United States. *See NTP, Inc. v. Research in Motion, Ltd., 418 F.3d 1282, 1318 (Fed. Cir. 2005).* The Court agrees with MPT that the jury reasonably concluded that MPT did prove all steps of the method were performed in the United States. Marathon flatly admitted that at least some of its customers perform all of the steps of the method in the United States. Marathon's largest customer also testified to all of the steps of the method being performed in the United States. Although in some cases certain method steps are performed in Mexico, the jury clearly considered this and limited damages accordingly.

6. Contributory Infringement - Substantial Non-Infringing Use

In this case, it was Marathon's customers who practiced the method. Marathon and Polymeric were accused of contributory infringement and inducement to infringe. Contributory infringement requires that the items sold by Marathon and Polymeric are "not a staple article or commodity of commerce suitable for substantial noninfringing use." *35 U.S.C. 271(c)* [*18] .

Defendants make two arguments with respect to substantial non-infringing uses. First, they generally argue that MPT failed to show that the products produced by Defendants do not have other uses. However, Marathon testified that the Smart Surface Placards are "all custom products." Testimony from Polymeric indicated that the Teflon coating was produced specifically for Marathon's application. MPT's expert also testified that the sole purpose of Marathon's end-product was to perform the patented method. Based on this testimony, a jury could reasonably conclude that MPT met its burden of demonstrating no substantial noninfringing use. [5]

5 Defendants also argue that use of the Smart Surface placard on racks is a substantial noninfringing use. The jury implicitly found that sales for racks are not a substantial noninfringing use. This conclusion was reasonable in light of Claim 6 of the *'790 patent*, which covers a "process for providing product information on *objects* . . . ." (emphasis added). It is clear from Claim 7 that object is broad enough to include racks, since that dependent claim further provides for "the process of claim 6 wherein the object is a container." *See*

*Kim v. ConAgra Foods, Inc., 465 F.3d 1312, 1319 (Fed. Cir. 2006)* ("The doctrine of claim differentiation suggests that the independent claims here should not include explicit limitations of a dependent claim.").

[*19] Defendants' second argument is a legal argument that the use of their products to perform the methods abroad is a substantial noninfringing use. The Court agrees with other courts to address the issue that the substantial noninfringing use cannot be acts that would otherwise infringe but are performed in a country where there is no patent. [6] *Lucas Aerospace, Ltd. v. Unison Indus., L.P., 899 F. Supp. 1268, 1287 (D. Del. 1995); 02 Micro Int'l Ltd. v. Sumida Corp., No. 2:03-cv-07, 2006 U.S. Dist. LEXIS 18859, *8 (D. Tex. 2006); LG Elecs., Inc. v. Asustek Computer, Inc., No. C 01-00326, 2002 U.S. Dist. LEXIS 25956, *35-37 (N.D. Cal. Aug. 20, 2002).* As a general rule, United States patent laws do not reach conduct that occurs overseas. *Deepsouth Packing Co. v. Laitram Corp., 406 U.S. 518, 531, 92 S. Ct. 1700, 32 L. Ed. 2d 273 (1972)* (explaining that "[o]ur patent system makes no claim to extraterritorial effect"). It follows that acts that occur overseas cannot serve as a substantial noninfringing use for purposes of a domestic infringement analysis. This is particularly true where the overseas use would be an infringement of the patent if it occurred [*20] in the United States. The peculiar result of Defendants' reasoning would be that contributory infringers are immune from liability so long as the component used to infringe the method is also exported elsewhere. Defendants' reasoning might also require courts to opine on the scope of foreign patent rights. For example, if the patentee has a patent in a foreign country, the infringement of that foreign patent would negate a finding of a substantial noninfringing use. The Court does not believe Congress envisioned a test that would require advisory rulings on foreign patent rights as a precursor to liability in this country. For these reasons, the Court rejects Defendants' argument.

6 Defendants argue that none of these other courts have addressed a method patent. However, *Section 271(c)* does not distinguish between components that can be used to practice a method and components that can be combined into an apparatus. The Court cannot see any reason to distinguish between the two on the issue of whether foreign activities can serve as a substantial noninfringing use.

[*21] 7. Contributory Infringement - Polymeric

Polymeric argues that it cannot be liable in light of the Court's jury instruction regarding contributory infringement. The Court adopted MPT's proposed instruction and instructed the jury as follows:

2007 U.S. Dist. LEXIS 3992, *

MPT argues that Marathon and Polymeric have contributed to infringement by another. Contributory infringement may arise when someone supplies something that is used to infringe one or more of the patent claims. In order for there to be contributory infringement by a defendant, someone other than that defendant must directly infringe a claim of the *790* or *164* patents; if there is no direct infringement by anyone, there can be no contributory infringement. If you find someone has directly infringed the *790* or *164* patent, then contributory infringement exists if:

(1) The defendant supplied an important component of the infringing part of the method;

(2) The component is not a staple article of commerce suitable for non-infringing use; and

(3) The defendant supplied the component with the knowledge of the *790* and *164* patent and knowledge that the component was especially made or adapted for use in an infringing manner.

A "staple article [*22] of commerce capable of substantial noninfringing use" is something that has uses other than in the patented method, and those other uses are not occasional, farfetched, impractical, experimental, or hypothetical. In this case, as I have explained, MPT argues that Marathon's customers and others who use the product are the ones who are directly infringing the patents, and that the 'important component' supplied to them is the Smart Surface TM Placard. Defendants argue that the way the customers and others who use the Smart Surface TM Placard use that product does not infringe any claim of the *790* or *164* patents.

If you find that Marathon and/or Polymeric has contributed to the infringement of at least one claim of the *790* or *164* by another, then they are responsible for infringing that claim as if they were direct infringers.

Polymeric notes that the jury instruction states that "the 'important component' supplied to [Marathon's customers] is the Smart Surface TM Placard." Polymeric argues that this portion of the instruction required the jury to find that Polymeric actually supplied the Smart Surface placard in order to find it liable for contributory infringement. It points [*23] to testimony that its role was to provide the Teflon laminate to Marathon, which then combined the Teflon with other components [7] to make and sell the Smart Surface product. Marathon was thus the only Defendant to supply the finished Smart Surface product to its customers.

> 7 Polymeric notes in passing that its "role in producing the Teflon laminate is analogous to Avery Dennison's role in supplying a laminate that Marathon utilized in the manufacture of Marathon's Smart Surface Placard." Although there are some parallels, the Court notes a major distinction that the Avery Dennison portion of the Smart Surface placard is a standard product with obvious substantial noninfringing uses.

The Court finds that the jury instruction did not limit the jury as Polymeric contends. The portion of the instruction referenced by Polymeric merely described one portion of the component/supply relationship--i.e., the important component supplied by Marathon to its customers. Although it would have been acceptable to further [*24] explain that the important component supplied by Polymeric to Marathon [8] was the Teflon laminate, the instruction as a whole is clear that each Defendant, and the component supplied by that Defendant, must be considered individually.

> 8 The jury could also reasonably conclude from testimony, correspondence and Polymeric's own patent that Polymeric knew that the product it supplied to Marathon would be used to produce a product to practice the patented method.

8. Inducement to Infringe

Marathon's only argument is that MPT failed to prove direct infringement. Because the Court disagrees, the Court also finds that the inducement verdict is supported by substantial evidence.

**c. Invalidity/Unenforceability**

1. Failure to Comply with *Rule 50(a)(2)*

MPT also challenges Defendants' original JMOL motions on invalidity. It points to the argument of defense counsel at the close of the rebuttal case. However, that argument also incorporated earlier arguments, including Defendants' arguments in opposition [*25] to Plaintiff's JMOL motion at the close of Defendants' case

on invalidity, unenforceability and noninfringement. Referring back to that portion of the transcript, Defendants fully addressed the issues of obviousness, written description, indefiniteness and unenforceability. On these issues MPT was fully apprised of Defendants' position and the purpose of the rule has been met. *Kusens, 448 F.3d at 361*; *Jordan, 464 F.3d at 595*.

### 2. Obviousness

Defendants first state that the Court erred in submitting obviousness to the jury. The Court disagrees:

> Obviousness is a question of law based on factual underpinnings. *Graham v. John Deere Co., 383 U.S. 1, 17, 148 USPQ 459, 467, 15 L. Ed. 2d 545, 86 S. Ct. 684 (1966)*. When the parties dispute the underlying facts, the issue of obviousness typically is submitted to the jury, as it was in this case. *See Jurgens v. McKasy, 927 F.2d 1552, 1557, 18 USPQ2d 1031, 1035 (Fed. Cir. 1991)*.

*Duro-Last, 321 F.3d at 1108*; *see also Hewlett-Packard Co. v. Mustek Sys., 340 F.3d 1314, 1319 (Fed. Cir. 2003)*.

With respect to the jury's decision, [*26] Defendants did not claim that a single reference anticipated MPT's claims. Rather, they argued that a combination of prior art rendered the invention obvious. Obviousness is tested under the following standard:

> One attacking the validity of a patent must present clear and convincing evidence establishing facts that lead to the legal conclusion of invalidity. *35 U.S.C. § 282*. To establish invalidity under *35 U.S.C. § 103*, certain factual predicates are required before the legal conclusion of obviousness or nonobviousness can be reached. The underlying factual determinations to be made are (1) the scope and content of the prior art; (2) the differences between the claimed invention and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness, such as commercial success, long-felt but unsolved need, failure of others, copying, and unexpected results. *Graham v. John Deere Co., 383 U.S. 1, 17, 148 U.S.P.Q. (BNA) 459, 467, 15 L. Ed. 2d 545, 86 S. Ct. 684 (1966)*.

*Apple Computer, Inc. v. Articulate Sys., Inc., 234 F.3d 14, 26 (Fed. Cir. 2000)*.

Defendants [*27] claim that the patented method was rendered obvious by the combination of a number of prior art references. French Patent No. 2 649 522 and Derwent Publications Alerting Abstract Bulletin Week 9109 of French Patent No. 2 649 522 describe a structure with a silicone release surface for the labeling and relabeling of computer diskettes. Defendants' expert Stempel testified that this is essentially what MPT's patents attempt to claim. IRS address labels and other piggyback labels were in common use and also had a release surface that allowed for the removal of pressure sensitive adhesive labels. Testimony from an industry representative and an industry handbook explained that a piggyback label could be used for multiple applications of labels. As for the concept of labeling and relabeling, Robert Petrou, the inventor of the patents-in-suit, testified that he came up with his idea while observing Goodyear labeling and relabeling its containers, albeit without the use of a placard and with a buildup of residue. Delphi representative Rizzi testified that it had been labeling and relabeling for many years without the use of a placard. From this evidence Defendants conclude that the structure [*28] used to practice the method was not novel, that labeling and relabeling was not novel, and that the use of the structure to label and relabel was obvious.

Plaintiff responds, and the Court agrees, that Defendants are not entitled to JMOL on obviousness. A reasonable jury could conclude that the scope and content of the prior art was substantially different from the method and underlying structure of MPT's patents. MPT's expert Prahl testified to a number of structural differences between the device of the French patent and the structure used to practice MPT's patented method. The actual use of piggyback labels was as a carrier for a pressure sensitive adhesive label. In the example of an IRS 1040 label, the label is reused while the placard portion is thrown away. This is the opposite of MPT's method, where the placard is reused many times over. Testimony regarding prior practice of the method without a release coated placard actually supports a finding of nonobviousness. Prior to MPT's invention Goodyear and Delphi had difficulty removing labels and applying new ones, but nonetheless failed to utilize a placard to perform labeling and relabeling. A jury could reasonably conclude [*29] that those skilled in the art, such as Goodyear, Delphi and their suppliers, therefore did not find it obvious to use a placard to perform the method. Finally, the jury received evidence of substantial commercial success under the patent, industry awards, and copying by others--all of which are relevant objective evidence of nonobviousness.

### 3. Written Description

The Court previously summarized the written description requirement as follows:

As applied to this case, this means that the language of the later-amended claims must find appropriate support in the original specification of the '882 application. That specification must include sufficient information to show that the inventor possessed the later-claimed invention at the time of the original disclosure. *Pandrol USA, LP v. Airboss Railway Prods., Inc., 424 F.3d 1161, 1165 (Fed. Cir. 2005).* "The purpose of the written description requirement is to prevent an applicant from later asserting that he invented that which he did not; the applicant for a patent is therefore required to 'recount his invention in such detail that his future claims can be determined to be encompassed within his original creation. [*30] '" *Amgen Inc. v. Hoechst Marion Roussel Inc., 314 F.3d 1313, 1330 (Fed. Cir. 2003)* (quoting *Vas-Cath Inc. v. Mahurkar, 935 F.2d 1555, 1561 (Fed. Cir. 1991)).*

Although generally stated as the "possession" test, a showing of actual possession at the time of the original disclosure is not enough; rather, "the written description requirement is satisfied by the patentee's disclosure of 'such descriptive means as words, structures, figures, diagrams, formulas, etc., that fully set forth the claimed invention.'" *Enzo Biochem, Inc. v. Gen-Probe Inc., 323 F.3d 956, 969 (Fed. Cir. 2002)* (quoting *Lockwood v. American Airlines, 107 F.3d 1565, 1572 (Fed. Cir. 1997)).* In other words, the purpose of the test is to demonstrate possession of the claimed invention and possession is proved by full disclosure of what is claimed. *Enzo, 323 F.3d at 969.* "The possession test requires assessment from the viewpoint of one of skill in the art." *Pandrol, 424 F.3d at 1165.*

(Doc. 168).

As the Court previously explained in denying Defendants' motion for summary judgment that "substantially permanently" [*31] fails the written description test, that exact phrase does not appear in the original specification. Nonetheless, the original specification de-

scribes firmly securing the placard to a container using an adhesive, which closely parallels "substantially permanently" attaching a placard to a container with an adhesive as is described in the claims. The specification also describes permanent adhesives with respect to labels, which are known in the art to be the same type of adhesives used on the placard portion. There was a great deal of testimony at trial regarding the known properties of adhesives and adhesive bonding from which the jury could come to understand the level of skill in the art and reasonably conclude that Defendants failed to meet their burden of proving that MPT did not possess or describe the concept of "substantially permanent" attachment at the time the specification was filed.

4. Indefiniteness

The indefiniteness inquiry originates from the statutory requirement that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." *35 U.S.C. § 112* [*32] P2. A claim is invalid as indefinite if it is not amenable to construction. *Aero Prods. Int'l, Inc. v. Intex Rec. Corp., 466 F.3d 1000, 1016 (Fed. Cir. 2006).* At the behest of Defendants, the Court construed "permanently" by reference to a common industry definition of a permanent adhesive. Defendants now argue that other definitions of permanently--such as "high adhesion," "great deal of force to remove," and "high ultimate adhesion to a wide variety of surfaces"--render it impossible to construe permanently. To the contrary, these definitions are all similar, and only serve to reinforce that permanently is a term that was amenable to construction and was properly defined in the first place.

Defendants also argue that the claims are indefinite because adhesives have different properties on different substrates. This argument misses the point of the claims. They do not claim a particular adhesive or a substrate, but rather a method involving "substantially permanently" attaching a placard to a substrate. If a potential infringer chooses a substrate and adhesive where the placard does not attach in this manner, there is no infringement. The patent claims here provide [*33] ample guidance for competitors to make such an assessment.

5. Inequitable Conduct

A patent applicant has a duty of candor and good faith before the Patent and Trademark Office. *37 C.F.R. § 1.56(a).* Courts enforce the duty of candor and good faith through the doctrine of inequitable conduct. *Molins PLC v. Textron, 48 F.3d 1172, 1178 (Fed. Cir. 1995).* Inequitable conduct includes affirmative misrepresentations of material facts, failure to disclose material information, or submission of false material information, coupled with an intent to deceive. *Li Second Family Ltd.*

*P'shp. v. Toshiba Corp., 231 F.3d 1373, 1378 (Fed. Cir. 2000)*. When a claim of inequitable conduct is based on an applicant's failure to disclose material information, the party challenging the patent must show that the prior art information was material to patentability, the applicant had knowledge of the prior art and of its materiality, and the applicant intended to mislead the PTO through the failure to disclose the information. *FMC v. Manitowoc Co., 835 F.2d 1411, 1415 (Fed. Cir. 1987)*.

The jury concluded that Defendants failed to meet [*34] their burden of proving inequitable conduct. Defendants challenge that conclusion. However, the Court finds that the jury could have reasonably concluded that the applicant did not fail to disclose anything. There was conflicting testimony whether the applicant submitted an actual IRS label or a photocopy. If an actual label was submitted the jury could easily find that the duty of candor was satisfied.

### d. Damages

Defendants do not seriously challenge the amount of damages. Indeed, the jury only awarded $ 3,561.64 in damages based on a 7% reasonable royalty rate. In light of the total sales of products used to perform the patented method, this verdict clearly accounted for noninfringing sales, such as those to customers in Mexico. *See State Contracting & Eng'g Corp. v. Condotte Am., Inc., 346 F.3d 1057, 1072 (Fed. Cir. 2003)* ("A jury's decision with respect to an award of damages 'must be upheld unless the amount is "grossly excessive or monstrous," clearly not supported by the evidence, or based only on speculation or guesswork.'")(citation omitted).

Defendants focus instead on the jury's finding that infringement was willful. [9] A potential infringer [*35] on notice of another's patent right has an affirmative duty of due care to avoid infringement. *Rolls-Royce Ltd. v. GTE Valeron Corp., 800 F.2d 1101, 1109 (Fed. Cir. 1986)*. "A finding of willfulness requires that the fact-finder find, by clear and convincing evidence, that the infringer acted in disregard of the infringed patent with no reasonable basis to believe it had a right to the acts in question." *Transmatic, Inc. v. Gulton Indus., Inc., 53 F.3d 1270, 1279 (Fed. Cir. 1995); State Contracting & Eng'g Corp. v. Condotte Am., Inc., 346 F.3d 1057, 1063 (Fed. Cir. 2003)*. "This is a factual determination made after considering the totality of the circumstances." *Transmatic, 53 F.3d at 1279*. "[T]he primary consideration is whether the infringer, acting in good faith and upon due inquiry, had sound reason to believe that it had the right to act in the manner that was found to be infringing." *SRI Int'l v. Advanced Tech. Lab., 127 F.3d 1462, 1464-65 (Fed. Cir. 1997)*. Factors to be considered include "[w]hether the infringer intentionally copied the ideas of another; whether the infringer, [*36] once on notice of

the patented invention, investigated the scope of the patent to form a good-faith belief that it was invalid or not infringed; and the infringer's behavior as a party to the litigation . . . ." *In re Hayes Microcomputer Prods, 982 F.2d 1527, 1543 (Fed Cir. 1992)*.

9    The Court finds that Defendants adequately raised the issue of willfulness in their motions at trial.

The Court agrees with Defendants that a reasonable jury could not conclude that MPT submitted clear and convincing evidence of willful infringement. Rather, all of the evidence and testimony points to a conclusion that Defendants' infringement was not willful. When Marathon's Hurley came across a product which he believed to infringe earlier in his career, he immediately removed the product from the market. These are the acts of a person acting in good faith to avoid infringement. Although MPT accuses Defendants of slavishly copying their product, the undisputed testimony is that the products themselves have [*37] a different structure. They are manufactured from different sublaminates. Although this ultimately did not result in a verdict of noninfringement, [10] the undisputed testimony is that Defendants attempted to design around Plaintiff's patent. Infringement is not willful simply because Plaintiff's product was the starting point for Defendants' product. [11] *Read Corp. v. Portec, Inc., 970 F.2d 816, 828 (Fed. Cir. 1992)*. Rather, the patent system encourages good faith attempts to "design around" patented inventions. *Id.; see also WMS Gaming Inc. v. Int'l Game Tech., 184 F.3d 1339, 1355 (Fed Cir. 1999)* ("When the district court reconsiders its finding of willful infringement, it should bear in mind that the patent law encourages competitors to design around existing patents"). The fact that the Defendants' design turned out to be within the scope of the patent is not conclusive; what matters is state of mind. *Read, 970 F.2d at 828*.

10    For example, the structure of the "placard" portion of the two products is substantially different. However, a "placard" was widely defined as a "a structure adapted for supporting a pressure sensitive adhesive backed label." Similarly, the "release coating" of the Marathon product is made from Teflon while MPT's product is made from silicone. Both are nonetheless "coverings that permits the easy and complete removal of pressure sensitive adhesive labels."

[*38]

11    The Court of course recognizes that these are method patents at issue. However, the method involves the use of a specific structure. One way to avoid infringement would be to design a product that does not have that structure but can perform the same method steps.

2007 U.S. Dist. LEXIS 3992, *

Plaintiff argues that Defendants should have obtained an opinion of counsel. However, the Federal Circuit recently explained that the failure to obtain legal advice does not result in an adverse inference with respect to willful infringement. *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., 383 F.3d 1337, 1345 (Fed. Cir. 2004)*; *see also State Contracting, 346 F.3d at 1064* (noting that "we have not held that obtaining the advice of counsel is the only means to avoid a finding of willfulness, regardless of the circumstances"). Here, Dronzek of Polymeric--a person with significant industry experience--testified to his good faith belief that the Teflon surface he produced for use with the Smart Surface Placard was not a "release coating" as contemplated by the claims. [12] Along those [*39] lines, he obtained a patent related to the Smart Surface Placard. [13] Marathon's Smart Surface Placard was not sold until after the patent issued. In light of these circumstances, the only reasonable conclusion is that Defendants took care not to infringe.

    12

        Dronzek relied in part on a statement from a later Kennedy patent application that "The release surface may be a coating applied to the protective layer 22 or may be a property of material from which the protective layer 22 is made." The Court addressed this statement previously. Kennedy appears to be distinguishing between a protective layer (e.g., a functional layer like the "placard" support layer in the '790 and '164 patents) with inherent release properties and one that requires a coating. In the Smart Surface Placard, the Teflon coating only supplies release properties and does not also serve as the support layer. Nonetheless, this does not mean that Defendants were entirely unreasonable and were not acting in good faith.

    13

        The fact that a party has a patent does not mean that they cannot infringe the claims of another patent's broad "dominant" claims. *Rolls-Royce Ltd. v. GTE Valeron Corp., 800 F.2d 1101, 1110 n.9 (Fed. Cir. 1986)*. However, the issuance of a patent does provide evidence that Defendants' had a good faith belief of noninfringement.

[*40]    MPT's focus on communications between Dronzek, Hurley and a third party regarding the eventual marketing and sale of a product is similarly unavailing. The important point is that Defendants had a good faith belief that they were not infringing. In such cases, there is nothing willful about planning to start a business. Their attempts to remain "under the radar" until they launched their product are typical of reasonable business

actions. It is the rare business that will provide its competitors with advance notice that it has built what it believes to be a better product. When Marathon did launch the product, it did not hide that it would be used to perform the method. Instead, it candidly and prominently advertised its use to perform the method, a fact that Plaintiff used to its advantage in its infringement case. However, this is not the conduct of a party attempting to hide from a patent it believes to be infringed.

Moreover, MPT alleged infringement by Defendants almost immediately after the products hit the market. Defendants obtained counsel and responded with reasonable noninfringement and invalidity positions that they have maintained throughout this litigation. This is [*41] the conduct of reasonable actors acting in good faith and the Court does not believe a reasonable jury could conclude otherwise.

In sum, all of the evidence presented points to Defendants taking careful, measured action with respect to Plaintiff's patent rights. The Court therefore concludes that a reasonable jury could not have found clear and convincing evidence of willful infringement and JMOL is therefore appropriate on this issue.

### e. New Trial [14]

    14    Defendants have not moved for a new trial under *Rule 59*.

#### 1. Jury Confusion

At trial Marathon went through a list of its customers and explained how each customer used the Smart Surface Placards. Some of the purchasers were resellers-- i.e., middlemen who sold the Smart Surface Placard to the end user. At Defendants' request, the Court bifurcated liability and damages. In the liability phase of the trial, the jury was asked whether "any of Marathon's customers infringe any of claims 1, 2, 3, 4 or 6 of the '790 Patent or claim 1 of the '164 [*42] Patent?" The jury answered "yes" and in response to the next question indicated that all 6 of the claims at issue were infringed by "Marathon's customers . . . ." In the damages phase of the trial, the jury was asked "[i]f you find that a Marathon customer who bought the Smart Surface Placard performed all of the steps of the patents-in-suit in the United States, please identify the customer by name." The jury included two resellers in its list of customers. Defendants seek a new trial under *Rule 49(b)*, which states that "[w]hen the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, judgment shall not be entered, but the court shall return the jury for further consideration of its answers and verdict or shall order a new trial." *Fed R. Civ. P. 49(b)*.

Defendants have waived the right to challenge the verdicts as inconsistent. After the jury's damages verdict was read, the Court and the parties' counsel engaged in the following exchange:

> THE COURT: Counsel, do you wish to see it? Before I discharge the jury is there anything further?
>
> MR. SHUNK: Your Honor, obviously we want [*43] to move the Court for a permanent injunction, but I assume that you want to receive that in writing.
>
> THE COURT: That is correct. And I'm really speaking of any other matters before I discharge the Jury. But yes, you have to brief that.
>
> MR. SHUNK: Yes. Nothing from the plaintiff, Your Honor.
>
> MR. COSTIGAN: Nothing.
>
> MR. WILSON: I'll renew my motion, but that's for after you get rid of the Jury. Nothing further.

"Most courts that have addressed the issue have held that a party's failure to object to an inconsistency between a special interrogatory and the general verdict waives the right to further deliberation or to a new trial." 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2513 pp. 226-27 (2d ed. 1995). The Federal Circuit recently addressed the application of Sixth Circuit law to this issue as follows:

> We apply the law of the pertinent regional circuit to the procedural rules regarding inconsistent jury verdicts and the waiver of objections to such verdicts. *Minn. Mining & Mfg. Co. v. Chemque, Inc., 303 F.3d 1294, 1302 & n.1 (Fed. Cir. 2002).* Under Sixth Circuit law, a party waives its objection to [*44] inconsistency in a jury's verdict if the party had an adequate opportunity to object but failed to do so.

*L & W, Inc. v. Shertech, Inc., 06-1065, 06-1097, 471 F.3d 1311, 2006 U.S. App. LEXIS 30617, *16 (Fed. Cir. Dec. 14, 2006)* (citing *Tennessee Consolidated Coal Co. v. United Mine Workers of America, 416 F.2d 1192, 1200 (6th Cir. 1969)); see also Mitchell v. Hallden Mach. Co., Nos. 92-5465, 92-5596, 92-5706, 92-5707,* *1994 U.S. App. LEXIS 5640 (6th Cir March 23, 1994)* ("Failure to object to such an inconsistency in a timely manner constitutes a waiver of the objection.").

Because both of Defendants' counsel had ample opportunity to object to any inconsistency but failed to do so, the Motion is denied. [15]

> 15   The Court notes that in any event the verdicts were not inconsistent. The general verdict regarding infringement merely asked if "any" Marathon customer infringed. Moreover, evidence was presented that the resellers' customers infringe.

**f. Conclusion** [*45]   **- Defendants' Motions & MPT's Motion to Strike**

The Court GRANTS Defendants' JMOL motion on the issue of willfulness. The Court otherwise finds that Defendants' contentions are either without merit or stricken.

## PLAINTIFF'S MOTIONS

### a. Enhanced Damages

A patentee may be entitled to trebled damages for infringement under *35 U.S.C. § 284*. The threshold question is typically whether infringement was willful, and the enhanced damages inquiry involves similar factors. *See SRI Int'l v. Advanced Tech. Lab., 127 F.3d 1462, 1464 (Fed Cir. 1997)* (explaining that "willful infringement . . . is the term designating behavior for which enhanced damages may be assessed"); *In re Hayes, 982 F.2d at 1545* (explaining that a "finding of willfulness may be a basis for an award of enhanced damages"); *Read Corp. v. Portec, Inc., 970 F.2d 816, 826 (Fed. Cir. 1992)* (noting factors of deliberate copying, the infringer's investigation, the duration of misconduct, remedial action by the defendant, the defendant's motivation for harm, and whether the defendant attempted to conceal its conduct). Here, [*46] the Court finds that enhanced damages are improper for the same reasons it granted Defendants' JMOL motion on willful infringement. Moreover, other enhanced damages factors such as the infringer's behavior as a party, the Defendants' size and financial condition and the closeness of the case all counsel against enhanced damages. *Read, 970 F.2d at 827.* The Court finds that Defendants--both relatively small companies--were forthright throughout the proceedings. Moreover, MPT's claims were by their nature difficult to prove. Because it does not have a patent on the placards, it had to prove direct infringement of the patented method as well as contributory or induced infringement by Defendants.

### b. Permanent Injunction

The Supreme Court recently addressed injunctions in patent cases in *EBay Inc. v. MercExchange, L.L.C., 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006)*. At issue in the *Ebay* case was the Federal Circuit's "general rule that courts will issue permanent injunctions against patent infringement absent exceptional circumstances." *Id. at 1839*. A unanimous Supreme Court found this approach lacking, and held "that the decision whether to [\*47] grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards." *Id. at 1841*.

Two concurrences were filed which addressed related points. Chief Justice Roberts (joined by Justices Ginsburg and Scalia) noted that "from at least the early 19th century, courts have granted injunctive relief upon a finding of infringement in the vast majority of patent cases." *Id*. Although this historical practice does not entitle a patentee to an automatic permanent injunction or justify a general rule in favor of injunctions, it does provide guidance to courts in the vast majority of run-of-the-mill patent cases. *Id*. Justice Kennedy (joined by Justices Stevens, Souter and Breyer) first acknowledged that "historical practice . . . is most helpful and instructive when the circumstances of a case bear substantial parallels to litigation the courts have confronted before." *Id. at 1842*. Justice Kennedy then noted certain patent practices that arose only recently. For example, [\*48] some firms patent only a small component of a larger device, then use the threat of an injunction to charge exorbitant licensing fees to the manufacturer of the complete device. *Id*. Other patents such as business method patents are relatively new and have problems with "substantial vagueness and suspect validity." *Id*.

The core holding of *Ebay* is that a plaintiff must demonstrate the following four factors for a court to exercise its equitable discretion to grant a permanent injunction:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Id. at 1838*.

First, the Court finds that MPT has suffered irreparable injury. MPT, along with the closely related com-

pany The Kennedy Group ("TKG"), obtained patents that allowed them to gain a dominant position in the sale of placards for use in the patented method. These patents are not an insubstantial [\*49] component of a larger invention or a new form of patentable material. Instead, MPT has broad patent protection that reads directly upon the use of Marathon's Smart Surface Placard to practice the method. MPT invented a method, actively created a market, and established a strong market position and customer goodwill. Usurping this market by inducing or contributing to infringement will irreparably harm MPT. *See, e.g., Basicomputer Corp. v. Scott, 973 F.2d 507, (6th Cir. 1992)* ("The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute."); *TiVo Inc. v. EchoStar Communs. Corp., 446 F. Supp. 2d 664, 669 (E.D. Tex. 2006)* (finding irreparable harm where "Defendants compete directly with Plaintiffs" and the plaintiffs face loss of market share).

Second, monetary damages are not adequate to compensate for MPT's injury. Royalties will not stop the erosion of MPT and TKG's market. Another market entrant is likely to lead to a drop in prices, thus reducing MPT's royalties from Defendants and TKG as well as TKG's profits. Allowing Marathon to sell the Smart Surface Placard in [\*50] the United States market will also damage MPT in that all placards have previously been provided by MPT. This implicates a significant impact on MPT's commercial reputation.

Third, the balance of hardships tips in favor of MPT. Only 10-15 percent of Marathon's total business [16] consists of sales of Smart Surface Placards. A large percentage of those are sold to Mexico and are not subject to an injunction. Thus, only a small percentage of Marathon's total sales will be prohibited by an injunction. As has already been noted, MPT is likely to face substantial hardship from the continued infringement of the patents in the United States.

> 16    Defendants did not address hardship to Polymeric.

Finally, the public interest supports an injunction. There is a general public interest in favor of strong patent protection, except in cases where an obvious public interest such as public health and safety exists. *Tivo, 446 F. Supp. 2d at 670*. Here, the method at issue is quite useful to the shipping industry. [\*51] However, there is no critical public need for use of placards to practice the patented method, and MPT/TKG is more than willing to provide for customers' needs with a product that works in the vast majority of applications.

Accordingly, MPT is entitled to a permanent injunction under the traditional four-factor test.

Defendants next argue that MPT should be barred from seeking equitable relief by the doctrine of unclean hands. The Court is well aware of the conduct of all parties and counsel throughout this litigation. It finds that the parties and their counsel have acted professionally, complied with Court orders, and otherwise have generally taken good faith positions during this litigation. Accordingly, unclean hands has no application here.

Finally, the Court generally finds that Plaintiff's proposed language for a permanent injunction is proper. Although the Court agrees with Defendants that an injunction must be stated in specific terms and narrowly tailored to fit the specific legal violations, [17] their arguments regarding the scope of the injunction largely miss the mark. The jury has already found that the Marathon Smart Surface Placard does not have a substantial noninfringing [*52] use. Thus, any use of the placards will necessarily be to practice the method. However, the Court does agree that the prohibited products should be limited to those only "colorably different" from the Marathon Smart Surface Placard. *E.g., Int'l Rectifier Corp. v. IXYS Corp., 383 F.3d 1312, 1316-17 (Fed. Cir. 2004); Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc., 986 F.2d 476, 480 (Fed. Cir. 1993).*

> 17    *Fed. R. Civ. P. 65(b); Gemveto Jewelry Co., Inc. v. Jeff Cooper Inc., 800 F.2d 256, 259 (Fed. Cir. 1986); KSM Fastening Sys., Inc. v. H.A. Jones Co., Inc., 776 F.2d 1522, 1525-27 (Fed. Cir. 1985).*

As for Defendants' argument that placards sold in the United States may be shipped to Mexico for use there, the Court recognizes that use of the devices in Mexico does not infringe the patents. However, this does not justify allowing the sale of placards in the United States, based on the mere possibility [*53] that they may be shipped to Mexico or some other country for their use. Instead, it is most likely that placards will be used in the country where they are purchased. However, if Defendants wish to sell Smart Surface Placards in the United States for use in other countries, the Court notes that the Smart Surface Placards are capable of marking with print and graphics on the top coat. Products to be sold in the United States could carry a warning, permanently and prominently printed upon the top coat, explaining that the use of the placard to perform the method in the United States infringes the '790 and '164 patents. Absent an appropriate disclaimer, Defendants and their employees, officers, agents, and those acting in concert therewith are permanently enjoined from using, selling, or offering to sell within the United States, or importing into the United States, the SmartSurface Placard or any product that is not colorably different from the SmartSurface Placard.

### c. Attorneys' Fees

MPT seeks attorneys' fees under *35 U.S.C. § 285*, which states that the "court in exceptional cases may award reasonable attorney fees to the prevailing party." "Among [*54] the types of conduct which can form a basis for finding a case exceptional are willful infringement, inequitable conduct before the P.T.O., misconduct during litigation, vexatious or unjustified litigation, and frivolous suit." *Beckman Instruments, Inc. v. LKB Produkter AB, 892 F.2d 1547, 1551 (Fed. Cir. 1989).* A case may be exceptional where the losing party is found to have acted willfully, recklessly, or with gross negligence in assessing and presenting its case to the court. *Eltech Systems Corp. v. PPG Indus., Inc., 903 F.2d 805, 810-811 (Fed. Cir. 1990).*

MPT contends that Defendants were at least guilty of gross negligence in their defense. It argues that Defendants only had one reasonable defense--relating to the release coating--and that the defense was negated with the Court's *Markman* decision. Defendants nonetheless continued to press their release coating argument throughout the proceedings and into trial. MPT further notes what it perceives as bad faith litigation conduct regarding the substantially permanent attachment argument. It posits that this Court's denial of its infringement summary judgment motion hinged solely upon a Telofski [*55] DVD test that later turned out to have been the second test conducted after the first test failed.

With respect to the DVD test, the Court agrees with Defendants that it was not the reason the Court denied summary judgment on infringement. Rather, the Court found that MPT had failed to provide sufficient evidence to meet its burden of proving that Defendants' customers practiced the claimed methods. This distinction is important, because it also demonstrates why Defendants were not willful, reckless or grossly negligent in continuing to press their case after the *Markman* ruling. This case was not solely about the structure of the Smart Surface Placard. Because MPT's patents have method claims, it also had to prove that the method was practiced by someone. This is an inherently difficult inquiry where none of the direct infringers are parties to the suit. Morever, Defendants had reasonable invalidity and unenforceability defenses. For these reasons, the Court declines to find that this case is exceptional as would warrant attorneys fees.

However, MPT is entitled to costs under *Rule 54(d)*. Defendants argue that costs are prohibited under *28 U.S.C. § 1928* [*56] , which provides as follows:

> Whenever a judgment is rendered for the plaintiff in any patent infringement action involving a part of a patent and it appears that the patentee, in his specifica-

tions, claimed to be, but was not, the original and first inventor or discoverer of any material or substantial part of the thing patented, no costs shall be included in such judgment, unless the proper disclaimer has been filed in the United States Patent and Trademark Office prior to the commencement of the action.

*28 U.S.C. § 1928*. Defendants then focus on the testimony of the inventor Petrou who explained that he witnessed Goodyear employees labeling and relabeling without placards. It was Goodyear's problems with messy removal, cleaning and multiple barcodes that led Petrou to invent the use of a placard device to practice the method of labeling and relabeling. Because labeling and relabeling without placards existed prior to Petrou's invention, Defendants argue that Goodyear was the "original and first inventor of any material or substantial part of the thing patented . . . ."

The parties have not provided and the Court has been unable to uncover any [*57] modern authority regarding *Section 1928*. However, older cases are in agreement that the statute refers to instances where the plaintiff has prevailed on some claims of the patent while other claims have been held invalid but not disclaimed or would have been held invalid without a disclaimer. *United Shoe Machinery Corp. v. Mathey, 117 F.2d 331, 334 (1st Cir. 1941)* (refusing costs for successful infringement plaintiff where other claims were invalid but not disclaimed); *John W. Gottschalk Mfg. Co. v. Springfield Wire & Tinsel Co., 75 F.2d 907, 908 (1st Cir. 1935)* (holding that "no costs can be allowed when a claim is held invalid and no disclaimer has been filed before suit is brought"); *Nat'l Elec. Signaling Co. v. De Forest Wireless Tel. Co., 140 F. 449, 455 (C.C.N.Y. 1905)* ("The statutes restricting costs upon filing a disclaimer after suit seem only to apply where a disclaimer is necessary

to upholding the patent, and is filed for the purpose of saving it."); *Metallic Extraction Co. v. Brown, 110 F. 665, 668 (8th Cir. 1901)* (holding "although the decree below is sustained as to claim 1, no costs can be recovered [*58] by the complainant below . . ., since no disclaimer was filed by the complainant as to claim 4 before the present action was instituted"). Defendants did not argue at trial that Goodyear was a prior inventor such that a part of the patent would be invalid. Rather, Goodyear was an example of a company that was involved in the earlier practices that Petrou's inventive method improved upon. Accordingly, the Court finds that *Section 1928* is inapplicable to these facts. Because Defendants make no other arguments that MPT is not entitled to costs, the Court agrees that costs are appropriate.

**CONCLUSION**

Accordingly, the parties' motions are GRANTED in part and DENIED in part. The Court agrees with Defendants that they are entitled to JMOL that they were not willful infringers. The Court also finds that MPT is not entitled to attorneys fees. Accordingly, MPT is entitled to judgment that the patents are valid and infringed by Defendants, awarding damages in the amount of $ 3,561.64 plus costs, dismissing Defendants' counterclaims with prejudice and permanently enjoining Defendants and their employees, officers, agents, and those acting in concert therewith from using, selling, offering [*59] to sell, within the United States, or importing into the United States, the SmartSurface Placard or any product that is not colorably different from the SmartSurface Placard.

IT IS SO ORDERED.

/s/ Patricia A. Gaughan

United States District Judge

Dated: 1/19/07

# EXHIBIT 3

```
                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS


DePUY MITEK, INC.,              )
a Massachusetts Corporation,   )
                               )
             Plaintiff         )
                               )
        -VS-                    ) CA No. 04-12457-PBS
                               ) Pages 1 - 35
ARTHREX, INC.,                 )
a Delaware Corporation,        )
and Pearsalls Ltd.,            )
a Private Limited Company      )
of the United Kingdom,         )
                               )
             Defendants        )



                      MOTION HEARING

          BEFORE THE HONORABLE PATTI B. SARIS
               UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:

     DIANNE B. ELDERKIN, ESQ. and MICHAEL J. BONELLA, ESQ.,
Woodcock Washburn, LLP, Cira Centre, 12th Floor, 2929 Arch
Street, Philadelphia, Pennsylvania, 19104-2891, for the
Plaintiff.

     CHARLES W. SABER, ESQ. and SALVATORE P. TAMBURO, ESQ.,
Dickstein Shapiro, LLP, 1825 Eye Street, N.W., Washington,
D.C., 20006-5403, for the Defendants.

                         United States District Court
                         1 Courthouse Way, Courtroom 19
                         Boston, Massachusetts
                         June 19, 2007, 2:50 p.m.

                     LEE A. MARZILLI
                  OFFICIAL COURT REPORTER
                United States District Court
                1 Courthouse Way, Room 3205
                     Boston, MA  02210
                      (617)345-6787
```

1      P R O C E E D I N G S

2          THE CLERK:  The case of DePuy Mitek, Incorporated

3      V. Arthrex, Inc., et al, Civil Action 04-12457, will now be

4      heard before this Court.  Will counsel please identify

5      themselves for the record.

6          MS. ELDERKIN:  Dianne Elderkin on behalf of DePuy

7      Mitek.

8          MR. BONELLA:  Michael Bonella for DePuy Mitek.

9          MR. SABER:  Charles Saber for Defendants Arthrex

10     and Pearsalls.

11         MR. TAMBURO:  Salvatore Tamburo for Defendants

12     Arthrex and Pearsalls.

13         THE COURT:  All right, we have cross-motions here,

14     so it's not certain who should go first.  Let me start with

15     Arthrex because I wanted to deal with two minor issues before

16     we hit the main one.

17         MR. SABER:  Okay, yes, your Honor.

18         THE COURT:  I may be misunderstanding.  Are you

19     still pressing the reverse doctrine of equivalents?

20         MR. SABER:  Well, it's there only in this sense,

21     your Honor, is that it is a -- their motion is on

22     infringement, and it's based solely upon what the patent

23     teaches.  And we do believe, in fact particularly in light of

24     your Honor's interpretation of the PE issue, which I know is

25     not before us today, that we do think we have a viable

1    defense on doctrine of equivalents.

2          THE COURT:  We're doing some research on this, so I

3    don't pretend to be an expert.  I've never seen anyone assert

4    it before, and I don't know of any case where it's been

5    successful.  Do you?

6          MR. SABER:  Well, it gets asserted a fair amount of

7    times.  What the plaintiffs made reference to is that it's

8    not a basis where the Federal Circuit has solely affirmed

9    based on a reversed doctrine of equivalents.

10         THE COURT:  Do you view that as a jury issue or a

11   judge issue?

12         MR. SABER:  It's definitely a jury issue.

13         THE COURT:  Why don't you explain it to me.  I

14   mean, I get a fair number of these patent cases.

15         MR. SABER:  Sure.

16         THE COURT:  It's the first time.  So you are still

17   pressing it?

18         MR. SABER:  Yes, your Honor.

19         THE COURT:  The bottom line is, I'm very

20   skeptical.  What's the argument?  It's that what?

21         MR. SABER:  In a nutshell, because I do agree it's

22   not the major issue that we're here to talk about today, this

23   is a patent that talked about how it used the first group of

24   materials, which your Honor found that PE falls within and

25   ultrahigh falls within, for purposes of adding handleability

1    aspects to the suture; and the second group, which is the

2    PET, was added for strength.  That was so it wouldn't be too

3    weakened.  Because you were using this material that was

4    inherently not strong, inherently weak, you added in a little

5    stronger material to get where you are.

6         Our product we think has absolutely nothing to do

7    with that patent.  Our product is a product that came out, it

8    was the first one in the market.  It was a high-strength

9    suture to solve the strength issues, and it uses -- the

10   product that the patent describes as weak is this incredibly

11   strong product.  So we're the polar opposite kind of product

12   that's described by the patent in the polar opposite kind of

13   way, which is exactly what this doctrine says.

14        As you know, of course, your Honor, we disagree

15   with the claim interpretation you gave; but if it's correct,

16   we assert that it's all the more reason why the PEs that we

17   have, the ultrahigh, has nothing to do with what's being

18   taught.

19        THE COURT:  In any event, you're pressing it, so

20   I'm going to resolve that on the summary judgment.

21        Now, on the tipping issue, why does that apply,

22   because that's only at the end of it?

23        MR. SABER:  It does have a purpose.  The sutures

24   are tipped, so for ease of use, and it restricts the

25   movement.  That's why we think it's a viable defense.

Page 5

1          THE COURT:  Again, that was in a footnote

2    somewhere.

3          MR. SABER:  Yes, I think that's right, but the

4    reason that they raise that was because there aren't still

5    defenses that are in the case to their --

6          THE COURT:  I may resolve those in summary

7    judgment.  So now let's get to the main issue, which is

8    the --

9          MR. SABER:  Right, the "consisting essentially of"

10    issue.

11          THE COURT:  All right, so if I could just -- you

12    know, I've now read the briefs, although not every piece of

13    paper in the boxes.  Don't I simply have experts who

14    disagree?  Why isn't that a trial?

15          MR. SABER:  Not at all, your Honor.  As I say,

16    there are two issues that are before you, and the issue that

17    you're going to really is:  What does the evidence show in

18    terms of the effect of coating on suture handleability?  And

19    we put in evidence which is undisputed by the defendants.

20    This is every witness from DePuy Mitek and Ethicon, from the

21    other side, without exception, the inventor of the patent,

22    the people who developed their product, their 30(b)(6)

23    witness, their director of research and development --

24          THE COURT:  Right, they all say everyone uses

25    coatings.

Page 6

1          MR. SABER:  Everyone.  This is a universal --

2          THE COURT:  I understand that everyone uses

3    coatings, and I think that's absolutely correct in the

4    record.

5          MR. SABER:  That's right.

6          THE COURT:  Sometimes it helps the operation of the

7    suture.  Sometimes it's harmful and hurts it, which is one of

8    the reasons it was done, and at least there may be some

9    argument that some coatings have a de minimis impact one way

10   or another.

11         MR. SABER:  There is no argument -- let me try and

12   deal with both of those things that you said.  On the

13   handleability side of impact on the suture, there's no

14   debate, it's always helpful.  On the pliability side is where

15   there's a debate on it, and that's why it's not part of this

16   motion.  But on the handleability side, there's absolutely no

17   debate that coating is there.  It is a universally known

18   fact.

19         Your Honor, I really sincerely believe this is an

20   absolutely simple case, that the other side --

21         THE COURT:  Then why don't you just win it on a

22   record?  In other words --

23         MR. SABER:  We should win on the record.

24         THE COURT:  No, no, on a trial record, because

25   here's the problem:  You've got two of their experts, one of

1    theirs and one of yours actually, saying that it's subtle, or

2    in a surgical setting with latex gloves on, you can hardly

3    feel it.  Why isn't that just creating a fact dispute?

4              MR. SABER:  May I deal with both of the experts, if

5    I could, please?

6              THE COURT:  Yes.

7              MR. SABER:  Dr. Brookstein first, their expert.

8              THE COURT:  Right.

9              MR. SABER:  Number one, of course, he had nothing

10   to say about the evidence of what coating does.  In fact, he

11   said he doesn't have any idea.  So then he offered some

12   evidence.  But it's very revealing what he says in his

13   declaration, he said in his deposition, and he says in his

14   report about why his testimony is relevant, because we think

15   it's the answer as to why it doesn't create a factual

16   dispute.  Dr. Brookstein testified that to -- so it doesn't

17   affect the basic and novel characteristics because it doesn't

18   transform the suture into something else.  It doesn't stop it

19   from being in direct intertwining contact.  It doesn't stop

20   it from being a suture.

21             The quote that he said, and if I may just have a

22   moment to get what it is, he said, "There's not enough

23   coating to transform the braided FiberWire materials into

24   another structure or to cause it to lose its characteristics

25   that are attributable to the dissimilar yarns being

1  braided."

2          And then we asked him, "What do you mean by that?"

3  And he says -- well, that's where, you know, this magic or

4  miracles quote that you've seen.  He says, "By some magic or

5  by some miracle, it makes it into something that it's not."

6          Well, the tests that Dr. Brookstein used, that you

7  have to transform the product into something else that it's

8  not, has been specifically rejected by the Federal Circuit in

9  the PPG case which we cite to your Honor.  In the PPG case,

10  the plaintiff there made a very, very similar argument, that

11  argument.  That was a case about glass, and the claim said,

12  like the claim does here, that the glass has to do certain

13  things.  It had to do with color and something else.  I can't

14  remember exactly what it was.  And the plaintiff argued, to

15  have a material effect, it has to literally take away those

16  characteristics that are in the claim.  And the Federal

17  Circuit said, "No, that's not the test."

18          If I may read to your Honor from the PPG case:

19  "We are fortified in our interpretation of the specification

20  by the fact that PPG has not offered a satisfactory

21  alternative construction.  PPG's position at trial was that a

22  significant change in glass properties is one that results in

23  a glass product that does not satisfy the color or

24  transmittant limitations of the patent claims."  Just what

25  Dr. Brookstein is saying here:  You have to transform it into

1   something it's not.  And the Federal Circuit said, "That

2   proposed definition is suspect, however, because it would

3   mean that any residual sulfur compound in the glass

4   composition --" sulfur was what was being added there --

5   "could avoid the 'consisting essentially of' limitation only

6   by taking the glass outside the other limitations of the

7   patent.  If that definition of significant effect were

8   adopted, it would have the effect of converting the critical

9   claim language from 'consisting essentially of' to

10  'comprising.'"

11          So, in other words, that's exactly the evidence

12  that they put in from Dr. Brookstein:  You have to transform

13  it into something.  He was consistent.  It's the only thing

14  his report says.  It's the only thing his declaration says.

15  It's the only thing he said in his deposition:  That's what I

16  consider no material effect.  It's got to transform it into

17  something.  It's not in direct intertwining contact.

18          Well, what does that mean?  That means you just

19  wrote that claim term out of the patent.  The Federal Circuit

20  said that's not the way to construe a "consisting essentially

21  of" test.  And that's why Dr. Brookstein, even if he were

22  competent, doesn't raise an issue of fact.  It's plain and

23  simple.  He didn't do any tests of coated versus uncoated.

24  He just had this test of transformation:  You have to

25  transform it somehow by magic and miracles.  And that's the

Page 10

1    test that's been rejected by the Federal Circuit.

2            Your Honor said, "Does it have a material effect on

3    the handleability of the suture?"  That's what your Honor

4    said in your order.  We agreed with that, and he didn't put

5    in any evidence on that.  It was only in the context of

6    having to transform the product.

7            Now, one last word on Dr. Brookstein.  In their

8    most recent brief, they tried to recharacterize his testimony

9    and said, well, he said that compared to the benefits you get

10   of the two different sutures, any added benefit you get of

11   coating is minimal.  The problem is --

12           THE COURT:  Does he say that?

13           MR. SABER:  No, he never said that.  He never said

14   that.  First of all, he never tested coated versus uncoated,

15   and what he said in his declaration, which is what plaintiffs

16   rely upon, is, he said, "In other words --" this is the very

17   paragraph they rely upon -- "the coating did not transform

18   the braided FiberWire materials into another structure or

19   cause it to lose its characteristics that are attributable to

20   the dissimilar yarns being braided."  That's his opinion.

21   That's legally incorrect, and that's why we believe, your

22   Honor, that Dr. Brookstein simply does not raise a genuine

23   issue of material fact here.

24           Now, if I may turn to Dr. Burks, which is the other

25   piece of evidence that they tried to offer.

1          THE COURT:  That's your expert?

2          MR. SABER:  That's right.  As your Honor correctly

3     noted, Dr. Burks is not their expert.  He's someone that we

4     put on, and we had him do some of these kind of field tests.

5     He just felt some sutures and so forth.

6          The first reason why Dr. Burks doesn't create an

7     issue of material fact, number one is, in their brief they

8     told your Honor, "We don't think Dr. Burks has competent

9     evidence."  It's hornbook law, your Honor, that you can't

10    rely on evidence which you believe to be incompetent to

11    defeat a summary judgment motion.  I don't think your Honor

12    has to go any further than that with Dr. Burks to say, based

13    upon plaintiff's own position of Dr. Burks, that it's not

14    evidence that is of the quality to defeat a summary judgment

15    motion.  They say it should be excluded, and they give a

16    whole pile of reasons.  I won't go into that, but I think

17    that's reason one.

18         Reason two, if you look at Dr. Burks and what he

19    did, first of all, he did six blind tests.  He did it for his

20    report.  He did them at the deposition, all right?  Each time

21    he got it right.  When this issue of subtle came up, he

22    explained what it meant.  He said:  If you do it a hundred

23    times, you might not get it right every time.  But, you know,

24    going back to the PPG case, it says, is this something that's

25    of importance to someone in the market, right?  They never

Page 12

1    asked him that.

2            THE COURT:  What does your expert say?

3            MR. SABER:  Well, our expert relies upon what

4    everyone in the marketplace says, which is all the patents --

5            THE COURT:  But did your expert do his own testing

6    and say that it made a material difference?

7            MR. SABER:  No, our expert didn't.

8            THE COURT:  I disagree with either side's position

9    that I can do it off of the specification because the

10   specification says all things to all people.  It can help; it

11   can hurt.  I mean, I think you have to look at the specific

12   product to see whether it makes a material difference.

13           MR. SABER:  Actually, I'd agree with that.  I think

14   that this notion of looking at the patents probably doesn't

15   answer the question.  It comes down to the question of the

16   evidence.

17           THE COURT:  So if you don't have a doctor or an

18   expert who's tested it in a surgical setting and says it

19   makes no difference --

20           MR. SABER:  Well, we do.  Of course, Dr. Burks did

21   that, though we weren't the ones that offered that for

22   purposes of summary judgment.  The other side did.  He got it

23   right every time.  But that's not the test.  The test really

24   is, this is what one of ordinary skill would mean.  And

25   that's where every teaching and everything that's known in

1cc69953-d323-4ac2-bd45-2e4522f208c7

Page 13

1    the field would matter.  I mean, that's the evidence that,

2    frankly, ends this case.  It begins this case, and it ends

3    this case.  It is so universally known.  It's like having a

4    trial over whether the world is round or flat.  You don't

5    need to do it because it's so universally accepted.  So to

6    get into some sort of debate about tests where anyone can of

7    course create --

8         THE COURT:  But now you're moving me back in the

9    specifications.

10        MR. SABER:  No.

11        THE COURT:  You're absolutely correct that coatings

12   were universally known, and, as far as I could tell,

13   frequently used in the field.

14        MR. SABER:  That's correct.

15        THE COURT:  And the patent in a sense taught

16   against it in the sense of some of them apparently didn't

17   work very well and actually impeded the handleability of the

18   suture.

19        MR. SABER:  The pliability of the suture.

20        THE COURT:  The pliability, right, fair enough.

21   Other coatings, they said, well, maybe you can use, and maybe

22   you don't have to use.  I mean, they basically left it up to

23   the user, right, to use a coating?  So some coatings might be

24   effective, and some coatings may not be effective, and some

25   coatings may actually substantially change the handleability

Page 14

1    and some not, right?

2          MR. SABER:  Never, it never ever says that.  It

3    never ever says that.  It never ever questions the

4    universally known fact that coating helps handleability.

5          THE COURT:  No, I disagree with that.  It says you

6    don't need to use them.

7          MR. SABER:  That's what their invention was

8    allegedly about.  Their invention was allegedly about -- it

9    never worked.  They never could make a product under it, but

10   their invention was allegedly about, if you use enough of

11   this lubricious material, you won't need coating.

12         THE COURT:  You won't need coating.

13         MR. SABER:  That's right, and that's exactly, your

14   Honor, why we win this case, one hundred percent why we win

15   this case.

16         THE COURT:  Why wouldn't you win it on a record in

17   front of a jury instead of -- in other words, if I don't have

18   one of your people saying it doesn't make a difference and

19   I --

20         MR. SABER:  Well, you do, you know, and our experts

21   put it in, but it's based on the record, your Honor.  It's --

22         THE COURT:  I understand.  You keep pushing me

23   back; you keep agreeing with me that I can't look at the

24   specification.  I need some admissible evidence, admissible

25   evidence that the coating on your product makes a difference.

Page 15

1        MR. SABER:  Your Honor, let me tell you what it is,

2   if I may.

3        THE COURT:  Okay.

4        MR. SABER:  First of all, it starts with every

5   patent in the field, not this patent, every patent in the

6   field, every article in the field.

7        THE COURT:  Well, do you have an expert that says

8   that the coating on your product makes a material

9   difference?

10       MR. SABER:  Well, yes.  Dr. Mukherjee, you know,

11  looked at all the evidence, and he said that.  Now, the

12  specific evidence with respect to FiberWire comes from

13  Arthrex, and Arthrex says -- and, again, this is

14  undisputed -- Arthrex said their coating is on the FiberWire

15  for reasons of handleability to ease -- to do the better knot

16  tie-down.

17       THE COURT:  Do you have an expert report in there

18  that says it materially improves on the suture?

19       MR. SABER:  Well, based upon that evidence, yes,

20  your Honor.  I mean --

21       THE COURT:  So, you know, you're going round about.

22       MR. SABER:  Well, I don't want to tell you --

23       THE COURT:  Who says -- is there any expert in this

24  record who says, "I tested this, and it substantially

25  improves the coating over if there were no coating"?

Page 16

1          MR. SABER:  I want to divide up the summary

2    judgment record from the other record in the case, just to be

3    clear on this answer.  What the record for summary judgment

4    is, is that our expert looked at the state of the evidence,

5    which included --

6          THE COURT:  That's Burks?

7          MR. SABER:  No, no.  This is Dr. Mukherjee.

8          THE COURT:  This is Mukherjee.

9          MR. SABER:  Right, which is based upon the state of

10   the evidence.  It included Dr. Burks, by the way, but, you

11   know, he's the one that concluded, based on the state of the

12   evidence, based upon Arthrex's statements that were being

13   done and other things that he included, therefore, it's my

14   opinion that there's no -- that the coating creates a

15   material effect on handleability.

16         THE COURT:  So if I read Mukherjee, it's going to

17   say, "I did testing on the coatings," or, "I've looked at

18   this, and it makes a difference"?

19         MR. SABER:  He, I believe, did some of that, but

20   that testing -- there was some testing done by a Dr. Gitis

21   and by Dr. Burks.  They're the ones who actually did the

22   tests.  But we didn't believe because we don't, in any --

23   there isn't a case alive where someone can't create some sort

24   of issue about how the test was done.  We understand that,

25   and that's why it's not part of the summary judgment record.

Page 17

1   We don't believe it's necessary to be part of the summary

2   judgment record, and that's why we didn't put it in.  The

3   tests from Dr. Burks and from Dr. Gitis were not put into the

4   summary judgment record.  That's why I wanted to make that

5   distinction between the two for your Honor.  It's there. It's

6   just not part of the summary judgment record because we don't

7   think you need to do it to get to summary judgment.

8          THE COURT:  But you're making -- you want me -- I

9   know nothing about your area.  I know nothing, nothing.

10         MR. SABER:  Sure.

11         THE COURT:  I know what you told me is true, based

12  on having had this case, that the coatings are used

13  frequently.

14         MR. SABER:  Right.

15         THE COURT:  And my guess is that when the patent

16  was amended to add the "consisting essentially of," they were

17  not thinking about coatings but ended up with that as a

18  problem for them.

19         MR. SABER:  That's correct, your Honor.

20         THE COURT:  They were thinking about bio-absorbable

21  yarns, and they ended up with a big problem.

22         MR. SABER:  That's probably correct, yes, but

23  that's the legal effect of what they did.

24         THE COURT:  That's the legal effect of what they

25  did.

Page 18

1            MR. SABER:  That's right.

2            THE COURT:  And so now I've got this issue of, I

3    don't know whether every single coating out there makes a

4    material difference.  I don't.  I know that they're often

5    used, but I don't know whether that makes a material

6    difference if that's the standard.  I don't know that.

7            MR. SABER:  Well, as I say, I think all we have to

8    do is to look to the evidence on that, and that's why I hate

9    to go harken back to that, but they don't dispute our

10   evidence.  They don't say our evidence is wrong.  And I'm not

11   talking about the '446 patent specification.  I'm talking

12   about what people in the field have uniformly said, uniformly

13   said.

14           THE COURT:  But have they said it on your product?

15           MR. SABER:  They've said it about all coatings,

16   about all coatings.

17           THE COURT:  I just can't believe that all coatings

18   are created equally.

19           MR. SABER:  All coatings are created to improve the

20   handleability of the suture, yes, your Honor, and all the

21   evidence says that.

22           THE COURT:  But I don't know from my own knowledge

23   that they in effect do that; in other words, whether it's a

24   material difference.

25           MR. SABER:  Well, if the evidence all shows that,

Page 19

1    all shows why coating is added, is to help on this knot

2    tie-down, if all the evidence shows that, every piece of

3    evidence shows that, we think your Honor is entitled to rely

4    upon that evidence.  If they disagreed with that, if they had

5    some evidence that somehow --

6             THE COURT:  All right, well, let me turn to them.

7             MR. SABER:  -- somehow -- let me just finish the

8    thought -- somehow that FiberWire was different and it wasn't

9    true, it's true for every suture in America except for

10   FiberWire, don't you think they would have come forward with

11   something?  And they didn't.

12            THE COURT:  Well, here's the question.  I mean, I'm

13   stuck on a record where neither of you are giving me what I

14   want, which is someone who looks at that wire and says, "Yes,

15   it makes a difference," or, "No, it doesn't."  So why didn't

16   your expert do that?

17            MS. ELDERKIN:  Well, for several reasons, your

18   Honor.  First of all, we submit that the disclosure in the

19   specification -- I know you're not going there, but just for

20   the record I'll say, the disclosure in the specification is

21   not as Arthrex has characterized it in their brief, which

22   says that coatings may be used to further enhance the

23   properties, surface coatings --

24            THE COURT:  So you have to concede that some

25   coatings are going to materially enhance it?

Page 20

1        MS. ELDERKIN:  Some coatings will materially

2   enhance it or materially detract from it.

3        THE COURT:  Or materially detract, but I won't know

4   which it is until someone looks at it and tests it.

5        MS. ELDERKIN:  Well, and somebody did look at it

6   and tested it, and it was actually Dr. Burks, their expert.

7   He looked at it.  He did side-by-side analyses of what they

8   purported to be coated and uncoated samples, and his

9   testimony, which has not been rebutted, is, "It's a subtle

10   difference.  It's very close.  If I had my gloves on as I use

11   it in surgery, which is the real environment in which I use

12   these sutures, I might not be able to tell the difference."

13   I mean, that is expert testimony about that there's not a

14   material difference.

15        THE COURT:  I'm a little floored on this.  I know

16   you're both pushing me to extremes that I should decide this

17   based on the specification, and I'm not going to do that, but

18   I'm just curious as to why you don't have an expert who's

19   actually on your own team who said that.

20        MS. ELDERKIN:  Well, there are several reasons for

21   that, your Honor.  One of the reasons is that my client,

22   Mitek, does not have access to the samples that are needed to

23   do this analysis.

24        THE COURT:  Can't you go out in the marketplace and

25   buy it?

Page 21

1          MS. ELDERKIN:  No, because you have to get the

2     suture coated.  You can buy the coated suture, we can

3     certainly buy that, but you can't buy uncoated suture on the

4     marketplace.

5          THE COURT:  Have you ever heard of discovery?

6          MS. ELDERKIN:  Well, we did ask for those samples,

7     and we actually went over to the United Kingdom where the

8     samples were made to see where they pulled them off of the

9     manufacturing line, and determined that the samples that they

10    had given us -- this was at the end of discovery -- were not

11    truly coated versus uncoated samples.

12         THE COURT:  Here's my problem:  I don't agree with

13    either side that I can resolve it for one person or the other

14    person off of the specification.  So now I'm into this

15    record, and I've got this odd position that neither of you

16    have an expert who themselves is saying it makes a material

17    difference or it doesn't, and you're relying on their

18    expert's acknowledgment that the differences are subtle.  The

19    only person that you have in your arsenal is their expert,

20    who you, as he says, attack his competence, but, more

21    significantly, you know, is obviously doing it in the context

22    of supporting their case.  It's just an odd case.  It's odd.

23         MS. ELDERKIN:  I would agree it's odd, your Honor.

24    We also have Dr. Brookstein, though, is also one of our

25    experts.

1          THE COURT:  But he never actually says it, right?

2          MS. ELDERKIN:  He says -- he analyzed the suture.

3    He went over.  He watched it being made.  He saw how the

4    coating was applied, which none of their experts did.  He

5    watched how it was applied.  He talked about it in his expert

6    report, which is Exhibit 6 to our motion.  He talked about

7    how the sutures passed very rapidly through a solution of

8    coating and then passed through rollers and dried.  He talked

9    about how much coating there is on the suture.  He measured

10   how much coating is on the suture.

11         THE COURT:  But did he try it in surgery?

12         MS. ELDERKIN:  No, but he determined that it was

13   merely a surface coating.

14         THE COURT:  So --

15         MS. ELDERKIN:  He looked at the sutures under the

16   photomicrograph, and he saw that it was just a surface

17   coating.  And if I could refer your Honor to --

18         THE COURT:  But if that substantially improved the

19   lubriciousness of it, why isn't that materially improving the

20   basic and novel characteristics of the invention?

21         MS. ELDERKIN:  Well, your Honor, if I could --

22         THE COURT:  Sure, go.

23         MS. ELDERKIN:  Somehow we're up on your screen

24   here.  I would like to bring us up to your Honor's definition

25   of the basic and novel characteristics, and particularly

Page 23

1    Item No. 4 there.  These are the basic and novel

2    characteristics as your Honor defined them, and I don't think

3    there's any dispute about the first three, so I won't even

4    spend time on that.  But the idea of the basic and novel

5    characteristics was to have the suture, these dissimilar

6    yarns, "So as to improve pliability and handleability without

7    significantly sacrificing the physical properties of the

8    constituent elements of the suture."

9        And as your Honor explained in your Markman order,

10   the idea of the invention in the Mitek patent is to use these

11   dissimilar heterogeneous yarns with different properties, to

12   braid them together in a certain way to mechanically blend

13   them to get an improved suture.  And that is the basic and

14   novel characteristic that we are looking at to determine

15   whether a coating affects that, and that's exactly what our

16   Dr. Brookstein has explained.  He said:  I've looked at this.

17   I've looked at the coating.  I can see it is just a surface

18   coating, and that surface coating is not affecting in any way

19   the ability of these heterogeneous yarns, which retain their

20   morphology -- they're not all gunked together and blended

21   together or melted together or glued together by some thick

22   coating -- there is nothing in this coating that is affecting

23   the ability of these yarns, the morphology of the yarns, the

24   ability of them to contribute to the overall properties of

25   the sutures.  They retain their individual characteristics.

Page 24

1    They're not significantly sacrificing the physical properties

2    of the constituent elements of the suture.

3            And, if you remember, Arthrex's proposed

4    construction used different language.  They wanted you to

5    rule that it would not significantly affect the physical

6    properties of the suture.  And your Honor's construction,

7    which we contend is correct, is that whatever this additional

8    element is, it cannot sacrifice the physical properties of

9    the constituent elements of the suture, and that's what

10   Dr. Brookstein says in his declaration.

11           THE COURT:  I think Dr. Brookstein's declaration is

12   certainly relevant.  It's just not a bingo for you because he

13   doesn't actually check to see whether it improves the

14   pliability and handleability.

15           MS. ELDERKIN:  With all due respect, your Honor, I

16   don't know that that is really the issue under this

17   construction of basic and novel characteristics.

18           THE COURT:  It's both.  It's got to improve the

19   handleability and pliability without impeding or sacrificing

20   the physical properties.  So he tells you it isn't

21   sacrificing anything, but if it also improved handleability,

22   wouldn't that take you out of the infringement under a

23   "consisting essentially of"?

24           MS. ELDERKIN:  Under this construction of basic and

25   novel characteristics, I would argue that it would not.

Page 25

1           THE COURT:  I'm not sure I agree, but, in any

2     event, what other issues are left in this suit?  Let's say I

3     went to trial on infringement.  Are there other defenses?

4           MR. SABER:  Oh, yes, your Honor.  I mean, if we go

5     to trial, not only do we have the issues that we've been

6     talking about today, but then there's the whole series of

7     invalidity defenses and inequitable conduct defenses.  As you

8     may remember --

9           THE COURT:  So is there obviousness and then

10    possibly anticipation?

11          MR. SABER:  That's correct, that's correct.  Now,

12    we moved on one anticipation grounds.  There actually are

13    several invalidity grounds that were put forward, but we

14    didn't put them in a motion to your Honor.  The one that we

15    did put into a motion, your Honor, on anticipation on the

16    Chesterfield patent, your Honor denied that motion.  The

17    other side had a motion on the inequitable conduct piece.

18    Your Honor also denied that as well.

19          THE COURT:  The inequitable conduct I'll put into

20    the "manana" world.

21          MR. SABER:  Well, at the end of the day, it's

22    something for the Court to determine, correct.

23          THE COURT:  Right.  So if I were to do a trial just

24    on infringement, would that make sense, or should I do it on

25    everything, because it sounds like a little infringement

Page 26

1    trial would take two days?

2            MR. SABER:  Well, I don't know whether it would or

3    it wouldn't.

4            THE COURT:  I'm always a little bit -- a week.  I

5    mean, it's not a big trial.

6            MR. SABER:  Sure.  I would say this, though, that,

7    you know, of course, if we prevailed at the infringement

8    trial --

9            THE COURT:  It's over.

10           MR. SABER:  So you wouldn't need to go to the

11   validity issues.  If we didn't prevail on it, then obviously

12   you'd need to go to the validity issues.  So I haven't really

13   thought about whether that makes sense.

14           THE COURT:  Doesn't that make sense to do a little

15   one-weeker this summer?

16           MR. SABER:  I don't know if that makes sense to

17   bifurcate it that way.  It's just --

18           THE COURT:  Well, think about it because as you're

19   gathering from what I'm saying, I'm not sure I go with the

20   tipping or the reverse doctrine.  I have to learn what the

21   reverse doctrine of equivalents is.

22           MR. SABER:  Yes, we don't think it's the major

23   issue, obviously, your Honor.  That's why --

24           THE COURT:  But could you do it in a week this

25   summer?  Then, if there's no infringement, you're off the

Page 27

1    hook, your patent remains --

2           MS. ELDERKIN:  I'd like to consider that, your

3    Honor, but --

4           THE COURT:  -- wholly intact, and we go on.

5           MR. SABER:  Your Honor, I don't know the answer to

6    that question.  I mean, my experience in these kinds of

7    trials is, of course, they do tend to take longer.

8           THE COURT:  Well, for sure, if I put in all the

9    rest of it, it would.  I'm just trying to figure out what's

10   the most efficient.  So if it took me two weeks to do the

11   stuff with the defenses in it, it might be worth it from your

12   point of view.  Where are you from?  Minnesota, right?

13          MS. ELDERKIN:  Philadelphia, but we have witnesses

14   from all over the place, so --

15          THE COURT:  So you're Philadelphia.  Where are you

16   from?

17          MR. SABER:  I'm from Washington, though born here.

18   I was born in Boston, but I've lived in Washington for the

19   last --

20          THE COURT:  Inside the city?

21          MR. SABER:  I was actually born in Boston, but I

22   was raised in Brockton.

23          THE COURT:  Okay.  Well, welcome home to you.  So

24   the question I'm really thinking out loud on is whether it

25   makes sense to do just a little infringement trial, which

Page 28

1    would be very straightforward and easy for a jury.  I mean,

2    it's really -- and I could possibly even do a judgment as a

3    matter of law, once I heard both experts really talk, after

4    the fact.  Or does it make more sense to do it with all the

5    defenses in the trial?  I'm thinking one week on

6    infringement.

7           MS. ELDERKIN:  I agree, your Honor, if we were only

8    doing infringement, easily within a week.

9           MR. SABER:  I'm just not sure about that because

10   there are actually several experts that are involved.  In

11   fact, one of the issues that we do have is, there was kind of

12   a side issue when we were before your Honor the last time,

13   not actually -- we didn't talk about it with your Honor, but

14   there was some motions with respect to Dr. Gitis, and the

15   parties have kind of put that on hold because it would be --

16          THE COURT:  I don't remember the issue.

17          MR. SABER:  Oh, Dr. Gitis had done some tests.

18   They weren't part of the summary judgment record, and the

19   other side had raised questions about the propriety of

20   Dr. Gitis' tests and had gone to the magistrate.  Your Honor,

21   that was the computer glitch issue and --

22          THE COURT:  You know, you must think I'm having

23   sort of a senior moment, but I've just had so much, I don't

24   remember it.

25          MR. SABER:  The details of it don't really matter.

Page 29

1   The point is that your Honor issued a ruling that said that

2   we could supplement Dr. Gitis' report, and they would have a

3   right to depose him on that.

4           THE COURT:  Sure, that seems fair.

5           MR. SABER:  Right, that's the way that played out.

6   The only thing is, because of the pendency of the summary

7   judgment motion, the parties put that in abeyance, only to do

8   that if it became necessary.

9           THE COURT:  Well, why don't I do this:  I could do

10  a little trial in August.  That would give you plenty of time

11  to do that, right, and any supplementation of reports?

12          MS. ELDERKIN:  As long as we don't have any dispute

13  about what the supplementation of the report is.  I fear that

14  we will.  Your Honor's order was that they could supplement

15  the reports to correct typographical errors.

16          MR. SABER:  Well, that's not correct, but -- that's

17  not correct.

18          THE COURT:  Now it's coming back to me.  There were

19  some calculation problems.

20          MS. ELDERKIN:  There were calculation problems and

21  alleged computer virus problems.

22          MR. SABER:  And the computer virus stuff was what

23  we couldn't fix, and the rest of the stuff we could.

24          THE COURT:  Well, let me ask you this point blank.

25  What I'm expressing to you is some frustration here that

Page 30

1   neither of you has an expert that just says, "I tried this

2   out in the setting for which it's used, and it does or does

3   not make a difference."  So the question really is, I

4   don't -- I feel as if there's, at least based on your

5   expert's concession of subtlety, that there's at least a fact

6   question here.  But it's an odd record for me.  I usually

7   have someone saying point-blank, "I tested it, and it's X."

8           MR. SABER:  May I finish on Dr. Burks because on

9   this whole subtlety thing, they tried to create this issue

10  about gloves to try and say that "Well, it might be different

11  through gloves."  That's not evidence, your Honor.  The man

12  did a report.  The report is in the record.  The record says

13  exactly what your Honor is asking for.  He did the tests.  He

14  said, "In my opinion, the coating makes a material effect."

15  He's a surgeon and so forth.  That was his report, right?

16          Then they took his deposition, and they're trying

17  to create these things about the dry versus wet issue and the

18  gloves versus nongloves issue.  On the gloves they said,

19  well, you know, it might have made a difference.  He didn't

20  say it did.  That's not evidence, your Honor.  That's

21  speculation.

22          THE COURT:  So that's why I'm asking both of you.

23  I always hate to reopen discovery, but let me just ask you

24  this.  I mean, do you both agree that this would be used in a

25  setting where people are wearing gloves and have got -- and

Page 31

1    I'm saying slurpy things, you know, like blood and --

2            MR. SABER:  I think sometimes it is, and sometimes

3    it isn't.

4            THE COURT:  Fluids and that sort of thing, so --

5            MS. ELDERKIN:  Dr. Burks's testimony is that it

6    would be, other than in a cadaver surgery, he said --

7            THE COURT:  But neither of you have tested it in

8    that setting to see if it makes a difference.

9            MR. SABER:  But, your Honor, because -- there's

10   something about common sense that's just missing here, your

11   Honor.

12           THE COURT:  I don't have common sense because I

13   wasn't trained as a surgeon, so I don't know.  I just don't

14   know.  And so on this record, I don't know.  And I wish I had

15   a surgeon or somebody who is an expert in this field who

16   tested it and said, "Yes, it does make a difference," or,

17   "No, it doesn't."

18           MR. SABER:  Right.  Well, as I say, Dr. Burks did.

19   It's in this record.

20           THE COURT:  With gloves and in a sort of wet

21   situation?

22           MR. SABER:  He did it in the wet situation.  He

23   didn't do it with the gloves.

24           THE COURT:  All right, well, I'll read it, but I'm

25   simply telling you what my frustration was, which is that

1   neither side really did it for me, and I'm not sure where

2   that would leave it for a jury.

3           MR. SABER:  And may I add just something else

4   because they said that we didn't give them samples.  We gave

5   them samples before this case started.  We gave them samples

6   twice during the case.  They've had all the samples.  They

7   haven't done any tests.  They actually did do some tests when

8   we gave it to them the first time.  They haven't produced the

9   tests to us.  I think we know why.  They're claiming work

10  product privilege on it.  I think we know why.

11          You would think, if some things were different,

12  that what everyone in the marketplace knows, that they would

13  have done a test to show that it's not true.  And that was

14  frustrating --

15          THE COURT:  You know, you're making a very good

16  point here, which I'm not going to reopen discovery on

17  experts.  You'll finish your tests.  You'll either meet your

18  burden or not meet it.  You'll put on your expert.  You know,

19  I have some sense of frustration because the obvious thing

20  isn't in my record, somebody just saying from your side it

21  doesn't make a difference.

22          MS. ELDERKIN:  And, if I may, your Honor, I would

23  like to refer you to Dr. Burks's report because it is

24  attached as an exhibit to our brief, and I'm sorry I don't

25  have the number for that particular exhibit.  He nowhere says

Page 33

1    that there's a material difference in that report.  Counsel

2    represents that he did.

3         THE COURT:  Well, I will relook at those.  As I

4    said, I've read the briefs.  I haven't had a chance to go

5    through every one of these, and I will go through them, but

6    right now I'm setting a trial date just on infringement.  Why

7    don't we do it in mid-August.  We will not reopen discovery.

8    No one's asking me for that.  So that's it.  We'll have

9    trial, and once I see the trial, maybe I'll agree with one

10   side or another based on the weight of the evidence.  I'm not

11   seeing it in this record.

12        So, Robert, when can we do it in August?

13   August 6?

14        MR. SABER:  Yes, I really fear whether that's going

15   to give us the time to get all the pretrial stuff done.  It's

16   now June 19.  It's six, seven weeks, and there's all kinds

17   of --

18        THE COURT:  What else?  You haven't told me what

19   else.

20        MR. SABER:  Well, just with getting the exhibits

21   and getting all the in limine motions and all of that before

22   your Honor.

23        THE COURT:  I'm just doing infringement, the little

24   baby piece.  I'm not persuaded that we can't do this.  How

25   old is this case?  It's old now, right?

1        MR. SABER:  I just think that's a little quick.  If

2   we can maybe do it in a couple months after that.

3        THE COURT:  Let me ask you this:  Is that your

4   vacation?

5        MR. SABER:  No, it isn't.

6        THE COURT:  I'm not here to destroy someone's

7   vacation.

8        MR. SABER:  No, no, it really was a fear that that

9   is simply not enough time.

10       THE COURT:  Let me do this:  I'm going to set it

11  for the 6th.  We'll give you a pretrial order, and then you

12  see if everyone can do it.  I'm doing it on the 6th because

13  most people take the end of August.  If you can't do it then,

14  I'll see -- if some of your experts can't make it, we'll see

15  when they can.  But it's basically, as far as I'm concerned,

16  pretty much teed up.  You do this deposition in the next few

17  weeks.  You can do it, right?

18       MR. SABER:  I suspect we could.  We probably could

19  get them the report within the next week and a half or so,

20  thereabouts.  The deposition, your Honor, only is about three

21  or four hours, something like that, so I'm sure we could get

22  that done.

23       THE COURT:  Sure, it was just a cleanup calculation

24  is what it should be.

25       MR. SABER:  I think we can get that done.  I

Page 35

1    just --

2            THE COURT:  Now, let's go off the record for a

3    minute.

4            (Discussion off the record.)

5            MR. SABER:  Your Honor, we had prepared a

6    PowerPoint for today.  I don't know if you'd like a copy of

7    it, your Honor.

8            THE COURT:  I would love it.

9            MR. SABER:  Okay, and I have plaintiff's PowerPoint

10   too.

11           THE COURT:  I'd love them.

12           MR. SABER:  Thank you, your Honor.

13           MS. ELDERKIN:  Thank you.

14           THE COURT:  Thank you.  I'm sure I won't see you

15   before then.  Have a nice July 4 weekend.

16           MS. ELDERKIN:  Thank you.

17           THE CLERK:  The final pretrial is July 31 at

18   4:00 p.m.  That will be in the pretrial order.  You'll get

19   that, okay?

20           (Adjourned, 3:35 p.m.)

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7

8          I, Lee A. Marzilli, Official Federal Court

9  Reporter, do hereby certify that the foregoing transcript,

10 Pages 1 through 35 inclusive, was recorded by me

11 stenographically at the time and place aforesaid in Civil

12 Action No. 04-12457-PBS, DePuy Mitek, Inc. V. Arthrex, Inc.,

13 et al, and thereafter by me reduced to typewriting and is a

14 true and accurate record of the proceedings.

15         In witness whereof I have hereunto set my hand this

16 10th day of July, 2007.

17

18

19

20

21             /s/ Lee A. Marzilli
22 _____

   LEE A. MARZILLI, CRR
23 OFFICIAL FEDERAL COURT REPORTER

24

25

# EXHIBIT 4

DOCKET NO.  ETH-782
Joint Inventors

# A S S I G N M E N T

Serial No._____
Filed_____


WHEREAS, Mark Steckel, Citizen of the United States of America, residing at 9819 Farmdale Way, Maineville, Ohio 45039 (hereinafter called "Assignors"), have made certain new and useful inventions or discoveries relating to

STERILIZED HETEROGENEOUS BRAIDS,

for which they have this day executed an application for Letters Patent of the United States; and

WHEREAS, Ethicon, Inc., a corporation of the State of Ohio, (hereinafter called "Assignee"), is desirous of acquiring Assignors' entire right, title, and interest therein:

NOW, THEREFORE, BE IT KNOWN that for and in consideration of the sum of One Dollar and other valuable considerations to them moving, the receipt of which is hereby acknowledged, Assignors have sold, assigned, and transferred, and do hereby sell, assign and transfer unto said Assignee their entire right, title and interest in and to all said inventions and discoveries disclosed in said application whose identification above by serial number and filing date, when available is hereby authorized, and in and to said application, all substitutions, divisions, and continuations thereof, and in and to all Letters Patent, United States and foreign, that may be granted for said inventions and discoveries, and in and to all extensions, renewals, and reissues thereof, the same to be held and enjoyed by said Assignee, its successors and assigns, as fully and entirely as the same would have been held and enjoyed by Assignors if this Assignment and sale had not been made;

And Assignors hereby authorize and request the Commissioner of Patents of the United States to issue said Letters Patent in accordance with this Assignment;

And for the consideration aforesaid, Assignors covenant and agree with said Assignee that he has a full and unencumbered title to the inventions and discoveries above described and hereby assigned, which title they warrant unto said Assignee, its successors and assigns;

And for the consideration aforesaid, Assignors further covenant and agree that they will, whenever requested, but without cost to them promptly communicate to said Assignee or its representatives any facts known to them relating to said inventions and discoveries, testify in any interference or legal proceedings involving said inventions and discoveries, and execute any additional papers that may be necessary to enable said Assignee or its representatives, successors, nominees, or assigns to secure full and complete protection for the said inventions and discoveries or that may be necessary to vest in said Assignee the complete title to the said inventions and discoveries and patents hereby conveyed and to enable it to record said title.

DEPUY MITEK
EXHIBIT 562
04cv12457

VIA EXPRESS MAIL NO. HB346860118
MAILED FEBRUARY 19, 1992

– 2 –

IN TESTIMONY WHEREOF, Assignors have hereunto set their hands and seals this   17   day of   FEB   , 1992.

_____ (L.S.)
Mark Steckel

STATE OF OHIO        )
                     ) ss.
COUNTY OF            )

BE IT REMEMBERED, That on this 17 day of February, 1992, before me, a Notary Public, personally appeared Mark Steckel, who I am satisfied are the persons named in and who executed the foregoing instrument in my presence, and I having first made known to them the contents thereof, they did acknowledge that they signed, sealed, and delivered the same as their voluntary act and deed for the uses and purposes therein expressed.

_____
Notary Public

MARY L. FLESHER
Notary Public, State of Ohio
My Commission Expires June 3, 1996

REEL6023 FRAME946

RECORDED
PATENT & TRADEMARK OFFICE

FEB 19 92

# EXHIBIT 5

DOCKET NO. ETH-788 838511
Joint Inventors

# ASSIGNMENT

Serial No._____
Filed_____

WHEREAS, Alastair W. Hunter, Dennis D. Jamiolkowski and Arthur Taylor, Jr., Citizens of the United States of America, residing at 516 Spring Valley Drive, Bridgewater, New Jersey 08807; 20 Fawnridge Drive, Long Valley, New Jersey 07853; and 1217 East Second Street, Plainfield, New Jersey 07062 (hereinafter called "Assignors"), have made certain new and useful inventions or discoveries relating to

### STERILIZED HETEROGENEOUS BRAIDS,

for which they have this day executed an application for Letters Patent of the United States; and

WHEREAS, Ethicon, Inc., a corporation of the State of Ohio, (hereinafter called "Assignee"), is desirous of acquiring Assignors' entire right, title, and interest therein:

NOW, THEREFORE, BE IT KNOWN that for and in consideration of the sum of One Dollar and other valuable considerations to them moving, the receipt of which is hereby acknowledged, Assignors have sold, assigned, and transferred, and do hereby sell, assign and transfer unto said Assignee their entire right, title and interest in and to all said inventions and discoveries disclosed in said application whose identification above by serial number and filing date, when available is hereby authorized, and in and to said application, all substitutions, divisions, and continuations thereof, and in and to all Letters Patent, United States and foreign, that may be granted for said inventions and discoveries, and in and to all extensions, renewals, and reissues thereof, the same to be held and enjoyed by said Assignee, its successors and assigns, as fully and entirely as the same would have been held and enjoyed by Assignors if this Assignment and sale had not been made;

And Assignors hereby authorize and request the Commissioner of Patents of the United States to issue said Letters Patent in accordance with this Assignment;

And for the consideration aforesaid, Assignors covenant and agree with said Assignee that he has a full and unencumbered title to the inventions and discoveries above described and hereby assigned, which title they warrant unto said Assignee, its successors and assigns;

And for the consideration aforesaid, Assignors further covenant and agree that they will, whenever requested, but without cost to them promptly communicate to said Assignee or its representatives any facts known to them relating to said inventions and discoveries, testify in any interference or legal proceedings involving said inventions and discoveries, and execute any additional papers that may be necessary to enable said Assignee or its representatives, successors, nominees, or assigns to secure full and complete protection for the said inventions and discoveries or that may be necessary to vest in said Assignee the complete title to the said inventions and discoveries and patents hereby conveyed and to enable it to record said title.

VIA EXPRESS MAIL NO. HB346860118
MAILED FEBRUARY 19, 1992

REEL 6023 FRAME 942

DEPUY MITEK
EXHIBIT 563
04cv12457

- 2 -

IN TESTIMONY WHEREOF, Assignors have hereunto set their hands and seals this 18th day of February, 1992.

_Alastair W. Hunter_ (L.S.)
Alastair W. Hunter

_Dennis D. Jamiolkowski_ (L.S.)
Dennis D. Jamiolkowski

_Arthur Taylor, Jr._ (L.S.)
Arthur Taylor, Jr.

STATE OF NEW JERSEY )
) ss.
COUNTY OF SOMERSET )

BE IT REMEMBERED, That on this 18th day of February, 1992, before me, a Notary Public, personally appeared Alastair W. Hunter, Dennis D. Jamiolkowski and Arthur Taylor, Jr., who I am satisfied are the persons named in and who executed the foregoing instrument in my presence, and I having first made known to them the contents thereof, they did acknowledge that they signed, sealed, and delivered the same as their voluntary act and deed for the uses and purposes therein expressed.

_Judy A. Reilly_
Notary Public

RECORDED
PATENT & TRADEMARK OFFICE

FEB 19 92

# EXHIBIT 6

*DePuy Mitek, Inc. v. Arthrex, Inc*
*C.A. No.04-1245ᵀ PBS*
*DMI039981*

## ASSIGNMENT AND ASSUMPTION

THIS ASSIGNMENT AND ASSUMPTION (this "Assignment") is made effective as of the 29th day of December, 2003 (the "Effective Date") by and between Ethicon, Inc., a corporation organized under the laws of the State of New Jersey (hereinafter "Ethicon"), and DePuy Mitek, Inc. (formerly Innovasive Devices, Inc.), a corporation organized under the laws of the State of Massachusetts (hereinafter "DMI").

WHEREAS, Ethicon is desirous of transferring to DMI all of the assets and liabilities of Ethicon's Mitek Worldwide Division (the "Division"), and DMI is desirous of accepting such assets and assuming such liabilities.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and undertakings set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties hereby agree as follows:

1. Ethicon does hereby grant, assign, convey, transfer, set over and confirm, unto DMI, its successors and assigns, forever, all the businesses, franchises, properties, and assets of every nature and description, tangible and intangible, wherever located, on the books and records of Ethicon with respect to the Division immediately prior to the Effective Date (the "Properties"), the same to include, without limiting the generality of the foregoing, those assets that are more particularly described as follows, to the extent relating to the Division:

(i) All inventories, materials, supplies, furniture, machinery, equipment, automobiles, trucks and other tangible personal property, goods and chattels, wherever located;

(ii) All right, title, and interest in, to and under all contracts, including leases (except that nothing herein contained shall be deemed to constitute the assignment of any claim against the United States of America or of any contract that is not assignable without the consent of the other party or parties thereto unless and until such consent shall have been obtained);

(iii) All right, title and interest in, to and under cash (whether on hand or in banks), notes, bonds, inventions, improvements, patents and patent applications, trademarks, copyrights, domain names, discoveries, know-how, data, accounts and bills receivable, books of account, records, agreements, licenses, claims, demands, judgments, equities and choses in action, and all other intangible property of every nature and description; and

(iv) All right, title and interest in, to and under any real estate, and any improvements and appurtenances thereon or thereto, as well as all rights and obligations appertaining thereto.

2. Ethicon hereby constitutes and appoints DMI, its successors and assigns, the true and lawful attorney or attorneys of Ethicon, with full power of substitution, for Ethicon and in its name and stead or otherwise, but on behalf and for the benefit of DMI, its successors and assigns, to demand and receive from time to time any and all the Properties hereby assigned, transferred and conveyed, and to give receipts and releases for and in respect of the same and any part thereof, and from time to time to institute and prosecute in the name of Ethicon or otherwise, but at the expense and for the benefit of DMI, its successors and assigns, any and all proceedings at law, in equity or otherwise that DMI, its successors or assigns, may deem proper in order to collect, assert or enforce any claim, right or title of any kind in or to the Properties hereby assigned, transferred and conveyed,

DEPUY MITEK
EXHIBIT 525
04cv12457

and to defend or compromise any and all actions, suits or proceedings in respect of any of said Properties and to do all such acts and things in relation thereto as DMI, its successors, or assigns shall deem desirable; Ethicon hereby declaring that the appointment hereby made and the powers hereby granted are coupled with an interest and are and shall be irrevocable by Ethicon in any manner or from any reason.

3. Ethicon, for itself and its successors and assigns, hereby covenants and agrees with DMI and its successors and assigns, that Ethicon and its successors and assigns will do, execute and deliver, or will cause to be done, executed and delivered, all such further acts, transfers, assignments and conveyances, powers of attorney, and assurances, for the better assuring, assigning, conveying, transferring and confirming unto DMI, its successors and assigns, all and singular the Properties hereby assigned, transferred and conveyed, as DMI or its successors or assigns shall reasonably require.

4. For the consideration aforesaid, and in consideration of the assignment, transfer and conveyance to it of the Properties, DMI hereby assumes, and agrees to pay, perform or discharge when due, as the case may be, all the indebtedness, liabilities and obligations of every kind and description, to the extent associated with the Properties or otherwise pertaining to the Division. DMI hereby covenants and agrees with Ethicon that DMI will forever indemnify and save harmless Ethicon against all the indebtedness, liabilities and obligations aforesaid hereby assumed and agreed to be paid, performed or discharged, as the case may be, by DMI and to assume and complete all pending contracts of Ethicon to the extent relating to the Division or allocated on Ethicon's books or records to the Division immediately prior to the Effective Time, and to indemnify and save harmless Ethicon and its officers, directors and stockholders from any liability under any such indebtedness, liabilities and obligations.

5. This Assignment and the covenants and agreements herein contained shall inure to the benefit of and shall bind the parties hereto and their respective successors and assigns.

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be executed in their respective corporate names as of the 29th day of December, 2003.

ETHICON, INC.

By: _____
Name: K. O'Brien
Title:   Worldwide Vice President, Finance

Attest: _____
R. E. Skula, Assistant Secretary

DEPUY MITEK, INC.

By: _____
Name: H. Zauberman
Title:   Vice President

Attest: _____
S. M. Rosenberg, Clerk

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
*DMI039982*

# EXHIBIT 7

## Mitek/Innovasive History

**Mitek Surgical Products, Inc.**
4/17/91 - Mitek Surgical Products, Inc. incorporated in Delaware.

5/13/91 - Mitek Surgical Products, Inc. merged with and into Mitek Merger Corporation with name change to Mitek Surgical Products, Inc.

**Innovasive Devices, Inc.**
9/30/91 – Minvasive Devices, Inc. incorporated in Massachusetts
10/8/92 – Name change from Minvasive Devices, Inc. to Innovasive Devices, Inc.
12/29/03 – Name change to Depuy Mitek, Inc. (via Restatement of Articles)

4/5/95 - Acquired by a subsidiary of Johnson & Johnson called MTS Merger Corp. MTS Merger Corp. was merged into Mitek Surgical Products, Inc. (survivor)

12/18/97 – Johnson & Johnson transferred its ownership in Mitek Surgical Products, Inc. to Ethicon Endo-Surgery, Inc.

12/29/97 - Mitek Surgical Products, Inc., Menlo Care, Inc. and Ethicon, Inc. merged with and into Johnson & Johnson Medical, Inc. (survivor) who simultaneously changed name to Ethicon, Inc.

12/30/97 - Mitek Division of Ethicon, Inc. established

12/31/98 – Innovasive Corp. a sub of Innovasive Devices, Inc. is merged with and into Innovasive Devices, Inc. (survivor).

2/11/00 – Agreement and Plan of Merger by and among Johnson & Johnson (parent), Raptor Acquisition Corp. (sub) and Innovasive Devices, Inc. (target) whereby Raptor Acquisition Corp. merged with and into Innovasive Devices, Inc.

7/2/01 - Name change of Mitek Division to Mitek Worldwide Division of Ethicon, Inc.

12/29/03 – Johnson & Johnson transfers its ownership of Innovasive Devices, Inc. to Ethicon, Inc. – (evidenced on certificate)

12/29/03 – Articles of Incorporation of Innovasive Devices, Inc. restated to reflect the new name to DePuy Mitek,Inc.

12/29/03 – Assignment and Assumption whereby Ethicon, Inc. transfers to DePuy Mitek, Inc. all assets and liabilities of Ethicon's Mitek Worldwide Division. (Former name Innovasive Devices, Inc.)

12/29/03 - Dissolution of the Mitek Worldwide Division of Ethicon, Inc.

As at 11/1/2005 - DePuy Mitek, Inc. is owned by Ethicon, Inc.

CONFIDENTIAL

EXHIBIT
Dy 6
11/2/65 WD

DePuy Mitek, Inc. v. Arthrex, Inc.
C.A. No.04-12457 PBS
**DMI040002**

# EXHIBIT 8

## ASSIGNMENT

WHEREAS, **Ethicon, Inc.**, hereinafter referred to as the ASSIGNOR, a **Corporation** of **New Jersey**, having its principal place of business at **Route 22, Somerville, New Jersey, 08876** is the owner of certain inventions or improvements for which application for Letter Patent have been made and for which Letter Patent have been issued on May 24, 1994, as U.S Patent No. 5,314,446 entitled "Sterilized Heterogeneous Braids"(hereafter Patent Property); and

WHEREAS, DePuy Mitek, Inc., hereinafter referred to as the ASSIGNEE, a **Corporation** of **Massachusetts**, having its principal place of business at **249 Vanderbilt Avenue, Norwood, Massachusetts, 02062**, is desirous of acquiring the entire right, title and interest in and to the said Patent Property in any and all countries;

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, and intending to be legally bound hereby, ASSIGNOR has sold, assigned, transferred and set over, and by these presents does hereby sell, assign, transfer and set over to said ASSIGNEE, the entire right, title and interest in and to said Patent Property and any and all continuations, divisions and renewals of and substitutes for said Patent Property and to and under any and all additional Letters Patent which may be granted on or as a result thereof in the United States and any and all other countries, and any reissue or reissues or extension or extensions of said Letters Patent, and the full right to sue for and recover damages recoverable for past infringement of the same, and for violations of provisional rights having arisen from any published application(s) for said Patent Property. ASSIGNOR further assigns to and authorizes said ASSIGNEE to file corresponding applications for Letters Patent in all countries, to be held and enjoyed by said ASSIGNEE, its successors, assigns, nominees or legal representatives, to the full end of the term or terms for which said Letters Patent respectively may be granted, reissued or extended, as fully and entirely as the same would have been held and enjoyed by ASSIGNOR had this assignment, sale and transfer not been made.

It is hereby covenanted that ASSIGNOR has full right to convey the entire interest herein assigned, and that ASSIGNOR has not executed and will not execute any agreement in conflict herewith, and ASSIGNOR further covenants and agrees that it will each time request is made and without undue delay, execute and deliver all such papers as may be necessary or desirable to perfect the title to said Patent Property in said assignee, its successors, assigns, nominees, or legal representatives, and ASSIGNOR agrees to communicate to said ASSIGNEE or to its nominee all known facts respecting said Patent Property, to testify in any legal proceedings, to sign all lawful papers to execute all disclaimers and divisional, continuing, reissue and foreign applications, to make all rightful oaths, and generally to do everything reasonably possible to aid said ASSIGNEE, its successors, assigns, nominees and legal representatives to obtain and enforce for its or their own benefit proper patent protection for said inventions or improvements in any and all countries, all at the expense, however, of said ASSIGNEE, its successors, assigns, nominees or legal representatives.

*DePuy Mitek, Inc v Arthrex, Inc*
*C.A. No 04-12457 PBS*
*DMI000338*

DEPUY MITEK
EXHIBIT 523
04cv12457

AND ASSIGNOR hereby authorizes and requests the Commissioner of Patents and Trademarks of the United States and any official of any country or countries foreign to the United States whose duty it is to issue patents on applications as aforesaid, to issue to said ASSIGNEE, as assignee of the entire right, title and interest, any and all Letters Patent for said Patent Property, including any and all Letters Patent of the United States which may be issued and granted on or as a result of any applications included in said Patent Property, in accordance with the terms of this assignment.

IN WITNESS WHEREOF, the undersigned, being properly authorized to execute this Assignment, hereunto sets their hand and seal.

Ethicon, Inc.

By: _____
        Matthew S. Goodwin

Its: _____
        Assistant Secretary

Date: _August 9, 2004_

STATE OF _New Jersey_ :
                                          SS
COUNTY OF _Middlesex_

On this _9th_ day of _August_, year of _2004_ before me, the undersigned officer, personally appeared _Matthew S. Goodwin_ who acknowledged himself/herself to be the _Asst. Secty._ of _Ethicon, Inc._, a corporation, and that he/she as such _Asst. Secty._, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself/herself as _Asst. Secty._

_____
        Notary Public

JACQUELINE S. RETKWA
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES APRIL 10, 2006

DePuy Mitek, Inc. v. Arthrex, Inc.
C.A. No 04-12457 PBS
DMI000339

Page 2 of 3

DePuy Mitek, Inc.

By: _____
Laurence Rickles

Its: _____
Assistant Secretary

Date: _August 9, 2004_

STATE OF New Jersey ____:
                              : SS
COUNTY OF Middlesex ____:

On this 9th day of August ____, year of 2004, before me, the
undersigned officer, personally appeared Laurence Rickles ____, who
acknowledged himself/herself to be the Assistant Secretary ____ of
DePuy Mitek, Inc. ____, a corporation, and that he/she as such Assistant Secretary ____,
being authorized to do so, executed the foregoing instrument for the purposes therein
contained by signing the name of the corporation by himself/herself as Assistant Secretary.

_____
Notary Public

EDNA ARNOLD
A NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES 9/27/2008

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No 04-12457 PBS*
*DM1000340*

# EXHIBIT 9



CENTER FOR TRIBOLOGY, INC.
1715 Dell Avenue
Campbell, CA 95008 USA
(408) 376-4040 Tel • (408) 376-4050 Fax

"Confidential-Non-Patent-Prosecution Counsel Only"

March 23, 2006

## Comparative Suture Testing

### 1. Introduction

Center for Tribology, Inc., abbreviated CETR, is a privately held California corporation, located in the heart of Silicon Valley in the city of Campbell, county of Santa Clara. It was founded by Dr. Norm Gitis in November 1993 and incorporated in California in October 1994. Its main charter has been helping major corporations and universities all over the world in research, development and failure analysis of materials, coatings and lubricants for the computer peripherals (20% of revenues), semiconductor (20% of revenues), biomedical (15% of revenues) and other industries (20% of revenues), as well as for fundamental academic studies (25% of revenues). A list of its customers is attached in Appendix 1.

CETR is a multi-million-dollars corporation with two lines of business, design & sales of mechanical & tribology test equipment (90% of revenues) and testing & consulting services on mechanical & tribological properties of materials and devices (10% of revenues).

CETR is one of the largest and leading producers of mechanical and tribology testers in the world. In particular, it has supplied them to leading domestic suture manufacturers, such as Ethicon, Inc. of Johnson & Johnson and United States Surgical of Tyco Healthcare, as well as such well-known corporations as Gillette, Guidant, Medtronic, Schick, Procter & Gamble, Unilever, etc.

Dr. Norm Gitis, President of CETR, is a well-known expert on tribology testing with 30 years of experience in friction, wear and fatigue testing of materials and devices. His resume is attached in Appendices 2a – 2c.

CETR has successfully provided highest quality laboratory test data in several lawsuits, including most recently between Alaska Airlines, Boeing, and families of victims of the Alaska flight 261 (related to the reliability of a jack-screw/nut assembly on Boeing airplanes and a plane crash in 2000), between American Airlines, Sabre Travel Network and Western Digital (related to the reliability of computer disk drives used for travel reservations), and between Boston Scientific and US Justice Department (related to the quality of implantable cardiovascular stents). It has been charging $ 2,500 per day or $ 10,000 per week for its regular lab testing services and double prices for priority urgent services.

Dr. Gitis has successfully testified in several depositions, most recently in a lawsuit between Seagate Technology and Cornice, Inc. related to the intellectual property on the mechanical design of portable magnetic disk drives. He has also given successful testimonies at several trials, most recently in lawsuits between Swiss Air, Interactive Flight Technology, Avnet and other parties (related to the reliability of computerized on-demand in-flight video system and a crash of Swiss flight 111) in the court of Arizona and between Iomega and Nomai (related to the reliability of Zip high-density floppy-drives) in the Higher Court of



CENTER FOR TRIBOLOGY, INC.
1715 Dell Avenue
Campbell, CA 95008 USA
(408) 376-4040 Tel • (408) 376-4050 Fax

United Kingdom, courts of Amsterdam, Dusseldorf, etc. He has been charging $ 350 per hour plus trip expenses for his consulting and expert witnessing services.

## 2. Project Goal

At the end of February 2006 CETR was requested by a law firm of Dickstein, Shapiro, Morin & Oshinsky, LLP (located at 2101 L Street NW, Washington, DC 20037) and its technical expert Dr. Debi Mukherjee to perform comparative mechanical and tribological testing of two types of FiberWire surgical sutures, coated and uncoated.

They requested the following parameters be tested: i) pliability/bendability, ii) knot tie-down/run-down, iii) knot security, iv) chatter, v) coefficient of friction, vi) tissue drag, vii) microscopy examination.

We have been told that this project is related to a patent infringement lawsuit between DePuy Mitek, a Johnson & Johnson company and Arthrex, the latter being the client of this law firm. Any details of the lawsuit have been neither requested by CETR nor provided to CETR.

## 3. Suture Samples

In the beginning of March 2006 CETR received via FedEx two new spools of US 2 FiberWire sutures from the law firm, one coated and the other uncoated. Each spool contained approximately 20 m of suture. Two CETR employees Dr. Norm Gitis and Mr. Michael Vinogradov examined the spools of sutures and found them to be apparently brand new.

Upon agreement with the law firm and Dr. Mukherjee, before conducting any tests, we sent both the spools of sutures for ETO sterilization to a reputable sterilization lab Sterile Systems, Division of Medtronic Inc. (located at 520 Watson S.W., Grand Rapids, MI 49504). The same Mr. Michael Vinogradov handled the sutures before the shipment and after receiving them back. Both shipments to and from Sterile Systems were performed via FedEx.

Upon receiving back the sterilized sutures, we handled them only and always with clean-room gloves. We cut about 3 m of each of the coated and uncoated sutures and shipped by FedEx to a surgeon expert, as requested by the law firm. The rest of the spools were utilized in our tests described below.

## 4. Set Of Test Procedures

Based on the CETR experience with its suture-tester customers Ethicon (New Jersey) and US Surgical (Connecticut), its general expertise in mechanical & tribology testing and familiarity with the relevant literature, as well as on the suggestions of the law firm, CETR has proposed a suit of test procedures for the requested tests, that was approved by the law firm's technical expert Dr. Mukherjee and then performed by CETR in mid-March, 2006.

## 5. Pliability Tests

The experimental procedure, based on the published work of Rodeheaver et al. [1], was as follows.



CENTER FOR TRIBOLOGY, INC.
1715 Dell Avenue
Campbell, CA 95008 USA
(408) 376-4040 Tel • (408) 376-4050 Fax

Suture of 50 mm in length and 0.65 mm in diameter was clamped between the force sensor and the lower specimen holder as shown in fig. 1. The suture was preloaded with a tension of 0.5 Kg (5 N). Preloaded suture was then pulled at a force, uniformly increasing at the rate of 0.33 kg/sec. Force and elongation data were continuously monitored and recorded. The strain in the suture was calculated as the ratio of elongation to the initial length of 50 mm. The force-strain plots like the one shown in fig. 2 were made and their slopes were measured. Modulus of elasticity (E) was then calculated by dividing the slope with the cross-sectional area of the suture. Area moment of inertia (I) was calculated assuming a circular cross-sectional area. Stiffness was then calculated as a product of the modulus of elasticity and the area moment of inertia of the suture:

$$K = E*I$$

where
K – Stiffness,
E - Modulus of elasticity - Slope of the force-strain graph / cross-sectional area of the suture

I - Area moment of inertia - $\dfrac{\pi * D^4}{64}$ where D - diameter of the suture (0.65 mm)



Force sensor

Angle braket

Suture

Figure 1. Test set up for pliability testing



CENTER FOR TRIBOLOGY, INC.
1715 Dell Avenue
Campbell, CA 95008 USA
(408) 376-4040 Tel • (408) 376-4050 Fax



Figure 2. Typical force-strain data for coated and uncoated sutures during pliability tests

The stiffness values as calculated in the above described procedure are summarized in the Table 1.

Table 1. Pliability test data

| Exp # | Stiffness  (*E10-7 kg x m$^2$) | |
|:-----:|:-----:|:-----:|
|  | Coated Suture | Uncoated Suture |
| 1 | 6.51 | 10.07 |
| 2 | 7.53 | 9.73 |
| 3 | 5.98 | 11.3 |
| 4 | 6.44 | 11.3 |
| 5 | 4.95 | 8.29 |
| 6 | 5.67 | 8.00 |
| 7 | 5.98 | 9.61 |
| 8 | 5.41 | 10.6 |
| Average | 6.06 ± 1.29 | 9.93 ± 1.66 |

The stiffness of the coated sutures was found to be lower than that of the uncoated ones. This suggests that the coated sutures have higher pliability and thus facilitate better handling during surgical use. The test data corresponds well to the data reported by Rodeheaver et al [1].



CENTER FOR TRIBOLOGY, INC.
1715 Dell Avenue
Campbell, CA 95008 USA
(408) 376-4040 Tel • (408) 376-4050 Fax

## 6. Knot Slippage Strength Tests

The knot slippage strength tests were conducted to evaluate the knot security offered by each suture. The experimental procedure was carried out based on previous works in the literature [2, 3]. A loop of the suture was formed by tying a 'square knot' as shown in fig 3 [4] around a cylinder of 2.5 cm diameter. The loop thus formed was slipped off the cylinder and soaked in 0.9% weight/volume sodium chloride for 1 minute to closely represent the real environment. The soaked loop was then placed around 2 parallel brass rods of 5 mm diameter, which were mounted onto the UMT-2 machine as shown in fig. 4. A pre-load of 1 N was applied to the loop. The parallel rods were then pulled apart at a constant velocity of 1 mm/sec. The force was continuously monitored and recorded during the experiment. The force when the knot starts slipping was noted as the knot slippage force. The rods continued to be pulled apart until either the knot got untied or a slippage of 3 mm occurred. The force at that instant gives the knot failure force.



Square

Figure. 3 'Square knot' used for the knot slippage strength tets



Force sensor

Angle bracket

Brass rod

Suture loop

Figure 4. Test set up for knot slippage strength measurement



CENTER FOR TRIBOLOGY, INC.
1715 Dell Avenue
Campbell, CA 95008 USA
(408) 376-4040 Tel • (408) 376-4050 Fax

The typical force response curves as recorded during the experiments are presented in the fig. 5 below.



Figure 5. Typical data for force at slippage and knot failure for coated and uncoated sutures

The knot strength values as determined from the curves are summarized in the Table 2 below.

Table 2. Knot strength data for coated and uncoated sutures

| Exp # | Knot strength (kg) | | | |
|---|---|---|---|---|
| | at slippage | | at knot failure | |
| | Coated | Uncoated | Coated | Uncoated |
| 1 | 3.52 | 5.33 | 3.06 | 4.09 |
| 2 | 2.36 | 4.97 | 2.03 | 4.09 |
| 3 | 3.46 | 4.80 | 3.15 | 2.42 |
| 4 | 4.25 | 6.04 | 2.07 | 2.98 |
| 5 | 3.74 | 4.70 | 2.40 | 3.53 |
| 6 | 2.43 | 5.36 | 2.77 | 4.79 |
| 7 | 3.47 | 4.86 | 2.09 | 3.45 |
| 8 | 3.27 | 5.10 | 2.64 | 3.90 |
| Average | 3.31± 0.95 | 5.14 ± 0.67 | 2.52 ± 0.56 | 3.36 ± 1.19 |



CENTER FOR TRIBOLOGY, INC.
1715 Dell Avenue
Campbell, CA 95008 USA
(408) 376-4040 Tel • (408) 376-4050 Fax

From the above data it can be concluded that the knots tied using the coated sutures slipped and failed at lower forces when compared to the knots tied using uncoated sutures. The experimental data compare well with the data reported in the previous works [2, 3].

### 7. Knot Run-down Tests

The suture was tied with a 'half hitch knot' as shown in fig. 6 [4] around a supplemental cylinder with a 2.5 cm diameter. The loop thus formed was then slipped off the supplemental cylinder and placed on the lower brass rod of the UMT-2 testing machine. The knot was then subjected to running-down by pulling at a constant speed of 1.5 mm/sec on the longer free end in the testing machine as shown in fig. 7. The test procedure was based on the description provided in the literature [5]. The pulling force was continuously recorded as the knot traveled down the suture. Chatter or variation in knot run-down force was also noted.



Half-hitch

Figure 6. Half-hitch tied for the knot run-down tests



Figure 7. Test set up for the knot run-down test



CENTER FOR TRIBOLOGY, INC.
1715 Dell Avenue
Campbell, CA 95008 USA
(408) 376-4040 Tel • (408) 376-4050 Fax

The typical pulling force data from the tests performed on coated and uncoated sutures plotted versus time is shown in fig. 8 below:



Figure 8. Force versus time for coated and uncoated sutures during knot run-down experiments

The force when the knot begins to slide over the suture was noted from the pulling force data. This gives the run-down force. The run-down force values as measured from the test data are tabulated in the Table. 3 below:

Table 3. Knot run-down test data

| Exp # | Run-down force (kg) | |
| --- | --- | --- |
| | Coated suture | Uncoated suture |
| 1 | 0.28 | 0.39 |
| 2 | 0.20 | 0.54 |
| 3 | 0.26 | 0.42 |
| 4 | 0.22 | 0.49 |
| 6 | 0.18 | 0.44 |
| 7 | 0.19 | 0.28 |
| 8 | 0.21 | 0.26 |
| average | $0.22 \pm 0.05$ | $0.40 \pm 0.14$ |



CENTER FOR TRIBOLOGY, INC.
1715 Dell Avenue
Campbell, CA 95008 USA
(408) 376-4040 Tel • (408) 376-4050 Fax

As can be seen from the above result, the coated sutures had lower run-down force when compared to the uncoated sutures.

### 8. Friction tests

The schematic of suture-on-suture testing set-up is shown in the fig. 9 below.



Figure 9. Test schematic for measuring suture-on-suture friction

A sample of suture was mounted and tensioned on the upper sample holder and another sample of the same suture was mounted and tensioned on the lower sample holder. The tension of both the sutures was adjusted using side screws to ensure constant tension for each suture, as shown in fig. 10. The upper suture was moved on the lower one back and forth with a reciprocating length of 3 mm at a frequency of 0.5 Hz under a constant normal load of 2 N (0.2 kg) for 200 seconds. A close-loop feedback loading mechanism ensured a constant normal force.

Both the applied vertical load and friction (shear) response force were continuously monitored and recorded during the tests.



CENTER FOR TRIBOLOGY, INC.
1715 Dell Avenue
Campbell, CA 95008 USA
(408) 376-4040 Tel • (408) 376-4050 Fax



Figure 10. Set up of suture-on-suture friction tests

The coefficient of friction curves as recorded during the reciprocating tests are presented in fig. 11 below. The uncoated sutures had higher average coefficient of friction. The numerical data from the tests are noted and summarized in table. 4



Figure 11. Typical Coefficient of Friction curves for Coated and Uncoated Sutures



CENTER FOR TRIBOLOGY, INC.
1715 Dell Avenue
Campbell, CA 95008 USA
(408) 376-4040 Tel • (408) 376-4050 Fax

Table 4: Average coefficient of friction data from suture-on-suture tests

| Exp # | Coefficient of Friction | |
|---|---|---|
| | Coated suture | Uncoated suture |
| 1 | 0.09 | 0.15 |
| 2 | 0.10 | 0.17 |
| 3 | 0.08 | 0.16 |
| 4 | 0.10 | 0.16 |
| 5 | 0.09 | 0.16 |
| 6 | 0.09 | 0.16 |
| 7 | 0.09 | 0.17 |
| 8 | 0.10 | 0.17 |
| Average | $0.09 \pm 0.01$ | $0.16 \pm 0.01$ |

From the above results, it can be seen that the coated sutures have lower coefficient of friction when compared to the uncoated sutures. This result correlates well with the run-down force data in the previous section. The average coefficient of friction data is similar to the previous data [1, 6].

## 9. Chatter Data

Chatter is termed as the variation in friction during knot run-down and/or reciprocating friction tests. These variations are due to stick-slip process between the interacting suture surfaces when the knot is tied-down [5]. The difference between the maximum and the minimum friction coefficients, or amplitude of frictional auto-oscillations, is the measure of the chatter. Chatter data measured from both the knot run-down and the suture-on-suture friction tests are summarized in the table 5 below.

Table 5: Chatter data from knot run-down and suture-on-suture tests

| Test # | Chatter data | |
|---|---|---|
| | Coated suture | Uncoated suture |
| 1 | 0.009 | 0.013 |
| 2 | 0.009 | 0.017 |
| 3 | 0.008 | 0.013 |
| 4 | 0.008 | 0.013 |
| 5 | 0.010 | 0.012 |
| 6 | 0.012 | 0.011 |
| 7 | 0.008 | 0.014 |
| 8 | 0.010 | 0.019 |
| average | $0.009 \pm 0.001$ | $0.014 \pm 0.003$ |



CENTER FOR TRIBOLOGY, INC.
1715 Dell Avenue
Campbell, CA 95008 USA
(408) 376-4040 Tel • (408) 376-4050 Fax

The chatter was higher for the uncoated sutures when compared to the coated ones. This result strengthens the conclusion from the previous results that coated sutures provide greater ease of handling during surgical use.

## 10. Tissue Drag Tests

The frictional force encountered during the passage of the suture through a tissue is termed as tissue drag. A 20-mm length of suture was pulled through a piece of leather at a constant rate of 1 mm/sec, while continuously recording the pulling force. The test procedure is based on the description provided in the previous works [7]. The leather piece was held in position using fixtures as shown in fig. 12. Two types of tests were performed: dragging the suture through the hole made with a needle and dragging the suture between two tightly clamped pieces of leather. In both cases, the upper end of the suture was attached to the UMT upper bracket providing the well-controlled motorized dragging action. The average drag force measured in both types of experiments was identical.



Force sensor

Angle bracket

Suture

Clamped pieces of leather

Figure 12. Test set up for the tissue drag test

Fig. 13 presents the force required to pull the coated and uncoated sutures. The highest force recorded gives a measure of the static drag force that was necessary to overcome in order to initiate the suture motion through the leather. The dynamic drag force was measured during the motion of the suture. The average static and dynamic drag forces are summarized in Table 6. The data are comparable to the previously reported results [1].



CENTER FOR TRIBOLOGY, INC.
1715 Dell Avenue
Campbell, CA 95008 USA
(408) 376-4040 Tel • (408) 376-4050 Fax



Figure 13. Typical force curves for coated and uncoated sutures.

Table 6. Drag force from the tissue drag tests

| Exp # | Drag force (kg) | | | |
|---|---|---|---|---|
| | Static | | Dynamic | |
| | Coated suture | Uncoated suture | Coated suture | Uncoated suture |
| 1 | 1.10 | 1.15 | 0.55 | 0.74 |
| 2 | 0.85 | 1.20 | 0.52 | 0.78 |
| 3 | 0.71 | 1.19 | 0.41 | 0.84 |
| 4 | 0.68 | 1.39 | 0.46 | 0.91 |
| 5 | 0.97 | 1.10 | 0.46 | 0.85 |
| 6 | 1.11 | 1.19 | 0.58 | 0.64 |
| 7 | 0.90 | 1.13 | 0.51 | 0.77 |
| 8 | 0.92 | 1.13 | 0.50 | 0.72 |
| Average | $0.91 \pm 0.20$ | $1.18 \pm 0.15$ | $0.50 \pm 0.11$ | $0.78 \pm 0.14$ |

## 11. Microscopy Data

We have attempted to stud y the structure of the sutures with a digital optical microscope, attached to the same UMT tester, but the structure was undistinguishable. So, we utilized



CENTER FOR TRIBOLOGY, INC.
1715 Dell Avenue
Campbell, CA 95008 USA
(408) 376-4040 Tel • (408) 376-4050 Fax

laboratory imaging services of a reputable local analytical lab AMER in Sunnyvale, California. Dr. Gitis brought samples of the uncoated and coated sutures to AMER and was present there all the time while their lab engineer Tony Lin performed SEM (scanning electron microscopy) imaging.

The obtained images are presented below in figures 14 and 15.





Figure 14. SEM Photos of the Coated Suture



CENTER FOR TRIBOLOGY, INC.
1715 Dell Avenue
Campbell, CA 95008 USA
(408) 376-4040 Tel • (408) 376-4050 Fax





Figure 15. SEM Photos of Uncoated Sutures

## 12. Statistical Significance of Test Data

We used a common t-distribution statistical analysis, assuming the test data to be normally
distributed The t-analysis assesses whether the means of two data groups are statistically



CENTER FOR TRIBOLOGY, INC.
1715 Dell Avenue
Campbell, CA 95008 USA
(408) 376-4040 Tel • (408) 376-4050 Fax

different from each other. Then the test statistic (t-value) is calculated as [8, 9]:

$$t = \frac{X_u - X_c}{\sqrt{\frac{V_c}{N_c} + \frac{V_u}{N_u}}}$$

where $X_c$ and $V_c$ - mean and variance, correspondingly, of data for coated suture,
$X_u$ and $V_u$ - mean and variance, correspondingly, of data for uncoated suture,
$N_c$ and $N_u$ - number of tests for coated and uncoated sutures, correspondingly (N = 8).

The calculated t-values for all our test data are presented in Table 7 below.

Table 7. Comparison of t-values for data significance

| Test | Coated | | Uncoated | | Experimental "t"-value | "T" threshold |
|---|---|---|---|---|---|---|
| | Xc | Vc | Xu | Vu | t | T |
| Stiffness | 6.06 E-6 | 6.17 E -13 | 9.93 E-6 | 1.6 E -12 | 7.35 | 1.76 |
| Slippage Strength | 3.31 | 0.41 | 5.14 | 0.19 | 6.72 | 1.76 |
| Untie Strength | 2.52 | 0.2 | 3.66 | 0.54 | 3.72 | 1.76 |
| Run-down Force | 0.22 | 0.001 | 0.4 | 0.01 | 4.62 | 1.76 |
| Friction | 0.09 | 3.58 E -5 | 0.16 | 5.66 E -5 | 20.27 | 1.76 |
| Chatter | 0.009 | 1.58 E -6 | 0.014 | 6.91 E -6 | 4.63 | 1.76 |
| Static drag | 0.91 | 0.025 | 1.18 | 0.008 | 4.29 | 1.76 |
| Dynamic drag | 0.5 | 0.003 | 0.78 | 0.007 | 7.91 | 1.76 |

To make a conclusion that the difference between groups of data is statistically significant, the t-value should be larger when compared to a T-threshold calculated based on the degrees of freedom of the distribution and an error level. Degrees of freedom is calculated as [8]: DoF =

CENTER FOR TRIBOLOGY, INC.
1715 Dell Avenue
Campbell, CA 95008 USA
(408) 376-4040 Tel • (408) 376-4050 Fax

Nc + Nu – 2 = 14. An error level of 0.05 (5%) is most commonly used. Based on the DoF and error level, the T-threshold is found from a standard t-distribution table [8, 9] to be T = 1.76.

As seen from the Table 7, the computed t-values of test data are much greater than the threshold T level, which allows us to conclude that the observed differences between coated and uncoated sutures are statistically significant.

*Norm Gitis*

Dr. Norm Gitis
President, Center for Tribology, Inc.
Chairman, STLE Technical Committee on Tribotesting

**References:**

1. George Rodeheaver et al, Journal of Surgical Research 35, 525-530 (1983)
2. Arthroscopy: The Journal of Arthroscopic and Related Surgery Vol. 16, No 2, (2000), pp 202-207
3. Schubert et al, American Journal of Obstetrics and Gynecology, Vol.187, ( 6), (2002), 1439
4. www.ukvet.co.uk/ukvet/articles/ surgery_suture%20patterns.pdf
5. Perciaccante et al, US patent No: 4,047,533, September 1977
6. http://www.cetr.com/Brochures/Mechanical_Tester_for_Bio-Medical_Materials_and_Devices.htm
7. Rao Bezwada et al, Biomaterials 16 (1995) 1141-1148
8. http://www.socialresearchmethods.net/kb/stat_t.htm
9. Douglas Montgomery, Design and Analysis of Experiments, John Wiley & sons, Inc.

# EXHIBIT 10

1

```
1        IN THE UNITED STATES DISTRICT COURT FOR THE

2                  DISTRICT OF MASSACHUSETTS

3    ---------------------------x
     DEPUY MITEK INC., a            :
4    Massachusetts Corporation,     :
                                    :
5               Plaintiff,          :
                                    :
6          vs.                      :   Civil Action No.
                                    :
7    ARTHREX, INC., a Delaware      :     04-12457
     Corporation, and PEARSALLS     :
8    LIMITED, a Private Limited      :
     Company of the United          :
9    Kingdom,                       :
                                    :
10              Defendants.         :
     ---------------------------x
11

12                    Washington, D.C.

13                Wednesday, June 21, 2006

14
     Videotape Deposition of:
15

16              DR. NORM GITIS,

17      The witness, was called for examination by

18      counsel for the Plaintiff, pursuant to notice,

19      commencing at 8:15 a.m., at the law offices of

20      Dickstein Shapiro Morin & Oshinsky LLP, 2101 L

21      Street, Northwest, Washington, D.C., before

22      Dawn A. Jaques, Certified Shorthand Reporter

23      and Notary Public in and for the District of

24      Columbia, when were present on behalf of the

25      respective parties:
```

142

1    A.   Yes.
2    Q.   And on the graph that's on the first
3 page of Exhibit 393, there is eight graphs
4 present, eight lines presented. Do you see that?
5    A.   Yes.
6    Q.   And they're labeled Coated 1 through 8.
7 Do you see that?
8    A.   Yes.
9    Q.   Do the Coated 1 through 8 that are in
10 there correspond to the Experiment No. 1 through 8
11 that are in the pliability test data chart?
12    A.   Yes.
13    Q.   Okay. Now, if we look at 394, the first
14 column is FZ in kilograms. Do you see that?
15    A.   Yes.
16    Q.   What force is that?
17    A.   Vertical force.
18    Q.   That's the force that's being applied to
19 the specimen placed under tension?
20    A.   Yes.
21    Q.   The second column is time and seconds;
22 is that right?
23    A.   Yes.
24    Q.   The third column is Z in millimeters,
25 right?

143

1    A.   That's correct.
2    Q.   What is Z?
3    A.   Displacement in millimeters.
4    Q.   Vertical displacement, so it's how much
5 the specimen is being stretched, right?
6    A.   Yes.
7    Q.   Okay. The fourth column is ZABS,
8 Z-A-B-S; is that right?
9    A.   Yes.
10    Q.   What is ZABS?
11    A.   I don't remember.
12    Q.   Don't know?
13    A.   I don't remember.
14    Q.   Okay. The fifth column is Strain. Do
15 you see that?
16    A.   Yes.
17    Q.   What is that?
18    A.   Strain is the ratio of the relative
19 displacement over the initial position.
20    Q.   So this strain --
21    A.   Elongation over -- strain is defined as
22 relative elongation, elongation over the length.
23    Q.   So is it correct that the strain is the
24 distance measured with the Z parameter divided by
25 the length?

144

1    A.   Yes.
2    Q.   So at the first instance, the length was
3 measured to be 50 millimeters. That was the gauge
4 length you used, right?
5    A.   Yes.
6    Q.   So the time -- at the first entry, let's
7 say, the strain --
8    A.   No change.
9    Q.   There was no change.
10    A.   Zero change. Zero divided by any number
11 gives zero.
12    Q.   Zero. Second entry says -- for the Z
13 column is 24.8735, right?
14    A.   Yeah.
15    Q.   So the strain then would be 24.8735
16 divided by 50, plus 24.8735 for that data point?
17    A.   Yeah.
18    Q.   For the next data point, it would be
19 24 point -- the strain would be 24.8735 divided by
20 50, plus 24.8735?
21    A.   Yes.
22    Q.   So it keeps on doing that?
23    A.   Yes, all the time.
24    Q.   Okay. And you said in your task, if you
25 go back to your report on page 3 at the top, you

145

1 said that suture was tested -- was preloaded with
2 a tension of .5 kilograms, 5 newtons, right?
3    A.   Yes.
4    Q.   How did you arrive at that parameter?
5    A.   Why did we choose this parameter,
6 because we followed the literature recommendations
7 by Dr. Rodeheaver and by Ethicon.
8    Q.   Did one of those documents actually
9 specify a 5 newton preload?
10    A.   I think so.
11    Q.   What happens if they didn't?
12    A.   I would be surprised.
13    Q.   If they didn't, would you know where it
14 came from?
15    A.   I am under the impression that it came
16 from the literature.
17        (DePuy Mitek Exhibit No. 395 was marked
18        for identification.)
19        BY MR. BONELLA:
20    Q.   Let me show you what's been marked as
21 DePuy Mitek Exhibit 395. It's Dr. Mukherjee's
22 response of expert report. I'd like to ask you to
23 turn to Exhibit -- I'm going to turn to
24 Exhibit 13.
25        Exhibit 13 to that report is --

37 (Pages 142 to 145)

226

1  holders or these sensors or whatever, but I cannot
2  speculate what causes the difference between
3  uncoated and coated, because as we discussed, I
4  only know labels, coated and uncoated, so I cannot
5  speculate what causes their differences. Erich,
6  you need a new printer.
7      (DePuy Mitek Exhibit No. 404 was marked
8      for identification.)
9      BY MR. BONELLA:
10  Q   I'm going to show you the next exhibit,
11 Exhibit 404, which I believe is the knot strength
12 test data and curves for the uncoated samples. I
13 ask you to verify that.
14  A   Uncoated, yes.
15      MR. TAMBURO: You want him to look
16 through that 8 inches worth of documents?
17      BY MR. BONELLA:
18  Q   Do you know? Can you just look at
19 the --
20  A   Yeah, I see it. It's uncoated, yeah.
21  Q   Is that the data for the non-slippage
22 test?
23  A   Yes.
24      (DePuy Mitek Exhibit No. 405 was marked
25      for identification.)

227

1      BY MR. BONELLA:
2  Q   Is Exhibit 405 the graphs and data for
3  the coated non-slippage test?
4  A   Yes.
5  Q   Okay. Let's take, for example, the
6  coated. Turn to the first part. This is where
7  you were putting the preload on, right? The first
8  part of the data should be where you put the
9  preload on; is that right?
10  A   Yes.
11  Q   Okay. There is, for example, sample 1
12 we'll use an example, there's five columns, right?
13  A   Yes.
14  Q   First column is F sub X. What is that?
15  A   FX is horizontal force in X direction.
16  Q   Force in X direction. If we're looking
17 at Figure 7, your set-up, which is the X
18 direction?
19  A   X direction is parallel to the paper.
20  Q   Parallel to the paper. That's not
21 specific.
22  A   I'm sorry, what are you looking --
23  Q   Figure 7, your test set-up. That's
24 right, you got it.
25  A   No, you said Figure 7.

228

1  Q   Oh, do I have the wrong one? I'm sorry,
2  I have the wrong one. Figure 4.
3      Okay, so where was the X direction for
4  Figure 4?
5  A   Left-right direction within the plane of
6  the paper.
7  Q   I'm having a hard time understanding
8  because there's two planes to the paper. Well,
9  there's one plane, but there's two directions.
10 There's a --
11  A   I'm sorry, do you see -- how to define
12 X. If you see a force sensor, it has some kind of
13 lengths, so X is along the length of the force
14 sensor.
15  Q   Okay. So would the force X be into the
16 diameter of the brass rod?
17  A   Yes.
18  Q   Next column is F sub Z. What is that?
19  A   It's a vertical force.
20  Q   That's the tension force that you're
21 measuring?
22  A   The tension force.
23  Q   That you measure to get the results?
24  A   Yes.
25  Q   T is time and seconds, right?

229

1  A   Yes.
2  Q   Z is what?
3  A   Z is vertical displacement.
4  Q   Okay. So that's what you're looking at
5  to determine slippage?
6  A   Yes.
7  Q   And the last column is F sub F. Do you
8  see that?
9  A   Yes.
10  Q   Is that the force in the Y direction?
11  A   Actually, that's friction coefficient.
12  Q   That's friction coefficient?
13  A   Yeah.
14  Q   In kilograms?
15  A   Okay, I am confused.
16  Q   Weren't you trying to keep the forces in
17 the X direction and the Y direction the same?
18  A   No, FY would say FY. So I'm sorry, I
19 confused. I don't remember. I can find it out
20 and let you know. I don't remember specifically.
21  Q   You don't know what FF is? Look FX and
22 FF columns, if you look at those --
23  A   Yes. They seem to be of certainly
24 equal --
25  Q   Except for this sample they're not.

58 (Pages 226 to 229)

234

1 labeled brass rod is?
2   A   That's correct.
3   Q   The knot was then subject to running
4 down by pulling at a constant speed of one
5 and-a-half millimeters per second on the longer
6 free end in the testing machine as shown in
7 Figure 7, right?
8   A   Yes.  The free end was like upper end,
9 and the loop was like the lower end of the suture
10 on Figure 7.
11   Q   The loop is around the rod, right?
12   A   Yes.
13   Q   And then there's two ends?
14   A   Right.
15   Q   One was -- and you pulled on one end?
16   A   Yeah, the longer end.
17   Q   Okay.  And the longer end, how did you
18 attach that to something to pull on it?
19   A   How we attached it to the -- to the
20 upper specimen, with the same angle bracket as was
21 shown in pliability test and knot strength test.
22   Q   It doesn't show it.
23   A   As you said, you can call it bolt and
24 nut.
25   Q   I'm sorry.

235

1   A   As you said previously, you can call it
2 bolt and nut, how we clamp the suture.
3   Q   I don't understand what you just said.
4   A   Okay.
5   Q   I don't understand what you're saying.
6   A   Earlier when I described our clamp to
7 clamp the suture, you asked me whether you can
8 call it bolt and nut, and I said yes.
9   Q   Okay.  I see in the Figure 7, test
10 set-up for the knot run-down, there's a brass rod
11 in the upper fixture.
12   A   Yes.
13   Q   What was that used for?  Looks like the
14 suture is looped around it, no?
15   A   Yes.  Maybe it's wrong photo.  It's
16 photo from Figure 4.  Maybe it's the right photo
17 for the upper attachment is the same as in
18 Figure 1.
19   Q   Wait a minute, I'm confused now.  Are
20 you saying Figure 7 may not be the knot run-down
21 test?
22   A   Figure 7 is -- no, no.  It's correct.
23 Figure 7 is a knot run-down test.  The loop was
24 formed on the separate supplemental cylinder, was
25 then transferred on the brass -- on the lower

236

1 brass rod.
2   Q   Yes.
3   A   And then the free -- longer free end was
4 just attached to the upper rod.
5   Q   Attached to the upper brass rod?
6   A   Yes.
7   Q   How was it attached to the upper brass
8 rod?
9   A   I don't remember.
10   Q   Was it tied in a knot?
11   A   I don't remember.  Most likely it was
12 tied in a knot.
13   Q   How about the lower -- how about the
14 other end, what happened to the other end of the
15 suture?  What did you do with that?
16   A   I believe it was cut like in all the
17 referenced literature.
18   Q   What do you mean cut?  There's two ends
19 of the suture that are in the half hitch, and one
20 you said goes up --
21   A   The longer ones, the free one, goes on
22 the upper rod.
23   Q   Okay.  What happens to the lower one?
24 What happens to the other end?
25   A   I don't remember.  We didn't describe

237

1 here, and I don't remember.
2   Q   Well, how is the knot running down?  I
3 mean, what's holding the other end?  Something's
4 got to hold the other end, right --
5   A   Right.
6   Q   -- if it's a run-down test.
7   A   Right.  Sorry, I don't remember.
8   Q   So you can't exactly tell me how this
9 test was done?
10   A   I have to think about it.  I don't
11 remember.
12   Q   Okay.  How many kilograms in a newton?
13   A   One kilogram is 9.8 newton.
14   Q   Let me show you the first page of
15 Exhibit 404 back at the knot slippage strength
16 test.  I'm going to shift gears on you here.
17 There's a line at the 10-second point?
18   A   Yes.
19   Q   What is that line for, that vertical
20 line?
21   A   I do not remember.
22   Q   Is someone looking at the slope before
23 10 seconds?
24   A   I do not remember.
25   Q   So in this test, the -- I guess you

60 (Pages 234 to 237)

238

1 don't remember. Anyway, the constant speed at the
2 knot run-down, 1.5 millimeters per second, should
3 be reflected in the data, right?
4     A    Yes.
5     Q    If you go to the table of the data
6 results, see how Sample 1, coated, was .28, and
7 sample 7, uncoated, was .28?
8     A    Yes.
9     Q    How do you explain that they were the
10 same?
11        MR. TAMBURO:  Objection, calls for
12 speculation.
13        THE WITNESS:  I don't have any
14 explanation.
15        BY MR. BONELLA:
16     Q    And sample 3 was .26 and sample -- I'm
17 sorry, sample 3, coated, was .26, and sample 8,
18 uncoated, was .26.  Can you explain that?
19        MR. TAMBURO:  Same objection.
20        THE WITNESS:  No.
21        BY MR. BONELLA:
22     Q    Okay.  The data where knot run-down
23 force that's in the table, how did you generate
24 those values?
25     A    We calculated it as a force at the

239

1 moment when knot begins to slide down.
2     Q    And how do you know when the knot begins
3 to slide down?
4     A    You look in the Figure 8, and you can
5 clearly see that for as long as knot is intact,
6 like in previous test, force goes up with the
7 increase in time/distance.
8        As soon as force stops increasing with
9 time, it means that knot started to run down.
10     Q    Did you pick the peak of the curves, or
11 was there an algorithm?
12     A    Peak.
13     Q    Peak?
14     A    Yes.
15     Q    You say that you also noted chatter
16 variation, and knot run-down force was also noted.
17        Do you see that?
18     A    Yes.
19     Q    Did you determine chatter from this test
20 that present the chatter results?
21     A    When we presented the chatter in -- when
22 we presented chatter in Table 5, it was kind of
23 average of the amplitude in Figure 11 and
24 amplitude in Figure 8.
25     Q    It was the average of the amplitudes?

240

1     A    I'm sorry, it was average of two
2 chatters, right?  Chatter in Figure 11 and chatter
3 in Figure 8.
4     Q    Okay, I'll come back to that then when
5 we get to chatter.
6        (DePuy Mitek Exhibit Nos. 406 and 407
7        were marked for identification.)
8        BY MR. BONELLA:
9     Q    I'll show you Exhibit 406.  I believe
10 this is the printout of the uncoated data from the
11 knot run-down test.
12        I'll show you Exhibit 407.  I believe
13 this is the coated data from the knot run-down
14 test.  Does that look right?
15     A    It looks correct.
16     Q    Let's look at 407 for a minute, the
17 coated values.  If you look at the data under the
18 first sample -- I guess for all the data that we
19 look at, does the sample No. 1 always correspond
20 with the Experiment No. 1 value in your charts?
21     A    Yes.
22     Q    The first column is F sub X.  What is
23 that?
24     A    Again, it's the lateral force in X
25 direction.

241

1     Q    Which is the X direction?
2     A    As we discussed, it's longitudinal of
3 the force sensor -- along the longitudinal axis of
4 the force sensor.
5     Q    So it's into the brass rods on Figure 7?
6     A    Yes.
7     Q    And F sub Z?
8     A    Is vertical force.
9     Q    T is time and seconds?
10     A    Time.  Z is displacement.  And, again, I
11 don't remember what is sub F.
12     Q    So in this -- once the -- was a preload
13 done in this?
14     A    It doesn't specify preload.
15     Q    How about -- so a preload wasn't done?
16     A    Correct.
17     Q    Did you soak the sutures first?
18     A    It doesn't specify, so we did not.
19     Q    Now, for the knot run-down curves, can
20 you -- before the onset of the run-down
21 initiation, so before the peak is reached, can you
22 use that data to determine pliability as you did
23 for Table 1?
24     A    It would give you a big, big error.
25     Q    Why?

61 (Pages 238 to 241)

242

```
 1    A    Because of the same reasons as we
 2 discussed last time.  Because if there is a loop,
 3 it measures friction because it's combination of
 4 friction and elastic properties.  Because there
 5 was no substantial preload, you can really use it
 6 for pliability.
 7    Q    The duration in this, is that the time
 8 that the test took?
 9    A    Yes.
10    Q    And the count, what is that?
11    A    As last time, it's data rate, data
12 frequency, how many data points.  This count is
13 higher than in test one because we needed to catch
14 the peak, so we had higher frequency of data to
15 catch the weighted peak of the run-down.
16    Q    If you look at sample 7 in
17 Exhibit 407 --
18    A    7, Exhibit 407, yes.
19    Q    Coated, sample 7, it looks like it had
20 the highest force?
21    A    Yes.
22    Q    Okay.  And it was, I don't know, roughly
23 .28, .29?
24    A    Yes.
25    Q    If we go to your data for knot run-down
```

243

```
 1 test, sample 7 is 0.19 for coated.
 2    A    Yes.
 3    Q    How do you explain that?
 4    A    No explanation.
 5    Q    The next test, the friction test.
 6         (A discussion was held off the record.)
 7         MR. TAMBURO:  Do you mind taking a
 8 2-minute break?
 9         MR. BONELLA:  No.
10         THE VIDEOGRAPHER:  This is the end of
11 Tape 3.  Off the record at 3:26:09.
12         (A break was taken.)
13         THE VIDEOGRAPHER:  This is the beginning
14 of Tape 4 in the deposition of Dr. Norm V. Gitis.
15 On the record at 3:35:22.
16         BY MR. BONELLA:
17    Q    Dr. Gitis, is the Table 2 in Exhibit 382
18 of knot strength any different than the knot
19 strength data that you presented in Exhibit 381?
20    A    No, it's the same.
21    Q    I'd like to show you, this is going back
22 to this knot strength slippage test for a minute.
23    A    Yes.
24    Q    That was done, according to your report,
25 at a constant speed of 1.5 millimeters per second,
```

244

```
 1 right?
 2    A    1 millimeter per second, yes.
 3    Q    1 or 1.5?
 4    A    For slippage, 1; for run-down, 1.5.
 5    Q    Sorry.  Slippage was 1 millimeter per
 6 second?
 7    A    Right.
 8    Q    Okay.  Let's look at the -- this is the
 9 slippage data, Exhibit 405, with a coated suture,
10 right?  If you look --
11    A    Yes.
12    Q    Look at this page here, and you look at
13 time equals 4 seconds for sample 2 -- sample 1.
14    A    Okay.
15    Q    Sample 1, time of 4.002 -- wait.
16    A    Yeah, 4 seconds.
17    Q    For sample 1, the coated, time of 4.002
18 seconds, Z at a value of 115 --
19    A    .33.
20    Q    -- .33345, correct?
21    A    Yes.
22    Q    So if we're going at a constant velocity
23 of 1 millimeter per second, Z is in millimeters,
24 at 5 seconds we should have 116.3345, right, for
25 Z?
```

245

```
 1    A    Yes.
 2    Q    Let's mark the page we just looked at as
 3 Exhibit 408.
 4         (DePuy Mitek Exhibit No. 408 was marked
 5         for identification.)
 6         BY MR. BONELLA:
 7    Q    If we go to this page and we go to the
 8 time of 5.0003 seconds --
 9    A    Yes.
10    Q    -- the Z value is 115.199.  Do you see
11 that?
12    A    Yes.
13    Q    So the Z value from time equals 4.002,
14 time equals 5.0003 for sample 1 actually went
15 down.
16    A    Yes.
17    Q    Why is that?
18    A    I don't remember.  I'd have to look at
19 the entire curve, but --
20    Q    We'll just mark the page that we're
21 looking at now as Exhibit 409, the page that has
22 the 5.0003 seconds.
23         (DePuy Mitek Exhibit No. 409 was marked
24         for identification.)
25         THE WITNESS:  You're talking about one
```

62 (Pages 242 to 245)

VERITEXT CORPORATE SERVICES (800) 567-8658

258

1      BY MR. BONELLA:
2    Q   Let me show you Exhibit 410 and 411. I
3  think Exhibit 410 is the coated results from the
4  friction test, and Exhibit 411 is the uncoated
5  results from the friction test, right?
6    A   Yes.
7    Q   Let's look at Exhibit 410 for a minute.
8  The data show, for example, one, under that it
9  says radius. Do you see that?
10   A   Yes.
11   Q   What is that?
12   A   It's a relevant parameter for this test,
13 which is always shown.
14   Q   What is the radius?
15   A   It makes sense for the rotary motion,
16 but not for the linear motion.
17   Q   What is it?
18   A   It's a radius of rotary motion, which
19 makes no relation to -- has no relevance to the
20 linear motion.
21   Q   You didn't have the rotary motion driver
22 here, did you?
23   A   Right, this is why it was not supposed
24 to be recorded.
25   Q   What's set force? What is that?

259

1    A   Set force was 2 newton, or 200 grams.
2    Q   That's the force in the Z direction?
3    A   Z force.
4    Q   That's minus because it's pushing down?
5    A   That's correct.
6    Q   The next one is duration. What is that?
7    A   It's just times 100 seconds.
8    Q   The next one is --
9    A   If you look at the data, it's 100
10 seconds.
11   Q   Next one is entry something?
12   A   We already discussed. It's number of
13 data point, frequency of data acquisition.
14   Q   First column is FX. What is that?
15   A   Friction force.
16   Q   Next column is FZ, what is that?
17   A   Normal load.
18   Q   So that's the one you were trying to
19 keep constant?
20   A   Yes.
21   Q   Looks like it varied.
22   A   Yes.
23   Q   So it wasn't constant?
24   A   If you measure normal load, it's never
25 ever constant, so you try to maintain it as

260

1  constant as possible.
2    Q   What happens if it's not constant?
3    A   Pardon me?
4    Q   If it's not constant, that means the
5  upper suture is actually moving relative -- it's
6  actually moving relative to the lower suture in a
7  vertical direction, correct?
8    A   Right, correct.
9    Q   T is time and seconds?
10   A   Yes.
11   Q   In the distance, if the upper suture
12 moves relative to the lower suture, that affects
13 the friction force, right?
14   A   Yes.
15   Q   Z is what?
16   A   Z is still vertical displacement in
17 millimeters. So the original displacement, it's
18 like zero, and you can calculate practically the
19 rear depth of the suture. You have to do this
20 test longer, for several minutes. You can wear
21 out the suture, and Z will give you the dynamics
22 of the depths of wear.
23   Q   So Z just actually shows the relative
24 motion of the upper suture to the lower suture?
25   A   Yes.

261

1    Q   F sub F, what is that?
2    A   I'm sorry, like last time, I don't know.
3    Q   F sub X and F sub F look like they're
4  the same except -- the same magnitude, different
5  in negative or positives. See that?
6    A   I don't know.
7    Q   You don't know?
8    A   I have to consult my engineer. I don't
9  remember what's is FF.
10   Q   How about COF, what's that?
11   A   That's a coefficient of friction, ratio
12 of FX over FZ.
13   Q   So FX divided by FC should give me COF?
14   A   Yes.
15   Q   Did you have to put any other parameters
16 in the machine for the calculation of coefficient
17 of friction, or is it just strictly that ratio?
18   A   No, it's just ratio of friction force of
19 a normal load.
20   Q   See the average coefficient of friction
21 data that you presented?
22   A   Yes.
23   Q   When you say average, did you take it
24 across the whole time you did the sample, or did
25 you just do it over a portion of the time?

66 (Pages 258 to 261)

262

1    A    No, over the entire hundred seconds.
2    Q    Okay.  Why does it change initially,
3 drop off right away, like it's the only curve
4 where it drops?
5    A    There is always some so-called run-in
6 period or burnishing period.  When you put two
7 surfaces together, there's always some change in
8 friction in the beginning until they get adjusted
9 to each other.
10    Q    Do you have any idea whether -- see how
11 you got the average for point -- coated was .09,
12 uncoated was 0.16?
13    A    Yes.
14    Q    Do you have any idea of how big of a
15 difference that is relative to other sutures?
16        MR. TAMBURO:  Objection, vague.
17        THE WITNESS:  Relative to others
18 sutures?
19        BY MR. BONELLA:
20    Q    Like do sutures typically test in values
21 of .08, or do they typically test in values of .8
22 or 2?  Do you have any idea what the typical
23 results are for a suture?
24    A    I don't remember right now, but I do
25 remember that we compared data to several

263

1 references, and data was of the same order of
2 magnitude.
3        We compared to data of -- published data
4 of several authors, and they had the same order of
5 magnitude.
6    Q    What do you mean they had the same order
7 of magnitude?
8    A    The friction is around .1.
9    Q    Are you sure about that?
10    A    Yes, I am.
11    Q    Okay.  And if it isn't?
12    A    Huh?
13    Q    If it isn't?
14    A    Then somebody published wrong data.
15    Q    Let's go back to this exhibit, 407 --
16 410.  1.9, the first point, FX, and FZ is 199.386
17 of magnitude.  If you divide them, my consultants
18 here tell m you get 0.0095945.
19    A    Right.
20    Q    Which is not 0.139, which is the
21 coefficient.  If that math is correct, how do you
22 explain why the coefficient of friction is
23 different?
24    A    I don't know, because as I said, I'm
25 confused a little bit by this FF and FX.  I have

264

1 to clarify this with my engineer what is FX and
2 what is FF.
3    Q    They're the same, so you said
4 coefficient of friction was FX divided by FZ.
5    A    Yes.
6    Q    If this math is right, that means
7 coefficient of friction is not FX divided by FZ.
8 It's not F divided by FZ either.
9    A    I have to clarify.
10    Q    So you don't know how coefficient of
11 friction was obtained?
12    A    I know very well the coefficient of
13 friction was obtained as a ratio, but I have to
14 clarify columns FX and FF.
15    Q    So you don't know what it is a ratio of?
16    A    It's supposed to be a ratio of friction
17 force over normal load.
18    Q    Isn't FX the friction force, or FF the
19 friction force?
20    A    This will be my assumption.
21    Q    They're the same value, so it shouldn't
22 matter which one you use?
23        MR. TAMBURO:  Objection, asked and
24 answered.
25        BY MR. BONELLA:

265

1    Q    Right?
2    A    Right.
3    Q    So sitting here today, you can't really
4 tell me how you get coefficient of friction from
5 this data?
6    A    Right.
7    Q    The next section is the chatter data.
8 You said that the chatter data measured from both
9 the knot run-down and suture-on-suture friction
10 tests are summarized in Table 5 below.
11        Do you see that?
12    A    Yes.
13    Q    How did you determine the values that
14 are in Table 5 from the two tests?
15    A    If we talk amplitude of friction
16 fluctuations from the knot run-down test and from
17 amplitude of friction fluctuations from the
18 suture-on-suture test, we just took the ratio as
19 their average.
20    Q    Let me back up.  You say the variation
21 in amplitude.  Are you saying from each high point
22 to each low point in each test you calculated it,
23 or --
24    A    No, no, no.  We calculated not each and
25 every point, but we calculated the average

67 (Pages 262 to 265)

266

1 amplitude of fluctuations.
2    Q    Average amplitude of fluctuations. I
3 don't understand what you mean.
4    A    It consists of each and every point, but
5 for the sake of Table 5, we talk only average from
6 Figure 11 and average from Figure 8.
7    Q    Are you saying you took the average from
8 Figure 11 --
9    A    Average amplitude. Average amplitude
10 from Figure 8, average amplitude from Figure 11,
11 and we took their average as amplitude for
12 Table 5.
13    Q    So you got the average amplitude for
14 Figure 8 -- wait.
15    A    Yeah, it's true.
16    Q    It's difference in amplitudes, right?
17 Chatter isn't the difference in amplitude?
18    A    No, chatter is amplitude. Chatter is
19 amplitude of fluctuations. So if you look -- for
20 example, let's look at uncoated in Figure 11.
21        Uncoated in Figure 11 has amplitude from
22 about .15 to about .17. It's .02. So amplitude
23 is .02. Are you with me?
24    Q    Are you saying basically you just looked
25 at the graph, you drew a line that was along the

267

1 highest peaks here, and then looked at the line on
2 the bottom and said the amplitude is .02?
3    A    Yes.
4    Q    How did you know where to draw the line?
5 Like the beginning part goes down the curve. Did
6 you omit that part?
7    A    You don't really do it manually on the
8 plot. You do it in the computer automatically,
9 and --
10    Q    Let me back up. Did the computer
11 generate the values, or did you calculate them or
12 get them from the graph for chatter?
13    A    Amplitude of fluctuations is
14 automatically produced by the computer.
15    Q    By the computer, okay. Is that shown in
16 the --
17    A    Unfortunately not because secondary
18 parameters. The recorded data in our software is
19 only the original data, like force displacement,
20 but what you calculate, statistical analysis,
21 unfortunately, is not recorded.
22    Q    Is it gone?
23    A    Yeah.
24    Q    You don't have it anymore?
25    A    So this is what you have table for.

268

1    Q    Is there some computer program that's in
2 the machine that generates the difference in the
3 amplitude for the Figure 8 and Figure 11 curves?
4    A    Yes.
5    Q    Can you tell me the math that is used to
6 do that?
7    A    The math will calculate the amplitude --
8    Q    I mean, does it figure the average high
9 point and the average low point, and then take the
10 difference between the two, or does it take each
11 high point with the next low point and take those
12 differences and average them, or how does it work?
13        MR. TAMBURO: Objection, vague.
14        THE WITNESS: Can you please repeat?
15        BY MR. BONELLA:
16    Q    Sure. One thing you could do, I just
17 don't understand how the computer is doing this.
18 One thing you could do is you could take this high
19 point to the next low point, high point to low
20 point, and you figure out that difference for each
21 time and average them; or you can figure out what
22 the high point was, the average high point and the
23 average low point, and take the difference between
24 those two.
25    A    Yes.

269

1    Q    Or there could be some other way you
2 could do this. I don't know.
3    A    Yeah, I do not remember. I'm sorry.
4    Q    You don't know?
5    A    No.
6    Q    How about for determining it from the
7 other figure, Figure 08, do you know how that was
8 done?
9    A    Same thing.
10    Q    If you look at the Table 5 chatter
11 data --
12    A    Yes.
13    Q    Do you know why sample 6 had a chatter
14 data value of 0.012 for coated, which was greater
15 than the uncoated suture chatter data value? Do
16 you know why?
17        MR. TAMBURO: Objection, calls for
18 speculation.
19        THE WITNESS: Your question is
20 whether -- I see it here. Yes, I see it.
21        BY MR. BONELLA:
22    Q    Yeah. That's saying sample 6, coated,
23 got a greater chatter value than sample 6,
24 uncoated.
25    A    Yes, I see it, yeah.

68 (Pages 266 to 269)

270

1    Q    Can you explain why?
2    A    No, I cannot.
3    Q    The next test is the tissue drag tests,
4 right?
5    A    Yes.
6    Q    It says two types of tests were
7 performed, dragging the suture through the hole
8 made with a needle, and dragging the suture
9 between two tightly clamped pieces of leather.
10   A    Yes.
11   Q    In both cases, the upper end of the
12 suture was attached to the UMT upper bracket,
13 providing the well controlled motorized dragging
14 action. Do you see that?
15   A    Yes.
16   Q    Do you see the curves in Figure 13?
17   A    Yes.
18   Q    Are those for the tests for dragging the
19 suture through the hole made with the needle? Are
20 those for the tests of dragging the suture between
21 two tightly clamped pieces of leather?
22   A    These curves are result of needle.
23   Q    Are what?
24   A    In the case -- in the second case,
25 without the needle.

271

1    Q    So Figure 13 is a tissue drag test
2 without the needle test?
3    A    Correct.
4    Q    How about the Table 6 data?
5    A    Same thing.
6    Q    Where is the results of the tissue drag
7 with the needle?
8    A    We did not present them because average
9 was the same.
10   Q    So you did the tissue drag tests with
11 the needle, you just didn't present the results?
12   A    We started doing with the needle, then
13 we switched to the clamp, we found no difference,
14 and we continued with the clamp.
15   Q    Yeah, okay. You did it with the needle,
16 you didn't present the results. Do you still have
17 the results?
18   A    No, we do not.
19   Q    What happened to them?
20   A    We did not save them. I assume we
21 overwrote the test file with the data from the
22 clamp.
23   Q    You overwrote -- you just said -- you
24 just said you did the clamp first and the
25 needle --

272

1    A    No, no, we started from the needle, then
2 we decided to switch to just clamp and get rid of
3 the needle, and we found results are the same, so
4 we discarded needle and proceeded only with
5 clamping the suture between two pieces of leather.
6    Q    Do you have any results at all from the
7 needle testing that we can look at to assess your
8 statement that the results were the same?
9    A    No, we do not have.
10   Q    The test with the needle, let's do
11 the -- I'm sorry, let's do the clamp test first.
12 If I can call it the clamp test, is that okay, the
13 tissue drag clamp test?
14   A    Uh-huh.
15   Q    So that was done by clamping a suture
16 between two pieces of leather; is that right?
17   A    Yes.
18   Q    And how is the tension controlled on the
19 clamp?
20   A    I'm sorry, which tension?
21   Q    The clamping the suture between two
22 pieces of leather, right?
23   A    Yeah.
24   Q    And the clamp is a metal clamp with a
25 nut and bolt, right?

273

1    A    Yes.
2    Q    How are you controlling the tension or
3 the forces that are applied by the clamp
4 controlled by the nut and the bolt?
5    A    We didn't control it.
6    Q    You didn't control it, okay.
7        Now, so the suture is sandwiched, if you
8 will, between two pieces of leather, right?
9    A    That's correct.
10   Q    And then the upper part of the suture is
11 pulled; is that right?
12   A    Pulled up, yeah.
13   Q    And you used a 20 millimeter gauge
14 length, right?
15   A    Yes.
16   Q    So is that the same for all samples?
17   A    Is the same?
18   Q    Was the 20 millimeter length the same
19 for all samples for the clamp tissue drag?
20   A    Yes.
21   Q    And you did this test by pulling a
22 constant rate. You did the tissue drag clamp test
23 by pulling at a constant rate of 1 millimeter per
24 second?
25   A    Yes.

69 (Pages 270 to 273)

# EXHIBIT 11

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-o-

DEPUY MITEK, INC., a             :
Massachusetts Corporation,          Civil Action No.
                                 :  04-12457 PBS
              Plaintiff,

                                 :

-vs-

                                 :

ARTHREX, INC., a Delaware
Corporation, and PEARSALLS       :  EXPERT DEPOSITION OF:
LTD., a Private Limited
Company of the United            :  ROBERT T. BURKS, M.D.
Kingdom,

                                 :

          Defendants.

                        -o-


          Location:        Mariott University Hotel

                           Salt Lake City, Utah


          Date:            June 7, 2006

                           3:00 p.m.


          Reporter:        Denise Kirk, CSR/RPR



                        -o-

74

1    A.    I would say it was probably 45 minutes
2 plus ten minutes.
3    Q.    Did you tie knots in each of the
4 individual five sutures from suture A and suture B?
5         MR. TAMBURO: Objection, asked and
6 answered.
7    A.    Yes.
8    Q.    After you performed the tactile feel
9 analysis and knot tie-down, as reflected in Exhibit
10 232, what did you do with the sutures that you tested?
11    A.    I pitched them with the spools.
12    Q.    You threw them out?
13    A.    Yes.
14    Q.    Did counsel ever instruct you to not throw
15 away the samples?
16    A.    No.
17    Q.    Did counsel give you any instructions at
18 all what to do with the samples once you performed the
19 tests on them?
20    A.    No.
21    Q.    Did you throw them away at home or at the
22 office?
23    A.    At home.
24    Q.    And then once you completed the tactile
25 feel analysis and knot tie-down analysis and once you

75

1 threw away the sutures, what did you do next?
2    A.    Well, as it regards this, I sent an e-mail
3 to Sal and said here's what I thought.
4    Q.    Do you have a copy of that e-mail?
5    A.    Nope.
6    Q.    What did you do with the e-mail that you
7 sent to Sal after you concluded the tests?
8    A.    What did I do with the e-mail? I didn't do
9 anything with the e-mail. I hit "send".
10    Q.    It's still on your computer?
11    A.    I would doubt it's on the computer. I
12 mean, just due to the volume, they don't keep three
13 months or four months or whatever.
14    Q.    Did you send it from work or home, the
15 e-mail?
16    A.    I don't know for sure.
17    Q.    You don't know for sure?
18    A.    No.
19    Q.    Did you delete the e-mail you sent to Sal
20 after you finished performing the tests?
21    A.    I'm not sure I understand deleting the
22 e-mail. I sent him an e-mail. I didn't purposefully
23 delete any e-mail.
24    Q.    Do you use Microsoft Outlook for your
25 e-mails?

76

1    A.    No.
2    Q.    What program do you use for your e-mails?
3    A.    At home it's a Comcast e-mail and then
4 here it's a Group-Wise.
5    Q.    But do you use -- what e-mailing system do
6 you use at home? Is it AOL or Lotus Notes or
7 Microsoft Outlook or a Yahoo account?
8    A.    It's a Comcast.
9    Q.    That's done on a personal computer?
10    A.    Yes.
11    Q.    What about in the office? What kind of
12 e-mailing system do you use?
13    A.    We call it Group-Wise.
14    Q.    Is the e-mail account you have at home
15 different than the one you have at the office?
16    A.    Uh-huh.
17    Q.    Did you look for the e-mail in response to
18 the subpoena, Exhibit Number 231?
19    A.    Yes. The e-mail -- I mean, my awareness
20 of the e-mails is that they go back two or three weeks
21 or so and then after that they just go into
22 cyberspace.
23    Q.    So you did not look for the e-mail in
24 response to the subpoena, Exhibit 231?
25    A.    No, because that was like three months

77

1 ago.
2    Q.    When you say the e-mails go back two or
3 three weeks and then go into cyberspace, you are
4 referring to work e-mail or your home e-mail?
5    A.    Well, primarily, I guess I'm referring to
6 the work one. I don't use the home as much. So I
7 don't. . .
8    Q.    Do you remember what the e-mail said that
9 you wrote to Sal after you performed the tests in
10 Exhibit 232?
11    A.    Pretty much what's in here. I just said,
12 you know, sample A to me felt this way compared to
13 sample B.
14    Q.    Felt -- what word did you use to describe
15 how suture A felt in relationship to suture B?
16    A.    I don't remember specifically but, I mean,
17 I probably used a word like "smoother".
18    Q.    But you are not sure?
19    A.    I'm not sure of the word.
20    Q.    Did Sal send an e-mail back to you once
21 you sent him the e-mail after completing the tests in
22 Exhibit 232?
23    A.    Not that I remember specifically.
24    Q.    When was the next time you spoke to Sal
25 after sending the e-mail on which you completed the

20 (Pages 74 to 77)

# EXHIBIT 12

DR. NORM GITIS

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

- - -

DePUY MITEK, INC., a        : CIVIL ACTION
Massachusetts Corporation,  :
            Plaintiff       :
                            :
     vs.                    :
                            :
ARTHREX, INC., a Delaware   :
Corporation and PEARSALLS   :
LIMITED, a Private Limited  :
Company of the United       :
Kingdom,                    :
            Defendants      : NO. 04-12457 PBS

- - -

Video Taped Deposition of

DR. NORM GITIS, was taken pursuant to notice

at the Law Offices of Woodcock Washburn, 2929

Arch Street, Philadelphia, Pennsylvania, on

Wednesday, July 18, 2007, beginning at 9:00

a.m., before Jeanne Christian, Court

Reporter-Notary Public, and Robert Higham,

Video Tape Operator, there being present.

- - -

APPEARANCES:

        WOODCOCK WASHBURN
        BY:  MICHAEL J. BONELLA, ESQUIRE
        2929 Arch Street, 12th Floor
        Philadelphia, Pennsylvania 19104
        Phone:  (215) 568-3100
        Representing the Plaintiff

DR. NORM GITIS

| | Page 2 |
|---|---|
| 1 | APPEARANCES CONTINUED: |
| 2 | DICKSTEIN SHAPIRO |
| | BY: SALVATORE P. TAMBURO, |
| 3 | ESQUIRE |
| | 1825 Eye Street NW |
| 4 | Washington, DC 20006 |
| | Phone: (202) 420-5164 |
| 5 | Representing the Defendants |

Page 4

1           THE VIDEO TAPE OPERATOR:
2   We are on the record. This is a video tape
3   deposition for the United States District
4   Court for the District of Massachusetts. My
5   name is Robert Higham. I am the video tape
6   operator. I am employed by Veritext. The
7   court reporter is Jeanne Christian.
8         The caption for today's
9   case is as follows: DePuy Mitek versus
10   Arthrex, Incorporated; Civil Action Number
11   04-12457.
12         This deposition is being
13   taken on behalf of the Plaintiff at the law
14   offices at 2929 Arch Street, Philadelphia,
15   Pennsylvania.
16         At this time, I will ask
17   counsel to identify themselves for the
18   record.
19         MR. BONELLA: Michael
20   Bonella, Dianna Elderkin and Eric Falke for
21   the Plaintiff, DePuy Mitek.
22         MR. TAMBURO: Salvatore
23   Tamburo for Defendants Arthrex, Inc. and
24   Pearsalls Limited.
25         THE VIDEO TAPE OPERATOR:

Page 3

1           I N D E X
2           - - -
3   DR. NORM GITIS
4   EXAMINATION      PAGE
5
6   BY MR. BONELLA    5
7
8           - - -
9        E X H I B I T S
10         - - -

| 11 | EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|---|
| 12 | 585 | Dr. Brookstein's Report | 41 |
| 13 | 586 | E-Mail | 52 |
| 14 | 587 | Document | 52 |
| 15 | 588 | Document | 75 |
| 16 | 589 | Printout | 78 |
| 17 | 590-591 | Plots | 81 |
| 18 | 592 | Drawing | 89 |
| 19 | 593 | Graph | 107 |
| 20 | 594-597 | Data | 116 |
| 21 | 598-603 | Invoices | 121 |
| 22 | 604 | E-Mail | 123 |
| 23 | 605 | E-Mail | 126 |
| 24 | 606 | E-Mail | 127 |
| 25 | | | |

Page 5

1   The deponent today is Doctor Norm Gitis.
2   Today's date is July 18, 2007. The camera
3   time is 9:24.
4         The reporter will now swear
5   in the witness.
6         - - -
7         DR. NORM GITIS, after
8   having been first duly sworn, was examined and
9   testified as follows:
10         - - -
11         EXAMINATION
12         - - -
13   BY MR. BONELLA:
14   Q.  Good morning, Doctor Gitis.
15   A.  Good morning.
16   Q.  I show you DePuy Mitek Exhibit 581,
17   subpoena to you.
18         Have you seen that before?
19   A.  I saw -- I believe I saw only the first
20   part of it, not the attachment.
21   Q.  The attachment being the Complaint?
22   A.  Yes, Amended Complaint, I didn't see.
23   Q.  Did you see Page -- it is Page 2. It is
24   Schedule A. It is the fourth page of the
25   document, but it is labeled Page 2.

DR. NORM GITIS

Page 6

1    A.   Yes.
2    Q.   Where it lists -- the next page after
3    that. There you are.
4         Do you see where it says
5    document requests and it has a list?
6    A.   Yes, sir.
7    Q.   Did you review those?
8    A.   Yes, I did.
9    Q.   What did you do to search for documents
10   that were requested?
11        MR. TAMBURO:  Excuse me.
12   I'm just going to object to the extent that
13   Defendants have already notified Plaintiffs,
14   Plaintiff that there are objections to certain
15   of these requests, and I will just -- for
16   example, you know, some of them are overbroad,
17   they go to subject matter covered by the first
18   deposition of Doctor Gitis, and some of them
19   go to subject matter that is outside of the
20   scope of the deposition, according to the
21   Court's order.
22        So I'm not going to go into
23   detail about which is -- which request is
24   outside the scope, I don't want to take that
25   time now, but I'm just going to say for the

Page 7

1    record that some of these are overbroad and
2    improper and outside the scope of the Court's
3    order.
4         MR. BONELLA:  Are you
5    withholding any documents based on relevance
6    or breadth of the request?
7         MR. TAMBURO:  Are you
8    asking me?
9         MR. BONELLA:  Yes.
10        MR. TAMBURO:  There is one
11   document that I think is outside of the scope.
12        MR. BONELLA:  That you are
13   withholding?
14        MR. TAMBURO:  Yes.
15        MR. BONELLA:  What is it?
16        MR. TAMBURO:  A document
17   that goes directly to the virus.
18        MR. BONELLA:  It goes
19   directly to the virus, and you are withholding
20   it?
21        MR. TAMBURO:  Yes.
22        MR. BONELLA:  Who is it
23   authored by?
24        MR. TAMBURO:  Not the
25   witness.

Page 8

1         MR. BONELLA:  Counsel?
2         MR. TAMBURO:  Yes.
3    BY MR. BONELLA:
4    Q.   Back to my question, Doctor --
5    obviously, we disagree, and we will resolve it
6    later.
7         Doctor Gitis, what did you
8    do to look for documents that were requested
9    in the subpoena, Exhibit 581?
10   A.   First of all, I want to say that I saw
11   the subpoena only yesterday, so what I did, I
12   printed out all the e-mail communications
13   between our company and the legal office that
14   Sal Tamburo is representing, and also I
15   printed out all the invoices submitted by our
16   company to the legal office in Arthrex.
17   Q.   And you gave all those documents to
18   counsel?
19   A.   Yes.
20   Q.   Were there any -- did you have any
21   documents related to your investigation
22   surrounding your expert report that detailed
23   your work or analysis regarding your
24   investigation, other than the e-mails and the
25   invoices?

Page 9

1         MR. TAMBURO:  Objection.
2    Which expert report?
3         MR. BONELLA:  Any expert
4    report.
5         THE WITNESS:  We also had
6    the reports themselves.
7    BY MR. BONELLA:
8    Q.   Besides reports themselves, but any
9    documentation, work you did, either while you
10   were doing your investigation, notes, or work
11   you did to figure out what -- about a virus or
12   the effects of a virus or any documents, notes
13   you made or the gentlemen that work with you
14   made?
15   A.   Also, one more thing we have raw data
16   from our tests, one CD we submitted to you
17   last year, and another CD we submitted to
18   counsel recently.
19   Q.   In addition to those that you have
20   already identified, are there any notes or
21   work or details of the work that you --
22   surrounding your investigation regarding your
23   expert report and the work that you and the
24   gentlemen you work with did to try to
25   investigate any issues with your expert

3 (Pages 6 to 9)

DR. NORM GITIS

Page 10

1  report? Did you guys keep any work and any
2  documents that document any work you did?
3  A.  No, there are no more documents.
4  Q.  Have you had any communications with
5  Doctor Muckergie since the last time you were
6  deposed?
7  A.  I don't remember having any
8  communications with him afterwards.
9  Q.  Have you had any communications with
10  anyone from Arthrex since the last time you
11  were deposed?
12  A.  No, I don't remember having any
13  communications with Arthrex.
14  Q.  Have you had any communications with
15  anyone from Pearsalls since the last time you
16  were deposed?
17  A.  I have never had any communications with
18  Pearsalls.
19  Q.  Have you had any communications with a
20  Doctor Burks since the last time you were
21  deposed?
22  A.  No, I haven't.
23  Q.  Have you had -- other than counsel, have
24  you had any communications with anyone
25  connected with this litigation since the last

Page 11

1  time you were deposed?
2  A.  In addition to counsel, I also had
3  communication -- had one or two phone calls
4  with another lawyer, Jack --
5  Q.  Mr. Zaber?
6  A.  Yes, yes.
7  Q.  Other than Mr. Tamburo and Mr. Zaber and
8  people who you work with, have you had any
9  communications with anyone connected with this
10  litigation since the last time you were
11  deposed?
12  A.  No, I haven't.
13  Q.  How about the gentleman who took the
14  photomicrographs that are in your expert
15  report? Have you had any communications with
16  him since the last time you were deposed?
17  A.  Sorry, what micrographs?
18  Q.  The pictures of the sutures in your
19  expert report? Do you remember those?
20  A.  You mean SEM photographs or our
21  photographs?
22  Q.  The photographs, right, in your expert
23  report?
24  A.  No, no communications.
25  Q.  So you have had no communications with

Page 12

1  the people who took the photographs that are
2  in your expert report?
3  A.  No.
4  Q.  Let me just clean that up.
5      You have had no
6  communications with the people who took the
7  photographs in your expert report since your
8  last deposition?
9  A.  I'm sorry. Are you talking about
10  photographs or SEM photos? The kind you get
11  with microscope or just photos of the
12  sutures?
13  Q.  Let me show you your expert report,
14  Exhibit 381.
15      MR. TAMBURO:  I'm just
16  going to object to the extent this questioning
17  goes to something other than supplementation
18  of this report per the Court's order.
19  BY MR. BONELLA:
20  Q.  If you turn to Page 14 and 15?
21  A.  Yes, SEM photos.
22  Q.  Right.
23      Have you had any
24  communications with the folks who took those
25  SEM photos since your last deposition?

Page 13

1  A.  I believe that we requested them to do
2  another SEM photo for completely different
3  case, completely unrelated to this, and we
4  have not had with them any communications on
5  this case.
6  Q.  What is a typographical error, in your
7  mind?
8      MR. TAMBURO:  Objection,
9  vague.
10      THE WITNESS:  What is a
11  typographical error?
12      MR. TAMBURO:  Objection to
13  the extent the witness is being asked to
14  interpret the Court's order.
15      THE WITNESS:  What is a
16  typographical error? In general, we have to
17  look at the dictionary.com, but I believe that
18  typographical error is when a letter or a
19  number or several letters or numbers are typed
20  wrongly.
21  BY MR. BONELLA:
22  Q.  So as a general statement, would you say
23  a typographical error is when you intend to
24  type one thing, but you type something else
25  instead?

Page 14

1          MR. TAMBURO: Objection,
2   vague.
3          THE WITNESS: I believe it
4   is a good definition.
5   BY MR. BONELLA:
6   Q.   How about a calculation error?  What
7   would you consider a calculation error to be?
8   A.   Calculation error when result of
9   calculations does not correspond to the
10  correct commonly accepted calculation methods.
11  Q.   Kind of like a math error, an addition,
12  subtraction error, something like that would
13  be an example of a calculation error?
14  A.   Yes.
15  Q.   I show you DePuy Mitek Exhibit 582.  I
16  ask you if you recognize that.
17  A.   Yes, that's my October supplemental
18  report.
19         MR. TAMBURO:  I'm going to
20  object to the extent this report is not part
21  of the scope of this deposition, and depending
22  on the questions, we may have a big problem
23  today.
24         MR. BONELLA: Are you
25  representing that Arthrex is in no way relying

Page 15

1   on the report, the October report, Exhibit
2   582?
3          MR. TAMBURO:  Are you
4   asking me?
5          MR. BONELLA: Yes.
6          MR. TAMBURO:  Yes, we have
7   previously said that.
8   BY MR. BONELLA:
9   Q.   Let me show you DePuy Mitek Exhibit
10  583. I ask you if you recognize that.
11  A.   Yes, I do.
12  Q.   And what is Exhibit 583?
13  A.   It is my supplemental test report, dated
14  June 28, 2007.
15  Q.   Does Exhibit 583 contain all the
16  supplements you intend to testify about at
17  trial to your original report?
18  A.   To the best of my knowledge, yes.
19  Q.   Is there anything in your deposition
20  that you didn't know about when I asked you or
21  you were confused about the time or any other
22  mistakes in your original expert report that
23  you intend to talk about that aren't discussed
24  in Exhibit 583?
25  A.   I am sorry.  Very complicated question.

Page 16

1   Q.   Sure.
2          I just want to know if
3   there is anything else you want to change
4   about your deposition or your original expert
5   report, your testimony at your deposition or
6   your expert report, your original one?
7   A.   I'm not changing things.  I'm not
8   changing anything, and I don't want to change
9   anything.
10  Q.   You are saying you didn't make any
11  changes to your original expert report?
12         MR. TAMBURO:  Objection,
13  mischaracterizes his testimony.
14         THE WITNESS:  I -- if you
15  are asking about supplemental test report, it
16  provides more explanations to our last year
17  original report, but if you are asking whether
18  we have any additional supplements, at this
19  point, we don't have any additional
20  considerations, and we are not planning to
21  file any new supplements.
22  Q.   Is there anything you didn't know at
23  your deposition that you want to -- that you
24  have gone back and looked at, and now, you
25  know the answer to those questions?

Page 17

1          MR. TAMBURO: Objection,
2   vague.
3          THE WITNESS: I'm sorry.
4   BY MR. BONELLA:
5   Q.   Do you recall your deposition, I asked
6   you some questions, a lot of questions, and
7   sometimes, you didn't know the answer about
8   the data with the various tests?  And my
9   question to you is, is there any -- have you
10  gone back and looked, and do you know the
11  answer to those questions now?
12  A.   It is possible, yes.
13  Q.   It is possible, but they are not -- not
14  anything that is not in your expert report,
15  Exhibit 583, your supplemental report, is
16  there anything you intend to testify about
17  that you didn't put in there?
18  A.   My supplemental test report answers some
19  of the type of the errors found in the
20  original report, but it does not -- as far as
21  I understand, the goal of the supplemental
22  test report was not to answer all the hundreds
23  of questions that I was asked during the
24  previous deposition.
25  Q.   Did you investigate any of those answers

DR. NORM GITIS

Page 18

1 to -- are there any other questions that I
2 asked where you didn't know the answer at the
3 deposition? Did you investigate those and
4 intend to testify about them at trial?
5 A. I think so.
6 Q. You did? And what other questions do
7 you remember investigating?
8 A. I don't remember at this point of time,
9 but whatever is related to the original test
10 report and to the supplemental test report, I
11 am ready, and I have to testify.
12 Q. So you have additional information that
13 you didn't know at the deposition that's not
14 in your expert -- supplemental expert report?
15 Is that what you are telling me?
16 A. Can you please repeat?
17 Q. Sure.
18        So there were questions
19 that I asked you at your deposition that you
20 didn't know the answer to, right? Regarding
21 the data and the tests, right?
22 A. Yes.
23 Q. And now, you have submitted a
24 supplemental report, Exhibit 583?
25 A. Yes.

Page 19

1 Q. Are there -- is there information that
2 you investigated and found out since the
3 deposition that you have not included in
4 Exhibit 583 that you intend to testify about?
5        MR. TAMBURO: Objection,
6 vague.
7        THE WITNESS: If there are
8 no changes to the original -- if I am under
9 the impressions that I don't have to change
10 the original test report, I believe I don't
11 have to supplement it. So the supplemental
12 test report to my understanding is dealing
13 with substantial modifications, changes,
14 explanations to the original report, but as I
15 -- again, I just can repeat that I did not
16 try to answer all the questions asked me
17 during the deposition in the supplemental
18 report.
19 BY MR. BONELLA:
20 Q. So you do have additional information
21 regarding the questions I asked at the
22 deposition where you didn't know the answer
23 that you have not included in the supplemental
24 expert report?
25 A. Yes.

Page 20

1 Q. Do you know what those items are that
2 you intend to testify about that you haven't
3 included in the supplemental report?
4 A. No, as I said, I cannot think about this
5 right now.
6 Q. If you go to your supplemental report
7 under the section pliability test, do you see
8 that?
9 A. Yes.
10 Q. Exhibit 583, Paragraph 2.1 states: Our
11 March 2006 report erroneously stated that the
12 tests were performed at the continuously
13 increasing load stress at the rate of 0.33
14 KG/S.
15        Do you see that?
16 A. Yes.
17 Q. So if you go to Exhibit 381, the
18 original report?
19 A. Yes.
20 Q. On Page 3?
21 A. Yes.
22 Q. And that original report, you stated
23 that the same pliability tests were done with
24 a uniformly -- I'm sorry -- were performed
25 with a pre-load suture was pulled at a force

Page 21

1 uniformly increasing at the rate of 0.33
2 kilograms per second, right?
3 A. Yes.
4 Q. So that was incorrect in your original
5 report?
6 A. Yes.
7 Q. Was that a typographical error?
8 A. No.
9 Q. Was it a calculation error?
10 A. No.
11 Q. Why in your original report did you
12 think the pliability test was performed by
13 uniformly increasing the load at a rate of
14 0.33 kilograms per second?
15 A. It was some miscommunication between me
16 and the test engineer who conducted the test.
17 I was under the impression that he will do the
18 test at the -- with the continuously
19 increasingly force load, and I did not -- and
20 I did not realize until the deposition, when
21 you pointed it to my attention, that he did
22 the test differently.
23 Q. So you instructed your technician to
24 perform the pliability test with a uniformly
25 increasing load at a rate of 0.33 kilograms

6 (Pages 18 to 21)

DR. NORM GITIS

Page 22

1  per second; is that correct?
2  A.  I instructed him to increase the load
3  the way we did it in order for our large
4  customers like United States Surgical or
5  Ethicon, and we did it, I thought, at the .33
6  kilogram per second rate, but somehow, he
7  decided that the better, the cleaner way, the
8  better way, the more correct way to conduct
9  this test is to increase the extension
10  deformation, and somehow, it got lost in
11  communications.  He said that he told me
12  clearly, and I never remembered him telling me
13  this.
14  Q.  So you instructed your technician to
15  perform the pliability test at a uniformly
16  increasing load rate of 0.33 kilograms per
17  second; correct?
18  A.  Yes.
19  Q.  And your technician did not perform the
20  pliability test in accordance with your
21  instruction; correct?
22  A.  Yes.  He tried to do it better.
23  Q.  Did he communicate that to you before he
24  did the test?
25  A.  He believes he did.

Page 23

1  Q.  So with respect to the pliability test
2  at least, there was miscommunication between
3  you and your technician, and the technician
4  performed the test differently than you
5  intended it to be performed, right?
6  A.  Correct.
7  Q.  Do your technicians have latitude to
8  change the parameters of the tests?
9  A.  Yes.
10  Q.  Did your technicians review your expert
11  reports?
12  A.  I believe he did, and he believes that
13  he just looked at the results, and he didn't
14  pay attention to the details.
15  Q.  So your technician looked at the result
16  -- at the expert report before you signed it?
17  A.  Yes.
18  Q.  And they reviewed the results, but not
19  the description of the test?
20  A.  Yes.  He kind of -- he missed it.  He
21  missed it, and I missed what he believes that
22  he told me that he did it at the increasing
23  rate of extension, and he missed that I
24  actually wrote increasing rate of load.
25  Q.  So he didn't tell you that the

Page 24

1  description of the test was wrong when he read
2  the report?
3  A.  He did not tell me until after the
4  deposition, when I came back to the office and
5  started discussing with him how to -- how
6  exactly the test was conducted.
7  Q.  Did you discuss with your technician --
8  let me back up.
9  Were you really present
10  when this test, pliability test was
11  performed?
12  MR. TAMBURO:  Objection,
13  objection, argumentative.
14  THE WITNESS:  Yes, of
15  course.
16  BY MR. BONELLA:
17  Q.  You were?
18  A.  Yes.
19  Q.  And you didn't know which way he was
20  doing the test, constant increasing force or
21  constant extension?
22  A.  Looks like I didn't pay enough
23  attention.
24  Q.  So, now, in your new expert report,
25  supplemental expert report, Exhibit 583, you

Page 25

1  say the constant extension rate -- the average
2  constant extension rate for all samples was
3  0.113 millimeters per second, right?
4  A.  Yes.
5  Q.  And then you calculated new pliability
6  data for each of the samples on Page 2 based
7  on using that assumption or analysis that he
8  had a constant extension rate?
9  MR. TAMBURO:  Objection,
10  mischaracterizes the document.
11  THE WITNESS:  I am sorry.
12  What is your question?
13  BY MR. BONELLA:
14  Q.  Sure.
15  Paragraph 2, you are saying
16  that the test was performed at a constant
17  extension rate?
18  A.  Paragraph 2.1?
19  Q.  Right, yes.  And then, based on -- let
20  me go ahead to Paragraph 2.2.
21  In Paragraph 2.2, you state
22  that your March report had a typo, stating the
23  suture diameter was 0.65 millimeters, instead
24  of an intended 0.56 millimeters?
25  A.  Yes.

7 (Pages 22 to 25)

DR. NORM GITIS

Page 26

1   Q.   Do you believe that 0.56 millimeters was
2   a typographical error?
3   A.   Likely.
4   Q.   Likely?  Do you have memory of measuring
5   of 0.56 millimeter diameter?
6   A.   At this point, at this second, I don't
7   have exact memory of what we measured, but
8   most likely, it was .56, and there was a typo,
9   and we wrote .65.
10  Q.   Do you recall whether or not when you
11  typed the original expert report whether you
12  intended to type 0.65 or you intended to type
13  0.56?
14  A.   I cannot guarantee for sure.  I believe
15  I meant -- I intended to type 0.56, but I
16  don't have a document to prove it.
17  Q.   I'm not asking what you believe.  I'm
18  asking what you remember.  Either you remember
19  it or you don't remember it.
20       Do you remember, when you
21  typed the report, whether you intended to type
22  the 0.56 or 0.65?
23  A.   I don't remember for sure at this point
24  of time.
25  Q.   And you have no documents that would

Page 27

1   indicate one way or the other?
2   A.   I already said in my original deposition
3   that we didn't keep documents of this
4   measurement.
5   Q.   So in your first report, you are saying
6   now -- your testimony now is that when your
7   first report said 0.65 millimeters in
8   diameter, that was incorrect?
9   A.   Most likely, it was a typo, and most
10  likely, the correct number was 0.56.
11  Q.   Most likely?  Which -- so you really
12  don't know which it was?
13  A.   I do not know for sure.
14  Q.   On Page 2 of your supplemental report,
15  Exhibit 583, you have a pliability test data
16  chart.
17       Do you see that?
18  A.   Yes.
19  Q.   You calculated that new chart?
20  A.   It is not a chart.  It is a table.
21  Q.   Okay, table.
22       You calculated the
23  pliability test table based on the 0.65
24  millimeter diameter?
25  A.   No, no, based on 0.56 millimeter

Page 28

1   diameter.
2   Q.   I'm sorry, I misspoke.
3   A.   The original report of March of last
4   year assumed 0.65 millimeter.  And this
5   supplemental report has Table 1A, which
6   recalculates the original Table 1 with a
7   diameter of 0.56.
8   Q.   And then the knot slippage strength test
9   in Paragraph 3.1 -- I'm sorry.  Before I get
10  to that, did you do any statistical analysis
11  on the data that you have in Table 1A?
12  A.   I did statistical analysis on the
13  original data that I have in Table 1 of the
14  last year report.  I didn't repeat it for
15  Table 1A, which is supplemental report.
16  Q.   And the statistical analysis would not
17  be the same because the data is different,
18  right?
19  A.   Correct.
20  Q.   So you did not do a statistical analysis
21  for the data in Table 1A of Exhibit 583?
22  A.   That is correct.
23  Q.   Your knot slippage strength test, you
24  discuss in Paragraph 3.1 of your supplemental
25  report?

Page 29

1   A.   Yes.
2   Q.   Now, you say your March 2006 report was
3   erroneous in that it stated the test was
4   performed at a constant speed of one
5   millimeter per second; is that correct?
6   A.   Yes.
7   Q.   And now, you say that the analysis of
8   data shows that the test was performed at 0
9   point -- at roughly 0.134 millimeters per
10  second, right?
11  A.   Yes.
12  Q.   And if you go to your original report,
13  Exhibit 381, and you go to the description of
14  the knot slippage strength test on Page 5 of
15  your original report?
16  A.   Yes.
17  Q.   It says:  The parallel rods were then
18  pulled apart at a constant velocity of one
19  millimeter per second in the middle of the
20  paragraph.
21       Do you see that?
22  A.   Yes.
23  Q.   So that was a mistake in your original
24  report?
25  A.   Yes.

8 (Pages 26 to 29)

Page 30

1  Q.  Did you intend to type that when you
2  typed it?
3  A.  It was not a typo.  It was a mistake.
4  Q.  It was not a typo?
5  A.  Not a typo.
6  Q.  And it was not a calculation error?
7  A.  No.
8  Q.  Any other -- so in Exhibit 583, you
9  identify at least three mistakes in your
10  original report, the way at which the
11  pliability test was conducted, the diameter
12  measurement and the speed at which the knot
13  slippage strength test was conducted, right?
14  A.  I don't believe that it was at least
15  three mistakes.  There were just precisely
16  three mistakes.
17  Q.  Well, the pliability test data was then
18  different, right?
19  A.  Yes.
20  Q.  So that would be another difference,
21  right?
22  A.  Yes.
23  Q.  Okay.
24        Other than those, any other
25  mistakes in your original expert report?

Page 31

1  A.  I don't think so.
2  Q.  Now, you did not supplement to discuss
3  the knot run-down tests in your original
4  report?  You didn't have any supplementation
5  regarding those?
6  A.  Correct.
7  Q.  Do you still intend to rely on the knot
8  run-down test at trial and talk about those?
9  A.  Correct.
10  Q.  The friction tests in your original
11  report, do you intend to rely on your original
12  friction test that you did at trial and talk
13  about those?
14  A.  It depends on the counselor.  I don't
15  know where -- I agree to -- I am ready to
16  testify and to rely on all the tests in the
17  original report with the consideration of the
18  supplemental report.
19  Q.  So you think the analysis and the
20  results of the friction test that you
21  presented in your original report, Exhibit
22  381, are satisfactory to present to the jury?
23  A.  Yes.
24  Q.  And you think they are good results and
25  good to rely on, the friction test results in

Page 32

1  your original report?
2  A.  Yes.
3  Q.  How about the chatter data in your
4  original report?  Do you intend to rely on the
5  chatter data and results and tests that you
6  did at trial?
7  A.  Yes.
8  Q.  How about the tissue drag tests that are
9  in your original report?  Do you intend to
10  rely on those at trial?
11  A.  Yes.
12  Q.  I would like to go back to your first
13  report, Exhibit 381, your original report.
14  A.  Yes.
15  Q.  If you turn to Page 17, please?
16  A.  Yes.
17  Q.  Is that your signature on Page 17?
18  A.  Yes.
19  Q.  What does your signature mean when you
20  sign a document such as an expert report?
21        MR. TAMBURO:  Objection.
22  This is just -- I'm sure you asked him this
23  same question.  How is this related to the
24  supplement?
25        MR. BONELLA:  It is related

Page 33

1  to the supplement.
2        MR. TAMBURO:  How is it
3  related to the supplement?
4        MR. BONELLA:  I'm not
5  arguing with my deposition time.  If you want
6  to object, object.
7        MR. TAMBURO:  I'm surely
8  objecting.  This is related to the first
9  deposition, and you had seven hours plus a
10  year ago to ask him these questions.
11        You can answer, if you
12  know.
13        THE WITNESS:  My signature
14  means that I read and agreed with the content
15  of this document.
16  BY MR. BONELLA:
17  Q.  So when you signed Exhibit 381, you
18  thought it was truthful and accurate?
19  A.  Sorry?
20  Q.  So you when you signed Exhibit 381, you
21  thought it was truthful and accurate?
22  A.  Yes.
23  Q.  And it turns out it wasn't, right?
24  A.  What is your definition of truthful?
25  Q.  Well, it had mistakes.

9  (Pages 30 to 33)

DR. NORM GITIS

Page 50

```
1       THE WITNESS: So I -- first
2  of all, it is not that I believed that there
3  was a virus. It is a fact that there was a
4  virus. It is a fact that we had a virus. It
5  is not a belief, but I do not know and I
6  didn't know at that time whether it
7  infiltrated lap computers or what computers
8  have been infiltrated inside the company, I do
9  not know.
10 BY MR. BONELLA:
11 Q.   What was the name of the virus?
12       MR. TAMBURO: Objection.
13 Do not answer, beyond the scope. I instruct
14 him not to answer.
15 BY MR. BONELLA:
16 Q.   When did the virus occur?
17       MR. TAMBURO: Objection.
18 Objection, vague, asked and answered.
19       THE WITNESS: I do not
20 remember for sure, since we opened our office
21 in China, we have had several viruses coming
22 into the system from Chinese communications,
23 and when Chinese -- and I am not sure which
24 virus was in suspicion to penetrate these test
25 results.
```

Page 51

```
1  BY MR. BONELLA:
2  Q.   Tell me all the viruses you had, names
3  of all the viruses you had before April 2006.
4        MR. TAMBURO: Objection.
5  Objection, do not answer. Beyond the scope of
6  this deposition. It is a waste of your time
7  and beyond the Court's order.
8  BY MR. BONELLA:
9  Q.   Can you describe generally how the virus
10 worked?
11       MR. TAMBURO: Objection.
12 Same objection. Instruct him not to answer,
13 since it is beyond the scope of the Court's
14 order.
15       THE WITNESS: I am not an
16 expert in viruses.
17 BY MR. BONELLA:
18 Q.   Isn't it true that there was no virus
19 that affected your data or your report?
20       MR. TAMBURO: Objection,
21 argumentative and beyond the scope of this
22 deposition. And I'm instructing you not to
23 answer.
24 BY MR. BONELLA:
25 Q.   Sitting here today, do you believe you
```

Page 52

```
1  had a virus that infiltrated the data in the
2  report or not?
3        MR. TAMBURO: Same
4  objection. Instructing you not to answer,
5  beyond the scope of the Court's order and the
6  deposition.
7        (Whereupon documents were
8  marked as Exhibit 586 and 587 for
9  identification.)
10 BY MR. BONELLA:
11 Q.   I show you DePuy Mitek Exhibit 586.
12       Do you recognize it?
13 A.   Are you asking me?
14 Q.   Yes. Have you ever seen it before?
15 A.   I have never seen it. I am not among
16 the receipts of this e-mail.
17 Q.   This is an e-mail where your counsel
18 told us that you thought you had a software
19 virus, and it is dated July 24, 2006.
20       Do you see that?
21 A.   Yes.
22 Q.   So as of July 14, 2006, you represented
23 to counsel that you thought you had a software
24 virus that would cause you to redo all your
25 tests?
```

Page 53

```
1        MR. TAMBURO: Objection to
2  the date.
3        MR. BONELLA: July 24,
4  2006, right?
5        MR. TAMBURO: I think you
6  said 14th.
7  BY MR. BONELLA:
8  Q.   As of July 14, 2006, you thought you had
9  a software virus that would cause you to want
10 to redo all your tests; right?
11 A.   That's correct.
12 Q.   And you have no documentation or
13 anything regarding that virus?
14       MR. TAMBURO: Objection,
15 beyond the scope, instructing you not to
16 answer. I am instructing you not to answer.
17 BY MR. BONELLA:
18 Q.   Have you concluded now that the virus --
19 that no virus affected any of your results or
20 data?
21 A.   No, I have not.
22 Q.   You have not concluded that?
23 A.   No.
24 Q.   Are you certain that any test or data
25 was not infected by the virus?
```

14 (Pages 50 to 53)

DR. NORM GITIS

Page 62

1  remember.
2  BY MR. BONELLA:
3  Q.  Let me rephrase it this way.
4  A.  At least first time in writing.
5  Q.  So some time between August 9th and
6  August 28, 2006, is that when you thought
7  there might be a typographical error?
8          MR. TAMBURO:  Objection,
9  mischaracterize testimony, assumes facts,
10 vague.
11         THE WITNESS:  Again, I am
12 sorry, but I did not see the August 9
13 document.  I spent three weeks in Europe in
14 August because of some family circumstances,
15 so I was completely unaware of August 9
16 report, and my declaration of August 28th in
17 my mind was not reactive to the August 9
18 motion of DePuy.
19 BY MR. BONELLA:
20 Q.  So at least this was the first time in
21 writing, though, that you said there might be
22 a diameter -- that's what you said, right?
23         MR. TAMBURO:  Objection.
24 Again, mischaracterizes testimony.
25 BY MR. BONELLA:

Page 63

1  Q.  I will rephrase the question.
2          THE WITNESS:  Some time
3  after -- some time between June and August,
4  2006, I said to the counselors that it looks
5  like we made a typo in the diameter in the
6  original report.
7  BY MR. BONELLA:
8  Q.  Why did you say there appears, as
9  opposed to there is a typographical error in
10 your declaration?  Why did you say appears?
11 Appears is fuzzy.  It may be or it may not.
12 Why did you say appears as opposed to is?
13 A.  Because I don't like to speculate.
14 Q.  You didn't say is, because you didn't
15 want to speculate that, in fact, there was a
16 typo?
17 A.  I was not hundred percent sure that --
18 because I didn't have any document or proof
19 whether it was .56 or .65, but you showed me
20 the table which says that standard has to be
21 between .55 and .59 or whatever, so I saw that
22 probably, probably, it was a typo, but I was
23 not -- I was not hundred percent sure.
24 Q.  The other option is that you guys just
25 measured it wrong, right?  That's possible,

Page 64

1  too, right?
2  A.  It is possible, but unlikely.
3  Q.  Paragraph 9 of your declaration -- I'm
4  sorry, let's go to Paragraph 13.
5          You said you found
6  inconsistencies with the friction testing data
7  collected.  The calculations for friction
8  co-efficient appeared to be correct for
9  samples and incorrect for others.  My initial
10 belief was the only reasonable explanation for
11 the intermittent miscalculations was a
12 computer malfunction possibly caused by a
13 virus as described below, as is still my
14 belief.
15         What inconsistencies did
16 you find?
17         MR. TAMBURO:  Objection,
18 beyond the scope, instructing you not to
19 answer.
20         MR. BONELLA:  Instructing
21 him not to answer the inconsistencies found in
22 the friction data?
23         MR. TAMBURO:  Yes.  It is
24 not part of his supplemental test and beyond
25 the scope of the deposition according to the

Page 65

1  Court's order.
2  BY MR. BONELLA:
3  Q.  Do you plan on testifying about any
4  inconsistencies, if you are asked at trial, in
5  the friction data?  Do you plan on explaining
6  them?
7          MR. TAMBURO:  Objection.
8  When you say asked, do you mean on direct or
9  cross?
10         MR. BONELLA:  Either.
11         MR. TAMBURO:  He can't
12 anticipate what is going to be asked of him.
13 BY MR. BONELLA:
14 Q.  If you are asked about the
15 inconsistencies in your friction data at
16 trial, do you plan on explaining what the
17 inconsistencies were and how you found them?
18         MR. TAMBURO:  Objection.
19 Those questions are going to be beyond the
20 scope during trial, too.
21         MR. BONELLA:  Are you
22 saying you are not relying on friction tests?
23         MR. TAMBURO:  We are saying
24 those questions -- I'm not saying that.  I'm
25 saying those questions you just asked are

DR. NORM GITIS

Page 66

1  beyond the scope.
2           MR. BONELLA:  How are they
3  beyond the scope?  How can they he beyond the
4  scope?
5           MR. TAMBURO:  Friction test
6  is in his first report, and it is not in his
7  supplemental report.  This deposition is
8  regard to the supplemental report.
9           MR. BONELLA:  So you are
10  instructing him not to answer questions
11  regarding inconsistencies he found in the
12  friction test data; is that right?  I will
13  move on, if you are.
14           MR. TAMBURO:  Yes.
15           MR. BONELLA:  So I can't
16  ask any of those questions?
17           MR. TAMBURO:  You have
18  already asked several.
19           MR. BONELLA:  I know, but I
20  want to probe it, and I want to find out what
21  the exact inconsistencies were, what the
22  problems were, and you are instructing him not
23  to answer?
24           MR. TAMBURO:  That's
25  correct, because of the Court's order.

Page 67

1  BY MR. BONELLA:
2  Q.   Do you see Paragraph 14?
3  A.   Yes.
4  Q.   Talking about the loading rate?
5  A.   Yes.
6  Q.   And the pliability test rate?
7  A.   Yes.
8  Q.   You say:  Based upon my subsequent
9  investigation, I have since learned that this
10  issue had nothing to do with data corruption.
11           Do you see that sentence?
12  A.   Yes.
13  Q.   So at one time, did you believe that any
14  issues with the pliability test were due to
15  data corruption, and then you later learned
16  that it wasn't data corruption, it was
17  interpreting the data or how the test was run?
18  A.   Not necessarily.  Originally, I was very
19  concerned with the data corruption and
20  friction test, and I suggested that counsel
21  just redo all the tests independently on
22  whether they were good or not, just to have a
23  clean set of tests.  Then when I was told that
24  I have to analyze the data as is, and I have
25  to do more analysis of the data inputted in my

Page 68

1  original report, instead of redoing the tests,
2  then I did the analysis, and this declaration
3  was the result of it.
4  Q.   Did you ever provide specifics regarding
5  the virus that you believe may have infected
6  your system to counsel?
7           MR. TAMBURO:  Objection,
8  beyond the scope, instructing the witness not
9  to answer.
10           MR. BONELLA:  Let's take a
11  break.
12           THE VIDEO TAPE OPERATOR:
13  Off the record.  The time is 10:36.
14           (Whereupon a short break
15  was taken at this time.)
16           THE VIDEO TAPE OPERATOR:
17  Back on the record.  The time is 10:47.
18  BY MR. BONELLA:
19  Q.   Doctor Gitis, I show you an exhibit we
20  marked at your last deposition.  It is Exhibit
21  402.  I think we agreed at your last
22  deposition, at least for your last report,
23  that was the method you used to calculate the
24  stiffness that was in your first report?
25  A.   Yes, sir.

Page 69

1  Q.   Is that correct?
2  A.   Yes.
3  Q.   So did you use this same method to
4  calculate the pliability test data in your
5  supplemental report, Exhibit 583?
6  A.   Yes.
7  Q.   Did you -- so the stiffness, as you
8  calculated it, was basically a function of two
9  parameters, the slope and the diameter of the
10  suture, right?
11  A.   Correct.
12  Q.   Did you use the same slopes of the
13  graphs that you used in your first test --
14  sorry, let me rephrase the question.
15           Are the slopes that you
16  used to generate the pliability data in your
17  first report the same as the slopes that you
18  used to generate the pliability data in the
19  second report?
20  A.   Yes.
21  Q.   Do you have any written documentation as
22  to what those slopes were?
23  A.   No.  I have only you -- I'm sorry.  In
24  April or May of last year, we presented all
25  the plots.  Originally in March, we presented

18 (Pages 66 to 69)

DR. NORM GITIS

## Page 118

1  for all eight specimens.  In the knot slippage
2  strength test, I just compared first and
3  eighth.
4  Q.   And your plot showed the length going
5  down over time?
6  A.   Yes.
7  Q.   Knot slippage strength, you were
8  measuring that when it slides, you are
9  measuring the friction between the sutures on
10  itself as it slides before it failed?
11        MR. TAMBURO:  Objection,
12  vague.
13        THE WITNESS:  Yes.
14  Friction in the vertical direction.
15  BY MR. BONELLA:
16  Q.   Surface friction of the suture?
17  A.   Yes.
18        MR. BONELLA:  Sal, he, at
19  his last deposition, did not know what certain
20  data was in the columns represented in his
21  knot run-down test, his friction test.  He
22  didn't know how the chatter tests were
23  calculated, T was calculated, and he didn't
24  know some things with the tissue drag test.
25        Are you going to object to

## Page 119

1  him answering those questions?  Are you going
2  to instruct him not to answer?
3        MR. TAMBURO:  First off, I
4  disagree with your characterization.
5        MR. BONELLA:  I can give
6  you an example.
7        MR. TAMBURO:  Well, we are
8  going to disagree, believe me, no matter what
9  your example is, but I don't know -- all I
10  know is, the Court said what this deposition
11  is about.  That's all I know.  And we are
12  complying with that.  And if you ask him
13  questions outside the scope, I'm going to
14  object.
15        MR. BONELLA:  Well, I want
16  to get your opinion on whether it is or not,
17  because --
18        MR. TAMBURO:  Yes,
19  everything you just mentioned is outside the
20  scope, and I will instruct him not answer,
21  correct.
22        MR. BONELLA:  So, for
23  example, in the -- I will give you an example.
24        MR. TAMBURO:  Again, it
25  depends on the question, but generally, yeah,

## Page 120

1  it is outside the scope.
2        MR. TAMBURO:  So on the
3  friction test, I asked him what the F sub F
4  column was, and his answer was:  I'm sorry,
5  like last time, I don't know.
6        So I would like to ask him
7  what that column represents.  Are you
8  instructing him not to answer that type of
9  question?
10        MR. TAMBURO:  I am
11  following the Court's order.  It is outside
12  the scope.
13        MR. BONELLA:  Are you going
14  to instruct him not to answer that type of
15  question?
16        MR. TAMBURO:  Yes.
17        MR. BONELLA:  So the
18  chatter data, for example, the chatter data,
19  he didn't know how it was calculated.  Are you
20  going to instruct him not to answer that?
21        MR. TAMBURO:  Defendants
22  disagree with your characterization of his
23  testimony, and we will instruct him not to
24  answer, because it is outside the scope of the
25  Court's order for this deposition, yes.

## Page 121

1  Again, depending on the question.  If you ask
2  him generally, yes, we are going to instruct
3  him not to answer, but if you have specific
4  questions that are not objectionable --
5  BY MR. BONELLA:
6  Q.   How did the computer generate the
7  chatter values in your first report?
8        MR. TAMBURO:  Objection,
9  outside the scope, instruction not to answer.
10        MR. BONELLA:  Are you
11  instructing him not answer?
12        MR. TAMBURO:  Yes.
13        MR. BONELLA:  Let's take a
14  break.
15        THE VIDEO TAPE OPERATOR:
16  Off the record.  The time is 12:11.
17        (Whereupon a short break
18  was taken at this time.)
19        THE VIDEO TAPE OPERATOR:
20  Back on the record.  The time is 12:17.
21        (Whereupon documents were
22  marked as Exhibits 598 to 603 for
23  identification.)
24  BY MR. BONELLA:
25  Q.   Doctor Gitis, I would like to show you

DR. NORM GITIS

Page 130

1        MR. TAMBURO: Objection.
2  The response to that may call for information
3  that's outside the scope of this deposition,
4  and for that reason, I am instructing him not
5  to answer to the extent it calls for
6  information that does not go to a supplement.
7  You can answer.
8        THE WITNESS: So I am --
9        MR. BONELLA: Are you
10 instructing him not to answer or are you
11 saying he can answer? You gave him both
12 instructions.
13       MR. TAMBURO: I'm sorry.
14 Let me make myself a little more clear.
15       The answer would require --
16 may require information that is outside the
17 scope of the Court's order for this
18 deposition.
19       MR. BONELLA: He doesn't
20 know what that is.
21       MR. TAMBURO: Therefore, to
22 the extent it does require disclosure of
23 information that's outside the scope of this
24 deposition, I instruct you not to answer. To
25 the extent it is within, go ahead and answer.

Page 131

1        MR. BONELLA: How does he
2  know what that is?
3        MR. TAMBURO: He read the
4  order before we got here today.
5  BY MR. BONELLA:
6  Q.   Do you understand the Court's order?
7  A.   I understand it -- I believe I
8  understand it. I am not an expert in
9  understanding Court orders, but I was told to
10 be prepared today to discuss my supplemental
11 report. And I am not prepared at all to
12 discuss the original report, which you already
13 had the pleasure -- which I already had the
14 pleasure to discuss with you last year.
15 Q.   I just want to know if there is anything
16 you want to -- anything additional that you
17 didn't put in your supplemental report that
18 you want to change about the original report
19 or anything at your deposition last year that
20 you want to change or add to your testimony,
21 things you didn't know, is there anything that
22 you know today that you want to add that you
23 didn't know then or anything you want to
24 change from your report or your testimony or
25 your prior deposition?

Page 132

1        MR. TAMBURO: Same
2  objection.
3        THE WITNESS: I just want
4  to go home, so I don't have anything
5  additional. I am not volunteering to offer
6  any changes to my own reports.
7  BY MR. BONELLA:
8  Q.   How about your deposition of last year?
9  Is there anything additional you want to
10 comment on, things you didn't know then that
11 you know now that aren't in your supplemental
12 report?
13       MR. TAMBURO: Same
14 objection. To the extent it is beyond the
15 scope of the deposition, I instruct you not to
16 answer.
17       THE WITNESS: I am not
18 sorry, I am not prepared, not prepared to add,
19 to modify anything to the deposition.
20       MR. BONELLA: Subject to
21 our disagreement about the scope of the
22 deposition, we will obviously discuss that
23 going forward and take it up by motion, if
24 necessary, I think we are done.
25       MR. TAMBURO: Okay, no

Page 133

1  questions.
2        THE VIDEO TAPE OPERATOR:
3  Going off the record. The camera time is
4  12:30. That completes this video tape
5  deposition.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT 13

AO 88 (11/91) Subpoena in a Civil Case

# United States District Court

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

DePuy Mitek, Inc.,
    a Massachusetts Corporation

           **Plaintiff,**

              V.

Arthrex, Inc.,
    a Delaware Corporation and

Pearsalls Ltd.,
    A Private Limited Company
    of the United Kingdom,

          **Defendants.**

### SUBPOENA IN A CIVIL CASE in the United States District Court for the District of Massachusetts

### Case Number: 04cv12457 PBS

TO:    Norman Gitis
        1715 Dell Avenue
        Campbell, CA 95008 USA

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.  The deposition will be recorded by stenographic means and recorded by video and audio tape, and by instant visual display of the stenographic record.

| PLACE OF DEPOSITION<br>Dickstein Shapiro Morin & Oshinsky LLP<br>2101 L Street NW<br>Washington, D.C. 20037-1526 USA | DATE AND TIME | June 21, 2006 at 8:00 a.m. |
|---|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the documents and things set forth in Schedule A attached hereto at the place, dates, and time specified below:

| PLACE<br>Dickstein Shapiro Morin & Oshinsky LLP<br>2101 L Street NW<br>Washington, D.C. 20037-1526 USA | DATE AND TIME | June 13 and 21, 2006 at 8:00 a.m. |
|---|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (ATTORNEY FOR PLAINTIFF)<br>*[signature]* | DATE<br>6/8/06 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Lynn Malinoski, Woodcock Washburn LLP, One Liberty Place, 46th Floor, Philadelphia, Pennsylvania 19103, 215-568-3100

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

AO 88 (11/91) Subpoena in a Civil Case

---

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| **SERVED** | | |
| SERVED ON (PRINT NAME) | | MANNER OF SERVICE |
| SERVED BY (PRINT NAME) | | TITLE |

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

DATE

Signature of Server

Address of Server

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

© PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for depositions, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the material or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
(I) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place

more than 100 miles from the place where that person resides, is employed

or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(b)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or
(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden.
(B) If a subpoena
(I) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## Schedule A

Pursuant to Rule 45 of the Federal Rules of Civil Procedure and the Local Rules

of the District of Massachusetts, Plaintiff DePuy Mitek, by and through its counsel, will

take the deposition upon oral examination of Norman Gitis beginning on June 21, 2006 at

8:00 a.m. at the offices of Dickstein Shapiro Morin & Oshinsky LLP, 2101 L Street NW,

Washington, D.C. 20037 USA. The deposition will be conducted before an officer

authorized by law to administer oaths and will be recorded by stenographic and video

means. The deposition will proceed from day to day, weekends and federal holidays

excluded, until completed.

## Instructions and Definitions

1.      DePuy Mitek has sued Arthrex in the United States District Court for the

District of Massachusetts for Arthrex's infringement of U.S. Patent No. 5,314,446. A

copy of DePuy Mitek's Amended Complaint is attached as Exhibit 1.

2.      "Arthrex" means Arthrex, Inc. and includes each of its predecessors,

successors, subsidiaries, divisions, and departments.

3.      "FiberWire" means each Arthrex suture that is or have been sold under the

tradenames FiberWire or TigerWire.

4.      "Concerning" means referring to, relating to, commenting upon,

evidencing or embodying.

5.      "Communication(s)" means any transmission of information by one or

more persons or between two or more persons by any means including, but not limited to,

emails, telephone conversations, letters, telegrams, teletypes, telexes, telecopies,

computer linkups, written memoranda, and face-to-face conversations.

1

6.    "You" means Norman Gitis.

## Schedule A: Documents To Be Produced

**Request No. 1**

All documents that describe the test procedures used to test the FiberWire samples as described in Dr. Gitis' "Comparative Suture Testing" report dated March 23, 2006.

**Request No. 2**

All technical manuals for all equipment used to test the FiberWire samples as described in Dr. Gitis' "Comparative Suture Testing" report dated March 23, 2006.

**Request No. 3**

All documents that identify the testing equipment used to test the FiberWire samples as described in Dr. Gitis' "Comparative Suture Testing" report dated March 23, 2006.

**Request No. 4**

All communications between any of Arthrex, you, Dr. Mukherjee, Dr. Burks, and/or Dickstein, Shapiro, Morin & Oshinsky LLP concerning the lawsuit commenced by the Complaint attached as Exhibit 1.

**Request No. 5**

All documents and things concerning this lawsuit, including, but not limited to, documents concerning "Comparative Suture Testing" dated March 23, 2006.

## Things To Be Produced

**Request No. 1**

All tested and untested samples referred to in "Comparative Suture Testing" dated March 23, 2006 including but not limited to the spools on which they were wound.

# EXHIBIT 14

AO 88 (11/91) Subpoena in a Civil Case

# United States District Court

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

DePuy Mitek, Inc.,
    a Massachusetts Corporation

        Plaintiff,

               V.

Arthrex, Inc.,
    a Delaware Corporation and

Pearsalls Ltd.,
    A Private Limited Company
    of the United Kingdom,

        Defendants.

**SUBPOENA IN A CIVIL CASE in the United States District Court for the District of Massachusetts**

## Case Number: 04cv12457 PBS

TO:    **Norman Gitis**
        **1715 Dell Avenue**
        **Campbell, CA 95008 USA**

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case on topics set forth in Schedule A attached hereto. The deposition will be recorded by stenographic means and recorded by video and audio tape, and by instant visual display of the stenographic record.

| PLACE OF DEPOSITION<br>Woodcock Washburn LLP<br>Cira Centre, 12th Floor<br>2929 Arch Street<br>Philadelphia, PA 19104 | DATE AND TIME    July 18, 2007 at 9:00 a.m. |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the documents and things set forth in Schedule A attached hereto at the place, dates, and time specified below:

| PLACE<br>Woodcock Washburn LLP<br>Cira Centre, 12th Floor<br>2929 Arch Street<br>Philadelphia, PA 19104 | DATE AND TIME    July 18, 2007 at 9:00 a.m |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (ATTORNEY FOR PLAINTIFF )<br>*Angela Verrecchia* | DATE<br>7/16/07 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Angela Verrecchio, Woodcock Washburn LLP, Cira Centre, 12th Floor, 2929 Arch St., Philadelphia, Pennsylvania 19104, 215-568-3100

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

AO 88 (11/91) Subpoena in a Civil Case

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
|  | July 16, 2006 | Dickstein Shapiro LLP |
| SERVED |  | 1825 Eye Street, N.W.<br>Washington, D.C. 20006 |
| SERVED ON (PRINT NAME) |  | MANNER OF SERVICE |
| Salvatore Tamburo |  | Facsimile: (202)420-2201 |
| SERVED BY (PRINT NAME) |  | TITLE |
| Angela Verrecchio |  | Attorney |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
              DATE

_____
Signature of Server

_____
Address of Server

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

© PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for depositions, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the material or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
(I) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place

more than 100 miles from the place where that person resides, is employed

or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(b)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or
(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden.
(B) If a subpoena
(I) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## Schedule A

Pursuant to Rule 45 of the Federal Rules of Civil Procedure and the Local Rules of the District of Massachusetts, Plaintiff DePuy Mitek, by and through its counsel, will take the deposition upon oral examination of Norman Gitis beginning on July 18, 2007 at 9:00 a.m. at the offices of Woodcock Washburn LLP, Cira Centre, 12th Floor, 2929 Arch Street, Philadelphia, PA 19103, USA. The deposition will be conducted before an officer authorized by law to administer oaths and will be recorded by stenographic and video means. The deposition will proceed from day to day, weekends and federal holidays excluded, until completed.

## Instructions and Definitions

1.    DePuy Mitek has sued Arthrex in the United States District Court for the District of Massachusetts for Arthrex's infringement of U.S. Patent No. 5,314,446. A copy of DePuy Mitek's Amended Complaint is attached as Exhibit 1.

2.    "Arthrex" means Arthrex, Inc. and includes each of its predecessors, successors, subsidiaries, divisions, and departments.

3.    "FiberWire" means each Arthrex suture that is or have been sold under the tradenames FiberWire or TigerWire.

4.    "Concerning" means referring to, relating to, commenting upon, evidencing or embodying.

5.    "Communication(s)" means any transmission of information by one or more persons or between two or more persons by any means including, but not limited to, emails, telephone conversations, letters, telegrams, teletypes, telexes, telecopies, computer linkups, written memoranda, and face-to-face conversations.

1

6.    "You"  and "your" mean Norman Gitis.

## **Schedule A: Document Requests**

### **Document Request No. 1**

Any documents or information concerning the computer virus alleged to have corrupted the data in your "Comparative Suture Testing" Report dated March 23, 2006.

### **Document Request No. 2**

Any documents or information concerning the declaration executed by you on August 28, 2006 in connection with the lawsuit commenced by the Complaint attached as Exhibit 1.

### **Document Request No. 3**

All documents concerning your "Supplemental Test Report on Comparative Suture Testing (supplement to the test report of March 23, 2006)" dated June 28, 2007.

### **Document Request No. 4**

All communications between any of Arthrex, Pearsalls Ltd., you, Dr. Mukherjee, Dr. Burks, Dickstein, Shapiro, Morin & Oshinsky LLP, or any other person or entity concerning the lawsuit commenced by the Complaint attached as Exhibit 1.

### **Document Request No. 5**

All documents concerning the lawsuit commenced by the Complaint attached as Exhibit 1.

### **Document Request No. 6**

All of Dr. Gitis's invoices or bills for work that Dr. Gitis performed in connection with the lawsuit commenced by the Complaint attached as Exhibit 1.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DePuy Mitek Inc.,<br>    a Massachusetts Corporation | ) ) ) | |
|     Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 04-12457 PBS |
| Arthrex Inc.,<br>    a Delaware Corporation, and | ) ) ) | |
| Pearsalls Limited,<br>    a Private Limited Company of the<br>    United Kingdom, | ) ) ) ) | |
|     Defendant. | ) | |

### UPDATED NOTICE OF DEPOSITION OF NORMAN GITIS

PLEASE TAKE NOTICE THAT, pursuant to Rule 30 of the Federal Rules of Civil Procedure, beginning at 9:00 a.m., on July 3, 2007, Plaintiff DePuy Mitek will take the deposition upon oral examination of Norman Gitis at Woodcock Washburn LLP, Cira Centre, 12th Floor, 2929 Arch Street, Philadelphia, PA 19104 or at such other location, date and time as may be mutually agreed, before a Notary Public or duly authorized officer authorized to administer oaths. The deposition will be recorded by stenographic means and may also be recorded by video or audio tape, and by instant visual display of the stenographic record.

The deposition will proceed in accordance with the Federal Rules of Civil Procedure and will continue from day to day (Sundays and holidays excluded) until completed unless otherwise agreed.

You are invited to attend and cross-examine.

Date: July 16, 2007

DEPUY MITEK, INC.,
By its attorneys,

_Dianne B. Elderkin_
Dianne B. Elderkin
Lynn A. Malinoski
Michael J. Bonella
Erich M. Falke
WOODCOCK WASHBURN LLP
Cira Centre, 12th Floor
29292 Arch Street
Philadelphia, PA 19104
(215) 568-3100


Daniel J. Gleason (BBO #194900)
Michelle Chassereau Jackson (BBO 654825)
NUTTER MCCLENNEN & FISH LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA. 02210-2604
(617) 439-2000

## CERTIFICATE OF SERVICE

I certify that the foregoing DePuy Mitek Inc.'s Updated Notice of Deposition of Norman

Gitis was served *via* facsimile on July 16, 2007 on the following:


    Charles W. Saber
    Dickstein, Shapiro LLP
    1825 Eye Street NW
    Washington, DC 20006
    Fax: (202) 420-2201

    Christopher Weld, Jr.
    Todd & Weld LLP
    28 State Street, 31st Floor
    Boston, MA 02109
    Fax: (617) 227-5777


Dated:  July 16, 2007                          _____
                                               Angela Verrecchio

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

DePuy Mitek, Inc.             )
     a Massachusetts Corporation   )
                         )
       Plaintiff.           )
                         )
        V.            )
                         )   Civil Action No. 04-12457 PBS
Arthrex, Inc.             )
     a Delaware Corporation,     )
                         )
     and            )
                         )
Pearsalls Limited,       )   <u>AMENDED COMPLAINT</u>
     a Private Limited Company of the)
United Kingdom        )
                         )
     Defendants.       )

## COMPLAINT

Plaintiff, DePuy Mitek, Inc. ("DePuy Mitek") for its complaint against Defendants,

Arthex, Inc. ("Arthrex") and Pearsalls Ltd. ("Pearsalls") alleges:

### PARTIES, JURISDICTION AND VENUE

1.     This is an action for patent infringement arising under the United States Patent

Laws, Title 35 of the United States Code.  This Court has jurisdiction over this action's subject

matter under 28 U.S.C. §§ 1331 and 1338(a).  Venue is proper in this judicial district under 28

U.S.C. § 1400(b) and §1391.

2.     Plaintiff DePuy Mitek is a corporation organized and existing under the laws of

the State of Massachusetts and has a principal place of business at 249 Vanderbilt Avenue,

Norwood, Massachusetts 02602.

3.     Defendant Arthrex is a corporation organized and existing under the laws of the State of Delaware and has a principal place of business at 1370 Creekside Boulevard, Naples, Florida 34108.

4.     Defendant Pearsalls is a private limited company organized and existing under the laws of the United Kingdom and has a principal place of business at Tancred Street, Taunton, Somerset TA1 1RY.

**CLAIM FOR RELIEF**

5.     On May 24, 1994, United States Letters Patent No. 5,314,446 ("446 Patent") entitled "Sterilized Heterogeneous Braids" was duly and legally issued by the United States Patent and Trademark Office to Ethicon, Inc. as assignee.  Ethicon, Inc. assigned the 446 patent to DePuy Mitek, Inc.  A true and correct copy of the 446 Patent is attached as Exhibit A to this Complaint.

6.     On information and belief, without license or authorization, Arthrex has been and is infringing claims of the 446 Patent in the United States by making, using, selling, and offering for sale in the United States, including within this judicial district, sutures and sutures having attached needles, anchors, or other products, that are claimed in the 446 Patent, including at least the sutures sold under the trade name FiberWire™.  On information and belief, without license or authorization, Arthrex has been and is inducing others to directly infringe the 446 Patent in the United States, including within this judicial district, by inducing distributors to sell and surgeons to use sutures and sutures having attached needles, anchors, or other products, that are claimed in the 446 Patent, including at least the sutures sold under the trade name FiberWire™.

7.     On information and belief, Pearsalls has infringed and continues to infringe the 446 Patent by contributing to and inducing Arthrex's infringement of the 446 Patent by

2

providing Arthrex with sutures that are incorporated into the commercial TigerWire® and FiberWire™ products, which sutures are not a staple article of commerce and have no use other than to practice the invention claimed in the 446 Patent. These sutures and products incorporating the same are sold throughout the United States.

8.    On information and belief, Pearsalls has acted in concert with Arthrex to design, develop, and commercialize FiberWire™ and TigerWire® sutures with full knowledge that these products will be sold throughout the United States.

9.    On information and belief, Arthrex has known of the 446 patent's existence since at least shortly after its issuance. On information and belief, Arthrex's infringing acts as set forth above have been deliberate, willful, and in reckless disregard of DePuy Mitek's patent rights.

10.    On information and belief, Pearsalls has known of the 446 patent's existence since at least shortly after this lawsuit was filed in November 2004.

11.    DePuy Mitek has been damaged by Arthrex's and Pearsalls' infringing activities. On information and belief, Arthrex and Pearsalls will continue their infringing activities, and continue to damage DePuy Mitek, unless enjoined by this Court. DePuy Mitek has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff DePuy Mitek respectfully demands judgment for it and against Defendants Arthrex and Pearsalls as follows:

      (a)    That this Court adjudge that DePuy Mitek owns the 446 Patent and that DePuy Mitek has all rights of recovery under the 446 patent;

      (b)    That this Court adjudge that Arthrex and Pearsalls have been infringing the 446 patent;

      (c)    That this Court issue an injunction enjoining Arthrex and Pearsalls and their officers, agents, servants and employees, privies, distributors and all persons in active concert or participation with them from further infringement of the 446 patent;

      (d)    That this Court ascertain and award DePuy Mitek damages sufficient to compensate it for Arthrex's and Pearsalls' infringement and that the damages so ascertained be trebled and awarded to DePuy Mitek with interest;

      (e)    That this Court find this case to be exceptional and award DePuy Mitek its attorneys fees, costs and expenses in this action; and

      (f)    That this Court award DePuy Mitek such other relief as the Court may deem just and proper.

4

## JURY DEMAND

DePuy Mitek demands a jury trail on all issues so triable.

|                              | DEPUY MITEK, INC.,                              |
|------------------------------|-------------------------------------------------|
| Dated:  September 9, 2005    | By its attorneys,                               |

 /s/ Michelle Chassereau Jackson

Daniel J. Gleason (BBO # 194900)
Michelle Chassereau Jackson (BBO #654825)
NUTTER McCLENNEN & FISH LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA. 02210-2604
(617) 439-2000

and

Dianne B. Elderkin (pro hac vice)
Lynn A. Malinoski (pro hac vice)
Michael J. Bonella (pro hac vice)
Erich M. Falke (pro hac vice)
WOODCOCK WASHBURN LLP
One Liberty Place - 46th Floor
17th and Market Streets
Philadelphia, PA 19103
(215) 568-3100

1461235.1

5



US005314446A

## United States Patent [19]

### Hunter et al.

[11] **Patent Number:** 5,314,446

[45] **Date of Patent:** May 24, 1994

[54] **STERILIZED HETEROGENEOUS BRAIDS**

[75] Inventors: **Alastair W. Hunter**, Bridgewater; **Arthur Taylor, Jr.**, Plainfield, both of N.J.; **Mark Steckel**, Maineville, Ohio

[73] Assignee: **Ethicon, Inc.**, Somerville, N.J.

[21] Appl. No.: **838,511**

[22] Filed: **Feb. 19, 1992**

[51] Int. Cl.$^5$ ................................................ D04C 1/00

[52] U.S. Cl. .................................... 606/231; 606/228; 87/7; 87/9; 428/370

[58] Field of Search ........................ 606/228, 230, 231; 87/7, 8, 9; 428/225

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,187,752 | 6/1965 | Glick | 128/335.5 |
| 3,463,158 | 8/1969 | Schmitt et al. | 606/228 |
| 3,527,650 | 9/1970 | Block | 117/7 |
| 3,636,956 | 1/1972 | Schneider | 128/335.5 |
| 3,942,532 | 3/1976 | Hunter et al. | 128/335.5 |
| 4,043,344 | 8/1977 | Landi et al. | 128/335.5 |
| 4,047,533 | 8/1977 | Perciaccante et al. | 128/335.5 |
| 4,052,988 | 10/1977 | Doddi et al. | 128/335.5 |
| 4,141,087 | 2/1979 | Shalaby et al. | 3/1 |
| 4,470,941 | 9/1984 | Kurtz | 264/136 |
| 4,624,256 | 11/1986 | Messier et al. | 128/335.5 |
| 4,946,467 | 8/1990 | Ohi et al. | 606/228 |
| 4,959,069 | 9/1990 | Brennan et al. | 606/228 |
| 4,979,956 | 12/1990 | Silverstrini | 623/13 |
| 5,116,360 | 5/1992 | Pinchuk et al. | 623/1 |
| 5,147,400 | 9/1992 | Kaplan et al. | 623/13 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2949920 | 3/1981 | Fed. Rep. of Germany | A61F 1/00 |
| WO86/00020 | 1/1986 | PCT Int'l Appl. | A61L 17/00 |
| 2082213 | 8/1980 | United Kingdom . | |
| 2218312A | 11/1989 | United Kingdom | A01K 91/00 |

*Primary Examiner*—George F. Lesmes
*Assistant Examiner*—Chris Raimund
*Attorney, Agent, or Firm*—Hal Brent Woodrow

[57] **ABSTRACT**

Heterogeneous braided multifilament of first and second set of yarns mechanically blended by braiding, in which first and second set of yarns are composed of different fiber-forming materials.

Heterogeneous braids are useful for preparation of surgical sutures and ligatures.

**12 Claims, 3 Drawing Sheets**

**U.S. Patent**          May 24, 1994          Sheet 1 of 3          **5,314,446**







FIG-2

U.S. Patent

May 24, 1994

Sheet 2 of 3

5,314,446

U.S. Patent

May 24, 1994

Sheet 3 of 3

5,314,446



*FIG-3*

5,314,446

| 1 | 2 |

# STERILIZED HETEROGENEOUS BRAIDS

## BACKGROUND OF THE INVENTION

This invention relates to braided multifilaments, and especially to sterilized, braided multifilaments suitably adapted for use as surgical sutures or ligatures.

Braided multifilaments often offer a combination of enhanced pliability, knot security and tensile strength when compared to their monofilament counterparts. The enhanced pliability of a braided multifilament is a direct consequence of the lower resistance to bending of a bundle of very fine filaments relative to one large diameter monofilament. However, for this enhancement to be realized, the individual multifilaments must be able to bend unencumbered or unrestricted by their neighboring filaments. Any mechanism which reduces this individual fiber mobility, such as simple fiber-fiber friction, a coating which penetrates into the braid interstices, or a melted polymer matrix which adheres fibers together, will adversely affect braid pliability. In the extreme case where the multifilaments are entirely bonded together, the pliability or bending resistance closely approximates that of a monofilament.

Unfortunately, the prior art abounds with attempts to improve specific properties of multifilament braids at the expense of restricting the movement of adjacent filaments which make up the braid,. For example, multifilament sutures almost universally possess a surface coating to improve handling properties.

U.S. Pat. No. 3,942,532 discloses a polyester coating for multifilament sutures. The preferred polyester coating is polybutilate, which is the condensation product of 1,4-butanediol and adipic acid. U.S. Pat. No. 4,624,256 discloses a suture coating copolymer of at least 90 percent ε-caprolactone and a biodegradable monomer, and optionally a lubricating agent. Examples of monomers for biodegradable polymers disclosed include glycolic acid and glycolide, as well as other well known monomers typically used to prepare bioabsorbable coatings for multifilament sutures.

An alternative to the use of the commonly accepted coating compositions for multifilament sutures to improve handling properties is disclosed in U.S. Pat. 3,527,650. This patent discloses a coating composition of polytetrafluoroethylene (PTFE) particles in an acrylic latex. Although the PTFE particles act as an excellent lubricant to decrease the surface roughness of multifilament sutures, the particles have a tendency to flake off during use. Also, this particular coating is a thermoset which requires a curing step for proper application.

More recently, a dramatic attempt has been made to create a monofilament-like surface for a multifilament suture. U.S. Pat. No. 4,470,941 discloses the preparation of "composite" sutures derived from different synthetic polymers. The composite suture is composed of a core of low melting fibers around which are braided high melting fibers. Because of the lack of cohesiveness of the dissimilar fibers, the low melting fibers in the core are melted and redistributed throughout the matrix of the braided, high melting fibers. Although these composite sutures represent an attempt to combine the best properties of different synthetic fibers, it unfortunately fails in this respect due to increased stiffness (as evidenced by FIG. 3 which is described in detail below),

apparently due to the reduction of fiber mobility resulting from the fusing of the fibers together.

Another attempt to enhance the properties of multifilament sutures can be found in WO 86/00020. This application discloses coating an elongated core of a synthetic polymer having a knot tenacity of at least 7 grams/denier with a film-forming surgical material. The film-forming surgical material can be absorbable or nonabsorbable, and can be coated on the elongated core by solution casting, melt coating or extrusion coating. Such coated multifilament sutures suffer from the same deficiencies which plague conventionally coated multifilament sutures.

All of the attempts described in the prior art to improve braid properties have overlooked the importance of fiber-fiber friction and its impact on fiber mobility and braid pliability. The properties of concern here include the fiber-fiber frictional coefficients (which frequently relate to the polymer's surface energy), the fiber cross-sectional shape and diameter, and the braid structure which influences the transverse forces across the braid. If fibers composed of highly lubricous polymers are used in the traditional manner, then a highly pliable braid can be prepared. However, in most cases, these braids will be relatively weak and unusable. Hence, a tradeoff between braid strength and pliability exists in the design of conventional braided multifilaments.

In view of the deficiencies of the prior art, it would be desirable to prepare multifilament sutures exhibiting improved pliability and handling properties. More specifically, it would be most desirable to prepare braided multifilaments composed of dissimilar fiber-forming materials in which the fiber-forming materials contribute significantly to enhanced pliability for the braided multifilament without appreciably sacrificing its physical properties.

## SUMMARY OF THE INVENTION

The invention is a heterogeneous braid comprising a first and second set of continuous and discrete yarns in a sterilized, braided construction. At least one yarn from the first set is in direct intertwining contact with a yarn from the second set.

Each yarn from the first set is composed of a plurality of filaments of a first fiber-forming material, and each yarn from the second set is composed of a plurality of filaments of a second fiber-forming material.

Surprisingly, the heterogeneous braids may exhibit a combination of outstanding properties attributable to the specific properties of the dissimilar fiber-forming materials which make up the braided yarns. The dissimilar fiber forming materials do not require melt bonding or any other special processing techniques to prepare the heterogeneous braids of this invention. Instead, the integrity of the braid and therefore its properties is due entirely to the mechanical interlocking or weaving of the individual yarns. In fact, it is possible to tailor the physical and biological properties of the braid by varying the type and proportion of each of the dissimilar fiber forming materials used, as well as adjusting the specific configuration of the braid. For example, in preferred embodiments, the heterogeneous braid will exhibit improved pliability and handling properties relative to that of conventional homogeneous fiber braids, without sacrificing physical strength or knot security.

The sterilized, heterogeneous braids of this invention are useful as surgical sutures or ligatures, as well as for

5,314,446

| 3 | 4 |

the preparation of any other medical device which would benefit from its outstanding physical or biological properties.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 illustrates a carrier layout for the preparation of a heterogeneous braid within the scope of this invention;

FIG. 2 is a plot representing the relationship between the tensile strength of heterogeneous and homogeneous braids of polyethylene terephthalate (PET) and PTFE yarns, and the volume fraction of PTFE yarns in the braids; and

FIG. 3 is a plot representing a relationship between the initial bending rigidity of heterogeneous and homogeneous braids of PET and PTFE yarns, and the volume fraction of PTFE yarns in the braids.

## DETAILED DESCRIPTION OF THE INVENTION

For purposes of describing this invention, a "heterogeneous" braid is a configuration composed of at least two sets of dissimilar yarns mechanically blended by intertwining the dissimilar yarns in a braided construction. The yarns are continuous and discrete, so therefore each yarn extends substantially along the entire length of the braid and maintains its individual integrity during braid preparation, processing and use.

The heterogeneous braids of this invention can be conventionally braided in a tubular sheath around a core of longitudinally extending yarns, although such a core may be excluded, if desired. Braided sheath sutures with central cores are shown in U.S. Pat. Nos. 3,187,752; 4,043,344; and 4,047,533, for example. A core may be advantageous because it can provide resistance to flattening, as well as increased strength. Alternatively, the braids of this invention can be woven in a spiral or spiroid braid, or a lattice braid, as described in U.S. Pat. Nos. 4,959,069 and 5,059,213.

The dissimilar yarns of the first and second set of yarns are braided in such a manner that at least one yarn from the first set is directly intertwined with, or entangled about, a yarn from the second set. Direct mechanical blending of individual, dissimilar yarns therefore occurs from the interweaving and interlocking of these dissimilar yarns, enhancing yarn compatibility and the overall physical and biological properties of the heterogeneous braid. Preferably, every yarn from the first set is in direct intertwining contact with a yarn of the second set to achieve the maximum degree of mechanical blending of the dissimilar yarns.

The first and second fiber-forming materials which make up the filaments of the first and second set of yarns, respectively, can be any materials capable of being spun into continuous filaments. Advantageously, the fiber-forming materials are nonmetallic.

The preferred fiber-forming materials are synthetic fiber-forming polymers which are melt or solution spun through a spinneret to prepare continuous filaments. The filaments so prepared are advantageously stretched to provide molecular orientation and annealed to enhance dimensional stability and/or biological performance. The fiber-forming polymers can be bioabsorbable or nonabsorbable, depending on the particular application desired. Examples of monomers from which bioabsorbable polymers are derived include, but are not limited to, some hydroxyacids and lactones, e.g. glycolic acid, lactic acid, glycolide, lactide, p-dioxanone,

ε-caprolactone and trimethylene carbonate, as well as copolymers and polymer blends derived from these monomers and others. Interestingly, numerous bioabsorbable heterogeneous braids exhibiting varying useful biological properties, such as breaking strength retention in vivo and the absorption profiles in vivo, can be prepared for specific applications by using different combinations of bioabsorbable polymers.

Preferably, the continuous filaments which make up the first and second set of yarns are derived from nonabsorbable polymers. In a preferred embodiment, the first set of yarns acts as lubricating yarns to improve the overall pliability, or compliance, and surface lubricity of the heterogeneous braid. Preferably, the fiber-forming material of the first set exhibits a surface energy (which frequently relates to surface lubricity) less than about 38 dyne/cm, as measured by contact angle of liquids on polymer surfaces, as described by Kissa, E., "Handbook of Fiber Science and Technology," Vol. II, Part B, Marcel Decker, 1984. Such fiber forming polymers include perfluorinated polymers, e.g. PTFE and fluorinated ethylene/propylene copolymers (FEP) and perfluoroalkoxy (PFA) polymers, as well as non-perfluorinated polymers such as polyvinylidene fluoride (PVDF), polyethylene/tetrafluoroethylene copolymers (PETFE), the polycholorofluoroethylene polymers, polypropylene (PP) and polyethylene (PE). More preferably, the first fiber-forming material exhibits a surface energy less than about 30 dyne/cm. The preferred polymers for the first set are PTFE, PETFE, FEP, PE and PP, and the most preferred fiber forming polymer is PTFE.

In a more preferred embodiment, the lubricating yarns of the first set are mechanically blended with yarns of the second set which act to provide improved strength to the heterogeneous braid. Preferably, the second set of yarns exhibits a yarn tenacity greater than 3.0 grams/denier, more preferably greater than 5.0 grams denier. The preferred yarns are PET, nylon and aramid, and the most preferred yarns are PET.

In the most preferred embodiment, the heterogeneous braid is composed of a first set of PTFE yarns mechanically blended with a second set of PET yarns in a braided configuration. Advantageously, the braided sheath encloses a core of longitudinally extending PET yarns to further improve the overall strength and resistance to flattening of the heterogeneous braid. In this embodiment, the volume fraction of lubricating yarns in the braided sheath and core desirably ranges from about 20 to about 80 percent. A volume fraction of lubricating yarns below about 20 percent will not typically improve the pliability of the braid, and a volume fraction above about 80 percent may adversely affect the overall strength of the braid. The filament fineness for such a heterogeneous braid is preferably less than 10 denier per filament, preferably from about 0.5 to about 5 denier per filament. A more coarse filament may result in a stiffer braid. The preferred individual yarn denier is between 10 and 100 denier.

The heterogeneous braids of this invention can be prepared using conventional braiding technology and equipment commonly used in the textile industry, and in the medical industry for preparing multifilament sutures. For example, the first and second set of yarns can be interwoven as indicated by the plan view of the yarn carrier layout of FIG. 1 for the preparation of a braided multifilament. The individual yarns of the braided sheath feed from spools mounted on carriers 22, 22' and

| 5 | 6 |

24, 24′. The carriers move around the closed circular loop 28, moving alternately inside and outside the loop 28 to form the braiding pattern. One or more carriers are continually following a serpentine path in a first direction around the loop, while the remaining carriers are following a serpentine path in the other direction.

In the illustrated embodiment, carriers 22, 22′ are travelling around serpentine path 27 in a clockwise direction as indicated by directional arrows 23, and carriers 24, 24′ are travelling around serpentine path 29 in a counterclockwise direction as indicated by arrows 25. The moving carriers dispense yarns which intertwine to form the braid. The yarns from all the carriers in a constructed embodiment of FIG. 1 are dispensed upward with respect to the plane of the drawing, and the braid is taken up on a reel located above the plane of the drawing.

In one embodiment, moving carriers 22, 24 dispense yarns of the first set and moving carriers 22′, 24′ dispense yarns of the second set to form the heterogeneous braid. In a more preferred embodiment, moving carriers 22, 22′ dispense yarns of the first set and moving carriers 24, 24′ dispense yarns of the second set. This carrier layout provides a braid in which each yarn of the first set is directly intertwined with a yarn from the second set.

Advantageously, as illustrated in FIG. 1, disposed within the center of the loop 28 are carriers 26 which dispense the core yarns of the braid. In the most preferred embodiment of this invention, moving carriers 22, 22′ dispense PTFE yarns, moving carriers 24, 24′ dispense PET yarns, and core carriers 26 dispense PET yarns.

Numerous additional embodiments are contemplated within the scope of the invention using conventional braiding technology and equipment. For example, the carrier layout can be modified to prepare a braid configuration using from 3 to 28 sheath carriers, with or without any number of core yarns. Dissimilar yarns from the first and second set of yarns can be plied together using conventional techniques before braiding, and in this embodiment, the carriers can dispense identical bobbins of plied yarns composed of individual yarns from the first and second sets. This embodiment not only offers the advantage of inter-yarn mechanical blending, but also the intimate mixing associated with intra-yarn blending.

Similar to the preparation of conventional homogeneous braids, the yarns from which the heterogeneous braids are prepared are preferably nontextured. The yarn tension during braiding is advantageously adjusted so that the yarn elongation for each set of yarns is about equal. The equilibration of yarn elongation may prevent irregularities, for example, "core popping", which is the tendency of core yarns to break through the braided sheath as the braid is bent. The number of picks per inch in the finished braid can be adjusted to balance the tensile strength of the braid with braid quality, e.g. the tendency for core popping and overall braid smoothness.

After the heterogeneous braid is prepared, it is desirably scoured to remove machine oils and lubricants, and any foreign particles. The scoured braid is preferably stretched at a temperature between the glass transition temperature and melting temperature of the lower melting set of yarns. Therefore, the stretching temperature is such that none of the yarns is actually melted. The stretching operation densifies the braid and improves

braid smoothness. Afterwards, the braid may be annealed while under restraint to improve dimensional stability, and in the case of absorbable braids, to improve the breaking strength retention in vivo.

If desired, the surface of the heterogeneous multifilament braid can be coated with a bioabsorbable or nonabsorbable coating to further improve the handleability and knot tiedown performance of the braid. For example, the braid can be immersed in a solution of a desired coating polymer in an organic solvent, and then dried to remove the solvent. Most preferably, the coating does not cause the fibers or yarns to adhere to one another increasing stiffness. However, if the surface of the heterogeneous braid is engineered to possess a significant fraction of the lubricious yarn system, the conventional coating may be eliminated saving expense as well as avoiding the associated braid stiffening.

If the surface of the braid is coated, than the coating composition may desirably contain bioactive materials such as antibiotics and growth factors.

The post-treated heterogeneous braid is sterilized so it can be used for a host of medical applications, especially for use as a surgical suture, preferably attached to a needle. The braid can be sterilized using any of the conventional techniques well known in the art. For example, sterilization can be effected by exposing the braid to gamma radiation from a cobalt 60 source. Alternatively, the braid can be sterilized by exposure to ethylene oxide.

In the following examples, the tensile properties and knot security are each determined using an Instron Tensile Tester. The tensile properties, i.e. the straight and knot tensile strength and the percent elongation, are determined generally according to the procedures described in U.S. Pat. No. 4,838,267. The knot security, which provides an indication as to the number of throws required to secure a knot so that it fails to slip before cleanly breaking, is measured by first tieing a conventional square knot around a mandrel, pulling the knot apart on the Instron Tester to observe whether slipping occurs, and if so, then tieing knots with additional throws until 20 out of 20 knots break cleanly without slipping. The bending rigidity, which is the inverse of pliability, is determined using a Kawabata Pure Bending Tester, as discussed in "The Effects of Structure on the Geometric and Bending Properties of Small Diameter Braids", Drexel University Master Thesis, 1991, by Mr. E. Ritter.

The examples are illustrative only, and are not intended to limit the scope of the claimed invention. The types of yarns used to prepare the heterogeneous braid and the yarn geometry can be varied to prepare heterogeneous braids within the scope of the claimed invention which exhibit a combination of outstanding physical or biological properties.

## EXAMPLES

Examples I and II describe heterogeneous braids of PTFE and PET yarns. In order to evaluate the relative performance of these braids, two controls are included which represent 100% PET and 100% PTFE braids, respectively. To the extent possible, the yarn materials and processing conditions are identical for the controls and heterogeneous braid examples. In addition, for comparison purposes, a braid is fabricated with identical materials but processed per the prior art U.S. Pat. No. 4,470,941.

5,314,446

| 7 | 8 |

## CONTROL I

FIBER MATERIALS: An 8×0 PET braid is fabricated, i.e. 8 sheath yarns and 0 core yarns. All yarns are Dupont Dacron PET, 70 denier, 48 filament, type 52 yarn.

PROCESSING: The yarns are wound on braider

## PROCESSING
Identical to EXAMPLE I, except that the hot stretch temperature is at 300° C. and for a longer residence time to facilitate melting of the PET fibers.

The properties of CONTROLS I and II, and EXAMPLES I and II, and the PRIOR ART I are summarized in the following Table:

| | USP DIAMETER (mils) | TENSILE STRENGTH (lbs) | KNOT STRENGTH (lbs) | BENDING RIGIDITY (gm × cm²) | KNOT STABILITY (# of throws) |
|---|---|---|---|---|---|
| CONTROL I | 10.68 | 4.98 | 3.14 | 0.0680 | 4 |
| CONTROL II | 9.11 | 2.58 | 2.04 | 0.0196 | 7 |
| EXAMPLE I | 9.71 | 3.55 | 2.41 | 0.0257 | 5 |
| EXAMPLE II | 10.35 | 4.10 | 2.67 | 0.0371 | 5 |
| PRIOR ART I | 8.81 | | | 0.0966 | |

bobbins per conventional methods, and the bobbins loaded on each carrier of a N.E. Butt 8 carrier braider. Machine settings include: 32 pick gear, 0.009" wire tension springs, and 183 rpm. The braid is aqueous scoured, and hot stretched at 30% draw ratio at 225° C.

## CONTROL II

FIBER MATERIALS: An 8×0 PTFE braid is fabricated. All yarns are Dupont Teflon, 110 denier, 12 filament.

PROCESSING: The yarns are wound on braider bobbins per conventional methods, and the bobbins loaded on each carrier of a N.E. Butt 8 carrier braider. Machine settings include: 36 pick gear, no tension springs, and 183 rpm. The braid is scoured and hot stretched per the conditions described in CONTROL I.

## EXAMPLE I

FIBER MATERIALS: An 8×0 heterogeneous braid is fabricated, consisting of four PET 70 denier yarns and four PTFE 110 denier yarns. The yarns are identical to that employed in CONTROL I and II. On a volume basis, the braid is 50.3% PET, and 49.7% PTFE.

PROCESSING: Four bobbins of PET yarn and four bobbins of PTFE yarn were wound by conventional means. The PET bobbins were loaded on the clockwise moving carriers of the N.E. Butt 8 carrier braider, and the PTFE yarn bobbins on the counter-clockwise moving carriers. Machine settings include: 32 pick gear, 0.009" tension springs on PET carriers, no springs on PTFE carriers, and 183 rpm. The braid is scoured and hot stretched per the conditions described in CONTROL I.

## EXAMPLE II

FIBER MATERIALS: Identical to EXAMPLE I, except that 6 PET yarns and 2 PTFE yarns were used. On a volume basis, the braid is 75.5% PET, and 24.5% PTFE.

PROCESSING: Identical to EXAMPLE I, except that 2 PET bobbins replace 2 PTFE bobbins. All other braider machine settings, scour and hot-stretch conditions are identical to CONTROL I and II and EXAMPLE I.

## PRIOR ART I

FIBER MATERIALS: Identical to EXAMPLE I. On a volume basis, the braid is 50.3% PET, and 49.7% PTFE.

As may be expected, the tensile strengths of the heterogenous braid examples reflect the relative contributions of the individual components. This behavior is said to follow the "rule of mixtures", i.e. the composite property is a weighted average of the component properties. In equation form,

$$P_c = (Vf_a) (P_a) + (Vf_b) (P_b)$$

where $P_c$ is a composite property (such as tensile strength or modulus), $P_a$ and $P_b$ are the properties of the components a and b, and $Vf_a$ and $Vf_b$ are the volume fractions of components a and b. This behavior is clearly observed in FIG. 2, which shows a plot of tensile strength versus volume fraction of PTFE yarns for the Examples and Controls, in relation to the expected plot according to the rule of mixtures.

Surprisingly, the bending rigidity of the heterogeneous braids in EXAMPLES I and II do not follow the rule of mixtures, and show an enhanced bending rigidity relative to the weighted average of its components. This is shown in FIG. 3 as a plot of bending rigidity versus %PTFE in the braids. Bending rigidity is the inverse of pliability, and is obtained by measuring the slope of the *bending moment-radius of curvature* plot of a suture strand in pure bending. Hence lower bending rigidity relates to a more pliable suture, which is a highly desirable property. The mechanism of this enhanced pliability is believed to be internal lubrication of the braid by the "solid lubricant" behavior of the low surface energy PTFE.

U.S. Pat. No. 4,470,941 discloses the preparation of a "composite" suture with a monofilament-like surface made from multifilament yarns. The composite suture is composed of two different synthetic polymer fibers, which is thermally processed to melt one of the fibers to form a continuous matrix. This process was utilized to produce the PRIOR ART I suture, the data of which is shown in Table I and FIG. 3. It is observed that the melting of the PET fibers significantly increases the braid bending rigidity due to the bonding of the "non-melted" fibers together, hence resulting in a less pliable braid of diminished utility.

What is claimed is:

1. A surgical suture consisting essentially of a heterogeneous braid composed of a first and second set of continuous and discrete yarns in a sterilized, braided construction wherein at least one yarn from the first set is in direct intertwining contact with a yarn from the second set; and

5,314,446

9

a) each yarn from the first set is composed of a plurality of filaments of a first fiber-forming material selected from the group consisting of PTFE, FEP, PFA, PVDF, PETFE, PP and PE; and

b) each yarn from the second set is composed of a plurality of filaments of a second fiber-forming material selected from the group consisting of PET, nylon and aramid; and

c) optionally a core.

2. The surgical suture of claim 1 wherein the suture is attached to a needle.

3. The surgical suture of claim 1 wherein the first fiber-forming material exhibits a surface energy less than about 38 dynes/cm.

4. The surgical suture of claim 3 wherein the first fiber-forming material exhibits a surface energy less than about 30 dynes/cm.

5. The surgical suture of claim 4 wherein the first set of yarns is PTFE.

10

6. The surgical suture of claim 5 wherein the second set of yarns exhibits a yarn tenacity greater than 3.0 grams/denier.

7. The surgical suture of claim 6 wherein the second set of yarns exhibits a yarn tenacity greater than 5.0 grams/denier.

8. The surgical suture of claim 1 wherein the second set of yarns is PET.

9. The surgical suture of claim 8 wherein the volume fraction of the first set of yarns in the braided sheath and core ranges from about 20 to about 80 percent.

10. The surgical suture of claim 9 wherein the fiber fineness of the yarns of the first and second sets is less than 10 denier per filament.

11. The surgical suture of claim 1 wherein at least one yarn from the first set of yarns is plied together to a yarn from the second set of yarns.

12. The surgical suture of claim 8 wherein the suture is attached to a needle.

*  *  *  *  *

# EXHIBIT 15

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **DePuy Mitek, Inc.** | ) | |
| **a Massachusetts Corporation** | ) | |
| | ) | |
| **Plaintiff.** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 04-12457 PBS** |
| | ) | |
| **Arthrex, Inc.** | ) | |
| **a Delaware Corporation** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

### DePuy Mitek, Inc.'s First Set of Requests for Document and Things to Arthrex, Inc.

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiff, DePuy Mitek requests that Defendant, Arthrex, Inc. produce for inspection, copying and testing within thirty (30) days, the documents and things set forth below that are in its possession, custody or control, at the offices of Woodcock Washburn LLP, One Liberty Place, 46th Floor, Philadelphia, Pennsylvania 19103.

### DEFINITIONS

A.      "Patent-in-Suit" means U.S. Patent No. 5,314,446.

B.      "Prior Art" means any subject matter described in 35 U.S.C. §102 that Arthrex contends, or may contend, is prior art to the Patent-in-Suit.

C.      "Concerning" means relating to, referring to, describing, evidencing, or constituting.

D.      "Braided Suture Product(s)" and "Arthrex Braided Suture Product(s)" mean Arthrex's FiberWire™ suture products; any product made, used or sold by either

Arthrex or on behalf of Arthrex that incorporates FiberWire™ sutures, such as by being coupled to, preloaded with, or available with any other another device, such as an anchor or a needle (*e.g.* Arthrex's Corkscrew Suture Anchors, Bio-Corkscrew Suture Anchors, Corkscrew II, Bio-Corkscrew Suture Anchors with needles, FASTak II Suture Anchor, FASTak Suture Anchor with #2 FiberWire, Bio-FASTak Suture Anchor, Bio-SutureTak with #2 FiberWire, FiberStick, 2-0 FiberStick, FiberWire loop with Needle for Needle Punch);  any product made, used or sold by either Arthrex or on behalf of Arthrex since 1998 that has a braided suture construction; or any product made, used, or sold by either Arthrex or on behalf of Arthrex since 1998 that includes a braided suture construction coupled to, preloaded with, or available with any other device such as an anchor or a needle.

E.     " Convoyed Braided Suture Product(s)" and "Arthrex Convoyed Braided Suture Product(s)" mean any device, product, instrument or accessory that is sold as a result of the sale of any Braided Suture Product or is sold attendant to the sale of a Braided Suture Product.

F.     The term "Arthrex" means Arthrex, Inc. and includes each of its predecessors, successors, subsidiaries, divisions, and departments.

## REQUESTS

1.    Arthrex Organizational charts from May 24, 1994 to the present.

2.    Documents sufficient to describe each policy of Arthrex concerning document destruction or document retention from May 24, 1994 to present.

3.    All documents and things concerning the Patent-in-Suit, including, but not limited to, the files of any in-house Arthrex attorney regarding the Patent-in-Suit.

4.    All documents and things concerning any analysis that concerns the Patent-in-Suit, including but not limited, to analysis relating to infringement, validity, or unenforceability, willful infringement, strength, scope, clearance, or valuation of the Patent-in-Suit or any claim of the Patent-in-Suit.

5.    All communications between Arthrex and any person concerning the Patent-in-Suit including, but not limited to, communications with the assignee named on the cover of U.S. Patent No. 5,318,575.

6.    All opinions or communications of counsel concerning the Patent-in-Suit and all documents and things concerning such opinions or communications.

7.    All documents and things concerning Alastair W. Hunter, Arthur Taylor, Jr. or Mark Steckel.

8.    All documents and things upon which Arthrex relies, or intends to rely, to support the Affirmative Defense in paragraph 9 of Arthrex's Answer and Counterclaim in Response to DePuy Mitek's Complaint.

9.    All documents and things upon which Arthrex relies, or intends to rely, to support the Affirmative Defense in paragraph 10 of Arthrex's Answer and Counterclaim in Response to DePuy Mitek's Complaint.

10.    All documents and things upon which Arthrex relies, or intends to rely, to support the Affirmative Defense in paragraph 11 of Arthrex's Answer and Counterclaim in Response to DePuy Mitek's Complaint.

11.    All documents and things upon which Arthrex relies, or intends to rely, to support the Affirmative Defense in paragraph 12 of Arthrex's Answer and Counterclaim in Response to DePuy Mitek's Complaint.

12.    All documents and things upon which Arthrex relies, or intends to rely, to support the Affirmative Defense in paragraph 13 of Arthrex's Answer and Counterclaim in Response to DePuy Mitek's Complaint.

13.    All documents and things upon which Arthrex relies, or intends to rely, to support the Affirmative Defense in paragraph 14 of Arthrex's Answer and Counterclaim in Response to DePuy Mitek's Complaint.

14.    All documents and things upon which Arthrex relies, or intends to rely, to support the Affirmative Defense in paragraphs 15-17 of Arthrex's Answer and Counterclaim in Response to DePuy Mitek's Complaint.

15.    All documents and things upon which Arthrex relies, or intends to rely, to support the Affirmative Defense in paragraph 18 of Arthrex's Answer and Counterclaim in Response to DePuy Mitek's Complaint.

16.    All documents and things upon which Arthrex relies, or intends to rely, to support its Counterclaim in Arthrex's Answer and Counterclaim in Response to DePuy Mitek's Complaint.

17.    All documents and things upon which Arthrex relies, or intends to rely, to support its denial in Arthrex's Answer and Counterclaim in Response to DePuy Mitek's Complaint that Arthrex's infringement is willful.

18.    All Prior Art and all documents and things concerning any Prior Art including, but not limited to, the results of any prior art searches regarding the validity or invalidity of the Patent-in-Suit.

19.    All documents and things concerning any Arthrex foreign or United States patent or patent application that describes a braided suture.

20.    All documents and things concerning the level of ordinary skill in the art of the Patent-in-Suit.

21.    All documents and things that evidence or refute any secondary consideration (including, but not limited to, commercial success, long felt but unresolved need, failure of others, commercial acquiescence, and copying) that concern the nonobviousness or obviousness of the Patent-in-Suit.

22.    All documents and things that support or refute any definition, meaning, interpretation, or construction of any term, limitation, word, or element of any claim of the Patent-in-Suit espoused by either party.

23.    All extrinsic evidence or material upon which Arthrex relies, or intends to rely, to support any claim construction espoused by Arthrex.

24.     All documents and things concerning the operation, performance, material characteristics, or material properties of any Braided Suture Product or part of any Braided Suture Product.

25.     Documents sufficient to identify the structure and intended use of each Braided Suture Product and/or each Convoyed Braided Suture Product.

26.     All instructions for use and training materials for each Arthrex Braided Suture Product.

27.     Documents sufficient to identify the amount of each Braided Suture Product that has been imported into the United States by or for Arthrex and when importation of each Braided Suture Product occurred.

28.     Each sales contract for each Braided Suture Product.

29.     All documents and things concerning any acquisition or licensing by or from Arthrex of any technology concerning any Braided Suture Product.

30.     All documents and things concerning any changes or modifications to the design of any Braided Suture Product since 1998, including documents sufficient to identify the nature of such change or modification and the date such change or modification was made

31.     All correspondence between Arthrex and the U.S. Food and Drug Administration or foreign equivalent of the U.S. Food and Drug Administration related to obtaining marketing approval for any Braided Suture Product.

32.     All marketing materials, advertisements, press releases, news articles, and Internet web pages, concerning Arthrex's Braided Suture Products.

33.     Arthrex's financial statements, business plans, sales plans, and marketing plans concerning any Braided Suture Product.

34.     Periodic statements sufficient to describe Arthrex's costs for it Braided Suture Products.

35.     Documents and things sufficient to describe the market demand, including market and sales forecasts or surveys, for any Braided Suture Product, including documents concerning the actual or potential size of such market demand in dollars, units, or any other measure.

36.     For each fiscal quarter or other periodic summary that is less than a year, documents sufficient to identify all sales of Braided Suture Product including documents sufficient to identify the following information for each Braided Suture Product:

        a.     name of the product sold;

        b.     product indicia used by Arthrex to identify the product;

        c.     number of units sold;

        d.     total amount of sales in dollars;

        e.     average per unit price in dollars; and

        f.     gross and net profits (or losses).

37.     Documents sufficient to identify all selling prices and pricing policies for each Braided Suture Product.

38.     For each fiscal quarter or other periodic summary that is less than a year, documents sufficient to identify all actual or proposed discounting, or policies concerning the actual or proposed discounting, of any Braided Suture Product.

7

39.    Documents and things that describe any technical advantages of each Braided Suture Product or reasons why customers purchase each Braided Suture Product.

40.    Documents and things that reflect Arthrex's market share for its Braided Suture Products on a monthly or quarterly basis since the introduction of Arthrex's Braided Suture Products, including any third party reports and internally created documents, and analysis of the same.

41.    All documents and things concerning the date(s) on which and the circumstances under which Arthrex first became aware that DePuy Mitek claimed that any of its patents covered any Braided Suture Product.

42.    Documents sufficient to identify any person who has participated in the technical development of any Braided Suture Product (including corporate entities, business partners, engineers, designers, project managers, product managers, marketing mangers, product planners, or patent counsel, whether or not these persons are or were affiliated with Arthrex).

43.    Documents concerning the design and development of each Braided Suture Product including but not limited to the files and laboratory notebooks of each engineer or other person who participated in the development of each Braided Suture Product.

44.    All documents and things concerning any effort, attempt, or consideration by Arthrex or any other person to avoid infringement of the Patent-in-Suit.

45.    All documents concerning the date on which Arthrex first gained actual knowledge of the Patent-in-Suit.

8

46.    All documents and things concerning any decision of Arthrex to select any materials for the suture used in any Braided Suture Product including but not limited to any communications with vendors that state a material preference for Arthrex's Braided Suture Product.

47.    All documents and things concerning any policy or procedure of Arthrex concerning patent infringement or non-infringement.

48.    All reports that were generated by, or on behalf of, any person whom Arthrex expects to call as an expert witness at any hearing or at trial.

49.    All documents and things relied upon or considered by any person whom Arthrex expects to call as an expert witness at any hearing or at trial.

50.    All documents and things considered in preparing any response to DePuy Mitek's First Set of Interrogatories to Arthrex Inc., and all documents and things containing information responsive to any of those interrogatories.

51.    All customer surveys, market preference tests or surveys, or other studies concerning any Braided Suture Product.

52.    Each communication between Arthrex and any person whom Arthrex expects to call as an expert witness at any hearing or at trial.

53.    Any patent infringement indemnification or patent insurance agreement that Arthrex is a party to concerning any infringement of any Braided Suture Product.

54.    Each license or agreement under which Arthrex has or is paying royalties or consideration for sutures, anchors, needles, or shoulder surgical products, instruments, or technology and royalty reports reflecting payments under any such licenses or agreements.

9

55.    All documents and things concerning whether the selling, licensing, providing or otherwise distributing any Braided Suture Product affects the sales of other Arthrex products and/or services.

56.    Documents sufficient to identify the structure, identity and use of any product that is sold by Arthrex as a result of or is associated with the sale of any Braided Suture Product.

57.    For each fiscal quarter or other periodic summary that is less than a year, documents sufficient to identify all actual sales of each Convoyed Braided Suture Product including documents sufficient to identify the following information for each Convoyed Braided Suture Product:

> a.    name of the product sold;
>
> b.    product indicia used by Arthrex to identify the product;
>
> c.    number of units sold;
>
> d.    total amount of sales in dollars;
>
> e.    average per unit price in dollars; and
>
> f.    gross and net profits (or losses).

58.    All documents that support, contradict, or otherwise relate to Arthrex's admissions, denials or other allegations set forth in paragraphs 9-18 of Arthrex's Answer and paragraphs 6-8 of its counterclaim.

59.    All documents concerning any comparisons between any Braided Suture Product and any other product it competes with in the marketplace.

60.    All communication(s) with any non-party about this lawsuit.

61.     All documents that identify Arthrex's supplier(s) of materials or components for use in each Braided Suture Product.

62.     All documents that describe the tensile strength of any suture used in any Braided Suture Product with and without a coating and how the tensile strength was determined.

63.     All documents that describe the bending strength and rigidity of any suture used in any Braided Suture Product with and without a coating and how that bending strength and rigidity was determined.

64.     All documents concerning how Arthrex defines knot slippage and knot tiedown and the procedures that Arthrex's uses to determine them.

65.     All documents concerning the knot slippage tests set forth in Mr. Soffen's February 20, 2004 letter to Mr. Skula, how the knot slippage was determined, why it was determined, and who decided to determine it.

66.     All documents that identify who was involved in the tests set forth in Mr. Soffen's February 20, 2004 letter to Mr. Skula.

67.     Documents sufficient to describe the manufacturing process used to manufacture each Braided Suture Product, including but not limited to, manufacturing specifications and the manufacturing steps or processes taken to manufacture each Braided Suture Product.

68.     All documents concerning the nature of and the reasons for each coating used on each suture part of each Braided Suture Product.

11

69.     All documents concerning the testing of any Braided Suture Products that have a coating, including documents concerning the suture's tensile strength, knot-slippage properties, and bending strength and rigidity.

70.     All document that support any damages claim by Arthrex including but not limited to its trial counsel's hourly rates for attorneys that worked on this litigation, bills for this lawsuit, and any agreement concerning counsel fees for defending this lawsuit.

### **Things To Be Produced**

1.     A sample of each Braided Suture Product.

2.     A sample of each Convoyed Braided Suture Product.

3.     A sample of each Braided Suture Product without a coating but otherwise in its final manufacturing state (*i.e,* having all manufacturing process completed other than those associated with the coating).

Date: _1/14/05_

DEPUY MITEK, INC.,

By its attorneys,

_____
Dianne B. Elderkin
Lynn A. Malinoski
Michael J. Bonella
Erich M. Falke
WOODCOCK WASHBURN LLP
One Liberty Place - 46th Floor
17th and Market Streets
Philadelphia, PA 19103
(215) 568-3100

Daniel J. Gleason (BBO #194900)
Michelle Chassereau Jackson (BBO 654825)
Nutter McClennen & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA. 02210-2604

## CERTIFICATE OF SERVICE

I certify that the foregoing DePuy Mitek's First Set of Requests for Document and Things to Arthrex, Inc. was served by facsimile on the following on January 14, 2005:

Charles W. Saber
Dickstein, Shapiro, Morin & Ochinsky, LLP
2101 L. Street, NW
Washington, DC 20037-1526.
Fax: (202) 887-0689

Christopher Weld, Jr.
Todd & Weld LLP
28 State Street, 31st Floor
Boston, MA 02109
Fax: (617) 227-5777

Dated: January 14, 2005

_____
Erich Falke

13

# EXHIBIT 16

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **DePuy Mitek, Inc.**<br>    **a Massachusetts Corporation** | )<br>)<br>) |
|     **Plaintiff,** | )<br>) |
|     **v.** | )    **Civil No. 04-12457 PBS** |
| **Arthrex, Inc.**<br>    **a Delaware Corporation and** | )<br>)<br>) |
| **Pearsalls Ltd.**<br>    **a Private Limited Company**<br>    **of the United Kingdom** | )<br>) |
|     **Defendants.** | |

**DEFENDANTS ARTHREX, INC.'S AND PEARSALLS, LTD.'S RESPONSE TO
DEPUY MITEK'S DRAFT PROPOSED STIPULATED FACTS OF JUNE 29, 2007**

**Stipulated Fact #1**

    DePuy Mitek owns U.S. Patent No. 5,314,446 and has owned it since August, 2004 (DMI000338-340).

**OBJECT -- ownership of '446 patent being contested**

**Stipulated Fact #2**

    Ethicon, Inc. owned U.S. Patent No. 5,134,446 from May 24, 1994 until August, 2004 (446 Patent; DMI000338-340).

**OBJECT -- ownership of '446 patent being contested**

**Stipulated Fact #3**

    Arthrex, Inc. received actual notice of U.S. Patent No. 5,134,446 on December 1, 2003 (J. Schmeiding 1/5/06 Dep. at 64:12-15).

**OBJECT – irrelevant – goes to willfulness**

**Stipulated Fact #4**

FiberWire and TigerWire are surgical sutures (FiberWire IFU)(Undisputed Mitek Fact #11; Arthrex Response to Mitek Request to Admit No. 3).

**AGREE**

**Stipulated Fact #5**

Pearsalls manufactures FiberWire and TigerWire (Grieff Dep. at 12:2-11; 12:18-23; 16:24-17:3; 17:9-12).

**OBJECT – Pearsalls manufactures braids used in FiberWire and TigerWire**

**Stipulated Fact #6**

FiberWire and TigerWire have been manufactured according to the procedures set forth in DePuy Mitek Ex. 279 (Hallett 1/11/2006 Dep. at 12:21-13:9; 13:15-19).

**OBJECT -- Pearsalls manufactures braids used in FiberWire and TigerWire**

**Stipulated Fact #7**

FiberWire and TigerWire have been manufactured according to the procedures set forth in DePuy Mitek Ex. 281 (Hallett 1/11/2006 Dep. at 14:8-16; 19:10-13).

**OBJECT -- Pearsalls manufactures braids used in FiberWire and TigerWire**

**Stipulated Fact #8**

Pearsalls has imported unsterilized FiberWire and TigerWire into the United States (Grieff Dep. at 20:10-22).

**OBJECT -- Pearsalls manufactures braids used in FiberWire and TigerWire**

**Stipulated Fact #9**

Pearsalls has sold unsterilized FiberWire and TigerWire in the United States to R.K. Manufacturing (Grieff Dep. at 20:10-22).

**OBJECT -- Pearsalls manufactures braids used in FiberWire and TigerWire**

DSMDB-2292048v01

**Stipulated Fact #10**

RK Manufacturing does nothing to alter the construction of the braid it receives from Pearsalls and sells to Arthrex (Ponton Dep. at 74:16-21).

**OBJECT – "alter the construction" is undefined, confusing and misleading**

**Stipulated Fact #11**

RK Manufacturing has sold sterilized FiberWire and TigerWire to Arthrex, Inc. within the United States (Grieff Dep. at 37:23-38:8).

**AGREE**

**Stipulated Fact #12**

Arthrex, Inc. sells FiberWire and TigerWire in the United States (ARM 3355)(Undisputed Mitek Fact #51).

**AGREE**

**Stipulated Fact #13**

For all FiberWire and TigerWire products sold outside of the United States, Arthrex, Inc. supplies those products from the United States. (Grieff  Dep. at 70:16-24; 71:1-5, 6; 13-17).

**OBJECT – irrelevant**

**Stipulated Fact #14**

Arthrex, Inc. sells FiberWire and TigerWire sutures attached to a needle (DMI Ex. 5 at ARM 001469).

**AGREE**

**Stipulated Fact #15**

Arthrex's FiberWire and TigerWire suture products include at least the products having the following Arthrex catalog product codes: AR-7200, AR-7201, AR-7202, AR-7203, AR-7204, AR-7205, AR-7205T, AR-7207, AR-7209, AR-7209SN, AR-7209T, AR-7210, AR-7211, AR-7219, AR-7220, AR-7221, AR-7222, AR-7223, AR-7225, AR-7227-01, AR-7227-02, AR-7228, AR-7229-12, AR-7229-20, AR-7230-01, AR-7230-02, AR-7232-01, AR-7232-02, AR-7232-03, AR-7237, AR-7250, AR-7251, AR-1320BNF, AR-1322BNF, AR-1322-75SF, AR-1322-752SNF, AR-1915SNF, AR-1920SNF, AR-1322SX, AR-1322SXF, AR-1324B, AR-1324BF, AR-1324BF-2, AR-1324BNF, AR-1324HF, AR-1324SF,AR-1934BF, AR-1934BF-2,AR-1934BFT, AR-1934BFX, AR-1934BNF, AR-1934BLF, AR-1915SF, AR-1920BF, AR-

DSMDB-2292048v01

1920BF-37, AR-1920BFT, AR-1920BN, AR-1920BNF, AR-1920BNP, AR-1920BT, AR-1920SF, AR-1920SFT, AR-1925BF, AR-1925BFSP, AR-1925BNF, AR-1925BNP, AR-1925SF,AR1927-BF, AR-1927BNF, AR-1928SF, AR-1928SF-2, AR-1928SNF, AR-1928SNF-2, AR-2225S, and AR-2226S (DMI Ex. 101)(Undisputed Mitek Fact #26).

**AGREE**

**Stipulated Fact #16**

Arthrex's sells the following FiberWire and TigerWire suture product codes within the United States: AR-7200, AR-7201, AR-7202, AR-7203, AR-7204, AR-7205, AR-7205T, AR-7207, AR-7209, AR-7209SN, AR-7209T, AR-7210, AR-7211, AR-7219, AR-7220, AR-7221, AR-7222, AR-7223, AR-7225, AR-7227-01, AR-7227-02, AR-7228, AR-7229-12, AR-7229-20, AR-7230-01, AR-7230-02, AR-7232-01, AR-7232-02, AR-7232-03, AR-7237, AR-7250, AR-7251, AR-1320BNF, AR-1322BNF, AR-1322-75SF, AR-1322-752SNF, AR-1915SNF, AR-1920SNF, AR-1322SX, AR-1322SXF, AR-1324B, AR-1324BF, AR-1324BF-2, AR-1324BNF, AR-1324HF, AR-1324SF,AR-1934BF, AR-1934BF-2,AR-1934BFT, AR-1934BFX, AR-1934BNF, AR-1934BLF, AR-1915SF, AR-1920BF, AR-1920BF-37, AR-1920BFT, AR-1920BN, AR-1920BNF, AR-1920BNP, AR-1920BT, AR-1920SF, AR-1920SFT, AR-1925BF, AR-1925BFSP, AR-1925BNF, AR-1925BNP, AR-1925SF,AR1927-BF, AR-1927BNF, AR-1928SF, AR-1928SF-2, AR-1928SNF, AR-1928SNF-2, AR-2225S, and AR-2226S (ARM 3355).

**AGREE**

**Stipulated Fact #17**

FiberWire sutures and TigerWire sutures sold by Arthrex are sterilized (Arthrex Response to Mitek's Request to Admit No. 3)(DMI Ex. 3 at 13-1).

**AGREE**

**Stipulated Fact #18**

The cover in FiberWire suture is constructed of ultra high molecular weight polyethylene (UHMWPE) and polyethylene terephthalate (PET) (Arthrex Response to Mitek's Request to Admit No. 9).

**AGREE**

**Stipulated Fact #19**

FiberWire is a heterogeneous braid composed of a first and second set of continuous and discrete yarns (Mukherjee Dep. at 362:1-4)(Undisputed Mitek Fact #13).

- 4 -

**OBJECT – incorrect – FiberWire *includes* a heterogeneous braid composed of a first and second set of continuous and discrete yarns**

**Stipulated Fact #20**

     FiberWire includes a set of PET yarns made up of a plurality of PET filaments (Dreyfuss Dep. at 64:14-17).

**AGREE**

**Stipulated Fact #21**

     Each FiberWire suture product has PET as a second set of yarns (*id.*)(Undisputed Mitek Fact #49).

**OBJECT – confusing attempt to reference claim language – no context**

**Stipulated Fact #22**

     FiberWire has each yarn from the second set composed of a plurality of filaments of a second fiber-forming material of PET (Mukherjee Dep. at 363:7-16)(Undisputed Mitek Fact #46).

**OBJECT – confusing attempt to reference claim language – no context**

**Stipulated Fact #23**

     FiberWire includes a set of UHMW PE yarns made up of a plurality of UHMW PE filaments (Dreyfuss Dep. at 50:21-51:1)

**AGREE**

**Stipulated Fact #24**

     In FiberWire, at least one yarn of ultra high molecular weight PE is in direct intertwining contact with a PET yarn (Dreyfuss Dep. at 50:21-51:1).

**AGREE**

**Stipulated Fact #25**

     FiberWire is a heterogeneous sheath braid composed of discrete yarns in a sterilized braided construction (Mukherjee Dep. at 362:5-8)(Undisputed Mitek Fact #13).

**OBJECT – incorrect – FiberWire *includes* a heterogeneous sheath braid composed of discrete yarns in a sterilized braided construction**

DSMDB-2292048v01

**Stipulated Fact #26**

The polyethylene terephthalate yarns in FiberWire and TigerWire are continuous and discrete (*id*. at 362:1-4)(Undisputed Mitek Fact #15).

**AGREE**

**Stipulated Fact #27**

The ultra high molecular weight polyethylene yarns in FiberWire and Tiger Wire are continuous and discrete (*id.*)

**AGREE**

**Stipulated Fact #28**

The PET used in Arthrex's FiberWire sutures is in the form of yarn, and that PET yarn is made up of several twisted monofilaments of PET (Dreyfuss 9/16/05 Dep. at 64:14-17)(Undisputed Mitek Fact #17).

**AGREE**

**Stipulated Fact #29**

No. 2 FiberWire suture, No. 5 FiberWire, No. 0 FiberWire suture, the No. 2-0 FiberWire suture, and the 3-0 FiberWire suture are braided using the same process (Dreyfuss 9/16/05 Dep. at 38:20-24)(Undisputed Mitek Fact #23).

**AGREE**

**Stipulated Fact #30**

Arthrex's FiberWire sutures have a core except for 4-0 FiberWire (DMI Ex. 318)(Undisputed Mitek Fact #47).

**AGREE**

**Stipulated Fact #31**

The purpose of the nylon marking strand in Arthrex's TigerWire product is visual identification (Dreyfuss 12/7/05 Dep. at 74:21-23)(Undisputed Mitek Fact #39).

**OBJECT – irrelevant – Defendants not making distinction between FiberWire and TigerWire for purposes of this trial**

DSMDB-2292048v01

**Stipulated Fact #32**

Notwithstanding the color of the yarns, TigerWire's yarns are identical to FiberWire's yarn with the exception that one PET yarn is replaced by one nylon yarn (DMI Ex. 318)(Undisputed Mitek Fact #9).

**AGREE**

**Stipulated Fact #33**

TigerWire is braided in the same way as FiberWire (Dreyfuss 9/16/05 at 31:24–32:2)(Undisputed Mitek Fact #10).

**AGREE**

**Stipulated Fact #34**

Every FiberWire and TigerWire construction has a ratio of the cross-sectional area of ultra high molecular weight PE in the sheath and core to the total cross sectional area of all the yarns in the surgical suture that ranges from 20 to 80 percent (Brookstein Op. Expert Rpt. at ¶49; DMI Ex. 318)(Undisputed Mitek Fact #50).

**AGREE**

**Stipulated Fact #35**

FiberWire size 4-0 does not have a core (*id*. at 55:21-23)(Undisputed Mitek Fact #25).

**AGREE**

**Stipulated Fact #36**

The FiberWire size 4-0 suture has the same sheath configuration as the other size FiberWire sutures (*id*. at 104:17-105:9)(Undisputed Mitek Fact #24).

**AGREE**

**Stipulated Fact #37**

Ultra-high molecular weight polyethylene is a lubricious material (*id*. at 52:24-53:1)(Undisputed Mitek Fact #29).

**OBJECT – no context given**

DSMDB-2292048v01

**Stipulated Fact #38**

Tevdek is a 100% braided polyester suture (Sluss Dep. at 35:17-22; *See* Grafton Dep. at 36:17-18).

**AGREE**

**Stipulated Fact #39**

The initial FiberWire prototype was 100 percent ultra-high molecular weight polyethylene (Grafton Dep. at 51:15-17)(Undisputed Mitek Fact #27).

**OBJECT – "initial FiberWire prototype" undefined and also irrelevant**

**Stipulated Fact #40**

When developing FiberWire, Arthrex considered a 100% ultra high molecular weight PE braid before it considered braiding ultra high molecular weight PE with PET (Grafton Dep. at 51:15-17)(Undisputed Mitek Fact #139).

**OBJECT – irrelevant**

**Stipulated Fact #41**

The knot slippage of the 100% ultra-high molecular weight polyethylene suture was poor because of the lubricity of polyethylene (*id*. at 53:2-5)(Undisputed Mitek Fact #29).

**OBJECT -- irrelevant**

**Stipulated Fact #42**

The knot security of the initial FiberWire prototype made from 100 percent ultra-high molecular weight polyethylene was poor (*id*. at 51:4-7; 53:20-23)(Undisputed Mitek Fact #30).

**OBJECT -- irrelevant**

**Stipulated Fact #43**

Mr. Grafton's idea was to add the PET and to improve the knot security of the suture (Undisputed Mitek Fact #30)(*id*. at 53:24-54:5).

**AGREE**

DSMDB-2292048v01

**Stipulated Fact #44**

The FiberWire prototype suture that included PET braided with ultra-high molecular weight polyethylene had good knot security (*id*. at 54:24-55:1)(Undisputed Mitek Fact #31).

**AGREE**

**Stipulated Fact #45**

The FiberWire sample, denoted as DePuy Mitek Deposition Ex. 282, underwent all FiberWire manufacturing processes prior to the wind to skein process and the scouring process, but no other FiberWire manufacturing processes (Hallett 1/11/2006 Dep. at 33:3-34:7; 36:16-18).

**OBJECT – irrelevant**

**Stipulated Fact #46**

The FiberWire sample, denoted as DePuy Mitek Deposition Ex. 283, underwent the FiberWire braiding process and all FiberWire manufacturing processes that are before the braiding process, but no other FiberWire manufacturing processes (Hallett 1/11/2006 Dep. at 35:10-13; DMI Ex. 279).

**OBJECT -- irrelevant**

**Stipulated Fact #47**

The FiberWire sample, denoted as DePuy Mitek Deposition Ex. 284, underwent the FiberWire scouring and dying processes and all FiberWire manufacturing processes that are before the dying process, but no other FiberWire manufacturing processes (Hallett 1/11/2006 Dep. at 36:1-4; 36:19-12; DMI Ex. 279).

**AGREE**

**Stipulated Fact #48**

The FiberWire sample, denoted as DePuy Mitek Deposition Ex. 285, underwent the FiberWire scouring and dying processes and all FiberWire manufacturing processes before the "final inspection/measuring" process (Hallett 1/11/2006 Dep. at 37:10-13; DMI Ex. 279).

**AGREE**

**Stipulated Fact #49**

The FiberWire sample, denoted as DePuy Mitek Deposition Exhibit 342, under went all of the manufacturing process in DePuy Mitek Exhibit 279 before the stretching and coating

DSMDB-2292048v01

processes, and once coated, stretched, and heated a single time (Hallett 1/12/2006 Dep. at 349:7-13; 350:1-5).

**OBJECT – irrelevant and confusing**

**Stipulated Fact #50**

Pearsalls' "dye stage" testing occurs after the dying and scouring process but before the winding, stretching and coating, and final inspection/measuring processes (Hallett 1/11/2006 at 47:24-48:3; DMI Ex. 279).

**OBJECT – irrelevant and confusing**

**Stipulated Fact #51**

Pearsalls' "intermediate" testing occurs after the stretching and coating processes in Mitek deposition Ex. 279 but before the final inspection/measuring processes (Hallett 1/11/2006 Dep. at 49:14-16; DMI Ex. 279).

**OBJECT – irrelevant and confusing**

**Stipulated Fact #52**

Pearsalls' final stage measuring test occurs after the stretching and coating processes in Mitek deposition Ex. 279 and when Pearsalls' has completed manufacturing the product (Hallett 1/11/2006 Dep. at 53:18-25; DMI Ex. 279).

**OBJECT – irrelevant and confusing**

**Stipulated Fact #53**

There should not be any construction or manufacturing difference between FiberWire samples from the same batch that are tested at Pearsalls' intermediate and final tests (Hallett 1/11/2006 Dep. at 54:1-6; DMI Ex. 279).

**OBJECT – irrelevant and confusing**

**Stipulated Fact #54**

DePuy Mitek Deposition Exhibit 316 sets forth specification tolerances for FiberWire (Hallett 1/12/2006 at 237:9-11; 240:21-24).

**OBJECT – irrelevant and incorrectly describes document**

DSMDB-2292048v01

**<u>Stipulated Fact #55</u>**

DePuy Mitek Deposition Exhibit 317 sets forth specification acceptance criteria for FiberWire (Hallett 1/12/2006 Dep. at 241:15-18).

**AGREE**

**<u>Stipulated Fact #56</u>**

DePuy Mitek Deposition Exhibit 318 is a matrix for the developmental and commercial FiberWire and TigerWire products (Hallett 1/12/2006 Dep. at 245:21-25).

**OBJECT – irrelevant and confusing**

**<u>Stipulated Fact #57</u>**

Pearsalls' batch records were generated in the normal course of Pearsalls' business (Hallett 1/12/2006 Dep. at 269:5-11).

**AGREE**

DSMDB-2292048v01

# EXHIBIT 17

CONFIDENTIAL- NON-PATENT ATTORNEYS EYES ONLY

1

1    IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
         IN AND FOR THE NEW CASTLE COUNTY

2   _____

3   DEPUY MITEK, INC., a Massachusetts )
   Corporation,                   )
                Plaintiff,      )   Civil Action

4   v.                                )   No. 04-12457 PBS
   ARTHREX, INC., a Delaware        )

5   Corporation,                   )
                Defendant.      )

6   _____ )   **HIGHLY**
                                        **CONFIDENTIAL**

7

8      CONFIDENTIAL - NON-PATENT ATTORNEY'S EYES ONLY

9               deposition of:

10           BRIAN HALLETT

11             taken at:
          The Castle Hotel

12            Castle Green
             Taunton

13             Somerset
         UNITED KINGDOM

14                on
        11th January 2006

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL- NON-PATENT ATTORNEYS EYES ONLY

10

1    MR. TAMBURO: These are -- I just wanted
2    to produce over to you today the specifications
3    that accompany -- or that are identified in the
4    manufacturing flowchart and FiberWire -- they
5    are not Bates stamped today, but these are all
6    of the specs that are identified in the
7    flowchart. What we will do is make
8    a production to you today so you can use it for
9    the deposition in the next two days, and we
10   will produce a Bates-stamped copy once I get
11   back to the office. That is item number 1.
12   MR. BONELLA: Thank you.
13   MR. TAMBURO: You are welcome. Item
14   number 2, what I am going to hand to you is
15   a five-meter length of sample FiberWire
16   material, PS05T2, which was the -- it is
17   a coated sample which was the actual sample
18   used in the February 2004 -- I think it was
19   February 2004 -- tests that were done at
20   Arthrex. We have checked, and there is no
21   uncoated samples remaining, so what we have
22   here is a five-meter portion of the coated,
23   actual samples, and it is a supplement that was
24   asked for, and I told Angela that we could give
25   it to you today.

11

1    MR. BONELLA: Okay.
2    MR. TAMBURO: So, that is item number 2,
3    and what we will do is; I will identify the
4    Bates number for that when I get back to the
5    office and I will let you know what that is.
6    There are four more items here. They are
7    US2 FiberWire samples, all of them. They were
8    taken from production from various stages of
9    production, and item number 1 is going to be
10   US2 -- I should say item number 3 produced
11   today, is going to be US2 FiberWire M/C state
12   before scoured, and it is a little capsule
13   including the sample of the suture.
14   Item number 4 for production today is
15   going to be a similar capsule of suture from
16   a further stage of development which would be
17   US2 FiberWire, M/C state, scoured. That is how
18   it is labeled. And again, I will identify the
19   Bates stamp for that when I get back to the
20   office.
21   Item number 5 for production today would
22   be another capsule of FiberWire suture, and
23   at further stage of development which would be
24   US2 FiberWire, M/C state, scoured/dyed. This
25   has been dyed, and again, I will identify the

12

1    Bates number for that sample when I get back.
2    The last item today for production is
3    a US2 FiberWire M/C state dyed/coated. It is
4    the fourth capsule of suture, and I will
5    identify the Bates stamp when I get back to the
6    office. Thank you.
7    MR. BONELLA: I am going to show you,
8    Mr. Hallett, DePuy Mitek Exhibit 279. It has
9    a number on it. You may be familiar with
10   these. These are numbers that the attorneys
11   put on each page of the documents that are
12   exchanged between the parties to identify them,
13   so we can have a way to refer to them, and this
14   number has a -- this page, the DePuy Mitek
15   Exhibit 279 has what we -- we call these,
16   "Bates numbers" -- it is Bates number PR 08324.
17   I made a mark in here, but I will ask you if
18   you recognize Exhibit 279.
19 (DePuy Mitek Exhibit 279 marked for identification)
20   A    Yes.
21   Q    What is Exhibit 279?
22   A    It is a flowchart of FiberWire and
23 TigerWire.
24   Q    Flowchart for the manufacturing of
25 FiberWire and TigerWire?

13

1    A    Hmm hmm.
2    Q    "Yes"?
3    A    Yes.
4    Q    Is this the current manufacturing
5 flowchart for FiberWire and TigerWire?
6    A    Yes.
7    Q    Have there been previous versions of this
8 flowchart?
9    A    No.
10   Q    No?
11   A    No.
12   Q    Ever, for all time, FiberWire has been
13 manufactured commercially according to Exhibit 279?
14   A    No. Not that I am aware of.
15   Q    Let me make sure that the question is
16 clear. The question is; for all time, has FiberWire
17 been manufactured according to the processes set
18 forth in Exhibit 279?
19   A    Yes.
20   Q    Yes it has?
21   A    Yes.
22   Q    Next, I am going to show you DePuy Mitek
23 Exhibit 281.
24 (DePuy Mitek Exhibit 281 marked for identification)
25   A    Yes.

4 (Pages 10 to 13)

# Pearsalls Sutures

## Fibrewire/Tigerwire Flowchart



DEPUY MITEK
EXHIBIT 279
04cv12457

CONFIDENTIAL

PR 08324

QSM4.8.27     Page: 1 of 1     Issue: 6     Date: 08/05/05     Authorised:

# EXHIBIT 18

CONFIDENTIAL- NON-PATENT ATTORNEYS EYES ONLY

1

1    IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
          IN AND FOR THE NEW CASTLE COUNTY

2    _____
     DEPUY MITEK, INC., a Massachusetts )
3    Corporation,                        )
                         Plaintiff,      )  Civil Action
4    v.                                  )  No. 04-12457 PBS
     ARTHREX, INC., a Delaware           )
5    Corporation,                        )
                         Defendant.      )  **HIGHLY**
6    _____    )  **CONFIDENTIAL**

7

         CONFIDENTIAL - NON-PATENT ATTORNEY'S EYES ONLY

8

                       deposition of:

9

                       BRIAN HALLETT

10

                       taken at:
11                  The Castle Hotel
                     Castle Green
12                    Taunton
                      Somerset
13                UNITED KINGDOM

14                       on
                  11th January 2006

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL- NON-PATENT ATTORNEYS EYES ONLY

46

1        MR. BONELLA: What do you mean by that?
2        MR. TAMBURO: -- but I take you at your
3    word that this is the 30(b)(6) portion of
4    the deposition, and again, to the extent that
5    this testimony you are requesting right now is
6    duplicative of testimony that was already given
7    by Pearsalls in the past for this topic, topics
8    number 4, 5, 6 and 7 of the original notice,
9    Arthrex and Pearsalls are objecting to the
10    duplicative testimony requested.
11        MR. BONELLA: Let's just move on. We will
12    resolve it later. Exhibit 280. Do you
13    recognize that, Mr. Hallett?
14    A    I recognize it as it is.
15    Q    What is Exhibit 280?
16    A    It is a result of a batch of US2
17 FiberWire.
18    Q    Exhibit 280 is batch testing results?
19    A    Hmm hmm.
20    Q    The tests describe in Exhibit 280 are,
21 those tests that are run in the standard, ordinary
22 business of Pearsalls?
23    A    Correct.
24    Q    Do you see the test at the intermediate
25 stage?

47

1    A    Yes.
2    Q    Can you label in the manufacturing
3 flowchart where that test was done? Can you label
4 that as the intermediate stage? Okay. So, where you
5 have labeled Exhibit 280 interim/stage on Exhibit
6 279 reflects the intermediate stage testing done in
7 Exhibit 280?
8    A    Yes.
9    Q    If you could identify -- there is
10 a measure stage testing in Exhibit 280; correct?
11    A    Hmm hmm.
12    Q    Could you label on Exhibit 279 where the
13 measure stage testing is?
14    A    So, do you want me to put the --
15    Q    If you could just put, "Measure stage"?
16 "Exhibit 280 measure stage", and there is also the
17 stretch stage. Would you label where that is in
18 Exhibit 279? And there is also the dye stage
19 testing. Could you label where that is in Exhibit
20 279? Exhibit -- you have labeled in Exhibit 279,
21 "Exhibit 280 dye stage", and that refers to the dye
22 stage testing in Exhibit 280?
23    A    Yes.
24    Q    The dye testing that is done in Exhibit
25 280, is that all -- is that of samples of FiberWire

48

1 that have undergone the dyeing and scouring
2 processes and all processes before that?
3    A    Yes.
4    Q    You have labeled Exhibit 280, "Stretch
5 stage"?
6    A    Hmm hmm.
7    Q    On Exhibit 279; correct?
8    A    Yes.
9    Q    The samples -- I am sorry, the stretch
10 stage testing that is in Exhibit 280, does that
11 undergo the stretching in all processes before that?
12    A    Yes.
13    Q    The samples that have gone -- that are
14 stretch-tested in Exhibit 280 -- I am sorry, I will
15 rephrase the question. The samples that have been
16 stretch-tested as reflected in Exhibit 280 have not
17 been coated. Is that correct?
18    A    No.
19    Q    "No", it is not correct?
20    A    No. It is not correct.
21    Q    The samples that have been stretch test --
22 I am sorry, the samples that are tested at the
23 stretch stage have undergone the stretching and
24 coating processes?
25    A    Yes.

49

1    Q    Are you sure about that?
2    A    Repeat the question again.
3    Q    Sure. The stretch testing, samples that
4 are tested at the stretch stage as in Exhibit 280,
5 have they undergone the stretching and coating
6 processes that are reflected in Exhibit 279?
7        MR. TAMBURO: Asked and answered,
8    objection.
9        MR. BONELLA: Mr. Tamburo is going to
10    object to questions, but unless he instructs
11    you not to answer you have to answer the
12    question.
13    A    Yes.
14    Q    The intermediate stage testing, have those
15 samples been stretched and coated?
16    A    Yes.
17    Q    What is the difference between the
18 intermediate stage testing and the stretched stage
19 testing samples?
20    A    They are tested before they are actually
21 coated.
22    Q    Which are tested before they are coated?
23    A    The yarn. The braid.
24    Q    The samples that are tested during the
25 stretched stage, have they been stretched?

13 (Pages 46 to 49)

CONFIDENTIAL- NON-PATENT ATTORNEYS EYES ONLY

50

```
 1   A   No.
 2   Q   The samples that are tested during the
 3 coating -- I am sorry -- the samples that are tested
 4 during the stretched stage, have they been coated?
 5   A   No.
 6   Q   So, that is different to the way you
 7 testified before.
 8   A   Yes.  You have confused me.
 9   Q   Let me make sure we have it right.  The
10 samples that are tested at the stretched stage, what
11 processes have they undergone in Exhibit 279?
12   A   They are tested before they are stretched.
13   Q   All processes prior to stretching?
14   A   Yes.
15   Q   The samples that have been tested during
16 the stretched stage have not been coated; correct?
17   A   Correct.
18   Q   Intermediate stage, the samples that are
19 tested during the intermediate stage --
20   A   Which has been coated.
21   Q   They have been coated?
22   A   Yes.
23   Q   Coated or stretched?
24   A   Stretch-coated.  We don't -- it is just
25 a term.  What we call a, "Pad stretch".
```

51

```
 1         MR. TAMBURO:  Excuse me, if I can just
 2     interrupt?  Can we take a quick break and maybe
 3     get this straightened out?  I am sure --
 4     I think there is a little bit of inconsistent
 5     information, so we just want to make sure we
 6     get the correct information.  Take
 7     a five-minute break?
 8         MR. BONELLA:  Yes.
 9 (10.10 am)
10         OFF THE RECORD
11 (10.12 am)
12         MR. BONELLA:  Before we broke we were
13     discussing Exhibit 280 where the testing was
14     done with reference to Exhibit 279.  Let's go
15     back to the stretched stage testing.
16   A   Okay.
17   Q   The samples that are tested during the
18 stretched stage testing on Exhibit 280, what
19 processes have they undergone as set forth in
20 Exhibit 279?
21   A   The stretched stage is where -- those
22 figures there are where the machine operator was
23 setting up the machine.
24   Q   Setting up what machine?
25   A   Setting up the coating and stretching of
```

52

```
 1 the machine.  This is the preliminary figures that
 2 they, the operator, has actually taken.
 3   Q   The stretched stage?
 4   A   Hmm hmm.
 5   Q   The samples that are tested during the
 6 stretched stage, have they been stretched and
 7 coated?
 8   A   Yes.
 9   Q   They have been?
10   A   Yes.
11   Q   And the samples that are about the dye
12 stage, they have not been stretched and coated,
13 right?
14   A   Not at the dye stage, no.
15   Q   The intermediate stage, have they been
16 stretched and coated?
17   A   Yes.
18   Q   What is the difference between the
19 intermediate stage and the stretched stage?
20   A   The stretched stage is where the machine
21 operator has set the machine up to make sure they
22 are online for whatever size they are stretching.
23 They do a preliminary test before they set the
24 machine going, set the machine -- to make sure that
25 the machine is set up right, correct.
```

53

```
 1   Q   So, the samples that are tested at the
 2 stretched stage and the intermediate, they have both
 3 been stretched and they have both been coated?
 4   A   Yes.
 5   Q   And the difference is that the stretched
 6 stage samples are just kind of a preliminary stage
 7 where the coated stage is representative of the rest
 8 of the batch?
 9   A   Absolutely right.
10   Q   What is the purpose of the stretched stage
11 coating test?
12   A   To make sure that the machine is set up
13 correctly, yes.
14   Q   What was different than to Mr. Sonner's
15 (Phonetic) testimony from the last deposition.
16         MR. TAMBURO:  I don't know if it is or
17     isn't.
18         MR. BONELLA:  Exhibit -- and then the
19     final stage measuring test?
20   A   The final stage measuring test is when the
21 product has been completed.  It is on final reel, it
22 is sent to the lab for testing.
23   Q   The samples that are tested, the final
24 inspection stage, have been stretched and coated?
25   A   Yes.
```

14 (Pages 50 to 53)

CONFIDENTIAL- NON-PATENT ATTORNEYS EYES ONLY

54

1 Q What is the difference between the samples
2 that are stretched at the intermediate and the
3 samples that are tested at the final stage?
4 A There should not be any, but it is a test
5 that we do to make sure that nothing has been upset
6 if you like, at final measuring.
7 Q All right. I am ready to start walking
8 around, if you guys are ready. We would like, if
9 possible, if we could try to, if we could walk
10 around with a couple of the exhibits, 279, I think
11 it would be helpful, we will take both copies, and
12 Exhibit 280, if we could walk around with those, and
13 maybe start with Exhibit 279, if you could lead us
14 to the -- I guess wherever would be the point at the
15 beginning of the process.
16 A Yes.
17 Q Wherever you feel that would be the best
18 point to demonstrate how it is manufactured.
19 A Hmm hmm.
20 Q Great.
21 (10.16 am)
22        OFF THE RECORD
23 (Deposition resumes during tour of facility)
24 (10.20 am)
25 A This is our Quality Control Lab. All our

55

1 incoming products, yarns, are tested in here. This
2 is some of the stuff at the moment waiting to be
3 tested, or preparing to be tested. The PET is tested
4 before we use it. From there it goes to packing,
5 production, ready for processing.
6 Q This room here is the -- where the
7 coming-in yarns are inspected?
8 A Yes.
9 Q And the processes in Exhibit 279, in the
10 incoming yarn stores, blocked, are they -- are those
11 processes taking place in the quality testing
12 laboratory here?
13 A Yes. Correct.
14 Q These boxes over here are the incoming
15 yarns and this is an example of the Dyneema that is
16 used in FiberWire?
17 A Correct. These have been tested and have
18 been quality-controlled, so therefore each one is
19 now ready to go into the processing.
20 Q Okay, and what happens after that?
21 A From there, it has been -- it goes to the
22 first stage which is twisting of the product.
23 Q Twisting for the core cover?
24 A Yes.
25 Q Where does that take place?

56

1 A Over to the left of us.
2        MR. BONELLA: If we could proceed to
3 there?
4 (10.22 am)
5        (OFF THE RECORD)
6 (10.23 am)
7        MR. BONELLA: Mr. Hallett, we just looked
8 at the machine that does the twisting for the
9 FiberWire, right?
10 A Right.
11 Q And we saw the core, we saw the ultra high
12 molecular weight polyethylene and yarn being twisted
13 for the covers, right?
14 A Correct.
15 Q That was being twisted for the holding
16 twist for the cover?
17 A Correct.
18 Q That was Number 2 FiberWire?
19 A Correct.
20 Q Pearsalls was not currently doing any
21 twisting for the core; correct?
22 A Not at this moment in time.
23 Q Pearsalls were using the same machine to
24 twist the core; correct?
25 A Correct.

57

1 Q The difference being how the machine is
2 set for twisting for one core or another?
3 A Correct, yes.
4 Q Is that machine for twisting used for the
5 PET?
6 A We don't twist the PET.
7 Q Right. Now, after the twisting processes,
8 there is a steam set process for the core but not
9 the cover; correct?
10 A Correct.
11 Q Through here is the steam setting for
12 the --
13 A No. This is the room from when it has
14 been steam set, it is when it goes from bobbin to
15 core bobbin, core processing bobbin. It comes from
16 a twisted bobbin to a core processing bobbin.
17 Q A core processing bobbin? And so this is
18 where it has been wound from the twisting would be
19 into a core processing bobbin here?
20 A Correct. I can show you a bobbin that is
21 being wound at the moment.
22        MR. BONELLA: That would be great.
23 (10.26 am)
24        (OFF THE RECORD)
25 (10.28 am)

15 (Pages 54 to 57)

# Pearsalls Sutures

## Fibrewire/Tigerwire Flowchart



DEPUY MITEK
EXHIBIT 279
04cv12457

CONFIDENTIAL

PR 08324

QSM4.8.27    Page: 1 of 1    Issue: 6    Date: 08/05/05    Authorised:

# EXHIBIT 19

CONFIDENTIAL- NON-PATENT ATTORNEYS EYES ONLY

1

1   IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
          IN AND FOR THE NEW CASTLE COUNTY
2
    ─────────────────────────────────
3   DEPUY MITEK, INC., a Massachusetts  )
    Corporation,                        )
4                    Plaintiff,         )  Civil Action
    v.                                  )  No. 04-12457 PBS
5   ARTHREX, INC., a Delaware           )
    Corporation,                        )
6                    Defendant.         )  **HIGHLY
    ─────────────────────────────────   )  CONFIDENTIAL**
7

8        CONFIDENTIAL - NON-PATENT ATTORNEY'S EYES ONLY

9                    deposition of:

10                   BRIAN HALLETT

11                   taken at:
                 The Castle Hotel
12                 Castle Green
                    Taunton
13                  Somerset
                 UNITED KINGDOM
14
                      on
15             11th January 2006

16

17

18

19

20

21

22

23

24

25

Condensed Copy

CONFIDENTIAL- NON-PATENT ATTORNEYS EYES ONLY

14

1    Q    It is Bates number ARM 2554. It is
2 entitled, "Pearsalls Sutures, FiberWire Process
3 Flowchart", and I will ask if you recognize Exhibit
4 281.
5    A    Yes.
6    Q    Yes?
7    A    Yes.
8    Q    What is Exhibit 281?
9    A    It is a FiberWire flowchart.
10    Q    It is a manufacturing -- Exhibit 281 is
11 a Pearsalls manufacturing flowchart for FiberWire?
12    A    Yes. It is one of the earlier stages.
13    Q    Exhibit 279 differs from Exhibit 281;
14 correct?
15    A    Yes. The other one just gives more
16 information.
17    Q    Was there a difference in the way
18 FiberWire was manufactured, or is it that the
19 Exhibit 281 just is a simplified version of Exhibit
20 281?
21    A    Yes. On this one, the 08324, it shows
22 that we have twisted the cover. Previously we never
23 used a twisted cover.
24    Q    At what point did Pearsalls begin twisting
25 the cover for FiberWire manufacturing?

15

1    A    I would say about two to three months
2 after we started production.
3    Q    Somewhere in late 2001?
4    A    Yes.
5    Q    Other than twisting the cover, is there
6 any other differences between the way FiberWire has
7 been manufactured over the time period?
8    A    The core was steam set.
9    Q    It was steam set?
10    A    Afterwards.
11    Q    After what?
12    A    After this -- this is the first -- one of
13 the first processes.
14    Q    By, "This", you are referring to Exhibit
15 281?
16    A    Yes. 281.
17    Q    When you say, "It was steam set", where
18 are you referring to in the procedure that FiberWire
19 was steam set during the manufacturing process?
20    A    The core was steam set.
21    Q    Was that in the earlier versions or later?
22    A    No, later.
23    Q    Later.
24    A    As you can see, the difference is on the
25 flowchart.

16

1    Q    Right. So, that steam set for the core,
2 is that in Exhibit 279 but not 281; correct?
3    A    Yes.
4    Q    When did Pearsalls begin steam setting the
5 core in manufacturing FiberWire?
6    A    I think I believe it was about two months
7 afterwards.
8    Q    After --
9    A    We started producing.
10    Q    Sometime -- so, Pearsalls began steam
11 setting the core during the manufacturing process
12 for FiberWire sometime in late 2001?
13    A    Yes.
14    Q    How about for the cover? Was the cover
15 originally steam set as well?
16    A    No.
17    Q    No. When did Pearsalls begin steam
18 setting the cover for the manufacturing process?
19    A    That part, we did not steam set it.
20    Q    You, Pearsalls, has never steam set the
21 cover during the manufacture of FiberWire?
22    A    No. There is no need to. That part of
23 the flowchart is wrong, there.
24    Q    There is also that of the manufacturing
25 processes that are on the flowchart that are called

17

1 out by numbers. Is that right?
2        MR. TAMBURO: Which flowchart?
3        MR. BONELLA: Both of them. 279 and 281,
4    right? Some of them, some of the numbers are
5    the same on each flowchart, and some are
6    different. Just a little bit. For example,
7    under the twist of the core on Exhibit 279 it
8    refers to SP3.1.3a and SP3.2.1a, and in Exhibit
9    281 it refers to SP3.2.1 and SP3.2.2. Do you
10    see that?
11    A    Hmm hmm.
12    Q    Are those different versions of the same
13 procedure?
14    A    Yes.
15    Q    The procedure for the twisting of the
16 cores has changed over time for FiberWire?
17    A    No.
18    Q    Do you know the difference in the
19 versions?
20    A    I believe the actual -- that refers to the
21 processing of the twisting product.
22    Q    Right. My question is; the SP3.2.1a, is
23 it substantially different in any way than SP3.2.1?
24    A    I don't think so, no.
25    Q    I am sorry. Let me just finish the

5 (Pages 14 to 17)

CONFIDENTIAL- NON-PATENT ATTORNEYS EYES ONLY

18

1 question. Is SP3.2.1 and SP3.2.2 substantially
2 different in any way than SP3.1.3a and SP3.2.1a?
3         MR. TAMBURO: Object to the form.
4         MR. BONELLA: You can answer the question.
5    Q    I would also like to show you -- the
6 only -- is there anything else wrong about the
7 flowchart in Exhibit 279, other than the block that
8 specifies steam-setting the cover?
9    A    Not that I can see.
10   Q    Exhibit 279 and Exhibit 281 are identified
11 as both processes for manufacturing flowchart, or
12 manufacturing FiberWire. Are there any other
13 flowchart versions that describe the manufacturing
14 processes for FiberWire at any point in time?
15   A    There could be.
16   Q    For example, if you look at the bottom of
17 Exhibit 279, it says that the QSM4.8.27, is that
18 a reference to the -- well, what is that a reference
19 to?
20   A    If you look at the bottom, there is, like,
21 Issue 2 and Issue 6, so, therefore, it has been
22 upgraded six times.
23   Q    The manufacturing process?
24   A    Yes.
25   Q    The manufacturing process for FiberWire

19

1 has had six different --
2    A    Six different version.
3    Q    And the latest one, Exhibit 279, the one
4 that has been in existence since August 5th, 2005?
5    A    Yes.
6    Q    The processes called out in Exhibit 279
7 are the ones that have been used to manufacture
8 FiberWire since August 5th, 2005?
9    A    Yes.
10   Q    Exhibit 281 are manufacturing processes
11 that were used to make FiberWire beginning on
12 January -- I am sorry, June 29th, 2001?
13   A    Hmm hmm, yes.
14         MR. TAMBURO: I think that other date was
15 May 8th, Mike, because I think the European --
16 on Exhibit 279, I think you said, "August 5th".
17 I think it is actually May 8th, 2005.
18         MR. BONELLA: Thank you. Exhibit 279
19 reflects the manufacturing processes that have
20 been used to manufacture FiberWire since May
21 2005. Is that correct?
22   A    Yes.
23   Q    What I would like to do is just briefly,
24 if you could walk me through Exhibit 279 and just
25 for each block just talk at a very high, general

20

1 level so we understand, what each block is and then
2 after that I would like to go through the plant and
3 try to talk about each block as we go through, but
4 before we do that, I just want to mark these on the
5 record.
6         We will mark DePuy Mitek Exhibit 282
7 as the Pearsalls Limited US2 FiberWire M/C state
8 scoured FiberWire sample that was produced to us
9 today.
10 (Depuy Mitek Exhibit 282 marked for identification)
11        DePuy Mitek Exhibit 283 is the
12 Pearsalls Limited US2 FiberWire M/C state before
13 scoured that was produced to us today.
14 (Depuy Mitek Exhibit 283 marked for identification)
15        DePuy Mitek Exhibit 284 is the
16 Pearsalls Limited US2 FiberWire, M/C state
17 scoured/dyed sample that was produced to us today.
18 (DePuy Mitek Exhibit 284 marked for identification)
19        DePuy Mitek Exhibit 285 is the
20 Pearsalls Limited US2 FiberWire M/C state dye/coated
21 sample that was produced to us today.
22 (DePuy Mitek Exhibit 285 marked for identification)
23        Would you just identify these for the
24 record, if you would? Do you recognize Exhibit 282
25 as a Pearsalls Limited US2 FiberWire M/C state

21

1 scoured sample that was produced to us?
2    A    Yes.
3    Q    Do you recognize DePuy Mitek Exhibit 283
4 as the Pearsalls Limited US2 FiberWire M/C state
5 before scoured sample that was produced to us?
6    A    Yes.
7    Q    Do you recognize DePuy Mitek Exhibit 284
8 as the Pearsalls Limited US2 FiberWire M/C state
9 scoured/dyed sample that was produced to us today?
10   A    Yes.
11   Q    Do you recognize the DePuy Mitek Exhibit
12 285 as the Pearsalls Limited US2 FiberWire M/C state
13 dyed/coated sample that was produced to us today?
14   A    Yes.
15   Q    Let's just walk through the Exhibit 279
16 flowchart, if you would, and just tell us, beginning
17 with the, "Incoming yarn to stores", block, what
18 does that represent?
19   A    That represents the yarn which has been
20 brought into the factory.
21   Q    For example, for flowchart -- for
22 FiberWire that would represent the polyester and
23 ultra high molecular weight polyethylene and the
24 nylon?
25   A    PET.

6 (Pages 18 to 21)

# Pearsalls Sutures
## Fibrewire Process Flowchart



CONFIDENTIAL - NON-PATENT
PROSECUTION COUNSEL
ONLY

ARM 002554

QSM4.8-27      Page: 1 of 1      Issue: 2      Date: 29/06/01      Authorised:

DEPUY MITEK
EXHIBIT 281
04cv12457

# EXHIBIT 20

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DePuy Mitek, Inc.<br>     a Massachusetts Corporation<br><br>          Plaintiff,<br><br>     v.<br><br>Arthrex, Inc.<br>     a Delaware Corporation and<br><br>Pearsalls Ltd.<br>     a Private Limited Company<br>of the United Kingdom<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)     Civil No. 04-12457 PBS<br>)<br>)<br>)<br>)<br>) |

## JOINT PROPOSED STIPULATED FACTS

### Stipulated Fact #1

Arthrex, Inc. received actual notice of U.S. Patent No. 5,134,446 on December 1, 2003 (J. Schmeiding 1/5/06 Dep. at 64:12-15).

### Stipulated Fact #2

FiberWire and TigerWire are surgical sutures (FiberWire IFU)(Undisputed Mitek Fact #11; Arthrex Response to Mitek Request to Admit No. 3).

### Stipulated Fact #3

RK Manufacturing has sold sterilized FiberWire and TigerWire to Arthrex, Inc. within the United States (Grieff Dep. at 37:23-38:8).

### Stipulated Fact #4

Arthrex, Inc. sells FiberWire and TigerWire in the United States (ARM 3355)(Undisputed Mitek Fact #51).

**Stipulated Fact #5**

Pearsalls manufactures the braided products that are further processed and ultimately sold as FiberWire and TigerWire sutures (Grieff Dep. at 12:2-11; 12:18-23; 16:24-17:3; 17:9-12).

**Stipulated Fact #6**

Pearsalls has imported into the United States unsterilized braided products that are further processed and ultimately sold as FiberWire and TigerWire sutures (Grieff Dep. at 20:10-22).

**Stipulated Fact #7**

Pearsalls has sold unsterilized braided products to R.K. Manufacturing which are further processed and ultimately sold as FiberWire and TigerWire sutures and suture products (Grieff Dep. at 20:10-22).

**Stipulated Fact #8**

Arthrex, Inc. sells FiberWire and TigerWire sutures attached to a needle (DMI Ex. 5 at ARM 001469).

**Stipulated Fact #9**

Arthrex's FiberWire and TigerWire suture products include at least the products having the following Arthrex catalog product codes: AR-7200, AR-7201, AR-7202, AR-7203, AR-7204, AR-7205, AR-7205T, AR-7207, AR-7209, AR-7209SN, AR-7209T, AR-7210, AR-7211, AR-7219, AR-7220, AR-7221, AR-7222, AR-7223, AR-7225, AR-7227-01, AR-7227-02, AR-7228, AR-7229-12, AR-7229-20, AR-7230-01, AR-7230-02, AR-7232-01, AR-7232-02, AR-7232-03, AR-7237, AR-7250, AR-7251, AR-1320BNF, AR-1322BNF, AR-1322-75SF, AR-1322-752SNF, AR-1915SNF, AR-1920SNF, AR-1322SX, AR-1322SXF, AR-1324B, AR-1324BF, AR-1324BF-2, AR-1324BNF, AR-1324HF, AR-1324SF,AR-1934BF, AR-1934BF-2,AR-1934BFT, AR-1934BFX, AR-1934BNF, AR-1934BLF, AR-1915SF, AR-1920BF, AR-1920BF-37, AR-1920BFT, AR-1920BN, AR-1920BNF, AR-1920BNP, AR-1920BT, AR-1920SF, AR-1920SFT, AR-1925BF, AR-1925BFSP, AR-1925BNF, AR-1925BNP, AR-1925SF,AR1927-BF, AR-1927BNF, AR-1928SF, AR-1928SF-2, AR-1928SNF, AR-1928SNF-2, AR-2225S, and AR-2226S (DMI Ex. 101)(Undisputed Mitek Fact #26).

**Stipulated Fact #10**

Arthrex's sells the following FiberWire and TigerWire suture product codes within the United States: AR-7200, AR-7201, AR-7202, AR-7203, AR-7204, AR-7205, AR-7205T, AR-7207, AR-7209, AR-7209SN, AR-7209T, AR-7210, AR-7211, AR-7219, AR-7220, AR-7221, AR-7222, AR-7223, AR-7225, AR-7227-01, AR-7227-02, AR-7228, AR-7229-12, AR-7229-20, AR-7230-01, AR-7230-02, AR-7232-01, AR-7232-02, AR-7232-03, AR-7237, AR-7250, AR-7251, AR-1320BNF, AR-1322BNF, AR-1322-75SF, AR-1322-752SNF, AR-1915SNF, AR-1920SNF, AR-1322SX, AR-1322SXF, AR-1324B, AR-1324BF, AR-1324BF-2, AR-1324BNF, AR-1324HF, AR-1324SF,AR-1934BF, AR-1934BF-2,AR-1934BFT, AR-1934BFX, AR-1934BNF, AR-1934BLF, AR-1915SF, AR-1920BF, AR-1920BF-37, AR-1920BFT, AR-1920BN, AR-1920BNF, AR-1920BNP, AR-1920BT, AR-1920SF, AR-1920SFT, AR-1925BF, AR-1925BFSP, AR-1925BNF, AR-1925BNP, AR-1925SF,AR1927-BF, AR-1927BNF, AR-1928SF, AR-1928SF-2, AR-1928SNF, AR-1928SNF-2, AR-2225S, and AR-2226S (ARM 3355).

**Stipulated Fact #11**

FiberWire sutures and TigerWire sutures sold by Arthrex are sterilized (Arthrex Response to Mitek's Request to Admit No. 3)(DMI Ex. 3 at 13-1).

**Stipulated Fact #12**

The cover in FiberWire suture is constructed of ultra high molecular weight polyethylene (UHMWPE) and polyethylene terephthalate (PET) (Arthrex Response to Mitek's Request to Admit No. 9).

**Stipulated Fact #13**

FiberWire includes a heterogeneous braid composed of a first and second set of continuous and discrete yarns (Mukherjee Dep. at 362:1-4)(Undisputed Mitek Fact #13).

**Stipulated Fact #14**

FiberWire includes a set of PET yarns made up of a plurality of PET filaments (Dreyfuss Dep. at 64:14-17).

**Stipulated Fact #15**

Each FiberWire suture product has a set of yarns made of PET (*id.*)(Undisputed Mitek Fact #49).

**Stipulated Fact #16**

Each yarn of PET included in FiberWire is composed of a plurality of filaments (Mukherjee Dep. at 363:7-16)(Undisputed Mitek Fact #46).

**Stipulated Fact #17**

FiberWire includes a set of UHMW PE yarns made up of a plurality of UHMW PE filaments (Dreyfuss Dep. at 50:21-51:1)

**Stipulated Fact #18**

In FiberWire, at least one yarn of ultra high molecular weight PE is in direct intertwining contact with a PET yarn (Dreyfuss Dep. at 50:21-51:1).

**Stipulated Fact #19**

FiberWire includes a heterogeneous sheath braid composed of discrete yarns in a sterilized braided construction (Mukherjee Dep. at 362:5-8)(Undisputed Mitek Fact #13).

**Stipulated Fact #20**

The polyethylene terephthalate yarns in FiberWire and TigerWire are continuous and discrete (*id*. at 362:1-4)(Undisputed Mitek Fact #15).

**Stipulated Fact #21**

The ultra high molecular weight polyethylene yarns in FiberWire and Tiger Wire are continuous and discrete (*id.*)

**Stipulated Fact #22**

The PET used in Arthrex's FiberWire sutures is in the form of yarn, and that PET yarn is made up of several twisted monofilaments of PET (Dreyfuss 9/16/05 Dep. at 64:14-17)(Undisputed Mitek Fact #17).

**Stipulated Fact #23**

No. 2 FiberWire suture, No. 5 FiberWire, No. 0 FiberWire suture, the No. 2-0 FiberWire suture, and the 3-0 FiberWire suture are braided using the same process (Dreyfuss 9/16/05 Dep. at 38:20-24)(Undisputed Mitek Fact #23).

**Stipulated Fact #24**

Arthrex's FiberWire sutures have a core except for 4-0 FiberWire (DMI Ex. 318)(Undisputed Mitek Fact #47).

**Stipulated Fact #25**

Notwithstanding the color of the yarns, TigerWire's yarns are identical to FiberWire's yarn with the exception that one PET yarn is replaced by one nylon yarn (DMI Ex. 318)(Undisputed Mitek Fact #9).

**Stipulated Fact 26**

The addition of nylon to TigerWire does not materially affect the basic and novel characteristics of the invention.

**Stipulated Fact #27**

TigerWire is braided in the same way as FiberWire (Dreyfuss 9/16/05 at 31:24–32:2)(Undisputed Mitek Fact #10).

**Stipulated Fact #28**

Every FiberWire and TigerWire construction has a ratio of the cross-sectional area of ultra high molecular weight PE in the sheath and core to the total cross sectional area of all the yarns in the surgical suture that ranges from 20 to 80 percent (Brookstein Op. Expert Rpt. at ¶49; DMI Ex. 318)(Undisputed Mitek Fact #50).

**Stipulated Fact #29**

FiberWire size 4-0 does not have a core (*id*. at 55:21-23)(Undisputed Mitek Fact #25).

**Stipulated Fact #30**

The FiberWire size 4-0 suture has the same sheath configuration as the other size FiberWire sutures (*id*. at 104:17-105:9)(Undisputed Mitek Fact #24).

**Stipulated Fact #31**

Tevdek is a 100% braided polyester suture (Sluss Dep. at 35:17-22; *See* Grafton Dep. at 36:17-18).

**Stipulated Fact #32**

Mr. Grafton's idea was to add the PET and to improve the knot security of the suture (Undisputed Mitek Fact #30)(*id*. at 53:24-54:5).

**Stipulated Fact #33**

The FiberWire prototype suture that included PET braided with ultra-high molecular weight polyethylene had good knot security (*id*. at 54:24-55:1)(Undisputed Mitek Fact #31).

**Stipulated Fact #34**

The FiberWire sample, denoted as DePuy Mitek Deposition Ex. 284, underwent the FiberWire scouring and dying processes and all FiberWire manufacturing processes that are before the dying process, but no other FiberWire manufacturing processes (Hallett 1/11/2006 Dep. at 36:1-4; 36:19-12; DMI Ex. 279).

**Stipulated Fact #35**

The FiberWire sample, denoted as DePuy Mitek Deposition Ex. 285, underwent the FiberWire scouring and dying processes and all FiberWire manufacturing processes before the "final inspection/measuring" process (Hallett 1/11/2006 Dep. at 37:10-13; DMI Ex. 279).

**Stipulated Fact 36**

The FiberWire sample, denoted as DePuy Mitek Deposition Ex. 286, underwent the FiberWire scouring and dying processes and all FiberWire manufacturing processes before the "final inspection/measuring" process.  It is the same as US 2 commercial FiberWire(Hallett 1/11/2006 Dep. at 38:17-39:6; 39:12-18;40:2-9, 12-17; 41:5-11; DMI Ex. 279).

**Stipulated Fact #37**

DePuy Mitek Deposition Exhibit 317 sets forth specification acceptance criteria for FiberWire (Hallett 1/12/2006 Dep. at 241:15-18).

**Stipulated Fact #38**

Pearsalls' batch records were generated in the normal course of Pearsalls' business (Hallett 1/12/2006 Dep. at 269:5-11).

**Stipulated Fact #39**

Plaintiff DePuy Mitek, Inc. ("DePuy Mitek") is a corporation organized under the laws of the State of Massachusetts and maintains its principal place of business at 325 Paramount Drive, Raynham, Massachusetts 02767.

**Stipulated Fact#40**

Defendant Arthrex, Inc. ("Arthrex") is a corporation organized under the laws of the State of Delaware and maintains its principal place of business at 1370 Creekside Boulevard, Naples, Florida 34108.

**Stipulated Fact #41**

Defendant Pearsalls, Ltd. ("Pearsalls") is a corporation organized under the laws of the United Kingdom and maintains its principal place of business at Tancred Street, Taunton, Somerset, England.

**Stipulated Fact #42**

Ethicon, Inc. ("Ethicon") is a corporation organized under the laws of the State of New Jersey and maintains it principal place of business at U.S. Route 22 West, P.O. Box 151, Sommerville, New Jersey 08876-0151.

**Stipulated Fact #43**

Arthrex sells FiberWire suture in the United States, as stand-alone suture, and also attached to needles or suture anchors.

**Stipulated Fact #44**

Arthrex's FiberWire suture contains a braid of ultra high molecular weight polyethylene (UHMWPE) and PET.

**Stipulated Fact #45**

Arthrex's FiberWire suture includes a coating of NuSil Med 2174.

**Stipulated Fact #46**

Arthrex's TigerWire suture contains a braid of ultra high molecular weight polyethylene (UHMWPE) , PET, and one nylon yarn.

**Stipulated Fact #47**

Arthrex's TigerWire suture includes a coating of NuSil Med 2174.

**Stipulated Fact #48**

Arthrex's FiberWire sutures are tipped.

**Stipulated Fact #49**

Arthrex's TigerWire sutures are tipped.

**Stipulated Fact #50**

DePuy Mitek and Ethicon, Inc. are affiliated with Johnson & Johnson.

**Stipulated Fact #51:**

Before Dr. Gitis conducted the tests described in his report dated March 23, 2006, Dr. Gitis sent, via Fedex, two envelopes containing U.S. No. 2 FiberWire suture to Sterile Systems, in Grand Rapids, Michigan.  One of the envelopes Dr. Gitis sent to Sterile Systems contained a plastic bag of suture and was labeled "coated."  The other envelope Dr. Gitis sent to Sterile

Systems contained a plastic bag of suture and was labeled "uncoated."  The sutures were sterilized in the envelopes at Sterile Systems.  The two envelopes of suture were then returned to Dr. Gitis at CETR.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **DePuy Mitek, Inc.** | ) | |
| **a Massachusetts Corporation** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 04-12457 PBS** |
| | ) | |
| **Arthrex, Inc.** | ) | |
| **a Delaware Corporation and** | ) | |
| | ) | |
| **Pearsalls Ltd.** | ) | |
| **a Private Limited Company** | ) | |
| **of the United Kingdom** | | |
| | | |
| **Defendants.** | | |

**DEFENDANTS ARTHREX, INC.'S AND PEARSALLS, LTD.'S RESPONSE TO
DEPUY MITEK'S DRAFT PROPOSED STIPULATED FACTS OF JUNE 29, 2007**

**Stipulated Fact #1**

DePuy Mitek owns U.S. Patent No. 5,314,446 and has owned it since August, 2004 (DMI000338-340).

**OBJECT -- ownership of '446 patent being contested**

**Stipulated Fact #2**

Ethicon, Inc. owned U.S. Patent No. 5,134,446 from May 24, 1994 until August, 2004 (446 Patent; DMI000338-340).

**OBJECT -- ownership of '446 patent being contested**

**Stipulated Fact #3**

Arthrex, Inc. received actual notice of U.S. Patent No. 5,134,446 on December 1, 2003 (J. Schmeiding 1/5/06 Dep. at 64:12-15).

**OBJECT – irrelevant – goes to willfulness**

**Stipulated Fact #4**

FiberWire and TigerWire are surgical sutures (FiberWire IFU)(Undisputed Mitek Fact #11; Arthrex Response to Mitek Request to Admit No. 3).

**AGREE**

**Stipulated Fact #5**

Pearsalls manufactures FiberWire and TigerWire (Grieff Dep. at 12:2-11; 12:18-23; 16:24-17:3; 17:9-12).

**OBJECT – Pearsalls manufactures braids used in FiberWire and TigerWire**

**Stipulated Fact #6**

FiberWire and TigerWire have been manufactured according to the procedures set forth in DePuy Mitek Ex. 279 (Hallett 1/11/2006 Dep. at 12:21-13:9; 13:15-19).

**OBJECT -- Pearsalls manufactures braids used in FiberWire and TigerWire**

**Stipulated Fact #7**

FiberWire and TigerWire have been manufactured according to the procedures set forth in DePuy Mitek Ex. 281 (Hallett 1/11/2006 Dep. at 14:8-16; 19:10-13).

**OBJECT -- Pearsalls manufactures braids used in FiberWire and TigerWire**

**Stipulated Fact #8**

Pearsalls has imported unsterilized FiberWire and TigerWire into the United States (Grieff Dep. at 20:10-22).

**OBJECT -- Pearsalls manufactures braids used in FiberWire and TigerWire**

**Stipulated Fact #9**

Pearsalls has sold unsterilized FiberWire and TigerWire in the United States to R.K. Manufacturing (Grieff Dep. at 20:10-22).

**OBJECT -- Pearsalls manufactures braids used in FiberWire and TigerWire**

DSMDB-2292048v01

**Stipulated Fact #10**

RK Manufacturing does nothing to alter the construction of the braid it receives from Pearsalls and sells to Arthrex (Ponton Dep. at 74:16-21).

**OBJECT – "alter the construction" is undefined, confusing and misleading**

**Stipulated Fact #11**

RK Manufacturing has sold sterilized FiberWire and TigerWire to Arthrex, Inc. within the United States (Grieff Dep. at 37:23-38:8).

**AGREE**

**Stipulated Fact #12**

Arthrex, Inc. sells FiberWire and TigerWire in the United States (ARM 3355)(Undisputed Mitek Fact #51).

**AGREE**

**Stipulated Fact #13**

For all FiberWire and TigerWire products sold outside of the United States, Arthrex, Inc. supplies those products from the United States. (Grieff Dep. at 70:16-24; 71:1-5, 6; 13-17).

**OBJECT – irrelevant**

**Stipulated Fact #14**

Arthrex, Inc. sells FiberWire and TigerWire sutures attached to a needle (DMI Ex. 5 at ARM 001469).

**AGREE**

**Stipulated Fact #15**

Arthrex's FiberWire and TigerWire suture products include at least the products having the following Arthrex catalog product codes: AR-7200, AR-7201, AR-7202, AR-7203, AR-7204, AR-7205, AR-7205T, AR-7207, AR-7209, AR-7209SN, AR-7209T, AR-7210, AR-7211, AR-7219, AR-7220, AR-7221, AR-7222, AR-7223, AR-7225, AR-7227-01, AR-7227-02, AR-7228, AR-7229-12, AR-7229-20, AR-7230-01, AR-7230-02, AR-7232-01, AR-7232-02, AR-7232-03, AR-7237, AR-7250, AR-7251, AR-1320BNF, AR-1322BNF, AR-1322-75SF, AR-1322-752SNF, AR-1915SNF, AR-1920SNF, AR-1322SX, AR-1322SXF, AR-1324B, AR-1324BF, AR-1324BF-2, AR-1324BNF, AR-1324HF, AR-1324SF,AR-1934BF, AR-1934BF-2,AR-1934BFT, AR-1934BFX, AR-1934BNF, AR-1934BLF, AR-1915SF, AR-1920BF, AR-

DSMDB-2292048v01

1920BF-37, AR-1920BFT, AR-1920BN, AR-1920BNF, AR-1920BNP, AR-1920BT, AR-1920SF, AR-1920SFT, AR-1925BF, AR-1925BFSP, AR-1925BNF, AR-1925BNP, AR-1925SF,AR1927-BF, AR-1927BNF, AR-1928SF, AR-1928SF-2, AR-1928SNF, AR-1928SNF-2, AR-2225S, and AR-2226S (DMI Ex. 101)(Undisputed Mitek Fact #26).

**AGREE**

**Stipulated Fact #16**

Arthrex's sells the following FiberWire and TigerWire suture product codes within the United States: AR-7200, AR-7201, AR-7202, AR-7203, AR-7204, AR-7205, AR-7205T, AR-7207, AR-7209, AR-7209SN, AR-7209T, AR-7210, AR-7211, AR-7219, AR-7220, AR-7221, AR-7222, AR-7223, AR-7225, AR-7227-01, AR-7227-02, AR-7228, AR-7229-12, AR-7229-20, AR-7230-01, AR-7230-02, AR-7232-01, AR-7232-02, AR-7232-03, AR-7237, AR-7250, AR-7251, AR-1320BNF, AR-1322BNF, AR-1322-75SF, AR-1322-752SNF, AR-1915SNF, AR-1920SNF, AR-1322SX, AR-1322SXF, AR-1324B, AR-1324BF, AR-1324BF-2, AR-1324BNF, AR-1324HF, AR-1324SF,AR-1934BF, AR-1934BF-2,AR-1934BFT, AR-1934BFX, AR-1934BNF, AR-1934BLF, AR-1915SF, AR-1920BF, AR-1920BF-37, AR-1920BFT, AR-1920BN, AR-1920BNF, AR-1920BNP, AR-1920BT, AR-1920SF, AR-1920SFT, AR-1925BF, AR-1925BFSP, AR-1925BNF, AR-1925BNP, AR-1925SF,AR1927-BF, AR-1927BNF, AR-1928SF, AR-1928SF-2, AR-1928SNF, AR-1928SNF-2, AR-2225S, and AR-2226S (ARM 3355).

**AGREE**

**Stipulated Fact #17**

FiberWire sutures and TigerWire sutures sold by Arthrex are sterilized (Arthrex Response to Mitek's Request to Admit No. 3)(DMI Ex. 3 at 13-1).

**AGREE**

**Stipulated Fact #18**

The cover in FiberWire suture is constructed of ultra high molecular weight polyethylene (UHMWPE) and polyethylene terephthalate (PET) (Arthrex Response to Mitek's Request to Admit No. 9).

**AGREE**

**Stipulated Fact #19**

FiberWire is a heterogeneous braid composed of a first and second set of continuous and discrete yarns (Mukherjee Dep. at 362:1-4)(Undisputed Mitek Fact #13).

- 4 -

**OBJECT – incorrect – FiberWire *includes* a heterogeneous braid composed of a first and second set of continuous and discrete yarns**

**Stipulated Fact #20**

FiberWire includes a set of PET yarns made up of a plurality of PET filaments (Dreyfuss Dep. at 64:14-17).

**AGREE**

**Stipulated Fact #21**

Each FiberWire suture product has PET as a second set of yarns (*id.*)(Undisputed Mitek Fact #49).

**OBJECT – confusing attempt to reference claim language – no context**

**Stipulated Fact #22**

FiberWire has each yarn from the second set composed of a plurality of filaments of a second fiber-forming material of PET (Mukherjee Dep. at 363:7-16)(Undisputed Mitek Fact #46).

**OBJECT – confusing attempt to reference claim language – no context**

**Stipulated Fact #23**

FiberWire includes a set of UHMW PE yarns made up of a plurality of UHMW PE filaments (Dreyfuss Dep. at 50:21-51:1)

**AGREE**

**Stipulated Fact #24**

In FiberWire, at least one yarn of ultra high molecular weight PE is in direct intertwining contact with a PET yarn (Dreyfuss Dep. at 50:21-51:1).

**AGREE**

**Stipulated Fact #25**

FiberWire is a heterogeneous sheath braid composed of discrete yarns in a sterilized braided construction (Mukherjee Dep. at 362:5-8)(Undisputed Mitek Fact #13).

**OBJECT – incorrect – FiberWire *includes* a heterogeneous sheath braid composed of discrete yarns in a sterilized braided construction**

DSMDB-2292048v01

**Stipulated Fact #26**

The polyethylene terephthalate yarns in FiberWire and TigerWire are continuous and discrete (*id*. at 362:1-4)(Undisputed Mitek Fact #15).

**AGREE**

**Stipulated Fact #27**

The ultra high molecular weight polyethylene yarns in FiberWire and Tiger Wire are continuous and discrete (*id.*)

**AGREE**

**Stipulated Fact #28**

The PET used in Arthrex's FiberWire sutures is in the form of yarn, and that PET yarn is made up of several twisted monofilaments of PET (Dreyfuss 9/16/05 Dep. at 64:14-17)(Undisputed Mitek Fact #17).

**AGREE**

**Stipulated Fact #29**

No. 2 FiberWire suture, No. 5 FiberWire, No. 0 FiberWire suture, the No. 2-0 FiberWire suture, and the 3-0 FiberWire suture are braided using the same process (Dreyfuss 9/16/05 Dep. at 38:20-24)(Undisputed Mitek Fact #23).

**AGREE**

**Stipulated Fact #30**

Arthrex's FiberWire sutures have a core except for 4-0 FiberWire (DMI Ex. 318)(Undisputed Mitek Fact #47).

**AGREE**

**Stipulated Fact #31**

The purpose of the nylon marking strand in Arthrex's TigerWire product is visual identification (Dreyfuss 12/7/05 Dep. at 74:21-23)(Undisputed Mitek Fact #39).

**OBJECT – irrelevant – Defendants not making distinction between FiberWire and TigerWire for purposes of this trial**

- 6 -

DSMDB-2292048v01

**Stipulated Fact #32**

Notwithstanding the color of the yarns, TigerWire's yarns are identical to FiberWire's yarn with the exception that one PET yarn is replaced by one nylon yarn (DMI Ex. 318)(Undisputed Mitek Fact #9).

**AGREE**

**Stipulated Fact #33**

TigerWire is braided in the same way as FiberWire (Dreyfuss 9/16/05 at 31:24–32:2)(Undisputed Mitek Fact #10).

**AGREE**

**Stipulated Fact #34**

Every FiberWire and TigerWire construction has a ratio of the cross-sectional area of ultra high molecular weight PE in the sheath and core to the total cross sectional area of all the yarns in the surgical suture that ranges from 20 to 80 percent (Brookstein Op. Expert Rpt. at ¶49; DMI Ex. 318)(Undisputed Mitek Fact #50).

**AGREE**

**Stipulated Fact #35**

FiberWire size 4-0 does not have a core (*id*. at 55:21-23)(Undisputed Mitek Fact #25).

**AGREE**

**Stipulated Fact #36**

The FiberWire size 4-0 suture has the same sheath configuration as the other size FiberWire sutures (*id*. at 104:17-105:9)(Undisputed Mitek Fact #24).

**AGREE**

**Stipulated Fact #37**

Ultra-high molecular weight polyethylene is a lubricious material (*id*. at 52:24-53:1)(Undisputed Mitek Fact #29).

**OBJECT – no context given**

DSMDB-2292048v01

**Stipulated Fact #38**

Tevdek is a 100% braided polyester suture (Sluss Dep. at 35:17-22; *See* Grafton Dep. at 36:17-18).

**AGREE**

**Stipulated Fact #39**

The initial FiberWire prototype was 100 percent ultra-high molecular weight polyethylene (Grafton Dep. at 51:15-17)(Undisputed Mitek Fact #27).

**OBJECT – "initial FiberWire prototype" undefined and also irrelevant**

**Stipulated Fact #40**

When developing FiberWire, Arthrex considered a 100% ultra high molecular weight PE braid before it considered braiding ultra high molecular weight PE with PET (Grafton Dep. at 51:15-17)(Undisputed Mitek Fact #139).

**OBJECT – irrelevant**

**Stipulated Fact #41**

The knot slippage of the 100% ultra-high molecular weight polyethylene suture was poor because of the lubricity of polyethylene (*id*. at 53:2-5)(Undisputed Mitek Fact #29).

**OBJECT -- irrelevant**

**Stipulated Fact #42**

The knot security of the initial FiberWire prototype made from 100 percent ultra-high molecular weight polyethylene was poor (*id*. at 51:4-7; 53:20-23)(Undisputed Mitek Fact #30).

**OBJECT -- irrelevant**

**Stipulated Fact #43**

Mr. Grafton's idea was to add the PET and to improve the knot security of the suture (Undisputed Mitek Fact #30)(*id*. at 53:24-54:5).

**AGREE**

DSMDB-2292048v01

**Stipulated Fact #44**

The FiberWire prototype suture that included PET braided with ultra-high molecular weight polyethylene had good knot security (*id*. at 54:24-55:1)(Undisputed Mitek Fact #31).

**AGREE**

**Stipulated Fact #45**

The FiberWire sample, denoted as DePuy Mitek Deposition Ex. 282, underwent all FiberWire manufacturing processes prior to the wind to skein process and the scouring process, but no other FiberWire manufacturing processes (Hallett 1/11/2006 Dep. at 33:3-34:7; 36:16-18).

**OBJECT – irrelevant**

**Stipulated Fact #46**

The FiberWire sample, denoted as DePuy Mitek Deposition Ex. 283, underwent the FiberWire braiding process and all FiberWire manufacturing processes that are before the braiding process, but no other FiberWire manufacturing processes (Hallett 1/11/2006 Dep. at 35:10-13; DMI Ex. 279).

**OBJECT -- irrelevant**

**Stipulated Fact #47**

The FiberWire sample, denoted as DePuy Mitek Deposition Ex. 284, underwent the FiberWire scouring and dying processes and all FiberWire manufacturing processes that are before the dying process, but no other FiberWire manufacturing processes (Hallett 1/11/2006 Dep. at 36:1-4; 36:19-12; DMI Ex. 279).

**AGREE**

**Stipulated Fact #48**

The FiberWire sample, denoted as DePuy Mitek Deposition Ex. 285, underwent the FiberWire scouring and dying processes and all FiberWire manufacturing processes before the "final inspection/measuring" process (Hallett 1/11/2006 Dep. at 37:10-13; DMI Ex. 279).

**AGREE**

**Stipulated Fact #49**

The FiberWire sample, denoted as DePuy Mitek Deposition Exhibit 342, under went all of the manufacturing process in DePuy Mitek Exhibit 279 before the stretching and coating

DSMDB-2292048v01

processes, and once coated, stretched, and heated a single time (Hallett 1/12/2006 Dep. at 349:7-13; 350:1-5).

**OBJECT – irrelevant and confusing**

**Stipulated Fact #50**

Pearsalls' "dye stage" testing occurs after the dying and scouring process but before the winding, stretching and coating, and final inspection/measuring processes (Hallett 1/11/2006 at 47:24-48:3; DMI Ex. 279).

**OBJECT – irrelevant and confusing**

**Stipulated Fact #51**

Pearsalls' "intermediate" testing occurs after the stretching and coating processes in Mitek deposition Ex. 279 but before the final inspection/measuring processes (Hallett 1/11/2006 Dep. at 49:14-16; DMI Ex. 279).

**OBJECT – irrelevant and confusing**

**Stipulated Fact #52**

Pearsalls' final stage measuring test occurs after the stretching and coating processes in Mitek deposition Ex. 279 and when Pearsalls' has completed manufacturing the product (Hallett 1/11/2006 Dep. at 53:18-25; DMI Ex. 279).

**OBJECT – irrelevant and confusing**

**Stipulated Fact #53**

There should not be any construction or manufacturing difference between FiberWire samples from the same batch that are tested at Pearsalls' intermediate and final tests (Hallett 1/11/2006 Dep. at 54:1-6; DMI Ex. 279).

**OBJECT – irrelevant and confusing**

**Stipulated Fact #54**

DePuy Mitek Deposition Exhibit 316 sets forth specification tolerances for FiberWire (Hallett 1/12/2006 at 237:9-11; 240:21-24).

**OBJECT – irrelevant and incorrectly describes document**

DSMDB-2292048v01

**Stipulated Fact #55**

DePuy Mitek Deposition Exhibit 317 sets forth specification acceptance criteria for FiberWire (Hallett 1/12/2006 Dep. at 241:15-18).

**AGREE**

**Stipulated Fact #56**

DePuy Mitek Deposition Exhibit 318 is a matrix for the developmental and commercial FiberWire and TigerWire products (Hallett 1/12/2006 Dep. at 245:21-25).

**OBJECT – irrelevant and confusing**

**Stipulated Fact #57**

Pearsalls' batch records were generated in the normal course of Pearsalls' business (Hallett 1/12/2006 Dep. at 269:5-11).

**AGREE**

DSMDB-2292048v01

1

```
 1  UNITED STATES DISTRICT COURT

 2  DISTRICT OF MASSACHUSETTS
    ---------------------------------------------x
 3  DEPUY MITEK, INC,  a Massachusetts
    Corporation,
 4                      ' Plaintiff,

 5            -against-          Civil Action No.
                                 04-12457PBS
 6
    ARTHREX INC., a Delaware Corporation and
 7
    Pearsalls Limited,
 8         a Private Limited Company of the

 9         United Kingdom,

10                      Defendants.
    ---------------------------------------------x
11

12                      18 Old Ridgebury Road
                        Danbury, Connecticut
13
                        December 14, 2005
14                      9:00 a.m.

15

16

17            VIDEOTAPED DEPOSITION of RICHARD PONTON

18      taken before Cheryll Kerr, LSR, a Licensed

19      Shorthand Reporter within and for the State

        of Connecticut.
20

21

22

23

24

25
```

**74**

1 previous address, and I don't have that address.

2       I believe it was Six Finance Drive, but I

3 am not -- I could not confirm that accurately.

4    Q.  Okay.  Does RK Manufacturing ever change

5 or alter the braid construction of the braided

6 suture that it receives from Pearsalls that RK

7 Manufacturing manufactures for Arthrex as FiberWire

8 sutures or suture products?

9       MR. TAMBURO:  Objection, asked and

10      answered.

11 BY MR. FALKE:

12   Q.  You can answer.

13   A.  Okay.

14   Q.  Do you want me to repeat it?

15   A.  Yes, please.

16   Q.  Does RK Manufacturing ever change the

17 braid design and construction of the bulk suture

18 that it receives from Pearsalls and that RK

19 Manufacturing makes into Arthrex FiberWire sutures

20 or suture products?

21   A.  No.

22   Q.  Exhibit 182 -- do you know who created

23 that?

24   A.  I believe it was done by Mary-Ellen.

25   Q.  Okay, and do you believe Exhibit 182 to

**75**

1 accurately reflect all the steps that RK

2 Manufacturing does with respect to Arthrex FiberWire

3 sutures and suture products?

4    A.  Yes.

5       MR. FALKE:  Okay.  I have no further

6       questions at this time.

7       MR. TAMBURO:  Okay.

8       THE VIDEOGRAPHER:  Going off the

9       record.  The time is 11:04.

10      (Time noted:  11:04 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**76**

1       STATE OF CONNECTICUT

2       I, CHERYLL KERR, A Licensed Shorthand

3 Reporter duly commissioned and qualified in and

4 for the State of Connecticut, do hereby certify

5 that pursuant to notice there came before me on

6 the 14th day of December, 2005, the following

7 person to wit:  Richard Ponton, who was duly

8 sworn to testify to the truth and nothing but

9 the truth; that he was thereupon carefully

10 examined upon his oath and his examination

11 reduced to writing under my supervision; that

12 this deposition is a true record of the

13 testimony given by the witness.

14      I further certify that I am neither

15 attorney nor counsel for nor related to nor

16 employed by any of the parties to the action in

17 which this deposition is taken and further that

18 I am not a relative or employee of any attorney

19 or counsel employed by the parties hereto, or

20 financially interested in this action.

21      IN WITNESS THEREOF, I have hereunto set my

22 hand this 14th day of December, 2005.

23      Cheryll Kerr, LSR

24

25      _____

**77**

1       JURAT

2       I, Richard Ponton, do hereby certify that

3 the foregoing testimony given by me on December

4 14, 2005 is true and accurate, including any

5 corrections noted on the corrections page, to

6 the best of my knowledge and belief.

7

8       _____

        Richard Ponton

9

10 Subscribed to and sworn before me on this

11 _____ day of _____ 2005.

12

13 My Commission Expires: _____

14

15

16

17

18

19

20

21

22

23

24

25

20 (Pages 74 to 77)

# EXHIBIT 21

CONFIDENTIAL- NON-PATENT ATTORNEYS EYES ONLY

1

```
1   IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
            IN AND FOR THE NEW CASTLE COUNTY
2
    _____
3   DEPUY MITEK, INC., a Massachusetts )
    Corporation,                       )
                    Plaintiff,         )  Civil Action
4   v.                                 )  No. 04-12457 PBS
    ARTHREX, INC., a Delaware          )
5   Corporation,                       )
                    Defendant.         )
6   _____     )
```

HIGHLY
CONFIDENTIAL

```
7
        CONFIDENTIAL - NON-PATENT ATTORNEY'S EYES ONLY
8
                    deposition of:
9
                    BRIAN HALLETT
10
                    taken at:
11              The Castle Hotel
                 Castle Green
12                  Taunton
                    Somerset
13              UNITED KINGDOM
14                    on
            11th January 2006
15
```

Condensed Copy

34

1 except for the steam setting process that is caught
2 up in the cover?
3    A   Yes.
4    Q   Did the FiberWire, Exhibit 282, undergo
5 any process after the wind to skein process, just
6 the scour one?
7    A   That is just scoured.
8    Q   Just scoured. Okay. I will show you
9 another copy of Exhibit 279 where we just wrote,
10 "279", at the top. Could you mark on Exhibit 279
11 where Exhibit 282 was taken, just so that we can
12 have it for the record?
13    A   Where it was taken from?
14    Q   Right. During the process. Would you
15 just label that DePuy Mitek Exhibit 282? Just
16 Exhibit, "EX 282", and your own arrow to that, if
17 you would. So, where you have drawn -- written --
18 "EX 282", on Exhibit 279, that represents where the
19 FiberWire Exhibit 282 was taken?
20    A   Hmm hmm.
21    Q   Now I will show you DePuy Mitek Exhibit
22 283. This is the one labeled, "Pearsalls Limited
23 US2 FiberWire M/C state before scoured".
24    A   Yes.
25    Q   Can you label on Exhibit 279 where that

36

1    Q   Is it -- the Exhibit 284 sample underwent
2 the dyeing process and all the processes that are
3 before the dyeing process in Exhibit 279?
4    A   Correct.
5    Q   The Exhibit 282 -- 284 -- was the Exhibit
6 284 sample scoured?
7    A   Yes. Scoured and dyed.
8    Q   The difference between exhibit --
9    A   That was taken out before it was dyed.
10    Q   I am sorry, say again?
11    A   It was taken out of the machine before it
12 gets dyed. It just goes through a scouring process
13    Q   Is there a scouring process before and
14 after the dyeing process or just before?
15    A   It is before.
16    Q   Exhibit 282 was taken after the scouring
17 but before the dyeing?
18    A   Yes.
19    Q   Exhibit 284 was taken after the scouring
20 and after the dyeing?
21    A   Yes.
22    Q   You have labeled them on the chart as 284
23 coming first, but that is not really right. 284
24 comes after --
25    A   Yes. It is the other way around,

35

1 was taken? (Pause)
2        So, the Exhibit 283 sample you marked
3 as being taken after the braiding process on Exhibit
4 279.
5    A   Correct.
6    Q   So, the FiberWire in Exhibit 283 underwent
7 all the processes before the braiding process that
8 are in Exhibit 279?
9    A   Repeat the question?
10    Q   Sure. The FiberWire that is in the sample,
11 Exhibit 283, underwent all the processes that are
12 before the braiding process in Exhibit 279; correct?
13    A   Yes.
14    Q   I would like to show you Exhibit 284. It
15 is the Pearsalls Limited US2 FiberWire 10/C state
16 scoured/dyed sample. Can you label where the
17 Exhibit 284 sample was taken? (Pause)
18        So, where you have written, "EX 284",
19 is where the DePuy Mitek Exhibit 284 sample was
20 taken; correct?
21    A   Yes.
22    Q   You have labeled the Exhibit 284 sample as
23 being taken before the Exhibit 282 sample. Is that
24 right?
25    A   That's correct.

37

1 actually, as that is written down.
2    Q   DePuy Mitek Exhibit 285 is entitled, "US2
3 FiberWire, M/C state dyed/coated"?
4    A   Hmm hmm.
5    Q   Can you label where Exhibit 285 was taken?
6 (Pause)
7        Now, you have labeled Exhibit 285 as
8 the stretching coating block; correct?
9    A   Correct.
10    Q   Exhibit 285 FiberWire was -- underwent all
11 the processes before the final inspection measuring
12 process. Is that correct?
13    A   Correct.
14    Q   So, Exhibit 285 was stretched and coated;
15 correct?
16    A   Correct.
17    Q   So, the differences between Exhibit 284
18 and 285 is Exhibit 285 was wound and then stretched
19 and then coated; correct?
20    A   Correct.
21    Q   Any other differences between Exhibit 284
22 and 285?
23    A   No.
24    Q   Exhibits 282, 283, 284 and 285, when were
25 they taken?

10 (Pages 34 to 37)

# Pearsalls Sutures

## Fibrewire/Tigerwire Flowchart



DEPUY MITEK
EXHIBIT 279
04cv12457

CONFIDENTIAL

PR 08324

QSM4.8.27        Page: 1 of 1        Issue: 6        Date: 08/05/05        Authorised:

# EXHIBIT 22

CONFIDENTIAL- NON-PATENT ATTORNEYS EYES ONLY

1

```
 1   IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
           IN AND FOR THE NEW CASTLE COUNTY
 2   _____
     DEPUY MITEK, INC., a Massachusetts )
 3   Corporation,                       )
                     Plaintiff,         )  Civil Action
 4   v.                                 )  No. 04-12457 PBS
     ARTHREX, INC., a Delaware          )
 5   Corporation,                       )
                     Defendant.         )  HIGHLY
 6   _____   )  CONFIDENTIAL

 7
         CONFIDENTIAL - NON-PATENT ATTORNEY'S EYES ONLY
 8
                    deposition of:
 9
                    BRIAN HALLETT
10
                    taken at:
11               The Castle Hotel
                  Castle Green
12                  Taunton
                   Somerset
13             UNITED KINGDOM

14                    on
             11th January 2006
15

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL- NON-PATENT ATTORNEYS EYES ONLY

30

1 together for further processing.
2    Q    And then what happens in the, "Dyehouse",
3 block?
4    A    The dyehouse? The skeins are then loaded
5 onto what we call a, "Dye crown", and submerged into
6 a dye vessel where the dyeing takes place, which is
7 done under a programme in a high-pressure dyeing
8 machine.
9    Q    That is for dyeing the FiberWire blue?
10    A    Yes.
11    Q    Any other dyeing which takes place
12 during -- dye colour that takes place during that
13 process for FiberWire or TigerWire?
14    A    No.
15    Q    Did TigerWire, with the black strand --
16 are you familiar with that?
17    A    Yes.
18    Q    The material that is blacked is nylon,
19 right?
20    A    Yes.
21    Q    The nylon comes back black so you don't
22 have to dye it?
23    A    No.
24    Q    You do dye it?
25    A    Yes.

31

1    Q    Is that reflected on the flowchart?
2    A    No.
3    Q    Does that happen before --
4    A    That happens before they get to there.
5    Q    Before the twist?
6    A    Yes. The nylon is not twisted?
7    Q    It is not?
8    A    No. Not at that stage.
9    Q    No? Is the nylon ever twisted?
10    A    Yes.
11    Q    It is?
12    A    Hmm hmm.
13    Q    Is the nylon manufactured according to the
14 cover section of the -- of the flowchart?
15    A    Can you repeat the question?
16    Q    Sure. The cover section of the flowchart,
17 does that reflect the manufacturing processes for
18 the nylon, other than the steam set?
19    A    No. It is not shown on there.
20    Q    So, when it says, "Cover can go, here,
21 that is really referring to the polyester and ultra
22 high molecular weight polyethylene?
23    A    Yes.
24    Q    Is there a separate flowchart for nylon?
25    A    I am not sure.

32

1    Q    After -- you have mentioned the dyeing.
2 What is the scouring process that is referred to?
3    A    It is a cleaning process.
4    Q    Then there is a winding process after the
5 dyeing?
6    A    They have got a -- from the skein it goes
7 back to a bobbin so we can further process it.
8    Q    It is wound. Okay. And then after that,
9 after -- I am sorry, when it is wound, is it wound
10 on a bobbin?
11    A    From a skein, yes.
12    Q    After it is wound, then it is stretched
13 and coated?
14    A    Yes. Hmm hmm. It is pad-stretched.
15    Q    Is it hot-stretched before it is coated or
16 after?
17    A    At the same time.
18    Q    At the same time. After its coating it
19 goes to the final inspection and measuring process?
20    A    Correct.
21    Q    What does the final inspection measuring
22 entail?
23    A    It is wound to a finished bobbin where the
24 operators are inspecting the product, and it is
25 wound to certain lengths. After that, after the

33

1 final stretching and measuring it is packed and
2 despatched.
3    Q    DePuy Mitek Exhibit 282, the US2 FiberWire
4 M/C state scoured sample, can you show me on the
5 flowchart where that sample was taken during the
6 manufacturing process?
7    A    Here.
8    Q    You are referring to Exhibit 279, the,
9 "Dyehouse", block?
10    A    Yes.
11    Q    Now, it says dyeing or scouring there.
12    A    Hmm hmm.
13    Q    The Exhibit 282 sample is not dyed;
14 correct?
15    A    No. That is machine state.
16    Q    Exhibit 282 is not dyed?
17    A    Not dyed.
18    Q    Has the FiberWire, Exhibit 282, been
19 scoured?
20    A    Yes.
21    Q    So, the FiberWire, Exhibit 282, underwent
22 the wind to skein process in the flowchart; right?
23    A    Correct.
24    Q    The FiberWire, Exhibit 282, underwent all
25 the processes prior to the wind to skein process

9 (Pages 30 to 33)

CONFIDENTIAL- NON-PATENT ATTORNEYS EYES ONLY

34

1 except for the steam setting process that is caught
2 up in the cover?
3    A    Yes.
4    Q    Did the FiberWire, Exhibit 282, undergo
5 any process after the wind to skein process, just
6 the scour one?
7    A    That is just scoured.
8    Q    Just scoured. Okay. I will show you
9 another copy of Exhibit 279 where we just wrote,
10 "279", at the top. Could you mark on Exhibit 279
11 where Exhibit 282 was taken, just so that we can
12 have it for the record?
13    A    Where it was taken from?
14    Q    Right. During the process. Would you
15 just label that DePuy Mitek Exhibit 282? Just
16 Exhibit, "EX 282", and your own arrow to that, if
17 you would. So, where you have drawn -- written --
18 "EX 282", on Exhibit 279, that represents where the
19 FiberWire Exhibit 282 was taken?
20    A    Hmm hmm.
21    Q    Now I will show you DePuy Mitek Exhibit
22 283. This is the one labeled, "Pearsalls Limited
23 US2 FiberWire M/C state before scoured".
24    A    Yes.
25    Q    Can you label on Exhibit 279 where that

36

1    Q    Is it -- the Exhibit 284 sample underwent
2 the dyeing process and all the processes that are
3 before the dyeing process in Exhibit 279?
4    A    Correct.
5    Q    The Exhibit 282 -- 284 -- was the Exhibit
6 284 sample scoured?
7    A    Yes. Scoured and dyed.
8    Q    The difference between exhibit --
9    A    That was taken out before it was dyed.
10    Q    I am sorry, say again?
11    A    It was taken out of the machine before it
12 gets dyed. It just goes through a scouring process
13    Q    Is there a scouring process before and
14 after the dyeing process or just before?
15    A    It is before.
16    Q    Exhibit 282 was taken after the scouring
17 but before the dyeing?
18    A    Yes.
19    Q    Exhibit 284 was taken after the scouring
20 and after the dyeing?
21    A    Yes.
22    Q    You have labeled them on the chart as 284
23 coming first, but that is not really right. 284
24 comes after --
25    A    Yes. It is the other way around,

35

1 was taken? (Pause)
2        So, the Exhibit 283 sample you marked
3 as being taken after the braiding process on Exhibit
4 279.
5    A    Correct.
6    Q    So, the FiberWire in Exhibit 283 underwent
7 all the processes before the braiding process that
8 are in Exhibit 279?
9    A    Repeat the question?
10    Q    Sure. The FiberWire that is in the sample,
11 Exhibit 283, underwent all the processes that are
12 before the braiding process in Exhibit 279; correct?
13    A    Yes.
14    Q    I would like to show you Exhibit 284. It
15 is the Pearsalls Limited US2 FiberWire 10/C state
16 scoured/dyed sample. Can you label where the
17 Exhibit 284 sample was taken? (Pause)
18        So, where you have written, "EX 284",
19 is where the DePuy Mitek Exhibit 284 sample was
20 taken; correct?
21    A    Yes.
22    Q    You have labeled the Exhibit 284 sample as
23 being taken before the Exhibit 282 sample. Is that
24 right?
25    A    That's correct.

37

1 actually, as that is written down.
2    Q    DePuy Mitek Exhibit 285 is entitled, "US2
3 FiberWire, M/C state dyed/coated"?
4    A    Hmm hmm.
5    Q    Can you label where Exhibit 285 was taken?
6 (Pause)
7        Now, you have labeled Exhibit 285 as
8 the stretching coating block; correct?
9    A    Correct.
10    Q    Exhibit 285 FiberWire was -- underwent all
11 the processes before the final inspection measuring
12 process. Is that correct?
13    A    Correct.
14    Q    So, Exhibit 285 was stretched and coated;
15 correct?
16    A    Correct.
17    Q    So, the differences between Exhibit 284
18 and 285 is Exhibit 285 was wound and then stretched
19 and then coated; correct?
20    A    Correct.
21    Q    Any other differences between Exhibit 284
22 and 285?
23    A    No.
24    Q    Exhibits 282, 283, 284 and 285, when were
25 they taken?

10 (Pages 34 to 37)

# EXHIBIT 23

227

```
 1  IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
         IN AND FOR THE NEW CASTLE COUNTY
 2  _____
    DEPUY MITEK, INC., a Massachusetts )
 3  Corporation,                       )
                        Plaintiff,     )   Civil Action
 4  v.                                 )   No. 04-12457 PBS
    ARTHREX, INC., a Delaware          )
 5  Corporation,                       )
                        Defendant.     )
 6  _____   )
```

**HIGHLY CONFIDENTIAL**

```
 7
          CONFIDENTIAL - NON-PATENT ATTORNEY'S EYES ONLY
 8
                      deposition of:
 9
                      BRIAN HALLETT
10
                       taken at:
11                  The Castle Hotel
                     Castle Green
12                      Taunton
                       Somerset
13                  UNITED KINGDOM
14                        on
                 12th January 2006
15
16
17
18
19
20
21
22
23
24
25
```

348

1   A   No.
2   Q   How do you know at the measure stage it
3   was -- in Exhibit 341 it was 16.482; right?
4   A   So it is increased.
5   Q   Check numbers. But how do you know -- it
6   is increased. There is nothing done with the suture
7   between the intermediate stage and the measure stage
8   that would change the property of the suture; right?
9   A   Hmm hmm.
10  Q   Right?
11  A   Yes.
12  Q   Yes, I am correct?
13  A   Yes, you are correct.
14  Q   How do you know which one's right, the
15  decreased one at the intermediate stage or the
16  increased one at the end stage?
17      MR. TAMBURO: Calls for expert testimony
18  and object to the form.
19      MR. BONELLA: Or were they all about the
20  same?
21  A   They all vary.
22  Q   Well, if you look at the testing you
23  cannot really say -- are they all within the
24  tolerance of the testing so that you cannot really
25  say that one of these values is greater than the

350

1       MR. TAMBURO: I think he knows only what
2   I know. He wasn't there watching it when it
3   was done.
4       MR. BONELLA: All right. I will take your
5   representation that it is what it is.
6       I will show you DePuy Mitek Exhibit 343.
7   It is a three-page document test recorded
8   summary and sign-off sheet from Arthrex. Sal,
9   do you have any problems in me showing him
10  Exhibit 343? It was disclosed to J&J as
11  non-contentious.
12      MR. TAMBURO: No objection.
13      MR. BONELLA: Mr. Hallett, I am showing
14  you Exhibit 343. I believe it has Brian
15  Hallett's writing on the first page, I believe
16  it is a document from Arthrex. Have you ever
17  seen this document before?
18  (DePuy Mitek Exhibit 343 marked for identification)
19  A   Yes.
20  Q   You have?
21  A   Hmm hmm.
22  Q   When did you see it?
23  A   Sometime last year.
24  Q   And why did you see it?
25  A   I think it was describing or showing the

349

1   other?
2       MR. TAMBURO: Objection, calls for expert
3   testimony and speculation.
4   A   Yes.
5       MR. BONELLA: That's correct?
6   A   Yes.
7       MR. TAMBURO: Mike, this is the
8   once-passed coating sample of US2 FiberWire.
9   We don't have a Bates number but I will send
10  you a Bates number by e-mail. It is a little
11  capsule labeled, "Sample Pearsalls Limited blue
12  FiberWire single coating 15 metres US2 batch
13  number 28790".
14      MR. BONELLA: Okay. We will mark it as
15  DP342 and ask Mr. Hallett if you can identify
16  DePuy Mitek Exhibit 342, or take counsel's
17  representation that it is number 2 blue
18  FiberWire that has been run through the
19  coating, stretching and drying process only one
20  time. Is that correct?
21  (DePuy Mitek Exhibit 342 marked for identification)
22      MR. TAMBURO: That is my understanding
23  yes.
24      MR. BONELLA: Can he testify to that?
25  Does he know?

351

1   test procedure for doing a braid load on the loops.
2   Q   On what?
3   A   On the loop.
4   Q   If you look at the top it says the
5   description of the procedure on the first page is
6   number 2 FiberWire 2174 coated and uncoated USIPG
7   dyed, and the date is February 16, '04, and the type
8   of test it says, knot tiedown, and it says:
9       "The test objective: To determine
10  the peak force required to advance a single half
11  hitch using coated and uncoated Fiberwire suture".
12      Do you see that?
13  A   Hmm hmm.
14  Q   The test method is described as:
15      "The 50lb load cell was attached to
16  the MTS Sintech 1/S and calibrated. A custom
17  fixture as shown was used to simulate knot tying
18  that would occur clinically. The top end of the
19  suture was clamped in a custom fixture that was
20  attached to the load cell, and then a single half
21  hitch was tied around a guide block such that the
22  loop length was consistent between samples.
23  A weight of .375 kg was then attached to the free
24  end of the suture in order to tension the loop.
25  Care was taken to tension the legs of the suture

32 (Pages 348 to 351)

# Pearsalls Sutures

## Fibrewire/Tigerwire Flowchart



DEPUY MITEK
EXHIBIT 279
04cv12457

CONFIDENTIAL

PR 08324

QSM4.8.27    Page: 1 of 1    Issue: 6    Date: 08/05/05    Authorised:

# EXHIBIT 24

227

1   IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
        IN AND FOR THE NEW CASTLE COUNTY
2   _____
    DEPUY MITEK, INC., a Massachusetts )
3   Corporation,                       )
                        Plaintiff,     )   Civil Action
4   v.                                 )   No. 04-12457 PBS
    ARTHREX, INC., a Delaware          )
5   Corporation,                       )
                        Defendant.     )   **HIGHLY**
6   _____)      **CONFIDENTIAL**

7
        CONFIDENTIAL - NON-PATENT ATTORNEY'S EYES ONLY
8
9                   deposition of:

10                  BRIAN HALLETT

11                    taken at:
                  The Castle Hotel
12                  Castle Green
                      Taunton
13                    Somerset
                  UNITED KINGDOM

14                      on
                12th January 2006
15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL- NON-PATENT ATTORNEYS EYES ONLY

236

1  Q  In this document, it is 11.4a, but 11.4a
2 does refer to FiberWire?
3  A  That's correct.
4  Q  Is 11.4a used in the manufacture of
5 FiberWire?
6  A  Yes.
7  Q  Did 11.4a supersede 11.4?
8  A  Yes.
9  Q  You are able to obtain a FiberWire sample
10 after one run of the coating stretching drying
11 process?
12  A  I am sorry, were we able to?  Yes.
13 I don't know, were we able to?  I don't know.  We
14 didn't try at the time, since you asked.
15      MR. BONELLA:  We would like to identify
16    that before we go, if you can.  If you want to
17    produce it later and stipulate to its
18    authenticity, that is fine.
19      MR. TAMBURO:  Can we go off-the-record one
20    second?
21 (9.49 am)
22          OFF THE RECORD
23 (10.00 am)
24      MR. BONELLA:  Mr. Hallett, I will show you
25    DePuy Mitek Exhibit 316.  It is a two-page

237

1    document entitled, "FiberWire Chart", dated
2    November 11th, 2002. I am sorry. It is
3    a one-page document. DePuy Mitek Exhibit 316
4    is a one-page document entitled, "FiberWire
5    Chart", dated November 11th, 2002. Do you
6    recognize Exhibit 316?
7 (DePuy Mitek Exhibit 316 marked for identification)
8  A  Yes.
9  Q  What is Exhibit 316?
10  A  It is the specification tolerances for the
11 FiberWire.
12  Q  So, Pearsalls at one point in time in the
13 manufacture of FiberWire meet -- at some point in
14 time Pearsalls had to manufacture FiberWire to meet
15 the specifications set forth in Exhibit 316?
16  A  Yes.
17  Q  Was Exhibit 316 later superseded?
18  A  Yes.
19  Q  Exhibit 316 spells out a knot pull,
20 straight pull and a diameter specification; correct?
21  A  That's correct.
22  Q  Any other specifications that FiberWire
23 had to meet other than a knot pull, straight pull
24 and diameter?
25  A  No.

238

1  Q  For each of the knot pull, straight pull
2 and diameter, the specification was a minimum,
3 a maximum, and a mean.  Do you see that?
4  A  Yes.
5  Q  For each product listed in the chart, did
6 the FiberWire products have to meet the minimum
7 value, the maximum value and the mean value?
8  A  The minimum.
9  Q  Just the minimum?
10  A  Hmm hmm.
11  Q  The only acceptance criteria was the
12 minimum knot pull, the minimum straight pull and the
13 minimum diameter?
14  A  That's correct.
15  Q  The mean and the maximum were just guides?
16  A  Guidelines, yes.
17  Q  Was any FiberWire rejected for not meeting
18 the maximum, or mean values?
19      MR. TAMBURO:  Object to the form.
20  A  No.
21      MR. BONELLA:  Is the maximum diameter
22    specification that has to be met -- and the
23    reason I ask is because doesn't the USP sizes
24    require a minimum and a maximum diameter?
25  A  Yes.

239

1  Q  So yes, the maximum diameter is also
2 a specification that FiberWire has to meet?
3      MR. TAMBURO:  Objection, asked and
4    answered.
5  A  I don't know.
6      MR. BONELLA:  You don't know?
7  A  No.
8  Q  Yesterday we looked at Exhibit 315 which
9 was FiberWire acceptance criteria.
10  A  That's correct.
11  Q  Exhibit 315 talks about rejecting a bundle
12 of the straight pull testing as below a certain
13 value.
14  A  Yes.
15  Q  For example, number 2 FiberWire, it says
16 24.
17  A  Correct.
18  Q  In the exhibit, 316, chart, it lists the
19 minimum straight pull for number 2 FiberWire as
20 32.99; correct?
21  A  Correct.
22  Q  Do you know why the difference?
23  A  No.
24  Q  Is the Exhibit 315 criteria, is that
25 a criteria that Pearsalls ever applied?

4 (Pages 236 to 239)

CONFIDENTIAL- NON-PATENT ATTORNEYS EYES ONLY

240

1    A    No.
2    Q    Pearsalls has applied the criteria in
3 Exhibit 316?
4    A    Yes.
5    Q    Is the criteria in Exhibit 316 what
6 Pearsalls applied against the measured test data
7 that obtains for each batch?
8    A    Yes.
9    Q    You understand what I mean by, "Measure
10 test stage data"?
11    A    That it meets that criteria?
12    Q    No, the data itself, measure test stage
13 data. Do you understand what I mean by that?
14    A    No. I don't understand your question.
15    Q    The measure test stage data I am referring
16 to is the, for example, in Exhibit 280, the data at
17 the measure stage.
18    A    Yes.
19    Q    Do you see that?
20    A    Hmm hmm.
21    Q    My question was; does Pearsalls apply the
22 criteria in Exhibit 316 against the data from the
23 measurement test stage?
24    A    Yes.
25    Q    Does Pearsalls apply the criteria in

241

1 Exhibit 316 to the data at any of the other stages,
2 the intermediate, stretch, or dye?
3    A    No.
4    Q    I will show you Exhibit 317. It is
5 a one-page document entitled, "Table 1 Approved
6 FiberWire Constructs", dated September 27th, 2004.
7 Do you recognize Exhibit 317?
8 (DePuy Mitek Exhibit 317 marked for identification)
9    A    Yes.
10    Q    What is Exhibit 317?
11    A    It is an updated version of the 316.
12    Q    Was Exhibit 317 updated on about September
13 27th, 2004?
14    A    That's correct.
15    Q    Has Exhibit 317 been applied by Pearsalls
16 as an acceptance criteria since September 27th,
17 2004?
18    A    That's correct.
19    Q    Has Pearsalls applied Exhibit 317 to the
20 measured test data?
21    A    That's right.
22    Q    It looks like for number 5 FiberWire the
23 values are the same in Exhibit 316 and 317. Is that
24 right?
25    A    Probably, yes.

242

1    Q    It looks like FiberWire number 3/4 was
2 added to 317, to Exhibit 317. Is that correct?
3    A    That's correct.
4    Q    FiberWire number 2, it looks like the
5 values change for FiberWire number 2. Is that
6 right?
7    A    Yes.
8    Q    Why?
9    A    I think something was probably altered
10 within the specification.
11    Q    But why does specification for FiberWire
12 number 2 change?
13    A    It probably improved it.
14    Q    Improved the specification?
15    A    Hmm hmm.
16    Q    But why?
17    A    It would have given it more strength.
18    Q    But how did the product -- why did the
19 acceptance criteria change?
20         MR. TAMBURO: Objection. Asked and
21    answered, and it has already been established
22    this is not a Pearsalls document.
23    A    The values there are governed by what
24 Arthrex has put down.
25         MR. BONELLA: You don't know why they

243

1    changed it?
2    A    No. Each value changes from each batch.
3    Q    What do you mean by that?
4    A    The break loads can change from one batch
5 to another within -- probably within one or two
6 kilos.
7    Q    The knot strength can vary from one batch
8 to another by 1 or 2 kilos?
9    A    Yes.
10    Q    Why is that?
11    A    Because of the input of the product.
12    Q    What do you mean by that?
13    A    You would get a fluctuation between the
14 raw material.
15    Q    You mean differences in the starting raw
16 material?
17    A    Yes.
18    Q    A change to the knot strength?
19    A    Hmm hmm.
20    Q    It is just a fluctuation in the material?
21    A    Yes.
22    Q    How about the processing?
23    A    The processing, the process stays the
24 same.
25    Q    How about the -- but can the processing

5 (Pages 240 to 243)

**FiberWire Chart:** Unit of Force: *Kgf,* Unit of Diameter: *mm*                                         11/11/2002

| Comparison Chart 11-Nov-02 | | FiberWire # 5 | | | | FiberWire # 2 | FiberWire # 2 | FiberWire # 1 | FiberWire # 1 |
|---|---|---|---|---|---|---|---|---|---|
| | | AR-7210, AR-7211 | SP-05-01G | SP-05-01N | SP-05-01W | AR-7200, AR-7202 | AR-7201, 2 Strands | AR-7216 | AR-7216 |
| | | 1 Strand, Blue | 1 Strand, Green | 1 Strand, White | 1Strand, B&W | 1 Strand, Blue | 1 Blue, and 1 B&W | 1 Strand, Blue | 1 Strand, B&W |
| | | DT PS 07 | PSH1 | PSH1/1 | PSNH1 | DT PS 05 | DT PSN 05 | DT PS 45 | DTPSNH 5 |
| Knot Pull | Minimum | 29.75 | 27.80 | 28.57 | 26.98 | 12.87 | 14.57 | 10.70 | 10.42 |
| | Maximum | 32.19 | 30.34 | 32.88 | 33.57 | 14.93 | 15.71 | 12.97 | 14.02 |
| | Mean | 30.86 | 28.93 | 30.64 | 30.05 | 14.03 | 15.15 | 11.70 | 12.10 |
| Straight Pull | Minimum | 58.31 | 51.46 | 55.51 | 48.10 | 32.99 | 32.20 | 26.80 | 26.31 |
| | Maximum | 61.91 | 58.53 | 65.29 | 54.87 | 36.15 | 37.21 | 29.55 | 28.98 |
| | Mean | 59.66 | 55.56 | 61.34 | 51.96 | 34.70 | 35.04 | 28.17 | 27.83 |
| Diameter | Minimum | 0.769 | 0.762 | 0.759 | 0.764 | 0.557 | 0.537 | 0.467 | 0.515 |
| | Maximum | 0.952 | 0.940 | 0.960 | 0.927 | 0.665 | 0.704 | 0.567 | 0.586 |
| | Mean | 0.830 | 0.849 | 0.859 | 0.843 | 0.612 | 0.618 | 0.510 | 0.541 |

| Comparison Chart 11-Nov-02 | | FiberWire # 2-0 | FiberWire # 3-0 | FiberWire # 4-0 |
|---|---|---|---|---|
| | | AR-7220, AR-7221 | AR-7225 | AR-7228 |
| | | 1 Strand, Blue | 1 Strand, Blue | 1 Strand, Blue |
| | | DT PS 12/2 | DT PS 31 | DT PS 30 |
| Knot Pull | Minimum | 5.19 | 2.06 | 1.64 |
| | Maximum | 6.53 | 2.38 | 1.90 |
| | Mean | 5.65 | 2.26 | 1.78 |
| Straight Pull | Minimum | 12.20 | 6.10 | 5.75 |
| | Maximum | 14.78 | 6.62 | 6.42 |
| | Mean | 13.53 | 6.39 | 6.01 |
| Diameter | Minimum | 0.309 | 0.219 | 0.196 |
| | Maximum | 0.430 | 0.275 | 0.271 |
| | Mean | 0.366 | 0.245 | 0.228 |

DEPUY MITEK
EXHIBIT 316
04cv12457

# EXHIBIT 25

CONFIDENTIAL- NON-PATENT ATTORNEYS EYES ONLY

227

1  IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
2          IN AND FOR THE NEW CASTLE COUNTY

   _____
3  DEPUY MITEK, INC., a Massachusetts  )
   Corporation,                         )
4                      Plaintiff,        )   Civil Action
                                         )   No. 04-12457 PBS
5  v.                                    )
   ARTHREX, INC., a Delaware             )
6  Corporation,                          )
                       Defendant.        )   **HIGHLY**
   _____           )   **CONFIDENTIAL**

7        CONFIDENTIAL - NON-PATENT ATTORNEY'S EYES ONLY
8
9                      deposition of:
10                     BRIAN HALLETT
11                        taken at:
                       The Castle Hotel
12                      Castle Green
                          Taunton
13                       Somerset
                      UNITED KINGDOM
14
                            on
15                  12th January 2006
16
17
18
19
20
21
22
23
24
25

—

244

1 affect the testing results, the knot strength
2 testing results?
3    A   Not generally it doesn't.
4    Q   How about the testing? Can the testing
5 show variations in the testing results?
6    A   Sometimes, yes.
7    Q   But you don't know for sure why the
8 specifications changed?
9         MR. TAMBURO: Objection. Asked and
10 answered.
11    A   No.
12        MR. BONELLA: In Exhibit 316, do you see
13 the second column under number 5 FiberWire
14 lists a green product?
15    A   Yes.
16    Q   Similarly, Exhibit 317, the second column
17 lists a green number 5 FiberWire. Do you see that?
18    A   Yes.
19    Q   Has Pearsalls manufactured green number 5
20 FiberWire for commercial use?
21    A   No.
22    Q   The products shown on Exhibit 316, have
23 they all been manufactured for commercial use other
24 than the green FiberWire, number 5?
25    A   Yes.

246

1    Q   Have all the products listed in Exhibit
2 318 been sold for commercial use?
3    A   I don't know.
4    Q   How was this chart prepared?
5    A   It was prepared by myself and one of the
6 engineers at Arthrex.
7    Q   Who? What Arthrex engineer?
8    A   Tara Shanoville (Phonetic).
9    Q   Why were -- how did you select certain
10 products for entry into this matrix?
11    A   Most of them would have been what they had
12 been regarding.
13    Q   What Arthrex had been ordering?
14    A   Yes.
15    Q   What about what Arthrex didn't order?
16    A   Similarly they were listed.
17    Q   Why were they listed?
18    A   Because it may happen at some time or not.
19    Q   Let's go through the chart, then. The
20 first product, PS 30, has that been manufactured for
21 commercial use?
22    A   Yes.
23    Q   How about the second product, PS C33? Has
24 that been manufactured for commercial use?
25    A   Yes.

245

1    Q   How about Exhibit 317? Other than the
2 green number 5 FiberWire, have all those other
3 products been manufactured for commercial use?
4    A   Whether they have been used for commercial
5 use, I don't really know, but these have been given
6 those references in case -- the product has been
7 made, and that is how they would order it.
8    Q   They would order it -- Arthrex orders it
9 by the Pearsalls number?
10    A   PS.
11    Q   For example, Arthrex would order number 5
12 FiberWire but specifying DTPS 07?
13    A   That's correct.
14    Q   Next I will show you Exhibit 318. It is
15 a two-page document produced to us this morning
16 labeled, "Arthrex Products, Matrix of Label Product
17 and Development Codes". Do you recognize Exhibit
18 318?
19 (DePuy Mitek Exhibit 318 marked for identification)
20    A   Yes.
21    Q   What is Exhibit 318?
22    A   What is it?
23    Q   Yes.
24    A   It is a matrix both for the development
25 and products for the use of FiberWire and TigerWire

247

1    Q   How about PS 12/2? Has that been
2 manufactured for commercial use?
3         MR. TAMBURO: Objection. Mike, is your
4 question, have they been sold commercially,
5 or -- because I think he testified that they
6 are prepared to be sold commercially, so when
7 you say, "Are they for commercial use", it is
8 a little confusing, because they are all really
9 for commercial use, but the question you may
10 want to ask is; have they been sold
11 commercially. I am not sure.
12        MR. BONELLA: What I am asking,
13 Mr. Hallett, is typically Pearsalls sells
14 the -- the products just aren't samples, they
15 are providing to Arthrex. They sell the
16 product to -- they actually sell it to RK
17 Manufacturing or to Arthrex?
18    A   They would have gone -- originally they go
19 to Arthrex.
20    Q   They are sold to Arthrex?
21    A   Yes.
22    Q   Not RK?
23    A   They go to RK, but if I made a development
24 they normally go to Arthrex first for verification.
25    Q   Development, but when they are sold, the

6 (Pages 244 to 247)

## Arthrex Products
## Matrix of Label Product&Development codes

### B Hallett …NOVEMBER 2005

| Suture Spool Label | Pearsalls Product Code | Development construction code | Product | Size | Braid - Sleeve | | | Core | | | | Percentage of Suture (Approx.) | | |
| | | | | | Yarn Type | D'tex | Number of yarns | Yarn Type | D'tex | Number of yarns | Ply | UHMWPE | Polyester | Nylon |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4-0B-F/W | 37G153000 | PS30 | Blue Fiberwire | 4/0 | UHMWPE Polyester | 55 33 | 4 4 | N/A | N/A | N/A | N/A | 62.5% | 37.50% | N/A |
| 3-0B-F/W | 37G203000 | PSC33 | Blue Fiberwire | 3/0 | UHMWPE Polyester | 55 49 | 4 4 | UHMWPE | 55 | 1 | 0 | 58.4% | 41.6% | N/A |
| 2-0B-F/W | 37G302000 | PS12/2 | Blue Fiberwire | 2/0 | UHMWPE Polyester | 111 61 | 4 4 | UHMWPE | 144 | 1 | 0 | 70.7% | 29.3% | N/A |
| 0B-F/W | 37G351000 | DT3.5-3 | Blue Fiberwire | 0 | UHMWPE Polyester | 111 61 | 6 6 | UHMWPE | 217 | 1 | 0 | 70.7% | 29.3% | N/A |
| 0W-F/W | 38G351000 | PS3.5-3 | White Fiberwire | 0 | UHMWPE Polyester | 111 61 | 6 6 | UHMWPE | 217 | 1 | 0 | 70.7% | 29.3% | N/A |
| 1B-F/W | 37G401000 | PS53 | Blue Fiberwire | 1 | UHMWPE Polyester | 144 113 | 6 6 | UHMWPE | 144 | 1 | 3 | 65.7% | 34.3% | N/A |
| 1W-T/W | 36G401000 | PS54 | White Tigerwire | 1 | UHMWPE Polyester Nylon | 144 95 78 | 6 5 1 | UHMWPE | 144 | 1 | 3 | 70.1% | 25.7% | 4.2% |
| 1B-T/W | 36G401000BLUE | PS55 | Blue Tigerwire | 1 | UHMWPE Polyester Nylon | 144 95 78 | 6 5 1 | UHMWPE | 144 | 1 | 3 | 70.1% | 25.7% | 4.2% |
| 2B-F/W | 37G500500 | PS05T2 | Blue Fiberwire | 2 | UHMWPE Polyester | 144 95 | 8 8 | UHMWPE | 144 | 1 | 3 | 67.6% | 32.4% | N/A |
| 2W-F/W | 38G500500 | PSO5W | White Fiberwire | 2 | UHMWPE Polyester | 144 95 | 8 8 | UHMWPE | 144 | 1 | 3 | 67.6% | 32.4% | N/A |
| 2W-T/W | 36G500500 | PSN14Na | White Tigerwire | 2 | UHMWPE Polyester Nylon | 144 95 78 | 8 7 1 | UHMWPE | 144 | 1 | 3 | 68.1% | 28.6% | 3.4% |
| U/T 2W-FW | 38A500500 | PS05WU-a | White untreated Fiberwire | 2 | UHMWPE Polyester | 144 95 | 8 8 | UHMWPE | 144 | 1 | 3 | 67.6% | 32.4% | N/A |
| 5B-F/W | 37G700250 | PS07 | Blue Fiberwire | 5 | UHMWPE Polyester | 217 190 | 8 8 | UHMWPE | 217 | 2 | 3 | 66.7% | 33.3% | N/A |
| 5W-F/W | 38G700250 | PSH 1/1 | White Fiberwire | 5 | UHMWPE Polyester | 217 190 | 8 8 | UHMWPE | 217 | 2 | 3 | 66.7% | 33.3% | N/A |
| 5W-T/W | 36G700250 | PSNH 1 | White Tigerwire | 5 | UHMWPE Polyester Nylon | 217 190 78 | 8 6 2 | UHMWPE | 217 | 2 | 3 | 70.1% | 26.3% | 3.6% |
| See Note Below | See Note Below | PSH 1 | Green Fiberwire | 5 | UHMWPE Polyester | 217 190 | 8 8 | UHMWPE | 217 | 2 | 3 | 66.7% | 33.3% | N/A |
| 3+4W-FW | 38A600500 | PS 34 | White Fiberwire | 3/4 | UHMWPE Polyester | 217 190 | 6 6 | UHMWPE | 144 | 1 | 3 | 60.3% | 39.7% | N/A |
| 3+4B-FW | 38G600500 | PS 34A | Blue Fiberwire | 3/4 | UHMWPE Polyester | 217 190 | 6 6 | UHMWPE | 144 | 1 | 3 | 60.3% | 39.7% | N/A |

DEPUY MITEK
EXHIBIT 318
04cv12457

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| See Note Below | See Note Below | PS67A | White / Black TigerTail | 1 | UHMWPE Polyester Nylon | 144 95 78 | 6 6 1 | UHMWPE | 144 | 1 | 3 | 66.7% | 29.3% | 4.0% |
| See Note Below | See Note Below | PS67B | Blue / Black TigerTail | 1 | UHMWPE Polyester Nylon | 144 95 78 | 6 6 1 | UHMWPE | 144 | 1 | 3 | 66.7% | 29.3% | 4.0% |
| 2W-T/T-46 2W-T/T-54 | PSDH5-38 PSDH3-38 | PSDH5-38A PSDH3-38A | White / Black TigerTail | 2 | UHMWPE Polyester Nylon | 144 95 78 | 8 8 1 | UHMWPE | 144 | 1 | 3 | 65.4% | 31.4% | 3.2% |
| 2B-T/T-46 2B-T/T-54 | PSDH5-38 PSDH3-38 | PSDH5-38B PSDH3-38B | Blue / Black TigerTail | 2 | UHMWPE Polyester Nylon | 144 95 78 | 8 8 1 | UHMWPE | 144 | 1 | 3 | 65.4% | 31.4% | 3.2% |
| SPD-02-01B | 95G-500-500 | DPM1 | Blue Fiberwire | 2 | PURITY Polyester | 110 113 | 8 8 | PURITY | 165 | 1 | 3 | 60.3% | 39.7% | N/A |
| SPD-02-01W | 96G-500-500 | DPM02 | White Fiberwire | 2 | PURITY Polyester | 110 113 | 8 8 | PURITY | 165 | 1 | 3 | 60.3% | 39.7% | N/A |
| SPD-02-01TW | 97G-500-500 | DPM03 | White Tigerwire | 2 | PURITY Polyester Nylon | 110 113 78 | 8 7 1 | PURITY | 165 | 1 | 3 | 61.3% | 35.2% | 3.5% |

FiberWire is a suture with an outer covering of Ultra High Molecular Weight Polyethylene (UHMWPE) and polyester braided over an UHMWPE core.
TigerWire is a version of white FiberWire suture with a black strand creating spiral markings along the entire length of the suture.
TigerTail is a version of FiberWire suture with a black strand that creates spiral markings along one-half the length of the suture.

NOTE
Suture Spool Label and Pearsalls Product Code have not been assigned to these products.

PRODUCT CODE IDENTIFICATION

UNTREATED         A

MED COATED        G
BLUE              37

WHITE             38
TIGERWIRE         36        Please state blue if required