## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **DePuy Mitek Inc.,** | ) | |
| **a Massachusetts Corporation** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 04-12457 PBS** |
| | ) | |
| **Arthrex Inc.,** | ) | |
| **a Delaware Corporation, and** | ) | |
| | ) | |
| **Pearsalls Limited,** | ) | |
| **a Private Limited Company of the** | ) | |
| **United Kingdom,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### DePuy Mitek's Bench Memorandum Relating to Mitek's Protected Presuit Testing

Mitek submits this bench memo on the attorney-client privilege and work product issues relating to Mitek's pre-suit testing, as raised in Mitek's motion *in limine* no. 2 and discussed at the July 31st Pretrial Conference.[1] (Ex. 1 at 25-28).   To recap, Mitek claimed privilege and work product protection for pre-litigation testing that it carried out in connection with pre-litigation discussions held between the parties pursuant to FED. R. EVID. 408.  Mitek moved to preclude Arthrex from presenting evidence or argument about the existence of the tests for which Mitek claimed such protection.

At the July 31st Pretrial Conference, the Court stated that Arthrex "can argue that '[y]ou won't see any tests,'" from Mitek (*id.* at 28:6).  Mitek is concerned that if Arthrex is permitted to present to the jury the existence of Mitek's pre-suit tests, there will necessarily be an implicit adverse inference that the test results were unfavorable to Mitek.  At the conference, the Court

---

[1]     Plaintiff DePuy Mitek's Motion *In Limine* (No. 2) to Preclude Arthrex from Presenting Evidence that Mitek Performed Pre-Suit Testing on Coated vs. Uncoated FiberWire

indicated that this was not a "straightforward" issue and that it had not found a case directly on

point.  The Court pointed to cases relating to investigation interviews as perhaps being relevant.

But in those situations, as well as in the *Dupont* and *Loctite* cases cited in Arthrex's opposition

brief at page 4 (D.I. 140), the issue was one of discoverability and not admissibility at trial.

Discoverability and admissibility are distinct issues.  Accordingly, Mitek is submitting this bench

memorandum on the issue to provide additional guidance to the Court.

As explained in Mitek's motion *in limine*, allowing Arthrex to reference the existence of

Mitek's pre-suit tests would be inconsistent with the principles espoused in *Knorr-Bremse.*

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.,* 383 F.3d 1337 (Fed. Cir.

2004).  The issue of whether the assertion of privilege of a withheld opinion is admissible was

addressed in *McKesson Info. Solutions, Inc. v. Bridge Med., Inc.,* 434 F. Supp 2d 810, 812 (E.D.

Cal. 2006) and is directly applicable to the issue at bar.

In *McKesson*, the defendant moved in limine to preclude any evidence or testimony

regarding its assertion of the attorney-client privilege with respect to on opinion of counsel. *Id.*at

811.  The court granted the motion, stating that:

> to permit such evidence, even with a cautionary instruction imposing
> *Knorr's* limitations (of no adverse inference), the jury would nevertheless
> be left to speculate as to why Bridge would not reveal its counsel's
> opinion. It is inescapable that the jury would likely conclude that Bridge
> received an unfavorable opinion, otherwise Bridge would reveal it.

*Id.* at 812.  In analyzing the issue, the Court reasoned that any inference drawn by the jury from

knowing that the defendant received an opinion of counsel and refused to reveal it because of

privilege, contradicts the rationale of *Knorr. Id.*  The Court ruled that the patentee was precluded

"in all respects" from introducing evidence or testimony pertaining to defendant's assertion of

the attorney-client privilege over the opinion of counsel. *Id.*  Mitek fairly interprets "all respects" as precluding the plaintiff from mentioning the opinion or even the fact that it existed.

Mitek's motion *in limine* presents a similar issue.  Here, Mitek performed pre-suit tests at the direction of counsel on samples Arthrex produced.  For a variety of reasons, Mitek is not relying on the tests and is asserting that the tests, both their existence and the results, are protected by the attorney-client privilege and work product doctrine.  Mitek is concerned that if Arthrex is permitted to tell the jury about the pre-suit tests (even their existence), and the jury recognizes that the results were not presented to them, it would lead the jury to impermissibly conclude that the results were unfavorable to Mitek.

These tests are not at all relevant to the infringement issues because of the samples provided, as explained more fully in Mitek's motion *in limine* no. 2.  Even if they could be considered relevant, any marginal probative value of the mere existence of Mitek's pre-suit tests is substantially outweighed by the unfair prejudice to Mitek for asserting the attorney-client privilege and/or work product doctrine.  Such evidence and argument should be precluded under FED. R. EVID 401, 402, and 403.

For these reasons and the reasons in Mitek's motion *in limine* no. 2, Mitek requests that the Court preclude Arthrex from submitting any evidence or making any argument to the jury about the existence of Mitek pre-suit testing and Mitek's assertion of attorney-client privilege or work product protection.

Date:   August 3, 2007

DEPUY MITEK, INC.,
By its attorneys,


  /s/ Erich M. Falke

Dianne B. Elderkin
Lynn A. Malinoski
Michael J. Bonella
Erich M. Falke
WOODCOCK WASHBURN LLP
Cira Centre - 12th Floor
2929 Arch Street
Philadelphia, PA 19104
(215) 568-3100


Daniel J. Gleason (BBO #194900)
Heather Repicky (BBO #663347)
NUTTER MCCLENNEN & FISH LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
(617) 439-2000

## CERTIFICATE OF SERVICE

I certify that I am counsel for DePuy Mitek, Inc. and that true and correct copies of:

**DePuy Mitek's Bench Memorandum Relating to Mitek's Protected Presuit Testing**

were served on counsel for Defendants Arthrex, Inc. and Pearsalls Ltd. on this date *via* the Court's e-mail notification with the following recipients being listed as filing users for Defendants:

> Charles W. Saber
> Dickstein Shapiro LLP
> 1825 Eye Street, NW
> Washington, DC 20006
> saberc@dicksteinshapiro.com

> Raymond P. Ausrotas
> Todd & Weld LLP
> 28 State Street, 31st Floor
> Boston, MA 02109
> rausrotas@toddweld.com

Dated:  August 3, 2007                    _/s/ Erich M. Falke_____
                                          Erich M. Falke

0001

1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS

2

3  DePUY MITEK, INC.,          )
    a Massachusetts Corporation, )

4          Plaintiff    )
                       )

5        -VS-          ) CA No. 04-12457-PBS
                       ) Pages 1 - 37

6  ARTHREX, INC.,            )
    a Delaware Corporation,     )

7  and Pearsalls Ltd.,         )
    a Private Limited Company    )

8  of the United Kingdom,      )
            Defendants   )

9

10

              FINAL PRETRIAL CONFERENCE

11

        BEFORE THE HONORABLE PATTI B. SARIS

12            UNITED STATES DISTRICT JUDGE

13

    A P P E A R A N C E S :

14

      DIANNE B. ELDERKIN, ESQ., MICHAEL J. BONELLA, ESQ.,

15  LYNN A. MALINOSKI, ESQ., and ANGELA VERRECCHIO, ESQ.,
    Woodcock Washburn, LLP, Cira Centre, 12th Floor,

16  2929 Arch Street, Philadelphia, Pennsylvania, 19104-2891,
    for the Plaintiff.

17

      CHARLES W. SABER, ESQ. and SALVATORE P. TAMBURO, ESQ.,

18  Dickstein Shapiro, LLP, 1825 Eye Street, N.W., Washington,
    D.C., 20006-5403, for the Defendants.

19

20              United States District Court
                 1 Courthouse Way, Courtroom 19

21              Boston, Massachusetts
                 July 31, 2007, 4:00 p.m.

22

              LEE A. MARZILLI

23          OFFICIAL COURT REPORTER
          United States District Court

24          1 Courthouse Way, Room 3205
              Boston, MA  02210

25              (617)345-6787

0002
1            P R O C E E D I N G S
2            THE CLERK:  The case of DePuy Mitek, Incorporated
3  V. Arthrex, Incorporated, et al, Civil Action
4  No. 04-12457, will now be heard before this Court.  Will
5  counsel please identify themselves for the record.
6            MS. ELDERKIN:  Good afternoon.  On behalf of DePuy
7  Mitek, Diane Elderkin.  We've moved our team up from
8  Philadelphia, so we have a lot of people here today.  Mike
9  Bonella, Lynn Malinoski, and Angela Verrecchio are here at
10  the table with me.
11            THE COURT:  You've already moved up here?
12            MS. ELDERKIN:  Yes, today.
13            MR. SABER:  We're a little behind them, your
14  Honor.  We haven't moved up yet.  Charles Saber from
15  Dickstein Shapiro, and with me is Sal Tamburo, also from my
16  office, and we represent the defendants, Arthrex and
17  Pearsalls.
18            THE COURT:  Okay.  So let's just talk about some
19  basic things before we get into these millions of motions in
20  limine.  I was shocked at how many came in and how much paper
21  was involved, and it's quite clear to me that we won't get
22  through it all, or at least it's unlikely we will.  First of
23  all, you've all agreed it's a one-week trial.  Is that
24  correct?
25            MS. ELDERKIN:  That's our understanding, your
0003
1  Honor.  That was what we understood you to say when you
2  scheduled it, and we've planned--
3            THE COURT:  On a 9:00-to-1:00 basis?
4            MS. ELDERKIN:  Yes, your Honor.
5            MR. SABER:  Well, your Honor, I don't think that's
6  exactly right.  I know your Honor had indicated when we were
7  here the last time -- this, of course, just came up, as you
8  said, that you hoped, that you thought this could get done in
9  a week, and I think there was actually a little colloquy;
10  maybe we could, maybe we couldn't, we'd see whether we could
11  or not.
12            THE COURT:  Well, let me just start going through
13  the witnesses.  Let me just say the following:  I know you're
14  both looking for the knock-dead punch.  I'm not going to
15  eliminate either of your experts.  I mean, it's just not
16  going to happen.  So, you know, we're not doing it.  Now,
17  does that mean that I'm not going to maybe not permit certain
18  questions to be asked?  Maybe.  So we should assume that
19  Mukherjee and Brookstein, and who's the guy --

20          MR. SABER:  Witherspoon and Gitis.
21          THE COURT:  Witherspoon we're going to talk about.
22  Witherspoon cannot give the kinds of opinions -- I mean,
23  we're jumping ahead of ourselves.  Sometimes I let a lawyer
24  talk about what's the patent process.  Like, all the things
25  she cited?  We're not doing.
0004
1          MR. SABER:  Right.
2          THE COURT:  Okay, if there's some sort of general
3  background and you want to use your time that way, I'll think
4  about it; you know, like what the heck is a patent, and
5  what's a claim, and what's a specification, and what is the
6  Patent Office, and et cetera?  We're not doing what is claim
7  infringement, what is the law?  We're not doing it.
8          MR. SABER:  That's not what he's here for, but --
9          THE COURT:  Okay.  But, in any event, so who's your
10  first witness?
11          MS. ELDERKIN:  We have three live witnesses, your
12  Honor.  Our first witness will be Neil Weber.  He's the vice
13  president of marketing for DePuy Mitek.
14          THE COURT:  And how long will he be?
15          MS. ELDERKIN:  We expect maybe a half an hour at
16  the most with Mr. Weber.
17          THE COURT:  What do you think you're going to do?
18          MR. SABER:  I probably would have at least a half
19  an hour of cross, maybe more.
20          THE COURT:  Fine.  Who's the next one?
21          MS. ELDERKIN:  Then we have the inventor, Mr. Mark
22  Steckel, and we're expecting an hour with him.
23          THE COURT:  What do you have?
24          MR. SABER:  It's hard to tell.  Probably about an
25  hour or two.
0005
1          THE COURT:  Okay.
2          MS. ELDERKIN:  And then our expert, Dr. Brookstein.
3          THE COURT:  And how long will he be?
4          MS. ELDERKIN:  I expect about an hour and a half
5  with him.
6          MR. SABER:  I expect his cross to be quite lengthy.
7          THE COURT:  Like?
8          MR. SABER:  It's hard to tell with what he's going
9  to say, but two, three, four hours, something like that.
10          THE COURT:  So let's say --
11          MR. SABER:  Three?
12          THE COURT:  We'll say two to three.
13          MS. ELDERKIN:  Those are our live witnesses, your

14  Honor.  The others are --
15          THE COURT:  So just so far.  Now, you sent chills
16  down my back when you started saying that there were lots of
17  deposition excerpts and lots of objections.  Has that not
18  been worked out?
19          MS. ELDERKIN:  The objections to the depositions?
20          THE COURT:  I guarantee you one thing I won't do
21  because it's happened in other cases.  The night before you
22  say, "Oh, by the way, we have these 100 pages of
23  depositions," and you have these objections, and you have
24  these objections, and you want me to sit that night and do
25  them all.  So have you met and conferred yet on all the
0006
1  depositions and the objections?
2          MS. MALINOSKI:  Your Honor, I'll speak to that.  On
3  the deposition designations, we're certainly still talking
4  about certain things where maybe we can just stipulate
5  regarding some of the testimony to avoid having to read in
6  the testimony, and we're hoping to actually cut down on some
7  of the testimony, and we're going to continue to work on
8  that.
9          THE COURT:  Well, how many objections are we
10  talking about?  How many pages of depositions and
11  objections?
12          MS. MALINOSKI:  Well, Mitek has, I think, four
13  witnesses by deposition.  I guess if I could step back for
14  one second.  There's Dr. Burks's testimony, who's an Arthrex
15  witness, who's going to be presented by videotape, and that's
16  sort of a combined presentation by both sides.
17          THE COURT:  How long is that?
18          MS. MALINOSKI:  And we're --
19          MS. ELDERKIN:  It will be about an hour, an hour
20  and a half.
21          MS. MALINOSKI:  Yes, about an hour, an hour and a
22  half.
23          MR. SABER:  Dr. Burks we found out has contracted
24  prostate cancer, and he's going through treatments, and
25  that's why he's testifying this way.
0007
1          THE COURT:  Is it all agreed on?
2          MR. SABER:  Well, we're working on it.
3          THE COURT:  I can't operate in realtime on this
4  stuff.  So, like, you can't come in that morning and say, "We
5  have these objections," and then have me rule off the bench,
6  and then have you be able to edit, right?  And I don't want
7  to spend my weekend doing it, so if I haven't heard it so

8  far, you need to work it out, or reserve for me one or two
9  issues, kind of thing.
10     MS. MALINOSKI:  We'll continue to work on it.  And,
11  actually, with Dr. Burks, we were trying to get all the
12  testimony onto one DVD so we can view that, but I expect that
13  we can work things out with respect to that testimony, and
14  perhaps some of the other witnesses too.
15     THE COURT:  How long will it be to read in the
16  others?
17     MS. MALINOSKI:  We're saying probably, at least
18  from Mitek's perspective, probably a half hour, forty-five
19  minutes.
20     THE COURT:  All right, so already we're talking
21  about, if we have three-and-a-half-hour days, let's say, and
22  we have to impanel and do openings, say a half an hour apiece
23  for openings and then my preliminary jury instructions, we
24  already are talking about at least two or three days, okay?
25     So what witnesses do you have?  I'm talking about
0008
1  with direct and cross.
2     MR. SABER:  We have, I believe, seven, your Honor,
3  and the number, of course, is -- we go second, so you're
4  never quite, quite sure.
5     THE COURT:  Sure.  So who do you have?
6     MR. SABER:  We start with Mr. Benavitz, who is the
7  marketing person from Arthrex who will be testifying.
8     THE COURT:  Okay.
9     MR. SABER:  And then the next one is --
10     THE COURT:  For how long?
11     MR. SABER:  I'd say he's probably forty-five
12  minutes.
13     THE COURT:  What do you have?
14     MS. ELDERKIN:  I don't believe in cross-examining
15  witnesses for longer than they're on a direct, so I would
16  suspect twenty, twenty-five minutes for Mr. Benavitz.
17     THE COURT:  Okay.
18     MR. SABER:  The next witness would be Mr. Lyons,
19  and I expect him to be a rather lengthy witness probably.
20     THE COURT:  Who's he now?
21     MR. SABER:  He's the head of Pearsalls, the people
22  who actually make the braids and were involved in the
23  development of this product.
24     THE COURT:  So how long?
25     MR. SABER:  About a couple hours, two to three
0009
1  hours.

2        THE COURT:  There's no way this is going to be one
3    week.  What's your cross?
4        MS. ELDERKIN:  If I may, your Honor, this is a very
5    simple trial.
6        THE COURT:  Yes, but what's the cross?
7        MS. ELDERKIN:  An hour.
8        THE COURT:  Go ahead.
9        MR. SABER:  The next would be Dr. Burkhart, and I
10   would expect him to be a short witness, probably twenty
11   minutes to a half hour.
12        MS. ELDERKIN:  Ten minutes.
13        THE COURT:  Okay.
14        MR. SABER:  Next is Ms. Willoughby, who's one of
15   the people who did some tests, and I would expect her to be
16   half hour, forty-five minutes?
17        MR. TAMBURO:  Half hour.
18        THE COURT:  Cross?
19        MS. ELDERKIN:  Twenty minutes.
20        THE COURT:  Okay.
21        MR. SABER:  Next is Dr. Gitis.  I'd expect him to
22   be an hour and a half.
23        MS. ELDERKIN:  One hour.
24        MR. SABER:  And Dr. Mukherjee, who, again, I expect
25   to be a lengthy witness, probably two and a half to three
0010
1    hours.
2        THE COURT:  Cross?
3        MS. ELDERKIN:  An hour.
4        MR. SABER:  And then there's Mr. Witherspoon who
5    you mentioned before, but he would be short, in any event.  I
6    expect about a half hour.
7        THE COURT:  Let me just say, this is not a
8    week-long trial.  We'll deal with that in a minute but -- so
9    I'm likely to do some -- this matters for two reasons.  One
10   is, there's a case right behind you, so for me schedulingwise
11   it's a big deal.
12        The other issue is, there is a potential problem in
13   my personal family where someone might die, and I don't know
14   when that's going to happen, so you need to keep in touch
15   with me as to -- I might lose a day or two in the interim.
16        So it just means that I think as a practical
17   matter -- I know you're all coming in from out of town,
18   you're going to be here for more than a week.  Now, I am
19   guaranteeing it won't be more than two weeks, and I'm going
20   to have to think about what's fair in terms of how far it
21   goes because I often find that if I give people forever,

22  they'll take forever, and that's why I go through this
23  exercise.
24         Mr. Alba at some point adds all this up.  I don't
25  know if he's doing it, but it's clearly more than one week.
0011
1  If you take into account, one, a day for impaneling,
2  openings, and preliminary jury instructions, and, two, a day
3  for closing arguments and final jury instructions, and at
4  least one day for jury deliberations -- those are three days
5  on the house -- you're talking a minimum of three days
6  apiece, if not more, for testimony -- so I'm just playing
7  this out -- we're talking a two-week trial.  Now, maybe we
8  can narrow this down.
9         How many deposition transcripts do you have?
10         MR. TAMBURO:  I don't know the exact number
11  offhand, but I'd say approximately seven, eight.
12         THE COURT:  Have you worked out the objections with
13  them?  Have you designated?
14         MR. TAMBURO:  Preliminarily we have talked, but we
15  need to do some more discussion.
16         THE COURT:  Okay, so this is what happens:  I
17  guarantee you I'm not going to do this on the fly.  If anyone
18  hasn't worked it out in advance or has a hundred objections,
19  I'm going to exclude the deposition testimony, because I've
20  been here, done this, you know, where people hand me a pile
21  and say, "Go home and do it tonight."  So what needs to
22  happen is, you need to confer.  If it doesn't matter, let it
23  go.  I don't want to deal with leading questions and that
24  kind of stuff.  So if you don't agree, you'll give me a
25  binder.  And you'll be pink, and you'll be green, or whatever
0012
1  you choose.  And so one will, you know, underline where
2  there's an objection and what the basis for it is, literally
3  in the margins so I don't have seventeen things to read; you
4  know, "Objection, hearsay, objection, lack of foundation,
5  objection," whatever.  I don't even care if you handwrite it
6  in, so that I have it all in one place.
7         And I don't know when you're going to get it to me,
8  and today's Tuesday.  When can you get it to me?  Let me put
9  it this way.  Let's do it this way:  at least 48 hours before
10  you plan to read it.  And if there are hundreds of them, I
11  won't do it, okay?
12         MS. MALINOSKI:  Your Honor, we've already provided
13  binders with the transcripts in them.  I wonder if we should
14  just get those back.  They're color-coded copies with Mitek's
15  designations in yellow, Arthrex's counters in orange, and

16  then counter-counters in green.  And Arthrex I believe has
17  done the same thing, and we've noted some objections.  Maybe
18  we can work those out.
19          THE COURT:  Do I have those?
20          MS. MALINOSKI:  They were filed on Tuesday.
21          THE COURT:  How many objections were there?
22          MR. SABER:  Quite a few.
23          MR. TAMBURO:  A lot of the objections, your Honor,
24  depend on the in limine motions.  I know that.
25          THE COURT:  I know, but let's just start going
0013
 1  through them.  I'm not going to do it, okay?  You need to
 2  work out any of the little nitpicky ones.  If it's the big
 3  motions in limine, that's what I'm here for.
 4          MR. SABER:  I don't know how much of it is those --
 5  I'm sure there are some that are those kind of little
 6  objections that you're talking about, and I'm confident that
 7  we will eliminate most of those, if not all of those.
 8          THE COURT:  Okay, so let's go through the big
 9  ones.  Let's just start going through.  First of all, I am
10  granting judgment as a matter of law on tipping and reverse
11  doctrine of equivalents.  That's gone.  The second issue
12  is -- and I'll write an opinion on that.  It was extremely
13  cursory briefing.  There was hardly anything written.  One
14  was just a footnote, and I -- anyway, the law is pretty
15  clear, the record is pretty clear, but there was almost no
16  briefing by either side.  Let me just start there.  But I'm
17  going to direct it out.
18          Now, the next issue is ownership.  Is there case
19  law on that?  I mean, what's the issue?
20          MR. SABER:  Well, what the issue is here, your
21  Honor, is this was -- we know that there's a written document
22  with an assignment on it, but there's no consideration for
23  the assignment, and the assignment --
24          THE COURT:  Well, which cases say there's got to be
25  consideration?
0014
 1          MR. SABER:  I think it's just basic contract law.
 2          THE COURT:  No, you hand me some cases because we
 3  started trying to look this up.  You think it's easy to look
 4  this up.  We couldn't find cases on this.  Why can't it be
 5  gifted?  It can be inherited, by the way.  Why isn't it like
 6  property?  Why do you need consideration?  I don't know what
 7  the law is, and so we started doing research, and neither of
 8  you have given me any briefs on the issue whatsoever.  It
 9  isn't waived.  That was a different kind of situation.  I

10  need some -- it does say for -- was there any consideration
11  so this can go away?
12      MS. ELDERKIN:  There was consideration, your Honor.
13      THE COURT:  What was it?
14      MS. ELDERKIN:  Mitek is a sister company with
15  Ethicon, the assignor.  Their fortunes rise and fall together
16  in large part.  Ethicon, the assignor, sells sutures to
17  Mitek.  Mitek then resells them, many of its products.  The
18  particular patent at issue, the patent in suit, was directed
19  to marketplaces that Mitek was more directly involved in.  It
20  made sense for Mitek to be the owner of the patent to protect
21  its market share.  When it protects its market share, it
22  sells more product.  That benefits Ethicon, the assignor.  So
23  it was a business relationship.  Ethicon benefits by having
24  Mitek have this product.
25      THE COURT:  It's a brand-new issue.  No one has
0015
1  brief it.
2      MS. ELDERKIN:  Your Honor, it was never pleaded.
3      THE COURT:  Excuse me.  It's subject matter
4  jurisdiction which is part of the problem, right?  So no
5  one's briefed it.  We couldn't find anything on it.  It can
6  be inherited, a patent can be inherited, so that's obviously
7  not with consideration.  So you need -- it does say in the
8  body of it, the boilerplate, you know, consideration is due
9  and granted.  We can make her put on the testimony, but just
10  so that we don't -- you know, we have so much going on here,
11  I don't want to waste people's time.
12      MR. SABER:  I understand, your Honor.  The problem,
13  of course, is that what Ms. Elderkin just said doesn't square
14  with the evidence in the case.  That's of course why --
15      THE COURT:  No one has given me anything,
16  anything.  I know nothing about this issue, and it just
17  popped up.  And I would have thrown it out if it weren't
18  subject matter jurisdiction.
19      MR. SABER:  It's true, we haven't had a chance to
20  brief it yet.  It was just raised in their trial brief.  They
21  didn't file an in limine motion on this, and we would like to
22  have an opportunity to brief it for your Honor.
23      THE COURT:  I need it, and I'm sure not doing
24  anything with it, but I would very much welcome the notion
25  about whether you even need a peppercorn.  But assume for a
0016
1  minute you need a peppercorn for the consideration -- which
2  I'm not sure you do because it's treated like personal
3  property so I think I could give it to you -- you can't gift

4  a patent?
5       MR. SABER:  Your Honor, I hadn't really thought
6  about it.  This was a business transaction between two
7  companies.
8       THE COURT:  Maybe, but maybe the dispute then as to
9  whether the consideration was valid or not is between the two
10  companies, if it ever came to that.  I'm not sure you can
11  raise it.  In any event, I've never seen anyone raise this.
12  I know there are issues of whether somebody -- there are
13  issues that come up in the assignment area, for sure, as to
14  who the appropriate party should be and that sort of thing.
15  I've just never seen anything like this.
16       MR. SABER:  Okay, your Honor.  As I say, we would
17  like to have an opportunity to brief it, and we will.
18       MS. ELDERKIN:  We'd be happy to brief it, your
19  Honor.
20       THE COURT:  Let me put it this way:  If there's any
21  issue at all, I have no problems with having Ethicon, or
22  whoever it is -- what's the company again?
23       MS. ELDERKIN:  Ethicon is the assignor.
24       THE COURT:  I have no problems with them joining at
25  the last minute.  I don't want this issue going to a jury.
0017
1  No one's briefed it.  It's been completely poorly vetted.
2  It's just a mess because I just saw it for the first time
3  preparing for this, and so I expect a brief from both sides
4  on what the law is on this.  And let me tell you, it's not a
5  quick hit, all right?
6       The next issue, which is brand-new for me, although
7  obviously a fact dispute, is the contributory infringement.
8  I just don't even know enough to discuss it.  It's obviously
9  a fact issue, but it's a new issue to me.  I haven't had a
10  chance to walk through it.
11       MR. SABER:  I don't think there are actually any
12  motions that are to that issue.  Fundamentally what the issue
13  is -- and it is a small issue in the case, your Honor --
14  Pearsalls, one of the defendants here, doesn't make, use, or
15  sell what's in the patent.  They don't make surgical
16  sutures.  So the theory against them has to be some sort of
17  indirect infringement, and contributory is what they're
18  alleging on that.  And --
19       THE COURT:  Can I ask you, why does this matter?
20  Why are we adding this in?  Are they not good for the money?
21       MS. ELDERKIN:  No.  Pearsalls supplies the suture,
22  and if we prevail ultimately, we would like to have the
23  injunction against Pearsalls as well as Arthrex because --

24          THE COURT:  Are they related companies?
25          MS. ELDERKIN:  Pardon me?
0018
1          THE COURT:  Are they related entities?
2          MS. ELDERKIN:  They're not related entities.
3          MR. SABER:  No, no, they're separate companies,
4   though it is interesting, your Honor, Pearsalls was not
5   originally a defendant in the case, and this was fairly late
6   in the discovery where --
7          THE COURT:  Who represents Pearsalls?
8          MR. SABER:  We do.  We do, your Honor.  But DePuy
9   Mitek moved to amend to add them.
10          THE COURT:  Just, you know, we have one week or a
11   week and a half.  We have plenty of issues of coating.  I
12   just don't want to muck up this trial with an issue for the
13   jury on ownership or contributory infringement if it's not
14   the heart and soul of this case.
15          MS. ELDERKIN:  Your Honor, we could certainly hold
16   that issue to a second phase, if we get to a second phase.
17          THE COURT:  Well, would Pearsalls stipulate that it
18   wouldn't sell it again if there was an infringement found?
19          MR. SABER:  You know, I'd have to ask them, your
20   Honor, because I can't make that representation.
21          THE COURT:  Why don't you do that.  I think coating
22   is what this case is about.  It has been from the beginning.
23   You basically -- I went back and reread it -- you don't even
24   deal with any of these other issues.  About 99.9 percent of
25   your briefing has been on the issue of coating.  And so I
0019
1   don't want to both on your end -- maybe there would be an
2   agreed-upon injunction if infringement is found, or maybe
3   there would be a judicial stipulation filed.  Just --
4          MR. SABER:  Well, it's way too early, your Honor,
5   to talk about injunctions because, of course, this is only
6   the one issue, and we have -- you know, there are the
7   validity issues.
8          THE COURT:  I understand, but maybe there would be
9   some judicial stipulation that if it's found to be valid and
10   infringing, that Pearsalls wouldn't sell it.
11          MR. SABER:  I could talk to them about that.
12          THE COURT:  Yes, why don't you do that.  I'm just
13   trying to sort of streamline this case to where we all agree
14   there's a disagreement.
15          MR. SABER:  I mean, I think the easiest thing,
16   frankly, would be for them to take a voluntary dismissal of
17   Pearsalls --

18          THE COURT:  Why should they?  Then they have to
19  re- --
20          MR. SABER:  If in fact, you know, Pearsalls does
21  something that --
22          THE COURT:  I don't want to have relitigate it
23  against Pearsalls.  There just should be some agreement that
24  if it's found valid and infringing and if it's upheld on
25  appeal, that Pearsalls won't sell it.  If not, I'll just do
0020
 1  it, and they'll have to get a judgment one way or another,
 2  you know.  So I don't view that as the heart of this issue.
 3          MR. SABER:  It is a relatively minor issue.  I
 4  think the parties would agree on that.
 5          THE COURT:  Okay, so let's just try and streamline
 6  this to get to the jury what we need to.
 7          What does Mr. Witherspoon want to say?
 8          MR. SABER:  Witherspoon is here fundamentally for
 9  two purposes:  One is, this, as you know, this "consisting
10  essentially of" is a very, very complicated legal area, and
11  there are lots of theories that have been thrown out in this
12  case which have to do with how it interacts with the patent,
13  how it interacts with the prosecution history, things that
14  are precisely what patent experts do.
15          THE COURT:  I'm not going to let him talk about
16  "consisting essentially of."  So what's the next one?  You
17  know, I'm open to some sort of preliminary jury instruction,
18  which might be helpful.
19          MR. SABER:  The problem, your Honor, as you know
20  from the -- or perhaps you don't, but the parties submitted a
21  bunch of proposed instructions, and many we agreed on, but
22  some we didn't.  And one of the big areas where there was
23  disagreement was on what the instruction should be on
24  "consisting essentially of."
25          THE COURT:  All right, so I won't give one until we
0021
 1  have a charge conference, but I'm not -- especially if
 2  there's disagreement on it, I'm not going to let some lawyer
 3  get on the stand.
 4          So what's the next issue?  We don't have a lot of
 5  time, so I'm trying to move it.  What's the next issue?
 6          MR. SABER:  It's a mixed question of fact and law,
 7  and he's going to explain what the specification is about and
 8  what's important about the specification and how that relates
 9  to the claims in the case.
10          THE COURT:  Okay, so he's just going to talk
11  generally about what's a specification and what's a claim,

12  but he cannot interpret this specification and this claim.  I
13  will cut him off on that.  So I don't know if it's worth your
14  dime bringing him here.  I've allowed legal, quote/unquote,
15  "experts" if they talk about the system because I think
16  that's a little confusing.  You know, I sometimes actually --
17  do you want to do that movie, you know, what's a patent?  I'm
18  happy to do the movie.
19          MR. SABER:  The problem with the movie is -- and
20  I've done that in other cases -- is that it brings in so many
21  other issues that are not involved in this case, and
22  that's --
23          THE COURT:  Fair enough.  So, I mean, if someone
24  wants to do that taxonomy of a patent, "Here's a claim, and
25  here's a specification, and here's what we mean by the Patent
0022
 1  and Trademark Office, and here's what an inventor does," I'm
 2  happy to do that.  But, otherwise, I'm not going to have
 3  Witherspoon talk about these claims and this specification on
 4  the merits.
 5          MS. ELDERKIN:  Your Honor, we actually have
 6  proposed a preliminary instruction where you would walk the
 7  jury through the patent and explain what a specification is
 8  and what the claim is and the like.
 9          THE COURT:  Maybe, and I'll look at that, so --
10          MR. SABER:  And, again, I think we differed a
11  little bit on it, but the notion of doing some of that was
12  actually acceptable to both sides.
13          THE COURT:  All right.  So, now, the next issue is,
14  I deny the motion to exclude Brookstein.  I deny the motion
15  to exclude Mukherjee and Gitis.  I deny all that.  I deny the
16  motion to exclude the testing of the -- what was that?  I
17  never saw that word before.  What are they called?
18          MS. ELDERKIN:  CETR testing?
19          THE COURT:  Yes.
20          MS. ELDERKIN:  That's the name of the organization
21  that did the testing.
22          THE COURT:  What's the name of it?  It's a special
23  kind of --
24          MR. SABER:  Center for Tribology.
25          THE COURT:  Tribology.  I thought it was about
0023
 1  native Americans.
 2          (Laughter.)
 3          THE COURT:  Tribology, what's it about?
 4          MR. SABER:  It has to do with these kinds of
 5  products, your Honor.

6        MR. TAMBURO:  It has to do with friction of
7  surfaces, I believe.
8        THE COURT:  Where do they get t-r-i-b?
9        MR. TAMBURO:  CETR?
10       THE COURT:  No, tribology.
11       MR. TAMBURO:  Tribology, oh, I don't know.
12       THE COURT:  Study of --
13       MR. TAMBURO:  We'll have to ask Dr. Gitis.
14  Friction of surfaces.
15       THE COURT:  Speaking of which, what on earth --
16  see, you just all assume too much knowledge.  What's
17  chatter?
18       MR. SABER:  Chatter is when as the -- when a
19  surgeon is making a knot, he throws down what are called
20  packages, which are like half knots, or sometime the knot
21  itself.  This is arthroscopic surgery.  The knots are made
22  outside, and they have to be slid down the suture, so the
23  suture slides on itself.  And chatter is when it goes
24  bumpety, bumpety, bumpety, bumpety, bump, as opposed to going
25  down nice and smoothly.  It's one of the key issues in this
0024
1  case.
2        THE COURT:  I know, but no one ever defined it for
3  me.  Chatter, to me, sounds like --
4        MR. SABER:  Well, actually, chatter is that
5  bumpety, bumpety, bumpety, bumpety, bump.
6        THE COURT:  It makes noise?
7        MR. SABER:  Well, no, no, it doesn't make noise,
8  but it has --
9        THE COURT:  You guys are too steeped in this.
10       MR. SABER:  And, you know, because it's a braid,
11  your Honor, and a braided suture is not that smooth.
12       THE COURT:  I got it now.  I'm just simply saying,
13  you are assuming too much knowledge on my part, and I've been
14  with this for a few years, so just take that as a word of --
15       MR. SABER:  And, of course, that's part of the
16  reason why it does take a little bit of time to present this
17  to the jury.
18       THE COURT:  So those are all gone.
19       All right, now, as far as those extra two patents,
20  the ones I don't remember, I'll allow people to cross-examine
21  based on it, but they can't be introduced because if you
22  wanted to supplement, time for supplementation has passed, so
23  the other two patents don't come in.
24       So start going through the other issues.  I've read
25  it all at this point.  Oh, I found this to be an extremely

0025
1  difficult issue, I have to say, the issue of the adverse
2  inference with respect to the tests that were done by DePuy
3  Mitek.  That is not a straightforward, easy answer.  I think
4  that Arthrex can fairly argue there were missing tests, "Have
5  you seen any tests like were done here?"  But not if they
6  were done under the supervision of an attorney.  So, in other
7  words, you can make the missing test argument all you want.
8          MR. SABER:  Right.
9          THE COURT:  I have a little bit of a problem
10  because I think there's at least an argument that if the
11  tests were done under the supervision of an attorney, that it
12  does qualify for work product.
13          MR. SABER:  Well, your Honor, I think that the
14  distinction on that issue is that we -- understand that we're
15  not asking -- I hope I made this clear in our response --
16  we're not asking for any sort of mental impressions or any
17  sort of analysis that DePuy Mitek did with the tests.  It's
18  really just the underlying results, and that's what I think
19  that the law --
20          THE COURT:  It's too late to ask for it.
21          MR. SABER:  No, I understand that, but they chose
22  not to produce it, and I don't think it's a valid claim of
23  privilege just on the underlying tests, which is why I think
24  we're entitled to comment.
25          THE COURT:  It's not a question of attorney-client
0026
1  privilege, as I understand it --
2          MR. SABER:  Or work product, the same thing, your
3  Honor.
4          THE COURT:  -- protection under the work product
5  doctrine.  And it's just I don't know if it is or not.  It's
6  quite clear that if a lawyer hires a private eye to go out
7  and take witness statements, that those are protected under
8  the work product doctrine, and you have to make certain
9  showings to get them.  It's also clear you can't draw an
10  adverse inference if it's a fair application of a work
11  product doctrine.  That's clear Federal Circuit law.  Is this
12  the fair assertion of the work product doctrine?  Have either
13  of you found a case on this?
14          MR. SABER:  Yes, your Honor.  I think we cited four
15  cases to you.
16          THE COURT:  Not directly on this.
17          MR. SABER:  Well, two of them were exactly on
18  point.
19          THE COURT:  Which are the two that you say are

20  directly on point?
21         MR. SABER:  I don't have the names, but they're the
22  first two that we cited, your Honor.
23         THE COURT:  The first two?
24         MR. SABER:  Yes.
25         THE COURT:  Say what, that you can get what?
0027
1          MR. SABER:  That there's no privilege for -- these
2  were both cases about test results done by the plaintiff in a
3  case.
4          THE COURT:  Well, by the plaintiff, that's one
5  thing, but what if --
6          MR. SABER:  That's what this is.
7          MS. VERRECCHIO:  Your Honor, those tests were not
8  conducted at the request of counsel.  And in this case,
9  in-house counsel for DePuy Mitek and outside litigation
10  counsel directed the tests to be done before the suit was
11  filed and in anticipation of litigation, so it's clearly work
12  product.
13         THE COURT:  I'm just saying, we're two days before
14  trial.  I don't know what the answer is.  No one should argue
15  it in their opening.  We did not find a case directly -- your
16  cases were not where they were directed by an attorney in
17  anticipation of litigation.  On the other hand, we found a
18  case that said that the fact that there were tests was not
19  protected -- that's why it's not so straightforward -- the
20  fact that there are tests, but the results of the test may
21  well be protected.  But, you know, just like an investigator
22  has to disclose whom he interviewed but maybe not what the
23  statement was.  So I think it's not protected that you
24  conducted tests, and that can come out.  But you can't ask
25  for an instruction on an adverse inference if in fact that
0028
1  they were protected or argue they should have been produced
2  because I think there's some argument that that is
3  protected.  They're pretty fine lines that we're walking
4  here, and I am not prepared to rule right now, and no one
5  should argue any adverse inference in their opening
6  statements.  You can argue that "You won't see any tests,"
7  because the absence of evidence is a strong thing in your
8  quiver because you do have tests, but that's different from
9  saying, "The lawyers ordered tests, and they won't produce
10  them," because I think there's at least a good shot that they
11  are protected, the actual results.
12         MR. SABER:  Okay, well, I won't make that argument,
13  your Honor.

14        THE COURT:  None of these want to be an appeal
15  issue.  You don't want to draw -- unless you've got a slam
16  dunk about it, permitting an adverse inference on a test
17  conducted under the auspices of a lawyer in anticipation of
18  litigation are too close to the line, so we don't want that
19  appeal issue.
20        So then what are the other issues that we have?
21        MS. ELDERKIN:  Your Honor, we had some issues come
22  up with Dr. Gitis' supplemental report.  This was not raised
23  in the motions in limine because his deposition didn't happen
24  until last week.  I'll let Mr. Bonella --
25        THE COURT:  If it's not a motion in limine, I'm not
0029
1  dealing with it, okay.  I have a room upstairs full.  What
2  are the other motions in limine?
3        MR. TAMBURO:  Your Honor, we filed a motion in
4  limine on a new argument that DePuy Mitek made for the first
5  time late in this case regarding the minimal impact of
6  coating, and --
7        THE COURT:  I read that, and that's overruled.
8  That's what their whole argument has been all along.
9        MR. TAMBURO:  Well, actually, it's not quite right,
10  your Honor.  They've been arguing all along that the coating
11  does not prevent certain things from happening in the
12  suture.  This is a new argument they're making, and they're
13  citing Dr. Brookstein to support it, but he never made these
14  arguments.
15        THE COURT:  That's overruled.  Yes, he did.  I
16  mean, that was the whole gist of this thing, that it doesn't
17  matter, and it's just a tiny amount of coating, and it's
18  de minimis and insignificant.  That's what this case is
19  about.  Both of you are trying to get me to direct the case,
20  and I'm not going to do it.
21        What's the next motion in limine?
22        MS. MALINOSKI:  We had filed a motion that was
23  directed to Arthrex trying to introduce evidence about the
24  development of the Orthocord product and the reasons that
25  Mitek developed it.  Orthocord is a suture that DePuy Mitek
0030
1  sells in competition with FiberWire, and through the course
2  of this case --
3        THE COURT:  Isn't that sort of like, in general,
4  why you're putting on the inventor?  You've got to have some
5  background to this whole thing, what's the motive, you know,
6  of the companies and evaluating credibility and that sort of
7  thing, the marketing directors.  I'll allow some of that in,

8  although I don't want the whole "This is nothing but a paper
9  patent." You know, I'll allow a little latitude here, but,
10  you know, the fact that they're competing with each other is
11  relevant.
12      MR. SABER: Your Honor, I couldn't agree more that
13  this motion was entirely premature because it really roughly
14  depends upon what they're going to say. I mean, if they come
15  in and argue the benefits from their invention and all of
16  that kind of stuff, I have to be able to respond to it.
17      THE COURT: This is not an obviousness. We're not
18  dealing with secondary considerations. This is just an
19  infringement case.
20      MR. SABER: I know. Your Honor, what they signaled
21  that they're going to do is, they're going to come in and
22  say, "We had this great idea in our patent, it was a
23  wonderful idea, and Arthrex copied it." That's what they've
24  signaled that they're going to do in this case. Now, if they
25  do that, I have to be able to respond to that.
0031
1       THE COURT: If they get too colorful there, I'll
2   let you be colorful back, but I can't script this in this
3   mini-detail. You have to give a sense of your company, just
4   like, you know, who people are, whether they're credible,
5   what are the motives maybe for people testifying one way or
6   another. I'm not going to be too micromanaging right now.
7       So what's the next issue?
8       MS. MALINOSKI: Your Honor, if I could just ask for
9   clarification on that one point. The Orthocord product that
10  Depuy Mitek sells is not covered by the patent, and through
11  the course of this, defendants have sort of telegraphed that
12  they're going to make an argument that Mitek was not able to
13  compete with Arthrex, and that all of this was a retaliatory
14  suit against Arthrex. So we just want to get some
15  clarification about what they can say or not say.
16      THE COURT: I'm not going to micromanage it. You
17  be careful because you don't want me to cut you off at the
18  pass in your opening statement.
19      MR. SABER: I understand, your Honor.
20      THE COURT: Okay, so what's the next thing?
21      MS. ELDERKIN: Those are all the motions, your
22  Honor.
23      THE COURT: How about yours?
24      MR. SABER: I think we talked about the two, your
25  Honor.
0032
1       THE COURT: Good, we're done. So it strikes me the

2   one that I actually am worried about is this ownership thing
3   because I just had never seen an argument like that, and I
4   couldn't -- my law clerk was looking today, and we didn't
5   find anything obvious, other than in general the law treats
6   it as personal property.  And so while there may be a
7   contract claim as between two entities as to whether or not
8   there was consideration and a breach of contract, I'm not
9   sure that someone else can raise it.  And, to boot, I think
10  you can gift it or inherit it or -- I'm not sure you even
11  need consideration.  Anyway, I know nothing about it.  You
12  can have some fun doing it.
13          MR. SABER:  Okay.
14          MS. ELDERKIN:  We'll brief it, your Honor.
15          MR. SABER:  Your Honor, may I suggest that we try
16  and put in -- I think we both understand the issue, and maybe
17  we can put in simultaneous briefs by the end of the week, by
18  Friday night?
19          MS. ELDERKIN:  We can do it earlier than that if
20  you'd like.
21          MR. SABER:  Well, they have nine lawyers here;
22  we've got two.
23          MS. ELDERKIN:  They have lawyers in Washington.
24          MR. SABER:  Not like what you've got, believe me.
25          THE COURT:  Excuse me.  If it goes away, I don't
0033
1   need a brief on it, obviously.  So I'm not going to be doing
2   it over the weekend.  So let me just say, when is the --
3   you're essentially -- it's your burden to prove ownership.
4          MS. ELDERKIN:  Right, right.
5          THE COURT:  So when can you get me a brief to
6   discuss the assignment issue?
7          MS. ELDERKIN:  Midday Thursday?
8          MS. MALINOSKI:  Yes, midday Thursday.
9          THE COURT:  I probably won't deal with it before
10  trial.  I strongly suggest that neither of you make a big
11  deal of it in the opening because I may either direct it out
12  as a matter of law or at the close of the evidence or
13  something like that, but I'm just going to need something to
14  go on, unless you both agree it's just not worth a dime.
15          And the one I turn to you on with Pearsalls, I
16  understand why they want them in there.  It's perfectly
17  legitimate.  Now, we've raised the motion in limine about it,
18  but the problem that I run into is, I don't have that long,
19  you know, really.  We all discussed and agreed.
20          MR. SABER:  Your Honor, I will talk to Pearsalls
21  about your suggestion.  I just can't represent right now.

22          THE COURT:  Everyone agreed that there's such
23   disputed issues of fact on whether this coating makes a
24   material difference or not, the specification is so ambiguous
25   about it.  In my mind, part of it says it hurts, part of part
0034
1   of it says it helps, it can hurt, it can help.  The experts
2   disagree on it.  That's really what this case is about, and
3   so I don't think it will be that hard for them to figure
4   out.  It's not that hard a concept.  It's not like some of
5   these biotech things, and I just don't want to divert their
6   attention.
7          I would like you all to think about what I've ruled
8   here today and see if you can possibly do this within a week,
9   this trial.  The reason I say that is because there's a very,
10   very contested civil case that's right on the heels of yours,
11   and to some extent, all my planning may go to not.  And I
12   suggest very much that you speak to Mr. Alba because I have
13   this personal issue, and I don't know what's going to happen,
14   so --
15          MR. SABER:  When should we be checking with
16   Mr. Alba on that?  Daily or --
17          THE COURT:  Daily.
18          MR. SABER:  Daily?
19          THE COURT:  It could happen before the end of the
20   week.
21          MR. SABER:  I understand, your Honor.
22          THE COURT:  I just can't predict.  But I know
23   people traveled in from out of town.  I'm not going to ditch
24   the trial.  The question is, it may go longer if it happens
25   smack in the middle of it.  So we'll know as we go, okay.
0035
1          MS. ELDERKIN:  I understand, your Honor.  Your
2   Honor, if I may, the times that we propose for our witnesses
3   and our crosses, we really tried to streamline our
4   presentation because we do believe this should be triable in
5   a week, and I'm a little bit flummoxed at the thought of
6   Mr. Saber cross-examining our witness, who we had up for an
7   hour, for three hours.  Will your order give us some guidance
8   as to how you're going to keep time between the two parties?
9   I don't want to shortchange my presentation if time is going
10   to not be balanced between the two parties.
11          THE COURT:  He was estimating that it would take
12   roughly seven days if you add all this together, including --
13   so my guess is, we'll ask for a jury that can sit up to two
14   weeks, but I'm going try and prune down your case a little
15   bit.  I'd love to do it within a week.  If it spins into the

16  following Monday or Tuesday, so be it, but I'm not going to
17  be at the end of that week.
18        MR. SABER:  I hear your Honor, and, believe me, I
19  don't want to elongate this.  But in all due respect to
20  Ms. Elderkin, we're the side that actually has the evidence,
21  and that's why it's going to take longer to do.
22        THE COURT:  Maybe.  I'm just simply saying, I have
23  scheduling issues, but, more importantly, if I tell a jury a
24  week to two weeks, I can guarantee you it's not going to go
25  to a third, so --
0036
1         MR. SABER:  I don't anticipate in any way that this
2   would go more than two weeks, and in fact I think probably
3   seven to eight days is what I believe, my best guess.
4         MS. ELDERKIN:  Your Honor, do you keep track of
5   parties' times?  Do you try to keep it equal between the
6   parties?
7         THE COURT:  Well, I do, but I was hoping that since
8   you both agreed that it was going to be a week or so, that
9   I'm going to hold you to something roughly that.  Now, if it
10  goes into another day, I don't feel so strongly about that,
11  but, you know, it strikes me that three hours to
12  cross-examine one of these witnesses sounds like a very long
13  time.
14        MR. SABER:  It all depends what they say, of
15  course, your Honor, and --
16        THE COURT:  You know exactly.  You have hundreds
17  and hundreds and hundreds of pages of deposition testimony,
18  so you know pretty much.  You're a good lawyer, and you
19  scripted it out, so --
20        MR. SABER:  I'm working on it, your Honor, as I
21  say -- well, in any event, I'm not interested in wasting
22  anyone's time, the least of which is my own, but -- and
23  yours, I guess.
24        THE COURT:  Good.  So we'll see you on Monday.  You
25  keep in touch with Mr. Alba on scheduling.  Now, let me go
0037
1   off the record for one minute.
2         (Discussion off the record.)
3         THE CLERK:  Court is in recess.
4         (Adjourned, 4:40 p.m.)
5
6
7
8
9

```
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0038
 1              C E R T I F I C A T E
 2
 3
    UNITED STATES DISTRICT COURT )
 4  DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )
 5
 6
 7
 8       I, Lee A. Marzilli, Official Federal Court
 9  Reporter, do hereby certify that the foregoing transcript,
10  Pages 1 through 37 inclusive, was recorded by me
11  stenographically at the time and place aforesaid in Civil
12  Action No. 04-12457-PBS, DePuy Mitek, Inc. V. Arthrex, Inc.,
13  et al, and thereafter by me reduced to typewriting and is a
14  true and accurate record of the proceedings.
15       In witness whereof we have hereunto set our hand
16  this 1st day of August, 2007.
17
18
19
20
21
           /s/ Lee A. Marzilli
22         _____
           LEE A. MARZILLI
23            OFFICIAL FEDERAL COURT REPORTER
24
25
```