# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DePuy Mitek, Inc. | ) | |
|   a Massachusetts Corporation | ) | |
| | ) | |
|        Plaintiff, | ) | |
| | ) | |
|        v. | ) | Civil Action No. 04-12457 PBS |
| | ) | |
| Arthrex, Inc. | ) | |
|   a Delaware Corporation, *et al*. | ) | |
| | ) | |
|        Defendants. | ) | |
| | ) | |

## DEFENDANTS ARTHREX, INC.'S AND PEARSALLS, LTD.'S MEMORANDUM RELATING TO PATENT OWNERSHIP

Dated: August 7, 2007

Charles W. Saber
Stephen A. Soffen
Salvatore P. Tamburo
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, D.C. 20006-5403
Telephone: (202) 420-3116
Facsimile: (202) 420-2201

Christopher Weld, Jr. (BBO # 522230)
Raymond P. Ausrotas (BBO # 640315)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
Telephone: (617) 720-2626
Facsimile: (617) 227-5777

Counsel for Defendants
Arthrex, Inc. and Pearsalls Ltd.

## I.    INTRODUCTION

Defendants, Arthrex, Inc. and Pearsalls, Ltd. (collectively "Arthrex") submit this paper in response to the memorandum relating to patent ownership filed by DePuy Mitek on August 2, 2007.

DePuy Mitek would have this Court ignore the evidence in this case establishing that DePuy Mitek does not own the '446 patent and, therefore, has no standing to bring this suit.  The facts are that the August 9, 2004 "Assignment" between Ethicon, Inc. and DePuy Mitek fails for lack of consideration.  DePuy Mitek tries to ignore this plain fact and instead wants to invent consideration through attorney argument of DePuy Mitek's motive to bring suit.  This attorney afterthought does not cure the lack of consideration in the "Assignment."  Furthermore, the evidence of record shows that Ethicon, Inc. of New Jersey, the company that allegedly assigned the patent to DePuy Mitek, *did not own the '446 patent when it executed the purported "Assignment."*  DePuy Mitek's assertion that Ethicon could have gifted the '446 patent to DePuy Mitek also does not solve the problem.  DePuy Mitek cites *nothing* to support the assertion that one corporation can gift a patent to another corporation.  In any event, the "gift" theory cannot aid DePuy Mitek because it simply did not happen.

Knowing full well it was told by the Court that it has the burden to establish ownership, DePuy Mitek again obfuscates the legal and factual issues.  As a matter of first import, and contrary to DePuy Mitek's attempt to place the burden on Arthrex, "[t]he party invoking federal jurisdiction bears the burden of establishing [the] elements" of standing.  *Lujan v. Defenders of Wildlife*, 112 S. Ct. 2130, 2136 (1992).  Accordingly, the burden of proving sufficient rights in the '446 patent, a predicate of bringing this suit, falls squarely on DePuy Mitek's shoulders, not Defendants.'  Notwithstanding the fact that the burden is with DePuy

1

Mitek, Defendants offer compelling evidence that demonstrates DePuy Mitek is not the owner of the '446 patent.

## II.    THE "ASSIGNMENT" TO DEPUY MITEK FAILS FOR LACK OF CONSIDERATION

In an argument that is amazing even by DePuy Mitek's standards, Plaintiff contends that the consideration issue is decided because "Arthrex needs more than attorney argument." DePuy Mitek Memo at 4. In its zeal to blame the attorneys, DePuy Mitek apparently forgets that Arthrex has not yet submitted any briefing on this issue. Rather, DePuy Mitek, which never bothered to file a motion on this subject, but instead simply raised the issue in its Trial Brief, is relying on little more than rhetoric.

Arthrex asserts that the "Assignment" is invalid because it recites "for good and valuable consideration," but there is no evidence that there was in fact "good and valuable consideration" in exchange for the '446 patent.[1] "The essential elements necessary to constitute a valid contract are mutual assent to the terms of the agreement by all parties and the existence of consideration." *Barshinger v. Orca Industries, Inc.*, CIV. A. No. 89-4808, 1990 WL 5166, at *5 (E.D.Pa. Jan. 23, 1990) Ex. 1. "Valid consideration confers a benefit upon the promisor or causes a detriment to the promisee and must be an act, forbearance or return promise bargained for and given in exchange for the original promise." *Id.* at *5. "If there is a lack of consideration then a contract never existed." *Id.* at *5. As described below, the facts establish that although the "Assignment" purports to identify "consideration," none exists. Thus, the August 9, 2004 "Assignment" is invalid.

---

[1]    Contrary to DePuy Mitek's assertion, Defendants have not asserted that the August 9, 2004 "Assignment" fails because it does not recite specific consideration in the agreement itself. Rather, Defendants assert that, in fact, there was no consideration.

2

DePuy Mitek claims that Mr. Goodwin and Mr. Weber provided testimony that establishes that there is consideration for the '446 patent. But the cited testimony, as well as the portions of these witnesses testimony that DePuy Mitek conveniently ignores, establishes that there is *no* consideration. DePuy Mitek improperly attempts to color Mr. Goodwin's testimony as a failure of memory. DePuy Mitek Memo at 4. But Mr. Goodwin testified that, in spite of the fact that he signed the assignment on behalf of Ethicon, he did not know what consideration was received by Ethicon. Ex. 2 at 156:11-16. Mr. Weber, the Rule 30(b)(6) witness for DePuy Mitek on the same subject, likewise could not identify *a single thing* that DePuy Mitek gave to Ethicon for the patent. Ex. 3 at 57:21-60:10. What could be better proof that there is no consideration than testimony of the party that signed the assignment on behalf of Ethicon, Mr. Goodwin, and DePuy Mitek's Rule 30(b)(6) witness, Mr. Weber, that neither can identify even a mere peppercorn of consideration.

Unable to identify consideration, DePuy Mitek instead cites to alleged motive evidence for assigning the patent to DePuy Mitek. The short answer is that the alleged reason for the assignment is not consideration.[2] Moreover, the *evidence* shows that the alleged motive is simply not true. For example, Mr. Weber, who admitted that he was not involved in the assignment, but rather had an understanding of the reason for the transfer, originally stated "his understanding" that the patent was assigned to DePuy Mitek because it applied "specifically to a product that [DePuy Mitek is] marketing." Ex. 3 at 47:20-24. When he was confronted with the fact that Orthocord did not fall within the '446 patent,[3] Mr. Weber changed his tune and stated that the patent "applied to a market that we are addressing" (Ex. 3 at 47:25-48:21), which he defined as the sports medicine and arthroscopic market" or later as "the marketplace for shoulder

---

[2]     It makes no sense that motive could establish consideration. There is a reason for everything. A reason for a transfer cannot be the consideration.

[3]     Nothing sold by DePuy Mitek falls within the '446 patent. Ex. 4 at 10.

DSMDB-2300300v01

repair." Ex. 3 at 53:8-55:7.  But Mr. Weber could not identify anywhere in the '446 patent where it indicated that the suture was for that market.  Ex. 3 at 55:2-22.  The reason that Mr. Weber could not identify that market is because there is not a single word in the '446 patent that it is for sports medicine, arthroscopic surgery or shoulder repair.[4]  Even if "motive" for assigning evidence were a substitute for consideration, which it is not, the *evidence* in the case shows that DePuy Mitek's purported reason just is not true.[5]  But even if this evidence were relevant to the consideration issue, and even if there were some merit to DePuy Mitek's made-up excuse, the most that could be said is that it is a classic question of fact.

In true irony in view of its "don't listen to the lawyers refrain," DePuy Mitek submits a new reason there is consideration which is based *only* on attorney argument and without a shred of evidence.  DePuy Mitek Memo at 4-5.  DePuy Mitek's attorneys now argue without evidence that there is consideration because Ethicon benefits when DePuy Mitek sells more products.  That attorney argument makes no sense.  Ethicon would receive the same benefit if it enforced the patent, rather than DePuy Mitek.  If anything, Ethicon loses more by the transfer because it loses the right to collect damages.  DePuy Mitek's new made-up argument, like its other ones, cannot establish consideration.

The "Assignment" recites that it was made "for good and valuable consideration" making it "instinct with an obligation."  *Thomas v. Webster Spring Co., Inc.*, 638 N.E.2d 51, 53 (Mass. App. Ct. 1994).  As discussed above, DePuy Mitek confuses obligation with motive,

---

[4] It is not surprising that there is no such mention.  Ethicon performed the development work that led to the '446 patent in the late 1980s, long before Johnson & Johnson bought Mitek.

[5] DePuy Mitek's reliance on Mr. Goodwin's "motive for transfer" evidence fairs no better. Goodwin, who only remembered lawyers being involved in the transfer, asserted that the patent was transferred to DePuy Mitek because that company sold suture anchors.  Ex. 1 at 155:23-156:5; 157:3-158:4.  But once again, there is absolutely no mention of suture anchors in the '446 patent.  As much as DePuy Mitek wants to spin, the undisputable facts are that the '446 patent is merely a suture patent, one that relates to Ethicon's business, not DePuy Mitek's business.

DSMDB-2300300v01

effectively arguing that consideration is an irrelevancy.  If an assignment recites consideration, that consideration cannot be an "irrelevancy."  *Id.*  The "Assignment" has a failure of consideration and DePuy Mitek did not obtain title to the '446 patent.  DePuy Mitek should not be allowed to now invent consideration through attorney argument and conjecture where the evidence establishes there is none.

III.    **EVEN IF THERE WAS CONSIDERATION RECEIVED FOR THE ASSIGNMENT OF THE '446 PATENT, IT IS STILL INVALID BECAUSE ETHICON, INC. NEVER OWNED IT IN THE FIRST PLACE**

Back in 1992, the inventors of the '446 patent assigned their rights to their invention, as is normally done in the corporate world.  The entity that received the inventor's rights was "*Ethicon, Inc. a corporation of the State of Ohio*."  Exs. 5, 6 (emphasis added).  The problem for DePuy Mitek, however, is that it purportedly received its rights to the '446 patent from "Ethicon, Inc. ... *a Corporation of New Jersey*."  Ex. 7 (emphasis added).  There is no record evidence that the '446 patent was ever transferred from the Ohio Ethicon entity to the New Jersey Ethicon entity.  Thus, there is a missing link in the chain of title.  There simply is no evidence that Ethicon, Inc., of New Jersey ever received title to the '446 patent.  Indeed, a search of the Patent Office's Assignment Database shows that these two assignments to "Ethicon, Inc. a corporation of the State of Ohio" are the *only* assignments of record for the '446 patent.  Ex. 8.  DePuy Mitek has made *no showing* that Ethicon, Inc. "a Corporation of New Jersey" was ever the owner of the '446 patent.  A corporation – here Ethicon, Inc., the New Jersey corporation -- cannot assign that which it does not own.  Accordingly, DePuy Mitek *does not own* the '446 patent.

5

## IV.    ETHICON DID NOT GIFT THE '446 PATENT TO DEPUY MITEK

DePuy Mitek asserts another new argument without any support. This time it asserts that the '446 patent could have been gifted by DePuy Mitek, so it really does not matter whether there was consideration in the "Assignment." DePuy Mitek makes this assertion without citing any law evidencing that one corporation can gift a patent to another corporation. Further, DePuy Mitek completely ignores the complicated corporate and tax ramifications and reporting requirements that would arise if a corporation could, in fact, gift a patent to another corporation. In short, there simply is no law that says that a patent can be gifted from one company to another.[6]

Moreover, even if Ethicon could have gifted the '446 patent to DePuy Mitek, the fact is it simply did not do so and that defect cannot be cured retroactively. The "Assignment" recites the words "for good and valuable consideration." Had Ethicon intended to gift the '446 patent, it would not have titled the agreement "Assignment" and it would not have specifically required consideration by the terms of the agreement. "A 'gift' is a gratuity and not only does not require consideration, but there can be none." *Commissioner of Internal Revenue v. Montague*, 126 F.2d 948 (C.A. 6 1942). By including the consideration clause in the "Assignment," Ethicon and DePuy Mitek gave clear indication that this attempted transfer was not a gift. DePuy Mitek

---

[6]    DePuy Mitek cites 35 U.S.C. § 261 for the proposition that a patent can be "gifted just like any other property." DePuy Mitek Memo at 5. But 35 U.S.C. § 261 *never says* a patent can be gifted. All it says is "*[s]ubject to the provisions of [Title 35],*" a patent has the attributes of personal property. But that same section goes on to say that the transfer must be an *assignment* in writing. If Congress had wanted to say that a patent could be gifted it would have said so. Its conscious choice to state that the transfer of a patent must be by an assignment in writing is strong evidence that gifting is *not* permitted. DePuy Mitek's reliance on 26 U.S.C. § 1235 has nothing to do with this issue. It is merely a provision of the tax code, not the governing patent law.

DSMDB-2300300v01

cannot have it both ways.  It is disingenuous to argue that DePuy Mitek owns the patent because there was consideration, while urging the court to find a gift if the consideration fails.

As described above, there is no evidence of donative intent on the part of Ethicon. Much to the contrary, Ethicon required "good and valuable consideration" by the terms of the "Assignment" as executed by Ethicon and DePuy Mitek.  DePuy Mitek cannot transform an attempted assignment, found invalid for lack of consideration, into a gift.

Further, to the extent DePuy Mitek urges the Court to find a gift based on the unwritten intent of the parties, this too fails.  The Federal Circuit refused to find standing based on a verbal licensing arrangement stating that "[p]arties would be free to engage in revisionist history, circumventing the certainty provided by the writing requirement of section 261 by claiming to be patentee by virtue of a verbal licensing arrangement."  *Enzo APA & Son, Inc. v. Geapa A.G.*, 134 F.3d 1090, 1093 (Fed. Cir. 1998).  It then follows that if a gift is to be considered a basis for standing, it must be memorialized in writing.  Only a party holding legal title, or all substantial rights, to a patent has standing to bring suit for infringement.  *Id.*  As demonstrated above, DePuy Mitek has no such legal title and, thus, has no such standing.

Finally, Ethicon and DePuy Mitek cannot go back now and cure the failure to properly place ownership in DePuy Mitek.  "Allowing a subsequent assignment to automatically cure a standing defect would unjustifiably expand the number of people who are statutorily authorized to sue."  *Enzo*, 134 F.3d at 1093.  "Permitting non-owners and licensees the right to sue, so long as they eventually obtain the rights they seek to have redressed, would enmesh the judiciary in abstract disputes, risk multiple litigations, and provide incentives for parties to obtain assignment in order to expand their arsenal and the scope of litigation."  *Id.* at 1093-94.  For that reason, courts have definitively held that a subsequent assignment *cannot* cure the initial failure.

DSMDB-2300300v01

*Gaia Techs., Inc. v. Reconversion Techs., Inc.*, 93 F.3d 774, 779-80 (Fed. Cir. 1996), *amended by* 104 F.3d 1296 (Fed. Cir. 1997); *accord Enzo*, 134 F.3d at 1093-94.

## V.     CONCLUSION

For the foregoing reasons, the Court should find that DePuy Mitek is not the owner of the '466 Patent.

Dated: August 7, 2007                              Respectfully submitted,

By:   **/s/Charles W. Saber**
Charles W. Saber
Stephen A. Soffen
Salvatore P. Tamburo
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, D.C.  20006-5403
Telephone:  (202) 420-3116
Facsimile:  (202) 420-2201

Christopher Weld, Jr. (BBO # 522230)
Raymond P. Ausrotas (BBO # 640315)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
Telephone:  (617) 720-2626
Facsimile:  (617) 227-5777

Counsel for Defendants
Arthrex, Inc. and Pearsalls Ltd.

DSMDB-2300300v01

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing DEFENDANTS ARTHREX, INC.'S AND PEARSALLS LTD.'S MEMORANDUM RELATING TO OWNERSHIP was served, via the Court's email notification system on the following counsel for Plaintiff on the 7th day of August 2007:

Lynn A. Malinoski
Woodcock Washburn, LLP
Cira Centre, 12th Floor
2929 Arch Street
Philadelphia, PA  19104-2891
Telephone: (215) 568-3100
Facsimile: (215) 568-3439

Daniel J. Gleason
Nutter McClennan & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
Telephone:  (617) 439-2000
Facsimile:  (617) 310-9000


        **/s/Charles W. Saber**

# Exhibit 1

Not Reported in F.Supp.                                                        Page 1
Not Reported in F.Supp., 1990 WL 5166 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

C
Barshinger v. Orca Industries, Inc.
E.D.Pa.,1990.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Craig W. BARSHINGER, Plaintiff,
v.
ORCA INDUSTRIES, INC. and Rodel, Inc., De-
fendants.
**CIV. A. No. 89-4808.**

Jan. 23, 1990.

Gawthrop, Greenwood & Halsted, Mark, L.
Tunnell, West Chester, Pa., for plaintiff.
Thomas A. Masterson, Nancy E. Bloomberg, Mor-
gan, Lewis & Bockius, Philadelphia, Pa., for de-
fendants.

*MEMORANDUM*
NEWCOMER, District Judge.
**\*1** This is a diversity action brought by plaintiff on
June 30, 1989, alleging claims against Rodel and
Orca Industries, Inc. for promissory estoppel,
breach of contract, deception and equitable estop-
pel, and against Rodel only for tortious interference
with contract. Plaintiff Craig W. Barshinger com-
menced this action to recover damages from de-
fendants, alleging that defendants refused to pay
plaintiff deferred compensation, in the form of roy-
alties, which defendants are alleged to have prom-
ised to pay plaintiff in accordance with a written
agreement dated February 21, 1986.

Before me now are defendants' respective motions
for summary judgment on plaintiff's claims. For the
rationale which follows, I will GRANT defendants'
motions for summary judgment.

*I. Factual Background.*

In 1982, plaintiff Craig W. Barshinger
("Barshinger") co-founded defendant Orca Indus-
tries, Inc. ("Orca" or the "Company") for the pur-
pose of designing, manufacturing and selling an un-
derwater dive computer, called the EDGE, that Bar-

shinger had begun to develop. This computer em-
ployed a novel display scheme for computing and
displaying decompression data for divers. Bar-
shinger subsequently assigned all of his right, title
and interest in the invention, including any patent
rights, to Orca. For approximately one and one-half
years, Orca developed and manufactured the
EDGE. However, the company soon encountered
financial difficulties due to a scarcity of computer
chips and also due to a lack of sufficient capital to
maintain the enterprise. At about this time, plaintiff
conceptualized and originated plans and technology
for a newer and smaller drive computer called the
SkinnyDipper, and had acquired a grant from a
Pennsylvania organization to develop this com-
puter. As project coordinator for the SkinnyDipper
computer, Barshinger's responsibilities included the
further conceptualization of the project as well as
the delegation of design subfunctions to various
members of the design team at Orca.

Nevertheless, by the summer of 1985, Orca had
failed completely. The Company was heavily in
debt, experiencing serious manufacturing problems,
and unable to obtain necessary supplies because of
an almost total breakdown in its relationship with
suppliers. Furthermore, a patent application that
Barshinger had filed in 1982, covering certain as-
pects of the EDGE dive computer, had been rejec-
ted by the Patent Office because of procedural er-
rors which Barshinger made in the initial filing.

Due to the Company's significant financial diffi-
culties, Orca's shareholders, including Barshinger,
entered into an agreement with defendant Rodel,
Inc. ("Rodel") pursuant to which, *inter alia,* Bar-
shinger and Orca's other shareholders agreed to as-
sign their shares to Rodel; in return for this assign-
ment, Rodel agreed to infuse additional funds into
the Orca, and Orca would make certain payments to
creditors of the Company. Defendant alleges that
this lawsuit represents only the most recent of Bar-
shinger's attempts to change the terms of the agree-
ment under which Rodel acquired Orca.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*2** Plaintiff alleges that, by mid-January 1986, he perceived that the president of Rodel, William Budinger, was interfering with his ability to do his job well, and that, as a consequence, plaintiff lost confidence in the management of Orca by Rodel. (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, hereafter "Plaintiff's Brief", at 3). Accordingly, plaintiff maintains that he had resolved to leave Orca at that time. However, plaintiff alleges that he nevertheless entered into negotiations with Rodel, in the person of its president and majority shareholder, William Budinger, "which culminated with the execution on February 21, 1986, of a document under which the defendants' [sic] promise to pay plaintiff a deferred compensation in the nature of a royalty in the amount of 2.5% of net sales of all products built using the teachings of patents which were effectively assigned to Orca at that time." (Plaintiff's Brief at 3).

The February 21, 1986 agreement, according to plaintiff, was a further clarification of a January 1986 written offer that William Budinger had sent to plaintiff concerning the terms and conditions under which Rodel would effect payment by Orca to plaintiff of a 2.5% royalty on net sales of the EDGE and SkinnyDipper computers. (Plaintiff's Brief at 4). Plaintiff maintains that he confronted William Budinger with the February 21, 1986 agreement and told Budinger to sign it if he wanted plaintiff to do any further work for Orca. Plaintiff argues that had Budinger not signed the document, plaintiff "would have ceased working on the SkinnyDipper project, for which effort he was a critical member." (Plaintiff's Brief at 5).

Defendants, naturally, have a significantly different interpretation of the events and underlying facts involved. According to defendants, following Rodel's acquisition of Orca, plaintiff continued to work for Orca at an increased salary, but almost immediately regretted his loss of control over Orca and sought additional incentives for continuing his association with the Orca. (Pretrial Memorandum of Defendants Orca Industries, Inc. and Rodel, Inc., hereafter "Defendants' Pretrial Brief", at 2). In response to

plaintiff's concerns, Rodel provided plaintiff with a letter dated January 28, 1986 ("the January 28 Letter"), stating that: (a) subject to certain conditions, Rodel would make 10 percent of Orca's shares available for plaintiff to purchase; and (b) Rodel also would approve Orca's payment of certain royalties to plaintiff, "which would continue only *so long as Barshinger remained associated with Orca as an employee or a consultant.*" (Defendants' Pretrial Brief at 3, emphasis in original).

On or about February 21, 1986, defendants argue that plaintiff, on the pretense of seeking a clarification of the January 28, 1986 agreement, approached William Budinger, Rodel's president and allegedly an Orca director, and asked Budinger to review a few paragraphs of writing that plaintiff had prepared. The purpose of the February 1986 document purportedly was to clarify the tax treatment for which the royalty payments would be eligible. Thus, the document purported to characterize the royalty payments as consideration for Barshinger's assignment of his patent rights and modified the description of the proposed payments. Budinger believed that plaintiff was proposing a modification of the language of the January 28 Letter, and that such modification ultimately would be included in a more formal document. Therefore, Budinger told plaintiff that he had no problem with the proposed language and, at plaintiff's request, signed the document to signify his approval of the language.

**\*3** Defendants argue that plaintiff's true purpose in preparing the February 21 document was not to clarify the tax treatment for which the royalty payments would be eligible, but was rather an attempt to trick Orca into agreeing to unconditional royalty payments. Consequently, the February 21, 1986 document did not include the language in the January 28, 1986 Letter explicitly providing that royalty payments would continue only so long as the plaintiff remained an employee or consultant of Orca. According to defendants, William Budinger did not object to the absence of the conditional royalty language in the February 21, 1986 agreement because Budinger thought that the agreement was merely a further clarification of the January 28 Let-

Not Reported in F.Supp.                                                    Page 3
Not Reported in F.Supp., 1990 WL 5166 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

ter rather than a modification of its terms. (Defendants' Reply Brief at 4). Ultimately, Orca stopped using plaintiff's services in October 1987.

On or about June 30, 1989, plaintiff commenced this present action by filing a complaint, in which he alleges claims against both Orca and Rodel for promissory estoppel, breach of contract, deception and equitable estoppel, and against Rodel only for tortious interference with contract.

On November 22, 1989, Rodel and Orca filed motions for summary judgment. Rodel's motion for summary judgment requests that this Court dismiss all claims against Rodel for the following reasons: (1) plaintiff cannot predicate a claim for tortious interference with contract on the actions of William Budinger, who at all relevant times was a director of Orca, because Budinger was not a third party to the contract between plaintiff and Orca; (2) there are no facts supporting plaintiff's conclusory allegation that Rodel guaranteed Orca's alleged obligation to plaintiff; and (3) there are no facts supporting plaintiff's conclusory allegation that Orca was operated as the alter ego of Rodel.

Orca's motion for summary judgment requests that this Court dismiss all claims against Orca for the following reasons: (1) plaintiff's contract claim should be dismissed on the ground that no consideration existed for the promise allegedly made by Orca in February 1986; and (2) plaintiff's promissory estoppel, fraud and equitable estoppel claims should be dismissed on the ground that plaintiff has not alleged, and there are no facts which would support an allegation, that plaintiff relied to his detriment on any representation allegedly made by Orca.

## II. *Summary Judgment Standard.*

A trial court may enter summary judgment if, after review of all evidentiary material in the record, there is no genuine issue as to any material facts, and the moving party is entitled to judgment as a matter of law. *Long v. New York Life Insurance Co., 721 F.2d 118, 119 (3d Cir.1983); Bank of America National Trust and Savings Association v.*

*Hotel Rittenhouse Associates, 595 F.Supp. 800, 802 (E.D.Pa.1984).* Where no reasonable resolution of the conflicting evidence and inferences therefrom, when viewed in a light most favorable to the non-moving party, could result in a judgment for the nonmoving party, the moving party is entitled to summary judgment. *Tose v. First Pennsylvania Bank, N.A., 648 F.2d 879, 883 (3d Cir.), cert. denied* 454 U.S. 893 (1981); *Vines v. Howard, 676 F.Supp. 608, 610 (E.D.Pa.1987).*

**\*4** The moving party must initially show an absence of a genuine issue concerning any material facts. *Celotex Corp. V. Catrett, 477 U.S. 317, 324 (1986); Childers v. Joseph, 842 F.2d 689, 694 (3d Cir.1988).* The moving party discharges this burden by demonstrating that there is an absence of evidence to support the nonmoving party's case. *Celotex, 477 U.S. at 325; Vines, 676 F.Supp. at 610.* Once the moving party satisfies this burden, the burden then shifts to the nonmoving party, who must go beyond his pleadings and designate specific facts by the use of affidavits, depositions, admissions and answers to interrogatories showing that there is a genuine issue for trial. *Celotex, 477 U.S. at 324.* Moreover, Fed.R.Civ.P. 56 mandates that when the nonmoving party bears the burden of proof it must "make a showing sufficient to establish [every] element essential to that party's case." *Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp., 812 F.2d 141, 144 (3d Cir.1987)* (quoting *Celotex, 477 U.S. at 322).*

## III. *Discussion.*

A. *Tortious Interference with Contract.*

Count IV of the plaintiff's Complaint sets forth a claim for tortious interference with contract based on William Budinger's subsequent actions with respect to the February 21, 1986 document. According to the Complaint, Budinger interfered with Orca's purported promise, and Rodel "acquiesced" in Budinger's conduct (Complaint, ¶¶ 32, 33).

An action for tortious interference with contract requires interference with a contract between the plaintiff and a third party. *Gilbert v. El Paso Co.,*

Not Reported in F.Supp.

Page 4
Not Reported in F.Supp., 1990 WL 5166 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

490 A.2d 1050, 1058 (Del.Ch.1984); FN1 see *Newmann v. Legal Services Corp.*, 628 F.Supp. 535, 541 (D.D.C.1986). Corporate officers and directors are not considered to be third parties to a contract between their corporation and one of its employees. *Morast v. Lance*, 807 F.2d 926 (11th Cir.1987); Newmann, supra; *DuSesoi v. United Refining Co.*, 540 F.Supp. 1260, 1275 (W.D.Pa.1982).

Defendants contend that even if the plaintiff could demonstrate a contract between plaintiff and Orca (which defendants strenuously deny), this cause of action must fail because plaintiff cannot predicate a claim for tortious interference with contract on Budinger's actions. In support of this contention, defendants allege that at all relevant times, Budinger was a director of Orca and president of the principal shareholder of Orca and, thus, was not a third party to the alleged contract between plaintiff and Orca.

Plaintiff agrees that corporate officers and directors are not considered to be third parties to a contract between their corporation and one of its employees. However, plaintiff argues that William Budinger was not an officer or shareholder of Orca during the time in question; plaintiff further disputes Budinger's statement that he was a director of Orca at the time. In support of this, plaintiff points out that while Budinger maintains in his affidavit that he was a director of Orca at the time, when he was asked in his deposition, Budinger could not remember whether Orca had a board in 1985 or 1986. (Plaintiff's Brief at pgs. 14-15). Budinger could not recall whether he attended any Orca board meeting in either year, nor the identity of anyone who may have sat on such a board if it existed. Plaintiff argues that a jury may choose to disbelieve testimony that Budinger was a director. However, Orca's alleged obligation to pay plaintiff could not have arisen until August, 1988, at the earliest (Defendants' Reply Memorandum at pg. 14, fn. 6). Orca's board of directors meeting minutes for 1987, 1988 and 1989 all show William Budinger as a director of Orca at that time (Defendants' Reply Memorandum at pg. 14, fn. 6, citing Tr. Exh. 47, 48). Furthermore, I find that plaintiff has failed to allege any

acts of "interference" on the part of William Budinger sufficient to withstand defendants' motion for summary judgment as to plaintiff's claim for tortious interference with contract. Accordingly, I hereby dismiss Count IV of plaintiff's Complaint.

**\*5 B. *Rodel's Alleged Guaranty of Orca's Payments to Plaintiff.***

Plaintiff claims that Rodel guaranteed Orca's alleged promise to pay the royalties described in the February 21 document. However, plaintiff is unable to show any actual guaranty by Rodel.

In the alternative, plaintiff contends that Rodel is liable for Orca's obligation to pay royalties since Rodel exercised direct and immediate control over Orca such that Orca was nothing more than a passive instrumentality in Rodel's hands (Complaint, ¶ 17). I find, however, that plaintiff has failed to show facts sufficient to demonstrate that Rodel's control of Orca is such that it can be found to have guaranteed any alleged promise on the part of Orca. Accordingly, plaintiff's claims against Rodel as a guarantor are hereby dismissed.

C. *Claims Against Orca Industries, Inc.*

1. *Breach of Contract.*

In Count II of the Complaint, plaintiff alleges that the February 21, 1986 agreement constitutes a contract, which defendants breached by failing to pay him the royalties set forth therein. Defendants argue that this agreement does not constitute a valid contract because there was no consideration for any promise of future royalties. I find that the February 21, 1986 agreement did not contain the consideration necessary to create a new contract redefining the royalty payment terms between the parties in this case. Accordingly, I shall grant defendants' motion for summary judgment as to the breach of contract claim in Count II of plaintiff's Complaint.

The essential elements necessary to constitute a valid contract are mutual assent to the terms of the agreement by all parties and the existence of consideration. *Research & Trading Corp. v. Powell,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

468 A.2d 1301 (Del.Ch.1983); *Faw, Casson & Co. v. Cranston,* 375 A.2d 463 (Del.Ch.1977); Restatement (Second) of Contracts § 17 (1979). Valid consideration confers a benefit upon the promisor or causes a detriment to the promisee and must be an act, forbearance or return promise bargained for and given in exchange for the original promise. Restatement (Second) of Contracts § 72 (1981); *Channel Home Centers, Division of Grace Retail Co. v. Grossman,* 795 F.2d 291, 299 (3d Cir.1986); *First Mortgage Company of Pennsylvania v. Federal Leasing Corporation,* 456 A.2d 794, 796 (Del.Supr.1982). Failure of consideration occurs when the bargained-for consideration is not rendered by one of the parties, while **lack of consideration** refers to the complete absence of the bargained-for consideration. *Baynard v. Tervey, Sr.,* 1985 WL 21132 (Del.Ch.1985); 1 Corbin on Contracts § 133. If there is a **lack of consideration**, then a contract never existed. *Hensel v. U.S. Electronics Corp.,* 262 A.2d 648, 651 (Del.Supr.1970).

According to the terms of the February 21, 1986 document, the plaintiff's legal detriment consisted of his assignment of patent rights to Orca. However, Orca already owned these very same patent rights since plaintiff had assigned them to Orca on three prior occasions. (Defendants' Brief at pgs. 21-22). During his deposition, plaintiff acknowledged that the patent technology he developed became the property of Orca several years prior to the February 1986 document. (Defendants' Brief at pg. 22, citing Barshinger Dep. Tr., II-17 to II-18). Defendants correctly argue that where the plaintiff's legal detriment had already been incurred years prior to the signing of the February 21, 1986 document, it cannot be said to have been bargained for in exchange for Orca's alleged promise of February 21, 1986.

**\*6** Plaintiff recognizes that consideration is an essential element of a valid contract and that past consideration already given for a previous agreement cannot constitute valid consideration for a new agreement. (Plaintiff's Brief at pg. 12). Plaintiff argues however, that he has alleged, and that a jury may find, that defendants contracted to

pay plaintiff "in return for future services, the deferred compensation in the amount of the 2.5% royalty, and that plaintiff rendered due performance of services as requested by defendants from time to time." (Plaintiff's Brief at pg. 12). Furthermore, plaintiff argues that not only did he in fact work thereafter, but he continued to sign additional patent assignments himself after February 21, 1986, which he would not have otherwise done. Despite plaintiff's arguments, there is nothing in the February 21, 1986 agreement that in any way reflects that future services or future patents were a consideration forming the basis of the alleged contract. To the contrary, the February 21, 1986 agreement upon which plaintiff's action is founded speaks only of past patents:

This is the agreement which outlines the good and **valuable consideration** for which the patent rights for the decompression computer patents prepared or filed to date were assigned to Orca Industries.

Presently Orca is paying off creditor debts and stockholders under the arrangement wherein Rodel purchased 100% of Orca stock. When there are no further obligations under this arrangement, the owner of the patent rights will pay to Craig Barshinger a royalty of 2.5% of net sales of the products built using the teachings of these patents. The sale or transfer of these patents rights by Orca to another party shall be subject to the same conditions.

Net sales is defined as gross sales minus sales rep. commissions, returns and allowances.

Accordingly, I find that because plaintiff has been unable to establish the existence of consideration for the promise allegedly made by Orca in the February 21, 1986 document, I must, and hereby do, dismiss Count II of plaintiff's Complaint.

2. *Plaintiff's Claims for Promissory Estoppel and Fraud.*

Counts I and III of plaintiff's Complaint set forth, respectively, claims for promissory estoppel and fraud.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

To establish promissory estoppel, plaintiff must prove (1) the making of a promise, (2) with the intent to induce action or forbearance based on the promise, (3) reliance and (4) injury. *Rabkin v. Philip A. Hunt Chemical Corp., 480 A.2d 655, 661 (Del.Ch.1984),* rev'd on other grounds, 480 A.2d 655, 661 (Del.Ch.1985), *In re: Phillips Petroleum Securities Litigation,* 697 F.Supp. 1344, 1353-4 (D.Del.1988). Plaintiff must prove that Orca's alleged promise induced an "action or forbearance of a definite and substantial character." Restatement (Second) of Contracts § 90, quoted in *Slater v. George B. Clarke and sons, Inc.,* 186 F.Supp. 814, 816 (D.Del.1960). Furthermore, a party asserting promissory estoppel has the burden of proving the cause of action by clear and convincing evidence. *See Reeder v. Sanford Schools, Inc., 397 A.2d 139, 141 (Del Super.1979).*

*7 Plaintiff has alleged that the promise purportedly made by Orca in February and August, 1986 induced him to continue to work for Orca (Complaint, §§ 10, 12). Defendants state that the plaintiff has not alleged that he suffered any detriment as a result of his continued association with Orca. On the contrary, defendants argue that the facts actually negate any showing of detrimental reliance. (Defendants' Brief at pg. 24). Almost immediately after plaintiff obtained Budinger's signature on the February 21, 1986 document, plaintiff took a two-month leave of absence from Orca to teach skin diving and to finish building a house in St. John's, U.S.V.I. (Fulton Affidavit, ¶ 23). Furthermore, at about the same time that he began his leave of absence, Barshinger withdrew as a full-time employee of Orca so that he could become involved in other projects (Fulton Affidavit, ¶ 24). Thus, between March 1986 and October 1987, plaintiff was associated with Orca only as a part-time independent consultant (*Id.*). According to defendants, there is no evidence in the record that, as a result of any alleged promise or representations made by Orca: (1) Plaintiff failed to pursue other employment opportunities; (2) anyone offered to employ him; or (3) he rejected any offers of employment. In his answers to Interrogatories, plaintiff acknowledges that, other than Orca and

Rodel, he has not sought or considered employment with any person, corporation or business entity in the diving industry during the last six years (Answ. to Interr. No. 34, Exhibit "C" to Defendants' Brief).

Plaintiff argues that promissory estoppel applies in cases in which a party's reliance on a promise induces action, rather than a response of the type in which he forbears from doing something. Thus, plaintiff argues that the wrong here is the deprivation of the promised reward and he posits that "the Court should not take up the invitation to apply any mechanical rules such as to require plaintiff, a gratuitous promisee, to show damages from forbearance. Plaintiff would urge upon this Court that the proper characterization of his claim is "as an 'action-in-reliance' case, not a forbearance case, although there are some forbearance elements at play." (Plaintiff's Brief at pg. 9). Plaintiff has alleged, and argues that he can prove, that, relying on Orca's alleged specific promise to pay compensation in the future, he relented from leaving Orca and took action for Orca-working on a project, the SkinnyDipper project-to which he was critical.

Plaintiff has also asserted a claim for fraud against Orca on the basis that at the time Budinger signed the February 21, 1986 agreement, Budinger never intended to pay any such royalty to the plaintiff. Furthermore, plaintiff argues that supporting evidence includes Budinger's failure to respond to plaintiff's confirmatory letter of March 21, 1986 directed to Budinger and his counsel, his failure to promptly "negative or disabuse plaintiff of any contrary belief on Budinger's part, and his quietude until the letter of October, 1987 in which he says to plaintiff that this very document is 'gratuitous' ". In order to prove fraud, however, plaintiff must be able to show that he justifiably relied to his detriment upon the representation of the defendants. *Schmeusser v. Schmeusser,* 559 A.2d 1294, 1297 (Del.Supr.1989).

*8 Plaintiff has simply not made a showing, with respect to his claims for promissory estoppel and fraud, that he relied to his detriment upon any alleged representations by defendants. Moreover, I

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

remain unpersuaded by plaintiff's argument that the Court should view this matter as an "action-in-reliance" case. Accordingly, I hereby dismiss Counts I and III, plaintiff's claims for promissory estoppel and fraud, of plaintiff's Complaint.

3. *Plaintiff's Claim for Equitable Enforcement.*

Defendant's motion for summary judgment as to plaintiff's purported claim for equitable estoppel is granted. Plaintiff, in his reply brief, has represented that he is not seeking equitable estoppel, as defendants suggest, under Count V. Rather, plaintiff states that in paragraph 35 of his Complaint he has requested that he be granted equitable enforcement of the alleged promise in the event that the jury should find in his favor on the basis that this would provide plaintiff with his only avenue for receiving continuing relief as to the payments in question, *in futuram.* (Plaintiff's Brief at pg. 17). Nevertheless, as I have dismissed all other counts of plaintiff's Complaint, this issue is now moot.

An appropriate Order follows.

### ORDER

AND NOW, this 22nd day of January, 1990, upon consideration of defendants' Motions for Summary Judgment, and the response thereto, and consistent with the foregoing Memorandum Opinion in this matter, it is hereby ORDERED as follows:

1. Defendant Rodel's motion for summary judgment as to plaintiff's claim for Tortious Interference with Contract is GRANTED.

2. Defendant Rodel's motion for summary judgment as to plaintiff's claim that Rodel Guaranteed Orca's Alleged Obligation is GRANTED.

3. Defendants motion for summary judgment as to plaintiff's claim for Breach of Contract is GRANTED.

4. Defendants motion for summary judgment as to plaintiff's claims for Promissory Estoppel, Fraud and Equitable Estoppel are GRANTED.

Accordingly, judgment is entered in favor of defendants Orca Industries, Inc. and Rodel, Inc. and against plaintiff Craig W. Barshinger.

AND IT IS SO ORDERED.

> FN1. As defendants correctly point out, because this is a diversity case, this court must apply the conflicts rules of Pennsylvania to determine what law should apply. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496 (1941). Pennsylvania conflict of laws rules are a hybrid of the Restatement (Second) of Conflicts and interests analysis. *Complaint of Bankers Trust Co.,* 752 F.2d 874 (3d Cir.1984), *Griffith v. United Airlines, Inc.,* 416 Pa. 1, 203 A.2d 796 (1964). In this case, Delaware has a more compelling interest than Pennsylvania in having its law applied since Delaware has the most significant relationship to the parties and the transaction in question. Specifically, both Rodel and Orca are Delaware corporations, the alleged contract was executed in Delaware and performance of the alleged contract was to occur in Delaware. Accordingly, Delaware law should apply in this action.

E.D.Pa.,1990.
Barshinger v. Orca Industries, Inc.
Not Reported in F.Supp., 1990 WL 5166 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 2

2              UNITED STATES DISTRICT COURT

3              DISTRICT OF MASSACHUSETTS

4                 C.A. No. 04-12457 PBS

5      -----------------------------x

6      DePUY MITEK, INC.,

7          A Massachusetts Corporation,

8                     Plaintiff,

9              v.

10     ARTHREX INC.,

11         A Delaware Corporation,

12                    Defendants.

13     -----------------------------x

14

15

16             DEPOSITION OF MATTHEW GOODWIN

17              New Brunswick, New Jersey

18                 January 17, 2006

19

20     Reported by:

21     MARY F. BOWMAN, RPR, CRR

22     JOB NO.:  SE 173

2           not to answer to the extent it would reveal

3           any work product or any attorney/client

4           privileged information.  If you can answer

5           factually, you can answer.

6           A.    The assignment was for the purpose of

7    assigning the patent to the principal party in

8    interest which in this case is DePuy Mitek.

9           Q.    What does a principal party of

10   interest mean?

11          A.    It is the party that is most affected

12   in connection with the infringement of the '446

13   patent.

14          Q.    What do you mean by most connected?

15          A.    Most affected.

16          Q.    I am sorry, what do you mean by most

17   affected?

18          A.    It is the party that is being damaged

19   in connection with the infringement of the '446

20   patent as a result of Arthrex's continued sale of

21   infringing sutures.

22          Q.    How was DePuy Mitek any more damaged

23   than Ethicon?

24          A.    DePuy Mitek is the business unit of

25   Johnson & Johnson which manufactures, develops and

2    markets suture anchors.  It is my understanding

3    that the infringing suture is used in connection

4    with suture anchors that are manufactured and sold

5    by Arthrex.

6        Q.    Do you know why the '446 patent was

7    assigned in August of 2004, why that particular

8    time frame was chosen?

9        A.    I don't recollect why it was assigned

10   on that particular date or time frame.

11       Q.    Do you know what consideration was

12   received?

13       A.    No, I do not.

14       Q.    Yet you signed the document, you don't

15   know what consideration was received?

16       A.    That's correct.

17       Q.    Who is Lawrence Rickels?

18       A.    Lawrence Rickels is an attorney who is

19   employed in the Johnson & Johnson law department.

20       Q.    Do you know why Lawrence Rickels is

21   signing on behalf of DePuy Mitek Inc.?

22       A.    Presumably because he is an assistant

23   secretary of DePuy Mitek.

24       Q.    Do you know if Ethicon has assigned

25   any other patents to DePuy Mitek?

156

2          A.    No, I do not know.

3          Q.    Do you know whose idea it was to

4    transfer the '446 patent from Ethicon to DePuy

5    Mitek?

6                MS. MALINOSKI:   Assumes facts not in

7           evidence, vague.

8          A.    I don't think it was one individual's

9    idea.

10         Q.    Do you know who was involved with the

11   decision?

12         A.    Counsel was involved in the decision

13   to assign the patent.

14         Q.    Did that include yourself and

15   Mr. Rickels?

16         A.    It would have included myself.  I

17   don't believe it would have included Mr. Rickels

18   in particular.

19         Q.    Do you recall any other individuals

20   besides yourself that were involved in the

21   decision to transfer the '446 patent from Ethicon

22   and DePuy Mitek?

23         A.    Counsel for Woodcock Washburn, as well

24   as Richard Skula who was a colleague of mine and

25   who works in my group.

2          Q.    Were any business persons consulted in

3     connection with the transfer of this patent?

4          A.    I don't recollect.

5          Q.    Does Ethicon sell suture?

6          A.    Yes.

7          Q.    Does Ethicon sell stand-alone suture?

8                MS. MALINOSKI:  Objection, vague.

9          Q.    Do you know what I mean by that?

10         A.    No.

11         Q.    Does Ethicon sell suture attached to

12     nothing?

13         A.    I don't know.  Typically the sutures

14     are attached to needles.

15         Q.    From Ethicon?

16         A.    Yes.

17         Q.    Typically Ethicon sells suture

18     attached to needles?

19         A.    Yes.

20         Q.    And you are not certain -- I am sorry,

21     I don't want to put words in your mouth, but do

22     you know whether Ethicon sells stand-alone suture,

23     so-called stand-alone suture without being

24     attached to anything?

25         A.    No, I am not certain.

# Exhibit 3

**1/10/2006  Weber, Neil**

1                    UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF MASSACHUSETTS

2                    C.A. NO. 04-12457 PBS

3

4

                _____)

5        DePUY MITEK, INC.,              )

                        Plaintiffs,       )

6                                          )

                        vs.               )

7                                          )

        ARTHREX, INC., a Delaware        )

8        corporation,                     )

                        Defendants.       )

9        _____)

10

11

12

13                    DEPOSITION of DePUY MITEK BY NEIL

14    D. WEBER, called as a witness by and on behalf of

15    the Defendant, pursuant to the applicable

16    provisions of the Federal Rules of Civil Procedure,

17    Rule 30 (b) (6), before P. Jodi Ohnemus, Notary

18    Public, Certified Shorthand Reporter, Certified

19    Realtime Reporter, and Registered Merit Reporter,

20    within and for the Commonwealth of Massachusetts,

21    at the Four Points Sheraton Hotel, 1125 Providence

22    Boston Highway, Norwood, Massachusetts, on Tuesday,

23    10 January, 2006, commencing at 9:08 a.m.

1

1          MS. MALINOSKI:  I'm not instructing him

2     not to answer.  I said he can answer.  I'm just

3     preserving my objection.

4          A.   I was not part of the conversation.

5          Q.   Okay.  Well, what's your understanding as

6     to -- what's DePuy Mitek's understanding as to why

7     the patent was assigned to DePuy Mitek?

8          A.   My understanding of it --

9          MS. MALINOSKI:  You mean Neil Weber's

10    understanding or DePuy Mitek's --

11         MR. SABER:  Well, he's testifying for

12    DePuy Mitek, so I want to know DePuy Mitek's

13    understanding.

14         MS. MALINOSKI:  Okay.

15         A.   My understanding, as Neil Weber

16    representing DePuy Mitek, is that it was assigned

17    to us because the company, Mitek, that had most

18    need or use for the patent was -- deemed it was

19    appropriate for us to take ownership of it.

20         Q.   Why did DePuy Mitek have the most need for

21    the patent?

22         A.   Because -- my understanding is because it

23    applied to -- specifically to a product that we are

24    marketing.

25         Q.   Does it apply to the Orthocord product?

47

**1/10/2006 Weber, Neil**

```
1        A.   Yes.

2        Q.   Does the Orthocord product fall within

3   this patent?

4             MS. MALINOSKI:  I'll object to the extent

5   that's asking him for a legal conclusion that's

6   beyond the scope, and I think, with all due

7   respect, beyond his expertise?

8        A.   I don't know.

9        Q.   Well, I'm trying to understand what you

10  mean when you say that it applied to a product that

11  you have?

12       A.   It applied to a market that we are

13  addressing.

14       Q.   What do you mean by that?

15       A.   I simply mean that it applies to a -- I

16  don't know how I can really clarify that any

17  differently.

18       Q.   Well, I don't understand your answer.  It

19  applies to a market?

20       A.   It's -- it pertains to the marketplace

21  that Mitek serves.

22       Q.   Does the 446 patent cover a high-strength

23  suture?

24             MS. MALINOSKI:  And again, to the extent

25  he can answer, it's beyond the scope and his
```

1    expertise, but he can answer if he can.

2        A.    I don't know.

3        Q.    Isn't it true that you've received -- that

4    DePuy Mitek received the assignment so it could be

5    the plaintiff to sue Arthrex.

6            MS. MALINOSKI:  And I'll object to that as

7    harassing the witness, and also to the extent it

8    would reveal any communications and beyond the

9    scope of the notice.

10            MR. SABER:  Well, it's right to the heart

11    of the scope of the notice, and it can't be an

12    attorney/client privilege.  I mean, why DePuy Mitek

13    obtained this --

14            MS. MALINOSKI:  Chuck, I'm not instructing

15    him not to answer.  I said he could answer the

16    question.

17        A.    Can you repeat the question.

18            MR. SABER:  Could you read it back.

19            (Question read back.)

20        A.    No.

21        Q.    When DePuy Mitek received the assignment,

22    were they considering suing?  Was a Johnson &

23    Johnson company considering suing Arthrex for a

24    patent infringement under this patent?

25            MS. MALINOSKI:  And I'll object, and I'll

```
 1    instruct the witness not to answer to the extent

 2    that would call for work product or privileged

 3    information.

 4         A.   I don't know.

 5         Q.   Who made the decision to assign this

 6    patent to DePuy Mitek?

 7         A.   Again, I don't know.

 8         Q.   Who in DePuy Mitek was involved in that

 9    decision?

10         A.   As I said at the very beginning of this

11    line of questions, I was not part of the

12    conversation, so I don't know.

13         Q.   I understand, but you're the witness who's

14    been designated on this topic.  That's why I'm

15    asking the questions.

16         A.   Can you repeat the question again.

17         Q.   Yeah.  Who in DePuy Mitek was involved in

18    the decision to have the patent assigned to DePuy

19    Mitek?

20         A.   I don't know.  I can speculate, but I

21    don't know.

22         Q.   Well, what's your best understanding?

23              MS. MALINOSKI:  I caution you not to

24    speculate, but if you can answer --

25         A.   In general, IP related topics are handled
```

1/10/2006  Weber, Neil

```
 1    by our vice president of research and development,
 2    Izi Bruker.
 3        Q.   Izi who?
 4        A.   Izi Bruker.
 5        Q.   How does the 446 relate to the market that
 6    you're serving -- that DePuy Mitek is serving?
 7        A.   It relates to the market and the fact that
 8    suture is a critical component of the marketplace
 9    that we serve, and this is a patent that pertains
10    to suture.
11        Q.   Why was this -- why weren't other suture
12    patents assigned to DePuy Mitek?
13             MS. MALINOSKI:  Objection.  Assumes facts
14    not in evidence.
15        A.   I don't know if they were or were not.
16        Q.   Ethicon's the largest suture company in
17    the world, isn't that true?
18        A.   I believe they still are, yes.
19        Q.   They own lots of patents on sutures, isn't
20    that true?
21             MS. MALINOSKI:  Lack of foundation.
22    Beyond the scope.
23        A.   I don't know.
24        Q.   And you have -- you have no answer to me
25    as to why this was the only patent that was
```

1   assigned to DePuy Mitek, the only suture patent

2   assigned to DePuy Mitek?

3        MS. MALINOSKI:  Again, assumes facts not

4   in evidence and mischaracterizes his testimony.  He

5   just said he does not know.

6        A.   Can you ask me the question that you're

7   looking for an answer to.  I didn't understand.

8        Q.   Yeah.  I'd like to know why this was the

9   only suture patent that was assigned to DePuy.

10       MS. MALINOSKI:  Asked and answered.

11       A.   I did not say that that was the only

12  patent.

13       Q.   Tell me all the other patents that you

14  know that were assigned to DePuy Mitek.

15       MS. MALINOSKI:  It's beyond the scope of

16  the notice and beyond his expertise.  He referred

17  you to IP issues are not within his bailiwick.

18       A.   I don't know.

19       Q.   Do you know of any other suture patents

20  that were assigned to DePuy Mitek?

21       MS. MALINOSKI:  Asked and answered.

22       A.   I already answered.  I'm not aware

23  specifically.

24       Q.   Do you know -- do you know specifically

25  why it was decided that this patent should be

**1/10/2006  Weber, Neil**

1   assigned to DePuy Mitek?

2          MS. MALINOSKI:   Objection.   Asked and

3   answered.   Chuck, at this point you're just

4   harassing him, trying to get an answer from him.

5   He's answered it several different times several

6   different ways.

7          A.   I don't know anymore.

8          Q.   How does this patent relate to your -- to

9   the suture products that DePuy Mitek sells?

10         MS. MALINOSKI:   Object as beyond the

11  scope.

12         A.   I don't know that it specifically relates

13  to any of the products we sell, but obviously, as I

14  said before, it's a suture patent, and as we

15  develop and market sutures, it pertains to that

16  marketplace.

17         Q.   It pertains to the marketplace of sutures?

18         A.   Yes.

19         Q.   Any specific marketplace of suture?

20         MS. MALINOSKI:   Objection.   Vague.

21         A.   I'm not sure how you define -- how you're

22  defining the market.

23         Q.   Well, what did you mean when you said the

24  marketplace of suture?

25         A.   In our marketplace, there are -- suture is

**1/10/2006  Weber, Neil**

1    a critical component, and there's various types of

2    suture offerings.  So, this patent, for example, is

3    relevant to that -- to the -- what I refer to as

4    the sports medicine and arthroscopy marketplace.

5         Q.    Why do you believe that it's relevant to

6    the sports medicine and arthroscopic market?

7         A.    Why do I believe it's relevant?

8         Q.    Yes, sir.

9              MS. MALINOSKI:  And Neil Weber?

10        Q.    Why does DePuy Mitek believe it's

11   relevant?

12             MS. MALINOSKI:  And that's -- I'll object

13   as beyond the scope, but you can answer if you

14   know.

15        A.    I guess, you know, speaking for the

16   company, it's relevant because it has to do with a

17   certain construct of suture, which is found in the

18   marketplace.

19        Q.    What construct are you talking about?

20        A.    A combination of two different materials

21   in a suture.

22        Q.    Does the combination of two different

23   materials define the marketplace?

24        A.    In my opinion, no.

25        Q.    Why not?

54

1      A.   The marketplace, to me, is the marketplace

2   for shoulder repair --

3      Q.   Okay.

4      A.   -- which includes suture and anchors and

5   other ancillary products.  So, to me, that's the

6   marketplace.  That marketplace are suture offerings

7   and anchor offerings.

8      Q.   And what I'm trying to understand is why

9   does the 446 patent relate to that market?

10         MS. MALINOSKI:  Asked and answered.

11     A.   I don't know that I can offer any more.

12  I'm not an expert on this patent.

13     Q.   Okay.  Is the 446 patent limited to the

14  sports medicine market?

15         MS. MALINOSKI:  I'll object to the extent

16  it is outside the scope and calls for some sort of

17  legal conclusion or expert opinion.

18     A.   I don't know.

19     Q.   Is it -- is the 446 patent specifically

20  designed for the sports medicine market?

21         MS. MALINOSKI:  Same objections.

22     A.   I don't know.

23     Q.   In the course of the decisions for

24  assigning the 446 patent, were there any

25  discussions about Arthrex between DePuy Mitek and

```
 1    Ethicon or any other J&J company?
 2           MS. MALINOSKI:  And I'll object to the
 3    extent that would reveal attorney/client or work
 4    product communications and instruct you not to
 5    answer.
 6        A.   I can't answer that.
 7        Q.   You can't answer 'cause you don't know or
 8    because it would fall within the privilege?  I
 9    mean, 'cause your counsel has -- she didn't
10    instruct you -- if I understand correctly, she
11    didn't instruct you not to answer the question.
12    She said don't answer the question if it would
13    reveal client information.
14        A.   I thought she did tell me that.
15           MR. SABER:  Is that correct?
16           MS. MALINOSKI:  If you could answer that
17    question without revealing any work product or
18    attorney/client privileged information, you can
19    answer, but to the extent your answer would require
20    you to reveal work product or attorney/client
21    privileged information, I'd instruct you not to
22    answer.
23        A.   I think I should not answer the question.
24        Q.   Okay.  In the course of the assignment of
25    the 446 patent to Ethicon -- from Ethicon to DePuy
```

1    Mitek, was there any discussion about Arthrex which

2    did not involve attorneys?

3        A.   As I mentioned before, I was not part of

4    that conversation, so I don't know.

5        Q.   Okay.  Anything you know would have come

6    from an attorney, is that what you're telling me --

7    anything you know on that subject?

8        A.   Yes.

9        Q.   Okay.  Could you look at the first page of

10   the document, sir, the third paragraph.  It says,

11   "Now, therefore, for good and valuable

12   consideration the receipt of which is hereby

13   acknowledged."

14       A.   I'm sorry.  What --

15       Q.   The third paragraph.

16       A.   The first page?

17       Q.   On the first page where it says, "Now,

18   therefore --"

19            MS. MALINOSKI:  Here (indicating).

20       A.   Oh.  I'm sorry.

21       Q.   "Now, therefore, for good and valuable

22   consideration, the receipt of which is hereby

23   acknowledged and intending to be legally bound

24   hereby, assignor has sold, assigned, transferred,

25   and set over and by these presents does hereby

```
 1   sell, assign, transfer, and set over to said

 2   assignee the entire right, title, and interest in

 3   and to said patent property and any and all

 4   continuations," etcetera.  Do you know what the

 5   consideration that Ethicon received for

 6   transferring -- for assigning the patent to DePuy

 7   Mitek was?

 8            MS. MALINOSKI:  And I'll object to the

 9   extent it asks for a legal understanding of

10   valuable consideration, but if he knows, he can

11   answer.

12        A.   I don't know.

13        Q.   DePuy Mitek received the ownership of the

14   446 patent, correct?

15        A.   According to this letter, yes.

16        Q.   Yes.  What did DePuy Mitek give Ethicon in

17   return for receiving ownership of the patent?

18        A.   I don't know.

19        Q.   Did they receive anything?

20        A.   I don't know.

21        Q.   As best as you sit here today, can you

22   identify anything that DePuy Mitek gave Ethicon in

23   return for receiving ownership of the 446 patent?

24            MS. MALINOSKI:  And I'll object to the

25   extent that's beyond the scope of the notice.  I
```

1/10/2006  Weber, Neil

1    think our objections are clear on the extent of

2    testimony that would be provided on this topic.

3        A.   I don't think I can answer that question.

4        Q.   Well, I'm asking if you can identify

5    anything that was transferred from DePuy Mitek to

6    Ethicon in return for obtaining ownership of the

7    patent.

8            MS. MALINOSKI:  And I'll object as beyond

9    the scope.  And if you cannot answer that question

10   without revealing any attorney/client information,

11   I'd instruct you not to answer.

12       A.   I'm not going to answer the question.

13       Q.   Well, I -- my question is for on behalf of

14   DePuy Mitek.  I want to know if you can identify

15   anything that DePuy Mitek gave to Ethicon in return

16   to -- in return for receiving the patent -- the 446

17   patent.

18           MS. MALINOSKI:  Same objections.

19       A.   In terms of the scope of my testimony, I

20   -- to me, that's outside the scope of what I can

21   provide you.

22       Q.   I understand.  If you say you can't

23   identify anything, just tell me that.  Can you

24   identify anything --

25           MS. MALINOSKI:  And again, beyond --

1        Q.    -- that DePuy Mitek gave to Ethicon in

2    return for receiving ownership of the 446 patent?

3            MS. MALINOSKI:  And beyond the scope.

4        A.    It's outside the scope of my testimony --

5    it's outside the scope of why I'm here.

6        Q.    I understand, but you have to answer the

7    question.  I understand that's your position, which

8    I disagree with.

9        A.    My position -- Neil Weber -- I cannot, no.

10    The answer is no.

11            MR. SABER:  Why don't we take a break.

12            MS. MALINOSKI:  Okay.

13            (Recess was taken.)

14            (DMI039387-402 marked D-52.)

15        Q.    Mr. Webb, let me show you what has been

16    marked as Defendant's Exhibit 52 and ask if you're

17    familiar with this document.

18        A.    Yes.

19        Q.    Okay.  And what is it?

20        A.    It appears to be excerpts or some portion

21    of a strategy document.

22        Q.    And was this a Mitek strategy document?

23        A.    It appears to be, yes.

24        Q.    And do you know approximately when this

25    was created?

# Exhibit 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| DePuy Mitek, Inc.<br>     a Massachusetts Corporation | )<br>)<br>) |
|          Plaintiff. | )<br>) |
|               v. | )<br>)      Civil No. 04-12457 PBS |
| Arthrex, Inc.<br>     a Delaware Corporation | )<br>)<br>) |
|          Defendant. | )<br>) |

**DePuy Mitek's Responses To Arthrex, Inc.'s First Set of Interrogatories**

**General Objections**

1.    DePuy Mitek objects to Arthrex's definitions and instructions to the extent they purport to enlarge, expand, or alter in any way the plain meaning and scope of any specific request, on the ground that such enlargement, expansion, or alteration renders said request vague, ambiguous, unintelligible, unduly broad, and uncertain.

2.    DePuy Mitek objects to Arthrex's "instructions" including, but not limited to Arthrex's instructions nos. 1, 3, 4, 5, 6, and 9, as overbroad, unduly burdensome and demanding discovery obligations beyond those authorized by the Federal Rules of Civil Procedure and the Court's Local Rules. DePuy Mitek responds to Arthrex's discovery requests in accordance with the Federal Rules of Civil Procedure and the Court's Local Rules, not in accordance with Arthrex's unauthorized demands.

3.    DePuy Mitek objects to Arthrex's definition of "DePuy Mitek" as overbroad and unduly burdensome. DePuy Mitek, Inc. is the only party to this action and it will respond to discovery requests in accordance with the Federal Rules of Civil Procedure and the Court's Local Rules. Neither Ethicon, Inc. nor any other Johnson and Johnson Company is a party to this action, and

therefore it is improper for Arthrex to request discovery of them through Rule 33 interrogatories and Rule 34 document requests.

4.       DePuy Mitek objects to Arthrex's definition of "firm or company" as overbroad and unduly burdensome because it includes "parents, subsidiaries, associated, affiliated, related or controlled companies."

5.       DePuy Mitek objects to Arthrex's definition of "date" as including a "best approximation."

6.       DePuy Mitek objects to Arthrex's definitions of "identify," "identification," "describe," and "description" as overbroad, unduly burdensome, and demanding discovery not authorized by the Federal Rules of Civil Procedure or the Court's Local Rules.

7.       DePuy Mitek objects to Arthrex's definitions of "describe" and "state" as overbroad, unduly burdensome, and demanding discovery not authorized by the Federal Rules of Civil Procedure or the Court's Local Rules.

8.       DePuy Mitek objects to Arthrex's definitions "O" as overbroad, unduly burdensome, and demanding discovery not authorized by the Federal Rules of Civil Procedure or the Court's Local Rules.

9.       DePuy Mitek objects to Arthrex's Interrogatories insofar as they seek production of documents or information protected by the attorney-client privilege, the work-product protection, Rule 26(b)(4)(B) immunity or any other evidentiary privilege.

10.      DePuy Mitek objects to producing publicly available documents demanded by Arthrex's Requests.

11.      DePuy Mitek objects to Arthrex's interrogatories as containing numerous subparts and exceeding the limit on the number of interrogatories.

2

12.    DePuy Mitek hereby incorporates by reference its objections and responses to Arthrex's

First Set of Requests For Production of Documents and Things to DePuy Mitek, Inc.

**Interrogatory No. 3**

State with specificity and particularity every DePuy Mitek (as defined above) product that DePuy Mitek believes embodies, and/or includes at least in part, the subject matter of the '446 Patent, and for each such product, identify the earliest date on which such product was sold and/or offered for sale, state whether and how Plaintiff DePuy Mitek, Inc. is currently marking each such product to indicate that the product is covered by the '446 Patent, when Plaintiff DePuy Mitek, Inc., began such marking and whether such marking has been continuous, and if not, when such marking ended; state whether and how Ethicon, Inc, is currently marking each such product, when Ethicon, Inc. began such marking and whether such marking has been continuous from the date the '446 Patent issued, and if not, when such marking ended; identify all documents referring or relating to the subject matter of this interrogatory, and identify the three persons currently and/or formerly within DePuy Mitek's employ who are believed to be the most knowledgeable with respect to the subject matter of this interrogatory.

**Response to Interrogatory No. 3**

DePuy Mitek objects to this interrogatory to the extent that it demands information that is immune from discovery on the basis of the attorney-client privilege, the work-product doctrine, or Rule 26(b)(4)(B) immunity.

DePuy Mitek objects to this interrogatory as overbroad and unduly burdensome, ambiguous, and unintelligible because of its improper definition of DePuy Mitek. It demands an answer from companies and persons other than DePuy Mitek. DePuy Mitek is the only plaintiff in this action and therefore, no other company or person is answering this interrogatory. Further, to the extent that it requests information regarding Ethicon products, DePuy Mitek will answer based on its knowledge, but DePuy Mitek is not in possession, custody, or control of Ethicon and

9

can only answer to the extent of its knowledge concerning Ethicon products, and any statements made by DePuy Mitek are its statements, not Ethicon, Inc.'s statements.

DePuy Mitek objects to this interrogatory and the phrases "specificity and particularity" and "embodies, and/or includes at least in part, the subject matter of the '446 patent" as vague, unintelligible, overbroad, unduly burdensome, and demanding discovery that is irrelevant to any pled claim or defense and not likely to lead to the discovery of admissible evidence. DePuy Mitek construes this interrogatory as requesting information regarding DePuy Mitek's products that DePuy Mitek contends are within the scope of any claim of the Hunter patent and answers in accordance with that construction.

DePuy Mitek also objects to this request to the extent it calls for a legal conclusion and expert opinion.

DePuy Mitek objects to the phrase "all documents referring or relating to the subject matter of this interrogatory" as overbroad, unduly burdensome, and demanding information that is not reasonably calculated to lead to the discovery of admissible evidence or relevant to any pled claim or defense.

Subject to its general and specific objections and without waiving them and based on the information currently available to it, DePuy Mitek states that it does not sell a product that embodies the subject matter claimed in the '446 patent. DePuy Mitek further states that based on the information available to it, Ethicon does not sell a product that embodies the subject matter claimed in the '446 patent.

10

Dated: 4/4/05

DEPUY MITEK, INC.,

By its attorneys,

Dianne B. Elderkin
Lynn A. Malinoski
Michael J. Bonella
Erich M. Falke
WOODCOCK WASHBURN LLP
One Liberty Place - 46th Floor
17th and Market Streets
Philadelphia, PA 19103
(215) 568-3100

Daniel J. Gleason (BBO #194900)
Michelle Chassereau Jackson (BBO #654825)
Nutter McClennen & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA. 02210-2604
617-439-2000

## CERTIFICATE OF SERVICE

I certify that the foregoing **DePuy Mitek's Responses to Arthrex's, Inc.'s First Set of Interrogatories** was served by email and overnight mail on April 4, 2005 on the following:

Charles W. Saber
Dickstein, Shapiro, Morin & Ochinsky, LLP
2101 L. Street, NW
Washington, DC 20037-1526.
Fax: (202) 887-0689

Christopher Weld, Jr.
Todd & Weld LLP
28 State Street, 31st Floor
Boston, MA 02109
Fax: (617) 227-5777

Dated:  April 4, 2005

Erich Falke

39

# Exhibit 5

DOCKET NO.  ETH-782
Joint Inventors

# A S S I G N M E N T

Serial No._____
Filed_____


WHEREAS, Mark Steckel, Citizen of the United States of America, residing at 9819 Farmdale Way, Maineville, Ohio 45039 (hereinafter called "Assignors"), have made certain new and useful inventions or discoveries relating to

STERILIZED HETEROGENEOUS BRAIDS,

for which they have this day executed an application for Letters Patent of the United States; and

WHEREAS, Ethicon, Inc., a corporation of the State of Ohio, (hereinafter called "Assignee"), is desirous of acquiring Assignors' entire right, title, and interest therein:

NOW, THEREFORE, BE IT KNOWN that for and in consideration of the sum of One Dollar and other valuable considerations to them moving, the receipt of which is hereby acknowledged, Assignors have sold, assigned, and transferred, and do hereby sell, assign and transfer unto said Assignee their entire right, title and interest in and to all said inventions and discoveries disclosed in said application whose identification above by serial number and filing date, when available is hereby authorized, and in and to said application, all substitutions, divisions, and continuations thereof, and in and to all Letters Patent, United States and foreign, that may be granted for said inventions and discoveries, and in and to all extensions, renewals, and reissues thereof, the same to be held and enjoyed by said Assignee, its successors and assigns, as fully and entirely as the same would have been held and enjoyed by Assignors if this Assignment and sale had not been made;

And Assignors hereby authorize and request the Commissioner of Patents of the United States to issue said Letters Patent in accordance with this Assignment;

And for the consideration aforesaid, Assignors covenant and agree with said Assignee that he has a full and unencumbered title to the inventions and discoveries above described and hereby assigned, which title they warrant unto said Assignee, its successors and assigns;

And for the consideration aforesaid, Assignors further covenant and agree that they will, whenever requested, but without cost to them promptly communicate to said Assignee or its representatives any facts known to them relating to said inventions and discoveries, testify in any interference or legal proceedings involving said inventions and discoveries, and execute any additional papers that may be necessary to enable said Assignee or its representatives, successors, nominees, or assigns to secure full and complete protection for the said inventions and discoveries or that may be necessary to vest in said Assignee the complete title to the said inventions and discoveries and patents hereby conveyed and to enable it to record said title.

REEL 6,023 FRAME 945

VIA EXPRESS MAIL NO. HB346860118
MAILED FEBRUARY 19, 1992

DEPUY MITEK
EXHIBIT 562
04cv12457

- 2 -

IN TESTIMONY WHEREOF, Assignors have hereunto set their hands and seals this   17   day of   FEB   , 1992.

_____ (L.S.)
Mark Steckel

STATE OF OHIO          )
                       ) ss.
COUNTY OF              )

BE IT REMEMBERED, That on this 17 day of February, 1992, before me, a Notary Public, personally appeared Mark Steckel, who I am satisfied are the persons named in and who executed the foregoing instrument in my presence, and I having first made known to them the contents thereof, they did acknowledge that they signed, sealed, and delivered the same as their voluntary act and deed for the uses and purposes therein expressed.

_____
Notary Public

MARY L. FLESHER
Notary Public, State of Ohio
My Commission Expires June 3, 1996

REEL6023 FRAME946

RECORDED
PATENT & TRADEMARK OFFICE
FEB 19 92

# Exhibit 6

DOCKET NO.  ETH-788**838511**
Joint Inventors

# A S S I G N M E N T

Serial No._____
Filed_____

WHEREAS, Alastair W. Hunter, Dennis D. Jamiolkowski and Arthur Taylor, Jr., Citizens of the United States of America, residing at 516 Spring Valley Drive, Bridgewater, New Jersey 08807; 20 Fawnridge Drive, Long Valley, New Jersey 07853; and 1217 East Second Street, Plainfield, New Jersey 07062 (hereinafter called "Assignors"), have made certain new and useful inventions or discoveries relating to

STERILIZED HETEROGENEOUS BRAIDS,

for which they have this day executed an application for Letters Patent of the United States; and

WHEREAS, Ethicon, Inc., a corporation of the State of Ohio, (hereinafter called "Assignee"), is desirous of acquiring Assignors' entire right, title, and interest therein:

NOW, THEREFORE, BE IT KNOWN that for and in consideration of the sum of One Dollar and other valuable considerations to them moving, the receipt of which is hereby acknowledged, Assignors have sold, assigned, and transferred, and do hereby sell, assign and transfer unto said Assignee their entire right, title and interest in and to all said inventions and discoveries disclosed in said application whose identification above by serial number and filing date, when available is hereby authorized, and in and to said application, all substitutions, divisions, and continuations thereof, and in and to all Letters Patent, United States and foreign, that may be granted for said inventions and discoveries, and in and to all extensions, renewals, and reissues thereof, the same to be held and enjoyed by said Assignee, its successors and assigns, as fully and entirely as the same would have been held and enjoyed by Assignors if this Assignment and sale had not been made;

And Assignors hereby authorize and request the Commissioner of Patents of the United States to issue said Letters Patent in accordance with this Assignment;

And for the consideration aforesaid, Assignors covenant and agree with said Assignee that he has a full and unencumbered title to the inventions and discoveries above described and hereby assigned, which title they warrant unto said Assignee, its successors and assigns;

And for the consideration aforesaid, Assignors further covenant and agree that they will, whenever requested, but without cost to them promptly communicate to said Assignee or its representatives any facts known to them relating to said inventions and discoveries, testify in any interference or legal proceedings involving said inventions and discoveries, and execute any additional papers that may be necessary to enable said Assignee or its representatives, successors, nominees, or assigns to secure full and complete protection for the said inventions and discoveries or that may be necessary to vest in said Assignee the complete title to the said inventions and discoveries and patents hereby conveyed and to enable it to record said title.

REEL 6023 FRAME 942

DEPUY MITEK
EXHIBIT 563
04cv12457

VIA EXPRESS MAIL NO. HB346860118
MAILED FEBRUARY 19, 1992

- 2 -

IN TESTIMONY WHEREOF, Assignors have hereunto set their
hands and seals this 18th day of February, 1992.

_Alastair W. Hunter_ (L.S.)
Alastair W. Hunter

_Dennis D. Jamiolkowski_ (L.S.)
Dennis D. Jamiolkowski

_Arthur Taylor, Jr._ (L.S.)
Arthur Taylor, Jr.

STATE OF NEW JERSEY        )
                          ) ss.
COUNTY OF SOMERSET         )

BE IT REMEMBERED, That on this 18th day of February
1992, before me, a Notary Public, personally appeared Alastair W.
Hunter, Dennis D. Jamiolkowski and Arthur Taylor, Jr., who I am
satisfied are the persons named in and who executed the foregoing
instrument in my presence, and I having first made known to them
the contents thereof, they did acknowledge that they signed,
sealed, and delivered the same as their voluntary act and deed for
the uses and purposes therein expressed.

_Judy A. Reilly_
Notary Public

RECORDED
PATENT & TRADEMARK OFFICE

FEB 19 92

# Exhibit 7

## ASSIGNMENT

WHEREAS, **Ethicon, Inc.**, hereinafter referred to as the ASSIGNOR, a **Corporation of New Jersey**, having its principal place of business at **Route 22, Somerville, New Jersey, 08876** is the owner of certain inventions or improvements for which application for Letter Patent have been made and for which Letter Patent have been issued on May 24, 1994, as U.S Patent No. 5,314,446 entitled "Sterilized Heterogeneous Braids"(hereafter Patent Property); and

WHEREAS, DePuy Mitek, Inc., hereinafter referred to as the ASSIGNEE, a **Corporation of Massachusetts**, having its principal place of business at **249 Vanderbilt Avenue, Norwood, Massachusetts, 02062**, is desirous of acquiring the entire right, title and interest in and to the said Patent Property in any and all countries;

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, and intending to be legally bound hereby, ASSIGNOR has sold, assigned, transferred and set over, and by these presents does hereby sell, assign, transfer and set over to said ASSIGNEE, the entire right, title and interest in and to said Patent Property and any and all continuations, divisions and renewals of and substitutes for said Patent Property and to and under any and all additional Letters Patent which may be granted on or as a result thereof in the United States and any and all other countries, and any reissue or reissues or extension or extensions of said Letters Patent, and the full right to sue for and recover damages recoverable for past infringement of the same, and for violations of provisional rights having arisen from any published application(s) for said Patent Property. ASSIGNOR further assigns to and authorizes said ASSIGNEE to file corresponding applications for Letters Patent in all countries, to be held and enjoyed by said ASSIGNEE, its successors, assigns, nominees or legal representatives, to the full end of the term or terms for which said Letters Patent respectively may be granted, reissued or extended, as fully and entirely as the same would have been held and enjoyed by ASSIGNOR had this assignment, sale and transfer not been made.

It is hereby covenanted that ASSIGNOR has full right to convey the entire interest herein assigned, and that ASSIGNOR has not executed and will not execute any agreement in conflict herewith, and ASSIGNOR further covenants and agrees that it will each time request is made and without undue delay, execute and deliver all such papers as may be necessary or desirable to perfect the title to said Patent Property in said assignee, its successors, assigns, nominees, or legal representatives, and ASSIGNOR agrees to communicate to said ASSIGNEE or to its nominee all known facts respecting said Patent Property, to testify in any legal proceedings, to sign all lawful papers to execute all disclaimers and divisional, continuing, reissue and foreign applications, to make all rightful oaths, and generally to do everything reasonably possible to aid said ASSIGNEE, its successors, assigns, nominees and legal representatives to obtain and enforce for its or their own benefit proper patent protection for said inventions or improvements in any and all countries, all at the expense, however, of said ASSIGNEE, its successors, assigns, nominees or legal representatives.

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
*DMI000338*

DEPUY MITEK
EXHIBIT 523
04cv12457

AND ASSIGNOR hereby authorizes and requests the Commissioner of Patents and Trademarks of the United States and any official of any country or countries foreign to the United States whose duty it is to issue patents on applications as aforesaid, to issue to said ASSIGNEE, as assignee of the entire right, title and interest, any and all Letters Patent for said Patent Property, including any and all Letters Patent of the United States which may be issued and granted on or as a result of any applications included in said Patent Property, in accordance with the terms of this assignment.

IN WITNESS WHEREOF, the undersigned, being properly authorized to execute this Assignment, hereunto sets their hand and seal.

Ethicon, Inc.

By: _Matthew Goodwin_
     Matthew S. Goodwin

Its: _____
      Assistant Secretary

Date: _August 9, 2004_

STATE OF _New Jersey_ :
COUNTY OF _Middlesex_ : SS

On this _9th_ day of _August_, year of _200_ before me, the undersigned officer, personally appeared _Matthew S. Goodwin_ who acknowledged himself/herself to be the _Asst Secy_ of _Ethicon Inc._, a corporation, and that he/she as such _Asst. Secy_ being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself/herself as _Asst. Secy_.

_Jacqueline S. Retkwa_
Notary Public

JACQUELINE S. RETKWA
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES APRIL 10, 2006

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
*DMI000339*

DePuy Mitek, Inc.

By: _____
        Laurence Rickles

Its: _____
        Assistant Secretary

Date: _August 9, 2004_____

STATE OF _New Jersey_____ :
                                              : SS
COUNTY OF _Middlesex_____ :

    On this _9th_ day of _August___, year of _2004_, before me, the undersigned officer, personally appeared _Laurence Rickles_____, who acknowledged himself/herself to be the _Assistant Secretary_____ of _DePuy Mitek, Inc.___, a corporation, and that he/she as such _Assistant Secretary___, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself/herself as _Assistant Secretary_.

_____
Notary Public

EDNA ARNOLD
A NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES 9/27/2008

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
*DM1000340*

# Exhibit 8



**United States Patent and Trademark Office**

Home | Site Index | Search | Guides | Contacts | *e*Business | *e*Biz alerts | News | Help



**Assignments on the Web** > Patent Query

# Patent Assignment Abstract of Title

**NOTE:Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff.**

**Total Assignments: 2**

| | | |
|---|---|---|
| **Patent #:** 5314446 | **Issue Dt:** 05/24/1994 | **Application #:** 07838511 | **Filing Dt:** 02/19/1992 |

**Inventors:** ALASTAIR W. HUNTER, ARTHUR TAYLOR JR., MARK STECKEL

**Title:** STERILIZED HETEROGENEOUS BRAIDS

## Assignment: 1

**Reel/Frame:** 006023/0944     **Recorded:** 02/19/1992     **Pages:** 3

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST.

**Assignor:** STECKEL, MARK     **Exec Dt:** 02/17/1992

**Assignee:** ETHICON, INC. A CORP. OF OHIO

**Correspondent:** ROBERT L. MINIER
ONE JOHNSON & JOHNSON PLAZA
NEW BRUNSWICK, NJ 08933-7003

## Assignment: 2

**Reel/Frame:** 006023/0941     **Recorded:** 02/19/1992     **Pages:** 3

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST.

**Assignors:** HUNTER, ALASTAIR W.     **Exec Dt:** 02/18/1992

JAMIOLKOWSKI, DENNIS D.     **Exec Dt:** 02/18/1992

TAYLOR, ARTHUR, JR.     **Exec Dt:** 02/18/1992

**Assignee:** ETHICON, INC. A CORP. OF OHIO

**Correspondent:** ROBERT L. MINIER
ONE JOHNSON & JOHNSON PLAZA
NEW BRUNSWICK, NJ 08933-7003

Rd`dpg Qdrt ker `r ne9/ 7./ 5.1/ / 6 / 8935 @L
I¢xnt g`ud`mx bnl l dmsr nqpt dr strnr bnmbdqmnf sgd c`s chrok xdc+bnmsi bsOQC . @r rli ml dmsr `s460,161,224/ - u-1-/ -0
V da l mdoi bd k rsl nchtdc9@bdtk1/ +1/ / 6 u-1-/ -0

| .HOME | INDEX | SEARCH | *e*BUSINESS | CONTACT US | PRIVACY STATEMENT