**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| DePuy Mitek, Inc. <br>   a Massachusetts Corporation <br><br>        Plaintiff, <br><br>       v. <br><br> Arthrex, Inc. <br>   a Delaware Corporation, *et al*. <br><br>       Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Civil Action No. 04-12457 PBS |

## DEFENDANTS ARTHREX, INC.'S AND PEARSALLS, LTD.'S RESPONSE TO DEPUY MITEK'S BENCH MEMORANDUM RELATING TO PRE-SUIT TESTING

Dated: August 10, 2007

Charles W. Saber
Stephen A. Soffen
Salvatore P. Tamburo
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, D.C.  20006-5403
Telephone:  (202) 420-3116
Facsimile:  (202) 420-2201

Christopher Weld, Jr. (BBO # 522230)
Raymond P. Ausrotas (BBO # 640315)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
Telephone:  (617) 720-2626
Facsimile:  (617) 227-5777

Counsel for Defendants
Arthrex, Inc. and Pearsalls Ltd.

DSMDB-2302648v01

Defendants Arthrex, Inc. and Pearsalls, Ltd. (collectively "Arthrex") submit this paper in response to the bench memorandum relating to pre-suit testing filed by DePuy Mitek on August 3, 2007.

This Court has already stated the fact that DePuy Mitek conducted tests is not privileged information. Yet, DePuy Mitek continues to argue that Arthrex should not be permitted to refer to this *admissible* evidence, blithely contradicting this Court's prior pronouncement. As explained below, the fact that DePuy Mitek conducted tests is *not* privileged information. To the extent any question exists as to whether this information is privileged -- which there is none -- DePuy Mitek waived its claim of privilege. Further, DePuy Mitek's reliance on *McKesson Info. Solutions, Inc. v. Bridge Med., Inc.*, 434 F. Supp. 2d. 810 (E.D. Cal. 2006) is entirely misplaced. *McKesson* merely precludes evidence pertaining to the assertion of privilege, something Arthrex has already agreed not to introduce.

DePuy Mitek raised this issue in its second motion *in limine* and this Court responded that "it's not protected that you conducted tests, and that can come out." Ex. 1 at 27:23-24. The fact that DePuy Mitek conducted tests is *not* privileged information. Simply because DePuy Mitek believes "there will necessarily be an implicit adverse inference that the test results were unfavorable to Mitek" does not warrant the preclusion of otherwise *relevant and admissible* evidence. DePuy Mitek cites no law for the proposition that *relevant and admissible* evidence should be precluded simply because it is unfavorable to a party.

The fact that DePuy Mitek did tests, as this Court has repeatedly noted, is simply not privileged information. But even if DePuy Mitek had a colorable argument that the fact it conducted tests is privileged -- which they do not -- that argument was waived. DePuy Mitek has produced documents indicating that it conducted tests. Ex. 2 at 2d; Ex. 3 at 2b. DePuy

1

Mitek has likewise permitted testimony relating to these tests.[1] Ex. 4 at 58:6-59:2; 59:15-70:22. DePuy Mitek cannot now claim that the fact that it conducted tests is privileged.

Furthermore, DePuy Mitek woefully overstates the facts and the holding of *McKesson*.[2] The *McKesson* court held that the plaintiff was "precluded, in all respects, from introducing evidence or testimony *pertaining to Bridge's assertion of the attorney client privilege* over the opinion of counsel it received…." *Id.* at 812 (emphasis added). This Court has already stated that the results of the tests are likely privileged and instructed Arthrex's Counsel not to argue the assertion of privilege to the jury. Ex. 1 at 28:6-13. *McKesson* does nothing more than restate the demarcation that this Court has already expressed.

For the foregoing reasons and the reasons in Arthrex's response to DePuy Mitek's motion *in limine* no. 2, Arthrex should not be precluded from submitting any evidence or making any argument to the jury about the existence of DePuy Mitek's pre-suit testing.

---

[1]  Such testimony regarding the pre-suit testing conducted by DePuy Mitek is the only remaining issue to be resolved on the deposition designation objections. Should the Court maintain its position that the fact that the tests were conducted is not privileged this remaining dispute should, likewise, be resolved.

[2]  It is questionable if *McKesson*, a case regarding an opinion of counsel relating to patent infringement, even applies to this case where privilege is being asserted to protect the fact that tests were conducted.

DSMDB-2302648v01

Dated: August 10, 2007

Respectfully submitted,

By:    **/s/Charles W. Saber**

Charles W. Saber
Stephen A. Soffen
Salvatore P. Tamburo
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, D.C.  20006-5403
Telephone:  (202) 420-3116
Facsimile:  (202) 420-2201

Christopher Weld, Jr. (BBO # 522230)
Raymond P. Ausrotas (BBO # 640315)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
Telephone:  (617) 720-2626
Facsimile:  (617) 227-5777

Counsel for Defendants
Arthrex, Inc. and Pearsalls Ltd.

DSMDB-2302648v01

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing DEFENDANTS ARTHREX, INC.'S AND PEARSALLS LTD.'S RESPONSE TO DEPUY MITEK'S BENCH MEMORANDUM RELATING TO PRE-SUIT TESTING was served, via the Court's email notification system on the following counsel for Plaintiff on the 10th day of August 2007:

Lynn A. Malinoski
Woodcock Washburn, LLP
Cira Centre, 12th Floor
2929 Arch Street
Philadelphia, PA  19104-2891
Telephone: (215) 568-3100
Facsimile: (215) 568-3439

Daniel J. Gleason
Nutter McClennan & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
Telephone:  (617) 439-2000
Facsimile:  (617) 310-9000


**/s/Charles W. Saber**

# Exhibit 1

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DePUY MITEK, INC.,              )
a Massachusetts Corporation,    )
                Plaintiff       )
                                )
        -VS-                     )  CA No. 04-12457-PBS
                                )  Pages 1 - 37
ARTHREX, INC.,                  )
a Delaware Corporation,         )
and Pearsalls Ltd.,             )
a Private Limited Company       )
of the United Kingdom,          )
                Defendants      )


FINAL PRETRIAL CONFERENCE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:

    DIANNE B. ELDERKIN, ESQ., MICHAEL J. BONELLA, ESQ.,
LYNN A. MALINOSKI, ESQ., and ANGELA VERRECCHIO, ESQ.,
Woodcock Washburn, LLP, Cira Centre, 12th Floor,
2929 Arch Street, Philadelphia, Pennsylvania, 19104-2891,
for the Plaintiff.

    CHARLES W. SABER, ESQ. and SALVATORE P. TAMBURO, ESQ.,
Dickstein Shapiro, LLP, 1825 Eye Street, N.W., Washington,
D.C., 20006-5403, for the Defendants.

                    United States District Court
                    1 Courthouse Way, Courtroom 19
                    Boston, Massachusetts
                    July 31, 2007, 4:00 p.m.

            LEE A. MARZILLI
        OFFICIAL COURT REPORTER
        United States District Court
        1 Courthouse Way, Room 3205
            Boston, MA  02210
            (617)345-6787

Page 26

1   privilege, as I understand it --
2        MR. SABER:  Or work product, the same thing, your
3   Honor.
4        THE COURT:  -- protection under the work product
5   doctrine.  And it's just I don't know if it is or not.  It's
6   quite clear that if a lawyer hires a private eye to go out
7   and take witness statements, that those are protected under
8   the work product doctrine, and you have to make certain
9   showings to get them.  It's also clear you can't draw an
10  adverse inference if it's a fair application of a work
11  product doctrine.  That's clear Federal Circuit law.  Is this
12  the fair assertion of the work product doctrine?  Have either
13  of you found a case on this?
14       MR. SABER:  Yes, your Honor.  I think we cited four
15  cases to you.
16       THE COURT:  Not directly on this.
17       MR. SABER:  Well, two of them were exactly on
18  point.
19       THE COURT:  Which are the two that you say are
20  directly on point?
21       MR. SABER:  I don't have the names, but they're the
22  first two that we cited, your Honor.
23       THE COURT:  The first two?
24       MR. SABER:  Yes.
25       THE COURT:  Say what, that you can get what?

Page 27

1        MR. SABER:  That there's no privilege for -- these
2   were both cases about test results done by the plaintiff in a
3   case.
4        THE COURT:  Well, by the plaintiff, that's one
5   thing, but what if --
6        MR. SABER:  That's what this is.
7        MS. VERRECCHIO:  Your Honor, those tests were not
8   conducted at the request of counsel.  And in this case,
9   in-house counsel for DePuy Mitek and outside litigation
10  counsel directed the tests to be done before the suit was
11  filed and in anticipation of litigation, so it's clearly work
12  product.
13       THE COURT:  I'm just saying, we're two days before
14  trial.  I don't know what the answer is.  No one should argue
15  it in their opening.  We did not find a case directly -- your
16  cases were not where they were directed by an attorney in
17  anticipation of litigation.  On the other hand, we found a
18  case that said that the fact that there were tests was not
19  protected -- that's why it's not so straightforward -- the
20  fact that there are tests, but the results of the test may
21  well be protected.  But, you know, just like an investigator
22  has to disclose whom he interviewed but maybe not what the
23  statement was.  So I think it's not protected that you
24  conducted tests, and that can come out.  But you can't ask
25  for an instruction on an adverse inference if in fact that

Page 28

1   they were protected or argue they should have been produced
2   because I think there's some argument that that is
3   protected.  They're pretty fine lines that we're walking
4   here, and I am not prepared to rule right now, and no one
5   should argue any adverse inference in their opening
6   statements.  You can argue that "You won't see any tests,"
7   because the absence of evidence is a strong thing in your
8   quiver because you do have tests, but that's different from
9   saying, "The lawyers ordered tests, and they won't produce
10  them," because I think there's at least a good shot that they
11  are protected, the actual results.
12       MR. SABER:  Okay, well, I won't make that argument,
13  your Honor.
14       THE COURT:  None of these want to be an appeal
15  issue.  You don't want to draw -- unless you've got a slam
16  dunk about it, permitting an adverse inference on a test
17  conducted under the auspices of a lawyer in anticipation of
18  litigation are too close to the line, so we don't want that
19  appeal issue.
20       So then what are the other issues that we have?
21       MS. ELDERKIN:  Your Honor, we had some issues come
22  up with Dr. Gitis' supplemental report.  This was not raised
23  in the motions in limine because his deposition didn't happen
24  until last week.  I'll let Mr. Bonella --
25       THE COURT:  If it's not a motion in limine, I'm not

Page 29

1   dealing with it, okay.  I have a room upstairs full.  What
2   are the other motions in limine?
3        MR. TAMBURO:  Your Honor, we filed a motion in
4   limine on a new argument that DePuy Mitek made for the first
5   time late in this case regarding the minimal impact of
6   coating, and --
7        THE COURT:  I read that, and that's overruled.
8   That's what their whole argument has been all along.
9        MR. TAMBURO:  Well, actually, it's not quite right,
10  your Honor.  They've been arguing all along that the coating
11  does not prevent certain things from happening in the
12  suture.  This is a new argument they're making, and they're
13  citing Dr. Brookstein to support it, but he never made these
14  arguments.
15       THE COURT:  That's overruled.  Yes, he did.  I
16  mean, that was the whole gist of this thing, that it doesn't
17  matter, and it's just a tiny amount of coating, and it's
18  de minimis and insignificant.  That's what this case is
19  about.  Both of you are trying to get me to direct the case,
20  and I'm not going to do it.
21       What's the next motion in limine?
22       MS. MALINOSKI:  We had filed a motion that was
23  directed to Arthrex trying to introduce evidence about the
24  development of the Orthocord product and the reasons that
25  Mitek developed it.  Orthocord is a suture that DePuy Mitek

# Exhibit 2

Katie's Current Projects     6/29/04

1. Project MoniTorr – CPC representative
   a. Recently completed Design Verification completion reports for Cost Reduction project for Cartridge top and meatus cone changes.
   b. Regularly attended weekly Cost Reduction meetings to keep up-to-date on progress.
   c. One more cost reduction project in process (catheter change). Will likely require design verification testing.
   d. Collaborated with Ziad Mohamed (cost reduction project leader), Sharon Shantz, and MoniTorr members from AVAIL medical.
2. Project Orthocord, Violet - CPC representative
   a. Working with MITEK project leader, Jonathan Howe, to gather information for Marketing. White papers have been written by MITEK which included data gathered here in CPC.
   b. Working with J/H and Dan Burkley to gather SEM pictures for MITEK marketing of violet Orthocord and competitor, Fiberwire.
   c. Completed summary report memos of possible competitors to Orthocord, including MaxBraid and Arthrex Bio-Fastak and Corkscrew sutures.
   d. *REDACTED DUE TO ATTORNEY-CLIENT OR WORK PRODUCT PRIVILEGE* Coated and Uncoated Fiberwire was sent to test for straight tensile and bending rigidity as per a patent. Composition, SEM and denier analysis were needed to verify the coated and uncoated samples were the same. Bending rigidity was done in the patent using a Kawabata Bend tester. Tried to understand and learn how to use the tester in Ilya's lab.
   e. *REDACTED DUE TO ATTORNEY-CLIENT OR WORK PRODUCT PRIVILEGE*
   f. Finalizing technical reports for violet ORTHCORD design verification and stability study.
   g. PQ is on-going in San Angelo.
   h. The second stability study for Orthocord violet is being developed. Les and I met to finalize the protocol. This protocol will test for 2X EO sterilization.
3. Project Orthocord, Blue – CPC representative
   a. Spoke to Michael Pelekis to get ETHICON biocompatibility recommendations for Orthocord blue. MITEK has previous biocompatibility studies on D&C blue #6 for anchors. Michael and I are going to research biocompatability studies for PDS blue. If enough information exists, it is ETHICON's recommendation that no new biocompatibility studies are needed.
   b. Orthocord blue was brought to the stability study committee on 6/10/04. It was the stability committee's recommendation to initiate an off-critical path study to verify stability of the suture with the blue dye out to 5 years.
   c. Currently working on revising the CPC Orthocord Blue plan. I would like to set up a CPC project review meeting soon.

CONFIDENTIAL- OUTSIDE
ATTORNEYS EYES ONLY

*DePuy Mitek, Inc v. Arthrex, Inc*
*C.A. No.04-12457 PBS*
**DMI039571**



DEFENDANT'S
EXHIBIT
3 0

DEFENDANT'S
EXHIBIT
1024
CA 04-12457-PBS

     d.  Development samples of Orthocord blue are being made.

     e.  Met with Enilma Miller to discuss using the violet TM's for blue.  Most of them will not have to be updated.  We would like to verify with the more development data.

4.  LIMS

     a.  Completed Agilent CSV 1st completion report.  Qiang ran protocol a 2nd time successfully.

     b.  The 2nd Agilent CSV completion report is written, awaiting signatures. The only items left are the SMP (which may need some testing) and the relevant SOPs.

     c.  I have finalized the Waters SRS and have routed it for approval in ECCS.

     d.  Waters IQ/OQ/PV was completed.  Once I receive the paperwork, we can move into developing the tracematrix and any subsequent protocol and test scripts.

     e.  Participated in Value Stream Mapping process with LIMS project team and Jim Pastore to create current state map of CPC processes.

5.  Part 11/CSV

     a.  I worked with Mark Storch to determine if there is any money in the R&D budget to bring in vendor to work on the remedial CSV of several pieces of equipment (including the Instron software, viscometer, titrator, NMR and x-ray Diffractometer.)  Mark said there was capital money available.  I worked with Mark and Darrie Christmas to determine if CSV would be capital or expense. With input from Phyllis Woodford and Jean Carbone, it was determined that it was.

     b.  I have called Stelex to obtain a quote for the remedial CSV work on equipment previously mentioned.  Currently working on putting together the information Stelex need to create their quote.

     c.  I have worked with Robin Ragland and Josh Samon about obtaining quotes for software upgrades to the viscometer and x-ray Diffractometer.  These upgrades would have to be done before the remedial CSV work.  I spoke to the sales representative to the x-ray Diffractometer to clarify quote and have received new quote from Viscotek for the viscometer.

     d.  I spoke to Jack Zhou about the Part 11/CSV plans.  He felt the Instron Series IX software could be done in-house.  For the x-ray Diffractometer, due to the time needed by the vendors to learn the equipment to do the CSV, it may take less time for Josh to do the CSV himself, then to spend time teaching the vendors about the equipment.  I need to talk to Josh about this issue.  Jack Zhou has also obtained a quote from Nugenesis for them to perform the CSV – not to be done in-house.

     e.  I attended a conference call with Part 11 leaders in the field concerning new issues around Part 11.

6.  Barbed Suture

     a.  There are no new updates on the Belle project.

7.  Calibration

     a.  Still trying to get onto the Pilgrim system.  There have been many software related problems with my access.   I have been working with Pat Raics to gain access.

     b.  Once I get on the system, inventory of all the equipment in CPC can roll out.

CONFIDENTIAL- OUTSIDE
ATTORNEYS EYES ONLY

*DePuy Mitek, Inc v. Arthrex, Inc*
*C.A. No04-12457 PBS*
**DMI039572**

       c.  Analytical chemistry has already begun their inventory with help from Robin
          Larkin and May Xu.

8.  Mulberry

       a.  Samples will be here this week to start stability study.  I will be working with
          Claudia to complete the baseline testing.

CONFIDENTIAL- OUTSIDE
ATTORNEYS EYES ONLY


*DePuy Mitek, Inc v. Arthrex, Inc*
*C.A. No04-12457 PBS*
**DMI039573**

# Exhibit 3

Katie's Current Projects        7/26/04

1. Project MoniTorr – CPC representative
   a. Regularly attended weekly Cost Reduction meetings to keep up-to-date on progress.
   b. Met to discuss requirement matrix for 3rd cost reduction project – catheter change. Design Verification testing including CMG flow rate, pressure accuracy, catheter diameter, catheter length and tube length will need to be done.
   c. Started this Design Verification Protocol
   d. Collaborated with Hannah Davies (cost reduction project leader), Sharon Shantz, and MoniTorr members from AVAIL medical.

2. Project Orthocord, Violet - CPC representative
   a. Working with MITEK project leader, Jonathan Howe, to gather information for Marketing. White papers have been written by MITEK which included data gathered here in CPC.
   b. *REDACTED DUE TO ATTORNEY-CLIENT OR WORK PRODUCT PRIVILEGE*
      Tested coated and uncoated Fiberwire for straight tensile and bending stiffness. Mitek would now like to remove the coating from finished goods Fiberwire and test again.
   c. Finalized technical reports for violet ORTHCORD design verification, stability study and other studies.
   d. Orthocord violet launched for non-needled product. Investigation is on-going for needled product failure in OQ.
   e. The second stability study for Orthocord violet is being developed. Should sing off on the protocol this week. This protocol will test for 2X EO sterilization.

3. Project Orthocord, Blue – CPC representative
   a. CPC project review meeting set up for next week.
   b. Development/Coating samples in sterilization. I should have them today.
   c. Met with Enilma Miller, Ilya Koyfman, Don Hill to discuss Orthocord blue development testing plan.

4. LIMS
   a. Waters SRS approved in ECCS.
   b. Started Waters traceability matrix.
   c. Started the Instron Series IX SRS.
   d. Met with several CPC associates (Christophe, Liz, Chris, Hwason, Debi) to explain and discuss filling out data gathering survey for LIMS.
   e. Filled out survey.

5. Part 11/CSV
   a. Worked with Stelex to put together quote for remedial CSV. Put together CAR for the work. Awaiting response.
   b. I have obtained software upgrade quotes for x-ray Diffractometer and Viscometer. I am going to meet with Jack to put in PO's. Once they complete the upgrades, Stelex can come in and start the CSV.

CONFIDENTIAL- OUTSIDE
ATTORNEYS EYES ONLY

*DePuy Mitek, Inc v. Arthrex, Inc C.A. No04-12457 PBS*
DMI039560



DEFENDANT'S
EXHIBIT
31

    c.  I attended John Sheets' staff meeting to give an update on Part 11. JS wanted assessments done of all of R&D. I am going to coordinate this assessment. Meeting with Mark and Jack this Friday to discuss.

    d.  Attended a meeting with Kathye Concannon, Robin Larkin, Rich Hutchinson, Len Chiu concerning a Honeywell monitoring system they might purchase for LAR.

6. Barbed Suture

    a.  Belle is now the Barbed suture project. Met with Nick Popadiuk to test a few in-house produced samples.

    b.  Met with Nick, Brian Lisa and others to discuss the relationship matrix.

7. Calibration

    a.  Started the inventory listing. I put together the lists that the Calibration dept. has of CPC equipment and sent out to the group. I have asked that everyone do any inventory and get back to me.

    b.  I will be compiling the lists and setting up meetings to discuss new equipment.

8. Mulberry

    a.  Completed baseline stability study testing with Claudia on TVT-O.

CONFIDENTIAL- OUTSIDE
ATTORNEYS EYES ONLY

*DePuy Mitek, Inc v. Arthrex, Inc*
*C.A. No04-12457 PBS*
**DMI039561**

# Exhibit 4

Page 1

1

2                    UNITED STATES DISTRICT COURT

3                      DISTRICT OF MASSACHUSETTS

4                        C.A. No. 04-12457 PBS

5     ------------------------------x         **TRAVEL**

6     DePUY MITEK, INC.,                     **TRANSCRIPT**

7          A Massachusetts Corporation,

8                    Plaintiff,

9               v.

10    ARTHREX INC.,

11        A Delaware Corporation,

12                   Defendants.

13    ------------------------------x

14

15

16        30(b)(6) DEPOSITION OF KATHERINE SEPPA

17                   Somerset, New Jersey

18                    February 10, 2006

19

20    Reported by:

21    MARY F. BOWMAN, RPR, CRR

22    JOB NO.:  SE 226

23

24

25

30(b)(6) Deposition of:
Katherine Seppa

February 10, 2006

Page 58

SEPPA
1
2  validation of the subjective handling wet dry tie
3  down version 2.
4      Q.   This is version 2?
5      A.   Yes.
6      Q.   Let me show you what has previously
7  been marked as Defendant's Exhibit 30. I am going
8  to ask if you are familiar with that?
9      A.   Yes.
10     Q.   What is this?
11     A.   This is a list of my projects that I
12 have been working on.
13     Q.   You are the Katie?
14     A.   Yes.
15     Q.   And this is -- is this something you
16 do regularly, list, do a current projects list?
17     A.   I wouldn't say regularly but
18 occasionally.
19     Q.   I want to ask you about a couple of
20 things on here, if I could. Number one, project
21 Orthocord, violet item C completed report, members
22 and possible competitors to Orthocord, including
23 Max Braid, Arthrex, BioFastrak and Corkscrew
24 sutures. Do you know what that is referring to?
25     A.   There was competitive testing that we

Page 59

SEPPA
1
2  did on those particular three sutures.
3      Q.   What is Max Braid?
4      A.   I don't remember.
5      Q.   Do you know what testing you did on
6  the Max Braid?
7      A.   I don't remember.
8      MR. FALKE:  Objection, outside the
9  scope.
10     Q.   Do you know what testing you did on
11 the Arthrex BioFastrak?
12     A.   I don't remember.
13     Q.   Or the Corkscrew sutures?
14     A.   I don't remember.
15     Q.   Item D, and part of that has been
16 redacted, "coated and uncoated Fiber Wire was sent
17 for straight tensile and bending rigidity as per
18 patent."
19     Do you see that?
20     A.   Yes.
21     Q.   Did you perform or supervise tests of
22 coated and uncoated Fiber Wire for straight
23 tensile and bending rigidity?
24     A.   Yes.
25     Q.   When it says bending rigidity as per

Page 60

SEPPA
1
2  patent, do you know what that means?
3      A.   It meant that those two --
4      MR. FALKE:  Wait. I am going to
5  caution you not to disclose the substance of
6  communications you might have had with
7  counsel. If you can answer the question
8  without revealing the substance of those
9  communications, then you can answer the
10 question. If you can answer the question
11 without revealing that substance, you can
12 answer the question. But if you can't
13 answer the question without revealing that,
14 then I am going to ask you not to answer the
15 question.
16     A.   Can you repeat the question?
17     (Record read)
18     MR. FALKE:  You can answer that yes,
19 no or I don't know.
20     A.   I don't remember. I don't remember.
21     Q.   But did you do a bending rigidity test
22 on the coated and uncoated Fiber Wire?
23     MR. FALKE:  Objection, asked and
24 answered.
25     A.   I can't answer?

Page 61

SEPPA
1
2  MR. FALKE:  It was asked and answered.
3      Q.   No, you can answer that question. It
4  is a slightly different question than I asked
5  before. That's an example of where your counsel
6  objected, and you should go ahead and answer the
7  question.
8      (Record read)
9      A.   Yes.
10     Q.   Now, it says bending rigidity -- how
11 many times did you do that test, bending rigidity
12 test on the coated, uncoated Fiber Wire?
13     A.   I don't remember.
14     Q.   Now, it says further on this that
15 paragraph, bending rigidity was done in the patent
16 using a kawabata bend tester. Do you see that?
17     A.   Yes.
18     Q.   Remember we had some discussion
19 earlier today about the Kawabata bend tester? Did
20 you actually use the Kawabata bend tester to do
21 the bending rigidity test?
22     A.   No.
23     Q.   What equipment did you use to do the
24 bending rigidity test? What equipment did you
25 use?

16 (Pages 58 to 61)

30(b)(6) Deposition of:
Katherine Seppa

February 10, 2006

Page 62

SEPPA

1
2     A.   The Instron, the bending stiffness.
3     Q.   You did it on the Instron test?
4     A.   Yes.
5     Q.   Why didn't do you do it on the
6  Kawabata bend tester?
7          MR. FALKE:  I am going to caution the
8     witness not to disclose the substance of any
9     communications you had with counsel.  You
10    can answer the question if your answer will
11    not reveal the substance of those
12    communications, or if you don't know, then
13    you can say you don't know.
14    A.   I don't know.
15    Q.   What were the results of the test on
16  the coated and uncoated Fiber Wire?
17         MR. FALKE:  Again, I will caution you
18    not to disclose the substance of any
19    privileged communication you had with
20    counsel.  If you can answer the question
21    without revealing that privilege, then you
22    can answer the question.  But if you can't,
23    I will ask you not to answer the question.
24    A.   I can't answer.
25    Q.   You can't answer because of the

Page 63

SEPPA

1
2  instruction that he gave you?
3     A.   Yes.
4          MR. FALKE:  Can you repeat the
5     question?
6     A.   Was it what were the results?
7     Q.   Yes, sir.
8          MR. FALKE:  If you don't know the
9     answer, you can say you don't know.  If you
10    know the answer, you can answer only if
11    answering will not reveal the substance.
12    A.   I don't remember.
13    Q.   You don't remember the results.  Do
14  you recall whether the one -- whether the coated
15  and uncoated gave different numbers?
16    A.   I don't remember.
17    Q.   You said you don't remember if the
18  numbers were the same or numbers were different?
19    A.   I don't remember the results.
20    Q.   Were the results put in written form?
21    A.   Yes.
22    Q.   And what did you do with the written?
23  Did you make a report of the results?
24    A.   Yes.
25    Q.   And to whom did you give the report?

Page 64

SEPPA

1
2          MR. FALKE:  I am going to caution you
3     not to disclose the substance of
4     communications with counsel.  If you can
5     answer the question without revealing the
6     substance, you can answer.  But if in
7     answering the question you will reveal the
8     substance of the communication, then I am
9     going to instruct you not to answer.
10    A.   I can't answer.
11    Q.   Again, I want to make sure is it
12  because you don't remember the answer?
13    A.   On the advice of my counsel.
14    Q.   Because my only -- Eric, my only
15  question is who did she give the report to?
16         MR. FALKE:  Right.  I understand, but
17    I think the answer would reveal what the
18    substance of the communication was.  Right?
19         MR. SABER:  I don't think so but --
20         MR. FALKE:  I am going to stand.
21    Q.   This also refers to a straight tensile
22  test.  Did you do a straight tensile test on the
23  coated and uncoated Fiber Wire?
24    A.   Yes.
25    Q.   And what were the results of those

Page 65

SEPPA

1
2  tests?
3     A.   I don't remember.
4     Q.   Do you remember whether you got the
5  same result for the coated and uncoated or whether
6  you got different results?
7     A.   I don't remember.
8     Q.   Were those results also put into
9  writing?
10    A.   Yes.
11    Q.   And who did you give that report to?
12         MR. FALKE:  I will give you the same
13    instruction as before.
14    A.   I can't answer on the advice of my
15  counsel.
16    Q.   Let me show you what has previously
17  been marked Defendant's Exhibit 31, and I ask if
18  you can identify this?
19    A.   Again, it is a list of my current
20  projects.
21         MR. FALKE:  Hold on one second.
22    Why don't you reask those two
23    questions I told her not to answer, and she
24    can answer them.
25

17 (Pages 62 to 65)

30(b)(6) Deposition of:
Katherine Seppa

February 10, 2006

Page 66

1              SEPPA
2  BY MR. SABER:
3      Q.   On the record.  The results of the
4  coated and uncoated Fiber Wire, the bending
5  rigidity test, who did you give those to?
6      A.   Rich Skula.
7      Q.   Straight tensile test between coated
8  and uncoated test, who did you give that report
9  to?
10     A.   Rich Skula.
11     Q.   Let's go to Defendant's Exhibit 31.
12 And I think this is another one of those Katie
13 current project reports.  I want to ask about item
14 2B, tested uncoated, coated and uncoated for
15 straight tensile and bending stiffness.  Does that
16 refer to same tests referred to in Defendant's
17 Exhibit 130?
18     A.   I don't know.
19     Q.   You don't know if these are additional
20 tests, or whether these are referring to the same
21 test?
22         MR. FALKE:  Objection, asked and
23     answered.
24     A.   I don't know.
25     Q.   I may have asked you this, Ms. Seppa,

Page 67

1              SEPPA
2  and I apologize if I did.  But do you recall
3  whether you did more than one series of tests,
4  bending rigidity test or straight testing test?
5         MR. FALKE:  Objection, asked and
6     answered.
7      A.   I said I didn't know.
8      Q.   Does showing you documents refresh
9  your recollection at all of that question?
10     A.   No.
11     Q.   Now, next sentence, Mitek would like
12 now to remove the coating from the finished goods
13 Fiber Wire and test again.
14         Did that happen?
15     A.   Yes.
16     Q.   That the coating was removed from
17 finished fiber wires and tested again?
18         Was the coating removed -- was coating
19 removed from finished good Fiber Wire?
20         MR. FALKE:  Do you need to take a
21     break?
22         THE WITNESS:  Yes.
23         (Recess)
24         (Record read)
25     A.   I don't know.

Page 68

1              SEPPA
2      Q.   Was a further test done of uncoated
3  Fiber Wire versus coated Fiber Wire?
4         MR. FALKE:  Object to the form.
5     Outside the scope of the notice.
6      A.   Could you clarify the question?
7      Q.   Yes.  Was a further test done on
8  coated, uncoated Fiber Wire for doing -- was a
9  further bending rigidity test done after
10 Defendant's Exhibit 31 between coated and uncoated
11 Fiber Wire?
12     A.   Yes.
13         MR. FALKE:  Object, outside the scope.
14     You can answer.
15     A.   Yes.
16     Q.   And did you supervise that test?  Did
17 you do that test?
18     A.   I performed that test.
19     Q.   Was that using the same equipment as
20 the earlier test?
21     A.   Yes.
22     Q.   And what were the results of that
23 test?
24     A.   I don't know.  I don't remember.
25     Q.   Do you know whether one scored higher

Page 69

1              SEPPA
2  than the other?
3      A.   I don't remember.
4      Q.   Did you make a written report of that
5  test?
6      A.   I don't remember.
7      Q.   I take it you wouldn't remember if you
8  made it a report if you gave it to anybody?
9      A.   I don't remember.
10     Q.   Do you know why Mitek wanted to have
11 the coating removed from the finished goods Fiber
12 Wire tested again?
13         MR. FALKE:  Yeah.  I am going to
14     instruct you not to answer that question
15     based on attorney work product.
16         MR. SABER:  That one I only asked if
17     she knows.
18         MR. FALKE:  You can answer yes, no or
19     I don't know.
20     A.   Yes.
21     Q.   And why was that?
22         MR. FALKE:  I am going to instruct you
23     not to answer based on work product grounds.
24     A.   I cannot answer on the advice of
25 counsel.

18 (Pages 66 to 69)

30(b)(6) Deposition of:
Katherine Seppa

February 10, 2006

Page 70

SEPPA

1
2     Q.    Other than the bending rigidity test
3  that you told me about today, between coated and
4  uncoated Fiber Wire, the one before Defendant's
5  Exhibit 31, and the one after Defendant's Exhibit
6  31, were there any other tests, bending rigidity
7  tests between coated and uncoated Fiber Wire?
8         MR. FALKE: Objection, outside the
9     scope.
10    A.   I don't recall.  I don't remember.
11    Q.    Did you do, after Defendant's Exhibit
12  31, did you do an additional straight tensile test
13  between coated and uncoated Fiber Wire?
14        MR. FALKE: Objection, outside the
15    scope.
16    A.   I don't remember.
17    Q.    Other than what you have told me about
18  today, did you perform or supervise any other
19  tests between coated and uncoated Fiber Wire?
20        MR. FALKE: Objection, outside the
21    scope.
22    A.   I don't remember.
23        MR. SABER:  Can I have a moment to
24    check my notes?
25        THE WITNESS:  Sure.

Page 71

SEPPA

1
2         MR. SABER:  Ms. Seppa, I have no
3  further questions of you today.  Thank you
4  very much for coming in, and I apologize we
5  kept you until about 10 minutes to 6.
6         THE WITNESS:  Thank you.
7         (Time noted:  5:50 p.m.)
8
9
      _____
10
      KATHERINE RACHEL SEPPA
11
      Subscribed and sworn to
12  before me this      day
13  of February, 2006.
14
15    _____
16
17
18
19
20
21
22
23
24
25

Page 72

SEPPA
EXHIBITS

1
2
3  Exhibit No.                      Marked
4  Exhibit 134  document Bates stamped 389        28
5      through 397
6  Exhibit 135  document Bates stamped DMI1147    33
7      through 1153
8  Exhibit 136  document Bates stamped            36
9      DMI94256 through 257
10 Exhibit 137  document Bates stamped            43
11     DMI15592 through 594
12 Exhibit 138  document Bates stamped            53
13     DMI061623 through 62006
14
15
16
17
18
19
20
21
22
23
24
25

Page 73

SEPPA

1
2
3     C E R T I F I C A T E
4     I, Mary Reilly Bowman, Notary Public
   and Certified Shorthand Reporter of the
5     State of New Jersey, do hereby certify that
   prior to the commencement of the examination
6     KATHERINE RACHEL SEPPA was duly sworn by me
   to testify the truth, the whole truth and
7     nothing but the truth.
8     I DO FURTHER CERTIFY that the
   foregoing is a true and accurate transcript
9     of the testimony as taken stenographically
   by and before me at the time, place and the
10    date hereinbefore set forth.
11
12    I DO FURTHER CERTIFY that I am neither
   a relative nor employee nor attorney nor
13    counsel of any of the parties to this
   action, and that I am neither a relative nor
14    employee of such attorney or counsel, and
   that I am not financially interested in the
15    action.
16
   ------------------------------------------
17 Notary Public of the State of New Jersey
   My commission expires 6/30/2006
18 C.S.R. License No. 30X100226200
   Dated: 2/22/06
19
20
21
22
23
24
25

19 (Pages 70 to 73)