# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DePuy Mitek, Inc. | ) | |
| a Massachusetts Corporation | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-12457 PBS |
| | ) | |
| Arthrex, Inc. | ) | |
| a Delaware Corporation, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS ARTHREX, INC.'S AND PEARSALLS LTD.'S OPPOSITION TO DEPUY MITEK'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER FED. R. CIV. P. 50 AND MOTION FOR A NEW TRIAL**

Dated: October 18, 2007

Charles W. Saber
Stephen A. Soffen
Salvatore P. Tamburo
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, D.C. 20006-5403
Telephone: (202) 420-3116
Facsimile: (202) 420-2201

Christopher Weld, Jr. (BBO # 522230)
Raymond P. Ausrotas (BBO # 640315)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
Telephone: (617) 720-2626
Facsimile: (617) 227-5777

Counsel for Defendants
Arthrex, Inc. and Pearsalls Ltd.

## TABLE OF CONTENTS

Page No.

I.    INTRODUCTION ...................................................................................................1

II.   DEPUY MITEK'S RULE 50(a) MOTION WAS IMPROPER, AND
      THEREFORE, CANNOT NOW BE RENEWED UNDER RULE 50(b).........................2

III.  DEPUY MITEK'S MOTION FOR A NEW TRIAL UNDER RULE 59 IS IMPROPER
      AND CANNOT BE CURED BY ITS MEMORANDUM................................................3

IV.   STANDARDS FOR GRANTING MOTIONS UNDER FED. R. CIV. P. 50
      AND 59 ...................................................................................................................4

V.    DEPUY MITEK IS NOT ENTITLED TO JUDGMENT AS A MATTER
      OF LAW BASED ON THE DISCLOSURE OF THE '446 PATENT ..............................5

VI.   THE JURY HAD A LEGALLY SUFFICIENT EVIDENTIARY BASIS FOR
      ITS VERDICT OF NON-INFRINGEMENT .....................................................................7

VII.  CONCLUSION........................................................................................................14

DSMDB-2335746v01

# TABLE OF AUTHORITIES

Page No.(s)

## FEDERAL CASES

*AFG Industrial, Inc. v. Cardinal IG Co., Inc.*, 239 F.3d 1239 (Fed Cir. 2001)............5, 12

*AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234 (Fed. Cir. 2003)...................................5

*Ahern v. Scholz*, 85 F.3d 774 (1st Cir. 1996).......................................................................4

*American Machine & Foundry Co. v. Liggett & Myers Tobacco Co.*, 172 F. Supp.
    12 (D. N.J. 1959)..........................................................................................................5, 12

*American National Fire Insurance Co. v. Mirasco, Inc.*, 451 F. Supp. 2d 576
    (S.D.N.Y. 2006) ...............................................................................................................2, 3

*Bayer A.G. v. Sony Electronics, Inc.*, 228 F. Supp. 2d 332 (D. Del. 2002) .......................12

*Binney & Smith v. Rose Art Industrial, Inc.*, 1995 U.S. Dist. LEXIS 2602 (N.D.
    Ill. 1995)..............................................................................................................................12

*Free Motion Fitness, Inc. v. Cybex Intern, Inc.*, 423 F.3d 1343 (Fed. Cir. 2005) ..............6

*Hinz v. Neuroscience, Inc.*, No. 04-CV-0142 (PJS/RLE) .....................................................3

*Kim v. Conagra Foods, Inc.*, 465 F.3d 1312 (Fed. Cir. 2006).......................................5, 12

*Kutner Vuick, Inc. v. American Motors Corp.*, 848 F.2d 614 (3rd Cir. 1989)....................3

*Marcano Rivera v. Turabo Medical Center Partnership*, 415 F.3d 162 (1st Cir.
    2005) ......................................................................................................................................4

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000).................................4

*Riley v. Northwestern Bell Telephone Co.*, 1 F.2d 724 (8th Cir. 1993)..............................3

*Rivera Castillo v. Autokirey, Inc.*, 379 F.3d 4 (1st Cir. 2004) ............................................4

*Vargas v. Gonzalez*, 975 F.2d 916 (1st Cir. 1992)...............................................................3

*W.S. Molnar Co. v. IKG Industries*, 82 F.3d 434, 1996 WL. 128262 (Fed. Cir.
    1996) ......................................................................................................................................2

DSMDB-2335746v01

# I.      INTRODUCTION

Defendants Arthrex, Inc. ("Arthrex") and Pearsalls, Ltd. ("Pearsalls") (together, "defendants") submit this opposition to DePuy Mitek, Inc.'s ("DePuy Mitek's") renewed motion for judgment as a matter of law under FED. R. CIV. P. 50 and motion for a new trial ("Mitek Mem."). DePuy Mitek's motion should be denied on several grounds. First, DePuy Mitek purports to renew its original motion for judgment as a matter of law made under Rule 50(a); however, as described below, DePuy Mitek's Rule 50(a) motion at trial was improper because it failed to state any grounds and made no reference to the law or the facts, and thus, can not be renewed under Rule 50(b). Second, DePuy Mitek's motion for a new trial under Rule 59 was improper because it failed to state any grounds on which it was based, as required by the Federal Rules; and it cannot be cured by DePuy Mitek's later-filed memorandum.

Should the Court reach the merits of DePuy Mitek's motion, there are a multitude of reasons why it should be denied. For example, DePuy Mitek argues, as a matter of law, that FiberWire's coating does not materially affect the basic and novel properties of the '446 patent merely because the '446 patent mentions that a coating can be used on the disclosed suture. As this Court has already explained over and over again, both at the summary judgment phase and at trial, DePuy Mitek is wrong. The most that can be said about the '446 patent is what the Court has repeatedly said: it "says all things to all people," and "[coating] can help; it can hurt." In such circumstances, mere reference to the patent cannot decide the issue as a matter of law.

DePuy Mitek also asserts that it is entitled to judgment as a matter of law because there was no legally sufficient basis for the jury's verdict of non-infringement because FiberWire's coating is merely a surface coating that does not permeate the braid. In its Memorandum, however, DePuy Mitek repeatedly misrepresents and/or simply ignores the

DSMDB-2335746v01

Court's claim construction, and then asserts that the evidence it presented at trial proves that FiberWire's coating does not materially affect its version of the claim construction.

As described below, Defendants presented overwhelming evidence at trial that FiberWire's coating materially affects the basic and novel properties of the invention -- *i.e.,* the coating materially affects FiberWire's handleability and pliability properties. Once again, this Court already recognized -- correctly -- that such evidence would be sufficient to support Defendants' position. Ex. 1 at 24:18-25:1. That is the short and dispositive answer to DePuy Mitek's motion.[1]

## II. DEPUY MITEK'S RULE 50(a) MOTION WAS IMPROPER, AND THEREFORE, CANNOT NOW BE RENEWED UNDER RULE 50(b)

To properly move for judgment as a matter of law, a party "must specify the judgment sought and the law and facts that entitle the movant to the judgment" before the case is submitted to the jury. FED. R. CIV. P. 50(a)(2). "A general reference to a count, which is the most that [movant] can be said to have provided, is insufficient to meet the rule's requirements." *W.S. Molnar Co. v. IKG Industries*, 82 F.3d 434, 1996 WL 128262 at *1 (Fed. Cir. 1996) (unpublished), Ex. 2. *See also American National Fire Ins. Co. v. Mirasco, Inc.*, 451 F. Supp. 2d 576, 580-883 (S.D.N.Y. 2006). Further, "the grounds supporting [a Rule 50(a)] motion must be specifically articulated, and may include explicit references to material and arguments previously supplied to the court." *Id.* at 581. *See also* FED. R. CIV. P. 50 advisory committee's note (1991).

At the close of Defendants' case at trial, counsel for DePuy Mitek stated "[y]our Honor, they have a declaratory judgment counterclaim for noninfringement, and we're moving as a matter of law on that counterclaim." Ex. 3 at 804:25-805:2. DePuy Mitek stated absolutely no grounds for its Rule 50(a) motion, nor did DePuy Mitek include explicit references to

---

[1]    Even if DePuy Mitek's perversion of the claim construction were correct, its motion should still be denied because there was sufficient evidence that the FiberWire coating does permeate the braid.

DSMDB-2335746v01

materials and arguments previously supplied to the court to remedy these deficiencies.  Thus,

DePuy Mitek's purported Rule 50(a) motion was totally inadequate.

"A post-trial motion for judgment can be granted only on grounds advanced in the

pre-verdict motion."  FED. R. CIV. P. 50 advisory committee's note (1991) (citing *Kutner Vuick,*

*Inc. v. American Motors Corp.*, 848 F.2d 614 (3rd Cir. 1989)).  *See also American National Fire*

*Ins. Co.*, 451 F. Supp. 2d at 581.  Since DePuy Mitek failed to articulate grounds supporting its

Rule 50(a) motion; it cannot now cure that deficiency by articulating grounds in a post-verdict

memorandum.  Thus, as DePuy Mitek's Rule 50(a) motion was insufficient, DePuy Mitek cannot

renew that motion pursuant to Rule 50(b).

## III.    DEPUY MITEK'S MOTION FOR A NEW TRIAL UNDER RULE 59 IS IMPROPER AND CANNOT BE CURED BY ITS MEMORANDUM

DePuy Mitek's first and only motion for a new trial under Rule 59 was filed on

August 28, 2007.  That motion, however, failed to state *any* grounds on which it was based; a

failure that is fatal to DePuy Mitek.  Rule 7(b) requires that motions "shall state with

particularity the grounds therefore."  FED. R. CIV. P. 7(b).  DePuy Mitek simply failed to file a

proper motion within the time limit prescribed by FED. R. CIV. P. 59(b).[2]

Moreover, DePuy Mitek's memorandum in support of its motion under Rule 59,

which was filed after the ten-day deadline, is insufficient to cure this deficiency.  *Riley v.*

*Northwestern Bell Telephone Co.*, 1 F.2d 724, 726-727 (8th Cir. 1993) (stating that "overlooking

the defect of this document would only serve to whittle away at the rules and ultimately render

them meaningless and unenforceable"); *Hinz v. Neuroscience, Inc.*, No. 04-CV-0142(PJS/RLE)

---

[2]    While DePuy Mitek obtained an extension to file a memorandum in support of its motion, DePuy Mitek did not request, nor could it have requested, an extension for filing its motion.  *Vargas v. Gonzalez*, 975 F.2d 916, 917 (1st Cir. 1992) ("the ten-day deadline is mandatory, Fed. R. Civ. P. 6(b), and it is well established that the district court has no power or discretion to modify it.").

DSMDB-2335746v01

Slip Copy, 2007 WL 1576116 at *3 (D. Minn. May 31, 2007). Ex. 4. Thus, since DePuy

Mitek's Rule 59 motion was improper, it should be denied.

**IV.     STANDARDS FOR GRANTING MOTIONS UNDER FED. R. CIV. P. 50 AND 59**

Judgment as a Matter of Law is appropriate only where "there is no legally sufficient

evidentiary basis for a reasonable jury to find for [a] party on [an] issue." FED. R. CIV. P.

50(a)(1). "Courts may only grant a judgment contravening a jury's determination when the

evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable

jury could have returned a verdict adverse to that party." *Marcano Rivera v. Turabo Medical*

*Center Partnership*, 415 F.3d 162, 167 (1st Cir. 2005) (quoting *Rivera Castillo v. Autokirey, Inc.*,

379 F.3d 4, 9 (1st Cir. 2004)). In entertaining a motion for judgment as a matter of law, "the

court must draw all reasonable inferences in favor of the nonmoving party, and it must not make

credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products,*

*Inc.*, 530 U.S. 133, 150 (2000). While "the court should review the record as a whole, it must

disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.*

at 151.

"A verdict may be set aside and new trial ordered [pursuant to Rule 59] when the

verdict is against the clear weight of the evidence, or is based upon evidence which is false, or

will result in a clear miscarriage of justice." *Ahern v. Scholz*, 85 F.3d 774, 780 (1st Cir. 1996)

(citation omitted). While the court has discretion, it "must be exercised with due regard to the

rights of both parties to have questions which are fairly open resolved finally by the jury at a

single trial." *Id.* (citation omitted). The court "cannot displace a jury's verdict merely because

[it] disagrees with it or would have found otherwise in a bench trial." *Id.* (citation omitted).

Indeed, "[t]he mere fact that a contrary verdict may have been equally -- or even more easily --

supportable furnishes no cognizable ground for granting a new trial." *Id.* (citation omitted)

DSMDB-2335746v01

**V.      DEPUY MITEK IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW BASED ON THE DISCLOSURE OF THE '446 PATENT**

In what amounts to nothing more than a regurgitation of its failed summary judgment motion, DePuy Mitek wrongly asserts that, as a matter of law, coating cannot materially affect the basic and novel properties of the invention because the '446 patent states that a coating may be applied to the disclosed suture.  Mitek Mem. at 1, 11-12; Ex. 5 at 7-9.  DePuy Mitek was legally wrong when it first made this argument and it is legally wrong today.

Citing *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234 (Fed. Cir. 2003), the Court noted in its Memorandum and Order dated January 31, 2007, "where the specification and/or prosecution history *directly speaks to and conclusively answers the question of what constitutes a material affect*, the issue may be resolved as a question of law."  Ex. 6 at 14 (emphasis added). The *only* way DePuy Mitek can assert that *AK Steel* supports its motion is by ignoring this very important language.

For example, DePuy Mitek asserts that it is entitled to judgment as a matter of law because "the '446 patent expressly teaches one of ordinary skill in the art that surface coatings may optionally be applied to the braided sutures claimed in the patent, in other words they are part of the invention."  Mitek Mem. at 10.  But DePuy Mitek conveniently forgets the well-established law that the assertion in a patent that an ingredient can be added does *not* establish the added ingredient cannot have a material effect on the basic and novel properties of the invention.  *Kim v. Conagra Foods, Inc.*, 465 F.3d 1312, 1319-20 (Fed. Cir. 2006); *AFG Indus., Inc. v. Cardinal IG Co., Inc.*, 239 F.3d 1239 (Fed Cir. 2001); *American Machine & Foundry Co. v. Liggett & Myers Tobacco Co.*, 172 F. Supp. 12, 19 (D. N.J. 1959).[3]

---

[3]      DePuy Mitek also makes the facile argument that if applying a coating to FiberWire "removes [it] from the scope of the Hunter 446 Patent, then the patent is not worth the paper it is written on" which would be "an absurd result."  Mitek Mem. at 4.  The short answer is "so what;" even if DePuy Mitek's assertion were true, court's simply decide patent claims as they are written.  Moreover, DePuy Mitek's protestations are wrong.  DePuy Mitek itself put in evidence that not all sutures are coated (Ex. 3 at 155:5-13; 406:1-4), and more importantly, DePuy Mitek

DSMDB-2335746v01

Rather, as *AK Steel* states, and as this Court correctly observed, the issue can be decided as a matter of law if the 446 patent "directly speak[s] to and conclusively answer[s] the question of *what constitutes a material effect.*"[4]  On this relevant question, the Court already explained that the '446 patent does not conclusively answer the *AK Steel* question.  As the Court stated, the '446 patent "says all things to all people," and that "[coating] can help; it can hurt." Ex. 1 at 12:8-11.

Without question, there is an overabundance of evidence that the use of coating (including what DePuy Mitek characterizes as "surface coating")[5] does materially affect the basic and novel characteristics of the invention.  For example, the '446 patent states that there are "deficiencies which plague conventionally coated sutures" and that it is best to eliminate and avoid a coating.  Ex. 7 at col. 2, ll. 11-13; col. 6, ll. 15-16.  Moreover, the '446 patent also

---

knows that the effect of the coating must be material; something that is not automatically true just because there is a coating.

Further, in the facts of this case, DePuy Mitek's argument is mere makeweight.  DePuy Mitek conveniently fails to mention that the claims as originally filed with the Patent Office did *not* contain the "consisting essentially of" transitional phrase.  Rather, the transitional phrase in the original claims was "comprising."  For a "comprising" claim, it is no defense that the accused product has additional unlisted materials.  *Free Motion Fitness, Inc. v. Cybex Intern, Inc.*, 423 F.3d 1343, 1353 (Fed. Cir. 2005).  Accordingly, it makes perfect sense, as the application was originally filed, that the patent would state that coating could be used to further improve handleability.  But once the transitional phrase "consisting essentially of" was added to the claim, which in turn narrowed the claim as a matter of law, DePuy Mitek's rationale falls apart.  Since the transitional phrase was amended to "consisting essentially of," the use of a coating which is *unlisted* in the claims *does* avoid infringement if that coating materially affects the basic and novel characteristics of the invention.  As described herein, there is no question that it does.

[4]    DePuy Mitek asserts that "the Hunter 446 Patent 'directly speaks' about surface coating." Mitek Mem. at 12.  It simply ignores the *second* requirement -- that the patent "conclusively answer the question of what constitutes a material effect."

[5]    DePuy Mitek acknowledges that the coating added to FiberWire is the same as the conventional coating described in the '446 patent.  Mitek Mem. at 12.  Dr. Steckel also acknowledged at trial that the "conventional coatings," described in the '446 patent are "the same conventional standard coatings that everyone" in the industry, "including Arthrex and Johnson & Johnson" uses.  Ex. 3 at 175:13-20.

DSMDB-2335746v01

discloses that coating improves suture handleability and knot tiedown (Ex. 7 at col. 6, ll. 5-8),

itself an *admission* that coating materially affects the basic and novel properties of the invention.

Indeed, the goal of the '446 patent was to design a braid that *did not require a coating*. The '446 patent proudly proclaims that the benefits of the invention were "due *entirely* to the mechanical interlocking or weaving of the individual yarns." Ex. 7 at col. 2, ll. 55-58. [Emphasis added]. In other words, it achieves the goals *without* coating. It comes as no surprise that Dr. Steckel's testimony regarding his development of the invention is entirely consistent. He testified that *none* of the sample braids that he tested, the results of which are described in the '446 patent, had a coating on them. Ex. 3 at 176:10-177:8. Dr. Steckel also wrote in his lab notebook that "the composite [braid] also ranked better than the silk and Ethibond in knot tiedown *even without a coating*." Ex. 8 at DMI2666. [Emphasis added]. Dr. Steckel confirmed that these were his findings and that "on this one particular embodiment, *you may not want to add a coating*." Ex. 3 at 178:4-12. [Emphasis added].[6] For all these reasons, the Court should, once again, reject DePuy Mitek's oft-repeated, but always-incorrect, argument.

## VI.    THE JURY HAD A LEGALLY SUFFICIENT EVIDENTIARY BASIS FOR ITS VERDICT OF NON-INFRINGEMENT

The Court construed the basic and novel properties of the '446 patent invention as

follows:

> (1) a surgical suture, (2) composed of two dissimilar yarns from the lists in Claim One, (3) where at least one yarn from the first set is in direct intertwining contact with the yarn from the second set, (4) so as to improve pliability and handleability without significantly sacrificing the physical properties of the constituent elements of the suture.

Ex. 6 at 18-19. The jury was instructed that these are the basic and novel properties of the '446

patent. Ex. 9 at 14:2-10; Ex. 3 at 890:22-891:10. Defendants presented *overwhelming* evidence

---

[6]    If anything, Defendants submit that the evidence is so overwhelming that, as a matter of law, the Court should find that coating *does* affect the basic and novel characteristics.

at trial that the coating added to FiberWire materially affects these basic and novel properties of the '446 patent.[7]  Specifically, Defendants showed unequivocally, that the FiberWire coating materially and dramatically affects both the handleability and pliability of the suture.  And, Defendants also showed that the coating materially, and adversely, affects a physical property -- knot security -- of the suture; yet another reason to uphold the jury's finding.

For example, with respect to coating's effect on FiberWire's handleability and pliability:

- Ms. Ashley Willobee, Arthrex's director of research, conducted a knot rundown test showing that two-and-one-half-times more force was required to move a half-hitch knot down a line of uncoated suture as compared with a line of coated suture.  Ex. 10; Ex. 3 at 511:6-10; 515:19-24.

- Dr. Stephen Burkhart testified that it was understood from the very beginning of the FiberWire development that it would have a coating.  He explained that since FiberWire is a braided suture, it is bumpy and has a lot of friction and the coating smoothes out the bumps and reduces the coefficient of friction. Ex. 3 at 450:14-451:6; 461:18-462:2.[8]

- Dr. Norman Gitis, president of CETR, tested several suture handleability parameters and explained that the difference between the coated and uncoated FiberWire was 60% for the pliability test, 81% for the knot run-down test,

---

[7]    An effect is material if it is of importance or of consequence to a person of ordinary skill in the art.  Ex. 9 at 15:22-16:6; Ex. 3 at 892:22-893:6

[8]    DePuy Mitek points to Dr. Burkhart's testimony that the original idea for FiberWire was a "killer idea" and tries to create the impression that Dr. Burkhart was commenting on a prototype without coating.  Mitek Mem. at 14-15.  But, Dr Burkhart explained that his "killer idea" comment in no way meant the suture did not have to be coated.  To the contrary, as mentioned above, Dr. Burkhart explained that it was understood from the very beginning that FiberWire would require a coating so that it has a low enough coefficient of friction so you can tie a knot.  Ex. 3 at 460:23-462:2.

DSMDB-2335746v01

77% for the friction test, 55% for the chatter test, 30% for the static tissue drag test and 56% for the dynamic tissue drag test.  He also explained that these differences were statistically meaningful and statistically substantial. Ex. 11; Ex. 3 at 615:4-619:15; 625:22-629:12; 629:13-631:11; 631:16-634:13; 635:3-636:24; 637:3-638:18; 642:7-644:4.[9]

- Dr. Robert Burks evaluated samples of coated and uncoated FiberWire for knot tie-down both in connection with his expert report and also in connection with his deposition.  Even though Dr. Burks was never told which samples were coated and which were uncoated, *every time* he was able to distinguish the coated FiberWire from the uncoated FiberWire.  Ex. 12 at ¶¶ 12-13; Ex. 3 at 427:21-428:10.

- Mr. Lawson Lyon, managing director of Pearsalls, Ltd. ("Pearsalls"), testified that he believed FiberWire required a coating "because a braid without a coating does not give you good knot run-down and the surgeons would not be happy to have a suture like that."  Ex. 3 at 549:12-15.  Mr. Lyon also testified that Arthrex's FiberWire patent describes why coating is added to FiberWire -- *i.e.,* "to fill in voids and provide optimum run-down."  Ex. 13 at col. 2, l. 48; Ex. 3 at 552:15-19.

- Dr. Debi Mukherjee testified that in his opinion, the silicone coating added to FiberWire materially affects the basic and novel properties of the invention. Ex. 3 at 705:14-22.  His opinion was based on his decades of experience

---

[9]     Notably, Dr. Gitis testified that CETR sold the same testing machine used to conduct his tests on FiberWire suture to Ethicon, Inc., another Johnson & Johnson company, and the assignee listed on the face of the '446 patent.  Ex. 3 at 608:7-12.  Dr. Gitis also performed similar suture tests for both Ethicon and U.S. Surgical (another very large suture manufacturer) and that the pliability test he conducted on FiberWire was the same pliability test he performed in the past for Ethicon, Inc.  Ex. 3 at 609:16-19; 616:15-24.

DSMDB-2335746v01

working with sutures, the suture patent literature, including an Ethicon patent, Ethicon documents, the testimony of DePuy Mitek and Ethicon witnesses, Arthrex documents, and tests conducted by Dr. Gitis and Ms. Willobee.  Ex. 3 at 705:14-22; 706:8-707:1; 707:8-17; 708:9-24; 709:4-10; 709:17-712:20; 714:23-715:5; 718:9-23; 719:16-720:6; 723:1-9; 726:1-23; 728:14-18.

And with respect to FiberWire's knot security (*i.e.,* one of a suture's physical properties, according to the '446 patent),[10] Dr. Gitis's tests revealed that coating has a significant detrimental effect.  In fact, Dr. Gitis's tests revealed that the knot security of the coated FiberWire was 50% worse than that of the uncoated FiberWire.  Ex. 11; Ex. 3 at 639:4-641:7.

At trial, DePuy Mitek's principal contention was that the FiberWire coating had no material impact on suture handleability or pliability, and more specifically, had nothing to do with "smoothing out the braid."  Recognizing, as it must, that the jury could (and did) rightfully reject its contentions, DePuy Mitek abandons these trial arguments and now argues that none of this overwhelming evidence matters.  According to DePuy Mitek now, enhancing handleability and pliability has "nothing to do" with the basic and novel properties of the invention because the FiberWire coating does not permeate the braid.  Mitek Mem. at 18.  DePuy Mitek is both legally and factually wrong.

DePuy Mitek asserts that the basic and novel properties "have to do with the mechanical blending of dissimilar materials to reap the benefits of each material."  Mitek Mem. at 18.  But, this language *appears nowhere in the Court's claim construction*.  More importantly, DePuy Mitek's assertion simply *ignores* the last portion of the basic and novel properties: "(4) so as to improve pliability and handleability without significantly sacrificing the physical properties of the constituent elements of the suture."  As the Court made clear, and as DePuy Mitek itself

---

[10]    Ex. 7 at col. 2, ll. 31-37; 62-66.

DSMDB-2335746v01

inadvertently seems to recognize, it is the handleability and pliability *of the suture braid itself* that needs to be materially affected.  Ex. 6 at 16-18; Mitek Mem. at 1, 7.  Of course, this comes as no surprise as the '446 patent makes it abundantly clear that the basic and novel characteristics involve improvements to the *suture braid* itself.  Ex. 7 col. 2, ll. 32-37.

DePuy Mitek's argument here is nothing more than a regurgitation of the ill-conceived argument already-rejected by this Court during summary judgment, where, as here, DePuy Mitek tried to ignore the claim construction.  Discussing, at the summary judgment hearing, a declaration prepared by Dr. Brookstein, this Court previously rejected DePuy Mitek's attempt to gloss over relevant portions of the Court's claim construction as if they were not there.  DePuy Mitek asserted:

> And your Honor's construction, which we contend is correct, is that whatever the additional element is, it cannot sacrifice the physical properties of the constituent elements of the suture, and that's what Dr. Brookstein says in his declaration.

Ex. 1 at 24:6-10.

> In response to this assertion, the Court correctly noted:

> I think Dr. Brookstein's declaration is certainly relevant.  It's just not a bingo for you *because he doesn't actually check to see whether it improves the pliability and handleability*.

Ex. 1 at 24:11-14. [Emphasis added].

> DePuy Mitek responded as follows:

> With all due respect, your Honor, I don't know that that is really the issue under this construction of basic and novel characteristics.

Ex. 1 at 24:15-17.

> The Court responded:

> *It's both.  It's got to improve the handleability and pliability without impeding or sacrificing the physical properties*.  So he tells you it isn't sacrificing anything, but if it also improved handleability, wouldn't that take you out of infringement under a 'consisting essentially of'?

DSMDB-2335746v01

Ex. 1 at 24:18-23. [Emphasis added].

As the Court correctly stated at the summary judgment hearing, and as DePuy Mitek continues to disregard, if the FiberWire coating materially affects FiberWire's handleability and/or pliability, there is no infringement.  As described above, Defendants presented overwhelming evidence that FiberWire's coating *does* materially improve both its handleability and pliability.[11]

But even if DePuy Mitek's attempt to rewrite the claim construction were valid -- and it certainly is not -- DePuy Mitek's motion must still be denied because both sides presented evidence as to whether the coating permeates the braid.  The jury, of course, was free to reject DePuy Mitek's evidence and accept Defendants' evidence.

For example, Dr. Mukherjee testified that based on his review of Dr. Brookstein's scanning electron micrographs ("SEMs") of FiberWire, it appeared to him that the coating does penetrate into the braid.  Ex. 3 at 742:3-8.

Dr. Mukherjee also explained that there is a phenomenon which draws coating from outside of the braid to within the braid known as the "wicking" effect.  Based on FiberWire's braided construction, it was Dr. Mukherjee's opinion that FiberWire's coating penetrates into the

---

[11]    DePuy Mitek also asserts what it knows to be a legally-incorrect argument -- *i.e.,* that coating cannot have a material effect on the basic and novel properties of the '446 patent since the coating "enhances," rather than detracts from, the pliability of the suture.  Mitek Mem. at 17. This assertion is surprising because DePuy Mitek already admitted at the *Markman* hearing that an added ingredient can materially affect the basic and novel properties even if it materially *improves* rather than materially *detracts*.  Ex. 14 at 16:16-17:1.  DePuy Mitek had no choice but to acknowledge this, because it is the well-known law of "consisting essentially of" claims.  *See, e.g., Kim v. Conagra Foods, Inc.*, 465 F.3d 1312, 1319-20 (Fed. Cir. 2006); *AFG Indus., Inc.*, 239 F.3d at 1246; *Bayer A.G. v. Sony Electronics, Inc.*, 228 F. Supp.2d 332, 346-47 (D. Del. 2002); *Binney & Smith v. Rose Art Indus., Inc.*, 1995 U.S. Dist. LEXIS 2602 at *30 (N.D. Ill. 1995) (Ex. 15); *American Machine,* 172 F.Supp. 12, 19 (D. N.J. 1959).

For the same reasons, DePuy Mitek's reference to Dr. Brookstein's "card trick" is irrelevant.  Mitek Mem. at 16.  Dr. Brookstein's misleading and prejudicial card trick demonstration was designed to mislead the jury into believing the only way FiberWire's coating can materially affect the basic and novel properties of the invention is if it were to somehow get into the braid *and* detract from its pliability.  Ex. 3 at 274:11-277:16.  That is not the law.

DSMDB-2335746v01

braid through this wicking effect.  Ex. 3 at 742:15-743:1.  Moreover, the fact that FiberWire's pliability is so dramatically improved after it is coated, as shown by Dr. Gitis's test, is still further evidence that the silicone coating does permeate the braid, thereby facilitating movement between fibers within the braid.  Ex. 11.

Further, Mr. Lyon testified that FiberWire is coated *twice* to make sure the coating is effective.  As Mr. Lyon explained, the coating fills in the voids better when it is coated twice as compared to being coated once.  Ex. 3 at 558:9-11.

The jury, of course, was free to accept this evidence, a sufficient basis to deny DePuy Mitek's motion.  But the jury was also free to reject DePuy Mitek's testimony presented by Dr. Brookstein, who, the evidence showed, was unqualified to render *any* opinions on coating's impact on suture properties.  As Dr. Brookstein admitted, he had no background in this area; his *only knowledge* regarding the impact of coatings on suture came *in conjunction with his work in this case.*  Ex. 3 at 315:10-21. [Emphasis added].

Further, the testimony at trial showed that DePuy Mitek's "evidence" that FiberWire's coating does not permeate the braid, principally Dr. Brookstein's testimony about his SEMs, was completely unreliable.  Dr. Mukherjee explained that SEMs are *not* generally used in the suture industry to look for coating on sutures; and especially not silicone coating as is used on FiberWire.  As Dr. Mukherjee explained, silicone coating is transparent and colorless so it does not appear in SEMs.  He also testified that a person with experience in reviewing suture micrographs who wanted to review them for the presence of a coating would have applied a pigment to make the coating visible in the micrographs.  Ex. 3 at 740:24-741:3.  Dr. Brookstein (who had never used an SEM on sutures before this case) did not do this.  Ex. 3 at 346:9-18; 739:18-740:5; 742:3-8.

DSMDB-2335746v01

In addition, on cross-examination at trial, Dr. Brookstein admitted that during his deposition, he was *not* able to see coating anywhere on the surface of a commercial FiberWire suture *that had been coated twice*, *nor could he tell whether the coating partially impregnated the braid.* Ex. 3 at 352:7-353:15; 356:2-18. In other words, his trial testimony was *entirely inconsistent* with his prior deposition testimony. Moreover, Dr. Brookstein admitted that *he used different angles and magnifications* on the SEMs he showed to the jury purporting to compare a twice-coated FiberWire sample to an uncoated FiberWire sample and he used *different pictures* in his expert report from those he used at trial. Ex. 3 at 350:2-11. For all these reasons, the jury rightfully rejected Dr. Brookstein's SEM "evidence."

DePuy Mitek also asserts that Dr. Brookstein found FiberWire's coating did not permeate the braid because the suture contains less than 5% coating by weight. Mitek Mem. at 16. This evidence likewise proves nothing. Dr. Brookstein admitted at trial that he does not know how the 4.8% coating he purportedly measured on FiberWire compares with other sutures or even whether it is considered a "small amount" in the suture art. Ex. 3 at 360:14-17. For all these reasons, the jury was free to reject Dr. Brookstein's evidence.

## VII.    CONCLUSION

For all the foregoing reasons, DePuy Mitek's motions should be denied.

DSMDB-2335746v01

Dated: October 18, 2007

Respectfully submitted,

By:   **/s/Charles W. Saber**
Charles W. Saber
Stephen A. Soffen
Salvatore P. Tamburo
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, D.C.  20006-5403
Telephone:  (202) 420-3116
Facsimile:  (202) 420-2201

Christopher Weld, Jr. (BBO # 522230)
Raymond P. Ausrotas (BBO # 640315)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
Telephone:  (617) 720-2626
Facsimile:  (617) 227-5777

Counsel for Defendants
Arthrex, Inc. and Pearsalls Ltd.

DSMDB-2335746v01

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing DEFENDANTS ARTHREX, INC.'S AND PEARSALLS LTD.'S OPPOSITION TO DEPUY MITEK'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER FED. R. CIV. P. 50 AND MOTION FOR A NEW TRIAL was served, via the Court's email notification system on the following counsel for Plaintiff on the 18th day of October 2007:

Lynn A. Malinoski
Woodcock Washburn, LLP
Cira Centre, 12th Floor
2929 Arch Street
Philadelphia, PA  19104-2891
Telephone: (215) 568-3100
Facsimile: (215) 568-3439

Daniel J. Gleason
Nutter McClennan & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
Telephone:  (617) 439-2000
Facsimile:  (617) 310-9000

**/s/Charles W. Saber**

# Exhibit 1

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DePUY MITEK, INC.,                )
a Massachusetts Corporation,      )
                                  )
                Plaintiff         )
                                  )
        -VS-                      ) CA No. 04-12457-PBS
                                  ) Pages 1 - 35
ARTHREX, INC.,                    )
a Delaware Corporation,           )
and Pearsalls Ltd.,               )
a Private Limited Company         )
of the United Kingdom,            )
                                  )
                Defendants        )


MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:

    DIANNE B. ELDERKIN, ESQ. and MICHAEL J. BONELLA, ESQ.,
Woodcock Washburn, LLP, Cira Centre, 12th Floor, 2929 Arch
Street, Philadelphia, Pennsylvania, 19104-2891, for the
Plaintiff.

    CHARLES W. SABER, ESQ. and SALVATORE P. TAMBURO, ESQ.,
Dickstein Shapiro, LLP, 1825 Eye Street, N.W., Washington,
D.C., 20006-5403, for the Defendants.

                        United States District Court
                        1 Courthouse Way, Courtroom 19
                        Boston, Massachusetts
                        June 19, 2007, 2:50 p.m.

                    LEE A. MARZILLI
                OFFICIAL COURT REPORTER
             United States District Court
             1 Courthouse Way, Room 3205
                 Boston, MA  02210
                  (617)345-6787

1    asked him that.

2              THE COURT:  What does your expert say?

3              MR. SABER:  Well, our expert relies upon what

4    everyone in the marketplace says, which is all the patents --

5              THE COURT:  But did your expert do his own testing

6    and say that it made a material difference?

7              MR. SABER:  No, our expert didn't.

8              THE COURT:  I disagree with either side's position

9    that I can do it off of the specification because the

10   specification says all things to all people.  It can help; it

11   can hurt.  I mean, I think you have to look at the specific

12   product to see whether it makes a material difference.

13             MR. SABER:  Actually, I'd agree with that.  I think

14   that this notion of looking at the patents probably doesn't

15   answer the question.  It comes down to the question of the

16   evidence.

17             THE COURT:  So if you don't have a doctor or an

18   expert who's tested it in a surgical setting and says it

19   makes no difference --

20             MR. SABER:  Well, we do.  Of course, Dr. Burks did

21   that, though we weren't the ones that offered that for

22   purposes of summary judgment.  The other side did.  He got it

23   right every time.  But that's not the test.  The test really

24   is, this is what one of ordinary skill would mean.  And

25   that's where every teaching and everything that's known in

Page 24

1   They're not significantly sacrificing the physical properties

2   of the constituent elements of the suture.

3          And, if you remember, Arthrex's proposed

4   construction used different language.  They wanted you to

5   rule that it would not significantly affect the physical

6   properties of the suture.  And your Honor's construction,

7   which we contend is correct, is that whatever this additional

8   element is, it cannot sacrifice the physical properties of

9   the constituent elements of the suture, and that's what

10  Dr. Brookstein says in his declaration.

11         THE COURT:  I think Dr. Brookstein's declaration is

12  certainly relevant.  It's just not a bingo for you because he

13  doesn't actually check to see whether it improves the

14  pliability and handleability.

15         MS. ELDERKIN:  With all due respect, your Honor, I

16  don't know that that is really the issue under this

17  construction of basic and novel characteristics.

18         THE COURT:  It's both.  It's got to improve the

19  handleability and pliability without impeding or sacrificing

20  the physical properties.  So he tells you it isn't

21  sacrificing anything, but if it also improved handleability,

22  wouldn't that take you out of the infringement under a

23  "consisting essentially of"?

24         MS. ELDERKIN:  Under this construction of basic and

25  novel characteristics, I would argue that it would not.

Page 25

1      THE COURT:  I'm not sure I agree, but, in any

2 event, what other issues are left in this suit?  Let's say I

3 went to trial on infringement.  Are there other defenses?

4      MR. SABER:  Oh, yes, your Honor.  I mean, if we go

5 to trial, not only do we have the issues that we've been

6 talking about today, but then there's the whole series of

7 invalidity defenses and inequitable conduct defenses.  As you

8 may remember --

9      THE COURT:  So is there obviousness and then

10 possibly anticipation?

11      MR. SABER:  That's correct, that's correct.  Now,

12 we moved on one anticipation grounds.  There actually are

13 several invalidity grounds that were put forward, but we

14 didn't put them in a motion to your Honor.  The one that we

15 did put into a motion, your Honor, on anticipation on the

16 Chesterfield patent, your Honor denied that motion.  The

17 other side had a motion on the inequitable conduct piece.

18 Your Honor also denied that as well.

19      THE COURT:  The inequitable conduct I'll put into

20 the "manana" world.

21      MR. SABER:  Well, at the end of the day, it's

22 something for the Court to determine, correct.

23      THE COURT:  Right.  So if I were to do a trial just

24 on infringement, would that make sense, or should I do it on

25 everything, because it sounds like a little infringement

# Exhibit 2

Westlaw.

82 F.3d 434                                                                 Page 1
82 F.3d 434, 1996 WL 128262 (C.A.Fed.), 39 U.S.P.Q.2d 1219
**(Cite as: 82 F.3d 434, 82 F.3d 434 (Table))**

**H**

Molnar v. IKG Industries

C.A.Fed.,1996.

NOTICE: THIS IS AN UNPUBLISHED OPIN-ION.(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTAF Rule 47.6 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Federal Circuit.

W.S. MOLNAR COMPANY, Plaintiff/

Cross-Appellant,

v.

IKG INDUSTRIES, a division of Harsco Corpora-tion, Defendant-Appellant.

**Nos. 95-1352, 95-1364.**

March 21, 1996.

Rehearing Denied May 6, 1996.

E.D.Mich.

AFFIRMED.

Before LOURIE, CLEVENGER, and BRYSON, Circuit Judges.

DECISION

LOURIE, Circuit Judge.

**\*1** IKG Industries, a division of Harsco Corpora-tion, appeals from the decision of the United States District Court for the Eastern District of Michigan denying its renewed motion for Judgment as a Mat-ter of Law (JMOL) or, alternatively, a new trial. W.S. Molnar Company cross-appeals from the dis-trict court's denial of its motion for enhanced dam-ages and attorney fees. *W.S. Molnar Co. v. IKG In-dus.,* No. 93-CV-60028-AA (E.D.Mich. Mar. 31, 1995). Because the district court did not err in denying IKG's and Molnar's post-trial motions, we *affirm.*

DISCUSSION

Molnar owns U.S. Patents 4,961,973 and 5,077,137, which are directed to a grit-free slip res-istant coating for a surface and a process for mak-ing the coating. Molnar sued IKG for infringement, and a jury found that the patents were not invalid and were willfully infringed. At the close of Mol-nar's case, IKG had moved for JMOL with respect to the patent count, providing no details. At the close of all the evidence, IKG moved for JMOL on infringement only, questioning whether it met the hardness limitation in the claims. After the jury re-turned its verdict, IKG renewed its motion for JMOL and alternatively moved for a new trial, and Molnar moved for enhanced damages. The district court denied IKG's motion, holding that IKG had not properly preserved its right to move for JMOL on the validity issues, the jury's infringement find-ing was supported by substantial evidence, and each party had received a fair trial. The court also denied Molnar's motion, holding that, although the jury found willful infringement, most of the evid-ence of copying involved pre-issuance activity; the other evidence did not justify enhanced damages.

On appeal, IKG argues that a new trial is required in view of our decision in *Markman v. Westview In-struments Inc.,* 52 F.3d 967, 34 USPQ2d 1321 (Fed.Cir.) (*en banc* ), *cert. granted,*116 S.Ct. 40 (1995), which issued after the trial. We do not agree. IKG agreed to a jury trial and did not object to the jury instruction regarding claim interpreta-tion. IKG thus waived its right to have the claims construed by the district court judge.

IKG also argues that it preserved its right to move for JMOL on the validity issues and that the patents are invalid. We disagree. Rule 50 requires that a motion for JMOL "shall specify the judgment sought and the law and the facts on which the mov-ing party is entitled to the judgment." Fed.R.Civ.P. 50(a)(2). IKG did not do this. A general reference to a count, which is the most that IKG can be said to have provided, is insufficient to meet the rule's requirements. *E.g., Libbey-Owens-Ford Co. v. In-surance Co. of N. Am.,* 9 F.3d 422, 426 (6th Cir.1993). Rule 50 also requires that a motion for JMOL be made at the close of all the evidence in

82 F.3d 434, 1996 WL 128262 (C.A.Fed.), 39 U.S.P.Q.2d 1219
**(Cite as: 82 F.3d 434, 82 F.3d 434 (Table))**

order for a party to renew that motion after entry of judgment. Fed.R.Civ.P. 50(b). Even if IKG were to be given the full benefit of its JMOL motion at the close of Molnar's case, it did not preserve its right to a post-trial renewal of a JMOL motion on validity. The rule required it to state its motion with specificity and it did not do so with respect to validity. Furthermore, contrary to IKG's assertion, the transcript of the court proceedings does not indicate that IKG was cut off by the district court. Even if it was apparent that the JMOL motion would be denied, it was incumbent upon IKG to clearly establish in the record the grounds for any later motion.

**\*2** IKG also argues that the district court erred in denying its motion for JMOL on infringement. According to IKG, the jury's finding of infringement is not supported by substantial evidence. The disputed claim limitation specifies a range of hardness (macrohardness) on the Rockwell C scale. Although the Rockwell C macrohardness of the accused product could not be directly measured, there was evidence that its microhardness could be measured and converted to macrohardness. According to expert testimony, conversion to obtain Rockwell C macrohardness is well known and used in the art, and the accused product had the hardness that met the claim limitation. Moreover, IKG's brochure describing the product specified an approximate Rockwell C macrohardness value for the product in the range specified by the claims. The jury's infringement finding is thus supported by substantial evidence. *See In re Hayes Microcomputer Prods., Inc. Patent Litig., 982 F.2d 1527, 1532, 25 USPQ2d 1241, 1245 (Fed.Cir.1992)* ("Fact findings reviewed under the substantial evidence standard require affirmance unless appellant shows that no reasonable juror could have reached such a result."). Accordingly, the district court did not err in denying IKG's motion.

IKG also argues that the district court erred in denying its motion for a new trial under Fed.R.Civ.P. 59. IKG argues that the jury's verdict was against the great weight of the evidence concerning its invalidity defenses, particularly its best

mode defense. We do not agree. When a party has not properly preserved an issue in a motion for JMOL, we review the jury's verdict for plain error. *See Biodex Corp. v. Loredan Biomedical, Inc., 946 F.2d 850, 854, 20 USPQ2d 1252, 1255 (Fed.Cir.1991),* cert. denied,504 U.S. 980 (1992). Although IKG submitted strong evidence of a best mode violation, we cannot conclude, considering our standard of review, that the jury's verdict constituted plain error. In addition, there is no indication that IKG did not receive a fair trial. Accordingly, the district court did not err in denying IKG's motion for a new trial.

On cross-appeal, Molnar argues that the district court abused its discretion in denying its motion for enhanced damages and attorney fees. According to Molnar, the court erred by substituting itself for the fact finder when it stated in its opinion that it would have found differently from the jury on willful infringement. Molnar also argues that IKG copied the invention and did not obtain an opinion of counsel. However, nearly all the activities supporting Molnar's assertion of copying occurred before the patents issued. Moreover, the evidence tends to show that IKG had a good faith belief that the patents were invalid in view of prior art, and an opinion of counsel is not an absolute prerequisite to avoiding willful infringement. Thus, the district court properly considered the various factors and did not abuse its discretion in denying Molnar's motion.

C.A.Fed.,1996.
W.S. Molnar Co. v. IKG Industries, a Div. of Harsco Corp.
82 F.3d 434, 1996 WL 128262 (C.A.Fed.), 39 U.S.P.Q.2d 1219

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


DePUY MITEK, INC.                  )
a Massachusetts Corporation,       )
                Plaintiff          )
                                   )
        VS.                        )  CA No. 04-12457-PBS
                                   )  Pages 143-290
ARTHREX, INC.,                     )
a Delaware Corporation,            )
and Pearsalls Ltd.,                )
a Private Limited Company          )
of the United Kingdom,             )
                Defendants         )


JURY TRIAL - DAY TWO

BEFORE THE HONORABLE PATTI B. SARIS

UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

    DIANNE B. ELDERKIN, ESQ., MICHAEL J. BONELLA, ESQ.,
LYNN A. MALINOSKI, ESQ., and ANGELA VERRECCHIO, ESQ.,
Woodcock Washburn, LLP, Cira Centre, 12th Floor,
2929 Arch Street, Philadelphia, Pennsylvania  19104-2891,
for the Plaintiff;

    CHARLES W. SABER, ESQ. and SALVATORE P. TAMBURO, ESQ.,
Dickstein Shapiro, LLP, 1825 Eye Street, N.W., Washington,
D.C., 200006-5403, for the Defendants.

                        United States District Court
                        1 Courthouse Way, Courtroom 19
                        Boston, Massachusetts
                        August 7, 2007  9:02 a.m.

        LEE A. MARZILLI and VALERIE A. O'HARA
            OFFICIAL COURT REPORTERS
          United States District Court
          1 Courthouse Way, Room 3205
              Boston, MA  02210
                (617)345-6787

192370df-87df-4257-bb04-d7a24b0388c5

1    surgeons tie these knots over and over and very small

2    vessels deep in the body, so if the suture is overly stringy

3    or stiff or you can't tie a knot and it's not secure, those

4    are issues that silk have some very nice properties.

5    Q.  And what other kind of sutures were on the market other

6    than silk?

7    A.  So other products came along even though silk, it was

8    still not very strong and some people were getting an

9    inflammatory response when you put silk in, so the synthetic

10   fibers like polyester and nylon came to market both in an

11   uncoated form and coated form and those in addition to the

12   dissolvable or the braided sutures, that dominated the

13   market.

14   Q.  Can you tell the jury what were the characteristics of

15   the polyester sutures that were on the market?

16   A.  The polyester sutures, the benefit of those, they were

17   stronger so for some applications it was very important,

18   and, again, they were maybe more bio-compatible.  Again,

19   some people react to silk in a negative way.

20   Q.  How would you characterizes polyester sutures that were

21   on the market in terms of their stiffness?

22   A.  So they were clearly not as pliable or didn't have the

23   handling properties that silk had, hence there was an

24   opportunity if we could develop a new product that had both

25   that handleability and the strength properties that we could

1   without melting or sticking the fibers together is what

2   would give you the optimal properties.

3   Q.  Thank you.  If I could ask you to go to column 6,

4   please, Dr. Steckel.  I think you just read part of this.  I

5   just wanted to read it again.  The sentence that begins at

6   line I think it's 14 and goes to the end of that paragraph,

7   "However, if the surface --" do you see that?

8   A.  Yes.

9   Q.  "However, if the surface of the heterogeneous braid is

10  engineered to present a significant fraction of the

11  lubricious yarn system, the conventional coating may be

12  eliminated saving the expense as well as avoiding the

13  associated braid stiffening."  The conventional coating

14  you're referring to here, is that the same conventional

15  coating that plagues prior art?

16  A.  That it is the same conventional standard coatings that

17  everyone uses, the soaps, the silicones.

18  Q.  I'm sorry.

19  A.  Soap, silicone, what Arthrex, Johnson & Johnson, what

20  everyone uses, yes.

21  Q.  Okay.  And it's best to eliminate those coatings, is

22  that what your patent is teaching?

23  A.  I'm saying there's a benefit of cost saving if you

24  eliminate it, but it's not best.  Really for sutures, it's

25  the performance and for the patient account and the surgeon

1    more than the costs.

2    Q.   And you're getting the benefits of the performance

3    without the coating?

4    A.   That particular property, knot tiedown you could get in

5    this case with coating, but that's just one example.

6    Q.   If I direct you to column 7 of your patent, Dr. Steckel,

7    there are two examples listed there beginning on line 35 and

8    going down to line roughly 64.  Do you see that?

9    A.   Yes, sir.

10   Q.   Now, these braids, there are two different braids that

11   were tested; is that correct?

12   A.   Right.  These would be examples of the invention.

13   Q.   One of them was a braid made of PET and PTFE but a

14   different braid of materials; is that correct?

15   A.   That's correct.

16   Q.   Another one is a braid of PTE and PTFE with a different

17   percent of materials; is that correct?

18   A.   One is 50-50, and the other is a 75-25 blend.

19   Q.   And are these the configurations that you tested,

20   Dr. Steckel?

21   A.   These were examples of the braids, yes.

22   Q.   And if you turn to column 8 beginning at line 36,

23   there's a paragraph there that begins with,

24   "Surprisingly"?

25   A.   Right.

1    Q.   Now, it says, "Surprisingly, the bending rigidity of the

2    heterogeneous braids in Examples I and II do not follow the

3    rule of mixtures."  You're saying that you had superior

4    results with these braids, correct?

5    A.   Better than expected.

6    Q.   Better than expected.  Neither one of these braids was

7    coated, correct, Dr. Steckel?

8    A.   Correct.

9    Q.   And if I turn you to the claims of your patent,

10   beginning on the bottom of column 8 going to the end of

11   column 10 the last two pages of your patent beginning at the

12   bottom, do you see that?

13   A.   Yes.

14   Q.   Do you see the word "coating" anywhere in any of those

15   12 claims?

16   A.   I would -- well, I would expect not.

17   Q.   Thank you.  Can I ask you to turn now, Dr. Steckel, to

18   your exhibit, I'm sorry, there's a Plaintiff's Exhibit 520.

19   That's your notebook.

20   A.   520?

21   Q.   Yes, sir, that's your lab notebook.  Can I ask you to

22   turn to the page that's Bates stamped 2666.  It's kind of

23   near the end.

24   A.   Yes.

25   Q.   Now, you see it's actually on the screen, too.  It might

1    be easier to read in front of you.  You did read it earlier,

2    I just want to go over it one more time and ask you a

3    question.  The composite, the last sentence of that

4    paragraph says, "The composite also ranked better than the

5    silk and Ethicon and knot tiedown even without a coating."

6    Do you see that?

7    A.  Yes, that was a surprise.  We were going after

8    pliability, but we ended up with this nice add-on.

9    Q.  Doesn't this say that you don't need a coating on the

10   suture you made?

11   A.  On this one particular embodiment, you may not want to

12   add a coating, but we talk about coatings through the

13   patent.

14   Q.  Now, Dr. Steckel, you said this particular embodiment,

15   this particular embodiment was a combination of PTFE and PET

16   or PT, and I know that's a lot of acronyms, ladies and

17   gentlemen, but it was two different braids, isn't that

18   right, of the PTFE and PET?

19   A.  Yes.

20   Q.  And the second combination was PP, polypropylene, and

21   PET, correct?

22   A.  Yes.

23   Q.  Now, Dr. Steckel, you never tested a braid of the same

24   materials as FiberWire; is that correct?

25   A.  Polyester and polyethylene.

Page 274

1    Q.    Okay.  Is this a demonstrative you use to teach with?

2    A.    I have used not this particular one but the same one for

3    almost thirty years that I've been teaching about yarn

4    mechanics and bending and pliability of structures like these

5    sutures.  It's my touchstone.

6    Q.    Can you explain with reference -- this is demonstrative

7    Exhibit 613.  Explain what you have in demonstrative

8    Exhibit 613, and then we'll talk about the sutures, but let's

9    just stick to the Exhibit 613.  Explain the three sets of

10   cards.

11   A.    We have three sets of cards -- and I'm not going to do a

12   card trick here -- we have three sets of cards and one set

13   with 16 cards, and they're all individual, okay, 16 cards,

14   and I punched a hole and secured them to this board, okay.

15   Then I took over here the same 16 cards, and I glued each one

16   together, so card 1 got glued to 2, 2 to 3, and so on.  So

17   these are all glued together.  And then in the middle here I

18   have a kind of an intermediate situation where I have 16

19   cards, but I've glued 1 and 2 together and 15 and 16

20   together.

21   Q.    Okay.  Now, with Plaintiff's Exhibit 613, can you

22   explain the pliability concept to the jury.

23   A.    Yes.

24   Q.    And how it varies.

25   A.    Remember earlier I talked about monofilament versus

1    multifilament.  When they're all glued together, this would

2    be an analog to a monofilament.

3    Q.    You used the word "analog."  What's that?

4    A.    It would be a model.  It would be similar to the -- it

5    would be comparable to what you'd have if you had a

6    monofilament where everything was all one structure, okay.

7    So I did that.

8            This over here would be the example or similar to a

9    multifilament where you had 16 individual materials, each one

10   having its own set of properties, and you were going to see

11   how that bent, okay.  And then the middle one would be, all

12   right, I'm going to have a little bit of coating, if you

13   will, on the outside, so I'm going to glue 1 and 2 and 15 and

14   16.

15   Q.    Now, how does the bending or pliability compare?  Can

16   you describe how that works?

17   A.    Yes.  Okay, and my hand is not calibrated, but, okay,

18   that's -- they're free to slide by each other, okay?  Here

19   they're not free to slide by each other, okay?  I can't bend

20   that.  This is very rigid.  The same cards, but these are

21   glued together.  These are not glued together.  And this one

22   where it's just 1 and 2 are glued and 15 and 16, it's about

23   the same as this.

24   Q.    When you say about the same as this, you're referring

25   to --

1  A.    The one that 1 and 2 and 15 and 16 are glued together is

2  about the same as they're not glued together.  But you can

3  see this, you can't --

4            (Witness indicating.)

5  Q.    Now, how does that relate to the concept of bendability

6  and pliability of FiberWire and what we've observed with

7  respect to the FiberWire coating?

8  A.    Well, we know FiberWire is made from multifilaments, and

9  we can see from these pictures that the coating doesn't get

10 into the structure.  We can see that the coating doesn't bond

11 the fibers together, okay?  So these type of structures would

12 be similar to these cards here that can bend.  If the coating

13 was into the structure, you'd have something like that.

14           (Witness indicating.)

15 Q.    Okay.  Now, in forming your opinion that FiberWire's

16 coating does not have a material effect relative to the

17 pliability in the novel and basic characteristics, does this

18 relate to that?

19 A.    Yes.  Once I observed that the coating was not getting

20 inside the structure and bonding these fibers together, then

21 I knew that those fibers could act individually; and if they

22 acted individually, it would be pliable.

23 Q.    Now, does that go back to what we talked about before,

24 the multifilament pliability and how that works?

25 A.    Yes.  These operate as multifilament structures where

1    there is lubricity and there's freedom of motion between the

2    fibers.

3    Q.    Now, when talking about freedom of motion, we had that

4    demonstrative up there.  We had the little circles, the

5    little diameter of filaments.  How does that relate to what

6    we see in FiberWire?

7    A.    That's what it is.  That picture we saw is a schematic

8    representation of what's actually the case of FiberWire.

9    Q.    Now, can you give us an example of a FiberWire coating

10   if it was on FiberWire, not FiberWire's coating but a

11   hypothetical coating, that could have a material effect on

12   the pliability of FiberWire.

13   A.    Coating can have a material effect if it gets inside and

14   bonds all these together, yes.

15   Q.    But does FiberWire have that type of coating?

16   A.    Not at all.

17   Q.    Oh, one other question.  With regard to the

18   handleability and the smoothness of the structures, you were

19   able to see the exterior, the peaks and valleys?

20   A.    Yes.

21   Q.    From your examination, did you conclude whether

22   FiberWire's coating had a material effect on the smoothness

23   and the bumpiness of the structure, the peaks and the

24   valleys?

25   A.    Yes.  FiberWire's coating had no material effect on

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DePUY MITEK, INC.                    )
a Massachusetts Corporation,        )
                    Plaintiff       )
                                    )
        VS.                         )    CA No. 04-12457-PBS
                                    )    Pages 381-429
ARTHREX, INC.,                      )
a Delaware Corporation,             )
and Pearsalls Ltd.,                 )
a Private Limited Company           )
of the United Kingdom,              )
                    Defendants      )

JURY TRIAL - DAY THREE

BEFORE THE HONORABLE PATTI B. SARIS

UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

    DIANNE B. ELDERKIN, ESQ., MICHAEL J. BONELLA, ESQ.,
LYNN A. MALINOSKI, ESQ., and ANGELA VERRECCHIO, ESQ.,
Woodcock Washburn, LLP, Cira Centre, 12th Floor,
2929 Arch Street, Philadelphia, Pennsylvania  19104-2891,
for the Plaintiff;

    CHARLES W. SABER, ESQ. and SALVATORE P. TAMBURO, ESQ.,
Dickstein Shapiro, LLP, 1825 Eye Street, N.W., Washington,
D.C., 200006-5403, for the Defendants.

                        United States District Court
                        1 Courthouse Way, Courtroom 19
                        Boston, Massachusetts
                        August 8, 2007   9:00 a.m.

            LEE A. MARZILLI and VALERIE A. O'HARA
                OFFICIAL COURT REPORTERS
                United States District Court
                1 Courthouse Way, Room 3205
                    Boston, MA  02210
                    (617)345-6787

'Page 315

1        MR. SABER:  It's just the yellow part.  It goes

2   over to the next page.  Just the top part of that, the first

3   two lines, the first three lines and the two lines from the

4   page before.

5   Q.  Did I ask you this question?

6   A.  Excuse me, I don't know where.

7   Q.  I'm sorry, page 165, line 24.  It goes over to 166, line

8   3.

9   A.  Okay.

10  Q.  Now, did I ask you this question and did you give me

11  this answer:  "Would it be correct to say that what you've

12  learned about coating and its impact on suture properties is

13  in conjunction with your work on this case?"  Answer:  "That

14  would be proper to say that, yes."  Did I ask that question,

15  and did you give that answer, sir?

16  A.  At the time I told you I didn't remember if it was

17  coated or not.  I later found out it was coated.

18  Q.  Sir, did I ask you that question, and did you give me

19  that answer?

20  A.  You did ask me that question, and I gave you that

21  answer.

22  Q.  Thank you.  Now, you're, of course, being paid for your

23  time that you put into this matter; is that correct?

24  A.  That is correct.

25  Q.  And you're being paid $300 an hour?

Page 346

1    A.   Show me where it says that.

2    Q.   Okay.   I apologize, I think I got the page wrong in my

3    outline.

4    A.   That's all right.

5    Q.   Okay.   Could you turn to page 223.

6    A.   Yes, I can.

7    Q.   Line 2.

8    A.   Just give me a second please.   Yes, sir.

9    Q.   And I asked you, "Have you ever done it --"  WE'RE

10   talking about the scanning microscope, "-- on sutures

11   before?"  And you answered, "Not that I can recall;" is that

12   correct?

13   A.   Let me just look at the page before because I don't know

14   what it is.

15   Q.   Of course.

16   A.   I said I couldn't recall at the time just like I

17   couldn't recall what we did for U.S. Surgical, it was 20

18   years ago.

19   Q.   Okay.   Now, you told me where you hadn't used a scanning

20   microscope before, correct?

21   A.   Yes.

22   Q.   You told me you used it on an air beam for the Army?

23   A.   Yes, I used it on an air beam for the Army.

24   Q.   And air beam replaces steel in a military structure; is

25   that correct?

Page 350

1    A.   Yeah.

2    Q.   And both of those are purporting to show -- 533 is

3    purporting to show a cross-section?

4    A.   That's what it shows, yes.

5    Q.   Double coated?

6    A.   Double coated, heated, stretched, yes.

7    Q.   Now, you didn't show the same angle when you showed the

8    uncoated one in 499; is that correct?

9    A.   Not in those two pictures, that's correct.

10   Q.   And they're not the same magnification, are they, sir?

11   A.   They are not the same magnification, sir.

12   Q.   Thank you.  Now, at your deposition we discussed some of

13   your pictures that you had done for the microscope.  Do you

14   remember that, sir?

15   A.   I remember we discussed them.

16   Q.   We discussed it, yeah.  I'm just going to ask you a

17   couple of questions about that, if you don't mind.

18   A.   Sure.

19   Q.   Right.  Now, you had attached some pictures to an expert

20   report that you had done in this case.  Do you recall that,

21   sir?

22   A.   Yes, I did.

23   Q.   Okay.  And we talked about some of those pictures that

24   were attached to your report.  Do you recall that?

25   A.   Yes, I do.

1    talk about your deposition.

2    A.  I know to just see Exhibit G out there, I have to relate

3    to it one of the pictures you gave me.

4    Q.  I'm not sure if it is one of the pictures you gave.  I

5    think Exhibit G was something different you showed the jury.

6    A.  I don't remember.

7    Q.  I just want to ask you about what you told me at the

8    deposition about the picture of the double coated FiberWire.

9    A.  Okay.

10   Q.  We've already established Exhibit G was a double coated

11   FiberWire, right?

12   A.  Yes.

13   Q.  I said, "It's your opinion -- " excuse me, "Exhibit G,

14   is it your opinion that there's coating on the surface?"

15   Answer:  "I can't -- the coating appears to be so small I

16   can't even see it."  Question:  "You can't see it.  So you

17   don't have an opinion as to whether there's coating on the

18   surface of G -- "

19   A.  Correct.

20   Q.  Answer:  "I was presented --"  Question:  "From your

21   observations?"  Answer:  "I was presented as a double coated

22   specimen, and when I look for that, I look for coating, I

23   don't see any, which later, when I measured and saw how much

24   coating there was, it didn't surprise me that you didn't see

25   it because it was so small."  Question:  "Okay.  So is your

1    opinion is you can't see the coating on Exhibit G; is that

2    your opinion?"  Answer:  My opinion is I haven't been able

3    to see the coating, that's correct."  Does that refresh your

4    recollection that you told me that you couldn't see the

5    coating on the sample that was double coated?

6    A.  It refreshs my recollection, and I measured and I knew

7    it was there but I couldn't see it.

8    Q.  And then if you turn to line, page 252, line 13?

9    A.  Yes.

10   Q.  I asked you, "But it's your opinion the coating is on

11   the surface even though you can't see it?"  "No."  "Is that

12   your opinion?"  "No.  My opinion is I cannot see where the

13   coating is on this at all."

14   A.  Right.

15   Q.  Is that what you said?

16   A.  I could not see where it was on that.

17   Q.  Right.  Then you summarized line 19 on page 253.  I

18   said, "Right.  But you can't testify here today where the

19   coating is?"  The answer is, is that correct?

20   A.  You tailed off.

21   Q.  I'm sorry, strike that.  Could you go to 234.

22   A.  Wait, you want me to go to page 234?

23   Q.  254, I apologize, sir, line 14.

24   A.  Right.

25   Q.  I asked you, "Can you tell me if it's not on the

Page 356

1    and the lake.

2    Q.  Sir, did I ask you these questions, and did you give me

3    these answers?  "Can you tell me whether it's partially

4    impregnated, to use your term?"  Answer:  "No, I cannot."

5    Question:  "One way or the other?"  Answer:  "That's

6    correct."

7    A.  Excuse me, can you tell me where in the deposition?

8    Q.  Page 256.

9    A.  You didn't tell me that.

10   Q.  I'm sorry, if I didn't tell you that, lines 15 to 19.

11   A.  Okay.

12   Q.  Did I ask you these questions, and did you give me these

13   answers:  "Sir, can you tell me whether it's partially

14   impregnated, to use your term?"  Answer:  "No, I cannot

15   tell."  Question:  "One way or the other?"  Answer:  "That's

16   correct."  Did I ask those questions, and did you give those

17   answers, sir?

18   A.  Yes, but you're taking it out of order.

19          MR. BONELLA:  Can we have 254 4 through 7 with

20   that?

21          MR. SABER:  My question went to partially

22   impregnation.  This is something else.

23          THE COURT:  Well, it's not even a full sentence.

24          MR. BONELLA:  4 through --

25          THE COURT:  It's got to be 4 through something

1  Q.  Now, you never did any study as to what percentage of

2  weight is typical for coated sutures; isn't that correct?

3  A.  There is no typical.

4  Q.  Sir, did you do any study?

5  A.  No, because there's no typical.

6           MR. SABER:  Your Honor, could you please ask him

7  to answer my questions.

8           THE COURT:  The answer is no.  What's the next

9  question?

10  Q.  Now, you have no knowledge of the percentage by weight

11  of coating that is found on sutures other than FiberWire; is

12  that correct?

13  A.  I have no basis to know.  I have no reason to know.

14  Q.  Okay.  You have no knowledge as to whether 4.8 percent

15  is a small amount of coating compared to other sutures; is

16  that correct?

17  A.  Compared to other sutures, I would not know.

18  Q.  Okay.  Now, you would have had to do a test to know if

19  surface coating of 4.8 percent can affect the knot tiedown

20  characteristics of a multifilament braided suture; is that

21  correct?

22  A.  No, again we conclude heating and stretching, it's not

23  just the coating.

24  Q.  Sir, could you answer my question?

25  A.  I'll try.

1    Q.    Do you know of any uncoated sutures that are currently

2    on the market?

3    A.    I think there may be many sutures that don't have

4    coating.

5    Q.    Do you know of any uncoated sutures that are currently

6    on the market?

7    A.    I wouldn't be able to say I know this is an uncoated

8    suture, no.

9    Q.    Can you specifically name any uncoated suture that

10    you've used in a surgical environment?

11    A.    No.

12    Q.    Okay, moving on to Paragraph 9 of Exhibit 232, you

13    state:  "In March, 2006, I received two samples of suture

14    labeled Suture A and Suture B.  Each sample was on a spool

15    and it was approximately 3 meters in length."  Do you see

16    that?

17    A.    I do.

18    Q.    Who sent you the two samples you refer to in Paragraph 9

19    of Exhibit 232?

20    A.    I believe I received them from a company in California.

21    Q.    Do you know the name of that company?

22    A.    I don't.

23    Q.    Does the name CETR mean anything to you?

24    A.    Only in that I think that Sal had mentioned that they

25    had done tests or had been somewhat involved with the suture,

1    Q.    And now can you explain what you're doing, Dr. Burks.

2    A.    Same thing.

3    Q.    With which exhibit?

4    A.    286.

5    Q.    Are you doing the same thing you did with --

6    A.    Yes.

7    Q.    -- the previous one?  The same knot configurations?

8    A.    Uh-huh.

9    Q.    Can you tell a difference between the first two sutures,

10   Dr. Burks, Exhibit 285 and --

11   A.    286.

12   Q.    -- and 286?

13   A.    I'll let you know in a minute.

14   Q.    And can you explain for the record, please, what you're

15   doing now, Dr. Burks.

16   A.    I'm tying 284

17            (Discussion off the record.)

18   A.    Okay, so where's my little sheet here?

19   Q.    Now, based on what you've done so far, Dr. Burks, can

20   you tell any difference between the sutures?

21   A.    I feel like I do feel a difference.

22   Q.    Okay.  How would you describe that difference?

23   A.    Well, I would say at the moment 285 seems a little

24   smoother to me than 284.

25   Q.    Okay.

1    A.    So I would say 285 is coated, and I would say 284 isn't

2    coated.

3    Q.    How sure are you of that?

4    A.    I would not put my children's life on it, but given the

5    subjective feel.

6    Q.    Is it a subtle difference or is it --

7    A.    It's a subtle difference.

8    Q.    And can you explain, Dr. Burks, what you're doing now?

9    A.    Just throwing knots.  So I would say, for me, 286 seems

10   coated as well.

11   Q.    If you had gloves on right now, would that change the

12   confidence level you have in determining whether those are

13   coated or uncoated sutures?

14   A.    I think gloves can make a difference, yeah.

15   Q.    How do they make a difference?  The difference between

16   the sutures is more subtle, right, with gloves because you

17   don't have the contact like you described earlier with the

18   skin?

19   A.    Yeah.  Again, this is obviously a very subjective feel

20   test.  Some of that feel comes from how the suture feels, and

21   some of it comes from how you feel when you slide a knot.

22   And so we're not talking rocks and water as far as

23   differences, and so. . .

24   Q.    Well, how would you qualify the difference that you just

25   observed based on your test?

Page 430

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


DePUY MITEK, INC.,                    )
a Massachusetts Corporation, )
                Plaintiff    )
                             )
        -VS-                 ) CA No. 04-12457-PBS
                             ) Pages 430 - 522
ARTHREX, INC.,              )
a Delaware Corporation,      )
and Pearsalls Ltd.,          )
a Private Limited Company    )
of the United Kingdom,       )
                Defendants   )


JURY TRIAL - DAY FOUR

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:

    DIANNE B. ELDERKIN, ESQ., MICHAEL J. BONELLA, ESQ.,
LYNN A. MALINOSKI, ESQ., and ANGELA VERRECCHIO, ESQ.,
Woodcock Washburn, LLP, Cira Centre, 12th Floor,
2929 Arch Street, Philadelphia, Pennsylvania, 19104-2891,
for the Plaintiff.

    CHARLES W. SABER, ESQ. and SALVATORE P. TAMBURO, ESQ.,
Dickstein Shapiro, LLP, 1825 Eye Street, N.W., Washington,
D.C., 20006-5403, for the Defendants.


                        United States District Court
                        1 Courthouse Way, Courtroom 19
                        Boston, Massachusetts
                        August 10, 2007, 9:00 a.m.


        LEE A. MARZILLI and VALERIE A. O'HARA
            OFFICIAL COURT REPORTERS
        United States District Court
        1 Courthouse Way, Room 3205
            Boston, MA  02210
            (617)345-6787

Page 450

1    and with gloves on.  And my feeling was, it had too much

2    friction, too much drag, and I was having a lot of trouble

3    tying knots with it that were secure.

4    Q.    Okay.  Did you talk to Mr. Grafton about your

5    observations on the handleability aspects?

6    A.    Yes.

7    Q.    And what did you tell him?

8    A.    Well, I told him that, you know, I liked his idea of a

9    high-strength suture, obviously, but he was going to have to

10   basically get some better handling characteristics, have it

11   so it had better run-down basically when you try to push the

12   knot down, and that he was going to have to, as you would

13   expect on any braided suture, have a coating to it.

14   Q.    Did you have a discussion with Mr. Grafton about the

15   need to have a coating on FiberWire?

16   A.    Yes.

17   Q.    Okay.  Now, those discussions that you had with

18   Mr. Grafton about the need for coating, was that for however

19   FiberWire was going to end up?

20   A.    Oh, absolutely.  I mean, every braided suture worth its

21   salt has a coating on it, so --

22   Q.    And could you explain what you mean when you say that,

23   that every braided suture worth its salt has to have a

24   coating on it?

25   A.    Well, the thing about braided suture is it's basically

1    bumpy, and it has a lot of friction.  It has, you know, a

2    high coefficient of friction relative to other types of

3    suture; for example, the monofilament, which is just a single

4    strand and doesn't have a lot of friction to it.  So you have

5    to have some way to smooth out the bumps, and a coating is a

6    very tried and true tested type of way to do that.

7    Q.    Now, I think you mentioned sliding through suture.

8    Could you explain to the jury what that is?  Sliding the

9    suture and sliding through suture, you used a couple terms

10   there.

11              MS. ELDERKIN:  Objection.  Expert.

12              THE COURT:  Overruled.

13   Q.    Go ahead, you can answer.

14   A.    Well, the suture has to slide actually through a number

15   of different interfaces.  It has to slide against each other,

16   so, you know, when you tie a knot, you have two suture

17   strands.  So if you have one braided suture strand against

18   another suture strand, if they have a very high friction and

19   a lot of bumps, you're not going to be able to slide them as

20   well.

21              They also have to slide through soft tissue, so

22   you're pulling your suture through, for example, tendon; and

23   if it's too bumpy, it actually tends to cut the tendon.  In

24   fact, there are some mechanical saws that are based on that

25   principle of having bumps on them.  They actually can even

1          THE COURT:  Can I see you at side bar.

2    SIDE-BAR CONFERENCE:

3          THE COURT:  It may be I'm not understanding it, but

4    he seems to have the expertise.

5          MS. ELDERKIN:  He didn't put in an expert report.

6          THE COURT:  It wasn't clear what the objection

7    was.  It sounded as if you're challenging qualifications.

8          MS. ELDERKIN:  He has no expert report, and when we

9    filed a motion to exclude him, Mr. Saber represented in the

10   declaration he's not being brought to testify as an expert.

11         MR. SABER:  When he had these conversations with

12   Mr. Grafton, and we'll get into the killer idea in a moment,

13   he has to explain what he meant by it and why he told

14   Mr. Grafton what he told him.

15         MS. ELDERKIN:  This is expert testimony.

16         THE COURT:  I wish I had understood the basis for

17   your objection better.  I thought you meant he didn't have

18   the expertise to say it.  He certainly does have the

19   expertise to say it.

20         MR. SABER:  I'm almost done with it.

21         THE COURT:  Now that I understand it, move on.

22         (End of side-bar conference.)

23   Q.   Now, Dr. Burkhart, did there come a time when you had an

24   E-mail exchange with Mr. Grafton about some of the ideas

25   Mr. Grafton had for FiberWire?

Page 461

1    A.    Yes.

2    Q.    And in that E-mail exchange, did you refer to some of

3    his ideas as a "killer idea"?

4    A.    Yes.

5    Q.    And when you made those comments to Mr. Grafton, were

6    you conveying that the suture did not have to be coated?

7    A.    No.

8    Q.    Okay, could you explain why you say that?

9    A.    Well --

10         THE COURT:  Say what, "killer idea"?

11         MR. SABER:  No, why he wasn't saying that it didn't

12   have to be coated.

13   A.    Well, as we'd said from the very beginning --

14         MR. SABER:  Say that it had to be coated.  I'm

15   sorry, your Honor.

16   A.    Too many negatives in there.

17   Q.    Sure.

18   A.    From the very beginning when we tie tested that first

19   uncoated product or uncoated prototype, I talked to Don and

20   said, you know, "Do these have to be coated?" and he said,

21   "Well, of course."  I mean, that was understood from the

22   beginning because you have to have something that has a low

23   enough coefficient of friction that you can tie a knot that

24   is secure and that isn't going to have that drag.

25   Q.    And did that relate to what you explained about the need

Page 462

1      to smooth out the bumps?

2      A.    Exactly.

3                MR. SABER:  I have no further questions, your

4      Honor.

5                MS. ELDERKIN:  Your Honor, if we could approach to

6      put some exhibits on the bench for Dr. Burkhart?

7                THE COURT:  Yes.

8      CROSS-EXAMINATION BY MS. ELDERKIN:

9      Q.    Good morning, Dr. Burkhart.  My name is Dianne Elderkin.

10     A.    Good morning.

11     Q.    Now, Dr. Burkhart, you weren't retained as an expert in

12     this case by Arthrex, were you?

13     A.    No.

14     Q.    And you did not put in an expert report to advise the

15     parties of your expert opinions before the litigation, did

16     you?

17     A.    No, I did not.

18     Q.    Now, you testified that you tested an uncoated FiberWire

19     prototype, but the prototype you tested was actually a

20     prototype that was made of all PE, wasn't it?

21     A.    My understanding, it was the ultrahigh molecular weight

22     polyethylene.

23     Q.    It had no PET in it, did it?

24     A.    That's my understanding.

25     Q.    And you found that that all PE suture did not have good

Page 511

1          THE COURT:  Sustained.  Well, actually --

2    Q.    Did you have an understanding as to why the testing was

3    being done?

4    A.    I had very limited understanding.  I knew it was somehow

5    related to patent infringement, but I didn't know a lot.

6    Q.    What type of test did you decide to do?

7    A.    We decided on a knot rundown test, and it's actually a

8    test that's performed to determine the amount of force it

9    would require to move a half hitch or start moving a half

10   hitch down a line of suture.

11   Q.    Can you explain what a half hitch is.

12   A.    Yes.  A half hitch is basically just the start of any

13   type of knot.  It's the first throw of any type of knot

14   really.

15   Q.    Why was a half hitch knot specifically chosen?

16   A.    Because that's what surgeons use for all of their knots,

17   all of their arthroscopic knot tyings that they do in the OR.

18   Q.    Can you put up Exhibit 1357, please.  Ms. Willobee, does

19   this demonstrative accurately depict the test setup that you

20   worked on?

21   A.    Yes, it does.

22   Q.    Can you describe the components of the test setup?

23   A.    Yes, I can.  I don't have a pointer, I think.

24   Q.    I think you can touch the screen, Ms. Willobee.

25   A.    Oh, okay.  Let's start at the top.  If you see where it

1    the chart, those two values are what you measured for the

2    noncoated suture?

3    A.    Yes.

4    Q.    And what unit are these measured in?

5    A.    This is measured in neutons.  It's a measure of force.

6    Q.    What do these other indications mean?  "Mean,

7    Std. Dev.," what do those mean?

8    A.    Well, the mean is basically the average, so average

9    meaning if you take the three samples and add them together

10   and divide by three, you would have the mean or the average

11   of 12.72 for the coated.  And std. dev. is the standard

12   deviation, and that just gives you an idea regarding the

13   variance.  If you have a large standard deviation, you have a

14   large variance in your data.  This is a small variance or a

15   small standard deviation, so it means that the results

16   themselves are pretty repeatable.  And then minimum would be

17   the minimum value out of that data set, and maximum would be

18   the maximum value.  Maximum value is 13.08.

19   Q.    Thank you.  Can you explain the difference that you

20   recorded for the coated versus the noncoated?

21   A.    Right.  What we found is that there was basically two

22   and a half times more force or load required to move the

23   noncoated than the coated suture, and you can see that if you

24   look at mean, 12.72 compared to 32.88.

25   Q.    Thank you.  If we could focus on the bottom graph,

Page 523

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


DePUY MITEK, INC.                )
a Massachusetts Corporation,     )
                    Plaintiff    )
                                 )
        VS.                      )  CA No. 04-12457-PBS
                                 )  Pages 523-682
ARTHREX, INC.,                   )
a Delaware Corporation,          )
and Pearsalls Ltd.,              )
a Private Limited Company        )
of the United Kingdom,           )
                    Defendants   )


JURY TRIAL - DAY FIVE



BEFORE THE HONORABLE PATTI B. SARIS

UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

    DIANNE B. ELDERKIN, ESQ., MICHAEL J. BONELLA, ESQ.,
LYNN A. MALINOSKI, ESQ., and ANGELA VERRECCHIO, ESQ.,
Woodcock Washburn, LLP, Cira Centre, 12th Floor,
2929 Arch Street, Philadelphia, Pennsylvania 19104-2891,
for the Plaintiff;

    CHARLES W. SABER, ESQ. and SALVATORE P. TAMBURO, ESQ.,
Dickstein Shapiro, LLP, 1825 Eye Street, N.W., Washington,
D.C., 200006-5403, for the Defendants.

                        United States District Court
                        1 Courthouse Way, Courtroom 19
                        Boston, Massachusetts
                        August 13, 2007  9:04 A.M.

        LEE A. MARZILLI and VALERIE A. O'HARA
            OFFICIAL COURT REPORTERS
          United States District Court
          1 Courthouse Way, Room 3205


Boston, MA   02210(617)345-6787

e0a670b8-7235-4511-9247-8dc697ba45fc

1    A.   Yes, it is.

2    Q.   Could you explain how it was decided to coat FiberWire,

3    your involvement in that, sir?

4    A.   Well, pretty soon after we established that the mixture

5    of the two materials would give us the knot security, then

6    we said we'd go to various things we've got to do before

7    this can be a suture, and one of them that it has to have a

8    coating.

9    Q.   Were you part of that decision on having to have a

10   coating?

11   A.   Oh, yes.

12   Q.   Why did you believe it needed to have a coating?

13   A.   Well, because a braid without a coating does not give

14   you a good knot run-down and the surgeons would not be happy

15   to have a suture like that.

16   Q.   And so did you suggest a specific coating to use?

17   A.   Yes, I did.

18   Q.   And what coating did you suggest?

19   A.   This was the Nusil 2174.

20   Q.   And that suggestion came from you, sir?

21   A.   Yes.

22   Q.   And when you described why you suggested the coating,

23   does FiberWire coating meet those goals?

24   A.   Yes, it does.

25   Q.   Okay.  Now, you identified Nusil 2174.  What kind of

Page 552

1    and admitted into evidence as Defendant's Exhibit No. 1133.)

2    Q.  In this patent that you're an inventor on, do you make

3    any statements in this patent as to why coating is added to

4    FiberWire?

5              MS. MALINOSKI:  Objection, leading.

6    A.  Yes, I do.

7              THE COURT:  Overruled.

8    Q.  Could you identify where in the patent that is?

9    A.  It's in example 2.

10   Q.  Okay.  Is that the second column?  It might be a little

11   bit easier if you could identify the lines and the numbers

12   so Derek can put it up on the board.

13   A.  It's in column No. 2 in example 2, third paragraph which

14   is line 48.

15   Q.  Could you read to the jury what your patent says about

16   why coating was added to FiberWire?

17   A.  Yes, the suture is preferably coated with a

18   silicone-based coating to fill in voids and provide optimum

19   run-down.

20   Q.  Thank you.  Let me now turn to the process that

21   Pearsalls uses to apply the coating to FiberWire.  Were you

22   involved in the development of that process?

23   A.  Yes, I was.

24   Q.  Could you -- we've developed, put an animation on this

25   to perhaps help Mr. Lyon's testimony.

Page 558

1    A.   Yes, sir.

2    Q.   Why do you go through the process the second time?

3    A.   Well, when we were talking about it, we said that we

4    could have one coating or two coatings.  We've validated

5    both.  I remember discussing it with Mr. Grafton.  He said

6    well, which --

7                 MS. MALINOSKI:  Objection, your Honor.

8                 THE COURT:  Sustained.

9    Q.   If you could just tell them why you do the two coatings.

10   A.   Well, we felt it would fit in any voids in the braid

11   better than if we did one.

12   Q.   Now, when did Pearsalls start using silicone coating for

13   its sutures?

14   A.   1986.

15   Q.   Were you personally involved in that process?

16   A.   Yes, I was.

17   Q.   Could you explain what your involvement was in 1986?

18   A.   The second biggest suture company in the world, Davis &

19   Geck came to us and said --

20                 MS. MALINOSKI:  Objection, your Honor.

21                 THE COURT:  Sustained.  You know, the basic

22   concept is you can't tell us what somebody else said.

23   That's hearsay.

24                 THE WITNESS:  All right.  Even if he said it to

25   me?

```
 1   provided testing services and testing equipment to another
 2   huge manufacturer, United States Surgical, which is a
 3   division of Tyco Healthcare.
 4   Q.  Now, you talked about two different things, equipment
 5   and testing services?
 6   A.  Yes.
 7   Q.  Let me talk, and I want to concentrate specifically to
 8   suture manufacturers.  What kind of equipment do you sell to
 9   suture manufacturers?
10   A.  We sell our testing equipment called UMC2, universal
11   market fibrometer, and we use it for both Ethicon and U.S.
12   Surgical as well as for this case.
13   Q.  Is the equipment that you sell to the suture
14   manufacturers, is it all testing equipment?
15   A.  Yes, it is.
16   Q.  Do you develop any procedures that go along with the
17   testing equipment?
18   A.  We always do.
19   Q.  Could you explain what that is, please?
20   A.  You mean both our particular procedures?
21   Q.  Yes, what kind of procedures, just generally?
22   A.  Typically we develop procedures to test for such
23   properties as friction, tissue drag test because we always
24   test mechanical things like elastic modulars, tension,
25   pliability and so on.
```

1    Q.  Could you look at Exhibit 1252, please, kind of near the

2    back of the book.

3    A.  1252?

4    Q.  Yes.  We'll skip over it.

5         THE COURT:  All right.

6    Q.  Dr. Gitis, have you ever seen your equipment on display

7    at Ethicon, your testing equipment on display at Ethicon?

8    A.  Yes, I have.

9    Q.  Could you tell us about that, please?

10        MS. BONELLA:  Objection, your Honor.

11        THE COURT:  Sustained.  Let's get to this case

12   right now.

13   Q.  You've also mentioned you've done some work on testing

14   sutures before this case; is that correct?

15   A.  Yes.

16   Q.  Could you explain about that a bit?  Who have you done

17   those tests for?

18   A.  Mostly for the same customers, Ethicon from Johnson &

19   Johnson and U.S. Surgical from Tyco Healthcare.

20   Q.  Could you explain generally?

21        THE COURT:  No, we don't need that.  Just jump

22   into this case.

23   Q.  Now, let's talk about were you hired to do some work in

24   this case?

25   A.  Yes.

1  A.  Yes.

2          MR. SABER:  Okay.  Derek, could you put up the

3  animation for the pliability.  It's 1364.

4  Q.  Dr. Gitis, could you explain what this exhibit is and

5  how it relates to your pliability test?

6  A.  This exhibit illustrates the setup and procedure we used

7  to perform the liability test.  The single suture was

8  attached assembled vertically.  The lower end was attached

9  to the stationary clamp, and the upper end was attached to

10  the for in some sense the moving up vertically, and by

11  moving it up, the tension up, we continuously monitor more

12  and more of the load and displacement which allowed us to

13  calculate the stiffness of the suture.

14          THE COURT:  What does pliability mean?

15          THE WITNESS:  Pliability, it's opposite to

16  stiffness, it's compliance of the suture.

17          THE COURT:  So what's the difference between

18  pliability and handleability?

19          THE WITNESS:  I am not an expert in terms of this,

20  but I can speak related to handleability.

21          THE COURT:  Don't.

22          MR. SABER:  I think, your Honor, you may want to

23  save that for another witness.

24          THE COURT:  I want to understand, the pliability

25  test, what were you testing for?

1          THE WITNESS:  Pliability, we test stiffness or

2     compliance of the option, in this case, Fiberglas.

3     Q.  Does this Exhibit 1364 accurately describe your test?

4     A.  Yes, it does.

5     Q.  I understand it's a demonstrative exhibit, but it does

6     generally describe it?

7     A.  It generally describes it, yeah.

8     Q.  When you say on this exhibit, measurements used to

9     calculate pliability, could you explain what you mean?

10    A.  Yeah.  As I said, the monitor force and vertical force

11    and corresponding vertical displacement, and then we used

12    common equations to calculate elastic and motion of inertia,

13    which the product of each gives you the stiffness of the

14    suture.

15    Q.  Could you explain to the jury why you chose to use this

16    pliability test?

17    A.  We chose this test based on the literature, in

18    particular, a well known paper by Professor George

19    Rodeheauer from the Virginia University based on the

20    publications by our customer, Ethicon, which is a division

21    of Johnson & Johnson and based on our own experience testing

22    sutures for Ethicon.

23    Q.  Had you used this test previously for Ethicon?

24    A.  Yes.

25          MR. SABER:  Now, could you put up Exhibit 1371,

Page 617

1    please.

2    Q.   What is this exhibit, sir?

3    A.   This exhibit on the left, it has the echograph, graph

4    with the blue line is for the uncoated suture, the red line

5    for the coated suture, and it just shows the force,

6    displacement data of applied force on the corresponding

7    elongation of the suture, and on the right, there is the

8    summary data for this test.  As I described, we conducted

9    eight tests of the coated suture and eight tests of the

10   uncoated suture.

11           There are results, stiffness results for each of

12   them, and the last line of the table is average numbers,

13   average for coated suture and average for uncoated suture.

14   As you clearly see, there is more than 60 percent difference

15   in stiffness or pliability or compliance between the coated

16   and uncoated sutures.

17           MR. SABER:  Derek, could you show the bottom line

18   so the jury can see what Dr. Gitis is referring to.

19   A.   Yes.  So one of them has stiffness of 6 and the other

20   has stiffness of 9, and as a statistical analysis confirmed,

21   these are quite substantial differences.

22   Q.   Now, in this test, this pliability test, any of the

23   errors that you told the jury about, did they relate to this

24   pliability test?

25   A.   Yeah.  I'm sorry, I didn't mention one more, I didn't

1  mention one error.  In the regional report, we had a typo of

2  describing the diameter of the suture.  I wrote the diameter

3  of 0.65, but in fact we measured it to be 0.56, so the

4  diameter of the suture does not change the over 60 percent

5  difference between coated and uncoated sutures, but it does

6  change the ratio numbers.

7  Q.  Okay.  We'll get to that in just a second.  Was there a

8  second misreporting that related to the pliability test?

9  A.  Yes.  In my original report, I wrote that the test

10  performed as a continually increasingly load but in fact

11  looking at the test data, it's a test performed as

12  continuously decreasing displacement.

13  Q.  Did that reporting error, did that have any impact on

14  either the numbers or the results?

15  A.  No, it has no bearing whatsoever because the stiffness

16  test, pliability test, tension test can be conducted easily

17  with either increase in force measuring displacement or

18  increase in displacement measuring force.

19       THE COURT:  So we can't see the headings on these

20  columns.  So the coated is on the left and the uncoated on

21  the right?

22       THE WITNESS:  That's correct, ma'am, yeah.  So

23  coated suture has less stiffness which gives you more

24  compliance and maybe one can speculate it's better for

25  handling.

Page 619

1    Q.  Now, could you turn to Exhibit 1377, please, sir.  It's

2    going to come up on the screen.  I think it's in third to

3    last in the book.

4    A.  Yes.

5    Q.  Okay.  What is 1377?

6    A.  1377, it's a Table 1-A which I presented in my

7    supplemental report which re-calculates the same pliability

8    that the individuals discussed, but it has the corrected

9    diameter of the suture.

10   Q.  So what is the comparison between the pliability numbers

11   for the coated vs. the uncoated suture?

12   A.  It makes no difference, it still stays the same.  The

13   coated suture was four and a half and for the uncoated

14   suture the stiffness was 7.45, still over 60 percent of the

15   suture pliability in the equation.

16          MR. SABER:  Your Honor, I move to admit Exhibits

17   1377 and 1371.

18          MS. BONELLA:  No objection, your Honor.

19          THE COURT:  This is a good time for a break.

20          MR. SABER:  It's a great time.

21          THE CLERK:  All rise for the jury.

22          (THE FOLLOWING OCCURRED AT SIDEBAR:)

23          THE COURT:  Just one housekeeping matter I wanted

24   to mention, he's very difficult to understand with all the

25   words that he uses so hopefully you're getting daily copy,

```
 1              THE WITNESS:  For some time, I understood it this
 2    way.  It's not your American Indian tribes.
 3              THE CLERK:  All rise for the jury.
 4              (Jury enters the courtroom.)
 5              MR. SABER:  May I proceed?
 6              THE COURT:  Yes.
 7    BY MR. SABER:
 8    Q.   Welcome back, Dr. Gitis.
 9    A.   Thank you.
10    Q.   Before the break we were talking about your tests, and I
11    want to move to the next one, the knot slippage test.  Now, I
12    know you testified earlier that you were asked to look at
13    knot security.  Does knot slippage test relate to knot
14    security?
15              MR. BONELLA:  Objection.
16              THE COURT:  Overruled.
17    A.   To the best of my understanding, knot slippage test
18    gives very good characteristic of knot security or knot
19    strength, or whatever other terms are used.
20    Q.   Okay.  Could you turn to Exhibit 1365.
21    A.   Yes.
22    Q.   Could you explain what Exhibit 1365 is, this
23    demonstrative exhibit?
24    A.   It shows the -- it illustrates the schematics of our
25    knot slippage test.  It's different from the previously
```

1    described pliability test.  In particular, now we have a knot

2    on the suture, and also now we have a suture in form of a

3    loop.  If you remember in the tension pliability test, it was

4    just a single suture.  Now we've got a loop of the suture

5    tied with a knot.  And the lower end is wrapped around a

6    stationary rod, and the upper end of the suture loop is

7    wrapped around upper rod which is moving up vertically,

8    exactly as it's shown here.  And the sensor continuously

9    monitors the vertical rod.

10            And to characterize knot slippage and knot

11   security, we use two parameters; one parameter, the force at

12   the very moment of the beginning onset of knot slippage; and

13   the other parameter is the force at the knot failure.  And

14   typically in the literature, the knot failure is defined as

15   either knot being untied or when slippage reaches and exceeds

16   3 millimeters.

17   Q.   So do I understand you had to measure two different

18   things; is that correct?

19   A.   We monitored force, and we recorded two different

20   values, two different levels of force, maximum force before

21   slippage and then force at the moment of knot breaking.

22   Q.   Now, what machine did you use to do this test?

23   A.   We used the same UMT2 as we used for all other tests,

24   and it's the same UMT2 which we sold to Ethicon, U.S.

25   Surgical.  We used our patented universal tester for all

1    suture tests.

2    Q.    Okay.  Now, let's move to Exhibit 1372.

3    A.    Yes.

4    Q.    What is this, Dr. Gitis?

5    A.    This shows the results of our knot slippage test.  On

6    the left you will see is a graphical representation, and on

7    the right you see the summary table.  If you look at the

8    plot, force versus time, you can clearly see that in the

9    beginning, when you pull the suture loop up, force is

10   increasing with time.  Then at some moment of time, the knot

11   begins to slip, and it creates force to the maximum force.

12   So the moment of maximum force is detected as the

13   characteristic of knot slippage.

14        And then we continue the test for at least three

15   more millimeters, or until the knot is completely untied, and

16   we record the other force value which corresponds to the

17   complete knot failure.

18   Q.    Okay.  Could you explain how recording those forces

19   relate to the chart that's on the right-hand side?

20   A.    So those recorded forces are presented in the table.

21   Again, as you remember, we tested eight samples of each,

22   eight samples of the coated suture and eight samples of the

23   uncoated suture.  And for each, we recorded two values of

24   force, at the onset of slippage and at the complete knot

25   failure.  And those values happen to be recorded in

1    kilograms.  So the horizontal rows depict the corresponding

2    values of the forces, and the very last row gives you the

3    average values for the both eight forces.

4            As you can see, the coated and uncoated samples

5    differed quite substantially, both at the onset of slippage

6    and at the complete knot failure.  At the onset of slippage,

7    the coated samples showed knot strengths of about 3.3 kilo,

8    and the uncoated samples showed over 5, 5.14 kilo.  And at

9    the same -- similar difference was observed at the knot

10   failure, and the knot failure point, coated samples gave you

11   an average strength of 2.5 kilo, and uncoated samples gave an

12   average strength of 3.36 kilo.  The differences are

13   substantial, as later on confirmed by the statistical

14   analysis.

15   Q.   Now, just on this chart there's some plusses and minuses

16   next to your averages.  Do you see that in the bottom line?

17   A.   Yes.

18   Q.   Could you explain to the jury what that is.

19   A.   In addition to showing the average values, this also

20   shows the opposite of the variation, the fluctuations from

21   sample to sample.  So, as you can see, for example, from the

22   first column, knot strength at slippage for coated samples,

23   it was 3.3 plus/minus 0.95 kilogram, and for the second

24   column, it was 5.14 plus/minus 0.67.  This plus/minus gives

25   you a good idea of the fluctuation of each and every number

1    around the average value for the eight-sample set.

2    Q.   Okay.  Now, I think you testified earlier that there

3    would have been a reporting error on the speed that the test

4    was conducted; is that correct?

5    A.   Yes.  In my report, I described the speed being one

6    value, and after it was pointed out to me at the deposition,

7    I looked more carefully and found the actual speed of the

8    test had a different one.

9    Q.   Okay.  Now, the difference in the speed of the test, did

10    that change your opinions or your results at all?

11    A.   It changes neither results nor opinion, can change

12    nothing but just minor description of the test procedure.

13    Q.   Now, Dr. Gitis, let me turn to the next test that you

14    did which was your knot run-down test.  Derek, could you put

15    up 1366, please.  And could you describe this test for the

16    jury, Dr. Gitis?

17    A.   Yes.  Knot run-down test, even though again we see a

18    suture loop, we see vertical orientation of the suture, but

19    it's quite different from the two previous tests.  In the

20    knot run-down test, we still have a knot, but the knot is

21    somewhere in the middle of the suture.  Above the knot there

22    is just single suture, and below the knot there is a suture

23    loop.  And the idea, the goal of this test is to measure

24    slippage of the knot, run-down of the half hitch knot when

25    you tension the suture up.  So the lower end of the suture

Page 630

1    loop is wrapped around the stationary brass rod, and the

2    upper end is clamped to the force sensor.  Force sensor goes

3    up vertically.  And we measure knot run-down.  We measure the

4    force required to start knot going down on the suture.

5    Q.    Okay, could you turn to Exhibit 1372.  And could you,

6    Dr. Gitis, could you explain what this is?

7    A.    Yes.  I'm sorry, we need knot run-down.

8    Q.    Oh, I apologize, I apologize.  It's my fault.  1369.

9          MR. SABER:  Well, while we're on 1372, before you

10   get it off, your Honor, I'd like to move to admit 1372.

11         MR. BONELLA:  No objection.

12         (Defendant Exhibit 1372 received in evidence.)

13   Q.    1369.

14   A.    Yes, 1369 describes the results of the test which we

15   just saw the animation of.  On the left we see is a plot of

16   force versus time, and we see three examples for the uncoated

17   suture and three examples of the coated suture.  And you can

18   clearly see that in the beginning when we were starting to

19   going up and tensioning the suture, the knot was intact, and

20   force was increasing.  And then at some point the knot gave

21   up and started going down, and force dropped.  And while knot

22   was sliding on the suture, we were measuring the -- we

23   continued to monitor the force and measure knot sliding

24   force.

25   Q.    Okay, could you move to the chart, please.

1   A.    And the summary of the results -- actually, all the

2   results are presented in the table.  And, again, we tested

3   eight samples of the coated suture and eight samples of the

4   uncoated suture.  And the last row on the bottom shows

5   average results and data fluctuation, and you can clearly see

6   that coated sutures had the run-down force of about 0.22

7   kilogram, and uncoated sutures had the run-down force of

8   about 0.40 kilogram, which is almost a two times difference.

9   It obviously looks like coated suture has better slippage

10  characteristics, and so it requires smaller force to start

11  knot run-down.

12          MR. SABER:  Your Honor, I move to admit

13  Exhibit 1369.

14          MR. BONELLA:  No objection, your Honor

15          (Defendant Exhibit 1369 received in evidence.)

16  Q.   Could you turn now to your setup for your friction test,

17  Exhibit 1367.  Could you explain this, Dr. Gitis?

18  A.    Yes.  In the friction test, there are two suture

19  samples.  Both of them are assembled horizontally.  The lower

20  one is assembled around X axis, and the upper one is

21  assembled around Y axis, so they are perpendicular to each

22  other.  One of them is moved back and forth over the other,

23  and we continuously monitor the frictional force, force to

24  resist the relative portion of one suture over the other

25  suture.

1   Q.   And what are you trying to measure in this test?

2   A.   We are measuring the frictional characteristics,

3   friction between friction of suture on suture.

4   Q.   And could you turn to Defendant's Exhibit 1373.   And

5   what is this, sir?

6   A.   These are the results of our friction test.   As in

7   previous slides, on the left there is a graphical

8   representation, and on the right there is a table with the

9   actual hard data.   And if you look at the graph, first of

10  all, you clearly see differences in levels of friction of

11  uncoated, which depicts in black color, versus coated suture,

12  which is depicted in red color.

13       Also, for the future, you can clearly see that

14  uncoated sample has a larger magnitude of friction

15  fluctuations than the coated sample, which was later used to

16  characterize the chatter.

17  Q.   Okay.   Could you turn to the table, please.   First, let

18  me ask you, Dr. Gitis, there's this word of coefficient of

19  friction at the top.   Could you explain to the jury what that

20  means?

21  A.   Yes.   The term "coefficient of friction" has been around

22  for about five centuries.   The coefficient of friction is a

23  ratio of the friction force over the applied normal load.

24  Q.   Okay, go ahead, explain the rest of the chart.   Go ahead

25  and explain the rest of the chart.

1    A.    And if you see the data here, if you look at the eight

2    rows, again, we tested eight coated samples, eight uncoated

3    samples, coated over coated, uncoated over uncoated.  And you

4    can clearly see that the uncoated samples had very similar

5    friction levels, with the average being 0.09 in friction

6    coefficient; and all the uncoated samples had very close

7    results, with an average of .16.  So there's a really big

8    difference in average friction between coated and uncoated

9    sutures, which is later confirmed by the statistical

10   analysis.  And as you see, the deviations among all of the

11   eight coated samples and the deviations among all of the

12   eight uncoated samples are rather very small.

13   Q.    Now, I think you told us before the break that you saw

14   some inconsistency of the data, of the underlying data as it

15   related to the friction test?

16   A.    Yes.  Unfortunately, the raw data file has some partial

17   corruption into it.

18   Q.    Does that issue with the underlying data affect your

19   opinions about this friction test?

20   A.    No, it doesn't.  It cannot and doesn't affect my

21   opinions because the results are very clear.  The results

22   look quite alike for coated and quite alike for uncoated.

23   And I don't believe that any data corruption in the raw data

24   file can shake my belief in these results.

25   Q.    Now, what did you mean when you said that the coated

Page 634

1  was -- the differences in the coated were very similar, very

2  little, and the differences between the coated were very

3  similar?

4  A.   Well, because if you look again at the table on the

5  right, you can see that the numbers don't really overlap.

6  All coated samples produce friction coefficients between 0.08

7  and 0.10, which is quite remarkably consistent.  And all

8  uncoated samples produced friction coefficients from 0.15 to

9  0.17, which is also very consistent.

10          Also, the difference between friction of coated and

11  friction of uncoated samples in this friction test

12  corresponds very nicely to a difference in friction between

13  coated and uncoated samples in the previously described --

14          MR. BONELLA:  Objection, your Honor.  Outside the

15  scope of his expert report.

16          THE COURT:  I didn't hear what you said.

17          MR. BONELLA:  Outside the scope of his expert

18  report.  There's no comparison of other sutures in his expert

19  report.

20          THE COURT:  Yes, so ask another question.

21          MR. SABER:  Okay.  Well, Mr. Bonella's statement

22  was just simply wrong.  Okay, let's move on.  I move to admit

23  Exhibit 1373.

24          MR. BONELLA:  No objection, your Honor.

25          (Defendant Exhibit 1373 received in evidence.)

Page 635

1  Q.   Okay, let me move to -- I think the next one you said

2  was chatter.  Could you show Defendant's Exhibit 1374.

3          Now, for the chatter, did you have to do a separate

4  test, Dr. Gitis?

5  A.   No.  You don't have to reduce number of tests.  We just,

6  for chatter or amplitude of friction fluctuations, we just

7  use the --

8          THE COURT:  So what's chatter now?

9          THE WITNESS:  Chatter is the amplitude of friction

10  fluctuations.  The term of "chatter" is very common not only

11  for sutures but, for example, for your car brake.  If your

12  brake requires repair, you will hear chatter.  Chatter means

13  fluctuations in friction.

14          THE COURT:  So what does it mean in the context of

15  a suture, bumpiness of the braid?

16          THE WITNESS:  Chatter means bumpiness of the

17  suture.

18          THE COURT:  I think we heard that five days ago,

19  but I for one wasn't sure I remembered correctly.  So when

20  we're talking here chatter, it's bumpiness of the braid.

21          THE WITNESS:  That's correct.

22          THE COURT:  It's not very scientific, but at least

23  I --

24          MR. SABER:  It works for me.

25          THE COURT:  All right.

1   Q.    Okay, so what did you use to -- I know you didn't do a

2   separate test -- what did you use to get the chatter results?

3   A.    We just used results of the friction test and results of

4   the tissue drag test.  If we go back to the friction, to the

5   friction -- blowups of the friction graph of the friction

6   test results, you can clearly see that in addition to the

7   average level of friction, from the same plot, you can get

8   the amplitude of friction fluctuation.  And the amplitude is

9   the only and the direct characteristic of chatter.

10  Q.    Could you go back to 1374, please.  Okay, and could you

11  explain the results here on this test?

12  A.    Again, we compared eight samples of the coated suture,

13  and we compared eight samples of the uncoated suture, and you

14  can clearly see the difference in chatter.  It's kind of well

15  expected.  If you have coating it, smoothens the bumpiness,

16  as we just discussed.  So coated suture exhibited chatter of

17  just 0.009 in terms of friction coefficient, and uncoated

18  suture exhibited chatter of 0.014, which is more than

19  50 percent higher.  And the fluctuations from sample to

20  sample are rather small.  All eight coated sutures produced

21  chatter from 0.008 to 0.012, and all the uncoated samples

22  produced chatter from 0.011 to 0.019.  So average one is

23  differed substantially, which is later confirmed by

24  statistical analysis.

25  Q.    Let's turn to your last test, the tissue drag test on

1    1368.

2    A.    Okay.

3    Q.    And, again, Dr. Gitis, if you could just very briefly

4    explain what is going on with this test.

5    A.    The tissue drag test.  So in the previous test we

6    measured friction of suture on suture, but this test is

7    measuring friction of suture against the tissue.  And the

8    tissue is simulated with the unfinished, unpolished piece of

9    leather.

10           This slide just illustrates the test setup.  The

11    upper -- we use the single suture.  The upper end was clamped

12    to the force sensor, and the lower end was clamped between

13    the two leather pads, tightly clamped together.  And when we

14    moved -- when we put the suture vertically up, the suture was

15    rubbing against the leather, and thus we were able to measure

16    the friction force and friction coefficient between the

17    suture and leather, which simulates the actual body tissue.

18    Q.    Okay, let's go to Exhibit 1370.  And again if you could

19    explain the results that you received on the tissue drag

20    test.

21    A.    Again, we can start from the plot on the left.  The plot

22    on the left shows force versus time dependencies for uncoated

23    and coated samples.  Uncoated samples are shown in black

24    color, and the coated samples are shown in red, and you

25    immediately see significant difference in the levels.

1          And in this test we measured two friction forces.

2     We measured static friction force, and the definition of

3     static friction force is the maximum force before the motion

4     begins.  And after motion started, after the initial

5     start-up, we measured the average friction force during just

6     slides in coated suture in the leather.

7     Q.   Could you move to the chart, please, Derek.  And if you

8     could just get to the averages that are reported here.  Could

9     you explain what those are.

10    A.   Yes.  So, again, we report two forces, two friction

11    forces or drag forces, static and dynamic.  And static

12    friction force for coated sutures was about .09, and static

13    friction force for the uncoated sutures was about 1.18.

14    Q.   And how about on the dynamic?

15    A.   The same similar difference was observed with the

16    dynamic values.  The coated sutures exhibited lower drag

17    force of about 0.5, and the uncoated samples exhibited a

18    higher dragging force of about 0.78.

19              MR. SABER:  Your Honor, I move to admit

20    Exhibit 1370.

21              MR. BONELLA:  No objection, your Honor.

22              MR. SABER:  I believe I may have forgotten to

23    introduce 1374, so I offer that as well.

24              MR. BONELLA:  Which one is that?

25              MR. SABER:  That's the chatter results.

Page 639

1          MR. BONELLA:  No objection, your Honor.

2          (Defendant Exhibits 1370 and 1374 received in

3    evidence.)

4    Q.    Could you turn to Exhibit 1378, please.  Could you

5    explain what this is, Dr. Gitis.

6    A.    This is a summary of all the previous tables with test

7    results.  This shows only average values because only average

8    values make sense in the statistical approach, and they show

9    differences between average values for the coated and

10   uncoated sutures.  And you can clearly see that in the

11   pliability data, there was over 60 percent difference between

12   coated and uncoated.

13   Q.    Before you move on, that over 60 percent difference,

14   which one between the coated and uncoated had the better

15   pliability?

16   A.    The stiffness of the coated samples was over 60 percent

17   lower than stiffness of the uncoated samples.

18   Q.    For the jury, what does that mean on pliability?

19   A.    Stiffness is reversed in proportion of the compliance

20   and probably for the handling.  So lower stiffness means

21   better handling characteristics, better compliance of the

22   suture in the hands of the surgeon.

23   Q.    Okay, let's turn to the next one, knot run-down.  Where

24   it says 81 percent difference, what does that mean?

25   A.    It means that the coated samples showed knot run-down,

1    showed knot run-down force almost -- over 80 percent lower

2    than the uncoated samples, which is probably beneficial for

3    the surgeon.

4    Q.    Okay, which has the better knot run-down?

5    A.    The coated samples have better knot run-down.

6    Q.    Okay, the 77 on the friction, what does that mean?

7    A.    It means that the coated samples had almost 80 percent

8    lower friction than the uncoated samples, and the lower

9    friction is probably beneficial.  This is why they use

10   coatings.

11   Q.    Okay.  Now, actually, Dr. Gitis, I'm really just asking

12   you to show what the numbers show.  We'll let another witness

13   talk about the meaning of them.  On the chatter, the 55

14   percent?

15   A.    The 55 percent, we clearly see that the uncoated sutures

16   had more fluctuations in friction force, more chatter, and

17   the difference was 55 percent more chatter for the uncoated

18   sutures as compared to the coated sutures.

19   Q.    And how about the two numbers that were reported for

20   tissue drag, static and dynamic?

21   A.    Similar, similar situation.  The coated samples had less

22   both static and dynamic drag against tissue as compared to

23   the uncoated samples.

24   Q.    Okay.  And the last two, the knot slippage, which I

25   think you said related to knot security, those have a

Page 641

1    negative number.  What does that mean?

2    A.   It means that for the coated samples, knot security

3    turned out to be about 50 percent lower comparing to the

4    uncoated samples.

5    Q.   And just so the jury understands, which one did better,

6    the coated or the uncoated?

7    A.   On the knot slippage, uncoated did better, and the

8    speculation is that because the coated samples had lower --

9           MR. BONELLA:  Objection, your Honor.

10   Q.   We can let another witness testify about that.  I just

11   wanted to know about the numbers that you did.

12          THE COURT:  Are you almost done?

13          MR. SABER:  Yes, about three minutes.  I move to

14   admit 1378.

15          THE COURT:  All right.

16          MR. BONELLA:  I have an objection, your Honor.

17          THE COURT:  Can you say it here, or do you have to

18   come up to side bar because we need to wrap up this witness?

19          MR. BONELLA:  Well, how about side bar?

20          THE COURT:  All right.

21   SIDE-BAR CONFERENCE:

22          THE COURT:  What's the problem?  It's just a

23   summary like everything else was.

24          MR. BONELLA:  We have an objection because we think

25   he calculated his numbers wrong, which will come out on

Page 642

1    cross.

2              THE COURT:  Overruled.

3              (End of side-bar conference.)

4              MR. SABER:  I move to admit 1378.

5              THE COURT:  Yes.

6              (Defendant Exhibit 1378 received in evidence.)

7    Q.    Could you turn to Exhibit 1379, please.  Could you

8    explain what 1379 is?

9    A.    1379 shows the results of the statistical analysis of

10   all of the previous test data in terms of how statistically

11   correct, how statistically significant are the differences

12   between coated and uncoated samples in each of the performed

13   tests.

14   Q.    Now, the columns under coated and the columns under

15   uncoated on chart, what are those?

16   A.    The coated corresponds to the coated samples, and

17   uncoated corresponds to the uncoated samples.  And each

18   column has two subcolumns.  X stands for the average, Xc

19   average for coated, Xu average for uncoated.  And V stands

20   for variance or fluctuation, Vc for the coated samples and Vu

21   for the uncoated samples.

22   Q.    And is that part of the data that you used to do your

23   statistical analysis?

24   A.    Yes.

25   Q.    Okay, let me turn to the last two columns where it says

1    experimental "t" value and "T" threshold.  What is being

2    shown there?

3    A.    Parameter T is calculated -- the "T" threshold is

4    calculated based, typically practically taken from the

5    handbook tables, based on how many samples you test.  In this

6    case, it was sixteen, eight coated and eight uncoated.  And

7    what degree of confidence, you choose.  We chose 95 percent

8    of confidence.  For the confidence of 95 percent with the

9    sixteen tests, the threshold value of "T" is 1.76.

10   Q.    And could you explain the experimental "t" value

11   quickly.

12   A.    Experimental "t" value is calculated out of this -- can

13   you please show the formula for experimental "t."  The

14   formula has on the two the difference between average values,

15   and in the bottom it has total fluctuation, total fluctuation

16   of coated and uncoated samples.  So, roughly speaking, the

17   experimental "t" shows how significant is the difference in

18   mean average values versus total fluctuation of data.

19   Q.    And going back to the chart on the experimental "t"

20   values that you report, what is the significance of those

21   numbers?

22   A.    We can see that -- so in order to be statistically

23   substantial, statistically correct, the experimental "t" has

24   to be equal or greater to the threshold "T."  And in all

25   these tests, it was much greater than the threshold "T,"

1   which confirms the already-made observations that the

2   differences between coated and uncoated samples for each of

3   the tests were statistically meaningful and statistically

4   substantial.

5           MR. SABER:  Your Honor, I move to admit

6   Exhibit 1375.

7           MR. BONELLA:  No objection, your Honor

8           (Defendant Exhibit 1379 received in evidence.)

9           MR. SABER:  And I have no further questions, your

10  Honor.

11          THE COURT:  Thank you.

12  CROSS-EXAMINATION BY MR. BONELLA:

13  Q.   Dr. Gitis, I'd like to start with your pliability test.

14  A.   Sure.

15  Q.   In your pliability test, you first told us in your

16  expert report that you performed that test at a 0.33

17  kilograms per second uniformly increasing load rate; isn't

18  that correct?

19  A.   Yes, sir.

20  Q.   And that was incorrect?

21  A.   Yes.  It was the wrong time.

22  Q.   And you learned that at your deposition when I deposed

23  you, correct?

24  A.   Yes.  You were very careful.

25  Q.   And when you signed your expert report, you thought it

Page 683

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


DePUY MITEK, INC.                )
a Massachusetts Corporation,     )
                Plaintiff        )
                                 )
     VS.                         )   CA No. 04-12457-PBS
                                 )   Pages 683-904
ARTHREX, INC.,                   )
a Delaware Corporation,          )
and Pearsalls Ltd.,              )
a Private Limited Company        )
of the United Kingdom,           )
                Defendants       )


JURY TRIAL - DAY SIX



BEFORE THE HONORABLE PATTI B. SARIS

UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

     DIANNE B. ELDERKIN, ESQ., MICHAEL J. BONELLA, ESQ.,
LYNN A. MALINOSKI, ESQ., and ANGELA VERRECCHIO, ESQ.,
Woodcock Washburn, LLP, Cira Centre, 12th Floor,
2929 Arch Street, Philadelphia, Pennsylvania  19104-2891,
for the Plaintiff;

     CHARLES W. SABER, ESQ. and SALVATORE P. TAMBURO, ESQ.,
Dickstein Shapiro, LLP, 1825 Eye Street, N.W., Washington,
D.C., 200006-5403, for the Defendants.

                         United States District Court
                         1 Courthouse Way, Courtroom 19
                         Boston, Massachusetts
                         August 14, 2007  9:03 A.M.

          LEE A. MARZILLI and VALERIE A. O'HARA
               OFFICIAL COURT REPORTERS
             United States District Court
             1 Courthouse Way, Room 3205

Boston, MA   02210(617)345-6787

eb7c588b-add2-44b3-96ad-3e73a0c12a04

1    understand the needs of surgeons?

2    A.   Absolutely.   We always, even for the early part of the

3    development phase, when we were making polymers, we always

4    speak to surgeons.

5    Q.   And why do you do that?

6    A.   Because they're the customer.   Like you develop

7    something, whether it's a toy or a fabric or whatever, you

8    look at who is using it and what the requirements are, and

9    you try to satisfy those on met needs.

10   Q.   Now, did you come to an opinion as to whether the

11   coating on FiberWire affects the basic and novel

12   characteristics of the '446 patent?

13   A.   The coating -- what is your question again?

14   Q.   Did you come to an opinion as to whether the coating on

15   FiberWire affects the basic and novel characteristics that

16   you see in the claim construction?

17   A.   Yes, I did.

18   Q.   What is your opinion?

19   A.   That it does affect the basic and novel

20   characteristics.

21   Q.   Is that a material effect in your opinion?

22   A.   It's a material effect.

23   Q.   Now, when you rendered your opinions on this matter, did

24   you render it from the position of one of ordinary skill in

25   the art?

1    A.   Absolutely.

2    Q.   Could you explain what is the ordinary skill in the art

3    here?

4    A.   My experience, I hire a lot of people in the suture

5    industry.   They should have a science and engineering

6    degree, about two to three years experience working in the

7    suture company.

8    Q.   Now, you see in the claim construction there's a term

9    called "handleability" and term "pliability."   Could you

10   explain what that means?

11   A.   Yes, sir.

12   Q.   Sure.

13   A.   Pliability is -- I'll give you a very simple example.

14   If you take a small steel rod and you bend it, it's very

15   stiff, but if you take a straw that you drink your soda, you

16   bend it very easy, and that's pliability.

17   Q.   How about handleability?

18   A.   Handleability is a mixture of many things, but the first

19   thing is the feel.   And the suture, you give it to a

20   surgeon's hands, how is the tactile feeling, then comes how

21   does he tie the knot, what happens when the one strand goes

22   with the other and then whether the knot is secure or not.

23   All these things go in to handleability.

24   Q.   Okay.   How about as the suture is being used going

25   through tissue, is that part of handleability?

1    A.  Absolutely, absolutely.

2    Q.  Okay.  Now, I know we've had a lot of terms thrown

3    around in this case, and I don't want to take long.  I think

4    the jury's start to get at, so perhaps if I could ask you a

5    few of the terms you made, if you could just explain them to

6    the jury.  I think you talked about, just mentioned that a

7    suture running down -- the knot running down the suture.

8    What is that called, and can you explain that to the jury?

9    A.  Knot run-down, this is one term used that when you --

10   especially when you do the arthroscopic knot, you tie the

11   knot at the top, and the knot has to slide all the way down.

12   That's the knot run-down.

13   Q.  Okay.  And how about the word, "chatter."  You've heard

14   that in this case.  Could you explain what that is?

15   A.  Yes.  Chatter is whenever there is friction that it

16   produces a lot of resistance, there's a measure of how rough

17   the surface is.

18   Q.  And I think suture slide, is that the same thing as the

19   knot?  What is suture slide?

20   A.  Well, suture slide is a lot of different things because

21   when you take one up strand and it goes with the other, it's

22   a very important property.  In fact, I learned, if I may say

23   so, maybe I take a little bit of time, when I was developing

24   polyethylene suture, the suture was breaking, and our

25   straight pull and knot pull is much higher than our

1    competitor Ethicon, so I asked the product manager, show me

2    how, why is the suture breaking because our measurements

3    show that it's much stronger.  Then he showed me what is

4    going on.  He take the one strand going with the other, when

5    you tie the knot, and polypropylene is known for

6    fibrillation, so it picks up the small fibers, and it

7    breaks, so the surface, how the suture is stranded one over

8    the other slide is very important property, by the way.

9    Q.  Now, we've heard the term, "tissue drag."  Could you

10   just give a moment on tissue drag?

11   A.  That is after let's say you succeed, suture is not

12   rough, you can tie the knot, but, ultimately, proof of the

13   pudding that it has to go through the tissue.  Basically the

14   function of the suture is to stick to the tissue, so if it

15   is too stiff and too much resistance, the surgeons will not

16   use it, so tissue drag resistance should be very low.

17   Q.  Okay.  Now, this case, of course, is about braided

18   sutures, as I think we all know by now.  Are there

19   handleability problems that arise with braided sutures?

20   A.  Absolutely.

21   Q.  Could you explain what those are?

22   A.  These are the like at first, give you an example of your

23   uncoated, that when you tie the knot, it gets stuck and it

24   does not slip all the way.

25   Q.  Let me just ask you, is Dexon a braided suture?

1    A.  Yes, I'm sorry, I should have said that.  It's a braided

2    suture, and the ease of tieing the knot is not there in an

3    uncoated braided suture.

4    Q.  And in your experience, how were these handleability --

5    are those handleability problems solved with braided

6    sutures?

7    A.  The only way that I know is put a coating on it.  And

8    most of the braided sutures, even today, they have coating

9    if they are sold in the market.  You can develop uncoated

10   but don't do any good.

11   Q.  Okay.  I have a little animation here to talk about some

12   of the things you've talked about knot run-down and the

13   difference between coated and uncoated.

14        MR. SABER:  Could you put up 1355, please.

15   Q.  You may have a picture of it in your book.

16   A.  Yes, I have it.

17   Q.  Could you explain what this is, Dr. Mukherjee?

18   A.  This is, you know, you are tieing the knot and you're

19   pulling the two, what do you call it, eye of the sutures,

20   two ends, and you pull it and you see how the knot travels

21   all the way.

22   Q.  Okay.  We're going to show it kind of running here.

23   Could you explain what the words that came up and what

24   those, how that relates to an uncoated braided suture and

25   with the knot run-down?

1   A.   The uncoated, as I said, it will chatter.  It goes and

2   stops, goes and stops.  That's the way you see the chatter.

3   It's slower to use and a difficult knot to slide, and,

4   moreover, the greater force to maintain, greater force to

5   start.  All the way it produces a lot of resistance for the

6   surgeon.

7   Q.   Now, I see the word, "slower to use."  What is that

8   referring to?

9   A.   It's slower to get the knot where you want to put it in

10  because, you know, the word we use, stick slip, it slips and

11  sticks, that's the kind of thing that slows down the use of

12  the suture.

13  Q.   Could you turn to Exhibit 1356, which is the next

14  animation.

15          MR. SABER; derek, why don't you run it first then

16  we'll let Dr. Mukherjee explain.  Could you do it again,

17  please.

18  Q.   Now, first let me ask you, we've shown you a couple

19  animations.  Are these exactly accurate?

20  A.   Yes, close to, yes.

21  Q.   This is just -- is this a depiction of what's going on,

22  it's not the exact thing?

23  A.   It's as close as you can get.

24  Q.   Okay.  Now, could you explain what's going on in this

25  animation?

1   A.   Okay.   This is a coated braided suture.   First of all,

2   less chatter, not much of friction, and it's quicker to use

3   because when you tie the knot, it goes, slides easily,

4   doesn't feel that resistance and less force to maintain and

5   less force to start.   All of these are very important for a

6   surgeon because he doesn't have time to fool around with the

7   suture.   His main mind is doing the surgery.

8   Q.   Now, I want to talk a couple on the tissue drag and show

9   a couple animations for you on that.

10          MR. SABER:   Could you turn to animation 1362,

11  please.   I'm sorry, I might have given you the wrong.   That

12  one is 1363 on mine.   I want the one for the uncoated one,

13  Derek.   The numbers got transposed, okay.   Why don't you run

14  it and we'll show what's going on here.

15  Q.   Now, Dr. Mukherjee, could you explain what we saw on

16  this tissue drag for uncoated braided suture?

17  A.   This is another way of showing how difficult for the

18  suture to go through the tissue even though the needle has

19  made the hole, but because of these, this has been animated

20  to show this like a saw that in order to produce through the

21  tissue, you have to cut through the tissue, so it produces

22  the damage plus, again, the surgeon really has to put effort

23  to get the suture through the tissue.   That's tissue drag.

24  Q.   Now, you see the words, "sawing effect."   Is that a term

25  that's known in this art?

Page 712

1   A.  Yes.

2   Q.  Could you explain what that is?

3   A.  That's like, again, you know, again when you cut

4   something, you feel, it goes and then stops, goes and then

5   stops.  That's the sawing effect.  The surgeons always --

6   Q.  Could you turn to I guess it would be 1362 in yours.

7   Why don't we show this animation.  Dr. Mukherjee, could you

8   explain what this is?

9         This is a coated braided suture, and it requires

10  less force because there's no roughness on the surface, and

11  it allows a small incision.  By the way, you have for

12  different applications like if you do a plastic surgery or

13  microvascular surgery, they're very, very small needles that

14  are used, and this is a very important thing, small

15  incision.  There's less damage to the tissue and minimal

16  injury to the tissue, and that's the whole thrust behind the

17  suture, this whole arthroscopy is that that reduces the size

18  of the incision.  By the way, you may know this, arthroscopy

19  was discovered here in Boston by our X, what do you call it,

20  he was from India, Dr. Patel.

21  Q.  Now, I think as you know we've had testimony in this

22  case, the coating that's on FiberWire is silicone coating.

23  Are you familiar with silicone coatings?

24  A.  Absolutely.

25  Q.  Could you explain how you've become familiar -- what is

1    Q.  Now, was silicone used by Davis & Geck on braided

2    sutures?

3    A.  Yes, sir.

4    Q.  Now, have you reviewed the patent literature as to how

5    it relates to why coatings are on sutures?

6    A.  Yes.

7    Q.  Okay.  And let me just go through a couple of those, if

8    I may.  We're not going to go through them all.  Could you

9    put up Exhibit 1100, please.  Do you know what this is?  Is

10   this one of the patents that you reviewed?

11   A.  Oh, yeah.  He's a good friend of mine.

12   Q.  Which one?

13   A.  Bezwada.

14   Q.  Let me ask you about the second guy, Alastair Hunter, do

15   you know who he is?

16   A.  I don't remember, but I used to know a lot of different

17   people at that time.

18   Q.  Do you know whether Mr. Hunter is the same inventor

19   that's on the '446 patent?

20   A.  Yes.

21   Q.  Who's the assignee of this patent?

22   A.  Assignee is Ethicon, Somerville, New Jersey.

23   Q.  Let's turn to column 1.  I want to draw your attention

24   to the language.  Could you read the highlighted portion?

25   A.  "Surgery sutures often require a surface coating to

Page 715

1    improve one or more of their performance properties.  For

2    example, multifilament suture typically requires a surface

3    coating to improve the tactile smoothness, pliability and

4    tiedown performance of the suture, so it passes easily and

5    smoothly through tissue during operative procedures."

6    Q.  Is this passage typical of the general understanding of

7    what coatings do for sutures?

8            MS. ELDERKIN:  Objection.  Leading.

9            THE COURT:  Overruled.

10   A.  It does.

11   Q.  Now, in your opinion is your opinion as you read this,

12   is this passage talking about using coating on a specific

13   suture, or is it a more generalized teaching of using

14   coating on sutures?

15   A.  No, sir.  It's for general specific, it's not a specific

16   one.

17   Q.  Is it limited to any specific type of coatings, this

18   teaching?

19   A.  It does not.

20   Q.  Let me move to the next one briefly.  Could you move to

21   1101.  Is this also one of the patents that you looked at?

22   A.  Yes, sir.

23   Q.  And is Ethicon also the assignee of this patent?

24   A.  Yes.

25   Q.  Okay.  Could you turn to column 1.  And is the

1   A.   In fact, that's what it's used most, not absorbable

2   sutures.

3   Q.   It's usually used?

4   A.   Yes, because silicone is nonabsorbable so they don't put

5   absorbable sutures on a nonabsorbable coating.

6   Q.   Okay, thank you.  Now, did you review documents and

7   testimony from Ethicon and Depuy Mitek in this case?

8   A.   Yes, sir.

9   Q.   Okay.  I'm not going to take the time to put that stuff

10  up now, but could you just generally tell the jury what you

11  learned from your review of the Ethicon and Depuy Mitek

12  documents and testimony.

13  A.   If my memory serves right that the coating improves the

14  performance of these braided sutures.

15  Q.   Okay.  In what kinds of performances?

16  A.   Knot tiedown, tissue drag, all the properties,

17  handleability, pliability that we talked about.

18  Q.   Did it come as any surprise to you to see such

19  statements made by the Ethicon Depuy Mitek witnesses and

20  documents?

21  A.   No, sir.

22  Q.   And could you explain why?

23  A.   Because that's generally accepted in the field.

24  Q.   Okay.  Now, let me turn to some discussion about

25  FiberWire, in particular, if I could.  As you know, I think

Page 719

1    one thing that everybody agrees on that FiberWire has a

2    silicone coating.  Do you have any reason to believe that

3    the coating on FiberWire, that its use is any different than

4    what you just described to us as general teachings in the

5    field?

6    A.  No, sir.

7    Q.  Okay.  Could you tell, generally, the jury why you have

8    that opinion?

9    A.  Because my experience of more than 30 years, and I'm

10   quite familiar with the suture performance properties, all

11   those things plus the literature, that's what I based on my

12   opinion.

13   Q.  Now, have you seen any statements by Arthrex as to why

14   or by Pearsalls as to why they use the coating?

15   A.  Yes.

16          MR. SABER:  Could you put 1106 up on the board, up

17   on the screen, please.

18   Q.  Is this one of the documents that you reviewed?

19   A.  Absolutely.

20   Q.  Okay.  Could you identify what this is?

21   A.  This is a product information FiberWire information from

22   Arthrex.

23   Q.  Could you read the highlighted portion, please.

24   A.  "The suture is made of polyethylene fibers and polyester

25   fibers braided, sterilized and coated for surgery use.  The

Page 720

1   coating acts as a lubricant for suture sliding, knot tieing,

2   and ease of passing suture through tissue."

3   Q.  Is this one of the documents that you used in forming

4   your opinion about the material effect of FiberWire's

5   coating?

6   A.  Yes, sir.

7   Q.  And could you tell the jury why, please?

8   A.  Because this is exactly what I was talking about that

9   the coating does improve, and silicone, there's a reason why

10  silicone is used, and this word is "lubricant."  You have a

11  surface that is much lower than 30, in fact, '446 patent

12  talks about that, so there's a specific property,

13  lubricant.

14  Q.  Now, have you seen any test results comparing coated and

15  uncoated FiberWire -- let me ask you first whether you've

16  seen any that Arthrex themselves performed?

17  A.  Yes.

18  Q.  And could you turn to Exhibit 1026, please.  Do you have

19  it there, Dr. Mukherjee?

20  A.  Yes, I got it.

21  Q.  Great.  What is Exhibit 1026?

22  A.  This is a test, I guess it's a report from Arthrex

23  summary and signup sheet, and the testing was done by Ashley

24  Holloway.

25  Q.  Now, was Ms. Holloway in court and she testified last

1   A.   That, again, the peak load with the resistance is

2   about -- now again my math is not very good -- is about

3   three times for the uncoated compared to coated.

4   Q.   And what does that tell you as an expert in this

5   field?

6   A.   Uncoated is not a usable suture.

7   Q.   The difference you described, is that an important

8   difference?

9   A.   Based on that data, yes.

10  Q.   Is it -- okay.  Is it a significant difference?

11  A.   Well, that's why I was hesitating because I would not

12  run only two samples in one, but the standard deviation is

13  very low so that's the reason why I suggested to do the

14  testing outside.

15  Q.   Okay.

16  A.   And Dr. Gitis did the testing.

17  Q.   We'll get to that in just a moment.  I just want to

18  finish up with Ms. Willobee's test.  Could you just explain

19  why these, this kind of a test, how it relates to what

20  actually goes on in surgery?

21  A.   This is, again, I was trying to describe especially this

22  product using arthroscopy surgery, and when the knot is tied

23  at the top and you're sliding, if the load is too high, the

24  doctor will feel a lot of resistance and he'll not use the

25  suture so it's very important to have the big load lower,

1  Q.  Okay.  Let me turn to Exhibit 1379, if I could.  1379.

2  A.  That's on the end.

3  Q.  Yes, I think it's at the end.  We'll make sure we get

4  the right one up.

5  A.  Yes.

6  Q.  What is this?

7  A.  This is a table, most meaningful table of the data.  It

8  gives all the property.  Can you blow it up a little bit?

9  No.  Anyway the test on the left is stiffness, which is a

10  pliability, slippage, strength, untie strength, run-down

11  force, friction, chatter, static drag and dynamic drag.

12  Q.  Now, the title of the table says, "Comparison of Values

13  For Data Significance."  What is the significance of this?

14  A.  Yes.  This is where we use the term, seems technical

15  term, statistical significance, you know, if life would have

16  been simple, every data would be the same, but it isn't, it

17  will vary, so that's why you do statistical analysis, very

18  important.  You can't publish any information, any journal

19  without this analysis.

20  Q.  Okay.  Now, is this what you -- is this -- strike that.

21  Did you rely on this statistical analysis in forming your

22  opinions?

23  A.  Absolutely.

24  Q.  And could you briefly explain from a statistical

25  analysis point of view what is being shown in this chart?

Page 728

1   Q.  If you can, the last two columns, the T threshold and

2   the experimental T value, I think that's what you're

3   referring to?

4   A.  Yeah.

5   Q.  If you could try and make it so somebody like me can

6   understand.

7   A.  We do every day all the data, so I'm accustomed.  What

8   we're trying to do, the question is that is this average

9   uncoated and the coated, are they significantly different,

10  and this is a tool to determine that, and these values

11  higher than the threshold value means significantly

12  different.  That's what in plain English that I can

13  describe.

14  Q.  Now, what is your opinion as to the statistical

15  significance of what is reported in Dr. Gitis' tests?

16  A.  That 95 percent confidence they're different.

17  Q.  And is it a significant difference?

18  A.  Yes.

19  Q.  Okay.  Now, could you turn to Exhibit 1378, please.

20  A.  Yes.

21  Q.  Now, did you hear Dr. Gitis talking about this chart

22  yesterday?

23  A.  Yes.

24  Q.  Okay.  Now, I don't want to go through it in great

25  detail with you because he did, but what is this showing

1   Q.  Now, does the heat stretching process help or hurt

2   pliability?

3   A.  The heat stretching hurts the pliability.

4   Q.  Could you explain, give an example to explain why?

5   A.  Best example I can give you, if I may, if you got a

6   guitar string and you pull it all the way, it becomes very

7   stiff, so that's what the stretching does to the

8   stiffness.

9   Q.  Does the heat stretching fill in those bumps on the

10  braided suture, those rough surfaces?

11  A.  There's no way.

12  Q.  Now, in the report that you reviewed from

13  Dr. Brookstein, did you make reference to his scanning

14  electron microscope?

15  A.  Yes.

16  Q.  Did you review what he had to say about that?

17  A.  Yes.

18  Q.  Okay.  Now, are you familiar with that equipment?

19  A.  Very much so.

20  Q.  And in your experience, is scanning electron microscopes

21  used to look at sutures?

22  A.  Yes.

23  Q.  And have you -- is that something you've done?

24  A.  We have done several of those.

25  Q.  Okay.  Could you explain why scanning electron

Page 740

1    microscopes are used for sutures?

2    A.   We -- as a lot of times the process of making suture

3    used before that, we looked at the scanning electron

4    microscopy and we see some damages.  That kind of

5    examination always goes on.

6    Q.   And did you ever look with the use of a scanning

7    electron microscope to look at the coating on sutures?

8    A.   No.

9    Q.   Could you explain why?

10   A.   Coating, especially like a silicone coating is so

11   transparent, it's colorless, so you cannot see anything.

12   Q.   Now, did you ever have any discussions with your

13   colleagues when you were at Davis & Geck as to what looking

14   at a scanning microscope would show with respect to the

15   coating?

16   A.   Oh, yeah, because we were --

17            MS. ELDERKIN:  Objection.

18            THE COURT:  Overruled.

19   Q.   Go ahead.

20   A.   We were putting coating on Dexon sutures so we wanted to

21   see at SEM nobody agreed, one person will say that there is,

22   another person will say no, there isn't, so they were not

23   really a very good test to find coating.

24   Q.   If Dr. Brookstein had wanted to do a fair test with his

25   microscope or something else, could he have done that?

1    A.   The only way is to put pigment into a silicone, you may.

2    Q.   And did he do that as far as you know?

3    A.   No.

4    Q.   Now, in your opinion, sir, would a person with

5    experience using a scanning electron microscope for suture

6    ever use such microscope for the purpose of seeing coating

7    on a suture?

8    A.   No.

9    Q.   Now, there was also some, you know, in Dr. Brookstein's

10   report that you reviewed for your report, did he opine that

11   the coating did not permeate into the braid?

12   A.   Yeah.

13   Q.   Okay.   Into the FiberWire braid?

14   A.   Right.

15   Q.   Okay.   In your opinion, sir, does it matter to affecting

16   the basic and novel characteristics of the '446 patent

17   whether the coating permeates the braid?

18   A.   It does not.

19   Q.   And could you explain why?

20   A.   Yeah.   Silicone is a coating, and its properties are

21   more or less, more than 100 times lower than the

22   polyethylene, so the sum of the mixture is better in the

23   direction making it more pliable so it does not matter where

24   the coating is going to go.

25   Q.   And how about for handleability, does it matter where

Page 742

1    the coating goes?

2    A.   No, it doesn't.

3    Q.   Okay.   Now, do you have an opinion as to whether in fact

4    the coating on the FiberWire does get into the braid?

5    A.   You know, it appears to me that it probably did.

6    Q.   Okay.   Why do you say that?

7    A.   Again, this is I'm looking at the scanning microscope

8    pictures.   They appear to be there is something there.   Now,

9    I do not hang my hat on this observation.   This is just kind

10   of a, to some extent, stipulation.

11   Q.   Now, are you familiar with I think you told me earlier

12   that you're familiar with the coating process for braided

13   sutures?

14   A.   Absolutely.

15   Q.   Is there anything in the braiding process that's used

16   for braided sutures, coating process that's used in braided

17   sutures that would allow you to come to the conclusion that

18   the coating gets into the braid?

19   A.   There is only thing because it's twice coated, there's a

20   good chance it will get in and also the waking action, if

21   you remember these little lamps that you put in the lamps

22   and the oil goes up, that's the wicking effect so it may get

23   in there from the operation itself.

24   Q.   Could you explain a bit more about the wicking effect

25   and what that has to do with coating processes for braided

Page 743

1    sutures?

2    A.   Like I gave you an example, you take the wick in the

3    lamp, then there's oil in the globe, and the way the oil

4    gets in through the scapular through what is called the

5    wicking action, and the same thing will happen when

6    designing solution is going into the braid.

7    Q.   Okay.  Now, in your experience with the coating process

8    that you're familiar with, is the oven part of that coating

9    process?

10   A.   The oven is used only for curing because there is a

11   cross-linking, now, again, confusing term probably.

12   Q.   Could you take a moment and explain what cross-linking

13   and curing is?

14   A.   What it is, if I can show you is like a fisherman's net,

15   no nets are made, they're not connected.  When you put the

16   connection between the two linear separate threads, that's

17   cross-linking, and silicone, if you cross-link, silicone is

18   going to wash away so there's a small amount of benzoyl

19   peroxide.  That's the chemical to produce that effect so

20   that's why you need the oven to cure it, nothing else.

21   Q.   Can you coat silicone coating without putting it through

22   the oven?

23   A.   No.

24   Q.   Okay.  The -- I want to ask you some about what

25   Dr. Brookstein said about Mr. Grafton's testimony to support

Page 804

1   A.   Based on a lot of experience and testing of existing

2   products.

3            MR. SABER:  We have no further ones to read to the

4   jury, your Honor.  There are a couple which we will just be

5   submitting for the record.

6            THE COURT:  All right.  And so?

7            MR. SABER:  If I can just have a moment.

8            (Discussion off the record between defense

9   counsel.)

10           MR. SABER:  And subject to just submitting these

11  additional deposition designations that I just mentioned, the

12  defense rests.

13           MS. ELDERKIN:  Can we see you at side bar?

14           THE COURT:  Yes.

15

16  SIDE-BAR CONFERENCE:

17           MR. SABER:  Excuse me.  And may I add, your Honor,

18  of course we have to respond to whatever is necessary to

19  respond to.

20           THE COURT:  Say it again?

21           MR. SABER:  Also, you know, we'd like the

22  opportunity to respond to anything further on the ownership

23  issue, if it becomes appropriate.

24           THE COURT:  Yes, I understand.

25           MR. BONELLA:  Your Honor, they have a declaratory

Page 805

1    judgment counterclaim for noninfringement, and we're moving

2    as a matter of law on that counterclaim.

3              THE COURT:  Denied.  Okay, thank you.  And so how

4    long do you have?

5              MR. BONELLA:  I think Dr. Brookstein, no more than

6    ten minutes.

7              THE COURT:  Ooh.

8              MR. SABER:  I'm going to hold you to it, Mike.

9              (End of side-bar conference.)

10             THE COURT:  The defense has rested, and now there

11   will be a brief rebuttal testimony by Dr. Brookstein.  Is

12   that correct?

13             MS. ELDERKIN:  Yes, your Honor.

14             MS. MALINOSKI:  Yes.

15             THE COURT:  Come on up, sir.  You're still under

16   oath.  Thank you.

17                       DAVID BROOKSTEIN

18   having been previously duly sworn, was examined and testified

19   further as follows:

20             THE COURT:  Oh, my gosh, look at these binders.  I

21   thought you wanted the jury to read those during

22   deliberations.

23             MR. SABER:  I want to see Dr. Brookstein read them

24   in the amount of time Mr. Bonella said.

25   DIRECT EXAMINATION BY MR. BONELLA:

1    two-step process.  The first step is to decide the meaning of

2    the patent claim.  I've already made this determination and

3    will instruct you as to the meaning of the claim at issue

4    here, and I showed you what that was on the patent.  The

5    second step is to decide whether defendants have made, used,

6    sold, offered for sale, or imported within the United States

7    a product covered by Claim 1 of the Hunter '446 patent.  You,

8    the jury, must make the determination about whether there's

9    been an infringement, and that's what you're asked on the

10   verdict form.

11        Now, the following claim terms -- and I'm once

12   again referring back to Claim 1 in the patent that I handed

13   out to all of you -- the following claim terms have the

14   following meanings.  You'll see in Claim 1 that there is the

15   abbreviation PE.  PE includes all polymers formed from a

16   repeating ethylene monomer, including ultra high molecular

17   weight polyethylene.  You've sometimes seen that shortened as

18   UHMWPE.

19        So let me say that again:  PE as it is in Claim 1

20   includes all polymers formed from a repeating ethylene

21   monomer, including ultra high molecular weight polyethylene.

22        What do we mean by the "basic and novel properties"

23   of the suture described in the Hunter '446 patent?  You

24   remember I handed that out to you on the very first day, and

25   I hope you still have a copy of what I said it was so you

Page 891

1    don't have to write it down, but I'm going to read it to you

2    right now.  The "basic and novel properties" of the suture

3    described in the Hunter '446 patent are:  (1) a surgical

4    suture, (2) composed of two dissimilar yarns from the lists

5    in Claim 1, (3) where at least one yarn from the first set is

6    in direct intertwining contact with a yarn from the second

7    set, (4) so as to improve pliability and handleability

8    without significantly sacrificing the physical properties of

9    the constituent elements of the suture.  You have that

10   already in writing.

11          So to prevail on its claim, what does the plaintiff

12   have to prove?  To prevail on its claim, DePuy Mitek must

13   prove by a preponderance of the evidence that defendants have

14   made, used, offered for sale, sold, or imported into the

15   United States the invention defined in Claim 1 of the Hunter

16   patent.

17          A person can directly infringe a patent without

18   knowing that what he is doing is an infringement of the

19   patent.  He may also infringe even though in good faith he

20   believes that what he is doing is not an infringement of any

21   patent.

22          Also, an accused product may infringe an asserted

23   patent regardless of whether the accused infringer has its

24   own later-issued patent on the accused product.  In other

25   words, the fact that Arthrex has a patent covering FiberWire

1    does not constitute a defense to infringement of plaintiff's

2    Hunter '446 patent.

3            So now I want to discuss a very unique patent term,

4    which is the term "consisting essentially of." You've seen

5    that a lot and heard a lot about it, "consisting essentially

6    of."

7            I call your attention to a phrase used in the

8    Hunter '446 patent, "consisting essentially of," which has a

9    very special meaning in patent law. Here, the phrase

10   "consisting essentially of" means that the claim may

11   encompass FiberWire sutures that include ingredients that are

12   not expressly listed in the claim, provided those ingredients

13   do not materially affect the basic and novel properties of

14   the invention, as I've just defined them.

15           I'll repeat that again. Here, the phrase

16   "consisting essentially of" means that the claim may

17   encompass FiberWire's sutures that include ingredients that

18   are not expressly listed in the claim, provided those

19   ingredients do not materially affect the basic and novel

20   properties of the invention, as I have just defined them to

21   you.

22           An effect on the basic and novel characteristics of

23   an invention is material -- that's a legal term,

24   "material." You've heard that term too. An effect on the

25   basic and novel characteristics of an invention is material

1    if the effect is of importance or of consequence to those of

2    ordinary skill in the art.

3           Let me state it again:  An effect on the basic and

4    novel characteristics of an invention is material if the

5    effect is of importance or of consequence to those of

6    ordinary skill in the art.

7           The only question here before you is the effect of

8    the silicone coating.  The only question here is the effect

9    of the silicone coating.  You will need to consider the

10   evidence and decide whether the silicone coating on FiberWire

11   has a material effect on the basic and novel properties of

12   the suture.

13          Again, you will need to consider the evidence and

14   decide whether the silicone coating on the FiberWire suture

15   has a material effect on the basic and novel properties of

16   the suture.

17          Mitek claims it does not have a material or

18   important effect, and Arthrex contends that it does have a

19   material or important effect.

20          To say it another way, the FiberWire sutures do not

21   infringe the claims of the Hunter '446 patent if the coating

22   on the FiberWire sutures materially affects the basic and

23   novel properties of the invention, as I have defined it.

24   Ultimately, you will have to decide based upon the evidence

25   whether plaintiff has proven that the coating included in the

# Exhibit 4

Slip Copy                                                                                    Page 1
Slip Copy, 2007 WL 1576116 (D.Minn.)
**(Cite as: Slip Copy)**

Hinz v. Neuroscience, Inc.
D.Minn.,2007.
Only the Westlaw citation is currently available.Dr.
Martin HINZ and Neuroresearch Clinics, Inc.,
Plaintiffs,
v.
NEUROSCIENCE, INC. and Gottfried Kellermann,
Defendants.
**No. 04-CV-0142(PJS/RLE).**

May 31, 2007.

Aaron W. Davis and Brian L. Stender, Patterson
Thuente Skaar & Christensen, PA, for plaintiffs.
Henry M. Helgen, III, Amanda R. Cefalu, and Carl
S. Wosmek, McGrann Shea Anderson Carnival
Straughn & Lamb, CHTD, for defendants.

ORDER
PATRICK J. SCHILTZ, United States District
Judge.
**\*1** On October 10, 2006, a jury found defendants
Neuroscience, Inc. and Gottfried Kellermann
(collectively "Kellermann") liable to plaintiffs Dr.
Martin Hinz and Neuroresearch Clinics, Inc.
(collectively "Hinz") on Hinz's claim for breach of
contract. The jury awarded Hinz $1,989,373.00 in
damages, and the Court entered judgment on the
jury's verdict.

This matter is before the Court on six post-trial mo-
tions: (1) Kellermann's motion for judgment as a
matter of law or, in the alternative, a new trial; (2)
Kellermann's motion for a stay of judgment; (3)
Kellermann's motion for an extension of time to file
a notice of appeal; (4) Hinz's motion for a perman-
ent injunction, and for pre- and post-judgment in-
terest; (5) Kellermann's motion for a stay of any
permanent injunction granted pursuant to Hinz's
motion; and (6) Hinz's motion for attorney's fees
and costs.FN1For the reasons set forth below, the
Court grants Kellermann's motion for judgment as a
matter of law with respect to damages and denies it
in every other respect. The Court also denies Hinz's
motions for a permanent injunction and for attor-

ney's fees and costs. The remaining motions are
denied as moot.

> FN1. The Court also previously granted
> Kellermann's motion for an order requiring
> Hinz to show cause why he should not be
> held in contempt for violating the Court's
> October 2, 2006 injunction. For the reasons
> stated at the February 20, 2007 hearing, the
> Court declines to impose any sanctions on
> Hinz for his one-time violation of the in-
> junction.

*A. Kellermann's Motion for Judgment as a Matter
of Law or a New Trial*

1. Sufficiency under Fed.R.Civ.P. 7(b)

Both Rule 50(b) (governing post-trial motions for
judgment as a matter of law) and Rule 59(a)
(governing motions for a new trial) require that
these motions be filed no later than ten days after
the entry of judgment. Kellermann filed Rule 50(b)
and Rule 59(a) motions on the tenth day after judg-
ment, but those motions did not describe the
grounds on which they were based. The basis of the
motions was described in a supporting memor-
andum, but that supporting memorandum was not
filed until the next day-after the ten-day deadline
had passed. *See*Docket No. 411 (motion filed Oct.
25, 2006); Docket No. 425 (noting that Keller-
mann's conventionally filed memorandum was re-
ceived in the clerk's office on Oct. 26, 2006). Hinz
argues that Kellermann's motions therefore failed to
"state with particularity the grounds therefor" as re-
quired by Rule 7(b), and that this failing was not
"cured" by the memorandum because the memor-
andum was filed after the ten-day deadline-a dead-
line that this Court has no power to extend. See
Fed.R.Civ.P. 6(b)(2). Therefore, Hinz contends,
Kellermann's motions must be dismissed under
Rule 7(b).

Rule 7(b)'s particularity requirement does not apply
to oral motions made during a hearing or trial,
however. *See*5 Charles Alan Wright & Arthur R.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Miller, Federal Practice and Procedure* § 1193 (3d ed. 2004) ("Rule 7(b)(1) specifically exempts oral motions made during a hearing or trial from the requirements of particularity[.]"). At the close of Hinz's case, Kellermann properly made an oral Rule 50(a) motion and specified the grounds for the motion in court as well as in a written submission. Trial Tr. vol. III, 478-490, Oct. 6, 2006; Docket No. 382.After the jury returned its verdict, Kellermann orally renewed his motion under Rule 50(b). Trial Tr. vol. V, 577, Oct. 10, 2006. The Court immediately informed Kellermann that it would "take [the motion] under advisement and expect you to brief it ... as part of your post-trial motions."Thus, the motion now pending before the Court is the oral Rule 50(b) motion that Kellermann made immediately after the jury returned its verdict. As noted, the particularity requirement of Rule 7(b) did not apply to that oral motion.[FN2]*Cf. Meriwether v. Coughlin,* 879 F.2d 1037, 1041-42 (2d Cir.1989) (holding that the following statement, made after the jury returned its verdict, was sufficient to comply with Rule 50(b): "I would, your Honor, like to at this time note that defendants wish to move for a judgment notwithstanding the verdict").

> FN2. The fact that Kellermann later-and unnecessarily-reduced his Rule 50(b) motion to writing does not change this analysis. Obviously, by reducing his oral Rule 50(b) motion to writing, Kellermann did not *withdraw* the oral Rule 50(b) motion-a motion that the Court had under advisement.

**\*2** One might argue that exempting oral motions from Rule 7(b)'s particularity requirement would lead to the absurd result that a party could move for judgment as a matter of law without ever having to specify the grounds for its motion. But Rule 50(a)(2) requires that a 50(a) motion "specify the judgment sought and the law and facts that entitle the movant to the judgment," without regard to whether the motion is oral or written. The reason for this particularity requirement is to give the non-movant the opportunity to introduce evidence sufficient to cure the claimed defect before the case is submitted to the jury. *See Canny v. Dr. Pepper/Seven-Up Bottling Group, Inc.,* 439 F.3d 894, 901 (8th Cir.2006). A Rule 50(b) motion is, by definition, a renewal of a Rule 50(a) motion. Thus, Rule 50(a)(2) has the practical effect of ensuring that the opposing party and the court will be apprised of the basis for any kind of Rule 50 motion.

Even if this analysis is incorrect-that is, even if Rule 7(b)'s particularity requirement *did* apply to Kellermann's Rule 50(b) motion-it is clear under *Andreas v. Volkswagen of America, Inc.,* 336 F.3d 789, 794 (8th Cir.2003), that the Court may look to Kellermann's *previous* filings to satisfy that requirement. Hinz argues that the written Rule 50(b) motion in *Andreas* was held to be sufficient only because the motion specifically alluded to one of the grounds raised in the Rule 50(a) motion. But the salient point of *Andreas* was the following holding: In the present case, the district court rightly looked to the Rule 50(a) pleadings. By definition, a Rule 50(b) motion is a renewal of a prior Rule 50(a) motion made at the close of the evidence and as such is limited to those issues raised in the previous motion.

*Id.* While *Andreas* pointed out that the written Rule 50(b) motion referred specifically to one of the four issues raised in the Rule 50(a) motion, it is not clear that *Andreas's* holding *depended* on that fact. Indeed, the Eighth Circuit has previously held:Once a sufficient motion for judgment as a matter of law has been made, nothing in the law requires the movant continually to make arguments or to file written motions repeating the details of the original over and over again. We believe that it is sufficient for the movant ... simply to renew the motion generically.

*Kline v. City of Kansas City, Fire Dep't,* 175 F.3d 660, 670 (8th Cir.1999).

Hinz contends that *Kline* is distinguishable because it concerned the sufficiency of the moving party's Rule 50(a) motion made at the close of all the evidence, rather than the sufficiency of a renewed motion under Rule 50(b).[FN3] But, as *Andreas* ex-

Slip Copy
Slip Copy, 2007 WL 1576116 (D.Minn.)
(Cite as: Slip Copy)

Page 3

plains, a Rule 50(b) motion is simply a renewal of a Rule 50(a) motion. If a Rule 50(a) motion can be "generically renewed" at the close of the evidence (as *Kline* held), then surely it can be "generically renewed" after the jury has returned its verdict.

> **FN3.** Although *Kline* cites Rule 50(b), it appears that the court was discussing only whether the moving party had properly made a Rule 50(a) motion at the close of the evidence. *See Kline,* 175 F.3d at 670 (discussing the motions made at the close of the plaintiffs' evidence, at the close of the defendant's evidence, and at the close of all the evidence).

**\*3** The Eighth Circuit has emphasized that technical precision is not necessary under Rule 50 or Rule 7, so long as the court and the opposing party are aware of the grounds for the motion. *Andreas,* 336 F.3d at 793; *Jarvis v. Sauer Sundstrand Co.,* 116 F.3d 321, 323 n. 4 (8th Cir.1997); *Cortez v. Life Ins. Co. of N. Am.,* 408 F.2d 500, 502-04 (8th Cir.1969). Here, the issue of damages raised in Kellermann's late-filed memorandum was also raised in his Rule 50(a) motion and was extensively argued throughout trial. When Kellermann orally renewed his motion after the verdict-and when Kellermann later (and unnecessarily) reduced that pending motion to writing-neither the Court nor the parties could have had any doubt regarding the basis for the motion. The Court therefore finds that Kellermann's Rule 50(b) motion is properly before the Court.[FN4]

> **FN4.** Because the Court has found that Kellermann's Rule 50(b) motion is sufficient, Kellermann's motion for an extension of time to file a notice of appeal is moot. *See* Fed. R.App. P. 4(a)(4)(A)(i) (a timely-filed Rule 50(b) motion tolls the deadline to file a notice of appeal).

The same is not true, however, for Kellermann's Rule 59(a) motion for a new trial. Kellermann did not move for a new trial under Rule 59(a) until ten days after the judgment, the final day for filing such

a motion. *See* Docket No. 411.As noted, that motion did not describe the grounds on which it was based, and Kellermann did not file a supporting memorandum identifying those grounds until the next day-one day after the ten-day deadline. *See* Docket No. 425.The Rule 59 motion is therefore insufficient under Rule 7(b), and the Court is without power to consider Kellermann's request for a new trial.[FN5] *See* Fed.R.Civ.P. 6(b)(2); *Riley v. Nw. Bell Tel. Co.,* 1 F.3d 725, 727 (8th Cir.1993).

> **FN5.** Although Rule 50(b)(1)(B) grants the Court the discretion to order a new trial, that discretion exists for the benefit of the *nonmoving* party, so that it may remedy the lack of evidence that would otherwise require entry of judgment against it. *See Goldsmith v. Diamond Shamrock Corp.,* 767 F.2d 411, 414 (8th Cir.1985). In contrast, an alternative motion for a new trial under Rule 59(a) is for the benefit of the party moving for judgment under Rule 50(b). In the event that the party is not entitled to judgment under Rule 50(b), it can ask, in the alternative, for a new trial under Rule 59(a). *See* 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* §§ 2538, 2539 (3d ed.2004).

Because Rule 50(b) expressly permits a party to jointly move under Rule 50(b) and Rule 59(a), Kellermann could argue that, to the extent that his Rule 59(a) motion presents the same issues as his Rule 50(b) motion, it is properly before the Court. But a Rule 59(a) motion can be based on any number of grounds, many of which would not be evident in the record of the trial. Simply invoking Rule 59 provides the Court with no basis on which to grant a new trial. The fact that Kellermann simultaneously moved for judgment as a matter of law under Rule 50(b) does not help him, because a Rule 59(a) motion is not equivalent to a Rule 50(b) motion. The standards applicable to the two motions are quite different. *See White v. Pence,* 961 F.2d 776, 779-80 (8th Cir.1992); 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2531 (3d ed.2004). Indeed, courts

Slip Copy
Slip Copy, 2007 WL 1576116 (D.Minn.)
(Cite as: Slip Copy)

Case 1:04-cv-12457-PBS    Document 176-7    Filed 10/18/2007    Page 5 of 10    Page 4

carefully distinguish between the two motions: A party who moves only for judgment as a matter of law under Rule 50(b)-and whose motion is denied-cannot be granted a new trial on the basis that the verdict is against the weight of the evidence. *See Goldsmith v. Diamond Shamrock Corp., 767 F.2d 411, 414-15 (8th Cir.1985).* The Court therefore concludes that the reference to Rule 59 in Kellermann's only timely filing is not sufficient to bring his Rule 59 motion properly before the Court. *See Riley, 1 F.3d at 726-27.*

### 2. Standard of Review

**\*4** Judgment as a matter of law is appropriate when a party has been fully heard on an issue and "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue [.]"Fed.R.Civ.P. 50(a)(1). In considering a motion for judgment as a matter of law, the Court must view the facts in a light most favorable to the nonmoving party and grant the nonmoving party the benefit of all reasonable inferences. *See Canny v. Dr. Pepper/Seven-Up Bottling Group, Inc., 439 F.3d 894, 899-900 (8th Cir.2006).* The Court should not grant the motion unless the evidence is susceptible of no reasonable inference sustaining the position of the nonmoving party. *Children's Broad. Corp. v. Walt Disney Co., 357 F.3d 860, 863 (8th Cir.2004).*

### 3. Damages

This case arose out of a previous lawsuit between the parties that ended in settlement. The jury in this case found that the parties' settlement agreement, which they signed in September 2003, prohibited Kellermann from promoting, marketing, using, or selling any product that contains the ingredient mucuna pruriens. *See*Docket No. 392.During the trial, Hinz argued that he was entitled to lost profits in the amount of $5.5 million, Cefalu Aff. Ex. L, Oct. 25, 2006, but the jury awarded him $1,989,373.00. Kellermann argues that the evidence was insufficient, as a matter of law, to support any award of damages.

Under Minnesota law, a plaintiff may recover dam-

ages for lost profits if the claimed damages are not remote, speculative, or conjectural. *See Cashman v. Allied Prods. Corp., 761 F.2d 1250, 1252 (8th Cir.1985)* (applying Minnesota law).[FN6] A plaintiff need not establish the amount of damages with absolute certainty. As long as the *fact* of damage is proven by a preponderance of the evidence, the difficulty of calculating the precise *amount* of damage will not preclude recovery if there is a reasonable basis on which to approximate that amount. *See Polaris Indus. v. Plastics, Inc., 299 N.W.2d 414, 419 (Minn.1980);* accord *Blaine Econ. Dev. Auth. v. Royal Elec. Co., 520 N.W.2d 473, 479 (Minn.Ct.App.1994); Cashman, 761 F.2d at 1253;*LeSueur Creamery, Inc. v. Haskon, Inc., 660 F.2d 342, 351 (8th Cir.1981).

> FN6. Both sides have applied Minnesota law to the issue of the sufficiency of the evidence on damages, and the Court will therefore do the same. *See Heatherly v. Alexander, 421 F.3d 638, 641-42 (8th Cir.2005)* (applying state law on causation in analyzing a motion for judgment as a matter of law).*But see Finley v. River N. Records, Inc., 148 F.3d 913, 918 (8th Cir.1998)* (in a diversity case brought under state law, the standard for reviewing whether the evidence was sufficient to support the verdict is set by federal law).

Ordinarily, to recover damages for lost profits, a plaintiff needs to offer evidence defining the market, demonstrating what his share of the market would have been but for the defendant's breach, and establishing the profit he would have earned on the increased sales. At trial, Hinz offered evidence that the market for the use of mucuna pruriens as a treatment for neurotransmitter dysfunction was essentially a two-seller market consisting of Hinz and Kellermann, who competed for the same specialized customer base-and, at least initially, for some of the same customers. To calculate his damages, Hinz offered evidence that the rate of his sales growth fell after Kellermann began breaching the settlement agreement (which, under Hinz's theory, happened immediately after the parties signed it).

Slip Copy, 2007 WL 1576116 (D.Minn.)
**(Cite as: Slip Copy)**

**\*5** Specifically, Hinz offered evidence that in the year preceding the parties' settlement agreement (August 2002 to September 2003), Hinz's sales grew by 88.2%. Cefalu Aff. Ex. L, Oct. 25, 2006. In contrast, in the three years after the parties entered into the settlement agreement (when Kellermann was continually in breach of it), Hinz's sales grew by only 28.4%, 10.5%, and 18.8%, respectively. *Id.* Because there is no other reason why Hinz's rate of growth would have dropped so substantially, Hinz argues, it is reasonable to assume that Kellermann's breach caused the drop. Further, Hinz contends, in a two-seller market in which his competitor's sales were rapidly increasing, it is reasonable to infer that Hinz's sales would have increased by at least 88.2% per year if Kellermann had not breached the settlement agreement. *See B & Y Metal Painting, Inc. v. Ball,* 279 N.W.2d 813, 816 (Minn.1979) (holding that evidence that the plaintiff's growth rate declined while the overall industry grew at a steady pace would tend to prove that the defendant's breaches caused the plaintiff's decline). Hinz argues that a reasonable approximation of his damages can be reached by applying his historical 43% royalty rate to the difference between his actual rate of growth (28.4%, 10.5%, or 18.8%) and his expected rate of growth (88.2%).

The Court has carefully considered the parties' arguments and, although the Court does not doubt that Hinz suffered *some* injury as a result of Kellermann's breach, and although the Court is loathe to overturn the verdict of any jury, the Court cannot help but conclude that Hinz's evidence is too speculative to support an award of damages under Minnesota law. There are several problems with Hinz's evidence.

First, Hinz offered virtually no evidence about his and Kellermann's products, other than that all of the breaching products contain mucuna pruriens and all of them treat neurotransmitter dysfunction. But Hinz and Kellermann sell numerous products containing mucuna pruriens in combination with various other ingredients. These products are used to treat dozens of different conditions and are aimed at very different groups of consumers. Hinz testified

that his products are effective in treating obesity, insomnia, pre-menstrual syndrome, depression, and restless leg syndrome, among other conditions. Hinz lumps together all products containing mucuna pruriens in order to compare his sales with Kellermann's sales, but Hinz offered no evidence explaining the difference between the products or why a customer would buy one over another.

Second, because Hinz made no effort to segment the market, he also made no effort to prove which segments of the market were growing and at what rates. There was also no evidence to indicate whether Hinz's sales growth came from new customers or increased sales to existing customers-an important point, since Hinz's chief piece of evidence that Kellermann's breach depressed Hinz's sales was that Kellermann initially marketed his products to Hinz's customers.

**\*6** Third, Hinz's reliance on only one year's worth of sales growth as a benchmark-his assumption that, because during one year his sales grew by 88.2%, his sales would have continued to grow by 88.2%-is extremely problematic. Hinz offered no evidence whatsoever about whether this one-year increase in sales was aberrational or typical. Nor did Hinz offer any evidence, expert or otherwise, about overall sales growth in the industry-an "industry" that, it should be noted, is small and in its infancy and thus presumably subject to wild fluctuations. The fact that Hinz's sales grew 88.2% in a single year gave the jury no basis for concluding whether, in the absence of competition from Kellermann, Hinz's sales in future years would have grown 8.2%, 88.2%, or 882.0%. The jury was left to speculate, and speculation cannot sustain an award of lost profits.

Hinz's use of the 88.2% sales-growth rate has another flaw. Again, Hinz's argument is that, because his sales increased 88.2% from August 2002 to September 2003 (when the settlement agreement with Kellermann was signed), they would have continued to increase by 88.2% if Kellermann had honored the settlement agreement and not sold products containing mucuna pruriens. According to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Hinz, the fact that his sales-growth rate dropped from 88.2% in 2002-2003 (the year before the settlement agreement was signed) to 28.4% in 2003-2004 (the year after the settlement agreement was signed) was entirely due to the fact that Kellermann was selling products containing mucuna pruriens in violation of the settlement agreement.

The problem with this reasoning is that, during *both* the "benchmark" year (2002-2003) *and* the three "damages" years (2003-2006), Kellermann was selling products containing mucuna pruriens. Hinz and Kellermann originally planned to be in business together. After their relationship deteriorated, they each went their separate ways, but both continued to sell products containing mucuna pruriens. In September 2003, Hinz and Kellermann signed the settlement agreement, but, from the outset, Kellermann did not interpret the settlement agreement as restricting his ability to sell products containing mucuna pruriens. To this day, Kellermann has not stopped selling products containing mucuna pruriens.

Had Kellermann not been selling products containing mucuna pruriens before the settlement agreement was signed, and then begun selling the products after the settlement agreement was signed, then it would make sense to attribute the drop in Hinz's sales-growth rate to Kellermann. Something would have changed, and that "something" would most likely have been Kellermann. But that's not what happened. Before the settlement agreement was signed, both Hinz and Kellermann were selling products containing mucuna pruriens. After the settlement agreement was signed, both Hinz and Kellermann continued to sell products containing mucuna pruriens. The "something" that changed from the year before the settlement agreement was signed (when Hinz's sales-growth rate was 88.2%) to the year after the settlement agreement was signed (when Hinz's sales-growth rate was 28.4%) was obviously not Kellermann. Hinz's sales must have dropped for some other reason-a reason not even hinted at, much less quantified, by the evidence presented at trial.

**\*7** This is not to deny that Kellermann's continued presence in the market cost Hinz some sales. Without question, Hinz would have sold more products containing mucuna pruriens had he been able to sell in a one-seller market, instead of competing against Kellermann in a two-seller market. But the jury had no basis whatsoever for figuring out *how many* more products Hinz would have sold. Hinz's theory-that *all* of the drop in his sales-growth rate from 88.2% to 28.4% (and then to 10.5% and 18.8%) was caused by Kellermann's continued presence in the market-simply makes no sense.

With only a rudimentary outline of the relevant market, one year's worth of sales growth at a particular rate, and no evidence that Kellermann's breach actually altered the competitive conditions of the market, Hinz has provided no reasonable basis for the calculation of his damages. Kellermann's motion for judgment as a matter of law is therefore granted with respect to the issue of damages. In light of the Court's disposition of this motion, Kellermann's motion for stay of judgment and Hinz's motion for pre- and post-judgment interest are both denied as moot.

### 4. Interpretation of the Settlement Agreement

The remainder of Kellermann's motion is based on his argument that there is insufficient evidence to support Hinz's interpretation of the settlement agreement. Kellermann did not properly preserve this argument, because he failed to make it as part of his Rule 50(a) motion. *See Andreas,* 336 F.3d at 794. Instead, Kellermann's Rule 50(a) argument was that the Court erred in finding that the settlement agreement was ambiguous and therefore erred in permitting the jury to consider parol evidence. *See* Trial Tr. vol. III, 488-89, Oct. 6, 2006. This is not the same as arguing that the parol evidence was insufficient to support the jury's verdict as to liability. Kellermann's motion on the issue of the meaning of the settlement agreement is therefore denied.

To the extent that Kellermann's motion rests on his properly preserved argument-that the Court erred in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1576116 (D.Minn.)
**(Cite as: Slip Copy)**

permitting the jury to consider parol evidence-the motion is denied for the reasons stated at the February 20, 2007 hearing. The Court continues to believe that the settlement agreement was ambiguous, that parol evidence was admissible on the question of its meaning, and that the jury's verdict regarding the meaning of the agreement was supported by the evidence.

### 5. Federal Rule of Civil Procedure 50(c)

When a court grants a Rule 50(b) motion, it must also rule in the alternative on a motion for a new trial, if one was brought. See Fed.R.Civ.P. 50(c). As explained above, Kellermann's Rule 59(a) motion is not properly before the Court, and the Court therefore need not rule on it under Rule 50(c).

### B. Hinz's Motion for a Permanent Injunction

Hinz moves for an injunction permanently prohibiting Kellermann from promoting, marketing, using, or selling any product containing mucuna pruriens. In this diversity action, the Court applies Minnesota law to determine whether a permanent injunction is appropriate. See *Kelly v. Golden,* 352 N.W.3d 344, 353 (8th Cir.2003); 19 Charles Alan Wright et al., *Federal Practice & Procedure* § 4513 (2d ed.1996).

**\*8** In Minnesota, a party seeking an injunction must establish that it has no adequate legal remedy and that an injunction is necessary to prevent great and irreparable harm. *Cherne Indus., Inc. v. Grounds & Assocs., Inc.,* 278 N.W.2d 81, 92 (Minn.1979); *Jackel v. Brower,* 668 N.W.2d 685, 688 (Minn.Ct.App.2003). In this case, although Hinz offered sufficient proof that Kellermann breached the settlement agreement, Hinz has failed to provide a reasonable basis for calculating his damages. This failure also precludes the Court from granting Hinz's requested equitable relief.

To be irreparable, the harm must be of such a nature that money alone cannot remedy it. *See Morse v. City of Waterville,* 458 N.W.2d 728, 729-30 (Minn.Ct.App.1990). The only injury Hinz has identified in this action is lost profits, which are obviously compensable with money damages. Hinz

has not shown that he has suffered, or will suffer, any other type of injury. The Court is therefore unable to say that any harm Hinz may be suffering is irreparable.

This case is not like a typical non-compete or trade-secret case in which, absent specific performance, the plaintiff's business is likely to suffer an impairment of goodwill or some other intangible, protectable interest. *Cf. Cherne,* 278 N.W.2d at 94 (affirming injunction against use of confidential information); *Chesney v. Hypertension Diagnostics, Inc.,* No. A05-2210, 2006 WL 2256590, at \*6 (Minn.Ct.App. Aug. 8, 2006) (affirming injunction against use of the plaintiffs' names in corporate communications where such use threatened fundamental harm to the plaintiffs' reputations). Nothing in the settlement agreement prevents Kellermann from competing with Hinz for the same customers or in the same territory, and Hinz himself argues that Kellermann is free to use other, equally effective ingredients. If that is the case, there is no basis to infer that Hinz will suffer irreparable harm in the absence of an injunction. Without any showing of irreparable harm, Hinz's motion for an injunction must be denied.

### C. Attorney's Fees and Costs

Hinz moves for attorney's fees and costs under ¶ 2 of the settlement agreement, which states as follows:

To the extent it becomes necessary for [Hinz], or any entity substantially owned or controlled by [Hinz], to seek Court enforcement of this provision of the Agreement, and [Hinz] prevails, [Kellermann] agrees to pay all attorneys fees and all costs necessarily incurred by [Hinz] in enforcing this provision[.]

Cefalu Aff. Ex. A at 4, Oct. 25, 2006. The "provision of the Agreement" to which this language refers is the section in which Kellermann agreed to permanently discontinue the promotion, sale, and use of certain specified trade names, trademarks, and products, including, as the jury found, any products containing mucuna pruriens.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1576116 (D.Minn.)
(Cite as: Slip Copy)

Case 1:04-cv-12457-PBS    Document 176-7    Filed 10/18/2007    Page 9 of 10    Page 8

Although this case originally involved multiple claims and counterclaims, the only claim that went to trial was Hinz's claim that Kellermann breached the settlement agreement by selling products containing mucuna pruriens. As Kellermann concedes, the settlement agreement grants Hinz the right to recover all fees and costs "necessarily incurred" in prosecuting that claim. *See* Schwickert, Inc. v. Winnebago Seniors, Ltd., 680 N.W.2d 79, 87 (Minn.2004) (recovery of attorney's fees must be based either on a statute or a contract). The settlement agreement also requires, however, that Hinz *prevail* before he can recover his fees and costs. In light of the pendency of Kellermann's motion for judgment as a matter of law, the Court asked the parties to brief the issue of whether Hinz would be entitled to recover fees and costs even if he did not recover any damages.

*9 Having considered the parties' arguments, the Court reluctantly concludes that Hinz is not entitled to recover attorney's fees and costs under the settlement agreement. As explained above, Hinz has failed to provide sufficient evidence to support an award of damages or the entry of a permanent injunction. Hinz's failure to prove that he is entitled to damages means that his breach-of-contract claim fails as a matter of law. *See* Jensen v. Duluth Area YMCA, 688 N.W.2d 574, 578-79 (Minn.Ct.App.2004) ("A breach of contract claim fails as a matter of law if the plaintiff cannot establish that he or she has been damaged by the alleged breach.")

The only manner in which Hinz can be said to have prevailed is that he obtained a jury finding interpreting the settlement agreement in his favor. But Hinz did not seek declaratory relief defining the meaning of the settlement agreement; he sought damages, which he did not recover. While Hinz argues that, at a minimum, he can now take advantage of the preclusive effect of the jury's finding of liability, that is not at all clear. To be given preclusive effect in later litigation, a finding must have been "necessary and essential to the resulting judgment." *See* Conwed Corp. v. Union Carbide Corp., 443 F.3d 1032, 1038 (8th Cir.2006) (applying Min-

nesota law). Because a failure to prove damages defeats Hinz's claim as a matter of law, *see* Jensen, 688 N.W.2d at 578-79, the judgment in this case will provide that Hinz take nothing. The jury's finding of liability cannot be said to be necessary and essential to such a judgment.

To argue otherwise, Hinz points to a quote from a concurrence in Buckhannon Board and Care Home, Inc. v. West Virginia Department of Health and Human Resources, 532 U.S. 598 (2001), in which Justice Scalia said: "['Prevailing party'] has traditionally-and to my knowledge, prior to enactment of the first of the statutes at issue here, *invariably*-meant the party that wins the suit or obtains a finding (or an admission) of liability."*Id.* at 616.Hinz contends that he has "obtain[ed] a finding of liability" and therefore has prevailed.

But Justice Scalia wrote this in the context of rejecting the "catalyst" theory for recovery of attorney's fees in civil-rights cases-the theory that, if the plaintiff's lawsuit prompts the defendant to voluntarily cease its allegedly illegal conduct, the plaintiff ought to recover attorney's fees. Justice Scalia was not distinguishing between liability and damages. On that subject, the Supreme Court has said that, when a plaintiff recovers only nominal damages, a reasonable attorney's fee will normally be no fee at all. *See* Farrar v. Hobby, 506 U.S. 103, 115 (1992). Similarly, the Supreme Court has held that an appellate court's finding of a constitutional violation did not entitle a plaintiff to recover fees when the plaintiff failed to take the steps necessary to obtain a declaratory judgment, or any other relief, from the district court. *See* Hewitt v. Helms, 482 U.S. 755, 760 (1987). As the *Hewitt* Court aptly stated, "Respect for ordinary language requires that a plaintiff receive at least some relief on the merits of his claim before he can be said to prevail."*Id.* Here, Hinz has not obtained any relief on the merits of his claim. The Court therefore concludes that Hinz has not "prevail[ed]" within the meaning of the settlement agreement, and his motion for attorney's fees is therefore denied.

ORDER

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*10** Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendants' motions for judgment as a matter of law, or, in the alternative, a new trial [Docket No. 411] are GRANTED in part and DENIED in part as follows:

a. The motion for judgment as a matter of law is GRANTED with respect to the issue of damages.

b. The motions are DENIED in all other respects.

2. Defendants' motion to stay the judgment [Docket No. 413] is DENIED as moot.

3. Plaintiffs' motion [Docket No. 420] is DENIED to the extent that it seeks a permanent injunction and DENIED as moot to the extent it seeks pre- and post-judgment interest.

4. Defendants' motion to stay permanent injunction [Docket No. 434] is DENIED as moot.

5. Defendants' motion to extend time to file notice of appeal [Docket No. 443] is DENIED as moot.

6. Plaintiffs' motion for attorney's fees and costs [Docket No. 459] is DENIED.

7. The judgment entered on October 11, 2006 [Docket No. 395] is VACATED, and a new judgment shall be entered as follows: Plaintiffs shall take nothing from defendants.

LET JUDGMENT BE ENTERED ACCORDINGLY.

D.Minn.,2007.
Hinz v. Neuroscience, Inc.
Slip Copy, 2007 WL 1576116 (D.Minn.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

DePuy Mitek, Inc.
  a Massachusetts Corporation   )
               )
     Plaintiff,      )
               )  Civil No. 04-12457 PBS
     v.        )
               )
Arthrex, Inc.
  a Delaware Corporation and   )
               )
Pearsalls Ltd.
  a Private Limited Company   )
  of the United Kingdom

     Defendants.

**DePuy Mitek's Memorandum in Support of Its Motion for Summary Judgment of
Infringement & Opposing Arthrex's Motion for Summary Judgment of Noninfringement**

handleability without significantly sacrificing the physical properties of the constituent elements of the suture"

(Ex. 1 at 18-19).

### 2. As a Matter of Law, FiberWire's Surface Coating Does Not Materially Affect Basic and Novel Properties

As the Court recognized in its Order, in attempting to improve suture properties, the prior art had overlooked the importance of fiber-fiber friction and its impact on fiber mobility and braid pliability (*id.* at 17). Prior art methods frequently attempted to improve suture properties by using coatings which significantly restricted the movement of adjacent filaments of the braid (*id.*). As explained above, the benefits of the invention claimed in the 446 Patent are realized by mechanically blending dissimilar yarns in direct intertwining contact (Ex. 2 at 2:32-37; 2:49-66; 3:40-51; 8:50-61). But the 446 Patent also teaches that, once those advantageous suture properties are realized by the formation of the heterogeneous braid, they can be *further enhanced* by applying a surface coating to the suture (*id.* at 6:5-21). The 446 Patent therefore "directly speaks to and conclusively answers the question of what constitutes a material effect," as the Court noted in its Order a patent can do (Ex. 1 at 14). The Patent directly states that surface coatings which further enhance properties are contemplated by the invention. Since it is undisputed that FiberWire's coating is a surface coating (it does not substantially penetrate the braid interstices, does not materially affect "fiber mobility," "movement of adjacent filaments," the dissimilar yarn fibers, direct intertwining contact, or the resulting suture properties) (Ex. 6 at ¶¶44; 47; 53; 62-64)), this Court can and should rule, as a matter of law, that FiberWire's silicone coating does not materially affect the basic and novel properties of the suture.

Trying to avoid summary judgment, Arthrex incorrectly tries to spin a single sentence from column 6, lines 13-17 of the 446 Patent as "criticizing" the use of coatings and stating that it is "best to 'avoid'" coatings. But the 446 Patent says neither thing. Rather, it merely states

that, in certain limited circumstances where the amount of lubricous yarn in the suture is significant enough, a "conventional coating *may* be eliminated" saving expense and avoiding potential stiffening (Ex. 2 at 6:16-17) (emphasis added). "May" does not equal "criticize" or "best." Consistent with the remainder of the 446 Patent disclosure, the use of the term "may" indicates that the coating is optional or immaterial.[5]

Arthrex tries to suggest that the Court adopted Arthrex's construction, and that Mitek's counsel admitted that there would be issues of fact precluding summary judgment of infringement if Mitek's construction were not adopted. But the Court did not adopt Arthrex's construction in total, and therefore based on the Court's construction and its statement of the law of materiality, the Court can decide Mitek's motion as a matter of law (Ex. 1 at 14, citing *AK Steel*, 344 F.3d at 1240).[6]

Arthrex cites *AFG Indus., Inc. v. Cardinal IG Co., Inc.*, 239 F. 3d 1239 (Fed. Cir. 2001), for the proposition that materials disclosed in the patent and not recited in the claims can materially alter the basic and novel properties of the invention. The case, however, does not stand for that broad proposition. The patent asserted in *AFG Indus.* disclosed that the unlisted ingredient, an interlayer, did not have a material affect if it improved adhesion but did not

---

[5]    Arthrex incorrectly contends that the 446 Patent criticizes FiberWire's coating because it is supposedly a "thermoset" and the 446 Patent supposedly criticizes all thermoset coatings. But Arthrex's cited "evidence" does not even mention "thermoset" (Arthrex Ex. 24), and there is no evidence defining a "thermoset." Further, the 446 Patent does not "criticize" all thermoset coatings. Rather, it refers to a "particular" PTFE thermoset coating that has a "tendency to flake off during use" (Ex. 2 at 1:48-53). FiberWire's coating is indisputably not PTFE.

[6]    *See also PPG Indus. v. Guardian Indus. Corp.*, 156 F. 3d 1351, 1356-57 (Fed. Cir. 1998) (considering patent specification and prosecution history in considering whether effects are material); *Ex parte Boukidis*, 154 U.S.P.Q. 444, 444 (B.P.A.I. 1966) (finding that the expression "consisting essentially of" does not exclude ingredients from the scope of the claims when the specification clearly indicates that other ingredients may be present); *Bayer AG v. Sony Elecs., Inc.*, 229 F. Supp. 2d 332, 343-344 (D. Del. 2002) (considered intrinsic record to determine whether it defined what was per se a material effect); *BASF Corp. v. Eastman Chem. Co.*, No. 95-746-RRM, 1998 U.S. Dist. LEXIS 23054, *28-30 (D. Del. Mar. 24, 1998) (Ex. 18).

substantially affect the optical properties. *Id.* at 1242. The Federal Circuit specifically adopted this standard as the materiality standard. *Id.* at 1252. Because the materiality standard matched the disclosure, if the unlisted ingredient, the interlayer, satisfied the materiality standard, then it also was disclosed as being part of the invention. Thus, *AFG Indus.* actually supports Mitek's position that the Court should adopt the materiality standard defined in the 446 Patent.

Arthrex now alleges that the 446 Patent's prosecution history indicates that the "consisting essentially of" language excludes all coatings. An examination of the prosecution history (Ex. 19) shows that the addition of "consisting essentially of" to the claims had nothing to do with coatings. As Mitek explained in its *Markman* briefing, the "consisting essentially of" language was added to the claims to exclude certain bioabsorbable yarns. Ironically, in response, Arthrex argued that "The Reasons for Adding 'Consisting Essentially of to the Claims [sic] *Has No Impact* On Whether An Unrecited Ingredient *Materially Affects* the Novel and Basic Characteristics" (D.I. 55 at 5) (emphasis added), and the Court addressed the reasons for adding the "consisting essentially of" language separate from defining the novel and basic characteristics (Ex. 1 at 16). Arthrex's position now, that the prosecution history somehow shows that the "consisting essentially of" language excludes coatings, is inconsistent with its prior position.

In summary, even accepting as true Arthrex's factual allegations that FiberWire's surface coating improves knot-tying and handleability, summary judgment of infringement is warranted as a matter of law because the 446 Patent explicitly contemplates such coatings.

### 3.    Arthrex's Tipping Allegations Are Legally Erroneous

Although it is not clear if Arthrex is maintaining this argument, it had previously made an additional "consisting essentially of" argument, alleging that FiberWire does not infringe because about one inch of both ends of the about 38 or 18 inch long FiberWire sutures (Ex. 13 at

Exhibit 6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DePUY MITEK, INC.,<br>Plaintiff,<br><br>v.<br><br>ARTHREX, INC. and<br>PEARSALLS LTD.<br>Defendants. | CIVIL ACTION NO. 04-12457-PBS |

**MEMORANDUM AND ORDER**

January 31, 2007

Saris, U.S.D.J.

**INTRODUCTION**

Plaintiff DePuy Mitek, which specializes in the manufacture
of surgical devices, alleges that Arthrex, Inc., and Pearsalls
Ltd. (collectively "Arthrex"), two of Plaintiff's competitors,
have infringed U.S. Patent No. 5,314,446 ("the '446 Patent").
Broadly, the '446 patent protects a braided surgical suture with
two multi-filament yarns made from different materials.  Beyond
this definition, though, the parties disagree as to two key terms
in the '446 Patent.

DePuy Mitek and Arthrex have moved for summary judgment on
the issue of infringement.  After a <u>Markman</u> hearing, the Court
defines the two contested patent terms and **DENIES** without
prejudice Plaintiff's motion for summary judgment of infringement
and Defendants' motion for summary judgment of noninfringement.

at 1240.  Where the specification and/or prosecution history directly speaks to and conclusively answers the question of what constitutes a material effect, the issue may be resolved as a question of law.  Id.  In some situations, however, whether an additional ingredient materially affects the basic and novel characteristics of a patented invention is a question of fact for a jury.  See PPG, 156 F.3d at 1357 (stating that it is the province of the jury to determine whether the iron sulfide had a material affect on the basic and novel characteristics of the patented glass).

The key question of claim construction for this term in Claim One involves discerning the basic and novel properties of the heterogeneous suture.  Once this determination has been made, the Court can attempt to resolve the parties' disagreement over whether the surgical coating placed on FiberWire braided suture "materially affects" the basic and novel properties of the suture described by the '446 Patent.  AK Steel, 344 F.3d at 1239.

The Defendants submit that this Court should construe the claim term "consisting essentially of" as follows:

> i) The claimed surgical suture excludes additional ingredients that materially affect the basic and novel characteristics of the claimed invention.
> ii) The basic and novel characteristics of the claimed invention are a suture having two dissimilar yarns (from the list identified in the claims) braided together to achieve improved handleability and pliability performance without significantly sacrificing its physical properties.

14

added).  Later, the applicant again distinguishes the prior art:
"Kaplan does not suggest or disclose combining a first set of
nonabsorbable yarns (i.e., PTFE) and a second set of
nonabsorbable yarn (i.e., PET).  (DM 1000260).[4]  Id.  Thus the
Plaintiff argues there is a clear and express disclaimer of
bioabsorbable yarns in the prosecution history.  SanDisk Corp. v.
Memorex Prods., Inc., 415 F.3d 1278, 1286 (Fed. Cir. 2005).

Defendants contend that the prosecution history does not
support this interpretation because the patent specification
provides, "The fiber-forming polymers can be bioabsorbable or
nonabsorbable, depending on the particular application desired."
'446 Patent col.3 ll.63-65 (emphasis added).  Still, under the
doctrine of prosecution disclaimer, Plaintiff's argument that it
clearly disclaimed bioabsorbable yarns to overcome the rejection
seems persuasive.  Nonetheless, this debate seems largely beside
the point because the issue here involves coatings, not
bioabsorbable yarns.

The Defendants contend that the invention's primary basic
and novel characteristic is that it improves the handleability
and pliability of a suture without significantly sacrificing any
physical properties of the constituent materials of the device,
like strength or knot tiedown.  The specifications reveal that

---

[4]In addition, the plaintiff pointed out that Kaplan taught
that sheath yarns listed in the invention should not be used in
sheaths.

the mechanical braiding of the two dissimilar fibers was intended to enhance the overall pliability of the device. As the "Background of the Invention" section notes, "the enhanced pliability of a braided multifilament is a direct consequence of the lower resistance to bending of a bundle of very fine filaments relative to one large diameter monofilament." '446 Patent col.1 ll.12-15. For this reason, the inventors eschewed "any mechanism which reduces this individual fiber mobility." Id. at col.1 ll.18-19. The specification states that the invention relates to "sterilized, braided multifilaments suitably adapted for use as surgical sutures or ligatures." Id. at col. 1 ll. 6-8. These "[b]raided multifilaments often offer a combination of enhanced pliability, knot security and tensile strength when compared to their monofilament counterparts." Id. at col.1 ll.8-10. The specification points out, "Unfortunately, the prior art abounds with attempts to improve specific properties of multi-filament braids at the expense of restricting the movement of adjacent filaments which make up the braid. For example, multi-filament sutures almost universally possess a surface coating to improve handling properties." Id. at col. 1 ll. 26-31. It continues: "All of the attempts described in the prior art have overlooked the importance of fiber-fiber friction and its impact on fiber mobility and braid pliability." Id. at col. 2 ll. 14-17. Of significance, the specification states:

17

In view of the deficiencies of the prior art, it would be desirable to prepare multifilament sutures exhibiting improved pliability and handling properties.  More specifically, it would be most desirable to prepare braided multifilaments composed of dissimilar fiber-forming materials in which the fiber-forming materials contribute significantly to enhanced pliability for the braided multifilament without appreciably sacrificing its physical properties."

Id. at col.2 ll, 32-37 (Emphasis added).

Plaintiff argues that increased pliability is a property only of the preferred embodiment, pointing to the passage that states: "For example, in preferred embodiments, the heterogenous braid will exhibit improved pliability and handling properties relative to that of conventional homogeneous fiber braids, without sacrificing physical strength or knot security." Id. at col. 2 ll. 50-67.  As shown above, this is a myopic view of the specification, which states throughout that a primary goal of the invention is to achieve enhanced pliability and handleability. The sterilized heterogeneous braids described in this patent seek to achieve a high degree of pliability and handleability by mechanically blending together two dissimilar synthetic yarns.

Therefore, this Court concludes that the basic and novel properties of the suture described in the '446 Patent are: (1) a surgical suture, (2) composed of two dissimilar yarns from the lists in Claim One, (3) where at least one yarn from the first set is in direct intertwining contact with the yarn from the second set, (4) so as to improve pliability and handleability

18

without significantly sacrificing the physical properties of the
constituent elements of the suture.

## 2. Summary Judgment

As noted previously, both DePuy Mitek and Arthrex have moved
for summary judgment on the issue of patent infringement.
However, the summary judgment record is a mess because of the
multiple motions to strike, each with extensive appendices and
confusing briefing.  This Court has allowed Arthrex to supplement
Dr. Gitis's expert report to correct certain typographical and
computational errors.  Moreover, DePuy Mitek has launched a
Daubert challenge to Defendants' expert report, and it is
difficult to figure out the various expert opinions on the affect
of the coatings on the accused devices.  Accordingly, this Court
will deny these cross-motions for summary judgment without
prejudice.

### ORDER

Plaintiff's motion for summary judgment of infringement is
**DENIED** without prejudice (Docket No. 36).  Defendants' motion for
summary judgment of noninfringement is **DENIED** without prejudice
(Docket No. 39).

All parties are ordered to submit a single brief, not to
exceed 20 pages, on the summary judgment issue of patent
infringement within 60 days in light of the Court's construction
of the '446 Patent.  The parties shall file no additional motions

# Exhibit 7



US005314446A

# United States Patent [19]

## Hunter et al.

[11] **Patent Number:** 5,314,446

[45] **Date of Patent:** May 24, 1994

[54] **STERILIZED HETEROGENEOUS BRAIDS**

[75] Inventors: Alastair W. Hunter, Bridgewater; Arthur Taylor, Jr., Plainfield, both of N.J.; Mark Steckel, Maineville, Ohio

[73] Assignee: **Ethicon, Inc.**, Somerville, N.J.

[21] Appl. No.: **838,511**

[22] Filed: **Feb. 19, 1992**

[51] Int. Cl.⁵ ............................................ D04C 1/00

[52] U.S. Cl. .................................. 606/231; 606/228; 87/7; 87/9; 428/370

[58] Field of Search .................. 606/228, 230, 231; 87/7, 8, 9; 428/225

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,187,752 | 6/1965 | Glick | 128/335.5 |
| 3,463,158 | 8/1969 | Schmitt et al. | 606/228 |
| 3,527,650 | 9/1970 | Block | 117/7 |
| 3,636,956 | 1/1972 | Schneider | 128/335.5 |
| 3,942,532 | 3/1976 | Hunter et al. | 128/335.5 |
| 4,043,344 | 8/1977 | Landi et al. | 128/335.5 |
| 4,047,533 | 8/1977 | Perciaccante et al. | 128/335.5 |
| 4,052,988 | 10/1977 | Doddi et al. | 128/335.5 |
| 4,141,087 | 2/1979 | Shalaby et al. | 3/1 |
| 4,470,941 | 9/1984 | Kurtz | 264/136 |
| 4,624,256 | 11/1986 | Messier et al. | 128/335.5 |
| 4,946,467 | 8/1990 | Ohi et al. | 606/228 |
| 4,959,069 | 9/1990 | Brennan et al. | 606/228 |
| 4,979,956 | 12/1990 | Silverstrini | 623/13 |
| 5,116,360 | 5/1992 | Pinchuk et al. | 623/1 |
| 5,147,400 | 9/1992 | Kaplan et al. | 623/13 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2949920 | 3/1981 | Fed. Rep. of Germany | A61F 1/00 |
| WO86/00020 | 1/1986 | PCT Int'l Appl. | A61L 17/00 |
| 2082213 | 8/1980 | United Kingdom . | |
| 2218312A | 11/1989 | United Kingdom | A01K 91/00 |

*Primary Examiner*—George F. Lesmes
*Assistant Examiner*—Chris Raimund
*Attorney, Agent, or Firm*—Hal Brent Woodrow

[57] **ABSTRACT**

Heterogeneous braided multifilament of first and second set of yarns mechanically blended by braiding, in which first and second set of yarns are composed of different fiber-forming materials.

Heterogeneous braids are useful for preparation of surgical sutures and ligatures.

**12 Claims, 3 Drawing Sheets**

DEPUY MITEK
EXHIBIT 130
04cv12457
dk 12-6-05

# FIG-1





FIG-2



FIG-3

5,314,446

1

# STERILIZED HETEROGENEOUS BRAIDS

## BACKGROUND OF THE INVENTION

This invention relates to braided multifilaments, and especially to sterilized, braided multifilaments suitably adapted for use as surgical sutures or ligatures.

Braided multifilaments often offer a combination of enhanced pliability, knot security and tensile strength when compared to their monofilament counterparts. The enhanced pliability of a braided multifilament is a direct consequence of the lower resistance to bending of a bundle of very fine filaments relative to one large diameter monofilament. However, for this enhancement to be realized, the individual multifilaments must be able to bend unencumbered or unrestricted by their neighboring filaments. Any mechanism which reduces this individual fiber mobility, such as simple fiber-fiber friction, a coating which penetrates into the braid interstices, or a melted polymer matrix which adheres fibers together, will adversely affect braid pliability. In the extreme case where the multifilaments are entirely bonded together, the pliability or bending resistance closely approximates that of a monofilament.

Unfortunately, the prior art abounds with attempts to improve specific properties of multifilament braids at the expense of restricting the movement of adjacent filaments which make up the braid,. For example, multifilament sutures almost universally possess a surface coating to improve handling properties. U.S. Pat. No. 3,942,532 discloses a polyester coating for multifilament sutures. The preferred polyester coating is polybutilate, which is the condensation product of 1,4-butanediol and adipic acid. U.S. Pat. No. 4,624,256 discloses a suture coating copolymer of at least 90 percent ε-caprolactone and a biodegradable monomer, and optionally a lubricating agent. Examples of monomers for biodegradable polymers disclosed include glycolic acid and glycolide, as well as other well known monomers typically used to prepare bioabsorbable coatings for multifilament sutures.

An alternative to the use of the commonly accepted coating compositions for multifilament sutures to improve handling properties is disclosed in U.S. Pat. 3,527,650. This patent discloses a coating composition of polytetrafluoroethylene (PTFE) particles in an acrylic latex. Although the PTFE particles act as an excellent lubricant to decrease the surface roughness of multifilament sutures, the particles have a tendency to flake off during use. Also, this particular coating is a thermoset which requires a curing step for proper application.

More recently, a dramatic attempt has been made to create a monofilament-like surface for a multifilament suture. U.S. Pat. No. 4,470,941 discloses the preparation of "composite" sutures derived from different synthetic polymers. The composite suture is composed of a core of low melting fibers around which are braided high melting fibers. Because of the lack of cohesiveness of the dissimilar fibers, the low melting fibers in the core are melted and redistributed throughout the matrix of the braided, high melting fibers. Although these composite sutures represent an attempt to combine the best properties of different synthetic fibers, it unfortunately fails in this respect due to increased stiffness (as evidenced by FIG. 3 which is described in detail below),

2

apparently due to the reduction of fiber mobility resulting from the fusing of the fibers together.

Another attempt to enhance the properties of multifilament sutures can be found in WO 86/00020. This application discloses coating an elongated core of a synthetic polymer having a knot tenacity of at least 7 grams/denier with a film-forming surgical material. The film-forming surgical material can be absorbable or nonabsorbable, and can be coated on the elongated core by solution casting, melt coating or extrusion coating. Such coated multifilament sutures suffer from the same deficiencies which plague conventionally coated multifilament sutures.

All of the attempts described in the prior art to improve braid properties have overlooked the importance of fiber-fiber friction and its impact on fiber mobility and braid pliability. The properties of concern here include the fiber-fiber frictional coefficients (which frequently relate to the polymer's surface energy), the fiber cross-sectional shape and diameter, and the braid structure which influences the transverse forces across the braid. If fibers composed of highly lubricous polymers are used in the traditional manner, then a highly pliable braid can be prepared. However, in most cases, these braids will be relatively weak and unusable. Hence, a tradeoff between braid strength and pliability exists in the design of conventional braided multifilaments.

In view of the deficiencies of the prior art, it would be desirable to prepare multifilament sutures exhibiting improved pliability and handling properties. More specifically, it would be most desirable to prepare braided multifilaments composed of dissimilar fiber-forming materials in which the fiber-forming materials contribute significantly to enhanced pliability for the braided multifilament without appreciably sacrificing its physical properties.

## SUMMARY OF THE INVENTION

The invention is a heterogeneous braid comprising a first and second set of continuous and discrete yarns in a sterilized, braided construction. At least one yarn from the first set is in direct intertwining contact with a yarn from the second set.

Each yarn from the first set is composed of a plurality of filaments of a first fiber-forming material, and each yarn from the second set is composed of a plurality of filaments of a second fiber-forming material.

Surprisingly, the heterogeneous braids may exhibit a combination of outstanding properties attributable to the specific properties of the dissimilar fiber-forming materials which make up the braided yarns. The dissimilar fiber forming materials do not require melt bonding or any other special processing techniques to prepare the heterogeneous braids of this invention. Instead, the integrity of the braid and therefore its properties is due entirely to the mechanical interlocking or weaving of the individual yarns. In fact, it is possible to tailor the physical and biological properties of the braid by varying the type and proportion of each of the dissimilar fiber forming materials used, as well as adjusting the specific configuration of the braid. For example, in preferred embodiments, the heterogeneous braid will exhibit improved pliability and handling properties relative to that of conventional homogeneous fiber braids, without sacrificing physical strength or knot security.

The sterilized, heterogeneous braids of this invention are useful as surgical sutures or ligatures, as well as for

5,314,446

3

the preparation of any other medical device which would benefit from its outstanding physical or biological properties.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 illustrates a carrier layout for the preparation of a heterogeneous braid within the scope of this invention;

FIG. 2 is a plot representing the relationship between the tensile strength of heterogeneous and homogeneous braids of polyethylene terephthalate (PET) and PTFE yarns, and the volume fraction of PTFE yarns in the braids; and

FIG. 3 is a plot representing a relationship between the initial bending rigidity of heterogeneous and homogeneous braids of PET and PTFE yarns, and the volume fraction of PTFE yarns in the braids.

## DETAILED DESCRIPTION OF THE INVENTION

For purposes of describing this invention, a "heterogeneous" braid is a configuration composed of at least two sets of dissimilar yarns mechanically blended by intertwining the dissimilar yarns in a braided construction. The yarns are continuous and discrete, so therefore each yarn extends substantially along the entire length of the braid and maintains its individual integrity during braid preparation, processing and use.

The heterogeneous braids of this invention can be conventionally braided in a tubular sheath around a core of longitudinally extending yarns, although such a core may be excluded, if desired. Braided sheath sutures with central cores are shown in U.S. Pat. Nos. 3,187,752; 4,043,344; and 4,047,533, for example. A core may be advantageous because it can provide resistance to flattening, as well as increased strength. Alternatively, the braids of this invention can be woven in a spiral or spiroid braid, or a lattice braid, as described in U.S. Pat. Nos. 4,959,069 and 5,059,213.

The dissimilar yarns of the first and second set of yarns are braided in such a manner that at least one yarn from the first set is directly intertwined with, or entangled about, a yarn from the second set. Direct mechanical blending of individual, dissimilar yarns therefore occurs from the interweaving and interlocking of these dissimilar yarns, enhancing yarn compatibility and the overall physical and biological properties of the heterogeneous braid. Preferably, every yarn from the first set is in direct intertwining contact with a yarn of the second set to achieve the maximum degree of mechanical blending of the dissimilar yarns.

The first and second fiber-forming materials which make up the filaments of the first and second set of yarns, respectively, can be any materials capable of being spun into continuous filaments. Advantageously, the fiber-forming materials are nonmetallic.

The preferred fiber-forming materials are synthetic fiber-forming polymers which are melt or solution spun through a spinneret to prepare continuous filaments. The filaments so prepared are advantageously stretched to provide molecular orientation and annealed to enhance dimensional stability and/or biological performance. The fiber-forming polymers can be bioabsorbable or nonabsorbable, depending on the particular application desired. Examples of monomers from which bioabsorbable polymers are derived include, but are not limited to, some hydroxyacids and lactones, e.g. glycolic acid, lactic acid, glycolide, lactide, p-dioxanone,

4

ε-caprolactone and trimethylene carbonate, as well as copolymers and polymer blends derived from these monomers and others. Interestingly, numerous bioabsorbable heterogeneous braids exhibiting varying useful biological properties, such as breaking strength retention in vivo and the absorption profiles in vivo, can be prepared for specific applications by using different combinations of bioabsorbable polymers.

Preferably, the continuous filaments which make up the first and second set of yarns are derived from nonabsorbable polymers. In a preferred embodiment, the first set of yarns acts as lubricating yarns to improve the overall pliability, or compliance, and surface lubricity of the heterogeneous braid. Preferably, the fiber-forming material of the first set exhibits a surface energy (which frequently relates to surface lubricity) less than about 38 dyne/cm, as measured by contact angle of liquids on polymer surfaces, as described by Kissa, E., "Handbook of Fiber Science and Technology," Vol. II, Part B, Marcel Decker, 1984. Such fiber forming polymers include perfluorinated polymers, e.g. PTFE and fluorinated ethylene/propylene copolymers (FEP) and perfluoroalkoxy (PFA) polymers, as well as non-perfluorinated polymers such as polyvinylidene fluoride (PVDF), polyethylene/tetrafluoroethylene copolymers (PETFE), the polychlorofluoroethylene polymers, polypropylene (PP) and polyethylene (PE). More preferably, the first fiber-forming material exhibits a surface energy less than about 30 dyne/cm. The preferred polymers for the first set are PTFE, PETFE, FEP, PE and PP, and the most preferred fiber forming polymer is PTFE.

In a more preferred embodiment, the lubricating yarns of the first set are mechanically blended with yarns of the second set which act to provide improved strength to the heterogeneous braid. Preferably, the second set of yarns exhibits a yarn tenacity greater than 3.0 grams/denier, more preferably greater than 5.0 grams denier. The preferred yarns are PET, nylon and aramid, and the most preferred yarns are PET.

In the most preferred embodiment, the heterogeneous braid is composed of a first set of PTFE yarns mechanically blended with a second set of PET yarns in a braided configuration. Advantageously, the braided sheath encloses a core of longitudinally extending PET yarns to further improve the overall strength and resistance to flattening of the heterogeneous braid. In this embodiment, the volume fraction of lubricating yarns in the braided sheath and core desirably ranges from about 20 to about 80 percent. A volume fraction of lubricating yarns below about 20 percent will not typically improve the pliability of the braid, and a volume fraction above about 80 percent may adversely affect the overall strength of the braid. The filament fineness for such a heterogeneous braid is preferably less than 10 denier per filament, preferably from about 0.5 to about 5 denier per filament. A more coarse filament may result in a stiffer braid. The preferred individual yarn denier is between 10 and 100 denier.

The heterogeneous braids of this invention can be prepared using conventional braiding technology and equipment commonly used in the textile industry, and in the medical industry for preparing multifilament sutures. For example, the first and second set of yarns can be interwoven as indicated by the plan view of the yarn carrier layout of FIG. 1 for the preparation of a braided multifilament. The individual yarns of the braided sheath feed from spools mounted on carriers 22, 22' and

5,314,446

5

24, 24'. The carriers move around the closed circular loop 28, moving alternately inside and outside the loop 28 to form the braiding pattern. One or more carriers are continually following a serpentine path in a first direction around the loop, while the remaining carriers are following a serpentine path in the other direction.

In the illustrated embodiment, carriers 22, 22' are travelling around serpentine path 27 in a clockwise direction as indicated by directional arrows 23, and carriers 24, 24' are travelling around serpentine path 29 in a counterclockwise direction as indicated by arrows 25. The moving carriers dispense yarns which intertwine to form the braid. The yarns from all the carriers in a constructed embodiment of FIG. 1 are dispensed upward with respect to the plane of the drawing, and the braid is taken up on a reel located above the plane of the drawing.

In one embodiment, moving carriers 22, 24 dispense yarns of the first set and moving carriers 22', 24' dispense yarns of the second set to form the heterogeneous braid. In a more preferred embodiment, moving carriers 22, 22' dispense yarns of the first set and moving carriers 24, 24' dispense yarns of the second set. This carrier layout provides a braid in which each yarn of the first set is directly intertwined with a yarn from the second set.

Advantageously, as illustrated in FIG. 1, disposed within the center of the loop 28 are carriers 26 which dispense the core yarns of the braid. In the most preferred embodiment of this invention, moving carriers 22, 22' dispense PTFE yarns, moving carriers 24, 24' dispense PET yarns, and core carriers 26 dispense PET yarns.

Numerous additional embodiments are contemplated within the scope of the invention using conventional braiding technology and equipment. For example, the carrier layout can be modified to prepare a braid configuration using from 3 to 28 sheath carriers, with or without any number of core yarns. Dissimilar yarns from the first and second set of yarns can be plied together using conventional techniques before braiding, and in this embodiment, the carriers can dispense identical bobbins of plied yarns composed of individual yarns from the first and second sets. This embodiment not only offers the advantage of inter-yarn mechanical blending, but also the intimate mixing associated with intra-yarn blending.

Similar to the preparation of conventional homogeneous braids, the yarns from which the heterogeneous braids are prepared are preferably nontextured. The yarn tension during braiding is advantageously adjusted so that the yarn elongation for each set of yarns is about equal. The equilibration of yarn elongation may prevent irregularities, for example, "core popping", which is the tendency of core yarns to break through the braided sheath as the braid is bent. The number of picks per inch in the finished braid can be adjusted to balance the tensile strength of the braid with braid quality, e.g. the tendency for core popping and overall braid smoothness.

After the heterogeneous braid is prepared, it is desirably scoured to remove machine oils and lubricants, and any foreign particles. The scoured braid is preferably stretched at a temperature between the glass transition temperature and melting temperature of the lower melting set of yarns. Therefore, the stretching temperature is such that none of the yarns is actually melted. The stretching operation densifies the braid and improves

6

braid smoothness. Afterwards, the braid may be annealed while under restraint to improve dimensional stability, and in the case of absorbable braids, to improve the breaking strength retention in vivo.

If desired, the surface of the heterogeneous multifilament braid can be coated with a bioabsorbable or nonabsorbable coating to further improve the handleability and knot tiedown performance of the braid. For example, the braid can be immersed in a solution of a desired coating polymer in an organic solvent, and then dried to remove the solvent. Most preferably, the coating does not cause the fibers or yarns to adhere to one another increasing stiffness. However, if the surface of the heterogeneous braid is engineered to possess a significant fraction of the lubricous yarn system, the conventional coating may be eliminated saving expense as well as avoiding the associated braid stiffening.

If the surface of the braid is coated, than the coating composition may desirably contain bioactive materials such as antibiotics and growth factors.

The post-treated heterogeneous braid is sterilized so it can be used for a host of medical applications, especially for use as a surgical suture, preferably attached to a needle. The braid can be sterilized using any of the conventional techniques well known in the art. For example, sterilization can be effected by exposing the braid to gamma radiation from a cobalt 60 source. Alternatively, the braid can be sterilized by exposure to ethylene oxide.

In the following examples, the tensile properties and knot security are each determined using an Instron Tensile Tester. The tensile properties, i.e. the straight and knot tensile strength and the percent elongation, are determined generally according to the procedures described in U.S. Pat. No. 4,838,267. The knot security, which provides an indication as to the number of throws required to secure a knot so that it fails to slip before cleanly breaking, is measured by first tieing a conventional square knot around a mandrel, pulling the knot apart on the Instron Tester to observe whether slipping occurs, and if so, then tieing knots with additional throws until 20 out of 20 knots break cleanly without slipping. The bending rigidity, which is the inverse of pliability, is determined using a Kawabata Pure Bending Tester, as discussed in "The Effects of Structure on the Geometric and Bending Properties of Small Diameter Braids", Drexel University Master Thesis, 1991, by Mr. E. Ritter.

The examples are illustrative only, and are not intended to limit the scope of the claimed invention. The types of yarns used to prepare the heterogeneous braid and the yarn geometry can be varied to prepare heterogeneous braids within the scope of the claimed invention which exhibit a combination of outstanding physical or biological properties.

## EXAMPLES

Examples I and II describe heterogeneous braids of PTFE and PET yarns. In order to evaluate the relative performance of these braids, two controls are included which represent 100% PET and 100% PTFE braids, respectively. To the extent possible, the yarn materials and processing conditions are identical for the controls and heterogeneous braid examples. In addition, for comparison purposes, a braid is fabricated with identical materials but processed per the prior art U.S. Pat. No. 4,470,941.

5,314,446

7 8

## CONTROL I

FIBER MATERIALS: An 8×0 PET braid is fabricated, i.e. 8 sheath yarns and 0 core yarns. All yarns are Dupont Dacron PET, 70 denier, 48 filament, type 52 yarn.

PROCESSING: The yarns are wound on braider

PROCESSING: Identical to EXAMPLE I, except that the hot stretch temperature is at 300° C. and for a longer residence time to facilitate melting of the PET fibers.

The properties of CONTROLS I and II, and EXAMPLES I and II, and the PRIOR ART I are summarized in the following Table:

|  | USP DIAMETER (mils) | TENSILE STRENGTH (lbs) | KNOT STRENGTH (lbs) | BENDING RIGIDITY (gm × cm²) | KNOT STABILITY (# of throws) |
|---|---|---|---|---|---|
| CONTROL I | 10.68 | 4.98 | 3.14 | 0.0680 | 4 |
| CONTROL II | 9.11 | 2.58 | 2.04 | 0.0196 | 7 |
| EXAMPLE I | 9.71 | 3.55 | 2.41 | 0.0257 | 5 |
| EXAMPLE II | 10.35 | 4.10 | 2.67 | 0.0371 | 5 |
| PRIOR ART I | 8.81 |  |  | 0.0966 |  |

bobbins per conventional methods, and the bobbins loaded on each carrier of a N.E. Butt 8 carrier braider. Machine settings include: 32 pick gear, 0.009″ wire tension springs, and 183 rpm. The braid is aqueous scoured, and hot stretched at 30% draw ratio at 225° C.

## CONTROL II

FIBER MATERIALS: An 8×0 PTFE braid is fabricated. All yarns are Dupont Teflon, 110 denier, 12 filament.

PROCESSING: The yarns are wound on braider bobbins per conventional methods, and the bobbins loaded on each carrier of a N.E. Butt 8 carrier braider. Machine settings include: 36 pick gear, no tension springs, and 183 rpm. The braid is scoured and hot stretched per the conditions described in CONTROL I.

## EXAMPLE I

FIBER MATERIALS: An 8×0 heterogeneous braid is fabricated, consisting of four PET 70 denier yarns and four PTFE 110 denier yarns. The yarns are identical to that employed in CONTROL I and II. On a volume basis, the braid is 50.3% PET, and 49.7% PTFE.

PROCESSING: Four bobbins of PET yarn and four bobbins of PTFE yarn were wound by conventional means. The PET bobbins were loaded on the clockwise moving carriers of the N.E. Butt 8 carrier braider, and the PTFE yarn bobbins on the counter-clockwise moving carriers. Machine settings include: 32 pick gear, 0.009″ tension springs on PET carriers, no springs on PTFE carriers, and 183 rpm. The braid is scoured and hot stretched per the conditions described in CONTROL I.

## EXAMPLE II

FIBER MATERIALS: Identical to EXAMPLE I, except that 6 PET yarns and 2 PTFE yarns were used. On a volume basis, the braid is 75.5% PET, and 24.5% PTFE.

PROCESSING: Identical to EXAMPLE I, except that 2 PET bobbins replace 2 PTFE bobbins. All other braider machine settings, scour and hot-stretch conditions are identical to CONTROL I and II and EXAMPLE I.

## PRIOR ART I

FIBER MATERIALS: Identical to EXAMPLE I. On a volume basis, the braid is 50.3% PET, and 49.7% PTFE.

As may be expected, the tensile strengths of the heterogenous braid examples reflect the relative contributions of the individual components. This behavior is said to follow the "rule of mixtures", i.e. the composite property is a weighted average of the component properties. In equation form,

$$P_c = (Vf_a)(P_a) + (Vf_b)(P_b)$$

where $P_c$ is a composite property (such as tensile strength or modulus), $P_a$ and $P_b$ are the properties of the components a and b, and $Vf_a$ and $Vf_b$ are the volume fractions of components a and b. This behavior is clearly observed in FIG. 2, which shows a plot of tensile strength versus volume fraction of PTFE yarns for the Examples and Controls, in relation to the expected plot according to the rule of mixtures.

Surprisingly, the bending rigidity of the heterogeneous braids in EXAMPLES I and II do not follow the rule of mixtures, and show an enhanced bending rigidity relative to the weighted average of its components. This is shown in FIG. 3 as a plot of bending rigidity versus %PTFE in the braids. Bending rigidity is the inverse of pliability, and is obtained by measuring the slope of the *bending moment-radius of curvature* plot of a suture strand in pure bending. Hence lower bending rigidity relates to a more pliable suture, which is a highly desirable property. The mechanism of this enhanced pliability is believed to be internal lubrication of the braid by the "solid lubricant" behavior of the low surface energy PTFE.

U.S. Pat. No. 4,470,941 discloses the preparation of a "composite" suture with a monofilament-like surface made from multifilament yarns. The composite suture is composed of two different synthetic polymer fibers, which is thermally processed to melt one of the fibers to form a continuous matrix. This process was utilized to produce the PRIOR ART I example, the data of which is shown in Table 1 and FIG. 3. It is observed that the melting of the PET fibers significantly increases the braid bending rigidity due to the bonding of the "non-melted" fibers together, hence resulting in a less pliable braid of diminished utility.

What is claimed is:

1. A surgical suture consisting essentially of a heterogeneous braid composed of a first and second set of continuous and discrete yarns in a sterilized, braided construction wherein at least one yarn from the first set is in direct intertwining contact with a yarn from the second set; and

5,314,446

9

a) each yarn from the first set is composed of a plurality of filaments of a first fiber-forming material selected from the group consisting of PTFE, FEP, PFA, PVDF, PETFE, PP and PE; and

b) each yarn from the second set is composed of a plurality of filaments of a second fiber-forming material selected from the group consisting of PET, nylon and aramid; and

c) optionally a core.

2. The surgical suture of claim 1 wherein the suture is attached to a needle.

3. The surgical suture of claim 1 wherein the first fiber-forming material exhibits a surface energy less than about 38 dynes/cm.

4. The surgical suture of claim 3 wherein the first fiber-forming material exhibits a surface energy less than about 30 dynes/cm.

5. The surgical suture of claim 4 wherein the first set of yarns is PTFE.

10

6. The surgical suture of claim 5 wherein the second set of yarns exhibits a yarn tenacity greater than 3.0 grams/denier.

7. The surgical suture of claim 6 wherein the second set of yarns exhibits a yarn tenacity greater than 5.0 grams/denier.

8. The surgical suture of claim 1 wherein the second set of yarns is PET.

9. The surgical suture of claim 8 wherein the volume fraction of the first set of yarns in the braided sheath and core ranges from about 20 to about 80 percent.

10. The surgical suture of claim 9 wherein the fiber fineness of the yarns of the first and second sets is less than 10 denier per filament.

11. The surgical suture of claim 1 wherein at least one yarn from the first set of yarns is plied together to a yarn from the second set of yarns.

12. The surgical suture of claim 8 wherein the suture is attached to a needle.

* * * * *

# Exhibit 8

BOOK NO. 2175

# ETHICON, INC.
a Johnson-Johnson company

Issued to *Mark Stickel*

Covering the Period

*Feb 29, 1988* to



EXACT COPY

CONFIDENTIAL

CONFIDENTIAL -
NON-PATENT
PROSECUTION COUNSEL ONLY

This notebook is the property of ETHICON INC. and constitutes part of its permanent records.
It should be returned to the company when not in active use, or upon request.

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI002605**



Project No. _CBE_     Experiment No. _____     Date _12/13/89_

Subject _CONTIN FROM 2125-56_

Purpose

Page
Book No.
**2175**

Properties:

THE DE-DRAWN composite braid HAD superior
handling properties relative to silk and
Ethibond, which is demonstrated quantitatively
in fig 2 of the Kawabata bending rigidity
results. The intrinsic tensile and knot
strengths were 87 KSI and 48 KSI
respectively. The composite also ranked better
than the silk and Ethibond in knot tie-down,
even without a coating.

• PET CARRIERS
○ PTFE CARRIERS

FIG. 1.  SCHEMATIC OF CARRIER LAY. OUT FOR
         BALANCED COMPOSITE BRAID.

CONFIDENTIAL -
NON-PATENT
PROSECUTION COUNSEL ONLY

*DePuy Mitek, Inc. v. Arthrex, Inc.*
*C.A. No.04-12457 PBS*
**DMI002666**

Investigator _____     Date _12/12/89_
Witness _Crawford Britt_        Date _3-15-90_

# Exhibit 9

1

1           THE CLERK:  Members of the jury, please remain

2    standing.  Everyone else, you may be seated.

3           THE COURT:  Good afternoon.

4           THE JURY:  Good afternoon.

5           THE COURT:  There's an old traditional in the

6    Federal Courts and in the courts of our Commonwealth that at

7    this stage of the proceedings, the judge stands and faces the

8    jury, and the jury faces the judge.  This is the best way

9    that I know how to symbolize the important role that we both

10   play at this trial.

11          My job has been threefold.  The first was to

12   impanel a fair and impartial jury.  You heard both sides say,

13   "We're content with this jury," and on behalf of everyone in

14   this room, I thank you for spending the time here in court.

15   My second job was to rule on the evidentiary objections.  We

16   did that before court, while you were here, and after court.

17   And now my third and final task is to give you the

18   instructions of law.  You must follow those instructions

19   whether you agree with them or not.  To the extent that I say

20   anything differently from what the attorneys say, you must

21   follow my instructions of law.  As I'm sure you will now

22    agree, though, I have the easy job, and you've got the
tough

23    one, because it will be your job to render a unanimous

24    verdict, and I will give you instructions now to tell
you the

25    law that applies in rendering your verdict.


2


1        My instructions will be in three parts.  The
first

2    part is very general, similar to the instructions I
gave you

3    on the first day of this trial:  What is evidence?
What

4    isn't evidence?  What is the burden of proof?  The
second

5    portion is very specific to the claim in this case, the
one I

6    gave you the verdict form on, and I will go through in
detail

7    what the plaintiff must prove.  My third portion of the

8    instruction is what I call the mechanics of
deliberation:

9    How do you choose a foreperson, and how do you go about

10    deliberating?

11        I want to emphasize that although I look as
if I'm

12    reading, I really am reading, and the reason I do is to
make

13    sure that I get the law to you as clearly as I can
based on

14    the federal statutes that govern patent law as well as
based

15    on the case law interpreting that patent law.

16        You will get a tape recording of my charge, but I

17    will not today give you a written charge.  Ms. Marzilli has

18    offered to try and get you a written charge tomorrow, but as

19    I may have said at the start of this trial, we're not like an

20    ATM machine.  She doesn't just press a button and a charge

21    doesn't just pop out.  So I don't want you to have to wait

22    for deliberations until the written charge is prepared, so

23    what I'm going to be doing is giving you a tape recording of

24    the charge to help you.  But I want to emphasize that you

25    should be taking notes about the charge.  Why?  First,

3

1    because it will help you get to the tape recording and get to

2    the portion of the charge that you may need to go through

3    again, and, second, because it's now past 3:30, it's almost

4    quarter to 4:00, and just I want to make sure you don't

5    daydream because it's absolutely essential that you get down

6    what the law is that you must apply in resolving this

7    dispute.  So why don't we sit down and get going, all right?

8        What is my role as the Court?  These instructions

```
          9    are about the law you must apply.  I don't mean any of
my

          10   instructions to be understood by you as a comment by me
on

          11   the facts or on the evidence of the case.  Rather,
you're the

          12   judges of the facts and the sole judges of the
credibility of

          13   the witnesses.

          14          I may repeat certain of the instructions.
Why?

          15   Because I might think one of you looks confused or
because I

          16   think that it is a difficult concept, but all of the
portions

          17   of the instruction are equally important.  The fact
that I

          18   repeat one sentence or another does not mean that that
is

          19   more important.

          20          Even if you disagree with some of the rules
of law

          21   or don't understand the reasons for them, you are bound
to

          22   follow them as jurors in this case.  This is a
fundamental

          23   part of our system of government by law rather than by
the

          24   individual views of me as the judge or by you, jurors,
who

          25   have the responsibility for deciding a specific case.
```

4

```
          1          To the extent I say something differently
from the
```

Also,

2    attorneys, again, these instructions of law govern.

3    I'm not a judge of the facts.  I have no opinion as to
the

4    appropriate outcome of the case, and you must disregard
any

5    facial expressions or questions that I may have asked
as far

6    as any way you think I'm indicating how I think this
case

7    should come out.  It is your memory of the evidence
that

8    controls, not my memory, not the attorneys' memory, and

9    you're the ones who render the unanimous verdict.

10        What is your job as the jury?  You're the
sole and

11   exclusive judges of the facts.  You decide the weight,

12   effect, and value of the evidence.  You determine the

13   credibility of the witnesses.  Once you determine the
facts,

14   it is your duty to apply those facts to the law as I'm

15   explaining it to you.  You must determine the facts
without

16   prejudice, fear, favor, bias, or sympathy.  You may not

17   consider any personal feelings you may have about the
race,

18   religion, national origin, sex, or age of any of the

19   witnesses who testified during the trial.  You must
determine

20   the facts solely from a fair consideration of the
evidence.

21   If you were to let fear, favor, prejudice, bias, or
sympathy

22   enter into your deliberations, there's a great risk
that you

23   would not arrive at a true and just verdict.

24        You are not to decide the case based on what

you

cannot

25    may have heard or read outside the courtroom.  You

5

1    speculate or guess as to what might or might not have

2    happened.  You must confine your deliberations to the

3    evidence and nothing but the evidence.

4         The lawyers at various times and in closing

but,

5    arguments were allowed to comment on the rules of law,

they say

6    again, it's my instructions which govern.  Also, if

memory,

7    something about the evidence that differs from your

8    your collective memory controls.

plaintiff

9         Now, what is the burden of proof?  Again,

10   has the burden of proof to establish its claim by a

e, the

11   preponderance of the evidence, p-r-e-p-o-n-d-e-r-a-n-c-

evidence.

12   weight of the evidence, the preponderance of the

to

13   To establish by a preponderance of the evidence means

more

14   prove that something is more likely true than not true,

preponderance

15   likely true than not true.  In other words, a

16   of the evidence in the case means such evidence, when

more

17   considered and compared with that opposed to it, has

belief that

18   convincing evidence and produces in your mind the

19   what is sought to be proved is more likely true than not

20   true.

21              In determining whether any fact in issue has been

22   proven by a preponderance of the evidence in the case, you

23   may, unless otherwise instructed, consider the testimony of

24   all witnesses, regardless of who may have called them, and

25   all exhibits received in evidence, regardless of who may have

6

1   produced them.  The burden of proof has not been carried if,

2   after you have considered all the evidence, you find that you

3   must speculate, guess, or imagine that one or more of the

4   necessary facts is true.

5              The burden of proof does not, of course, require

6   proof of an absolute certainty.  Proof of an absolute

7   certainty is seldom possible in any case.  Nor is proof

8   beyond a reasonable doubt or by clear and convincing evidence

9   required.  A burden of proof by a more stringent standard

10   applies in criminal cases and in other special circumstances,

11   but in civil cases generally, and in particular as to all the

12     issues in this case, the standard of defining the burden of

13     proof is preponderance of the evidence.

14          In applying this standard of preponderance of the

15     evidence, you will find that the plaintiff has succeeded in

16     meeting the burden of proof on an issue of fact if, after

17     consideration of all of the evidence in the case, and on the

18     basis of the evidence, you find that what is sought be to

19     proved on that issue is more likely true than not true.

20          And I want to remind you about that example or

21     metaphor I gave you at the start of this trial of blindfolded

22     Lady Justice.  Plaintiff has the burden of making those

23     scales tip, albeit slightly, in its favor; but if at the end

24     of all the evidence the scales are evenly balanced or

25     balanced against it, plaintiff has not met its burden.

7

1          So how do you decide the case?  What is evidence?

2     Evidence consists of the sworn testimony of the witnesses.

3     It includes that deposition testimony which you sometimes saw

4     on videotape and sometimes you heard read in, and all

5     exhibits that were received into evidence and will come with

6   you into the jury room.  There are also a number of facts

7   that have been admitted or stipulated.  You will receive

8   those on a piece of paper.  You heard many of them read to

9   you.

10         However, the mere number of witnesses or length of

11   the testimony or number of exhibits has no bearing on what

12   weight you give to the evidence or on whether you find that a

13   party's burden of proof has been met.  Weight does not mean

14   the amount of the evidence.  Weight means your judgment about

15   the credibility and importance of the evidence.

16         Now, many things happen over the course of a trial

17   that are not evidence, and I want to go through that with you

18   now.  Opening statements and closing arguments made by the

19   lawyers are not evidence in the case.  Questions which

20   weren't answered or as to which objections were sustained

21   aren't evidence in the case.  Also, the function of the

22   lawyers in making their closing arguments is to point out

23   those things that are most significant or most helpful to

24   their side of the case, and in so doing to call your

25   attention to facts or inferences that might otherwise escape

8

1    your notice.  In the final analysis, however, it is your

2    recollection and interpretation of the evidence that controls

3    in the case.

4         Also, many times over the course of this trial, as

5    in every case I've ever sat in for the last twenty years,

6    lawyers make objections to evidence or to questions. That's

7    their job.  Their job is to object if they think that

8    evidence isn't reliable or not relevant or is otherwise

9    inadmissible.  You should never hold it against a lawyer, or

10   the party that the lawyer works for, for making objections.

11   That's their job in doing that.  Also, you should not draw

12   any conclusion from any objections or from my rulings on the

13   objection.  These only relate to the legal questions that I

14   had to determine and should not influence your thinking.

15        Again, when I sustained an objection to a question,

16   the witness was not allowed to answer, and you should not

17   guess as to what that answer may have been had I allowed the

18   question to be answered.  Also, if I received evidence but

19   told you it was for a limited purpose, or if in the

20   instructions I'm now giving you I tell you that some of the

21   evidence should be considered only for that purpose,
you're

22   bound by that limitation.

23         As you heard, sometimes I asked a witness a

24   question if I didn't understand something.  I actually

25   offered that to you, and none of you did it, but
sometimes,

9

1   if I thought something wasn't clear, I asked a
question.

2   But, again, you shouldn't assume from anything that I
asked

3   that I have an opinion concerning the appropriate
outcome of

4   the case or the credibility of any witness.

5         Now, I want to go through the difference
between

6   direct and circumstantial evidence again.  There are
two

7   types of evidence which you may use to determine the
facts of

8   this case:  There's direct evidence and circumstantial

9   evidence.  Direct evidence is where a witness testifies

10  directly about the fact that is to be proved based on
what he

11  or she claims to have seen or heard or felt with his or
her

12  own senses, and the only question is whether you
believe the

13  witness.  Circumstantial evidence is different.  It's
where

14  no witness can testify directly about the fact that is
to be

15    proved, but you are presented with evidence of other
facts

16    and then asked to draw reasonable inferences from them
about

17    the fact to be proved.

18         The law allows both types of proof in a civil

19    trial, and while you may rely entirely on
circumstantial

20    evidence, any inferences or conclusions which you draw
must

21    be reasonable and natural, based on your common sense
and

22    experience of life.  In a chain of circumstantial
evidence,

23    it is not required that each one of your inferences and

24    conclusions be inevitable, but it is required that any

25    inferences be reasonable.

10

1         Direct and circumstantial evidence have equal

2    standing in the law.  That is, with respect to what
weight

3    should be begin to evidence before you, the law makes
no

4    distinction between direct and circumstantial.  Also,
no

5    greater degree of certainty is required of
circumstantial

6    evidence.  You are to consider all of the evidence in
the

7    case and give each item of evidence the weight that you

8    believe it deserves.

9         Now let me talk about your role in assessing
the

10    credibility of witnesses.  As jurors, your function is to

11    evaluate the exhibits that have been introduced and determine

12    the credibility of witnesses' testimony.  Credibility, of

13    course, is simply another word for believability.  It is your

14    function to determine the believability of the witnesses who

15    testified.  You're free to decide that you believe all of

16    what a witness told you, none of what a witness told you, or

17    some of what a witness told you.  You're free to do that in

18    accordance with your collective judgment as to the

19    believability of what it was that the witness told you while

20    testifying.

21              Neither I nor anyone else can tell you all the

22    different ways that you go about making the important

23    judgment about credibility.  However, I can suggest some

24    things for you to consider.  You should consider the conduct

25    and demeanor of the witness while testifying, the frankness

11

1    or lack of frankness that the witness showed while the

2    testifying, the reasonableness or unreasonableness of the

          3    witness's testimony, the probability or improbability
of that

          4    testimony, the opportunity or lack of opportunity that
the

          5    witness had to see and know the facts about which he or
she

          6    was testifying, the accuracy of the witness's
recollection,

          7    the degree of intelligence shown by the witness, the

          8    witness's prior conduct for truthfulness, and whether
the

          9    witness has attempted to fill in gaps in his memory of
events

         10    with information he obtained after the event.

         11              You may also consider whether the witness has
a

         12    motive for testifying and the interest or lack of
interest

         13    that the witness may have in the outcome of the case.
You

         14    may take into consideration the character and the
appearance

         15    of the witness at trial and any bias he's shown in his

         16    testimony.  You should also consider whether the
witness made

         17    prior inconsistent statements before trial in
considering

         18    credibility.  This list is not exhaustive.  Rather, it
is a

         19    list of factors you can consider.

         20              You've also heard testimony from persons
described

         21    as experts, so-called expert witness testimony.
Persons who,

         22    by reason of skill, training, education or experience
have

         23    become expert in some field may state their opinions on

         24    matters in that field and may also state the reasons
for

25    their opinion.


12


1          Expert testimony should be considered just like any

2    other testimony.  You may accept or reject it, and give it as

3    much weight as you think it deserves, considering the

4    witness's education and experience, the soundness of the

5    reasons given for the opinion, the acceptability of the

6    methods used, and all other evidence in the case.

7          Okay, now, that is what I would call the first

8    portion of the jury charge, and I'm about to move on to the

9    things that are very specific to this case, the middle

10   portion of the charge.

11         As you know, the plaintiff in this case is DePuy

12   Mitek.  Sometimes the parties refer to it as Mitek.  That's

13   the plaintiff.  The defendants in this case are Arthrex, Inc.

14   and Pearsalls Limited.  You have heard evidence regarding

15   both defendants' involvement in the case, but for purposes of

16   your deliberationss, you should treat Arthrex and Pearsalls

17   the same.  And you'll see we've done that in the verdict

18   slip, so you need not make distinctions between the two.

19          Now, what are the claims here?  I'm going to give

20    you a little bit of an overview.  Plaintiff alleges that the

21    defendants have infringed upon the claims of the '446 patent,

22    which we've also called the Hunter patent, and that's the

23    patent I handed out on the first day of trial.  Defendants

24    deny this allegation.

25          Deciding whether a claim has been infringed is a


13


1    two-step process.  The first step is to decide the meaning of

2    the patent claim.  I've already made this determination and

3    will instruct you as to the meaning of the claim at issue

4    here, and I showed you what that was on the patent.  The

5    second step is to decide whether defendants have made, used,

6    sold, offered for sale, or imported within the United States

7    a product covered by Claim 1 of the Hunter '446 patent.  You,

8    the jury, must make the determination about whether there's

9    been an infringement, and that's what you're asked on the

10    verdict form.

11          Now, the following claim terms -- and I'm

once

12    again referring back to Claim 1 in the patent that I
handed

13    out to all of you -- the following claim terms have the

14    following meanings.  You'll see in Claim 1 that there
is the

15    abbreviation PE.  PE includes all polymers formed from
a

16    repeating ethylene monomer, including ultra high
molecular

17    weight polyethylene.  You've sometimes seen that
shortened as

18    UHMWPE.

19            So let me say that again:  PE as it is in
Claim 1

20    includes all polymers formed from a repeating ethylene

21    monomer, including ultra high molecular weight
polyethylene.

22            What do we mean by the "basic and novel
properties"

23    of the suture described in the Hunter '446 patent?  You

24    remember I handed that out to you on the very first
day, and

25    I hope you still have a copy of what I said it was so
you

14

1    don't have to write it down, but I'm going to read it
to you

2    right now.  The "basic and novel properties" of the
suture

3    described in the Hunter '446 patent are:  (1) a
surgical

4    suture, (2) composed of two dissimilar yarns from the
lists

          5    in Claim 1, (3) where at least one yarn from the first
set is

          6    in direct intertwining contact with a yarn from the
second

          7    set, (4) so as to improve pliability and handleability

          8    without significantly sacrificing the physical
properties of

          9    the constituent elements of the suture.  You have that

         10    already in writing.

         11             So to prevail on its claim, what does the
plaintiff

         12    have to prove?  To prevail on its claim, DePuy Mitek
must

         13    prove by a preponderance of the evidence that
defendants have

         14    made, used, offered for sale, sold, or imported into
the

         15    United States the invention defined in Claim 1 of the
Hunter

         16    patent.

         17             A person can directly infringe a patent
without

         18    knowing that what he is doing is an infringement of the

         19    patent.  He may also infringe even though in good faith
he

         20    believes that what he is doing is not an infringement
of any

         21    patent.

         22             Also, an accused product may infringe an
asserted

         23    patent regardless of whether the accused infringer has
its

         24    own later-issued patent on the accused product.  In
other

         25    words, the fact that Arthrex has a patent covering
FiberWire

15

1    does not constitute a defense to infringement of
plaintiff's

2    Hunter '446 patent.

3              So now I want to discuss a very unique patent
term,

4    which is the term "consisting essentially of."  You've
seen

5    that a lot and heard a lot about it, "consisting
essentially

6    of."

7              I call your attention to a phrase used in the

8    Hunter '446 patent, "consisting essentially of," which
has a

9    very special meaning in patent law.  Here, the phrase

10   "consisting essentially of" means that the claim may

11   encompass FiberWire sutures that include ingredients
that are

12   not expressly listed in the claim, provided those
ingredients

13   do not materially affect the basic and novel properties
of

14   the invention, as I've just defined them.

15             I'll repeat that again.  Here, the phrase

16   "consisting essentially of" means that the claim may

17   encompass FiberWire's sutures that include ingredients
that

18   are not expressly listed in the claim, provided those

19   ingredients do not materially affect the basic and
novel

20   properties of the invention, as I have just defined
them to

21   you.

22          An effect on the basic and novel
characteristics of

23   an invention is material -- that's a legal term,

24   "material."  You've heard that term too.  An effect on
the

25   basic and novel characteristics of an invention is
material



16


1   if the effect is of importance or of consequence to
those of

2   ordinary skill in the art.

3          Let me state it again:  An effect on the
basic and

4   novel characteristics of an invention is material if
the

5   effect is of importance or of consequence to those of

6   ordinary skill in the art.

7          The only question here before you is the
effect of

8   the silicone coating.  The only question here is the
effect

9   of the silicone coating.  You will need to consider the

10   evidence and decide whether the silicone coating on
FiberWire

11   has a material effect on the basic and novel properties
of

12   the suture.

13          Again, you will need to consider the evidence
and

14   decide whether the silicone coating on the FiberWire
suture

15   has a material effect on the basic and novel properties
of

16   the suture.

17        Mitek claims it does not have a material or

have a

18   important effect, and Arthrex contends that it does

19   material or important effect.

do not

20        To say it another way, the FiberWire sutures

coating

21   infringe the claims of the Hunter '446 patent if the

and

22   on the FiberWire sutures materially affects the basic

it.

23   novel properties of the invention, as I have defined

evidence

24   Ultimately, you will have to decide based upon the

in the

25   whether plaintiff has proven that the coating included


17


affect the

1   sutures sold by the defendants does not materially

just

2   basic and novel properties of the invention as I have

3   read them.

started

4        I'm going to read that paragraph again that

5   "to put it another way." To put it another way, the

Hunter

6   FiberWire sutures do not infringe the claims of the

7   '446 patent if the coating on the FiberWire sutures

the

8   materially affects the basic and novel properties of

have

9   invention, as I have defined it. Ultimately, you will

10   to decide based on the evidence you heard whether plaintiff

11   has proven that the coating included on the FiberWire sutures

12   sold by the defendants does not materially affect the basic

13   and novel properties of the invention as I have just read

14   them to you.

15          What do I mean by materially affecting?  In

16   determining whether the coating added to FiberWire materially

17   affects the basic and novel properties of the invention, it

18   does not matter whether you determine that the coating has an

19   improving effect or a worsening effect on those properties.

20   The only thing that matters in your analysis is whether the

21   effect is material or important.  Material means important.

22   If you decide that the effect is not material, then you

23   should find that FiberWire infringes.  If you decide that the

24   effect is important, then you should find no infringement.

25          In determining whether the coating added to

18

1   FiberWire materially affects the basic and novel properties

2   of the invention, you may consider the '446 patent, or the

3   Hunter patent, concerning the effect of coatings.

Actually, both sides rely on the patent to some extent. However, you must look at all the evidence in deciding the question of whether the coating added to FiberWire materially affects the basic and novel properties of the invention as I just read them to you.

I now move on to what I will call Part III, which is the mechanics of deliberation. The first thing that you should do when you go back into that jury room is to select a foreperson. I used to do that when I was a newer judge. I used to watch who took notes, who seemed to be paying attention and who seemed to be daydreaming, who came on time. But it soon became apparent to me that you all know each other a whole lot better than I would know any of you at this point. So, please, the first thing you do is go in and choose a foreperson.

But the foreperson is not more equal than the rest. You've heard, again, both sides say, "We're content with all the jurors." So all of you serve as equals in that room. Rather, the foreperson has certain obligations to me. First, the foreperson will fill in the verdict form. There will be one official verdict form. The foreperson will fill

                    25   it in, sign it, date it, and certify that it's
unanimous.  It




19


                    1    must be a unanimous verdict.  It can't be five-three.
I

                    2    don't ever want to hear running tallies.  It's not a

                    3    majority.  It's got to be all of you.  And I don't want
to

                    4    know where the splits are or when the splits are.  I
don't

                    5    want to know until it's unanimous.  So it must be a
unanimous

                    6    verdict.  The foreperson will, again, fill in the slip,
sign

                    7    it and date it and certify that it's unanimous.  That's
the

                    8    first job.

                    9          The second job will be to write me questions.

                    10   Look, patent law can be hard, and this involves
science, and

                    11   so there may be certain questions that you have about
the law

                    12   that applies in this case.  I cannot tell you what the

                    13   testimony was.  You have your notes; I have mine.
Again, to

                    14   put together a transcript of what any witness says will
take

                    15   hours.  However, you can ask me legal questions like,
"What

                    16   on earth were you talking about when you said
consisting

                    17   essentially of?"  I suggest you go through your notes.
I

                    18   noticed many of you diligently taking it down.  I

suggest you

         19    listen to the tape recording.  I suggest, hopefully,
I'll get

         20    you a charge if you're still deliberating tomorrow, you
know,

         21    tomorrow morning.  But if you have a question that
cannot be

         22    answered by internally and you think it's an important

         23    question, the foreperson should write me a note and ask
me to

         24    explain.  Some of these are tough concepts.

         25          The third role of the foreperson will be to

20

         1    announce the verdict in court, but the foreperson will
not be

         2    standing alone because, of course, this will be a
unanimous

         3    verdict, so you'll hear us say "So say you, madam
forelady?

         4    So say you, all members of the jury?"  So the
foreperson will

         5    announce the verdict, but all of you will remain
standing.

         6          Now, at this point I want to discuss for a
minute

         7    alternates.  This is simple.  In a criminal case, I
have to

         8    exclude two alternates as a matter of constitutional
law.

         9    This is a civil case, so all of you will deliberate,
and

         10    there will be no alternates in this case, so you are
all

         11    going to be going in for deliberation.

These are

lawyers,

for you

to

you

not

where

should go

one's

is

and

12            Third, how do you go about deliberating?

13    tough cases, and I have to say, these are fabulous

14    and in some ways that's made your job a little harder

15    because they're such good lawyers and they've presented

16    you so much.  Everyone goes in with some sense of what

17    think might be the right answer or what you think might

18    be the right answer.  Everyone will have a sense of

19    they're leaning on a particular issue, but no one

20    in there and say, "I know what I'm going to do, and no

21    going to change my mind."  That's not what deliberation

22    all about.  Deliberation means going in there but a

23    willingness to change your mind if there's a reasonable

24    principled basis for doing so.

25            But no one should change her mind because the

21

or

case.

1    weather's absolutely fabulous, which I'm told it is, or

2    because it's time to go back to work or to your family,

3    enough with sutures.  The truth is, it's too important.

4    You've seen how much these people have put into this

5    So, please, no one should change their mind just

because the

6    others think otherwise.  Make sure that you believe in
a

7    principled and reasoned fashion that that's your
verdict

8    because, remember, at the end when it's a unanimous
verdict,

9    you're standing to support that verdict.

10           Now, what I'm going to do is, I want to go
and ask

11   the lawyers -- we actually spent, I think, the last
couple of

12   days on and off discussing this.  I've read it, and I
want to

13   make sure I didn't misread something.  Or sometimes,
you

14   know, you write something out, but then when you read
it,

15   you're not sure it comes out as clearly, and I just
want to

16   make sure that they're okay with this charge as I've
given it

17   to you.  So you can stand, you can stretch, but please
don't

18   listen.  So I'm going to let them right now come talk
to me

19   for two seconds, and then I'm going to let you go out.

20           We're pretty close to organizing these
exhibits for

21   all of you, we're pretty far along, and so we'll
probably

22   bring them right in with you.  You can start the
deliberation

23   process, but, frankly, if you're exhausted and want to
go

24   home and start tomorrow, fair enough.  If you think you
can

25   just sort of start making some headway, you'll have
about

22

1    forty-five minutes or so, that's fine with me too.
We'll cut

2    it at 5:00 o'clock.

3         Okay, let me go talk to the lawyers just for
a

4    second.

5         (Side-bar conference.)

6         THE COURT:  At one point I apparently misread
and

7    said the "basic and novel properties of the suture"
rather

8    than "basic and novel properties of the invention," as
I've

9    described it.  I said it correctly about nine times out
of

10   ten, but I missed it once, and so if you still need
that

11   written instruction, we will correct it.  But,
otherwise, I

12   am going to let you go.  You should let Mr. Alba know
if

13   you're just too tired and don't want to get going right
now,

14   but I suggest, why don't you just get going for half an
hour

15   just to organize yourself.  We'll bring in the
exhibits.  And

16   then you may not want to stay all the way to 5:00.
It's been

17   a really long day for everybody here.  So why don't we
stand

18   in recess, and we'll bring in the exhibits in a second.

19        THE CLERK:  All rise for the jury.

20          (Jury excused.)

21

22

23

24

25

# Exhibit 10

Arthrex, Inc., Naples, FL
Test Report Summary and Sign-Off Sheet

Ref:   RAF-04.16-1
Rev:   3
Date:  01/08/04
Approved DCN: 03310

**Test Report: # TEST021104**

| Part number: | Rev: | Description: | Material: |
|---|---|---|---|
| DT PS05 T2 | N/A | #2 Fiberwire MED2174 Coated and Uncoated USIPG Dyed | Polyethylene, Polyester |
| **Vendor Name:** | | **Lot Numbers:** | **Number Tested:** |
| Pearsalls | | N/A | 3/2 |
| **Performed by:** | | **Type of Test:** | **Date:** |
| Ashley Holloway | | Knot Tiedown | 02/16/04 |

**Test Objective:**

To determine the peak force required to advance a single half hitch using coated and uncoated Fiberwire suture.

**Materials and Methods:**

The 50lb load cell was attached to the MTS Sintech 1/S and calibrated. A custom fixture as shown was used to simulate knot tying that would occur clinically. The top end of the suture was clamped in a custom fixture that was attached to the load cell, and then a single half hitch was tied around a guide block such that the loop length was consistent between samples. A weight of .375 kg was then attached to the free end of the suture in order to tension the loop. Care was taken to tension the legs of the suture consistently. The loop was then loaded at 12 in/min for 30mm and data was collected at 200 Hz. The peak load required to cause the half hitch to slip was recorded and used for data analysis purposes.



CONFIDENTIAL

ARM 000699

Page 1 of 2


DEFENDANT'S EXHIBIT
1026
CA 04-12457-PBS

Arthrex, Inc., Naples, FL
Test Report Summary and Sign-Off Sheet

Ref:    RAF-04.16-1
Rev:    3
Date:    01/08/04
Approved DCN: 03310



**Data Analysis/Conclusions:**

A mean peak force of 12.7 N was recorded for the coated suture. This force represents the force required to initiate slippage of the half hitch. A mean peak force of 32.9 N was recorded for the uncoated suture. A significantly greater amount of force was required to advance the uncoated suture.

CONFIDENTIAL

ARM 000700

2/16/04

| | |
|---|---|
| Sample ID: | coated_uncoated suture_1_021004.mss |
| Method: | Suture Test.msm |

| | |
|---|---|
| Test Date: | 2/11/04 |
| Operator: | Ashley Holloway |

**Sample Information:**

| Name | Value |
|---|---|
| Lot Number | n/a |
| Part Number | Coated/Uncoated suture test |
| Revision Level | #2 Fiberwire |

**Specimen Results:**

| Specimen # | Peak Load Coated (N) | | Specimen # | Peak Load Noncoated (N) |
|---|---|---|---|---|
| 1 | 12.43 | | 4 | 34.04 |
| 2 | 13.08 | | 5 | 31.71 |
| 3 | 12.64 | | | |
| Mean | 12.72 | | | 32.88 |
| Std. Dev. | 0.33 | | | 1.65 |
| Minimum | 12.43 | | | 31.71 |
| Maximum | 13.08 | | | 34.04 |

**Calculation Inputs:**
**Test Inputs:**

| Name | Value | Units |
|---|---|---|
| Break Threshold | 5.620 | lbf |
| Brk Sensitivity | 95 | % |
| Data Acq. Rate | 200.0 | Hz |
| Ext Limit HI | 30.0 | mm |
| Initial Speed | 300.00 | mm/min |
| Load Limit HI | 150 | N |
| MaxSpecimens | 999 | |
| Outer Loop Rate | 100 | Hz |
| Slack Pre-Load | 5.00 | N |
| Slowdown Extension | 0.000 | in |
| Slowdown Load | 0.000 | lbf |
| Slowdown Strain | 0.000 | % |
| Test Speed | 305.00 | mm/min |



ARM 000701

CONFIDENTIAL



# Exhibit 11

## Dr. Gitis' Test Results --
## Coated vs. Uncoated FiberWire
## Summary of Test Results

| Test | Coated Averages | Uncoated Averages | Difference |
|---|---|---|---|
| Pliability | 4.49 | 7.35 | 64% |
| Knot Run-Down | 0.22 | 0.4 | 81% |
| Friction | 0.09 | 0.16 | 77% |
| Chatter | 0.009 | 0.014 | 55% |
| Tissue Drag (Static) | 0.91 | 1.18 | 30% |
| Tissue Drag (Dynamic) | 0.5 | 0.78 | 56% |
| Knot Slippage (Begin) | 3.31 | 5.14 | -55% |
| Knot Slippage (Untie) | 2.52 | 3.66 | -45% |



DEFENDANT'S EXHIBIT
1378
04 04-12457-PBS
exhibit sticker 2

# Exhibit 12

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

DePuy Mitek, Inc.
    a Massachusetts Corporation

        Plaintiff,

    v.

Arthrex, Inc.
    a Delaware Corporation

        Defendant.

Civil Action No. 04-12457 PBS

## EXPERT REPORT OF ROBERT T. BURKS, M.D.

1.    I am an orthopaedic surgeon with the University of Utah Orthopaedic Center.

My office is at 590 Wakara Way, Salt Lake City, Utah 84108. I have been practicing for

more than 23 years.

2.    I received my M.D. from St. Louis University in 1974. I completed a residency in

Orthopaedics at the University of California at San Diego in 1983. I completed a knee

and sports medicine fellowship at Kaiser Permanente Hospital in San Diego in 1983,

and sabbatical at Steadman Hawkins in Vail, Colorado in 1995

3.    I am a Professor and Mary Scowcroft Peery Presidential Endowed Chair at the

University of Utah Health Sciences Center. I am also the Director of Sports Medicine

and Head Physician at the University of Utah. My curriculum vitae are attached as

Exhibit 1.

DEFENDANT'S
EXHIBIT
1309
CA 04-12457-PBS

4.    My specialties include arthroscopy of the shoulder, knee and ankle, and ligament reconstruction. My research interests include patella stability, cartilage defects, tendon healing to bone.

5.    I have reviewed Dr. Fenton's report and I understand he may provide testimony on certain subjects including human anatomy, surgical techniques and surgical devices. I may also provide testimony on these same subjects.

6.    I may describe the characteristics of a surgical suture that are generally important to an orthopaedic surgeon. I may also describe the specific features of FiberWire that I find beneficial in my practice.

7.    I have been using FiberWire suture in my surgical procedures since 2001. Most of my subjective use of FiberWire occurs during surgery and in the surgical environment, FiberWire is generally wet.

8.    Sometime in February 2006, I was contacted by attorneys for Arthrex, Inc. and asked to conduct a tactile feel analysis as well as a knot tie-down analysis of coated and uncoated FiberWire suture. I agreed to conduct the analysis.

9.    In March 2006, I received two samples of suture labeled "suture A" and "suture B." Each sample was on a spool and was approximately 3 meters in length. I was told by Arthrex's attorneys that one sample was coated US No. 2 FiberWire and that the other sample was uncoated US No. 2 FiberWire, however, I was not told which sample was coated and which was uncoated.

2

10.    I took the sutures and cut them into some lengths that are appropriate for intraoperative tying and for intraoperative knot tying done arthroscopically. This allowed 5 strands from each spool.

11.    I conducted a tactile feel analysis of both suture samples ("suture A" and "suture B"). During the analysis, I noticed that the sample labeled "suture A" generally felt smoother than "suture B." The difference between the two samples was even more pronounced when they were wet, which is how I am most accustomed to using FiberWire.

12.    I also conducted a knot tie-down analysis on the two suture samples. I tied several surgeons knots and found that the knots slid easier on the sample labeled "suture A" as compared with the sample labeled "suture B." I felt less friction when sliding the knot on the sample labeled "suture A" as compared with the sample labeled "suture B." Here again, the difference between the two samples was most noticeable when they were wet, as I am accustomed to using FiberWire.

13.    After conducting my analysis, I was informed that "suture A" was the coated FiberWire and "suture B" was the uncoated FiberWire.

14.    If asked to testify at trial, I may use physical exhibits, as well as other demonstrative exhibits, which have not yet been developed.

3

15.    Within the past four years, I have testified as an expert at deposition in

connection with one other case: Philip D. Ceriani, M.D. v. Lonnie Paulos, M.D., and

Simon Finger, M.D., et al, Case #: 030906702 (Civil 3rd District Court, Salt Lake City).

16.    I am being compensated at a rate of $400 per hour.


Dated: March 24, 2006

_____
            Robert T. Burks, M.D.

4

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Expert Report

of Robert T. Burks, M.D., was served, via Fedex (Saturday delivery to Ms. Malinoski

and regular delivery to Mr. Gleason), along with a courtesy copy of the text of this

report (without exhibits), via email, on the following counsel for Plaintiff on the 24th

day of March 2006:


Lynn A. Malinoski
Woodcock Washburn, LLP
One Liberty Place, 46th Floor
Philadelphia, PA. 19103
Telephone:  (215) 568-3100
Facsimile:  (215) 568-3439

Daniel J. Gleason
Nutter McClennan & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
Telephone:  (617) 439-2000
Facsimile:  (617) 310-9000



_____s/Salvatore P. Tamburo_____

# EXHIBIT 1

# CURRICULUM VITAE

## PERSONAL DATA

Name:               Robert T. Burks, M.D.

Office Address:     University of Utah Orthopaedic Center
                    590 Wakara Way
                    Salt Lake City, UT 84101
                    (801) 587-5455
                    (801) 587-5411 (fax)

Birth Date:         May 12, 1952

Birthplace:         St. Louis, Missouri

Citizenship:        USA

Social Security #:

## EDUCATION

1974                Southern Methodist University          B.A., Chemistry

1978                St. Louis University                   M.D.

## RESIDENCY (ORTHOPEDICS)

1979-83             University Hospital Medical Center
                    University of California at San Diego

## FELLOWSHIP

7/82-1/83           Knee Fellowship and Sports Medicine
                    with Dale M. Daniel, M.D.
                    Kaiser Permanente Hospital
                    San Diego, California

## BOARD CERTIFICATION

7/19/85             American Board of Orthopedic Surgery

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 1983-86 | Private Orthopedic Practice Group<br>Orthopedic Associates, Inc.<br>3009 North Ballas Road, Suite 105<br>St. Louis, Missouri   63131 |
| 1986-88 | Assistant Professor<br>Orthopedic Surgery<br>Wayne State University |
| | Director of Sports Medicine<br>Harper Hospital |
| 1988-95 | Assistant Professor<br>Orthopedic Surgery<br>University of Utah |
| 1994-1999 | Associate Professor<br>Orthopedic Surgery<br>University of Utah |
| 1999-Present | Professor<br>Orthopedic Surgery<br>University of Utah |
| 1992 – Present | Director<br>University of Utah Red Butte<br>Sports Medicine Center |
| 1988-92 | Team Physician<br>University of Utah |
| 1992-Present | Head Team Physician<br>University of Utah |
| 1992 | Adjunct Assistant Professor of Bioengineering |
| 5/95-9/95 | Sabbatical with Richard Hawkins at Steadman Hawkins Clinic<br>Vail, Colorado |
| 7/2002 | Adjunct Professor of Physical Therapy |
| 2003 - Present | Chairman, Metcalf Memorial Meeting |

## EDITORIAL EXPERIENCE

| | |
|---|---|
| 1993 - Present | Reviewer for Clinical Orthopaedics and Related Research |
| 1993 - Present | Reviewer for The American Journal of Sports Medicine |
| 2001 - Present | Editorial Board Sports Medicine and Arthroscopy Review |
| 2002 - Present | Editorial Board Member of "Techniques in Knee Surgery" |

## AWARDS

| | |
|---|---|
| 1983 | Vernon P. Thompson Award Western Orthopedic Surgery for paper entitled "Anterior Cruciate Graft Preload and Anterior Knee Stability" |
| 1986 | Distinguished Service Award, Meramec Community College |
| 1989 | Cabaud Award American Orthopedic Society for Sports Medicine for paper "Biomechanical and Histological Observations on the Dog Patellar Tendon After   Removal of Its Central One-Third" |
| June1999 | Outstanding Service Award – AOSSM |
| June 2000 | Selected Outstanding Teacher of the Year Department of Orthopedics |
| 2002 | Outstanding Service Award - AOSSM |
| February 2003 | "Anatomic Lateral Ligamentous Reconstruction of the Ankle Utilizing  Autologous Hamstring Graft".  Curtin MJ, Burks RT, and Melhart K.  AAOS, New Orleans 2/03. |

## RESEARCH AWARDS (GRANTS)

FMRE funds, Biomechanical and Histological Observations on the Dog Patellar Tendon After Removal of Its Central One-Third Wayne State University, $14,000, 1988

3M, for tissue fixation study, $12,125, 1989

Lifecore as co-investigator on hyaluronic acid study, $88,000, 1989

The American Orthopedic Society for Sports Medicine Society, "Biomechanical and Histological Observations on the Dog Patellar Tendon After Removal of Its Medial One-Third," $15,000, 1990

Orthopedic Research and Education Fund, "Biomechanical and Histological Observations on the Dog Patellar Tendon After Removal of Its Medial One-Third," $15,000, 1990

3

The American Orthopedic Society for Sports Medicine, co-investigator, "The Influence of Interface Area and Interference Fit on the Ultimate Tensile Strength of a Healed Tendon-Bone Tunnel Complex," $15,000, 1998

Evaluation of a single osteochondral autograft plug and the treatment of a large osteochondral lesion in the femoral condyle: Experimental study in sheep. Arthrex $50,000 2002.

## SCHOLASTIC HONORS

1982   Outstanding Pediatric Orthopedic Resident

1983   McCoy Award for Most Outstanding Senior Resident

1992   American Orthopedic Society for Sports Medicine - European Society for Surgery of the Knee and Arthroscopy European Traveling Fellow

1997   Elected to Herodicus Society

2001   Mary Scowcroft Peery Presidential Endowed Chair

2001   Elected to American Orthopedic Association

## ADMINISTRATIVE EXPERIENCE

| | |
|---|---|
| 1992-2002 | Co-Chairman Metcalf Memorial Meeting |
| 2003-Present | Chairman Metcalf Memorial Meeting |
| 2003-Present | Chairman Membership Committee American Orthopedic Society for Sports Medicine |
| 1989-96 | Coordinator Orthopedic Mortality and Morbidity Conference |
| 1990-Present | Director Dunbar Sports Medicine Lecture Series |
| 1991-Present | University of Utah Sports Medicine Fellowship Program Director |
| 1998-99 | Faculty Council Representative |
| 1998- | American Orthopedic Society for Sports Medicine Membership Committee |
| 2001-2003 | Chairman American Orthopedic Society for Sports Medicine Fellowship Director Committee |
| 1999-2001 | FPO Clinical Affairs Committee |
| 2000-2001 | Faculty Practice Steering Committee |
| 2001 | Member of the PM&R Search Committee |
| 1998-Present | Medical Director Sports Medicine |
| 2001-Present | Medical Director Madsen Outpatient Surgery Center |
| 2004-Present | Orthopedic Chairman Search Committee |
| 2004-Present | University of Utah School of Medicine PRT Committee |

4

## SERVICE

| | |
|---|---|
| 1992-1997 | Utah Delegate to The American Orthopedic Society for Sports Medicine |
| 1995-Present | Utah Delegate to  Arthroscopy Association of North America |
| 1993 - 1996 | Fellowship Committee American Orthopedic Society for Sports Medicine |
| 1996 - 1998 | Committee Chairman (Sports Medicine Fellowship Examination) |
| 1998 | University of Utah PRT Committee for Clinical Appointments |
| 1998 | Salt Lake City Olympic Committee |
| 1998 | American Orthopedics Society for Sports Medicine (Membership Committee) |
| 1999 | US Figure Skating Medical Coverage |
| 1999 | FPO Clinical Affairs Sub Committee |
| 8/99-Present | Sports Medicine Fellowship Director's Committee Chairman |

## MEDICAL SOCIETY MEMBERSHIPS

American Academy of Orthopedic Surgeons
American Orthopedic Society for Sports Medicine
Arthroscopy Association of North America
Magellan Orthopedic Society -1992
American Orthopedic Association
Herodicus Society
American Orthopedic Association

## ELECTRONIC

"Anatomic Lateral Ligamentous Reconstruction of the Ankle Utilizing  Autologous Hamstring Graft".  Curtin MJ, Burks RT, and Melhart K.  AAOS, New Orleans 2/03.

## PUBLICATIONS

Burks RT and Sutherland DH:  Stress Fractures of the Femoral Shaft in Children: Report of Two Cases and Discussion.  J Pediatr Orthop.  4(5):614-616, 1984.

Burks RT, Daniel DM, and Losse G:  The Effects of Continuous Passive Motion on Anterior Cruciate Ligament Reconstruction Stability.  Am. J. Sports Med.  12:323-327, 1984.

Daniel DM, Malcolm,L, Stone M, Losse G, Sachs R, and Burks RT:  Instrumented Measurement of Anterior Laxity of the Knee.  J. Bone and Joint Surg.  67A:720-726, 1985.

Burks RT and Leland R:  Determination of Graft Tension Before Fixation in Anterior Cruciate Ligament Reconstruction.  Journal of Arthroscopic and Related Surgery. 4(4):260-266, 1988.

Burks RT:  Cruciate Graft Tensioning.  Surg. Rounds Ortho. 3(2):57-61, 1989.

Burks RT and Schaffer J:  A Simplified Approach to the Tibial Attachment of the Posterior Cruciate Ligament.  CORR 254:216-219, 1990.

Burks RT, Haut RC, and Lancaster RL:  Biomechanical and Histological Observations on the Dog Patellar Tendon After Removal of Its Central One-Third.  Am. J. Sports Med. 18(2):146-153, 1990.

Burks RT:  Arthroscopy and Degenerative Arthritis of Knee.  Orthopedics/Rheumatology Digest 8:5-6, 1990.

Faciszewski T, Burks RT, and Manaster, BJ:  Subtle Injuries of the Lisfranc Joint.  J. Bone and Joint Surg.  72A:1519-1522, 1990.

Burks RT:  Arthroscopy and Degenerative Arthritis of the Knee.  A Review of the Literature.  Arthroscopy.  6(1):43-47, 1990.

Burks RT:  Letter to the Editor.  Arthroscopy. 6(1):68-69, 1990.

Burks RT, Bean BG, Marcus R, and Barker HB:  Analysis of Athletic Performance with Prophylactic Ankle Devices.  Am. J. Sports Med.  19(2):104-107, 1991.

Burks RT, Lock TR, and Negendank WG:  Occult Tibial Fracture in a Gymnast: Diagnosis by Magnetic Resonance Imaging.  Am. J. Sports Med. 20(1), 1992.

Burks RT:  Practical Considerations in Graft Fixation.  Operative Techniques in Orthopaedics, 2(2):71-75, 1992.

Robins AJ, Newman AP, and Burks RT:  Post-Operative Return of Motion in Anterior Cruciate Ligament and Medial Collateral Injuries:  The Effect of Medial Collateral Ligament Rupture Location.  Am. J. Sports Med. 21(1):20-25, 1993.

Newman AP, Daniels AU, and Burks RT:  Principles and Decision Making in Meniscal Surgery.  Arthroscopy, 9(1):33-51, 1993.

Almekinders LC, Burks RT, Parker RD, and Collins HR:  Report and Study of the 1992 AOSSM-ESKA Traveling Fellows.  Am. J. Sports Med., 21(1):161-162, 1993.

Burks RT:  Exposures in Posterior Cruciate Ligament Surgery.  Operative Techniques in Sports Medicine.  1(2):121-124, 1993.

6

Burks RT and Morgan J: Anatomy of the Lateral Ankle Ligaments. Am. J. Sports Med. 22(1):72-77, 1994.

Mantas JP and Burks RT: Lisfranc Injuries in the Athlete. Clin. Sports Med. 13(4):719-730, 1994.

Linder LH, Sukin DL, Burks RT, and Haut RC: Biomechanical and Histological Changes of the Dog Patellar Tendon After Removal of the Medial One-Third. Am. J. Sports Med. 22(1):136-142, 1994.

Newman AP and Burks RT: Arthroscopic Meniscal Repair: Inside-Out Technique. Operative Tech. Sports Med. 2(3):177-189, 1994.

Burks RT and Edelson RH: Allograft Reconstruction of the Patellar Ligament. A Case Report. J. Bone and Joint Surg. 76A:1077-1079, 1994.

Edelson R, Burks RT, and Bloebaum RD: Short Term Effects of Knee Washout for Osteoarthritis. Am. J. Sports Med. 23(3):345-349, 1995.

Stringham DR, Pelmas CJ, Burks RT, et al: Comparison of Anterior Cruciate Ligament Reconstruction Using Patellar Tendon Autograft or Allograft. Arthroscopy 12(4):414-421, 1996.

Burks RT and Luker M: Medial Patellofemoral Ligament Reconstruction. Techniques in Orthopedics. Lippincott Raven Publisher. 12(3):185-191, 1997.

Burks RT, Metcalf MH, and Metcalf RW: Fifteen Year Follow-Up of Arthroscopic Partial Meniscectomy. Arthroscopy 13(6):673-679, 1997.

Desio SM, Burks RT, and Bachus KN: Soft Tissue Restraints to Lateral Patella Translation in the Human Knee. Am J Sports Med 26(1):59-65, 1998.

Burks RT, Desio SM, Bachus KN, et al: Biomechanical Evaluation of Lateral Patellar Dislocations. Am J Knee Surg 11(1):24-31, 1998.

Burks RT and Doyle AD: Comparison of Humeral Head Retroversion to the Humeral Axis/Biceps Groove Relationship: A Study in Live Subjects and Cadavers. JSES 7(5):453-457, 1998.

Sandmeier H, Burks RT, Bachus KN, and Billings A: The Effect of Reconstruction of the Medial Patellofemoral Ligament on Patellar Tracking. Am J Sports Med 28(3):345-349, 2000.

Bardana DD and Burks RT: Meniscectomy: Is There Still a Role? Operative Techniques in Orthopaedics 10(3):183-193, 2000.

Street CS and Burks RT: Chronic Complete Hamstring Avulsion Causing Foot Drop. A Case Report. Am J Sports Med 28(4):574-576, 2000.

Friederichs MG, Greis PE, and Burks RT: Pitfalls Associated with Fixation of Osteochondritis Dissecans Fragments Using Bioabsorbable Screws. Arthroscopy 17(5):542-545, 2001.

Burks, RT: Obtaining Intraarticular Bone Grafts Arthroscopically for Intraarticular Grafting. Arthroscopy 17(6):672-674, 2001.

Gryler EC, Greis PE, Burks RT, and West J: Axillary Nerve Temperatures During Radiofrequency Capsulorrhaphy of the Shoulder. Arthroscopy 17(6):567-572, 2001.

Cunningham R, West JR, Greis PE, and Burks RT: A Survey of the Tension Applied to a Doubled Hamstring Tendon Graft for Reconstruction of the Anterior Cruciate Ligament. Arthroscopy 18(9):983-988, 2002.

Greis PE, Burks RT, Bachus KN, and Luker MG: The Influence of Tunnel Length and Fit on the Strength of a Tendon-Bone Tunnel Complex. Am J Sports Med 29(4):493-497, 2001.

Greis PE, Burks RT, Schickendantz MS, and Sandmeier R: Axillary Nerve Injury Following Thermal Capsular Shrinkage of the Shoulder. JSES 10(3):231-235, 2001.

Schlegel TF, Burks RT, Marcus RL, and Dunn HK: A Prospective Evaluation of Untreated Acute Grade III Acromioclavicular Separations. AJSM 29(6):699-703, 2001.

Schock EJ and Burks RT: Medial Patellofemoral Ligament Reconstruction Using a Hamstring Graft. Operative Techniques in Sports Medicine, 9(3): 169-175, 2001.

Greis PE, Bardana DD, Holmstrom MC, and Burks RT: Meniscal Injury: I Basic Science and Evaluation. Journal of American Academy Orthopaedic Surgeons 10(3):168-176, 2002.

Greis PE, Holmstrom MC, Bardana DD, and Burks RT: Meniscal Injury: II Management. Journal of American Academy Orthopaedic Surgeons 10(3):177-187, 2002.

Burks RT: Letter to the Editor. Arthroscopy 18(5):560, 2002.

Greis PE, Scuderi MG, Mohr RA, Bachus KN, and Burks R.T.: Glenohumeral Articular Contact Areas and Pressures Following Labral and Osseous Injury to the Anterior-Inferior Quadrant of the Glenoid. Journal of Shoulder and Elbow Surgery, 11(5):442-451, 2002.

8

Dienst M, Burks RT, and Greis PE:  Anatomy and Biomechanics of the Anterior Cruciate Ligament.  Orthop Clin N Am, 33:605-620, 2002.

Bardana DD, Burks RT, West JR, and Greis PE:  The Effect of Suture Anchor Design and Orientation on Suture Abrasion: An In Vitro Study.  Arthroscopy, 19(3):274-281, 2003.

Burks RT, Friederichs MG, Fink B, et al:  Treatment of Postoperative Anterior Cruciate Ligament Infections with Graft Removal and Early Reimplantation.  Am Journal of Sports Med, 31(3):414-418, 2003.

Boylan D, Greis PE, West JR, Bachus KN, and Burks RT: Effects of Initial Graft Tension on Knee Stability After Anterior Cruciate Ligament Reconstruction Using Hamstring Tendons: A Cadaver Study.  Arthroscopy 19(7):700-705, 2003.

Lahav A, Burks RT, and Scholl MD:  Allograft Reconstruction of the Patellar Tendon: 12-Year Follow-Up.  Am J Orthop.  33(12):623-24, 2004.

Lahav A and Burks RT:  Evaluation of the Failed ACL Reconstruction.  Sports Med Arthros Rev. 13(1):8-16, 2005.

Mashoof AA, Scholl MD, Lahav A, Greis PE, and Burks RT:  Osteochondral Injury to the Mid-Lateral Weight-Bearing Portion of the Lateral Femoral Condyle Associated with Patella Dislocation.  Arthroscopy 21(2):228-232, 2005.

Burks RT, Crim J, Fink BP, Boylan DN, and Greis PE:  The Effects of Semitendinosus and Gracilis Harvest in Anterior Cruciate Ligament Reconstruction.  Arthroscopy 21(10):1177-1185, 2005.

## BOOK CHAPTERS

Daniel DM, Penner D, and Burks RT:  Anterior Cruciate Ligament Graft Isometry and Tensioning.  Prosthetic Knee Ligament Reconstruction.  Ed. Friedman, M., and Ferkel, R.  W.B. Saunders, Philadelphia, 1988.

Burks RT:  Knee Anatomy.  Knee Ligaments Structure, Function, Injury, and Repair. Ed.  Daniel, D.M., Akeson, W.H., and O'Conner, J.J.  Raven Press, N.Y., N.Y., 1990.

Burks RT:  Exposures in Posterior Cruciate Ligament Surgery.  Sports Medicine Orthopedic Rehabilitation, Second Edition.  Ed. C. Vernon Nichol and Michael J. Botte. Churchill Livingstone Inc., 1992.

Burks RT and Butorac RB:  Injuries and Diseases of the Articular Surfaces of the Knee. The Knee.  Ed. W. Norman Scott.  Mosby-Year Book, 1992.

Burks RT:  American Academy of Orthopaedic Surgeons Monograph Series.  Diagnosis of ACL Injuries.  Pgs. 19-26.  <u>The ACL Deficient Knee</u>.  Ed. Edward M. Wojyts. American Academy of Orthopaedic Surgeons, 1994.

Burks RT and Luker MG:  Knee Anatomy.  <u>Daniel's Knee Injuries:  Knee Ligaments and Cartilage Structure, Function, Injury, and Repair.</u>  Second Edition.  Eds. Robert A. Pedowitz, John O'Connor, and Wayne Akeson.  Lippincott Williams & Wilkins, Philadelphia, PA, 2003.

## PRESENTATIONS – INTERNATIONAL

"Arthroscopic Ankle Fusion,"  52nd Annual Scientific Meeting of Australian Orthopaedic Association, Hobart, Australia, September 1992.

"15 Year Follow-Up of Arthroscopic Meniscectomy," European Society of Sports Traumatology Knee Surgery and Arthroscopy, Berlin, Germany, April, 1994.

"Arthroscopic Ankle Fusion," Dermot Morgan Memorial Scientific Conference, Launceston, Tasmania, June 1993.

"Meniscus Transplantation," Guest Lecturer, Brazilian Orthopedics Society, Belo Horizonte, Brazil, May 1997.

"Rotator Cuff Repair," Guest Lecturer,  Brazilian Orthopedics Society, Belo Horizonte, Brazil, May 1997.

"PCL Reconstruction," Guest Lecturer, Brazilian Orthopedics Society, Belo Horizonte, Brazil, May 1997.

"Athletic Shoulder Injuries," Guest Lecturer, Brazilian Orthopedics Society, Belo Horizonte, Brazil, May 1997.

"Arthroscopic Ankle Fusion," Guest Lecturer, Brazilian Orthopedics Society, Belo Horizonte, Brazil, May 1997.

"PCL Reconstruction," Current Concepts of PCL Reconstruction, Posterolateral Reconstruction, and Treatment of Osteochondral Injury," London, England, October 1997.

"Posterolateral Corner Reconstruction," Current Concepts of PCL Reconstruction, Posterolateral Reconstruction, and Treatment of Osteochondral Injury,  London, England, October 1997.

"Treatment of Osteochondritis Dissecans," Current Concepts of PCL Reconstruction, Posterolateral Reconstruction, and Treatment of Osteochondral Injury,  London, England, October 1997.

Invited International Guest Speaker to International Congress of Arthroscopy and Related Sciences, Buenos Aires, Argentina, May 25-29, 2002.

"Meniscus Transplantation." 3rd Basel International Knee Congress, January 2003, Basel, Switzerland.

"Arthroscopic Rotator Cuff Repair." XIV Congresso Mineiro De Ortopedia E Traumatologia, Sao Lourenco, Brazil, May 2004.

"Arthroscopic Shoulder Instability Repair." XIV Congresso Mineiro De Ortopedia E Traumatologia, Sao Lourenco, Brazil, May 2004.

"Arthroscopic Ankle Fusion." XIV Congresso Mineiro De Ortopedia E Traumatologia, Sao Lourenco, Brazil, May 2004.

"Osteoarticular Grafts in the Knee." XIV Congresso Mineiro De Ortopedia E Traumatologia, Sao Lourenco, Brazil, May 2004.

"Medial Patellofemoral Ligament Reconstruction." XIV Congresso Mineiro De Ortopedia E Traumatologia, Sao Lourenco, Brazil, May 2004.

"ACL Reconstruction." XIV Congresso Mineiro De Ortopedia E Traumatologia, Sao Lourenco, Brazil, May 2004.
"ACL MCL Injury Treatment." XIV Congresso Mineiro De Ortopedia E Traumatologia, Sao Lourenco, Brazil, May 2004.

## PRESENTATIONS - NATIONAL

"Laboratory Studies on Fixation," Symposium on Prosthetic Augmentation of Autogenous Grafts, Carmel, California, August 1984.

"Cruciate Anatomy," Conference on Cruciate Ligament Surgery:  Principles and Practice, La Jolla, California, March 1987.

"Drill Guides, Isometers, and Tensioning Devices," Conference on Cruciate Ligament Surgery:  Principles and Practice, La Jolla, California, March 1987.

"Management of Knee Injuries," Michigan State Medical Society Annual Scientific Meeting, Dearborn, Michigan, November 1987.

"Determination of Graft Tension Prior to Fixation in Anterior Cruciate Reconstruction," Annual Meeting of Arthroscopy Association of North America, Washington, D.C., March 1988.

"Cruciate Anatomy and ACL Rehabilitation," Knee Reconstruction Surgery, San Diego, California, February 1989.

"Biomechanical and Histological Observations of the Dog Patellar Tendon After Removal of Its Central One-Third," American Orthopedic Society for Sports Medicine, Traverse City, Michigan, June 1989.

"Role of Arthroscopy in Osteochondritis Dissecans," Metcalf Arthroscopy Seminar 1990 Snowbird, Utah, January 1990.

"Knee Arthrodesis," Arthritic Hip, Knee, and Shoulder Conference, Snowbird, Utah, January 1990.

"Shoulder Hemiarthroplasty and Irreparable Rotator Cuff Tear," Arthritic Hip, Knee, and Shoulder Conference, Snowbird, Utah, January 1990.

"Examination of the Knee," American College for Sports Medicine, Salt Lake City, Utah, May 1990.

"Subtle Injuries of the Lisfranc Joint," Western Orthopedic Association, October 1990.

"Arthroscopy and Arthritis,"  Metcalf Arthroscopy Seminar, Phoenix, Arizona, January 1991.

"Ankle Arthroscopy," Metcalf Arthroscopy Seminar, Phoenix, Arizona, January 1991.

"Beach Chair Position for Shoulder Arthroscopy," Metcalf Arthroscopy Seminar, Phoenix, Arizona, January 1991.

"Use of Fluoroscopy with Arthroscopic Posterior Cruciate Reconstruction,"  Metcalf Arthroscopy Seminar, Phoenix, Arizona, January 1991.

"Subtle Injuries of the Lisfranc Joint," American Academy of Orthopedic Surgeons, Anaheim, California, March 1991.

"Surgical Anatomy of the Lateral Ankle Ligaments," American Academy of Orthopedic Surgeons, Anaheim, California, March 1991.

"Arthroscopy," American Academy of Orthopedic Surgeons, Chicago, Illinois, April 1991. "Patellofemoral Joint," American Academy of Orthopedic Surgeons, Chicago, Illinois, April 1991.

"Multiple Injuries Ligament Injuries to the Knee," Knee Reconstruction San Diego, California, May 1991.

"Biomechanical and Histological Changes of the Dog Patellar Tendon After Removal of the Medial One-Third," American Society of Mechanical Engineers, Anaheim, California December 1991.

"Slippage Under Load at Sites of Human Ligament and Tendon Re-Attachment to Bone," Orthopaedic Research Society, Washington, D.C., February 1992.

"Results of Simple Knee Lavage," American Academy of Orthopedic Surgeons, Washington, D.C., February 1992.

"The Scope in DJD & Inflammatory Arthritis," Arthritic Hip, Knee and Shoulder Symposium, Snowbird, Utah, January 1993.

"Shoulder Arthroscopy/Decompression & Cuff Lesions," Arthritic Hip, Knee and Shoulder Symposium, Snowbird, Utah, January 1993.

"Arthroplasty with Severe Cuff Disease," Arthritic Hip, Knee and Shoulder Symposium Snowbird, Utah, January 1993.

"Ancillary Testing for ACL," Advanced Concepts in Anterior Cruciate Ligament, Tucson, Arizona, January 1993.

"Considerations in Graft Placement," Advanced Concepts in Anterior Cruciate Ligament Tucson, Arizona, January 1993.

"Arthroscopic Ankle Arthrodesis," Metcalf Arthroscopy Seminar, Snowbird Utah, January 1993.
A15 Year Follow-up of Partial Meniscectomy," Metcalf Arthroscopy Seminar, Snowbird, Utah, January 1993.

"Arthroscopic Management of Osteochondritis Dissecans," Arthroscopy Seminar Snowbird, Utah, January 1993.

"Use of Fluoroscopy in Posterior Cruciate Ligament Reconstruction," Metcalf Arthroscopy Seminar, Snowbird, Utah, January 1993.

"Prospective Evaluation of Grade III Acromioclavicular Separation," American Academy of Orthopedic Surgeons, San Francisco, California, February 1993.

"15 Year Follow-Up of Arthroscopic Meniscectomy," American Academy of Orthopedic Surgery, New Orleans, Louisiana, February 1994.

A15 Year Follow-Up of Arthroscopic Meniscectomy," Arthroscopy Association of North America Annual Meeting, Orlando, Florida, May 1994.

"Ligamentous Laxity as a Contributing Factor in Anterior Cruciate Ligament Injury and Shoulder Dislocation in Male and Female Basketball Players," American Orthopaedic Society for Sports Medicine Annual Meeting, Palm Desert, California June 1994.

"Comparison of Anterior Cruciate Ligament Reconstructions Using Patellar Tendon Autograft or Allograft," American Orthopaedic Society for Sports Medicine Annual Meeting, Palm Desert, California, June 1994.

"Ankle Arthroscopy and Set-up," Metcalf Arthroscopy Seminar, Sun Valley, Idaho, January 1995.

"Arthroscopic Ankle Fusion," Metcalf Arthroscopy Seminar,  Sun Valley, Idaho, January 1995.

"Patellofemoral Pain," Metcalf Arthroscopy Seminar,  Sun Valley, Idaho, January 1995.

"Meniscal Repair," Metcalf Arthroscopy Seminar, Sun Valley, Idaho, January 1995.

"Complications of Arthroscopic Surgery," Metcalf Arthroscopy Seminar, Sun Valley, Idaho, January 1995.

"Approach to Chondral Defects in the Knee," Metcalf Arthroscopic Seminar, Sun Valley, Idaho.  January 1995.

"Subcutaneous Harvest of the Patella Tendon ACL Graft," Arthroscopy Association of North America 14th Annual Meeting, San Francisco, California, May 1995.

"Patellofemoral Disorders and Osteochondral Lesions," Arthroscopy Association of North America 14th Annual Meeting, San Francisco, California, May 1995.

"Soft Tissue Restraints to Lateral Patella Translation in the Human Knee." Desio SM, Burks RT, and Bachus KN.  American Orthopedic Society for Sports Medicine. Orlando, Florida 1996.

"Shoulder Rehabilitation After Instability or After Rotator Cuff Repair," Metcalf Arthroscopy Seminar, Scottsdale, Arizona, January 1996.

"Osteochondral Lesions," Metcalf Arthroscopy Seminar, Scottsdale, Arizona, January 1996.

"Patellar Instability," Metcalf Arthroscopy Seminar, Scottsdale, Arizona, January 1996.

"Patellofemoral Anatomy," Metcalf Arthroscopy Seminar, Scottsdale, Arizona, January 1996.

14

"Anterior Cruciate Ligament Reconstruction," Metcalf Arthroscopy Seminar, Scottsdale, Arizona, January 1996.

"Rehabilitation for Anterior Shoulder Stabilization," Metcalf Arthroscopy Seminar, Sun Valley, Idaho, January 1997.

"Rehabilitation for Cuff Repair," Metcalf Arthroscopy Seminar, Sun Valley, Idaho, January 1997.

"ACL Repair," Metcalf Arthroscopy Seminar, Sun Valley, Idaho, January 1997.

"Rehabilitation for Arthroscopic Acromioplasty," Metcalf Arthroscopy Seminar, Sun Valley, Idaho, January 1997.

"Rehabilitation after Shoulder Arthroscopy," Metcalf Arthroscopy Seminar, Sun Valley, Idaho, January 1997.

"Patellofemoral Pain and Its Management, American Academy of Orthopedic Surgery Instructional Course, San Francisco, California, February 1997.

"ACL Graft Harvest," American Orthopedic Society for Sports Medicine Comprehensive Knee Surgery, Lake Buena Vista, Florida, April 1997.

"Surgical Approach to the Posterior Cruciate," American Orthopedic Society for Sports Medicine Comprehensive Knee Surgery, Lake Buena Vista, Florida, April 1997.

"Posterior Cruciate Graft Placement," Arthroscopy and Reconstructive Surgery Seminar, Scottsdale, Arizona, January 1998.

"Treatment of Meniscal Injuries," Arthroscopy and Reconstructive Surgery Seminar, Scottsdale, Arizona, January 1998.

"Arthroscopic Treatment of Degenerative Knee Conditions," Arthroscopy and Reconstructive Surgery Seminar, Scottsdale, Arizona, January 1998.

"Rehabilitation of the Shoulder After Arthroplasty, Anterior Stabilization, and Acromioplasty," Arthroscopy and Reconstructive Surgery Seminar, Scottsdale, Arizona, January 1998.

"Prospective Evaluation of Untreated Acute Grade III Acromioclavicular Separations," American Shoulder and Elbow Surgeons Meeting, New Orleans, Louisiana, March 1998.

"R-F Probe Shrinkage of the Shoulder Capsule for Shoulder Instability," Herodicus Society Meeting, Portland, Maine, June 1998.

15

"Meniscal Repair," Arthroscopy and Reconstructive Surgery Seminar, Sun Valley, Idaho, January 1999.

"Osteochondritis Dissecans,"  Arthroscopy and Reconstructive Surgery Seminar, Sun Valley, Idaho,  January1999.

"Articular Cartilage Injury and Repair," Arthroscopy and Reconstructive Surgery Seminar, Sun Valley, Idaho, January 1999.

"Arthroscopic Treatment of the Degenerative Knee," Arthroscopy and Reconstructive Surgery Seminar, Sun Valley, Idaho, January 1999.

"Osteotomies for the Valgus Knee,"  AOSSM, Traverse City, Michigan, June 1999.

"Osteochondral Graft Contact Pressures,"  Herodicus Society, Bay Harbor, Michigan, June 1999.

"PCL Reconstruction," Comprehensive Knee Surgery for Sports Trauma (AOSSM). Rosemont, Illinois, October 1-3, 1999.

"Meniscal Surgery," Comprehensive Knee Surgery for Sports Trauma (AOSSM). Rosemont, Illinois, October 1-3, 1999.

"ACL Graft Harvest," Comprehensive Knee Surgery for Sports Trauma (AOSSM). Rosemont, Illinois, October 1-3, 1999.

"Arthroscopic Distal Clavicle Excision,"  Arthroscopic and Reconstructive Surgery Seminar, Scottsdale, Arizona, January 2000.

"Arthroscopic Capsular Shrinkage," Arthroscopic and Reconstructive Surgery Seminar, Scottsdale, Arizona, January 2000.

"Microfracture of Articular Lesions in the Knee," Arthroscopic and Reconstructive Surgery Seminar, Scottsdale, Arizona, January 2000.

"Cyclic Loading of Rotator Cuff Repairs:  A Comparison of Two Repair Techniques." Street CS, West JR, Bachus KN, and Burks RT.  AOSSM Orlando, Florida, March 2000.

"Hamstring Tendon Grafts for Reconstruction of the ACL:  Analysis of Tension Degradation in a Cadaveric Model."  Boylan DN, West JR, Bachus KN, Greis PE, and Burks RT.  AOSSM Orlando, Florida, March 2000.

"Temperatures Along the Axillary Nerve During Radiofrequency Induced Thermal Capsular Shrinkage of the Shoulder."  Gryler, EC, Greis PE, West JR, and Burks RT. AAOS Orlando, Florida, March 2000.

"Meniscal Transplantation," "Abrasion Arthroplasty," "Treatment of Acute Multiple Knee Ligament Knee Injury."   Invited speaker to Royal College of Physicians and Surgeons of Canada, Calgary, Canada, March 2000.

"Management of the Valgus Knee," AOSSM Sun Valley, June 2000.

"Osteochondritis Dissecans Management Valgus Osteotomy for the Varus Knee and Varus Osteotomy for the Valgus Knee,"  AOSSM Marquis Course Knee and Shoulder in the Athlete, Scottsdale, AZ, December 2000.

"Arthroscopic Anatomy and Common Variants in the Shoulder."   Arthroscopic and Reconstructive Surgery Seminar, Sun Valley, Idaho, January 2001.

"Arthroscopic Treatment of the Painful AC Joint."   Arthroscopic and Reconstructive Surgery Seminar, Sun Valley, Idaho, January 2001.

"ACL Reconstruction Technique."   Arthroscopic and Reconstructive Surgery Seminar, Sun Valley, Idaho, January 2001.

"Osteotomy for the Valgus Knee."   Arthroscopic and Reconstructive Surgery Seminar, Sun Valley, Idaho, January 2001.

"When is Arthroscopic Debridement, Microfracture Indicated and When Is It a Waste of Time?"  Arthroscopic and Reconstructive Surgery Seminar, Sun Valley, Idaho, January 2001.

"Effects of Harvest of the Semitendinosus and Gracilis Tendons in ACL Reconstruction."  Burks RT, Fink B, Crim J, Boylan D, and Greis PE.   AOSSM at AAOS, San Francisco, California.  March 2001.

"Glenohumeral Articular Contact Area and Pressure Following Anterior Inferior Glenoid Quadrant Labral and Osseus Injury."  Scuderi M, Greis PE, Mohr A, Bachus K, and Burks RT.  AAOS, San Francisco, California.  March 2001.

"Understanding Electrosurgery."  Herodicus Society, Keystone, Colorado.  June 2001.

"Management of Anterior Cruciate Ligament Reconstruction Infection."   AOSSM, Keystone, Colorado.  June 2001.

Instructional Course Moderator.   "Evaluation and Management of Articular Cartilage Injuries of the Knee."  AOSSM, Keystone, Colorado.  June 2001.

"Arthroscopic Mumford."  Arthroscopy and Reconstructive Surgery Seminar, Salt Lake City, Utah.  January 2002.

"Arthroscopic Rotator Cuff Repair."  Arthroscopy and Reconstructive Surgery Seminar, Salt Lake City, Utah.  January 2002.

"Lateral Meniscus Transplant."  Arthroscopy and Reconstructive Surgery Seminar, Salt Lake City, Utah.  January 2002.

"Management of Anterior Cruciate Ligament Infection."   AAOS, New Orleans, LA.  February 2003.

"Instructional Course:  Osteotomies About the Knee in Sports Medicine.  American Orthopedic Society for Sports Medicine, July 2003.

Case Presentations:  Multiple knee and shoulder panel discussions.  Arthroscopic Surgery Seminar, Sun Valley, ID.  January 2004

"Efficacy of Shoulder Arthroscopy for Degenerative Arthritis of the Shoulder."  Hip, Knee, and Shoulder Course.  Park City, UT, February 2004.

"The Use of a Single Osteochondral Autograft Plug in the Treatment of a Large Osteochondral Lesion in the Femoral Condyle:  An Experimental Study in Sheep."  Burks RT, Greis PE, Scher C, and Arnoczky SP.  AOSSM Quebec City, Canada, June 2004.

"The Use of a Single Osteochondral Autograft Plug in the Treatment of a Large Osteochondral Lesion in the Femoral Condyle:  An Experimental Study in Sheep."  Burks RT, Greis PE, Scher C, and Arnoczky SP.  AOA Boston, MA, June 2004.

"Posterior Instability:  Keys to Addressing the Spectrum of Pathology."  Burks RT.  AANA Fall Course, Phoenix, AZ, December 2005.

## NEWSPAPER EDITORIAL

"Why Don't We Pay Lawyers Like Doctors."  Editorial Opinion, Salt Lake Tribune, Sunday Edition, paper AA6, 2003.

**Revised 10/26/05**

# Exhibit 13

US006716234B2

| (12) **United States Patent** | (10) Patent No.: | **US 6,716,234 B2** |
|---|---|---|
| Grafton et al. | (45) Date of Patent: | **Apr. 6, 2004** |

(54) **HIGH STRENGTH SUTURE MATERIAL**

(75) Inventors: **R. Donald Grafton**, Naples, FL (US); **D. Lawson Lyon**, Exeter (GB); **Brian Hallet**, Taunton (GB)

(73) Assignee: **Arthrex, Inc.**, Naples, FL (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 5 days.

(21) Appl. No.: **09/950,598**

(22) Filed: **Sep. 13, 2001**

(65) **Prior Publication Data**

US 2003/0050666 A1 Mar. 13, 2003

(51) Int. Cl.7 ............................................. A61L 17/04
(52) U.S. Cl. ....................................................... 606/228
(58) Field of Search ........................................ 606/228

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,942,532 A | 3/1976 | Hunter et al. | |
| 4,047,533 A | * 9/1977 | Perciaccante et al. | 606/230 |
| 4,344,908 A | 8/1982 | Smith et al. | 264/203 |
| 4,411,854 A | 10/1983 | Maurer et al. | 264/205 |
| 4,422,993 A | 12/1983 | Smith et al. | 264/210.8 |
| 4,430,383 A | 2/1984 | Smith et al. | 428/364 |
| 4,436,689 A | 3/1984 | Smith et al. | 264/204 |
| 4,668,717 A | 5/1987 | Lemstra et al. | 523/322 |
| 5,019,093 A | * 5/1991 | Kaplan et al. | 606/228 |
| 5,067,538 A | 11/1991 | Nelson et al. | 152/451 |

| | | | |
|---|---|---|---|
| 5,234,764 A | 8/1993 | Nelson et al. | 428/364 |
| 5,261,886 A | * 11/1993 | Chesterfield et al. | 606/228 |
| 5,318,575 A | 6/1994 | Chesterfield et al. | 606/151 |
| 5,383,925 A | * 1/1995 | Schmitt | 623/1.53 |
| 5,403,659 A | 4/1995 | Nelson et al. | 428/364 |
| 5,540,703 A | 7/1996 | Barker, Jr. et al. | |
| 5,630,976 A | 5/1997 | Nelson et al. | 264/210.8 |
| 5,720,765 A | * 2/1998 | Thal | 606/232 |
| 6,045,571 A | * 4/2000 | Hill et al. | 606/228 |
| 6,063,105 A | * 5/2000 | Totakura | 606/228 |

FOREIGN PATENT DOCUMENTS

EP      0561108 A2      9/1993

OTHER PUBLICATIONS

"SecureStrand™ Cable System," Surgical Dynamics, Inc. 1999.

* cited by examiner

*Primary Examiner*—David O. Reip
(74) *Attorney, Agent, or Firm*—Dickstein Shapiro Morin & Oshinsky, LLP

(57) **ABSTRACT**

A high strength abrasion resistant surgical suture material with improved tie down characteristics. The suture features a multifilament cover formed of braided strands of ultra high molecular weight long chain polyethylene and polyester. The cover surrounds a core formed of twisted strands of ultrahigh molecular weight polyethylene. The suture, provided in a #2 size, has the strength of #5 Ethibond, is ideally suited for most orthopedic procedures, and can be attached to a suture anchor or a curved needle.

**9 Claims, 2 Drawing Sheets**



500µm

2      10      8

DEFENDANT'S EXHIBIT

1133

CA 04-12457-PBS



FIG. 1



FIG. 2



FIG. 3



FIG. 4A



FIG. 4B

US 6,716,234 B2

1

# HIGH STRENGTH SUTURE MATERIAL

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to high strength surgical suture materials, and more particularly to braided suture blends of ultrahigh molecular weight polyethylene and polyester having high strength and excellent tie down characteristics.

### 2. Description of the Related Art

Suture strength is an important consideration in any surgical suture material. One of the strongest materials currently formed into elongated strands is an ultrahigh molecular long chain weight polyethylene, typically used for fishing line and the like, which is sold under the trade names Dyneema or Spectra. However, this material, while much stronger than ordinary surgical suture, does not have acceptable knot tie down characteristics for use in surgical applications.

## SUMMARY OF THE INVENTION

The present invention advantageously provides a high strength surgical suture material with improved tie down characteristics. The suture features a braided cover made of a blend of ultrahigh molecular weight long chain polyethylene and polyester. The polyethylene provides strength. The polyester provides improved tie down properties.

The preferred suture includes a multifilament cover formed of a plurality of fibers of ultrahigh molecular weight polyethylene braided with fibers of polyester. The cover surrounds a core of twisted fibers of ultrahigh molecular weight polyethylene.

Preferably, the ultrahigh molecular weight polyethylene includes about 60% of the cover fibers, with polyester making up about 40% of the cover filaments. The core comprises about 30% of the suture, the cover making up about 70%. As an enhancement, the suture is provided with a coating on the cover, as is known in the prior art. The suture can be packaged ready for use attached to a suture anchor.

Ultrahigh molecular weight polyethylene fibers suitable for use in the present invention are marketed under the Dyneema trademark by Toyo Boseki Kabushiki Kaisha.

The suture of the present invention advantageously has the strength of Ethibond #5 suture, yet has the diameter, feel and tie ability of #2 suture. As a result, the suture of the present invention is ideal for most orthopedic procedures such as rotator cuff repair, archilles tendon repair, patellar tendon repair, ACL/PCL reconstruction, hip and shoulder reconstruction procedures, and replacement for suture in anchors.

Other features and advantages of the present invention will become apparent from the following description of the invention which refers to the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWING(S)

FIG. 1 is a copy of a scanning electron micrograph of a length of suture according to the present invention.

FIG. 2 is a schematic cross section of a length of suture according to the present invention.

FIG. 3 is an illustration of the suture of the present invention attached to a suture anchor.

FIGS. 4A and 4B show the suture of the present invention attached to a half round, tapered needle.

2

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring to FIG. 1, a scanning electron micrograph of a length of suture 2 according to the present invention is shown. Suture 2 is made up of a cover 4 and a core 6 surrounded by the cover. See FIG. 2. Strands of ultrahigh molecular weight polyethylene (UHMWPE) 8, sold under the tradename Dyneema or Spectra, and strands of polyester 10 are braided together to form the cover 4. The core is formed of twisted UHMWPE.

Details of the present invention will be described further below in connection with the following examples:

### EXAMPLE 1

#### USP Size 5 (EP size 7)

Made on a 16 carrier Hobourns machine, the yarns used in the braided cover are polyester type 712 and Dyneema SK65. The cover is formed using eight carriers with one end of 190 d'tex polyester per carrier, and eight carriers with one end of 220 d'tex Dyneema per carrier. The core is formed of Dyneema using one end of 440/1/3 twisted 10 tpi "z" and 7 tpi "s" (core is not steam set). Picks per inch (PPI)=36. In forming the suture, the percent cover is 71.31, while the percent of the core is 28.69. Runnage is 1991 meters per kilo.

Of the overall suture, the polyester in the cover (8 carriers×190 d'tex=1520 d'tex) makes up 33.04% of the suture, and the Dyneema in the cover (8 carriers×220 d'tex=1760 dtex) makes up 38.76% of the suture. The Dyneema core (3 carriers×440 d'tex=1320 d'tex) is 28.69% of the suture.

### EXAMPLE 2

#### USP Size 2

The suture is 38.09% polyester, 61.91% UHMWPE, or about 40% polyester and about 60% UHMWPE.

The examples above are for size 2 and size 5 sutures. In the making of various sizes of the inventive suture, different decitex values and different PPI settings can be used to achieve the required size and strength needed. In addition, smaller sizes may require manufacture on 12 carrier machines, for example. The very smallest sizes are made without a cover. Overall, the suture may range from 5% to 90% ultrahigh molecular weight polymer (Dyneema), with the balance formed of polyester.

The suture is preferably coated with a silicon based coating to fill in voids and provide optimum run down.

The Dyneema component of the present invention provides strength, and the polyester component is provided to improve tie ability and tie down characteristics. However, it has been found that the Dyneema provides an unexpected advantage of acting as a cushion for the polyester fibers, which are relatively hard and tend to damage each other. The Dyneema prevents breakage by reducing damage to the polyester when the suture is subjected to stress.

According to an alternative embodiment of the present invention, a partially bioabsorbable suture is provided by blending a high strength material, such as UHMWPE fibers, with a bioabsorbable material, such as PLLA or one of the other polylactides, for example. Accordingly, a suture made with about 10% Dyneema blended with absorbable fibers would provide greater strength than existing bioabsorbable suture with less stretch. Over time, 90% or more of the suture would absorb, leaving only a very small remnant of the knot.

US 6,716,234 B2

3

In one method of using the suture of the present invention, the suture 2 is attached to a suture anchor 14 as shown in FIG. 3 (prepackaged sterile with an inserter 16), or is attached to a half round, tapered needle 18 as shown in FIGS. 4A and 4B.

Although the present invention has been described in relation to particular embodiments thereof, many other variations and modifications and other uses will become apparent to those skilled in the art. It is preferred, therefore, that the present invention be limited not by the specific disclosure herein, but only by the appended claims.

What is claimed is:

1. A suture filament suitable for use as a suture or ligature comprising:

a cover formed of a plurality of braided fibers of ultrahigh molecular weight polyethylene and polyester; and

a core of twisted ultrahigh molecular weight polyethylene surrounded by the cover.

2. The suture filament of claim 1, wherein the ultrahigh molecular weight polyethylene comprises about 60% of the braided fibers.

3. The suture filament of claim 1, wherein the polyester comprises about 40% of the braided fibers.

4. The suture filament of claim 1, wherein the core comprises about 30% of the filament.

4

5. The suture filament of claim 1, wherein the cover comprises about 70% of the filament.

6. The suture filament of claim 1, further comprising a coating disposed on the cover.

7. The suture filament of claim 1, wherein the polyester is non-absorbable.

8. A suture assembly comprising:

a suture having a multifilament cover formed of a plurality of braided fibers of ultrahigh molecular weight polyethylene and fibers of polyester;

a core formed of twisted fibers of ultrahigh molecular weight polyethylene; and

a suture anchor attached to the suture.

9. A suture assembly comprising:

a suture having a multifilament cover formed of a plurality of braided fibers of ultrahigh molecular weight polyethylene and fibers of polyester;

a core formed of twisted fibers of ultrahigh molecular weight polyethylene; and

a half round, tapered needle attached to the suture.

* * * * *

# Exhibit 14

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


DePUY MITEK, INC.,            )
a Massachusetts Corporation  )
                             )
            Plaintiff        )
                             )
        -VS-                  ) CA No. 04-12457-PBS
                             ) Pages 1 - 87
ARTHREX, INC.,               )
a Delaware Corporation, et al,)
                             )
            Defendant        )



MARKMAN HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE



A P P E A R A N C E S:

    DIANNE B. ELDERKIN, ESQ., LYNN A. MALINOSKI, ESQ., and
MICHAEL J. BONELLA, ESQ., Woodcock Washburn, One Liberty
Place, 47th Floor, Philadelphia, Pennsylvania, 19103,
for the Plaintiff.

    CHARLES W. SABER, ESQ. and SALVATORE P. TAMBURO, ESQ.,
Dickstein Shapiro, LLP, 1825 Eye Street, N.W., Washington,
D.C., 20006-5403, for the Defendants.


                    United States District Court
                    1 Courthouse Way, Courtroom 19
                    Boston, Massachusetts
                    September 26, 2006, 2:00 p.m.


LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1 talking about the coatings, right?

2          MS. ELDERKIN:  Right.

3          THE COURT:  And the coatings make it more slippery,

4 maybe.

5          MS. ELDERKIN:  Purportedly, maybe.

6          THE COURT:  Okay, and lubricous.  So they

7 essentially enhance the invention.

8          MS. ELDERKIN:  Right.

9          THE COURT:  All right?  So originally I had thought

10 "materially affect the novel and basic characteristics"

11 meant somehow change them.  You used the word "alter," and

12 one case uses the word "alter," but the case law doesn't

13 consistently use the word "alter."  They usually use the word

14 "materially affect."

15          MS. ELDERKIN:  Materially affect, right.

16          THE COURT:  So if it significantly improves on the

17 invention, materially improves on, let's say, the

18 flexibility, would that be improving the novel and basic

19 characteristics?

20          MS. ELDERKIN:  Well, it's obviously so

21 fact-intensive; you know, how much change is there, how much

22 alteration?

23          THE COURT:  But if it's materially improved, you'd

24 say that that fell within this "consisting essentially of,"

25 even if it's not a detracting from?

1        MS. ELDERKIN:  It certainly could.  And a lot

2 obviously depends on, what are those novel and basic

3 characteristics?  Now, Arthrex argues that those

4 characteristics are flexibility, handleability, and not

5 diminishing the strength of the suture.  But our position is

6 that that is much too narrow a definition, that the basic and

7 novel characteristics of this invention encompass this

8 concept that I discussed earlier about mechanical blending of

9 the properties of the two discrete sets of yarns.

10        Now, it may very well be that the effects of those

11 yarns, one enhances pliability and one enhances strength, but

12 the patent specification is not limited to that.  The

13 preferred embodiments are talked about in terms of, well, gee

14 in some preferred embodiments, you might take a weak material

15 that's slippery or lubricous and --

16        THE COURT:  Well, is there evidence that just the

17 yarn piece of it, you know, the braiding of the yarn, is

18 novel and basic?

19        MS. ELDERKIN:  That the braiding of the yarn --

20        THE COURT:  In other words, what makes this novel,

21 this invention?

22        MS. ELDERKIN:  Well, I don't mean to be trite, but

23 everything in the claim, which is the concept of a braided

24 construction, two discrete yarns.

25        THE COURT:  So no suture before it ever had that?

# Exhibit 15

LEXSEE 1995 US DIST LEXIS 2602



Analysis
As of: Oct 17, 2007

**BINNEY & SMITH INC., Plaintiff, v. ROSE ART INDUSTRIES, INC., Defendants.**

**No. 94 C 6882**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1995 U.S. Dist. LEXIS 2602*

**March 2, 1995, Decided
March 3, 1995, DOCKETED**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent holder charged that defendant competitor was infringing on its patent by marketing a product that was similar to the patented product. The patent holder requested a preliminary injunction to keep the competitor from making, using, or selling products that contained the asserted infringing product while the action was pending.

**OVERVIEW:** Plaintiff patent holder charged that defendant competitor was infringing on its patent by marketing a product that was similar to the patented product. The patent holder requested a preliminary injunction to keep the competitor from making, using, or selling products that contained the asserted infringing product while the action was pending. The court denied the request for preliminary injunction and determined that (1) the patent holder had not made a clear or strong showing of likelihood of success on the merits of patent validity, or infringement but rather only a reasonable showing, (2) the patent holder had not demonstrated irreparable injury but only injury that was capable of monetary damages, (3) the hardships did not weigh in favor of the patent holder because its damages could be compensated while those of the competitor for lost marketing start were difficult to calculate, and (4) the public interest in patent protection was equal to the interest in market protection.

**OUTCOME:** The court denied the request for a preliminary injunction in the action by plaintiff patent holder for patent infringement by defendant competitor because the court determined that the patent holder had failed to demonstrate that it had a reasonable likelihood of success of proving infringement in the action.

**CORE TERMS:** patent, filler, prior art, infringement, compound, polyvinyl alcohol, microsphere, invention, plastic, preliminary injunction, composition, modeling, dough, likelihood of success, polyvinyl acetate, obviousness, irreparable harm, injunction, consisting, silicon dioxide, patentee, public interest, infringer's, examiner, invalidity, literal, skill, hardship, patented, monetary

**LexisNexis(R) Headnotes**

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN1] Injunctive relief in patent cases is authorized by *35 U.S.C.S. § 283*. Preliminary injunctions protect the right to exclude secured by a patent while the lawsuit is pending to prevent irreparable harm to the patent owner. A preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted. Courts have over the years developed a reluctance to resort to preliminary injunctions in patent infringement cases, and have constructed a rather strict standard for the granting of this form of equitable relief.

*Civil Procedure > Remedies > Injunctions > Elements > General Overview*
*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN2] The determination of whether a preliminary injunction should issue turns upon four factors: (1) the movant's reasonable likelihood of success on the merits; (2) the irreparable harm the movant will suffer if preliminary relief is not granted; (3) the balance of hardships tipping in the movant's favor; and (4) the impact of the injunction on the public interest. Each factor must be weighed and assessed against the others and against the form and magnitude of the relief requested. Id. The burden is always on the movant to show entitlement to a preliminary injunction.

*Civil Procedure > Remedies > Injunctions > Elements > Likelihood of Success*
*Patent Law > Inequitable Conduct > General Overview*
*Patent Law > Infringement Actions > Burdens of Proof*
[HN3] The first factor required to be established by a party seeking a preliminary injunction is a reasonable likelihood of success on the merits when the trial court finally adjudicates the dispute. In order to show a reasonable likelihood of success on the merits, the patentee must establish both validity and infringement of the patents.

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN4] Substantive issues, such as validity and infringement, are not raised for final resolution by motions for preliminary injunction. A denial of a preliminary injunction does not require that noninfringement be clear beyond all question.

*Evidence > Procedural Considerations > Burdens of Proof > Clear & Convincing Proof*
*Patent Law > Inequitable Conduct > General Overview*
*Patent Law > Infringement Actions > Defenses > Patent Invalidity > Validity Presumption*
[HN5] The patent statute, *35 U.S.C.S. § 282*, provides that a patent is presumptively valid and that the burden of establishing invalidity of a patent or any claim is on the party asserting such invalidity. The party asserting invalidity bears the burden of persuasion and must establish by clear and convincing evidence a prima facie case

of invalidity before the patent holder will be required to come forward with evidence to the contrary.

*Civil Procedure > Remedies > Injunctions > Elements > Likelihood of Success*
*Evidence > Inferences & Presumptions > Exceptions > Statutory Presumptions*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN6] At the preliminary injunction stage, because of the extraordinary nature of the relief, the patentee carries the burden of showing likelihood of success on the merits of the substantive issues relating to validity and enforceability of patent. The statutory presumption is not evidence which can be weighed in determining the likelihood of success on the merits. The statutory presumption of validity does not relieve a patentee who moves for a preliminary injunction in an infringement action from carrying its normal burden of demonstrating that it will likely succeed on all disputed liability issues at trial, even when the issue concerns the patent's validity.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
*Patent Law > Infringement Actions > Burdens of Proof*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN7] While it is not the patentee's burden to prove validity, the patentee must show that the alleged infringer's defense lacks substantial merit. The court must make an assessment of the persuasiveness of the challenger's evidence presented in support of invalidity.

*Patent Law > Anticipation & Novelty > Elements*
*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
*Patent Law > Infringement Actions > Defenses > Patent Invalidity > General Overview*
[HN8] Invalidity for anticipation exists only if all the elements and limitations of the claimed invention are found within one single prior art reference. A patented combination which results in a more facile, economical or efficient unit, or which provides results unachieved by prior art structures, cannot be anticipated piecemeal by a showing that various elements of the invention are old.

*Patent Law > Claims & Specifications > Definiteness > Relative Terms*
*Patent Law > Claims & Specifications > Enablement Requirement > General Overview*

[HN9] To be definite, a patent must particularly point out and distinctly claim the invention. *35 U.S.C.S. § 112*. The use of the word "about" does not render a claim indefinite. The mere fact that specific percentage ranges are not used in the patents in suit will not, in itself, render the claims indefinite. Open-ended composition claims are not inherently improper; as for all claims their appropriateness depends on the particular facts of the invention, the disclosure, and the prior art. The scope of the claim must be understandable to the ordinary person skilled in the art.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
*Patent Law > Nonobviousness > Elements & Tests > Ordinary Skill Standard*
*Patent Law > Nonobviousness > Elements & Tests > Prior Art*
[HN10] A patent may be found invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *35 U.S.C.S. § 103*. The question is not whether the invention is obvious now, but whether it would have been obvious when the invention was made.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
*Patent Law > Nonobviousness > Elements & Tests > General Overview*
[HN11] The ultimate question of obviousness will be one of law based upon underlying facts in four categories. The four factors relevant to the determination of obviousness are: (1) the level of skill in the pertinent art, (2) the scope and content of the prior art, (3) the differences between the prior art and the claims at issue, and (4) as a guard against using hindsight, the court secondarily considers objective indicia of nonobviousness such as: commercial success, long felt but unsolved need, failure of others, and copying of the invention. Another indicia of obviousness is whether the development achieved unexpected results. In determining obviousness, one must consider the invention as a whole; small differences between the claims and the prior art can therefore give rise to patentability.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN12] The determination of the scope of the claims is a matter of law.

*Patent Law > Claims & Specifications > Enablement Requirement > General Overview*
*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
*Patent Law > Nonobviousness > Evidence & Procedure > General Overview*
[HN13] Obviousness under *35 U.S.C.S. § 103* turns on whether the prior art, including the knowledge available to one of ordinary skill in the art, provides some suggestion or motivation to combine the known elements. The suggestion or motivation to combine references need not be explicit. The knowledge pertaining to the art, including an understanding of the principles and application of the prior art elements of the claimed invention, may lead a person of ordinary skill to combine the relevant teachings. The motivation to combine can arise from the knowledge that the prior art elements will perform their expected functions to achieve their expected results when combined for their common known purpose.

*Patent Law > Nonobviousness > Elements & Tests > Secondary Considerations*
[HN14] The secondary factors, commercial success, long felt but unsolved need, failure of others, copying of the invention, and unexpected results, are particularly appropriate when trying to determine the obviousness of an invention that combines conventional elements in a new way. When the differences appear technologically minor but nonetheless have a practical impact, particularly in a crowded field, the court must consider the obviousness of the new structure in light of the objective indicia.

*Patent Law > Nonobviousness > Elements & Tests > Secondary Considerations*
[HN15] Commercial success is most relevant in an obviousness determination when there is evidence of a nexus between commercial success and the merits of the invention.

*Patent Law > Infringement Actions > Burdens of Proof*
[HN16] The standard of showing infringement at this stage is a reasonable likelihood of success in proving infringement at trial. Determination of infringement involves two steps: (1) construing the claims, which is a question of law; and (2) comparing the properly construed claims with the accused composition to determine whether each limitation of the properly construed claim is found in the accused product.

1995 U.S. Dist. LEXIS 2602, *

**Patent Law > Infringement Actions > Claim Interpretation > General Overview**

[HN17] In construing the meaning of claims, they must be interpreted in light of the claim language, the specification, and the prosecution history, including prior art, and given the same meaning for the analysis of both validity and infringement.

**Patent Law > Claims & Specifications > Claim Language > Claim Transitions**
**Patent Law > Infringement Actions > Claim Interpretation > General Overview**

[HN18] "Comprising," a patent term of art, is an open transitional word that generally allows additional elements to be added. "Comprising" means "including the following elements but not excluding others." The claims may cover additional elements to the extent of material not disclaimed in distinguishing the prior art. Although an open term, "comprising" cannot extend the scope of the patents to aspects given up during prosecution in distinguishing the invention from the prior art.

**Patent Law > Anticipation & Novelty > Combinations**
**Patent Law > Claims & Specifications > Claim Language > Claim Transitions**
**Patent Law > Infringement Actions > Claim Interpretation > General Overview**

[HN19] The expression "essentially consisting of" is a partially closed transitional phrase. In general, the phrase "essentially consisting of" covers a combination with some additional elements but excludes "additional unspecified ingredients that would affect the basic and novel characteristics of the product defined in the balance of the claim."

**Patent Law > Infringement Actions > Claim Interpretation > General Overview**
**Patent Law > Infringement Actions > Doctrine of Equivalents > General Overview**
**Patent Law > Infringement Actions > Reverse Doctrine of Equivalents**

[HN20] The second step in determining infringement is to compare the properly construed claims with the accused composition to determine whether each limitation of the properly construed claim is found in the accused product.

**Patent Law > Claims & Specifications > Claim Language > Elements & Limitations**
**Patent Law > Inequitable Conduct > General Overview**

**Patent Law > Infringement Actions > General Overview**

[HN21] Literal infringement of a claim requires that the allegedly infringing product embody every element and limitation of the claim. To determine whether a claim limitation is met literally, the court must compare the accused structure with the disclosed structure, and must find equivalent structure as well as identity of claimed function for that structure.

**Patent Law > Claims & Specifications > Description Requirement > General Overview**

[HN22] A patent is not limited to the preferred embodiment shown in the specification.

**Patent Law > Infringement Actions > Doctrine of Equivalents > General Overview**
**Patent Law > Infringement Actions > Reverse Doctrine of Equivalents**

[HN23] The reverse doctrine of equivalents is an equitable doctrine invoked in applying properly construed claims to an accused device. Under the reverse doctrine of equivalents an accused article may avoid infringement, even within the literal words of the claims, if it is so far changed in principal from a patented article that it performs the same or a similar function in a substantially different way. The purpose of the "reverse doctrine" is to prevent unwarranted extension of the claims beyond a fair scope of the patented invention. Application of the doctrine requires that facts specific to the accused device be determined and weighed against the equitable scope of the claims.

**Patent Law > Infringement Actions > Reverse Doctrine of Equivalents**

[HN24] The central question in the reverse doctrine of equivalents is whether the accused product is so far changed in principle that it performs the function of the claimed invention in a substantially different way.

**Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions**
**Governments > Legislation > Statutory Remedies & Rights**
**Patent Law > Infringement Actions > Defenses > Marking**

[HN25] Irreparable injuries are those that are impossible to measure in monetary terms. While monetary relief is often the sole remedy for past infringement, it does not follow that a money award is also the remedy against future infringement. The patent statute provides injunc-

1995 U.S. Dist. LEXIS 2602, *

tive relief to preserve the legal interests of the parties against future infringement that may have marked effects never fully compensable in money. If monetary relief were the sole relief afforded by the patent statute, then injunctions would be unnecessary and infringers could become compulsory licensees during the pendency of the litigation. Because the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole.

*Civil Procedure > Remedies > Injunctions > Elements > Irreparable Harm*
*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Patent Law > Remedies > Equitable Relief > Injunctions*

[HN26] Where a strong or clear showing of validity and infringement has not been made, the moving party must make an independent showing of irreparable harm in order to be entitled to a preliminary injunction.

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
*Patent Law > Remedies > Equitable Relief > Injunctions*

[HN27] In patent infringement cases, although there exists a public interest in protecting rights secured by valid patents, the court should focus on whether a critical public interest would be injured by the grant of a preliminary injunction.

**COUNSEL:** [*1] FOR BINNEY & SMITH, INC., plaintiff: Theodore W. Anderson, Jeffrey Brandon Burgan, Donald Jay Silvert, Leydig, Voit & Mayer, Ltd., Chicago, IL.

FOR ROSE ART INDUSTRIES, INC., defendant: Kathleen Ann Lyons, Keith V. Rockey, Rockey, Rifkin and Ryther, Chicago, IL.

FOR ROSE ART INDUSTRIES, INC., counter-claimant: Kathleen Ann Lyons, Keith V. Rockey, Rockey, Rifkin and Ryther, Chicago, IL.

FOR BINNEY & SMITH, INC., counter-defendant: Theodore W. Anderson, Jeffrey Brandon Burgan, Donald Jay Silvert, Leydig, Voit & Mayer, Ltd., Chicago, IL.

**JUDGES:** BLANCHE M. MANNING, U.S. District Court Judge

**OPINION BY:** BLANCHE M. MANNING

**OPINION**

*MEMORANDUM AND ORDER*

Plaintiff Binney & Smith, Inc. (Binney & Smith) brought this action against a competitor, Rose Art Industries, Inc. (Rose Art) for alleged patent infringement of *United States Patents Number 5,171,766 ("the '766 Patent")* and Number 5,364,892 ("the '892 Patent"), a continuation in part of the *'766 Patent*. Both patents are entitled "Modeling Dough." The Patents relate to a modeling dough comprising gelled poly(vinyl alcohol), water, and a filler. Binney & Smith moved for a preliminary injunction to prohibit Rose Art from making, using, or selling certain products containing a modeling dough that allegedly infringes the patents in suit. [1] After careful consideration of the evidence, oral arguments, and written submissions of the parties, this Court determines that a grant of injunctive relief is not warranted at this stage of the case.

> 1    For this motion, the consideration of the claims was limited by Plaintiff to the broadest and next representative claim for each patent, namely:
>
> the *'766 Patent*
>
> Claim 1. A moldable composition comprising poly(vinyl alcohol), water, a gellant, and a filler, said filler consisting essentially of plastic microspheres having a wettable particulate coating.
>
> Claim 2. The composition of claim 1, wherein said wettable particulate coating comprises calcium carbonate.
>
> the '892 Patent
>
> Claim 1. A water-based moldable molding dough composition comprising poly(vinyl alcohol), water, a gellant, and a filler, said composition having a pH of about 7.0 or greater, and said filler consisting essentially of a plastic microspheres.
>
> Claim 2. The composition of claim 1, wherein said plastic microspheres have a wettable particulate coating.

[*2] [HN1]

Injunctive relief in patent cases is authorized by *35 U.S.C. § 283*. Preliminary injunctions protect the right to exclude secured by a patent while the lawsuit is pending to prevent irreparable harm to the patent owner. A pre-

1995 U.S. Dist. LEXIS 2602, *

liminary injunction is a drastic and extraordinary remedy that is not to be routinely granted. *Nutrition 21 v. United States, 930 F.2d 867, 869, 18 U.S.P.Q. 2d 1347, 1349 (Fed. Cir. 1991); Illinois Tool Works, Inc. v. Grip-Pak, Inc., 906 F.2d 679, 683, 15 U.S.P.Q. 2d 1307, 1310 (Fed. Cir. 1990).* Courts "have over the years developed a reluctance to resort to preliminary injunctions in patent infringement cases, and have constructed a rather strict standard for the granting of this form of equitable relief." *Smith Int'l, Inc. v. Hughes Tool Co., 718 F.2d 1573, 1578 (Fed. Cir. 1983).*

[HN2] The determination of whether a preliminary injunction should issue turns upon four factors: (1) the movant's reasonable likelihood of success on the merits; (2) the irreparable harm the movant will suffer if preliminary relief [*3] is not granted; (3) the balance of hardships tipping in the movant's favor; and (4) the impact of the injunction on the public interest. *Hybritech Inc. v. Abbott Lab., 849 F.2d 1446, 1451, 7 U.S.P.Q. 2d 1191, 1195 (Fed. Cir. 1988); New England Braiding Co., Inc. v. A.W. Chesterton Co., 970 F.2d 878, 882, 23 U.S.P.Q. 2d 1622, 1625 (Fed. Cir. 1992).* Each factor must be weighed and assessed against the others and against the form and magnitude of the relief requested. *Id.* The burden is always on the movant to show entitlement to a preliminary injunction. *H.H. Robertson Co. v. United Steel Deck, Inc., 820 F.2d 384, 388, 2 U.S.P.Q. 2d 1926, 1928 (Fed. Cir. 1987).*

*A. Likelihood of Success*

[HN3] The first factor required to be established by a party seeking a preliminary injunction is a reasonable likelihood of success on the merits when the trial court finally adjudicates the dispute. *Hybritech, 849 F.2d at 1451, 7 U.S.P.Q. 2d at 1195.* In order to show a reasonable likelihood of success on the merits, the [*4] patentee must establish both validity and infringement of the patents. *Id.*

Deciding whether Binney & Smith has demonstrated a reasonable likelihood of success requires the Court to make factual findings and decide factual issues without all evidence that may be admitted at trial. [HN4] Substantive issues, such as validity and infringement, are not raised for final resolution by motions for preliminary injunction. *Roper Corp. v. Litton Systems, Inc., 757 F.2d 1266, 1271, 225 U.S.P.Q. 345, 348 (Fed. Cir. 1985).* A denial of a preliminary injunction does not require that noninfringement be clear beyond all question. *Illinois Tool Works, 906 F.2d at 679, 15 U.S.P.Q. 2d at 1307.*

*Validity*

[HN5] The patent statute, *35 U.S.C. § 282*, provides that a patent is presumptively valid and that the burden of establishing invalidity of a patent or any claim is on the party asserting such invalidity. Generally, the party asserting invalidity bears the burden of persuasion and must establish by clear and convincing evidence a *prima facie* case of invalidity before the patent [*5] holder will be required to come forward with evidence to the contrary. *Buildex, Inc. v. Kason Indus., Inc., 849 F.2d 1461 (Fed. Cir. 1988).* [HN6] At the preliminary injunction stage, however, because of the extraordinary nature of the relief, the patentee carries the burden of showing likelihood of success on the merits of the substantive issues relating to validity and enforceability of patent. *Nutrition 21, 930 F.2d at 869, 18 U.S.P.Q. 2d 1347.* The statutory presumption is not evidence which can be weighed in determining the likelihood of success on the merits. *New England Braiding Co., 970 F.2d at 882.* Moreover, the statutory presumption of validity does not relieve a patentee who moves for a preliminary injunction in an infringement action from carrying its normal burden of demonstrating that it will likely succeed on all disputed liability issues at trial, even when the issue concerns the patent's validity. *Id. at 878.*

[HN7] While it is not the patentee's burden to prove validity, the patentee must show that the alleged infringer's [*6] defense lacks substantial merit. *Id. at 883.* The Court must make an assessment of the persuasiveness of the challenger's evidence presented in support of invalidity. *Id.* In the instant case, Rose Art bears the burden of producing evidence sufficient to raise a substantial question regarding the validity of Binney & Smith's two patents. Rose Art challenges the validity of the '766 and '892 patents by asserting that the patents are anticipated under *35 U.S.C. § 102*, indefinite under *35 U.S.C. § 112*, and obvious under *35 U.S.C. § 103*.

*Novelty*

[HN8] Invalidity for anticipation exists only if all the elements and limitations of the claimed invention are found within one single prior art reference. *Scripps Clinic & Research Foundation v. Genentech, Inc., 927 F.2d 1565, 18 U.S.P.Q. 2d 1001 (Fed. Cir. 1991).* When the five prior art references produced by Rose Art are compared to the patents in suit, there is no substantial identity to show lack of novelty. No single prior art reference submitted [*7] by Rose Art discloses all the elements of the claimed modeling dough. "A patented combination which results in a more facile, economical or efficient unit, or which provides results unachieved by prior art structures, cannot be anticipated piecemeal by a showing that various elements of the invention are old." *Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 31 S. Ct. 444, 55 L. Ed. 527 (1911); O'Brien v. O'Brien, 202 F.2d 254, 255 (7th Cir. 1953).* Although the elements in the patents in suit are old, they are combined to produce a new and useful product for

the consumer, therefore, making Binney & Smith's invention novel. Hence, Rose Art's burden of persuasion as to anticipation under *35 U.S.C. § 102* has not been satisfied.

### Definiteness

[HN9] To be definite, a patent must "particularly point out and distinctly claim" the invention. *35 U.S.C. § 112*. Generally, the use of the word "about" does not render a claim indefinite. Also, the mere fact that specific percentage ranges are not used in the patents [*8] in suit will not, in itself, render the claims indefinite. Open-ended composition claims are not inherently improper; as for all claims their appropriateness depends on the particular facts of the invention, the disclosure, and the prior art. *Scripps Clinic, 927 F.2d at 1565, 1572, 18 U.S.P.Q. 2d at 1001*. The scope of the claim must be understandable to the ordinary person skilled in the art. *Hybritech, Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 231 U.S.P.Q. 81 (Fed. Cir. 1986), cert. denied, 480 U.S. 947, 107 S. Ct. 1607 (1987)*.

Rose Art also contends that the patents in suit were indefinite and hence, invalid under *35 U.S.C. § 112*. While Rose Art has made general allegations in its counterclaims that the specifications were indefinite, uncertain, not enabling, and failed to set forth the best mode, it has not come forward with evidence regarding any of these assertions in its opposition to the motion for preliminary injunction. Defendant appears no longer to be pressing this argument. The presumption [*9] of validity, therefore, controls at this juncture, and the Court finds no evidence that the patent should be invalid under *35 U.S.C. § 112*.

### Obviousness

Rose Art's final ground for seeking invalidity is that the patents in suit are invalid for obviousness under *35 U.S.C. § 103*. [HN10] A patent may be found invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *35 U.S.C. § 103*. The question is not whether the invention is obvious now, but whether it would have been obvious when the invention was made.

[HN11] The ultimate question of obviousness will be one of law based upon underlying facts in four categories. The four factors relevant to the determination of obviousness are: (1) the level of skill in the pertinent art, (2) the scope and content of the prior art, and (3) the differences between the prior art and the claims at issue. *Alco Standard Corp. v. Tennessee Valley Authority, 808 F.2d 1490, 1498 (Fed. Cir. 1986)* [*10] (citing *Graham v. John Deere Co., 383 U.S. 1, 17-18, 86 S. Ct. 684, 693-94, 15 L. Ed. 2d 545 (1966)*). Additionally, (4) as a guard against using hindsight, the Court secondarily considers objective indicia of nonobviousness such as: commercial success, long felt unsolved need, failure of others, and copying of the invention. *Panduit Corp. v. Dennison Mfg. Co., 810 F.2d 1561, 1569 (Fed. Cir. 1987)*. Another indicia of obviousness is whether the development achieved unexpected results. *Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co., 730 F.2d 1452, 1461 (Fed. Cir. 1984)*. In determining obviousness, one must consider the invention as a whole; small differences between the claims and the prior art can therefore give rise to patentability. *See Jones v. Hardy, 727 F.2d 1524, 1529 (Fed. Cir. 1984)*.

### The Level of Ordinary Skill in the Pertinent Art

Before reaching the substantive obviousness criteria, the Court must determine the relevant level of art against which obviousness must be measured. In this case, the parties [*11] agree that the appropriate level of ordinary skill in the modeling dough art is held by a chemist having knowledge of chemistry equivalent to a bachelor's degree in chemistry or chemical engineer with a few years experience in polymer chemistry. (Plaintiff's Finding of Fact "FF" 77 & Defendant's Post-Hearing Argument p. 43).

The determination of whether an invention is obvious depends on the opinion of experts based upon their knowledge and experience in that particular art. Two experts, one on each side, purport to speak from the perspective of a person having ordinary skill in this particular art. The experts came to different conclusions on whether the invention was obvious to a person of ordinary skill in this particular art at the time of the invention. Binney & Smith's expert testified that the composition was not obvious. He further testified that it took Rose Art's chief chemist six months to find out what was in the composition, and that the chemist tried many fillers without trying the plastic microspheres of the patents in suit. Rose Art's expert did not sufficiently show that the invention was obvious to overcome the Binney & Smith expert's opinion.

### The Scope and Content [*12] of the Prior Art

Next, the court must determine the scope and content of the prior art to which a person skilled in the art would use in attempting to improve the subject matter of the claimed invention. The scope and content of the prior art are closely related to the patents in suit. [HN12] The determination of the scope of the claims is a matter of law. *Smithkline Diagnostics Inc. v. Helena Lab. Corp., 859 F.2d 878, 889 (Fed. Cir. 1988)*. The patents in suit are not pioneering and will be given a very limited scope.

The scope and content of the prior art is largely undisputed since most of the prior art that Rose Art put in evidence was considered by the examiner. In support of its obviousness argument, Rose Art offers five prior art references. Three patents, *U.S. Patent 3,135,648* (Hawkins '648), *U.S. Patent 3,607,332* (Wingfield '332) and *U.S. Patent 4,172,054* (Ogawa '054) were considered by the examiner at the Patent and Trademark Office in granting both patents in suit. Another patent *U.S. Patent 4,956,404* (Pelzig '404) is not more material than other prior art; however, it is most like the Rose Art compound. Finally, Rose Art provided a brochure on [*13] Pierce and Stevens DUALITE microspheres, which had the material aspects considered by the examiner.

The Hawkins '648 Patent describes a composition containing polyvinyl alcohol, clay (filler), water, and boric acid (gellant). The Hawkins '648 Patent teaches all elements of the patents in suit, except the use of plastic microspheres and a pH over about 7.0. The Wingfield '332 Patent describes the use of hollow microspheres, but not plastic microspheres. To overcome the prior art, the claim was limited to a filler "consisting essentially of" plastic microspheres having a wettable particulate coating for the '766 Patent and essentially of plastic microspheres for the '896 Patent. The partially closed phrase allows the patents in suit to exclude prior art that recites the elements of the claims plus additional elements. This phrase allowed the patents in suit to exclude fillers not materially affecting the characteristics of the compound, and thus, not read on the Hawkins '648 and Wingfield '332 Patents.

The Ogawa '054 Patent teaches the combination of polyvinyl acetate stabilized with a small amount of polyvinyl alcohol, and the examiner was aware of polyvinyl alcohol-borate gelled systems [*14] during the examination of the '766 Patent. During the examination of the '766 Patent, the Ogawa '054 Patent, in combination with Japanese prior art described a polyvinyl alcohol, borate gel, clay, and water composition. In one of the arguments raised to distinguish the Ogawa '054 Patent in light of the Japanese publication, Binney & Smith noted that the prior art suggests using a synthetic latex (the polyvinyl acetate contains usually polyvinyl alcohol as an emulsifying stabilizer. ( '054 Patent, col. 6 lines 12-13) instead of mere polyvinyl alcohol as the patents in suit claim. Other conventional elements, such as starch bearing material and bread were also distinguished from the patents in suit. Thus, Binney & Smith distinguished a compound that includes a polyvinyl acetate stabilized with a small amount of polyvinyl alcohol from the compound in the patents in suit.

The Pelzig '404 Patent also is prior art since it is based on an application filed in January 1989, which is before the date asserted by Binney & Smith. It discloses a compound similar to the Rose Art compound including a polyvinyl acetate emulsion stabilized by polyvinyl alcohol. The Pelzig '404 Patent uses about 2.7% [*15] polyvinyl alcohol. (col. 4 lines 18-35). The only significant difference is Rose Art's use of plastic microspheres as the filler. Both parties admit that the Pelzig '404 Patent was no more material than other prior art considered by the examiner. It will not render the patent in suit obvious since it is no more material than the Ogawa '054 Patent, it covers a different compound, and it does not mention plastic microspheres or a pH level of over 7.0.

The brochure for Pierce and Stevens DUALITE microspheres is not dispositive of obviousness at this stage of the case. The examiner was apprised of the pertinent information during the prosecution of both patents in suit. The examiner knew of and the patents disclose DUALITE by name as a preferred microsphere filler, its ultra-low density characteristics, and its function in the patents in suit as a lightweight filler that reduces the density and occupies volume. The brochure does not suggest the use of plastic microspheres in the molding compound, but lists "specific end uses... cast polymers, body patch, paints, adhesives, sealants, BMC, SMC, rubber compounding, building materials, explosives, paper manufacturing, spackle, polymer concrete." [*16] Rose Art has not defined or related any of these terms to a modeling dough. BMC (Bulk Molding Compound) and SMC (Sheet Molding Compound) are different processes that might not suggest use in a modeling dough for use by children and artists. Certain elements of the modeling dough act like adhesives; however, the DUALITE material does not recommend even for evaluation any specific DUALITE microsphere. Cast polymers may be somewhat similar; however, Rose Art has not shown that the Pierce and Stevens DUALITE brochure suggests combining its teachings with the other prior art to create the patents in suit. It is not presently determinative of obviousness that DUALITE micro spheres were marketed for the express purpose of providing low density fillers since that is how they were portrayed to the reader of the patent.

[HN13] Obviousness under *35 U.S.C. § 103* turns on whether the prior art, including the knowledge available to one of ordinary skill in the art, provides some suggestion or motivation to combine the known elements. *Fromson v. Advance Offset Plate, Inc., 755 F.2d 1549, 1556, 225 U.S.P.Q. 26, 31 (Fed. Cir. 1985).* [*17] The suggestion or motivation to combine references need not be explicit. The knowledge pertaining to the art, including an understanding of the principles and application of the prior art elements of the claimed invention, may lead a person of ordinary skill to combine the relevant teachings. *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc., 776 F.2d 281, 297 n. 24, 227 U.S.P.Q. 657, 667 n.*

1995 U.S. Dist. LEXIS 2602, *

24 (Fed. Cir. 1985), cert. denied, 475 U.S. 1017, 89 L. Ed. 2d 315, 106 S. Ct. 1201 (1986). The motivation to combine can arise from the knowledge that the prior art elements will perform their expected functions to achieve their expected results when combined for their common known purpose. See Miles Lab., Inc. v. Shandon, Inc., 997 F.2d 870, 878 (Fed. Cir. 1993). Thus, the issue of motivation to combine is extremely close in this case.

However, on a motion for preliminary injunction, Binney & Smith must demonstrate the likelihood of success on the merits in light of Rose Art's burden of raising a substantial question regarding the obviousness of the Binney [*18] & Smith's patents. The standard to overcome validity is clear and convincing evidence. The prior art in evidence was before the examiner in the applications for the patents in suit or was analogous to such references and does not provide any new, material information. The burden of persuasion is particularly difficult since Rose Art relies on prior art references no more pertinent than prior art considered by the examiner. Based on the evidence presented, the Court does not find that Rose Art has raised a substantial question of obviousness for either patent in suit.

*The Differences Between the Claims in Suit and the Prior Art*

The differences between the prior art and the claims for the moldable composition at issue are the use of a filler consisting essentially of plastic microspheres with a wettable particulate coating for the '766 Patent, and the use of plastic microspheres and a pH of about 7.0 for the '892 Patent. In distinguishing the prior art from the '892 Patent, Binney & Smith stressed the importance of the pH being over 7.0.

*Secondary Considerations*

[HN14] The secondary factors, (commercial success, long felt but unsolved need, failure of others, copying of the invention, [*19] and unexpected results) are particularly appropriate when trying to determine the obviousness of an invention that combines conventional elements in a new way. See Continental Can Co. USA, Inc. v. Monsanto Co., 948 F.2d 1264, 1273 (Fed. Cir. 1991) (finding that where the patent at issue is a variation on known themes, the "objective indicia--the so-called secondary considerations-- are most useful to the decision-maker."); Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc., 807 F.2d 955, 960 (Fed. Cir. 1986) (stating that objective evidence "can be the most probative evidence of nonobviousness in the record, and enables the district court to avert the trap of hindsight."). When the differences appear technologically minor but nonetheless have a practical impact, particularly in a crowded field, the Court must consider the obviousness of the new structure in light of the objective indicia. Continental Can, 948 F.2d at 1273.

The first factor of commercial success modestly indicates nonobviousness. Binney & Smith's product "Model Magic" has been a commercial success. [HN15] Commercial success is [*20] most relevant when there is "evidence of a nexus between [commercial success] and the merits of the invention." Kansas Jack, Inc. v. Kuhn, 719 F.2d 1144, 1151 (Fed. Cir. 1983). Binney & Smith has not shown a strong nexus. Binney & Smith did not firmly establish that "Model Magic" incorporated the subject matter and limitations of the patents in suit. (Russomano, pp. 62-63, 12/22/94). Many factors other than the claimed invention contributed to the success of Binney & Smith's Model Magic, such as the licensing of the "Barney" trademark under which the product was sold. At least some success can be attributable to the patented compound. It is not necessary that the patented invention be solely responsible for the commercial success for this factor to be given weight. Continental Can, 948 F.2d at 1273.

The next two factors, long felt but unsolved need and the failure of others, are indicia of nonobviousness. Before the modeling dough disclosed in patents in suit was developed, there had been no lightweight modeling dough available that was water-based, air-drying, free of excessive shrinking, cracking, and crumbling upon drying. [*21] Rose Art's chief chemist could not reproduce the Model Magic compound after working on reverse engineering for six months until he became aware of the plastic microsphere filler through the '766 Patent. Based on the above facts, Rose Art's chemists could not readily solve the need that was overcome by the use of a plastic microsphere filler.

The next two factors, copying of the invention and unexpected results, could be an indication of nonobviousness. Rose Art studied the "Model Magic" compound; however, it copied the use of the plastic microspheres. Rose Art did not copy the entire invention. Polyvinyl acetate was included by mistake since Binney & Smith product was misanalyzed, (Plf's FF 79) but the use of polyvinyl acetate was well known at that time. The expected results of a lighter filler by using plastic microspheres now seem obvious using hindsight. However, it has not been shown that results were obvious at the time that the inventions were made.

The evidence on these secondary considerations does not tilt entirely in one direction. However, it supports a finding of nonobviousness. Rose Art has not presented sufficient evidence in the prior art that suggests the desirability [*22] and obviousness of making the modeling dough with plastic microspheres. Although the individual elements of the patents may have been well-

known to those with ordinary skill in the art, Rose Art's evidence does not raise a substantial question of invalidity of the patents in suit at this preliminary stage.

At this point, Binney & Smith has adequately rebutted Rose Art's challenges to the validity of the patents in suit and has shown a reasonable likelihood that Rose Art will fail to carry its burden of invalidity by clear and convincing evidence. However, Binney & Smith has not made a clear or strong showing of likelihood of success on the merits of patent validity, but rather only a reasonable showing.

*Infringement*

[HN16] The standard of showing infringement at this stage is a reasonable likelihood of success in proving infringement at trial. Determination of infringement involves two steps: (1) construing the claims, which is a question of law; and (2) comparing the properly construed claims with the accused composition to determine whether each limitation of the properly construed claim is found in the accused product. *Hormone Research Foundation, Inc. v. Genentech, Inc., 904 F.2d 1558, 1562 (Fed. Cir. 1990).* [*23]

[HN17] In construing the meaning of claims, they must be interpreted in light of the claim language, the specification, and the prosecution history, including prior art, and given the same meaning for the analysis of both validity and infringement. *Smithkline Diagnostics Inc., 859 F.2d at 882.* Since the claims at issue here have been narrowed to overcome the prior art, the Court will apply the same narrow meaning for determining infringement as it did to find their validity reasonably likely.

In the prosecution history in order to obtain an allowance, Binney & Smith argued to narrow the *'766 Patent* from any filler to a filler "consisting essentially of plastic microspheres having a wettable particulate coating..." and narrowed the filler in the '892 Patent to "a filler consisting essentially of plastic microspheres" in addition to the compound having a pH of about 7.0 or greater.

[HN18] "Comprising," a patent term of art, is an open transitional word that generally allows additional elements to be added to the polyvinyl alcohol, water, gellant, and filler. "Comprising" means --"including the following elements but not excluding others." *Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261, 229 U.S.P.Q. 805, 812 (Fed. Cir. 1986),* [*24] *cert. denied, 479 U.S. 1030, 107 S. Ct. 875, 93 L. Ed. 2d 829 (1987).* The claims may cover additional elements to the extent of material not disclaimed in distinguishing the prior art. Although an open term, "comprising" cannot extend the scope of the patents to aspects given up during prosecu-

tion in distinguishing the invention from the prior art. *See Graham v. John Deere, 383 U.S. at 33.*

[HN19] The expression "essentially consisting of" is a partially closed transitional phrase. In general, the phrase "essentially consisting of" covers a combination with some additional elements but excludes "additional unspecified ingredients that would affect the basic and novel characteristics of the product defined in the balance of the claim." *Water Technologies Corp. v. Calco Ltd., 850 F.2d 660, 7 U.S.P.Q. 2d 1097, 1102 (Fed. Cir. 1988).* Thus, the claims are not limited to plastic microspheres as the only filler as Rose Art contends. The phrase is used in the patents in suit to limit one element (the filler) rather than in the normal [*25] manner as the main transition connecting the preamble with the elements.

Binney & Smith's Proposed Finding of Facts, Conclusions of Law and Argument assert that the addition of other elements must materially affect the functioning or characteristics of the plastic microspheres as a filler. The Court cannot adopt this interpretation of "essentially consisting of" since the additional elements traditionally must affect the larger component, the "product defined by the balance of the claim" or composition, not the elements. Thus, when used on an element, the phrase means that the additional elements must affect basic and novel characteristics of the element (the filler), not merely the subcomponent (the plastic microspheres) to avoid infringement.

Binney & Smith asserts that when the phrase "consisting essentially of" is used with respect to only one element, such as the filler, literal infringement is precluded where that component contains additional filler sufficient to change the basic and novel characteristics of that component. The case cited to support Binney & Smith's contention, *Air Products and Chem., Inc. v. Chas S. Tanner Co., 219 U.S.P.Q. 223, 249 (D.S.C. 1983),* [*26] states that the "essentially consisting of" expression "precludes a finding of literal infringement only where a product contains additional, unrecited ingredients which, in nature and amount, change the basic and novel characteristics of the *product.*" (emphasis added). In this particular case, however, the inventive step is primarily the plastic microspheres so the addition of ingredients affecting the filler element would affect the composition as a whole. On these specific facts, the additional ingredient must change the basic and novel characteristics of the entire component or only the filler element to avoid infringement.

*The pH Limitation of the '892 Patent*

The pH feature was important in overcoming prior art, and the specification clarifies the measure by stating that when the pH is below 7.0, the polyvinyl alcohol

does not gel properly. ( '892 Patent, col. 6 line 24). Also, it states that a buffer is needed if pH is below 7.0. (*Id.,* line 34). Finally, the description states that when altering formulas, it is important to maintain a pH near 7.5 or higher. (*Id.,* lines 47-48). Thus, a pH over 7.0 is critical to the function of the disclosed invention. The imprecise [*27] use of a term does not allow the patentee to redefine the term after the issuance of a patent to extend the scope of the patent. A potential infringer in clarifying "about 7.0" could reasonably conclude that a compound with a pH below 7.0 would not infringe. In construing the claim language in light of the specification, the Court determines as a matter of law that "pH of about 7.0 or greater" in claim 1 of the '892 Patent means a pH over 7.0. Thus, the claims of the '892 Patent read on modeling doughs with a pH greater than 7.0.

[HN20] The second step in determining infringement is to compare the properly construed claims with the accused composition to determine whether each limitation of the properly construed claim is found in the accused product. *Hormone Research, 904 F.2d at 1562.* The controversy over the patents in suit centers on five features: (1) literal infringement; (2) the limitation on the filler; (3) the pH level; (4) the relatively low percentage of polyvinyl alcohol used by Rose Art; and (5) the reverse doctrine of equivalents.

### Literal Infringement

Rose Art has not admitted literal infringement as Binney & Smith claims. [2] Rose Art admits [*28] that its modeling dough, "Air-Dry Modeling Composition," contains all four elements [3] recited in claims 1 and 2 of both the '766 and '892 patents. However, [HN21] literal infringement of a claim requires that the allegedly infringing product embody every element and *limitation* of the claim. *Smithkline, 859 F.2d at 889.* To determine whether a claim limitation is met literally, the Court must compare the accused structure with the disclosed structure, and must find equivalent structure as well as identity of claimed function for that structure. *Pennwalt Corp. v. Durand-Wayland Inc., 833 F.2d 931, 934 (Fed. Cir. 1987).* Rose Art defends arguing that its compound does not have all the limitations in the patents in suit. Similarly based on the evidence presented, Binney & Smith has not shown that the Rose Art compound contains all the limitations.

> 2  A note made by Rose Art's Kennedy detailing a conversation with patent attorney is not an admission of literal infringement. The note relayed the patent attorneys opinion that Binney & Smith would probably take legal action, but the odds of succeeding were placed at 20-25%.

[*29]

3  poly(vinyl alcohol), water, a gellant, and a filler including plastic microspheres.

### The Filler

The filler is limited in the broadest claims of both patents to a filler "consisting essentially of plastic microspheres...." In light of the Court's construction of "essentially consisting of," the additional ingredients must change the basic and novel characteristics of the entire filler element or of the compound to avoid infringement. First, the Court must determine whether another filler is present. The Court is not persuaded that the Pelzig *'404 Patent,* which calls silicon dioxide an "additional additive," determines that silicon dioxide is not a filler. Under other cited prior art patents, silicon dioxide can be considered a filler.

The Rose Art Air-Dry Modeling Composition contains silicon dioxide in the amount of 2.4% of the total weight of the composition (20% of the filler) and one percent of the volume. Plastic microspheres in the Rose Art compound comprise 11.6% of the total weight.

The filler described in the patents in suit functions to both fill space and lower overall density. [*30] Rose Art's silicon dioxide is not a lightweight filler. The lightweight characteristics of the Binney & Smith invention is listed as an important characteristic in the patents in suit. Also, silicon dioxide has a very large surface area as compared to the plastic microspheres. The large volume of silicon dioxide overcomes the loss of volume (shrinkage) upon drying. Substantial shrinkage upon drying was another shortcoming in the prior art that both the plastic microspheres and silicon dioxide overcame. Binney & Smith has not overcome the assertion that the addition of silicon dioxide is significant in its nature and in the amount (20% of the filler) used by Rose Art. Since the additional filler affects the filler element, it affects the whole invention in this case. The filler is the claimed limitation that makes the *'766 Patent* nonobvious over the prior art. If Rose Art merely added silicon dioxide just to get around the patent, the addition might not be enough. Since the *'766 Patent* is so narrow, Rose Art may have circumvented the *'766 Patent* by using another filler in addition to the other following distinctions that further support the lack of success in finding infringement. [*31] Binney & Smith has not shown that the addition of silicon dioxide as a filler does not materially affect the basic and novel characteristics of the filler element or the invention as a whole.

### The pH Level

As required by the Court's construction of "pH of about 7.0" Binney & Smith has not clearly shown that the pH of the Rose Art compound is over 7.0. A Binney

1995 U.S. Dist. LEXIS 2602, *

& Smith declaration [4] filed with its motion determined that the pH (a logarithmic scale) of the Rose Art compound ranged from 6.50 to 6.88, averaging 6.71. In later samples tested by Dr. Olexia after pH level became an issue, Binney & Smith determined that Rose Art's Air-Dry Modeling Compound has a measured pH over 7.0. (Plf's FF 50). The later inconsistent results are not dispositive.

    4 Kaufman, a Binney & Smith polymer chemist.

It is not Rose Art's burden to rebut any finding of pH, but Binney & Smith's burden to show that it will prevail. However, Rose Art asserts that a pH over 7.0 is not satisfied by its composition. Rose Art asserts that its composition [*32]  does not use polyvinyl alcohol as the primary binder, thus controlling the pH is not necessary for Rose Art to assure gelation. Binney & Smith has not shown otherwise.

*Minimal Use of Polyvinyl Alcohol / Reverse Doctrine of Equivalents*

Since apparent literal infringement seems conceivable but not presently shown, the Court further considers the equivalents between the patents in suit and the Rose Art compound. As discussed, Binney & Smith, during the prosecution of the patents in suit, distinguished a compound with polyvinyl acetate stabilized with a small amount of polyvinyl alcohol.

Rose Art notes that in the '892 Patent the preferred formulation of the polyvinyl alcohol content was increased from about 8% to about 12% because of a cracking problem. ( '892 Patent, col. 3 line 24.) However, [HN22] a patent is not limited to the preferred embodiment shown in the specification. *Ziegler v. Phillips Petroleum Co., 483 F.2d 858, 869, 177 U.S.P.Q. 481 (5th Cir. 1973), cert. denied, 414 U.S. 1079, 38 L. Ed. 2d 485, 94 S. Ct. 597 (1973).* Thus, the minimum disclosed quantity of 4% will  [*33]  be used in interpreting the claims rather than the 8% or 12% of the preferred embodiments.

The patents in suit disclose about 4% minimum to about 15% polyvinyl alcohol resin. A compound with less than about 4% would not make a suitable molding compound as disclosed by the patents in suit. Binney & Smith did not overcome the Rose Art assertion that its compound contains only about 4.2% polyvinyl alcohol in an analysis most favorable to Binney & Smith (Tsimberg Ex A., para. 6). The Court does not read this as an admission that Rose Art compound contains *at least* 4.2% polyvinyl alcohol. Evidence submitted by Binney & Smith determined the concentration of polyvinyl alcohol in two samples to be 3.6% and 6.08% by weight. (Exhibit 5). If the Rose Art compound only contains 3.6% polyvinyl alcohol, then it would be at the minimum

amount of polyvinyl alcohol disclosed in the patents. Binney & Smith has not adequately shown that the Rose Art composition meets the minimal polyvinyl alcohol percentage required by the patents in suit.

An infringing composition must contain enough polyvinyl alcohol to produce the results described in the patent without reading on the distinguished Ogawa '054 [*34]  and Pelzig *'404 Patents*. Polyvinyl alcohol in an allegedly infringing compound could not be a mere by-product of using polyvinyl acetate. Commercial polyvinyl acetate emulsions contain a small amount of polyvinyl alcohol (about 2-3%) to stabilize the emulsion, (Def's FF 31) so excluding any use of polyvinyl alcohol would practically cover the use of polyvinyl acetate. However, Binney & Smith alleges Rose Art added an additional 3% polyvinyl alcohol. (Pf's Exhs 11-12). The polyvinyl alcohol portion of the emulsion and the additional 3% still range around 4%.

The patents in suit rely on polyvinyl alcohol as a binder; whereas, Rose Art's polyvinyl alcohol is a secondary binder that stabilizes the polyvinyl acetate, which holds the filler. This mechanism of coalescence is described in the Pelzig *'404 Patent*. The filler could not be added if polyvinyl alcohol was the primary binder since the polyvinyl alcohol would be already solidified. (Def's FF 44) The Rose Art composition is similar to the Pelzig *'404 Patent* except for the plastic microspheres allegedly added after reading the *'766 Patent*.

Rose Art distinguished the Ogawa *'054 Patent* on the ground that it contained a "synthetic latex."  [*35]  The Rose Art Air-Dry Modeling Compound is over 70% polyvinyl acetate, and uses polyvinyl alcohol as a stabilizer. Thus, a polyvinyl acetate composition that is similar to Rose Art's compound was distinguished from the prior art. It is not proper to narrowly construe claims before the patent examiner to obtain allowance and then broadly before the courts. *See Tandon Corp. v. United States Trade Commission, 831 F.2d 1017, 1021 (Fed. Cir. 1987).*

[HN23] The reverse doctrine of equivalents is an equitable doctrine invoked in applying properly construed claims to an accused device. *Scripps Clinic, 927 F.2d at 1581*. The reverse doctrine of equivalents flows from the Supreme Court's statement that an accused article may avoid infringement, even within the literal words of the claims, if it is so far changed in principal from a patented article that it performs the same or a similar function in a substantially different way. *Graver Tank & Mfg. Co. v. Linde Air Prod. Co., 339 U.S. 605, 608-09, 70 S. Ct. 854, 856, 94 L. Ed. 1097, 85 U.S.P.Q. 328, 330,* [*36]  *reh'g denied, 340 U.S. 845, 71 S. Ct. 12, 95 L. Ed. 620 (1950).* The purpose of the "reverse doctrine" is to prevent unwarranted extension of the claims beyond a

fair scope of the patented invention. Application of the doctrine requires that facts specific to the accused device be determined and weighed against the equitable scope of the claims. *Scripps Clinic, 927 F.2d at 1581.*

Rose Art has not made a strong showing that under the equitable doctrine of the reverse doctrine of equivalents, it cannot be found to be an infringer. [HN24] The central question is whether the accused product is so far changed in principle that it performs the function of the claimed invention in a substantially different way. *SRI Int'l v. Matsushita Elec. Corp., 775 F.2d 1107, 1123-24 (Fed. Cir. 1985).* There are significant differences between polyvinyl alcohol and polyvinyl acetate, but there are also similarities. Polyvinyl alcohol can be made from polyvinyl acetate by hydrolysis, a chemical reaction. Polyvinyl acetate is not water soluble; whereas, polyvinyl alcohol is water [*37] soluble. (Def's FF 6). The polyvinyl alcohol used by Rose Art gels by cross linking with borate, but the polyvinyl acetate does not react with borate. This gelation (the cross linked polyvinyl alcohol) is a binder, which makes the moldable compound in a similar manner as the patents in suit. However, Rose Art asserts that polyvinyl acetate is its primary binder, but that binder is not as strong as a polyvinyl alcohol sequence.

During the prosecution to distinguish from the prior art, the claims were so restricted in meaning and limited in scope that it appears that the claims might not embrace the modeling dough made or sold by Rose Art. However similar prior art, such as the Pelzig *'404 Patent,* does not include plastic microspheres. To read the patents in suit broadly enough to cover the Rose Art modeling dough, the patents might also read on a mechanism of coalescence distinguished from the patents in suit. (Def's FF 42).

Based on the evidence presented, the plaintiff has not made out a clear and convincing case for infringement. Thus, the Court cannot, on the present record, conclude that Binney & Smith has demonstrated a likelihood of success on the merits.

### B. Irreparable Harm

[*38] Next, Binney & Smith must establish that it will suffer irreparable harm if the preliminary injunction is not granted. [HN25] Irreparable injuries are those that are impossible to measure in monetary terms. *Atlas Powder Co. v. Ireco Chem., 773 F.2d 1230, 1233 (Fed. Cir. 1985).* While monetary relief is often the sole remedy for past infringement, it does not follow that a money award is also the remedy against future infringement. *Id.* The patent statute provides injunctive relief to preserve the legal interests of the parties against future infringement that may have marked effects never fully compensable in money. *Id.* If monetary relief were the sole relief af-

forded by the patent statute, then injunctions would be unnecessary and infringers could become compulsory licensees during the pendency of the litigation. *Id.* Because the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole. *Hybritech, 849 F.2d at 1459, 7 U.S.P.Q. 2d at 1200.*

In this case, Binney & Smith is not entitled [*39] to a presumption of irreparable injury since it did not clearly show validity and infringement. *See Smith Int'l, 718 F.2d at 1581, 219 U.S.P.Q. at 692.* [HN26] Since a strong or clear showing has not been made, the moving party must make an independent showing of irreparable harm in order to be entitled to a preliminary injunction. *Roper Corp., 757 F.2d at 1271, 225 U.S.P.Q. 349.*

Binney & Smith claims lost investment in its product development and promotion, lost sales opportunities, lost profit margin, and lost shelf space. Loss of sales, profits, and market share is traditionally not irreparable harm. In *Illinois Tool Works,* the Federal Circuit rejected the patentee's argument that potential lost sales alone could demonstrate "manifest irreparable harm" because acceptance of that position would require a finding of irreparable harm to every patentee, regardless of the circumstances. *Id., 906 F.2d at 683, 15 U.S.P.Q. 2d at 1310.* Rose Art's entry into the market with a similar product may have contributed to Binney & Smith's loss of shelf space, may have significantly [*40] damaged Binney & Smith's market exposure and penetration, market share, exclusivity, and sales of its Model Magic. If solely based on the characteristics of the patented product, the substantial loss of business opportunity could be enough to show irreparable harm. However, an unassailable marketing stance of a product will not be protected until the allegedly infringing product has been shown likely to be excludable under Binney & Smith's patent rights. Money damages could effectively compensate Binney & Smith for these alleged injuries.

Injury to patent rights may have irreparable consequences independent of the defendant's ability to compensate in money. *Atlas Powder Co., 773 F.2d at 1233.* The availability of monetary relief is not always an adequate remedy. Because the principal value of a patent is in its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole. *See Hybritech, 849 F.2d at 1456-57.* Binney & Smith also claims a loss of credibility with key customers that its products were unique and patented. [*41] Confusion over the uniqueness of the product and Binney & Smith's reputation for producing unique products is important as far as it is valid. Binney & Smith must show that any damage to its commercial reputation and good will result from

infringing acts not just from mere competition in order for the Court to enjoin those acts.

Finally, the ability of Rose Art to fully compensate any harm with money damages, will be weighed in determining whether the principles of equity require the granting or denial of a preliminary injunction. In *Illinois Tool Works, 906 F.2d at 679*, the Federal Circuit upheld a denial of a preliminary injunction where the district court considered the alleged infringer's ability to pay sufficient monetary damages for any infringement during the litigation and had concluded there was no irreparable harm. In the record currently before this Court, it appears, from an undisputed affidavit of Rose Art's chief executive officer attesting to Rose Art's financial soundness, that Rose Art can satisfy a monetary damage award if it is eventually found liable for patent infringement. Thus, Binney & Smith's likelihood of suffering [*42] irreparable harm is lessened because Rose Art is a financially responsible company that could satisfy money damages that Binney & Smith might be awarded. *See Nutrition 21, 930 F.2d at 871* (no finding of irreparable harm because alleged infringer is a financially responsible company answerable in damages).

In light of the fact that the Court has concluded that Binney & Smith has not demonstrated that its patent is infringed, the possibility that Binney & Smith might lose profits and goodwill if the Court permits Rose Art to continue to sell its modeling dough is not the type of harm that warrants the issuance of a preliminary injunction. Money damages might not fully compensate Binney & Smith if there were in fact a showing of a likelihood of infringement; however, without a demonstrated likelihood of success on the merits, there is no showing of irreparable harm. Binney & Smith may experience irreparable harm from competition, but the Court should not use an injunction to preclude legitimate competition until there is a determination of infringement and irreparable harm.

*C. Balance of Hardships*

The third factor in determining whether [*43] to award a preliminary injunction is the balance of the hardships. The Court must balance the harm that will occur to Binney & Smith, the moving party, from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted. *See Hybritech, 849 F.2d at 1457*. The Court must weigh "the magnitude of the threatened injury to the patent owner ... in the light of the strength of the showing of the likelihood of success on the merits, against the injury to the accused infringer if the preliminary decision is in error." *H.H. Robertson Co., 820 F.2d at 388, 2 U.S.P.Q. 2d at 1928*.

Preliminary injunction is a drastic remedy, which can cause hardship to both the alleged infringer, if granted, by requiring removal of its product from the market, or to the patentee, if denied, by delaying the exercise of its limited-in-time property right to exclude. *See Illinois Tool Works, 906 F.2d at 683*. Neither hardship necessarily controls in all cases, and a court must balance the hardships in light of all the factors. [*44] *Id.* Since Binney & Smith has not sufficiently persuaded this Court of its reasonable likelihood of success on the merits, and has not established irreparable injury, the balance of hardships will not tip in favor of Binney & Smith though the magnitude of injury could be significant.

The injury to Rose Art would be great if an injunction is issued in error. Rose Art plans to market aggressively its Power Ranger product containing its modeling dough. It cannot quickly change or redevelop another compound and maintain its top-selling toy. Rose Art's license for "Power Rangers" is dependent on the use of the Rose Art modeling compound for which a likelihood of infringement of the patents in suit has not been found. An injunction would also damage Rose Art's reputation and customer relationships. Since Binney & Smith has not shown that the modeling compound used by Rose Art is likely to infringe, forcing the replacement of the Rose Art compound is not warranted at this time. An injunction on the alleged infringement would severely hamper Rose Art's ability to compete. The hardship of preliminarily enjoining Rose Art forcing it to withdraw its product from the market before trial would [*45] be severe. If a preliminary injunction would have a more severe impact on the enjoined party than the moving party would suffer if not granted, that can be a basis for denying the injunction. *Illinois Tool Works, 906 F.2d at 683*. A preliminary injunction would shut defendant out of this market and result in a loss of profits and good will.

Balancing the potential harms to the parties, the Court finds that the potential harm to Rose Art in issuing an injunction would be a greater burden than the potential harm to Binney & Smith if the Court would deny its request for an injunction. The Court thus concludes that the balance of harms weighs in favor of denying Binney & Smith's motion for an injunction on its patent claim.

*D. Public Interest*

The fourth factor is the impact of a preliminary injunction on the public interest. Rose Art has offered no input on the public interest issue. [HN27] In patent infringement cases, although there exists a public interest in protecting rights secured by valid patents, the court should focus on whether a critical public interest would be injured by the grant of a preliminary injunction. *Hybritech, 849 F.2d at 1458, 7 U.S.P.Q. at 1201*. [*46] The public interest in the toy modeling dough industry is *per*

*se* not critical. However, patents must be measured against the basic constitutional requirement, "... to promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." *U.S. Const., Art. I, Sec. 8, cl. 8.* The primary purpose is to promote the progress of science by the means of granting exclusive rights as an incentive to create.

The public interest is in improving inventions by building on inventions such that they do not infringe and bypass the technology of the prior inventions. Patents encourage competitors to conduct research, experiment, and attempt to create alternate, improved noninfringing products. Most inventors are creators in part and borrowers in part. Binney & Smith, itself, borrowed the elements of its patents in suit, and combined them in a new way.

Rose Art also borrowed. It did not precisely copy the claimed invention, but learned of using plastic microspheres through the *'766 Patent.* It attempted to improve the invention by designing around it. Rose Art made a major mistake in analyzing the [*47] Model Magic. (Plf's FF 22) Rose Art misidentified the polyvinyl alcohol in Model Magic as polyvinyl acetate and included polyvinyl acetate in their composition. Also, an additional filler was added so that the patents in suit may not literally read on Rose Art's compound. Since Binney & Smith has not shown a reasonable likelihood of success on infringement, it would unduly hinder progress of science by precluding the use of a product before infringement is shown to be likely. This could generate a chilling effect on the development of improved noninfringing compounds.

Generally, the public has an interest in protecting and enforcing valid patents. *Illinois Tool Works, 906 F.2d at 684*; *Hybritech, 849 F.2d at 1458.* The public has a corollary interest in assuring that preliminary injunctions are not improvidently granted where they are not deserved. *H.H. Robertson, Co., 820 F.2d at 391.* A patent should not be enforced beyond its scope. Since Binney & Smith has not made a showing of likelihood of success in proving infringement at trial, Binney & Smith [*48] should not at this point benefit from the general interest in protecting its patent rights. Binney & Smith's right to protect its patent is counterbalanced by Rose Art's right to compete and the public's interest in fostering competition and product availability. *See Illinois Tool Works, 906 F.2d at 684* (approving district court's weighing of public's interest in the protection of patent rights against the alleged infringer's legitimate right to compete "in view of ... [the alleged infringer's] 'remote' showing of likelihood of success in proving infringement at trial."). Although Binney & Smith has shown more than a remote showing of infringement on its narrow patents, the Court finds that at this stage of the litigation, the balance weighs in favor of Rose Art's right to compete legitimately and the public's right to promote the progress of science. Thus, since infringement has not been shown likely, the Court concludes that granting a preliminary injunction based on evidence presented would disserve the public interest.

*Conclusion*

Giving the most weight to the lack of showing a reasonable likelihood of success of infringement, [*49] the evidence presented in this preliminary injunction motion does not warrant the issuance of an injunction. The next three factors are related to the strength of plaintiff's showing of likelihood of success. Carefully weighing, measuring, and interrelating the four factors and the parties' evidence and arguments on each, this Court determines that Binney & Smith has not sufficiently met its burden of showing that it is entitled to a preliminary injunction. Binney & Smith's motion for preliminary injunction is denied.

**ENTER:**

**BLANCHE M. MANNING**

**U.S. District Court Judge**

**DATED:** March 2, 1995